# <u>EXHIBIT A</u>

11240624.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

| | |
|---|---|
| LI FEN YAO, as ADMINISTRATOR OF THE ESTATE OF SAM MINGSAN CHEN, deceased, 13717 Travilah Road Rockville, MD 20850 <br><br> Plaintiff, <br><br> -v- <br><br> ROBERT CHEN, 4710 142 Pl. SE Bellevue, WA 98006; <br><br> OTTER AUDITS LLC, 519 West 22nd Street Suite 100 Sioux Falls, SD 57105; and <br><br> RC SECURITY LLC, 519 West 22nd Street Suite 100 Sioux Falls, SD 57105 <br><br> Defendants. | Civil Action No. _____ <br><br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Li Fen Yao ("Plaintiff"), as Administrator of the Estate of Sam Mingsan Chen (the "Estate"), by and through her undersigned attorneys, hereby brings this action against Defendants Robert Chen ("Robert" or "Robert Chen"), Otter Audits LLC ("Otter Audits"), and RC Security LLC ("RC Security" and, together with Robert Chen and Otter Audits, "Defendants") and, in support thereof, respectfully alleges on knowledge as to herself and her own actions and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1. This action arises out of Defendants' brazen plot to steal the Estate's interest in a limited liability company known as OtterSec LLC ("OtterSec").

2.      OtterSec was formed in February 2022 under Wyoming law, and its only two members were Sam Chen ("Sam" or "Sam Chen") and Defendant Robert Chen.[1] After Sam Chen tragically passed away in a car accident on July 13, 2022, Robert Chen seized the opportunity to follow through with a duplicitous scheme, which he threatened months earlier, to make off with the entire company for himself.

3.      In particular, while Sam Chen's family was still grieving his loss, Robert Chen (a) secretly formed two new companies in South Dakota, Defendants Otter Audits and RC Security, (b) proceeded to exploit his control and authority over OtterSec to unilaterally dissolve OtterSec, and then (c) misappropriated OtterSec's assets, employees, clients, opportunities, and other tangible and intangible property for his new companies, Otter Audits and RC Security, and to the exclusion of the Estate.

4.      By all appearances, Otter Audits and RC Security are engaged in the exact same business as OtterSec, utilizing OtterSec's employees, assets, and other resources, providing services to OtterSec's clients, and capitalizing on OtterSec's business opportunities and good-will. Defendants are even making use of OtterSec's name, logo, website, and social media presence to portray themselves outwardly as though they actually are OtterSec.

5.      All of Robert Chen's maneuvering and chicanery is a classic example of a de facto merger, and Otter Audits and RC Security are the essence of a mere continuation of OtterSec. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, in order to effectuate the master plan he formulated to, in his own words, "dissolve the company and remake it" without Sam Chen or the Estate.

6.      Accordingly, by this action, Plaintiff seeks to recover the Estate's rightful interest in OtterSec's successors, Otter Audits and RC Security, together with an award of

---

[1] Although they share the same last name, Sam Chen and Robert Chen are not related.

damages, profits, costs, and other relief available at law and in equity as a direct and proximate result of Defendants' wrongful actions and misconduct as detailed further below.

## PARTIES

7.     Plaintiff Li Fen Yao is the widow of the Sam Chen. She is a resident of Rockville, Maryland, where she resided with her husband at the time of his passing. Ms. Yao is the personal representative of the Estate pursuant to Letters of Administration issued on January 27, 2023, by the Register of Wills for Montgomery County, Maryland.

8.     Defendant Robert Chen is an individual, residing in Bellevue, Washington.

9.     Defendant Otter Audits is a limited liability company formed under the laws of South Dakota, with a principal place of business located in Sioux Falls, South Dakota. On information and belief, Defendant Robert Chen is the sole member of Otter Audits.

10.     Defendant RC Security is a limited liability company formed under the laws of South Dakota, with a principal place of business located in Sioux Falls, South Dakota. On information and belief, Defendant Robert Chen is the sole member of RC Security.

## JURISDICTION AND VENUE

11.     Plaintiff asserts claims against Defendants arising under and pursuant to the Lanham Act, 15 U.S.C. § 1125, over which this Court has original subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

13.     Defendants are subject to personal jurisdiction in this judicial district pursuant to Fed. R. Civ. P. 4 and Md. Code Ann. Courts & Jud. Proc. §6-103(b).

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. The Formation and Growth of OtterSec

15.     OtterSec is a limited liability company that was formed on February 8, 2022, pursuant to the Wyoming Limited Liability Company Act, Wyo. Stat. Ann. § 17-29-101, *et seq*. Sam Chen and Robert Chen were initially the only two members of OtterSec and remained the only two members of OtterSec until Sam Chen passed away on July 13, 2022, at which time Sam's interest in OtterSec passed to the Estate.

16.     OtterSec was engaged in the business of performing security assessments of software code used by companies operating on the blockchain. OtterSec audited code for security flaws or weaknesses that potentially exposed clients to risks from malicious actors, such as hackers and other cybercriminals, seeking to exploit vulnerabilities for personal gain or other nefarious reasons.

17.     OtterSec was the brainchild of Robert Chen and Sam Chen's minor son, David Chen ("David" or "David Chen"). David, who was sixteen years old and still in high school when OtterSec was formed, had demonstrated an exceptional aptitude for computer coding, and the digital asset world generally, from a very early age. He regularly competed in cyber security competitions and, before OtterSec was formed, developed his own computer code for decentralized finance liquidations that performed remarkably well.

18.     David was introduced to Robert Chen in 2019 while participating in a cyber security competition that Robert helped to organize. David's cyber security competition team eventually partnered with Robert's team in 2021, and they began working together. Robert was impressed by David and even recommended him for an internship with a burgeoning cyber security firm.

19.     In early February 2022, Robert approached David with a proposal to start their own cyber security company together. Robert, who was an adult, knew that David was still a

minor and in high school. David indicated to Robert that he was interested and expressed his desire to pursue the idea further.

20.     Robert and David then began working together on the business concept that would eventually become OtterSec. However, in the course of developing their idea, they encountered various obstacles due to David's status as a minor. Robert thus suggested that David's father, Sam Chen, be the co-owner of OtterSec.

