## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LI FEN YAO, as Administrator of the
Estate of Sam Mingsan Chen,

               Plaintiff,

     v.

ROBERT CHEN, OTTER AUDITS
LLC, and RC SECURITY LLC,

             Defendant.

Case No. 8:23-cv-00889-TDC

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR JUDGMENT
## ON THE PLEADINGS AND TO STAY DISCOVERY

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

SUMMARY OF FACTS AND PROCEDURAL HISTORY ............................................... 3

    A.    Defendants' Scheme ............................................................................. 3

    B.    Robert's Negotiations with Jump ....................................................... 4

    C.    OtterSec's Three Operating Agreements ............................................ 7

    D.    Procedural History .............................................................................. 8

ARGUMENT ....................................................................................................................... 9

I.    LEGAL STANDARD ............................................................................................... 9

II.    DEFENDANTS' ARGUMENTS CONCERNING DISSOLUTION RELY ON THE
WRONG OPERATING AGREEMENT AND ARE IMMATERIAL ................................ 10

    A.    The Second Amendment Was in Effect When Robert Dissolved OtterSec ................. 10

    B.    Robert Chen's Authority to Dissolve OtterSec is Irrelevant ......................................... 11

III.    THE ESTATE'S STATUS AS A TRANSFEREE OF SAM CHEN'S MEMBERSHIP
INTEREST DOES NOT PRECLUDE PLAINTIFF'S CLAIMS .......................................... 14

    A.    Plaintiff Has Direct Claims for Breach of Fiduciary Duty, Breach of Contract and
Tortious Interference ....................................................................................................... 14

        1.    Breach of Fiduciary Duty ................................................................... 14

        2.    Breach of Contract ............................................................................. 16

        3.    Tortious Interference .......................................................................... 17

    B.    A Direct Action and Recovery is Authorized and Appropriate ..................................... 17

IV.    PLAINTIFF ADEQUATELY ALLEGES PLAUSIBLE CLAIMS FOR EACH CAUSE OF
ACTION PLEADED IN THE COMPLAINT ....................................................................... 21

    A.    Lanham Act ......................................................................................... 21

    B.    Declaratory Judgment ........................................................................ 22

    C.    Breach of Fiduciary Duty ................................................................... 23

    D.    Aiding and Abetting ........................................................................... 25

E.      The Complaint Adequately Alleges Fraud and it is Not Barred by Laches .................. 26

F.      Misappropriation and Conversion ............................................................................... 29

G.      Breach of Contract ...................................................................................................... 30

H.      Tortious Interference ................................................................................................... 31

I.      The Complaint States a Claim Against the Corporate Defendants .............................. 32

J.      Accounting ................................................................................................................... 32

V.   DEFENDANTS' REQUEST FOR A STAY SHOULD BE DENIED ................................. 33

CONCLUSION ..................................................................................................................... 34

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acorn v. Moncecchi*,
   386 P.3d 739 (Wyo. 2016) .............................................................................................13, 29

*Ademiluyi v. Egbuonu*,
   215 A.3d 329 (Md. Ct. App. 2019) ....................................................................................28

*Anderson v. Thomas*,
   2022 U.S. Dist. LEXIS 225178 (D. Md. Dec. 13, 2022) .....................................................9

*Auto USA, Inc. v. DHL Express (USA), Inc.*,
   2018 U.S. Dist. LEXIS 30084 (D. Md. Feb. 26, 2018) ..................................................17, 26

*Bamford v. Penfold, L.P.*,
   2022 Del. Ch. LEXIS 147 (Del. Ch. June 24, 2022) ...........................................................19

*Botts v. Johns Hopkins Univ.*,
   2021 U.S. Dist. LEXIS 76788 (D. Md. Apr. 21, 2021) .......................................................17

*Carrillo v. Borges Constr., LLC*,
   2016 U.S. Dist. LEXIS 135556 (D. Md. Sept. 30, 2016) ....................................................13

*Castle v. Capital One, N.A.*,
   2014 U.S. Dist. LEXIS 4923 (D. Md. Jan. 15, 2014) ..........................................................26

*Chambers v. Buick GMC, LLC*,
   43 F. Supp. 3d 575 (D. Md. 2014) ......................................................................................26

*Cosner v. Dodt*,
   526 F. App'x 252 (4th Cir. 2013) ........................................................................................34

*CX Reins, Co. v. Leader Rlty. Co.*,
   252 F. Supp. 3d 439 (D. Md. 2017) ....................................................................................24

*Donegal Assocs., LLC v. Christie-Scott, LLC*,
   241 A.3d 1011 (Md. Ct. Sp. App. 2020) ............................................................................30

*Estate of Alvarez v. Johns Hopkins Univ.*,
   373 F. Supp. 3d 639 (D. Md. 2019) ......................................................................................9

11299355.3

*Fox v. DRA Services, LLC*,
    2012 U.S. Dist. LEXIS 202767 (D. Wyo. May 17, 2012) ...................................................24

*Fritchel v. White*,
    452 P.3d 601 (Wyo. 2019) ...................................................................................................20

*Goldstein v. Denner*,
    2022 Del. Ch. LEXIS 125 (Del. Ch. June 2, 2022) ........................................................18, 19

*Gomez v. Heights Sch.*,
    2023 U.S. Dist. LEXIS 195728 (D. Md. Nov. 1, 2023) ........................................................34

*John C. Grimberg Co. v. Indian Harbor Ins. Co.*,
    2023 U.S. Dist. LEXIS 59097 (D. Md. Apr. 3, 2023) ..........................................................34

*Johnson v. Reiger*,
    93 P.3d 992 (Wyo. 2004) .......................................................................................................16

*Lamone v. Schlakman*,
    153 A.3d 144 (Md. Ct. App. 2017) ........................................................................................28

*Lefkoe v. Jos. A. Bank Clothiers*,
    2008 U.S. Dist. LEXIS 134730 (D. Md. May 1, 2008) ......................................................9, 10

*Levin v. Levin*,
    405 A.2d 770 (Md. Ct. Sp. App. 1979) ..................................................................................23

*Lynch v. Patterson*,
    701 P.2d 1126 (Wyo. 1985) .......................................................................................19, 20, 21

*Lyon v. Campbell*,
    707 A.2d 850 (Md. Ct. Sp. App. 1998) ..................................................................................18

*Mancho v. Select Portfolio Servicing, Inc.*,
    2022 U.S. Dist. LEXIS 220501 (D. Md. Dec. 6, 2022) ......................................................9, 10

*Mantle v. North Star Energy & Constr. LLC*,
    437 P.3d 758 (Wyo. 2019) ...............................................................................................16, 25

*Motzko Co. USA, LLC v. A&D Oilfield Dozers*,
    316 P.3d 1177 (Wyo. 2014) ...................................................................................................30

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) *as amended* .........................................................................19

*PNS Stores, Inc. v. Cap. City Props., LLC*,
    515 P.3d 606 (Wyo. 2022) ...............................................................................................12, 17

iv

*Roussalis v. Wyoming Med. Ctr., Inc.*,
  4 P.3d 209 (Wyo. 2000) ........................................................................16, 17

*Sartin v. Chula Vista, Inc.*,
  2019 U.S. Dist. LEXIS 109537 (E.D. Wisc. July 1, 2019)......................10

*Scherer Constr. LLC v. Hedquist Constr., Inc.*,
  18 P.3d 645 (Wyo. 2001) ........................................................................12

*Schmidt v. Wells Fargo Bank, N.A.*,
  2020 U.S. Dist. LEXIS 26586 (M.D. Fla. Feb. 14, 2020) ......................33

*Smith v. Clark/Smoot/Russell, a JV*,
  796 F.3d 424 (4th Cir. 2015) ..................................................................26

*Sol v. M&T Bank*,
  2024 U.S. Dist. LEXIS 15344 (D. Md. Oct. Jan. 29, 2024) ............32, 33

*Squaw Mountain Cattle Co. v. Bowen*,
  804 P.2d 1292 (Wyo. 1991) ....................................................................24

*Starleper v. Hamilton*,
  666 A.3d 867 (Md. Ct. Sp. App. 1995)....................................................23

*Wallop Canyon Ranch, LLC v. Goodwyn*,
  351 P.3d 943 (Wyo. 2015) ......................................................................15

## Statutes & Rules

28 U.S.C. § 2202 ...........................................................................................23

Fed. R. Civ. P. 8 .........................................................................................9, 33

Fed. R. Civ. P. 9 ...........................................................................................26

Fed. R. Civ. P. 12 ................................................................................... *passim*

Wyo. Stat. Ann. § 17-29-102 .......................................................................11

Wyo. Stat. Ann. § 17-29-107 .......................................................................20

Wyo. Stat. Ann. § 17-29-112 .......................................................................11

Wyo. Stat. Ann. § 17-29-407 .......................................................................11

Wyo. Stat. Ann. § 17-29-409 ................................................................. *passim*

Plaintiff Li Fen Yao ("Plaintiff"), as administrator of the estate (the "Estate") of Sam Chen ("Sam" or "Sam Chen"), respectfully submits this memorandum of law in opposition to the motion of Defendants Robert Chen ("Robert"), Otter Audits LLC ("Otter Audits") and RC Security LLC ("RC Security") (together, "Defendants") for judgment on the pleadings and for a stay of discovery.

