# EXHIBIT A

# (January 3, 2025 Transcript)



# Transcript of Meet & Confer

**Date:** January 3, 2025
**Case:** Yao -v- Chen, et al.

**Planet Depos**

**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

**Page 1**

```
1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF MARYLAND

3     - - - - - - - - - - x

4     LI FEN YAO,                    :

5              Plaintiff,            :

6        v.                 : Case No. 23-cv-889

7     CHEN, et al.,                  :

8              Defendants.           :

9     - - - - - - - - - - x

10

11

12

13                    Meet and Confer

14                     Held Remotely

15              Friday, January 3, 2025

16           10:05 a.m. Eastern Standard Time

17

18

19

20    Job No. 565541

21    Pages: 1 - 196

22    Reported by:  Janet A. Hamilton, RDR
```

**Page 2**

```
1          Meet and Confer, held remotely:

2

3

4

5

6

7

8

9

10          Pursuant to Agreement, before Janet A.

11   Hamilton, Registered Diplomate Reporter and Notary

12   Public in and for the State of Maryland.

13

14

15

16

17

18

19

20

21

22
```

**Page 3**

```
1                  A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3         STEPHEN M. PLOTNICK, ESQUIRE

4         ALEXANDER G. MALYSHEV, ESQUIRE

5         MADELYN K. WHITE, ESQUIRE

6         28 Liberty Street, 41st Floor

7         New York, New York  10005

8         212.732.3200

9

10   ON BEHALF OF THE DEFENDANTS:

11        JOSHUA A. LEVY, ESQUIRE

12        KEVIN P. CRENNY, ESQUIRE

13        RACHEL CLATTENBURG, ESQUIRE

14        JUSTIN A. DiCHARIA, ESQUIRE

15        LEVY FIRESTONE MUSE LLP

16        900 17th Street, NW, Suite 1200

17        Washington, DC  20006

18        202.261.6564

19

20   ALSO PRESENT:

21        EMMA FLOYD, Paralegal, Levy Firestone Muse

22
```

**Page 4**

1     MR. PLOTNICK:  I take it we should
2 probably for the record put in our appearances at
3 the outset.  I'll suggest that just for the record
4 so it's clear when we start off.
5     MR. CRENNY:  That sounds good.  Do you
6 want to --
7     MR. PLOTNICK:  Are we officially on the
8 record now?
9     THE REPORTER:  Yes, we are.
10     MR. PLOTNICK:  Good morning, everyone.
11 Stephen Plotnick from Carter, Ledyard & Milburn
12 joining the meet and confer.  I'm joined this
13 morning by my colleagues, Madelyn White and Alex
14 Malyshev, also of Carter, Ledyard & Milburn.  We
15 represent the plaintiff, Li Fen Yao.  We also, of
16 course, which will be subject to discussion, I'm
17 sure, represent the third party, David Chen.
18     MR. CRENNY:  Thank you, Steve.  This is
19 Kevin Crenny from the firm Levy Firestone Muse.
20 With me are Josh Levy, Rachel Clattenburg, Justin
21 DiCharia and paralegal Emma Floyd.  We represent
22 the defendants Robert Chen, RC Security, LLC and

5

1  Otter Audits, LLC.  I hope everybody had a happy
2  new year and happy holidays and are looking
3  forward to working things out over the next ten
4  days or so.
5      MR. PLOTNICK:  We did.  Steve Plotnick
6  speaking.  We did, and yeah, same to you all.
7  Just as we're getting started, as sort of an
8  opening, at least sort of question, I have, at
9  least in terms of the scope of the call today --
10  Josh, I got your e-mail last night.  I just want
11  to make sure that we're on the same page here in
12  terms of what we're talking, setting aside the
13  motion to consolidate, which I'll clarify for the
14  record what that is.
15      So, Josh, our understanding from the
16  judge's directions and, you know, I recognize from
17  a portion of the transcript, but I think there are
18  other portions of the transcript of the conference
19  that we had with Judge Simms that for certain left
20  us with the impression that the scope of the call
21  today or the scope of the meet and confer more
22  generally is to really resolve all discovery

6

1  issues, not just the pending motions to compel
2  that were filed, but really the idea here is to
3  raise and attempt to resolve as best we can any
4  discovery issues that we may have with each other
5  at this point and discuss those, and of course I'm
6  happy to deal with this in whatever order.
7  Motions to compel first is certainly fine.
8      But I take it as a general matter that the
9  defendants are at least not in disagreement with
10  that based on what you had said, Josh, sort of
11  towards the end of the e-mail, and just to clarify
12  for the record yesterday afternoon we forwarded to
13  the defendants at a very high level an agenda of
14  the items that we wished to discuss for purposes
15  of the meet and confer, and Josh, Mr. Levy, had
16  responded me last night via e-mail.  And that's
17  just a threshold point that I wanted to raise with
18  you, Josh.
19      And then I'll just raise the one point I
20  have about the motion to consolidate just
21  separately, but I just want to clarify that the
22  idea here is not to confine ourselves just to the,

7

1  you know, the motions to compel that were the
2  subject of the notices of intent to file the
3  motions.
4      MR. LEVY:  Thanks, Steve, and you may call
5  me Josh for purposes of this meet and confer.
6      MR. PLOTNICK:  Yeah.  Just trying to be
7  formal for the record, that's all.
8      MR. LEVY:  I appreciate that, and if it's
9  okay with you, I'm happy to address you the way
10  you'd like to be addressed, same with your
11  colleagues.  And I think we're on the same page --
12      MR. PLOTNICK:  Okay.
13      MR. LEVY:  -- in terms of the purpose of
14  today.  Our e-mail tried to make that same point
15  that you were making, that the purpose of this
16  meet and confer is to resolve any known discovery
17  disputes.  We do want to prioritize, of course,
18  the motions --
19      MR. PLOTNICK:  Yeah.
20      MR. LEVY:  -- that both parties noticed
21  before the court.  And so inasmuch as there are
22  disputes about discovery, we want to use this time

8

1  productively to resolve them with you.
2      MR. PLOTNICK:  Yeah, good.  That's -- I
3  had kind of -- that was my takeaway from your
4  e-mail.  Again, it's Steve Plotnick speaking.  So
5  thanks for that, Josh.
6      In terms of the motion to consolidate, and
7  again, we can sort of turn to that later, and of
8  course, we have other meet and confers scheduled
9  too.  And just to clarify for the record since I
10  presume Judge Simms will be reviewing the
11  transcript, so there was a Complaint that was
12  filed in Wyoming, in Federal Court in Wyoming,
13  originally filed by the defendant in this case,
14  Robert Chen.  The Complaint was subsequently
15  amended to add as an additional plaintiff in the
16  case the entity OtterSec, LLC which is, of course,
17  the subject of this pending action that has been
18  pending in Maryland or at least the, sort of
19  the -- the dissolution of that company is the
20  subject of this litigation.
21      The defendant that was named in the
22  Wyoming Complaint is David Chen whom, whom my firm

Transcript of Meet & Confer
Conducted on January 3, 2025

3 (9 to 12)

9

1  also represents.
2       At a high level the Complaint concerns
3  allegations of alleged theft of computer code and
4  some other items from OtterSec.
5       On behalf of David Chen a motion was filed
6  to transfer the Wyoming case to the District of
7  Maryland, again, just to summarize at a high level
8  essentially on the basis of its relationship and
9  overlap with the pending litigation that is the
10 subject of this meet and confer, it was just prior
11 to Christmas or so, the court in Wyoming granted
12 the motion to transfer.
13      The case has now been transferred to the
14 District of Maryland.  It has been assigned to a
15 judge different from the judge that is hearing
16 this case.
17      We have expressed to the defendants our
18 intent or our desire to consolidate the cases
19 together primarily because of common issues of
20 fact or law to avoid inconsistent determinations.
21 We have reached out to the defendants to assess
22 their position on that point, and we've been

10

1  awaiting their response.
2       I know you needed to speak with your
3  client, Josh, about that.  We understood from our
4  exchange of e-mails that you did that yesterday.
5  You know, we had raised it in our agenda as one of
6  the items we wanted to discuss with you today.
7  You pointed out, Josh, in your e-mail to me of
8  last night that it's, you know, sort of outside
9  the scope of the meet and confer because it's not
10 a discovery dispute.  I mean, I suppose I don't --
11 I don't dispute that, but it's not a discovery
12 issue.  We just wanted to raise it, well, really
13 for two reasons, I would say, for you to think
14 about -- we can come back to this later -- number
15 one, quite frankly, because we're just awaiting
16 your position on it, and if a motion needs to be
17 filed, we want to move forward with that and get
18 that moving forward.
19      I guess also in our view it is -- has a
20 relationship to the subject matter of the meet and
21 confer, Josh, really because our takeaway from the
22 conference that we had with Judge Simms is that,

11

1  you know, the idea here is to tee up all of the
2  pending discovery issues, if there are any left
3  that are in dispute once we're done with the meet
4  and confer -- the court will obviously resolve
5  those issues -- but with a view towards
6  establishing a discovery schedule.
7       So our thinking here and sort of raising
8  it as part of the meet and confer is that if the
9  cases are going to be consolidated together for
10 purposes of trial, it would be ideal to have them
11 proceeding on a similar track that puts them on
12 pace to be completed together.
13      Again, in our view I think there's a lot
14 of -- there's a substantial amount of overlap in
15 discovery.  So a lot of what we'd be doing today
16 and have already done so far in the course of
17 discovery in this pending matter will necessarily
18 involve discovery that would overlap with
19 discovery in the, well, now former Wyoming case.
20      So really that's why we raised it is with
21 the view towards setting the schedule for
22 discovery in the cases.  So that -- just wanted to

12

1  point that out for you, Josh.  That was why we
2  wanted to discuss it.  I understand that you said
3  that you'd be sending us an e-mail later today
4  with your position, which is certainly fine.  You
5  know, we were just hoping at least to kind of get
6  a sense of, yea or nay, of your view on
7  consolidating the cases together.
8       MR. LEVY:  Thanks, Steve.  As you note,
9  the consolidation question is not a discovery
10 issue.  It is -- it relates to claims that we
11 have -- our client has not brought in this
12 original Maryland case that is before Judge Simms.
13 They are separate claims made against your
14 client's sons:  theft of computer code and money
15 from OtterSec.  They are, again, not before this
16 judge.  They -- those claims have not been
17 consolidated.
18      As we indicated to you yesterday, as
19 you've acknowledged today, we are going to send
20 you our position on that after this meet and
21 confer on discovery issues, and when and if the
22 matter is consolidated, we will deal with related

13

1  issues then.  It's not been consolidated at this
2  time, and we have limited time to try to resolve
3  our differences on discovery.  Again, we're very
4  optimistic that we can do that, but we'd like to
5  focus today on those discovery issues.
6       So as we indicated to you yesterday, we'll
7  send you our position on consolidation in an
8  e-mail after, after this meet and confer and
9  suggest that we move back to the discovery issues
10 that we were all instructed to resolve on this
11 meet and confer.
12      MR. PLOTNICK:  Steve Plotnick speaking.
13 That's fine.  I mean, if we're going to get your
14 position later today, I don't think there's any
15 material difference and we can move on and sort of
16 focus on the discovery issues in the case.  As I
17 said -- and we can take it up again at our next
18 meet and confer, which I think is, if necessary,
19 which is scheduled for I think, what, next
20 Wednesday or so if we need to talk about it
21 further.  So we'll just await your position and go
22 from there.  I just wanted to make the point that,

14

1  again, depending on what your position here is, it
2  does have the potential to have some overlap with
3  the scheduling issue, but that's all, but you
4  know, if you're going to oppose it, then we'll
5  have to deal with it in the normal course, and
6  that's fine.  So we can come back to that, you
7  know, once we see your position.
8       So where should we start?  I'm happy to
9  take it in order.  Shall we start with -- from the
10 items that you had the listed, you know, take it
11 in order, our motion to compel?  Does that make
12 sense, Josh?
13      MR. LEVY:  Fine with me.
14      MR. PLOTNICK:  Yeah.  As I said, I don't
15 have a strong preference here.  So I will start
16 off with that.  I mean, I think at a high level I
17 think our issues that we've raised that are the
18 subject of our motion to compel primarily deal
19 with I would say production of non-OtterSec
20 documents, documents related to the internal
21 operations, employees, finances of the, of the two
22 defendants in this case, RC Security and Otter

15

1  Audits, and at a high level my understanding of
2  the defendants' objections to producing the
3  documents that we had requested fundamentally fall
4  into two categories.  One is time frame.  At least
5  that's one point of dispute, and secondarily, the
6  primary objection to those requests, as I
7  understand it, or at least read in the defendants'
8  papers, is fundamentally an argument that the two
9  entities, RC Security and Otter Audits, are not
10 successors to OtterSec, LLC.
11      We've obviously briefed it.  I don't --
12 we've had some time now to consider our respective
13 positions.  We can go through them, you know, on
14 an item-by-item basis if that's what you want to
15 do, but I think the objections to them are
16 fundamentally the same.
17      So, you know, perhaps I'll turn it over to
18 you, Josh, or whomever is going to be addressing
19 this issue and just ask whether or not you have
20 considered that position, whether there's any sort
21 of change in position, and go from there.
22      MR. CRENNY:  So we have -- this is Kevin

16

1  Crenny.  I think we need more specifics on what
2  you want, like what, you know, we understand that
3  the types of issues you have at a very high level,
4  but I think we need to get more specific for
5  purposes of the meet and confer and to be able to
6  try to find areas of compromise.
7       I don't know if you want to go, you know,
8  you could go request by request.  You could go by
9  -- like, you had done like five categories in your
10 notice.  I don't know if that's a helpful way.
11 That's the way we were kind of looking at it as we
12 were getting ready was those five categories you
13 had outlined, but we can do it -- it's your
14 motion, so however you want to organize, but I
15 think we need more specifics on anything before we
16 could get into it much further.
17      MR. PLOTNICK:  Sure, yeah.  Again, Steve
18 Plotnick speaking.  Yeah.  Kevin, thanks for that.
19 Why don't I sort of start off.
20      Yes, we did sort of group them kind of
21 together broadly in categories.  I think -- you
22 know, I'll just start off with some of the

17

1 specific requests and interrogatories at issue,
2 and I think we'll probably find that there's going
3 to be some similar overlap here in what we're
4 dealing with.
5      So I'll start with, you know, what I'll
6 call DANS:  Digital -- Digital Asset Network
7 Security.  So we had document request number 1
8 which asked for documents and communications
9 concerning the formation, organization,
10 reorganization, management or governance, and the
11 request encompassed DANS, RC Security, Otter
12 Audits and OtterSec.
13      The defendants, as I understand their
14 objections, as I'm reading that, in the first
15 instance the defendants objected to producing
16 Digital Asset Network Security documents, DANS,
17 D-A-N-S for short, and the objection was based on
18 an argument that DANS is not a party to the case,
19 isn't mentioned in the Complaint, and there was a
20 further objection -- again, this deals with the
21 time frame issue -- there was a further objection
22 that the document requests sought documents

18

1 postdating the filing of the Complaint.  So that's
2 one.
3      And then separately there was an objection
4 to producing the documents that we had requested
5 from RC Security and Otter Audits who are
6 defendants in the case, and that objection was
7 that those two entities are distinct and separate
8 from OtterSec, that they're not successors or
9 continuations of OtterSec and that, therefore,
10 documents pertaining to those entities are not
11 relevant to the action.  So I'm going to take them
12 in order dealing first with the DANS entity.
13      We -- in part they're not mentioned in the
14 Complaint because we learned of them when
15 defendants filed their corporate disclosure
16 statement and sort of through, I would say,
17 independent investigation and just sort of general
18 review of other documents that had been produced
19 in the case our understanding is that DANS,
20 Digital Asset Network Security, is a wholly owned
21 subsidiary of Otter Audits, that it is effectively
22 a division in the sense that it is performing

19

1 specific services for specific categories of
2 clients, customers of -- of Otter Audits.
3      So in our view, I think as a wholly owned
4 subsidiary, you know, whether or not they're a
5 party to the action, I mean we could subpoena them
6 seeking documents related to DANS, but we believe
7 that as a wholly owned subsidiary they would be
8 documents that would be deemed to be in the
9 possession, custody or control of Otter Audits.
10      Fundamentally the relevance of DANS is,
11 quite frankly, to kind of get an understanding of
12 what that aspect of the business is.  I mean, if
13 it is part of the same business where essentially
14 all that has happened is that Otter Audits has
15 sort of broken off a portion of its existing
16 business for some specific reason of its own, it's
17 still part of the same business and goes
18 fundamentally to the question of -- well, it
19 relates to a few issues, but at the highest level
20 certainly the question of whether or not these are
21 successor entities it also potentially relates to
22 damages to the extent that DANS is, you know,

20

1 generating business, generating profits, those
2 profits are being shared with Otter Audits.  They
3 may be entities in which we would claim an
4 interest in, either directly or indirectly,
5 through Otter Audits.  But it is fundamentally I
6 think most relevant to the successor claim, the
7 declaratory judgment claim that we have in the
8 case, bleeds over into other issues, and that is
9 fundamentally I think the relevance of DANS is
10 getting an understanding of exactly what the
11 entity is.
12      Insofar as the objections to producing the
13 RC Security and Otter Audits components of the
14 requests --
15      MR. CRENNY:  Steve, can I interrupt you?
16 Sorry.
17      MR. PLOTNICK:  Sure.  Of course.
18      MR. CRENNY:  This is Kevin.  Can we -- I
19 think it would be more productive if we just talk
20 about DANS first before we get into the other.  Is
21 that all right?
22      MR. PLOTNICK:  That is totally -- yeah.

Transcript of Meet & Confer
Conducted on January 3, 2025

21

1  That's fine.
2      MR. CRENNY:  And correct me if you
3  disagree, but I think this, just so we only talk
4  about DANS once potentially, I think this also
5  covers your document request number 4.  Is there
6  anything you want to add on that one, which is
7  request for documents and communications
8  concerning the ownership or financial interest of
9  defendants in DANS?  Can we do those -- just for
10  purposes of streamlining the conversation, can we
11  talk about those together, the two DANS ones,
12  so that --
13      MR. PLOTNICK:  Yes, absolutely.
14      MR. CRENNY:  Is there anything that you
15  want to add to 4 that you hadn't said a moment
16  ago?
17      MR. PLOTNICK:  No.
18      MR. CRENNY:  Okay.  So I guess questions
19  we have in response to that.  What -- what are the
20  DANS documents that you feel are relevant that are
21  -- you're not getting?  And what element of
22  successor liability do you think this is -- this

22

1  is relevant to that you need their documents?  You
2  know, as you said, it's a subsidiary of Otter
3  Audits.  Does Otter Audits stuff not cover it
4  somehow?  Like why we're -- we're trying to
5  understand your position on this, a separate
6  entity.
7      MR. PLOTNICK:  Sure.  Well, I mean the
8  documents that we're seeking are, and not to be
9  cavalier, the documents that we asked for, right,
10  so the documents, communications concerning
11  formation, the organization, the management.  So,
12  you know, how -- how -- formation documents,
13  entity formation documents, right.  When -- when
14  was it created?  What was it created for?  You
15  know, organizational documents, typical documents
16  that you would see to create an entity, governance
17  documents.  So if there is an operating agreement
18  or a shareholder agreement or something of the
19  same, something that shows, you know, what the
20  ownership of the entity is, who the owners of the
21  entity are, what business it's in, you know, what
22  it does.

23

1      Similarly with, you know, request that's
2  also -- I'm speaking of both requests, number 1
3  and 4 together, but as I said, so they're kind of
4  fundamentally getting an idea of what it is, why
5  it was created, what it does, who its customers
6  are, who its clients are, who works for it.
7      I mean I think that all relates to the
8  questions of successor because, again, what we're
9  trying to determine here as part of this is what
10  is this entity?  Is it effectively just, you know,
11  doing the same business as OtterSec potentially
12  using the same employees, infrastructure,
13  customers, clients of OtterSec, that sort of
14  thing, all of which go to the successor liability
15  question.
16      Again, if this is say, for example, you
17  know, these are clients and customers of OtterSec
18  that it is servicing, then, you know, is this an
19  entity where they've just effectively, for
20  whatever the reason may be, broken off a component
21  of the former OtterSec business under the umbrella
22  of a separate entity?  Those are all the points

24

1  that we're trying to cover and why, why we sought
2  that discovery.
3      MR. CRENNY:  And how are you -- how do you
4  -- the fact that this was not formed until mid
5  2023 after the lawsuit was initiated, how do you
6  view that?  That seems to us like this is not part
7  of the claim, you know, that the Otter Audits --
8  you can find out about Otter Audits from the Otter
9  Audits discovery and then whatever they, you know,
10  the subsidiary started doing after the Complaint
11  was filed, that seems --
12      MR. PLOTNICK:  Yeah -- sorry.  I didn't
13  mean to cut you off.
14      MR. CRENNY:  Yeah.  I mean, like, the
15  successor liability, like, the factors are, you
16  know, the ownership, the management, the continued
17  existence of the selling corporation, the adequacy
18  of consideration, the transfer of employees from
19  the predecessor to the successor, the purpose of
20  the asset sales that's -- I don't know how to
21  pronounce this case -- but it's O-D-J-A-G-H-I-A-N,
22  848 F Appendix at 539.

Transcript of Meet & Confer
Conducted on January 3, 2025

---

25

1       I mean this subsidiary that's created the
2  following year doesn't seem to us like it tells
3  you those things about Otter Audits.  It seems
4  like the discovery on Otter Audits would be the
5  stuff that matters for that and the creation
6  there.
7       You know, you're curious about what it's
8  doing and what's happening in 2023, but that
9  doesn't really tell us, as we see it, to whether
10 Otter Audits is a successor corporation.  You
11 know, discovery on Otter Audits will prove that or
12 not.
13      MR. PLOTNICK:  Sorry.  I didn't want to
14 cut you off and speak while you were speaking
15 again.  Yes.
16      So I am struggling a bit, Kevin, to
17 understand the position that the date of the
18 filing of the Complaint matters one way or the
19 other with respect to this point, others as well,
20 which we'll deal with later, but, you know, if --
21 if the -- say, for example, the clients, the
22 customers, whatever it may, whoever it is that

---

26

1  DANS may be servicing, what employees they may be
2  using, the fact that Otter Audits, you know, made
3  a decision, for whatever reason it did, following
4  the filing of the Complaint to colloquially break
5  off a portion of its existing business after the
6  date of the filing of the Complaint, I don't think
7  that matters.  I mean that's -- the question is
8  whether or not this is part of the same business
9  and goes to the question of successor liability.
10      I mean it's possible that -- I don't know
11 at this point because we don't have the discovery,
12 but it's possible that DANS could be added as a
13 defendant in the case via an Amended Complaint,
14 but, you know, the fact -- the timing of the
15 decision to create this entity, I struggle to see
16 how that is pertinent to the question of whether
17 or not they are, in fact, part of the same
18 business.
19      So in other words, I guess what I'm saying
20 is, just to -- again, I don't know because we
21 don't have the discovery -- but if this was at one
22 point a component of the existing Otter Audits

---

27

1  business and they chose, for whatever the reason
2  may be, perhaps they brought in another investor,
3  whatever, to spin off that business into a
4  separate entity and the fact that they may have
5  done that post filing of the Complaint, I don't
6  think that matters.
7       I mean, you know, at least for purposes of
8  discovery that's exactly what we're trying to
9  determine, right:  What is it that this business
10 does?  Is it, in fact, part of the former -- well,
11 prior to that Otter Audits, prior to that the
12 OtterSec business.  That's exactly what we're
13 trying to determine through discovery.
14      I don't know if that answered all of your
15 questions.  It's the only ones that I can remember
16 that you had asked about.
17      MR. CRENNY:  Yeah.  No, I think -- you
18 know, I think that's all helpful.  I think, you
19 know, this is -- this is day one of this process,
20 and there are points like this where we, you know,
21 wanted a clarification of your position, and,
22 like, elaboration of it, and I think there are

---

28

1  points like this where we now have to kind of take
2  your position and think about it and look at it
3  now that we've gotten it clear, clarified.
4       So I think this is one where, you know, we
5  understand -- we heard what you're saying on this
6  at this point, and it's something to circle back
7  to next week for discussion probably.  I think
8  there's going to be a few of these, but I think
9  that's helpful and that's how the process is
10 supposed to work, and that's why we're doing more
11 than one day I think, if that makes sense, and you
12 might have ones like that from us.  Does that make
13 sense?
14      MR. PLOTNICK:  I guess what you're saying
15 is you're going to think about it and come back to
16 us at the next meet and confer on the DANS stuff?
17      MR. CRENNY:  Yeah.  But I think I'm saying
18 in a way of, like, thank you for elaborating, it's
19 helpful, you know, we are in a better position to
20 think about it and discuss having gotten the
21 clarification from you.  If there's anything
22 further you want to add at this point, go ahead.

---

Transcript of Meet & Confer
Conducted on January 3, 2025

29

1  I don't mean to cut off the discussion of it.  I'm
2  saying I don't -- I think I've asked the questions
3  I wanted to ask, and we've gotten the
4  clarification here.
5        MR. PLOTNICK:  Yeah.  I mean I guess -- I
6  guess the only thing that I would add to it is I
7  mean I think that there are at least potentially
8  other reasons why, you know, DANS is relevant here
9  that we're trying to determine.  I mean I could
10 probably think of some others.
11       You know, if this is some, for example, an
12 effort to sort of shield assets by transferring
13 them to another entity, right, I mean that's the
14 kind of thing that we're trying to determine here
15 is -- you know, as I said at the outset, I mean at
16 a high level because we don't really have the
17 details and this is not a public company,
18 obviously we don't have all of the details of what
19 DANS is, what it does, who its employees are, but
20 that's fundamentally what we're trying to go to,
21 and that is:  Is DANS effectively a part of, you
22 know, the former OtterSec business in some way,

30

1  shape or form?  So that's -- that's the only
2  addition I guess I would have to add to that,
3  Kevin.
4        MR. CRENNY:  Okay.  Give me one second to
5  just look over, make sure we don't have any other
6  questions before I close this one out.
7        MR. LEVY:  Steve, just to be clear, you
8  indicated a couple of ways in which this request
9  might be relevant.  You said there might be
10 others.  It would be helpful to know all of the
11 grounds for relevance today.
12       MR. PLOTNICK:  Yeah, I don't know that I
13 could list out every single one in part, to be
14 honest with you.  I think, Josh, you know, we
15 don't have all the documents.  I mean I think --
16 candidly, I think I've listed enough at this
17 point, but I mean I guess if I was going to add to
18 it, right, I think it, as I said, it sort of
19 touches on the point about whether or not assets
20 have been transferred, that sort of thing.  I mean
21 that's also a damages issue I think as well for
22 us, too, and whether or not we would have an

31

1  interest in this entity.
2        It depends on I think, you know, obviously
3  the way the entity was structured, the purpose for
4  which, you know, DANS was created, whether there
5  are other investors in it, that sort of thing.
6  So, you know, as I said, fundamentally it's a
7  liability and damages issue.
8        MR. LEVY:  And -- look, it's helpful for
9  us to know what the grounds for relevance are so
10 that we can evaluate those positions and come back
11 to you.  We have set forth objections.  We'll come
12 back to you and add specificity to the objections
13 where appropriate and/or come up with a proposal
14 about how to address your request.
15       DANS being a wholly owned subsidiary is a
16 separate party and, and so it's a separate entity,
17 and so there's a unique burden that falls on our
18 clients to gather and produce documents from a
19 separate party, and so we're just -- we need to
20 evaluate your claims of relevance as we look at
21 and the specificity of the documents that you
22 want, and this is information that we didn't have

32

1  until today.  We appreciate it.  And if there's
2  anything more you want to tell us, let us know,
3  and we'll take that back and work with you.
4        MR. PLOTNICK:  Yeah.  I think we've
5  covered it.  We could move on to the next point
6  and, you know, give you guys the opportunity to,
7  you know, consider our position some more, and
8  that's why we have another meet and confer
9  scheduled.
10       MR. LEVY:  Right.  Kevin, anything else?
11       MR. CRENNY:  No.  Yes.  I think that's --
12 that's what I was getting at.  So, yeah, I think
13 that makes sense.
14       MR. LEVY:  Okay.  Thanks.
15       MR. CRENNY:  That's helpful.  Thank you.
16       MR. PLOTNICK:  All right.  So I'll move on
17 to the next aspect of that request, and again, I
18 think, Kevin, this one sort of is a consistent
19 objection sort of throughout several of the
20 document requests, if not all of the ones that are
21 the subject of our motion to compel, and that is
22 the RC Security and Otter Audit documents, and

Transcript of Meet & Confer
Conducted on January 3, 2025

---

33

1  that there has been an objection to producing RC
2  Security and Otter Audits documents based on an
3  assertion that the two entities are distinct and
4  separate from OtterSec, that they're not
5  successors, et cetera, and obviously I mean that
6  is the issue in the case.  I mean it is
7  certainly -- well, one of the issues in the case
8  for certain but certainly a central issue in the
9  case, that, you know -- look, we briefed the
10 motions to compel already.  So we have the benefit
11 of our respective positions on that issue which is
12 helpful, but, you know, fundamentally, again at a
13 high level, I think the way I would describe our
14 response to those objections is that that's a
15 merits-based objection, that there is a -- you
16 know, there was a ruling in the case in connection
17 with the defendants' motion to dismiss for lack of
18 personal jurisdiction that we had pleaded a
19 successor claim.  I understand that was, or
20 at least the defendants' position on that is that
21 that was limited to personal jurisdiction issues.
22 I'm not -- I mean it's a 12(b) motion.  I'm not

---

34

1  sure that there's a material difference there
2  between the two.  But regardless, and
3  fundamentally the question of whether or not RC
4  Security and Otter Audits are separate and
5  distinct and whether or not they're successors to
6  the issue is, as I said, the issue in the case.
7       So where -- and I understand, you know,
8  again, sort of describing the motions at a high
9  level, you know, defendants have taken that
10 position, that the businesses are different in
11 some way, that they do different, different
12 categories of business, derive their revenue in
13 different ways, you know, that those are points
14 that all go to the merits, and our view is that's
15 exactly what we're entitled to take discovery on.
16      And, you know, again, this was an
17 objection to document request number 1.  You know,
18 we can go through these in a line-by-line basis,
19 but that was a consistent objection to, you know,
20 many of the other requests.  I'd say all, but it's
21 technically not all because as, Kevin, you had
22 pointed out, right, there was one request -- it

---

35

1  was document request number 4 that was focused
2  exclusively on the DANS entity, but it certainly
3  is, you know, document request number 1, document
4  request number 5, document request number 9 and,
5  you know, on and on.  I think it was a consistent
6  objection throughout when it came to producing
7  those documents.
8       Now, I would say related to that, one of
9  the difficulties I think or at least one of the
10 things that we had struggled with is a position
11 that the defendants took in their papers which is
12 that in I guess -- you know, I'll certainly let
13 you correct me if I'm wrong -- but the position
14 that the defendants took in their papers is that,
15 well, okay, well, we're reviewing RC Security and
16 Otter Audits documents as part of our document
17 collection and production, and the defendants have
18 said that the -- they would produce the RC
19 Security and Otter Audits documents -- I think the
20 language is to the extent that they mention
21 OtterSec, right.  That's obvious what that would
22 be, I take it, and then it said to the extent that

---

36

1  they mention OtterSec or to the extent that they
2  concern OtterSec, and that -- that is -- that's --
3  that's where we have some difficulty in
4  particular, and that is -- sort of sounds very,
5  very subjective, which I don't think is the point
6  of discovery and not consistent with what the
7  scope of discovery and the rules of discovery are
8  supposed to be.  It's a very sort of subjective
9  criteria and seems sort of inextricably
10 intertwined with these objections which is
11 fundamentally that documents -- and I don't know
12 if that's the case or not or what the specific
13 criteria is that you're utilizing to determine it,
14 but it's difficult to separate that subjective
15 analysis that is, well, we'll produce the RC
16 Security and Otter Audits documents to the extent
17 that they concern OtterSec.  It's difficult to
18 sort of reconcile that, I suppose, with the
19 objection, that this sort of takes the position
20 that, well, these are separate entities and what
21 they do has nothing to do with OtterSec.
22      So I don't know if you have had the

---

37

1 opportunity to consider that objection. I have
2 other points, too, about the time frame as well,
3 which I'll get into, but sort of consistent with
4 your point here, Kevin, with going issue by issue
5 I'll hold that and let you respond on that.
6      MR. CRENNY: Thanks. So I think, as you
7 say, we have produced documents that mention
8 OtterSec, concern OtterSec operation. We have
9 produced thousands, thousands of documents from
10 Otter Audits, RC Security I believe. I'm just
11 pulling that number off the top of my head. I
12 don't have the number in front of me. But the
13 point being we didn't withhold based on these
14 objections in all cases. I think we -- both sides
15 here have a number of objections that we've made
16 but are not withholding based on.
17      So I think, you know, it's not like we
18 have not given you anything that touches on or is
19 from RC Security and Otter Audits here. We've
20 produced a lot of material that falls under RFP 1
21 that relates to those two companies, and the same
22 for a lot of the other RFPs here, and then, you

38

1 know, we've -- in an effort to compromise in
2 advance, you know, where we met and conferred last
3 month, we gave over a lot of financial information
4 for the latter part of 2022 that didn't, you know,
5 didn't touch on OtterSec, and we gave you the
6 DocuSign agreements that showed you clients and
7 customers up through the date of the Complaint
8 being filed -- the Complaints being filed, excuse
9 me.
10      So I think this is -- you know, this is
11 one the judge highlighted in our hearing that in
12 our notice we had, or in our response to your
13 notice we said we're not clear on what more they
14 want here. We understand that there are these
15 objections that you think are not correct because
16 of your successor liability claim. That's fine if
17 we, you know, disagree on them, but they're not --
18 what are we withholding based on those that you
19 think we should not be withholding?
20      I think we want to try to get a little
21 more specific than the high level like, oh, well,
22 they're objecting -- we're objecting that these

39

1 are different companies, and you're saying, well,
2 they're really the same company. Like we got
3 that, but what more are you looking for here?
4 Especially in light of our additional stuff we've
5 given, not waiving our objections, but, you know,
6 trying to get you the financial information, you
7 know, any trends, transfer from OtterSec to one of
8 these companies we've produced, or I think we did
9 produce, have produced at this point.
10      So I think we're just not sure what you
11 are looking for here.
12      MR. PLOTNICK: So I think -- I'm sorry,
13 Kevin. I didn't mean to cut you off. Were you --
14      MR. CRENNY: No, no. That was the -- I
15 think that was the point for you to jump in.
16      MR. PLOTNICK: Yeah. I mean, look, I
17 think that's a little bit of a case of the tail
18 wagging the dog, right? I mean we don't know what
19 you're withholding. And I think you even said it,
20 like, you didn't withhold in all cases which
21 necessarily means that in some cases you withheld
22 some documents, and, sure, you have produced some,

40

1 some stuff through 2022 and, you know, for other
2 categories of documents you've produced beyond
3 2022. So, you know, when you say, you know, what
4 more do we want, I mean I could give several
5 examples.
6      But I mean they're your documents. So I
7 think you are in the better position as the party
8 who has gathered, collected, reviewed the
9 documents to know what is being withheld and on
10 what basis it's being withheld.
11      I mean I gather things have been withheld
12 on the basis of that objection, correct?
13      MR. CRENNY: Well, I mean not for request
14 1. On request 1 we didn't withhold except for
15 privileged or things after the date of the
16 Complaint, which I know you want to talk about;
17 that's on the list, we'll get to after the date of
18 the Complaint, but I think we're not on that yet,
19 right?
20      Like, we think our responses are clear in
21 laying out what categories of documents we're
22 producing, and we're trying to understand what

Transcript of Meet & Confer
Conducted on January 3, 2025

41

1  categories you have not seen that you could point
2  to where we have stood on this objection, and
3  you're asking for something more.
4       MR. PLOTNICK: Well, again, it is my tail
5  wagging the dog point. You're asking me to tell
6  you essentially what documents you've withheld,
7  and I can't answer that, but I can give you
8  some -- so you had mentioned the -- those sort of
9  DocuSign agreements. You know, again, the -- at
10 least some of the requests, right, that we're
11 talking about refer to things like, you know, give
12 us -- give us, you know, your employees, your
13 agreements with your employees; give us the
14 agreements that you have with clients and
15 customers.
16      If you are saying to us that the
17 production of the DocuSign, HelloSign documents
18 are documents that are sufficient to identify all
19 employees, right, all independent contractors that
20 ever performed any work for RC Security, for Otter
21 Audits, if you're saying that those, you know,
22 DocuSign and HelloSign documents are sufficient to

42

1  identify all of the employees, right, the dates,
2  the times, the periods of time that they worked
3  for the company, right, that would be one thing,
4  but that's not what I understand, you know, what
5  that is. Again, correct me if I'm wrong. But
6  what we want to know is, again, sort of staying
7  with that example, who all of the clients and
8  customers are, and again that --
9       MR. CRENNY: Can I --
10      MR. PLOTNICK: Yeah. That fundamentally
11 relates to, you know, are they the same as
12 OtterSec? Same thing with the you know,
13 employees and their agreements: Are they the
14 same? So that was our concern with sort of
15 limiting -- I mean just to --
16      MR. CRENNY: Could I respond on that one
17 before we go to the next one?
18      MR. PLOTNICK: Yes, yes. Please, go
19 ahead.
20      MR. CRENNY: You have all of the
21 agreements that we have: All the customer,
22 clients, employees, contractors. They use

43

1  DocuSign and HelloSign. So any agreements that
2  they have in records we have given you. So this
3  is, you know -- for the customers -- you know, the
4  way you broke it down in your notice was that from
5  Otter Audits and RC Security you had concerns
6  about the production of, you know, documents about
7  formation of business plan, financial stuff, and
8  then stuff about clients and customers. So for
9  like the clients and customers category we've
10 given you the agreements that we have with clients
11 and customers through the date of the Complaint.
12      MR. PLOTNICK: You have all agreement --
13 so -- so -- okay. So that would be -- but is that
14 -- so part of the question is though, does every
15 single client and customer of RC Security and
16 Otter Audits have an agreement, right, and --
17 well, specifically with RC Security and Otter
18 Audits. So, you know, whether that's sufficient
19 or not to identify who all of them were is really
20 the question that I have. I mean if there was a
21 client or customer that they had of the company
22 that they did not have an agreement with or with

44

1  whom they were operating under a prior OtterSec
2  agreement, that's a separate, separate question
3  from whether or not -- so I appreciate that,
4  right -- so if you're telling me that that's
5  everyone, that would, you know, kind of cover
6  that, but the -- then you also have questions
7  about sort of the employees. Did they all have --
8  does that cover all of the employees' agreements,
9  including independent contractors? Did all of
10 them even have agreements? I mean that's why, for
11 example, we asked for things like W-2s, 1099s,
12 that sort of thing, to, you know, kind of cover
13 who they are, what they were being paid, when they
14 worked for the company; did they come over from,
15 you know, OtterSec? Are they the same? Again,
16 that's just one example.
17      So that was our concern with sort of
18 limiting it to, you know, the specific DocuSign/
19 HelloSign. I mean I know, for example, that each
20 of the, at least the agreements that were signed
21 with OtterSec employees and independent
22 contractors, I mean each of the documents, they

Transcript of Meet & Confer
Conducted on January 3, 2025

45

1 had, like, the same title on them, and, you know,
2 just it just struck us -- not trying to get too
3 deep into the search protocol questions -- that
4 logically one would run searches for the actual
5 title of the document, particularly when it's
6 consistent what they're saying as opposed to sort
7 of limiting your search to, you know, one database
8 in particular. But, you know, again, that's part
9 of what we're trying to get at with those specific
10 requests. It's fundamentally linked to the
11 successor point.
12      But I just want to make one other point,
13 and that is I just want to clarify that on the
14 basis of -- that you said not in response to
15 number 1, okay, that you've withheld documents on
16 the basis of this objection, but this objection,
17 you know, sort of appears in others, and we could
18 run through them. But document request number 5
19 asked for documents and communication concerning
20 dividends or distributions paid to shareholders,
21 members or partners of RC Security, Otter Audits
22 and OtterSec. You had the same objection in

46

1 there. That's a damages issue. We're trying to
2 determine whether or not obviously dividends or
3 distributions were paid to, you know, members of
4 these companies, and if we are entitled to have an
5 interest in these companies, then that's a damages
6 question for us. So that's certainly a point.
7      When you get into the clients and
8 customers and RC Security and Otter Audit stuff
9 goes into -- we also have a lost profits claim in
10 the case under the Lanham Act as well.
11      MR. CRENNY: Steve, can I make a
12 suggestion?
13      MR. PLOTNICK: Yes, of course.
14      MR. CRENNY: Can we go back to the
15 employees, customers, clients stuff?
16      MR. PLOTNICK: Yes.
17      MR. CRENNY: I think that is -- we can
18 segregate that from the financial stuff, and I
19 think we could potentially tie up the employees,
20 customers, clients stuff. I just think if we keep
21 them separate, we are more likely to make progress
22 on this, but it's your motion. So tell me if this

47

1 is not working. So I think that may be the way to
2 do it.
3      But, you know, again, we weren't searching
4 a particular database. We -- the way they signed
5 agreements was HelloSign and DocuSign. You asked
6 us for those agreements, so we produced all the
7 HelloSign and DocuSigns. That is how we would go
8 about identifying them is through going through
9 the DocuSigns and HelloSigns the same way we
10 produced them to you.
11      There's not some database that we're
12 restricting ourselves to. We are trying to -- we
13 searched for and have produced every agreement
14 through the way that they signed agreements.
15 We're not aware of agreements with customers,
16 clients, employees that are not HelloSign and
17 DocuSign.
18      MR. PLOTNICK: Right. But the question
19 is, though, is that -- does that cover every
20 single employee and every single independent
21 contractor in the sense that did every single one
22 of them have an employment or consulting agreement

48

1 with the company? That's in part why we had asked
2 for in addition to the agreements themselves, you
3 know, things like W-2s and 1099s, that sort of
4 thing, because that would also encompass those,
5 you know, that category of employee or customer.
6      MR. CRENNY: We've produced the W-2s and
7 1099s. I think we've produced the documents we
8 would use to answer the questions you're asking,
9 and that's, you know, a proper way to respond to
10 an RFP or an interrogatory looking for the
11 identification is, like, give the business records
12 that so that the opposing side can do it as easily
13 as you could, you know, if you want to make a
14 list, there's no more comprehensive list that
15 we've withheld.
16      MR. PLOTNICK: Well, maybe we're getting
17 into the time frame, the time for --
18      MR. CRENNY: Yeah. Maybe if we -- which
19 request are you talking about specifically that
20 you think we've failed to, you know, do what we
21 need to do in response to with regard to
22 customers, clients, employees?

49

1    MR. PLOTNICK:  Sure.  There is a request
2  for -- let me look for it in my notes here.  I
3  have it right here.  One second.
4    So on the customers and clients we have
5  document request number 19.  So document request
6  number 19 asked for documents sufficient to show
7  all customers and clients of RC Security, Otter
8  Audits and OtterSec, including all persons for
9  whom RC Security, Otter Audits and OtterSec has
10 performed any auditing work or from whom RC
11 Security, Otter Audits and OtterSec has collected
12 any payments for services or products.  So
13 that's -- that the customers and clients point.
14    MR. CRENNY:  I'm looking at that one, too.
15    MR. PLOTNICK:  Yeah, and that's, again,
16 what I'm getting at.  Again, if you're telling me
17 we have all of the agreements, then we have all
18 the agreements.  Then we can again come back to
19 the time period thing.  The question really is
20 whether they're sufficient to show, right, all of
21 them for whom they performed work.
22    MR. CRENNY:  They are -- we are not aware

50

1  of any that we are missing, and we don't know
2  where we'd look for others that we haven't looked
3  already if they're, you know -- we only have the
4  company records we have, but we have given you
5  what we have, we're aware of -- yeah.
6    MR. PLOTNICK:  Yeah.  I mean does -- I
7  mean I think, again, on some level --
8    MR. CRENNY:  We aren't aware of any that
9  didn't have some sort of agreement, and we've
10 given you the agreements that we have.
11    MR. PLOTNICK:  I'm sorry.  I'm just --
12    MR. CRENNY:  Yes.
13    MR. PLOTNICK:  I think it makes sense at
14 least to sort of talk here, too, about the time
15 period as well.  We have -- I do know that you've
16 produced some W-2s and 1099s, but I think that's
17 only through -- correct me if I'm mistaken -- that
18 one is limited to the end of 2022.  Correct?
19    MR. CRENNY:  Um...
20    MR. PLOTNICK:  Or at least that's one of
21 the categories where we had limited it to --
22    MR. CRENNY:  I think that's right.

51

1    MR. PLOTNICK:  Yeah.
2    MR. CRENNY:  I believe that's right.  For
3  RC Security and Otter Audits, not for OtterSec.
4    MR. PLOTNICK:  Right.  So, you know,
5  again, it's not clear to me why that would be cut
6  off at 2022 specifically or what the reasons would
7  be for cutting that off in 2022 if, you know --
8  the fact that they -- there could have been, you
9  know, very easily -- just say, for example, there
10 could have been an existing client or customer,
11 for example, of OtterSec that they performed work
12 for at some point in time prior to its
13 dissolution, and whatever the reason may be that
14 client or customer didn't necessarily need any
15 specific work, right, to be done through the end
16 of 2022, but they're still an existing client or
17 were a client or customer of OtterSec at the time.
18 So the fact that they may have come in February
19 or, you know, March or April whatever --
20    MR. CRENNY:  You would have them --
21 February and March you would have for 2022, you
22 would have through the date of the Complaint for

52

1  clients.
2    MR. PLOTNICK:  Or April, for that matter,
3  right?  That's the -- that's part of what we're --
4  again, so to me I still sort of struggle -- I'm
5  trying to understand -- maybe I could ask you --
6  why, you know, using the date of the filing of the
7  Complaint is being used when, you know, again,
8  fundamentally when you're talking about, you know,
9  questions of successor, well, are these
10 successors, these are the factors that you're
11 looking at, right?  Are the clients, are the
12 customers the same as the ones that were with
13 OtterSec?
14    If these were employees, for example, who
15 worked for OtterSec and had restrictive covenants
16 with OtterSec and had agreements with OtterSec and
17 were hired or rehired to perform work or signed an
18 agreement in April, May, June, whenever it may be,
19 2023 or later, the pertinent and sort of relevant
20 to the successor question, you know, whether or
21 not, you know, it was in 2022 or not.  So that's
22 where I'm struggling to at least understand.  I

53

1  mean --
2      MR. CRENNY:  We're using -- we're using --
3  sorry.
4      MR. PLOTNICK:  Yeah.  No.  Go ahead.  I
5  think I was really just going to repeat myself.
6      MR. CRENNY:  I mean we are using the dates
7  of the Complaint as the cutoff because that's the
8  day that the claims were brought.
9      You know, at the time that the Complaint
10 was brought you thought these were successors.
11 You thought that you could -- you know, the
12 evidence existed in the world to establish that
13 they were successors under the, you know, as the
14 Complaint says it.  We disagree.  But that's --
15 the evidence on the claims should exist before the
16 Complaint is filed.  You raised the claim on that
17 date claiming that they were successors as of that
18 date, and you have the documents to show that at
19 that time they were successors -- I mean if you
20 don't have the documents to show that because they
21 don't exist because, you know, we have not -- we
22 have produced the things up to that date when the

54

1  claims were brought, and that's the reasoning.
2      MR. PLOTNICK:  But -- but that would
3  only --
4      MR. CRENNY:  Pertinent to the cutoff.
5      MR. PLOTNICK:  Yeah.  That would only go
6  to the question of the basis for filing the
7  Complaint in the first place.  One could have a
8  good faith basis for filing a Complaint as of the
9  date of the filing of the Complaint, but surely
10 there can be evidence that postdates the filing of
11 the Complaint that's relevant to the claims and
12 supports the claims themselves, which is exactly
13 what I'm talking about here, and that's the kind
14 of discovery -- I mean a perfect example of that
15 is some of the -- and I know we're not talking
16 about the financial stuff -- but the financial
17 stuff.
18      I mean there's a lost profits claim in the
19 case under the Lanham Act.  There are damages
20 claims, I mean distributions.  To the extent that
21 there were distributions to members of these
22 companies after the fact, that would be part of

55

1  our damages claim as well.
2      You know, as I said, to the extent that
3  there were customers, clients, you know, that are
4  the same as OtterSec's that postdate the filing of
5  the Complaint, those, in our view, would be
6  relevant to the claim.
7      I mean what you're talking about, or at
8  least it sounds to me what you're talking about is
9  only directed to the question of what was the
10 basis for filing the Complaint, the good faith
11 basis for filing the Complaint in the --
12      MS. CLATTENBURG:  Steve, can I jump in
13 just to clarify because I think I'm getting lost
14 here.  This is Rachel, by the way.  I'm getting
15 lost because I thought we were talking about
16 request 19, and it seems to be about showing the
17 customers and clients, and as we've said, we have
18 produced those agreements that we have.  We don't
19 know of any other clients or customers that didn't
20 have agreements, and we've produced all the
21 agreements we have up through the date of the
22 filing of the Complaint.

56

1      You seem to be pushing back I think on
2  that cutoff for showing customers and clients of
3  two entities that were created in the fall of
4  2022.  So how -- I just want to know what
5  relevance you think it has to continue showing
6  customers and clients this many months after they
7  were created?  And can you point us to some case
8  law that shows that this long after that would be
9  relevant to whatever claim you're trying to show
10 here?
11      And I want to limit this to request 19
12 because I'm getting very confused when you start
13 bringing in, like, financial information.  I'm
14 having trouble following what request you're
15 talking about.  So if we're talking about
16 something other than request 19, can you point me
17 to it?  And if it is request 19, can you tell us
18 why and point to something in the law that shows
19 why customers and clients after 3/31/2023 are in,
20 you know, it's relevant to your claims here?
21      MR. PLOTNICK:  Well, sure.  I mean --
22      MR. MALYSHEV:  Excuse me.  This is Alex.

Case 8:23-cv-00889-TDC    Document 106-1    Filed 02/10/25    Page 17 of 97
Transcript of Meet & Confer    15 (57 to 60)
Conducted on January 3, 2025

57

1   If I can jump in just for one second. I think
2   something that might have been getting sort of
3   overlooked. This is not a car accident where
4   you're just talking about what happened on this
5   date caused the accident. This was an ongoing
6   theme is made in our Complaint to divert the
7   business of OtterSec to these successors which is
8   necessarily an ongoing enterprise. I'm not aware
9   of anything in the law that requires us to wait
10  until every single client has been transferred and
11  everything is complete before filing a claim.
12      So despite the date of the filing of the
13  Complaint it is certainly relevant to show that we
14  already had a basis to make the claim, but this is
15  what applies to damages. If it's transfer of the
16  clients is ongoing and at least based on what
17  we've pleaded, we have shown that your client has
18  used a dissolution after Sam's death to start
19  transferring the business, it is absolutely
20  relevant and it's ongoing even after the Complaint
21  is filed, and that is also why the DANS
22  information is relevant.

58

1       MR. PLOTNICK: Yeah, and, Rachel, I'm
2   happy to answer your question. So I mean if you
3   want me to sort of focus on, kind of do this more
4   on a request-by-request basis, I'm happy to do
5   that. As I said, I mean I think, you know, there
6   has been a general objection I guess I would say
7   or at least a similar objection to many of these
8   requests, but in terms of your question with
9   document request number 19 which was -- which
10  document request number 19, just for the record,
11  called for documents sufficient to show all
12  customers and clients of RC Security, Otter Audits
13  and OtterSec including all persons for whom RC
14  Security, Otter Audits and OtterSec has performed
15  any auditing work or from whom RC Security, Otter
16  Audits and OtterSec has collected any payments for
17  services or products.
18      So I think your question -- to answer your
19  question, the case law is, quite frankly, it's
20  just -- I don't know that this really is a case
21  law issue. It's a relevance issue, and to sort
22  of -- I mean I thought I addressed this, but the

59

1   point fundamentally is that utilizing -- I think,
2   Rachel, just to -- your question was more so about
3   the time frame, the scope, the time frame being
4   used, that 2022 is the cutoff, correct?
5       MS. CLATTENBURG: No, no, no, no. I just
6   want to clarify for the record. For request 19
7   you have everything up through 3/31/2023. So what
8   I'm trying to get at is what -- what else are you
9   guys asking for then for request 19?
10      MR. PLOTNICK: We want to know who the
11  customers and clients were of RC Security, Otter
12  Audits and OtterSec obviously beyond I think you
13  said, right, March 31, 2023, because -- I guess
14  this is really related to Alex's point -- but --
15  but the fact -- if you have a customer or a client
16  that perhaps did not transfer their business to RC
17  Security, Otter Audits until after March, March of
18  2023 -- could have happened in April; it could
19  have happened in May -- I mean clients in general,
20  right, they need services from time to time, and
21  that can postdate it. So the relevance goes to
22  who their clients, who their customers were. It's

60

1   fundamentally -- well, it's largely related to the
2   declaratory judgment claim and successor liability
3   claim. I think it's also related to fiduciary
4   duty claims as well and damages, as Alex had
5   mentioned, but to the extent that you have an
6   overlap in clients or customers of the company,
7   that's the question. And there could be overlap,
8   right, where there was a client or customer of
9   OtterSec as of, you know -- pick a date -- August
10  of 2022 where work was performed for that client
11  or customer, and they didn't need services again
12  until April, June, July of 2023, but if --
13      MR. CRENNY: Steve, can I just -- sorry.
14      MR. PLOTNICK: No, I was just --
15      MR. CRENNY: I was looking for a point to
16  jump in.
17      MR. PLOTNICK: Yeah. The question is:
18  Are they the same? So we're really just looking
19  for a current list of who all of their clients and
20  customers are. I'm not turning to the financial
21  stuff because I'll restrict myself to the question
22  of who they are. So this is really going to the

61

1  question of who they are and looking for who they
2  are. Are they doing the same work for them? Is
3  this the same business? And so go ahead, Kevin.
4      MR. CRENNY: Yeah. So I think this goes
5  to that, and to -- I understand Alex's point. I
6  don't think that's -- that's wrong, but it's not
7  like the Complaint was filed on October 1st here.
8  Like, it was filed while things were still
9  happening. It was filed five, six months later.
10      You know, if you were a customer of
11 OtterSec in August, then by January OtterSec is
12 not doing any business, you're not a customer of
13 OtterSec anymore, and then if you're finding
14 somebody new in, you know, April or past that,
15 there has to be some point at which it's more, you
16 know, the burden outweighs the benefit of the --
17 of additional discovery. The date of the
18 Complaint we think is a reasonable cutoff where
19 we'll give you, you know, six months or however
20 many months that is after the dissolution, but
21 there's got to be some -- we think there's got to
22 be some point where it could be cut off, and we

62

1  think that's a reasonable cutoff date that would
2  give you the things that are relevant to the claim
3  as it was filed at that time.
4      You know, if the Complaint had been filed
5  on October 1st, I don't know that we'd take the
6  same position because obviously then, like, that's
7  just as it's dissolved.
8      But here we've given a number of months
9  past the dissolution, and we think there's got to
10 be some cutoff, and when I say dissolved --
11     MR. MALYSHEV: I have a question. Sorry.
12 I thought you were done. Sorry.
13     MR. CRENNY: No. I just wanted to
14 clarify, you know, the assets were sold in
15 September. I said dissolution. Our position is
16 that it dissolved back in July, but I think you
17 probably understood what I was saying.
18     MR. MALYSHEV: Yeah. So is the windup
19 complete?
20     MR. CRENNY: No. The windup -- we've said
21 the windup is not complete. It's still in an
22 extended windup period.

63

1      MR. MALYSHEV: So I don't think -- so I
2  think our position is you cannot take that
3  position while the windup is ongoing. You might
4  disagree, but I think that's our position.
5      MR. PLOTNICK: Well, and also -- look, let
6  me just kind of come back. You raise a reasonable
7  point, Kevin, and that is, you know, what are we
8  using here as a cutoff? And that's something that
9  we're open to discussing with you. In other
10 words, saying, like, let's, like, just sort of
11 pick a date, right, for now as, like, at least as
12 a for-now question and as a starting point. I
13 think where our disagreement is, is utilizing
14 March.
15      I mean, you know, you're talking about a
16 date of --
17      MR. CRENNY: Okay. What date would you
18 prefer? Is there a date you want to propose as a
19 compromise in the interest of resolving some of
20 these things today? Do you have an alternative
21 date to propose?
22      MR. PLOTNICK: Yeah. We --

64

1      MR. CRENNY: If you leave at a minute,
2  then we're never going to finish discovery if they
3  keep signing clients, right? Like we've got to
4  have something.
5      MR. PLOTNICK: Yeah. I don't disagree
6  with that, and that's my point. You know, we do
7  need to at least have some certainty and, you
8  know, perhaps pick up, if things need to be
9  supplemented at a later date, we could do that.
10      But yeah. I mean the short answer to your
11 question is we would propose what we have done
12 with our discovery responses to use, you know,
13 March of 2024 as a cutoff date.
14      Really what we're trying to do, and this I
15 think would at least apply across the board with
16 the financial stuff is to kind of capture at least
17 all the way through 2023 and at least a little bit
18 into 2024 for some of this stuff. So that's what
19 we propose.
20      But, you know, again, just to reiterate my
21 point about the client, you know, you're talking
22 about it that would have been in operations, I mean

65

1 these entities RC Security and Otter Audits were
2 formed in, what, September of 2022. OtterSec was
3 dissolved in -- what was -- the certificate of
4 dissolution was filed in October of 2022. You
5 know, so utilizing 2022, you're talking about, you
6 know, two, three months of operations of the
7 business in our view is sort of plainly not enough
8 to sort of capture --
9     MR. CRENNY: We did 2023 though. We did
10 the end of March 2023.
11     MR. PLOTNICK: Sorry. Correct.
12     MR. CRENNY: So they were started in
13 September. September, October, November,
14 December, January, February, March. That's seven
15 months of operation, you know, six of which, you
16 know, OtterSec is in windup but not doing any
17 business anymore.
18     MR. PLOTNICK: Yeah. I think six, right,
19 I think six months, but --
20     MR. CRENNY: Six on one side. Seven on
21 the other.
22     MR. PLOTNICK: Yeah. Sorry. I was kind

66

1 of conflating I think the customers and clients,
2 same with the employees.
3     But, yes. Our proposal was through March
4 of 2024, quite frankly, for the reasons that I had
5 mentioned before, and that is you could have very
6 easily a situation where you have clients and
7 customers who did not necessarily need --
8     MR. CRENNY: Sure, sure. We understand
9 that point. We agree about that. We get that.
10     MR. PLOTNICK: That's fine.
11     MR. CRENNY: We can take it under
12 consideration.
13     MR. PLOTNICK: Yeah.
14     MR. CRENNY: So this 2024 cutoff, what do
15 you -- this is RFP 19 we're talking about. Is
16 that a cutoff -- you know, I just want to try to
17 cover as much ground as we can. Which requests do
18 you propose that cutoff for? And then we can come
19 back and talk about it next week. Is it just RFP
20 19 or where do you want to -- just so we don't
21 have to do it again every time.
22     MR. PLOTNICK: I would say -- I mean we're

67

1 happy to talk about that for others, but as a
2 general cutoff date that has been our -- that is
3 our overall proposal to use as a cutoff date. I
4 mean it bleeds over into some of the financial
5 documents that we've been looking for which I know
6 we're not taking up, but I'm happy to kind of go
7 through these on a more document request by
8 document basis. So why don't we do that.
9     So document request number 1, I think we
10 covered before, but that's -- that I think -- I
11 think we covered that already. That was one of
12 the requests that was the subject of our motion.
13 We covered 4 which was restricted to the DANS
14 documents as well.
15     MS. CLATTENBURG: So wait. Steve, Steve,
16 can I point one thing out? This is Rachel. On
17 request number 1, for example, where we say
18 subject to the foregoing objections, defendants'
19 general objections and responses set forth above,
20 defendants will make a good faith effort to locate
21 and produce available non-privileged and
22 responsive documents. So again, that means we are

68

1 not withholding non-privileged documents on the
2 basis of those objections for that request number
3 1. That's why we were confused as to what -- you
4 know, I think we've gone through this one, but I
5 just -- that's how you read them, and I think it's
6 similar to how you all wrote your responses. I
7 mean we had this discussion in a prior meet and
8 confer. So it's not a mystery as to where the
9 objections are, basis for withholding and where
10 they are.
11     MR. PLOTNICK: Yeah. Let me pull that up
12 because I thought that you had said specifically
13 in your response that you had only produced them
14 for OtterSec. So if you bear with me one second,
15 I want to pull this up.
16     MS. CLATTENBURG: You have these for Otter
17 -- you have these for the other entities, so are
18 we repeating --
19     MR. PLOTNICK: But you still had -- but
20 you're questioning why I'm raising this, and
21 you're telling me that you produced it, and what
22 I'm saying is in your document responses you have

Transcript of Meet & Confer
Conducted on January 3, 2025

69

1  a written response that says we object and here's
2  what we're going to give you, and I believe that
3  your response said specifically that you would
4  only provide them for OtterSec.  Now, you're
5  telling me something different, and I think that
6  would mean that you need to revise your document
7  responses to clarify what it is that you're
8  actually agreeing to give to us because I think
9  the confusion may actually be --
10     MS. CLATTENBURG:  Well, Steve, can you
11  just point to where -- I just want to find where
12  you're saying that.  In response to request number
13  1, can you just point me to what you're talking
14  about specifically, please?
15     MR. PLOTNICK:  Yes, Rachel.  I'm just
16  trying to -- I was trying to pull that up.  Just
17  give me one second.
18     MR. CRENNY:  It could be -- I'll let you
19  find it, Steve.  Give us an idea of what sentence
20  you're looking at.  That would be helpful.
21     MR. PLOTNICK:  Yeah.  Hold on.
22     So okay.  So I have your responses and

70

1  objections up in front of me.  Just give me one
2  second.  So we were talking about request number
3  1, correct?
4     MR. CRENNY:  Yes.
5     MR. PLOTNICK:  So, yeah, in your
6  response to -- wait, wait.  Sorry.  I was looking
7  at the wrong one.  Withdrawn.
8     Yeah.  So that is not 1.  So request
9  number 1 is not one where your response was
10  limited to producing OtterSec documents
11  specifically.  So, yeah.  Rachel, that -- you're
12  correct, but there are others, and, you know, as I
13  said, I'm happy to kind of go through this on a
14  line by -- in fact, why don't we --
15     MR. CRENNY:  I think that might be the way
16  to do it so we stop jumping around so much.
17     MR. PLOTNICK:  I agree.  Yeah.  I'm coming
18  around to that agreement with you, Kevin.  Yeah.
19  Go ahead.
20     MR. CRENNY:  Yeah.  One other thing.
21  We're approaching the halfway point, and we
22  haven't gotten to our motions.  If we get -- only

71

1  talk about your motions today, because -- that's
2  okay, but then we want to start with ours at the
3  next meeting rather than get back into these, I
4  think would be the fair way to do it.  We can --
5  if these take all day, they take all day, but I
6  just want to get that out there for scheduling
7  purposes as a suggestion.
8     MR. PLOTNICK:  Yeah.  I'll do it either
9  way.  I mean, if you want to sort of -- I know we
10  have four hours blocked off today.  We could just
11  kind of get as far as we can on this and sort of
12  put our pencils down and then -- we should get to
13  some of your stuff today, too, to the extent --
14     MR. CRENNY:  Yeah.  It might be --
15     (Overlapping speakers/crosstalk)
16     MR. CRENNY:  -- it's probably more helpful
17  to get through yours, but yeah, we don't want to
18  start the next session starting back over on yours
19  I think is just what I want to put out there.
20     MR. PLOTNICK:  Yeah.  My only thinking on
21  that is that to the extent you want to raise the
22  things where perhaps we need to consider some

72

1  things in advance of the next one, I think it
2  might make sense to turn to yours, but why don't
3  we just at least spend the next half hour or so,
4  we can start going up -- I think you're right,
5  Kevin.  Let's do this on a document request by
6  document request basis.
7     So I think we've -- I think we've covered
8  now 1.  I think we've covered 4.  4 was related
9  exclusively to the DANS stuff which you had said
10  you guys will consider.  Okay.
11     So 5, document request number 5.
12  Documents, communications concerning all dividends
13  or distributions paid to any shareholder, member,
14  partners of RC Security and Otter Audits.  This is
15  a request where there were sort of the similar
16  objection to producing documents for RC Security
17  and Otter Audits because they're separate and
18  distinct entities.  They're not successors or mere
19  continuations of OtterSec.
20     Let me look specifically, Rachel, thinking
21  of your point -- and then -- right.  So this is
22  one where at least appears that there was an

Transcript of Meet & Confer
Conducted on January 3, 2025

73

1 objection that the defendants stood on to
2 producing RC Security and Otter Audits documents
3 all together because I'm looking at, you know,
4 after the series of objections that RC Security
5 and Otter Audits aren't the successors and some
6 others. The response simply says that subject to
7 the foregoing objections OtterSec has no
8 responsive documents, but no response is provided
9 for RC Security and Otter Audits.
10     I will at least take the opportunity to
11 head off a question that I think you might be
12 asking, Kevin, and that is: Why is this relevant?
13 It's a damage -- this is a damages question.
14 Fundamentally it goes to damages because at least
15 our claim is that OtterSec was improperly
16 dissolved, that we should have an ownership
17 interest in Otter Audits and RC Security, and if
18 dividends or distributions were made to
19 shareholders, members -- really these are LLCs --
20 that would go to our claim for damages to our
21 portion, our appropriate portion of the dividends
22 or the distributions in this case, right. So --

74

1     MR. CRENNY: So we can revise our response
2 on this because we have produced some of this.
3 We've given you 1099 -- RC Security 1099s. We've
4 given you these to the extent they exist for 2022.
5 Sorry. I'm looking at my list of what we've
6 produced.
7     So I think this is -- this is one where
8 we've produced stuff in the, you know, as part of
9 our effort at compromising in advance of filing
10 our notices back in late November/early December.
11 So beyond that I think we hear you. We got your
12 arguments. This is -- we'll take it under
13 consideration at this point. I don't think we
14 need to get on it right now, but I think you have
15 some of -- I think the document request -- the
16 response you're looking at is not up to date of
17 what we've done at this point.
18     MR. PLOTNICK: And, again, I'd sort of
19 raise to the extent that it's sort of part of the
20 discussion, you had said you produced some of it
21 for 2022. Again, the idea is I don't -- I don't
22 want to --

75

1     MR. CRENNY: I think we produced -- we've
2 produced the financials for all of 2022. The only
3 reason I said some of was because I am not a
4 financial expert and I don't have an immediate
5 sense of like, oh, we did a 1099; that's a
6 dividend; like, I'm not -- I don't know all that
7 off the top of my head. I was just being
8 cautious, but I think we gave you financials for
9 2022 broadly, so --
10     MR. PLOTNICK: Yeah, and this is a date
11 range point, right? So --
12     MR. CRENNY: Yeah, yeah. I'm taking your
13 point on the date range point, and we will -- I
14 think we understand your position on that and your
15 suggestion of March 2024.
16     MR. PLOTNICK: Okay. So let's go to the
17 next one. Document request number 9 is -- let me
18 get to that. Document request number 9 called for
19 documents, communications concerning any offers,
20 bids, auctions, appraisals or valuations of RC
21 Security, Otter Audits or OtterSec, any ownership
22 interest in RC Security, Otter Audits or OtterSec

76

1 or any assets of RC Security, Otter Audits or
2 OtterSec.
3     Let me just get to the written responses
4 and objections. Right. So again, you know, we
5 have sort of a similar series of objections
6 including the objection that these are not
7 successors. I think we covered this in the
8 motion. You had indicated that defendants RC
9 Security and Otter Audits have no responsive
10 documents and that defendant Robert Chen will make
11 a good faith effort to locate and produce
12 available non-privileged responsive documents
13 concerning offers, bids, auctions, appraisals or
14 valuations of OtterSec.
15     This I think to me really just is more of
16 the time frame issue. I mean I think -- I take it
17 that the response saying that RC Security and
18 Otter Audits have no responsive documents was
19 limited to the time frame that you were utilizing
20 which is the, I think for this one as well, the
21 date of the filing of the Complaint. So this one
22 is more of a time frame issue I think than

77

1  anything else.
2      MR. CRENNY:  Okay.  We will double check
3  that.  I'm not sure if there's a time frame issue
4  on this, but we will -- we understand your
5  position on this one, that the only issue here is
6  time frame?
7      MR. PLOTNICK:  Yeah.  I mean if you have
8  none for the time frame, then you have none.  You
9  know, but if, you know, it just limits it to the
10 time frame I think.  Okay.
11     So document request number 10.
12     MR. CRENNY:  Mm-hmm.
13     MR. PLOTNICK:  Sorry.  I'm just flipping
14 back and forth between screens.  Here we go.
15 Documents and communications concerning any
16 acquihire of, investment in or purchase, sale,
17 transfer or acquisition of RC Security, Otter
18 Audits or OtterSec, any ownership interest in RC
19 Security, Otter Audits or OtterSec.
20     Flipping pages here.  Again, this is one
21 where I think, again, sort of same series of
22 objections that we have spoken about before, and

78

1  there happens to be a specific objection.  I think
2  that was -- Kevin, just for your information, too,
3  I think there was the same objection in the
4  previous request that we had talked about, and
5  there was a time frame objection.
6      But in any event, I know you're talking it
7  under advisement, but number 10 does specifically
8  have this time frame objection in it as I'm
9  looking at it, and, you know, again, this is a
10 time frame issue as I see it because it says -- in
11 your response to 10 it said that defendants RC
12 Security and Otter Audits have no responsive
13 documents, and otherwise you said that Robert Chen
14 would make a good faith effort to locate and
15 produce documents for OtterSec.
16     MR. CRENNY:  Okay.  So I think this one
17 leaves us in the same spot as the previous of --
18 we're just talking about time frame?
19     MR. PLOTNICK:  Yes.
20     MR. CRENNY:  Okay.
21     MR. PLOTNICK:  And again, just high level,
22 just to clarify for the record, I mean I think

79

1  we'll come back because we do have some questions
2  related to the protocol.  So I think there's
3  potentially some issues there, too, related to the
4  protocol, but we'll save that issue for a later
5  point.  But, yes, fundamentally it is a time frame
6  issue.  Okay.  So that's 10.
7      11 is -- 11 was the next one.  Documents,
8  communications concerning efforts to raise money,
9  funds or capital for RC Security, Otter Audits and
10 OtterSec.  Looking at the objections again here
11 just to refresh my memory on them from my notes.
12 This one looks like this is a time frame issue
13 more than anything else here on this as well
14 because again here you say defendants RC Security,
15 Otter Audits have no responsive documents.  So
16 again I think, Kevin, we're on the same issue
17 here, too, with that one.
18     MR. CRENNY:  Okay.
19     MR. PLOTNICK:  The next one up that was
20 the subject of our motion is 15:  Documents,
21 communications concerning general ledgers, state
22 and federal tax returns, financial statements.

80

1  This is the financial stuff, right:  Loans,
2  expenses, payroll records, balance sheets, revenue
3  or income, cash flow, assets, liabilities and debt
4  schedules for the defendants and OtterSec.  And in
5  response in 15, again, similar series of
6  objections; entirely separate and distinct from
7  OtterSec, and the response -- this is -- this is
8  one where the response was limited to OtterSec,
9  but I know -- I think it was -- there was some of
10 your recent productions that you have produced
11 some of the stuff through 2022.  So I think this
12 is one where you have a --
13     MR. CRENNY:  We have an update to make,
14 yeah.
15     MR. PLOTNICK:  -- an update to make and,
16 but still, like, a time frame issue as well, and I
17 know -- I think I saw -- I mean I can pull it
18 up -- I think -- I mean you may know better.  I
19 mean I think I looked at what it was.  I know some
20 general ledgers were produced.  I think in the
21 more recent productions that just came through
22 within the last week or so -- I can't remember off

81

1  the top of my head who they were for.  Yeah.  So
2  I'm kind of looking at a summary that I have in
3  here.  We got a balance sheet for RC Security, P&L
4  for RC Security, a few other -- so I gather that
5  essentially at least some responsive documents to
6  this request had been produced.  The question is
7  really sort of what it is, what hasn't been
8  produced.  But it sounds like this one is sort of
9  turning more into a time frame issue more than
10 anything else.  Correct?
11      MR. CRENNY:  Right.  I mean it's your
12 issues.  So you tell me if there's something else,
13 but my understanding is that we have given you the
14 kinds of documents you've requested through 2022,
15 and the remaining area of dispute is whether to
16 give you those same kinds of things further into
17 the future.
18      You know, we don't think they're relevant
19 even in 2022, but I think -- yeah.  I think -- are
20 you telling me that the only issue is you want the
21 same for farther, or is there something that
22 you've not received that you're saying you think,

82

1  you know -- I think the question you asked me I
2  think is a question for your side.  Maybe Alex can
3  jump in a little.
4      MR. MALYSHEV:  Yeah, I had --
5      MR. PLOTNICK:  Yeah.  Go ahead, Alex.  Go
6  ahead.
7      MR. MALYSHEV:  Yeah.  So I was going to
8  ask, and this is relevant to some other issues
9  that we'll get to later, but whether you were not
10 objecting on the basis of this concerns Otter
11 Audits, RC Security, because that is obviously
12 relevant to our subpoena to Agassi, and I need to
13 know what your position is with respect to
14 documents.
15      MR. CRENNY:  We have -- sorry.  I'm not
16 totally understanding what you're saying.
17      MR. PLOTNICK:  Let me take a step back and
18 maybe I can --
19      MR. MALYSHEV:  Sure, yeah.
20      MR. PLOTNICK:  Yeah, I know what you're
21 going at, Alex, because I was going to sort of ask
22 the same question.  I mean I can see, right,

83

1  Kevin, that certainly some documents responsive to
2  this request apply to RC Security have been
3  produced.  So I guess the question really is in
4  the first instance whether the objection that was
5  in here that, and the limiting response saying
6  we're only going to produce responsive info,
7  responsive documents for OtterSec has been at
8  least partially withdrawn such that the agreement
9  here is to produce responsive documents for all of
10 the defendants.  Okay.  So that's my question.
11      MR. CRENNY:  No.  We think they are only
12 relevant if they concern OtterSec.  We are
13 producing things that are not relevant in our view
14 in an effort at compromise and in good faith to
15 try to resolve the number of things the court
16 needs to decide, but we are not, you know,
17 admitting that anything that is only related to
18 the South Dakota companies is relevant.  We do not
19 think that stuff is relevant.  We are just acting
20 in good faith and trying to limit the scope of
21 what the court needs to rule on.
22      MR. PLOTNICK:  So that's what I'm trying

84

1  to understand.  So -- well, so first of all, just
2  to be clear, even to the extent the documents have
3  been produced to some degree through 2022 we think
4  they should be produced beyond '22 for the reasons
5  that I think I've already articulated.
6      MR. CRENNY:  Sure, sure.
7      MR. PLOTNICK:  So you've got the time
8  frame issue.  Yeah.  Separately, since you brought
9  it up, what I'm trying to discern here is what
10 sounds to me like a very sort of subjective
11 criteria that the defendants are utilizing to
12 produce documents, and that is this, what you just
13 said, and that is, well, we're only producing them
14 to the extent that they concern OtterSec, and
15 that's where I'm struggling to sort of understand
16 what that means, because the claim in the case,
17 right, fundamentally or at least one of the claims
18 in the case fundamentally is that Otter Audits and
19 RC Security are OtterSec, that it's a continuation
20 of the same business, that they are successors.
21      So what it sounds to me is that this is
22 sort of a -- the same -- that you are in some way

85

1 relying on a merits-based objection to producing
2 documents that would otherwise be responsive to
3 that request, and that's what I'm trying to
4 understand.
5     MR. CRENNY: No. I think we're talking
6 about the separate corporate entity. We
7 understand your argument that, you know, in
8 really -- you know, we understand your position in
9 your Complaint, but if OtterSec transferred
10 something to these new entities there's some,
11 you know, record of it that says OtterSec on it,
12 that is a document that RC Security might have
13 that relates to OtterSec because OtterSec, says
14 OtterSec on. I'm making this up. I don't know if
15 there's something like that. I'm just trying to
16 provide an example. You know, or if there are any
17 transactions between the two companies, those are
18 things that we agree are relevant because they
19 relate to OtterSec. They concern OtterSec.
20     I don't think -- I think concern is, like,
21 a normal word to use in this sort of response in
22 that it has plain normal meaning.

86

1     We are talking about OtterSec, LLC, the
2 entity that is in Wyoming. You know, we are not
3 using it in a way that -- we understand what
4 you're saying about continuation. We are not
5 treating it that way. We are producing things
6 that do not -- we are producing other things that
7 we do not think are relevant that do not touch on
8 OtterSec at all that come from the new company.
9 So we are not conceding that those are relevant,
10 and we don't think they are. I think this is
11 stated pretty clearly in our --
12     MR. MALYSHEV: Let me ask a question.
13     MR. CRENNY: Sure, yeah.
14     MR. MALYSHEV: This is Alex. If I can ask
15 a question. So let's say a tax return, right,
16 which wouldn't identify necessarily information
17 about, you know, specific counterpoints. What is
18 your view on that? Is that responsive or not? Or
19 is that produced or not?
20     MR. CRENNY: I could tell you we've
21 produced some tax returns, but what -- is there a
22 specific question? It's like a hypothetical.

87

1 It's kind of hard --
2     MR. MALYSHEV: No. No, it's not a
3 hypothetical. Do we have --
4     MR. CRENNY: That's what this -- yes, it
5 is.
6     MR. MALYSHEV: -- loans, so financial
7 statements, federal tax returns -- financial
8 statements may or may not include specific
9 information about parties and let you identify
10 OtterSec or whether or not you're also including
11 any documents in which a client that was
12 previously a client of OtterSec produced. Do you
13 have a list of clients that you're checking them
14 against, or you're just checking against OtterSec?
15     MR. CRENNY: Sorry. Are we doing what?
16     MR. MALYSHEV: If you have a document, are
17 you only checking whether or not it mentions
18 OtterSec to determine whether it's related to
19 OtterSec, or are you also checking against a list
20 of clients of OtterSec that is known to you?
21 Because that would capture documents in documents
22 -- in document request number 15 which talks

88

1 about, you know, a whole list of financial
2 documents. So I'm trying to understand how you're
3 getting to determining whether something is
4 related to OtterSec and you reviewed.
5     MR. CRENNY: Yes.
6     MS. WHITE: Can I just jump in? This is
7 Madelyn White, because if I'm understanding you,
8 Kevin, this might kind of moot what Alex is
9 saying.
10     So for request number 15, are you
11 giving -- I understand your objections as to
12 relevancy. Have you produced profit and loss
13 statements for RC Security or Otter Audits that
14 don't mention OtterSec even though your position
15 is that those are not relevant? Have you produced
16 them?
17     MR. CRENNY: Yes, for 2022. We have
18 produced financial documents from these companies
19 for 2022 regardless of whether the word OtterSec
20 appears on them, regardless of whether they
21 mention OtterSec.
22     MR. PLOTNICK: I want to -- I don't --

Transcript of Meet & Confer
Conducted on January 3, 2025

89

1  Steve Plotnick speaking here. I don't -- we're
2  trying to really understand -- right -- so --
3  okay. So to the extent an RC Security or Otter
4  Audits document specifically mentions, uses the
5  word OtterSec, right, through 2022, those
6  documents are being produced, right? And --
7  right, Kevin?
8      MR. CRENNY: Yeah, for any time. For any
9  time that specifically mentions it.
10     MR. PLOTNICK: Or, well -- through -- I
11 would say through March -- when we say anytime,
12 through March of 2022, right, because this is the
13 time --
14     MR. CRENNY: Right.
15     MR. PLOTNICK: So, and then separately
16 there is this other criteria that you've mentioned
17 -- you had mentioned it in your opposition to our
18 motion, and the way I think it was phrased was to
19 the extent they mention OtterSec or concern
20 OtterSec, and I think that's what we're trying to
21 understand, what is different between those two,
22 and how is it that you're making a determination

90

1  that a document concerns, quote, unquote,
2  OtterSec? Because sort of utilizing Alex's
3  example, I mean it just sounds to me that this is
4  fundamentally related to the merits-based argument
5  that these are separate entities, that they're not
6  the successors to OtterSec, which is, you know, a
7  key issue in the case.
8      So if you have P&Ls or general ledgers or
9  whatever it may be, some sort of financial
10 document that would otherwise be responsive to
11 this request, I mean I think fundamentally those
12 types of documents go directly to that question,
13 whether or not they specifically mention OtterSec,
14 and to use Alex's example, right, it's a customer
15 or a former customer, right, of OtterSec. Doesn't
16 -- it's not mentioning OtterSec, but if that's a
17 former customer that is responsible for generating
18 revenue for OtterSec and RC Security --
19     MR. CRENNY: Well, you have the customers
20 up through the date of the Complaint.
21     MR. PLOTNICK: But the financial --
22     MR. CRENNY: I mean is this a time frame

91

1  issue? I understand you're raising this other
2  hypothetical, but is there really anything that's
3  not settled by if we just discuss and figure out a
4  time frame answer?
5      MR. PLOTNICK: Well, I don't think so, not
6  without having an understanding of what that
7  criteria is that you're utilizing to say --
8  right -- saying something mentions OtterSec is
9  objective, right? It's black and white. Either
10 it mentions OtterSec or it doesn't. So that's
11 easy, right? You run a search term, say it
12 doesn't say OtterSec in it, we'll produce it to
13 you.
14     MR. CRENNY: Mm-hmm.
15     MR. PLOTNICK: But the question is how are
16 you making determinations about whether or not the
17 documents concern OtterSec? Because what I'm
18 trying to say, Kevin, is how are we slicing that
19 up? Because fundamentally the claim in the case
20 is that RC Security and Otter Audits are a
21 continuation of the same business, that they are
22 OtterSec.

92

1      So I think in our view all of this stuff,
2  and I think you're saying that you have not
3  produced everything that would be responsive to
4  this request if it didn't sort of fall within that
5  criteria, but you've -- you have -- are you --
6  meaning the defendants -- utilizing some sort of
7  criteria to make determinations as to what to
8  produce and what not to produce, and, again, I
9  think our view is that all of this concerns
10 OtterSec because our claim is that they are
11 OtterSec, but it sounds like you have withheld
12 some responsive documents on the basis of what we
13 consider to be an argument that goes to the merits
14 of the case that will be determined by the fact
15 finder, and that is: Are they, in fact, the same
16 business? So that's what we're trying to get to
17 here.
18     MR. CRENNY: Yeah. I mean I see what
19 you're saying. I think this request is very
20 broad. You know, is there a way we could work out
21 a compromise of, like, financial information, you
22 know, the financial information of the kind we've

Transcript of Meet & Confer
Conducted on January 3, 2025

93

1 given you, if we discuss the time period on that,
2 does that solve this other issue that you're
3 raising? I think maybe we have just discussed
4 this request enough, and we've gotten clarity on
5 your position. You know, I understand what you're
6 saying more than I did at the start of the
7 conversation from the briefing we had done. So
8 that's good, but, you know, if that could be --
9 that's where we got on this one for today, that
10 would be productive. So maybe if we want to come
11 back to it or maybe -- like, what do you see as a
12 possible way of compromising on this one in a way
13 that could, you know, hypothetically could resolve
14 this in a way that's manageable? I don't know if
15 you have any thoughts on that. Sorry. That was
16 like two different things.
17     MR. PLOTNICK: Yeah. I mean I don't think
18 that there should be this sort of subjective
19 criteria that is not in any way transparent with
20 us as to how these determinations are being made.
21 So I mean to the extent that you are withholding
22 really any responsive documents to this request,

94

1 be it, you know, financial statements, P&L,
2 whatever it may be, payroll records, right, all
3 that stuff, that are RC Security and Otter Audits
4 documents, we think that they should be produced.
5 Yes, there's a time frame issue on it, but I mean
6 part of it goes to the question I would sort of
7 put over to you in terms of like a compromise. I
8 mean I don't think it's that broad. I mean it
9 certainly covers a lot of categories of
10 information, but, you know, when you're talking
11 about, you know, basically financial statements,
12 general ledgers, P&L, I mean those are, you know,
13 specific identifiable, you know, categories of
14 documents that we're talking about.
15     If some categories of documents don't
16 exist, well, then, then they don't exist.
17 Obviously they wouldn't be produced, but I think
18 what I heard from you is that documents that would
19 be responsive to this request are being withheld
20 on the basis of this criteria that we don't quite
21 understand what it is or how determinations are
22 being made, and that's what we consider to be

95

1 problematic.
2     MR. CRENNY: Okay. I think we've --
3 sorry. Alex, you want to say -- go ahead.
4     MR. MALYSHEV: Yeah. Quick question. Is
5 your issue with the fact that it's asking for
6 documents and communications? Because I think the
7 list of documents actually is trying to define
8 that. Is your issue communications or the actual,
9 you know, document for document for each defendant
10 for a period of three years?
11     MR. CRENNY: I don't have an answer to
12 that off the top of my head right now. I think
13 we've gotten your clarification on your position.
14 I think we discussed this one. We'll come back.
15 I want to just clarify two things for the record.
16 One being I don't think that the concerns OtterSec
17 phrasing is particularly subjective or confusing.
18 I don't think it's that different from, like,
19 relevance. You know, if you're trying to decide
20 if something's relevant, we're all reading these
21 Discord conversations and deciding if it's
22 relevant, and that's not exactly, you know, a word

96

1 search and is the word there or not. But that's
2 not unacceptably subjective. I don't think our
3 concerns OtterSec thing is that -- the phrasing
4 there is that subjective in the way that you're
5 suggesting.
6     We can discuss it further next week. I
7 don't think going in circles on this one is
8 super-productive at this point. I just wanted to
9 state that for the record.
10     Also I just want to clarify for the record
11 to the extent that I've said at any point
12 something like, quote, "there's a date range
13 issue," quote, I mean the dispute is over the date
14 range. I'm not conceding that we have an issue
15 with as we've done something wrong or that a
16 longer date range would be appropriate. So I just
17 wanted to clarify those two points.
18     MR. PLOTNICK: No. Thanks, Kevin. So I'm
19 looking at my watch here. It's 12:00, and I'm
20 fine with sort of turning over to your stuff. I
21 mean there's a few more that we have to go to, but
22 I do think it would be a good idea if we sort of

Transcript of Meet & Confer
Conducted on January 3, 2025

97

1  put our pencils down maybe on this and turn to
2  some of your stuff because to the extent that
3  there is anything that we need to kind of go
4  through ahead of the next meet and confer, you
5  know, at a high level, I want to make sure that we
6  have enough time to do that. So should we turn
7  over to some of your motion to compel maybe is the
8  best place to go to?
9      MR. CRENNY: I think we should keep going
10 on yours while we're this deep into it, and then
11 we'll get as far as we can on yours and we'll try
12 to highlight the things that we think we need a
13 response for if we're short on time, rather than
14 have --
15     (Overlapping speakers/crosstalk).
16     MR. CRENNY: -- stuff that we didn't touch
17 on yours. But I would --
18     MR. PLOTNICK: Me neither. Let's do this.
19 Let me make a suggestion.
20     MR. CRENNY: I would request a five-minute
21 break right now to --
22     MR. PLOTNICK: Why don't we do this.

98

1  Kevin, let me make a suggestion because I do think
2  we should get to some of yours today. Let's --
3  I'll follow -- let's finish up -- let's at least
4  finish going through our document requests, right,
5  and we'll sort of put our pencils down on the
6  document requests at that point and turn to your
7  stuff, and then we can, you know -- the
8  interrogatories are sort of separate issues, and
9  we'll at least put our pencil there, but I do want
10 to make some time to turn to your stuff, too. So
11 why don't we do that. Do you want to take like,
12 take like five, ten minutes or so and come back?
13     MR. CRENNY: Yeah. Let's take five
14 minutes, and I will -- let me just confer with
15 Josh and Rachel on that idea of stopping after
16 your document requests and leaving
17 interrogatories, see if they feel -- and you can
18 check with Madelyn and Alex as well, and then
19 we'll come up with a plan when we get back from
20 five minutes.
21     MR. PLOTNICK: Yeah. Sounds good.
22 Thanks.

99

1      (A recess was taken.)
2      MR. PLOTNICK: Okay. So we were on 15,
3  right? So just -- just thinking about one of the
4  things that you had -- Steve Plotnick speaking for
5  the record. I just want to clarify, because I had
6  asked Kevin about -- so talking to our document
7  request number 15 which was for the general
8  ledger, the federal tax returns, the state tax
9  returns, financial statements, et cetera. I
10 just -- am I -- I had asked whether or not you
11 were withdrawing the objection, the objection
12 based on the argument that these entities are
13 separate and distinct entities, if that objection
14 was being withdrawn at least through the end of 15
15 2022. I think you said no. So do I take it from
16 that that there are documents that would otherwise
17 be responsive to request number 15 even through
18 the end of 2022 that have been withheld or have
19 not been produced?
20     MR. CRENNY: I'm not sure I understand --
21 understood the question up to the last sentence or
22 two. We are not withdrawing our relevance

100

1  objection for documents that do not, you know,
2  mention or concern OtterSec. We are not
3  withdrawing it through the end of '22,
4  notwithstanding the fact that we've produced some
5  documents in an effort at compromising and
6  narrowing issues for the court. We are still
7  drawing the line where we have drawn it for
8  purposes of relevance or with respect to
9  relevance. Does that answer your question?
10     MR. PLOTNICK: Partially. Okay. So the
11 objection was not withdrawn -- is not withdrawn.
12 So am I correct then through the end of 2022 then,
13 therefore, if the objection is not being
14 withdrawn, that there are documents that are
15 responsive to document request number 15 that have
16 been withheld on the basis of that objection?
17     MR. CRENNY: Well, we produced those.
18 We've produced the ones for 2022. So I think, no,
19 there are none being withheld on that point
20 because we've produced them, even though we're
21 standing on the objection, even though we're not
22 conceding the objection.

101

1    MR. PLOTNICK:  Okay.  So -- so what you --
2 okay.  So just to be clear, any documents that you
3 have, notwithstanding the fact that you're not --
4 well, so you're -- you're keeping the objection,
5 but you're saying notwithstanding that objection
6 you are still producing all documents I guess that
7 you have, right, that would be responsive to
8 request number 15 through the end of 2022.
9    MR. CRENNY:  That sounds correct to me, if
10 I'm understanding what you're saying correctly,
11 but we can get back to you to verify that if you
12 want, you know, to make sure we're being precise
13 there.
14    MR. PLOTNICK:  Yeah.  That would be
15 helpful because it's not -- it's not clear,
16 because, again --
17    MR. CRENNY:  I think I'm giving you the
18 right answer, but just because it's a complicated
19 question with different clauses and qualifiers, I
20 would like to look at it in writing and then
21 respond in writing.  That might be helpful for
22 everybody.

102

1    MR. PLOTNICK:  Yeah.  That would be
2 helpful.  Because, again, I'm -- I want to kind of
3 come back to the question that we were talking
4 about, and that is, you know, the -- I understand
5 your position that it's a valid objection to say
6 that you'll only produce them to the extent that
7 they concern OtterSec, but I guess the fact that
8 you are at least maintaining that objection, still
9 I'm trying to discern whether or not anything is
10 being withheld on that basis obviously still.  You
11 have to check, you have to check.
12    But I'm still trying to understand and
13 just sort of ask if you could sort of explain to
14 me what it means.  So you're looking at documents
15 and you're reviewing documents.  What criteria are
16 you utilize -- again, like I said, saying whether
17 or not a document mentions OtterSec is -- that's
18 black and white.  It either says the word OtterSec
19 in it or it doesn't.  But then separately there's
20 what I consider to be a little bit more subjective
21 and certainly more vague an objection that says,
22 well, and also, right, to the extent that they

103

1 concern OtterSec, we'll produce them.  So the
2 question is:  How are you determining -- if you
3 have a document that is otherwise responsive, say,
4 to request number 15, okay, that doesn't utilize
5 the word OtterSec, what criteria are you utilizing
6 to say this either does or does not, quote,
7 unquote, concern OtterSec?
8    MR. CRENNY:  Yeah.  Steve, I think we're
9 going in circles on this.  I think we understand
10 what you're saying.  We understood -- we
11 understand Alex's point about, you know, a
12 customer, his hypothetical.  I think we don't
13 agree that we're applying a subjective criteria,
14 if that's a word.
15    We think what we're doing is appropriate.
16 We understand what your question is and what
17 you're saying.  We will take your question and
18 concern under advisement, and we'll see if we have
19 any further clarification to make on what, to
20 answer it next week, but I think -- I don't think
21 I'm going to give you a better answer today in
22 this meeting as I think we've said what we can say

104

1 right now.  I don't know.  I just feel like we're
2 going in circles on the same point.
3    MR. PLOTNICK:  Okay.  All right.  So then
4 I guess we'll move on to the next document request
5 which is number 16.  Documents and communications
6 concerning any accounts or joint accounts, open,
7 closed, or maintained by or for the benefit or use
8 of RC Security, Otter Audits and OtterSec with
9 any -- and we could talk about I think 16 and 17
10 together because, if you're open to that, because
11 one concerns, you know, traditional banking
12 institutions, and then 17 effectively calls for,
13 you know, the same type of request for a, you
14 know, a defi -- decentralized finance institution,
15 a crypto type of exchange, and those both called
16 for -- both of those, 16 and 17, sought for RC
17 Security, Otter Audits and OtterSec.  Both had
18 sort of the similar objections that RC Security
19 are separate entities and Otter Audits are
20 separate entities, and the response to both
21 requests was limited to OtterSec.
22    You know, again, this goes to a number of

105

1  issues.  I mean there are -- there are
2  transactions.  There's obviously the Mercury
3  account.  There are transactions between the
4  entities that we can see in the Mercury account
5  statements that have been produced.
6      MR. CRENNY:  But you have them.  I mean
7  that's stuff you have, so --
8      MR. PLOTNICK:  Right.  And for that I'm
9  sort of looking -- so I think this is another one
10 probably where the written responses may need to
11 be revised.  But I know you gave us -- I disagree
12 that we have all of that stuff.  I think we have
13 some of that stuff.
14     MR. CRENNY:  No.  I'm saying you have the
15 stuff where you're saying, you know, there's this
16 transaction in the Mercury bank account.  That's
17 also something you're looking at.  So you have
18 that one.
19     MR. PLOTNICK:  Right.  So there's the
20 Mercury bank account.  We have that, and we have
21 that through the end of 2022 though only, correct?
22     MR. CRENNY:  That's correct.

106

1      MR. PLOTNICK:  Right.  So, again, this is
2  another situation where we would be looking to go
3  certainly beyond 2022.  I mean even looking at
4  Mercury bank account statements as late as 2024, I
5  mean I was looking yesterday, I think it was the
6  April 2024 Mercury statement there were -- there
7  continue to be ongoing transactions in that
8  Mercury account as recent in that where we see
9  transfers of funds.  I think the one that I'm
10 thinking of specifically from April 2024 was a
11 transfer to Robert Chen.
12     But again, again, I don't want to sort of
13 confine this specifically to Mercury.  I mean what
14 we know of is certainly there was the Mercury.  We
15 know that there were, you know, wallets, digital
16 wallets that were utilized by OtterSec.  We could
17 see transactions kind of going out of the account,
18 but, of course, that either goes out onto an
19 exchange or to another wallet.  We can't know
20 specifically in the case of a digital wallet who
21 owns the wallet.  We can only see the descriptive
22 hash, the number/letter sequence that goes with

107

1  that.
2      We also, although we have -- although we
3  have received some -- we know that OtterSec had an
4  FTX account.  We're also aware of the fact that
5  Robert Chen has, in fact -- he filed the claim on
6  behalf of OtterSec and I think it was Otter Audits
7  in the FTX bankruptcy.  It's a public document.
8  It's been filed.  But we haven't received much in
9  the way of, you know, the documentation at least
10 that would be responsive to 16 or 17 with respect
11 to the FTX account and what happened with respect
12 to those accounts.
13     So, you know, I think this is one that,
14 you know, the question becomes -- it's sort of
15 both a what has and has not been produced, what
16 has been withheld on the basis of these
17 objections.
18     I mean, again, I realize some stuff has
19 been produced, but that's to my point with respect
20 to the FTX accounts or any other institutions
21 where they might have maintained -- RC Security
22 and Otter Audits is the they in that sentence --

108

1  wherever else they might have, you know,
2  maintained accounts as well.
3      MR. CRENNY:  So I'm just looking.  We
4  produced OtterSec documents sufficient to show
5  accounts.  I'm looking at your objections.  Did
6  you object that we didn't produce one sufficient
7  to show, or did you challenge that, that we
8  didn't?
9      MR. PLOTNICK:  Which?  This was the --
10 yes.  Both requests 16 and 17 --
11     MR. CRENNY:  16 and 17, correct.
12     MR. PLOTNICK:  Yeah, we're -- if you say
13 -- yeah.  By objection you mean were they the
14 subject of our motion to compel --
15     MR. CRENNY:  Yeah.  That's what I mean.
16 I'm trying to --
17     MR. PLOTNICK:  Yes.  Yes.
18     MR. CRENNY:  So I think what -- we'll
19 review your position and take it under advisement.
20 We'll consider it.  I'm not sure if there's
21 another specific question beyond that that I can
22 answer right now.

109

1    And clearly FTX I don't think exists
2 anymore, and we can't get any records there, I
3 don't believe but --
4    MR. PLOTNICK: Well, yes, FTX certainly
5 filed for bankruptcy. That was in November of
6 2022. You can absolutely get account statements
7 from them, and that can -- those can be -- those
8 could be obtained to the extent that you have
9 them. This is more of a search protocol issue,
10 but it doesn't appear that you had searched for
11 them because I think FTX was -- FTX and I think
12 their US-based entity came from -- like the
13 statements came from an entity by the name of,
14 like, West Realm Shire Services, I think is the
15 name of the entity as well, but those don't appear
16 to have been searched for also separately.
17    Now, again, whether that's because it's on
18 the basis of your objections or not I don't know.
19 That's a better question for you. But those types
20 of documents for that account we have not seen.
21 But there's a website where you can obtain your
22 account statements for FTX. Those can be

110

1 obtained, to the extent they already have them in
2 their own records. I don't know off the top of my
3 head how they would have been delivered the
4 account statements, like whether they were sent to
5 e-mails or someplace else.
6    MR. LEVY: Steve, thank you for clarifying
7 what exactly plaintiff wants from RFPs 16 and 17.
8 Now that we have that clarification we'll get back
9 to you on the next meet and confer.
10    MR. PLOTNICK: Yeah. I mean this has been
11 the subject of -- I mean this was the subject --
12 you didn't consider any of this ahead of the meet
13 and confer today? I mean these were the subject
14 of the motion. I'm really not raising anything
15 that wasn't already the subject of our motion to
16 compel.
17    MR. CRENNY: I think you're being much
18 more specific in a helpful way today than the
19 motion to compel was, and we have a clearer
20 understanding than we did from the briefing. You
21 know, I mean your motion to compel is -- it's not
22 as long as ours. I think it's a little less

111

1 detailed and organized differently. If you want
2 to point out where in your motion to compel you
3 were talking about the FTX account statements. I
4 don't recall that level of detail.
5    So, yeah, I think we needed -- we were
6 hoping to use today to get clarification on your
7 position which is something that the judge said.
8 I remember her going through the notices, and I
9 remember we had said -- Judge Simms said, like,
10 where we had said "We don't understand their
11 position," Judge Simms said, "Okay. Well, it will
12 be on the record and we'll be clear on it now
13 because we're going to do it in front of a court
14 reporter." So I think that's part of the process
15 is us understanding it better.
16    MR. PLOTNICK: Yeah. FTX, I don't think
17 we mentioned FTX specifically, but, you know,
18 again, like I said, at a higher level I mean part
19 of this is also, you know, 16 and 17, I think, you
20 know, 18 also, too, is more generally, you know,
21 the question of producing, you know, account
22 documents, statements, et cetera, for more broadly

112

1 RC Security and Otter Audits which was
2 specifically the subject of our motion to compel
3 that was in there. That's why I raised that. I
4 was I was at least hoping to have some level of
5 answer today, but if you don't have an answer, you
6 don't have an answer.
7    MR. CRENNY: I mean I think we said we'd
8 produce documents sufficient to show, and I did
9 not understand your motion to be saying you want
10 all of the account documents, not just documents
11 sufficient to show. So that is news to us I think
12 that we can take under advisement and try to get
13 back to you. But, no, we did not understand that
14 to be your argument previously.
15    MR. PLOTNICK: Okay. 18 is actually also
16 -- and I should have looped 18 in with 16 and 17
17 because that's also going to the, you know, as
18 opposed to, you know, account maintained with a
19 defi institution like a coin base or something
20 like that. 18 just goes to, you know, the digital
21 wallets that were utilized by -- well, as I
22 understand the objection I think -- and I think

113

1 you had provided to us in your interrogatory
2 responses the digital wallets utilized by
3 OtterSec. I think the question here is the RC
4 Security and Otter Audits digital wallets.
5        MR. CRENNY: I think we understand you on
6 that one.
7        MR. PLOTNICK: Okay. And that's another
8 one that you don't have an answer for today?
9        MR. CRENNY: That's correct. That's what,
10 you know -- we're getting all -- we want to
11 understand everything that you're looking for, and
12 then we can come back with, you know, proposals
13 and stuff on some of these, but that one -- that
14 -- you know, there I understand from your
15 briefing, yeah, you wanted the other wallet,
16 whereas the other ones I didn't know that you
17 wanted more accounts. Or no, you're not saying
18 you wanted more accounts. You're saying you
19 wanted more account documents, which is different
20 than this one, which I did understand you wanted
21 the Otter Audits and RC Security ones.
22        So, yeah, we're reading what you're

114

1 sending us, and we're trying to do our best to
2 understand and figure out where we can compromise,
3 but there's some parts we just didn't realize,
4 didn't know.
5        MR. PLOTNICK: All right. So that's -- I
6 think that covers 16, 17 and 18 together.
7        MR. CRENNY: Yes.
8        MR. PLOTNICK: And there, again, I think
9 you have similar -- the question also -- again, I
10 think it's true with most of these, although I
11 will just add into this that when there are sort
12 of specific instances, if there are ways to limit
13 time frames, we're happy to hear your proposal on
14 that point if it makes sense to us, but I think
15 for a lot of these I think time frame is an
16 overarching issue with all of them.
17        So number 19 is -- 19 I think we covered
18 before, right? That's the customers and clients?
19        MR. CRENNY: We definitely talked about
20 it. Yeah. I think we're good. I think we
21 understand -- we at least understand each other on
22 that one.

115

1        MR. PLOTNICK: Yeah. That sounds like
2 Josh. Did you have something to add there, Josh?
3 I don't want to --
4        MR. LEVY: No. Just saying yes, 19, we
5 definitely covered.
6        MR. PLOTNICK: Yeah. 19 I think we
7 covered. Okay. Yeah. So, yeah, 20 is the W-2s,
8 the 1099s, K-1s. K-1 is maybe a little bit
9 different than the others. I mean K-1 largely
10 will deal with -- you know, I think a lot of it has
11 to do with -- it's the ownership question. You
12 know, what a K-1 would typically show you:
13 Ownership, capital, distributions to members as
14 well as -- and then you have W-2s and 1099s,
15 again, which is going to -- I think, again, the
16 idea with asking for W-2s and the 1099s is going
17 to a few things. It's potentially damages
18 question, but at bottom I think what we're really
19 looking to do there on the W-2s and the 1099s is
20 to have information that would cover, you know,
21 give us information sufficient to show who all of
22 the employees and who all of the, you know, any

116

1 independent contractor was who worked for, you
2 know, OtterSec, RC Security, Otter Audits
3 primarily.
4        MR. CRENNY: Yeah. And this is one we
5 need to update to reflect that we've given you
6 2022 material.
7        MR. PLOTNICK: Right, right, which would
8 limit it to the time frame, the time frame scope
9 question.
10        MR. CRENNY: Yeah. I think that's the
11 area of dispute here.
12        MR. PLOTNICK: Yep.
13        MR. CRENNY: Okay. I think that's it for
14 20?
15        MR. PLOTNICK: Yeah. 20 -- okay. So 21
16 called for documents, communications concerning
17 the ownership interest, financial interests or
18 rights of Robert Chen, Sam Chen, plaintiff, the
19 estate or David Chen in or to RC Security, Otter
20 Audits and OtterSec. Let me just take a quick
21 look, and this is -- yeah. So this is another one
22 where the response was limited only to OtterSec,

Transcript of Meet & Confer
Conducted on January 3, 2025

117

1 but -- I mean if there are none, there are none,
2 but, you know, the question is, you know, are
3 there documents or communications, you know,
4 concerning, you know, ownership interest,
5 financial interest, rights in these other entities
6 as well.
7     MR. CRENNY: Yeah. I think we'll -- we
8 understand, and we'll take it under advisement.
9     Rachel, if you want to jump in with
10 anything on this one.
11     MS. CLATTENBURG: I just think if you want
12 to just explain the relevance of some of this
13 stuff for the other entities?
14     MR. PLOTNICK: Sure. To the extent there
15 was a discussion taking place, you know, a
16 non-privileged discussion, about rights that --
17 well, I think -- look, to break it down into sort
18 of two categories. One is who the sort of
19 existing owner of these entities are, right.
20 That's Robert, and what the nature of his
21 financial interest is in these entities.
22     Then separately you might have also,

118

1 right, to the extent that there is a discussion,
2 about ownership rights, claims, right, to
3 ownership interests in these entities that Sam
4 Chen might have or claims by the estate, right, or
5 David Chen, for that matter, that's what we're
6 looking for. So the relevance is the discussion
7 which is the, I think one of the central issues in
8 the case, and that is, is that we should have an
9 ownership interest in these entities because they
10 are the same as OtterSec.
11     So there could be admissions in there.
12 There could be discussions generally about rights
13 that they would have in those entities.
14     MS. CLATTENBURG: I don't think we have
15 anything more on that. Do you, Kevin?
16     MR. CRENNY: Yeah. No, I don't --
17     MS. CLATTENBURG: I don't think any of
18 this exists. I don't think we have anything more
19 on this request right now.
20     MR. PLOTNICK: When you say you don't
21 think you have anything more, meaning you don't
22 have any more documents or you don't know anything

119

1 more, meaning more to add?
2     MS. CLATTENBURG: I don't have anything
3 more to add right now.
4     MR. PLOTNICK: Yeah. Okay. That's what I
5 thought you meant.
6     MR. CRENNY: Yeah.
7     MR. PLOTNICK: Okay. And then document
8 request number 22 which is -- yes. It is the last
9 one that was the subject of our motion to compel,
10 which is documents and communications concerning
11 any business plans, opportunities or strategies
12 for RC Security, Otter Audits and OtterSec. Let
13 me turn over to your objections to that. Yeah.
14     So the same series of objections, and the
15 response was limited to producing documents for
16 OtterSec. I mean, you know, again, to explain the
17 relevance of that request. I mean, again,
18 fundamentally it's -- it's looking not just for
19 OtterSec but, you know, what the nature of the
20 business is of Otter Audits and RC Security.
21     So it's -- again, this is going to the,
22 the fundamentally the successor claim, the

120

1 declaratory judgment claim. I think it does also
2 have a relationship claim as well or is relevant
3 to things like the breach of fiduciary duty claim
4 as well in the case. And, you know, so we're
5 looking for, you know, what the nature of RC
6 Security's business is, what the nature of Otter
7 Audits' business is, what the business, right,
8 that's kind of coming forward in plans as well as
9 when those plans were being put together I think
10 is also just as relevant as well.
11     MR. CRENNY: Okay. Thank you. I don't
12 think we have anything to add on that one. You
13 know, some of these required more explaining than
14 others, but we kind of want to get a sense of all
15 of them before we start figuring out how we're
16 going to narrow things. So we have nothing to add
17 to our objections there, yeah.
18     MR. PLOTNICK: Okay. So now we're at the
19 interrogatories. Do you want to keep -- do you
20 want to finish up with the interrogatories, or do
21 you want to turn to yours and put them on --
22     MR. CRENNY: Yeah. I think we like the

121

1 plan of turning to ours at this point, if that
2 works.
3       MR. PLOTNICK: Yeah, it does. Either way.
4 I offered -- I offered it. So, you know, that's
5 certainly fine. So we'll turn to your motion to
6 compel.
7       MR. CRENNY: Sure. So -- yeah. The
8 first -- we thought it made sense to talk about
9 our first motion to compel directed at the
10 plaintiff, not the one that's David --
11       MR. PLOTNICK: Yeah.
12       MR. CRENNY: -- first. So we have this
13 broken up into a number of topics. There's a
14 couple rogs or RFPs that hit on multiple topics,
15 but I think topic by topic will make sense here.
16 That's kind of how we've organized our briefing to
17 date.
18       So tell me if you're confused, but here's
19 what -- I'm going to present it the way we had it.
20       MR. PLOTNICK: Sure.
21       MR. CRENNY: So the first thing is the
22 plaintiff's, her responsibility for and possession

122

1 of David's documents and information. This
2 relates to rogs 6, 7, 11 and 14 where she's
3 objected that those, and all the RFPs where she's
4 objected that they seek information not within her
5 possession and, you know, the same, the document
6 productions and documents not being in her
7 possession.
8       Our position, which we've laid out in the
9 briefing, is that she clearly has control of the
10 documents. You know, she's relied on them for his
11 Complaint. She's produced them to date. She is,
12 therefore, treated as having possession, custody
13 or control of them. She's, you know, using them
14 to respond to things. She's using them to put the
15 Complaint together. Her attorneys at the very
16 least have them.
17       MS. WHITE: Sorry, Kevin. This is Madelyn
18 White. I'm going to just kind of cut you off just
19 in the interest of time --
20       MR. CRENNY: Okay.
21       MS. WHITE: -- because I think our
22 objections to those that you mentioned were based

123

1 on the relevancy. I mean we are asserting an
2 objection that, you know, you're requesting things
3 that aren't in her possession, custody or control
4 just to preserve that objection because these are
5 documents you're requesting that are really in
6 David's possession, custody and control, not the
7 plaintiff's. But we are not withholding documents
8 that -- or information that you've directed to the
9 plaintiff on the basis that those are in David's
10 possession, custody or control.
11       So to the extent we're withholding
12 information or documents, it's on the basis of
13 other objections, not that they are in David's
14 custody, not the plaintiff's.
15       MR. CRENNY: Yeah. We appreciate that you
16 are not withholding, and thank you for that. I
17 think we do still feel that this objection is
18 improper and should be withdrawn because, you
19 know, as a matter of law, she does control them
20 and is responsible for them, and we need to have
21 the lines of authority clear for the court,
22 especially with the potential spoliation issues in

124

1 this case.
2       You know, under Rule 34 she has the right,
3 authority or practical ability to obtain the
4 documents from a nonparty, which is her reasonably
5 minor son, now 18, who, you know, lives in the
6 house and whose documents she is using and who her
7 lawyers are using to make this case.
8       So we think it's improper to be objecting
9 that she doesn't control them even if it's not a
10 basis for withholding.
11       MS. WHITE: So we're not -- I mean we'll
12 have to think about that, but sitting here today
13 we're not prepared to withdraw that objection.
14 David is not a minor anymore. He is 18 now. He
15 is, you know, his own independent person. He is
16 voluntarily giving them to, you know, his mother
17 for purposes of this litigation, but were he to
18 suddenly refuse, I don't think she has the ability
19 to obtain them. She can't -- you know, she
20 doesn't have legal control over David or his
21 documents.
22       So I don't think we're willing to withdraw

125

1 that objection. But as I said, we weren't
2 withholding based on that objection. We were
3 withholding based on other objections, and we have
4 reconsidered those other objections.
5     MR. CRENNY: Okay. I mean I think -- his
6 minor status is I don't think really, like,
7 legally relevant here. I think there's case law
8 in our memos, like Beneseck versus Limone that
9 says, you know, the question is whether the
10 parties have the legal right to obtain the
11 documents and whether they practically have the --
12 sorry -- have the practical ability to obtain the
13 documents from another, regardless of whether
14 they're legally entitled to it. I misspoke at the
15 beginning of that quote, so I'll just take it
16 again.
17     The courts have sometimes interpreted Rule
18 34 to require production if the party has the
19 practical ability to obtain the documents from
20 another, irrespective of the legal entitlement to
21 the documents.
22     There's other case law saying -- this is a

126

1 Supreme Court case that says a party clearly
2 cannot refuse to answer interrogatories on the
3 ground that the information sought is solely
4 within the knowledge of his attorney. That's
5 Hickman versus Taylor. I think the information
6 from David is in her practical ability to obtain
7 under the case law we've cited and the rules we've
8 cited, and she is responsible for and it's
9 improper for her to say otherwise.
10     You know, it seems like the documents have
11 already been collected and are now in her
12 attorney's possession at the very least.
13     She through, at least through her counsel,
14 has been accessing his documents. It seems like
15 she has the practical ability to obtain them
16 regardless of whether David changes his mind
17 later.
18     MS. WHITE: We will --
19     MR. PLOTNICK: I think just to -- yeah,
20 just to interject, I think, Kevin, sort of I hear
21 you, but I think even in the case law that you're
22 citing I think the answer I think, which is what

127

1 Madelyn just is -- we're not withholding any
2 documents on the basis of an objection for
3 possession, custody and control. So if your
4 question is just sort of simply will we withdraw
5 the objection? I mean it's -- nothing has been
6 withheld -- yeah. Nothing has been withheld on
7 that basis I guess is unequivocally the answer.
8     MR. CRENNY: No. We hear that. We've
9 heard that -- you've said that before, but I think
10 it is an issue that needs to go to the court if
11 it's not being withdrawn.
12     You know, we have the spoliation issue
13 and, like, who's responsible for the fact that
14 David deleted Discord messages, and who's
15 responsible for if something happened to their
16 phone, if that's what we hear from Tealtech. We
17 have these spoliation issues that we need -- that
18 we think the plaintiff is responsible for.
19     So, and it's an issue that's going to have
20 to go to the court at some point if these are not
21 being withdrawn.
22     MS. WHITE: We will consider what -- you

128

1 know, we'll take under advisement under your
2 position. We will think about it and get back to
3 you on it. But as of now we are not withdrawing
4 that objection. Just kind of, you know, so we'll
5 think about that and get back to you at the next
6 meet and confer. I can tell you right now though,
7 like I said, we're not withholding documents based
8 on that objection. We were withholding documents
9 based on other objections, primarily relevancy,
10 and we have, you know, prior to this call in an
11 effort to compromise and move things along
12 discussed, you know, whether or not we would
13 withdraw other objections.
14     So for the three requests that you mention
15 maybe it makes sense for me to tell you, you know,
16 our revised position that we would then, you know,
17 follow up with a revised interrogatory response.
18     MR. CRENNY: Yeah. Let me -- I'll -- I
19 think we're wrapping up discussion on this first
20 topic of mine, and I understand that these ones
21 touch on a couple different topics. But we
22 appreciate that you are not withholding based on

129

1  this, her control of the documents thing.
2  Unfortunately, I don't think that gets us anywhere
3  because of the spoliation issue. So I don't think
4  that really helps in the end, but it's good to
5  hear that there's other, you know, basis for
6  withholding that we are going to be able to reach
7  some agreement on.
8      I think -- I think you understand our
9  position on the first one, and we can, you know --
10 you'll take it under advisement is what it sounds
11 like, which, you know, fair. That's why we do it
12 on your side, too.
13     I think we can move on to the next thing,
14 if that's okay with you, with the understanding
15 that this one is still something we are concerned
16 about, this control issue.
17     MS. WHITE: That's fine. I mean do you
18 want to keep discussing those three
19 interrogatory -- I guess I'm a little --
20     MR. CRENNY: Yeah. So I have them -- so
21 it's, what, 6, 7, 11, 14? I have 6, 7 and 14
22 together in the next topic I want to talk about,

130

1  and then I have 11 on its own later. So I'll come
2  back to 11, so if that makes sense, because we had
3  objected to them on -- you know, the objections
4  were different.
5      So the next thing I wanted to talk about
6  is -- I'll give you a preview of the
7  structure. The next thing I want to talk about
8  was the information concerning David's revenues,
9  which is rogs 6, 7 and 14 touch on that, along
10 with RFPs 7, 8 and 9, and then the issue for rog
11 11 was the multiple parts thing which I had
12 structured somewhere -- I was going to -- you
13 know, that's the next one after that, and the
14 references to improper sources of information
15 issue also is in 11.
16     What do you -- what do you think for
17 talking about -- I don't know what you're planning
18 on suggesting, so --
19     MS. WHITE: I think --
20     MR. CRENNY: -- David's revenue, we could
21 do that next.
22     MS. WHITE: Just like with our requests to

131

1  you, I felt it was the most productive when we
2  went through them request by request.
3      MR. CRENNY: Okay. Yeah. I can pull them
4  up that way. Okay. So you want to talk about --
5      MR. MALYSHEV: Do the want to do the
6  document requests first since there's a few of
7  them? I think we only have disputes about three
8  of them. Did you want to do the document requests
9  and then do interrogatories or keep the
10 interrogatories separate?
11     MR. CRENNY: Yeah. I think we have three
12 of them with the, you know, asterisk of
13 plaintiff's control of David's documents is an
14 overarching one on all the document requests, but
15 yeah, we can do the document requests first. That
16 sounds fine to me. So it's 7 -- 7, 8 and 9,
17 right?
18     MS. WHITE: Yes.
19     MR. CRENNY: Okay.
20     MS. WHITE: So I can say, I mean, again,
21 we're not withdrawing our objections based on, you
22 know, possession, custody or control. We were

132

1  withholding documents to request number 7
2  primarily on the basis of relevancy. We continue
3  to think that those documents are not relevance,
4  you know, when we're talking about this case in
5  isolation, not with the other case, but we are
6  willing, notwithstanding that objection, to
7  produce responsive documents to your request
8  number 7.
9      MR. CRENNY: Okay. So -- okay. So you're
10 withdrawing the -- sorry. You're not withdrawing,
11 but you're going to -- so you had said -- yeah,
12 sorry. Your last sentence here is plaintiff will
13 make a good faith effort -- I'm looking at the
14 response -- to locate and produce communications
15 concerning, and then how are you I guess amending
16 this? Is that a helpful way to do it?
17     MS. WHITE: Yeah. Give me one second to
18 pull it up.
19     MR. CRENNY: Because there was some stuff
20 you were already producing here. So I guess
21 you're -- it sounds like you're broadening it
22 here, and I just want to make sure I understand

133

1 exactly how.
2        MS. WHITE:  I would say just
3 notwithstanding and without waiving these
4 objections and subject to plaintiff's general
5 responses and objections, plaintiff will make a
6 good faith effort to locate and produce responsive
7 documents.  We're dropping the qualifications --
8        MR. CRENNY:  Okay.  So --
9        MS. WHITE:  -- for request number 7.
10        MR. CRENNY:  Yeah, yeah, yeah.  So the
11 most important of them being I think that we had
12 said we wanted communications about the personal
13 code and other property, and you had limited it to
14 David Chen's removal of the personal code and
15 other property, but you're now, you know, going
16 with our phrasing, it sounds like.  I think that's
17 the most significance of these, but tell me.
18        MR. PLOTNICK:  Kevin, we could give you --
19 I think we talked about --
20        MR. CRENNY:  We can do all that in a
21 subsequent phone call.  That's great.
22        MR. PLOTNICK:  Yeah.  We'll need to amend

134

1 it, but I think the --
2        MR. CRENNY:  Sure.
3        MR. PLOTNICK:  -- I think the spirit of
4 this is, yes, we will not -- we will not so limit
5 it that it would be expanded to provide responsive
6 documents across the board.
7        MR. CRENNY:  Okay.  Thank you.  Appreciate
8 that.  Okay.  So then you want to go on to 8?
9        MS. WHITE:  Yeah.
10        MR. CRENNY:  So 8 was copies of David's
11 federal and state tax returns.
12        MS. WHITE:  So subject to our objections
13 we will produce copies of David's 2022 and 2023
14 federal and state tax returns.
15        MR. CRENNY:  Okay.  Easy.  We appreciate
16 that.  Thank you.  9, documents sufficient to
17 identify David Chen's work and all his sources of
18 income through April 22nd, 2022 through March 31,
19 2023.
20        MS. WHITE:  For that one we are willing to
21 amend our response to produce documents related to
22 the personal code and other property that's

135

1 referenced in the Complaint, but we are not
2 willing to provide documents related to other work
3 or other sources of income that David might have
4 unrelated to that code and personal property
5 because we don't see how it's relevant.  I mean
6 we're open to listening to an explanation that you
7 have, but that's our revised position there.
8        MR. CRENNY:  Okay.  Sorry.  I'm just
9 reading over.
10        MR. PLOTNICK:  Yeah.  I think as we
11 understand that this was -- most of these requests
12 were sort of focused on this defense related to
13 the code and the money earned from the code.  So
14 we hear you on that.  You know, as we said with
15 the other requests, we're, you know, looking for
16 the communication; we'll search for that stuff and
17 produce it.
18        And the -- and this one -- this request
19 number 9, is broader than that, right.  It looks
20 like it's -- I'm just, you know -- if he worked at
21 Foot Locker -- I mean he didn't -- he didn't, but
22 I'm just using that as an example jokingly.

136

1        MR. CRENNY:  Yeah.
2        MR. PLOTNICK:  But, you know, I guess the
3 question is:  Are you looking for that?  You know,
4 why?  You know, sort of -- certainly willing to
5 hear from you if you're looking for more than
6 just, you know, revenue or income from -- from
7 code.
8        MR. CRENNY:  Okay.  I think -- I think we
9 very much appreciate what you're offering here.  I
10 think we -- I think we can probably get back to
11 you confirming whether that satisfies it or
12 whether we still have concerns there next week
13 after we've all kind of conferred a little bit.
14 It's just hard for me to, you know, for the whole
15 team say on the fly whether that settles it or
16 whether we still have questions with it.
17        MR. PLOTNICK:  Okay.
18        MR. CRENNY:  Okay.  So that was -- that's
19 7, 8 and 9.  Let me just look at my outline if I
20 had anything else on those.  No.  Okay.  I
21 think -- okay.  So that's all the RFPs.
22        So then going on to the interrogatories.

137

1 We have -- so for 2, 5, 9, 10, 11 and 12 we had
2 the issue we raised about referencing improper
3 sources of information, and I could go through
4 these one at a time, but I think our arguments on
5 all of them are the same legal argument here. So
6 I was thinking of them together, but if that's not
7 helpful for you, we can go one by one.
8        So, you know, for rog 2 you had objected
9 that it was better suited to a document demand and
10 deposition, and you referred to the Complaint. As
11 we said in the briefing -- I know we've discussed
12 this before -- Rule 34(d) says you can respond by
13 referencing business records or you can respond --
14 you know, the other option's respond in writing
15 under oath referencing depositions that have not
16 been noticed yet or, you know, our document
17 demands that we didn't issue or referring to the
18 Complaint we think is not acceptable.  We think
19 the case law supports us on that.
20       There's the International Painters case
21 that said federal courts nationwide have fairly
22 unequivocally established that merely pointing to

138

1 a noticed deposition, either past or present, is
2 an inappropriate means of answering an
3 interrogatory.  There's this Tailwind Sports
4 Company case out of DDC that says Rule 33(d)
5 cannot be used for documents other than business
6 records.
7        There's other case law we've cited that
8 says that you can't use, you know, pleadings,
9 depositions or exhibits and you can't -- you know,
10 restating the general allegations in the Complaint
11 is not a proper answer to an interrogatory.
12 That's this Pennsylvania case at 144 F.R.D. 258.
13       And I think this matters because the
14 responses to interrogatories are, you know, sworn
15 statements from the party that are verified, and
16 we can cite them in the context of a motion for
17 summary judgment when we get to it and, you know,
18 the Complaint is not that.  The Complaint is not a
19 sworn thing, and so that applies to the Complaint
20 specifically, and also in rog 10 where you've
21 cited a memorandum of law, that's similarly not
22 something that the plaintiff has verified.

139

1        So that's our position on these, that we
2 think the references to these other sorts of --
3 these other things are not proper on these.
4        MS. WHITE:  So we're willing to amend our
5 response to this one to list, you know, the
6 communications referenced in the Complaint which
7 the plaintiff is currently aware of, you know, in
8 the response to the interrogatory as opposed to
9 just referring back to the Complaint.
10       Where we're going to continue to object, I
11 mean she will list the communications that she's
12 currently aware of.  We don't think that list will
13 be exhaustive.
14       Our real objection -- our remaining
15 objection here is that when you're asking us to
16 identify and describe all instances where certain
17 topics are referenced in communications, we're
18 producing those communications, and this
19 interrogatory is under, you know, burden and other
20 things is better suited to a document request, and
21 we are producing these document records.
22       MR. CRENNY:  I think -- yeah.  I think

140

1 that makes sense.  I think if we get an answer
2 that doesn't reference the Complaint and, you
3 know, makes a reasonable effort at answering as
4 opposed to just saying ask in a deposition, I
5 think that's -- you know, our main objection is
6 where it's saying ask in a deposition instead of
7 making an effort, but I think if those are removed
8 and there is a proper answer, that, you know, that
9 would satisfy it on rog 2.
10       MS. WHITE:  Okay.
11       MR. CRENNY:  And I mean, when I say --
12 when I say reasonable effort, I mean like, you
13 know, I'm referring to -- you know, we cited cases
14 about if the plaintiff is unable to answer after a
15 reasonable effort, she has to indicate what
16 efforts she may -- you know, explain what you've
17 done to search for the thing.  I didn't mean just,
18 you know, do your best.  I was trying to
19 paraphrase the language in the case law about
20 having to make an effort.
21       MR. PLOTNICK:  Understood.
22       MS. WHITE:  Understood.  I mean, like I

Transcript of Meet & Confer
Conducted on January 3, 2025

141

1 said, we will, you know, disclose the
2 communications that she's aware of, but we are
3 also, you know, standing on our objection that
4 this is better suited to a document request, and
5 we are producing these documents.
6    MR. CRENNY: Okay. So that's, that's rog
7 2 it sounds like?
8    MS. WHITE: Yeah.
9    MR. CRENNY: And then 5, 5 has the
10 reference to the Complaint and then adds several
11 things.
12    MS. WHITE: I mean we're willing to remove
13 the reference to the Complaint. I mean this --
14 you know, we've identified the code here. So I
15 think that we largely answered this interrogatory
16 already even though there was the reference to the
17 Complaint.
18    MR. CRENNY: Yeah. I think this one from
19 my perspective is not a difficult fix on your end.
20 I think it's just remove the reference to the
21 Complaint, and if there's anything you need to say
22 that was in the Complaint, you just say it in an

142

1 interrogatory, and then we get it signed by the
2 plaintiff verifying it instead of it's just a
3 reference to the Complaint which, you know,
4 doesn't even cite which paragraphs you're talking
5 about, and then we have, like, evidence we can use
6 in a motion for summary judgment here to the
7 extent we need it. So I think that sounds good.
8    MS. WHITE: Okay.
9    MR. CRENNY: 9 is similar in that we have
10 a reference to the Complaint rather than an
11 answer.
12    MS. WHITE: So again, we can revise this
13 to have a substantive answer in the
14 interrogatories referring to the communications
15 that the plaintiff is aware of, you know, which
16 are largely the ones in the Complaint.
17    But we are going to continue to object
18 that this is just overly burdensome to itemize and
19 describe all communications and documents with a
20 particular individual. It's just much better
21 suited to a document request, and we are producing
22 these documents.

143

1    MR. CRENNY: I mean I don't -- yeah. We
2 appreciate -- yeah. If you can amend it, that's
3 great. I know, if I'm remembering correctly,
4 David filed a declaration at one point where he
5 said exactly how many messages he had sent over
6 Discord with Robert. So I don't know that it's
7 actually impossible to itemize them.
8    So we will look forward to seeing the
9 amended version, but it doesn't seem impossible to
10 me or overly burdensome necessarily.
11    MR. MALYSHEV: I wouldn't say impossible.
12 I wouldn't say impossible at best.
13    MR. CRENNY: Yeah. No. Madelyn didn't
14 say impossible, but it doesn't seem overly
15 burdensome to me given the way that these
16 communications happened over Discord that I'm --
17 yeah. So that's 9. It sounds like you'll amend
18 9.
19    10, same issue here. We have a reference
20 to a brief and a reference to the Complaint --
21 well, no. We have reference to a brief and to
22 depositions that we haven't noticed which is

144

1 improper for the same reasons as these other ones
2 as -- that I've stated.
3    MS. WHITE: So we will amend our answer
4 here to remove the reference to the Complaint and
5 the memorandum of law and provide the plaintiff's
6 understanding of why David Chen ceased working for
7 OtterSec.
8    MR. CRENNY: Okay. I believe -- well,
9 that goes then to our other -- the issue we've
10 discussed above. So I don't want to say that
11 sounds good here because that goes to the issue
12 we've said above of her responsibility for David's
13 information, which, you know, we've left for the
14 moment. So I won't say, okay, sounds good on that
15 one, but --
16    MS. WHITE: Right. I mean --
17    MR. CRENNY: -- I understood what you're
18 saying. Yeah. That issue is still outstanding to
19 be discussed and resolved.
20    MS. WHITE: It's the plaintiff's
21 understanding based on information she gains from
22 David Chen, but ultimately it is the plaintiff who

Transcript of Meet & Confer
Conducted on January 3, 2025

145

1  is signing these under penalty of perjury. So
2  ultimately it has to be based on the plaintiff's
3  knowledge. Now, it's her knowledge informed by
4  information she has learned from David Chen.
5      MR. CRENNY: Mm-hmm. Yeah. So maybe it's
6  a -- I mean that's part of the problem is that
7  this is a very confusing standard here. So I
8  don't want to agree that any of the issues are
9  resolved by that. It just doesn't --
10     MR. MALYSHEV: It would be helpful for us
11  to see any authority you might have for the
12  proposition that a party, a noncorporate party
13  needs to swear as to the information of another
14  noncorporate party.
15     MR. CRENNY: Yeah. That's in our reply
16  brief and further support of our motion to compel
17  at pages 3 through 5. We've got, like, three
18  pages of case law on it. I think there might be a
19  bit more in the intro as well right before that
20  where we explain that she has possession, custody
21  or control of David's information and documents.
22  I quoted a bunch of this case law earlier -- I'm

146

1  happy to read it back again -- that she must
2  produce responsive and relevant discovery in her
3  possession, custody or control under Rule 34, that
4  this encompasses documents over which she does not
5  have legal ownership or actual physical possession
6  so long as she has the right, authority or
7  practical ability to obtain the documents from a
8  nonparty to the action.
9      MR. MALYSHEV: Right.
10     MR. CRENNY: That's documents. We
11  have other case --
12     MR. MALYSHEV: I refer to --
13     THE REPORTER: One at a time, please.
14     MR. MALYSHEV: Yeah. Sorry. We'll revise
15  our answers and we can deal with it then.
16     MR. CRENNY: Okay. And I would suggest
17  you review pages 3 to 5 of our reply brief there
18  if you're looking for the case law on these
19  points.
20     MR. MALYSHEV: Thank you.
21     MR. CRENNY: Thanks. Madelyn, do you want
22  to do 12 before 11? Because 11 raises some

147

1  slightly different issues as well.
2      MS. WHITE: Sure. We can do that.
3      MR. CRENNY: Is that okay? Okay. So 12
4  we have references -- you know, it says it's
5  cumulative of the Complaint. We've explained why,
6  you know, interrogatory answers are different from
7  a Complaint and allegations in a Complaint, and --
8      MS. WHITE: We will --
9      MR. CRENNY: -- made references to
10  these -- yeah.
11     MS. WHITE: Yeah. We will revise this
12  answer to remove the references to the Complaint
13  and provide a substantive response subject to our
14  other objections.
15     MR. CRENNY: Okay. Are you removing the
16  references in all these to more appropriate for
17  other discovery devices including depositions?
18  That appears in a few of them, and I understand
19  you're removing those references to Complaint. Are you
20  removing those references as well, or are they
21  standing there but you're going to give
22  substantive responses -- yeah.

148

1      MS. WHITE: For some of them, no. I mean,
2  as I said, for the ones we were just discussing,
3  like, for the ones where you ask us to, you know,
4  itemize and describe all communications or all
5  documents, things of that nature, we are
6  continuing to object that those are overly
7  burdensome as interrogatories and are better
8  suited to document requests, but we will provide
9  substantive responses.
10     For 12 this is different because you
11  aren't asking us about all communications or
12  documents. I don't think we referred to other
13  discovery -- oh, okay.
14     MR. CRENNY: No. It's in there.
15     MS. WHITE: We would remove that -- I'll
16  need to confirm with my team, but we would
17  consider removing that objection as well for this
18  one.
19     MR. CRENNY: Okay, yeah. And then we have
20  the same concern every time that that phrase shows
21  up, but I understand you're going to confer and --
22  I get it. Understood. Okay.

Transcript of Meet & Confer
Conducted on January 3, 2025

149

1      So then 11, there is the issue of
2  referencing the Complaint, and then there is the
3  separate issue of the -- you've objected that it's
4  multiple parts, and we've said and provided case
5  law explaining that -- that an interrogatory --
6  this is -- I'm quoting this -- Mezu, M-E-Z-U,
7  versus Morgan State case which is from Maryland
8  2010.  An interrogatory containing subparts
9  directed at eliciting details concerning a common
10 theme should be considered a single question.  And
11 we identified in our briefing that this is on the
12 common theme of David's growing distrust of Robert
13 over the course of, you know, February to May
14 2022, and we're looking for the facts concerning
15 that.
16      We think this is not multiple parts.  We
17 think it is a common theme.  It is a common theme.
18 And at the very least you -- it was improper for
19 you to decline to answer any part of it if it --
20 there is the discovery guideline 10(b) says that
21 no part of an interrogatory should be left
22 unanswered merely because an objection is

150

1  interposed to another part of the interrogatory.
2      So, you know, even if you thought it was
3  multiple parts, that it's improper to not answer
4  the first part and to give us no facts at all here
5  and instead to cite the Complaint in an unverified
6  way and reference other discovery devices
7  including depositions.  So those are the concerns
8  we have with 11.
9      MS. WHITE:  So looking at the paragraphs
10 that you cite or that you're pointing to in your
11 interrogatory, we think that these are much
12 broader than the common theme that you are
13 identifying and that there is no singular common
14 theme between them.  So based on that we continue
15 to assert that this is an improper interrogatory
16 and it's just -- I don't know what the first part
17 is.
18      Like, you're saying that we were supposed
19 to answer the first part of a multi-part
20 interrogatory even if we believe other parts are
21 objectionable.  I don't understand what the first
22 part is here.  If you want to -- maybe a way of

151

1  dealing with this one, you could revise this
2  interrogatory to ask us specifically about the
3  common theme that you're identifying, removing the
4  references to just pointing to paragraphs in the
5  Complaint that we think have a multiple of themes,
6  we would then respond to a proper interrogatory.
7      MR. CRENNY:  I mean I think that's --
8  that's fine -- if you want to amend it in a way
9  that objects that -- I'm just trying to streamline
10 this.  If you want to give us an answer that
11 states the facts concerning, you know, when and
12 why David came to believe that Robert was
13 concealing information from him relating to Jump
14 Crypto, and then you wanted to object, you know,
15 maintain an objection or something that, you know,
16 these paragraphs also touch on other things that
17 we're not going to state all the facts concerning,
18 I think that would be an answer that states the
19 facts concerning the topic I said which is the
20 common theme we had identified.  I believe we'd be
21 satisfied with that.
22      MR. PLOTNICK:  Yeah, I mean just to

152

1  interject here.  I mean I think it would -- even
2  if it's not by way of sort of a formal amendment,
3  Kevin, if you could at least sort of, at least
4  confirm, like, what it is that you're looking for.
5  Because if you look at the specific paragraphs,
6  right, there's lots of stuff going on in those
7  paragraphs.  When you say, like, sort of state the
8  facts concerning these -- I'm just looking at
9  paragraph, you know, 41, which is the first one
10 listed, and the first sentence of that is
11 OtterSec's explosive growth was due in significant
12 part to David's exceptional dedication and work
13 ethic, right.  So that's a fact that's in there,
14 but I think what I'm hearing from you is you're
15 really not looking for those kinds of facts,
16 right?  To the extent you're sort of focused on, I
17 think the way you describe it was this growing
18 mistrust thing --
19      MR. CRENNY:  Yes.
20      MR. PLOTNICK:  -- if you confirm that, I
21 think it would make it easier, because that was
22 the difficulty that we had with those requests,

153

1 right. There's sort of lots of different sort of
2 minutiae that could be implicated by things like
3 that, right, David's, you know, work ethic, right?
4 So here --
5         MR. CRENNY: Yeah, I've typed up a version
6 of it that we would be happy with an answer that
7 answered that. We could e-mail this to you at the
8 end, but I can read it just for the record. If
9 the answer states the facts concerning when and
10 why David Chen came to believe that Robert Chen
11 was concealing information from him relating to
12 his, Robert Chen's, conversations with Jump
13 Crypto, that's what we want to know here.
14        MR. PLOTNICK: Got it.
15        MS. WHITE: Yeah. If you could e-mail
16 that to us --
17        MR. CRENNY: Yeah. We'll send that to
18 you.
19        MS. WHITE: -- we'll take it under
20 advisement, but I think that's something that we
21 can provide an answer to. You know, we'll confirm
22 when we see it. Like I heard you read it, but I

154

1 want to see it with my own eyes.
2         MR. CRENNY: Yes. That's reasonable. I
3 have it written down. That's fine. Okay. So
4 that is -- that is it on the references to other
5 sources of information topic that I had.
6         The next one I have is rog 13 regarding
7 the notice to OtterSec of Li Fen Yao's appointment
8 as personal representative of the estate. So --
9         MS. WHITE: We will revise this to provide
10 a substantive response.
11        MR. CRENNY: Okay. That's -- we will -- I
12 think we'll look forward to seeing that. I think
13 that's -- there's no point of getting into it if
14 you're going to be revising the whole thing anyway
15 to make it substantive. So we can move along.
16        Next one is the rog 16, the explanation of
17 the valuation of the claim in the filing with the
18 Register of Wills for Montgomery County. I know
19 we've discussed this with Steve before. We think
20 the response you gave here is excessively and
21 impermissibly vague and it's a nonanswer. It also
22 includes a reference to non -- things that are not

155

1 business records under 33(d), and these are
2 documents that have not been produced insofar as
3 it's referring to the information that was
4 available to the plaintiff generally without
5 telling us what that is. So I think -- we think
6 this is -- is relevant and, and that we're
7 entitled to an answer here.
8         MS. WHITE: I'm not sure how we revise
9 this one without waiving attorney-client
10 privilege. I mean most of this information, like
11 we say here, like, this was based -- this was
12 between plaintiff and counsel who's representing
13 her in connection with the estate, and this is
14 going to be subject to attorney-client and work
15 product privilege.
16        MR. PLOTNICK: Yeah, I guess -- I guess
17 what else are you looking for? I mean what --
18 maybe it would be helpful to just know and we can
19 think about it some more. But what specifically
20 are you looking for in response to this
21 interrogatory?
22        MR. CRENNY: I -- sorry. I think this is

156

1 basically not an answer is our -- is our position.
2         MR. PLOTNICK: All right. But why?
3 That's what I'm asking. I mean what else -- we
4 gave what I thought was kind of a good faith
5 effort to respond to that without, as Madelyn
6 indicated, you know, revealing any sort of details
7 of attorney-client communications. So --
8         MR. CRENNY: I mean if you're standing on
9 privilege -- sorry.
10        MR. PLOTNICK: No, I'm saying if you think
11 it is not sufficient, I guess my question is why?
12 What else do you think it should include that it
13 does not?
14        MR. CRENNY: I guess I don't -- this is,
15 you know -- you were saying this to me -- I don't
16 know. If there's nothing more you can say here
17 that wouldn't be privileged, I think you could
18 amend the answer to make that clearer, because
19 that is not what it looked like. It looks like
20 here, the way I read the answer is there's some
21 stuff that's privileged, and then we're going to
22 give you this really vague nonanswer. It does not

157

1  say that all of this is privileged. It doesn't
2  say that, you know, the information that was then
3  reasonably accessible and available to plaintiff
4  or her counsel was privileged. If it is, then I
5  think it could be revised to make it clearer the
6  contours of the privilege you're asserting here.
7      MS. WHITE: We can take that under
8  advisement whether or not we can amend this to
9  make it clearer, but privilege objection.
10     MR. CRENNY: Okay. I mean if it's
11 privileged, we could talk about whether it's an
12 appropriate privilege objection. I don't know
13 that we disagree, but it's that information that
14 was then reasonably accessible and available to
15 plaintiff is the part that we were concerned about
16 because it sounds like you're trying not to say
17 what that information is and you're trying to be
18 really vague. If it's a privilege concern, that
19 is different from what it reads to us as, which is
20 we don't want to answer this question.
21     MR. LEVY: And, Steve, just to answer your
22 question, the answer to this interrogatory

158

1  referred to inventories. It did not include any
2  additional information about how the litigation
3  claim or claims were valued, and so if there is
4  non-privileged information related to how the
5  litigation claim was valued, that is not included
6  in inventories.
7      MR. PLOTNICK: Yeah, I get that. In other
8  words, if there is non-privileged information that
9  was relied on to arrive at the number or whatever
10 it is, some sort of information that was
11 utilized -- I'm just riffing here -- from some
12 sort of third party independent source, you know,
13 perhaps we could provide more details.
14     I think, candidly, I think basically the
15 response of saying based on information that was
16 then available or reasonably accessible at the
17 time is more so referring to the information that
18 we did not have as opposed to what we do have,
19 but, you know, that's something we could take a
20 look at and maybe make that clearer in there, but
21 we could take a look at that.
22     MR. LEVY: Yeah. I think it's pretty

159

1  simple. If you have information that isn't
2  privileged that speaks to how these claims were
3  evaluated and valued, we'd like it, and if you
4  have that information and it is privileged, let us
5  know that, because right now the answer is not
6  clear on either of those points.
7      MR. PLOTNICK: Got it.
8      MR. CRENNY: Okay. So it sounds like that
9  one will be amended as well.
10     MR. PLOTNICK: I think we'll take a look
11 at whether we can amend it.
12     MR. CRENNY: Yeah. Sorry. Yeah. I
13 didn't mean to try to upsell you. Okay. So I
14 think those are the issues on our motion to compel
15 the plaintiff. The next is the motion to compel
16 directed at David.
17     MR. PLOTNICK: Just as an aside before we
18 kind of move on to the next thing, since we have
19 -- if we -- you know, I'll sort of let us go
20 through this, but if you guys are available, we
21 can continue past -- because I'm looking, it's
22 1:25 now -- we can continue past 2:00 even, you

160

1  know, to -- we'll kind of get through this, and I
2  know we left our interrogatories open -- we could
3  go back to that. So I don't know if you guys are
4  able to hang on for a little bit longer past 2:00,
5  but on the break as on our side we can keep going
6  for, you know, a little bit longer, too, at least
7  for the sake of trying to sort of push through all
8  of this for day one so that we can kind of go into
9  day two at least having at the top level
10 addressed, kind of gone through these one by one.
11     MR. LEVY: Hi, Steve. This is Josh Levy.
12 I didn't anticipate that we would be talking about
13 the plaintiff's motion for a couple hours.
14     MR. PLOTNICK: Me neither.
15     MR. LEVY: And I have a call scheduled
16 right at 2 that I unfortunately have to take, and
17 we're happy to continue this with dispatch in the
18 next session, but I'm going to have to go.
19     MR. PLOTNICK: Okay. Go ahead. All
20 right. So all right. I don't want to interrupt.
21 So we'll use the time that we have.
22     MR. CRENNY: Can we take just a

161
1  five-minute break before we get into David
2  hopefully?
3        MR. PLOTNICK:  Sure.
4        MR. CRENNY:  Okay.  We'll be back 1:30?
5        MS. WHITE:  Okay.
6        MR. PLOTNICK:  Sounds good.
7        (A recess was taken.)
8        MR. CRENNY:  Thank you.  So this is Kevin
9  Crenny.  So the next thing to talk about is the
10 subpoena on David and our motion to compel
11 relating to that.
12       The one overarching -- the overarching
13 thing on this is our position that the -- is the
14 fact that the objections were untimely that David
15 has raised to the subpoena.  Rule 45 is clear that
16 objections have to be served before the earlier of
17 the time specified for compliance or 14 days after
18 the subpoena is served.  The compliance date in
19 the subpoena is July 8 which is more than 14 days
20 after service on June 6.  So objections were due
21 on June 20th.  This was before the stay of
22 discovery because -- that we agreed to because of

162
1  mediation.  So David did not object until well
2  after the deadline.  So in that regard he's waived
3  the objections.
4        We cited case law from the Second Circuit,
5  DG Acquisition Corp. saying that objections must
6  be waived within 14 days of service, and then an
7  EEOC case, EEOC versus Green Job Works in Maryland
8  which is, you know, citing that same DG
9  Acquisition Corp. case.  We cited other case law
10 about failing to observe it.  But the EEOC case is
11 2024 Westlaw 96340, and that is citing EG
12 Acquisition Corp. which is 151 F.R.D. 75.  End
13 cite is page 81.  I'm going into detail here
14 because these briefs are not on the record
15 anywhere.
16       We also cited Williams versus Big Picture
17 Loans from the Eastern District of Virginia.
18 That's 303 Federal Supplement Third 434.
19 Nonparty's noncompliance with Rule 45 means that
20 its objections must be considered waived.
21       There's also a Ninth Circuit case,
22 Arrowhead Capital Finance, 2023 Westlaw 109722.

163
1  That's from the Ninth Circuit 2023 holding that a
2  subpoena respondent failed to preserve its
3  objections and could not preserve any objections
4  when it did not raise them within the 14-day time
5  period under Rule 45.
6        We -- you know, we understand your
7  position is that we should have known that these
8  were going to be objections because they were
9  similar to plaintiff's objections.  We have not
10 seen any case law supporting that position that
11 would make that an exception to the clearer rules
12 and cases regarding waiver of such objections.  So
13 we -- so in that regard David's -- all these
14 objections are waived and improper.
15       Before you respond to that, however, we do
16 have a compromise to suggest here.  We wanted to
17 offer dropping some of our requests and dropping
18 this argument about the waiver of the objections
19 if you would agree to a production on this.
20       So what we're looking -- we're looking for
21 here is we want to see David's tax returns for
22 2022 and 2023 along with the supporting

164
1  documentation for those tax returns and wallet
2  addresses that he used, and in exchange for that,
3  that would satisfy requests 8, 10, 11, 12, 13, 14
4  and 16 which are the ones that are the subject of
5  the motion to compel here.
6        MR. PLOTNICK:  Could you just clarify?
7  You said tax returns '22 and '23 which I think we
8  already told you in response to the party requests
9  we'd be giving to you anyway.
10       MR. CRENNY:  Yes.
11       MR. PLOTNICK:  If you just sort of run
12 through which requests are you proposing to
13 resolve with this and what specifically is it that
14 you're --
15       MR. CRENNY:  These are all the ones that
16 were the subject of our motion to compel which
17 is --
18       MR. PLOTNICK:  Okay.
19       MR. CRENNY:  -- 8, 10, 11, 12, 13, 14, 16.
20 We can read through them but --
21       MR. PLOTNICK:  You're saying all of them
22 basically.

165

1     MR. CRENNY:  Yeah.
2     MR. PLOTNICK:  This is your proposal to
3  resolve all the objections to it, and you said it
4  was tax returns.  What else?  Which I, like I
5  said, we've already agreed to that, yeah.
6     MR. CRENNY:  Tax returns.  The supporting
7  documentation that was provided to, you know, that
8  was used to create the tax returns, whether it was
9  provided to an accountant or whether David was
10 using it himself, you know, what was he looking at
11 make these tax returns, to do the tax returns or
12 whoever filled them out.
13    MS. WHITE:  So I don't -- I'm just going
14 to state for the record obviously we disagree with
15 your position on waiver and don't believe that
16 we've waived anything, but, you know, for purposes
17 of moving this along I don't think it's productive
18 to get into that here.
19    Our position for the requests to David,
20 you know, and I'm looking at what you're asking
21 for now, we are willing to give you some of that.
22 I mean we're already giving you the tax returns.

166

1  But then when you're asking for -- so you said,
2  you know, for example, 11, this would apply to as
3  well -- sorry.  No.  11 is restricted to the
4  personal code and property, but for 14 you're
5  asking for documents sufficient to identify your
6  work and all your sources of income as well as,
7  you know, the supporting documents for the tax
8  returns.  We're willing to give you that to the
9  extent that it's related to the code that is
10 alleged to have been taken from OtterSec.
11    You know, going back to Steve's earlier
12 example, to the extent that David had a part-time
13 job at Foot Locker, we don't see how that's
14 relevant, and we would not agree to produce that.
15    MR. PLOTNICK:  Why don't we -- I think --
16 right.  We're not going through these request by
17 request.  So I just -- Kevin, go ahead.  Why don't
18 you make --
19    MR. CRENNY:  Yeah.
20    MR. PLOTNICK:  -- your proposal on them,
21 because I guess what you're doing is you're
22 looking at this and saying what do we really need.

167

1  So I'm fine with listening to that because we had
2  looked at this in advance of the call on like a
3  request-by-request basis, but it's -- yeah.
4     MR. CRENNY:  Yeah.  No.  It's a global
5  proposal to resolve these specific RFPs and the
6  waiver issue as well.  So we won't press on that
7  if we get these things is the idea.  We're trying
8  to save time.
9     MR. PLOTNICK:  You said tax returns, the
10 supporting documents behind them and then what --
11    MR. CRENNY:  And then wallet addresses
12 that he used.
13    MR. PLOTNICK:  Anything else or just those
14 two?
15    MR. CRENNY:  Just the tax -- the tax
16 returns, the 2022, 2023, which I know you already
17 said, supporting documentation and wallet
18 addresses.
19    MR. PLOTNICK:  So for the wallet addresses
20 my only question is the -- and this is I think
21 what Madelyn's point was -- the wallet addresses
22 that were used for the liquidator code you're

168

1  talking about, meaning any wallet into which, you
2  know, funds received from the liquidator code were
3  used, or are you talking sort of more, more
4  generally and even broader?
5     MR. CRENNY:  I think more generally.  Any
6  wallets.  We're not limiting it to that.
7     MS. WHITE:  I mean I think for this one,
8  you know, what we should do here is, you know, put
9  your proposal in writing, send it to us.  We will
10 consider it, and probably what we would do is send
11 you a counter-proposal.
12    MR. PLOTNICK:  Yeah.  We're in agreement,
13 we're in agreement.  I think we just have to think
14 about that on the proposal.
15    MR. CRENNY:  Yeah.  No.  I think we would
16 want to discuss that at the next session here.
17 Yeah, not just take it offline and do it in
18 writing but keep it on the record here because I
19 think that's what Judge Simms was looking for us
20 to do.  So I don't want to transition the whole
21 discussion to e-mails that --
22    MS. WHITE:  Yes.  Sorry.  Agreed.  We

169

1  could then discuss it.
2     MR. CRENNY:  Yeah, that -- that sounds
3  good.  So you've got a proposal, and we can type
4  it up as well for you.  Okay.  I think that --
5  that's everything to discuss on David's subpoena
6  at the moment.
7     MR. PLOTNICK:  Yeah.  So should we turn
8  back to our interrogatories with the last sort of
9  bit of time that we have?
10    MR. CRENNY:  Well, we have another
11 motion -- we have another set of motions to compel
12 still which is the -- the ones that were not fully
13 briefed.  I think we were planning to do those
14 next.
15    MR. PLOTNICK:  Yeah.  We can do that,
16 yeah.
17    MR. CRENNY:  Thank you.  So these ones --
18 so we have what -- we have a compromise to suggest
19 here right off the bat, which is on the, the RFPs,
20 we serve -- the defendants collectively served 17
21 RFPs in October, and your position was that they
22 only had 15 remaining at that point.  We're

170

1  willing to drop two of those.  So we're down to 15
2  RFPs, and then we can just talk about rogs just to
3  limit the scope of the dispute.
4     You know, obviously we want to -- I guess
5  you agree to drop your cross-motion with regard to
6  the RFPs as well, but that's our proposal at the
7  start is that we're going to drop two RFPs.  I
8  could tell you which ones, without waiving our
9  objections obviously, or conceding anything, but
10 just we get that down to 15 to start.
11    MR. PLOTNICK:  Which two?
12    MR. CRENNY:  RC Security's number 3 and
13 number 7.
14    MR. PLOTNICK:  I mean I think you're right
15 about getting to 15.  I just want to double check
16 it.  I don't have the numbers in front of me, but
17 I think -- I will take you at your word for it.
18 So if dropping the two RFPs, you know, gets --
19    MR. CRENNY:  Yeah.  15 was the number you
20 wanted us to choose.
21    MR. PLOTNICK:  Yeah.
22    MR. CRENNY:  So this gets us down to that.

171

1     MR. PLOTNICK:  Then if that's the case,
2  then it's something we can agree, then I can, you
3  know -- we'll confirm it for you.  All I want to
4  do is double check.
5     MR. CRENNY:  Sure.  Interrogatories, on
6  the other hand, we are -- we do still need and we
7  don't agree with your positions on this.  The
8  rules are clear that each party gets 25
9  interrogatories.  Rule 33(a) says unless otherwise
10 stipulated or ordered by the court a party may
11 serve on any other party no more than 25 written
12 interrogatories.  That's very clear.  We don't
13 have a court order that says otherwise.  We don't
14 have a stipulation that says otherwise.
15    So we are standing on the fact that you're
16 obligated to respond to these interrogatories that
17 were served by the defendants.  That's the main
18 point that we know your position is that
19 defendants should be treated as one party.  That
20 we don't see any case law that you've cited that
21 says that's the case.  You know, there's case law
22 that says that could make sense in some cases, but

172

1  those are not situations that apply here.
2     For one thing the defendants have not
3  acted together as a single unit in all aspects of
4  the case.  There were motions to dismiss that had
5  different declarations from each defendant.  The
6  12(c) motion highlights different deficiencies in
7  the Complaint with regard to each defendant.  The
8  Complaint obviously charges them with different
9  conduct and different claims, and the plaintiffs
10 would need to prove elements of each claim against
11 each defendant in order to succeed on any given
12 claim.
13    It doesn't make sense to say that, you
14 know, Robert Chen should use his interrogatory --
15 that an interrogatory concerning only something
16 that's directed at Robert Chen should count
17 against Otter Audits' total number of
18 interrogatories.  They should each be able to ask
19 about the sufficiency of the evidence that's going
20 to -- that you say is going to prove each of their
21 conduct.
22    We know that Wright & Miller says that it

Transcript of Meet & Confer
Conducted on January 3, 2025

173

1  could be attractive in some cases to count
2  multiple parties as one for interrogatories, but
3  the situations they're talking about in the
4  language you cite is about circumstances that
5  aren't present here, like a parent corporation as
6  a subsidiary or, like, a class action of people
7  injured in a bus crash all suing the same
8  defendants.
9      There -- we just don't think that you've
10 cited case law establishing that this nominally
11 separate parties thing applies here, especially
12 where no court has said it in their -- at the
13 outset where you didn't move for a protective
14 order prior to the due date.  You waited until the
15 due date to not respond and then waited until
16 after we filed a motion or served a motion to
17 start moving for a protective order.
18     The cases you've cited are all
19 distinguishable, so I'm concerned, like, way
20 higher numbers.  Skinner v. Liller is the Maryland
21 case that mentions this nominally separate parties
22 thing, and in that case the court permitted

174

1  service of 177 interrogatories.  We're nowhere
2  near that close -- that many.  The only other
3  Maryland case that uses this nominally separate
4  parties language is Layani versus Ouzani.  That's
5  2024 Maryland 3233999 from 2024, and the court
6  there declined to construe Rule 33 as imposing a
7  per-side limitation.
8      Skinner v. Liller, by the way, the other
9  one is 2023 Maryland 85 -- sorry -- 2023 Westlaw
10 8520240, and there the court said that they were
11 not nominally separate parties, only nominally
12 separate parties, and permitted 177 separate rogs.
13 The other cases -- some other cases you cited it
14 was interrogatories with 205 subparts or an
15 attempt to serve 150 of these interrogatories.
16     There are other cases that I think you
17 just misrepresented in your briefing.  This
18 McCarthy versus Paine Webber, the defendant was
19 required to seek leave of court before serving
20 interrogatories because he was trying to serve
21 interrogatories with 26 subparts.  It was not
22 about the fact that they were only nominally

175

1  separate parties.  It was just too many for one
2  party.
3      And then the Door Dash case that you've
4  cited, the party raising the objection had already
5  responded to 25 interrogatories from each serving
6  party, whereas here you've responded to just 16
7  total.  So that's our position on this motion.
8      (A discussion was held off the record.)
9      MR. MALYSHEV:  Yes.  So, Kevin, this is
10 Alex.  So obviously it sounds like you had the
11 brief ready, your reply ready to go.  I am happy
12 to take a look if you want to send it to me on a
13 no-prejudice basis, and we can take a look at your
14 arguments.  But, you know, sitting here today I
15 think we -- this is something we need the court's
16 decision on because we couldn't reach a compromise
17 on answering some and reserving decision on
18 others.  So I think our position is laid out in
19 our papers.
20     We don't think that Otter Audits and RC
21 are separate parties.  We don't think they're
22 separate parties from Robert's.  We understand to

176

1  be their sole member.  Maybe that's not correct
2  and you'll correct me that he's not the sole
3  member.  So we don't believe that you will be
4  successful on this point, but, again, we want to
5  work in the spirit of compromise.
6      If you want to send me your brief in
7  advance of the next meet and confer, I can take a
8  look and tell you our position.
9      MR. PLOTNICK:  And I would also add -- let
10 me just add to that, Alex.  You know, Kevin, I'll
11 just say our -- our offer still stands, and that
12 is, at least for the sake of moving things
13 forward, and again, it would be on a
14 without-prejudice basis, off the top of my head I
15 don't recall sort of what the math was of the
16 calculation on how many interrogatories were left.
17 We had sort of laid it out in our objections.  You
18 know, if you wanted to select the ones that fall
19 within those limits, you know, again, for the sake
20 of, you know, just avoiding delay because, you
21 know, we do -- we are and would continue to be
22 willing to respond to interrogatories, you know,

177

1 that are within the 25 interrogatory limit. So,
2 you know, that offer still stands that, you know,
3 if you wanted to pick -- I forget how many were
4 left, as I said -- but we would proceed to move
5 forward and, you know, even if by the time of the
6 next meet and confer we still can't reach
7 agreement on it, at least -- at least we're moving
8 forward on -- on those.
9      MR. CRENNY:  Thanks.  We'll consider that.
10 I believe, as we've said before, just to get it on
11 the record, we are not able to identify a subset
12 because if the court were to agree with your
13 position, we would need to -- we would have
14 drafted these differently if we knew we only had,
15 you know, nine remaining, which we don't think is
16 correct because we don't think there's a per-side
17 limit.
18      So that's why we didn't agree to that
19 previously and we're going to -- we'll consider
20 it, but that's been our position thus far.
21      MR. MALYSHEV:  And, again, just also
22 without prejudice, do you guys want to redraft and

178

1 serve nine?  We're certainly open to that to
2 resolve this issue.  It sounds to me the way you
3 said it that there was a way for you to draft just
4 nine.  So if you want to do that and serve those,
5 we're happy to answer those and move this whole
6 issue.
7      MR. CRENNY:  I didn't say that.
8      MR. MALYSHEV:  I believe what you said was
9 had we known that it was a 25 limit, we would have
10 just drafted nine.  So I'm saying --
11      MR. CRENNY:  Right, but we don't think
12 there is a 25 limit --
13      (Overlapping speakers/crosstalk)
14      MR. MALYSHEV:  All right.  Fair enough.
15      MR. CRENNY:  -- so I'm not saying that
16 that's the way we're agreeing we want to do it.
17      MR. MALYSHEV:  Fair enough.
18      MR. CRENNY:  Sorry.  But Steve, we
19 appreciate the additional offer there.  Sorry.
20 We're talking at the same time.
21      MR. MALYSHEV:  Fair enough.
22      MR. CRENNY:  Okay.  So it sounds like

179

1 no -- no progress on that one at this point.
2      MR. PLOTNICK:  No.  Do you think it would
3 be able to --
4      MR. MALYSHEV:  I'm sorry.  Go ahead.
5 We're speaking -- no.  What I said was, if you
6 want to send me your brief which you were due to
7 file the day the court took it off -- off the
8 calendar for me to take a look at your arguments
9 rather than your summary that you sounded like you
10 were reading from, I'm happy to do that in advance
11 of the next meet and confer.
12      MR. CRENNY:  Okay.  Yeah, we'll consider
13 that, yeah.
14      MR. LEVY:  Steve, do you want to move to
15 the remainder of your motion?
16      MR. PLOTNICK:  Yeah.  I think that makes
17 sense.  Right.  We're done with everything, right.
18 So that left open -- I think we were up to our
19 interrogatories because we went through the
20 document requests.  Let me just get to my notes on
21 that.
22      MR. LEVY:  And, Steve, actually before you

180

1 do that, just some housekeeping as we get close to
2 departing here.  We know that you had indicated
3 some -- some questions about our production.  We
4 indicated we had questions about your production.
5 Is there -- can we reach an agreement that we will
6 each send each other questions about the
7 productions that we can respond to and/or discuss
8 in the next call?
9      MR. PLOTNICK:  Oh, meaning -- sort of like
10 an agenda, kind of like what I did yesterday,
11 meaning get a little bit more specificity behind
12 the questions about the productions?
13      MR. LEVY:  Yeah, to move things along.  I
14 think -- exactly, right, Steve, more specificity.
15 Just if we have questions --
16      MR. CRENNY:  Yeah, and we won't be able to
17 answer them on the fly if they're the first time
18 we're hearing them.  So not just the topics but
19 the actual questions:  What is your issue?  What
20 is your question?
21      MR. PLOTNICK:  Yes, yes, and we can get
22 you some more speci- -- the answer is yes, we can

181

1 get you some more specificity on it. We're
2 saying -- yeah. In other words, yeah, so that you
3 have -- you're a little bit more prepared for the
4 details of it when we get into the next call.
5 Yes. We can do that, absolutely. I think that
6 makes very, very good sense.
7     MR. LEVY: Great. Thank you. Sorry for
8 the interruption. Proceed.
9     MR. PLOTNICK: Yeah. No problem. So
10 first interrogatory that is the subject of
11 plaintiff's motion to compel, interrogatory number
12 3. Look, there's going to be a lot of overlap
13 here with some of the issues that we raised with
14 the document request, but, you know, interrogatory
15 number 3 asked for all current and former
16 customers and clients of RC Security, Otter Audits
17 and OtterSec including all persons for whom RC
18 Security, Otter Audits and OtterSec has performed
19 any auditing work or from whom RC Security, Otter
20 Audits and OtterSec has collected any payments for
21 service, goods or products.
22     So, you know, this is sort of another one

182

1 that sort of fell into the category of the
2 objections being based on the, the separateness I
3 suppose, the -- the separateness, I suppose, of RC
4 Security and Otter Audits from OtterSec, which,
5 again, in our view is a merits-based argument, and
6 in the defendants' response they are referring to
7 documents, but I don't -- so there's sort of two
8 components of this. One is the doc -- whether the
9 documents that have been produced are sufficient
10 to show what we've asked for, right, which is an
11 issue that you have agreed to consider some more
12 and come back to us and, you know, it may be
13 something that gets resolved if you're able to,
14 you know, sort of produce documents in the
15 ordinary course that are maintained that would
16 show that if there's a list, or alternatively, I
17 guess -- I'm not sure if you're taking the
18 position that it's too burdensome to list all the
19 customers and clients.
20     MR. CRENNY: I think -- if I -- if I could
21 -- sorry.
22     MR. PLOTNICK: No. Go ahead. Go ahead.

183

1     MR. CRENNY: I think we're referring to
2 documents we're producing in response to RFPs 6
3 and 19. I think that's the, you know, pointing to
4 business records option for responding here.
5     You know, if you -- if the concern is the
6 time frame, we can put that in, you know, the pile
7 of ones where the concern is the time frame, but
8 other than the time frame is there an issue with
9 this one?
10     MR. PLOTNICK: Well, the question is
11 whether or not the documents that you would be
12 producing are, again, subject to the time frame
13 question, yes, that is -- that is certainly a
14 component of it, but in addition to the time frame
15 component of it, right, the question is whether or
16 not the documents would, in fact, right -- I mean
17 you still have objections in there that deal with
18 sort of the relevance arguments that have been
19 made based on --
20     MR. CRENNY: Yeah. We have an amended
21 based on our --
22     MR. PLOTNICK: Right, correct. It's sort

184

1 of intertwined, right, sort of fundamentally with
2 that objection and where your -- what your
3 position is with respect to that objection as well
4 as the time frame, right, and sort of what is
5 being withheld, again, without kind of going back
6 over what we've already gone over, you know, the
7 objections about, you know, we'll give you stuff
8 to the extent that concerns OtterSec and, right.
9     So fundamentally what we want, whether
10 it's in the documents that you provide, which,
11 like you said, we'd be fine if you were able to
12 produce business records that are sufficient to,
13 in fact, reflect every customer or client that
14 they have, I think that would be fine. If we
15 could reach an agreement on that, I think it would
16 cover this response subject to the time frame and
17 other issues.
18     MR. CRENNY: Okay. We will take that
19 under advisement along with the other similar
20 ones.
21     MR. PLOTNICK: Okay. So the next --
22     MR. CRENNY: I'm not hearing anything

185

1  brand new on this one.
2      MR. PLOTNICK:  No.  That was really --
3      MR. CRENNY:  Okay.  Good.  Okay.
4      MR. PLOTNICK:  As I said, it's really tied
5  -- it's you referring to documents which we think
6  are not sufficient for what we're looking for I
7  guess is really my point.
8      MR. CRENNY:  Got it.  I think it's stuff
9  for 6 that we already discussed on 19.
10     MR. PLOTNICK:  All right.  So --
11     MR. LEVY:  I apologize.  As I indicated
12 earlier, I need to depart at 2 for this other
13 call.  I can -- if, Steve, you don't have very
14 much, I can just trail off.  My colleagues can
15 tell me what happened, or if you have a lot we can
16 continue later.
17     MR. PLOTNICK:  I don't think it's a lot
18 because I think that there's overlap because I
19 think we're going to run into some similar stuff
20 here.  And there actually aren't that many
21 interrogatories.  So if the others on the call are
22 willing to sort of see this through, I don't see

186

1  this taking very long at all.
2      MR. CRENNY:  Is Miss Hamilton able to do
3  another 10, 15 minutes?
4      (A discussion was held off the record.)
5      MR. LEVY:  We can also break here and just
6  pick it up.
7      MR. PLOTNICK:  Yeah, I'll use my ten
8  minutes.  That's fine.  I'll use my ten minutes.
9  Okay.  So --
10     MR. LEVY:  Good-bye, everyone.
11     MR. PLOTNICK:  Oh, of course.  Thank you.
12 So I've lost my page.  So here we are.
13     MR. CRENNY:  15.
14     MR. PLOTNICK:  Yeah.  15, again, similar
15 issue, right, as the document request.  As I said,
16 you know, we're looking for the identity of all
17 the accounts that were -- that were maintained by
18 all three entities, and again, whether that's, you
19 know, similar objections.  There's been a
20 reference to documents in the response.
21     You know, I'm looking at the actual
22 response, and it identifies OtterSec, that

187

1  OtterSec had bank accounts with Mercury Bank, an
2  account with TransferWise, an account with FTX,
3  you know, but we're obviously also looking for the
4  RC Security and Otter Audits side of things.
5      Again, this has to do with transfers of
6  funds between the companies that we're seeing, and
7  I think this also is sort of tied up with
8  interrogatory number 16, right, which asked for
9  the digital wallets.
10     It's -- you know, it's a damages issue,
11 right, tracing the flow of funds that were
12 transferred from one entity to the other, what was
13 transferred out of OtterSec accounts into RC
14 Security, Otter Audits.
15     You know, in the case of the digital
16 wallets, I know we had discussed this once before,
17 you know, the nature of the digital wallet is such
18 that without being provided with the identity
19 of -- right, we obviously know and that's been
20 identified, the OtterSec wallet, but without
21 knowing the wallets that were used by Otter
22 Audits, by RC Security, we don't know where the

188

1  funds are going.  I mean you could see the -- you
2  could see funds going out.  You could see funds
3  going to wallets, but, you know, we're looking for
4  both sides of the transaction here, and there's
5  really -- there's really no way to do that
6  reasonably without seeing both sides.
7      What happened to the funds in the FTX
8  account, you know, whether there are other
9  accounts into which funds had been transferred is
10 impossible to determine without having both sides
11 of it.
12     So that's -- it's -- again, it's really
13 related to the similar document request that we
14 had made on that point.
15     Is everyone still on?  Am I the only one
16 talking to myself?  Kevin?
17     MR. CRENNY:  I was talking but I was
18 muted.  I apologize.  That was -- was that 15 and
19 16?
20     MR. PLOTNICK:  Yeah, 15 and 16, right.
21 Yeah.  15 is sort of like, you know, basically
22 bank accounts, and, you know, 16 is specific to

189

1 the wallets.
2      MR. CRENNY:  All right.  Yeah.  I think
3 these are the same.  Whether they're left to
4 resolve or for the court, they're the same issues
5 as the other ones.  So okay.
6      MR. PLOTNICK:  Yep, and then you've got
7 Tom, which is -- for the benefit of our court
8 reporter, this is actually the final one, so I
9 think we're going to be within the ten minutes.
10 Interrogatory number 17 is the last one in here,
11 and that's identifying all persons in possession,
12 custody or control of business or financial
13 records for each of the defendants and OtterSec.
14 And, again, the answer that was provided -- you
15 know, again, there's -- the objection's in there.
16 So part of the question is whether or not anything
17 has been withheld.  I think, Rachel, you answered
18 that, that to the extent the response has been
19 provided, it's basically just a preservation of
20 the objection.
21      Let me just look at the actual written
22 objection.  If you can just bear with me one

190

1 second.
2      Yeah, I guess -- I guess the -- I guess
3 that's really -- I'm sort of looking at the
4 response here, and fundamentally that's the
5 question.  I -- perhaps, Rachel, your
6 clarification earlier is, right, that given this
7 response that says subject to and without waiver
8 of these objections defendants respond -- in other
9 words, this is everyone, for all of the
10 defendants.  Notwithstanding the fact that you
11 have interposed that objection, it's these
12 individuals:  Darrell -- if I'm pronouncing this
13 right -- Yeo, Y-E-O; Craig Gatesman, David Agassi
14 and Gusto.
15      Kevin, you might be on mute.
16      MR. CRENNY:  I'm sorry.  No, I'm not on
17 mute.  I just missed the last thing you said.  I
18 apologize.
19      MR. PLOTNICK:  My question is whether or
20 not this response -- I mean, for example, I don't
21 think Robert Chen was listed in response to this
22 interrogatory, but maybe that was an assumption on

191

1 your part that that was a given, but there are a
2 series of objections in here including RC Security
3 and Otter Audits aren't successors, that they're
4 just -- again, what I was referring to was the
5 merits-based argument, and then there's an answer
6 given, and I suppose -- well, not I suppose.  The
7 question is whether or not this provides, you
8 know, all of the individuals that you're aware of
9 obviously that would have control, notwithstanding
10 those objections, because I did -- I don't even
11 think Robert Chen's name appears.
12      MR. CRENNY:  I think for OtterSec, yes.
13 This is the ones for OtterSec.  We objected that
14 for Robert his personal financial records are not
15 relevant, and we objected with respect to the
16 other two defendants.  So we've given you in the
17 last two paragraphs and then the list there is the
18 answer for OtterSec.  I think the answer is clear
19 on what it is.  I think it's pretty -- it's
20 specific that --
21      MR. PLOTNICK:  Okay.  So this would --
22 because it does say -- I think your answer says

192

1 subject to and without waiver of these objections
2 defendants respond that persons likely to be in
3 possession, custody -- right --
4      MR. CRENNY:  For OtterSec.
5      MR. PLOTNICK:  Right, sorry.  Right.  You
6 said for OtterSec.  So, again, our view is that
7 this should encompass Otter Audits.  It should
8 encompass all defendants.  In part, you know,
9 again, when you're looking for financial records,
10 you know, look, Robert is a defendant in the case,
11 and if he's in possession, custody or control of
12 documents, whether it's relating to OtterSec or RC
13 Security, certainly those would be relevant to the
14 case for all the reasons I think which we've gone
15 over before that we're seeking business financial
16 records in the first place.
17      I also think -- I disagree with your point
18 that, you know, Robert's personal records are not
19 relevant.  I mean there is -- there -- I was
20 referencing or I referenced it earlier before.
21 You know, there is just in the Mercury bank
22 account statements that we do have, I mean there's

Case 8:23-cv-00889-TDC    Document 106-1    Filed 02/10/25    Page 51 of 97
Transcript of Meet & Confer
Conducted on January 3, 2025                                    49 (193 to 196)

193

1  evidence of transfers of funds out of OtterSec
2  accounts as recently that I can recall as April of
3  2024 for Robert Chen personally.  I mean it's
4  shown up on the bank account.  So there's, you
5  know, evidence of money going from OtterSec to him
6  personally, and it's in the documents that have
7  been produced so far.
8       So for that reason we think also his
9  personal records in relation to this interrogatory
10 are relevant.
11      MR. CRENNY:  Okay.  I -- we will take that
12 under advisement.  This is another one where this
13 was not clear what you were saying from the
14 briefing.  So some of this is new to us and we can
15 take it under advisement and have further
16 discussions next week I think.  We're at 2:10.  No
17 changes today regarding our objections here.
18      Steve, I'm not hearing you.  It looks like
19 you're talking but I'm not hearing you.
20      MR. PLOTNICK:  No, yeah.  Just to add --
21 just to add to that.  I think part of your
22 response also I should say was a little bit of

194

1  lack of clarity I think in the interrogatory
2  response because you also had said OtterSec used a
3  number of vendors and service providers -- maybe
4  it's just a choice of language -- but it says many
5  of which can be identified in the documents
6  defendants intend to produce, including Google,
7  Discord, Tele -- the question is whether there's
8  any others, right, because it says --
9       MR. CRENNY:  The next sentence says, to
10 the best of their knowledge they're the following.
11      MR. PLOTNICK:  Okay.  So the answer to
12 that is you don't know of any others off the top
13 of your head.
14      MR. CRENNY:  No.  This was an effort to
15 respond to the interrogatory.  You know, we didn't
16 --
17      MR. PLOTNICK:  Okay.  Yeah.  So that
18 handles that and just the question is whether, as
19 I said, you have Robert's records and what he has
20 and the RC Security and Otter Audits stuff as
21 well.
22      MR. CRENNY:  Yeah.  We will take that

195

1  under advisement, and we will I think let the
2  court reporter off the hook now.
3       MR. PLOTNICK:  I think we're concluded for
4  today, yes.  Thank you.
5       (Off the record at 2:14 p.m.)

196

1              CERTIFICATE OF REPORTER
2
3       I, Janet A. Hamilton, the officer before
4  whom the foregoing proceedings were taken, do
5  hereby certify that the foregoing transcript is a
6  true and correct record of the proceedings; that
7  said proceedings were taken by me stenographically
8  and thereafter reduced to typewriting under my
9  supervision; and that I am neither counsel for,
10 related to, nor employed by any of the parties to
11 this case and have no interest, financial or
12 otherwise, in its outcome.
13      IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 5th day of
15 January, 2025.
16
17 My commission expires
18 February 4, 2028.
19
20 _____
21 NOTARY PUBLIC IN AND FOR
22 STATE OF MARYLAND

Transcript of Meet & Confer
Conducted on January 3, 2025

50

## A

**ability**
124:3, 124:18,
125:12, 125:19,
126:6, 126:15,
146:7
**able**
16:5, 129:6,
160:4, 172:18,
177:11, 179:3,
180:16, 182:13,
184:11, 186:2
**above**
67:19, 144:10,
144:12
**absolutely**
21:13, 57:19,
109:6, 181:5
**acceptable**
137:18
**accessible**
157:3, 157:14,
158:16
**accessing**
126:14
**accident**
57:3, 57:5
**account**
105:3, 105:4,
105:16, 105:20,
106:4, 106:8,
106:17, 107:4,
107:11, 109:6,
109:20, 109:22,
110:4, 111:3,
111:21, 112:10,
112:18, 113:19,
187:2, 188:8,
192:22, 193:4
**accountant**
165:9
**accounts**
104:6, 107:12,
107:20, 108:2,
108:5, 113:17,
113:18, 186:17,
187:1, 187:13,

188:9, 188:22,
193:2
**acknowledged**
12:19
**acquihire**
77:16
**acquisition**
77:17, 162:5,
162:9, 162:12
**across**
64:15, 134:6
**act**
46:10, 54:19
**acted**
172:3
**acting**
83:19
**action**
8:17, 18:11,
19:5, 146:8,
173:6
**actual**
45:4, 95:8,
146:5, 180:19,
186:21, 189:21
**actually**
69:8, 69:9,
95:7, 112:15,
143:7, 179:22,
185:20, 189:8
**add**
8:15, 21:6,
21:15, 28:22,
29:6, 30:2,
30:17, 31:12,
114:11, 115:2,
119:1, 119:3,
120:12, 120:16,
176:9, 176:10,
193:20, 193:21
**added**
26:12
**addition**
30:2, 48:2,
183:14
**additional**
8:15, 39:4,
61:17, 158:2,

178:19
**address**
7:9, 31:14
**addressed**
7:10, 58:22,
160:10
**addresses**
164:2, 167:11,
167:18, 167:19,
167:21
**addressing**
15:18
**adds**
141:10
**adequacy**
24:17
**admissions**
118:11
**admitting**
83:17
**advance**
38:2, 72:1,
74:9, 167:2,
176:7, 179:10
**advisement**
78:7, 103:18,
108:19, 112:12,
117:8, 128:1,
129:10, 153:20,
157:8, 184:19,
193:12, 193:15,
195:1
**affixed**
196:14
**after**
12:20, 13:8,
24:5, 24:10,
26:5, 40:15,
40:17, 54:22,
56:6, 56:8,
56:19, 57:18,
57:20, 59:17,
61:20, 73:4,
98:15, 130:13,
136:13, 140:14,
161:17, 161:20,
162:2, 173:16
**afternoon**
6:12

**again**
8:4, 8:7, 9:7,
11:13, 12:15,
13:3, 13:17,
14:1, 16:17,
17:20, 23:8,
23:16, 25:15,
26:20, 32:17,
33:12, 34:8,
34:16, 41:4,
41:9, 42:5,
42:6, 42:8,
44:15, 45:8,
47:3, 49:15,
49:16, 49:18,
50:7, 51:5,
52:4, 52:7,
60:11, 64:20,
66:21, 67:22,
74:18, 74:21,
76:4, 77:20,
77:21, 78:9,
78:21, 79:10,
79:14, 79:16,
80:5, 92:8,
101:16, 102:2,
102:16, 104:22,
106:1, 106:12,
107:18, 109:17,
111:18, 114:8,
114:9, 115:15,
119:16, 119:17,
119:21, 125:16,
131:20, 142:12,
146:1, 176:4,
176:13, 176:19,
177:21, 182:5,
183:12, 184:5,
186:14, 186:18,
187:5, 188:12,
189:14, 189:15,
191:4, 192:6,
192:9
**against**
12:13, 87:14,
87:19, 172:10,
172:17
**agassi**
82:12, 190:13

Transcript of Meet & Confer
Conducted on January 3, 2025

51

**agenda**
6:13, 10:5,
180:10
**ago**
21:16
**agree**
66:9, 70:17,
85:18, 103:13,
145:8, 163:19,
166:14, 170:5,
171:2, 171:7,
177:12, 177:18
**agreed**
161:22, 165:5,
168:22, 182:11
**agreeing**
69:8, 178:16
**agreement**
2:10, 22:17,
22:18, 43:12,
43:16, 43:22,
44:2, 47:13,
47:22, 50:9,
52:18, 70:18,
83:8, 129:7,
168:12, 168:13,
177:7, 180:5,
184:15
**agreements**
38:6, 41:9,
41:13, 41:14,
42:13, 42:21,
43:1, 43:10,
44:8, 44:10,
44:20, 47:5,
47:6, 47:14,
47:15, 48:2,
49:17, 49:18,
50:10, 52:16,
55:18, 55:20,
55:21
**ahead**
28:22, 42:19,
53:4, 61:3,
70:19, 82:5,
82:6, 95:3,
97:4, 110:12,
160:19, 166:17,

179:4, 182:22
**al**
1:7
**alex**
4:13, 56:22,
60:4, 82:2,
82:5, 82:21,
86:14, 88:8,
95:3, 98:18,
175:10, 176:10
**alex's**
59:14, 61:5,
90:2, 90:14,
103:11
**alexander**
3:4
**allegations**
9:3, 138:10,
147:7
**alleged**
9:3, 166:10
**along**
128:11, 130:9,
154:15, 163:22,
165:17, 180:13,
184:19
**already**
11:16, 33:10,
50:3, 57:14,
67:11, 84:5,
110:1, 110:15,
126:11, 132:20,
141:16, 164:8,
165:5, 165:22,
167:16, 175:4,
184:6, 185:9
**also**
3:20, 4:14,
4:15, 9:1,
10:19, 19:21,
21:4, 23:2,
30:21, 44:6,
46:9, 48:4,
57:21, 60:3,
63:5, 87:10,
87:19, 96:10,
102:22, 105:17,
107:2, 107:4,

109:16, 111:19,
111:20, 112:15,
112:17, 114:9,
117:22, 120:1,
120:10, 130:15,
138:20, 141:3,
151:16, 154:21,
162:16, 162:21,
176:9, 177:21,
186:5, 187:3,
187:7, 192:17,
193:8, 193:22,
194:2
**alternative**
63:20
**alternatively**
182:16
**although**
107:2, 114:10
**amend**
133:22, 134:21,
139:4, 143:2,
143:17, 144:3,
151:8, 156:18,
157:8, 159:11
**amended**
8:15, 26:13,
143:9, 159:9,
183:20
**amending**
132:15
**amendment**
152:2
**amount**
11:14
**analysis**
36:15
**another**
27:2, 29:13,
32:8, 105:9,
106:2, 106:19,
108:21, 113:7,
116:21, 125:13,
125:20, 145:13,
150:1, 169:10,
169:11, 181:22,
186:3, 193:12
**answer**
41:7, 48:8,

58:2, 58:18,
64:10, 91:4,
95:11, 100:9,
101:18, 103:20,
103:21, 108:22,
112:5, 112:6,
113:8, 126:2,
126:22, 127:7,
138:11, 140:1,
140:8, 140:14,
142:11, 142:13,
144:3, 147:12,
149:19, 150:3,
150:19, 151:10,
151:18, 153:6,
153:9, 153:21,
155:7, 156:1,
156:18, 156:20,
157:20, 157:21,
157:22, 159:5,
178:5, 180:17,
180:22, 189:14,
191:5, 191:18,
191:22, 194:11
**answered**
27:14, 141:15,
153:7, 189:17
**answering**
138:2, 140:3,
175:17
**answers**
146:15, 147:6
**anticipate**
160:12
**any**
6:3, 7:16,
11:2, 13:14,
15:20, 30:5,
39:7, 41:20,
43:1, 49:10,
49:12, 50:1,
50:8, 51:14,
55:19, 58:15,
58:16, 61:12,
65:16, 72:13,
75:19, 75:21,
76:1, 77:15,
77:18, 78:6,

85:16, 87:11,
89:8, 93:15,
93:19, 93:22,
96:11, 101:2,
103:19, 104:6,
104:9, 107:20,
109:2, 110:12,
115:22, 118:17,
118:22, 119:11,
127:1, 145:8,
145:11, 149:19,
156:6, 158:1,
163:3, 163:10,
168:1, 168:5,
171:11, 171:20,
172:11, 181:19,
181:20, 194:8,
194:12, 196:10
**anymore**
61:13, 65:17,
109:2, 124:14
**anything**
16:15, 21:6,
21:14, 28:21,
32:2, 32:10,
37:18, 57:9,
77:1, 79:13,
81:10, 83:17,
91:2, 97:3,
102:9, 110:14,
117:10, 118:15,
118:18, 118:21,
118:22, 119:2,
120:12, 136:20,
141:21, 165:16,
167:13, 170:9,
184:22, 189:16
**anytime**
89:11
**anyway**
154:14, 164:9
**anywhere**
129:2, 162:15
**apologize**
185:11, 188:18,
190:18
**appear**
109:10, 109:15

**appearances**
4:2
**appears**
45:17, 72:22,
88:20, 147:18,
191:11
**appendix**
24:22
**applies**
57:15, 138:19,
173:11
**apply**
64:15, 83:2,
166:2, 172:1
**applying**
103:13
**appointment**
154:7
**appraisals**
75:20, 76:13
**appreciate**
7:8, 32:1,
44:3, 123:15,
128:22, 134:7,
134:15, 136:9,
143:2, 178:19
**approaching**
70:21
**appropriate**
31:13, 73:21,
96:16, 103:15,
147:16, 157:12
**april**
51:19, 52:2,
52:18, 59:18,
60:12, 61:14,
106:6, 106:10,
134:18, 193:2
**area**
81:15, 116:11
**areas**
16:6
**aren't**
50:8, 73:5,
123:3, 148:11,
173:5, 185:20,
191:3
**argument**
15:8, 17:18,

85:7, 90:4,
92:13, 99:12,
112:14, 137:5,
163:18, 182:5,
191:5
**arguments**
74:12, 137:4,
175:14, 179:8,
183:18
**around**
70:16, 70:18
**arrive**
158:9
**arrowhead**
162:22
**articulated**
84:5
**aside**
5:12, 159:17
**asked**
17:8, 22:9,
27:16, 29:2,
44:11, 45:19,
47:5, 48:1,
49:6, 82:1,
99:6, 99:10,
181:15, 182:10,
187:8
**asking**
41:3, 41:5,
48:8, 59:9,
73:12, 95:5,
115:16, 139:15,
148:11, 156:3,
165:20, 166:1,
166:5
**aspect**
19:12, 32:17
**aspects**
172:3
**assert**
150:15
**asserting**
123:1, 157:6
**assertion**
33:3
**assess**
9:21

**asset**
17:6, 17:16,
18:20, 24:20
**assets**
29:12, 30:19,
62:14, 76:1,
80:3
**assigned**
9:14
**assumption**
190:22
**asterisk**
131:12
**attempt**
6:3, 174:15
**attorney**
126:4
**attorney's**
126:12
**attorney-client**
155:9, 155:14,
156:7
**attorneys**
122:15
**attractive**
173:1
**auctions**
75:20, 76:13
**audit**
32:22, 36:16,
46:8
**auditing**
49:10, 58:15,
181:19
**audits**
5:1, 15:1,
15:9, 17:12,
18:5, 18:21,
19:2, 19:9,
19:14, 20:2,
20:5, 20:13,
22:3, 24:7,
24:8, 24:9,
25:3, 25:4,
25:10, 25:11,
26:2, 26:22,
27:11, 33:2,
34:4, 35:16,

Transcript of Meet & Confer
Conducted on January 3, 2025                                        53

35:19, 37:10,
37:19, 41:21,
43:5, 43:16,
43:18, 45:21,
49:8, 49:9,
49:11, 51:3,
58:12, 58:14,
58:16, 59:12,
59:17, 65:1,
72:14, 72:17,
73:2, 73:5,
73:9, 73:17,
75:21, 75:22,
76:1, 76:9,
76:18, 77:18,
77:19, 78:12,
79:9, 79:15,
82:11, 84:18,
88:13, 89:4,
91:20, 94:3,
104:8, 104:17,
104:19, 107:6,
107:22, 112:1,
113:4, 113:21,
116:2, 116:20,
119:12, 119:20,
120:7, 172:17,
175:20, 181:16,
181:18, 181:20,
182:4, 187:4,
187:14, 187:22,
191:3, 192:7,
194:20
**august**
60:9, 61:11
**authority**
123:21, 124:3,
145:11, 146:6
**available**
67:21, 76:12,
155:4, 157:3,
157:14, 158:16,
159:20
**avoid**
9:20
**avoiding**
176:20
**await**
13:21

**awaiting**
10:1, 10:15
**aware**
47:15, 49:22,
50:5, 50:8,
57:8, 107:4,
139:7, 139:12,
141:2, 142:15,
191:8

---
**B**

---
**b**
33:22, 149:20
**back**
10:14, 13:9,
14:6, 28:6,
28:15, 31:10,
31:12, 32:3,
46:14, 49:18,
56:1, 62:16,
63:6, 66:19,
71:3, 71:18,
74:10, 77:14,
79:1, 82:17,
93:11, 95:14,
98:12, 98:19,
101:11, 102:3,
110:8, 112:13,
113:12, 128:2,
128:5, 130:2,
136:10, 139:9,
146:1, 160:3,
161:4, 166:11,
169:8, 182:12,
184:5
**balance**
80:2, 81:3
**bank**
105:16, 105:20,
106:4, 187:1,
188:22, 192:21,
193:4
**banking**
104:11
**bankruptcy**
107:7, 109:5
**base**
112:19

**based**
6:10, 17:17,
33:2, 37:13,
37:16, 38:18,
57:16, 99:12,
122:22, 125:2,
125:3, 128:7,
128:9, 128:22,
131:21, 144:21,
145:2, 150:14,
155:11, 158:15,
182:2, 183:19,
183:21
**basically**
94:11, 156:1,
158:14, 164:22,
188:21, 189:19
**basis**
9:8, 15:14,
34:18, 40:10,
40:12, 45:14,
45:16, 54:6,
54:8, 55:10,
55:11, 57:14,
58:4, 67:8,
68:2, 68:9,
72:6, 82:10,
92:12, 94:20,
100:16, 102:10,
107:16, 109:18,
123:9, 123:12,
124:10, 127:2,
127:7, 129:5,
132:2, 167:3,
175:13, 176:14
**bat**
169:19
**bear**
68:14, 189:22
**because**
9:19, 10:9,
10:15, 10:21,
18:14, 23:8,
26:11, 26:20,
29:16, 34:21,
38:15, 48:4,
53:7, 53:20,
53:21, 55:13,

55:15, 56:12,
59:13, 60:21,
62:6, 68:12,
69:8, 71:1,
72:17, 73:3,
73:14, 74:2,
75:3, 78:10,
79:1, 79:14,
82:11, 82:21,
84:16, 85:13,
85:18, 87:21,
88:7, 89:12,
90:2, 91:17,
91:19, 92:10,
95:6, 97:2,
98:1, 99:5,
100:20, 101:15,
101:16, 101:18,
102:2, 104:10,
109:11, 109:17,
111:13, 112:17,
118:9, 122:21,
123:4, 123:18,
129:3, 130:2,
132:19, 135:5,
138:13, 144:11,
146:22, 148:10,
149:22, 152:5,
152:21, 156:18,
157:16, 159:5,
159:21, 161:22,
162:14, 163:8,
166:21, 167:1,
168:18, 174:20,
175:16, 176:20,
177:12, 177:16,
179:19, 185:18,
191:10, 191:22,
194:2, 194:8
**becomes**
107:14
**been**
8:17, 9:13,
9:14, 9:22,
12:16, 13:1,
18:18, 30:20,
33:1, 40:11,
51:8, 51:10,

Transcript of Meet & Confer
Conducted on January 3, 2025                                             54

57:2, 57:10,
58:6, 62:4,
64:22, 67:2,
67:5, 81:6,
81:7, 83:2,
83:7, 84:3,
99:18, 99:19,
100:16, 105:5,
107:8, 107:15,
107:16, 107:19,
109:16, 110:3,
110:10, 126:11,
126:14, 127:5,
127:6, 137:16,
155:2, 166:10,
177:20, 182:9,
183:18, 186:19,
187:19, 188:9,
189:17, 189:18,
193:7
**before**
2:10, 7:21,
12:12, 12:15,
16:15, 20:20,
30:6, 42:17,
53:15, 57:11,
66:5, 67:10,
77:22, 114:18,
120:15, 127:9,
137:12, 145:19,
146:22, 154:19,
159:17, 161:1,
161:16, 161:21,
163:15, 174:19,
177:10, 179:22,
187:16, 192:15,
192:20, 196:3
**beginning**
125:15
**behalf**
3:2, 3:10, 9:5,
107:6
**behind**
167:10, 180:11
**being**
20:2, 31:15,
37:13, 38:8,
40:9, 40:10,

44:13, 52:7,
59:3, 75:7,
89:6, 93:20,
94:19, 94:22,
95:16, 99:14,
100:13, 100:19,
101:12, 102:10,
110:17, 120:9,
122:6, 127:11,
127:21, 133:11,
182:2, 184:5,
187:18
**believe**
19:6, 37:10,
51:2, 69:2,
109:3, 144:8,
150:20, 151:12,
151:20, 153:10,
165:15, 176:3,
177:10, 178:8
**benefit**
33:10, 61:16,
104:7, 189:7
**beneseck**
125:8
**best**
6:3, 97:8,
114:1, 140:18,
143:12, 194:10
**better**
28:19, 40:7,
80:18, 103:21,
109:19, 111:15,
137:9, 139:20,
141:4, 142:20,
148:7
**between**
34:2, 77:14,
85:17, 89:21,
105:3, 150:14,
155:12, 187:6
**beyond**
40:2, 59:12,
74:11, 84:4,
106:3, 108:21
**bids**
75:20, 76:13
**big**
162:16

**bit**
25:16, 39:17,
64:17, 102:20,
115:8, 136:13,
145:19, 160:4,
160:6, 169:9,
180:11, 181:3,
193:22
**black**
91:9, 102:18
**bleeds**
20:8, 67:4
**blocked**
71:10
**board**
64:15, 134:6
**both**
7:20, 23:2,
37:14, 104:15,
104:16, 104:17,
104:20, 107:15,
108:10, 188:4,
188:6, 188:10
**bottom**
115:18
**brand**
185:1
**breach**
120:3
**break**
26:4, 97:21,
117:17, 160:5,
161:1, 186:5
**brief**
143:20, 143:21,
145:16, 146:17,
175:11, 176:6,
179:6
**briefed**
15:11, 33:9,
169:13
**briefing**
93:7, 110:20,
113:15, 121:16,
122:9, 137:11,
149:11, 174:17,
193:14
**briefs**
162:14

**bringing**
56:13
**broad**
92:20, 94:8
**broadening**
132:21
**broader**
135:19, 150:12,
168:4
**broadly**
16:21, 75:9,
111:22
**broke**
43:4
**broken**
19:15, 23:20,
121:13
**brought**
12:11, 27:2,
53:8, 53:10,
54:1, 84:8
**bunch**
145:22
**burden**
31:17, 61:16,
139:19
**burdensome**
142:18, 143:10,
143:15, 148:7,
182:18
**bus**
173:7
**business**
19:12, 19:13,
19:16, 19:17,
20:1, 22:21,
23:11, 23:21,
26:5, 26:8,
26:18, 27:1,
27:3, 27:9,
27:12, 29:22,
34:12, 43:7,
48:11, 57:7,
57:19, 59:16,
61:3, 61:12,
65:7, 65:17,
84:20, 91:21,
92:16, 119:11,

Transcript of Meet & Confer
Conducted on January 3, 2025                                          55

| | | | |
|---|---|---|---|
| 119:20, 120:6, 120:7, 137:13, 138:5, 155:1, 183:4, 184:12, 189:12, 192:15 | **carter** 4:11, 4:14 **case** 1:6, 8:13, 8:16, 9:6, 9:13, 9:16, 11:19, 12:12, 13:16, 14:22, 17:18, 18:6, 18:19, 20:8, 24:21, 26:13, 33:6, 33:7, 33:9, 33:16, 34:6, 36:12, 39:17, 46:10, 54:19, 56:7, 58:19, 58:20, 73:22, 84:16, 84:18, 90:7, 91:19, 92:14, 106:20, 118:8, 120:4, 124:1, 124:7, 125:7, 125:22, 126:1, 126:7, 126:21, 132:4, 132:5, 137:19, 137:20, 138:4, 138:7, 138:12, 140:19, 145:18, 145:22, 146:11, 146:18, 149:4, 149:7, 162:4, 162:7, 162:9, 162:10, 162:21, 163:10, 171:1, 171:20, 171:21, 172:4, 173:10, 173:21, 173:22, 174:3, 175:3, 187:15, 192:10, 192:14, 196:11 | **174:13, 174:16** **cash** 80:3 **categories** 15:4, 16:9, 16:12, 16:21, 19:1, 34:12, 40:2, 40:21, 41:1, 50:21, 94:9, 94:13, 94:15, 117:18 **category** 43:9, 48:5, 182:1 **caused** 57:5 **cautious** 75:8 **cavalier** 22:9 **ceased** 144:6 **central** 33:8, 118:7 **certain** 5:19, 33:8, 139:16 **certainly** 6:7, 12:4, 19:20, 33:7, 33:8, 35:2, 35:12, 46:6, 57:13, 83:1, 94:9, 102:21, 106:3, 106:14, 109:4, 121:5, 136:4, 178:1, 183:13, 192:13 **certainty** 64:7 **certificate** 65:3, 196:1 **certify** 196:5 **cetera** 33:5, 99:9, 111:22 **challenge** 108:7 | **change** 15:21 **changes** 126:16, 193:17 **charges** 172:8 **check** 77:2, 98:18, 102:11, 170:15, 171:4 **checking** 87:13, 87:14, 87:17, 87:19 **chen** 1:7, 4:17, 4:22, 8:14, 8:22, 9:5, 76:10, 78:13, 106:11, 107:5, 116:18, 116:19, 118:4, 118:5, 144:6, 144:22, 145:4, 153:10, 172:14, 172:16, 190:21, 193:3 **chen's** 133:14, 134:17, 153:12, 191:11 **choice** 194:4 **choose** 170:20 **chose** 27:1 **christmas** 9:11 **circle** 28:6 **circles** 96:7, 103:9, 104:2 **circuit** 162:4, 162:21, 163:1 **circumstances** 173:4 **cite** 138:16, 142:4, |

**businesses**
34:10

### C

**c**
172:6
**calculation**
176:16
**calendar**
179:8
**call**
5:9, 5:20, 7:4,
17:6, 128:10,
133:21, 160:15,
167:2, 180:8,
181:4, 185:13,
185:21
**called**
58:11, 75:18,
104:15, 116:16
**calls**
104:12
**came**
35:6, 80:21,
109:12, 109:13,
151:12, 153:10
**can't**
41:7, 80:22,
106:19, 109:2,
124:19, 138:8,
138:9, 177:6
**candidly**
30:16, 158:14
**cannot**
63:2, 126:2,
138:5
**capital**
79:9, 115:13,
162:22
**capture**
64:16, 65:8,
87:21
**car**
57:3

150:5, 150:10,
162:13, 173:4
**cited**
126:7, 126:8,
138:7, 138:21,
140:13, 162:4,
162:9, 162:16,
171:20, 173:10,
173:18, 174:13,
175:4
**citing**
126:22, 162:8,
162:11
**claim**
20:3, 20:6,
20:7, 24:7,
33:19, 38:16,
46:9, 53:16,
54:18, 55:1,
55:6, 56:9,
57:11, 57:14,
60:2, 60:3,
62:2, 73:15,
73:20, 84:16,
91:19, 92:10,
107:5, 119:22,
120:1, 120:2,
120:3, 154:17,
158:3, 158:5,
172:10, 172:12
**claiming**
53:17
**claims**
12:10, 12:13,
12:16, 31:20,
53:8, 53:15,
54:1, 54:11,
54:12, 54:20,
56:20, 60:4,
84:17, 118:2,
118:4, 158:3,
159:2, 172:9
**clarification**
27:21, 28:21,
29:4, 95:13,
103:19, 110:8,
111:6, 190:6
**clarified**
28:3

**clarify**
5:13, 6:11,
6:21, 8:9,
45:13, 55:13,
59:6, 62:14,
69:7, 78:22,
95:15, 96:10,
96:17, 99:5,
164:6
**clarifying**
110:6
**clarity**
93:4, 194:1
**class**
173:6
**clattenburg**
3:13, 4:20,
55:12, 59:5,
67:15, 68:16,
69:10, 117:11,
118:14, 118:17,
119:2
**clauses**
101:19
**clear**
4:4, 28:3,
30:7, 38:13,
40:20, 51:5,
84:2, 101:2,
101:15, 111:12,
123:21, 159:6,
161:15, 171:8,
171:12, 191:18,
193:13
**clearer**
110:19, 156:18,
157:5, 157:9,
158:20, 163:11
**clearly**
86:11, 109:1,
122:9, 126:1
**client**
10:3, 12:11,
43:15, 43:21,
51:10, 51:14,
51:16, 51:17,
57:10, 57:17,
59:15, 60:8,

60:10, 64:21,
87:11, 87:12,
184:13
**client's**
12:14
**clients**
19:2, 23:6,
23:13, 23:17,
25:21, 31:18,
38:6, 41:14,
42:7, 42:22,
43:8, 43:9,
43:10, 46:7,
46:15, 46:20,
47:16, 48:22,
49:4, 49:7,
49:13, 52:1,
52:11, 55:3,
55:17, 55:19,
56:2, 56:6,
56:19, 57:16,
58:12, 59:11,
59:19, 59:22,
60:6, 60:19,
64:3, 66:1,
66:6, 87:13,
87:20, 114:18,
181:16, 182:19
**close**
30:6, 174:2,
180:1
**closed**
104:7
**code**
9:3, 12:14,
133:13, 133:14,
134:22, 135:4,
135:13, 136:7,
141:14, 166:4,
166:9, 167:22,
168:2
**coin**
112:19
**colleagues**
4:13, 7:11,
185:14
**collected**
40:8, 49:11,

58:16, 126:11,
181:20
**collection**
35:17
**collectively**
169:20
**colloquially**
26:4
**come**
10:14, 14:6,
28:15, 31:10,
31:11, 31:13,
44:14, 49:18,
51:18, 63:6,
66:18, 79:1,
86:8, 93:10,
95:14, 98:12,
98:19, 102:3,
113:12, 130:1,
182:12
**coming**
70:17, 120:8
**commission**
196:17
**common**
9:19, 149:9,
149:12, 149:17,
150:12, 150:13,
151:3, 151:20
**communication**
45:19, 135:16
**communications**
17:8, 21:7,
22:10, 72:12,
75:19, 77:15,
79:8, 79:21,
95:6, 95:8,
104:5, 116:16,
117:3, 119:10,
132:14, 133:12,
139:6, 139:11,
139:17, 139:18,
141:2, 142:14,
142:19, 143:16,
148:4, 148:11,
156:7
**companies**
37:21, 39:1,

39:8, 46:4,
46:5, 54:22,
83:18, 85:17,
88:18, 187:6
**company**
8:19, 29:17,
39:2, 42:3,
43:21, 44:14,
48:1, 50:4,
60:6, 86:8,
138:4
**compel**
6:1, 6:7, 7:1,
14:11, 14:18,
32:21, 33:10,
97:7, 108:14,
110:16, 110:19,
110:21, 111:2,
112:2, 119:9,
121:6, 121:9,
145:16, 159:14,
159:15, 161:10,
164:5, 164:16,
169:11, 181:11
**complaint**
8:11, 8:14,
8:22, 9:2,
17:19, 18:1,
18:14, 24:10,
25:18, 26:4,
26:6, 26:13,
27:5, 38:7,
40:16, 40:18,
43:11, 51:22,
52:7, 53:7,
53:9, 53:14,
53:16, 54:7,
54:8, 54:9,
54:11, 55:5,
55:10, 55:11,
55:22, 57:6,
57:13, 57:20,
61:7, 61:18,
62:4, 76:21,
85:9, 90:20,
122:11, 122:15,
135:1, 137:10,
137:18, 138:10,

138:18, 138:19,
139:6, 139:9,
140:2, 141:10,
141:13, 141:17,
141:21, 141:22,
142:3, 142:10,
142:16, 143:20,
144:4, 147:5,
147:7, 147:12,
147:19, 149:2,
150:5, 151:5,
172:7, 172:8
**complaints**
38:8
**complete**
57:11, 62:19,
62:21
**completed**
11:12
**compliance**
161:17, 161:18
**complicated**
101:18
**component**
23:20, 26:22,
183:14, 183:15
**components**
20:13, 182:8
**comprehensive**
48:14
**compromise**
16:6, 38:1,
63:19, 83:14,
92:21, 94:7,
114:2, 128:11,
163:16, 169:18,
175:16, 176:5
**compromising**
74:9, 93:12,
100:5
**computer**
9:3, 12:14
**concealing**
151:13, 153:11
**conceding**
86:9, 96:14,
100:22, 170:9
**concern**
36:2, 36:17,

37:8, 42:14,
44:17, 83:12,
84:14, 85:19,
85:20, 89:19,
91:17, 100:2,
102:7, 103:1,
103:7, 103:18,
148:20, 157:18,
183:5, 183:7
**concerned**
129:15, 157:15,
173:19
**concerning**
17:9, 21:8,
22:10, 45:19,
72:12, 75:19,
76:13, 77:15,
79:8, 79:21,
104:6, 116:16,
117:4, 119:10,
130:8, 132:15,
149:9, 149:14,
151:11, 151:17,
151:19, 152:8,
153:9, 172:15
**concerns**
9:2, 43:5,
82:10, 90:1,
92:9, 95:16,
96:3, 104:11,
136:12, 150:7,
184:8
**concluded**
195:3
**conduct**
172:9, 172:21
**confer**
1:13, 2:1,
4:12, 5:21,
6:15, 7:5, 7:16,
9:10, 10:9,
10:21, 11:4,
11:8, 12:21,
13:8, 13:11,
13:18, 16:5,
28:16, 32:8,
68:8, 97:4,
98:14, 110:9,

110:13, 128:6,
148:21, 176:7,
177:6, 179:11
**conference**
5:18, 10:22
**conferred**
38:2, 136:13
**confers**
8:8
**confine**
6:22, 106:13
**confirm**
148:16, 152:4,
152:20, 153:21,
171:3
**confirming**
136:11
**conflating**
66:1
**confused**
56:12, 68:3,
121:18
**confusing**
95:17, 145:7
**confusion**
69:9
**connection**
33:16, 155:13
**consider**
15:12, 32:7,
37:1, 71:22,
72:10, 92:13,
94:22, 102:20,
108:20, 110:12,
127:22, 148:17,
168:10, 177:9,
177:19, 179:12,
182:11
**consideration**
24:18, 66:12,
74:13
**considered**
15:20, 149:10,
162:20
**consistent**
32:18, 34:19,
35:5, 36:6,
37:3, 45:6

Transcript of Meet & Confer
Conducted on January 3, 2025                                        58

consolidate
5:13, 6:20,
8:6, 9:18
consolidated
11:9, 12:17,
12:22, 13:1
consolidating
12:7
consolidation
12:9, 13:7
construe
174:6
consulting
47:22
containing
149:8
context
138:16
continuation
84:19, 86:4,
91:21
continuations
18:9, 72:19
continue
56:5, 106:7,
132:2, 139:10,
142:17, 150:14,
159:21, 159:22,
160:17, 176:21,
185:16
continued
24:16
continuing
148:6
contours
157:6
contractor
47:21, 116:1
contractors
41:19, 42:22,
44:9, 44:22
control
19:9, 122:9,
122:13, 123:3,
123:6, 123:10,
123:19, 124:9,
124:20, 127:3,
129:1, 129:16,

131:13, 131:22,
145:21, 146:3,
189:12, 191:9,
192:11
conversation
21:10, 93:7
conversations
95:21, 153:12
copies
134:10, 134:13
corp
162:5, 162:9,
162:12
corporate
18:15, 85:6
corporation
24:17, 25:10,
173:5
correct
21:2, 35:13,
38:15, 40:12,
42:5, 50:17,
50:18, 59:4,
65:11, 70:3,
70:12, 81:10,
100:12, 101:9,
105:21, 105:22,
108:11, 113:9,
176:1, 176:2,
177:16, 183:22,
196:6
correctly
101:10, 143:3
could
16:8, 16:16,
19:5, 26:12,
29:9, 30:13,
32:5, 40:4,
41:1, 42:16,
45:17, 46:19,
48:13, 51:8,
51:10, 52:5,
53:11, 54:7,
59:18, 60:7,
61:22, 64:9,
66:5, 69:18,
71:10, 86:20,
92:20, 93:8,

93:13, 102:13,
104:9, 106:16,
109:8, 118:11,
118:12, 130:20,
133:18, 137:3,
151:1, 152:3,
153:2, 153:7,
153:15, 156:17,
157:5, 157:11,
158:13, 158:19,
158:21, 160:2,
163:3, 164:6,
169:1, 170:8,
171:22, 173:1,
182:20, 184:15,
188:1, 188:2
couldn't
175:16
counsel
126:13, 155:12,
157:4, 196:9
count
172:16, 173:1
counter-proposal
168:11
counterpoints
86:17
county
154:18
couple
30:8, 121:14,
128:21, 160:13
course
4:16, 6:5,
7:17, 8:8, 8:16,
11:16, 14:5,
20:17, 46:13,
106:18, 149:13,
182:15, 186:11
court
1:1, 7:21,
8:12, 9:11,
11:4, 83:15,
83:21, 100:6,
111:13, 123:21,
126:1, 127:10,
127:20, 171:10,
171:13, 173:12,

173:22, 174:5,
174:10, 174:19,
177:12, 179:7,
189:4, 189:7,
195:2
court's
175:15
courts
125:17, 137:21
covenants
52:15
cover
22:3, 24:1,
44:5, 44:8,
44:12, 47:19,
66:17, 115:20,
184:16
covered
32:5, 67:10,
67:11, 67:13,
72:7, 72:8,
76:7, 114:17,
115:5, 115:7
covers
21:5, 94:9,
114:6
craig
190:13
crash
173:7
create
22:16, 26:15,
165:8
created
22:14, 23:5,
25:1, 31:4,
56:3, 56:7
creation
25:5
criteria
36:9, 36:13,
84:11, 89:16,
91:7, 92:5,
92:7, 93:19,
94:20, 102:15,
103:5, 103:13
cross-motion
170:5

Transcript of Meet & Confer
Conducted on January 3, 2025                                                                59

**crosstalk**
71:15, 97:15,
178:13
**crypto**
104:15, 151:14,
153:13
**cumulative**
147:5
**curious**
25:7
**current**
60:19, 181:15
**currently**
139:7, 139:12
**custody**
19:9, 122:12,
123:3, 123:6,
123:10, 123:14,
127:3, 131:22,
145:20, 146:3,
189:12, 192:3,
192:11
**customer**
42:21, 43:15,
43:21, 48:5,
51:10, 51:14,
51:17, 59:15,
60:8, 60:11,
61:10, 61:12,
90:14, 90:15,
90:17, 103:12,
184:13
**customers**
19:2, 23:5,
23:13, 23:17,
25:22, 38:7,
41:15, 42:8,
43:3, 43:8,
43:9, 43:11,
46:8, 46:15,
46:20, 47:15,
48:22, 49:4,
49:7, 49:13,
52:12, 55:3,
55:17, 55:19,
56:2, 56:6,
56:19, 58:12,
59:11, 59:22,

60:6, 60:20,
66:1, 66:7,
90:19, 114:18,
181:16, 182:19
**cut**
24:13, 25:14,
29:1, 39:13,
51:5, 61:22,
122:18
**cutoff**
53:7, 54:4,
56:2, 59:4,
61:18, 62:1,
62:10, 63:8,
64:13, 66:14,
66:16, 66:18,
67:2, 67:3
**cutting**
51:7
**cv**
1:6

---
D
---

**d**
137:12, 138:4,
155:1
**d-a-n-s**
17:17
**dakota**
83:18
**damage**
73:13
**damages**
19:22, 30:21,
31:7, 46:1,
46:5, 54:19,
55:1, 57:15,
60:4, 73:13,
73:14, 73:20,
115:17, 187:10
**dans**
17:6, 17:11,
17:16, 17:18,
18:12, 18:19,
19:6, 19:10,
19:22, 20:9,
20:20, 21:4,
21:9, 21:11,

21:20, 26:1,
26:12, 28:16,
29:8, 29:19,
29:21, 31:4,
31:15, 35:2,
57:21, 67:13,
72:9
**darrell**
190:12
**dash**
175:3
**database**
45:7, 47:4,
47:11
**date**
25:17, 26:6,
38:7, 40:15,
40:17, 43:11,
51:22, 52:6,
53:17, 53:18,
53:22, 54:9,
55:21, 57:5,
57:12, 60:9,
61:17, 62:1,
63:11, 63:16,
63:17, 63:18,
63:21, 64:9,
64:13, 67:2,
67:3, 74:16,
75:10, 75:13,
76:21, 90:20,
96:12, 96:13,
96:16, 121:17,
122:11, 161:18,
173:14, 173:15
**dates**
42:1, 53:6
**david**
4:17, 8:22,
9:5, 116:19,
118:5, 121:10,
124:14, 124:20,
126:6, 126:16,
127:14, 133:14,
134:17, 135:3,
143:4, 144:6,
144:22, 145:4,
151:12, 153:10,

159:16, 161:1,
161:10, 161:14,
162:1, 165:9,
165:19, 166:12,
190:13
**david's**
122:1, 123:6,
123:9, 123:13,
130:8, 130:20,
131:13, 134:10,
134:13, 144:12,
145:21, 149:12,
152:12, 153:3,
163:13, 163:21,
169:5
**day**
27:19, 28:11,
53:8, 71:5,
160:8, 160:9,
163:4, 179:7,
196:14
**days**
5:4, 161:17,
161:19, 162:6
**dc**
3:17
**ddc**
138:4
**deadline**
162:2
**deal**
6:6, 12:22,
14:5, 14:18,
25:20, 115:10,
146:15, 183:17
**dealing**
17:4, 18:12,
151:1
**deals**
17:20
**death**
57:18
**debt**
80:3
**december**
65:14, 74:10
**decentralized**
104:14

decide
83:16, 95:19
deciding
95:21
decision
26:3, 26:15,
175:16, 175:17
declaration
143:4
declarations
172:5
declaratory
20:7, 60:2,
120:1
decline
149:19
declined
174:6
dedication
152:12
deemed
19:8
deep
45:3, 97:10
defendant
8:13, 8:21,
26:13, 76:10,
95:9, 172:5,
172:7, 172:11,
174:18, 192:10
defendants
1:8, 3:10,
4:22, 6:9, 6:13,
9:17, 9:21,
14:22, 15:2,
15:7, 17:13,
17:15, 18:6,
18:15, 21:9,
33:17, 33:20,
34:9, 35:11,
35:14, 35:17,
67:18, 67:20,
73:1, 76:8,
78:11, 79:14,
80:4, 83:10,
84:11, 92:6,
169:20, 171:17,
171:19, 172:2,

173:8, 182:6,
189:13, 190:8,
190:10, 191:16,
192:2, 192:8,
194:6
defense
135:12
defi
104:14, 112:19
deficiencies
172:6
define
95:7
definitely
114:19, 115:5
degree
84:3
delay
176:20
deleted
127:14
delivered
110:3
demand
137:9
demands
137:17
depart
185:12
departing
180:2
depending
14:1
depends
31:2
deposition
137:10, 138:1,
140:4, 140:6
depositions
137:15, 138:9,
143:22, 147:17,
150:7
derive
34:12
describe
33:13, 139:16,
142:19, 148:4,
152:17

describing
34:8
descriptive
106:21
desire
9:18
despite
57:12
detail
111:4, 162:13
detailed
111:1
details
29:17, 29:18,
149:9, 156:6,
158:13, 181:4
determination
89:22
determinations
9:20, 91:16,
92:7, 93:20,
94:21
determine
23:9, 27:9,
27:13, 29:9,
29:14, 36:13,
46:2, 87:18,
188:10
determined
92:14
determining
88:3, 103:2
devices
147:17, 150:6
dg
162:5, 162:8
dicharia
3:14, 4:21
difference
13:15, 34:1
differences
13:3
different
9:15, 34:10,
34:11, 34:13,
39:1, 69:5,
89:21, 93:16,
95:18, 101:19,

113:19, 115:9,
128:21, 130:4,
147:1, 147:6,
148:10, 153:1,
157:19, 172:5,
172:6, 172:8,
172:9
differently
111:1, 177:14
difficult
36:14, 36:17,
141:19
difficulties
35:9
difficulty
36:3, 152:22
digital
17:6, 17:16,
18:20, 106:15,
106:20, 112:20,
113:2, 113:4,
187:9, 187:15,
187:17
diplomate
2:11
directed
55:9, 121:9,
123:8, 149:9,
159:16, 172:16
directions
5:16
directly
20:4, 90:12
disagree
21:3, 38:17,
53:14, 63:4,
64:5, 105:11,
157:13, 165:14,
192:17
disagreement
6:9, 63:13
discern
84:9, 102:9
disclose
141:1
disclosure
18:15
discord
95:21, 127:14,

Transcript of Meet & Confer
Conducted on January 3, 2025                61

143:6, 143:16,
194:7
**discovery**
5:22, 6:4,
7:16, 7:22,
10:10, 10:11,
11:2, 11:6,
11:15, 11:17,
11:18, 11:19,
11:22, 12:9,
12:21, 13:3,
13:5, 13:9,
13:16, 24:2,
24:9, 25:4,
25:11, 26:11,
26:21, 27:8,
27:13, 34:15,
36:6, 36:7,
54:14, 61:17,
64:2, 64:12,
146:2, 147:17,
148:13, 149:20,
150:6, 161:22
**discuss**
6:5, 6:14,
10:6, 12:2,
28:20, 91:3,
93:1, 96:6,
168:16, 169:1,
169:5, 180:7
**discussed**
93:3, 95:14,
128:12, 137:11,
144:10, 144:19,
154:19, 185:9,
187:16
**discussing**
63:9, 129:18,
148:2
**discussion**
4:16, 28:7,
29:1, 68:7,
74:20, 117:15,
117:16, 118:1,
118:6, 128:19,
168:21, 175:8,
186:4
**discussions**
118:12, 193:16

**dismiss**
33:17, 172:4
**dispatch**
160:17
**dispute**
10:10, 10:11,
11:3, 15:5,
81:15, 96:13,
116:11, 170:3
**disputes**
7:17, 7:22,
131:7
**dissolution**
8:19, 51:13,
57:18, 61:20,
62:9, 62:15,
65:4
**dissolved**
62:7, 62:10,
62:16, 65:3,
73:16
**distinct**
18:7, 33:3,
34:5, 72:18,
80:6, 99:13
**distinguishable**
173:19
**distributions**
45:20, 46:3,
54:20, 54:21,
72:13, 73:18,
73:22, 115:13
**district**
1:1, 1:2, 9:6,
9:14, 162:17
**distrust**
149:12
**divert**
57:6
**dividend**
75:6
**dividends**
45:20, 46:2,
72:12, 73:18,
73:21
**division**
18:22
**doc**
182:8

**document**
17:7, 17:22,
21:5, 32:20,
34:17, 35:1,
35:3, 35:4,
35:16, 45:5,
45:18, 49:5,
58:9, 58:10,
67:7, 67:8,
67:9, 68:22,
69:6, 72:5,
72:6, 72:11,
74:15, 75:17,
75:18, 77:11,
85:12, 87:16,
87:22, 89:4,
90:1, 90:10,
95:9, 98:4,
98:6, 98:16,
99:6, 100:15,
102:17, 103:3,
104:4, 107:7,
119:7, 122:5,
131:6, 131:8,
131:14, 131:15,
137:9, 137:16,
139:20, 139:21,
141:4, 142:21,
148:8, 179:20,
181:14, 186:15,
188:13
**documentation**
107:9, 164:1,
165:7, 167:17
**docusign**
38:6, 41:9,
41:17, 41:22,
43:1, 44:18,
47:5, 47:17
**docusigns**
47:7, 47:9
**dog**
39:18, 41:5
**doing**
11:15, 23:11,
24:10, 25:8,
28:10, 61:2,
61:12, 65:16,

87:15, 103:15,
166:21
**done**
11:3, 11:16,
16:9, 27:5,
51:15, 62:12,
64:11, 74:17,
93:7, 96:15,
140:17, 179:17
**door**
175:3
**double**
77:2, 170:15,
171:4
**down**
43:4, 71:12,
97:1, 98:5,
117:17, 154:3,
170:1, 170:10,
170:22
**draft**
178:3
**drafted**
177:14, 178:10
**drawing**
100:7
**drawn**
100:7
**drop**
170:1, 170:5,
170:7
**dropping**
133:7, 163:17,
170:18
**due**
152:11, 161:20,
173:14, 173:15,
179:6
**duty**
60:4, 120:3

**E**

**e-mail**
5:10, 6:11,
6:16, 7:14, 8:4,
10:7, 12:3,
13:8, 153:7,
153:15

Transcript of Meet & Confer
Conducted on January 3, 2025

62

| | | | |
|---|---|---|---|
| **e-mails** | **either** | **encompasses** | 85:6, 86:2, |
| 10:4, 110:5, | 20:4, 71:8, | 146:4 | 109:12, 109:13, |
| 168:21 | 91:9, 102:18, | **end** | 109:15, 187:12 |
| **each** | 103:6, 106:18, | 6:11, 50:18, | **especially** |
| 6:4, 44:19, | 121:3, 138:1, | 51:15, 65:10, | 39:4, 123:22, |
| 44:22, 95:9, | 159:6 | 99:14, 99:18, | 173:11 |
| 114:21, 171:8, | **elaborating** | 100:3, 100:12, | **esquire** |
| 172:5, 172:7, | 28:18 | 101:8, 105:21, | 3:3, 3:4, 3:5, |
| 172:10, 172:11, | **elaboration** | 129:4, 141:19, | 3:11, 3:12, |
| 172:18, 172:20, | 27:22 | 153:8, 162:12 | 3:13, 3:14 |
| 175:5, 180:6, | **element** | **enough** | **essentially** |
| 189:13 | 21:21 | 30:16, 65:7, | 9:8, 19:13, |
| **earlier** | **elements** | 93:4, 97:6, | 41:6, 81:5 |
| 145:22, 161:16, | 172:10 | 178:14, 178:17, | **establish** |
| 166:11, 185:12, | **eliciting** | 178:21 | 53:12 |
| 190:6, 192:20 | 149:9 | **enterprise** | **established** |
| **early** | **else** | 57:8 | 137:22 |
| 74:10 | 32:10, 59:8, | **entirely** | **establishing** |
| **earned** | 77:1, 79:13, | 80:6 | 11:6, 173:10 |
| 135:13 | 81:10, 81:12, | **entities** | **estate** |
| **easier** | 108:1, 110:5, | 15:9, 18:7, | 116:19, 118:4, |
| 152:21 | 136:20, 155:17, | 18:10, 19:21, | 154:8, 155:13 |
| **easily** | 156:3, 156:12, | 20:3, 33:3, | **et** |
| 48:12, 51:9, | 165:4, 167:13 | 36:20, 56:3, | 1:7, 33:5, |
| 66:6 | **emma** | 65:1, 68:17, | 99:9, 111:22 |
| **eastern** | 3:21, 4:21 | 72:18, 85:10, | **ethic** |
| 1:16, 162:17 | **employed** | 90:5, 99:12, | 152:13, 153:3 |
| **easy** | 196:10 | 99:13, 104:19, | **evaluate** |
| 91:11, 134:15 | **employee** | 104:20, 105:4, | 31:10, 31:20 |
| **eeoc** | 47:20, 48:5 | 117:5, 117:13, | **evaluated** |
| 162:7, 162:10 | **employees** | 117:19, 117:21, | 159:3 |
| **effectively** | 14:21, 23:12, | 118:3, 118:9, | **even** |
| 18:21, 23:10, | 24:18, 26:1, | 118:13, 186:18 | 39:19, 44:10, |
| 23:19, 29:21, | 29:19, 41:12, | **entitled** | 57:20, 81:19, |
| 104:12 | 41:13, 41:19, | 34:15, 46:4, | 84:2, 88:14, |
| **effort** | 42:1, 42:13, | 125:14, 155:7 | 99:17, 100:20, |
| 29:12, 38:1, | 42:22, 44:7, | **entitlement** | 100:21, 106:3, |
| 67:20, 74:9, | 44:8, 44:21, | 125:20 | 124:9, 126:21, |
| 76:11, 78:14, | 46:15, 46:19, | **entity** | 141:16, 142:4, |
| 83:14, 100:5, | 47:16, 48:22, | 8:16, 18:12, | 150:2, 150:20, |
| 128:11, 132:13, | 52:14, 66:2, | 20:11, 22:6, | 152:1, 159:22, |
| 133:6, 140:3, | 115:22 | 22:13, 22:16, | 168:4, 177:5, |
| 140:7, 140:12, | **employment** | 22:20, 22:21, | 191:10 |
| 140:15, 140:20, | 47:22 | 23:10, 23:19, | **event** |
| 156:5, 194:14 | **encompass** | 23:22, 26:15, | 78:6 |
| **efforts** | 48:4, 192:7, | 27:4, 29:13, | **ever** |
| 79:8, 140:16 | 192:8 | 31:1, 31:3, | 41:20 |
| **eg** | **encompassed** | 31:16, 35:2, | **every** |
| 162:11 | 17:11 | | 30:13, 43:14, |

Transcript of Meet & Confer
Conducted on January 3, 2025                                              63

47:13, 47:19,
47:20, 47:21,
57:10, 66:21,
148:20, 184:13
**everybody**
5:1, 101:22
**everyone**
4:10, 44:5,
186:10, 188:15,
190:9
**everything**
57:11, 59:7,
92:3, 113:11,
169:5, 179:17
**evidence**
53:12, 53:15,
54:10, 142:5,
172:19, 193:1,
193:5
**exactly**
20:10, 27:8,
27:12, 34:15,
54:12, 95:22,
110:7, 133:1,
143:5, 180:14
**example**
23:16, 25:21,
29:11, 42:7,
44:11, 44:16,
44:19, 51:9,
51:11, 52:14,
54:14, 67:17,
85:16, 90:3,
90:14, 135:22,
166:2, 166:12,
190:20
**examples**
40:5
**except**
40:14
**exception**
163:11
**exceptional**
152:12
**excessively**
154:20
**exchange**
10:4, 104:15,

106:19, 164:2
**exclusively**
35:2, 72:9
**excuse**
38:8, 56:22
**exhaustive**
139:13
**exhibits**
138:9
**exist**
53:15, 53:21,
74:4, 94:16
**existed**
53:12
**existence**
24:17
**existing**
19:15, 26:5,
26:22, 51:10,
51:16, 117:19
**exists**
109:1, 118:18
**expanded**
134:5
**expenses**
80:2
**expert**
75:4
**expires**
196:17
**explain**
102:13, 117:12,
119:16, 140:16,
145:20
**explained**
147:5
**explaining**
120:13, 149:5
**explanation**
135:6, 154:16
**explosive**
152:11
**expressed**
9:17
**extended**
62:22
**extent**
19:22, 35:20,

35:22, 36:1,
36:16, 54:20,
55:2, 60:5,
71:13, 71:21,
74:4, 74:19,
84:2, 84:14,
89:3, 89:19,
93:21, 96:11,
97:2, 102:6,
102:22, 109:8,
110:1, 117:14,
118:1, 123:11,
142:7, 152:16,
166:9, 166:12,
184:8, 189:18
**eyes**
154:1

---

**F**

**fact**
9:20, 24:4,
26:2, 26:14,
26:17, 27:4,
27:10, 51:8,
51:18, 54:22,
59:15, 70:14,
92:14, 92:15,
95:5, 100:4,
101:3, 102:7,
107:4, 107:5,
127:13, 152:13,
161:14, 171:15,
174:22, 183:16,
184:13, 190:10
**factors**
24:15, 52:10
**facts**
149:14, 150:4,
151:11, 151:17,
151:19, 152:8,
152:15, 153:9
**failed**
48:20, 163:2
**failing**
162:10
**fair**
71:4, 129:11,
178:14, 178:17,

178:21
**fairly**
137:21
**faith**
54:8, 55:10,
67:20, 76:11,
78:14, 83:14,
83:20, 132:13,
133:6, 156:4
**fall**
15:3, 56:3,
92:4, 176:18
**falls**
31:17, 37:20
**far**
11:16, 71:11,
97:11, 177:20,
193:7
**farther**
81:21
**february**
51:18, 51:21,
65:14, 149:13,
196:18
**federal**
8:12, 79:22,
87:7, 99:8,
134:11, 134:14,
137:21, 162:18
**feel**
21:20, 98:17,
104:1, 123:17
**fell**
182:1
**felt**
131:1
**fen**
1:4, 4:15,
154:7
**few**
19:19, 28:8,
81:4, 96:21,
115:17, 131:6,
147:18
**fiduciary**
60:3, 120:3
**figure**
91:3, 114:2

Transcript of Meet & Confer
Conducted on January 3, 2025

64

figuring
120:15
file
7:2, 179:7
filed
6:2, 8:12,
8:13, 9:5,
10:17, 18:15,
24:11, 38:8,
53:16, 57:21,
61:7, 61:8,
61:9, 62:3,
62:4, 65:4,
107:5, 107:8,
109:5, 143:4,
173:16
filing
18:1, 25:18,
26:4, 26:6,
27:5, 52:6,
54:6, 54:8,
54:9, 54:10,
55:4, 55:10,
55:11, 55:22,
57:11, 57:12,
74:9, 76:21,
154:17
filled
165:12
final
189:8
finance
104:14, 162:22
finances
14:21
financial
21:8, 38:3,
39:6, 43:7,
46:18, 54:16,
56:13, 60:20,
64:16, 67:4,
75:4, 79:22,
80:1, 87:6,
87:7, 88:1,
88:18, 90:9,
90:21, 92:21,
92:22, 94:1,
94:11, 99:9,

116:17, 117:5,
117:21, 189:12,
191:14, 192:9,
192:15, 196:11
financials
75:2, 75:8
find
16:6, 17:2,
24:8, 69:11,
69:19
finder
92:15
finding
61:13
fine
6:7, 12:4,
13:13, 14:6,
14:13, 21:1,
38:16, 66:10,
96:20, 121:5,
129:17, 131:16,
151:8, 154:3,
167:1, 184:11,
184:14, 186:8
finish
64:2, 98:3,
98:4, 120:20
firestone
3:15, 3:21,
4:19
firm
4:19, 8:22
first
6:7, 17:14,
18:12, 20:20,
54:7, 83:4,
84:1, 121:8,
121:9, 121:12,
121:21, 128:19,
129:9, 131:6,
131:15, 150:4,
150:16, 150:19,
150:21, 152:9,
152:10, 180:17,
181:10, 192:16
five
16:9, 16:12,
61:9, 98:12,

98:13, 98:20
five-minute
97:20, 161:1
fix
141:19
flipping
77:13, 77:20
floor
3:6
flow
80:3, 187:11
floyd
3:21, 4:21
fly
136:15, 180:17
focus
13:5, 13:16,
58:3
focused
35:1, 135:12,
152:16
follow
98:3, 128:17
following
25:2, 26:3,
56:14, 194:10
foot
135:21, 166:13
for-now
63:12
foregoing
67:18, 73:7,
196:4, 196:5
forget
177:3
form
30:1
formal
7:7, 152:2
formation
17:9, 22:11,
22:12, 22:13,
43:7
formed
24:4, 65:2
former
11:19, 23:21,
27:10, 29:22,

90:15, 90:17,
181:15
forth
31:11, 67:19,
77:14
forward
5:3, 10:17,
10:18, 120:8,
143:8, 154:12,
176:13, 177:5,
177:8
forwarded
6:12
four
71:10
frame
15:4, 17:21,
37:2, 48:17,
59:3, 76:16,
76:19, 76:22,
77:3, 77:6,
77:8, 77:10,
78:5, 78:8,
78:10, 78:18,
79:5, 79:12,
80:16, 81:9,
84:8, 90:22,
91:4, 94:5,
114:15, 116:8,
183:6, 183:7,
183:8, 183:12,
183:14, 184:4,
184:16
frames
114:13
frankly
10:15, 19:11,
58:19, 66:4
friday
1:15
front
37:12, 70:1,
111:13, 170:16
ftx
107:4, 107:7,
107:11, 107:20,
109:1, 109:4,
109:11, 109:22,

Transcript of Meet & Confer
Conducted on January 3, 2025                                                65

111:3, 111:16,
111:17, 187:2,
188:7
**fully**
169:12
**fundamentally**
15:3, 15:8,
15:16, 19:10,
19:18, 20:5,
20:9, 23:4,
29:20, 31:6,
33:12, 34:3,
36:11, 42:10,
45:10, 52:8,
59:1, 60:1,
73:14, 79:5,
84:17, 84:18,
90:4, 90:11,
91:19, 119:18,
119:22, 184:1,
184:9, 190:4
**funds**
79:9, 106:9,
168:2, 187:6,
187:11, 188:1,
188:2, 188:7,
188:9, 193:1
**further**
13:21, 16:16,
17:20, 17:21,
28:22, 81:16,
96:6, 103:19,
145:16, 193:15
**future**
81:17

---
G
---

**gains**
144:21
**gatesman**
190:13
**gather**
31:18, 40:11,
81:4
**gathered**
40:8
**gave**
38:3, 38:5,

75:8, 105:11,
154:20, 156:4
**general**
6:8, 18:17,
58:6, 59:19,
67:2, 67:19,
79:21, 80:20,
90:8, 94:12,
99:7, 133:4,
138:10
**generally**
5:22, 111:20,
118:12, 155:4,
168:4, 168:5
**generating**
20:1, 90:17
**getting**
5:7, 16:12,
20:10, 21:21,
23:4, 32:12,
48:16, 49:16,
55:13, 55:14,
56:12, 57:2,
88:3, 113:10,
154:13, 170:15
**give**
30:4, 32:6,
40:4, 41:7,
41:11, 41:12,
41:13, 48:11,
61:19, 62:2,
69:2, 69:8,
69:17, 69:19,
70:1, 81:16,
103:21, 115:21,
130:6, 132:17,
133:18, 147:21,
150:4, 151:10,
156:22, 165:21,
166:8, 184:7
**given**
37:18, 39:5,
43:2, 43:10,
50:4, 50:10,
62:8, 74:3,
74:4, 81:13,
93:1, 116:5,
143:15, 172:11,

190:6, 191:1,
191:6, 191:16
**giving**
88:11, 101:17,
124:16, 164:9,
165:22
**global**
167:4
**go**
13:21, 15:13,
15:21, 16:7,
16:8, 23:14,
28:22, 29:20,
34:14, 34:18,
42:17, 42:18,
46:14, 47:7,
53:4, 54:5,
61:3, 67:6,
70:13, 70:19,
73:20, 75:16,
77:14, 82:5,
90:12, 95:3,
96:21, 97:3,
97:8, 106:2,
127:10, 127:20,
134:8, 137:3,
137:7, 159:19,
160:3, 160:8,
160:18, 160:19,
166:17, 175:11,
179:4, 182:22
**goes**
19:17, 26:9,
46:9, 59:21,
61:4, 73:14,
92:13, 94:6,
104:22, 106:18,
106:22, 112:20,
144:9, 144:11
**going**
11:9, 12:19,
13:13, 14:4,
15:18, 17:2,
18:11, 28:8,
28:15, 30:17,
37:4, 47:8,
53:5, 60:22,
64:2, 69:2,

72:4, 82:7,
82:21, 83:6,
96:7, 97:9,
98:4, 103:9,
103:21, 104:2,
106:17, 111:8,
111:13, 112:17,
115:15, 115:16,
119:21, 120:16,
121:19, 122:18,
127:19, 129:6,
130:12, 132:11,
133:15, 136:22,
139:10, 142:17,
147:21, 148:21,
151:17, 152:6,
154:14, 155:14,
156:21, 160:5,
160:18, 162:13,
163:8, 165:13,
166:11, 166:16,
170:7, 172:15,
172:20, 177:19,
181:12, 184:5,
185:19, 188:1,
188:2, 188:3,
189:9, 193:5
**gone**
68:4, 160:10,
184:6, 192:14
**good**
4:5, 4:10, 8:2,
54:8, 55:10,
67:20, 76:11,
78:14, 83:14,
83:20, 93:8,
96:22, 98:21,
114:20, 129:4,
132:13, 133:6,
142:7, 144:11,
144:14, 156:4,
161:6, 169:3,
181:6, 185:3
**good-bye**
186:10
**goods**
181:21
**google**
194:6

Transcript of Meet & Confer
Conducted on January 3, 2025                                              66

**gotten**
28:3, 28:20,
29:3, 70:22,
93:4, 95:13
**governance**
17:10, 22:16
**granted**
9:11
**great**
133:21, 143:3,
181:7
**green**
162:7
**ground**
66:17, 126:3
**grounds**
30:11, 31:9
**group**
16:20
**growing**
149:12, 152:17
**growth**
152:11
**guess**
10:19, 21:18,
26:19, 28:14,
29:5, 29:6,
30:2, 30:17,
35:12, 58:6,
59:13, 83:3,
101:6, 102:7,
104:4, 127:7,
129:19, 132:15,
132:20, 136:2,
155:16, 156:11,
156:14, 166:21,
170:4, 182:17,
185:7, 190:2
**guideline**
149:20
**gusto**
190:14
**guys**
32:6, 59:9,
72:10, 159:20,
160:3, 177:22

**H**

**half**
72:3

**halfway**
70:21
**hamilton**
1:22, 2:11,
186:2, 196:3
**hand**
171:6, 196:14
**handles**
194:18
**hang**
160:4
**happened**
19:14, 57:4,
59:18, 59:19,
107:11, 127:15,
143:16, 185:15,
188:7
**happening**
25:8, 61:9
**happens**
78:1
**happy**
5:1, 5:2, 6:6,
7:9, 14:8, 58:2,
58:4, 67:1,
67:6, 70:13,
114:13, 146:1,
153:6, 160:17,
175:11, 178:5,
179:10
**hard**
87:1, 136:14
**hash**
106:22
**head**
37:11, 73:11,
75:7, 81:1,
95:12, 110:3,
176:14, 194:13
**hear**
74:11, 114:13,
126:20, 127:8,
127:16, 129:5,
135:14, 136:5
**heard**
28:5, 94:18,
127:9, 153:22
**hearing**
9:15, 38:11,

152:14, 180:18,
184:22, 193:18,
193:19
**held**
1:14, 2:1,
175:8, 186:4
**hellosign**
41:17, 41:22,
43:1, 44:19,
47:5, 47:7,
47:16
**hellosigns**
47:9
**helpful**
16:10, 27:18,
28:9, 28:19,
30:10, 31:8,
32:15, 33:12,
69:20, 71:16,
101:15, 101:21,
102:2, 110:18,
132:16, 137:7,
145:10, 155:18
**helps**
129:4
**here**
5:11, 6:2,
6:22, 11:1,
11:7, 14:1,
14:15, 17:3,
23:9, 29:4,
29:8, 29:14,
37:4, 37:15,
37:19, 37:22,
38:14, 39:3,
39:11, 49:2,
49:3, 50:14,
54:13, 55:14,
56:10, 56:20,
61:7, 62:8,
63:8, 77:5,
77:14, 77:20,
79:10, 79:13,
79:14, 79:17,
81:3, 83:5,
83:9, 84:9,
89:1, 92:17,
96:19, 113:3,

116:11, 121:15,
124:12, 125:7,
132:12, 132:20,
132:22, 136:9,
137:5, 139:15,
141:14, 142:6,
143:19, 144:4,
144:11, 145:7,
150:4, 150:22,
152:1, 153:4,
153:13, 154:20,
155:7, 155:11,
156:16, 156:20,
157:6, 158:11,
162:13, 163:16,
163:21, 164:5,
165:18, 168:8,
168:16, 168:18,
169:19, 172:1,
173:5, 173:11,
175:6, 175:14,
180:2, 181:13,
183:4, 185:20,
186:5, 186:12,
188:4, 189:10,
190:4, 191:2,
193:17
**here's**
69:1, 121:18
**hereby**
196:5
**hereunto**
196:13
**hi**
160:11
**hickman**
126:5
**high**
6:13, 9:2, 9:7,
14:16, 15:1,
16:3, 29:16,
33:13, 34:8,
38:21, 78:21,
97:5
**higher**
111:18, 173:20
**highest**
19:19

highlight
97:12
highlighted
38:11
highlights
172:6
himself
165:10
hired
52:17
hit
121:14
hold
37:5, 69:21
holding
163:1
holidays
5:2
honest
30:14
hook
195:2
hope
5:1
hopefully
161:2
hoping
12:5, 111:6,
112:4
hour
72:3
hours
71:10, 160:13
house
124:6
housekeeping
180:1
however
16:14, 61:19,
163:15
hypothetical
86:22, 87:3,
91:2, 103:12
hypothetically
93:13

**I**

idea
6:2, 6:22,

11:1, 23:4,
69:19, 74:21,
96:22, 98:15,
115:16, 167:7
ideal
11:10
identifiable
94:13
identification
48:11
identified
141:14, 149:11,
151:20, 187:20,
194:5
identifies
186:22
identify
41:18, 42:1,
43:19, 86:16,
87:9, 134:17,
139:16, 166:5,
177:11
identifying
47:8, 150:13,
151:3, 189:11
identity
186:16, 187:18
immediate
75:4
impermissibly
154:21
implicated
153:2
important
133:11
imposing
174:6
impossible
143:7, 143:9,
143:11, 143:12,
143:14, 188:10
impression
5:20
improper
123:18, 124:8,
126:9, 130:14,
137:2, 144:1,
149:18, 150:3,

150:15, 163:14
improperly
73:15
inappropriate
138:2
inasmuch
7:21
include
87:8, 156:12,
158:1
included
158:5
includes
154:22
including
44:9, 49:8,
58:13, 76:6,
87:10, 147:17,
150:7, 181:17,
191:2, 194:6
income
80:3, 134:18,
135:3, 136:6,
166:6
inconsistent
9:20
independent
18:17, 41:19,
44:9, 44:21,
47:20, 116:1,
124:15, 158:12
indicate
140:15
indicated
12:18, 13:6,
30:8, 76:8,
156:6, 180:2,
180:4, 185:11
indirectly
20:4
individual
142:20
individuals
190:12, 191:8
inextricably
36:9
info
83:6

information
31:22, 38:3,
39:6, 56:13,
57:22, 78:2,
86:16, 87:9,
92:21, 92:22,
94:10, 115:20,
115:21, 122:1,
122:4, 123:8,
123:12, 126:3,
126:5, 130:8,
130:14, 137:3,
144:13, 144:21,
145:4, 145:13,
145:21, 151:13,
153:11, 154:5,
155:3, 155:10,
157:2, 157:13,
157:17, 158:2,
158:4, 158:8,
158:10, 158:15,
158:17, 159:1,
159:4
informed
145:3
infrastructure
23:12
initiated
24:5
injured
173:7
insofar
20:12, 155:2
instance
17:15, 83:4
instances
114:12, 139:16
instead
140:6, 142:2,
150:5
institution
104:14, 112:19
institutions
104:12, 107:20
instructed
13:10
intend
194:6

Transcript of Meet & Confer
Conducted on January 3, 2025                                           68

**intent**
7:2, 9:18
**interest**
20:4, 21:8,
31:1, 46:5,
63:19, 73:17,
75:22, 77:18,
116:17, 117:4,
117:5, 117:21,
118:9, 122:19,
196:11
**interests**
116:17, 118:3
**interject**
126:20, 152:1
**internal**
14:20
**international**
137:20
**interposed**
150:1, 190:11
**interpreted**
125:17
**interrogatories**
17:1, 98:8,
98:17, 120:19,
120:20, 126:2,
131:9, 131:10,
136:22, 138:14,
142:14, 148:7,
160:2, 169:8,
171:5, 171:9,
171:12, 171:16,
172:18, 173:2,
174:1, 174:14,
174:15, 174:20,
174:21, 175:5,
176:16, 176:22,
179:19, 185:21
**interrogatory**
48:10, 113:1,
128:17, 129:19,
138:3, 138:11,
139:8, 139:19,
141:15, 142:1,
147:6, 149:5,
149:8, 149:21,
150:1, 150:11,

150:15, 150:20,
151:2, 151:6,
155:21, 157:22,
172:14, 172:15,
177:1, 181:10,
181:11, 181:14,
187:8, 189:10,
190:22, 193:9,
194:1, 194:15
**interrupt**
20:15, 160:20
**interruption**
181:8
**intertwined**
36:10, 184:1
**intro**
145:19
**inventories**
158:1, 158:6
**investigation**
18:17
**investment**
77:16
**investor**
27:2
**investors**
31:5
**involve**
11:18
**irrespective**
125:20
**isolation**
132:5
**issue**
10:12, 12:10,
14:3, 15:19,
17:1, 17:21,
30:21, 31:7,
33:6, 33:8,
33:11, 34:6,
37:4, 46:1,
58:21, 76:16,
76:22, 77:3,
77:5, 78:10,
79:4, 79:6,
79:12, 79:16,
80:16, 81:9,
81:20, 84:8,

90:7, 91:1,
93:2, 94:5,
95:5, 95:8,
96:13, 96:14,
109:9, 114:16,
127:10, 127:12,
127:19, 129:3,
129:16, 130:10,
130:15, 137:2,
137:17, 143:19,
144:9, 144:11,
144:18, 149:1,
149:3, 167:6,
178:2, 178:6,
180:19, 182:11,
183:8, 186:15,
187:10
**issues**
6:1, 6:4, 9:19,
11:2, 11:5,
12:21, 13:1,
13:5, 13:9,
13:16, 14:17,
16:3, 19:19,
20:8, 33:7,
33:21, 79:3,
81:12, 82:8,
98:8, 100:6,
105:1, 118:7,
123:22, 127:17,
145:8, 147:1,
159:14, 181:13,
184:17, 189:4
**item-by-item**
15:14
**itemize**
142:18, 143:7,
148:4
**items**
6:14, 9:4,
10:6, 14:10

_____
**J**
_____
**janet**
1:22, 2:10,
196:3
**january**
1:15, 61:11,

65:14, 196:15
**job**
1:20, 162:7,
166:13
**joined**
4:12
**joining**
4:12
**joint**
104:6
**jokingly**
135:22
**josh**
4:20, 5:10,
5:15, 6:10,
6:15, 6:18, 7:5,
8:5, 10:3, 10:7,
10:21, 12:1,
14:12, 15:18,
30:14, 98:15,
115:2, 160:11
**joshua**
3:11
**judge**
5:19, 8:10,
9:15, 10:22,
12:12, 12:16,
38:11, 111:7,
111:9, 111:11,
168:19
**judge's**
5:16
**judgment**
20:7, 60:2,
120:1, 138:17,
142:6
**july**
60:12, 62:16,
161:19
**jump**
39:15, 55:12,
57:1, 60:16,
82:3, 88:6,
117:9, 151:13,
153:12
**jumping**
70:16
**june**
52:18, 60:12,

Transcript of Meet & Confer
Conducted on January 3, 2025                                         69

161:20, 161:21
**jurisdiction**
33:18, 33:21
**justin**
3:14, 4:20

**K**

**k-1**
115:8, 115:9,
115:12
**k-1s**
115:8
**keep**
46:20, 64:3,
97:9, 120:19,
129:18, 131:9,
160:5, 168:18
**keeping**
101:4
**kevin**
3:12, 4:19,
15:22, 16:18,
20:18, 25:16,
30:3, 32:10,
32:18, 34:21,
37:4, 39:13,
61:3, 63:7,
70:18, 72:5,
73:12, 78:2,
79:16, 83:1,
88:8, 89:7,
91:18, 96:18,
98:1, 99:6,
118:15, 122:17,
126:20, 133:18,
152:3, 161:8,
166:17, 175:9,
176:10, 188:16,
190:15
**key**
90:7
**kind**
8:3, 12:5,
16:11, 16:20,
19:11, 23:3,
28:1, 29:14,
44:5, 44:12,
54:13, 58:3,

63:6, 64:16,
65:22, 67:6,
70:13, 71:11,
81:2, 87:1,
88:8, 92:22,
97:3, 102:2,
106:17, 120:8,
120:14, 121:16,
122:18, 128:4,
136:13, 156:4,
159:18, 160:1,
160:8, 160:10,
180:10, 184:5
**kinds**
81:14, 81:16,
152:15
**knew**
177:14
**knowing**
187:21
**knowledge**
126:4, 145:3,
194:10
**known**
7:16, 87:20,
163:7, 178:9

**L**

**lack**
33:17, 194:1
**laid**
122:8, 175:18,
176:17
**language**
35:20, 140:19,
173:4, 174:4,
194:4
**lanham**
46:10, 54:19
**largely**
60:1, 115:9,
141:15, 142:16
**last**
5:10, 6:16,
10:8, 38:2,
80:22, 99:21,
119:8, 132:12,
169:8, 189:10,

190:17, 191:17
**late**
74:10, 106:4
**later**
8:7, 10:14,
12:3, 13:14,
25:20, 52:19,
61:9, 64:9,
79:4, 82:9,
126:17, 130:1,
185:16
**latter**
38:4
**law**
9:20, 56:8,
56:18, 57:9,
58:19, 58:21,
123:19, 125:7,
125:22, 126:7,
126:21, 137:19,
138:7, 138:21,
140:19, 144:5,
145:18, 145:22,
146:18, 149:5,
162:4, 162:9,
163:10, 171:20,
171:21, 173:10
**lawsuit**
24:5
**lawyers**
124:7
**layani**
174:4
**laying**
40:21
**learned**
18:14, 145:4
**least**
5:8, 5:9, 6:9,
8:18, 12:5,
15:4, 15:7,
27:7, 29:7,
33:20, 35:9,
41:10, 44:20,
50:14, 50:20,
52:22, 55:8,
57:16, 58:7,
63:11, 64:7,

64:15, 64:16,
64:17, 72:3,
72:22, 73:10,
73:14, 81:5,
83:8, 84:17,
98:3, 98:9,
99:14, 102:8,
107:9, 112:4,
114:21, 122:16,
126:12, 126:13,
149:18, 152:3,
160:6, 160:9,
176:12, 177:7
**leave**
64:1, 174:19
**leaves**
78:17
**leaving**
98:16
**ledger**
99:8
**ledgers**
79:21, 80:20,
90:8, 94:12
**ledyard**
4:11, 4:14
**left**
5:19, 11:2,
144:13, 149:21,
160:2, 176:16,
177:4, 179:18,
189:3
**legal**
124:20, 125:10,
125:20, 137:5,
146:5
**legally**
125:7, 125:14
**less**
110:22
**let's**
63:10, 72:5,
75:16, 86:15,
97:18, 98:2,
98:3, 98:13
**letter**
106:22
**level**
6:13, 9:2, 9:7,

Transcript of Meet & Confer
Conducted on January 3, 2025

70

| | | | |
|---|---|---|---|
| 14:16, 15:1, 16:3, 19:19, 29:16, 33:13, 34:9, 38:21, 50:7, 78:21, 97:5, 111:4, 111:18, 112:4, 160:9 | limited 13:2, 33:21, 50:18, 50:21, 70:10, 76:19, 80:8, 104:21, 116:22, 119:15, 133:13 | 136:13, 160:4, 160:6, 180:11, 181:3, 193:22 lives 124:5 | looking 5:2, 16:11, 39:3, 39:11, 48:10, 49:14, 52:11, 60:15, 60:18, 61:1, 67:5, 69:20, 70:6, 73:3, |
| levy 3:11, 3:15, 3:21, 4:19, 4:20, 6:15, 7:4, 7:8, 7:13, 7:20, 12:8, 14:13, 30:7, 31:8, 32:10, 32:14, 110:6, 115:4, 157:21, 158:22, 160:11, 160:15, 179:14, 179:22, 180:13, 181:7, 185:11, 186:5, 186:10 | limiting 42:15, 44:18, 45:7, 83:5, 168:6 limits 77:9, 176:19 limone 125:8 line 70:14, 100:7 line-by-line 34:18 lines 123:21 linked 45:10 | llc 4:22, 5:1, 8:16, 15:10, 86:1 llcs 73:19 llp 3:15 loans 80:1, 87:6, 162:17 locate 67:20, 76:11, 78:14, 132:14, 133:6 locker 135:21, 166:13 | 74:5, 74:16, 78:9, 79:10, 81:2, 96:19, 102:14, 105:9, 105:17, 106:2, 106:3, 106:5, 108:3, 108:5, 113:11, 115:19, 118:6, 119:18, 120:5, 132:13, 135:15, 136:3, 136:5, 146:18, 149:14, 150:9, 152:4, 152:8, |
| li 1:4, 4:15, 154:7 liabilities 80:3 | liquidator 167:22, 168:2 list 30:13, 40:17, | logically 45:4 long 56:8, 110:22, | 152:15, 155:17, 155:20, 159:21, 163:20, 165:10, 165:20, 166:22, |
| liability 21:22, 23:14, 24:15, 26:9, 31:7, 38:16, 60:2 | 48:14, 60:19, 74:5, 87:13, 87:19, 88:1, 95:7, 139:5, 139:11, 139:12, | 146:6, 186:1 longer 96:16, 160:4, 160:6 look | 168:19, 185:6, 186:16, 186:21, 187:3, 188:3, 190:3, 192:9 looks |
| liberty 3:6 light 39:4 | 182:16, 182:18, 191:17 listed 14:10, 30:16, | 28:2, 30:5, 31:8, 31:20, 33:9, 39:16, | 79:12, 135:19, 156:19, 193:18 looped |
| likely 46:21, 192:2 liller 173:20, 174:8 | 152:10, 190:21 listening 135:6, 167:1 litigation | 49:2, 50:2, 63:5, 72:20, 101:20, 116:21, 117:17, 136:19, | 112:16 loss 88:12 lost |
| limit 56:11, 83:20, 114:12, 116:8, 134:4, 170:3, 177:1, 177:17, 178:9, 178:12 | 8:20, 9:9, 124:17, 158:2, 158:5 little 38:20, 39:17, 64:17, 82:3, | 143:8, 152:5, 154:12, 158:20, 158:21, 159:10, 175:12, 175:13, 176:8, 179:8, 181:12, 189:21, | 46:9, 54:18, 55:13, 55:15, 186:12 lot 11:13, 11:15, 37:20, 37:22, |
| limitation 174:7 | 102:20, 110:22, 115:8, 129:19, | 192:10 looked 50:2, 80:19, 156:19, 167:2 | 38:3, 94:9, 114:15, 115:10, 181:12, 185:15, 185:17 |

Transcript of Meet & Confer
Conducted on January 3, 2025                    71

| | | | |
|---|---|---|---|
| **lots** | 156:18, 157:5, | 66:3, 75:15, | **mediation** |
| 152:6, 153:1 | 157:9, 158:20, | 89:11, 89:12, | 162:1 |
| **M** | 163:11, 165:11, | 134:18 | **meet** |
| **m-e-z-u** | 166:18, 171:22, | **maryland** | 1:13, 2:1, |
| 149:6 | 172:13 | 1:2, 2:12, | 4:12, 5:21, |
| **made** | **makes** | 8:18, 9:7, 9:14, | 6:15, 7:5, 7:16, |
| 12:13, 26:2, | 28:11, 32:13, | 12:12, 149:7, | 8:8, 9:10, 10:9, |
| 37:15, 57:6, | 50:13, 114:14, | 162:7, 173:20, | 10:20, 11:3, |
| 73:18, 93:20, | 128:15, 130:2, | 174:3, 174:5, | 11:8, 12:20, |
| 94:22, 121:8, | 140:1, 140:3, | 174:9, 196:22 | 13:8, 13:11, |
| 147:9, 183:19, | 179:16, 181:6 | **material** | 13:18, 16:5, |
| 188:14 | **making** | 13:15, 34:1, | 28:16, 32:8, |
| **madelyn** | 7:15, 85:14, | 37:20, 116:6 | 68:7, 97:4, |
| 3:5, 4:13, | 89:22, 91:16, | **math** | 110:9, 110:12, |
| 88:7, 98:18, | 140:7 | 176:15 | 128:6, 176:7, |
| 122:17, 127:1, | **malyshev** | **matter** | 177:6, 179:11 |
| 143:13, 146:21, | 3:4, 4:14, | 6:8, 10:20, | **meeting** |
| 156:5 | 56:22, 62:11, | 11:17, 12:22, | 71:3, 103:22 |
| **madelyn's** | 62:18, 63:1, | 52:2, 118:5, | **member** |
| 167:21 | 82:4, 82:7, | 123:19 | 72:13, 176:1, |
| **main** | 82:19, 86:12, | **matters** | 176:3 |
| 140:5, 171:17 | 86:14, 87:2, | 25:5, 25:18, | **members** |
| **maintain** | 87:6, 87:16, | 26:7, 27:6, | 45:21, 46:3, |
| 151:15 | 95:4, 131:5, | 138:13 | 54:21, 73:19, |
| **maintained** | 143:11, 145:10, | **maybe** | 115:13 |
| 104:7, 107:21, | 146:9, 146:12, | 48:16, 48:18, | **memorandum** |
| 108:2, 112:18, | 146:14, 146:20, | 52:5, 82:2, | 138:21, 144:5 |
| 182:15, 186:17 | 175:9, 177:21, | 82:18, 93:3, | **memory** |
| **maintaining** | 178:8, 178:14, | 93:10, 93:11, | 79:11 |
| 102:8 | 178:17, 178:21, | 97:1, 97:7, | **memos** |
| **make** | 179:4 | 115:8, 128:15, | 125:8 |
| 5:11, 7:14, | **manageable** | 145:5, 150:22, | **mention** |
| 13:22, 14:11, | 93:14 | 155:18, 158:20, | 35:20, 36:1, |
| 28:12, 30:5, | **management** | 176:1, 190:22, | 37:7, 88:14, |
| 45:12, 46:11, | 17:10, 22:11, | 194:3 | 88:21, 89:19, |
| 46:21, 48:13, | 24:16 | **mccarthy** | 90:13, 100:2, |
| 57:14, 67:20, | **many** | 174:18 | 128:14 |
| 72:2, 76:10, | 34:20, 56:6, | **meaning** | **mentioned** |
| 78:14, 80:13, | 58:7, 61:20, | 85:22, 92:6, | 17:19, 18:13, |
| 80:15, 92:7, | 143:5, 174:2, | 118:21, 119:1, | 41:8, 60:5, |
| 97:5, 97:19, | 175:1, 176:16, | 168:1, 180:9, | 66:5, 89:16, |
| 98:1, 98:10, | 177:3, 185:20, | 180:11 | 89:17, 111:17, |
| 101:12, 103:19, | 194:4 | **means** | 122:22 |
| 121:15, 124:7, | **march** | 39:21, 67:22, | **mentioning** |
| 132:13, 132:22, | 51:19, 51:21, | 84:16, 102:14, | 90:16 |
| 133:5, 140:20, | 59:13, 59:17, | 138:2, 162:19 | **mentions** |
| 152:21, 154:15, | 63:14, 64:13, | **meant** | 87:17, 89:4, |
| | 65:10, 65:14, | 119:5 | 89:9, 91:8, |

Transcript of Meet & Confer
Conducted on January 3, 2025                                      72

| | | | |
|---|---|---|---|
| 91:10, 102:17, 173:21 | 125:6 | 38:13, 38:21, | 110:19, 110:21, |
| **mercury** | **minute** | 39:3, 40:4, | 111:2, 112:2, |
| 105:2, 105:4, | 64:1 | 41:3, 46:21, | 112:9, 119:9, |
| 105:16, 105:20, | **minutes** | 48:14, 58:3, | 121:5, 121:9, |
| 106:4, 106:6, | 98:12, 98:14, | 59:2, 61:15, | 138:16, 142:6, |
| 106:8, 106:13, | 98:20, 186:3, | 67:7, 71:16, | 145:16, 159:14, |
| 106:14, 187:1, | 186:8, 189:9 | 76:15, 76:22, | 159:15, 160:13, |
| 192:21 | **minutiae** | 79:13, 80:21, | 161:10, 164:5, |
| **mere** | 153:2 | 81:9, 93:6, | 164:16, 169:11, |
| 72:18 | **misrepresented** | 96:21, 102:20, | 172:6, 173:16, |
| **merely** | 174:17 | 102:21, 109:9, | 175:7, 179:15, |
| 137:22, 149:22 | **miss** | 110:18, 111:20, | 181:11 |
| **merits** | 186:2 | 111:22, 113:17, | **motions** |
| 34:14, 92:13 | **missed** | 113:18, 113:19, | 6:1, 6:7, 7:1, |
| **merits-based** | 190:17 | 118:15, 118:18, | 7:3, 7:18, |
| 33:15, 85:1, | **missing** | 118:21, 118:22, | 33:10, 34:8, |
| 90:4, 182:5, | 50:1 | 119:1, 119:3, | 70:22, 71:1, |
| 191:5 | **misspoke** | 120:13, 136:5, | 169:11, 172:4 |
| **messages** | 125:14 | 145:19, 147:16, | **move** |
| 127:14, 143:5 | **mistaken** | 155:19, 156:16, | 10:17, 13:9, |
| **met** | 50:17 | 158:13, 158:17, | 13:15, 32:5, |
| 38:2 | **mistrust** | 161:19, 168:3, | 32:16, 104:4, |
| **mezu** | 152:18 | 168:5, 171:11, | 128:11, 129:13, |
| 149:6 | **mm-hmm** | 180:11, 180:14, | 154:15, 159:18, |
| **mid** | 77:12, 91:14, | 180:22, 181:1, | 173:13, 177:4, |
| 24:4 | 145:5 | 181:3, 182:11 | 178:5, 179:14, |
| **might** | **moment** | **morgan** | 180:13 |
| 28:12, 30:9, | 21:15, 144:14, | 149:7 | **moving** |
| 57:2, 63:3, | 169:6 | **morning** | 10:18, 165:17, |
| 70:15, 71:14, | **money** | 4:10, 4:13 | 173:17, 176:12, |
| 72:2, 73:11, | 12:14, 79:8, | **most** | 177:7 |
| 85:12, 88:8, | 135:13, 193:5 | 20:6, 114:10, | **much** |
| 101:21, 107:21, | **montgomery** | 131:1, 133:11, | 16:16, 66:17, |
| 108:1, 117:22, | 154:18 | 133:17, 135:11, | 70:16, 107:8, |
| 118:4, 135:3, | **month** | 155:10 | 110:17, 136:9, |
| 145:11, 145:18, | 38:3 | **mother** | 142:20, 150:11, |
| 190:15 | **months** | 124:16 | 185:14 |
| **milburn** | 56:6, 61:9, | **motion** | **multi-part** |
| 4:11, 4:14 | 61:19, 61:20, | 5:13, 6:20, | 150:19 |
| **miller** | 62:8, 65:6, | 8:6, 9:5, 9:12, | **multiple** |
| 172:22 | 65:15, 65:19 | 10:16, 14:11, | 121:14, 130:11, |
| **mind** | **moot** | 14:18, 16:14, | 149:4, 149:16, |
| 126:16 | 88:8 | 32:21, 33:17, | 150:3, 151:5, |
| **mine** | **more** | 33:22, 46:22, | 173:2 |
| 128:20 | 5:21, 16:1, | 67:12, 76:8, | **muse** |
| **minor** | 16:4, 16:15, | 79:20, 89:18, | 3:15, 3:21, |
| 124:5, 124:14, | 20:19, 28:10, | 97:7, 108:14, | 4:19 |
| | 32:2, 32:7, | 110:14, 110:15, | **must** |
| | | | 146:1, 162:5, |

Transcript of Meet & Confer
Conducted on January 3, 2025                    73

162:20
**mute**
190:15, 190:17
**muted**
188:18
**myself**
53:5, 60:21,
188:16
**mystery**
68:8

**N**

**name**
109:13, 109:15,
191:11
**named**
8:21
**narrow**
120:16
**narrowing**
100:6
**nationwide**
137:21
**nature**
117:20, 119:19,
120:5, 120:6,
148:5, 187:17
**nay**
12:6
**nd**
134:18
**near**
174:2
**necessarily**
11:17, 39:21,
51:14, 57:8,
66:7, 86:16,
143:10
**necessary**
13:18
**need**
13:20, 16:1,
16:4, 16:15,
22:1, 31:19,
48:21, 51:14,
59:20, 60:11,
64:7, 64:8,
66:7, 69:6,

71:22, 74:14,
82:12, 97:3,
97:12, 105:10,
116:5, 123:20,
127:17, 133:22,
141:21, 142:7,
148:16, 166:22,
171:6, 172:10,
175:15, 177:13,
185:12
**needed**
10:2, 111:5
**needs**
10:16, 83:16,
83:21, 127:10,
145:13
**neither**
97:18, 160:14,
196:9
**network**
17:6, 17:16,
18:20
**never**
64:2
**new**
3:7, 5:2,
61:14, 85:10,
86:8, 185:1,
193:14
**news**
112:11
**next**
5:3, 13:17,
13:19, 28:7,
28:16, 32:5,
32:17, 42:17,
66:19, 71:3,
71:18, 72:1,
72:3, 75:17,
79:7, 79:19,
96:6, 97:4,
103:20, 104:4,
110:9, 128:5,
129:13, 129:22,
130:5, 130:7,
130:13, 130:21,
136:12, 154:6,
154:16, 159:15,

159:18, 160:18,
161:9, 168:16,
169:14, 176:7,
177:6, 179:11,
180:8, 181:4,
184:21, 193:16,
194:9
**night**
5:10, 6:16,
10:8
**nine**
177:15, 178:1,
178:4, 178:10
**ninth**
162:21, 163:1
**no-prejudice**
175:13
**nominally**
173:10, 173:21,
174:3, 174:11,
174:22
**non**
154:22
**non-ottersec**
14:19
**non-privileged**
67:21, 68:1,
76:12, 117:16,
158:4, 158:8
**nonanswer**
154:21, 156:22
**noncompliance**
162:19
**noncorporate**
145:12, 145:14
**none**
77:8, 100:19,
117:1
**nonparty**
124:4, 146:8
**nonparty's**
162:19
**normal**
14:5, 85:21,
85:22
**notarial**
196:14
**notary**
2:11, 196:21

**note**
12:8
**notes**
49:2, 79:11,
179:20
**nothing**
36:21, 120:16,
127:5, 127:6,
156:16
**notice**
16:10, 38:12,
38:13, 43:4,
154:7
**noticed**
7:20, 137:16,
138:1, 143:22
**notices**
7:2, 74:10,
111:8
**notwithstanding**
100:4, 101:3,
101:5, 132:6,
133:3, 190:10,
191:9
**november**
65:13, 74:10,
109:5
**nowhere**
174:1
**number**
10:14, 17:7,
21:5, 23:2,
34:17, 35:1,
35:3, 35:4,
37:11, 37:12,
37:15, 45:15,
45:18, 49:5,
49:6, 58:9,
58:10, 62:8,
67:9, 67:17,
68:2, 69:12,
70:2, 70:9,
72:11, 75:17,
75:18, 77:11,
78:7, 83:15,
87:22, 88:10,
99:7, 99:17,
100:15, 101:8,

Transcript of Meet & Confer
Conducted on January 3, 2025                    74

103:4, 104:5,
104:22, 106:22,
114:17, 119:8,
121:13, 132:1,
132:8, 133:9,
135:19, 158:9,
170:12, 170:13,
170:19, 172:17,
181:11, 181:15,
187:8, 189:10,
194:3
**numbers**
170:16, 173:20
**nw**
3:16

**O**

**o-d-j-a-g-h-i-a-n**
24:21
**oath**
137:15
**object**
69:1, 108:6,
139:10, 142:17,
148:6, 151:14,
162:1
**objected**
17:15, 122:3,
122:4, 130:3,
137:8, 149:3,
191:13, 191:15
**objecting**
38:22, 82:10,
124:8
**objection**
15:6, 17:17,
17:20, 17:21,
18:3, 18:6,
32:19, 33:1,
33:15, 34:17,
34:19, 35:6,
36:19, 37:1,
40:12, 41:2,
45:16, 45:22,
58:6, 58:7,
72:16, 73:1,
76:6, 78:1,
78:3, 78:5,

78:8, 83:4,
85:1, 99:11,
99:13, 100:1,
100:11, 100:13,
100:16, 100:21,
100:22, 101:4,
101:5, 102:5,
102:8, 102:21,
108:13, 112:22,
123:2, 123:4,
123:17, 124:13,
125:1, 125:2,
127:2, 127:5,
128:4, 128:8,
132:6, 139:14,
139:15, 140:5,
141:3, 148:17,
149:22, 151:15,
157:9, 157:12,
175:4, 184:2,
184:3, 189:20,
189:22, 190:11
**objection's**
189:15
**objectionable**
150:21
**objections**
15:2, 15:15,
17:14, 20:12,
31:11, 31:12,
33:14, 36:10,
37:14, 37:15,
38:15, 39:5,
67:18, 67:19,
68:2, 68:9,
70:1, 73:4,
73:7, 76:4,
76:5, 77:22,
79:10, 80:6,
88:11, 104:18,
107:17, 108:5,
109:18, 119:13,
119:14, 120:17,
122:22, 123:13,
125:3, 125:4,
128:9, 128:13,
130:3, 131:21,
133:4, 133:5,

134:12, 147:14,
161:14, 161:16,
161:20, 162:3,
162:5, 162:20,
163:3, 163:8,
163:9, 163:12,
163:14, 163:18,
165:3, 170:9,
176:17, 182:2,
183:17, 184:7,
186:19, 190:8,
191:2, 191:10,
192:1, 193:17
**objective**
91:9
**objects**
151:9
**obligated**
171:16
**observe**
162:10
**obtain**
109:21, 124:3,
124:19, 125:10,
125:12, 125:19,
126:6, 126:15,
146:7
**obtained**
109:8, 110:1
**obvious**
35:21
**obviously**
11:4, 15:11,
29:18, 31:2,
33:5, 46:2,
59:12, 62:6,
82:11, 94:17,
102:10, 105:2,
165:14, 170:4,
170:9, 172:8,
175:10, 187:3,
187:19, 191:9
**october**
61:7, 62:5,
65:4, 65:13,
169:21
**offer**
163:17, 176:11,

177:2, 178:19
**offered**
121:4
**offering**
136:9
**offers**
75:19, 76:13
**officer**
196:3
**officially**
4:7
**offline**
168:17
**oh**
38:21, 75:5,
148:13, 180:9,
186:11
**okay**
7:9, 7:12,
21:18, 30:4,
32:14, 35:15,
43:13, 45:15,
63:17, 69:22,
71:2, 72:10,
75:16, 77:2,
77:10, 78:16,
78:20, 79:6,
79:18, 83:10,
89:3, 95:2,
99:2, 100:10,
101:1, 101:2,
103:4, 104:3,
111:11, 112:15,
113:7, 115:7,
116:13, 116:15,
119:4, 119:7,
120:11, 120:18,
122:20, 125:5,
129:14, 131:3,
131:4, 131:19,
132:9, 133:8,
134:7, 134:8,
134:15, 135:8,
136:8, 136:17,
136:18, 136:20,
136:21, 140:10,
141:6, 142:8,
144:8, 144:14,

146:16, 147:3,
147:15, 148:13,
148:19, 148:22,
154:3, 154:11,
157:10, 159:8,
159:13, 160:19,
161:4, 161:5,
164:18, 169:4,
178:22, 179:12,
184:18, 184:21,
185:3, 186:9,
189:5, 191:21,
193:11, 194:11,
194:17
**once**
11:3, 14:7,
21:4, 187:16
**ones**
21:11, 27:15,
28:12, 32:20,
52:12, 100:18,
113:16, 113:21,
128:20, 142:16,
144:1, 148:2,
148:3, 164:4,
164:15, 169:12,
169:17, 170:8,
176:18, 183:7,
184:20, 189:5,
191:13
**ongoing**
57:5, 57:8,
57:16, 57:20,
63:3, 106:7
**only**
21:3, 27:15,
29:6, 30:1,
50:3, 50:17,
54:3, 54:5,
55:9, 68:13,
69:4, 70:22,
71:20, 75:2,
77:5, 81:20,
83:6, 83:11,
83:17, 84:13,
87:17, 102:6,
105:21, 106:21,
116:22, 131:7,

167:20, 169:22,
172:15, 174:2,
174:11, 174:22,
177:14, 188:15
**open**
63:9, 104:6,
104:10, 135:6,
160:2, 178:1,
179:18
**opening**
5:8
**operating**
22:17, 44:1
**operation**
37:8, 65:15
**operations**
14:21, 64:22,
65:6
**opportunities**
119:11
**opportunity**
32:6, 37:1,
73:10
**oppose**
14:4
**opposed**
45:6, 112:18,
139:8, 140:4,
158:18
**opposing**
48:12
**opposition**
89:17
**optimistic**
13:4
**option**
183:4
**option's**
137:14
**order**
6:6, 14:9,
14:11, 18:12,
171:13, 172:11,
173:14, 173:17
**ordered**
171:10
**ordinary**
182:15

**organization**
17:9, 22:11
**organizational**
22:15
**organize**
16:14
**organized**
111:1, 121:16
**original**
12:12
**originally**
8:13
**other**
5:18, 6:4, 8:8,
9:4, 18:18,
20:8, 20:20,
25:19, 26:19,
29:8, 30:5,
31:5, 34:20,
37:2, 37:22,
40:1, 45:12,
55:19, 56:16,
63:9, 65:21,
68:17, 70:20,
81:4, 82:8,
86:6, 89:16,
91:1, 93:2,
107:20, 113:15,
113:16, 114:21,
117:5, 117:13,
123:13, 125:3,
125:4, 125:22,
128:9, 128:13,
129:5, 132:5,
133:13, 133:15,
134:22, 135:2,
135:3, 135:15,
137:14, 138:5,
138:7, 139:2,
139:3, 139:19,
144:1, 144:9,
146:11, 147:14,
147:17, 148:12,
150:6, 150:20,
151:16, 154:4,
158:7, 162:9,
171:6, 171:11,
174:2, 174:8,

174:13, 174:16,
180:6, 181:2,
183:8, 184:17,
184:19, 185:12,
187:12, 188:8,
189:5, 190:8,
191:16
**others**
25:19, 29:10,
30:10, 45:17,
50:2, 67:1,
70:12, 73:6,
115:9, 120:14,
175:18, 185:21,
194:8, 194:12
**otherwise**
78:13, 85:2,
90:10, 99:16,
103:3, 126:9,
171:9, 171:13,
171:14, 196:12
**otter**
5:1, 14:22,
15:9, 17:11,
18:5, 18:21,
19:2, 19:9,
19:14, 20:2,
20:5, 20:13,
22:2, 22:3,
24:7, 24:8,
25:3, 25:4,
25:10, 25:11,
26:2, 26:22,
27:11, 32:22,
33:2, 34:4,
35:16, 35:19,
36:16, 37:10,
37:19, 41:20,
43:5, 43:16,
43:17, 45:21,
46:8, 49:7,
49:9, 49:11,
51:3, 58:12,
58:14, 58:15,
59:11, 59:17,
65:1, 68:16,
72:14, 72:17,
73:2, 73:5,

73:9, 73:17,
75:21, 75:22,
76:1, 76:9,
76:18, 77:17,
77:19, 78:12,
79:9, 79:15,
82:10, 84:18,
88:13, 89:3,
91:20, 94:3,
104:8, 104:17,
104:19, 107:6,
107:22, 112:1,
113:4, 113:21,
116:2, 116:19,
119:12, 119:20,
120:6, 172:17,
175:20, 181:16,
181:18, 181:19,
182:4, 187:4,
187:14, 187:21,
191:3, 192:7,
194:20
**ottersec's**
55:4, 152:11
**ourselves**
6:22, 47:12
**out**
5:3, 9:21,
10:7, 12:1,
24:8, 30:6,
30:13, 34:22,
40:21, 67:16,
71:6, 71:19,
91:3, 92:20,
106:17, 106:18,
111:2, 114:2,
120:15, 122:8,
138:4, 165:12,
175:18, 176:17,
187:13, 188:2,
193:1
**outcome**
196:12
**outline**
136:19
**outlined**
16:13
**outset**
4:3, 29:15,

**173:13**
**outside**
10:8
**outstanding**
144:18
**outweighs**
61:16
**ouzani**
174:4
**over**
5:3, 15:17,
20:8, 30:5,
38:3, 44:14,
67:4, 71:18,
94:7, 96:13,
96:20, 97:7,
119:13, 124:20,
135:9, 143:5,
143:16, 146:4,
149:13, 184:6,
192:15
**overall**
67:3
**overarching**
114:16, 131:14,
161:12
**overlap**
9:9, 11:14,
11:18, 14:2,
17:3, 60:6,
60:7, 181:12,
185:18
**overlapping**
71:15, 97:15,
178:13
**overlooked**
57:3
**overly**
142:18, 143:10,
143:14, 148:6
**own**
19:16, 110:2,
124:15, 130:1,
154:1
**owned**
18:20, 19:3,
19:7, 31:15
**owner**
117:19

**owners**
22:20
**ownership**
21:8, 22:20,
24:16, 73:16,
75:21, 77:18,
115:11, 115:13,
116:17, 117:4,
118:2, 118:3,
118:9, 146:5
**owns**
106:21

**P**

**p&l**
81:3, 94:1,
94:12
**p&ls**
90:8
**pace**
11:12
**page**
5:11, 7:11,
162:13, 186:12
**pages**
1:21, 77:20,
145:17, 145:18,
146:17
**paid**
44:13, 45:20,
46:3, 72:13
**paine**
174:18
**painters**
137:20
**papers**
15:8, 35:11,
35:14, 175:19
**paragraph**
152:9
**paragraphs**
142:4, 150:9,
151:4, 151:16,
152:5, 152:7,
191:17
**paralegal**
3:21, 4:21
**paraphrase**
140:19

**parent**
173:5
**part**
11:8, 18:13,
19:13, 19:17,
23:9, 24:6,
26:8, 26:17,
27:10, 29:21,
30:13, 35:16,
38:4, 43:14,
45:8, 48:1,
52:3, 54:22,
74:8, 74:19,
94:6, 111:14,
111:18, 145:6,
149:19, 149:21,
150:1, 150:4,
150:16, 150:19,
150:22, 152:12,
157:15, 189:16,
191:1, 192:8,
193:21
**part-time**
166:12
**partially**
83:8, 100:10
**particular**
36:4, 45:8,
47:4, 142:20
**particularly**
45:5, 95:17
**parties**
7:20, 87:9,
125:10, 173:2,
173:11, 173:21,
174:4, 174:11,
174:12, 175:1,
175:21, 175:22,
196:10
**partners**
45:21, 72:14
**parts**
114:3, 130:11,
149:4, 149:16,
150:3, 150:20
**party**
4:17, 17:18,
19:5, 31:16,

31:19, 40:7,
125:18, 126:1,
138:15, 145:12,
145:14, 158:12,
164:8, 171:8,
171:10, 171:11,
171:19, 175:2,
175:4, 175:6
**past**
61:14, 62:9,
138:1, 159:21,
159:22, 160:4
**payments**
49:12, 58:16,
181:20
**payroll**
80:2, 94:2
**penalty**
145:1
**pencil**
98:9
**pencils**
71:12, 97:1,
98:5
**pending**
6:1, 8:17,
8:18, 9:9, 11:2,
11:17
**pennsylvania**
138:12
**people**
173:6
**per-side**
174:7, 177:16
**perfect**
54:14
**perform**
52:17
**performed**
41:20, 49:10,
49:21, 51:11,
58:14, 60:10,
181:18
**performing**
18:22
**perhaps**
15:17, 27:2,
59:16, 64:8,

71:22, 158:13,
190:5
**period**
49:19, 50:15,
62:22, 93:1,
95:10, 163:5
**periods**
42:2
**perjury**
145:1
**permitted**
173:22, 174:12
**person**
124:15
**personal**
33:18, 33:21,
133:12, 133:14,
134:22, 135:4,
154:8, 166:4,
191:14, 192:18,
193:9
**personally**
193:3, 193:6
**persons**
49:8, 58:13,
181:17, 189:11,
192:2
**perspective**
141:19
**pertaining**
18:10
**pertinent**
26:16, 52:19,
54:4
**phone**
127:16, 133:21
**phrase**
148:20
**phrased**
89:18
**phrasing**
95:17, 96:3,
133:16
**physical**
146:5
**pick**
60:9, 63:11,
64:8, 177:3,

186:6
**picture**
162:16
**pile**
183:6
**place**
54:7, 97:8,
117:15, 192:16
**plain**
85:22
**plainly**
65:7
**plaintiff**
1:5, 3:2, 4:15,
8:15, 110:7,
116:18, 121:10,
123:9, 127:18,
132:12, 133:5,
138:22, 139:7,
140:14, 142:2,
142:15, 144:22,
155:4, 155:12,
157:3, 157:15,
159:15
**plaintiff's**
121:22, 123:7,
123:14, 131:13,
133:4, 144:5,
144:20, 145:2,
160:13, 163:9,
181:11
**plaintiffs**
172:9
**plan**
43:7, 98:19,
121:1
**planning**
130:17, 169:13
**plans**
119:11, 120:8,
120:9
**pleaded**
33:18, 57:17
**pleadings**
138:8
**please**
42:18, 69:14,
146:13

**point**
6:5, 6:17,
6:19, 7:14,
9:22, 12:1,
13:22, 15:5,
25:19, 26:11,
26:22, 28:6,
28:22, 30:17,
30:19, 32:5,
36:5, 37:4,
37:13, 39:9,
39:15, 41:1,
41:5, 45:11,
45:12, 46:6,
49:13, 51:12,
56:7, 56:16,
56:18, 59:1,
59:14, 60:15,
61:5, 61:15,
61:22, 63:7,
63:12, 64:6,
64:21, 66:9,
67:16, 69:11,
69:13, 70:21,
72:21, 74:13,
74:17, 75:11,
75:13, 79:5,
96:8, 96:11,
98:6, 100:19,
103:11, 104:2,
107:19, 111:2,
114:14, 121:1,
127:20, 143:4,
154:13, 167:21,
169:22, 171:18,
176:4, 179:1,
185:7, 188:14,
192:17
**pointed**
10:7, 34:22
**pointing**
137:22, 150:10,
151:4, 183:3
**points**
23:22, 27:20,
28:1, 34:13,
37:2, 96:17,
146:19, 159:6

Transcript of Meet & Confer
Conducted on January 3, 2025                                      78

| | | | |
|---|---|---|---|
| **portion** | 192:11 | **pretty** | 196:7 |
| 5:17, 19:15, | **possible** | 86:11, 158:22, | **process** |
| 26:5, 73:21 | 26:10, 26:12, | 191:19 | 27:19, 28:9, |
| **portions** | 93:12 | **preview** | 111:14 |
| 5:18 | **post** | 130:6 | **produce** |
| **position** | 27:5 | **previous** | 31:18, 35:18, |
| 9:22, 10:16, | **postdate** | 78:4, 78:17 | 36:15, 39:9, |
| 12:4, 12:20, | 55:4, 59:21 | **previously** | 67:21, 76:11, |
| 13:7, 13:14, | **postdates** | 87:12, 112:14, | 78:15, 83:6, |
| 13:21, 14:1, | 54:10 | 177:19 | 83:9, 84:12, |
| 14:7, 15:20, | **postdating** | **primarily** | 91:12, 92:8, |
| 15:21, 22:5, | 18:1 | 9:19, 14:18, | 102:6, 103:1, |
| 25:17, 27:21, | **potential** | 116:3, 128:9, | 108:6, 112:8, |
| 28:2, 28:19, | 14:2, 123:22 | 132:2 | 132:7, 132:14, |
| 32:7, 33:20, | **potentially** | **primary** | 133:6, 134:13, |
| 34:10, 35:10, | 19:21, 21:4, | 15:6 | 134:21, 135:17, |
| 35:13, 36:19, | 23:11, 29:7, | **prior** | 146:2, 166:14, |
| 40:7, 62:6, | 46:19, 79:3, | 9:10, 27:11, | 182:14, 184:12, |
| 62:15, 63:2, | 115:17 | 44:1, 51:12, | 194:6 |
| 63:3, 63:4, | **practical** | 68:7, 128:10, | **produced** |
| 75:14, 77:5, | 124:3, 125:12, | 173:14 | 18:18, 37:7, |
| 82:13, 85:8, | 125:19, 126:6, | **prioritize** | 37:9, 37:20, |
| 88:14, 93:5, | 126:15, 146:7 | 7:17 | 39:8, 39:9, |
| 95:13, 102:5, | **practically** | **privilege** | 39:22, 40:2, |
| 108:19, 111:7, | 125:11 | 155:10, 155:15, | 47:6, 47:10, |
| 111:11, 122:8, | **precise** | 156:9, 157:6, | 47:13, 48:6, |
| 128:2, 128:16, | 101:12 | 157:9, 157:12, | 48:7, 50:16, |
| 129:9, 135:7, | **predecessor** | 157:18 | 53:22, 55:18, |
| 139:1, 156:1, | 24:19 | **privileged** | 55:20, 68:13, |
| 161:13, 163:7, | **prefer** | 40:15, 156:17, | 68:21, 74:2, |
| 163:10, 165:15, | 63:18 | 156:21, 157:1, | 74:6, 74:8, |
| 165:19, 169:21, | **preference** | 157:4, 157:11, | 74:20, 75:1, |
| 171:18, 175:7, | 14:15 | 159:2, 159:4 | 75:2, 80:10, |
| 175:18, 176:8, | **prejudice** | **probably** | 80:20, 81:6, |
| 177:13, 177:20, | 177:22 | 4:2, 17:2, | 81:8, 83:3, |
| 182:18, 184:3 | **prepared** | 28:7, 29:10, | 84:3, 84:4, |
| **positions** | 124:13, 181:3 | 62:17, 71:16, | 86:19, 86:21, |
| 15:13, 31:10, | **present** | 105:10, 136:10, | 87:12, 88:12, |
| 33:11, 171:7 | 3:20, 121:19, | 168:10 | 88:15, 88:18, |
| **possession** | 138:1, 173:5 | **problem** | 89:6, 92:3, |
| 19:9, 121:22, | **preservation** | 145:6, 181:9 | 94:4, 94:17, |
| 122:5, 122:7, | 189:19 | **problematic** | 99:19, 100:4, |
| 122:12, 123:3, | **preserve** | 95:1 | 100:17, 100:18, |
| 123:6, 123:10, | 123:4, 163:2, | **proceed** | 100:20, 105:5, |
| 126:12, 127:3, | 163:3 | 177:4, 181:8 | 107:15, 107:19, |
| 131:22, 145:20, | **press** | **proceeding** | 108:4, 122:11, |
| 146:3, 146:5, | 167:6 | 11:11 | 155:2, 182:9, |
| 189:11, 192:3, | **presume** | **proceedings** | 193:7 |
| | 8:10 | 196:4, 196:6, | |

Transcript of Meet & Confer
Conducted on January 3, 2025                                    79

| | | | |
|---|---|---|---|
| **producing** | **property** | **pull** | 58:2, 58:8, |
| 15:2, 17:15, | 133:13, 133:15, | 68:11, 68:15, | 58:18, 58:19, |
| 18:4, 20:12, | 134:22, 135:4, | 69:16, 80:17, | 59:2, 60:7, |
| 33:1, 35:6, | 166:4 | 131:3, 132:18 | 60:17, 60:21, |
| 40:22, 70:10, | **proposal** | **pulling** | 61:1, 62:11, |
| 72:16, 73:2, | 31:13, 66:3, | 37:11 | 63:12, 64:11, |
| 83:13, 84:13, | 67:3, 114:13, | **purchase** | 73:11, 73:13, |
| 85:1, 86:5, | 165:2, 166:20, | 77:16 | 81:6, 82:1, |
| 86:6, 101:6, | 167:5, 168:9, | **purpose** | 82:2, 82:22, |
| 111:21, 119:15, | 168:14, 169:3, | 7:13, 7:15, | 83:3, 83:10, |
| 132:20, 139:18, | 170:6 | 24:19, 31:3 | 86:12, 86:15, |
| 139:21, 141:5, | **proposals** | **purposes** | 86:22, 90:12, |
| 142:21, 183:2, | 113:12 | 6:14, 7:5, | 91:15, 94:6, |
| 183:12 | **propose** | 11:10, 16:5, | 95:4, 99:21, |
| **product** | 63:18, 63:21, | 21:10, 27:7, | 100:9, 101:19, |
| 155:15 | 64:11, 64:19, | 71:7, 100:8, | 102:3, 103:2, |
| **production** | 66:18 | 124:17, 165:16 | 103:16, 103:17, |
| 14:19, 35:17, | **proposing** | **pursuant** | 107:14, 108:21, |
| 41:17, 43:6, | 164:12 | 2:10 | 109:19, 111:21, |
| 125:18, 163:19, | **proposition** | **push** | 113:3, 114:9, |
| 180:3, 180:4 | 145:12 | 160:7 | 115:11, 115:18, |
| **productions** | **protective** | **pushing** | 116:9, 117:2, |
| 80:10, 80:21, | 173:13, 173:17 | 56:1 | 125:9, 127:4, |
| 122:6, 180:7, | **protocol** | **put** | 136:3, 149:10, |
| 180:12 | 45:3, 79:2, | 4:2, 71:12, | 156:11, 157:20, |
| **productive** | 79:4, 109:9 | 71:19, 94:7, | 157:22, 167:20, |
| 20:19, 93:10, | **prove** | 97:1, 98:5, | 180:20, 183:10, |
| 131:1, 165:17 | 25:11, 172:10, | 98:9, 120:9, | 183:13, 183:15, |
| **productively** | 172:20 | 120:21, 122:14, | 189:16, 190:5, |
| 8:1 | **provide** | 168:8, 183:6 | 190:19, 191:7, |
| **products** | 69:4, 85:16, | **puts** | 194:7, 194:18 |
| 49:12, 58:17, | 134:5, 135:2, | 11:11 | **questioning** |
| 181:21 | 144:5, 147:13, | | 68:20 |
| **profit** | 148:8, 153:21, | — **Q** — | **questions** |
| 88:12 | 154:9, 158:13, | | 21:18, 23:8, |
| **profits** | 184:10 | **qualifications** | 27:15, 29:2, |
| 20:1, 20:2, | **provided** | 133:7 | 30:6, 44:6, |
| 46:9, 54:18 | 73:8, 113:1, | **qualifiers** | 45:3, 48:8, |
| **progress** | 149:4, 165:7, | 101:19 | 52:9, 79:1, |
| 46:21, 179:1 | 165:9, 187:18, | **question** | 136:16, 180:3, |
| **pronounce** | 189:14, 189:19 | 5:8, 12:9, | 180:4, 180:6, |
| 24:21 | **providers** | 19:18, 19:20, | 180:12, 180:15, |
| **pronouncing** | 194:3 | 23:15, 26:7, | 180:19 |
| 190:12 | **provides** | 26:9, 26:16, | **quick** |
| **proper** | 191:7 | 34:3, 43:14, | 95:4, 116:20 |
| 48:9, 138:11, | **public** | 43:20, 44:2, | **quite** |
| 139:3, 140:8, | 2:12, 29:17, | 46:6, 47:18, | 10:15, 19:11, |
| 151:6 | 107:7, 196:21 | 49:19, 52:20, | 58:19, 66:4, |
| | | 54:6, 55:9, | |

Transcript of Meet & Confer
Conducted on January 3, 2025

80

| | | | |
|---|---|---|---|
| 94:20 | 34:3, 35:15, | 153:22, 156:20, | 157:14, 158:16, |
| **quote** | 35:18, 36:15, | 164:20 | 188:6 |
| 90:1, 96:12, | 37:10, 37:19, | **reading** | **reasoning** |
| 96:13, 103:6, | 41:20, 43:5, | 17:14, 95:20, | 54:1 |
| 125:15 | 43:15, 43:17, | 113:22, 135:9, | **reasons** |
| **quoted** | 45:21, 46:8, | 179:10 | 10:13, 29:8, |
| 145:22 | 49:7, 49:9, | **reads** | 51:6, 66:4, |
| **quoting** | 49:10, 51:3, | 157:19 | 84:4, 144:1, |
| 149:6 | 58:12, 58:13, | **ready** | 192:14 |
| **R** | 58:15, 59:11, | 16:12, 175:11 | **recall** |
| **rachel** | 59:16, 65:1, | **real** | 111:4, 176:15, |
| 3:13, 4:20, | 72:14, 72:16, | 139:14 | 193:2 |
| 55:14, 58:1, | 73:2, 73:4, | **realize** | **received** |
| 59:2, 67:16, | 73:9, 73:17, | 107:18, 114:3 | 81:22, 107:3, |
| 69:15, 70:11, | 74:3, 75:20, | **really** | 107:8, 168:2 |
| 72:20, 98:15, | 75:22, 76:1, | 5:22, 6:2, | **recent** |
| 117:9, 189:17, | 76:8, 76:17, | 10:12, 10:21, | 80:10, 80:21, |
| 190:5 | 77:17, 77:18, | 11:20, 25:9, | 106:8 |
| **raise** | 78:11, 79:9, | 29:16, 39:2, | **recently** |
| 6:3, 6:17, | 79:14, 81:3, | 43:19, 49:19, | 193:2 |
| 6:19, 10:12, | 81:4, 82:11, | 53:5, 58:20, | **recess** |
| 63:6, 71:21, | 83:2, 84:19, | 59:14, 60:18, | 99:1, 161:7 |
| 74:19, 79:8, | 85:12, 88:13, | 60:22, 64:14, | **recognize** |
| 163:4 | 89:3, 90:18, | 73:19, 76:15, | 5:16 |
| **raised** | 91:20, 94:3, | 81:7, 83:3, | **reconcile** |
| 10:5, 11:20, | 104:8, 104:16, | 85:8, 89:2, | 36:18 |
| 14:17, 53:16, | 104:18, 107:21, | 91:2, 93:22, | **reconsidered** |
| 112:3, 137:2, | 112:1, 113:3, | 110:14, 115:18, | 125:4 |
| 161:15, 181:13 | 113:21, 116:2, | 123:5, 125:6, | **record** |
| **raises** | 116:19, 119:12, | 129:4, 152:15, | 4:2, 4:3, 4:8, |
| 146:22 | 119:20, 120:5, | 156:22, 157:18, | 5:14, 6:12, 7:7, |
| **raising** | 170:12, 175:20, | 166:22, 185:2, | 8:9, 58:10, |
| 11:7, 68:20, | 181:16, 181:17, | 185:4, 185:7, | 59:6, 78:22, |
| 91:1, 93:3, | 181:19, 182:3, | 188:5, 188:12, | 85:11, 95:15, |
| 110:14, 175:4 | 187:4, 187:13, | 190:3 | 96:9, 96:10, |
| **range** | 187:22, 191:2, | **realm** | 99:5, 111:12, |
| 75:11, 75:13, | 192:12, 194:20 | 109:14 | 153:8, 162:14, |
| 96:12, 96:14, | **rdr** | **reason** | 165:14, 168:18, |
| 96:16 | 1:22 | 19:16, 23:20, | 175:8, 177:11, |
| **rather** | **reach** | 26:3, 27:1, | 186:4, 195:5, |
| 71:3, 97:13, | 129:6, 175:16, | 51:13, 75:3, | 196:6 |
| 142:10, 179:9 | 177:6, 180:5, | 193:8 | **records** |
| **rc** | 184:15 | **reasonable** | 43:2, 48:11, |
| 4:22, 14:22, | **reached** | 61:18, 62:1, | 50:4, 80:2, |
| 15:9, 17:11, | 9:21 | 63:6, 140:3, | 94:2, 109:2, |
| 18:5, 20:13, | **read** | 140:12, 140:15, | 110:2, 137:13, |
| 32:22, 33:1, | 15:7, 68:5, | 154:2 | 138:6, 139:21, |
| | 146:1, 153:8, | **reasonably** | 155:1, 183:4, |
| | | 124:4, 157:3, | |

Transcript of Meet & Confer
Conducted on January 3, 2025                                          81

184:12, 189:13,
191:14, 192:9,
192:16, 192:18,
193:9, 194:19
**redraft**
177:22
**reduced**
196:8
**refer**
41:11, 146:12
**reference**
140:2, 141:10,
141:13, 141:16,
141:20, 142:3,
142:10, 143:19,
143:20, 143:21,
144:4, 150:6,
154:22, 186:20
**referenced**
135:1, 139:6,
139:17, 192:20
**references**
130:14, 139:2,
147:4, 147:9,
147:12, 147:16,
147:19, 147:20,
151:4, 154:4
**referencing**
137:2, 137:13,
137:15, 149:2,
192:20
**referred**
137:10, 148:12,
158:1
**referring**
137:17, 139:9,
140:13, 142:14,
155:3, 158:17,
182:6, 183:1,
185:5, 191:4
**reflect**
116:5, 184:13
**refresh**
79:11
**refuse**
124:18, 126:2
**regard**
48:21, 162:2,

163:13, 170:5,
172:7
**regarding**
154:6, 163:12,
193:17
**regardless**
34:2, 88:19,
88:20, 125:13,
126:16
**register**
154:18
**registered**
2:11
**rehired**
52:17
**reiterate**
64:20
**relate**
25:9, 85:19
**related**
12:22, 14:20,
19:6, 35:8,
59:14, 60:1,
60:3, 72:8,
79:2, 79:3,
83:17, 87:18,
88:4, 90:4,
134:21, 135:2,
135:12, 158:4,
166:9, 188:13,
196:10
**relates**
12:10, 19:19,
19:21, 23:7,
37:21, 42:11,
85:13, 122:2
**relating**
151:13, 153:11,
161:11, 192:12
**relation**
193:9
**relationship**
9:8, 10:20,
120:2
**relevance**
19:10, 20:9,
30:11, 31:9,
31:20, 56:5,

58:21, 59:21,
95:19, 99:22,
100:8, 100:9,
117:12, 118:6,
119:17, 132:3,
183:18
**relevancy**
88:12, 123:1,
128:9, 132:2
**relevant**
18:11, 20:6,
21:20, 22:1,
29:8, 30:9,
52:19, 54:11,
55:6, 56:9,
56:20, 57:13,
57:20, 57:22,
62:2, 73:12,
81:18, 82:8,
82:12, 83:12,
83:13, 83:18,
83:19, 85:18,
86:7, 86:9,
88:15, 95:20,
95:22, 120:2,
120:10, 125:7,
135:5, 146:2,
155:6, 166:14,
191:15, 192:13,
192:19, 193:10
**relied**
122:10, 158:9
**relying**
85:1
**remainder**
179:15
**remaining**
81:15, 139:14,
169:22, 177:15
**remember**
27:15, 80:22,
111:8, 111:9
**remembering**
143:3
**remotely**
1:14, 2:1
**removal**
133:14

**remove**
141:12, 141:20,
144:4, 147:12,
148:15
**removed**
140:7
**removing**
147:15, 147:19,
147:20, 148:17,
151:3
**reorganization**
17:10
**repeat**
53:5
**repeating**
68:18
**reply**
145:15, 146:17,
175:11
**reported**
1:22
**reporter**
2:11, 4:9,
111:14, 146:13,
189:8, 195:2,
196:1
**represent**
4:15, 4:17,
4:21
**representative**
154:8
**representing**
155:12
**represents**
9:1
**request**
16:8, 17:7,
17:11, 21:5,
21:7, 23:1,
30:8, 31:14,
32:17, 34:17,
34:22, 35:1,
35:3, 35:4,
40:13, 40:14,
45:18, 48:19,
49:1, 49:5,
55:16, 56:11,
56:14, 56:16,

Transcript of Meet & Confer
Conducted on January 3, 2025                                          82

56:17, 58:9,
58:10, 59:6,
59:9, 67:7,
67:9, 67:17,
68:2, 69:12,
70:2, 70:8,
72:5, 72:6,
72:11, 72:15,
74:15, 75:17,
75:18, 77:11,
78:4, 81:6,
83:2, 85:3,
87:22, 88:10,
90:11, 92:4,
92:19, 93:4,
93:22, 94:19,
97:20, 99:7,
99:17, 100:15,
101:8, 103:4,
104:4, 104:13,
118:19, 119:8,
119:17, 131:2,
132:1, 132:7,
133:9, 135:18,
139:20, 141:4,
142:21, 166:16,
166:17, 181:14,
186:15, 188:13
**request-by-reque-
st**
58:4, 167:3
**requested**
15:3, 18:4,
81:14
**requesting**
123:2, 123:5
**requests**
15:6, 17:1,
17:22, 20:14,
23:2, 32:20,
34:20, 41:10,
45:10, 58:8,
66:17, 67:12,
98:4, 98:6,
98:16, 104:21,
108:10, 128:14,
130:22, 131:6,
131:8, 131:14,

131:15, 135:11,
135:15, 148:8,
152:22, 163:17,
164:3, 164:8,
164:12, 165:19,
179:20
**require**
125:18
**required**
120:13, 174:19
**requires**
57:9
**reserving**
175:17
**resolve**
5:22, 6:3,
7:16, 8:1, 11:4,
13:2, 13:10,
83:15, 93:13,
164:13, 165:3,
167:5, 178:2,
189:4
**resolved**
144:19, 145:9,
182:13
**resolving**
63:19
**respect**
25:19, 82:13,
100:8, 107:10,
107:11, 107:19,
184:3, 191:15
**respective**
15:12, 33:11
**respond**
37:5, 42:16,
48:9, 101:21,
122:14, 137:12,
137:13, 137:14,
151:6, 156:5,
163:15, 171:16,
173:15, 176:22,
180:7, 190:8,
192:2, 194:15
**responded**
6:16, 175:5,
175:6
**respondent**
163:2

**responding**
183:4
**response**
10:1, 21:19,
33:14, 38:12,
45:14, 48:21,
68:13, 69:1,
69:3, 69:12,
70:6, 70:9,
73:6, 73:8,
74:1, 74:16,
76:17, 78:11,
80:5, 80:7,
80:8, 83:5,
85:21, 97:13,
104:20, 116:22,
119:15, 128:17,
132:14, 134:21,
139:5, 139:8,
147:13, 154:10,
154:20, 155:20,
158:15, 164:8,
182:6, 183:2,
184:16, 186:20,
186:22, 189:18,
190:4, 190:7,
190:20, 190:21,
193:22, 194:2
**responses**
40:20, 64:12,
67:19, 68:6,
68:22, 69:7,
69:22, 76:3,
105:10, 113:2,
133:5, 138:14,
147:22, 148:9
**responsibility**
121:22, 144:12
**responsible**
90:17, 123:20,
126:8, 127:13,
127:15, 127:18
**responsive**
67:22, 73:8,
76:9, 76:12,
76:18, 78:12,
79:15, 81:5,
83:1, 83:6,

83:7, 83:9,
85:2, 86:18,
90:10, 92:3,
92:12, 93:22,
94:19, 99:17,
100:15, 101:7,
103:3, 107:10,
132:7, 133:6,
134:5, 146:2
**restating**
138:10
**restrict**
60:21
**restricted**
67:13, 166:3
**restricting**
47:12
**restrictive**
52:15
**return**
86:15
**returns**
79:22, 86:21,
87:7, 99:8,
99:9, 134:11,
134:14, 163:21,
164:1, 164:7,
165:4, 165:6,
165:8, 165:11,
165:22, 166:8,
167:9, 167:16
**revealing**
156:6
**revenue**
34:12, 80:2,
90:18, 130:20,
136:6
**revenues**
130:8
**review**
18:18, 108:19,
146:17
**reviewed**
40:8, 88:4
**reviewing**
8:10, 35:15,
102:15
**revise**
69:6, 74:1,

142:12, 146:14,
147:11, 151:1,
154:9, 155:8
**revised**
105:11, 128:16,
128:17, 135:7,
157:5
**revising**
154:14
**rfp**
37:20, 48:10,
66:15, 66:19
**rfps**
37:22, 110:7,
121:14, 122:3,
130:10, 136:21,
167:5, 169:19,
169:21, 170:2,
170:6, 170:7,
170:18, 183:2
**riffing**
158:11
**rights**
116:18, 117:5,
117:16, 118:2,
118:12
**robert**
4:22, 8:14,
76:10, 78:13,
106:11, 107:5,
116:18, 117:20,
143:6, 149:12,
151:12, 153:10,
153:12, 172:14,
172:16, 190:21,
191:11, 191:14,
192:10, 193:3
**robert's**
175:22, 192:18,
194:19
**rog**
130:10, 137:8,
138:20, 140:9,
141:6, 154:6,
154:16
**rogs**
121:14, 122:2,
130:9, 170:2,

174:12
**rule**
83:21, 124:2,
125:17, 137:12,
138:4, 146:3,
161:15, 162:19,
163:5, 171:9,
174:6
**rules**
36:7, 126:7,
163:11, 171:8
**ruling**
33:16
**run**
45:4, 45:18,
91:11, 164:11,
185:19

---
### S
---

**said**
6:10, 12:2,
13:17, 14:14,
21:15, 22:2,
23:3, 29:15,
30:9, 30:18,
31:6, 34:6,
35:18, 35:22,
38:13, 39:19,
45:14, 55:2,
55:17, 58:5,
59:13, 62:15,
62:20, 68:12,
69:3, 70:13,
72:9, 74:20,
75:3, 78:11,
78:13, 84:13,
96:11, 99:15,
102:16, 103:22,
111:7, 111:9,
111:10, 111:11,
111:18, 112:7,
125:1, 127:9,
128:7, 132:11,
133:12, 135:14,
137:11, 137:21,
141:1, 143:5,
144:12, 148:2,
149:4, 151:19,

164:7, 165:3,
165:5, 166:1,
167:9, 167:17,
173:12, 174:10,
177:4, 177:10,
178:3, 178:8,
179:5, 184:11,
185:4, 186:15,
190:17, 192:6,
194:2, 194:19,
196:7
**sake**
160:7, 176:12,
176:19
**sale**
77:16
**sales**
24:20
**sam**
116:18, 118:3
**sam's**
57:18
**same**
5:6, 5:11,
7:10, 7:11,
7:14, 15:16,
19:13, 19:17,
22:19, 23:11,
23:12, 26:8,
26:17, 37:21,
39:2, 42:11,
42:12, 42:14,
44:15, 45:1,
45:22, 47:9,
52:12, 55:4,
60:18, 61:2,
61:3, 62:6,
66:2, 77:21,
78:3, 78:17,
79:16, 81:16,
81:21, 82:22,
84:20, 84:22,
91:21, 92:15,
104:2, 104:13,
118:10, 119:14,
122:5, 137:5,
143:19, 144:1,
148:20, 162:8,

173:7, 178:20,
189:3, 189:4
**satisfied**
151:21
**satisfies**
136:11
**satisfy**
140:9, 164:3
**save**
79:4, 167:8
**saw**
80:17
**say**
10:13, 14:19,
18:16, 23:16,
25:21, 34:20,
35:8, 37:7,
40:3, 51:9,
58:6, 62:10,
66:22, 67:17,
79:14, 86:15,
89:11, 91:7,
91:11, 91:12,
91:18, 95:3,
102:5, 103:3,
103:6, 103:22,
108:12, 118:20,
126:9, 131:20,
133:2, 136:15,
140:11, 140:12,
141:21, 141:22,
143:11, 143:12,
143:14, 144:10,
144:14, 152:7,
155:11, 156:16,
157:1, 157:2,
157:16, 172:13,
172:20, 176:11,
178:7, 191:22,
193:22
**saying**
26:19, 28:5,
28:14, 28:17,
29:2, 39:1,
41:16, 41:21,
45:6, 62:17,
63:10, 68:22,
69:12, 76:17,

Transcript of Meet & Confer
Conducted on January 3, 2025                                                    84

81:22, 82:16,
83:5, 86:4,
88:9, 91:8,
92:2, 92:19,
93:6, 101:5,
101:10, 102:16,
103:10, 103:17,
105:14, 105:15,
112:9, 113:17,
113:18, 115:4,
125:22, 140:4,
140:6, 144:18,
150:18, 156:10,
156:15, 158:15,
162:5, 164:21,
166:22, 178:10,
178:15, 181:2,
193:13
**says**
53:14, 69:1,
73:6, 78:10,
85:11, 85:13,
102:18, 102:21,
125:9, 126:1,
137:12, 138:4,
138:8, 147:4,
149:20, 171:9,
171:13, 171:14,
171:21, 171:22,
172:22, 190:7,
191:22, 194:4,
194:8, 194:9
**schedule**
11:6, 11:21
**scheduled**
8:8, 13:19,
32:9, 160:15
**schedules**
80:4
**scheduling**
14:3, 71:6
**scope**
5:9, 5:20,
5:21, 10:9,
36:7, 59:3,
83:20, 116:8,
170:3
**screens**
77:14

**seal**
196:14
**search**
45:3, 45:7,
91:11, 96:1,
109:9, 135:16,
140:17
**searched**
47:13, 109:10,
109:16
**searches**
45:4
**searching**
47:3
**second**
30:4, 49:3,
57:1, 68:14,
69:17, 70:2,
132:17, 162:4,
190:1
**secondarily**
15:5
**security**
4:22, 14:22,
15:9, 17:7,
17:11, 17:16,
18:5, 18:20,
20:13, 32:22,
33:2, 34:4,
35:15, 35:19,
36:16, 37:10,
37:19, 41:20,
43:5, 43:15,
43:17, 45:21,
46:8, 49:7,
49:9, 49:11,
51:3, 58:12,
58:14, 58:15,
59:11, 59:17,
65:1, 72:14,
72:16, 73:2,
73:4, 73:9,
73:17, 74:3,
75:21, 75:22,
76:1, 76:9,
76:17, 77:17,
77:19, 78:12,
79:9, 79:14,

81:3, 81:4,
82:11, 83:2,
84:19, 85:12,
88:13, 89:3,
90:18, 91:20,
94:3, 104:8,
104:17, 104:18,
107:21, 112:1,
113:4, 113:21,
116:2, 116:19,
119:12, 119:20,
181:16, 181:18,
181:19, 182:4,
187:4, 187:14,
187:22, 191:2,
192:13, 194:20
**security's**
120:6, 170:12
**see**
14:7, 22:16,
25:9, 26:15,
78:10, 82:22,
92:18, 93:11,
98:17, 103:18,
105:4, 106:8,
106:17, 106:21,
135:5, 145:11,
153:22, 154:1,
163:21, 166:13,
171:20, 185:22,
188:1, 188:2
**seeing**
143:8, 154:12,
187:6, 188:6
**seek**
122:4, 174:19
**seeking**
19:6, 22:8,
192:15
**seem**
25:2, 56:1,
143:9, 143:14
**seems**
24:6, 24:11,
25:3, 36:9,
55:16, 126:10,
126:14
**seen**
41:1, 109:20,

163:10
**segregate**
46:18
**select**
176:18
**selling**
24:17
**send**
12:19, 13:7,
153:17, 168:9,
168:10, 175:12,
176:6, 179:6,
180:6
**sending**
12:3, 114:1
**sense**
12:6, 14:12,
18:22, 28:11,
28:13, 32:13,
47:21, 50:13,
72:2, 75:5,
114:14, 120:14,
121:8, 121:15,
128:15, 130:2,
140:1, 171:22,
172:13, 179:17,
181:6
**sent**
110:4, 143:5
**sentence**
69:19, 99:21,
107:22, 132:12,
152:10, 194:9
**separate**
12:13, 18:7,
22:5, 23:22,
27:4, 31:16,
31:19, 33:4,
34:4, 36:14,
36:20, 44:2,
46:21, 72:17,
80:6, 85:6,
90:5, 98:8,
99:13, 104:19,
104:20, 131:10,
149:3, 173:11,
173:21, 174:3,
174:11, 174:12,

Transcript of Meet & Confer
Conducted on January 3, 2025                                              85

175:1, 175:21,
175:22
**separately**
6:21, 18:3,
84:8, 89:15,
102:19, 109:16,
117:22
**separateness**
182:2, 182:3
**september**
62:15, 65:2,
65:13
**sequence**
106:22
**series**
73:4, 76:5,
77:21, 80:5,
119:14, 191:2
**serve**
169:20, 171:11,
174:15, 174:20,
178:1, 178:4
**served**
161:16, 161:18,
169:20, 171:17,
173:16
**service**
161:20, 162:6,
174:1, 181:21,
194:3
**services**
19:1, 49:12,
58:17, 59:20,
60:11, 109:14
**servicing**
23:18, 26:1
**serving**
174:19, 175:5
**session**
71:18, 160:18,
168:16
**set**
31:11, 67:19,
169:11, 196:13
**setting**
5:12, 11:21
**settled**
91:3

**settles**
136:15
**seven**
65:14, 65:20
**several**
32:19, 40:4,
141:10
**shall**
14:9
**shape**
30:1
**shared**
20:2
**shareholder**
22:18, 72:13
**shareholders**
45:20, 73:19
**sheet**
81:3
**sheets**
80:2
**shield**
29:12
**shire**
109:14
**short**
17:17, 64:10,
97:13
**should**
4:1, 14:8,
38:19, 53:15,
71:12, 73:16,
84:4, 93:18,
94:4, 97:6,
97:9, 98:2,
112:16, 118:8,
123:18, 149:10,
149:21, 156:12,
163:7, 168:8,
169:7, 171:19,
172:14, 172:16,
172:18, 192:7,
193:22
**show**
49:6, 49:20,
53:18, 53:20,
56:9, 57:13,
58:11, 108:4,

108:7, 112:8,
112:11, 115:12,
115:21, 182:10,
182:16
**showed**
38:6
**showing**
55:16, 56:2,
56:5
**shown**
57:17, 193:4
**shows**
22:19, 56:8,
56:18, 148:20
**side**
48:12, 65:20,
82:2, 129:12,
160:5, 187:4
**sides**
37:14, 188:4,
188:6, 188:10
**signature-p1kal**
196:19
**signed**
44:20, 47:4,
47:14, 52:17,
142:1
**significance**
133:17
**significant**
152:11
**signing**
64:3, 145:1
**similar**
11:11, 17:3,
58:7, 68:6,
72:15, 76:5,
80:5, 104:18,
114:9, 142:9,
163:9, 184:19,
185:19, 186:14,
186:19, 188:13
**similarly**
23:1, 138:21
**simms**
5:19, 8:10,
10:22, 12:12,
111:9, 111:11,

168:19
**simple**
159:1
**simply**
73:6, 127:4
**since**
8:9, 84:8,
131:6, 159:18
**single**
30:13, 43:15,
47:20, 47:21,
57:10, 149:10,
172:3
**singular**
150:13
**sitting**
124:12, 175:14
**situation**
66:6, 106:2
**situations**
172:1, 173:3
**six**
61:9, 61:19,
65:15, 65:18,
65:19, 65:20
**skinner**
173:20, 174:8
**slicing**
91:18
**slightly**
147:1
**sold**
62:14
**sole**
176:1, 176:2
**solely**
126:3
**solve**
93:2
**some**
9:4, 14:2,
15:12, 16:22,
17:3, 19:16,
29:10, 29:11,
29:22, 32:7,
34:11, 36:3,
39:21, 39:22,
40:1, 41:8,

Transcript of Meet & Confer
Conducted on January 3, 2025                86

41:10, 47:11,
50:7, 50:9,
50:16, 51:12,
54:15, 56:7,
61:15, 61:21,
61:22, 62:10,
63:19, 64:7,
64:18, 67:4,
71:13, 71:22,
73:5, 74:2,
74:15, 74:20,
75:3, 79:1,
79:3, 80:9,
80:11, 80:19,
81:5, 82:8,
83:1, 84:3,
84:22, 85:10,
86:21, 90:9,
92:6, 92:12,
94:15, 97:2,
97:7, 98:2,
98:10, 100:4,
105:13, 107:3,
107:18, 112:4,
113:13, 114:3,
117:12, 120:13,
127:20, 129:7,
132:19, 146:22,
148:1, 155:19,
156:20, 158:10,
158:11, 163:17,
165:21, 171:22,
173:1, 174:13,
175:17, 180:1,
180:3, 180:22,
181:1, 181:13,
182:11, 185:19,
193:14
**somebody**
61:14
**somehow**
22:4
**someplace**
110:5
**something**
22:18, 22:19,
28:6, 41:3,
56:16, 56:18,

57:2, 63:8,
64:4, 69:5,
81:12, 81:21,
85:10, 85:15,
88:3, 91:8,
96:12, 96:15,
105:17, 111:7,
112:19, 115:2,
127:15, 129:15,
138:22, 151:15,
153:20, 158:19,
171:2, 172:15,
175:15, 182:13
**something's**
95:20
**sometimes**
125:17
**somewhere**
130:12
**son**
124:5
**sons**
12:14
**sorry**
20:16, 24:12,
25:13, 39:12,
50:11, 53:3,
60:13, 62:11,
62:12, 65:11,
65:22, 70:6,
74:5, 77:13,
82:15, 87:15,
93:15, 95:3,
122:17, 125:12,
132:10, 132:12,
135:8, 146:14,
155:22, 156:9,
159:12, 166:3,
168:22, 174:9,
178:18, 178:19,
179:4, 181:7,
182:21, 190:16,
192:5
**sorts**
139:2
**sought**
17:22, 24:1,
104:16, 126:3

**sounded**
179:9
**sounds**
4:5, 36:4,
55:8, 81:8,
84:10, 84:21,
90:3, 92:11,
98:21, 101:9,
115:1, 129:10,
131:16, 132:21,
133:16, 141:7,
142:7, 143:17,
144:11, 144:14,
157:16, 159:8,
161:6, 169:2,
175:10, 178:2,
178:22
**source**
158:12
**sources**
130:14, 134:17,
135:3, 137:3,
154:5, 166:6
**south**
83:18
**speak**
10:2, 25:14
**speakers**
71:15, 97:15,
178:13
**speaking**
5:6, 8:4,
13:12, 16:18,
23:2, 25:14,
89:1, 99:4,
179:5
**speaks**
159:2
**speci**
180:22
**specific**
16:4, 17:1,
19:1, 19:16,
36:12, 38:21,
44:18, 45:9,
51:15, 78:1,
86:17, 86:22,
87:8, 94:13,

108:21, 110:18,
114:12, 152:5,
167:5, 188:22,
191:20
**specifically**
43:17, 48:19,
51:6, 68:12,
69:3, 69:14,
70:11, 72:20,
78:7, 89:4,
89:9, 90:13,
106:10, 106:13,
106:20, 111:17,
112:2, 138:20,
151:2, 155:19,
164:13
**specificity**
31:12, 31:21,
180:11, 180:14,
181:1
**specifics**
16:1, 16:15
**specified**
161:17
**spend**
72:3
**spin**
27:3
**spirit**
134:3, 176:5
**spoken**
77:22
**spoliation**
123:22, 127:12,
127:17, 129:3
**sports**
138:3
**spot**
78:17
**st**
3:6
**standard**
1:16, 145:7
**standing**
100:21, 141:3,
147:21, 156:8,
171:15
**stands**
176:11, 177:2

**start**
4:4, 14:8,
14:9, 14:15,
16:19, 16:22,
17:5, 56:12,
57:18, 71:2,
71:18, 72:4,
93:6, 120:15,
170:7, 170:10,
173:17
**started**
5:7, 24:10,
65:12
**starting**
63:12, 71:18
**state**
2:12, 79:21,
96:9, 99:8,
134:11, 134:14,
149:7, 151:17,
152:7, 165:14,
196:22
**stated**
86:11, 144:2
**statement**
18:16, 106:6
**statements**
79:22, 87:7,
87:8, 88:13,
94:1, 94:11,
99:9, 105:5,
106:4, 109:6,
109:13, 109:22,
110:4, 111:3,
111:22, 138:15,
192:22
**states**
1:1, 151:11,
151:18, 153:9
**status**
125:6
**stay**
161:21
**staying**
42:6
**stenographically**
196:7
**step**
82:17

**stephen**
3:3, 4:11
**steve**
4:18, 5:5, 7:4,
8:4, 12:8,
13:12, 16:17,
20:15, 30:7,
46:11, 55:12,
60:13, 67:15,
69:10, 69:19,
89:1, 99:4,
103:8, 110:6,
154:19, 157:21,
160:11, 178:18,
179:14, 179:22,
180:14, 185:13,
193:18
**steve's**
166:11
**still**
19:17, 51:16,
52:4, 61:8,
62:21, 68:19,
80:16, 100:6,
101:6, 102:8,
102:10, 102:12,
123:17, 129:15,
136:12, 136:16,
144:18, 169:12,
171:6, 176:11,
177:2, 177:6,
183:17, 188:15
**stipulated**
171:10
**stipulation**
171:14
**stood**
41:2, 73:1
**stop**
70:16
**stopping**
98:15
**strategies**
119:11
**streamline**
151:9
**streamlining**
21:10

**street**
3:6, 3:16
**strong**
14:15
**struck**
45:2
**structure**
130:7
**structured**
31:3, 130:12
**struggle**
26:15, 52:4
**struggled**
35:10
**struggling**
25:16, 52:22,
84:15
**stuff**
22:3, 25:5,
28:16, 39:4,
40:1, 43:7,
43:8, 46:8,
46:15, 46:18,
46:20, 54:16,
54:17, 60:21,
64:16, 64:18,
71:13, 72:9,
74:8, 80:1,
80:11, 83:19,
92:1, 94:3,
96:20, 97:2,
97:16, 98:7,
98:10, 105:7,
105:12, 105:13,
105:15, 107:18,
113:13, 117:13,
132:19, 135:16,
152:6, 156:21,
184:7, 185:8,
185:19, 194:20
**subject**
4:16, 7:2,
8:17, 8:20,
9:10, 10:20,
14:18, 32:21,
67:12, 67:18,
73:6, 79:20,
108:14, 110:11,

110:13, 110:15,
112:2, 119:9,
133:4, 134:12,
147:13, 155:14,
164:4, 164:16,
181:10, 183:12,
184:16, 190:7,
192:1
**subjective**
36:5, 36:8,
36:14, 84:10,
93:18, 95:17,
96:2, 96:4,
102:20, 103:13
**subparts**
149:8, 174:14,
174:21
**subpoena**
19:5, 82:12,
161:10, 161:15,
161:18, 161:19,
163:2, 169:5
**subsequent**
133:21
**subsequently**
8:14
**subset**
177:11
**subsidiary**
18:21, 19:4,
19:7, 22:2,
24:10, 25:1,
31:15, 173:6
**substantial**
11:14
**substantive**
142:13, 147:13,
147:22, 148:9,
154:10, 154:15
**succeed**
172:11
**successful**
176:4
**successor**
19:21, 20:6,
21:22, 23:8,
23:14, 24:15,
24:19, 25:10,

Transcript of Meet & Confer
Conducted on January 3, 2025

88

26:9, 33:19,
38:16, 45:11,
52:9, 52:20,
60:2, 119:22
**successors**
15:10, 18:8,
33:5, 34:5,
52:10, 53:10,
53:13, 53:17,
53:19, 57:7,
72:18, 73:5,
76:7, 84:20,
90:6, 191:3
**suddenly**
124:18
**sufficiency**
172:19
**sufficient**
41:18, 41:22,
43:18, 49:6,
49:20, 58:11,
108:4, 108:6,
112:8, 112:11,
115:21, 134:16,
156:11, 166:5,
182:9, 184:12,
185:6
**suggest**
4:3, 13:9,
146:16, 163:16,
169:18
**suggesting**
96:5, 130:18
**suggestion**
46:12, 71:7,
75:15, 97:19,
98:1
**suing**
173:7
**suite**
3:16
**suited**
137:9, 139:20,
141:4, 142:21,
148:8
**summarize**
9:7
**summary**
81:2, 138:17,

142:6, 179:9
**super-productive**
96:8
**supervision**
196:9
**supplement**
162:18
**supplemented**
64:9
**support**
145:16
**supporting**
163:10, 163:22,
165:6, 166:7,
167:10, 167:17
**supports**
54:12, 137:19
**suppose**
10:10, 36:18,
182:3, 191:6
**supposed**
28:10, 36:8,
150:18
**supreme**
126:1
**sure**
4:17, 5:11,
16:17, 20:17,
22:7, 30:5,
34:1, 39:10,
39:22, 49:1,
56:21, 66:8,
77:3, 82:19,
84:6, 86:13,
97:5, 99:20,
101:12, 108:20,
117:14, 121:7,
121:20, 132:22,
134:2, 147:2,
155:8, 161:3,
171:5, 182:17
**surely**
54:9
**swear**
145:13
**sworn**
138:14, 138:19
—————— **T** ——————
**tail**
39:17, 41:4

**tailwind**
138:3
**take**
4:1, 6:8,
13:17, 14:9,
14:10, 18:11,
28:1, 32:3,
34:15, 35:22,
62:5, 63:2,
66:11, 71:5,
73:10, 74:12,
76:16, 82:17,
98:11, 98:12,
98:13, 99:15,
103:17, 108:19,
112:12, 116:20,
117:8, 125:15,
128:1, 129:10,
153:19, 157:7,
158:19, 158:21,
159:10, 160:16,
160:22, 168:17,
170:17, 175:12,
175:13, 176:7,
179:8, 184:18,
193:11, 193:15,
194:22
**takeaway**
8:3, 10:21
**taken**
34:9, 99:1,
161:7, 166:10,
196:4, 196:7
**takes**
36:19
**taking**
67:6, 75:12,
117:15, 182:17,
186:1
**talk**
13:20, 20:19,
21:3, 21:11,
40:16, 50:14,
66:19, 67:1,
71:1, 104:9,
121:8, 129:22,
130:5, 130:7,
131:4, 157:11,

161:9, 170:2
**talked**
78:4, 114:19,
133:19
**talking**
5:12, 41:11,
48:19, 52:8,
54:13, 54:15,
55:7, 55:8,
55:15, 56:15,
57:4, 63:15,
64:21, 65:5,
66:15, 69:13,
70:2, 78:6,
78:18, 85:5,
86:1, 94:10,
94:14, 99:6,
102:3, 111:3,
130:17, 132:4,
142:4, 160:12,
168:1, 168:3,
173:3, 178:20,
188:16, 188:17,
193:19
**talks**
87:22
**tax**
79:22, 86:15,
86:21, 87:7,
99:8, 134:11,
134:14, 163:21,
164:1, 164:7,
165:4, 165:6,
165:8, 165:11,
165:22, 166:7,
167:9, 167:15
**taylor**
126:5
**tealtech**
127:16
**team**
136:15, 148:16
**technically**
34:21
**tee**
11:1
**tele**
194:7

Transcript of Meet & Confer
Conducted on January 3, 2025                                89

| | | | |
|---|---|---|---|
| **tell**<br>32:2, 41:5,<br>46:22, 56:17,<br>81:12, 86:20,<br>121:18, 128:6,<br>128:15, 133:17,<br>170:8, 176:8,<br>185:15<br>**telling**<br>44:4, 49:16,<br>68:21, 69:5,<br>81:20, 155:5<br>**tells**<br>25:2<br>**ten**<br>5:3, 98:12,<br>186:7, 186:8,<br>189:9<br>**term**<br>91:11<br>**terms**<br>5:9, 5:12,<br>7:13, 8:6, 58:8,<br>94:7<br>**th**<br>3:16, 161:21<br>**thank**<br>4:18, 28:18,<br>32:15, 110:6,<br>120:11, 123:16,<br>134:7, 134:16,<br>146:20, 161:8,<br>169:17, 181:7,<br>186:11, 195:4<br>**thanks**<br>7:4, 8:5, 12:8,<br>16:18, 32:14,<br>37:6, 96:18,<br>98:22, 146:21,<br>177:9<br>**theft**<br>9:3, 12:14<br>**theme**<br>57:6, 149:10,<br>149:12, 149:17,<br>150:12, 150:14,<br>151:3, 151:20<br>**themes**<br>151:5 | **themselves**<br>48:2, 54:12<br>**thereafter**<br>196:8<br>**therefore**<br>18:9, 100:13,<br>122:12<br>**thing**<br>23:14, 29:6,<br>29:14, 30:20,<br>31:5, 42:3,<br>42:12, 44:12,<br>48:4, 49:19,<br>67:16, 70:20,<br>96:3, 121:21,<br>129:1, 129:13,<br>130:5, 130:7,<br>130:11, 138:19,<br>140:17, 152:18,<br>154:14, 159:18,<br>161:9, 161:13,<br>172:2, 173:11,<br>173:22, 190:17<br>**things**<br>5:3, 25:3,<br>35:10, 40:11,<br>40:15, 41:11,<br>44:11, 48:3,<br>53:22, 61:8,<br>62:2, 63:20,<br>64:8, 71:22,<br>72:1, 81:16,<br>83:13, 83:15,<br>85:18, 86:5,<br>86:6, 93:16,<br>95:15, 97:12,<br>99:4, 115:17,<br>120:3, 120:16,<br>122:14, 123:2,<br>128:11, 139:3,<br>139:20, 141:11,<br>148:5, 151:16,<br>153:2, 154:22,<br>167:7, 176:12,<br>180:13, 187:4<br>**thinking**<br>11:7, 71:20,<br>72:20, 99:3, | **106:10, 137:6**<br>**third**<br>4:17, 158:12,<br>162:18<br>**thought**<br>53:10, 53:11,<br>55:15, 58:22,<br>62:12, 68:12,<br>119:5, 121:8,<br>150:2, 156:4<br>**thoughts**<br>93:15<br>**thousands**<br>37:9<br>**three**<br>65:6, 95:10,<br>128:14, 129:18,<br>131:7, 131:11,<br>145:17, 186:18<br>**threshold**<br>6:17<br>**through**<br>15:13, 18:16,<br>20:5, 27:13,<br>34:18, 38:7,<br>40:1, 43:11,<br>45:18, 47:8,<br>47:14, 50:17,<br>51:15, 51:22,<br>55:21, 59:7,<br>64:17, 66:3,<br>67:7, 68:4,<br>70:13, 71:17,<br>80:11, 80:21,<br>81:14, 84:3,<br>89:5, 89:10,<br>89:11, 89:12,<br>90:20, 97:4,<br>98:4, 99:14,<br>99:17, 100:3,<br>100:12, 101:8,<br>105:21, 111:8,<br>126:13, 131:2,<br>134:18, 137:3,<br>145:17, 159:20,<br>160:1, 160:7,<br>160:10, 164:12,<br>164:20, 166:16, | **179:19, 185:22**<br>**throughout**<br>32:19, 35:6<br>**tie**<br>46:19<br>**tied**<br>185:4, 187:7<br>**time**<br>1:16, 7:22,<br>13:2, 15:4,<br>15:12, 17:21,<br>37:2, 42:12,<br>48:17, 49:19,<br>50:14, 51:12,<br>51:17, 53:9,<br>53:19, 59:3,<br>59:20, 62:3,<br>66:21, 76:16,<br>76:19, 76:22,<br>77:3, 77:6,<br>77:8, 77:10,<br>78:5, 78:8,<br>78:10, 78:18,<br>79:5, 79:12,<br>80:16, 81:9,<br>84:7, 89:8,<br>89:9, 89:13,<br>90:22, 91:4,<br>93:1, 94:5,<br>97:6, 97:13,<br>98:10, 114:13,<br>114:15, 116:8,<br>122:19, 137:4,<br>146:13, 148:20,<br>158:17, 160:21,<br>161:17, 163:4,<br>167:8, 169:9,<br>177:5, 178:20,<br>180:17, 183:6,<br>183:7, 183:8,<br>183:12, 183:14,<br>184:4, 184:16<br>**times**<br>42:2<br>**timing**<br>26:14<br>**title**<br>45:1, 45:5 |

Transcript of Meet & Confer
Conducted on January 3, 2025                90

today
5:9, 5:21,
7:14, 10:6,
11:15, 12:3,
12:19, 13:5,
13:14, 30:11,
32:1, 63:20,
71:1, 71:10,
71:13, 93:9,
98:2, 103:21,
110:13, 110:18,
111:6, 112:5,
113:8, 124:12,
175:14, 193:17,
195:4
together
9:19, 11:9,
11:12, 12:7,
16:21, 21:11,
23:3, 73:3,
104:10, 114:6,
120:9, 122:15,
129:22, 137:6,
172:3
told
164:8
tom
189:7
took
35:11, 35:14,
179:7
top
37:11, 75:7,
81:1, 95:12,
110:2, 160:9,
176:14, 194:12
topic
121:15, 128:20,
129:22, 151:19,
154:5
topics
121:13, 121:14,
128:21, 139:17,
180:18
total
172:17, 175:7
totally
20:22, 82:16

touch
38:5, 86:7,
97:16, 128:21,
130:9, 151:16
touches
30:19, 37:18
towards
6:11, 11:5,
11:21
tracing
187:11
track
11:11
traditional
104:11
trail
185:14
transaction
105:16, 188:4
transactions
85:17, 105:2,
105:3, 106:7,
106:17
transcript
5:17, 5:18,
8:11, 196:5
transfer
9:6, 9:12,
24:18, 39:7,
57:15, 59:16,
77:17, 106:11
transferred
9:13, 30:20,
57:10, 85:9,
187:12, 187:13,
188:9
transferring
29:12, 57:17
transfers
106:9, 187:5,
193:1
transferwise
187:2
transition
168:20
transparent
93:19
treated
122:12, 171:19

treating
86:5
trends
39:7
trial
11:10
tried
7:14
trouble
56:14
true
114:10, 196:6
try
13:2, 16:6,
38:20, 66:16,
83:15, 97:11,
112:12, 159:13
trying
7:6, 22:4,
23:9, 24:1,
27:8, 27:13,
29:9, 29:14,
29:20, 39:6,
40:22, 45:2,
45:9, 46:1,
47:12, 52:5,
56:9, 59:8,
64:14, 69:16,
83:20, 83:22,
84:9, 85:3,
85:15, 88:2,
89:2, 89:20,
91:18, 92:16,
95:7, 95:19,
102:9, 102:12,
108:16, 114:1,
140:18, 151:9,
157:16, 157:17,
160:7, 167:7,
174:20
turn
8:7, 15:17,
72:2, 97:1,
97:6, 98:6,
98:10, 119:13,
120:21, 121:5,
169:7
turning
60:20, 81:9,

96:20, 121:1
two
10:13, 14:21,
15:4, 15:8,
18:7, 21:11,
33:3, 34:2,
37:21, 56:3,
65:6, 85:17,
89:21, 93:16,
95:15, 96:17,
99:22, 117:18,
160:9, 167:14,
170:1, 170:7,
170:11, 170:18,
182:7, 191:16,
191:17
type
104:13, 104:15,
169:3
typed
153:5
types
16:3, 90:12,
109:19
typewriting
196:8
typical
22:15
typically
115:12

U

ultimately
144:22, 145:2
um
50:19
umbrella
23:21
unable
140:14
unacceptably
96:2
unanswered
149:22
under
23:21, 37:20,
44:1, 46:10,
53:13, 54:19,

Transcript of Meet & Confer
Conducted on January 3, 2025                    91

66:11, 74:12,
78:7, 103:18,
108:19, 112:12,
117:8, 124:2,
126:7, 128:1,
129:10, 137:15,
139:19, 145:1,
146:3, 153:19,
155:1, 157:7,
163:5, 184:19,
193:12, 193:15,
195:1, 196:8
**understand**
12:2, 15:7,
16:2, 17:13,
22:5, 25:17,
28:5, 33:19,
34:7, 38:14,
40:22, 42:4,
52:5, 52:22,
61:5, 66:8,
75:14, 77:4,
84:1, 84:15,
85:4, 85:7,
85:8, 86:3,
88:2, 88:11,
89:2, 89:21,
91:1, 93:5,
94:21, 99:20,
102:4, 102:12,
103:9, 103:11,
103:16, 111:10,
112:9, 112:13,
112:22, 113:5,
113:11, 113:14,
113:20, 114:2,
114:21, 117:8,
128:20, 129:8,
132:22, 135:11,
147:18, 148:21,
150:21, 163:6,
175:22
**understanding**
5:15, 15:1,
18:19, 19:11,
20:10, 81:13,
82:16, 88:7,
91:6, 101:10,

110:20, 111:15,
129:14, 144:6,
144:21
**understood**
10:3, 62:17,
99:21, 103:10,
140:21, 140:22,
144:17, 148:22
**unequivocally**
127:7, 137:22
**unfortunately**
129:2, 160:16
**unique**
31:17
**unit**
172:3
**united**
1:1
**unless**
171:9
**unquote**
90:1, 103:7
**unrelated**
135:4
**until**
24:4, 32:1,
57:10, 59:17,
60:12, 162:1,
173:14, 173:15
**untimely**
161:14
**unverified**
150:5
**update**
80:13, 80:15,
116:5
**upsell**
159:13
**us-based**
109:12
**use**
7:22, 42:22,
48:8, 64:12,
67:3, 85:21,
90:14, 104:7,
111:6, 138:8,
142:5, 160:21,
172:14, 186:7,

186:8
**uses**
89:4, 174:3
**using**
23:12, 26:2,
52:6, 53:2,
53:6, 63:8,
86:3, 122:13,
122:14, 124:6,
124:7, 135:22,
165:10
**utilize**
102:16, 103:4
**utilized**
106:16, 112:21,
113:2, 158:11
**utilizing**
36:13, 59:1,
63:13, 65:5,
76:19, 84:11,
90:2, 91:7,
92:6, 103:5

---
**V**
---
**vague**
102:21, 154:21,
156:22, 157:18
**valid**
102:5
**valuation**
154:17
**valuations**
75:20, 76:14
**valued**
158:3, 158:5,
159:3
**vendors**
194:3
**verified**
138:15, 138:22
**verify**
101:11
**verifying**
142:2
**version**
143:9, 153:5
**versus**
125:8, 126:5,

149:7, 162:7,
162:16, 174:4,
174:18
**via**
6:16, 26:13
**view**
10:19, 11:5,
11:13, 11:21,
12:6, 19:3,
24:6, 34:14,
55:5, 65:7,
83:13, 86:18,
92:1, 92:9,
182:5, 192:6
**virginia**
162:17
**voluntarily**
124:16

---
**W**
---
**w-2s**
44:11, 48:3,
48:6, 50:16,
115:7, 115:14,
115:16, 115:19
**wagging**
39:18, 41:5
**wait**
57:9, 67:15,
70:6
**waited**
173:14, 173:15
**waived**
162:2, 162:6,
162:20, 163:14,
165:16
**waiver**
163:12, 163:18,
165:15, 167:6,
190:7, 192:1
**waiving**
39:5, 133:3,
155:9, 170:8
**wallet**
106:19, 106:20,
106:21, 113:15,
164:1, 167:11,
167:17, 167:19,

167:21, 168:1,
187:17, 187:20
**wallets**
106:15, 106:16,
112:21, 113:2,
113:4, 168:6,
187:9, 187:16,
187:21, 188:3,
189:1
**want**
4:6, 5:10,
6:21, 7:17,
7:22, 10:17,
15:14, 16:2,
16:7, 16:14,
21:6, 21:15,
25:13, 28:22,
31:22, 32:2,
38:14, 38:20,
40:4, 40:16,
42:6, 45:12,
45:13, 48:13,
56:4, 56:11,
58:3, 59:6,
59:10, 63:18,
66:16, 66:20,
68:15, 69:11,
71:2, 71:6,
71:9, 71:17,
71:19, 71:21,
74:22, 81:20,
88:22, 93:10,
95:3, 95:15,
96:10, 97:5,
98:9, 98:11,
99:5, 101:12,
102:2, 106:12,
111:1, 112:9,
113:10, 115:3,
117:9, 117:11,
120:14, 120:19,
120:20, 120:21,
129:18, 129:22,
130:7, 131:4,
131:5, 131:8,
132:22, 134:8,
144:10, 145:8,
146:21, 150:22,

151:8, 151:10,
153:13, 154:1,
157:20, 160:20,
163:21, 168:16,
168:20, 170:4,
170:15, 171:3,
175:12, 176:4,
176:6, 177:22,
178:4, 178:16,
179:6, 179:14,
184:9
**wanted**
6:17, 10:6,
10:12, 11:22,
12:2, 13:22,
27:21, 29:3,
62:13, 96:8,
96:17, 113:15,
113:17, 113:18,
113:19, 113:20,
130:5, 133:12,
151:14, 163:16,
170:20, 176:18,
177:3
**wants**
110:7
**washington**
3:17
**watch**
96:19
**way**
7:9, 16:10,
16:11, 25:18,
28:18, 29:22,
31:3, 33:13,
34:11, 43:4,
47:1, 47:4,
47:9, 47:14,
48:9, 55:14,
64:17, 70:15,
71:4, 71:9,
84:22, 86:3,
86:5, 89:18,
92:20, 93:12,
93:14, 93:19,
96:4, 107:9,
110:18, 121:3,
121:19, 131:4,

132:16, 143:15,
150:6, 150:22,
151:8, 152:2,
152:17, 156:20,
173:19, 174:8,
178:2, 178:3,
178:16, 188:5
**ways**
30:8, 34:13,
114:12
**we'll**
13:6, 13:21,
14:4, 17:2,
25:20, 31:11,
32:3, 36:15,
40:17, 61:19,
74:12, 79:1,
79:4, 82:9,
91:12, 95:14,
97:11, 98:5,
98:9, 98:19,
103:1, 103:18,
104:4, 108:18,
108:20, 110:8,
111:12, 117:7,
117:8, 121:5,
124:11, 128:1,
128:4, 133:22,
135:16, 146:14,
153:17, 153:19,
153:21, 154:12,
159:10, 160:1,
160:21, 161:4,
171:3, 177:9,
177:19, 179:12,
184:7
**we've**
9:22, 14:17,
15:11, 15:12,
28:3, 29:3,
32:4, 37:15,
37:19, 38:1,
39:4, 39:8,
43:9, 48:6,
48:7, 48:15,
48:20, 50:9,
55:17, 55:20,
57:17, 62:8,

62:20, 64:3,
67:5, 68:4,
72:7, 72:8,
74:3, 74:5,
74:8, 74:17,
75:1, 86:20,
92:22, 93:4,
95:2, 95:13,
96:15, 100:4,
100:18, 100:20,
103:22, 116:5,
121:16, 122:8,
126:7, 127:8,
136:13, 137:11,
138:7, 141:14,
144:9, 144:12,
144:13, 145:17,
147:5, 149:4,
154:19, 165:5,
165:16, 177:10,
182:10, 184:6,
191:16, 192:14
**webber**
174:18
**website**
109:21
**wednesday**
13:20
**week**
28:7, 66:19,
80:22, 96:6,
103:20, 136:12,
193:16
**went**
131:2, 179:19
**weren't**
47:3, 125:1
**west**
109:14
**westlaw**
162:11, 162:22,
174:9
**whatever**
6:6, 23:20,
24:9, 25:22,
26:3, 27:1,
27:3, 51:13,
51:19, 56:9,

Transcript of Meet & Confer
Conducted on January 3, 2025                                    93

| | | | |
|---|---|---|---|
| 90:9, 94:2,<br>158:9<br>**whenever**<br>52:18<br>**whereas**<br>113:16, 175:6<br>**whereof**<br>196:13<br>**wherever**<br>108:1<br>**whether**<br>15:19, 15:20,<br>19:4, 19:20,<br>25:9, 26:8,<br>26:16, 30:19,<br>30:22, 31:4,<br>34:3, 34:5,<br>43:18, 44:3,<br>46:2, 49:20,<br>52:20, 81:15,<br>82:9, 83:4,<br>87:10, 87:17,<br>87:18, 88:3,<br>88:19, 88:20,<br>90:13, 91:16,<br>99:10, 102:9,<br>102:16, 109:17,<br>110:4, 125:9,<br>125:11, 125:13,<br>126:16, 128:12,<br>136:11, 136:12,<br>136:15, 136:16,<br>157:8, 157:11,<br>159:11, 165:8,<br>165:9, 182:8,<br>183:11, 183:15,<br>184:9, 186:18,<br>188:8, 189:3,<br>189:16, 190:19,<br>191:7, 192:12,<br>194:7, 194:18<br>**white**<br>3:5, 4:13,<br>88:6, 88:7,<br>91:9, 102:18,<br>122:17, 122:18,<br>122:21, 124:11,<br>126:18, 127:22, | 129:17, 130:19,<br>130:22, 131:18,<br>131:20, 132:17,<br>133:2, 133:9,<br>134:9, 134:12,<br>134:20, 139:4,<br>140:10, 140:22,<br>141:8, 141:12,<br>142:8, 142:12,<br>144:3, 144:16,<br>144:20, 147:2,<br>147:8, 147:11,<br>148:1, 148:15,<br>150:9, 153:15,<br>153:19, 154:9,<br>155:8, 157:7,<br>161:5, 165:13,<br>168:7, 168:22<br>**whoever**<br>25:22, 165:12<br>**whole**<br>88:1, 136:14,<br>154:14, 168:20,<br>178:5<br>**wholly**<br>18:20, 19:3,<br>19:7, 31:15<br>**whomever**<br>15:18<br>**williams**<br>162:16<br>**willing**<br>124:22, 132:6,<br>134:20, 135:2,<br>136:4, 139:4,<br>141:12, 165:21,<br>166:8, 170:1,<br>176:22, 185:22<br>**wills**<br>154:18<br>**windup**<br>62:18, 62:20,<br>62:21, 62:22,<br>63:3, 65:16<br>**wished**<br>6:14<br>**withdraw**<br>124:13, 124:22, | 127:4, 128:13<br>**withdrawing**<br>99:11, 99:22,<br>100:3, 128:3,<br>131:21, 132:10<br>**withdrawn**<br>70:7, 83:8,<br>99:14, 100:11,<br>100:14, 123:18,<br>127:11, 127:21<br>**withheld**<br>39:21, 40:9,<br>40:10, 40:11,<br>41:6, 45:15,<br>48:15, 92:11,<br>94:19, 99:18,<br>100:16, 100:19,<br>102:10, 107:16,<br>127:6, 184:5,<br>189:17<br>**withhold**<br>37:13, 39:20,<br>40:14<br>**withholding**<br>37:16, 38:18,<br>38:19, 39:19,<br>68:1, 68:9,<br>93:21, 123:7,<br>123:11, 123:16,<br>124:10, 125:2,<br>125:3, 127:1,<br>128:7, 128:8,<br>128:22, 129:6,<br>132:1<br>**within**<br>80:22, 92:4,<br>122:4, 126:4,<br>162:6, 163:4,<br>176:19, 177:1,<br>189:9<br>**without**<br>91:6, 133:3,<br>155:4, 155:9,<br>156:5, 170:8,<br>177:22, 184:5,<br>187:18, 187:20,<br>188:6, 188:10,<br>190:7, 192:1 | **without-prejudice**<br>176:14<br>**witness**<br>196:13<br>**word**<br>85:21, 88:19,<br>89:5, 95:22,<br>96:1, 102:18,<br>103:5, 103:14,<br>170:17<br>**words**<br>26:19, 63:10,<br>158:8, 181:2,<br>190:9<br>**work**<br>28:10, 32:3,<br>41:20, 49:10,<br>49:21, 51:11,<br>51:15, 52:17,<br>58:15, 60:10,<br>61:2, 92:20,<br>134:17, 135:2,<br>152:12, 153:3,<br>155:14, 166:6,<br>176:5, 181:19<br>**worked**<br>42:2, 44:14,<br>52:15, 116:1,<br>135:20<br>**working**<br>5:3, 47:1,<br>144:6<br>**works**<br>23:6, 121:2,<br>162:7<br>**world**<br>53:12<br>**wouldn't**<br>86:16, 94:17,<br>143:11, 143:12,<br>156:17<br>**wrapping**<br>128:19<br>**wright**<br>172:22<br>**writing**<br>101:20, 101:21,<br>137:14, 168:9, |

Transcript of Meet & Confer
Conducted on January 3, 2025

168:18
**written**
69:1, 76:3,
105:10, 154:3,
171:11, 189:21
**wrong**
35:13, 42:5,
61:6, 70:7,
96:15
**wrote**
68:6
**wyoming**
8:12, 8:22,
9:6, 9:11,
11:19, 86:2

**Y**

**y-e-o**
190:13
**yao**
1:4, 4:15
**yao's**
154:7
**yea**
12:6
**year**
5:2, 25:2
**years**
95:10
**yeo**
190:13
**yep**
116:12, 189:6
**yesterday**
6:12, 10:4,
12:18, 13:6,
106:5, 180:10
**york**
3:7

**.**

**.3200**
3:8
**.6564**
3:18

**0**

**00**
96:19, 159:22,

160:4
**05**
1:16

**1**

**1**
159:22, 161:4
**10**
1:16, 77:11,
78:7, 78:11,
79:6, 137:1,
138:20, 143:19,
149:20, 164:3,
164:19, 186:3,
193:16
**10005**
3:7
**109722**
162:22
**1099**
44:11, 48:3,
48:7, 50:16,
74:3, 75:5,
115:8, 115:14,
115:16, 115:19
**11**
79:7, 122:2,
129:21, 130:1,
130:2, 130:11,
130:15, 137:1,
146:22, 149:1,
150:8, 164:3,
164:19, 166:2,
166:3
**12**
33:22, 96:19,
137:1, 146:22,
147:3, 148:10,
164:3, 164:19,
172:6
**1200**
3:16
**13**
154:6, 164:3,
164:19
**14**
122:2, 129:21,
130:9, 161:17,

161:19, 162:6,
163:4, 164:3,
164:19, 166:4,
195:5
**144**
138:12
**15**
79:20, 80:5,
87:22, 88:10,
99:2, 99:7,
99:17, 100:15,
101:8, 103:4,
169:22, 170:1,
170:10, 170:15,
170:19, 186:3,
186:13, 186:14,
188:18, 188:20,
188:21
**150**
174:15
**151**
162:12
**16**
104:5, 104:9,
104:16, 107:10,
108:10, 108:11,
110:7, 111:19,
112:16, 114:6,
154:16, 164:4,
164:19, 175:6,
187:8, 188:19,
188:20, 188:22
**17**
3:16, 104:9,
104:12, 104:16,
107:10, 108:10,
108:11, 110:7,
111:19, 112:16,
114:6, 169:20,
189:10
**177**
174:1, 174:12
**18**
111:20, 112:15,
112:16, 112:20,
114:6, 124:5,
124:14
**19**
49:5, 49:6,

55:16, 56:11,
56:16, 56:17,
58:9, 58:10,
59:6, 59:9,
66:15, 66:20,
114:17, 115:4,
115:6, 183:3,
185:9
**196**
1:21
**1st**
61:7, 62:5

**2**

**2**
159:22, 160:4,
193:16, 195:5
**20**
115:7, 116:14,
116:15, 134:18,
161:21
**20006**
3:17
**2010**
149:8
**202.261**
3:18
**2022**
38:4, 40:1,
40:3, 50:18,
51:6, 51:7,
51:16, 51:21,
52:21, 56:4,
59:4, 60:10,
65:2, 65:4,
65:5, 74:4,
74:21, 75:2,
75:9, 80:11,
81:14, 81:19,
84:3, 88:17,
88:19, 89:5,
89:12, 99:15,
99:18, 100:12,
100:18, 101:8,
105:21, 106:3,
109:6, 116:6,
134:13, 134:18,
149:14, 163:22,

```
167:16
2023
24:5, 25:8,
52:19, 56:19,
59:7, 59:13,
59:18, 60:12,
64:17, 65:9,
65:10, 134:13,
134:19, 162:22,
163:1, 163:22,
167:16, 174:9
2024
64:13, 64:18,
66:4, 66:14,
75:15, 106:4,
106:6, 106:10,
162:11, 174:5,
193:3
2025
1:15, 196:15
2028
196:18
205
174:14
21
116:15
212.732
3:8
22
84:4, 100:3,
119:8, 134:18,
164:7
23
1:6, 164:7
25
159:22, 171:8,
171:11, 175:5,
177:1, 178:9,
178:12
258
138:12
26
174:21
28
3:6
```

--- 3 ---

```
30
161:4
```

```
303
162:18
31
56:19, 59:7,
59:13, 134:18
3233999
174:5
33
138:4, 155:1,
171:9, 174:6
34
124:2, 125:18,
137:12, 146:3
```

--- 4 ---

```
41
3:6, 152:9
434
162:18
45
161:15, 162:19,
163:5
```

--- 5 ---

```
539
24:22
565541
1:20
5th
196:14
```

--- 7 ---

```
75
162:12
```

--- 8 ---

```
81
162:13
848
24:22
85
174:9
8520240
174:10
889
1:6
```

--- 9 ---

```
900
3:16
```

```
96340
162:11
```