21.     David's parents were protective of their minor son, but well-aware of his talents. They did not wish to discourage his entrepreneurial spirit and agreed that Sam Chen would co-own OtterSec with Robert.

22.     Accordingly, after OtterSec was legally formed, Sam Chen and Robert Chen entered into an operating agreement for the company on February 14, 2022 (the "Operating Agreement"). Pursuant to the Operating Agreement, Sam and Robert agreed that OtterSec was to be member-managed, that Sam and Robert were the only members of OtterSec, and that each owned a 50% interest in the company.

23.     David was actively involved in OtterSec from the outset, using his talents, know-how and burgeoning reputation to help grow the business in his spare time, when not otherwise occupied by his high school course work, family obligations, and other activities.

24.     David also used, and allowed OtterSec to use, personal resources that he purchased and/or developed on his own, utilizing his own time and money, prior to the formation of OtterSec. These included, in addition to his own code, relationships, auditing strategies, computer hardware, and accounts.

25.     The company eventually hired employees and consultants who were required to execute agreements (the "OtterSec Employment Agreements") that included restrictions on the use or disclosure of "Confidential Information" and required them to return any and all such "Confidential Information" to OtterSec upon the termination of their agreements.

26.     The OtterSec Employment Agreements also included (a) "Work for Hire" provisions, pursuant to which the employee or consultant expressly agreed that everything he or she "creates, writes or develops in the course of providing" services to OtterSec "shall be 'works made for hire' as defined by U.S. copyright law" and the property of OtterSec, (b) non-competition clauses, prohibiting the employees or consultants from working with, owning or having any financial interest in, or lending his or her name to any competing business "anywhere in the world" during the term of their agreements and for a period of time thereafter, and (c) non-solicitation provisions, prohibiting the direct or indirect solicitation of clients, prospective clients, other employees, and agents, contractors or vendors of OtterSec during the term of their agreements and for a period of time thereafter.

27.     Each of the OtterSec Employment Agreements was signed by Robert Chen for OtterSec and granted him authority to modify or waive them only to the extent that the modification or waiver "would not significantly harm the Company's legitimate, protectible interests." Any such modification or waiver was required to be in writing.

28.     David Chen executed no such agreement with OtterSec and was never asked to execute any such agreement with OtterSec.

**B. Robert Chen's Undisclosed Discussions with Jump Crypto**

29.     OtterSec experienced explosive growth from the outset and generated over $1 million in revenue in its first two months of operations. By March of 2022, Robert began to explore opportunities to raise money for OtterSec. He disclosed to David that he was engaged in preliminary discussions with two potential investors, Sino Global Capital and Race Capital, and David participated with Robert in calls with representatives of both. The discussions with Sino Global Capital and Race Capital did not progress any further.

30.     By no later than April 13, 2022, Robert entered into discussions in earnest with principals of Jump Trading, including Jonathan Claudius and Hendrik Hofstadt, regarding a

possible acquisition of OtterSec. Jump Trading is a registered broker-dealer with over 700 employees worldwide, and a member of multiple exchanges based in the United States and Europe, including the CME Group, the New York Stock Exchange, Eurex, and the London Stock Exchange.

31.     Robert's discussions with Messrs. Claudius and Hofstadt were focused on a potential acquisition of OtterSec by Jump Crypto, which at the time was a division of Jump Trading. Jump Trading had launched Jump Crypto in September of 2021 to focus on the growth and development of blockchain ecosystems and cryptocurrencies. Although Jump Trading and Jump Crypto (together, "Jump") had an in-house software auditing team, Jump was also a client of OtterSec and was interested in acquiring OtterSec because of the skills and talent of OtterSec's employees.

32.     Unlike with the Sino Global Capital and Race Capital discussions, Robert did not initially disclose his discussions with Jump to David (or Sam Chen) and did not involve David (or Sam Chen) in any of his initial discussions with Jump. Nonetheless, these discussions occurred, as confirmed by text messages exchanged between Robert and Jonathan Claudius.

33.     In the early morning hours of April 14, 2022, Robert sent a message to Jonathan Claudius, thanking him for "setting up the chat with Hendrick" and stating that it "was great to hear his perspective about being acquired by jump." Robert told Mr. Claudius that he "gathered up some approximate numbers" for OtterSec and advised that revenues for OtterSec's first two months of operations were approximately $1.36 million. He also told Mr. Claudius that he thought OtterSec's revenue would "stabilize at ~ 1-2 million per month" and that "[p]rofit margins are ~ 80% right now."

34.     In response, Mr. Claudius told Robert that, "for next steps, I was thinking of getting Kanav involved." "Kanav" is Kanav Kariya, the President of Jump Crypto. When Robert asked Mr. Claudius to "clarify what 'getting kanav involved' implies," Mr. Claudius

replied, "Yeah, probably a call with Kanav, if that jives well, I suspect the next step would be to make you an offer." Mr. Claudius then agreed to set up a telephone call between Robert and Mr. Kariya for Monday, April 18, 2022.

35.     Sam and David Chen were not parties to these discussions between Robert and Messrs. Claudius and Hofstadt, did not know that they had taken place, and Robert did not disclose them at the time to either of Sam or David.

36.     Instead, late in the day on April 14, 2022, Robert reached out to David asking to speak about raising money for OtterSec. Robert did not mention his discussions with Messrs. Claudius and Hofstadt, and stated only that he was "talking to some potential vcs." He characterized those discussions broadly as efforts to build "connections" with a view towards raising "500k" in exchange for about "2.5% equity."

37.     David pressed Robert for details, even asking him specifically, "what's the real reason you want investment?" and noting to Robert that he had "been very deflective about it in the past." Robert kept the discussion at a high-level, explaining only generally that he believed it would benefit the company to raise money because it would better position OtterSec to handle more clients and that "outside investment would definitely help somewhat with connections."

38.     Although David continued to ask for more specifics about Robert's discussions with the "potential vcs," Robert simply told David that he had been "connected ... w/ a company today" but did not mention that the "company" was Jump. Robert also concealed that his discussions with that "company" were "about being acquired" and affirmatively misrepresented them as being associated with his efforts to build "connections." Robert, in fact, specifically represented to David that his plan at that point was only to raise money for OtterSec from "friends and family."