## PRELIMINARY STATEMENT

Defendants' motion accuses Plaintiff of telling "a false story" in her Complaint, but the story they attribute to Plaintiff is a strawman. Rather than addressing Plaintiff's actual allegations and accepting them as true, Defendants variously ignore, misstate or gainsay the well-pleaded, factual contentions of the Complaint. Along the way, Defendants expound upon principles of law that are not in dispute and improperly attempt to rebut Plaintiff's allegations with conflicting factual assertions and outside documents that are not integral to the Complaint. In the end, the most noteworthy aspect of Defendants' motion is not what it says, but what it omits.

Perhaps the most glaring example of this is Defendants' insistence that "dissolution of OtterSec was required by the Operating Agreement." ECF No. 50 ("Def. Mem.") at 6-8. This argument relies upon a version of OtterSec's operating agreement that Defendants attached to their Amended Answer, which they conspicuously describe as the version that was "applicable at the time of Sam's death." Def. Mem. at 7; ECF No. 49 ("Am. Answer") at 1. Defendants fail to mention, however, that this version of the company's operating agreement *was not in effect at the time Robert Chen dissolved OtterSec.* Robert amended that version of the operating agreement on August 15, 2022, and removed the provision Defendants rely upon, Section 1.3(c). ECF No. 1 ("Compl.") ¶ 98; J.R. Ex. 1 at 0002. It was this amended version of the operating agreement that was in effect when Robert dissolved OtterSec, and it did not require dissolution of the company.

Beyond their reliance on the wrong operating agreement, Defendants' broader focus on Robert's supposed authority to dissolve OtterSec betrays a fundamental misapprehension of

Plaintiff's claims that permeates their entire motion. Whether Robert Chen had the authority to dissolve OtterSec has no bearing on Plaintiff's claims, which are founded upon Robert's subterfuge, bad faith and outright theft of OtterSec under the guise of an illusory dissolution that he foretold on May 10, 2022, before Sam Chen passed away, when he threatened to "dissolve the company and remake it." Compl. ¶ 77. OtterSec may have been dissolved in *form*, but it was not dissolved *properly* and it was not dissolved in *substance*. It continues to exist today as Defendants RC Security and Otter Audits, the entities that Robert established to abscond with the Estate's interest.

Defendants' motion also seeks to exalt form over substance by creating a false dichotomy between harms to OtterSec and the harms to Plaintiff that resulted from Robert's malfeasance. Although controlling law is sparse, persuasive authority recognizes that even if aspects of the asserted claims are premised on harms to OtterSec, Plaintiff may bring them directly, principally for two reasons. First, the entity "OtterSec LLC" has been dissolved. Channeling recovery through the company is no longer feasible and would be pointless, both because of its dissolution and because the only parties with an economic interest in the proceeds of any recovery are before the Court. Second, requiring recovery to proceed at the OtterSec level would place the claims and proceeds of any recovery within the control of the very same wrongdoer – Robert Chen – whose dishonesty and misconduct lies at the heart of this case. Under similar facts, courts (including in Wyoming) have permitted plaintiffs to bring direct actions and pursue direct recovery for their personal harm, and it is both permissible and appropriate to do so here. In any event, Defendants' motion mischaracterizes many of Plaintiff's claims as derivative when they are, in fact, direct.

As to Defendants' remaining arguments, and as further detailed below, there is ample factual detail and legal support for each cause of action asserted by Plaintiff in the Complaint, and there is no basis for a stay of discovery. Defendants' motion should be denied.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

### A.     Defendants' Scheme

OtterSec was born from a friendship between Robert Chen and David Chen. Compl. ¶¶ 17-20. Because David was still a minor at the time OtterSec was formed, his father, Sam Chen, became the co-owner with Robert and they agreed that David would act as Sam's "proxy." Compl. ¶¶ 20-22; ECF No. 31 at 61-62. OtterSec was immediately successful and generated $1.36 million in revenue in just its first few months of operations. Compl. ¶¶ 29, 33.  By April 2022, Robert was projecting the company's revenue to stabilize at $1-2 million per month. Compl. ¶ 33.

The relationship between Robert and David deteriorated in April 2022, and by May 10, 2022, Robert hatched a scheme to "dissolve the company and remake it" unless Sam Chen acceded to Robert's demand that Sam transfer his ownership interest to Robert. Compl. ¶ 77. When Sam refused, Robert put his plan in motion with the assistance of OtterSec's counsel. Compl. ¶¶ 77-82.

In an email sent to Sam and David on May 27, 2022, Iquan Fadaei, the company's attorney, announced that "Robert will be exercising his right to dissolve OtterSec shortly."  Compl. ¶ 82. A week later, Mr. Fadaei circulated a plan of dissolution and a list of the company's assets. Compl. ¶¶ 90-91. Mr. Fadaei stated in his email that Robert "has a right to dissolve the company" "whenever he so decides" based on his "60% ownership interest."  Compl. ¶¶ 90-93. He acknowledged Robert's responsibility to "maximize the value" of OtterSec's assets in connection with the dissolution, but represented that he was "not aware of any "interested third parties." Compl. ¶ 93.

After Sam passed away in a car accident on July 13, 2022, Robert finalized his plan. Compl. ¶¶ 97-99. On September 13, 2022, he secretly formed two companies in South Dakota, Otter Audits and RC Security. Compl. ¶ 100. A week later, on September 20, 2022, Mr. Fadaei announced that Robert had dissolved OtterSec and, thereafter, filed articles of dissolution on October 6, 2022. Compl. ¶¶ 101-02. Then, taking advantage of the gap in time between Sam's death and the

3

appointment of a legal representative for his Estate,[1] Robert proceeded with the wind-down process in secret, leaving Plaintiff to learn through her own investigation that Robert had taken OtterSec's assets and continued the business via Otter Audits and RC Security. Compl. ¶¶ 97-110.

To this day, Plaintiff has received no details of the dissolution of OtterSec or the transfer of its assets to Otter Audits and RC Security. Nor has Plaintiff received any funds. However, accepting the representations Defendants have made thus far, Robert apparently acted as the sole negotiator for a "sale" of OtterSec's assets to himself for an amount and on terms that Defendants have yet to reveal with any specificity. However, according to Defendants, the unspecified amount Robert paid is included in (although apparently does not compromise the totality of) the approximately $820,000 shown in bank statements covering the period of March 1-31, 2023, which Defendants attached to an Amended Answer filed on April 12, 2024. Am. Answer at 1, Ex. 5.

## B.    Robert's Negotiations with Jump

The breakdown in the relationship between Robert and David arose out of Robert's self-dealing discussions with Jump Trading and its affiliate, Jump Crypto (together, "Jump"). Citing to written communications obtained by Plaintiff, the Complaint alleges that Robert had an initial discussion with Jump on or about April 13, 2022, that focused on "being acquired by jump." Compl. ¶¶ 30-34. The next day, Robert provided Jump with financial information and projections for OtterSec and set up a call that was expected to lead to "an offer" from Jump. Compl. ¶¶ 33-34. "Sam and David Chen were not parties to these discussions," and the Complaint describes how Robert lied about and concealed the substance of those discussions from David and Sam. Compl. ¶¶ 35-39.

---

[1] Plaintiff was not appointed personal representative of the Estate until January 30, 2023. Compl. ¶ 7; ECF No. 31 at 71. Mr. Fadaei was kept apprised of the process, which required a court petition because the named executors declined to be appointed. Mr. Fadaei refused to delay dissolution, taking the position that "the Company does not need to await the appointment of a personal representative to wind up." *See* Letter from Iquan Fadaei to JoAnna DeWald dated October 11, 2022.

Citing messages between Robert and David, the Complaint details how Robert, despite pointed questions, mentioned only that he had spoken "to some potential vcs" in an effort to build "connections" with a view towards raising "500k" in exchange for about "2.5% equity." Compl. ¶¶ 36-38. Robert specifically represented that his plan at that point was only to raise money for OtterSec from "friends and family." Compl. ¶ 38. Robert never mentioned Jump or their discussions "about being acquired." *Id.*

A few days later, Robert proceeded with additional discussions with Jump without disclosing them to David or Sam. Compl. ¶¶ 50-65. The Complaint further details, with references to names, dates and times, that between April 18 and May 5, 2022, Robert's discussions with Jump focused on Robert taking "3-5" of OtterSec's "top guys" with him to Jump. *Id.* Robert also introduced OtterSec employees to Jump and negotiated terms for at least two of them who had contracts with OtterSec containing non-competes that Robert told Jump he could "void." Compl. ¶¶ 62-64. Robert falsely claimed to Jump that he had been speaking with David, and that David "would want to stay at osec" to "help manage the remaining people + smooth out the transition." Compl. ¶ 57. To conceal their discussions, Robert asked Jump to use his personal email account for future communications. Compl. ¶¶ 61-63.