39.     Robert misrepresented and failed to disclose the highly material facts that he was keenly aware of – namely, that (a) the "company" he had been "connected" with that day was Jump, (b) Jump was interested in acquiring OtterSec, (c) Robert had already provided Jump with financial details concerning OtterSec's revenue and profitability, (d) Robert's discussions with Jump were being elevated to a forthcoming call with Mr. Kariya, the President of Jump Crypto, scheduled for April 18, 2022, and (e) if the call with Mr. Kariya went well, the next step would be "an offer" from Jump.

40.     Sam and David Chen first learned of Robert's discussions with Jump after Sam agreed a few days later, on April 16, 2022, to amend the Operating Agreement and transfer 10% of Sam's membership interests in OtterSec to Robert.

## C. The First Amendment to the Operating Agreement

41.     OtterSec's explosive growth was due in significant part to David's exceptional dedication and work ethic. From the outset, David worked for OtterSec late-nights after high school, sometimes even before or during school, and on weekends.

42.     Nevertheless, Robert frequently expressed to David that he was dissatisfied with the amount of time David was dedicating to the business, and as OtterSec grew Robert became increasingly demanding of David's time. Robert even encouraged David to miss high school to work for OtterSec, or to drop-out of school entirely so that he could dedicate himself to the company full-time.

43.     David did not wish to drop-out of high school and, by April 2022, the combination of David's high school responsibilities and browbeating from Robert was taking a severe toll on David's physical and mental health. He reached a breaking point by April 15, 2022, and concluded that he would be unable to dedicate the time to OtterSec that Robert was consistently demanding of him.

44.     However, before advising Robert, David approached his father and proposed that Sam agree to transfer 10% of his membership interests in OtterSec to Robert. David expressed to Sam his view that the 10% transfer might appease Robert and help to resolve any disharmony over David's inability to dedicate himself to OtterSec full-time, which he believed would benefit the company.

45.     Although Sam agreed to David's proposal, neither Sam nor David was aware at the time of Robert's discussions with Jump because of Robert's material misrepresentations and omissions.

46.     On the basis of Robert's misrepresentations and omissions, David contacted Robert in the afternoon of April 15, 2022. He expressed to Robert his plan to finish high school, his regret that he would be unable to dedicate himself to OtterSec full-time, and conveyed the proposal for Sam to transfer 10% of his membership interests to Robert.

47.     Without revealing and continuing to conceal the highly material facts he actually knew about Jump, Robert accepted. Robert also conveyed to David that he "hope[d] this doesn't mean you'll adjust ur work down." David responded that he did not intend to adjust his work down, but could not "adjust my work up any further."

48.     Remaining unaware of the material facts concerning Jump that Robert had misrepresented and concealed, Sam agreed to an Amended Operating Agreement for OtterSec the next day, on April 16, 2022 (the "First Amendment"). Pursuant to the First Amendment, Sam transferred 10% of his membership interests to Robert, resulting in Robert owning 60% of OtterSec and Sam owning 40%.

49.     Had Robert disclosed what he actually knew about Jump, as he was required to do, Sam would not have agreed to the transfer or the First Amendment.

**D. The Offer from Jump Crypto**

50.     On April 18, 2022, Robert proceeded with his scheduled discussion with Mr. Kariya. Neither Sam nor David was invited to participate or made aware of the discussion at the time. Nonetheless, the discussion is confirmed by a text message Robert sent that day to Jonathan Claudius at 12:51 p.m., in which Robert stated that he "had a nice chat with kanav, I think we're moving forward with the acquihire offer."

51.     An "acquihire" is a term that is often used in the start-up tech-industry, and generally refers to the purchase of a company for the purpose of acquiring its employees. The acquiring company in an "acquihire" is primarily interested in the skill set or expertise of the target company's employees, rather than its products or services.

52.     At least some of the terms of the "acquihire" that Robert discussed with Mr. Kariya were detailed in a follow-up text message exchange between them that began on the morning of April 19, 2022. According to a log of their discussion (which did not include Sam or David Chen), Jump proposed for Robert to "bring 3-5 of your top guys in" and, during the period of transitioning OtterSec's employees to Jump, OtterSec would get to "keep the money" while they "work on winding down the contracts in a reasonable time frame."

53.     Robert advised David of his discussions with Jump for the first time in the afternoon of April 18, 2022, although he continued to conceal that those discussions had actually commenced prior to the First Amendment. Robert represented to David that Jump was proposing an acquihire, which David understood in the traditional sense to mean a purchase of OtterSec by Jump for the purpose of acquiring the talent of its personnel. Robert then invited David to participate in a call with Mr. Kariya later that afternoon.

54.     Mr. Kariya did not show up for the call on April 18, and Robert attempted to arrange for a rescheduled call. On Wednesday, April 20, 2022, Robert reached out to David asking if David could "skip school" the next day for a "jump meeting at 10am." David advised

Robert that he was "not going to be at school" and would be available because he was still "quarantining" as a result of an earlier COVID diagnosis. The call was eventually rescheduled to Friday, April 22, 2022 at 5:30 p.m.

55.     In the interim, and unbeknownst to David or Sam Chen, Robert was continuing his side-discussions with Jonathan Claudius. For example, on April 21, 2022, Mr. Claudius sent a text message to Robert, thanking him for the opportunity "to meet everyone" and asking Robert for the names and work experience of the employees Robert would bring to Jump.

56.     Robert responded that, in addition to himself, he "would probably just want to bring on william + kevin full time into jump for now (keep it smaller at first)." "[W]illiam" referred to William Wang and "kevin" referred to Kevin Chow, both of whom, as Robert later acknowledged, had executed OtterSec Employment Agreements containing the confidentiality, non-competition, non-solicitation, and other provisions referenced above.

57.     Mr. Claudius then proceeded to request additional details from Robert. He asked, "ok, so if we put together an offer it would be for OSec + You/Will/Kevin? Or for just you/will/kevin as fulltime staff?" Robert responded that "the former would make more sense" and stated that "it wouldn't make sense for me to still have significant equity in osec while focusing on work at jump." He then falsely claimed that he had spoken with David, and that David had told him that "he would want to stay at osec as long as he also got part of the acquihire bonus" and suggested that "maybe david can stay at osec to help manage the remaining people + smooth out the transition."