David first suspected that Robert was not being forthright following a call that was arranged by Robert with Jump on April 22, 2022. Compl. ¶¶ 53-59, 66-70.  Robert had only recently advised David of his discussions with Jump very generally, describing them as being focused on an "acquihire" of OtterSec by Jump – which David understood in the traditional sense: a purchase of OtterSec by Jump to acquire OtterSec's personnel. Compl. ¶¶ 50-53.  However, David learned for the first time during that call with Jump that the supposed "acquihire" would not be an acquihire at all, and that it would not include him or an acquisition of Sam's membership interest in OtterSec.

5

Compl. ¶ 58. The proposal that was conveyed to David by Jump – as though it was Jump's proposal only, and not one that Robert had already negotiated in secret with Jump – was for Robert to join Jump with William Wang and Kevin Chow, with David remaining at OtterSec to "help manage the remaining people + smooth out the transition." Compl. ¶¶ 57-59.

When David spoke to Robert afterwards, Robert pretended he did not to know about the terms of the proposal and concealed that he had been the one to pre-negotiate it. Compl. ¶ 59. Robert even attempted to persuade David that it would be "very useful to have one of us at jump and the other running osec cause we can funnel audits back." Compl. ¶ 59. David did not believe Robert, and decided on April 27, 2022, to cease any further work for OtterSec. Compl. ¶¶ 67-70.

Robert then attempted to negotiate with David to acquire Sam's interests in OtterSec. Compl. ¶¶ 74, 77. David and Sam insisted that Robert disclose the details of his discussions with Jump, including the terms of any offer Robert received. Compl. ¶¶ 74-76. Robert refused at first and then lied, telling David that "jump made an offer to just me" and that "the details are still up in the air but this is all that I know." Compl. ¶ 76. Unbeknownst to Robert, a mutual acquaintance revealed to David messages he exchanged with Robert on May 28-29, 2022, wherein Robert advised that he had "signed" a deal with Jump that was "structured" as "a partial share acquisition." Compl. ¶¶ 83-85. Robert told the acquaintance that aspects of "the deal" remained open but were expected "to be decided soon," including the OtterSec employees who would be joining him. Compl. ¶¶ 84-85. Robert told the acquaintance that he "should not tell anybody abt this for now." Compl. ¶ 86.

On May 10, 2022, Robert threatened in a message to David that he would "dissolve the company and remake it" if Sam refused to sell his interest in OtterSec. Compl. ¶ 77. He then repeated the threat on May 13, 2022. Compl. ¶¶ 77, 81. Immediately after these communications, Robert put his plan in motion, with the assistance of the company's attorney, Mr. Fadaei,, as set forth above.

6

**C.     OtterSec's Three Operating Agreements**

There were three versions of the operating agreement utilized for OtterSec. The original operating agreement was executed by Robert and Sam on February 14, 2022, after OtterSec was formed (the "Operating Agreement"). Compl. ¶ 22. The Operating Agreement confirmed that OtterSec was member-managed, that Robert and Sam were the only two members of OtterSec, and that each owned a 50% interest in the company. *Id.*

The Operating Agreement was amended on April 16, 2022 (the "First Amendment"). Pursuant to the First Amendment, Sam transferred 10% of his membership interests to Robert, resulting in Robert owning 60% of OtterSec and Sam owning 40%. Compl., ¶ 48. The First Amendment is the version of the company's operating agreement attached to Defendants' Amended Answer.  Am. Answer, Ex. 1. The Complaint seeks rescission of the transfer of Sam's 10% interest to Robert on the basis of Robert's fraudulent misrepresentations and omissions with respect to Jump. Compl. ¶ 143.

As set forth in the Complaint, "Robert executed a further amendment … on August 15, 2022 (the "Second Amendment")." Compl. ¶ 98. The Second Amendment, signed after Sam died but before Robert dissolved OtterSec, removed a provision set forth in Section 1.3(c) of the First Amendment, requiring dissolution upon the death of a member, substituted it with a new provision that required dissolution only upon the "termination of the membership of **_all_** members of the Company" and replaced the former Section 1.4 with a new Section 1.4  stating: "For the avoidance of doubt, the dissociation of a member shall not cause the dissolution of the Company."  Compl., ¶ 98.[2]; J.R. Ex. 1 at 0002 (emphasis added).

---

[2] A covering note from the company's attorney, Mr. Fadaei, forwarding the Second Amendment to Plaintiff's attorney on August 16, 2022, explained the basis for the Second Amendment, stating that "[f]ollowing Sam's death, Robert became the only member of the company and was therefore able to amend the operating agreement."

**D.     Procedural History**

Plaintiff commenced this action on March 31, 2023. The Complaint asserts eight causes of action: (1) unfair competition under Section 43(a) of the Lanham Act as to all Defendants, (2) Declaratory Judgment as to all Defendants, (3) Breach of Fiduciary Duty as to Robert Chen, and Aiding and Abetting Breach of Fiduciary Duty as to Otter Audits and RC Security, (4) Fraud as to Robert Chen, and Aiding and Abetting Fraud as to Otter Audits and RC Security, (5) Misappropriation and Conversion as to all Defendants, (6) Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing as to Robert Chen, (7) Tortious Interference as to all Defendants, and (8) Accounting. Compl. ¶¶ 111-164.

The Complaint pleads subject matter jurisdiction pursuant to both 28 U.S.C § 1331, because Plaintiff has asserted claims arising under the Lanham Act, and 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000 and the parties are citizens of different states. Compl. ¶¶ 11-12. The Complaint pleads that Plaintiff is a citizen of Maryland, that Robert is a citizen of Washington and (as Defendants have confirmed) that Robert is the sole member of the limited liability company defendants, Otter Audits and RC Security. Compl. ¶¶ 7-10.

By Order dated March 11, 2024, the Court denied Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and directed Defendants to file Answers by March 25, 2024.  ECF No. 37. In its Memorandum Opinion, the Court ruled that Plaintiff had established a *prima facie* case that Otter Audits and RC Security are successors to OtterSec, which the Court found to be "a significant issue that underlies the parties' arguments."  ECF No. 36 at pp. 9-14.

Defendants filed their Answer on March 25, 2024. ECF No. 38. By letters dated April 4, 2024, Defendants filed notices of intent to file motions for judgment on the pleadings and to stay discovery. ECF Nos. 43, 44. The Court held a conference on April 9, 2024, following which the Court entered an Order granting Defendants leave to file their motion by April 19, 2024. ECF No.

8

46.  Defendants then filed an Amended Answer on April 12, 2024.  ECF No. 49.  The only change to Defendants' original Answer is the inclusion of selected exhibits, which Defendants rely upon in support of their motion. J.R. Ex. 2 at 0005-7.

**ARGUMENT**

## I.  <u>LEGAL STANDARD</u>

"The standard of review for Rule 12(c) motions is the same as that under Rule 12(b)(6)." *Estate of Alvarez v. Johns Hopkins Univ.*, 373 F. Supp. 3d 639, 641 (D. Md. 2019). "The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff." *Id.* A defendant "may not prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would permit recovery for the plaintiff." *Anderson v. Thomas*, 2022 U.S. Dist. LEXIS 225178, at *12 (D. Md. Dec. 13, 2022). The allegations in the answer "also may be taken as true to the extent they have not been denied or do not conflict with the complaint." *Lefkoe v. Jos. A. Bank Clothiers*, 2008 U.S. Dist. LEXIS 134730, at *12 (D. Md. May 1, 2008).  However, since no reply to an answer is required "all of the factual allegations in an answer are deemed denied." *Id.* (citing Fed. R. Civ. P. 8(b)(6)).

On a Rule 12(c) motion the Court "may consider public documents appropriate for the taking of judicial notice and documents referred to in the complaint and relied upon by the plaintiff in bringing the action." *Lefkoe*, 2008 U.S. Dist. LEXIS 134730, at *14. It is "only those documents incorporated by reference into the complaint [that] may be considered in ruling on a motion for judgment on the pleadings." *Id.* at *16. A court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Mancho v. Select Portfolio Servicing, Inc.*, 2022 U.S. Dist. LEXIS 220501, at *6-7 (D. Md. Dec. 6, 2022). A document is deemed "integral" when "its very existence, and not the mere information it contains, gives rise to

9

the legal rights asserted." *Id.* at *7. As explained by another court, if the rule were otherwise, "a defendant need simply answer the complaint, append to the answer whatever documents it wants, and then move for judgment on the pleadings," which would "engender a sort of abbreviated summary judgment procedure, yet without the formalities that attend proceedings under Rule 56." *Sartin v. Chula Vista, Inc.*, 2019 U.S. Dist. LEXIS 109537, at *13 (E.D. Wisc. July 1, 2019).

Defendants' motion fails to accept Plaintiff's factual allegations as true and improperly relies both on factual assertions in their Amended Answer that conflict with the Complaint and documents that are not integral to the Complaint, which they appended to an Amended Answer filed just prior to filing their motion, ostensibly for the very purpose of using them for this motion.

## II. DEFENDANTS' ARGUMENTS CONCERNING DISSOLUTION RELY ON THE WRONG OPERATING AGREEMENT AND ARE IMMATERIAL

Defendants contend that Plaintiff's second through eighth causes of action "fail" for two reasons. First, they contend that "the Operating Agreement required OtterSec's dissolution once Sam died." Def. Mem. at 7. Second, they argue that "once Sam died, Robert, as the sole surviving member, had the authority to dissolve OtterSec." Id.  Both arguments are unavailing.