58.     David spoke with Mr. Kariya the next day, April 22, 2022, remaining unaware of Robert's discussions with Mr. Kariya the day before. During their call, Mr. Kariya conveyed the proposal Robert made to Mr. Claudius the day before, as though it was his own. David was surprised to hear that the supposed "acquihire" would not initially include him or an acquisition of Sam Chen's membership interest in OtterSec.

59.     David then spoke with Robert later the same day, April 22, 2022, after his call with Mr. Kariya. David relayed what they discussed and Robert not only pretended as though he did not to know about it, but he also concealed that he had been the one to propose for the supposed "aquihire" to be limited to himself, William Wang, and Kevin Chow. Worse, Robert attempted to persuade David that the idea made sense, telling him that it would be "very useful to have one of us at jump and the other running osec cause we can funnel audits back." They then agreed to "wait for them to send the paperwork" before reaching a final decision, and David began to digest what had been discussed.

60.     Robert proceeded to follow-up variously with Messrs. Claudius and Kariya in the days that followed, unbeknownst to David or Sam and without disclosing his discussions to them.

61.     On April 29, 2022, Mr. Kariya sent Jump's offer to Robert by text message. Jump proposed for Robert to receive a "$2m sign on," "$500k CIB," "$1.5m guaranteed min bonus for 2 years," and a "$150k base." Robert did not disclose the offer to David or Sam.

62.     Moreover, after negotiating for and receiving his own offer, and while still a member of OtterSec, Robert negotiated offers for William Wang and Kevin Chow with Mr. Claudius. In text messages they exchanged on May 5, 2022, Robert advised Mr. Claudius that "they'll both follow with no issue." They then discussed potential compensation terms for William Wang and Kevin Chow, and Mr. Claudius advised Robert that he would "get you the written offer" for both.

63.     Later that same day, Mr. Claudius also texted Robert that he wanted "to introduce you to my boss (Alex) via email, who functions as Jump Trading CTO, so you can meet him." Robert immediately responded and asked, "will this be via my osec email? or my personal[?]" Mr. Claudius replied, "you pick I can do either" – to which Robert responded, "let's do personal, me@robertchen.cc".

64.     On May 5, 2022, Mr. Claudius texted Robert, asking: "Any chance you, Kevin, or [W]ill have non-competes in place that would prevent bringing kevin and will along?" Robert responded and, confirming his knowledge of the terms of the OtterSec Employment Agreements, advised that "kevin and will both have non-compete clauses in their contract that prevent them from joining other audit firms" but that "it also specifies that the founder (me) can void it." Robert did not inform Mr. Claudius that he was only permitted to "void" the "non-compete clauses" to the extent that it "would not significantly harm the Company's legitimate, protectible interests."

65.     Neither Sam nor David were included in these discussions with Mr. Claudius, and Robert did not disclose them to either of Sam or David.

**E. The Corrosion of Robert's Relationship with Sam and David**

66.     After Sam and Robert executed the First Amendment on April 16, 2022, David continued to work for OtterSec consistent with his agreement not to adjust his work down or up any further. However, Robert persisted to make increasing demands of David's time and continued to criticize his work ethic when David was unavailable for projects due to his high school responsibilities.

67.     Moreover, after considering his conversations with Mr. Kariya and Robert on April 22, 2022, David was growing suspicious that Robert was not being forthright.

68.     Indeed, although David had been led by Robert to believe that he was discussing an "acquihire" with Jump, it was becoming apparent to David that Jump was not actually proposing an "acquihire." David was attuned to the fact that he had not been involved in discussions between Robert and Jump, and after reflecting upon his discussions with Mr. Kariya and Robert earlier that day it appeared to David that Robert had actually been negotiating a very different deal with Jump – one for Robert and other valuable OtterSec employees who had OtterSec Employment Agreements.

69. David expressed his views to Robert, beginning on April 22, 2022. Robert feigned ignorance and attempted to assuage David's concerns that he had been acting for himself and in his own interests to the detriment of OtterSec.

70. However, on the basis of David's observations of the manner in which the discussions with Robert and Jump had proceeded, David had lost faith in Robert's integrity. After some back and forth with Robert, David concluded by April 27, 2022, that he could no longer work with someone he did not trust and advised Robert that he would cease any further work for OtterSec.

71. Thereafter, David either took with him or removed Robert's and OtterSec's access to the personal code and other property that David had been using or allowing them to use previously. David notified Robert that he would be doing so, and Robert assented.

72. Subsequently, Robert asked David, over text on April 29, 2022, to return a specific subset of computer code, which he referred to as the "drift liquidator" code, that Robert claimed to own. David immediately returned it.

73. In the days and weeks that followed, Robert made a few additional requests for other information and materials related to OtterSec and, in each case, David provided the information or materials to Robert to the extent he had them. Otherwise, Robert raised no objections and took no action with respect to David's removal or retention of any other property or information.

74. Robert did, however, begin pressing for the remainder of Sam's membership interests, taking the position that it would be "unfair" for Sam to retain his 40% interest in OtterSec if David was no longer working for the company. Neither Sam nor David agreed with Robert's position, and they began requesting various documents and information relating to OtterSec and Robert's discussions with Jump. Robert responded by stonewalling.

75.     For example, at one point, Sam and David simply requested from Robert a copy of the First Amendment. Robert refused, but David was eventually able to locate it in his own records.

76.     Sam and David also requested that Robert share the logs of his discussions with the principals of Jump, but Robert refused. When they specifically asked Robert on May 4, 2022, to disclose the details of his negotiations with Jump, Robert initially dodged the question altogether, stating only that he would "let you know if/when I make a decision with jump." He revisited that response shortly thereafter and disclosed for the first time that "jump made an offer to just me." Robert falsely represented that "the details are still up in the air but this is all that I know."

77.     Robert then began to inquire about purchasing Sam's 40% interest in OtterSec. In a text message sent by Robert to David on May 10, 2022, Robert threatened that, if Sam was unwilling to sell his membership interests, "i'll probably dissolve the company and remake it." David accurately noted to Robert in a reply text message sent on May 13, 2022, that Robert was precluded from doing so.