### A.  The Second Amendment Was in Effect When Robert Dissolved OtterSec

Defendants' motion omits a key fact: "the Operating Agreement" upon which they rely is the First Amendment and was not in effect when Robert dissolved OtterSec because he amended it with the Second Amendment on August 15, 2022, nearly two months before he dissolved OtterSec on October 6, 2022. Compl. ¶ 98; J.R. Ex. 1 at 0002-3. The Second Amendment "deleted in its entirety" the provision Defendants' rely upon – Section 1.3(c) of the First Amendment – and substituted it with a new provision stating that OtterSec could "continue perpetually" except in the event of the "termination of the membership of **all** members of the Company."  *Id.* (emphasis added). The Second Amendment further "deleted in its entirety" Section 1.4 of the First Amendment, which

10

Defendants also rely upon, and substituted it with a new Section 1.4 stating: "For the avoidance of doubt, the dissociation of a member shall not cause the dissolution of the Company." *Id.*

Robert's authority to adopt the Second Amendment was premised upon the provisions of the Wyoming Limited Liability Company Act (the "Act") providing that "unless the articles of organization or the operating agreement provide otherwise, … The operating agreement may be amended only with the consent of all members." Wyo. Stat. Ann. § 17-29-407(b)(v).  Here, the First Amendment was silent on the issue of amendment and, as Defendants have argued in their motion, upon Sam's death Robert was the only "Member" of OtterSec within the meaning of the Act. Wyo. Stat. Ann. § 17-29-102(a)(xii). Under the Act, any "amendment to the operating agreement made after a person becomes a transferee or dissociated member is effective with regard to any debt, obligation or other liability of the limited liability company or its members to the person in the person's capacity as a transferee or dissociated member." Wyo. Stat. Ann. § 17-29-112(b). Thus, Defendants' reliance on the First Amendment is misguided.

Moreover, Plaintiff alleges specifically that Robert did not dissolve OtterSec because he was "required" to do so. Rather, Robert consistently maintained – beginning ***over two months before*** Sam passed away – that he was dissolving OtterSec because he "has a right to dissolve the company" "whenever he so decides" based on his "60% ownership interest." Compl. ¶¶ 82, 90, 93. Defendants' argument is thus contrary to the allegations of the Complaint, and improper for a Rule 12(c) motion.

**B.  Robert Chen's Authority to Dissolve OtterSec is Irrelevant**

Defendants' argument also misses the mark more broadly insofar as it mischaracterizes Plaintiff's second through eighth causes of action as being "based on the alleged invalidity of the dissolution." Def. Mem. at 7. Whether Robert Chen was "empowered" to dissolve OtterSec is not

the basis of those claims. Plaintiff's claims are founded upon Robert's subterfuge, dishonesty, bad faith and outright theft of OtterSec under the guise of an illusory dissolution.

Under the Act, the members of a member-managed company[3] must discharge *all* of their duties and must exercise *any* rights under the statute or the operating agreement "consistently with the contractual obligation of good faith and fair dealing." Wyo. Stat. Ann. § 17-29-409(d). This "requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Scherer Constr. LLC v. Hedquist Constr., Inc.*, 18 P.3d 645, 654 (Wyo. 2001). "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." *PNS Stores, Inc. v. Cap. City Props., LLC*, 515 P.3d 606, 615 (Wy. 2022) (quotation omitted). The obligations of good faith and fair dealing may "require more than honesty" and violations can include "evasion of the spirit of the bargain" and "abuse of a power." *Id.* Ultimately, "[w]hether there has been a breach of the covenant of good faith and fair dealing is a factual inquiry[.]" *Id.* at 611.

Thus, whether Robert could, in theory, have dissolved OtterSec if he had acted in good faith is beside the point. The Complaint plainly alleges that Robert dissolved OtterSec in bad faith, to deprive the Estate of its rightful interest and steal the company for himself.

Defendants' arguments also ignore Plaintiff's allegations that Robert's scheme was not merely to "dissolve the company" but also to "remake it." As the Court held in its Memorandum Opinion denying Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Plaintiff's allegations establish a *prima facie* case that Otter Audits and RC Security are successors to OtterSec. ECF No. 36 at pp. 9-14. Successor liability recognizes that a "transferee corporation," such as Otter

---

[3] The Operating Agreement and each of the First Amendment and Second Amendment provide in Section 4.1 that "[t]he members are responsible for the management of the Company." Am. Answer, Ex. 1 at 3; J.R. Ex. 1 at 0002-3.

Audits and RC Security, "is merely a continuation or reincarnation of the transferor corporation'; to wit, a change in corporate form, but not in substance, has occurred." *Carrillo v. Borges Constr., LLC*, 2016 U.S. Dist. LEXIS 135556 at *13 (D. Md. Sept. 30, 2016) (quotation omitted).  In other words, even though OtterSec may have been dissolved by Robert in *form*, he did not dissolve it in *substance*. OtterSec continues to exist as Otter Audits and RC Security.

Defendants' argument further overlooks another aspect of Plaintiff's claims, having nothing to do with Robert's "authority" to dissolve OtterSec, which this Court recognized in its Memorandum Opinion denying Defendants' Motion to Dismiss for Lack of Personal Jurisdiction:

> Robert Chen has stated in a declaration that he paid "hundreds of thousands of dollars" to acquire OtterSec's assets upon its dissolution. [ECF No. 31 at 133].  However, where Defendants have conceded in their reply brief that Robert Chen's payment for OtterSec's assets was sent to OtterSec itself, and David Chen has stated in his declaration that neither he nor the Estate "received any distribution of any funds from OtterSec," [ECF No. 31 at 68], the most reasonable inference is that the funds paid by Robert Chen for OtterSec's assets were then returned to him as the controlling member of OtterSec. ***Thus, there are serious questions whether the consideration paid for OtterSec's assets was adequate and whether this purchase was an arm's length transaction.***

ECF No. 36 at p. 12 (emphasis added). Indeed, pursuant to § 17-29-409(b)(ii) of the Act, Robert had a duty to "refrain from dealing with the company in the conduct or winding up of the company's activities as or on behalf of a person having an interest adverse to the company." By failing to refrain from engaging in a self-dealing transaction, it is now Robert's burden to establish that the transaction was fair. *Acorn v. Moncecchi*, 386 P.3d 739, 753 (Wyo. 2016).

Defendants have yet to disclose the precise amount they claim Robert paid for OtterSec's assets and have yet to distribute any funds to Plaintiff, even though they state in their motion that "Robert *admits* that the Estate has a 40% economic interest in Ottersec … and he always has." Def. Mem. at 25.  According to Defendants, whatever amounts Robert paid for OtterSec are included in

13

the approximately $820,000 shown in bank statements attached to the Amended Answer they filed just before filing their motion. Curiously, even though Defendants filed their Amended Answer on April 12, **2024,** the bank statements are for the period of March 1-31, **2023**. Am. Answer at 1, Ex. 5. Defendants are silent as to whether the amounts shown in the *2023* statements remain in the accounts as of *today*. Thus, Defendants' bank account records not only fail to answer the "serious questions" previously raised by the Court, they raise even more of them.[4]

### III. THE ESTATE'S STATUS AS A TRANSFEREE OF SAM CHEN'S MEMBERSHIP INTEREST DOES NOT PRECLUDE PLAINTIFF'S CLAIMS

Defendants' motion argues a point with which Plaintiff does not disagree – Plaintiff is not a "Member" of OtterSec as that term is defined in the Act and is instead a "transferee" of Sam's interest. However, Plaintiff does disagree with Defendants' analysis of Plaintiff's rights as a transferee, which argues that the Estate has not been harmed and, even if the Estate has been harmed, has no remedy available to it for Defendants' misconduct.  Def. Mem. at 8-11.

#### A.  Plaintiff Has Direct Claims for Breach of Fiduciary Duty, Breach of Contract and Tortious Interference

##### 1.  *Breach of Fiduciary Duty*

Defendants concede on page 16 of their brief that Robert owed "a fiduciary duty to Sam during Sam's lifetime."  Def. Mem. at 16. However, Defendants are incorrect that "the only direct harm to Sam the Complaint alleges is Sam's transfer of 10% of his interest to Robert." *Id.*

The Complaint alleges that Robert first announced his scheme to "dissolve the company and remake it" on May 10, 2022, and then repeated it again on May 13, 2022. Compl. ¶¶ 77, 81.  When Sam refused to transfer his interests, Robert put his plan in motion by no later than May 27, 2022,

---

[4] Whatever Robert may have paid for OtterSec appears to be a fraction of its actual value, given the $1.36 million in revenue the company generated in its first few months of operations and Robert's projections that revenue would stabilize at $12-24 million annually. Compl. ¶¶ 29, 33.