78.     Indeed, although David did not point it out at the time specifically, both the Operating Agreement and the First Amendment included a provision in Section 8.1 that precluded any member from dissolving the company "for a loss of membership interest" – which was precisely what Robert was proposing to do.

79.     Moreover, Robert was still a fiduciary and, by that point, already highly conflicted, self-interested, and lacking in the requisite independence to be entitled to any deference whatsoever that he could act in the best interests of OtterSec or its members with respect to any decision concerning a dissolution of OtterSec. Indeed, OtterSec was highly successful and there could be no legitimate basis to "dissolve the company and remake it," except to further Robert's personal interest in having the entire company for himself.

80. Nevertheless, David conveyed to Robert that Sam was willing to consider selling his membership interests. In order to determine the value of those interests, however, David requested that Robert disclose certain financial information and information in relation to the Jump "acquihire." Robert refused, and the parties did not reach an agreement.

81. By that point, whatever trust there had been between the parties had evaporated completely and their dealings with each other were consistently acrimonious. After David pointed out to Robert that his conduct and actions appeared rife with conflicts of interest and were contrary to Robert's fiduciary duties, Robert tacitly conceded the validity of David's view when he again threatened, in a message sent on May 13, 2022, to "forfeit all my shares, and just start a new firm with no fiduciary conflict."

**F. Robert Chen's Theft of OtterSec**

82. On May 27, 2022, Iquan Fadaei, an attorney purporting to act on behalf of OtterSec, sent an email to Sam and David Chen advising that "Robert will be exercising his right to dissolve OtterSec shortly." Mr. Fadaei did not offer an explanation or business justification for a dissolution of OtterSec.

83. However, on May 28-29, 2022, Robert exchanged text messages with an acquaintance he shared with David. Robert told the acquaintance that he had "signed" a deal with Jump. The acquaintance congratulated Robert and asked him what he planned to do "now that ur like officially a millionaire." Robert responded that he needed to pay "taxes" and, when the acquaintance asked if "the deal" was "all cash," Robert told him that the "deal [is] a bit weird" and "i think im gonna gap year and explore the world."

84. The acquaintance also asked Robert in the same exchange if "everyone at osec [is] gonna work for jump now" and Robert responded, "that's the messy part[,] i think i'll figure out as we go." The acquaintance then asked whether Robert specifically would be working for Jump, and Robert replied that it was "another thing to be decided soon."

85.     The acquaintance asked Robert about David and inquired whether Robert expected to be sued "now that uve signed the jump deal." Robert replied, "nah the deal we structured is entirely legal" and described it as a "partial share acquisition" that "might change."

86.     During their discussion, Robert was also careful to tell the acquaintance that he "should not tell anybody abt this for now." However, the acquaintance did indeed tell David about his discussion with Robert.

87.     In the weeks that followed, David and Robert continued to exchange messages, and Robert consistently refused to share the details of his offer from and discussions with Jump, variously claiming that they were "personal" or "confidential," or that they did not have "anything to do with osec" because (and contrary to what he had told the acquaintance) the deal with Jump was "not a share acquisition."

88.     Robert, moreover, would not even answer questions about the OtterSec employees involved in the supposed "acquihire," whose deals with Jump were being negotiated by Robert despite Robert's continuing fiduciary duties to OtterSec and the terms of the OtterSec Employment Agreements.

89.     Sam and David retained their own counsel, the law firm of Hathaway & Kunz, LLP ("Hathaway"), and advised OtterSec's attorney of the same by email on June 1, 2022.

90.     Following a preliminary discussion between counsel, Mr. Fadaei followed up with Hathaway by email on June 4, 2022. Among other things, Mr. Fadaei claimed that Robert "has a right to dissolve the company" based on his "60% ownership interest" and confirmed Robert's intent to proceed with the dissolution. His email also set forth Robert's plan for dissolution, which included having "each member submit bids for the various intangible assets they are interested in owning."

91.     The email from Mr. Fadaei then proceeded to set forth "an initial list of the company's assets" which included, among other things, client agreements, intellectual property

allegedly belonging to OtterSec (which he later amended in subsequent correspondence), OtterSec's "Twitter account," "Blog posts," the "Company name, website, domain and general goodwill," cash of approximately $500,000, and amounts owed to OtterSec for work it had performed.

92.    By letter dated June 9, 2022, Hathaway proceeded to serve OtterSec with a formal, statutory demand for various categories of records and information relating to OtterSec pursuant to Wyoming law, and in the same letter raised several concerns and objections to Robert's proposed plan of dissolution.

93.    Mr. Fadaei responded on June 23, 2022. The response contended that, because "Robert owns 60% of the Company's capital interests ... he is authorized to dissolve the Company whenever he so decides." Mr. Fadaei also represented that "[t]he Company will seek to maximize the value of any of its assets sold as part of the dissolution" but that "as a practical matter, the Company is not aware of any interested third parties."

94.    Mr. Fadaei's June 23, 2022, response agreed to produce some, but not all, of the records and information relating to OtterSec that were requested by Hathaway's demand letter dated June 9, 2022. Notably, Mr. Fadaei's letter agreed only to provide selected communications concerning Robert's discussions with Jump and stated that "[t]he Company disagrees with your claim that communications regarding Jump Crypto's hiring of Robert Chen are related to the Company's business." The letter also alleged that "Jump Crypto is no longer interested in hiring any Company personnel and did not ever hire any personnel" and, further, that "[t]he Company has not terminated any employee or independent contractor contracts in connection with Jump Crypto or otherwise."

95.    Moreover, Mr. Fadaei's June 23, 2022, response raised for the first time claims of "misappropriation and competition" arising out of David's departure from OtterSec that he alleged were breaches of David's "fiduciary duty of care and loyalty" – even though David was

not a member of the company and owed no such duties. The letter made counter-demands for various categories of documents and information associated with the alleged violations of David's non-existent fiduciary duties.

96. After Hathaway responded, Mr. Fadaei withdrew several aspects of the allegations against David. Hathaway also confronted Robert, through Mr. Fadaei, with Robert's communications with the acquaintance on May 28-29, 2022, relating to the "deal" he had reached with Jump that was "structured" as a "partial share acquisition." Robert responded through Mr. Fadaei by claiming that he had lied to the acquaintance, but continued to withhold many of his communications with Jump.