14

when Mr. Fadaei announced that "Robert will be exercising his right to dissolve OtterSec shortly." Compl. ¶ 82.  A week later, on June 4, 2022, Mr. Fadaei circulated a proposed plan of dissolution and initial list of the company's assets, which included the assets that Robert eventually took for Otter Audits and RC Security. Compl. ¶¶ 90-91. Robert, therefore, had taken substantial steps to dissolve OtterSec *before* Sam died, based on his position that he "has a right to dissolve the company" "whenever he so decides."  Compl. ¶¶ 90-93. The additional details of what else actually transpired outside of Plaintiff's view remains a mystery, and is properly the subject of discovery.

These allegations are detailed in the Complaint, they form part of the basis of Plaintiff's breach of fiduciary duty claim, they are based on Robert's "fiduciary duty to Sam during Sam's lifetime," and they allege a direct harm. *Wallop Canyon Ranch, LLC v. Goodwyn*, 351 P.3d 943, P53 (Wyo. 2015) ("It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.") (quoting *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989)).

Moreover, Robert owed duties to the Estate in connection with the dissolution of OtterSec. Under the Act, Robert owed a "duty of care … in the conduct and winding up of the company's activities" to "act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner the member reasonably believes to be in the best interests or at least not opposed to the best interests of the company." Wyo. Stat. Ann. § 17-29-409(c). Wyoming law also recognizes an "informal fiduciary relationship," sometimes referred to as a "confidential relationship," can be "implied in law due to the factual situation surrounding the involved transaction, and the relationship of the parties to each other and to the transaction." *Johnson v.*

15

*Reiger*, 93 P.3d 992, 999 (Wyo. 2004) (holding "sufficient evidence was presented to overcome the motion for judgment as a matter of law" where the defendant owed an implied-in-law duty "based upon the relationship of the parties to each other and the transaction … derive[d] from the evidence presented that the [defendants] undertook to act with the [plaintiffs'] benefit in mind and, by that undertaking, assumed a duty of honest advice and full disclosure.").

Although not proper to decide on a motion for judgment on the pleadings, the Court could certainly find on the basis of the facts alleged that Robert owed such a duty to the Estate, particularly given his decision to speak to Plaintiff about the dissolution of OtterSec. *Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 786 (Wyo. 2019) ("[E]ven if someone is not under a duty to speak, if he does speak, he is under a duty to speak truthfully and to make a full and fair disclosure.").

### 2. *Breach of Contract*

Plaintiff also has direct claims for breach of contract which are based in part upon Section 8.1 of the Operating Agreement, First Amendment and Second Amendment. Compl. ¶ 151-52. That clause prohibited the members of OtterSec from dissolving OtterSec "for a loss of membership interest." Compl. ¶ 78. Robert's threat on May 10, 2022, to "dissolve the company and remake it" unless Sam agreed to transfer his interests to Robert, which Robert repeated again on May 13, 2022, and thereafter put in motion, equated to a repudiation of his obligations under Section 8.1. *Roussalis v. Wyoming Med. Ctr., Inc.*, 4 P.3d 209, 254 (2000) ("A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of its obligations under the contract. … Furthermore, if a party wrongfully states that it will not perform unless the other party consents to a modification of the contract, the statement is a repudiation.") (quoting Farnsworth on Contracts § 8.21, 474-79 (1990)). A repudiation "gives the injured party an immediate claim to damages for total breach." *Id.* (quoting Farnsworth on Contracts § 8.20, at 470).

16

Defendants' argument also fails to consider Plaintiff's direct claim for breach of the implied covenant of good faith and fair dealing, which is properly set forth in the cause of action for breach of contract (Compl. ¶ 155) because, under Wyoming law, "parties to a commercial contract may bring a claim for breach of the implied covenant of good faith and fair dealing based on a contract theory." *PNS Stores, Inc*., 515 P.3d at 615 (quotation omitted).

### 3.   *Tortious Interference*

Plaintiff has a direct claim for tortious interference based upon a direct harm: Robert's theft of OtterSec. Under Maryland law,[5] the elements of the tort of interference with contractual or business relationships are: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes  malice); and (4) actual damage and loss resulting." *Lyon v. Campbell*, 707 A.2d 850, 859-60 (Md. Ct. Sp. App. 1998). Here, Robert wrongfully interfered with Plaintiff's interest in OtterSec and OtterSec's business, by virtue of intentional and wrongful acts – the theft of Plaintiffs' interest in OtterSec – that began prior to Sam's death and are continuing today.

### B.   A Direct Action and Recovery is Authorized and Appropriate

Insofar as any of Plaintiff's claims allege what would otherwise appear to be traditionally derivative harms, they may still be pursued directly on the basis of the facts alleged.

Courts have recognized that there are many circumstances in which harms appearing to be derivative can support a direct action. For example, courts in Delaware have held that "a plaintiff

---

[5]  "When … exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Botts v. Johns Hopkins Univ.*, 2021 U.S. Dist. LEXIS 76788, at *15 (D. Md. Apr. 21, 2021). Maryland's choice of law rules apply "the law of the place where the tort or wrong was committed," which is "the place of injury." *Auto USA, Inc. v. DHL Express (USA), Inc.*, 2018 U.S. Dist. LEXIS 30084, at *5 (D. Md. Feb. 26, 2018).

can bring a direct claim challenging a merger that results, in whole or in part, from conduct that otherwise might be viewed as giving rise to a derivative claim" to the extent that the plaintiff has also been injured directly. *Goldstein v. Denner*, 2022 Del. Ch. LEXIS 125, at *7-8 (Del. Ch. June 2, 2022); *see also id.* at *31 ("The weight of Delaware authority has … recogniz[ed] that a stockholder can assert a direct claim challenging a merger based on … breaches of fiduciary duty that resulted in either an unfair price or an unfair process.").

Direct actions and investor-level recovery have also been held to be appropriate where "the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control"; where "an investor-level recovery could be more narrowly tailored to benefit only 'innocent" stockholders'"; and where "the entity is no longer an independent going concern, such that channeling the recovery through the corporation is no longer feasible or a *pro rata* recovery is more efficient." *Id.* at *44-45; *id.* at *44 ("Because a claim for breach of fiduciary duty is fundamentally a creature of equity, the court has the power to craft a remedy that is appropriate based on the specific facts and equities of the case" which may include an individual cause of action and remedy); *see generally id.* at *31-45 n.9, n.11, n.16 (collecting caselaw from many jurisdictions describing circumstances in which direct actions or recovery by individual owners or shareholders is appropriate). The Supreme Court of Wyoming has recognized similar principles. *See Lynch v. Patterson*, 701 P.2d 1126, 1131-32 (Wyo. 1985) ("Direct recovery assures that [the minority-owner plaintiff] will reap some benefit from his lawsuit. We refuse to order payment into the corporate treasury in this case and risk necessitating a subsequent suit … to compel the directors to declare a dividend or apply the funds to legitimate corporate purposes").

Direct actions have been found to be especially appropriate when a company has ceased business operations or entered liquidation. *See Goldstein*, 2022 Del. Ch. LEXIS 125, at *45 n.18

(collecting cases from Delaware and elsewhere in which courts permitted investor-level recovery because "the entity is no longer an independent going concern"); *see also Bamford v. Penfold, L.P.*, 2022 Del. Ch. LEXIS 147, at *146 (Del. Ch. June 24, 2022) ("The rule that calls for the investor to sue derivatively in the corporation's name and for the corporation to receive the recovery 'must always yield to the requirements of equity, and is cast aside in view of the fact that the stockholders are the real beneficiaries whenever the usual course is not open.'"). Further, "a direct action may be appropriate to provide a remedy to shareholders who have been injured and who would not recover under the traditional rules governing derivative actions." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1060 (9th Cir. 2015) *as amended*.

Many facts alleged in the Complaint weigh heavily in favor of reaching a similar conclusion. First, OtterSec has been dissolved.  It is no longer a going concern, such that channeling the recovery through the company would be feasible or even logical, as any recovery for OtterSec would be required to be paid out to the only parties with an economic interest in the company, Robert and the Estate. Thus, at this point, there can be little to no practical distinction between direct and derivative harm. Second, as Defendants themselves contend that Robert is the only person with managerial authority, requiring recovery to first proceed at the OtterSec-level would place the claims and recovery within the control of the wrongdoer – Robert. Thus, the same reasoning that led the Wyoming Supreme Court in *Lynch v. Patterson* to allow for direct recovery by the plaintiff in a derivative case applies with equal force here: Direct recovery would ensure that Robert cannot evade or benefit from his own wrongdoing.  Indeed, because there are only two parties with any interest in OtterSec, Robert and the Estate, there is no other party that can bring a derivative lawsuit; Robert would be rewarded for his own misconduct, and Plaintiff would have no remedy.

19

The cases cited by Defendants do not support a contrary conclusion, as they involve situations where the company continued to exist or a derivative remedy was available to the plaintiffs.  For instance, *Fritchel v. White*, 452 P.3d 601 (Wyo. 2019), involved a limited partnership that was in the process of being dissolved but for which a derivative remedy was available.  And while Defendants cite to that case for its statement that the Wyoming Supreme Court has "never strayed from the rule that derivative injuries must be remedied by derivative actions," *see* Def. Mem. at 12, they omit that (a) immediately preceding that statement, the Court acknowledged that its "precedent on direct versus derivative actions is limited," and (b) the Court's later statement that "even if [the Wyoming Court] adopted the [American Law Institute's Principles of Corporate Governance] § 7.01(d) principles [allowing some derivative injuries to be asserted in a direct action] or some similar rule, application of such principles would not save Appellants' direct cause of action," and thus the Court saw "no reason to deviate" from the general rule regarding direct versus derivative actions.  *See Fritchel*, 452 P.3d at 606.