97. While the parties were still discussing their disputes, Sam tragically passed away in a car accident on July 13, 2022. At the time of his passing, OtterSec had not been dissolved and Sam's membership interest in the company passed to the Estate.

98. Although the First Amendment, which was theoretically in effect at the time of Sam's death, would have required OtterSec to dissolve upon Sam's death, Robert executed a further amendment to the Operating Agreement on August 15, 2022 (the "Second Amendment"). The Second Amendment removed that provision so as to require dissolution upon the "termination of the membership of all members of the Company." The Second Amendment also added a provision stating: "For the avoidance of doubt, the dissociation of a member shall not cause the dissolution of the Company."

99. However, notwithstanding the Second Amendment, Robert proceeded to follow through with the threat he made months earlier to "dissolve the company and remake it."

100. On September 13, 2022, while he was still a member and fiduciary of OtterSec, Robert secretly formed two new companies in South Dakota: Defendants Otter Audits and RC Security.

101.     Next, Mr. Fadaei notified Hathaway on September 20, 2022, that "Robert has dissolved OtterSec LLC, and the company is now beginning to wind up." Articles of Dissolution were not filed with the Wyoming Secretary of State until October 6, 2022.

102.     Mr. Fadaei also emailed Hathaway on September 20, 2022, stating that "[p]art of the winding up process will involve the sale of Company assets" and attaching "a list of assets that prospective purchasers may offer to purchase from the Company." The list of assets changed from the original list he sent on June 4, 2022, but continued to include digital assets, "OtterSec trademarks," the "OtterSec website and domain name," "OtterSec code," and various "Communication and Operational Accounts" that included the "Company's Discord, Slack, Notion, and GSuite accounts."

103.     Robert did not make any offer to purchase the listed assets and did not disclose his formation of Otter Audits and RC Security in any of these communications or otherwise, because the last part of his plan to "dissolve the company and remake it" – which he has since executed on – was to simply take the listed assets (and others) for Otter Audits and RC Security, continue the exact same business through them, and thereby steal OtterSec for himself.

104.     It is evident that Robert formed his new companies in South Dakota, rather than Wyoming, to avoid detection and circumvent Wyoming law prohibiting the use of a name (like "Otter Audits") that is the same as, or deceptively similar to, the name "OtterSec."[2]  Robert's scheme to "dissolve the company and remake it" specifically included using a deceptively similar name and other means to capitalize on OtterSec's name and goodwill, and confuse third parties by outwardly portraying his new companies as though they are OtterSec.

105.     Indeed, despite having previously represented that "the Company is not aware of any … third parties" interested in acquiring any the OtterSec's assets included on the list prepared by Mr. Fadaei, Robert plainly took at least some of those assets for Otter Audits and

---

[2] *See* Wyo. Stat. Ann. § 17-29-108(a)(ii) (2015)

RC Security, including specifically "OtterSec trademarks," the "OtterSec website and domain name," and OtterSec "Communication and Operational Accounts."

106.    For example, Robert is using the "OtterSec website and domain name" for his companies' website (https://osec.io), which on the front page displays the OtterSec name and logo, lists OtterSec's clients, and describes a business identical to OtterSec:



107.    Robert has also appropriated OtterSec's social media accounts for his new companies, including its verified Twitter account:



108.    Notably, despite OtterSec's "dissolution," the verified Twitter account has remained active utilizing the OtterSec name and logo, links to the OtterSec website, includes all of OtterSec's pre-dissolution Tweets, describes a business identical to OtterSec, and even

notes that it was created in February 2022 – which was when OtterSec was formed, not Otter Audits or RC Security.

109.    The transfer of OtterSec's assets and property to Defendants Otter Audits and RC Security is a classic example of a de facto merger, and Otter Audits and RC Security are the essence of a mere continuation of OtterSec. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, in furtherance of his scheme to "dissolve the company and remake it" without Sam Chen or the Estate.

110.    Otter Audits and RC Security are the successors to OtterSec, and the Estate is therefore entitled to the same interest in Otter Audits and RC Security as it would be entitled to in OtterSec, together with an award of damages, profits, costs, and other relief as further detailed below.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)
### (Against All Defendants)

111.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.    In connection with their commercial services, Defendants have used and are continuing to use in interstate commerce the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts.

113.    Defendants use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts falsely portrays themselves as being OtterSec and constitute false or misleading descriptions or representations of fact.

114.    Defendants use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts are likely to cause (or are actually causing)

confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with OtterSec, or as to the origin, sponsorship or approval of Defendants' services or commercial activities by OtterSec.

115.    In addition, Defendants' use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts for purposes of commercial advertising or promotion, misrepresents the nature, characteristics, qualities or origin of Defendants' services or commercial activities.

116.    Defendants' false or misleading representations of fact are material because they are intended and likely to influence the decisions of existing and target clients, employees, consumers, and other third parties who are interested in Defendants' services or commercial activities.

117.    Defendants, in fact, are using the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts for the express purpose of concealing from existing and target clients, employees, consumers, and other third parties their misappropriation and theft of OtterSec.

118.    Defendants' false or misleading representations of fact are being widely disseminated in interstate commerce, including to the relevant industry and purchasing public.

119.    The Estate has been damaged by Defendants' false or misleading representations of fact through the non-payment for Defendants' use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts, the diversion of OtterSec's business and opportunities, and the loss of the Estate's interest in the company.

120.    Defendants know that their representations of fact are false or misleading, and have made them in bad faith, fraudulently, maliciously, deliberately, and willfully.

121.    Defendants' actions and conduct makes this an exceptional case within the meaning of 15 U.S.C. § 1117, thereby entitling the Estate to an award of attorneys' fees, in addition to Defendants' profits, damages, and costs.

122.    Defendants are continuing to make false and misleading representations of fact and will continue to do so unless enjoined as provided in 15 U.S.C. § 1116.

## SECOND CAUSE OF ACTION
### Declaratory Judgment, 28 U.S.C §§ 2201 and 2202
### (Against All Defendants)

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    The Declaratory Judgment Act, 28 U.S.C §§ 2201 and 2202, authorizes this Court to declare the rights and legal relations of the parties to this dispute, and to award necessary and proper relief based thereon.