In other words, the Court in *Fritchel* did not say that Wyoming law would always prohibit derivative injuries to be remedied through a direct action under all circumstances, but rather indicated that *Fritchel* was not the case to adopt a rule sometimes allowing derivative injuries to be remedied through direct action. In fact, in *Lynch v. Patterson*, the Wyoming Supreme Court specifically held that equity allowed for direct recovery under circumstances similar to the case here, *see* 701 P.2d at 1131-32, and the Act which applies in this case expressly provides that it is supplemented by "the principles of law and equity." Wyo. Stat. Ann. § 17-29-107(a).  The Act and facts as alleged in this case thus support allowing Plaintiff to bring her claims directly.

## IV. PLAINTIFF ADEQUATELY ALLEGES PLAUSIBLE CLAIMS FOR EACH CAUSE OF ACTION PLEADED IN THE COMPLAINT

### A. Lanham Act

Defendants' motion raises three arguments in support of their request for dismissal of Plaintiff's first cause of action alleging violations of Section 43(a) of Lanham Act. First, they contend that the Complaint pleads a derivative claim. Second, and relatedly, Defendants contend that Plaintiff has no direct claim. Third, Defendants argue that the claims should be dismissed as against Robert because Plaintiff "has not alleged facts providing a sufficient basis for the Court to pierce the corporate veil and hold him liable for conduct by" Otter Audits and RC Security.

As to Defendants' first two arguments, although the Complaint alleges claims under the Lanham Act that would traditionally be deemed derivative harms, for the reasons set forth above, the facts alleged in this case support allowing Plaintiff to pursue her claims and any recovery directly. With respect to Defendants' third argument, Plaintiff does not need to allege veil piercing. In paragraph 13 of the Second Declaration of Robert Chen, filed by Defendants in support of their Motion to Dismiss for Lack of Personal Jurisdiction, Robert states:

> On September 24, 2022, I personally purchased a number of OtterSec's assets, including intellectual property rights in OtterSec's logos, website, social media accounts, code, and computers. I also purchased the right to a cryptocurrency wallet containing OtterSec's funds, and where future funds owed to OtterSec were expected to be received.

ECF No. 31 at 133. Robert does not indicate that he is listing every asset that he "personally purchased," and goes on to state in paragraph 18 that certain of the assets he purchased "were contributed to RC Security." *Id.* at 134. Robert then continues in paragraph 19, stating that "certain of these RC Security assets … have been used by Otter Audits pursuant to a licensing agreement with RC Security." *Id.* He further muddies the waters in paragraphs 20 and 21, stating that he has "worked for RC Security as an independent contractor" since 2022 and that "Otter Audits contracts

21

with RC Security for my services through an Independent Contractor Agreement." *Id.* No support has been provided for any of these statements, which raise a number of factual issues as to who among the Defendants actually owns or is using OtterSec's assets and, thus, who has directly (*i.e.*, not through veil piercing) violated the Lanham Act, that cannot be resolved on this motion.

### B. Declaratory Judgment

Defendants make multiple arguments in support of dismissal of Plaintiff's second cause of action for a declaratory judgment, all of which are unavailing.

First, Defendants contend that "the Declaratory Judgment Act (DJA) is not available as a basis for jurisdiction." Def. Mem. at 28. But jurisdiction in this case is not founded upon the DJA. It is founded upon both 28 U.S.C § 1331 and 28 U.S.C. § 1332, because Plaintiff has asserted a Lanham Act claim and the amount in controversy exceeds the sum or value of $75,000 and is between citizens of different states. Compl. ¶¶ 11-12.

Second, Defendants mistakenly contend that "the DJA cannot function as a standalone cause of action" because "Plaintiff has failed to adequately plead any of its other claims" and because "the Complaint does not establish plausible grounds for the relief it seeks – a declaration of the Estate's ownership interest in Otter Audits and RC Security." Def. Mem. at 28. As set forth throughout this memorandum, Defendants are incorrect that Plaintiff has not adequately pleaded its other claims, and the question of whether Plaintiff has established "plausible grounds" for a declaration of the Estate's ownership interest in Otter Audits and RC Security was already decided by the Court when it denied Defendants' prior motion to dismiss and held that Plaintiff had established a *prima facie* case that Otter Audits and RC Security are successors to OtterSec. ECF No. 36 at pp. 9-14.

Third, Defendants challenge Plaintiff's request for the imposition of a constructive trust over the Estate's rightful interest in Otter Audits and RC Security, arguing that "these doctrines are

traditionally used to argue that a corporation would be liable for another entity's debts or liabilities." Def. Mem. at 29.  Constructive trust is not so limited.  Under Maryland law (which applies, as the law of the forum state), constructive trust is a remedy employed "to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property." *Starleper v. Hamilton*, 666 A.2d 867, 869 (Md. Ct. Sp. App. 1995); *see also Levin v. Levin*, 405 A.2d 770, 777 (Md. Ct. Sp. App. 1979) ("A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence, or mistake, or through a breach of fiduciary duty, or through wrongful disposition of another's property.").

This is precisely what Plaintiff alleges, and because the Court has broad discretion to grant "[f]urther necessary or proper relief based on a declaratory judgment or decree … against any adverse party whose rights have been determined by such judgment," (28 U.S.C. § 2202), it plainly has the power to impose a constructive trust over the Estate's rightful interest in Otter Audits and RC Security.

### C.  Breach of Fiduciary Duty

Defendants' motion improperly relies upon factual assertions in their Amended Answer and a document appended to their Amended Answer that is not integral to the Complaint to argue that Plaintiff does not "plausibly allege" a claim for breach of fiduciary duty by Robert.

First, Defendants' argument is premised upon the mistaken assumption that Plaintiff's claim with respect to the transfer of 10% of Sam's interest in OtterSec alleges simply that Robert did not advise David or Sam of the *fact* of Robert's call with Jump prior to April 18, 2022. In truth, Plaintiff's claim is premised upon Robert's misrepresentations and omissions concerning the *substance* of his discussions with Jump, which the document they rely upon (a generic Discord message from April

12, 2022) does nothing to refute. As the Complaint details, (a) Robert had a discussion with Jump on or about April 13, 2022, that focused on "being acquired by jump,"; (b) Robert provided Jump with financial information and projections for OtterSec on April 14, 2022, and set up a call with the President of Jump that was expected to lead to "an offer,"; and (c) "Sam and David Chen were not parties to these discussions." Compl. ¶¶ 30-35. The Complaint also describes how Robert lied about and concealed these discussions. Citing to messages exchanged between Robert and David just after Robert spoke with Jump, the Complaint alleges how Robert, despite questions from David,[6] mentioned only that he was "talking to some potential vcs" in an effort to build "connections." Compl. ¶¶ 36-38.  The Complaint then alleges:

> Robert misrepresented and failed to disclose the highly material facts that he was keenly aware of - namely, that (a) the "company" he had been "connected" with that day was Jump, (b) Jump was interested in acquiring OtterSec, (c) Robert had already provided Jump with financial details concerning OtterSec's revenue and profitability, (d) Robert's discussions with Jump were being elevated to a forthcoming call with Mr. Kariya, the President of Jump Crypto, scheduled for April 18, 2022, and (e) if the call with Mr. Kariya went well, the next step would be "an offer" from Jump.

Compl. ¶ 39. As a fiduciary, Robert owed duties of candor and full disclosure. *See Squaw Mountain Cattle Co. v. Bowen*, 804 P.2d 1292, 1297 (Wyo. 1991) (fiduciary's "lack of candor by itself amounts to a breach of his duty"). These duties are particularly salient where a party makes selective disclosures because, "even if someone is not under a duty to speak, if he does speak, he is under a duty to speak truthfully and to make a full and fair disclosure." *Mantle*, 437 P.3d at 786.

---

[6] Robert's misrepresentations to David, whom he knew to be acting as Sam's agent, are equivalent to misrepresentations to Sam. *See CX Reins, Co. v. Leader Rlty. Co.*, 252 F. Supp. 3d 439, 446 (D. Md. 2017) (knowledge gained by agent may be considered knowledge of the principal.); *Fox v. DRA Services, LLC*, 2012 U.S. Dist. LEXIS 202767, at *11 (D. Wyo. May 17, 2012) ("It is general rule of the law of agency that knowledge of the agent will be imputed to the principal[.]").

Plaintiff's allegations are thus far from "implausible." The Complaint details Sam's and David's good faith reasons for proposing to transfer the 10% interest to Robert; they thought it might "appease Robert and help to resolve any disharmony over David's inability to dedicate himself to OtterSec full-time, which he believed would benefit the company." Compl. ¶ 44. Sam and David had no reason to suspect that Robert was not also acting in good faith, or that Robert was already (only two months into their business relationship) engaging in self-dealing and lying about it. Nor was it unreasonable (or implausible) for David and Sam to have relied on the fact that Robert owed fiduciary duties, and assume that he was complying with them, when they agreed to transfer the 10% to him for no consideration.