125.    An actual controversy has arisen and now exists between the Estate and Defendants, concerning their respective rights in and to the companies that were formerly known as OtterSec, but which are now known as Otter Audits and RC Security.

126.    In particular, and as further detailed herein, Plaintiff contends, among other things, that Defendant Robert Chen acted without right or authority, in violation of his fiduciary duties of care and loyalty, committed fraud, and breached the Operating Agreement, the First Amendment, and the Second Amendment in connection with the dissolution of OtterSec and formation of Otter Audits and RC Security.

127.    Plaintiff further contends that Robert Chen was highly conflicted, self-interested, and lacking in the requisite independence to consider objectively whether the dissolution of OtterSec was in the best interests of OtterSec or the Estate. Accordingly, his decision to dissolve OtterSec is not entitled to deference under the business judgment rule but

is instead subject to review for "entire fairness." Viewed objectively, the dissolution was not fair, reasonable or in the best interests of OtterSec or the Estate and should be set aside.

128.     Additionally, and as further detailed herein, Plaintiff contends, among other things, that Defendants have violated the Lanham Act, and converted and misappropriated OtterSec's assets, property, goodwill, clients, and business opportunities for themselves. Defendants are using a deceptively similar name as OtterSec, are engaged in the same business as OtterSec, and are holding themselves out as though they are OtterSec.

129.     Accordingly, Plaintiff seeks a declaration as follows:

a. Robert Chen's dissolution of OtterSec was improper, invalid, subject to review for entire fairness, and not fair, reasonable or in the best interests of OtterSec or the Estate;

b. The transfer of OtterSec's assets and property to Otter Audits and RC Security equates to a de facto merger of the companies;

c. Otter Audits and RC Security are a mere continuation of OtterSec;

d. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, to deprive the Estate of its interest in OtterSec;

e. Otter Audits and RC Security are OtterSec's successors in interest; and

f. The Estate is entitled to the same interest in Otter Audits and RC Security as the Estate is entitled to have in OtterSec.

130.     Pursuant to and on the basis of the foregoing, Plaintiff seeks the following necessary and proper relief:

a. The imposition of a constructive trust over the Estate's rightful interest in Otter Audits and RC Security; and

   b.  The termination of the constructive trust and distribution to the Estate of the

Estate's rightful interest in Otter Audits and RC Security.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duty; Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

131.   Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

132.   Defendant Robert Chen owed fiduciary duties to OtterSec, Sam Chen, and the

Estate. He was required to act honestly, in good faith, and in the best interests of OtterSec, Sam

Chen, and the Estate, and to exercise the care, diligence, and skill that a reasonably prudent

person would exercise in comparable circumstances.

133.   Defendant Robert Chen repeatedly failed to faithfully execute and violated his

fiduciary duties in relation to, among other things, his dealings with Jump, the conduct and

affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and

winding up of OtterSec.

134.   Defendant Robert Chen was well aware of, and even acknowledged, the

fiduciary duties he owed to OtterSec, Sam Chen, and the Estate. Nevertheless, he willfully,

wantonly, and intentionally abused his position to breach, and to conceal his breaches of, his

fiduciary duties.

135.   As a direct and proximate result of Defendant Robert Chen's breaches of his

fiduciary duties, the Estate has been damaged.

136.   Defendants Otter Audits and RC Security are also liable for aiding and abetting

Robert Chen's breaches of his fiduciary duties. They provided substantial assistance to Robert

Chen in achieving the breaches of his fiduciary duties alleged herein, were proximate causes

of the Estate's losses and damages, and had knowledge of the breaches of fiduciary duty by

and through Robert Chen

## FOURTH CAUSE OF ACTION
### Fraud; Aiding and Abetting Fraud
### (Against All Defendants)

137.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.    Defendant Robert Chen made or approved the materially false and misleading statements and omissions specified above in relation his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, which he knew (or deliberately or recklessly disregarded) were false and misleading in that they contained material misrepresentations or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.    Defendant Robert Chen made or approved the materially false and misleading statements and omissions specified above to the Estate and Sam Chen directly, or via David Chen with the knowledge or belief that that they would be conveyed to the Estate and Sam Chen and that the Estate and Sam Chen would rely on them.

140.    Defendant Robert Chen had an affirmative duty to provide truthful, full, complete, and accurate disclosures of the material facts that were peculiarly within his knowledge. Defendant Robert Chen intentionally or recklessly failed to provide truthful, full, complete, and accurate disclosures of these material facts.

141.    In addition, in choosing to speak, make representations, and disclose the matters described above in relation to his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, Defendant Robert Chen undertook an affirmative duty to make truthful, full, complete, and accurate disclosures as to those matters and ensure that the representations and disclosures he was making or had previously made were not materially false or misleading or omitted material

facts necessary in order to make the statements he was making or had previously made, in light of the circumstances under which they were made, not materially false or misleading.

142.     The Estate and Sam Chen reasonably and justifiably relied to their detriment on Defendant Robert Chen's material misrepresentations and omissions, including Defendant Robert Chen's affirmative duty to provide truthful, full, complete, and accurate disclosures.

143.     Defendant Robert Chen's material misrepresentations and omissions made on or before April 16, 2022, in relation to his dealings with Jump specifically, fraudulently induced Sam Chen to enter into the First Amendment and transfer 10% of his membership interests in OtterSec to Defendant Robert Chen, which Sam Chen would not have agreed to if he had been aware of the true and complete facts. As a direct and proximate result of these material misrepresentations and omissions, the Estate has been damaged. In addition (or in the alternative), the Estate is entitled to rescission of the transfer of 10% of Sam Chen's membership interests in OtterSec to Defendant Robert Chen, which would restore the parties to their positions prior to Defendant Robert Chen's fraud. Otter Audits and RC Security are OtterSec's successors in interest, such that the Estate is entitled to a 50% interest in Otter Audits and RC Security.

144.     Defendant Robert Chen's material misrepresentations and omissions in relation to his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, further caused and resulted in the dissolution of OtterSec, the transfer of OtterSec's assets and property to Otter Audits and RC Security, and the loss of the Estate's interest in OtterSec. Otter Audits and RC Security are OtterSec's successors in interest. As a direct and proximate result these material misrepresentations and omissions, the Estate has been damaged.