Finally, as to the improper dissolution of OtterSec, as discussed above, the Complaint details how Robert took steps to wrongfully dissolve OtterSec in violation of his duties prior to Sam's death. Thus, the Complaint has plausibly alleged a claim for breach of fiduciary duty as to Robert.

### D. Aiding and Abetting

Defendants' argument that Plaintiff's aiding and abetting breach of fiduciary duty claim fails against Otter Audits and RC Security is based on the incorrect premise that the Complaint does not state predicate claims against Robert. Again, Defendants' assertion that the fiduciary duty Robert owed to Sam "ceased to exist at Sam's death, before the existence of" Otter Audits and RC Security disregards Plaintiff's allegations that Robert breached his fiduciary duties to Sam *prior* to his death, as detailed above. And in the case of at least one of those breaches – Robert's actions beginning in May 2022 to "dissolve the company and remake it" – Otter Audits and RC Security both had knowledge of those actions (through Robert, their only member) and provided substantial assistance to Robert by serving as the vehicles Robert used to steal OtterSec. Further, because the allegations in the Complaint allow the Court to find that Robert owed and violated a duty of care to Plaintiff in

25

connection with the dissolution of OtterSec, Plaintiff also has an aiding and abetting claim against Otter Audits and RC Security based on a breach of that duty owed to the Estate.

### E.  The Complaint Adequately Alleges Fraud and it is Not Barred by Laches

Maryland, not Wyoming, law applies to Plaintiff's fraud claim because it is a tort claim and the place of injury is Maryland. *Auto USA, Inc.,* 2018 U.S. Dist. LEXIS 30084, at *5. Where, as here, a fraud claim is based on a duty to disclose, a plaintiff must ordinarily allege that: (1) the defendant owed a duty to plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in reliance on the concealment; and (5) the plaintiff suffered damages as a result of the concealment. *Castle v. Capital One, N.A.*, 2014 U.S. Dist. LEXIS 4923, at *16 (D. Md. Jan. 15, 2014). Plaintiff alleges each of these elements with the particularity required under Fed. R. Civ. P. 9(b).

Fed. R. Civ. P. 9(b) generally only requires pleading "the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby." *See Chambers v. Buick GMC, LLC*, 43 F. Supp. 3d 575, 621 (D. Md. 2014).  This requirement is simply to provide defendants with sufficient notice of the basis of the claim, and courts "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial and (2) that plaintiff has substantial prediscovery evidence of those facts." *Smith v. Clark/Smoot/Russell, a JV*, 796 F.3d 424, 432 (4th Cir. 2015) (quotation omitted).

Plaintiff has easily met this standard and Defendants' argument that the Complaint does not satisfy the particularity requirements of Fed. R. Civ. P. 9(b), and that it "does not identify a single misrepresentation that Robert plausibly 'intended to induce' Sam to act upon and on which Sam relied" in connection with the transfer of his 10% interest to Robert, is baseless. As set forth above,

the Complaint alleges dates, names and contents of communications – including, in most cases, direct quotes regarding Robert's misrepresentations and omissions concerning to the substance of his discussions with Jump prior to the First Amendment and associated transfer of Sam's 10% interest. Compl. ¶¶ 30-49.

As set forth above, Defendants' argument is also premised in significant part upon the mistaken belief that Plaintiff's claim with respect to the transfer is founded upon Robert's failure to advise David or Sam Chen of the *fact* of Robert's discussions with Jump, and not the *substance* of them. Robert owed a duty to be truthful, particularly once he chose to speak. Whether David or Sam might have been aware of the *fact* that Robert was having discussions with Jump is irrelevant; the Complaint clearly alleges that Robert deceived David and Sam as to the *substance* of those discussions. *See* Compl. ¶¶ 44-49.

Defendants' argument that the fraud claim fails because David suggested the transfer would add an element of fraud that does not exist.  The issue is not whether Robert "intended his comments to David to induce David, let alone Sam, to accept a deal Robert had no idea David was contemplating." Def. Mem. at 21.  Rather, the issue is (a) whether Robert intended to defraud or deceive David and Sam, and (b) whether Robert and Sam took action in justifiable reliance on the concealment. By concealing the *substance* of his conversations with Jump, Robert intended to deceive Sam and David.  In reliance on their reasonable belief that Robert was acting in good faith and in accordance with his fiduciary duties, Sam and David agreed to amend the Operating Agreement and transfer 10% of their interest to Robert. As alleged, if they had known the truth, they clearly would not have given him 10% of their interest in OtterSec for no consideration.

Defendants' laches argument lacks merit.  Maryland recognizes "no inflexible rule as to what constitutes, or what does not constitute, laches; hence, its existence must be determined by the facts

27

and circumstances of each case." *Lamone v. Schlakman*, 153 A.3d 144, 154 (Md. Ct. App. 2016) (quotation omitted). "When considering whether the affirmative defense of laches has been established this Court is faced with both questions of fact and law." *Ademiluyi v. Egbuonu*, 215 A.3d 329, 349 (Md. Ct. App. 2019). Generally, laches only applies "where a party unreasonably delays an assertion of his or her rights that prejudices an opposing party." *Id.* at 355. "If the opposing party is unable to establish that the delay resulted in prejudice, laches will not bar a purely equitable action." *Id.*

Defendants set forth no argument whatsoever supporting inexcusable delay, because they cannot. The First Amendment was signed by Sam on April 16, 2022. The facts supporting Plaintiff's fraud claim trickled out in the following months and Plaintiff filed this action less than one year afterward, on March 31, 2023. To the extent there was any delay despite the fact that less than a year passed between the fraudulent transaction and the filing of the Complaint, that delay is excusable because, in those intervening months, Sam Chen passed away in July 2022, requiring the appointment of an administrator – which did not occur until January 2023.

Moreover, Defendants' claim of prejudice is not credible. Defendants argue that, in hindsight, if Plaintiff had simply objected earlier, Robert "could have remedied this supposed objection back in April 2022 had he known about because Robert could have set up calls between Sam and Jump, or had a conversation with Sam about the transfer, for instance." Def. Mem. at 22. In other words, Defendants' prejudice argument is that if Robert had known that Plaintiff would object to Robert's lies and self-dealing behavior, he would not have engaged in it. This is essentially the thief complaining that if he had known the victim would object to the theft, he would not have stolen the goods. The absence of any credible claim of prejudice is thus glaringly obvious and Defendants' defense of laches does not bar Plaintiff's well pled fraud claim.

28

### F. Misappropriation and Conversion

In arguing that Plaintiff has failed to state a claim for misappropriation and conversion, Defendants again misstate Plaintiff's allegations. It is immaterial that Robert does not dispute that the Estate had an interest in OtterSec, as Defendants argue. Def. Mem. at 26. The misappropriation and conversion claim is based on the fact that Robert improperly dissolved OtterSec, took OtterSec's assets and its entire business for himself, that Otter Audits and RC Security are now that business, and Plaintiff's interest has thus been stolen. Compl. ¶¶ 146-50.  As set forth in the Complaint and found by the Court, Plaintiffs have alleged that Otter Audits and RC Security are successors to OtterSec, and thus the Estate has lost its interest because it currently has no interest in those entities. *See* ECF No. 36 at pp. 9-14; Compl. ¶¶ 5, 103.

Further, and as set forth above, while Defendants contend that Robert paid for OtterSec's assets he has the burden to show the fairness of that self-dealing transaction. Wyo. Stat. Ann. § 17-29-409(b)(ii); *Acorn*, 386 P.3d at 753. Defendants' reliance in their April *2024* Amended Answer upon a March *2023* bank statement, which they claim includes the unspecified amounts Robert paid for OtterSec's assets, does not sustain his burden and, in fact, raises the further questions of whether those funds are still there or whether Defendants have now also converted and misappropriated the funds that were in that account.

Defendants' argument that the Estate could have bid on OtterSec's assets is similarly unavailing. While Defendants cite to the Complaint for this contention, Def. Mem. at 26 (citing Compl. ¶ 102), that paragraph of the Complaint simply alleges that OtterSec's counsel emailed Plaintiff's and David's attorney on September 20, 2022, advising them that there would be a sale of OtterSec's assets and included a list of those assets.  Compl. ¶ 102.  Notably, David was still a minor, Sam had already passed away, and no representative of the Estate with authority to act for it had

been appointed.  Accordingly, nowhere does the Complaint allege that the Estate had the *ability* or the *opportunity* to bid on the assets, and any argument by Defendant to the contrary raises issues of fact that are beyond the pleadings and inappropriate for a Rule 12(c) motion.

Finally, Defendants' argument that the Estate's failure to allege that it demanded the return of the property is somehow fatal to their claim is simply wrong, since there is no requirement to make a demand under the facts alleged in the Complaint – wherein Plaintiff plainly alleges that she seeks the return of property wrongfully taken. Indeed, as stated in the case relied upon by Defendants, a demand for the return of the property is only required when "the defendant lawfully, or at least without fault, obtained possession of the property."  *See Motzko Co. USA, LLC v. A&D Oilfield Dozers*, 316 P.3d 1177, 1182 (Wyo. 2014); *see also Donegal Assocs., LLC v. Christie-Scott, LLC*, 241 A.3d 1011, 1024 (Md. Ct. Sp. App. 2020).