145.     Defendants Otter Audits and RC Security are also liable for aiding and abetting Robert Chen's fraud. They provided substantial assistance to Robert Chen in achieving the

fraud alleged herein, were proximate causes of the Estate's losses and damages, and had knowledge of the fraud by and through Robert Chen.

### FIFTH CAUSE OF ACTION
### Misappropriation and Conversion
### (Against All Defendants)

146. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

147. Prior to his death, Sam Chen had legal rights in and title to his membership interest in OtterSec. Upon Sam's death on July 13, 2022, his interest and the legal rights in and title to that interest passed to the Estate.

148. Defendants have wrongfully misappropriated and converted the Estate's interest in OtterSec, to the exclusion of the Estate. Otter Audits and RC Security are OtterSec's successors in interest.

149. Defendants have exercised and are continuing to exercise dominion and control over the Estate's rightful interests in Otter Audits and RC Security so as to unlawfully deny the Estate its rightful interest in and to them.

150. As a direct and proximate result of Defendants' misappropriation and conversion, the Estate has been damaged.

### SIXTH CAUSE OF ACTION
### Breach of Contract
### (Against Robert Chen)

151. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152. Section 8.1 of OtterSec's Operating Agreement, the First Amendment, and the Second Amendment, prohibited the members of OtterSec, including Defendant Robert Chen, from dissolving OtterSec "for a loss of membership interest."

153.    In addition, OtterSec's Operating Agreement, the First Amendment, and the Second Amendment included an implied contractual covenant of good faith and fair dealing.

154.    Defendant Robert Chen dissolved OtterSec for the purpose of causing the loss of the Estate's interest in the company, and in furtherance of his scheme to misappropriate OtterSec and the Estate's interest in OtterSec.

155.    By reason of the forgoing, Defendant Robert Chen breached Section 8.1 and the implied covenant of good faith and fair dealing included in OtterSec's Operating Agreement, the First Amendment, and the Second Amendment, and the Estate has been damaged.

## SEVENTH CAUSE OF ACTION
### Tortious Interference
### (Against All Defendants)

156.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.    As detailed above, OtterSec had both existing and prospective contracts, relationships, business expectancies, and opportunities with its employees, clients, prospective employees, prospective clients, and other third parties (including Jump).

158.    Defendants were fully aware of these existing and prospective contracts, relationships, business expectancies, and opportunities, and intentionally and improperly interfered with them, by inducing or causing a breach, termination or misappropriation of the contracts, relationships, expectancies, and opportunities.

159.    By reason of Defendants' wrongful, tortious interference with OtterSec's existing and prospective contracts, relationships, business expectancies, and opportunities the Estate has been damaged.

## EIGHTH CAUSE OF ACTION
### Accounting
### (Against All Defendants)

160.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161.    Defendants have profited through their misappropriation of OtterSec's assets, property, goodwill, clients, and business opportunities, their misappropriation and conversion of the Estate's interests in OtterSec, and their continuing and ongoing denial of the Estate's rightful interest in Otter Audits and RC Security.

162.    Defendants have exercised complete dominion and control over the books, records, and financial affairs of OtterSec, Otter Audits, and RC Security, and have profited and been unjustly enriched thereby, to the exclusion of, and in defiance of the Estate's rights.

163.    Defendants have never accounted for the transactions and affairs of OtterSec, Otter Audits or RC Security, and the Estate is without an adequate remedy at law.

164.    Defendants are obligated to account, and must therefore fully account, for the transactions and affairs of OtterSec, Otter Audits and RC Security.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment in favor of the Estate and against Defendants as follows:

A.      Awarding the Estate profits, damages and costs, attorneys fees, and injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1117;

B.      Awarding the Estate other damages, including punitive damages, in an amount to be determined at trial;

C.      Rescinding the First Amendment and associated transfer of 10% of Sam Chen's membership interests to Defendant Robert Chen;

D.    Declaring and determining the rights and legal relations of the parties to this dispute, and entering relief based thereon, pursuant 28 U.S.C §§ 2201 and 2202 as follows:

(i)    Declaring and determining that Robert Chen's dissolution of OtterSec was improper, invalid, subject to review for entire fairness, and not fair, reasonable or in the best interests of OtterSec or the Estate;

(ii)    Declaring and determining that the transfer of OtterSec's assets and property to Otter Audits and RC Security equates to a de facto merger of the companies;

(iii)    Declaring and determining that Otter Audits and RC Security are a mere continuation of OtterSec;

(iv)    Declaring and determining that the dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, to deprive the Estate of its rightful interest in OtterSec;

(v)    Declaring and determining that Otter Audits and RC Security are OtterSec's successors in interest;

(vi)    Declaring and determining that the Estate is entitled to the same interest in Otter Audits and RC Security as the Estate is entitled to have in OtterSec, equating to a 50% interest, but in any event no less than a 40% interest;

(vii)    Imposing a constructive trust over the Estate's rightful interest in Otter Audits and RC Security; and

(viii)    Terminating the constructive trust and distributing to the Estate its rightful interest in Otter Audits and RC Security.

E.    Requiring Defendants to fully and completely account for the financial affairs and transactions of OtterSec, Otter Audits, and RC Security;

F.    Requiring Defendant Robert Chen to disgorge all compensation and benefits he obtained during the course of his breaches of his fiduciary duties, faithless service, and other wrongful conduct described above;

G.    Awarding the Estate pre-judgment and post-judgment interest;

H.    Awarding the Estate costs, expenses, and reasonable attorneys' fees; and

I.    Awarding the Estate such other and further relief as the Court may deem just and proper.

### <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 31, 2023

Respectfully Submitted,
BARKLEY & KENNEDY, CHARTERED


   /S/ Daniel M. Kennedy
By: Daniel M. Kennedy, III
BARKLEY & KENNEDY, CTRD.
51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600, 301-762-2606
dkennedy@barkenlaw.com
*Attorneys for Plaintiff*


OF COUNSEL:

Stephen M. Plotnick
Nathan D. Harp
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, NY 10005
212-238-8772
plotnick@clm.com
harp@clm.com