Plaintiff has alleged that Defendants knowingly stole its interest in OtterSec by wrongfully dissolving OtterSec and misappropriating it for themselves. This states a claim.

### G.  Breach of Contract

Defendants also argue that Robert's improper dissolution of OtterSec could not have caused Plaintiff to lose her membership interest because he admits that Plaintiff retains an economic interest in OtterSec. Def. Mem. at 25.  But this again misses the point. The economic interest to which Robert admits is the Estate's interest in the sale of OtterSec's assets by Robert to Robert at a price and on terms that he has failed to disclose, much less sustain his burden of showing how it was fair. Further, Defendant's argument fails to consider Plaintiff's allegations that OtterSec is now Otter Audits and RC Security, and that Robert's actions have deprived the Estate of that interest.[7]

---

[7] To the extent Robert argues that Plaintiff cannot state a claim for breach of contract on the grounds that it is derivative in nature, Def. Mem. at 27, that argument is addressed above.

Defendants also argue that Plaintiff cannot allege that Robert breached the implied covenant of good faith and fair dealing because he was exercising rights to which he was contractually entitled in that he "properly dissolved OtterSec." Def. Mem. at 25. But this completely ignores the essence of Plaintiff's claims. While Robert might have been entitled to <u>properly</u> dissolve OtterSec, that is not what he did. Robert <u>improperly</u> dissolved OtterSec to steal its assets for himself and continue the OtterSec business under a different corporate form in which Plaintiff has been denied an interest. Plaintiff has thus stated a claim for breach of the implied covenant of good faith and fair dealing that is incorporated into the company's operating agreement by statute. Wyo. Stat. Ann. § 17-29-409(d).

### H.  Tortious Interference

Defendants' argument that the claim for tortious interference should be dismissed is a regurgitation of arguments made elsewhere in their motion which have already been refuted. Defendants' primary argument is that the claim for tortious interference is derivative and not direct in nature. Def. Mem. at 27 (arguing that tortious interference claim fails because Estate did not have a business relationship, rather it was OtterSec). However, for the reasons set forth above, the Complaint has both stated a direct claim and should be allowed to assert any otherwise derivative claim directly under the circumstances presented here.

Similarly, Defendants' arguments that they did not do anything improper because David knew of Robert's conversations with Jump and the dissolution was not improper, *see* Def. Mem. at 27, are discussed above. By lying about the *substance* of his conversations with Jump and then dissolving OtterSec to steal the company, Defendants acted improperly.[8]

---

[8] Defendants do not dispute that the Complaint adequately alleges the other elements of a claim for tortious interference, they simply argue that the claim is derivative, not direct.

## I.  The Complaint States a Claim Against the Corporate Defendants

Defendants argue that the claims for tortious interference against Otter Audits and RC Security "alleges no tortious conduct."  Def. Mem. at 27.  But for all the reasons stated above, the Complaint *does* adequately allege that Robert committed several torts, and that he is using Otter Audits and RC Security to commit them with him. Indeed, just as Robert has wrongfully interfered with Plaintiff's interest in the OtterSec's business, so too are Otter Audits and RC Security because they have taken that business and the Estate is being denied its rightful interest in it.

## J.  Accounting

Defendants' argument that Plaintiff has not stated a claim for an accounting makes no sense, because they admit elsewhere in their motion that, at a bare minimum, Plaintiff has a statutory right to an accounting from the date of OtterSec's dissolution pursuant to §§ 17-29-504 and 17-29-502(c) of the Act. *See* Def. Mem. at 9.

Plaintiff is also entitled to seek an equitable accounting, which she seeks as a remedy in paragraph E in the "Request for Relief" section on page 33 of the Complaint (ECF No. 1), and is available where (1) there are "mutual accounts" between the parties, (2) the accounts are on "one side, but there are circumstances of great complication, or difficulties in the way of adequate remedy at law," and (3) a duty rests on the defendant to render an account.  *See Sol v. M&T Bank*, 2024 U.S. Dist. LEXIS 15344, at *37 (D. Md. Oct. Jan. 29, 2024).  Defendants do not dispute that Plaintiff has alleged these elements, nor could they.[9]  Rather, Defendants simply argue that the availability of a remedy at law should preclude a request for an accounting, and contend as a issue of fact that the accounts are not so complicated as to merit an accounting.  Def. Mem. at 28.

---

[9] In order to seek an accounting, a plaintiff is not required to allege a fiduciary relationship. Rather, a party may obtain an accounting where the parties were in a business relationship and the defendant deprived the other of access to the business's financial information or financial reports. *See Sol*, 2024 U.S. Dist. LEXIS 15344, at *38.

Defendants' argument also ignores the distinction between a remedy and a claim.  Under Maryland law, an equitable accounting is available as a potential remedy where "a plaintiff has alleged independent causes of action that survive a motion to dismiss."  *Sol*, 2024 U.S. Dist. LEXIS 15344, at *37. Thus, it is a prerequisite to a request for an accounting that a plaintiff have a claim which survives a motion to dismiss, and therefore, the fact that Plaintiff's claims survive the instant motion does not mean that Plaintiff cannot seek an accounting.

Moreover, while an equitable accounting is generally available only if remedies at law are inadequate, *see e.g. Sol*, 2024 U.S. Dist. LEXIS 15344, at *37, a plaintiff may plead such a theory in the alternative, *see e.g.* Fed. R. Civ. P. 8(d)(2).  The question of whether the accounts between the parties are so "complicated in nature" as to merit an equitable accounting is a question that at best raises factual issues that are incapable of being decided on the basis of the pleadings alone.  *See Schmidt v. Wells Fargo Bank, N.A.*, 2020 U.S. Dist. LEXIS 26586, at *15 (M.D. Fla. Feb. 14, 2020) ("Given that the determination of whether a transaction is sufficiently complex [to support an equitable accounting] is fact-specific, such determination is better left for the summary judgment stage."). Thus, there is no bar to Plaintiff pleading her request for an equitable accounting.

## V.  DEFENDANTS' REQUEST FOR A STAY SHOULD BE DENIED

Defendants have requested that discovery be stayed pending the outcome of their motion to dismiss. That request should be denied since (a) their motion should be denied, (b) this motion is Defendants' *second* motion filed under Rule 12, and (c) discovery has already commenced pursuant to the Scheduling Order entered by the Court on March 26, 2024. ECF No. 39.  Plaintiff filed her complaint more than a year ago, on March 31, 2023, and, notably, while Defendants have brought this motion under Rule 12(c), they could have made each and every argument they have made on

33

this motion in the motion they previously filed under Rule 12(b).  Discovery should not be stayed because of Defendants' afterthought, which has led to the filing of serial pleadings motions.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to dismiss be denied.  However, if and to the extent that the Court identifies any deficiencies in the Complaint, Plaintiff respectfully requests leave to amend in order to remedy them. *Gomez v. Heights Sch.*, 2023 U.S. Dist. LEXIS 195728, at *12 (D. Md. Nov. 1, 2023) ("Generally, when a plaintiff has not been afforded an opportunity to amend the complaint, dismissal should be without prejudice."); *Cosner v. Dodt*, 526 F. App'x 252, 253 (4th Cir. 2013) (affording plaintiff opportunity to amend the complaint "to add sufficient facts that make the claims plausible" where case was in its infancy and plaintiffs had not previously sought leave to amend); *John C. Grimberg Co. v. Indian Harbor Ins. Co.*, 2023 U.S. Dist. LEXIS 59097, at *10 (D. Md. Apr. 3, 2023) ("[D]istrict courts have discretion to grant leave to amend 'freely' and 'when justice so requires.'") (quoting Fed. R. Civ. P. 15(a)(2) and granting plaintiff opportunity to amend complaint within 21 days "to comply with federal pleading standards and remedy defects identified in this memorandum opinion.").

Dated:  May 10, 2024                    Respectfully submitted,

                                        CARTER LEDYARD & MILBURN LLP

                                                /s/ Stephen M. Plotnick
                                        By: _____
                                                Stephen M. Plotnick, *pro hac vice*
                                                Madelyn K. White, *pro hac vice*
                                                Nathan D. Harp, *pro hac vice*
                                        28 Liberty Street, 41st Floor
                                        New York, New York 10005
                                        Tel: 212.732.3200
                                        plotnick@clm.com
                                        white@clm.com
                                        harp@clm.com

                                        -and-

                                        BARKLEY & KENNEDY

                                                /s/ Daniel M. Kennedy, III
                                        By: _____
                                                Daniel M. Kennedy, III
                                        (signed by Stephen M. Plotnick with the
                                        permission of Daniel M. Kennedy, III)
                                        51 Monroe Street, Suite 1407
                                        Rockville, Maryland 20850
                                        301-251-6600
                                        dkennedy@barkenlaw.com

                                        *Attorneys for Plaintiff Li Fen Yao*

35