# EXHIBIT B

# (January 8, 2025 Transcript)



# Transcript of Meet and Confer

**Date:** January 8, 2025
**Case:** Yao/Estate of Chen -v- Chen, et al.

**Planet Depos**

**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

**Page 1**

```
1            UNITED STATES DISTRICT COURT
2                DISTRICT OF MARYLAND
3    ---------------------------x
4    LI FEN YAO,
5               Plaintiff, :
6        v.                    : Case No.:
7    CHEN, et al.,            : 23-cv-889
8               Defendants. :
9    ---------------------------x
10
11              Meet and Confer
12             Conducted Virtually
13          Wednesday, January 8, 2025
14               9:33 a.m. EST
15    Job No.: 565542
16    Pages: 1 - 168
17    Stenographically reported by: Judith E. Bellinger,
18    RPR, CRR, CSR-TX CCR-NM, CCR-WA
19
20
21
22
```

**Page 2**

```
1         Meet and Confer, conducted virtually,
2
3
4
5
6
7        Pursuant to agreement, before Judith E.
8    Bellinger, Registered Professional Reporter,
9    Certified Realtime Reporter, and E-Notary Public
10   in and for the State of Maryland.
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 3**

```
1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        STEPHEN M. PLOTNICK, ESQUIRE
4        ALEXANDER M. MALYSHEV, ESQUIRE
5        MADELYN K. WHITE, ESQUIRE
6        CARTER LEDYARD
7        28 Liberty Street
8        41st Floor
9        New York, NY 10005
10       212.238.8618
11
12   ON BEHALF OF THE DEFENDANTS:
13       JOSHUA A. LEVY, ESQUIRE
14       RACHEL CLATTENBURG, ESQUIRE
15       JUSTIN A. DiCHARIA, ESQUIRE
16       LEVY FIRESTONE MUSE LLP
17       900 17th Street NW
18       Suite 1200
19       Washington, DC 20006
20       202.261.6564
21   ALSO PRESENT:
22       EMMA FLOYD, Paralegal, Levy Firestone Muse
```

**Page 4**

```
1              P R O C E E D I N G S
2
3        MR. LEVY:  Good morning, good morning,
4    Steve, Alex, Madelyn.  Thanks for the last session
5    we had.  It was productive and, at least from our
6    standpoint, we're making progress, which is
7    terrific.
8        We wanted to address, first,
9    Plaintiff's motion, and then after that,
10   Defendants' motions as, Steve, you and I agreed
11   before this call, correct?
12       MR. PLOTNICK:  Yes, Josh.  Good
13   morning, Steve Plotnick speaking.  I think that's
14   the logical place to start here, is with the
15   document request and the interrogatories that were
16   the subject of Plaintiff's motion to compel.  I
17   agree with that.
18       MR. LEVY:  Terrific.  And from my
19   understanding, we only have a few interrogatories
20   from Plaintiff that require further conversation
21   and a handful of document requests.
22       I wanted to take the document requests
```

Transcript of Meet and Confer

Conducted on January 8, 2025

5

1 in order. I think that's probably the best way to
2 go.
3      The first two that I think we should
4 discuss are Plaintiff's RFPs 1 and 4. Grouping
5 them together only because there's overlap between
6 1 and 4 with the request for DANS documents.
7      MR. PLOTNICK: Right.
8      MR. LEVY: Knowing that number 4 does
9 not request documents from anything else. And I
10 don't believe Document Request 2 and 3 are in
11 contention.
12      So, with regard to Document Request
13 Number 1, broadly speaking, these are requests for
14 formation, organization, governance documents.
15      You have all of the OtterSec responsive
16 documents, whole stop here, for Document Request
17 Number 1.
18      And you also have the responsive
19 documents for the two South Dakota companies, RC
20 Security and Otter Audits, through March 31, 2023.
21 Those two South Dakota companies were created in
22 the fall of 2022. So you have, approximately,

6

1 six months of documents after those two companies
2 were formed. And as you could imagine, it's that
3 period of time, that first six-month period of
4 time, when the documents that are being sought
5 here are created. Things like Articles of
6 Incorporation, bylaws. The companies have not
7 dissolved, so there are no dissolution documents.
8 And the kinds of documents we understand that are
9 sought here and, admittedly, the terms, formation,
10 organization, reorganization, management and
11 governance, remain vague and still insufficiently
12 defined, which creates an enhanced burden for us
13 and is part of our objections. But we understand
14 you have what you need and don't see how extending
15 our search and production requirement beyond
16 March 31, 2023, for those two South Dakota
17 companies, for documents responsive, is merited
18 here.
19      And as far as the DANS documents go,
20 the DANS documents are ones that are, obviously,
21 looking for documents related to an entity called
22 DANS that is not in the Complaint. There's not a

7

1 claim that Plaintiff has filed against DANS.
2      The documents concerning DANS aren't
3 relevant, and the Court and the Federal Rules of
4 Civil Procedure, of course, have made it clear
5 that parties are entitled to documents relevant to
6 the Complaint. And there's no claim in the
7 Complaint against DANS. There's no lawsuit filed
8 against DANS, and there's no mention of DANS in
9 the Complaint.
10      You say -- we heard you say, in the
11 last meet and confer, that the DANS documents were
12 relevant and needed because they related to
13 successor liability and whether it's still part of
14 the same business, whether DANS is still part of
15 the same business, I think were the words that
16 were used by counsel for Plaintiff in the last
17 meet and confer. Of course, DANS was created in
18 2023, and Plaintiff has the OtterSec documents
19 responsive to Document Request Number 1. So if
20 there had been -- and OtterSec documents
21 responsive to other document requests.
22      But, if there had been any transfer of

8

1 any assets from OtterSec to DANS, or anything else
2 from OtterSec to DANS, or DANS' parent company,
3 Otter Audits, you would see it in the documents
4 that we've produced up to this point. So because
5 of that, we don't see that Plaintiff has met its
6 burden or articulated a specific need that
7 outweighs the objections that we've set forth,
8 given the amount of time and effort it would take
9 to search for a third -- for DANS' documents.
10 That's 1 and 4.
11      For number 5.
12      MR. PLOTNICK: Before we go on. Can
13 I -- can we stay on 1 and 4 and DANS so I can just
14 understand your position a little bit better
15 and -- so, the -- as I sort of understand -- or
16 our understanding, let me take a step back.
17      DANS was created, as you said, in 2023.
18 And as I mentioned -- I mean, this is a private
19 company. We learned about it through the filing
20 before, I believe, there really -- because it had
21 been through the filing of the corporate
22 disclosure statement by Defendants in the case.

Transcript of Meet and Confer
Conducted on January 8, 2025

9

1 It's a private company, we didn't know about it
2 otherwise. But I think our point is -- our
3 position on the DANS document is a little bit
4 different than what you -- how you articulated it,
5 Josh. And the point that we had made during the
6 last call is that this -- DANS is a wholly owned
7 subsidiary of Otter Audits, and the fact that
8 there would not be any sort of direct transfer of,
9 let's just call it OtterSec business to DANS, I
10 mean, that makes sense because it didn't exist at
11 the time that OtterSec was dissolved.
12      Our point, with respect to DANS, is
13 precisely the fact that it was created later. It
14 is a, you know, a division, a subsidiary, in
15 essence, of Otter Audits. And even though there,
16 perhaps, may not have been, because there couldn't
17 have been, a direct transfer of OtterSec business
18 or OtterSec assets to DANS when OtterSec was
19 resolved, the transfer very well may have been
20 sort of indirect. In other words, the very fact
21 that it was created later in 2023, as a subsidiary
22 of Otter Audits, does not answer the question of

10

1 whether or not a component of the former OtterSec
2 business now exists within DANS.
3      So, that is what -- that is, largely,
4 the reason that we have sought discovery with
5 respect to DANS, to the extent that there are, you
6 know, former OtterSec assets, customers, clients,
7 employees that are doing business for DANS. I
8 mean, that is precisely what we're trying to
9 discover and understand, right? I mean, under the
10 standard for, you know, relevance of discovery,
11 that is why those documents would be relevant.
12 The fact that a portion of the Otter Audits'
13 business, you know, may have been broken off into
14 DANS is, I guess, that's the question that we're
15 really looking at, fundamentally, to determine
16 exactly what DANS is and whether what exists
17 within DANS is now a component, you know, of,
18 essentially, the former OtterSec business.
19      So, it absolutely does, you know,
20 relate to these claims, to the extent that there
21 have been assets that were former OtterSec assets
22 or, you know, comprise a component of that

11

1 business. That's what we're trying to determine
2 and that's the basis, fundamentally, for seeking
3 that discovery.
4      I don't think the fact that they're not
5 mentioned in the Complaint, I can't recall, off
6 the top of my head, the date, I don't know if you
7 know, Josh, the date that DANS was actually
8 formed, you know, as of the date of the filing of
9 the Complaint, if it wasn't formed, right, then we
10 couldn't have included them as a party to the
11 case.
12      So, if there are assets that are,
13 essentially, being shielded through DANS, right, I
14 mean, for all of those reasons, that is what we're
15 attempting to discover, is at bottom,
16 fundamentally, what DANS is and whether, within
17 DANS, there are more OtterSec assets.
18      MR. LEVY: Thanks, Steve. So a few
19 things. One, why DANS doesn't appear in the
20 Complaint is not material. What's material is
21 whether Plaintiffs are entitled to discovery
22 relevant to the claims in the Complaint and

12

1 defenses alleged.
2      And so, we -- that the claim is not in
3 this Complaint, if there is a basis for them, I
4 don't know that there is, it's just not part of
5 this lawsuit.
6      MR. PLOTNICK: Well, but I think, Josh,
7 I'm sorry to interrupt, but I just sort of want to
8 make the point about whether they're mentioned in
9 the Complaint. I mean, discovery can be sought
10 from third parties, right? I mean, both sides in
11 the case have served discovery from third parties.
12 The question, really, is whether or not DANS is in
13 possession, custody, or control of documents that
14 are relevant to this lawsuit, right, or relevant
15 to the issues that are in the Complaint.
16      The fact that, you know, a party --
17 well, actually, it's a nonparty, you know, the
18 fact that they are not specifically mentioned in
19 the Complaint, I mean, there are, you know,
20 entities that have been subpoenaed by the
21 defendants, as well as the plaintiff in this case,
22 that are not specifically mentioned in the

13

1 Complaint. I don't think bears on the question of
2 whether or not, you know, that third party is in
3 possession of documents that are relevant to the
4 issues in the Complaint.
5        MR. LEVY: The reason why Congress
6 created Rule 45, and Rule 45D specifically, is
7 because of the extraordinary burden that Congress
8 didn't want to impose on third parties.
9        We have -- we are dealing with party
10 discovery right now. We're dealing with the
11 plaintiff's request for documents. The plaintiff
12 has asked for documents that are relevant to no
13 claim in the Complaint.
14       The second observation I wanted to make
15 before the interruption was that the -- inasmuch
16 as Plaintiff is interested in knowing what was
17 transferred indirectly, if anything, to DANS from
18 OtterSec, Plaintiff has the documents from
19 OtterSec that would show what, if anything, was
20 transferred to Otter Audits. And so, if anything
21 was transferred indirectly to DANS from Otter
22 Audits, it would have, first, come from OtterSec,

14

1 and you have that.
2        So, asking for documents from DANS
3 doesn't tell you anything new.
4        And, thirdly, as I understood it, and
5 maybe I didn't, I don't see a claim in this
6 lawsuit that entitles Plaintiff to seek documents
7 from DANS simply because Plaintiff, now, is
8 calling DANS a successor entity. And this gets
9 into confusion that Plaintiff has created by using
10 this term "successor" and "successor liability."
11 And I can get into that. It's certainly something
12 we need to get into with regards to Document
13 Requests 5, 15, 16, 17, and 18. And we can do
14 that now or later.
15       But, the trouble that I think we're
16 having here is that the contention that there's
17 a -- what you're claiming successor liability is
18 not successor liability. Successor liability is
19 not a way of saying one entity is another entity.
20 Successor liability is not a vehicle for obtaining
21 an equity interest in a new entity. We've not
22 seen any case law to support those propositions in

15

1 any jurisdiction. We've not seen any case law in
2 any jurisdiction where a court has held that a
3 party gets an equity interest in a new entity
4 based on successor liability. We've not seen that
5 in any of Plaintiff's papers. We didn't hear any
6 cases to that effect cited in the last meet and
7 confer session. If Plaintiff has such authority,
8 please, send it to us. We haven't seen it.
9        What successor liability actually is,
10 in the law, it's a rarely invoked exception to a
11 general rule that when a predecessor company sells
12 or transfers assets to another company, that new
13 company is, typically, under the rule, not
14 responsible or liable for that predecessor
15 company's debts or liabilities for alleged
16 misconduct.
17       And so, it applies only, the exception
18 to that rule applies only when there's a claim
19 against the predecessor entity. And in this case,
20 the predecessor entity is OtterSec, right?
21 There's no claim in this Complaint that Plaintiff
22 has filed against OtterSec. And so, there can't

16

1 be successor liability exception to that general
2 rule, and that's Drakes v. Glover Group
3 Investments, LLC, 2021 WL 1716650, page 4,
4 Maryland Court of Special Appeals, April 30, 2021.
5        And even if there were successor
6 liability to be established here, Maryland courts
7 apply that exception very stringently, and that's
8 In re: General Motors LLC Ignition Switch
9 Litigation, Number 14 -- Case Number 14-MC-2453,
10 2017 WL 6509256, at page 3, Southern District of
11 New York, April 25, 2018.
12       And when plaintiff -- if Plaintiff
13 wants to say that documents are relevant to
14 successor liability, it has to show that the
15 documents are relevant to the elements of
16 successor liability. And you have the documents
17 that are relevant to the elements of successor
18 liability. The documents that are in dispute, in
19 response to Document Request 1 and 4 and 5, 15,
20 16, 17, and 18, have not been shown by Plaintiffs,
21 in its papers in the meet and confer to be
22 relevant to any of the elements of successor

Transcript of Meet and Confer
Conducted on January 8, 2025

17

1  liability.
2         And those factors, for mere
3  continuation of former successor liability, were
4  laid out by my colleague last week in the
5  (indiscernible) for a Circuit Panel Decision 2021,
6  at 848F, Appendix 534 and 538 to 539.
7         And those factors are, one, any change
8  in corporation -- sorry, any change in ownership
9  and management, two, the continued existence of
10 the selling corporation, three, the adequacy of
11 consideration, four, the transfer of any
12 instrumental employees from the predecessor to the
13 successor, and, five, the purpose of the asset
14 sale.
15        You have the documents already that are
16 relevant to those factors.  You don't need
17 additional documents to show those factors,
18 certainly from periods of time of 2024.
19        Additionally, you've seemed to suggest
20 last week that, and maybe suggesting now, in the
21 context of DANS, that these documents -- and
22 certainly the financial records that you're

18

1  seeking from 5, 15, 16, 17, and 18, are relevant
2  to damages for a successor liability claim.
3         The successor liability claim, again,
4  is a way for a creditor to recover, from a
5  purchaser of assets, an underlying claim of
6  liability.  There aren't damages from a successor
7  liability claim.  So documents can't be relevant
8  to damages from a successor liability claim.
9         The documents need to be relevant to
10 the damages of one of the claims actually filed in
11 this lawsuit.  And, again, it's got to be relevant
12 to the Complaint.  And you've said, last week,
13 that the financial information you're seeking from
14 the South Dakota companies, that don't mention
15 OtterSec at all, are relevant to determining the
16 estate's ownership interest in RC Security and
17 Otter Audits, or the value of that interest for
18 purposes of calculating damages.
19        But those documents aren't relevant to
20 showing what you claim is this interest in the two
21 South Dakota companies.  Again, we can't locate
22 any case law that supports your contention that

19

1  successor liability is a vehicle for obtaining an
2  ownership in new entities.  And you don't need
3  financial documents from the South Dakota
4  companies or DANS, after 2022, to establish a
5  40 percent interest in them.  And you don't need
6  documents from DANS at all.
7         But it appears what you are claiming is
8  that Defendants converted the estate's 40 percent
9  interest in OtterSec.  And the documents need to
10 be relevant to the damages aspects of your
11 conversion claim.  But here's the rub:  The
12 damages of conversion in Wyoming are measured by
13 either the return of property or the value of the
14 property at the time of the conversion.  And in
15 the Complaint, not anywhere else, but in the
16 Complaint, what's alleged is that the conversion
17 occurred in the fall of 2022 when the dissolution
18 occurred.  And the damages would be measured then.
19        And here, I point you to Gould v.
20 Ochsner, 354 P.3d 965, at 976 Wyoming, 2015, and
21 Lieberman v. Mossbrook, 208 P.3d 1296 at
22 page 1311, 2009.

20

1         Defendants have never contested the
2  estate's 40 percent interest in OtterSec.  You
3  have the documents necessary to value that
4  interest in the fall of 2022.  And, again, you
5  have, for the documents in response to Request 5,
6  15, 16, 17, and 18, you have the OtterSec
7  responsive documents.  You have the RC Security
8  and Otter Audits' responsive documents for 2022.
9  You also have the South Dakota company responsive
10 documents beyond 2022 that mention OtterSec.
11        Any award that Plaintiff could
12 conceivably receive in this case would be based on
13 the value of OtterSec, not on the value of the
14 separate entities after OtterSec dissolved, based
15 on the claims filed in this Complaint.
16        So, we don't think it's valid that you
17 can just assert a 40 percent interest in the
18 separate entities, that is the two South Dakota
19 companies, without any legal support for that type
20 of claim or remedy and gain access to all of this
21 financial information for two years from these
22 South Dakota companies.

21

1    Sorry to combine all those document
2 requests together, but I think that the point you
3 were raising, Steve, required me to get into those
4 different document requests as well.
5    MR. PLOTNICK:  Yeah.  I mean, I didn't
6 want to cut you off.  I just wanted to make sure
7 you're done before I respond.
8    MR. LEVY:  Yeah.
9    MR. PLOTNICK:  Okay.  Well, thank you
10 for that, Josh.  It's helpful to understand your
11 position because I think that this is -- this
12 particular issue is one that carries across many
13 of the requests and just discovery, in general,
14 and sort of is a fundamental point of dispute that
15 we have.
16    I mean, my response to that is every
17 single argument you just made, Josh, might belong
18 in a summary judgment motion.  It might belong --
19 it might belong before the Court at trial.
20 They're all merits-based arguments.  I mean,
21 essentially, what you are saying is we're wrong.
22 That we're not entitled to an interest in these

22

1 companies.  We're not entitled to some of the
2 damages that we have claimed.  Those are all
3 merits-based arguments and they are not discovery
4 arguments.  And what we're dealing with here is
5 discovery issues.
6    There is a claim in the case, and
7 they're really related, but, fundamentally, our
8 claim is that OtterSec was not properly dissolved,
9 I would say in a summary way.  That the
10 dissolution of OtterSec was -- was a breach of
11 fiduciary duty, was not consistent with the law.
12 That your client, Robert Chen, was not entitled to
13 dissolve the company.  And that is part of the
14 declaratory judgment claims that we have in the
15 case.  And it is a claim that still exists in the
16 case.  It has not been dismissed.  And our claim
17 is that the company, OtterSec, continues to exist
18 today in the form of Otter Audits and RC Security,
19 the claim in the case.
20    And because the dissolution was
21 improper, and because this is the same business in
22 the form of Otter Audits and RC Security, that we

23

1 should continue to have an interest in that
2 business, just as we would have it if OtterSec
3 existed today as it should.
4    So the discovery that we are seeking
5 goes directly to that issue.  It also goes to, as
6 you accurately pointed out, other issues in the
7 case, including the conversion claim, which, I
8 think as you acknowledged, there is a cause of
9 action in the Complaint for conversion.  The Court
10 determined, in connection with the defendants'
11 motion to dismiss for lack of personal
12 jurisdiction, that for purposes of that motion, we
13 had stated a successor claim against these
14 entities.  I understand that Defendants dispute
15 the merits of that claim, as you've made clear.
16 But a dispute, with respect to the merits of the
17 claim, which is all I've heard from you just
18 before I responded, is not a basis for withholding
19 discovery.
20    In other words, your argument that the
21 documents are not relevant presupposes that our
22 claim is not a viable claim, which has not been

24

1 determined.  The claims are in the case.
2    So, Defendants are entitled to file a
3 motion or summary judgment, if that's what they
4 believe they can do.  But the claim exists and we
5 are entitled to discovery on those claims.  That's
6 our position here, is that these are all
7 merits-based arguments, but these merits-based
8 arguments are not a basis for withholding
9 discovery.  I thought the Court made that clear,
10 Judge Simms made that clear in our original
11 conference.
12    Turning back to --
13    MR. LEVY:  Steve, can I address that
14 point, if you're making another point?  Or go
15 ahead.
16    MR. PLOTNICK:  Sure.  Go ahead.
17    MR. LEVY:  Just to clarify.  We're not
18 disputing the merits.  We're not making a
19 merits-based argument.  We've said that you are
20 entitled to documents that are relevant to proving
21 your claims, including a successor liability
22 claim.  These documents, however, that you're

Transcript of Meet and Confer
Conducted on January 8, 2025

25

1 requesting, in these specific requests, are not
2 relevant to those claims.
3          And if you can tell us what claim in
4 the Complaint these documents are relevant to, let
5 us know.  But we don't know what the claim for
6 damages that these documents are relevant to.
7 We're not making a merits-based argument, we're
8 just trying to make sure that we're producing
9 documents that are only relevant to claims in the
10 Complaint.
11         The conversion claim that you mentioned
12 doesn't entitle Plaintiff to documents beyond the
13 point of the alleged conversion, under Wyoming
14 law.  There's no other claim that you've -- that
15 we've heard you articulate where we're
16 understanding what claim in the Complaint that
17 documents are relevant to.
18         Are you still maintaining a successor
19 liability claim?  Because -- and the Court, by the
20 way, for -- of course, in an order on a motion for
21 personal jurisdiction, did not reach or opine on
22 the question of successor liability, of course.

26

1 Is Plaintiff still maintaining its successor
2 liability claim and is it claiming that these
3 documents are relevant to that claim?  Because
4 we've laid out how that can't be, as a matter of
5 law.  And then, that's not alleged -- it's not
6 predicated on any claim against OtterSec.  It's
7 not in this case.
8          MR. PLOTNICK:  Are you done?
9          MR. LEVY:  I'm done.
10         MR. PLOTNICK:  I didn't want to
11 interrupt.  Okay.  Just making sure.
12         We're maintaining every claim that we
13 have in the case, every claim that is in the
14 Complaint.  Our claim is as I articulated it, just
15 prior to that answer.  Our claim is that, and this
16 is part of the declaratory judgment cause of
17 action, and the Federal Declaratory Judgment Act,
18 under which that claim -- under which that claim
19 arises and is pleaded in the Complaint, gives the
20 Court, as we cited to in our motion to -- or our
21 motion to compel papers, gives the Court broad
22 discretion to implement an appropriate remedy.

27

1          And our claim in the case is that the -- we've
2 pleaded various alternative successor theories,
3 including that the dissolution of OtterSec was
4 fraudulent.  And our claim is that the dissolution
5 of OtterSec was invalid -- is invalid.  And that
6 the business of OtterSec continues to exist today.
7 That, essentially, kind of stripped to its
8 essence, that the entire purpose of the
9 dissolution of OtterSec was improper.  It was for
10 the very purpose of depriving, now, that estate of
11 its interest in that business.  And that business
12 continues to exist today.
13         Now, I understand that the defendants
14 dispute that.  And, in fact, the defendants have
15 argued in their papers that this is not the same
16 business.  That we're wrong.  That the business of
17 RC Security, of Otter Audits is different from
18 OtterSec.
19         I don't think that the defendants,
20 which is what they appear to be doing, are
21 entitled to make an argument like that without
22 producing the discovery behind it.

28

1          You are saying you don't think that
2 this is a merits argument.  But your explanation
3 is not consistent with that, because your
4 explanation as to relevance goes directly to the
5 merits.  And that, in substance, appears to us to
6 be the basis upon which these documents are being
7 withheld.  That it is -- you disagree that we
8 have, in essence, stated a successor claim, which
9 is part of the declaratory judgment cause of
10 action.  You disagree that we're entitled to some
11 of the damages that we have sought as part of that
12 claim, as part of the breach of fiduciary duty
13 claim, as part of the conversion claim, and others
14 that are in the Complaint.
15         And I don't -- in substance, that is
16 the argument that the defendants are making, that
17 they disagree with the merits of the claim.  But
18 the claims exist.  And the claims are in the case.
19 And we are entitled to seek discovery with respect
20 to the defenses, in essence, that the defendants
21 have also raised, which is, this is a different
22 business from OtterSec.  It is not the same

29

1 business.
2        So, I just -- I have difficulty
3 understanding the position that the defendants can
4 dispute the merits of the claim, but, yet, not
5 produce the discovery that goes directly to that
6 question.
7        It is exactly what we are exploring in
8 the discovery process. It's not just our
9 affirmative claim, but it is also the defense to
10 that claim.
11       The damages question, that will
12 ultimately be, I think, part of the final expert
13 report and how the damages will be calculated.
14 But the Court certainly, under Declaratory
15 Judgment Act, which we have cited to multiple
16 times in papers to the defendants, does give the
17 Court broad discretion to implement the
18 appropriate remedy. And we believe that if the
19 Court does find that this dissolution was
20 improper, that it was a breach of fiduciary duty,
21 that there was inadequate consideration, that it
22 violated the company's operating agreement, for

30

1 all the reasons which are pleaded in the
2 Complaint, that one of the remedies that the Court
3 has available to it, under the Declaratory
4 Judgment Act, is to award us our interest in the
5 successor entities. That they are the same
6 entity. And that is exactly what we are exploring
7 in discovery. And that is -- sort of brings me
8 back to one of the points that we were discussing
9 before this, and that is the DANS-related
10 information.
11       And that is, sure, of course, we would
12 not see a direct transfer from OtterSec to DANS
13 because DANS didn't exist at the time of the
14 dissolution. But what we are attempting to
15 determine, through the request related to DANS, is
16 exactly what DANS is. Because DANS was created
17 after the fact, if assets were -- OtterSec assets
18 were, essentially, indirectly transferred to DANS
19 via Otter Audits, right?
20       So you have assets that are transferred
21 from OtterSec to, for example, to Otter Audits at
22 a later date in time, as appears to be the case.

31

1        This division of Otter Audits is created in the
2 form of DANS, and then some of that business ends
3 up part of DANS. Josh, that's exactly what we're
4 trying to determine here in discovery. And that's
5 a discovery-related issue, which is broad. And,
6 again, I understand that the defendants dispute
7 that on the merits. But I don't think
8 merits-based arguments have a place or belong as
9 part of an objection to discovery. As I said, I
10 think it could into a summary judgment motion, if
11 that's a motion that the defendants wish to make.
12 But we're in discovery now, and I think that we
13 are entitled to discovery that is in furtherance
14 of claims which have been asserted in the case.
15       That's our position.
16       MR. LEVY: Thanks, Steve.
17 Respectfully, again, we're not making merits-based
18 arguments. It sounds like you are seeking
19 financial records under the assertion that they
20 are relevant to claims in your Complaint and
21 damages for them. We've talked about conversion,
22 and as Judge Simms wanted us to do, we've cited

32

1 case law as to why what you're seeking isn't
2 relevant to the claim of conversion of alleged,
3 under Wyoming law, for purposes of those requests,
4 5, 15, 16, 17, and 18.
5        You mentioned declaratory judgment.
6 Declaratory judgment, itself, is a remedy. I
7 don't understand how you are getting damages from
8 declaratory judgment and how financial records
9 would be at all relevant to a declaratory judgment
10 claim.
11       If there's case law that you have that
12 shows that a plaintiff can obtain financial
13 records for purposes of showing damages relevant
14 to a declaratory judgment claim, then, please,
15 send that to us.
16       MR. PLOTNICK: I'll give it to you
17 right now. It's a statute, Josh. And declaratory
18 judgment is not just a remedy. Declaratory
19 judgment is a cause of action. It is 28 USC 2201,
20 okay? And under Federal Rules, I believe, going
21 off the top of my head, I think it's 57 as well.
22       But separately, part of the Declaratory

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 11 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
9 (33 to 36)

33

1  Judgment Act, which is 28 USC 2202, to the extent
2  that you need the cite again because we have cited
3  it before in our papers, it says, plainly, further
4  necessary or proper relief based on a declaratory
5  judgment or decree may be granted after reasonable
6  notice and hearing against any adverse party whose
7  rights have been determined by such judgment.
8       So, that gives the Court broad
9  discretion to implement the appropriate remedy.
10 If the Court were to determine, on the declaratory
11 judgment cause of action, that the dissolution of
12 OtterSec was improper, that it violated fiduciary
13 duties owed by Robert, if assets of OtterSec have
14 been, in fact, converted, if the dissolution
15 violated the company's -- the OtterSec operating
16 agreement, if there was inadequate consideration,
17 which -- that was paid for OtterSec by
18 Robert Chen, and it is in the statute 2202, 28 USC
19 2202, the relief that we're entitled to seek.  And
20 what we are claiming, as you mentioned, is an
21 interest in these new entities.
22       And the discovery that we are seeking

34

1  is not just relevant to the question of whether or
2  not these entities are, in fact, the former
3  OtterSec business, but as I mentioned during our
4  previous call, it also goes to the question of
5  damages, where, at a minimum, if the Court does
6  grant our, for example, our declaratory
7  judgment -- grant us relief under the declaratory
8  judgment cause of action, one form of damages that
9  we could seek, at a bare minimum, are things like,
10 to the extent distributions have been made from
11 these businesses.
12       So if we have -- we also have,
13 obviously, as you know, a claim in the case that
14 our interest should actually be 50 percent, not
15 40 percent.  But either way, whatever the
16 percentage is, if distributions had been made
17 along the way to Robert Chen, for example, who we
18 understand to be the 100 percent owner of these
19 new entities, that we also are entitled to, be it
20 from him or the entities, we don't know because we
21 haven't seen the documents yet or how it was --
22 how the -- essentially, if any, distributions were

35

1  made or how they were made, but that would be one
2  example of damages that would be -- one of the
3  reasons for which we would be seeking these, you
4  know, financial documents, financial records, to
5  determine exactly what our damages are.  And
6  that's the reason why we are seeking this type of
7  discovery.  Because we don't know.  But
8  fundamentally, the claim is through the interest
9  in these new entities because of our position that
10 the dissolution of OtterSec was improper, and that
11 that business continues to exist today, in the
12 form of RC Security, and audits, likewise, all of
13 that extends to DANS equally.  The fact that a
14 division of the former -- or excuse me.  That a
15 portion of the Otter Audits business was spun off
16 into a new entity, that equally relates to our
17 claims, both with respect to liability and damages
18 for the same reasons.
19       In terms of the question of whether or
20 not we're entitled to the discovery from DANS
21 because they are, you know, not a party to the
22 case or are not referenced in the Complaint.  I

36

1  mean, I went over this a bit before, so I don't
2  want to repeat myself again.  But, in our view, as
3  a wholly owned subsidiary of OtterSec.  The DANS
4  document are in the possession, custody, and
5  control of a defendant in this case.  So they
6  would need to be produced as part of that
7  production.
8       So, I think what I'm hearing from you,
9  at bottom, is that the defendants are objecting to
10 that -- to the production of the DANS documents.
11 I don't know what your position is with respect to
12 the question of whether or not Otter Audits has
13 possession, custody, and control of the DANS
14 documents.  But, again, we could certainly serve a
15 subpoena.  You mentioned Rule 45.  We certainly
16 could serve a subpoena on DANS.  I don't
17 personally believe that we need to because they
18 are in the possession, custody, or control of
19 Otter Audits.
20       MR. LEVY:  Okay.
21       MR. MALYSHEV:  Before Steve moves on.
22 This is Alex.  Just because we are punching on

37

1 DANS' possible possession, custody, and control.
2 Josh, you stated that the judge instructed you to
3 talk about relevance. I actually think you might
4 have it a little bit backward. It was up to us to
5 establish relevance, which I believe we did, and
6 Judge Simms was very clear that the standard for
7 relevance is very broad. It's not just evidence,
8 but anything likely to lead to the discovery of
9 evidence. And then it was up to you to show
10 burden.
11       While I heard you say "burden," I
12 actually didn't hear you articulate it with
13 respect to DANS. I would particularly be
14 interested in knowing whether you ran search hits,
15 how many hits were running, you know, how many
16 documents are we talking about here? Why would it
17 be burdensome for you to produce them?
18       MR. LEVY: Anything else from either of
19 you?
20       MR. PLOTNICK: No.
21       MR. LEVY: Okay. Steve, with regard
22 to, I guess just taking this in order, the request

38

1 that you're making for financial records, going to
2 declaratory judgment, that, as you are
3 articulating what the declaratory judgment statute
4 provides and what your claim alleges, it is
5 predicated, as you stated, on the other claims
6 asserted in the case. You have the financial
7 records and other documents that you need to
8 determine whether there was liability under those
9 claims or not. You have the documents you need to
10 determine whether there was a breach of fiduciary
11 duty or not.
12       You have the documents you need to
13 determine whether there was conversion or not.
14 You don't need financial records from these two
15 other entities after 2022, that don't mention
16 OtterSec, to determine whether there was an
17 underlying breach. And you have not alleged or
18 claimed damages in the form of an interest in
19 these companies in perpetuity from those claims.
20       The financial records that we have
21 produced are the financial records that you need
22 to establish the damages that you've claimed in

39

1 your Complaint.
2       And, Alex, what the judge said to both
3 parties, not just to me, was that the barrier for
4 relevance has to be documents that are possibly
5 relevant to the Complaint. And you're right in
6 terms of the order of operations. The requesting
7 party is to state, with clarity, what the
8 plaintiff is seeking and what the relevance
9 grounds for those requests are. And last week, we
10 asked you for both.
11       Part of the burden that is on our
12 clients, that we did specify earlier today, is
13 that -- and earlier in our papers and our
14 objections, is that with regard to Document
15 Requests 1 and 4, the terms that are used in those
16 requests are vague and the meaning is very hard to
17 ascertain. Things like organization, formation,
18 management, governance. And when you're asking us
19 to go through a few years of documents for a
20 company responsive to vague terms, that imposes a
21 burden on us, particularly in light of the
22 proportionate needs to the case, where we've told

40

1 you that if what you want to know is whether
2 OtterSec transferred anything directly or
3 indirectly to Otter Audits or its subsidiary, you
4 would have those documents because Otter Audits
5 and DANS -- DANS was created in 2023. You have
6 the documents from the relevant time period. You
7 have the documents from 2022. You have the Otter
8 Audits documents that mention OtterSec. You have
9 the OtterSec documents. You have what you need to
10 show whatever was transferred to Otter Audits and,
11 thus, whatever else Otter Audits may have sent to
12 anybody else or not.
13       With regard to -- so that's -- so
14 that's really it. We're not making merits-based
15 arguments. We're just trying to clarify and
16 establish, and we're still not seeing it, how the
17 financial records that you're requesting are
18 relevant to damages that you are claiming in the
19 Complaint.
20       MR. MALYSHEV: Sorry, Steve.
21       MR. PLOTNICK: No, Alex, let me just go
22 on this for one point, if you don't mind, and I'll

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 13 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
11 (41 to 44)

41

1 let you get your point in.
2         MR. MALYSHEV:  Yeah.
3         MR. PLOTNICK:  Again, Josh, you keep
4 saying that you're not making merits-based
5 arguments, but that's all we're hearing.  We're
6 not hearing relevance objections.  I mean, just to
7 take a step back.  You know, you're saying we have
8 everything that we need -- well, a couple things.
9 You said that we don't need records after 2022 to
10 determine what was transferred.  I disagree with
11 that for a few reasons.
12         I also want to point out --
13         MR. LEVY:  Records that don't include
14 OtterSec.  Sorry to interrupt you.  Go ahead.
15         MR. PLOTNICK:  Yeah, I want to point
16 out when I asked -- it was Kevin, it was Kevin who
17 was doing most of the talking during the previous
18 call.  When I asked Kevin, specifically, whether
19 the objection that the defendants have interposed,
20 which is what we consider to be a merits-based
21 argument, that RC Security and Otter Audits are
22 two entities entirely distinct and separate from

42

1 OtterSec, which is one of the objections that
2 have, essentially, been interposed throughout the
3 Defendants' document request, when I asked Kevin
4 whether or not that objection was being withdrawn,
5 at a bare minimum, through the end of 2022, the
6 answer we received was no.  That objection is not
7 being withdrawn through the end of 2022.
8         I also disagree that -- with your
9 statement that we have what we need.  While,
10 perhaps, we might be able to see some assets of
11 OtterSec that were transferred to the new entities
12 from OtterSec immediately, other assets of
13 OtterSec are not necessarily encompassed within
14 2022, including employees that joined the new
15 businesses after 2022, and even, more importantly,
16 clients post 2022.  We wouldn't see that.  And we
17 don't -- we wouldn't get to see that unless we
18 entered 2023, with respect to discovery.
19         Separately, the question -- among the
20 reasons why we are seeking documents beyond 2022
21 is specifically because the defendants have -- you
22 know, are arguing in response to our claim, the

43

1 defendants are arguing, this is not the same
2 business.  These are different businesses.
3         There's really no practical way, that I
4 can think of, to evaluate that without seeing
5 exactly what these entities, meaning Otter Audits
6 and RC Security, what their business is, how they
7 are deriving their revenue, who works for them,
8 from whom they are deriving their revenue, what
9 type of work they were doing for these clients.
10 And, you know, a small snapshot of that, within
11 2022, doesn't give us that.  And we believe that
12 giving us the full operational year, through the
13 end of 2022, is necessary to see what percentage
14 of their revenue is being derived from -- what
15 their business is.  What percentage of the revenue
16 is being derived, from what kind of work they were
17 doing, which clients, which employees are doing
18 this type of work for these new entities.
19         And, again, I would add to that, that
20 this objection, that is focused on the points that
21 you had made about whether or not we have --
22 whether or not we have or have stated a claim to

44

1 the 40 percent interest in these entities, it's
2 not being withdrawn through the end of 2022, which
3 raises the question of what is being withheld on
4 the basis.  We don't believe that's a proper
5 objection, period.  We don't think it belongs, at
6 all, because it is directed to the merits.
7         I mean, essentially, that argument
8 is -- I mean, I think it's plain from the
9 language, that the defendants have put in their
10 objections, which is an argument that they are not
11 successors or mere continuations of OtterSec.
12 That is disputing the merits of our claim, that
13 they are successors and continuations of OtterSec.
14 So the relevance argument is tied to that dispute
15 of our claim.
16         So, I think for all of those reasons,
17 and, Alex, I'm happy to let you add what you need
18 to here, we just don't think that is a proper
19 objection that belongs in the case at all.  At
20 all.
21         MR. MALYSHEV:  Thank you.  Thank you,
22 Steve.

45

1        And my point is wholly distinct.  And
2    the burden, I thank you, Josh, again, for your
3    input, and to the extent this is something that
4    should be addressed, perhaps, by somebody closer
5    to the document, you know, we are tag-teaming you
6    so I have no objection to somebody else speaking.
7        But my question is, yeah, how many
8    documents are there, like an actual number?  Did
9    you search anything that could give you an idea of
10   how many documents you would have to review in
11   response to these requests, for both DANS and the
12   two Wyoming companies?  Because that is, I think,
13   the only way we and Judge Simms, to the extent
14   that this needs to go before her, can determine
15   whether there is burden.  I think talking about
16   burden generally, you know, we're talking about
17   two private companies for a number -- sorry, three
18   private companies for less than three years.  How
19   many actual documents are we talking about?  Did
20   we spend more lawyer time and lawyer dollars
21   talking about them than it would take to review
22   them?  Because I think that goes directly to

46

1    burden.
2        MR. LEVY:  Anything else?
3        MR. MALYSHEV:  Not on that point, no.
4        MR. PLOTNICK:  No.
5        MR. LEVY:  So let me, first, go to
6    Steve's discussion about the request for the
7    South Dakota companies.
8        First, we don't think financial records
9    requested that don't mention OtterSec are
10   relevant.  We've produced them, but we aren't
11   withdrawing the objection to relevance.
12       We also -- we need to understand a
13   specific claim in the Complaint that these
14   financial records are relevant to.  Is it just
15   your declaratory judgment claim or is it other
16   claims and why?
17       Third -- go ahead.
18       MR. PLOTNICK:  No, go ahead.  I'll let
19   you finish, Josh.
20       MR. LEVY:  Third, you were talking
21   about, and, specifically, here, what financial
22   records for the two South Dakota entities that

47

1    don't mention OtterSec.  What specific claim in
2    the Complaint are those records relevant to?
3        And then, next, you were talking,
4    Steve, about how you want to understand what the
5    customers were for the two South Dakota companies.
6    You have the customer agreements through March 31,
7    2023.  So you do have that information beyond
8    2022.  It's just in response to a different
9    document request.  And you have the agreement
10   saying what these entities do.
11       And we'll get to Document Request 19.
12   I think we're going to be -- we should be okay
13   there, who knows, but we should be.  I want to be
14   optimistic.  And what we need to understand from
15   you is what else, specifically, you need beyond
16   what we've already produced.  Respectfully, that
17   should -- the Court has asked the requesting party
18   to specify what is needed.  So, please let us
19   know, beyond what we've produced already,
20   specifically, what you -- what you think you need
21   that is relevant to a claim in the Complaint.
22       And then with regard to Alex's

48

1    question, you asked a question that is
2    self-incriminatory, ironically, on our whole team,
3    but we'll get back to you on that.  And we can
4    quantify hours and that sort of thing, if that's
5    necessary.
6        MR. MALYSHEV:  I appreciate that, Josh.
7    Just so I'm clear for the record, when you were
8    talking about the burden that those would create,
9    did you have numbers in mind or an actual analysis
10   of why it's burdensome, or was that just a general
11   burden objection?  I just want to be very clear
12   for the record.
13       MR. LEVY:  Both.  But we're working on
14   getting you the response to your question.
15       MR. MALYSHEV:  Yeah.
16       MR. LEVY:  Which has been posed for the
17   first time right now.
18       MR. MALYSHEV:  I think, to be clear,
19   the Court was very clear that you have to
20   demonstrate burden and you asked us for it.  So I
21   was just wondering whether you did any analysis.
22   Sounds like you did, but it's not quite ready to

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 15 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
13 (49 to 52)

49

1 share with us; is that correct?
2       MR. LEVY: Alex, with respect, we have
3 articulated our burden. We have not responded to
4 the question that you have just asked, just right
5 now. That, obviously, would take time. And so,
6 we will get back to you.
7       MR. PLOTNICK: All right. Yeah, I
8 mean, I think, just to sort of put a period on the
9 end of that sentence, Josh, I think if Defendants
10 are articulating, you know, that it's too
11 burdensome to search for the DANS documents or
12 anything else, for that matter, if the defendants
13 are claiming it as too burdensome, we believe that
14 it is the defendants' burden to articulate, with
15 specificity, why it is burdensome, and that's the
16 reason for the question.
17       I mean, if it's simply just burdensome
18 because, say, for example, searches were run
19 through DANS' documents and you got a million hits
20 of potentially relevant responsive documents, we
21 think it's, you know, the defendants' burden to
22 articulate that. And, again, even if that were

50

1 the case, we can look at ways for narrowing the
2 scope of those requests to reduce the burden.
3       So the question, I think, we're really
4 posing here is, can you sort of put in more
5 tangible terms what the nature of the burden is?
6 Is it too many documents?
7       MR. LEVY: Right.
8       MR. PLOTNICK: And are there ways to
9 more fine-tune the scope of the request that would
10 help alleviate that burden. And that's certainly
11 a discussion that we're willing to have.
12       Going back to --
13 MR. LEVY: Steve, Steve, real quick.
14 MR. PLOTNICK: Yes.
15 MR. LEVY: That's a quick yes,
16 appreciate it.
17 MR. PLOTNICK: Yeah.
18 MR. LEVY: And we'll get back to you.
19 Thank you.
20       MR. PLOTNICK: And kind of going back.
21 I mean, I think you're asking a question, you
22 know, your question is about what claims are these

51

1 documents relevant to? I mean, I think I already
2 answered that. And I guess I'll answer it again.
3 And I'll use one example that you gave, right,
4 where you're saying that, you know, we have an
5 agreement with customers. It's one thing to have
6 an agreement with a customer; it's another thing
7 to understand what work is being done for that
8 customer. And relatedly, when an argument is
9 being made by the defendants that these are
10 separate and distinct, they're separate entities,
11 that they're not -- it's not the same business,
12 how much of Otter Audits and RC Security's
13 business is, in fact, dedicated to doing the same
14 work for the same clients, through the same
15 employees as OtterSec, is relevant to the
16 successor claim, to the conversion claim --
17       MS. CLATTENBURG: Stop. Stop. Please
18 stop a second. Can you go through each of those?
19 So when you say it's relevant to the successor
20 claim, I think what we've been waiting for is, can
21 you, please, specify what elements of successor
22 liability you're relying on, and then tell us

52

1 which of those elements these relate to. When you
2 say "conversion," can you specify the elements
3 you're relying on and which ones these relate to,
4 specifically, rather than listing all your claims
5 in this general way. This is where we're having
6 trouble. Point us to the specifics of each claim.
7       MR. PLOTNICK: Mere continuation of the
8 same business.
9       MS. CLATTENBURG: Tell us the element.
10 Where?
11       MR. PLOTNICK: I'm getting -- I just
12 said it.
13       MS. CLATTENBURG: Mere continuation of
14 the same business. Okay.
15       So what documents are you saying you
16 need for that, that you don't already have?
17       MR. PLOTNICK: The documents that are
18 the subject of these requests, including the --
19       MS. CLATTENBURG: Why? Why all the
20 financials?
21       MR. PLOTNICK: You keep saying why.
22 I've already answered the question. It is because

53

1  the financial documents tell you what work they're
2  doing for the clients, how much revenue they're
3  deriving from these clients.
4      MS. CLATTENBURG:  And why would you
5  need that for such a long period, if you already
6  have several months of this, even though we
7  contest the relevance of those?  You have several
8  months of this.  Why would you need it beyond
9  that?
10      MR. PLOTNICK:  So, number one, the
11 objection is not being withdrawn through the end
12 of 2022.  If no documents are being withheld --
13      MS. CLATTENBURG:  None are being
14 withheld on that.  We told you we're producing
15 this stuff for them, we produced the stuff for
16 2022 for these entities.
17      MR. PLOTNICK:  Then that objection
18 should be withdrawn.
19      MS. CLATTENBURG:  No, because we still
20 say -- no, because we still don't think they're
21 relevant.  But to avoid litigation, we said we are
22 producing ones that don't mention OtterSec because

54

1  we're trying to avoid that through 2022.  So you
2  have financial documents from these other
3  entities, that don't mention OtterSec, that show
4  you whatever it is you're looking for, and we're
5  asking why you need it beyond that point?
6      MR. PLOTNICK:  So, I'm trying to answer
7  the question.  I think it would be helpful if
8  you'd let me actually answer the question rather
9  than cutting me off.  I think we kind of had a
10 good back-and-forth going and I'm trying to answer
11 the question, and I just ask that you let me do it
12 without interrupting me so that I can make it
13 clear, at a bare minimum, for the record.
14      If no documents are being withheld
15 through the end of 2022, on the basis of this
16 objection that these entities are not the
17 successors to OtterSec, then that objection should
18 be withdrawn, at a bare minimum, through the end
19 of 2022.  Because part of the confusion that is
20 being created here is -- it goes to that very
21 question, whether or not anything is being
22 withheld on the basis of that argument.  And if

55

1  they are not, the objection should be withdrawn
2  through the end of 2022.
3      Insofar as what we would need beyond
4  2022, again, I already answered that, and that is
5  just having a couple of months, which is what
6  you're talking about, of a -- of insight into the
7  business of newly formed companies is not
8  sufficient, in our view, to give us that picture
9  of what the business actually is, where the
10 defendants have said it is not the same business.
11      I will add to this, as well, that there
12 is a claim in the case, also, under the Lanham
13 Act, for profits.  And that is a claim that most
14 certainly extends beyond 2022 and into 2023 and
15 beyond, quite frankly, from a damages perspective.
16 And that can only be shown through documents that
17 are necessarily extended beyond 2022.
18      So, I don't know how else to -- I mean,
19 you keep saying explain it.  I think I have.  And
20 I think I have articulated it quite clearly why
21 these documents are relevant.  Why these documents
22 are relevant beyond 2022.

56

1      I don't -- I don't know what more I
2  could add to it.  But it is fundamentally, which
3  is why I keep sort of putting it under the broad
4  umbrella of both liability and damages.  What we
5  are trying to determine is what these businesses
6  are, what assets of the former OtterSec entity are
7  being utilized by these new entities, what work
8  they're doing, what revenue they're deriving,
9  which, also, to the revenue point, goes to, also,
10 the damages question as well.  And as I said
11 before, things like distributions to members of
12 the company, if we are, in fact, entitled to a
13 percentage of the new businesses, which is an
14 issue for trial, be it 40 percent or 50 percent,
15 that's part of the damages as well.  It's part of
16 the lost profits damages element as well.  It's
17 part of the conversion claim also.  It's also
18 relevant to the breach of fiduciary duty claim
19 that is in the case.
20      So, I don't know how else I can explain
21 it when I'm giving you the causes of action.  I'm
22 giving you the elements.  I'm giving you the

57

1  reasoning behind all of it.  So I really don't
2  know what else it is that I can add to that if the
3  defendants are not moved by that to assess or
4  reassess this objection that they've interposed,
5  both with respect to time frame and the merits.
6  Really, I don't know what else I can say on that
7  point.
8          MR. MALYSHEV:  This is Alex.  Perhaps I
9  can take a shot at just addressing the time
10 period.  This is something that came up between
11 you and me, Rachel, actually, at the last meet and
12 confer.  This is not a snapshot-in-time case.
13 This is not an auto accident that occurred on the
14 single day.  This is, as Steve said, these are
15 newly formed entities and the clients didn't do
16 work right away, to the best of our knowledge.  We
17 are certainly entitled to explore, under the
18 relevant standard, whether any work was
19 transitioned beyond that stop period that you're
20 giving to us.  Whether revenue was generated or
21 recognized at a later period.
22         We, sitting here today, do not have the

58

1  ability to assess whether what you're giving us is
2  the full picture.  That is why discovery is
3  broader and requires you to also produce documents
4  that are likely to lead to the discovery of
5  relevant evidence.
6          And I think we meet that standard here,
7  with respect to the time period, because these are
8  entities controlled by a single individual.  He
9  has -- we've made out a claim that the employees
10 and the customers have transitioned.  We're
11 entitled to see, on a longer period of time, how
12 that unfolded, especially, as we said, we're
13 claiming an interest because of the improper
14 dissolution.
15         So we are certainly entitled to see
16 what the companies look like in the following
17 year, at least that is our position.
18         So I think we've stated that, but
19 I'm -- you know, I'm having to restate it now.
20         MR. LEVY:  Anything else from either of
21 you before we respond?
22         MR. PLOTNICK:  No.

59

1          MR. LEVY:  Okay.  So, with regard to
2  what it is that Plaintiff is seeking --
3          MR. PLOTNICK:  Josh, could I just, I'm
4  sorry, before you go on.  I'm just sort of looking
5  at my notes of what you're saying.  Can I just add
6  one thing on to what I said a moment ago?
7          MR. LEVY:  Oh, sure.
8          MR. PLOTNICK:  Sorry.  Realizing it
9  after the fact, after looking at my notes and
10 talking, I spoke too soon.
11         You had said, or at least as I heard
12 you and wrote down in my notes, you know, the
13 documents that don't mention OtterSec are not
14 relevant.  And I don't know if I heard you
15 correctly or not.  But certainly, I will tell you
16 that it's certainly our position that the mere
17 fact that a document does not mention OtterSec,
18 right, which, you know, you're talking about does
19 it use the word OtterSec as I hear that from you,
20 is not an appropriate line to draw in the sand
21 when it comes to producing documents.
22         You know, this came up on our previous

60

1  call, but the point there is utilizing the
2  financial information specifically.  You know, a
3  document may not necessarily, say, a financial
4  document, a financial statement, P&L, or perhaps a
5  tax return or a ledger, or whatever the financial
6  document may be in particular, the fact that that
7  document may not use the word "OtterSec" in it
8  doesn't mean that it does not relate to our claims
9  because it is going -- the question of whether or
10 not -- if -- let me withdraw that and take a step
11 back.
12         The new entities, RC Security and Otter
13 Audits, if they are deriving revenue, okay, from
14 business that they are doing that is the same
15 service, that is in the nature of being the same
16 services for a particular client or customer of
17 the former OtterSec entity, that is going to be
18 included, right, within the financial statements
19 of Otter Audits or RC Security.  And, again, I
20 don't know, I haven't seen it, but, presumably,
21 right, there's no entry in any of the new
22 entities' books and records that's going to say,

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 18 of 85
Transcript of Meet and Confer
16 (61 to 64)
Conducted on January 8, 2025

61

1  specifically, hey, a former OtterSec client,
2  right, revenue, to the extent it's not broken out
3  in that way.  So there are financial documents
4  that the new entities would have, is my point,
5  that incorporate within them aspects of our claim
6  or issues that go directly to our claim.  And that
7  is specifically, right, who the clients are, and
8  how much revenue they are deriving from these
9  clients without mentioning the OtterSec name.
10      So the fact that -- the point is,
11 the -- we do not have what we would need simply by
12 drawing the line.  When the line in the sand is
13 drawn, do they mention the word OtterSec, that is
14 not sufficient, in our view, because this is a --
15 an issue of, I think, substance over form.
16 Because the substance of the work and for whom
17 these new entities are doing the work for is
18 relevant to the claim, independent of the question
19 of whether or not, you know, the entries in the
20 books and records of the new entities utilize the
21 word OtterSec.
22      So, that was my addition to that point,

62

1  Josh, and I'll let you respond.
2      MR. LEVY:  Thanks so much.  So when we
3  search for documents, we search for -- again, you
4  have all of the responsive records with regard to
5  5, 15, 16, 17, 18, from OtterSec.  When we
6  searched for responsive documents for Otter Audits
7  and RC Security, we searched for documents that
8  mentioned OtterSec.  That was a good way to do
9  that.  We're confident that the documents that
10 mention OtterSec concern OtterSec in some way, at
11 least in that they mention OtterSec.
12      Beyond that, we're wary of accepting,
13 certainly, Plaintiff's position of what concerns
14 OtterSec because, as you indicated, I think last
15 time, that there's a bit of subject activity
16 there.  And based on the position Plaintiff's
17 taking, it could be everything.  And it can't be
18 that.
19      So -- and we're talking about time
20 periods that go far out in time.  And as time goes
21 out, relevance diminishes, from the alleged
22 breaches and torts.  Which occurred, of course, in

63

1  fall of 2022, allegedly.  So we've given you a lot
2  of documents that show what you need.
3      And I want to know, and I'm going to
4  list them and ask what, beyond them, you would
5  need.  And this may clarify matters.  Obviously,
6  you have all the OtterSec documents that are
7  responsive.  You have the 2022 Otter Audits and RC
8  Security documents and the documents from those
9  two companies beyond that date that mention
10 OtterSec.  You have the NDAs from the South Dakota
11 companies.  You have the statements of work.  You
12 have the customer agreements.  You will have all
13 of the customers.  We're going to get to that.
14 There are just a couple that aren't reflected in
15 agreements, but then you'll have everything, in
16 terms of the customers.  You also have the
17 blockchain, which is public, right?  And that is a
18 way to understand what business on the blockchain
19 the two South Dakota companies are doing.
20      So, beyond that, it would be very
21 helpful to know what else you need, you claim you
22 need.  The Otter reports are publicly posted, for

64

1  the most part.
2      MR. PLOTNICK:  Were you finished with
3  that, Josh?
4      MR. LEVY:  Yeah, thanks.
5      MR. PLOTNICK:  So, to sort of take that
6  in order.  First off, I would say, saying what do
7  we need?  I mean, the answer is that we need the
8  documents that are responsive to our requests.  I
9  mean, we don't know.  They are your -- "your"
10 meaning the defendants' documents.  So what else
11 there is, we don't know.  So sort of looking at
12 the way, hearing you on this, right, you said we
13 have the OtterSec documents.  And I think where I
14 would sort of focus on is the second thing that
15 you said.  You have said that we have the 2022 RC
16 and Otter Audits documents that mention OtterSec.
17 And that's a problem for us, from our perspective,
18 and that is the limitation to documents that
19 mention OtterSec.  So --
20      MR. LEVY:  Sorry to interrupt.
21      MR. PLOTNICK:  Okay.  I'm going by what
22 you had said you had given to us.  And you said

65

1 that we have the 2022 RC Security and Otter Audits
2 documents that mention OtterSec --
3       MS. CLATTENBURG: Can I just jump in
4 and clarify this? Okay. I think we said this
5 multiple times last time and this time. Anything
6 that mentions OtterSec you have, okay? That isn't
7 being withheld on the grounds of relevance. Okay?
8       We also produced, for 2022, financials
9 for RC Security and Otter Audits, regardless of
10 whether or not it mentions OtterSec. You also
11 have the customer agreements or any signed
12 agreement, employment, contractors, anything that
13 went through HelloSign, Docusign, which we are
14 going to get to, was, virtually, everything,
15 except for something we're going to mention.
16       You have those up through March 31,
17 2023, regardless of whether it mentions OtterSec,
18 okay? I just want to clarify for the record. Not
19 just stuff that mentions OtterSec.
20       MR. PLOTNICK: Got it. Thank you for
21 that, Rachel.
22       The -- the searches, when you say

66

1 anything that mentions OtterSec. So, again, even
2 sort of more broadly than just the financials,
3 right, our requests for documents, even for 2022
4 and beyond, I just -- I think that our view is
5 that the limitation of -- in any way, sort of
6 limiting responsiveness to documents that simply
7 mention OtterSec is improper.
8       Insofar as the 2022, and thank you, we
9 can come to this, I don't know in what you are
10 saying is that, say, for example, let me look at
11 the specific request, there's a Document Request
12 Number 15, which is the one that I would focus on,
13 which is documents of communications concerning
14 general ledgers. Again, we can come back to this.
15 I'm not saying I would ask for clarification about
16 whether or not you are saying we have all
17 documents responsive to Request Number 15 for RC
18 Security and Otter Audits. So let me just --
19 we'll stop there.
20       MR. LEVY: I don't know if you have all
21 of the documents responsive to this request. So I
22 have other questions to ask of you about other

67

1 aspects of what you were saying, but I don't know
2 if it's helpful for me, if you were done, Steve,
3 or if you wanted to keep going.
4       MR. PLOTNICK: No. That was just sort
5 of my response to, you know, what Rachel had said
6 there, for the 2022 stuff. Because, again, part
7 of it is, as I understand, there's still -- right,
8 there's still an objection in there, even through
9 the end of 2022, and I think that's what we're
10 trying to get clarification on. Because I think
11 Request Number 15 is not vague in any way. It
12 asks for very specific categories of documents,
13 and our view is that, you know, we're entitled to
14 everything responsive to a Document Request
15 Number 15. And what I'm trying to understand is,
16 if it's something that you need to check on,
17 that's certainly fine, but the question that I
18 would have on that point is, when, you know,
19 Rachel, you say we have the 2022 -- when we have
20 2022 information for RC Security and Otter Audits,
21 again, if you have to check, that's fine. My
22 question is whether or not we have everything that

68

1 would be responsive to number 15, at a bare
2 minimum, through the end of 2022. Again, if
3 that's the case, then I think the objection should
4 be withdrawn. I think that's part of the -- part
5 of the reason we're sort of having some
6 difficulty, and that is the -- the standing on
7 that objection, if documents are not being
8 withheld. It's what's most troubling to us about
9 that and raises that question.
10       MR. LEVY: Rachel, hold on.
11       Steve, two things. One, for 2022, for
12 Document Request Number 15, we've given you the
13 financials.
14       What you -- what we want to
15 double-check, and what we think, respectfully, is
16 vague, is that you've asked not just for general
17 ledgers, tax returns, financial statements, P&L
18 statements, et cetera, but documents and
19 communications concerning them.
20       MR. PLOTNICK: Yeah. We could -- yeah.
21 I mean, I think -- I think we can start off, let's
22 put it this way, with the question of whether or

69

1  not we have the actual general ledgers, I mean,
2  sort of specifically, and kind of go from there.
3  I said before, right, when it comes to sort of
4  running the searches, happy to have a discussion
5  about sort of narrowing that down.
6          MR. LEVY:  Right.
7          MR. PLOTNICK:  But I think the leaping
8  off point is, you know, if there are, again,
9  payroll records, balance sheets, cash flow
10 statements, that sort of thing, which are all
11 delineated in Document Request Number 15, which do
12 not have.  I'm happy to sort of take that as a
13 leaping off point.  But going back to the question
14 of, you know, again, what it is that we don't
15 have, I mean, I don't know what we don't have,
16 obviously, because they're your documents.
17         MR. LEVY:  That's not the question,
18 right?  It's what you're seeking.
19         MR. PLOTNICK:  Yeah.
20         MR. LEVY:  And what's relevant and
21 what's the limiting principal on concerning
22 OtterSec.  So it's going to be something, in your

70

1  view, that's more than mentioning OtterSec, but
2  what is it?
3          MR. PLOTNICK:  Yeah, I mean -- well, at
4  the risk of repeating myself here again, as I
5  said, it's information that goes beyond, as not
6  just 2022, that goes beyond 2023 because, again,
7  our claim in the case is that, effectively, that
8  these entities are the successors, that they are
9  OtterSec.  And the documents that we are seeking
10 for 2022 and past 2022, are relevant to that point
11 for all of the reasons that I said before, right,
12 and I'll say it again.  Where they're deriving the
13 revenue, from what clients and customers they're
14 deriving revenue, what work they're doing for
15 them, what employees are being deployed or sort of
16 working on these matters.  Are they former
17 OtterSec employees.  And providing us that
18 information for 2022 is just insufficient, in our
19 view, because it's just a small snapshot, it's a
20 few months we're talking about in time, and is not
21 sufficient to give a view of, you know, a more
22 mature business and what the mature business looks

71

1  like as of today.
2          And, again, you know, I think we could
3  talk about, as I had mentioned on the previous
4  call, sort of establishing a limiting time period.
5  I think, again, our view is that as long as we
6  have everything that would sort of cover the final
7  information for -- through the entirety of 2023, I
8  think that's a good leaping off point on that as
9  well because, again, it's a full year of
10 operation.  And as I had mentioned to Kevin on the
11 last call, that's why we had proposed to just go a
12 little bit into 2024 as well, it sort of bookends
13 it a little bit better.  But, again, you know,
14 I'll also reiterate another point, and that is
15 there's a lost profits claim in the case.  And the
16 claim seeks lost profits, and lost profits
17 continues beyond 2022 and, certainly, into 2023.
18         You know, Josh, you had made a
19 statement about as time goes out, relevance
20 diminishes.  I don't think that's correct at all.
21 And that's a perfect example of what I'm talking
22 about.  I mean, the lost profits claim, in

72

1  particular, right, continues on.  Because our
2  claim is for an interest in these companies.  So,
3  it's, again, from the damages side of things, it
4  is a lost profits claim.  It is, as I have
5  mentioned multiple times already, things like
6  understanding and having a picture of whether
7  distributions have been made to Robert Chen.  What
8  those distributions had been.  What expenses he
9  has run through the company.  It's getting a full
10 financial picture of what a mature Otter Audits
11 and RC Security looks like.  And there is,
12 really -- it's certainly insufficient, we think,
13 in any way, to include a limitation that is tied
14 to whether or not a document mentions OtterSec.
15 Certainly, we should be getting documents that
16 mention OtterSec.
17         MR. LEVY:  Yeah.
18         MR. PLOTNICK:  But beyond -- but my
19 point is, whether or not they mention OtterSec
20 should not be a dividing line in any way, shape,
21 or form, because a document cannot -- can
22 certainly not mention OtterSec but be relevant to

73

1 all of these issues that I mentioned before.
2 Whether it's the Lanham Act claim, the conversion
3 claim, the declaratory judgment claim. You know,
4 again, at the risk of repeating myself here,
5 that's -- that is our point.
6          MR. LEVY: Okay. So my question was,
7 what's the limiting principal for concerning
8 OtterSec. And what I heard you say was that it's
9 information that goes beyond 2022 to 2023, and
10 then you're including knowledge of who's working
11 there, documentation which you have, who the
12 customers are, documentation which you have.
13 Remember, we're talking about 15 -- 5, 15, 16, 17,
14 18, the request for financial records.
15          MR. PLOTNICK: But I'm not -- sorry, go
16 ahead, Josh.
17          MR. LEVY: And so, I was just listening
18 to what you were saying and the kinds of
19 information that you said you would need, that you
20 thought was concerning OtterSec for purposes of
21 these document requests. I wasn't hearing
22 anything you were seeking that we haven't produced

74

1 already.
2          MR. PLOTNICK: I mean, you keep -- when
3 you sort of restate things, I don't think that's
4 an -- I mean, you keep saying you're not hearing
5 it. But I think I've already said it. And as I
6 said, particularly sort of focusing on -- in on
7 the financial documents for these entities. As I
8 think I've said multiple times now, the fact that
9 these financial records, talking about two
10 separate issues, right, and that is the time
11 frame -- well, it's the time frame and what is
12 being produced, specifically. The fact that a
13 document does not mention OtterSec does not make
14 it irrelevant to the claim. I mean, it's very --
15 it is the very question that is at issue in the
16 case. It's determining what these businesses are,
17 what they do. Not just employees, it's for whom
18 they're doing it. And as I said before, how much
19 they're doing it for. When there is an argument
20 in the case, as the defendants have made, that
21 these are different businesses, that they are
22 doing different work, that it's not the same,

75

1 things like, questions of let me -- just for the
2 sake of this discussion, let's say, for example,
3 there is a component of the RC Security and Otter
4 Audits business that is different in some way,
5 shape, or form --
6          MR. LEVY: Are you there?
7          MR. PLOTNICK: -- than OtterSec --
8          MR. LEVY: Can anyone else not hear
9 Steve?
10          MR. MALYSHEV: I can hear Steve.
11          MR. LEVY: You can?
12          MS. CLATTENBURG: Yeah, I can hear
13 Steve.
14          MR. PLOTNICK: Josh, can you hear me
15 now?
16          MR. LEVY: A part of me, I think my
17 Internet connection went out. Would you mind
18 repeating what you said? I apologize.
19          MR. PLOTNICK: No problem.
20          Do you know where I got cut off, where
21 you didn't hear me?
22          MR. LEVY: Right probably where I said,

76

1 can anyone hear Steve.
2          So you were explaining, why --
3          MR. PLOTNICK: Yeah. I think I know
4 where I was. Let me see if I can kind of just
5 sort of back up and sort of where I was going with
6 this.
7          I'm going to assume, for purposes of
8 this discussion, you know, part of the argument
9 that the defendants have made in this case is that
10 the RC Security and the Otter Audits businesses,
11 for lack of a better term, are different from what
12 OtterSec was. That's exactly what we're trying to
13 assess. But let me just sort of assume, for
14 purposes of this discussion, that there is some
15 component of the RC Security and Otter Audits
16 business that is entirely different, right, than
17 the OtterSec business. I'll just assume that for
18 purposes of this hypothetical.
19          If that comprises 1 percent of these
20 new businesses, whereas, 99 percent of it is the
21 same as the OtterSec business, well, I guess
22 that's the question for the -- for the fact finder

77

1 to determine.  But that's sort of the point,
2 right?  How much of it is different?  And how much
3 of it is the same?
4        And there's no way for us to determine
5 that without seeing what the business actually is.
6 And, again, there's no way to determine that based
7 on this sort of small snapshot in time, where
8 you're talking about sort of just a couple of
9 months of 2022.  Nor is it possible to determine
10 it without having, you know, all the financial
11 information that we have, you know, requested and
12 other requests in here, which we haven't
13 specifically gotten to.
14        But, again, to sort of circle back to
15 the point where we were at the beginning of this
16 discussion, what I hear us discussing back and
17 forth here, over this, is the merits, is the
18 merits of the claim.  And the standard for
19 discovery is, right, relevant documents and, you
20 know, documents that are likely to lead to the
21 discovery of admissible evidence.  And I think
22 this is all fairly within the scope of what the

78

1 standard is, the broad standard is, for obtaining
2 discovery.  And that's really what we're asking
3 for.  That's what these documents go to.
4        You know, as I -- I agree with Kevin
5 and the point that he had made on the call, right,
6 that, you know, in theory, discovery could
7 continue into perpetuity.  We're not suggesting
8 that it should.  And what we are proposing is to
9 sort of put a limitation on what I think we
10 reasonably need to start off with here to assess
11 that.  I think we need a full, you know, I think
12 we need, certainly, all of the information, you
13 know, that would cover the full period of a full
14 year of operations, which include -- you know,
15 which is the final numbers for 2023, as I said
16 before.  Again, I think I am repeating myself here
17 and points I've already made.
18        But all I am hearing is a summary
19 judgment motion that the defendants intend to make
20 at a later date, and I just don't think that's
21 appropriate when we're talking about discovery
22 issues.

79

1        MR. LEVY:  Respectfully, I don't think
2 we're talking about merits at all.  And we're not
3 talking about matters that will come before the
4 Court on summary judgment.  We're talking about
5 whether -- I'm trying to understand what a request
6 for financial records of two companies are
7 relevant to in the case.  That's simply what we're
8 doing.
9        MR. PLOTNICK:  And what is it that I
10 have said about that, that is sort of not coming
11 across?  You keep saying -- I think I've said it
12 multiple times now, and then I keep getting asked
13 the same question of what they're relevant to.  I
14 mean, I have said it's a question of determining
15 what these businesses are, what they do, who their
16 customers are, how much revenue they're deriving
17 from them, the lost profits claim.  I mean, I've
18 said all of that.  I have to put it back over to
19 you and say, what is it about that, that you
20 consider to be -- I mean, let's just look at the
21 lost profits claims and the lost profits argument.
22        MR. LEVY:  Steve, I was going to get to

80

1 all of that, if you didn't interrupt me.  Hold on.
2        MR. PLOTNICK:  Yeah, sorry, Josh.  Go
3 ahead.
4        MR. LEVY:  Okay.  So, what I did hear
5 you say is that you want all these financial
6 records because they should be relevant to proving
7 that the two South Dakota companies are continuing
8 as the same business as OtterSec or doing the same
9 business as OtterSec.  And I understand that
10 argument.  And what -- and that position.  And
11 what -- where I am hung up is that, and of course
12 that is -- that point, continuing to do business
13 or doing the same business as the predecessor
14 company, is limited to successor liability.
15 That -- those documents, we have produced to show
16 that the two South Dakota companies are doing the
17 same business or not.
18        You don't need a P&L to see whether
19 they're doing the same business or not.  You need
20 to see the customer agreements.  You need to see
21 the audit reports, the blockchain activity, who
22 the workers are, that kind of thing.  You don't

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 23 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
21 (81 to 84)

81

1 need a general ledger for that.  You don't need a
2 P&L for that.  So we're trying to just show --
3 understand what's relevant and what's not.  And we
4 don't think that's relevant.  We think it's
5 marginally relevant, based on the needs of the
6 case and, in contrast, the burden it would impose
7 on our clients to go through their financial
8 documents.  So that's that.
9        Secondly, on lost profits, and you
10 mentioned the Lanham Act there, the lost profits
11 in the Complaint seem only to be alleged from the
12 Lanham Act.  And with regard to that, that's --
13 the Lanham Act claim in the Complaint is alleging
14 that there was a use of the OtterSec mark at Otter
15 Audits.  So, that claim isn't going to be relevant
16 to RC Security, right?  It's just Otter Audits.
17 And what we would offer to you, as a compromise,
18 is to produce the 2023 tax return from Otter
19 Audits.  We understand what you're saying there.
20        Otter Audits is the only entity that
21 used the mark.
22        MR. MALYSHEV:  Josh, were you done?

82

1        MR. LEVY:  Yeah.  Just to clarify, I
2 don't think it's the Complaint that specifies that
3 it's Otter Audits only, but I'm telling you it's
4 just Otter Audits that used the mark.
5        MR. MALYSHEV:  So that is Alex, just
6 for the record.
7        I think where we're sort of having a
8 difficulty here with your position is, to
9 determine the sort of volume of how much business
10 is attributable to prior OtterSec clients and
11 business that's derived from that, we need two
12 pieces of information.  One, you told us you
13 produced, which was the customer information.
14 I'll take you at your word that we have everything
15 we need, including the information about how much
16 profits they derived from each client, then we can
17 talk about time periods, but, you know, for the
18 time period that you agreed to.  I'll take you at
19 your word, for the purposes of this discussion,
20 and correct me if I'm wrong, that we have that
21 information.
22        MR. LEVY:  We didn't say that, Alex.

83

1        MR. MALYSHEV:  Okay.  So have you given
2 us this information?
3        MR. LEVY:  What we've said is that you
4 have the customer agreements and you're going to
5 have the customer agreements and the names of the
6 customers, and this is RFP 19.  We're not talking
7 about RFP 19, but we --
8        MR. MALYSHEV:  Okay.  So we need two
9 pieces of information for deriving how much
10 business.  One, thank you for that clarification,
11 perhaps we don't have yet, and you should produce,
12 which is information about how much they derive
13 from clients that formerly belong to OtterSec.
14 The second piece of information --
15        MR. LEVY:  Alex, could you repeat that?
16        MR. MALYSHEV:  Sure.  We need financial
17 information that shows us, clearly, how much
18 they're deriving in revenue from former OtterSec
19 clients.  So that is financial information that
20 we're entitled to, with respect to our request.
21        The second piece of information that we
22 need, and that's where the P&L comes in, is how

84

1 much business they've done generally.  Because
2 that is sort of the numerator and the denominator
3 of the equation.  How much business they got from
4 these clients, divided by how much business
5 they've done generally.  That's the only way we
6 can arrive as to whether it was 50 percent,
7 5 percent, 95 percent.  We need those -- both of
8 those pieces of information.
9        In addition, I'm actually not hearing,
10 and perhaps you'll explain to me now or you'll
11 explain to me after you confer with your
12 colleagues, because we asked you for more
13 clarification with respect to a different request
14 of you saying it would be burdensome to provide
15 this information.  Again, we're talking about
16 three private companies that have been in
17 operation for only a number of years.  We're not
18 talking about the complicated financial
19 mechanizations of Exxon here.  We're talking about
20 companies that are doing audits.  In addition, you
21 know, the way our Complaint is pleaded, I think we
22 are entitled to that information without

Transcript of Meet and Confer
Conducted on January 8, 2025

85

1 limitation. And with respect to the companies
2 that we named, we maintain that they are
3 successors, in the broadest sense of the word, and
4 we're asking for our share of their revenues and
5 whatever Robert has improperly removed.
6        Now, we are happy to discuss about a
7 way to make this less burdensome, if you don't
8 want to produce every single piece of information
9 for Otter Audits and RC, if we can come up with a
10 principle way to do that. But that actually
11 requires input from you and your client. Your
12 client is the one who would know which customers
13 were overlapping. And to the extent you want to
14 propose search terms that capture all of that, you
15 need to look at that. But it is not on us to,
16 essentially, justify sort of by touching a part of
17 the elephant to try to figure out what is missing.
18 So, respectfully, I think that is the position. I
19 think that on the financial information, I think
20 it's very clear what we need. On the customers
21 and how much was attributed to them, if you can
22 come up with a different way of showing us just

86

1 information that is overlapping, and we'll need to
2 be comfortable that you've sort of given us
3 everything, then we can discuss that. Otherwise,
4 the default position should be that you produce
5 everything. And that, I think, is consistent with
6 your obligations under Federal Rules of Civil
7 Procedure.
8        MR. LEVY: Alex, thanks for that
9 clarification. I just want to make sure I'm
10 really clear. And, obviously, we'll see a
11 transcript, but it's productive to get to work on
12 things we can.
13        So you're asking, you're proposing that
14 in response to 5, 15, 16, 17, 18, in addition to
15 what we've already produced, it would be
16 satisfactory to receive, number one, documentation
17 regarding the financial information for
18 overlapping customers, meaning customers or
19 clients that were once customers of OtterSec and
20 are now working with the two South Dakota
21 companies.
22        That's number one, correct?

87

1        MR. MALYSHEV: Not as a limitation
2 overall, but I think that's certainly --
3        MR. PLOTNICK: Like Alex had mentioned,
4 it's, like, a numerator/denominator point, right?
5 So I don't think it is -- I don't think it will be
6 sufficient to see it in isolation, alone, and kind
7 of this goes to my point before, because it is
8 also sort of a question of --
9        MR. LEVY: Sorry, Steve. There were
10 two things that Alex mentioned, and I think that I
11 was going to get to the second. And I don't know
12 if that -- I was confused by your
13 numerator/denominator, forgive me. I just want to
14 make sure that I'm completely recapitulating what
15 I thought was at least Alex's, may not be the full
16 team, proposal here. Number one what I said about
17 the overlapping customer.
18        Number two was the -- and I wasn't sure
19 if it the overall profits from the companies or
20 the gross revenue.
21        MR. MALYSHEV: Which would be as overly
22 inclusive as possible on the financial

88

1 information. We just can't limit just to the
2 overlap. I was talking about the overlap being a
3 starting point of information that you can provide
4 to us. Again, our position is that you should be
5 producing everything for these companies. But at
6 the very least, we need the information that
7 overlaps, as well as the financial picture of
8 these companies. Because we are claiming an
9 interest in those companies.
10        MR. LEVY: So maybe I misheard this
11 altogether. I thought you were proposing that we
12 produce these two categories of documents and
13 that's what you need to satisfy these requests.
14 If what you're saying is it's a starting point but
15 you need more, clarify that, please.
16        MR. MALYSHEV: It is a starting point
17 and we need more.
18        MR. LEVY: Okay. Can you -- hold on.
19        MR. PLOTNICK: Go ahead.
20        MR. LEVY: Can you tell me where,
21 within Document Requests 5, 15, 16, 17, 18, you
22 are asking for financial information about

89

1 overlapping clients?

2        MR. PLOTNICK:  Well, it's included
3 within 15.  I mean, it's sort of putting these
4 together, right?  I mean, we have made requests.
5 I can sort of point them out, right?  We've asked
6 for, you know, documents, the agreements with
7 customers.  We've also asked for the financial
8 agreement, too.

9        MR. LEVY:  No, 15 doesn't say that.

10 15 --

11        MR. PLOTNICK:  No.  15 is everything,
12 right?  So, 15 necessarily includes everything
13 within it, right?  I mean, it's not limited to --
14 it's not limited to any specific client in
15 particular, right?  And then there is the separate
16 request, which I could find, which asks for the
17 information about the clients and customers,
18 right?  So it's sort of merging the two together
19 and sort of looking at them both together.  And,
20 again, you know, without having the records, you
21 know, to Alex's point, about the burden and not
22 knowing, I don't know, is some of this just in,

90

1 like, a QuickBooks file?  That's pretty simple to
2 produce.  Wouldn't strike me to be particularly
3 burdensome.  We don't know.  I mean, you would
4 know that.  We don't.  We don't know what there is
5 or what they have that would be responsive to
6 Document Request Number 15.

7        If you want to give us a listing of
8 sort of what it is that they have, we could look
9 at that and say, you know, pick from the list.
10 That's an option that we can kind of consider
11 here.  I mean, for example, I don't want to argue
12 about things that they don't have, right?  So if
13 there are documents that would be responsive to
14 number 15 that they don't even have, or didn't
15 maintain, right, that's easy, right?  If they
16 don't have them, they don't have them.  But we
17 just don't know.

18        I mean, that's why I have trouble with
19 this question of sort of tell us what you don't
20 have because they're not our -- they're not our
21 documents and we don't know what you have.  And,
22 again, to reiterate, our position is that

91

1 everything, looking at number 15 in particular, is
2 that everything responsive to number 15 should be
3 produced.  It should be produced past 2022, for
4 the reasons that we've mentioned -- mentioned
5 before.  And if there -- my point about
6 considering what you have and what, you know, you
7 don't have, is largely directed to your question
8 about burden, right?  I mean, you know, when we're
9 talking about these types of financial records,
10 again, I don't know, but the company has to do its
11 tax returns.  So if all of this has been compiled
12 already and is in one location and has provided --
13 been provided already to the accountant, again,
14 it's -- I think it's the defendants' obligation to
15 explain, in better detail, sort of what the nature
16 of the burden is that they're claiming or why it
17 would be burdensome to do so.  And if you need
18 more time to do that and kind of go back.  And I
19 hear you on that, Josh, and I'm not asking you to
20 give me that, sort of those specific details right
21 now.  But there are documents.

22        You know, I just kind of want to go

92

1 back, Josh, a little bit, to a couple of points
2 that you had made about sort of what we do have.
3 And you had mentioned, you know, well, the
4 blockchain activity is public.  I think that's
5 right, but, again, I don't know if this is another
6 point that, you know, maybe it's one of the issues
7 that is the subject of the discovery request, and
8 that is that the defendants have refused to
9 provide us with the wallet addresses for these
10 entities.  So without having the wallet address
11 for these entities, there's no way for us to
12 determine what the blockchain activity is.  So we
13 don't have that, and we can't determine that
14 without that type of information.

15        And, you know, look, this all sort of
16 rolls up into the fundamental point that we just
17 don't think this objection is proper at all
18 because it really does go to the merits of the
19 case.  It should not be in here, to be arguing the
20 merits of the case that these are different
21 entities.  All of this discovery is going exactly
22 to that merits-based issue.

93

1          MR. LEVY:  Anything else?
2          MR. PLOTNICK:  No.
3          MR. LEVY:  Okay.  We were talking about
4  5, 15, 16, 17, and 18, which seeks not only the
5  financial records, but documents and
6  communications concerning them.  And that's the
7  burdensome elements of those requests.
8          And so --
9          MR. PLOTNICK:  Well, if you're -- I
10 don't want to -- I don't want -- if what you're
11 telling me here, today, right, is we'll -- right,
12 we will give you, right, the general ledgers, the
13 tax returns, the financial statements, the P&L,
14 right?  All of the specific named documents that
15 are in here, that you will give them not just for
16 OtterSec, but for RC Security and Otter Audits and
17 that you will give them to us, you know, as we've
18 requested, beyond 2022.  I think that's something
19 that we can give serious consideration to.  I
20 would just want to confer with my colleagues.
21         But, if you're not, right, I think -- I
22 don't want to just sort of talk about documents

94

1  and communications and concerns.  In other words,
2  if you're saying, look, either way, even if you
3  want these specific categories of documents that
4  are identified in here, you're not going to give
5  those to us either, I'm not sure what the point is
6  of talking about, like, you know, the limitation
7  of documents and communications is concerned.
8          MR. LEVY:  Right.  So what I'm hearing
9  you say is that if we're going to produce
10 financials for the South Dakota companies for
11 2023, say, you would not insist on documents and
12 communications concerning those financials?
13         MR. PLOTNICK:  I think we would give
14 serious consideration to that.  Yeah, I mean, I
15 don't want to commit to it right now.  I would
16 want to mull it over with my colleagues.
17         MR. LEVY:  Yeah.
18         MR. PLOTNICK:  But that is -- yeah, I
19 think that's what we're talking about, Josh, sort
20 of -- right, if there's any sort of confusion
21 about what this means and how we can sort of limit
22 the request.  Like I said, my only point is, you

95

1  know, I don't want to consider it if it's not
2  going to matter anyway, at the end of the day,
3  because --
4          MR. LEVY:  I understand.
5          MR. PLOTNICK:  Yeah.  And I just -- let
6  me just sort of add to one other point, and I'm
7  sorry to do this again, to go back, that I had
8  missed looking at my notes.
9          MR. LEVY:  No, that's okay.  I have a
10 proposal, too, but go ahead.
11         MR. PLOTNICK:  Yeah, the point about,
12 you had mentioned about giving us the 2022 Otter
13 Audits, tax return --
14         MR. LEVY:  2023.
15         MR. PLOTNICK:  Oh.  Well, I wrote down
16 in my notes -- this is when we were talking about
17 the Lanham Act.  Maybe I misheard you.  The Lanham
18 Act claim.  And you said that the -- that Otter
19 Audits is the only entity that is utilizing the
20 mark and, you know, so for that reason.
21         But, Josh, the OtterSec assets, right,
22 were purchased under the -- from OtterSec by

96

1  Robert Chen, and at least as we understand it, he
2  licensed or signed those for use, either sort of
3  directly or indirectly, you know, through RC
4  Security.  And, you know, I get it, you're telling
5  me, and I'm not -- I'm not questioning you
6  personally, Josh, when you say to me, like, I'm
7  telling you this is -- but I don't believe that
8  we're necessarily obligated to take your word for
9  it.
10         What we know is that those marks were
11 purchased by Robert Chen.  That is what that
12 agreement says.  He purchased them personally.
13 And has, you know, sort of assigned or licensed,
14 or however it is, the use of those.  Again, this
15 is discovery.  We're entitled to look at that as
16 part of discovery, and we're entitled to pursue
17 discovery, given, in particular, that they were
18 purchased by him directly under that agreement.
19         MR. LEVY:  Look, it was a proposed
20 compromise.
21         MR. PLOTNICK:  Yep.
22         MR. LEVY:  Perhaps there is an

97

1 interrogatory that speaks to that question, but --
2        MR. PLOTNICK:  Well, we have asked for
3 it, Josh, I'm sorry to interrupt.  But we have
4 asked for, right, the -- we have asked for, again,
5 using 15, 15 applies to the defense, which
6 includes, you know, Robert Chen.  So, you know,
7 that's included in there.  Look, if the answer
8 is -- like, for example, if you came back to me
9 and you said, listen, there's absolutely nothing
10 because Robert Chen utilized this stuff.  At no
11 point in time, right, if I looked at Robert Chen's
12 tax return, right, at no point in time did he sort
13 of directly derive any revenue through the use of
14 the marks.  Okay.  You know, I think we can kind
15 of consider that.
16        But just bigger picture.  My only point
17 is, again, while I just want to be clear, Josh,
18 I'm not questioning you, at all, or your
19 integrity, at all, of what you're telling me, at
20 all.  But, you know, again, I think, right, I
21 mean, this is discovery, and I don't think either
22 of us, right, it applies to me equally, are

98

1 entitled -- are obligated to just take my word for
2 it.
3        MR. LEVY:  No, Steve, I agree.  And
4 that's why we were having that discussion early in
5 the day today about what's alleged in the
6 Complaint and not what's discussed in the meet and
7 confers or what's stated in the brief.  I agree
8 with you.  I think we -- I totally understand.
9        MR. PLOTNICK:  Yeah.
10        MR. LEVY:  And I don't question your
11 integrity either.  And I won't go on for
12 five minutes about how you missed the argument
13 about the Lanham Act.
14        I will say, however, that it was an
15 offer of compromise to try to get this meet and
16 confer accomplished in a productive way with
17 regard to --
18        MR. PLOTNICK:  Yeah.
19        MR. LEVY:  -- an issue that you raised.
20 All we're trying to do is figure out what your
21 claims -- what document requests you're seeking
22 are relevant to -- you said lost profits, you

99

1 mentioned the Lanham Act.  I tried to make a
2 proposal with regard to that.  If you want to
3 accept it, great.  If you don't, that's fine too.
4 We're talking about it.
5        Back to the other proposal that we were
6 talking about, with regard to the financials,
7 irrespective of documents and communications
8 concerning them.  And, again, I'm not agreeing to
9 this either, but I just want to offer this for
10 your clients' consideration, is that to discharge
11 our obligations remaining under these Document
12 Requests 5, 16, 17, 18, that we look at documents
13 sufficient to show the overlapping business
14 from -- sorry, the business from the overlapping
15 clients and the overall profits and revenue from
16 the two companies, documents sufficient to show
17 those two items.
18        If we can do that, and we're not
19 required to produce documents and communications
20 concerning those documents sufficient to show
21 those two things, we can take that back to our
22 client and talk to them about it.

100

1        But -- and you have made your proposal.
2 And so, we can -- I think this is helpful to think
3 about ways forward to resolve our differences here
4 so that we can get you what you're seeking that's
5 relevant to the claims and defenses in the case.
6        MR. PLOTNICK:  Yeah, I think, I think,
7 Josh, I think -- I think maybe the difference
8 between what you're thinking and what I'm
9 thinking, that we would consider on 15 is to say,
10 rather than documents sufficient to show, what I
11 think we would give consideration here to, which
12 I'd want to talk about with my colleagues --
13        MR. LEVY:  Yeah.
14        MR. PLOTNICK:  -- is the actual
15 documents that are identified in here, as opposed
16 to -- because as I said, I mean, I think it goes
17 beyond just the overlap for all of the reasons
18 that I just mentioned.  I mean, I think it's
19 difficult to just look only at the overlap and say
20 that that's enough.
21        I think it covers -- it deals with
22 certain aspects of what the claims are in the

101

1 case, but I think it's difficult to limit it just
2 to the overlap because, you know, again, for all
3 the reasons that I mentioned, I think, in Alex's
4 point about the numerator/denominator thing, I
5 don't think it's, at the end of the day, it's
6 sufficient to give us enough.
7         So I guess if it's -- I don't know -- I
8 don't know who proposed it first, so whether this
9 is a counterproposal or what. I think what we
10 would consider is just saying, again, looking at
11 number 15, the documents that we've requested in
12 there, themselves, and again, sort of setting
13 aside the -- certainly not limiting it to 2022,
14 extending beyond 2022, and I think what we would
15 be willing to consider and give serious
16 consideration to is saying, forget about the, you
17 know, documents and communications concerning and
18 just say give us those documents.
19         MR. LEVY: Yeah. Okay. Well, so your
20 proposal, as I understand it, is that we produce
21 the financial records responsive to 15. And you
22 would -- and you haven't talked to your team about

102

1 it, you haven't talked to your client about it,
2 this is just the beauty of a meet and confer.
3         MR. PLOTNICK: Yeah, yeah.
4         MR. LEVY: We're doing what we're
5 supposed to be doing here. So, a proposal, no one
6 has to be the mother or father of it, is for both
7 of us to take back and talk to our clients
8 about --
9         MR. PLOTNICK: Right.
10         MR. LEVY: -- is a -- defendants'
11 production of the financial information sought in
12 15. No need to produce the documents and
13 communications concerning them. And that would
14 discharge defendants' obligations for 5, 15, 16,
15 17, and 18, beyond what's already produced.
16         MR. PLOTNICK: Yes, that is what we're
17 willing to consider. But kind of gut reaction is
18 I think that would be, probably, a good
19 compromise. Because I can see your point about
20 even setting aside Alex's point about how many
21 documents are we talking about here. It becomes a
22 little bit more difficult to search when you're

103

1 talking about, you know, documents and
2 communications concerning. So my point only is,
3 right, if that's the difficulty that we're having
4 here, we could fix that.
5         MR. LEVY: Yeah, exactly. Doesn't have
6 to be Exxon. You can get pretty voluminous with
7 email?
8         All right. Anyway, thank you. We'll
9 both take that back. We've got just a little bit
10 more to go through on your motion, but would it
11 make sense to take a five-minute comfort break?
12         MR. PLOTNICK: Yeah. Yes. Yes. I do.
13 I think it would be. Now is a good time to do
14 that.
15         MR. LEVY: Great. Thanks, everybody.
16 We'll be back in five.
17         MR. PLOTNICK: Okay. Sounds good.
18         (Recess taken from 11:42 a.m. to
19 11:49 a.m.)
20         MR. LEVY: So, this is Josh Levy for
21 the defendants, picking up where we left off on
22 Plaintiff's motion. I think, Steve, next that we

104

1 need to discuss would be request 9, 10, and 11. I
2 don't think 6, 7, or 8 are in dispute.
3         Is that correct?
4         MR. PLOTNICK: Yeah. That's correct.
5 If we go from 5 through, yeah, 9.
6         MR. LEVY: Okay. Great. So I think 9,
7 10, 11, it's all the same. I think there is some
8 confusion. I just wanted to clarify that we did
9 not apply the March 31, 2023 time period to
10 this -- to these responses.
11         MR. PLOTNICK: Let me just look at the
12 specific. Right. But, again, this kind of gets
13 into the, I think, the issue that we were talking
14 about before, and that is, when you say "to these
15 responses," there's still that same objection that
16 is in there. And there's a limitation in the
17 response to producing documents in relation to
18 OtterSec only.
19         So when you're saying we didn't apply
20 the March 2023 limitation to that, it still
21 remains limited to OtterSec documents, right?
22         MS. CLATTENBURG: No, no. If you look

105

1 at the response, Steve, it says Defendants RC
2 Security and Otter Audits have no responsive
3 documents.
4         MR. PLOTNICK:  Let me just --
5         MS. CLATTENBURG:  They don't have
6 responsive documents.  The question last time was,
7 are you saying only up through March 31st, 2023?
8 And we are clarifying, no, that's not only up
9 through March 31st, 2023.
10        MR. PLOTNICK:  Yeah, thank you.  Let me
11 just look.  I opened up the wrong ones.  I'm
12 sorry.
13        I got it.  So, again, just looking at
14 9, that the defendants have no responsive
15 documents.  10 -- well, yeah, you're right.
16 Right, yeah, I see that in here.  9 says
17 Defendants RC Security and Otter Audits have no
18 responsive documents.
19        10 says the same.
20        And so does 11.
21        So, I get -- maybe this is a question
22 for later.  When you're saying you didn't apply

106

1 the March 2023 limitation, you're saying that no
2 documents exist for any period of time?
3         MR. LEVY:  Right.
4         MR. PLOTNICK:  Even with respect to RC
5 Security and Otter Audits, even though there's
6 that -- right.  You have the objection in there,
7 but you say this is the case.  Notwithstanding the
8 objection, we don't have it?
9         MR. LEVY:  Right.
10        MR. PLOTNICK:  Okay.  I mean, this may
11 be sort of a question for the protocol because I
12 think -- and maybe sort of a later point that
13 we'll come back to later.  It looks like all of
14 the searches were cut off at March of 2023.
15        So, are you -- I guess my question is,
16 you're saying independent of the searches, you've
17 just kind of conferred with the client that
18 reviewed the documents, or whatever it is that
19 you've done, made some assessment that there's
20 just nothing responsive for any period of time for
21 9, 10, and 11, that RC Security and Otter Audits
22 would have?

107

1         MR. LEVY:  That's right.
2         MR. PLOTNICK:  Okay.
3         MR. LEVY:  So, with that, we can move
4 to 19.  Unless you want to continue to talk about
5 9, 10, and 11.
6         MR. PLOTNICK:  No, if you don't have
7 them, you don't have them.
8         MR. LEVY:  No, we don't.  Great.  It is
9 what it is.
10        19.  Here.
11        MS. CLATTENBURG:  Can I jump in one
12 second, Josh?
13        MR. LEVY:  Of course.
14        MS. CLATTENBURG:  16, there was one
15 question you had I wanted to clarify.  On
16 OtterSec's FTX account, you had some questions.  I
17 don't know if you remember this, Steve.
18        MR. PLOTNICK:  I do.
19        MS. CLATTENBURG:  You said we'd get the
20 statements, or something like.  I just want to --
21 there's two things I wanted to clarify.  One was,
22 so, I think OtterSec was automatically listed as a

108

1 claimant.  Our clients didn't register any claim
2 or go on there and file any sort of claim.  That
3 was sort of like an automatic thing.  That's one
4 thing.
5         The second thing was, in terms of
6 trying to retrieve these FTX statements.  Our
7 client, Robert, said that when he goes on the
8 claim site there's, like, a KYC process --
9         MR. PLOTNICK:  Yes.
10        MS. CLATTENBURG:  -- is that what
11 you're saying he needs to go through, and then
12 after that, he can access statements?
13        MR. PLOTNICK:  So I only know of the
14 website.  We wouldn't have the information to sort
15 of make the request for it.
16        We may be talking about the same
17 website.  Probably are.  I mean, it sounds like
18 he's looked at it, so...
19        MS. CLATTENBURG:  Before we go through
20 this, we wanted to make sure that's what you're
21 talking about.  You think he needs to go through
22 that process and he'll somehow have access to

Transcript of Meet and Confer
Conducted on January 8, 2025

109

1  statements?
2        MR. PLOTNICK: Yeah. I guess I don't
3  know what the process is that is involved. But --
4        MS. CLATTENBURG: I think it's just, is
5  this the right website? Is that the website
6  you're talking about, it's, like, the claims
7  website, maybe?
8        MR. PLOTNICK: Yeah. I mean, I don't
9  know if you have it. I can look at it.
10       MS. CLATTENBURG: I don't.
11       MR. PLOTNICK: I Googled it. I can
12 sort of tell you because I looked at it.
13       MR. LEVY: We can confirm it through
14 email after the meet and confer --
15       MR. PLOTNICK: Yeah.
16       MR. LEVY: -- and you can tell us if
17 it's the right one.
18       MR. PLOTNICK: Yeah, on the assumption,
19 you're saying there's some sort of KYC process
20 that --
21       MS. CLATTENBURG: There is some sort of
22 KYC process he had to go through. Before he did

110

1  that, we wanted to make sure it's the same
2  website.
3        MR. PLOTNICK: Maybe if we take another
4  break or something, I can check on that point.
5  This may also be a protocol, sort of related issue
6  to, again, which is, I think, probably for a later
7  discussion. We can come back to it. But, you
8  know, we had -- we had some, I think I had
9  mentioned this, we would at least want some sort
10 of search to be done for FTX, which, I think,
11 also, I think their U.S.-based entity was called,
12 like, West Realm Shires -- Madelyn, right? Like,
13 West Realm Shires?
14       MS. WHITE: Yeah. I think FTX, in the
15 U.S. at least, was a doing business as, and I
16 believe the entity was West Realm Shires.
17       MR. PLOTNICK: Yeah, and this -- we can
18 sort of put our pencils down and kind of come back
19 to it. I'll check that website. It may very well
20 be the same website.
21       But, are you -- is the -- is where
22 you're going with this, that the -- that sort of

111

1  whatever process is required is -- that's
2  something that he wanted to go through or --
3        MS. CLATTENBURG: No.
4        MR. PLOTNICK: -- should be required to
5  go through?
6        MS. CLATTENBURG: I don't think we are
7  saying that yet.
8        MR. PLOTNICK: Okay.
9        MS. CLATTENBURG: We can go through it
10 if we were -- it was unclear from the last call.
11 And before we went through anything, I wanted to
12 make sure we were talking about the same website.
13       MR. PLOTNICK: Yeah, I'll double-check.
14 This was some time prior to the previous call
15 where I had looked up. But I'll see if I can find
16 it. We can keep going for now and maybe come back
17 to this one. I'll just make a note here and I'll
18 double-check that, what the website it is that I'm
19 talking about, or maybe I can follow up with you,
20 after today's call, and send you a link to the
21 website that I'm talking about, if that works.
22       MS. CLATTENBURG: Yeah. That's great.

112

1  That's fine. Thanks.
2        MR. PLOTNICK: Okay.
3        MR. LEVY: Okay. So, then, moving to
4  RFP 19. This is the request for documents
5  sufficient to show customers and clients of the
6  three entities.
7        MR. PLOTNICK: Yeah.
8        MR. LEVY: We've produced the executed
9  agreements with the three entities, for our
10 customers and clients, through the end of
11 March 2023. Those agreements show the customers
12 of those three entities through that date.
13 Defendants are not aware of any customers who have
14 not signed an agreement of some sort, with two
15 exceptions. And our clients can't recall any
16 agreements not signed by a Docusign or HelloSign,
17 and none of the entities have a customer list.
18       The two clients that aren't -- that our
19 clients do know about, that aren't reflected in
20 the agreements, are going to be disclosed in an
21 answer to interrogatory, I think it's 40. And so
22 we'll have that information through

Transcript of Meet and Confer
Conducted on January 8, 2025

113

1  documentation, through March 31, 2023. Any
2  documents beyond that point, in our view, is of
3  marginal relevance, outweighed by the burden and
4  expense of reviewing and producing agreements for
5  a longer period of time.
6      MR. PLOTNICK: Okay. Are you finished
7  with that, Josh?
8      MR. LEVY: Yeah.
9      MR. PLOTNICK: Yeah, again, I mean, I
10 think from the time -- the time frame or scope
11 period. Again, on the burden point, if -- I mean,
12 it sounds like, if they were sort of using this
13 Docusign, this HelloSign, I guess I'm having
14 difficulty understanding what the burden would be.
15 I mean, if they're all in sort of one central
16 location or central repository with agreements, I
17 don't understand what the burden would be for
18 going beyond 2023.
19     Because, you know, without kind of
20 going over it again, our view is that going beyond
21 March of 2023 is appropriate, I think. And as I
22 had said on the prior call, you know, the fact

114

1  that a customer, I suppose this falls into two
2  different categories, the fact that a customer of
3  OtterSec did not utilize the services of Otter
4  Audits or RC Security, prior to March 2023, what
5  we're looking for right there is whether there is
6  overlap, again, in the customers and the clients.
7  And it's certainly possible that a client didn't
8  need those services between the time of the
9  dissolution of OtterSec, in October of '22, and
10 March of 2023.
11     And, again, beyond just who the client
12 is, and this is getting back to where we were
13 before, I didn't know we were both considering it,
14 beyond March of 2023, the question is not only who
15 the client is, but what the work was that they
16 were doing for them.
17     And, again, without beating a dead
18 horse, our view is that having the full picture of
19 a more mature company is -- I think that we're
20 entitled to that.
21     So, I guess, if this is a burden
22 question, I guess I would just ask, why is that

115

1  burdensome if the documents -- if they were just
2  using this central repository, Docusign,
3  HelloSign? Why would that be burdensome to
4  produce them beyond 2023? It seems like they're
5  in, you know, easily identifiable location, you
6  know, where the documents can be retrieved and
7  it's just a matter of producing the agreements
8  themselves.
9      MR. LEVY: There are a couple of
10 things. One, the -- 19 is just asking for
11 documents sufficient to show the customers and the
12 clients, right?
13     MR. PLOTNICK: Yep.
14     MR. LEVY: Not what the company's done
15 with the customers or the clients. And I think
16 part of what you just say related to the latter.
17 This request is just documents sufficient to show
18 the customers and clients themselves. This is not
19 just a question of burden, it's also a question of
20 relevance.
21     We've given you the documents through,
22 and identified the clients, through March 31,

116

1  2023. It would be burdensome for our client to go
2  and find this repository. I don't think it's as
3  straightforward as you make it out. And at the
4  same time, if you have -- this is -- those first
5  six months are where the overlap is almost
6  certainly going to be.
7      So, it just seems that anything beyond
8  that is going to be marginally relevant, and it is
9  going to take some gymnastics to get these
10 documents, if we were going to do that. So that's
11 where we are. We've given you everything we have
12 through March 31, 2023. We think that's
13 sufficient.
14     MR. PLOTNICK: As we're just sort of
15 talking this through. I mean, you know, again, I
16 think the question of whether or not those first
17 few months are going to show all of the overlap.
18 I appreciate the point, Josh, but, again, this is
19 discovery, so it's certainly not necessarily the
20 case that that's the only place that there would
21 be overlap.
22     But, as you were talking, one thing

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 32 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
30 (117 to 120)

117

1  that I think we can discuss on my side, if it's
2  something that the defendants are open to
3  discussing, and even before I say this, I think
4  it's sort of somewhat tied up into where we land
5  on that Document Request Number 15.
6          MR. LEVY:  Uh-huh.
7          MR. PLOTNICK:  But I -- kind of
8  thinking out loud here.  If we could reach an
9  agreement on 15, where we were satisfied with what
10 we were getting on the financials, one way which
11 we could look at limiting number 19 is to --
12 beyond March of 2023, would be to sort of focus on
13 customers or clients beyond 2023, who were also
14 customers or clients of OtterSec.
15         So, in other words, it wouldn't
16 necessarily need to be everybody --
17         MR. LEVY:  Yep.
18         MR. PLOTNICK:  -- but if there were
19 overlap, right, beyond March of 2023 --
20         MR. LEVY:  Yeah.
21         MR. PLOTNICK:  -- maybe that's one way
22 we could limit it.  I'm just kind of kicking that

118

1  over to you as I'm thinking out loud here --
2          MR. LEVY:  Yeah.
3          MR. PLOTNICK:  -- whether that would be
4  something that were acceptable to the defendants.
5  That's something that we could consider, also, is
6  a way to limit that.
7          MR. LEVY:  I also understand that it
8  would be a way to get the same responsive
9  information for overlapping clients only, after
10 March 31, 2023, through what period, Steve?
11         MR. PLOTNICK:  Through, I mean, our
12 overall sort of proposal would be through the
13 end -- I guess on that one, to stay consistent
14 with myself and capturing sort of the full year of
15 a more mature company, through the end of 2023.  I
16 think we could consider something like that.
17         MR. LEVY:  You mean through the end,
18 December 31, 2023?
19         MR. PLOTNICK:  Yeah.  I think that's
20 something that we can consider.
21         MR. LEVY:  Okay.  We will consider it
22 as well.

119

1          Shall we move to 20, 21, and 22?
2          MR. PLOTNICK:  Sure.
3          MR. LEVY:  Right.  So, here, again, for
4  all three of these requests, we have produced the
5  documents through the end of March 2023.  In the
6  last conversation we had, I recall Plaintiff being
7  interested in K-1s.
8          MR. PLOTNICK:  Yes.
9          MR. LEVY:  The entities, the defendant
10 entities, the subsequent entities are C corps, so
11 there is no K-1.
12         The requests used --
13         MR. PLOTNICK:  I'm just trying to
14 think.  If I can sort of stop you there.  So there
15 are no K-1s -- oh, you're saying -- so, Otter
16 Audits and RC Security, they're C corps?
17         MR. LEVY:  Right.
18         MR. MALYSHEV:  LLCs that are treated as
19 C corps, for the purposes of the Internal Revenue
20 code?
21         MR. PLOTNICK:  Yeah, because they're
22 LLCs, I thought, that he -- when he created them

120

1  in South Dakota, did he not create them as LLCs?
2  Unless I'm misremembering something.
3          MR. LEVY:  You have the tax returns for
4  2022.
5          MR. PLOTNICK:  Okay.
6          MR. LEVY:  So, anyway, there are no
7  K-1s.
8          MR. PLOTNICK:  Well, I think also --
9  no, I was going to say, the K-1s, I think, just
10 setting aside W-2s and 1099s, I think, I guess, we
11 need to think about that.
12         I think the K-1s, the point behind the
13 K-1s is -- I think I can sort of double-check
14 this, but the K-1s were -- fundamentally, I think,
15 the information that we were looking for on the
16 K-1s is really about, right, who the owners are,
17 because only the owners of an LLC, the members,
18 would get the K-1s.  And the K-1 information would
19 also include, you know, things like capital,
20 things like distributions, as well, that are made
21 to them.  And I think that's what we were looking
22 for.  Maybe there's another way to go about that.

121

1        And, in fact, maybe, again, depending
2   on how -- where we land on things, like Number 15,
3   that may give us what we're looking for anyway.
4        So, maybe we can put a pin in that and
5   come back to, you know, what we were looking for
6   in there, in the K-1s.
7        MR. LEVY:  So, Steve, all three of the
8   entities are taxed as a C corporation.  There was
9   a Form 8832 that was filed.  And so, there's not
10  going to be a K-1.
11       MR. PLOTNICK:  Yep.
12       MR. LEVY:  The other -- so just don't
13  have an expectation to see a K-1?
14       MR. PLOTNICK:  Right.  Yep.
15       MR. LEVY:  And there didn't need to be
16  a K-1.
17       We produced the documents responsive to
18  these three requests through the end of
19  March 2023, and, here, there is a significant
20  burden producing documents beyond what we've done
21  already because of these very broad terms,
22  documents, and communications concerning not only

122

1   things like W-2s and 1099s, ownership interest,
2   but, also, opportunities and strategies.
3        These are very amorphously -- they're
4   not defined terms.  And it would require us to do
5   quite a bit of work beyond what we've already done
6   to produce to you all of the responsive documents
7   through the end of March 2023.
8        MR. PLOTNICK:  I think this is one
9   where -- or at least on that issue, about the
10  burden.
11       MR. LEVY:  Steve, let me just clarify
12  one more point.  I apologize.
13       MR. PLOTNICK:  Yeah, sure.
14       MR. LEVY:  When we've looked at these
15  requests --
16       MR. PLOTNICK:  Yeah.
17       MR. LEVY:  -- in our response, we were
18  clear that what we were producing were formal
19  plans, strategies and opportunities.  That's very
20  clear here.  And we think we have made a -- we
21  understand that we've discharged our duties
22  relevant -- relative to what's relevant in this

123

1   case, juxtaposed to the burden it would require to
2   search through documents beyond this time period.
3        MR. PLOTNICK:  Yeah.  So, yeah, look, I
4   think some of this, when you're talking about, you
5   know, concerns about the potential breadth of
6   these requests.  My view of this all is that it
7   kind of comes down to the search terms that are
8   being utilized.  And this may be more of a search
9   term issue.  Because, you know, again, I think
10  we'll get to that because we did have some
11  questions that we wanted to talk to you about the
12  sort of search protocol that were utilized by the
13  defendants.  And I guess, setting aside the time
14  period issue, we may be able to resolve it through
15  the search terms, right?  Because I think -- I
16  think, really, when you're talking about
17  electronic documents, it really does kind of come
18  down to the search terms that you're using and how
19  broad they are or how narrow you can make them to
20  narrow down the burden.  And so, maybe this is
21  something that we could come back to, you know,
22  getting to Alex's point before, where I think if

124

1   you're saying it's burdensome, I think one of the
2   ways that we could look to narrow that burden is
3   by having, you know, targeted searches for
4   documents or categories of documents that we're
5   looking for.  And, you know, what we would ask for
6   is that if the defendants are saying that it is
7   too burdensome, to give us a little bit more
8   detail as to why.
9        As I said earlier, right, I mean, if
10  we're coming up for searches of responsive --
11  searches for responsive documents and, you know,
12  Josh, you come back to me and say, look, Steve, we
13  ran the search term and we got, you know, a
14  million hits for this document.  Then that is.
15  I'm not going to disagree with you.  That's
16  burdensome.
17       But I think we can kind of go from
18  there and narrow things down a bit more, just sort
19  of working through it in a, you know, more
20  cooperative way, recognizing that there would be a
21  burden on you, but we want to sort of find a way
22  to get what we need without there being a burden

125

1 on the defendants.
2        In terms of the time frame, the time
3 scope, I think -- so we're talking about which
4 one?  Are we talking about 20 -- are we talking
5 about 22, about the -- so, first of all, on the
6 documents of communications concerning.  Again, I
7 think if we were getting just the W-2s and the
8 1099s, since there are no K-1s, right?  So if
9 we're just getting all the W-2s and 1099s, would
10 that be, focusing in on 20 now specifically, would
11 that alleviate the burden concern?
12        MR. LEVY:  Well, you have them through
13 March of 2023.
14        MR. PLOTNICK:  Right.  So -- but if we
15 were to extend that through all of 2023, for
16 calendar year 2023, right?  So we're talking about
17 W-2s and 1099s issued for calendar year 2023.
18 Those could be issued, right, after December 31st,
19 2023.
20        But if we were to limit this down to
21 the W-2s and the 1099s for calendar year 2023,
22 would that alleviate the burden?  In other words,

126

1 take out the documents and communication
2 concerning aspect of it, just say give us the W-2s
3 and the 1099s?
4        MR. LEVY:  We can take that back.  And
5 just so I'm clear.  The reason for this request is
6 to see if there are overlapping employees and
7 contractors?
8        MR. PLOTNICK:  Yeah.  I think so.  I
9 think, fundamentally, yeah, it's about -- yes.
10 Yeah, I was going to say, you know, I don't know
11 if, for example, is a W-2 or 1099 being issued to,
12 say, Robert Chen because he's pulling out income,
13 say, as W-2, he's an employee.  But I think he
14 would fall into the category of an overlap.  So,
15 yeah, I think so.
16        Right.  So are you going with this, if
17 we sort of further limit it down to the overlap
18 question?
19        MR. LEVY:  Yeah, that was my question.
20 Sounds like we are.
21        MR. PLOTNICK:  Yeah.  Yeah, we can
22 consider that.  I think we can consider looking at

127

1 that as sort of overlap.
2        MR. LEVY:  Okay.
3        MR. PLOTNICK:  So that's 20.  And we'll
4 give some thought to that and get you an answer on
5 that.
6        Then I'm just looking at 21.  I think
7 21, in particular, again, on the burden point.  I
8 think that's an issue where -- which 21, for the
9 record, asked for documents and communications
10 concerning the ownership interest, financial
11 interest, or rights of Robert Chen, Sam Chen,
12 Plaintiff, the estate, or David Chen in or to RC
13 Security, Otter Audits, and OtterSec.
14        I think this is probably a search term
15 issue more than anything else.  I mean, I hear you
16 that it can be considered broad and maybe that's
17 one where we can sort of put a pin in that and
18 kind of come back to what we're -- some of our
19 concerns or questions, really, more so, at this
20 point, about the protocol.
21        But if there's a way to include some
22 targeted searches for the types of documents that

128

1 we're looking for in response to this request that
2 alleviates, you know, concerns that the defendants
3 might have about vagueness, we're happy to have
4 that discussion.  You know, vagueness,
5 overbreadth, that type of thing.  But, we're happy
6 to have that discussion in 21.
7        MR. LEVY:  Okay.  Keep going.
8        MR. PLOTNICK:  Yeah.  22 was documents
9 and communications concerning any business plans,
10 opportunities, or strategies for RC Security,
11 Otter Audits, and OtterSec.  I know, just sort of
12 thinking back, that there were some requests
13 that -- excuse me, some search terms that the
14 defendants were utilizing directed to this
15 request.  And this is one where -- let me just
16 look at the written response to number 22.
17        I mean, really, what this is
18 fundamentally going to is just the question sort
19 of what their business is and what they're doing.
20        MR. LEVY:  And we produced the
21 documents that are responsive through March of
22 2023.  But beyond that, we haven't.  We don't see

129

1 the need for it and these terms are overbroad.
2      MR. PLOTNICK: Okay. I think. Again,
3 if we can sort of resolve some of these others, I
4 might be less concerned about this one and
5 limiting it to March of 2023. So we'll give some
6 thought to that and let you know.
7      MR. LEVY: Okay. All right.
8      And then, that's it for the RFPs in
9 dispute from the plaintiff's motion. I think we
10 can go to the interrogatories, which we mostly
11 covered.
12      We've told you, I think the only three
13 that we had -- there were four that we needed to
14 discuss. One is Interrogatory 3, about the
15 customers and clients, and we've told you that
16 we're going to update that answer to indicate the
17 two customers that weren't on the agreements.
18      Number 15 --
19      MR. PLOTNICK: Before we move on to 15,
20 Josh. And I think this is another -- right. So
21 this is one where you've given us the customers
22 and clients --

130

1      MR. LEVY: Through March of 2023. So
2 you have this proposal that --
3      MR. PLOTNICK: Right.
4      MR. LEVY: -- we're going to take back
5 to our clients and think about.
6      MR. PLOTNICK: The overlap. That's
7 what I was going to say. Just for the
8 clarification, we have the -- or you're going to
9 give us, I suppose, all of the customer -- all of
10 the customers and clients of RC Security, Otter
11 Audits, and OtterSec, through March of 2023,
12 correct?
13      MR. LEVY: Correct.
14      MR. PLOTNICK: And what we were
15 discussing before, which I think would apply
16 equally to this one, is that going beyond March of
17 2023, limiting that to overlap.
18      MR. LEVY: Right. We made our
19 production.
20      MR. PLOTNICK: Right.
21      MR. LEVY: Then there's this question
22 of whether both of our clients would agree to

131

1 producing the overlapping client agreements
2 between the end of March 2023 --
3      MR. PLOTNICK: Yeah.
4      MR. LEVY: -- and December 2023.
5      MR. PLOTNICK: Yep. Got it.
6      So we can go to 15. Go ahead. You
7 were going to go there next.
8      MR. LEVY: Yeah, and 15, I think, also
9 gets wrapped in our discussion about 5, 15, 16,
10 17, 18 of the document request. So I think it's
11 all the same.
12      MR. PLOTNICK: I'm just looking, again,
13 at it just more closely.
14      Yeah, I think this is -- this is --
15 it's -- the answer was limited to OtterSec and
16 we -- so you're -- well, setting aside the FTX
17 thing, you agreed to give us -- OtterSec had or
18 has bank accounts with Mercury Bank, an account
19 with TransferWise, and an account with FTX. I
20 know we've gotten the Mercury Bank stuff, off the
21 top of my head. Are you saying we have the
22 TransferWise stuff too?

132

1      MR. LEVY: Yeah, we made a production.
2      MR. PLOTNICK: Okay.
3      MR. LEVY: What we're doing is we're
4 saying, right, as to OtterSec, we've stated what
5 we've stated here about those accounts.
6      For the other companies, we've referred
7 the plaintiff to the documents that we're
8 producing, that we did produce, in response to 15,
9 16, and 17. So these are the -- again, goes back
10 to the Otter Audits and RC Security documents that
11 mentioned OtterSec.
12      MR. PLOTNICK: Right.
13      MR. LEVY: And then we had an
14 hour-and-a-half conversation about --
15      MR. PLOTNICK: It's good to laugh at
16 this.
17      MR. LEVY: Truly. That's all we have.
18      MR. PLOTNICK: It's good to find the
19 humor in this.
20      MR. LEVY: A hundred percent, brother.
21      So we had the hour-and-a-half
22 conversation. We had proposals that our clients

Transcript of Meet and Confer
Conducted on January 8, 2025

133

1  are going to think about and we're going to get
2  back to each other on it.  And I would propose
3  that we think about that in the same vein as
4  Interrogatory 15.
5          MR. PLOTNICK:  Yeah, that's fine.  You
6  know, this is, really, a question of, as I said,
7  sort of seeing both sides of things.  And sort of
8  understanding what the businesses were.  We don't
9  have to go back over our hour-and-a-half
10 discussion before.  So I think we both understand
11 our respective positions on that point now.  It's
12 fundamentally the same issue --
13         MR. LEVY:  Okay.
14         MR. PLOTNICK:  -- when it comes to RC
15 Security and Otter Audits.  Okay.
16         MR. LEVY:  Agreed.
17         So Interrogatory 16.  Here, we have --
18 this is a request for information identifying the
19 wallets.
20         MR. PLOTNICK:  Yep.
21         MR. LEVY:  And we've given you the
22 wallets for OtterSec and, again, I think the same

134

1  discussion that we had about RFP 5, 15-18, applies
2  to 16 as well.
3          MR. PLOTNICK:  Yeah, I mean, just to
4  sort of add to that.  Specific to the -- the
5  wallet.  You know, as I had said before, without
6  beating the dead horse, we don't have it.  We
7  don't have the block chain activity for these
8  entities, so we can't see it because we don't know
9  what the wallet is.  Sure, it's out there.  But
10 without identifying the wallet, you know, the
11 nature of these is that you can't determine what
12 it is.
13         And, you know, looking at the activity
14 in the OtterSec wallet, sort of in the last, you
15 know, sort of couple of months there, you know,
16 what we can see are, you know, there were a
17 substantial amount of transfers equivalent to, I
18 don't have the number in front of me, but a couple
19 of million dollars' worth of funds going out of
20 the OtterSec wallet.  In some cases, you know, you
21 could see them going on to an exchange.  You could
22 see them going to other wallets.  You could see

135

1  them going to similar wallets -- I don't mean
2  similar, the same wallets.
3          But without knowing what the wallet
4  addresses are that were used by these other
5  entities, or having them identified, there's no
6  way for us to determine whether or not this was a
7  transfer to RC Security or Otter Audits.  That's
8  the fundamental point.
9          MR. LEVY:  And I think this goes to the
10 same conversation we had about 5, 15, 16, 17, 18.
11         MR. PLOTNICK:  Yeah.  Agreed.
12         MR. LEVY:  17, you've asked for us to
13 identify people in possession, custody, or control
14 of business financial records for the defendants
15 at OtterSec.
16         MR. PLOTNICK:  Well, the request was
17 for all of the defendants and OtterSec.  And I
18 think our issue with that was, is that the
19 response was only given for OtterSec.
20         MR. LEVY:  Yeah.  We'll update the
21 answer so that it applies to all three entities.
22         MR. PLOTNICK:  Okay.  Well, that's

136

1  easy.  The easiest one we've covered today.
2  That's good.
3          MR. LEVY:  We're on a roll, man.
4          Okay.  So, now, I guess we should turn
5  to our motion?
6          MR. PLOTNICK:  Yeah.
7          MR. LEVY:  To clarify 17.  We're
8  updating it for all three defendants through
9  March 31, 2023.
10         MR. PLOTNICK:  I think -- well, I
11 think -- yeah, this is a discovery sort of
12 question.  This was just sort of a request, sort
13 of seeking where we should be seeking discovery
14 from, right?  So I don't think that one -- I will
15 say, I don't think that one should be limited to
16 March of 2023.  I mean, if there were, say, for
17 example, we know of one account that they
18 utilized.  It's a question of if we need to issue
19 subpoenas to other third parties, who they would
20 be.  I don't think limiting that to, you know, who
21 had documents as of March of 2023 is an
22 appropriate limitation.

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 37 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
35 (137 to 140)

137

1    I mean, just utilizing Agasi Tax, which
2 is the accounting firm that we know of, you know,
3 somebody could have possession of OtterSec --
4 excuse me, of RC Security or Otter Audits or, for
5 that matter, OtterSec documents. They could have
6 easily had possession of them or acquired
7 possession of them after March of 2023, and they
8 could relate to, you know, other periods of time.
9    So that is one where we're looking for
10 a current response or who has the documents.
11    MR. LEVY: Yeah. Well, I think this
12 goes back to our hour-and-a-half conversation
13 about RFPs 15, 16, 17, and 18, and about relevance
14 of these documents after the end of March 2023 --
15 not documents. In this instance, information
16 after March 31, 2023.
17    MR. PLOTNICK: Yes, my point is a
18 little bit more sort of fine-tuned than that,
19 Josh. And that is, even if we're talking about
20 whether -- setting aside the question of whether
21 documents beyond March of 2023 are relevant. I
22 understand your position on that. My point is a

138

1 little bit finer than that. And that is, the
2 question is directed to who has possession of
3 documents, right? And my only point is, let's see
4 if I can articulate this in a clear way. There
5 may be someone, an accountant, a financial
6 advisor, who has -- who, because advice was
7 sought or tax advice was sought, or financial
8 planning advice was sought, that individual was
9 retained, let's use something easy, in sort of
10 April or May, right, of 2023.
11    Even accepting your underlying
12 position, which, again, I know you're considering
13 some more, that documents beyond March of 2023
14 don't need to be produced or shouldn't be produced
15 or won't be produced, you know, somebody could
16 have been retained in, as I said, April or May of
17 2023 and have possession of documents from March
18 of 2023 and earlier.
19    So that's my point as to why limiting
20 that response to individuals that had possession,
21 custody, or control of those documents, as of
22 March of 2023, would not be an appropriate

139

1 limitation.
2    Does that make sense? Am I kind of
3 being clear enough on that?
4    MR. LEVY: I understand what you're
5 saying. I think we will save both of our clients
6 money if we agree to the compromise, or a form of
7 it that we were talking about with regard to RFP
8 5, 15, 16, 17, 18, then you'll have the documents.
9    MR. PLOTNICK: Yeah.
10    MR. LEVY: You won't need to identify
11 anybody else in the world who has them and burden
12 them with the subpoena.
13    MR. PLOTNICK: Yes. I instinctively
14 agree with that, that if some of these other
15 issues that we've been talking about before, where
16 we're getting them anyway, that may also sort of
17 resolve this point on this interrogatory.
18    MR. LEVY: Yeah. Okay. So, with that,
19 why don't we go to Defendants' motion. And I
20 think we had sent you an email on January 3rd,
21 after our first meet and confer session, with a
22 proposal on the subpoena, the motion regarding the

140

1 subpoena that Defendants served on David Chen.
2    MR. PLOTNICK: Yes.
3    MR. LEVY: And I don't know if you've
4 evaluated that proposal and whether it's
5 acceptable to the plaintiff.
6    MR. PLOTNICK: Yeah. And I'll field
7 that. So, we're giving you the 2022 and 2023 tax
8 returns. We're giving you that.
9    Before I get to the second proposal,
10 the third was the wallet addresses that were used
11 by David Chen in 2022 and 2023. We'll give you
12 that also. We did consider that.
13    In terms of -- two. So the second
14 component is the supporting documents for David
15 Chen's tax returns from 2022 and 2023.
16    Here's what we're going to propose. So
17 we're going to give you the tax returns. We will
18 also give you any supporting documentation for
19 those tax returns, you know, associated with, you
20 know, income derived from the code. The use of
21 the code. Which is, I think, correct me if I'm
22 wrong, fundamentally, what you'd be seeking, or at

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 38 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
36 (141 to 144)

141

1 least that's sort of the relevance of
2 understanding the backup of that.  We will give
3 you that.
4         I just got David's tax returns and I
5 haven't -- going a little bit without having sort
6 of fully reviewed them.  But what I'm going to
7 prepose is we start there and you take a look at
8 the tax returns.  And if you think that you see
9 something in there that you need additional backup
10 for or support, you let us know and we can kind of
11 consider it.
12         The reason why I say that is I think he
13 had some, like, charitable contributions in there.
14 I think, like, he donated money to Ukraine.  I
15 mean, do you need, like, receipts for donations to
16 Ukraine, so the Ukraine relief?  I sort of wanted
17 to know if you really needed something like that
18 or, for that matter, if you would be interested in
19 something like that.  There might be some other
20 examples.  And as I said, I think that -- getting
21 into sort of that level of detail in looking for
22 those things, there may be some other examples as

142

1 I take a closer look at them.  I just got them.
2         Would that be acceptable to you, if we
3 just sort of say let's start with the tax returns,
4 any backup that we have for, you know, money or
5 income earned from the liquidator code.  And if
6 you see something else in the tax returns, that
7 you think you need, that would be sort of relevant
8 to a claim or defense in the case, you'll let us
9 know?  I just can't imagine why we would need to
10 kind of go back and look for, like, I said, things
11 like copies of receipts for charitable donations
12 or why that would be, you know, in any way
13 relevant --
14         MR. LEVY:  Well, you --
15         MR. PLOTNICK:  -- to any of this.
16         MR. LEVY:  Sorry.  Keep going.
17         MR. PLOTNICK:  No.  Go ahead.  That's
18 what I'm trying to figure out here, is whether
19 that would work for you as a -- on a
20 without-prejudice basis, a compromise.  In other
21 words, start with that and take a look at what's
22 in there.  And if you think you need something

143

1 more like that, and can explain to us why you
2 need, like I said, the backup for just sticking
3 with the charitable donation point, it's something
4 that we would be, you know, certainly willing to
5 discuss with you.
6         MR. LEVY:  Yeah.  So why don't I -- I
7 think just to clarify the record for the Court,
8 let me just read the proposal into the record.
9         MR. PLOTNICK:  Go ahead.  Yep.
10         MR. LEVY:  So what we had sent to you
11 on January 3rd was an email saying, among other
12 things, that regarding the subpoena on David Chen,
13 we offer the following compromise without
14 prejudice to our arguments:  Defendants will drop
15 their argument that David Chen has waived all of
16 his objections by failing to timely raise them and
17 would treat document requests 8, 9, 10, 11, 12,
18 13, 14 and 16 as satisfied (those are requests for
19 which David Chen has refused to provide any
20 responsive documents and for which Defendants are
21 prepared to move to compel).
22         If David Chen produces, 1, his 2022 and

144

1 2023 tax returns, 2, the supporting documentation
2 for those tax returns, i.e., any and all documents
3 he or others used, were shown or were relied on to
4 prepare those tax returns.
5         Number 3, the wallet addresses he used
6 in 2022 and 2023.
7         End of proposal.
8         What I heard from you is that you are
9 willing to produce the 2022 and 2023 tax returns
10 from David, which my understanding is you've
11 already agreed to produce in response to party
12 discovery requests to --
13         MR. PLOTNICK:  Yeah.  The Defendants
14 made the same request to Plaintiff as part of one
15 of their RFPs and part of our previous.  We did
16 originally have an objection in there, which, you
17 know, sort of per our prior meet and confer, we
18 had agreed to produce that.  Yes.  That's correct.
19         MR. LEVY:  So basically what your
20 proposal is, is that we were going to get that
21 anyway.  So what you're saying is, we're getting
22 the wallet addresses for 2022 and 2023 and

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 39 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
37 (145 to 148)

145

1 supporting documentation for tax returns that go
2 only to the use of code.
3          And that's insufficient, from our
4 standpoint, having the supporting documentation
5 for David's tax returns go far beyond any
6 charitable contributions that he may have made.
7 They go to the underlying financial documentation
8 that he relied on himself or gave to third parties
9 to prepare his taxes, to understand whether those
10 were done correctly and accurately.  It goes to
11 his credibility as a witness.  Obviously, that is
12 a very relevant issue here, in this case.  And so,
13 I would like you to go back to David and the
14 plaintiff and see if they will be willing to give
15 the supporting documentation for those tax
16 returns.  I can't imagine it being burdensome.
17 And we're not asking for very much else from him.
18 Otherwise, you know, we'll just have to revert
19 back to trying to enforce the entire subpoena.
20          MR. PLOTNICK:  So, a couple things.  My
21 proposal, actually, was not to say, flat-out,
22 we'll only give you the backup for, you know,

146

1 income derived from the code.  My proposal was,
2 let's start with that.  And if you take a look at
3 the tax returns and you see the information that's
4 in there and you were to come back and say, okay,
5 we see some entry on his tax returns that we
6 believe to be relevant to some aspect of the
7 claims in the case.
8          That's my proposal, is we start with
9 that.  And we would entertain, you know, just
10 having a discussion, much like we're having right
11 now, about producing additional documentation
12 supporting, you know, some -- whatever that entry
13 may be that's in there.
14          What I hear you saying is that you want
15 to question or you want to have the right to
16 question the accuracy of his tax returns.  I guess
17 I'm sort of having a little trouble as to what the
18 relevance of any of that would be.  It's a
19 credibility issue?  How is that a credibility
20 issue for David Chen?
21          MR. LEVY:  If he's lying to the IRS
22 about his information that is required to be

147

1 provided to the government, for purposes of his
2 tax returns, and maybe he's not, that would go to
3 his credibility.
4          MR. PLOTNICK:  Are you willing to
5 provide all of the tax returns and the supporting
6 documentation for the tax returns for Robert Chen,
7 for the same reason?  I mean, if you think that it
8 goes to credibility, I think it goes to
9 Robert Chen's credibility also, talking about
10 redoing or auditing somebody's tax returns.
11          MR. LEVY:  First of all, I think we've
12 produced his tax returns.
13          MR. PLOTNICK:  Right.
14          MR. LEVY:  And we've not received them
15 from David yet.
16          Your client has -- and if -- you know,
17 we can check on whether we produced those tax
18 returns or not.  But David Chen's conduct in this
19 case is unique.  We've not talked about it on the
20 record in this meet and confer yet.  I've tried to
21 avoid doing that.  I can get into it here.  And if
22 you need me to, I will.

148

1          But we're not asking for a ton from him
2 with this compromise.  I don't know why he'd be
3 unwilling to provide us with the underlying
4 documentation for his tax returns.
5          MR. PLOTNICK:  Well, it's a --
6          MR. LEVY:  Hold on.  Hold on, please.
7          MR. PLOTNICK:  Oh, I'm sorry.  Go
8 ahead.
9          MR. LEVY:  If you don't mind.  If you
10 don't mind.
11          And we have legitimate challenges -- we
12 have legitimate objections -- I'm sorry.  We have
13 real concerns about the waiver of objections to
14 the subpoena, and you're asking us to drop all
15 that in exchange for documents that you've already
16 agreed to produce.  And so, you know, you should
17 tell David and his mother that we're not going
18 to -- if they're only willing to produce the tax
19 returns and give us some wallet addresses and the
20 documents about the code, we're going to stand on
21 our arguments.  We're not --
22          MR. PLOTNICK:  I think -- well, first

149

1  of all, Josh, I'm sorry, I didn't mean to cut you
2  off.  Go ahead.
3         MR. LEVY:  That's all right.  Go ahead.
4         MR. PLOTNICK:  No, I was going to say,
5  I was dealing more so with your proposed
6  compromise in trying to understand why you would
7  want something beyond the code, the code-related
8  income.  And quite frankly, for that matter,
9  whether you really needed it.  I would say I hear
10 your clarification on that point because I don't
11 think that we discussed, specifically, the
12 reasoning behind why you wanted the backup for it.
13 Candidly, I didn't understand why you wanted it
14 before now.  Like, coming into this call, I,
15 incorrectly, was proceeding under the assumption
16 that what you were really looking for was the
17 support behind the code, the code-related income,
18 is what I'd call it.
19        MR. LEVY:  And that is part of the
20 reason.
21        MR. PLOTNICK:  Yeah, that's certainly
22 part of it.  But you're saying that it's more than

150

1  that and, you know, thank you for the
2  clarification.  And now that I have it, I'll talk
3  to him about it.
4         MR. LEVY:  Yeah.
5         MR. PLOTNICK:  Yeah.
6         MR. LEVY:  And I think there are
7  other -- sorry, Steve.  Go ahead.
8         MR. PLOTNICK:  No, I was just going to
9  say, there were some, I would say, you know, kind
10 of burden concerns and whether or not it was,
11 quite frankly, necessary or whether it was even
12 what you were looking for, which is why I went to
13 that proposal.  Yeah, like I said, I can kind of
14 go back.  I could talk to David Chen about that,
15 what it entails, and come back to you with an
16 answer, now that I, you know, understand what it
17 is and why -- and that you do, in fact, want more
18 than just the code-related income.  And I will
19 talk to him about that.
20        MR. LEVY:  Thanks.
21        So that's the subpoena on David.  And I
22 think, let's see, then we've got the -- our

151

1  request to Plaintiff, right?
2         MR. PLOTNICK:  Yes.  So we'll turn to
3  our stuff.
4         I just -- I want to be sensitive to our
5  court reporter, also.  I don't know whether -- we
6  can go off the record, if you would want.  I want
7  to see if our court reporter needs a break for
8  lunch.  I'm happy to keep going.  I think we have
9  this blocked off until 1:30 today, I think.
10        MR. LEVY:  Right.
11        MR. PLOTNICK:  I'm happy to keep going,
12 but I want to be sensitive to whether or not
13 anybody else here thinks they need a break, be it
14 for lunch or anything like that.  I don't know.
15 I'm not a big lunch eater, but...
16        Do you want to go off the record for a
17 minute?
18        MR. LEVY:  Yeah, why don't we just take
19 a five-minute break.
20        (Recess taken from 12:49 p.m. to
21 12:57 p.m.)
22

152

1         MR. LEVY:  So, Steve, going to our
2  motion.  I think the only issue left to discuss,
3  with regard to it, is Plaintiff's responsibility
4  for David's documents and whether Plaintiff is
5  withdrawing its objection.
6         MS. WHITE:  Josh, this is Madelyn.  I'm
7  going to kind of handle this stuff.
8         I mean, if you look at our documents,
9  our responses and objections to the document
10 request, we do not make that objection.  The
11 objection's in the interrogatory.  And that's an
12 important distinction, I think, that this
13 objection is in our responses to the
14 interrogatories, and we are not withdrawing it
15 there.
16        MR. LEVY:  You're not withdrawing it
17 there?
18        MS. WHITE:  Correct.
19        And we looked at the cases that were in
20 your reply, and this is -- I said this is an
21 important distinction that it's for the
22 interrogatories, not the document request.  Most

Transcript of Meet and Confer
Conducted on January 8, 2025

153

1 of those cases apply to rule -- or discuss Rule 34
2 and document requests, not interrogatories.
3        MR. LEVY:  Are you agreeing that
4 Plaintiff has control of David's documents?
5        MS. WHITE:  We did not assert that
6 objection in responding to the document request
7 that you propounded.  Am I willing to make a
8 blanket statement, right now, that she has control
9 over his documents?  No, I would not.  I think it
10 would have to be on a case-by-case basis.
11       There might be some that we would agree
12 that she has control over and others we would not
13 agree that she has control over.
14       MR. LEVY:  Of the documents that we
15 have asked for from Plaintiff that relate to
16 David, can she tell us what she has control over
17 and what she does not, in response to the document
18 request?
19       MS. WHITE:  I'm not sure I understand
20 your question.  We're not objecting to those
21 requests on that basis, so I don't understand why
22 you're asking me that.  What's the issue here?

154

1        MR. LEVY:  If we are asking, as we are,
2 for documents that are David's, in the request for
3 documents to Plaintiff, she can tell us whether
4 she has control of them when they're responsive.
5 And she should be able to tell us that in the
6 response to the RFPs.
7        MS. WHITE:  Again, I just don't
8 understand what you're asking.  This is a motion
9 to compel based on our objections.  We have not
10 objected to producing the documents on that basis.
11 So I don't -- it seems like you're asking me a new
12 question that's outside the scope of our responses
13 to the document request, and that's outside the
14 scope of the motion to compel.
15       MR. LEVY:  Okay.  She has -- she has --
16 is it -- I understand what your position is and
17 disagree with it.
18       But is she producing David's documents
19 that are responsive?
20       MS. WHITE:  Yes.  We've said that all
21 along.
22       MR. LEVY:  And the objection is not

155

1 asserted in response to the RFPs.  You have an
2 objection in response to the interrogatories and
3 you're not lifting that objection?
4        MS. WHITE:  Correct.
5        MR. LEVY:  So with regard to all the
6 RFPs where she has responsive documents that are
7 David's, she's producing it?
8        MS. WHITE:  Yes.
9        MR. LEVY:  Okay.  All right.  Then why
10 don't we move to the second set of Defendants'
11 motion to compel -- motions to compel.
12       This relates to the interrogatories
13 that we've propounded on the different -- on
14 plaintiffs from the different Defendants whom
15 Plaintiff has sued.
16       We still maintain that we have a right
17 to propound these interrogatories on behalf of
18 each defendant that's been sued in this case and
19 that we can get information from the Plaintiff
20 about its claim with regard to each individual
21 Defendants, since the claims are unique and the
22 defendants are unique, and we want to know where

156

1 matters stand from the Plaintiff's standpoint.
2        MR. MALYSHEV:  This is Alexander.  So I
3 was dealing on this with Doug.  And where we left
4 this was I asked Doug whether he would give me the
5 reply brief you guys have drafted.  He said he
6 would take it under consideration.  Sitting here
7 today, and if I missed it, I apologize, but I have
8 not received it.  Was it sent?
9        MR. LEVY:  Who is Doug?
10       MR. PLOTNICK:  I think you mean --
11       MR. MALYSHEV:  Sorry.  Kevin.
12 Kevin Crenny.
13       MR. PLOTNICK:  You mean Kevin?
14       MR. MALYSHEV:  Yes.
15       MR. LEVY:  Got it.  I don't know if
16 Kevin has sent it to you or not.  If he hasn't,
17 I'll go back to the team and talk.
18       MR. MALYSHEV:  Okay.  Sitting here
19 today, I haven't received it, so I haven't had a
20 chance to consider any arguments you made in
21 reply.  But as things stood, we were comfortable
22 with our motion, subject to whatever I see in the

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 42 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
40 (157 to 160)

157

1  reply.
2        MR. LEVY:  Well, this may be something
3  that we need to continue to talk about at our next
4  meet and confer session.
5        MR. MALYSHEV:  Okay.  That's fine.
6        MR. LEVY:  You have the motion, of
7  course.
8        MR. MALYSHEV:  I have what you filed,
9  and you have our opposition.  And your reply was
10 due the day the Court stayed the motions.  And we
11 obviously didn't have the benefit of your reply,
12 which would have addressed our arguments and
13 opposition.
14       MR. LEVY:  Right.  And of course, no
15 one filed a motion, you mean nobody served a
16 motion?
17       MR. MALYSHEV:  Served.  Apologize, yes.
18       MR. LEVY:  Got it.  All right.  We'll
19 continue this one the next session.
20       I think that's it for the motions and
21 from what we need to discuss today on the record.
22       I would propose that whatever else we

158

1  need to discuss, we just do it off the record and
2  we can use the time now, to 1:30, to do that and
3  we can continue to do that at some other time, if
4  we need more time than the half an hour.
5        MR. MALYSHEV:  So let me just suggest
6  that I put the issues on the record and then we go
7  off the record, and then we can address them on
8  the next meet and confer.  I just don't want there
9  to be a suggestion we didn't actually flag those
10 issues.  And this will be things that were in the
11 agenda we sent you yesterday.
12       MR. LEVY:  If you want to read the
13 agenda into the record, that's totally fine.
14       MR. MALYSHEV:  That's fine.  The
15 portions, big picture, I want to deal with is
16 questions concerning the discovery and protocol,
17 which includes whether or not you're agreeing to
18 include additional custodians, including OtterSec,
19 DANS, and Darrell Yao, issues concerning Robert
20 Chen's phone and clarification.  We're just really
21 trying to understand whether Robert's phone was
22 only imaged or whether it was searched for texts.

159

1  Whether text messages were extracted and searched.
2  Because there's an issue with metadata and that
3  might have to do with the fact that you used a
4  different appendix with respect to the metadata
5  you produced.
6        There was a question we had about the
7  methodology used for identifying channels that are
8  likely to have potentially responsive and relevant
9  material.  Questions about the date cutoff.  And
10 then, really, I'm just trying to understand the
11 reasoning behind why certain terms were not
12 included, including FTX and its trade name,
13 West Realm, Mercury, Equan, and OSec, which we
14 understand to be the term that was used for
15 OtterSec.  And some of the maybe more nitty-gritty
16 questions about construction of search terms, like
17 using the wildcard dissolute after T, which would
18 only capture dissolution, but not dissolve, and
19 using terms like State of Wyoming versus Wyoming.
20       Then, again, the issue we spent another
21 hour and a half on at the last meet and confer,
22 which was the methodology beyond determining what

160

1  concerns OtterSec and whether or not any documents
2  or categories of documents were not produced or
3  withheld pursuant to the objections.
4        And I already mentioned the production
5  format of the metadata.  And then there was an
6  issue with redactions, specifically with respect
7  to bank account numbers that were redacted in
8  full, as well as redactions based on relevance and
9  responsiveness in the middle of chats, which makes
10 it hard to understand context.  So, again, we just
11 wanted to talk this through and perhaps we can
12 arrive, off the record, at a solution for some of
13 these issues.
14       The other issue that is intertwined
15 with the subpoenas, we had served subpoenas on
16 Michael Best, which was the law firm that was
17 handling OtterSec, as well as Agasi, which is a
18 tax firm that we believe is handling the
19 defendants' taxes.  We wanted to understand
20 whether you were asserting privilege with respect
21 to the period of time during which David's father
22 was alive, Sam Chen was live and was a member of

Case 8:23-cv-00889-TDC    Document 106-2    Filed 02/10/25    Page 43 of 85
Transcript of Meet and Confer
Conducted on January 8, 2025
41 (161 to 164)

161

1  OtterSec, whether or not that privilege is being
2  asserted on behalf of OtterSec against the
3  Plaintiff.
4         And with respect to Agasi, we wanted to
5  understand whether you had any objections to them
6  complying with the subpoena, especially based on
7  your position that the accuracy of tax information
8  is relevant to issues of credibility, and we
9  believe that Robert Chen's credibility is uniquely
10 important to this case, especially in light of our
11 allegations in this case and with respect to how
12 he conducted the companies.
13        So I'm happy to discuss the search
14 protocol related issues when we go off the record,
15 but I did want to understand your position, on the
16 record, with respect to the Michael Best and the
17 Agasi Tax subpoenas.
18        MR. LEVY:  My position on the record is
19 that we should talk about everything you just said
20 off the record today.  And we're happy to have
21 that conversation.
22        MR. MALYSHEV:  Okay.

162

1         MR. LEVY:  And then, wanted to also
2  read our agenda that we sent to Plaintiff in
3  advance of this meet and confer so we can get our
4  questions on the record as well.  And, again, with
5  the intention that we work through these questions
6  off the record.
7         Number 1, how much more of the
8  production remains for the Plaintiff?  How much of
9  the production remains for David.  If the
10 productions are not substantially completed, on
11 what RFPs are we still waiting and why?
12        Number 2, this all goes to Discord.
13        **A.  In your latest production,**
14 **approximately, 241 of the Discord conversations**
15 **(not counting attachments) of only David's**
16 **messages are missing, all the other messages and**
17 **participants.  Please produce with the entirety of**
18 **the conversations and give a timeline for**
19 **production.**
20        **B.  What was your collection protocol**
21 **for Discord?  For example, we are not seeing any**
22 **group DMs.**

163

1         **C.  What Discord servers did you**
2  **search?**
3         **D.  How did you collect or export**
4  **Discord DM conversations?  How did you collect or**
5  **export channels?**
6         **E.  What date range did you apply to**
7  **Discord?  For instance, you have produced nothing**
8  **between David and Philip Papurt, P-A-P-U-R-T, past**
9  **August 2022, even though there were relevant**
10 **discussions between them on Discord after the**
11 **data -- after the date of August 2022.  And that**
12 **happens to be just one conversation we know about.**
13 **Most of the Discord conversations you produced**
14 **appear to be ending far earlier than we would**
15 **expect to see.  Most of them ended early to**
16 **mid-2022.**
17        **F.  There are a number of Discord**
18 **conversations between David and "closet duck," but**
19 **this individual does not appear in response to**
20 **Interrogatory Number 1.  Do you plan to amend that**
21 **answer to this individual?**
22        **Number 3, what are the Telegram**

164

1  **messages for David?**
2         **Number 4, we have seen no text**
3  **messages.  Is it correct that Plaintiff and David**
4  **have no responsive text messages?**
5         **5, what is the status of the phone**
6  **inspection?  We have not heard anything since**
7  **December 10th, when Madelyn said she expected the**
8  **phone to be shipped out today or tomorrow.  We**
9  **have not been copied on any correspondence.**
10        6, David's emails:  We received a
11 third-party production for Cloudflare showing that
12 the website ottersec.io, which hosts a collection
13 of documents related to this case, was registered
14 by someone using the email address
15 matthew.greensmith@proton.me.  Is this an email
16 address that is or was associated with David in
17 any way?  In other words, did he ever have access
18 to this email address, use it, or have messages
19 forwarded from it?
20        That concludes the agenda we sent to
21 you, that we can take up off the record with you
22 at a mutually convenient time.

Transcript of Meet and Confer
Conducted on January 8, 2025

165

1          MR. PLOTNICK:  Yeah, thanks for that,
2 Josh.  This is Steve.
3          I'm sort of happy -- look, I know
4 Rachel sent her email with those items over to us,
5 sort of later in the afternoon yesterday.  Look,
6 we do have responses for all that, which we're
7 happy to explain.  My only concern with going off
8 the record is that the Court, I think, sort of
9 made clear that they want all discovery
10 discussions to -- or at least these discovery
11 questions to be addressed on the record.  I mean,
12 I think I'm happy to go off the record.  We
13 both -- we sent our -- I also -- we sent our
14 agenda over to you later in the afternoon, or
15 early evening, even, perhaps it was, last night,
16 so --
17          MR. LEVY:  Around 7:00.
18          MR. PLOTNICK:  Yeah.
19          MR. LEVY:  We sent ours too.
20          MR. PLOTNICK:  I recognize that you're
21 probably not going to be prepared to discuss all
22 of those details today anyway.

166

1          And I take it, I'm sure there's a
2 reason why you'd prefer to have a discussion off
3 the record.  We can do that and go back on.  I
4 think most of this is probably going to need to be
5 discussed, in substance, on our next meet and
6 confer anyway, so I'm happy to go off the record
7 here and have just a high-level discussion on some
8 of this stuff.  We only have about 15 minutes left
9 today anyway.  I'm happy to do that.
10          I think we do have answers to most, if
11 not all, of the questions that you had raised
12 yesterday.  But, you know, sort of happy to go
13 over that with you, you know, at a high level off
14 the record, and we could kick some of this over
15 until the next meet and confer, sort of
16 recognizing, certainly from our end, that we sent
17 that over to you late yesterday.  So I'm sure you
18 haven't had the time to consider it all.
19          MR. LEVY:  No, we haven't.  And these,
20 unlike what had been before the Court on the
21 notices, these questions that you have, these
22 questions that we have, are not perfected

167

1 discovery disputes.  So what I'm hoping is that we
2 can talk through 95, if not a hundred percent of
3 these questions without them becoming perfected
4 discovery disputes.  And I don't know that that
5 needs to be all on the record.  That becomes very
6 expensive for the parties to do this with a court
7 reporter.
8          MR. PLOTNICK:  Yeah.  Yeah.  I'm with
9 you.  I understand.
10          MR. LEVY:  Okay.  So we can hop off the
11 record now and chat for a little bit, if you want,
12 you know, for another 15 minutes.  And then,
13 obviously, we'll be on the record to continue the
14 meet and confer in a couple days and we can also
15 schedule some time, additional time to talk off
16 the record to address both parties' questions.
17          MR. PLOTNICK:  Yep.
18          MR. LEVY:  Does that make sense?
19          MR. PLOTNICK:  That's fine with us.
20          (Off the record at 1:15 p.m.)
21
22

168

1          CERTIFICATE OF REPORTER
2
3          I, Judith E. Bellinger, the officer
4 before whom the foregoing proceedings were taken,
5 do hereby certify that the foregoing transcript is
6 a true and correct record of the proceedings; that
7 said proceedings were taken by me stenographically
8 and thereafter reduced to typewriting under my
9 supervision; and that I am neither counsel for,
10 related to, nor employed by any of the parties to
11 this case and have no interest, financial or
12 otherwise, in its outcome.
13          IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 9th day
15 of January, 2025.
16 My Commission Expires:  November 3, 2028
17
18  *Judith E. Bellinger*
19 _____
20 _____
21 E-NOTARY PUBLIC IN AND FOR
22 THE STATE OF MARYLAND

Transcript of Meet and Confer
Conducted on January 8, 2025                                            43

| A |
|---|

**ability**
58:1
**able**
42:10, 123:14,
154:5
**absolutely**
10:19, 97:9
**accept**
99:3
**acceptable**
118:4, 140:5,
142:2
**accepting**
62:12, 138:11
**access**
20:20, 108:12,
108:22, 164:17
**accident**
57:13
**accomplished**
98:16
**account**
107:16, 131:18,
131:19, 136:17,
160:7
**accountant**
91:13, 138:5
**accounting**
137:2
**accounts**
131:18, 132:5
**accuracy**
146:16, 161:7
**accurately**
23:6, 145:10
**acknowledged**
23:8
**acquired**
137:6
**across**
21:12, 79:11
**act**
26:17, 29:15,
30:4, 33:1,
55:13, 73:2,
81:10, 81:12,

81:13, 95:17,
95:18, 98:13,
99:1
**action**
23:9, 26:17,
28:10, 32:19,
33:11, 34:8,
56:21
**activity**
62:15, 80:21,
92:4, 92:12,
134:7, 134:13
**actual**
45:8, 45:19,
48:9, 69:1,
100:14
**actually**
11:7, 12:17,
15:9, 18:10,
34:14, 37:3,
37:12, 54:8,
55:9, 57:11,
77:5, 84:9,
85:10, 145:21,
158:9
**add**
43:19, 44:17,
55:11, 56:2,
57:2, 59:5,
95:6, 134:4
**addition**
61:22, 84:9,
84:20, 86:14
**additional**
17:17, 141:9,
146:11, 158:18,
167:15
**additionally**
17:19
**address**
4:8, 24:13,
92:10, 158:7,
164:14, 164:16,
164:18, 167:16
**addressed**
45:4, 157:12,
165:11
**addresses**
92:9, 135:4,

140:10, 144:5,
144:22, 148:19
**addressing**
57:9
**adequacy**
17:10
**admissible**
77:21
**admittedly**
6:9
**advance**
162:3
**adverse**
33:6
**advice**
138:6, 138:7,
138:8
**advisor**
138:6
**affirmative**
29:9
**affixed**
168:14
**after**
4:9, 6:1, 19:4,
20:14, 30:17,
33:5, 38:15,
41:9, 42:15,
59:9, 84:11,
108:12, 109:14,
111:20, 118:9,
125:18, 137:7,
137:14, 137:16,
139:21, 159:17,
163:10, 163:11
**afternoon**
165:5, 165:14
**again**
18:3, 18:11,
18:21, 20:4,
31:6, 31:17,
33:2, 36:2,
36:14, 41:3,
43:19, 45:2,
49:22, 51:2,
55:4, 60:19,
62:3, 66:1,
66:14, 67:6,

67:21, 68:2,
69:8, 69:14,
70:4, 70:6,
70:12, 71:2,
71:5, 71:9,
71:13, 72:3,
73:4, 77:6,
77:14, 78:16,
84:15, 88:4,
89:20, 90:22,
91:10, 91:13,
92:5, 95:7,
96:14, 97:4,
97:17, 97:20,
99:8, 101:2,
101:10, 101:12,
104:12, 105:13,
110:6, 113:9,
113:11, 113:20,
114:6, 114:11,
114:17, 116:15,
116:18, 119:3,
121:1, 123:9,
125:6, 127:7,
129:2, 131:12,
132:9, 133:22,
138:12, 154:7,
159:20, 160:10,
162:4
**against**
7:1, 7:7, 7:8,
15:19, 15:22,
23:13, 26:6,
33:6, 161:2
**agasi**
137:1, 160:17,
161:4, 161:17
**agenda**
158:11, 158:13,
162:2, 164:20,
165:14
**ago**
59:6
**agree**
4:17, 78:4,
98:3, 98:7,
130:22, 139:6,
139:14, 153:11,

153:13
**agreed**
4:10, 82:18,
131:17, 133:16,
135:11, 144:11,
144:18, 148:16
**agreeing**
99:8, 153:3,
158:17
**agreement**
2:7, 29:22,
33:16, 47:9,
51:5, 51:6,
65:12, 89:8,
96:12, 96:18,
112:14, 117:9
**agreements**
47:6, 63:12,
63:15, 65:11,
80:20, 83:4,
83:5, 89:6,
112:9, 112:11,
112:16, 112:20,
113:4, 113:16,
115:7, 129:17,
131:1
**ahead**
24:15, 24:16,
41:14, 46:17,
46:18, 73:16,
80:3, 88:19,
95:10, 131:6,
142:17, 143:9,
148:8, 149:2,
149:3, 150:7
**al**
1:7
**alex**
4:4, 36:22,
39:2, 40:21,
44:17, 49:2,
57:8, 82:5,
82:22, 83:15,
86:8, 87:3,
87:10
**alex's**
47:22, 87:15,
89:21, 101:3,

102:20, 123:22
**alexander**
3:4, 156:2
**alive**
160:22
**all**
5:15, 11:14,
18:15, 19:6,
20:20, 21:1,
21:20, 22:2,
23:17, 24:6,
30:1, 32:9,
35:12, 41:5,
44:6, 44:16,
44:19, 44:20,
49:7, 52:4,
52:19, 57:1,
62:4, 63:6,
63:12, 66:16,
66:20, 69:10,
70:11, 71:20,
73:1, 77:10,
77:22, 78:12,
78:18, 79:2,
79:18, 80:1,
80:5, 85:14,
91:11, 92:15,
92:17, 92:21,
93:14, 97:18,
97:19, 97:20,
98:20, 100:17,
101:2, 103:8,
104:7, 106:13,
113:15, 116:17,
119:4, 121:7,
122:6, 123:6,
125:5, 125:9,
125:15, 129:7,
130:9, 131:11,
132:17, 135:17,
135:21, 136:8,
143:15, 144:2,
147:5, 147:11,
148:14, 149:1,
149:3, 154:20,
155:5, 155:9,
157:18, 162:12,
162:16, 165:6,

165:9, 165:21,
166:11, 166:18,
167:5
**allegations**
161:11
**alleged**
12:1, 15:15,
19:16, 25:13,
26:5, 32:2,
38:17, 62:21,
81:11, 98:5
**allegedly**
63:1
**alleges**
38:4
**alleging**
81:13
**alleviate**
50:10, 125:11,
125:22
**alleviates**
128:2
**almost**
116:5
**alone**
87:6
**along**
34:17, 154:21
**already**
17:15, 47:16,
47:19, 51:1,
52:16, 52:22,
53:5, 55:4,
72:5, 74:1,
74:5, 78:17,
86:15, 91:12,
91:13, 102:15,
121:21, 122:5,
144:11, 148:15,
160:4
**also**
3:21, 5:18,
20:9, 23:5,
28:21, 29:9,
34:4, 34:12,
34:19, 41:12,
42:8, 46:12,
55:12, 56:9,

56:17, 58:3,
63:16, 65:8,
65:10, 71:14,
87:8, 89:7,
110:5, 110:11,
115:19, 117:13,
118:5, 118:7,
120:8, 120:19,
122:2, 131:8,
139:16, 140:12,
140:18, 147:9,
151:5, 162:1,
165:13, 167:14
**alternative**
27:2
**altogether**
88:11
**amend**
163:20
**among**
42:19, 143:11
**amorphously**
122:3
**amount**
8:8, 134:17
**analysis**
48:9, 48:21
**another**
14:19, 15:12,
24:14, 51:6,
71:14, 92:5,
110:3, 120:22,
129:20, 159:20,
167:12
**answer**
9:22, 26:15,
42:6, 51:2,
54:6, 54:8,
54:10, 64:7,
97:7, 112:21,
127:4, 129:16,
131:15, 135:21,
150:16, 163:21
**answered**
51:2, 52:22,
55:4
**answers**
166:10

any
7:22, 8:1, 9:8,
14:22, 15:1,
15:2, 15:5,
16:22, 17:7,
17:8, 17:11,
18:22, 20:11,
20:19, 26:6,
33:6, 34:22,
48:21, 57:18,
60:21, 65:11,
66:5, 67:11,
72:13, 72:20,
89:14, 94:20,
97:13, 106:2,
106:20, 108:1,
108:2, 112:13,
112:15, 113:1,
128:9, 140:18,
142:4, 142:12,
142:15, 143:19,
144:2, 145:5,
146:18, 156:20,
160:1, 161:5,
162:21, 164:9,
164:17, 168:10
anybody
40:12, 139:11,
151:13
anyone
75:8, 76:1
anything
5:9, 8:1,
13:17, 13:19,
13:20, 14:3,
37:8, 37:18,
40:2, 45:9,
46:2, 49:12,
54:21, 58:20,
65:5, 65:12,
66:1, 73:22,
93:1, 111:11,
116:7, 127:15,
151:14, 164:6
anyway
95:2, 103:8,
120:6, 121:3,
139:16, 144:21,

165:22, 166:6,
166:9
anywhere
19:15
apologize
75:18, 122:12,
156:7, 157:17
appeals
16:4
appear
11:19, 27:20,
163:14, 163:19
appears
19:7, 28:5,
30:22
appendix
17:6, 159:4
applies
15:17, 15:18,
97:5, 97:22,
134:1, 135:21
apply
16:7, 104:9,
104:19, 105:22,
130:15, 153:1,
163:6
appreciate
48:6, 50:16,
116:18
appropriate
26:22, 29:18,
33:9, 59:20,
78:21, 113:21,
136:22, 138:22
approximately
5:22, 162:14
april
16:4, 16:11,
138:10, 138:16
aren't
7:2, 18:6,
18:19, 46:10,
63:14, 112:18,
112:19
argue
90:11
argued
27:15

arguing
42:22, 43:1,
92:19
argument
21:17, 23:20,
24:19, 25:7,
27:21, 28:2,
28:16, 41:21,
44:7, 44:10,
44:14, 51:8,
54:22, 74:19,
76:8, 79:21,
80:10, 98:12,
143:15
arguments
21:20, 22:3,
22:4, 24:7,
24:8, 31:8,
31:18, 40:15,
41:5, 143:14,
148:21, 156:20,
157:12
arises
26:19
around
165:17
arrive
84:6, 160:12
articles
6:5
articulate
25:15, 37:12,
49:14, 49:22,
138:4
articulated
8:6, 9:4,
26:14, 49:3,
55:20
articulating
38:3, 49:10
ascertain
39:17
aside
101:13, 102:20,
120:10, 123:13,
131:16, 137:20
asked
13:12, 39:10,

41:16, 41:18,
42:3, 47:17,
48:1, 48:20,
49:4, 68:16,
79:12, 84:12,
89:5, 89:7,
97:2, 97:4,
127:9, 135:12,
153:15, 156:4
asking
14:2, 39:18,
50:21, 54:5,
78:2, 85:4,
86:13, 88:22,
91:19, 115:10,
145:17, 148:1,
148:14, 153:22,
154:1, 154:8,
154:11
asks
67:12, 89:16
aspect
126:2, 146:6
aspects
19:10, 61:5,
67:1, 100:22
assert
20:17, 153:5
asserted
31:14, 38:6,
155:1, 161:2
asserting
160:20
assertion
31:19
assess
57:3, 58:1,
76:13, 78:10
assessment
106:19
asset
17:13
assets
8:1, 9:18,
10:6, 10:21,
11:12, 11:17,
15:12, 18:5,
30:17, 30:20,

33:13, 42:10,
42:12, 56:6,
95:21
**assigned**
96:13
**associated**
140:19, 164:16
**assume**
76:7, 76:13,
76:17
**assumption**
109:18, 149:15
**attachments**
162:15
**attempting**
11:15, 30:14
**attributable**
82:10
**attributed**
85:21
**audit**
80:21
**auditing**
147:10
**audits**
5:20, 8:3, 9:7,
9:15, 9:22,
10:12, 13:20,
13:22, 18:17,
20:8, 22:18,
22:22, 27:17,
30:19, 30:21,
31:1, 35:12,
35:15, 36:12,
36:19, 40:3,
40:4, 40:8,
40:10, 40:11,
41:21, 43:5,
51:12, 60:13,
60:19, 62:6,
63:7, 64:16,
65:1, 65:9,
66:18, 67:20,
72:10, 75:4,
76:10, 76:15,
81:15, 81:16,
81:19, 81:20,
82:3, 82:4,

84:20, 85:9,
93:16, 95:13,
95:19, 105:2,
105:17, 106:5,
106:21, 114:4,
119:16, 127:13,
128:11, 130:11,
132:10, 133:15,
135:7, 137:4
**august**
163:9, 163:11
**authority**
15:7
**auto**
57:13
**automatic**
108:3
**automatically**
107:22
**available**
30:3
**avoid**
53:21, 54:1,
147:21
**award**
20:11, 30:4
**aware**
112:13
**away**
57:16

**B**

**back**
8:16, 24:12,
30:8, 41:7,
48:3, 49:6,
50:12, 50:18,
50:20, 60:11,
66:14, 69:13,
76:5, 77:14,
77:16, 79:18,
91:18, 92:1,
95:7, 97:8,
99:5, 99:21,
102:7, 103:9,
103:16, 106:13,
110:7, 110:18,
111:16, 114:12,

121:5, 123:21,
124:12, 126:4,
127:18, 128:12,
130:4, 132:9,
133:2, 133:9,
137:12, 142:10,
145:13, 145:19,
146:4, 150:14,
150:15, 156:17,
166:3
**back-and-forth**
54:10
**backup**
141:2, 141:9,
142:4, 143:2,
145:22, 149:12
**backward**
37:4
**balance**
69:9
**bank**
131:18, 131:20,
160:7
**bare**
34:9, 42:5,
54:13, 54:18,
68:1
**barrier**
39:3
**based**
15:4, 20:12,
20:14, 33:4,
62:16, 77:6,
81:5, 110:11,
154:9, 160:8,
161:6
**basically**
144:19
**basis**
11:2, 12:3,
23:18, 24:8,
28:6, 44:4,
54:15, 54:22,
142:20, 153:10,
153:21, 154:10
**bears**
13:1
**beating**
114:17, 134:6

**beauty**
102:2
**because**
5:5, 7:12, 8:4,
8:20, 9:10,
9:16, 13:7,
14:7, 21:11,
22:20, 22:21,
25:19, 26:3,
28:3, 30:13,
30:16, 33:2,
34:20, 35:7,
35:9, 35:21,
36:17, 36:22,
40:4, 42:21,
44:6, 45:12,
45:22, 49:18,
52:22, 53:19,
53:20, 53:22,
54:19, 58:7,
58:13, 60:9,
61:14, 61:16,
62:14, 67:6,
67:10, 69:16,
70:6, 70:19,
71:9, 72:1,
72:21, 80:6,
84:1, 84:12,
87:7, 88:8,
90:20, 92:18,
95:3, 97:10,
100:16, 101:2,
102:19, 106:11,
109:12, 113:19,
119:21, 120:17,
121:21, 123:9,
123:10, 123:15,
126:12, 134:8,
138:6, 149:10,
159:2
**becomes**
102:21, 167:5
**becoming**
167:3
**been**
7:20, 7:22,
8:21, 9:16,
9:17, 9:19,

Transcript of Meet and Confer
Conducted on January 8, 2025                                        47

10:13, 10:21,
12:20, 16:20,
22:16, 23:22,
31:14, 33:7,
33:14, 34:10,
34:16, 42:2,
48:16, 51:20,
72:7, 72:8,
84:16, 91:11,
91:13, 138:16,
139:15, 155:18,
164:9, 166:20
**before**
2:7, 4:11,
8:12, 8:20,
13:15, 21:7,
21:19, 23:18,
30:9, 33:3,
36:1, 36:21,
45:14, 56:11,
58:21, 59:4,
69:3, 70:11,
73:1, 74:18,
78:16, 79:3,
87:7, 91:5,
104:14, 108:19,
109:22, 111:11,
114:13, 117:3,
123:22, 129:19,
130:15, 133:10,
134:5, 139:15,
140:9, 149:14,
166:20, 168:4
**beginning**
77:15
**behalf**
3:2, 3:12,
155:17, 161:2
**behind**
27:22, 57:1,
120:12, 149:12,
149:17, 159:11
**being**
6:4, 11:13,
28:6, 42:4,
42:7, 43:14,
43:16, 44:2,
44:3, 51:7,

51:9, 53:11,
53:12, 53:13,
54:14, 54:20,
54:21, 56:7,
60:15, 65:7,
68:7, 70:15,
74:12, 88:2,
119:6, 123:8,
124:22, 126:11,
139:3, 145:16,
161:1
**believe**
5:10, 8:20,
24:4, 29:18,
32:20, 36:17,
37:5, 43:11,
44:4, 49:13,
96:7, 110:16,
146:6, 160:18,
161:9
**bellinger**
1:17, 2:8,
168:3
**belong**
21:17, 21:18,
21:19, 31:8,
83:13
**belongs**
44:5, 44:19
**benefit**
157:11
**best**
5:1, 57:16,
160:16, 161:16
**better**
8:14, 71:13,
76:11, 91:15
**between**
5:5, 57:10,
100:8, 114:8,
131:2, 163:8,
163:10, 163:18
**beyond**
6:15, 20:10,
25:12, 42:20,
47:7, 47:15,
47:19, 53:8,
54:5, 55:3,

55:14, 55:15,
55:17, 55:22,
57:19, 62:12,
63:4, 63:9,
63:20, 66:4,
70:5, 70:6,
71:17, 72:18,
73:9, 93:18,
100:17, 101:14,
102:15, 113:2,
113:18, 113:20,
114:11, 114:14,
115:4, 116:7,
117:12, 117:13,
117:19, 121:20,
122:5, 123:2,
128:22, 130:16,
137:21, 138:13,
145:5, 149:7,
159:22
**big**
151:15, 158:15
**bigger**
97:16
**bit**
8:14, 9:3,
36:1, 37:4,
62:15, 71:12,
71:13, 92:1,
102:22, 103:9,
122:5, 124:7,
124:18, 137:18,
138:1, 141:5,
167:11
**blanket**
153:8
**block**
134:7
**blockchain**
63:17, 63:18,
80:21, 92:4,
92:12
**blocked**
151:9
**bookends**
71:12
**books**
60:22, 61:20

**both**
12:10, 35:17,
39:2, 39:10,
45:11, 48:13,
56:4, 57:5,
84:7, 89:19,
102:6, 103:9,
114:13, 130:22,
133:7, 133:10,
139:5, 165:13,
167:16
**bottom**
11:15, 36:9
**breach**
22:10, 28:12,
29:20, 38:10,
38:17, 56:18
**breaches**
62:22
**breadth**
123:5
**break**
103:11, 110:4,
151:7, 151:13,
151:19
**brief**
98:7, 156:5
**brings**
30:7
**broad**
26:21, 29:17,
31:5, 33:8,
37:7, 56:3,
78:1, 121:21,
123:19, 127:16
**broader**
58:3
**broadest**
85:3
**broadly**
5:13, 66:2
**broken**
10:13, 61:2
**brother**
132:20
**burden**
6:12, 8:6,
13:7, 37:10,

37:11, 39:11,
39:21, 45:2,
45:15, 45:16,
46:1, 48:8,
48:11, 48:20,
49:3, 49:14,
49:21, 50:2,
50:5, 50:10,
81:6, 89:21,
91:8, 91:16,
113:3, 113:11,
113:14, 113:17,
114:21, 115:19,
121:20, 122:10,
123:1, 123:20,
124:2, 124:21,
124:22, 125:11,
125:22, 127:7,
139:11, 150:10
**burdensome**
37:17, 48:10,
49:11, 49:13,
49:15, 49:17,
84:14, 85:7,
90:3, 91:17,
93:7, 115:1,
115:3, 116:1,
124:1, 124:7,
124:16, 145:16
**business**
7:14, 7:15,
9:9, 9:17, 10:2,
10:7, 10:13,
10:18, 11:1,
22:21, 23:2,
27:6, 27:11,
27:16, 28:22,
29:1, 31:2,
34:3, 35:11,
35:15, 43:2,
43:6, 43:15,
51:11, 51:13,
52:8, 52:14,
55:7, 55:9,
55:10, 60:14,
63:18, 70:22,
75:4, 76:16,
76:17, 76:21,

77:5, 80:8,
80:9, 80:12,
80:13, 80:17,
80:19, 82:9,
82:11, 83:10,
84:1, 84:3,
84:4, 99:13,
99:14, 110:15,
128:9, 128:19,
135:14
**businesses**
34:11, 42:15,
43:2, 56:5,
56:13, 74:16,
74:21, 76:10,
76:20, 79:15,
133:8
**bylaws**
6:6

---
                    C
**calculated**
29:13
**calculating**
18:18
**calendar**
125:16, 125:17,
125:21
**call**
4:11, 9:6, 9:9,
34:4, 41:18,
60:1, 71:4,
71:11, 78:5,
111:10, 111:14,
111:20, 113:22,
149:14, 149:18
**called**
6:21, 110:11
**calling**
14:8
**came**
57:10, 59:22,
97:8
**can't**
11:5, 15:22,
18:7, 18:21,
26:4, 62:17,
88:1, 92:13,

112:15, 134:8,
134:11, 142:9,
145:16
**candidly**
149:13
**cannot**
72:21
**capital**
120:19
**capture**
85:14, 159:18
**capturing**
118:14
**carries**
21:12
**carter**
3:6
**case**
1:6, 8:22,
11:11, 12:11,
12:21, 14:22,
15:1, 15:19,
16:9, 18:22,
20:12, 22:6,
22:15, 22:16,
22:19, 23:7,
24:1, 26:7,
26:13, 27:1,
28:18, 30:22,
31:14, 32:1,
32:11, 34:13,
35:22, 36:5,
38:6, 39:22,
44:19, 50:1,
55:12, 56:19,
57:12, 68:3,
70:7, 71:15,
74:16, 74:20,
76:9, 79:7,
81:6, 92:19,
92:20, 100:5,
101:1, 106:7,
116:20, 123:1,
142:8, 145:12,
146:7, 147:19,
155:18, 161:10,
161:11, 164:13,
168:11

**case-by-case**
153:10
**cases**
15:6, 134:20,
152:19, 153:1
**cash**
69:9
**categories**
67:12, 88:12,
94:3, 114:2,
124:4, 160:2
**category**
126:14
**cause**
23:8, 26:16,
28:9, 32:19,
33:11, 34:8
**causes**
56:21
**ccr-nm**
1:18
**ccr-wa**
1:18
**central**
113:15, 113:16,
115:2
**certain**
100:22, 159:11
**certainly**
14:11, 17:18,
17:22, 29:14,
36:14, 36:15,
50:10, 55:14,
57:17, 58:15,
59:15, 59:16,
62:13, 67:17,
71:17, 72:12,
72:15, 72:22,
78:12, 87:2,
101:13, 114:7,
116:6, 116:19,
143:4, 149:21,
166:16
**certificate**
168:1
**certified**
2:9
**certify**
168:5

Transcript of Meet and Confer
Conducted on January 8, 2025                                          49

cetera
68:18
chain
134:7
challenges
148:11
chance
156:20
change
17:7, 17:8
channels
159:7, 163:5
charitable
141:13, 142:11,
143:3, 145:6
chat
167:11
chats
160:9
check
67:16, 67:21,
110:4, 110:19,
147:17
chen
1:7, 22:12,
33:18, 34:17,
72:7, 96:1,
96:11, 97:6,
97:10, 126:12,
127:11, 127:12,
140:1, 140:11,
143:12, 143:15,
143:19, 143:22,
146:20, 147:6,
150:14, 160:22
chen's
97:11, 140:15,
147:9, 147:18,
158:20, 161:9
circle
77:14
circuit
17:5
cite
33:2
cited
15:6, 26:20,
29:15, 31:22,

33:2
civil
7:4, 86:6
claim
7:1, 7:6, 12:2,
13:13, 14:5,
15:18, 15:21,
18:2, 18:3,
18:5, 18:7,
18:8, 18:20,
19:11, 20:20,
22:6, 22:8,
22:15, 22:16,
22:19, 23:7,
23:13, 23:15,
23:17, 23:22,
24:4, 24:22,
25:3, 25:5,
25:11, 25:14,
25:16, 25:19,
26:2, 26:3,
26:6, 26:12,
26:13, 26:14,
26:15, 26:18,
27:1, 27:4,
28:8, 28:12,
28:13, 28:17,
29:4, 29:9,
29:10, 32:2,
32:10, 32:14,
34:13, 35:8,
38:4, 42:22,
43:22, 44:12,
44:15, 46:13,
46:15, 47:1,
47:21, 51:16,
51:20, 52:6,
55:12, 55:13,
56:17, 56:18,
58:9, 61:5,
61:6, 61:18,
63:21, 70:7,
71:15, 71:16,
71:22, 72:2,
72:4, 73:2,
73:3, 74:14,
77:18, 79:17,
81:13, 81:15,

95:18, 108:1,
108:2, 108:8,
142:8, 155:20
claimant
108:1
claimed
22:2, 38:18,
38:22
claiming
14:17, 19:7,
26:2, 33:20,
40:18, 49:13,
58:13, 88:8,
91:16
claims
10:20, 11:22,
18:10, 20:15,
22:14, 24:1,
24:5, 24:21,
25:2, 25:9,
28:18, 31:14,
31:20, 35:17,
38:5, 38:9,
38:19, 46:16,
50:22, 52:4,
60:8, 79:21,
98:21, 100:5,
100:22, 109:6,
146:7, 155:21
clarification
66:15, 67:10,
83:10, 84:13,
86:9, 130:8,
149:10, 150:2,
158:20
clarify
24:17, 40:15,
63:5, 65:4,
65:18, 82:1,
88:15, 104:8,
107:15, 107:21,
122:11, 136:7,
143:7
clarifying
105:8
clarity
39:7
clattenburg
3:14, 51:17,

52:9, 52:13,
52:19, 53:4,
53:13, 53:19,
65:3, 75:12,
104:22, 105:5,
107:11, 107:14,
107:19, 108:10,
108:19, 109:4,
109:10, 109:21,
111:3, 111:6,
111:9, 111:22
clear
7:4, 23:15,
24:9, 24:10,
37:6, 48:7,
48:11, 48:18,
48:19, 54:13,
85:20, 86:10,
97:17, 122:18,
122:20, 126:5,
138:4, 139:3,
165:9
clearly
55:20, 83:17
client
22:12, 60:16,
61:1, 82:16,
85:11, 85:12,
89:14, 99:22,
102:1, 106:17,
108:7, 114:7,
114:11, 114:15,
116:1, 131:1,
147:16
clients
10:6, 39:12,
42:16, 43:9,
43:17, 51:14,
53:2, 53:3,
57:15, 61:7,
61:9, 70:13,
81:7, 82:10,
83:13, 83:19,
84:4, 86:19,
89:1, 89:17,
99:10, 99:15,
102:7, 108:1,
112:5, 112:10,

112:15, 112:18,
112:19, 114:6,
115:12, 115:15,
115:18, 115:22,
117:13, 117:14,
118:9, 129:15,
129:22, 130:5,
130:10, 130:22,
132:22, 139:5
**closely**
131:13
**closer**
45:4, 142:1
**closet**
163:18
**cloudflare**
164:11
**code**
119:20, 140:20,
140:21, 142:5,
145:2, 146:1,
148:20, 149:7,
149:17
**code-related**
149:7, 149:17,
150:18
**colleague**
17:4
**colleagues**
84:12, 93:20,
94:16, 100:12
**collect**
163:3, 163:4
**collection**
162:20, 164:12
**combine**
21:1
**come**
13:22, 66:9,
66:14, 79:3,
85:9, 85:22,
106:13, 110:7,
110:18, 111:16,
121:5, 123:17,
123:21, 124:12,
127:18, 146:4,
150:15
**comes**
59:21, 69:3,

83:22, 123:7,
133:14
**comfort**
103:11
**comfortable**
86:2, 156:21
**coming**
79:10, 124:10,
149:14
**commission**
168:16
**commit**
94:15
**communication**
126:1
**communications**
66:13, 68:19,
93:6, 94:1,
94:7, 94:12,
99:7, 99:19,
101:17, 102:13,
103:2, 121:22,
125:6, 127:9,
128:9
**companies**
5:19, 5:21,
6:1, 6:6, 6:17,
18:14, 18:21,
19:4, 20:19,
20:22, 22:1,
38:19, 45:12,
45:17, 45:18,
46:7, 47:5,
55:7, 58:16,
63:9, 63:11,
63:19, 72:2,
79:6, 80:7,
80:16, 84:16,
84:20, 85:1,
86:21, 87:19,
88:5, 88:8,
88:9, 94:10,
99:16, 132:6,
161:12
**company**
8:2, 8:19, 9:1,
15:11, 15:12,
15:13, 20:9,

22:13, 22:17,
39:20, 56:12,
72:9, 80:14,
91:10, 114:19,
118:15
**company's**
15:15, 29:22,
33:15, 115:14
**compel**
4:16, 26:21,
143:21, 154:9,
154:14, 155:11
**compiled**
91:11
**complaint**
6:22, 7:6, 7:7,
7:9, 11:5, 11:9,
11:20, 11:22,
12:3, 12:9,
12:15, 12:19,
13:1, 13:4,
13:13, 15:21,
18:12, 19:15,
19:16, 20:15,
23:9, 25:4,
25:10, 25:16,
26:14, 26:19,
28:14, 30:2,
31:20, 35:22,
39:1, 39:5,
40:19, 46:13,
47:2, 47:21,
81:11, 81:13,
82:2, 84:21,
98:6
**completed**
162:10
**completely**
87:14
**complicated**
84:18
**complying**
161:6
**component**
10:1, 10:17,
10:22, 75:3,
76:15, 140:14
**comprise**
10:22

**comprises**
76:19
**compromise**
81:17, 96:20,
98:15, 102:19,
139:6, 142:20,
143:13, 148:2,
149:6
**conceivably**
20:12
**concern**
62:10, 125:11,
165:7
**concerned**
94:7, 129:4
**concerning**
7:2, 66:13,
68:19, 69:21,
73:7, 73:20,
93:6, 94:12,
99:8, 99:20,
101:17, 102:13,
103:2, 121:22,
125:6, 126:2,
127:10, 128:9,
158:16, 158:19
**concerns**
62:13, 94:1,
123:5, 127:19,
128:2, 148:13,
150:10, 160:1
**concludes**
164:20
**conduct**
147:18
**conducted**
1:12, 2:1,
161:12
**confer**
1:11, 2:1,
7:11, 7:17,
15:7, 16:21,
57:12, 84:11,
93:20, 98:16,
102:2, 109:14,
139:21, 144:17,
147:20, 157:4,
158:8, 159:21,

162:3, 166:6,
166:15, 167:14
**conference**
24:11
**conferred**
106:17
**confers**
98:7
**confident**
62:9
**confirm**
109:13
**confused**
87:12
**confusion**
14:9, 54:19,
94:20, 104:8
**congress**
13:5, 13:7
**connection**
23:10, 75:17
**consider**
41:20, 79:20,
90:10, 95:1,
97:15, 100:9,
101:10, 101:15,
102:17, 118:5,
118:16, 118:20,
118:21, 126:22,
140:12, 141:11,
156:20, 166:18
**consideration**
17:11, 29:21,
33:16, 93:19,
94:14, 99:10,
100:11, 101:16,
156:6
**considered**
127:16
**considering**
91:6, 114:13,
138:12
**consistent**
22:11, 28:3,
86:5, 118:13
**construction**
159:16
**contention**
5:11, 14:16,

18:22
**contest**
53:7
**contested**
20:1
**context**
17:21, 160:10
**continuation**
17:3, 52:7,
52:13
**continuations**
44:11, 44:13
**continue**
23:1, 78:7,
107:4, 157:3,
157:19, 158:3,
167:13
**continued**
17:9
**continues**
22:17, 27:6,
27:12, 35:11,
71:17, 72:1
**continuing**
80:7, 80:12
**contractors**
65:12, 126:7
**contrast**
81:6
**contributions**
141:13, 145:6
**control**
12:13, 36:5,
36:13, 36:18,
37:1, 135:13,
138:21, 153:4,
153:8, 153:12,
153:13, 153:16,
154:4
**controlled**
58:8
**convenient**
164:22
**conversation**
4:20, 119:6,
132:14, 132:22,
135:10, 137:12,
161:21, 163:12

**conversations**
162:14, 162:18,
163:4, 163:13,
163:18
**conversion**
19:11, 19:12,
19:14, 19:16,
23:7, 23:9,
25:11, 25:13,
28:13, 31:21,
32:2, 38:13,
51:16, 52:2,
56:17, 73:2
**converted**
19:8, 33:14
**cooperative**
124:20
**copied**
164:9
**copies**
142:11
**corporate**
8:21
**corporation**
17:8, 17:10,
121:8
**corps**
119:10, 119:16,
119:19
**correct**
4:11, 49:1,
71:20, 82:20,
86:22, 104:3,
104:4, 130:12,
130:13, 140:21,
144:18, 152:18,
155:4, 164:3,
168:6
**correctly**
59:15, 145:10
**correspondence**
164:9
**could**
6:2, 20:11,
31:10, 34:9,
36:14, 36:16,
45:9, 56:2,
59:3, 62:17,

68:20, 71:2,
78:6, 83:15,
89:16, 90:8,
103:4, 117:8,
117:11, 117:22,
118:5, 118:16,
123:21, 124:2,
125:18, 134:21,
134:22, 137:3,
137:5, 137:8,
138:15, 150:14,
166:14
**couldn't**
9:16, 11:10
**counsel**
7:16, 168:9
**counterproposal**
101:9
**counting**
162:15
**couple**
41:8, 55:5,
63:14, 77:8,
92:1, 115:9,
134:15, 134:18,
145:20, 167:14
**course**
7:4, 7:17,
25:20, 25:22,
30:11, 62:22,
80:11, 107:13,
157:7, 157:14
**court**
1:1, 7:3, 15:2,
16:4, 21:19,
23:9, 24:9,
25:19, 26:20,
26:21, 29:14,
29:17, 29:19,
30:2, 33:8,
33:10, 34:5,
47:17, 48:19,
79:4, 143:7,
151:5, 151:7,
157:10, 165:8,
166:20, 167:6
**courts**
16:6

Transcript of Meet and Confer
Conducted on January 8, 2025

52

**cover**
71:6, 78:13
**covered**
129:11, 136:1
**covers**
100:21
**create**
48:8, 120:1
**created**
5:21, 6:5,
7:17, 8:17,
9:13, 9:21,
13:6, 14:9,
30:16, 31:1,
40:5, 54:20,
119:22
**creates**
6:12
**credibility**
145:11, 146:19,
147:3, 147:8,
147:9, 161:8,
161:9
**creditor**
18:4
**crenny**
156:12
**crr**
1:18
**csr-tx**
1:18
**current**
137:10
**custodians**
158:18
**custody**
12:13, 36:4,
36:13, 36:18,
37:1, 135:13,
138:21
**customer**
47:6, 51:6,
51:8, 60:16,
63:12, 65:11,
80:20, 82:13,
83:4, 83:5,
87:17, 112:17,
114:1, 114:2,

130:9
**customers**
10:6, 47:5,
51:5, 58:10,
63:13, 63:16,
70:13, 73:12,
79:16, 83:6,
85:12, 85:20,
86:18, 86:19,
89:7, 89:17,
112:5, 112:10,
112:11, 112:13,
114:6, 115:11,
115:15, 115:18,
117:13, 117:14,
129:15, 129:17,
129:21, 130:10
**cut**
21:6, 75:20,
106:14, 149:1
**cutoff**
159:9
**cutting**
54:9
**cv**
1:7

---
**D**
---

**dakota**
5:19, 5:21,
6:16, 18:14,
18:21, 19:3,
20:9, 20:18,
20:22, 46:7,
46:22, 47:5,
63:10, 63:19,
80:7, 80:16,
86:20, 94:10,
120:1
**damages**
18:2, 18:6,
18:8, 18:10,
18:18, 19:10,
19:12, 19:18,
22:2, 25:6,
28:11, 29:11,
29:13, 31:21,
32:7, 32:13,

34:5, 34:8,
35:2, 35:5,
35:17, 38:18,
38:22, 40:18,
55:15, 56:4,
56:10, 56:15,
56:16, 72:3
**dans**
5:6, 6:19,
6:20, 6:22, 7:1,
7:2, 7:7, 7:8,
7:11, 7:14,
7:17, 8:1, 8:2,
8:9, 8:13, 8:17,
9:3, 9:6, 9:9,
9:12, 9:18,
10:2, 10:5,
10:7, 10:14,
10:16, 10:17,
11:7, 11:13,
11:16, 11:17,
11:19, 12:12,
13:17, 13:21,
14:2, 14:7,
14:8, 17:21,
19:4, 19:6,
30:12, 30:13,
30:15, 30:16,
30:18, 31:2,
31:3, 35:13,
35:20, 36:3,
36:10, 36:13,
36:16, 37:1,
37:13, 40:5,
45:11, 49:11,
49:19, 158:19
**dans-related**
30:9
**darrell**
158:19
**data**
163:11
**date**
11:6, 11:7,
11:8, 30:22,
63:9, 78:20,
112:12, 159:9,
163:6, 163:11

**david**
127:12, 140:1,
140:11, 140:14,
143:12, 143:15,
143:19, 143:22,
144:10, 145:13,
146:20, 147:15,
147:18, 148:17,
150:14, 150:21,
153:16, 162:9,
163:8, 163:18,
164:1, 164:3,
164:16
**david's**
141:4, 145:5,
152:4, 153:4,
154:2, 154:18,
155:7, 160:21,
162:15, 164:10
**day**
57:14, 95:2,
98:5, 101:5,
157:10, 168:14
**days**
167:14
**dc**
3:19
**dead**
114:17, 134:6
**deal**
158:15
**dealing**
13:9, 13:10,
22:4, 149:5,
156:3
**deals**
100:21
**debts**
15:15
**december**
118:18, 125:18,
131:4, 164:7
**decision**
17:5
**declaratory**
22:14, 26:16,
26:17, 28:9,
29:14, 30:3,

Transcript of Meet and Confer
Conducted on January 8, 2025                    53

32:5, 32:6,
32:8, 32:9,
32:14, 32:17,
32:18, 32:22,
33:4, 33:10,
34:6, 34:7,
38:2, 38:3,
46:15, 73:3
**decree**
33:5
**dedicated**
51:13
**default**
86:4
**defendant**
36:5, 119:9,
155:18
**defendants**
1:8, 3:12,
4:10, 8:22,
12:21, 19:8,
20:1, 23:10,
23:14, 24:2,
27:13, 27:14,
27:19, 28:16,
28:20, 29:3,
29:16, 31:6,
31:11, 36:9,
41:19, 42:3,
42:21, 43:1,
44:9, 49:9,
49:12, 49:14,
49:21, 51:9,
55:10, 57:3,
64:10, 74:20,
76:9, 78:19,
91:14, 92:8,
102:10, 102:14,
103:21, 105:1,
105:14, 105:17,
112:13, 117:2,
118:4, 123:13,
124:6, 125:1,
128:2, 128:14,
135:14, 135:17,
136:8, 139:19,
140:1, 143:14,
143:20, 144:13,

155:10, 155:14,
155:21, 155:22,
160:19
**defense**
29:9, 97:5,
142:8
**defenses**
12:1, 28:20,
100:5
**defined**
6:12, 122:4
**delineated**
69:11
**demonstrate**
48:20
**denominator**
84:2, 87:4,
87:13, 101:4
**depending**
121:1
**deployed**
70:15
**depriving**
27:10
**derive**
83:12, 97:13
**derived**
43:14, 43:16,
82:11, 82:16,
140:20, 146:1
**deriving**
43:7, 43:8,
53:3, 56:8,
60:13, 61:8,
70:12, 70:14,
79:16, 83:9,
83:18
**detail**
91:15, 124:8,
141:21
**details**
91:20, 165:22
**determine**
10:15, 11:1,
30:15, 31:4,
33:10, 35:5,
38:8, 38:10,
38:13, 38:16,

41:10, 45:14,
56:5, 77:1,
77:4, 77:6,
77:9, 82:9,
92:12, 92:13,
134:11, 135:6
**determined**
23:10, 24:1,
33:7
**determining**
18:15, 74:16,
79:14, 159:22
**dicharia**
3:15
**difference**
100:7
**differences**
100:3
**different**
9:4, 21:4,
27:17, 28:21,
43:2, 47:8,
74:21, 74:22,
75:4, 76:11,
76:16, 77:2,
84:13, 85:22,
92:20, 114:2,
155:13, 155:14,
159:4
**difficult**
100:19, 101:1,
102:22
**difficulty**
29:2, 68:6,
82:8, 103:3,
113:14
**diminishes**
62:21, 71:20
**direct**
9:8, 9:17,
30:12
**directed**
44:6, 91:7,
128:14, 138:2
**directly**
23:5, 28:4,
29:5, 40:2,
45:22, 61:6,

96:3, 96:18,
97:13
**disagree**
28:7, 28:10,
28:17, 41:10,
42:8, 124:15,
154:17
**discharge**
99:10, 102:14
**discharged**
122:21
**disclosed**
112:20
**disclosure**
8:22
**discord**
162:12, 162:14,
162:21, 163:1,
163:4, 163:7,
163:10, 163:13,
163:17
**discover**
10:9, 11:15
**discovery**
10:4, 10:10,
11:3, 11:21,
12:9, 12:11,
13:10, 21:13,
22:3, 22:5,
23:4, 23:19,
24:5, 24:9,
27:22, 28:19,
29:5, 29:8,
30:7, 31:4,
31:9, 31:12,
31:13, 33:22,
35:7, 35:20,
37:8, 42:18,
58:2, 58:4,
77:19, 77:21,
78:2, 78:6,
78:21, 92:7,
92:21, 96:15,
96:16, 96:17,
97:21, 116:19,
136:11, 136:13,
144:12, 158:16,
165:9, 165:10,

167:1, 167:4
**discovery-related**
31:5
**discretion**
26:22, 29:17,
33:9
**discuss**
5:4, 85:6,
86:3, 104:1,
117:1, 129:14,
143:5, 152:2,
153:1, 157:21,
158:1, 161:13,
165:21
**discussed**
98:6, 149:11,
166:5
**discussing**
30:8, 77:16,
117:3, 130:15
**discussion**
46:6, 50:11,
69:4, 75:2,
76:8, 76:14,
77:16, 82:19,
98:4, 110:7,
128:4, 128:6,
131:9, 133:10,
134:1, 146:10,
166:2, 166:7
**discussions**
163:10, 165:10
**dismiss**
23:11
**dismissed**
22:16
**dispute**
16:18, 21:14,
23:14, 23:16,
27:14, 29:4,
31:6, 44:14,
104:2, 129:9
**disputes**
167:1, 167:4
**disputing**
24:18, 44:12
**dissolute**
159:17

**dissolution**
6:7, 19:17,
22:10, 22:20,
27:3, 27:4,
27:9, 29:19,
30:14, 33:11,
33:14, 35:10,
58:14, 114:9,
159:18
**dissolve**
22:13, 159:18
**dissolved**
6:7, 9:11,
20:14, 22:8
**distinct**
41:22, 45:1,
51:10
**distinction**
152:12, 152:21
**distributions**
34:10, 34:16,
34:22, 56:11,
72:7, 72:8,
120:20
**district**
1:1, 1:2, 16:10
**divided**
84:4
**dividing**
72:20
**division**
9:14, 31:1,
35:14
**dm**
163:4
**dms**
162:22
**document**
4:15, 4:21,
4:22, 5:10,
5:12, 5:16,
7:19, 7:21, 9:3,
14:12, 16:19,
21:1, 21:4,
36:4, 39:14,
42:3, 45:5,
47:9, 47:11,
59:17, 60:3,

60:4, 60:6,
60:7, 66:11,
67:14, 68:12,
69:11, 72:14,
72:21, 73:21,
74:13, 88:21,
90:6, 98:21,
99:11, 117:5,
124:14, 131:10,
143:17, 152:9,
152:22, 153:2,
153:6, 153:17,
154:13
**documentation**
73:11, 73:12,
86:16, 113:1,
140:18, 144:1,
145:1, 145:4,
145:7, 145:15,
146:11, 147:6,
148:4
**docusign**
65:13, 112:16,
113:13, 115:2
**doing**
10:7, 27:20,
41:17, 43:9,
43:17, 51:13,
53:2, 56:8,
60:14, 61:17,
63:19, 70:14,
74:18, 74:19,
74:22, 79:8,
80:8, 80:13,
80:16, 80:19,
84:20, 102:4,
102:5, 110:15,
114:16, 128:19,
132:3, 147:21
**dollars**
45:20, 134:19
**donated**
141:14
**donation**
143:3
**donations**
141:15, 142:11
**done**
21:7, 26:8,

26:9, 51:7,
67:2, 81:22,
84:1, 84:5,
106:19, 110:10,
115:14, 121:20,
122:5, 145:10
**double-check**
68:15, 111:13,
111:18, 120:13
**doug**
156:3, 156:4,
156:9
**down**
59:12, 69:5,
95:15, 110:18,
123:7, 123:18,
123:20, 124:18,
125:20, 126:17
**drafted**
156:5
**drakes**
16:2
**draw**
59:20
**drawing**
61:12
**drawn**
61:13
**drop**
143:14, 148:14
**duck**
163:18
**due**
157:10
**during**
9:5, 34:3,
41:17, 160:21
**duties**
33:13, 122:21
**duty**
22:11, 28:12,
29:20, 38:11,
56:18

━━━━━ E ━━━━━
**e-notary**
2:9, 168:21
**each**
51:18, 52:6,

Transcript of Meet and Confer
Conducted on January 8, 2025

55

82:16, 133:2,
155:18, 155:20
**earlier**
39:12, 39:13,
124:9, 138:18,
163:14
**early**
98:4, 163:15,
165:15
**earned**
142:5
**easiest**
136:1
**easily**
115:5, 137:6
**easy**
90:15, 136:1,
138:9
**eater**
151:15
**effect**
15:6
**effectively**
70:7
**effort**
8:8
**either**
19:13, 34:15,
37:18, 58:20,
94:2, 94:5,
96:2, 97:21,
98:11, 99:9
**electronic**
123:17
**element**
52:9, 56:16
**elements**
16:15, 16:17,
16:22, 51:21,
52:1, 52:2,
56:22, 93:7
**elephant**
85:17
**else**
5:9, 8:1,
19:15, 37:18,
40:11, 40:12,
45:6, 46:2,

47:15, 49:12,
55:18, 56:20,
57:2, 57:6,
58:20, 63:21,
64:10, 75:8,
93:1, 127:15,
139:11, 142:6,
145:17, 151:13,
157:22
**email**
103:7, 109:14,
139:20, 143:11,
164:14, 164:15,
164:18, 165:4
**emails**
164:10
**emma**
3:22
**employed**
168:10
**employee**
126:13
**employees**
10:7, 17:12,
42:14, 43:17,
51:15, 58:9,
70:15, 70:17,
74:17, 126:6
**employment**
65:12
**encompassed**
42:13
**end**
42:5, 42:7,
43:13, 44:2,
49:9, 53:11,
54:15, 54:18,
55:2, 67:9,
68:2, 95:2,
101:5, 112:10,
118:13, 118:15,
118:17, 119:5,
121:18, 122:7,
131:2, 137:14,
144:7, 166:16
**ended**
163:15
**ending**
163:14

**ends**
31:2
**enforce**
145:19
**enhanced**
6:12
**enough**
100:20, 101:6,
139:3
**entails**
150:15
**entered**
42:18
**entertain**
146:9
**entire**
27:8, 145:19
**entirely**
41:22, 76:16
**entirety**
71:7, 162:17
**entities**
12:20, 19:2,
20:14, 20:18,
23:14, 30:5,
33:21, 34:2,
34:19, 34:20,
35:9, 38:15,
41:22, 42:11,
43:5, 43:18,
44:1, 46:22,
47:10, 51:10,
53:16, 54:3,
54:16, 56:7,
57:15, 58:8,
60:12, 60:22,
61:4, 61:17,
61:20, 70:8,
74:7, 92:10,
92:11, 92:21,
112:6, 112:9,
112:12, 112:17,
119:9, 119:10,
121:8, 134:8,
135:5, 135:21
**entitle**
25:12
**entitled**
7:5, 11:21,

21:22, 22:1,
22:12, 24:2,
24:5, 24:20,
27:21, 28:10,
28:19, 31:13,
33:19, 34:19,
35:20, 56:12,
57:17, 58:11,
58:15, 67:13,
83:20, 84:22,
96:15, 96:16,
98:1, 114:20
**entitles**
14:6
**entity**
6:21, 14:8,
14:19, 14:21,
15:3, 15:19,
15:20, 30:6,
35:16, 56:6,
60:17, 81:20,
95:19, 110:11,
110:16
**entries**
61:19
**entry**
60:21, 146:5,
146:12
**equally**
35:13, 35:16,
97:22, 130:16
**equan**
159:13
**equation**
84:3
**equity**
14:21, 15:3
**equivalent**
134:17
**especially**
58:12, 161:6,
161:10
**esquire**
3:3, 3:4, 3:5,
3:13, 3:14, 3:15
**essence**
9:15, 27:8,
28:8, 28:20

essentially
10:18, 11:13,
21:21, 27:7,
30:18, 34:22,
42:2, 44:7,
85:16
est
1:14
establish
19:4, 37:5,
38:22, 40:16
established
16:6
establishing
71:4
estate
27:10, 127:12
estate's
18:16, 19:8,
20:2
et
1:7, 68:18
evaluate
43:4
evaluated
140:4
even
9:15, 16:5,
42:15, 49:22,
53:6, 66:1,
66:3, 67:8,
90:14, 94:2,
102:20, 106:4,
106:5, 117:3,
137:19, 138:11,
150:11, 163:9,
165:15
evening
165:15
ever
164:17
every
21:16, 26:12,
26:13, 85:8
everybody
103:15, 117:16
everything
41:8, 62:17,

63:15, 65:14,
67:14, 67:22,
71:6, 82:14,
86:3, 86:5,
88:5, 89:11,
89:12, 91:1,
91:2, 116:11,
161:19
evidence
37:7, 37:9,
58:5, 77:21
exactly
10:16, 29:7,
30:6, 30:16,
31:3, 35:5,
43:5, 76:12,
92:21, 103:5
example
30:21, 34:6,
34:17, 35:2,
49:18, 51:3,
66:10, 71:21,
75:2, 90:11,
97:8, 126:11,
136:17, 162:21
examples
141:20, 141:22
except
65:15
exception
15:10, 15:17,
16:1, 16:7
exceptions
112:15
exchange
134:21, 148:15
excuse
35:14, 128:13,
137:4
executed
112:8
exist
9:10, 22:17,
27:6, 27:12,
28:18, 30:13,
35:11, 106:2
existed
23:3

existence
17:9
exists
10:2, 10:16,
22:15, 24:4
expect
163:15
expectation
121:13
expected
164:7
expense
113:4
expenses
72:8
expensive
167:6
expert
29:12
expires
168:16
explain
55:19, 56:20,
84:10, 84:11,
91:15, 143:1,
165:7
explaining
76:2
explanation
28:2, 28:4
explore
57:17
exploring
29:7, 30:6
export
163:3, 163:5
extend
125:15
extended
55:17
extending
6:14, 101:14
extends
35:13, 55:14
extent
10:5, 10:20,
33:1, 34:10,
45:3, 45:13,

61:2, 85:13
extracted
159:1
extraordinary
13:7
exxon
84:19, 103:6

F

fact
9:7, 9:13,
9:20, 10:12,
11:4, 12:16,
12:18, 27:14,
30:17, 33:14,
34:2, 35:13,
51:13, 56:12,
59:9, 59:17,
60:6, 61:10,
74:8, 74:12,
76:22, 113:22,
114:2, 121:1,
150:17, 159:3
factors
17:2, 17:7,
17:16, 17:17
failing
143:16
fairly
77:22
fall
5:22, 19:17,
20:4, 63:1,
126:14
falls
114:1
far
6:19, 62:20,
145:5, 163:14
father
102:6, 160:21
federal
7:3, 26:17,
32:20, 86:6
fen
1:4
few
4:19, 11:18,

Transcript of Meet and Confer
Conducted on January 8, 2025                                    57

39:19, 41:11,
70:20, 116:17
**fiduciary**
22:11, 28:12,
29:20, 33:12,
38:10, 56:18
**field**
140:6
**figure**
85:17, 98:20,
142:18
**file**
24:2, 90:1,
108:2
**filed**
7:1, 7:7,
15:22, 18:10,
20:15, 121:9,
157:8, 157:15
**filing**
8:19, 8:21,
11:8
**final**
29:12, 71:6,
78:15
**financial**
17:22, 18:13,
19:3, 20:21,
31:19, 32:8,
32:12, 35:4,
38:1, 38:6,
38:14, 38:20,
38:21, 40:17,
46:8, 46:14,
46:21, 53:1,
54:2, 60:2,
60:3, 60:4,
60:5, 60:18,
61:3, 68:17,
72:10, 73:14,
74:7, 74:9,
77:10, 79:6,
80:5, 81:7,
83:16, 83:19,
84:18, 85:19,
86:17, 87:22,
88:7, 88:22,
89:7, 91:9,

93:5, 93:13,
101:21, 102:11,
127:10, 135:14,
138:5, 138:7,
145:7, 168:11
**financials**
52:20, 65:8,
66:2, 68:13,
94:10, 94:12,
99:6, 117:10
**find**
29:19, 89:16,
111:15, 116:2,
124:21, 132:18
**finder**
76:22
**fine**
67:17, 67:21,
99:3, 112:1,
133:5, 157:5,
158:13, 158:14,
167:19
**fine-tune**
50:9
**fine-tuned**
137:18
**finer**
138:1
**finish**
46:19
**finished**
64:2, 113:6
**firestone**
3:16, 3:22
**firm**
137:2, 160:16,
160:18
**first**
4:8, 5:3, 6:3,
13:22, 46:5,
46:8, 48:17,
64:6, 101:8,
116:4, 116:16,
125:5, 139:21,
147:11, 148:22
**five**
17:13, 98:12,
103:16

**five-minute**
103:11, 151:19
**fix**
103:4
**flag**
158:9
**flat-out**
145:21
**floor**
3:8
**flow**
69:9
**floyd**
3:22
**focus**
64:14, 66:12,
117:12
**focused**
43:20
**focusing**
74:6, 125:10
**follow**
111:19
**following**
58:16, 143:13
**foregoing**
168:4, 168:5
**forget**
101:16
**forgive**
87:13
**form**
22:18, 22:22,
31:2, 34:8,
35:12, 38:18,
61:15, 72:21,
75:5, 121:9,
139:6
**formal**
122:18
**format**
160:5
**formation**
5:14, 6:9,
39:17
**formed**
6:2, 11:8,
11:9, 55:7,

57:15
**former**
10:1, 10:6,
10:18, 10:21,
17:3, 34:2,
35:14, 56:6,
60:17, 61:1,
70:16, 83:18
**formerly**
83:13
**forth**
8:7, 77:17
**forward**
100:3
**forwarded**
164:19
**four**
17:11, 129:13
**frame**
57:5, 74:11,
113:10, 125:2
**frankly**
55:15, 149:8,
150:11
**fraudulent**
27:4
**front**
134:18
**ftx**
107:16, 108:6,
110:10, 110:14,
131:16, 131:19,
159:12
**full**
43:12, 58:2,
71:9, 72:9,
78:11, 78:13,
87:15, 114:18,
118:14, 160:8
**fully**
141:6
**fundamental**
21:14, 92:16,
135:8
**fundamentally**
10:15, 11:2,
11:16, 22:7,
35:8, 56:2,

Transcript of Meet and Confer
Conducted on January 8, 2025

58

| | | | |
|---|---|---|---|
| 120:14, 126:9, 128:18, 133:12, 140:22 | 129:5, 130:9, 131:17, 140:11, 140:17, 140:18, 141:2, 145:14, 145:22, 148:19, 156:4, 162:18 | 142:17, 143:9, 145:1, 145:5, 145:7, 145:13, 147:2, 148:7, 149:2, 149:3, 150:7, 150:14, 151:6, 151:16, 156:17, 158:6, 161:14, 165:12, 166:3, 166:6, 166:12 | 130:16, 131:7, 133:1, 134:19, 134:21, 134:22, 135:1, 140:16, 140:17, 141:5, 141:6, 142:16, 144:20, 148:17, 148:20, 149:4, 150:8, 151:8, 151:11, 152:1, 152:7, 165:7, 165:21, 166:4 |
| **funds** 134:19 | **given** 8:8, 63:1, 64:22, 68:12, 83:1, 86:2, 96:17, 115:21, 116:11, 129:21, 133:21, 135:19 | **goes** 23:5, 28:4, 29:5, 34:4, 45:22, 54:20, 56:9, 62:20, 70:5, 70:6, 71:19, 73:9, 87:7, 100:16, 108:7, 132:9, 135:9, 137:12, 145:10, 147:8, 162:12 | **good** 4:3, 4:12, 54:10, 62:8, 71:8, 102:18, 103:13, 103:17, 132:15, 132:18, 136:2 |
| **further** 4:20, 33:3, 126:17 | | | |
| **furtherance** 31:13 | | | **googled** 109:11 |
| G | **gives** 26:19, 26:21, 33:8 | | **gotten** 77:13, 131:20 |
| **gain** 20:20 | | **going** 32:20, 38:1, 47:12, 50:12, 50:20, 54:10, 60:9, 60:17, 60:22, 63:3, 63:13, 64:21, 65:14, 65:15, 67:3, 69:13, 69:22, 76:5, 76:7, 79:22, 81:15, 83:4, 87:11, 92:21, 94:4, 94:9, 95:2, 110:22, 111:16, 112:20, 113:18, 113:20, 116:6, 116:8, 116:9, 116:10, 116:17, 120:9, 121:10, 124:15, 126:10, 126:16, 128:7, 128:18, 129:16, 130:4, 130:7, 130:8, | **gould** 19:19 |
| **gave** 51:3, 145:8 | **giving** 43:12, 56:21, 56:22, 57:20, 58:1, 95:12, 140:7, 140:8 | | **governance** 5:14, 6:11, 39:18 |
| **general** 15:11, 16:1, 16:8, 21:13, 48:10, 52:5, 66:14, 68:16, 69:1, 81:1, 93:12 | **glover** 16:2 | | **government** 147:1 |
| | **go** 5:2, 6:19, 8:12, 24:14, 24:16, 39:19, 40:21, 41:14, 45:14, 46:5, 46:17, 46:18, 51:18, 59:4, 61:6, 62:20, 69:2, 71:11, 73:15, 78:3, 80:2, 81:7, 88:19, 91:18, 91:22, 92:18, 95:7, 95:10, 98:11, 103:10, 104:5, 108:2, 108:11, 108:19, 108:21, 109:22, 111:2, 111:5, 111:9, 116:1, 120:22, 124:17, 129:10, 131:6, 131:7, 133:9, 139:19, 142:10, | | **grant** 34:6, 34:7 |
| **generally** 45:16, 84:1, 84:5 | | | **granted** 33:5 |
| **generated** 57:20 | | | **great** 99:3, 103:15, 104:6, 107:8, 111:22 |
| **getting** 32:7, 48:14, 52:11, 72:9, 72:15, 79:12, 114:12, 117:10, 123:22, 125:7, 125:9, 139:16, 141:20, 144:21 | | | **greensmith@proton** 164:15 |
| | | | **gross** 87:20 |
| **give** 29:16, 32:16, 43:11, 45:9, 55:8, 70:21, 90:7, 91:20, 93:12, 93:15, 93:17, 93:19, 94:4, 94:13, 100:11, 101:6, 101:15, 101:18, 121:3, 124:7, 126:2, 127:4, | | | **grounds** 39:9, 65:7 |
| | | | **group** 16:2, 162:22 |
| | | | **grouping** 5:4 |

**guess**
10:14, 37:22,
51:2, 76:21,
101:7, 106:15,
109:2, 113:13,
114:21, 114:22,
118:13, 120:10,
123:13, 136:4,
146:16
**gut**
102:17
**guys**
156:5
**gymnastics**
116:9

**H**

**half**
158:4, 159:21
**hand**
168:14
**handful**
4:21
**handle**
152:7
**handling**
160:17, 160:18
**happens**
163:12
**happy**
44:17, 69:4,
69:12, 85:6,
128:3, 128:5,
151:8, 151:11,
161:13, 161:20,
165:3, 165:7,
165:12, 166:6,
166:9, 166:12
**hard**
39:16, 160:10
**he'll**
108:22
**head**
11:6, 32:21,
131:21
**hear**
15:5, 37:12,
59:19, 75:8,

75:10, 75:12,
75:14, 75:21,
76:1, 77:16,
80:4, 91:19,
127:15, 146:14,
149:9
**heard**
7:10, 23:17,
25:15, 37:11,
59:11, 59:14,
73:8, 144:8,
164:6
**hearing**
33:6, 36:8,
41:5, 41:6,
64:12, 73:21,
74:4, 78:18,
84:9, 94:8
**held**
15:2
**hellosign**
65:13, 112:16,
113:13, 115:3
**help**
50:10
**helpful**
21:10, 54:7,
63:21, 67:2,
100:2
**here**
4:14, 5:16,
6:5, 6:9, 6:18,
14:16, 16:6,
19:19, 22:4,
24:6, 31:4,
37:16, 44:18,
46:21, 50:4,
54:20, 57:22,
58:6, 70:4,
73:4, 77:12,
77:17, 78:10,
78:16, 82:8,
84:19, 87:16,
90:11, 92:19,
93:11, 93:15,
94:4, 100:3,
100:11, 100:15,
102:5, 102:21,

103:4, 105:16,
107:10, 111:17,
117:8, 118:1,
119:3, 121:19,
122:20, 132:5,
133:17, 142:18,
145:12, 147:21,
151:13, 153:22,
156:6, 156:18,
166:7
**here's**
19:11, 140:16
**hereby**
168:5
**hereunto**
168:13
**hey**
61:1
**high**
166:13
**high-level**
166:7
**himself**
145:8
**hits**
37:14, 37:15,
49:19, 124:14
**hold**
68:10, 80:1,
88:18, 148:6
**hop**
167:10
**hoping**
167:1
**horse**
114:18, 134:6
**hosts**
164:12
**hour**
158:4, 159:21
**hour-and-a-half**
132:14, 132:21,
133:9, 137:12
**hours**
48:4
**however**
24:22, 96:14,
98:14

**humor**
132:19
**hundred**
132:20, 167:2
**hung**
80:11
**hypothetical**
76:18

**I**

**idea**
45:9
**identifiable**
115:5
**identified**
94:4, 100:15,
115:22, 135:5
**identify**
135:13, 139:10
**identifying**
133:18, 134:10,
159:7
**ignition**
16:8
**imaged**
158:22
**imagine**
6:2, 142:9,
145:16
**immediately**
42:12
**implement**
26:22, 29:17,
33:9
**important**
152:12, 152:21,
161:10
**importantly**
42:15
**impose**
13:8, 81:6
**imposes**
39:20
**improper**
22:21, 27:9,
29:20, 33:12,
35:10, 58:13,
66:7

Transcript of Meet and Confer
Conducted on January 8, 2025                                          60

improperly
85:5
inadequate
29:21, 33:16
inasmuch
13:15
include
41:13, 72:13,
78:14, 120:19,
127:21, 158:18
included
11:10, 60:18,
89:2, 97:7,
159:12
includes
89:12, 97:6,
158:17
including
23:7, 24:21,
27:3, 42:14,
52:18, 73:10,
82:15, 158:18,
159:12
inclusive
87:22
income
126:12, 140:20,
142:5, 146:1,
149:8, 149:17,
150:18
incorporate
61:5
incorporation
6:6
incorrectly
149:15
independent
61:18, 106:16
indicate
129:16
indicated
62:14
indirect
9:20
indirectly
13:17, 13:21,
30:18, 40:3,
96:3

individual
58:8, 138:8,
155:20, 163:19,
163:21
individuals
138:20
information
18:13, 20:21,
30:10, 47:7,
60:2, 67:20,
70:5, 70:18,
71:7, 73:9,
73:19, 77:11,
78:12, 82:12,
82:13, 82:15,
82:21, 83:2,
83:9, 83:12,
83:14, 83:17,
83:19, 83:21,
84:8, 84:15,
84:22, 85:8,
85:19, 86:1,
86:17, 88:1,
88:3, 88:6,
88:22, 89:17,
92:14, 102:11,
108:14, 112:22,
118:9, 120:15,
120:18, 133:18,
137:15, 146:3,
146:22, 155:19,
161:7
input
45:3, 85:11
insight
55:6
insist
94:11
insofar
55:3, 66:8
inspection
164:6
instance
137:15, 163:7
instinctively
139:13
instructed
37:2

instrumental
17:12
insufficient
70:18, 72:12,
145:3
insufficiently
6:11
integrity
97:19, 98:11
intend
78:19
intention
162:5
interest
14:21, 15:3,
18:16, 18:17,
18:20, 19:5,
19:9, 20:2,
20:4, 20:17,
21:22, 23:1,
27:11, 30:4,
33:21, 34:14,
35:8, 38:18,
44:1, 58:13,
72:2, 88:9,
122:1, 127:10,
127:11, 168:11
interested
13:16, 37:14,
119:7, 141:18
internal
119:19
internet
75:17
interposed
41:19, 42:2,
57:4
interrogatories
4:15, 4:19,
129:10, 152:14,
152:22, 153:2,
155:2, 155:12,
155:17
interrogatory
97:1, 112:21,
129:14, 133:4,
133:17, 139:17,
152:11, 163:20

interrupt
12:7, 26:11,
41:14, 64:20,
80:1, 97:3
interrupting
54:12
interruption
13:15
intertwined
160:14
invalid
27:5
investments
16:3
invoked
15:10
involved
109:3
io
164:12
ironically
48:2
irrelevant
74:14
irrespective
99:7
irs
146:21
isolation
87:6
issue
21:12, 23:5,
31:5, 56:14,
61:15, 74:15,
92:22, 98:19,
104:13, 110:5,
122:9, 123:9,
123:14, 127:8,
127:15, 133:12,
135:18, 136:18,
145:12, 146:19,
146:20, 152:2,
153:22, 159:2,
159:20, 160:6,
160:14
issued
125:17, 125:18,
126:11

Transcript of Meet and Confer
Conducted on January 8, 2025                              61

issues
12:15, 13:4,
22:5, 23:6,
61:6, 73:1,
74:10, 78:22,
92:6, 139:15,
158:6, 158:10,
158:19, 160:13,
161:8, 161:14
items
99:17, 165:4
itself
32:6

**J**

january
1:13, 139:20,
143:11, 168:15
job
1:15
joined
42:14
josh
4:12, 9:5,
11:7, 12:6,
21:10, 21:17,
31:3, 32:17,
37:2, 41:3,
45:2, 46:19,
48:6, 49:9,
59:3, 62:1,
64:3, 71:18,
73:16, 75:14,
80:2, 81:22,
91:19, 92:1,
94:19, 95:21,
96:6, 97:3,
97:17, 100:7,
103:20, 107:12,
113:7, 116:18,
124:12, 129:20,
137:19, 149:1,
152:6, 165:2
joshua
3:13
judge
24:10, 31:22,
37:2, 37:6,

39:2, 45:13
judgment
21:18, 22:14,
24:3, 26:16,
26:17, 28:9,
29:15, 30:4,
31:10, 32:5,
32:6, 32:8,
32:9, 32:14,
32:18, 32:19,
33:1, 33:5,
33:7, 33:11,
34:7, 34:8,
38:2, 38:3,
46:15, 73:3,
78:19, 79:4
judith
1:17, 2:7,
168:3
jump
65:3, 107:11
jurisdiction
15:1, 15:2,
23:12, 25:21
justify
85:16
justin
3:15
juxtaposed
123:1

**K**

k-1
119:11, 120:18,
121:10, 121:13,
121:16
k-1s
119:7, 119:15,
120:7, 120:9,
120:12, 120:13,
120:14, 120:16,
120:18, 121:6,
125:8
keep
41:3, 52:21,
55:19, 56:3,
67:3, 74:2,
74:4, 79:11,

79:12, 111:16,
128:7, 142:16,
151:8, 151:11
kevin
41:16, 41:18,
42:3, 71:10,
78:4, 156:11,
156:12, 156:13,
156:16
kick
166:14
kicking
117:22
kind
27:7, 43:16,
50:20, 54:9,
69:2, 76:4,
80:22, 87:6,
90:10, 91:18,
91:22, 97:14,
102:17, 104:12,
106:17, 110:18,
113:19, 117:7,
117:22, 123:7,
123:17, 124:17,
127:18, 139:2,
141:10, 142:10,
150:9, 150:13,
152:7
kinds
6:8, 73:18
knowing
5:8, 13:16,
37:14, 89:22,
135:3
knowledge
57:16, 73:10
knows
47:13
kyc
108:8, 109:19,
109:22

**L**

lack
23:11, 76:11
laid
17:4, 26:4

land
117:4, 121:2
language
44:9
lanham
55:12, 73:2,
81:10, 81:12,
81:13, 95:17,
98:13, 99:1
largely
10:3, 91:7
last
4:4, 7:11,
7:16, 9:6, 15:6,
17:4, 17:20,
18:12, 39:9,
57:11, 62:14,
65:5, 71:11,
105:6, 111:10,
119:6, 134:14,
159:21, 165:15
late
166:17
later
9:13, 9:21,
14:14, 30:22,
57:21, 78:20,
105:22, 106:12,
106:13, 110:6,
165:5, 165:14
latest
162:13
latter
115:16
laugh
132:15
law
14:22, 15:1,
15:10, 18:22,
22:11, 25:14,
26:5, 32:1,
32:3, 32:11,
160:16
lawsuit
7:7, 12:5,
12:14, 14:6,
18:11
lawyer
45:20

Transcript of Meet and Confer
Conducted on January 8, 2025                                    62

lead
37:8, 58:4,
77:20
leaping
69:7, 69:13,
71:8
learned
8:19
least
4:5, 58:17,
59:11, 62:11,
87:15, 88:6,
96:1, 110:9,
110:15, 122:9,
141:1, 165:10
ledger
60:5, 81:1
ledgers
66:14, 68:17,
69:1, 93:12
ledyard
3:6
left
103:21, 152:2,
156:3, 166:8
legal
20:19
legitimate
148:11, 148:12
less
45:18, 85:7,
129:4
let's
9:9, 68:21,
75:2, 79:20,
138:3, 138:9,
142:3, 146:2,
150:22
level
141:21, 166:13
li
1:4
liabilities
15:15
liability
7:13, 14:10,
14:17, 14:18,
14:20, 15:4,

15:9, 16:1,
16:6, 16:14,
16:16, 16:18,
17:1, 17:3,
18:2, 18:3,
18:6, 18:7,
18:8, 19:1,
24:21, 25:19,
25:22, 26:2,
35:17, 38:8,
51:22, 56:4,
80:14
liable
15:14
liberty
3:7
licensed
96:2, 96:13
lieberman
19:21
lifting
155:3
light
39:21, 161:10
likely
37:8, 58:4,
77:20, 159:8
likewise
35:12
limit
88:1, 94:21,
101:1, 117:22,
118:6, 125:20,
126:17
limitation
64:18, 66:5,
72:13, 78:9,
85:1, 87:1,
94:6, 104:16,
104:20, 106:1,
136:22, 139:1
limited
80:14, 89:13,
89:14, 104:21,
131:15, 136:15
limiting
66:6, 69:21,
71:4, 73:7,

101:13, 117:11,
129:5, 130:17,
136:20, 138:19
line
59:20, 61:12,
72:20
link
111:20
liquidator
142:5
list
63:4, 90:9,
112:17
listed
107:22
listen
97:9
listening
73:17
listing
52:4, 90:7
litigation
16:9, 53:21
little
8:14, 9:3,
37:4, 71:12,
71:13, 92:1,
102:22, 103:9,
124:7, 137:18,
138:1, 141:5,
146:17, 167:11
live
160:22
llc
16:3, 16:8,
120:17
llcs
119:18, 119:22,
120:1
llp
3:16
locate
18:21
location
91:12, 113:16,
115:5
logical
4:14

long
53:5, 71:5
longer
58:11, 113:5
look
50:1, 58:16,
66:10, 79:20,
85:15, 90:8,
92:15, 94:2,
96:15, 96:19,
97:7, 99:12,
100:19, 104:11,
104:22, 105:11,
109:9, 117:11,
123:3, 124:2,
124:12, 128:16,
141:7, 142:1,
142:10, 142:21,
146:2, 152:8,
165:3, 165:5
looked
97:11, 108:18,
109:12, 111:15,
122:14, 152:19
looking
6:21, 10:15,
54:4, 59:4,
59:9, 64:11,
89:19, 91:1,
95:8, 101:10,
105:13, 114:5,
120:15, 120:21,
121:3, 121:5,
124:5, 126:22,
127:6, 128:1,
131:12, 134:13,
137:9, 141:21,
149:16, 150:12
looks
70:22, 72:11,
106:13
lost
56:16, 71:15,
71:16, 71:22,
72:4, 79:17,
79:21, 81:9,
81:10, 98:22
lot
63:1

Transcript of Meet and Confer
Conducted on January 8, 2025

63

**loud**
117:8, 118:1
**lunch**
151:8, 151:14,
151:15
**lying**
146:21

**M**

**made**
7:4, 9:5,
21:17, 23:15,
24:9, 24:10,
34:10, 34:16,
35:1, 43:21,
51:9, 58:9,
71:18, 72:7,
74:20, 76:9,
78:5, 78:17,
89:4, 92:2,
100:1, 106:19,
120:20, 122:20,
130:18, 132:1,
144:14, 145:6,
156:20, 165:9
**madelyn**
3:5, 4:4,
110:12, 152:6,
164:7
**maintain**
85:2, 90:15,
155:16
**maintaining**
25:18, 26:1,
26:12
**make**
12:8, 13:14,
21:6, 25:8,
27:21, 31:11,
54:12, 74:13,
78:19, 85:7,
86:9, 87:14,
99:1, 103:11,
108:15, 108:20,
110:1, 111:12,
111:17, 116:3,
123:19, 139:2,
152:10, 153:7,

167:18
**makes**
9:10, 160:9
**making**
4:6, 24:14,
24:18, 25:7,
26:11, 28:16,
31:17, 38:1,
40:14, 41:4
**malyshev**
3:4, 36:21,
40:20, 41:2,
44:21, 46:3,
48:6, 48:15,
48:18, 57:8,
75:10, 81:22,
82:5, 83:1,
83:8, 83:16,
87:1, 87:21,
88:16, 119:18,
156:2, 156:11,
156:14, 156:18,
157:5, 157:8,
157:17, 158:5,
158:14, 161:22
**man**
136:3
**management**
6:10, 17:9,
39:18
**many**
21:12, 37:15,
45:7, 45:10,
45:19, 50:6,
102:20
**march**
5:20, 6:16,
47:6, 65:16,
104:9, 104:20,
105:7, 105:9,
106:1, 106:14,
112:11, 113:1,
113:21, 114:4,
114:10, 114:14,
115:22, 116:12,
117:12, 117:19,
118:10, 119:5,
121:19, 122:7,

125:13, 128:21,
129:5, 130:1,
130:11, 130:16,
131:2, 136:9,
136:16, 136:21,
137:7, 137:14,
137:16, 137:21,
138:13, 138:17,
138:22
**marginal**
113:3
**marginally**
81:5, 116:8
**mark**
81:14, 81:21,
82:4, 95:20
**marks**
96:10, 97:14
**maryland**
1:2, 2:10,
16:4, 16:6,
168:22
**material**
11:20, 159:9
**matter**
26:4, 49:12,
95:2, 115:7,
137:5, 141:18,
149:8
**matters**
63:5, 70:16,
79:3, 156:1
**matthew**
164:15
**mature**
70:22, 72:10,
114:19, 118:15
**maybe**
14:5, 17:20,
88:10, 92:6,
95:17, 100:7,
105:21, 106:12,
109:7, 110:3,
111:16, 111:19,
117:21, 120:22,
121:1, 121:4,
123:20, 127:16,
147:2, 159:15

**mc**
16:9
**mean**
8:18, 9:10,
10:8, 10:9,
11:14, 12:9,
12:10, 12:19,
21:5, 21:16,
21:20, 36:1,
41:6, 44:7,
44:8, 49:8,
49:17, 50:21,
51:1, 55:18,
60:8, 64:7,
64:9, 68:21,
69:1, 69:15,
70:3, 71:22,
74:2, 74:4,
74:14, 79:14,
79:17, 79:20,
89:3, 89:4,
89:13, 90:3,
90:11, 90:18,
91:8, 94:14,
97:21, 100:16,
100:18, 106:10,
108:17, 109:8,
113:9, 113:11,
113:15, 116:15,
118:11, 118:17,
124:9, 127:15,
128:17, 134:3,
135:1, 136:16,
137:1, 141:15,
147:7, 149:1,
152:8, 156:10,
156:13, 157:15,
165:11
**meaning**
39:16, 43:5,
64:10, 86:18
**means**
94:21
**measured**
19:12, 19:18
**mechanizations**
84:19
**meet**
1:11, 2:1,

Transcript of Meet and Confer
Conducted on January 8, 2025                                    64

7:11, 7:17,
15:6, 16:21,
57:11, 58:6,
98:6, 98:15,
102:2, 109:14,
139:21, 144:17,
147:20, 157:4,
158:8, 159:21,
162:3, 166:5,
166:15, 167:14
**member**
160:22
**members**
56:11, 120:17
**mention**
7:8, 18:14,
20:10, 38:15,
40:8, 46:9,
47:1, 53:22,
54:3, 59:13,
59:17, 61:13,
62:10, 62:11,
63:9, 64:16,
64:19, 65:2,
65:15, 66:7,
72:16, 72:19,
72:22, 74:13
**mentioned**
8:18, 11:5,
12:8, 12:18,
12:22, 25:11,
32:5, 33:20,
34:3, 36:15,
62:8, 71:3,
71:10, 72:5,
73:1, 81:10,
87:3, 87:10,
91:4, 92:3,
95:12, 99:1,
100:18, 101:3,
110:9, 132:11,
160:4
**mentioning**
61:9, 70:1
**mentions**
65:6, 65:10,
65:17, 65:19,
66:1, 72:14

**mercury**
131:18, 131:20,
159:13
**mere**
17:2, 44:11,
52:7, 52:13,
59:16
**merging**
89:18
**merited**
6:17
**merits**
23:15, 23:16,
24:18, 28:2,
28:5, 28:17,
29:4, 31:7,
44:6, 44:12,
57:5, 77:17,
77:18, 79:2,
92:18, 92:20
**merits-based**
21:20, 22:3,
24:7, 24:19,
25:7, 31:8,
31:17, 40:14,
41:4, 41:20,
92:22
**messages**
159:1, 162:16,
164:1, 164:3,
164:4, 164:18
**met**
8:5
**metadata**
159:2, 159:4,
160:5
**methodology**
159:7, 159:22
**michael**
160:16, 161:16
**mid**
163:16
**middle**
160:9
**might**
21:17, 21:18,
21:19, 37:3,
42:10, 128:3,

129:4, 141:19,
153:11, 159:3
**million**
49:19, 124:14,
134:19
**mind**
40:22, 48:9,
75:17, 148:9,
148:10
**minimum**
34:5, 34:9,
42:5, 54:13,
54:18, 68:2
**minute**
151:17
**minutes**
98:12, 166:8,
167:12
**misconduct**
15:16
**misheard**
88:10, 95:17
**misremembering**
120:2
**missed**
95:8, 98:12,
156:7
**missing**
85:17, 162:16
**moment**
59:6
**money**
139:6, 141:14,
142:4
**months**
6:1, 53:6,
53:8, 55:5,
70:20, 77:9,
116:5, 116:17,
134:15
**more**
11:17, 42:15,
45:20, 50:4,
50:9, 56:1,
66:2, 70:1,
70:21, 84:12,
88:15, 88:17,
91:18, 102:22,

103:10, 114:19,
118:15, 122:12,
123:8, 124:7,
124:18, 124:19,
127:15, 127:19,
131:13, 137:18,
138:13, 143:1,
149:5, 149:22,
150:17, 158:4,
159:15, 162:7
**morning**
4:3, 4:13
**mossbrook**
19:21
**most**
41:17, 55:13,
64:1, 68:8,
152:22, 163:13,
163:15, 166:4,
166:10
**mostly**
129:10
**mother**
102:6, 148:17
**motion**
4:9, 4:16,
21:18, 23:11,
23:12, 24:3,
25:20, 26:20,
26:21, 31:10,
31:11, 78:19,
103:10, 103:22,
129:9, 136:5,
139:19, 139:22,
152:2, 154:8,
154:14, 155:11,
156:22, 157:6,
157:15, 157:16
**motions**
4:10, 155:11,
157:10, 157:20
**motors**
16:8
**move**
107:3, 119:1,
129:19, 143:21,
155:10
**moved**
57:3

Transcript of Meet and Confer
Conducted on January 8, 2025                                    65

**moves**
36:21
**moving**
112:3
**much**
51:12, 53:2,
61:8, 62:2,
74:18, 77:2,
79:16, 82:9,
82:15, 83:9,
83:12, 83:17,
84:1, 84:3,
84:4, 85:21,
145:17, 146:10,
162:7, 162:8
**mull**
94:16
**multiple**
29:15, 65:5,
72:5, 74:8,
79:12
**muse**
3:16, 3:22
**mutually**
164:22
**myself**
36:2, 70:4,
73:4, 78:16,
118:14

---
                    N
---

**name**
61:9, 159:12
**named**
85:2, 93:14
**names**
83:5
**narrow**
123:19, 123:20,
124:2, 124:18
**narrowing**
50:1, 69:5
**nature**
50:5, 60:15,
91:15, 134:11
**ndas**
63:10
**necessarily**
42:13, 55:17,

60:3, 89:12,
96:8, 116:19,
117:16
**necessary**
20:3, 33:4,
43:13, 48:5,
150:11
**need**
6:14, 8:6,
14:12, 17:16,
18:9, 19:2,
19:5, 19:9,
33:2, 36:6,
36:17, 38:7,
38:9, 38:12,
38:14, 38:21,
40:9, 41:8,
41:9, 42:9,
44:17, 46:12,
47:14, 47:15,
47:20, 52:16,
53:5, 53:8,
54:5, 55:3,
61:11, 63:2,
63:5, 63:21,
63:22, 64:7,
67:16, 73:19,
78:10, 78:11,
78:12, 80:18,
80:19, 80:20,
81:1, 82:11,
82:15, 83:8,
83:16, 83:22,
84:7, 85:15,
85:20, 86:1,
88:6, 88:13,
88:15, 88:17,
91:17, 102:12,
104:1, 114:8,
117:16, 120:11,
121:15, 124:22,
129:1, 136:18,
138:14, 139:10,
141:9, 141:15,
142:7, 142:9,
142:22, 143:2,
147:22, 151:13,
157:3, 157:21,

158:1, 158:4,
166:4
**needed**
7:12, 47:18,
129:13, 141:17,
149:9
**needs**
39:22, 45:14,
81:5, 108:11,
108:21, 151:7,
167:5
**neither**
168:9
**never**
20:1
**new**
3:9, 14:3,
14:21, 15:3,
15:12, 16:11,
19:2, 33:21,
34:19, 35:9,
35:16, 42:11,
42:14, 43:18,
56:7, 56:13,
60:12, 60:21,
61:4, 61:17,
61:20, 76:20,
154:11
**newly**
55:7, 57:15
**next**
47:3, 103:22,
131:7, 157:3,
157:19, 158:8,
166:5, 166:15
**night**
165:15
**nitty-gritty**
159:15
**nobody**
157:15
**none**
53:13, 112:17
**nonparty**
12:17
**notarial**
168:14
**note**
111:17

**notes**
59:5, 59:9,
59:12, 95:8,
95:16
**nothing**
97:9, 106:20,
163:7
**notice**
33:6
**notices**
166:21
**notwithstanding**
106:7
**november**
168:16
**number**
5:8, 5:13,
5:17, 7:19,
8:11, 16:9,
45:8, 45:17,
53:10, 66:12,
66:17, 67:11,
67:15, 68:1,
68:12, 69:11,
84:17, 86:16,
86:22, 87:16,
87:18, 90:6,
90:14, 91:1,
91:2, 101:11,
117:5, 117:11,
121:2, 128:16,
129:18, 134:18,
144:5, 162:7,
162:12, 163:17,
163:20, 163:22,
164:2
**numbers**
48:9, 78:15,
160:7
**numerator**
84:2, 87:4,
87:13, 101:4
**nw**
3:17
**ny**
3:9

---
                    O
---

**objected**
154:10

objecting
36:9, 153:20
objection
31:9, 41:19,
42:4, 42:6,
43:20, 44:5,
44:19, 45:6,
46:11, 48:11,
53:11, 53:17,
54:16, 54:17,
55:1, 57:4,
67:8, 68:3,
68:7, 92:17,
104:15, 106:6,
106:8, 144:16,
152:5, 152:10,
152:13, 153:6,
154:22, 155:2,
155:3
objection's
152:11
objections
6:13, 8:7,
39:14, 41:6,
42:1, 44:10,
143:16, 148:12,
148:13, 152:9,
154:9, 160:3,
161:5
obligated
96:8, 98:1
obligation
91:14
obligations
86:6, 99:11,
102:14
observation
13:14
obtain
32:12
obtaining
14:20, 19:1,
78:1
obviously
6:20, 34:13,
49:5, 63:5,
69:16, 86:10,
145:11, 157:11,

167:13
occurred
19:17, 19:18,
57:13, 62:22
ochsner
19:20
october
114:9
offer
81:17, 98:15,
99:9, 143:13
officer
168:3
oh
59:7, 95:15,
119:15, 148:7
okay
21:9, 26:11,
32:20, 36:20,
37:21, 47:12,
52:14, 59:1,
60:13, 64:21,
65:4, 65:6,
65:7, 65:18,
73:6, 80:4,
83:1, 83:8,
88:18, 93:3,
95:9, 97:14,
101:19, 103:17,
104:6, 106:10,
107:2, 111:8,
112:2, 112:3,
113:6, 118:21,
120:5, 127:2,
128:7, 129:2,
129:7, 132:2,
133:13, 133:15,
135:22, 136:4,
139:18, 146:4,
154:15, 155:9,
156:18, 157:5,
161:22, 167:10
once
86:19
one
11:19, 14:19,
17:7, 18:10,
21:12, 30:2,

30:8, 34:8,
35:1, 35:2,
40:22, 42:1,
51:3, 51:5,
53:10, 59:6,
66:12, 68:11,
82:12, 83:10,
85:12, 86:16,
86:22, 87:16,
91:12, 92:6,
95:6, 102:5,
107:11, 107:14,
107:21, 108:3,
109:17, 111:17,
113:15, 115:10,
116:22, 117:10,
117:21, 118:13,
122:8, 122:12,
124:1, 125:4,
127:17, 128:15,
129:4, 129:14,
129:21, 130:16,
136:1, 136:14,
136:15, 136:17,
137:9, 144:14,
157:15, 157:19,
163:12
ones
6:20, 52:3,
53:22, 105:11
only
4:19, 5:5,
15:17, 15:18,
25:9, 45:13,
55:16, 81:11,
81:20, 82:3,
84:5, 84:17,
93:4, 94:22,
95:19, 97:16,
100:19, 103:2,
104:18, 105:7,
105:8, 108:13,
114:14, 116:20,
118:9, 120:17,
121:22, 129:12,
135:19, 138:3,
145:2, 145:22,
148:18, 152:2,

158:22, 159:18,
162:15, 165:7,
166:8
open
117:2
opened
105:11
operating
29:22, 33:15
operation
71:10, 84:17
operational
43:12
operations
39:6, 78:14
opine
25:21
opportunities
122:2, 122:19,
128:10
opposed
100:15
opposition
157:9, 157:13
optimistic
47:14
option
90:10
order
5:1, 25:20,
37:22, 39:6,
64:6
organization
5:14, 6:10,
39:17
original
24:10
originally
144:16
osec
159:13
other
7:21, 9:20,
23:6, 23:20,
25:14, 38:5,
38:7, 38:15,
42:12, 46:15,
54:2, 66:22,

77:12, 94:1,
95:6, 99:5,
117:15, 121:12,
125:22, 132:6,
133:2, 134:22,
135:4, 136:19,
137:8, 139:14,
141:19, 141:22,
142:20, 143:11,
150:7, 158:3,
160:14, 162:16,
164:17
**others**
28:13, 129:3,
144:3, 153:12
**otherwise**
9:2, 86:3,
145:18, 168:12
**otter**
5:20, 8:3, 9:7,
9:15, 9:22,
10:12, 13:20,
13:21, 18:17,
20:8, 22:18,
22:22, 27:17,
30:19, 30:21,
31:1, 35:15,
36:12, 36:19,
40:3, 40:4,
40:7, 40:10,
40:11, 41:21,
43:5, 51:12,
60:12, 60:19,
62:6, 63:7,
63:22, 64:16,
65:1, 65:9,
66:18, 67:20,
72:10, 75:3,
76:10, 76:15,
81:14, 81:16,
81:18, 81:20,
82:3, 82:4,
85:9, 93:16,
95:12, 95:18,
105:2, 105:17,
106:5, 106:21,
114:3, 119:15,
127:13, 128:11,

130:10, 132:10,
133:15, 135:7,
137:4
**ottersec's**
107:16
**out**
17:4, 23:6,
26:4, 41:12,
41:16, 58:9,
61:2, 62:20,
62:21, 71:19,
75:17, 85:17,
89:5, 98:20,
116:3, 117:8,
118:1, 126:1,
126:12, 134:9,
134:19, 142:18,
164:8
**outcome**
168:12
**outside**
154:12, 154:13
**outweighed**
113:3
**outweighs**
8:7
**over**
36:1, 61:15,
77:17, 79:18,
94:16, 113:20,
118:1, 133:9,
153:9, 153:12,
153:13, 153:16,
165:4, 165:14,
166:13, 166:14,
166:17
**overall**
87:2, 87:19,
99:15, 118:12
**overbreadth**
128:5
**overbroad**
129:1
**overlap**
5:5, 88:2,
100:17, 100:19,
101:2, 114:6,
116:5, 116:17,

116:21, 117:19,
126:14, 126:17,
127:1, 130:6,
130:17
**overlapping**
85:13, 86:1,
86:18, 87:17,
89:1, 99:13,
99:14, 118:9,
126:6, 131:1
**overlaps**
88:7
**overly**
87:21
**owed**
33:13
**owned**
9:6, 36:3
**owner**
34:18
**owners**
120:16, 120:17
**ownership**
17:8, 18:16,
19:2, 122:1,
127:10

| P |
| --- |

**p&l**
60:4, 68:17,
80:18, 81:2,
83:22, 93:13
**p-a-p-u-r-t**
163:8
**page**
16:3, 16:10,
19:22
**pages**
1:16
**paid**
33:17
**panel**
17:5
**papers**
15:5, 16:21,
26:21, 27:15,
29:16, 33:3,
39:13

**papurt**
163:8
**paralegal**
3:22
**parent**
8:2
**part**
6:13, 7:13,
7:14, 12:4,
22:13, 26:16,
28:9, 28:11,
28:12, 28:13,
29:12, 31:3,
31:9, 32:22,
36:6, 39:11,
54:19, 56:15,
56:17, 64:1,
67:6, 68:4,
75:16, 76:8,
85:16, 96:16,
115:16, 144:14,
144:15, 149:19,
149:22
**participants**
162:17
**particular**
21:12, 60:6,
60:16, 72:1,
89:15, 91:1,
96:17, 127:7
**particularly**
37:13, 39:21,
74:6, 90:2
**parties**
7:5, 12:10,
12:11, 13:8,
39:3, 136:19,
145:8, 167:6,
167:16, 168:10
**party**
11:10, 12:16,
13:2, 13:9,
15:3, 33:6,
35:21, 39:7,
47:17, 144:11
**past**
70:10, 91:3,
163:8

Transcript of Meet and Confer
Conducted on January 8, 2025

68

**payroll**
69:9
**pd**
19:20, 19:21
**pencils**
110:18
**people**
135:13
**percent**
19:5, 19:8,
20:2, 20:17,
34:14, 34:15,
34:18, 44:1,
56:14, 76:19,
76:20, 84:6,
84:7, 132:20,
167:2
**percentage**
34:16, 43:13,
43:15, 56:13
**perfect**
71:21
**perfected**
166:22, 167:3
**perhaps**
9:16, 42:10,
45:4, 57:8,
60:4, 83:11,
84:10, 96:22,
160:11, 165:15
**period**
6:3, 40:6,
44:5, 49:8,
53:5, 57:10,
57:19, 57:21,
58:7, 58:11,
71:4, 78:13,
82:18, 104:9,
106:2, 106:20,
113:5, 113:11,
118:10, 123:2,
123:14, 160:21
**periods**
17:18, 62:20,
82:17, 137:8
**perpetuity**
38:19, 78:7
**personal**
23:11, 25:21

**personally**
36:17, 96:6,
96:12
**perspective**
55:15, 64:17
**philip**
163:8
**phone**
158:20, 158:21,
164:5, 164:8
**pick**
90:9
**picking**
103:21
**picture**
55:8, 58:2,
72:6, 72:10,
88:7, 97:16,
114:18, 158:15
**piece**
83:14, 83:21,
85:8
**pieces**
82:12, 83:9,
84:8
**pin**
121:4, 127:17
**place**
4:14, 31:8,
116:20
**plain**
44:8
**plainly**
33:3
**plaintiff**
1:5, 3:2, 4:20,
7:1, 7:16, 7:18,
8:5, 12:21,
13:11, 13:16,
13:18, 14:6,
14:7, 14:9,
15:7, 15:21,
16:12, 20:11,
25:12, 26:1,
32:12, 39:8,
59:2, 119:6,
127:12, 132:7,
140:5, 144:14,

145:14, 151:1,
152:4, 153:4,
153:15, 154:3,
155:15, 155:19,
161:3, 162:2,
162:8, 164:3
**plaintiff's**
4:9, 4:16, 5:4,
13:11, 15:5,
62:13, 62:16,
103:22, 129:9,
152:3, 156:1
**plaintiffs**
11:21, 16:20,
155:14
**plan**
163:20
**planning**
138:8
**plans**
122:19, 128:9
**pleaded**
26:19, 27:2,
30:1, 84:21
**please**
15:8, 32:14,
47:18, 51:17,
51:21, 88:15,
148:6, 162:17
**point**
8:4, 9:2, 9:5,
9:12, 12:8,
19:19, 21:2,
21:14, 24:14,
25:13, 40:22,
41:1, 41:12,
41:15, 45:1,
46:3, 52:6,
54:5, 56:9,
57:7, 60:1,
61:4, 61:10,
61:22, 67:18,
69:8, 69:13,
70:10, 71:8,
71:14, 72:19,
73:5, 77:1,
77:15, 78:5,
80:12, 87:4,

87:7, 88:3,
88:14, 88:16,
89:5, 89:21,
91:5, 92:6,
92:16, 94:5,
94:22, 95:6,
95:11, 97:11,
97:12, 97:16,
101:4, 102:19,
102:20, 103:2,
106:12, 110:4,
113:2, 113:11,
116:18, 120:12,
122:12, 123:22,
127:7, 127:20,
133:11, 135:8,
137:17, 137:22,
138:3, 138:19,
139:17, 143:3,
149:10
**pointed**
23:6
**points**
30:8, 43:20,
78:17, 92:1
**portion**
10:12, 35:15
**portions**
158:15
**posed**
48:16
**posing**
50:4
**position**
8:14, 9:3,
21:11, 24:6,
29:3, 31:15,
35:9, 36:11,
58:17, 59:16,
62:13, 62:16,
80:10, 82:8,
85:18, 86:4,
88:4, 90:22,
137:22, 138:12,
154:16, 161:7,
161:15, 161:18
**positions**
133:11

possession
12:13, 13:3,
36:4, 36:13,
36:18, 37:1,
135:13, 137:3,
137:6, 137:7,
138:2, 138:17,
138:20
possible
37:1, 77:9,
87:22, 114:7
possibly
39:4
post
42:16
posted
63:22
potential
123:5
potentially
49:20, 159:8
practical
43:3
precisely
9:13, 10:8
predecessor
15:11, 15:14,
15:19, 15:20,
17:12, 80:13
predicated
26:6, 38:5
prefer
166:2
prejudice
143:14
prepare
144:4, 145:9
prepared
143:21, 165:21
prepose
141:7
present
3:21
presumably
60:20
presupposes
23:21
pretty
90:1, 103:6

previous
34:4, 41:17,
59:22, 71:3,
111:14, 144:15
principal
69:21, 73:7
principle
85:10
prior
26:15, 82:10,
111:14, 113:22,
114:4, 144:17
private
8:18, 9:1,
45:17, 45:18,
84:16
privilege
160:20, 161:1
probably
5:1, 75:22,
102:18, 108:17,
110:6, 127:14,
165:21, 166:4
problem
64:17, 75:19
procedure
7:4, 86:7
proceeding
149:15
proceedings
168:4, 168:6,
168:7
process
29:8, 108:8,
108:22, 109:3,
109:19, 109:22,
111:1
produce
29:5, 37:17,
58:3, 81:18,
83:11, 85:8,
86:4, 88:12,
90:2, 94:9,
99:19, 101:20,
102:12, 115:4,
122:6, 132:8,
144:9, 144:11,
144:18, 148:16,

148:18, 162:17
produced
8:4, 36:6,
38:21, 46:10,
47:16, 47:19,
53:15, 65:8,
73:22, 74:12,
80:15, 82:13,
86:15, 91:3,
102:15, 112:8,
119:4, 121:17,
128:20, 138:14,
138:15, 147:12,
147:17, 159:5,
160:2, 163:7,
163:13
produces
143:22
producing
25:8, 27:22,
53:14, 53:22,
59:21, 88:5,
104:17, 113:4,
115:7, 121:20,
122:18, 131:1,
132:8, 146:11,
154:10, 154:18,
155:7
production
6:15, 36:7,
36:10, 102:11,
130:19, 132:1,
160:4, 162:8,
162:9, 162:13,
162:19, 164:11
productions
162:10
productive
4:5, 86:11,
98:16
professional
2:8
profits
55:13, 56:16,
71:15, 71:16,
71:22, 72:4,
79:17, 79:21,
81:9, 81:10,

82:16, 87:19,
98:22, 99:15
progress
4:6
proper
33:4, 44:4,
44:18, 92:17
properly
22:8
property
19:13, 19:14
proportionate
39:22
proposal
87:16, 95:10,
99:2, 99:5,
100:1, 101:20,
102:5, 118:12,
130:2, 139:22,
140:4, 140:9,
143:8, 144:7,
144:20, 145:21,
146:1, 146:8,
150:13
proposals
132:22
propose
85:14, 133:2,
140:16, 157:22
proposed
71:11, 96:19,
101:8, 149:5
proposing
78:8, 86:13,
88:11
propositions
14:22
propound
155:17
propounded
153:7, 155:13
protocol
106:11, 110:5,
123:12, 127:20,
158:16, 161:14,
162:20
provide
84:14, 88:3,

Transcript of Meet and Confer
Conducted on January 8, 2025                                     70

92:9, 143:19,
147:5, 148:3
**provided**
91:12, 91:13,
147:1
**provides**
38:4
**providing**
70:17
**proving**
24:20, 80:6
**public**
2:9, 63:17,
92:4, 168:21
**publicly**
63:22
**pulling**
126:12
**punching**
36:22
**purchased**
95:22, 96:11,
96:12, 96:18
**purchaser**
18:5
**purpose**
17:13, 27:8,
27:10
**purposes**
18:18, 23:12,
32:3, 32:13,
73:20, 76:7,
76:14, 76:18,
82:19, 119:19,
147:1
**pursuant**
2:7, 160:3
**pursue**
96:16
**put**
44:9, 49:8,
50:4, 68:22,
78:9, 79:18,
110:18, 121:4,
127:17, 158:6
**putting**
56:3, 89:3

**Q**

**quantify**
48:4

**question**
9:22, 10:14,
12:12, 13:1,
25:22, 29:6,
29:11, 34:1,
34:4, 35:19,
36:12, 42:19,
44:3, 45:7,
48:1, 48:14,
49:4, 49:16,
50:3, 50:21,
50:22, 52:22,
54:7, 54:8,
54:11, 54:21,
56:10, 60:9,
61:18, 67:17,
67:22, 68:9,
68:22, 69:13,
69:17, 73:6,
74:15, 76:22,
79:13, 79:14,
87:8, 90:19,
91:7, 97:1,
98:10, 105:6,
105:21, 106:11,
106:15, 107:15,
114:14, 114:22,
115:19, 116:16,
126:18, 126:19,
128:18, 130:21,
133:6, 136:12,
136:18, 137:20,
138:2, 146:15,
146:16, 153:20,
154:12, 159:6
**questioning**
96:5, 97:18
**questions**
66:22, 75:1,
107:16, 123:11,
127:19, 158:16,
159:9, 159:16,
162:4, 162:5,
165:11, 166:11,
166:21, 166:22,
167:3, 167:16
**quick**
50:13, 50:15

**quickbooks**
90:1
**quite**
48:22, 55:15,
55:20, 122:5,
149:8, 150:11

**R**

**rachel**
3:14, 57:11,
65:21, 67:5,
67:19, 68:10,
165:4
**raise**
143:16
**raised**
28:21, 98:19,
166:11
**raises**
44:3, 68:9
**raising**
21:3
**ran**
37:14, 124:13
**range**
163:6
**rarely**
15:10
**rather**
52:4, 54:8,
100:10
**rc**
5:19, 18:16,
20:7, 22:18,
22:22, 27:17,
35:12, 41:21,
43:6, 51:12,
60:12, 60:19,
62:7, 63:7,
64:15, 65:1,
65:9, 66:17,
67:20, 72:11,
75:3, 76:10,
76:15, 81:16,
85:9, 93:16,
96:3, 105:1,
105:17, 106:4,
106:21, 114:4,

119:16, 127:12,
128:10, 130:10,
132:10, 133:14,
135:7, 137:4
**reach**
25:21, 117:8
**reaction**
102:17
**read**
143:8, 158:12,
162:2
**ready**
48:22
**real**
50:13, 148:13
**realizing**
59:8
**really**
8:20, 10:15,
12:12, 22:7,
40:14, 43:3,
50:3, 57:1,
57:6, 72:12,
78:2, 86:10,
92:18, 120:16,
123:16, 123:17,
127:19, 128:17,
133:6, 141:17,
149:9, 149:16,
158:20, 159:10
**realm**
110:12, 110:13,
110:16, 159:13
**realtime**
2:9
**reason**
10:4, 13:5,
35:6, 49:16,
68:5, 95:20,
126:5, 141:12,
147:7, 149:20,
166:2
**reasonable**
33:5
**reasonably**
78:10
**reasoning**
57:1, 149:12,

159:11
**reasons**
11:14, 30:1,
35:3, 35:18,
41:11, 42:20,
44:16, 70:11,
91:4, 100:17,
101:3
**reassess**
57:4
**recall**
11:5, 112:15,
119:6
**recapitulating**
87:14
**receipts**
141:15, 142:11
**receive**
20:12, 86:16
**received**
42:6, 147:14,
156:8, 156:19,
164:10
**recess**
103:18, 151:20
**recognize**
165:20
**recognized**
57:21
**recognizing**
124:20, 166:16
**record**
48:7, 48:12,
54:13, 65:18,
82:6, 127:9,
143:7, 143:8,
147:20, 151:6,
151:16, 157:21,
158:1, 158:6,
158:7, 158:13,
160:12, 161:14,
161:16, 161:18,
161:20, 162:4,
162:6, 164:21,
165:8, 165:11,
165:12, 166:3,
166:6, 166:14,
167:5, 167:11,

167:13, 167:16,
167:20, 168:6
**records**
17:22, 31:19,
32:8, 32:13,
35:4, 38:1,
38:7, 38:14,
38:20, 38:21,
40:17, 41:9,
41:13, 46:8,
46:14, 46:22,
47:2, 60:22,
61:20, 62:4,
69:9, 73:14,
74:9, 79:6,
80:6, 89:20,
91:9, 93:5,
101:21, 135:14
**recover**
18:4
**redacted**
160:7
**redactions**
160:6, 160:8
**redoing**
147:10
**reduce**
50:2
**reduced**
168:8
**referenced**
35:22
**referred**
132:6
**reflected**
63:14, 112:19
**refused**
92:8, 143:19
**regard**
5:12, 37:21,
39:14, 40:13,
47:22, 59:1,
62:4, 81:12,
98:17, 99:2,
99:6, 139:7,
152:3, 155:5,
155:20
**regarding**
86:17, 139:22,

143:12
**regardless**
65:9, 65:17
**regards**
14:12
**register**
108:1
**registered**
2:8, 164:13
**reiterate**
71:14, 90:22
**relate**
10:20, 52:1,
52:3, 60:8,
137:8, 153:15
**related**
6:21, 7:12,
22:7, 30:15,
110:5, 115:16,
161:14, 164:13,
168:10
**relatedly**
51:8
**relates**
35:16, 155:12
**relation**
104:17
**relative**
122:22
**relevance**
10:10, 28:4,
37:3, 37:5,
37:7, 39:4,
39:8, 41:6,
44:14, 46:11,
53:7, 62:21,
65:7, 71:19,
113:3, 115:20,
137:13, 141:1,
146:18, 160:8
**relevant**
7:3, 7:5, 7:12,
10:11, 11:22,
12:14, 13:3,
13:12, 16:13,
16:15, 16:17,
16:22, 17:16,
18:1, 18:7,

18:9, 18:11,
18:15, 18:19,
19:10, 23:21,
24:20, 25:2,
25:4, 25:6,
25:9, 25:17,
26:3, 31:20,
32:2, 32:9,
32:13, 34:1,
39:5, 40:6,
40:18, 46:10,
46:14, 47:2,
47:21, 49:20,
51:1, 51:15,
51:19, 53:21,
55:21, 55:22,
56:18, 57:18,
58:5, 59:14,
61:18, 69:20,
70:10, 72:22,
77:19, 79:7,
79:13, 80:6,
81:3, 81:4,
81:5, 81:15,
98:22, 100:5,
116:8, 122:22,
137:21, 142:7,
142:13, 145:12,
146:6, 159:8,
161:8, 163:9
**relied**
144:3, 145:8
**relief**
33:4, 33:19,
34:7, 141:16
**relying**
51:22, 52:3
**remain**
6:11
**remaining**
99:11
**remains**
104:21, 162:8,
162:9
**remedies**
30:2
**remedy**
20:20, 26:22,

29:18, 32:6,
32:18, 33:9
**remember**
73:13, 107:17
**removed**
85:5
**reorganization**
6:10
**repeat**
36:2, 83:15
**repeating**
70:4, 73:4,
75:18, 78:16
**reply**
152:20, 156:5,
156:21, 157:1,
157:9, 157:11
**report**
29:13
**reported**
1:17
**reporter**
2:8, 2:9,
151:5, 151:7,
167:7, 168:1
**reports**
63:22, 80:21
**repository**
113:16, 115:2,
116:2
**request**
4:15, 5:6, 5:9,
5:10, 5:12,
5:16, 7:19,
13:11, 16:19,
20:5, 30:15,
37:22, 42:3,
46:6, 47:9,
47:11, 50:9,
66:11, 66:17,
66:21, 67:11,
67:14, 68:12,
69:11, 73:14,
79:5, 83:20,
84:13, 89:16,
90:6, 92:7,
94:22, 104:1,
108:15, 112:4,

115:17, 117:5,
126:5, 128:1,
128:15, 131:10,
133:18, 135:16,
136:12, 144:14,
151:1, 152:10,
152:22, 153:6,
153:18, 154:2,
154:13
**requested**
46:9, 77:11,
93:18, 101:11
**requesting**
25:1, 39:6,
40:17, 47:17
**requests**
4:21, 4:22,
5:13, 7:21,
14:13, 21:2,
21:4, 21:13,
25:1, 32:3,
39:9, 39:15,
39:16, 45:11,
50:2, 52:18,
64:8, 66:3,
73:21, 77:12,
88:13, 88:21,
89:4, 93:7,
98:21, 99:12,
119:4, 119:12,
121:18, 122:15,
123:6, 128:12,
143:17, 143:18,
144:12, 153:2,
153:21
**require**
4:20, 122:4,
123:1
**required**
21:3, 99:19,
111:1, 111:4,
146:22
**requirement**
6:15
**requires**
58:3, 85:11
**resolve**
100:3, 123:14,

129:3, 139:17
**resolved**
9:19
**respect**
9:12, 10:5,
23:16, 28:19,
35:17, 36:11,
37:13, 42:18,
49:2, 57:5,
58:7, 83:20,
84:13, 85:1,
106:4, 159:4,
160:6, 160:20,
161:4, 161:11,
161:16
**respectfully**
31:17, 47:16,
68:15, 79:1,
85:18
**respective**
133:11
**respond**
21:7, 58:21,
62:1
**responded**
23:18, 49:3
**responding**
153:6
**response**
16:19, 20:5,
21:16, 42:22,
45:11, 47:8,
48:14, 67:5,
86:14, 104:17,
105:1, 122:17,
128:1, 128:16,
132:8, 135:19,
137:10, 138:20,
144:11, 153:17,
154:6, 155:1,
155:2, 163:19
**responses**
104:10, 104:15,
152:9, 152:13,
154:12, 165:6
**responsibility**
152:3
**responsible**
15:14

**responsive**
5:15, 5:18,
6:17, 7:19,
7:21, 20:7,
20:8, 20:9,
39:20, 49:20,
62:4, 62:6,
63:7, 64:8,
66:17, 66:21,
67:14, 68:1,
90:5, 90:13,
91:2, 101:21,
105:2, 105:6,
105:14, 105:18,
106:20, 118:8,
121:17, 122:6,
124:10, 124:11,
128:21, 143:20,
154:4, 154:19,
155:6, 159:8,
164:4
**responsiveness**
66:6, 160:9
**restate**
58:19, 74:3
**retained**
138:9, 138:16
**retrieve**
108:6
**retrieved**
115:6
**return**
19:13, 60:5,
81:18, 95:13,
97:12
**returns**
68:17, 91:11,
93:13, 120:3,
140:8, 140:15,
140:17, 140:19,
141:4, 141:8,
142:3, 142:6,
144:1, 144:2,
144:4, 144:9,
145:1, 145:5,
145:16, 146:3,
146:5, 146:16,
147:2, 147:5,

Transcript of Meet and Confer
Conducted on January 8, 2025

73

147:6, 147:10,
147:12, 147:18,
148:4, 148:19
**revenue**
43:7, 43:8,
43:14, 43:15,
53:2, 56:8,
56:9, 57:20,
60:13, 61:2,
61:8, 70:13,
70:14, 79:16,
83:18, 87:20,
97:13, 99:15,
119:19
**revenues**
85:4
**revert**
145:18
**review**
45:10, 45:21
**reviewed**
106:18, 141:6
**reviewing**
113:4
**rfp**
83:6, 83:7,
112:4, 134:1,
139:7
**rfps**
5:4, 129:8,
137:13, 144:15,
154:6, 155:1,
155:6, 162:11
**rights**
33:7, 127:11
**risk**
70:4, 73:4
**robert**
22:12, 33:13,
33:18, 34:17,
72:7, 85:5,
96:1, 96:11,
97:6, 97:10,
97:11, 108:7,
126:12, 127:11,
147:6, 147:9,
158:19, 161:9
**robert's**
158:21

**roll**
136:3
**rolls**
92:16
**rpr**
1:18
**rub**
19:11
**rule**
13:6, 15:11,
15:13, 15:18,
16:2, 36:15,
153:1
**rules**
7:3, 32:20,
86:6
**run**
49:18, 72:9
**running**
37:15, 69:4

**S**

**said**
8:17, 18:12,
24:19, 31:9,
39:2, 41:9,
52:12, 53:21,
55:10, 56:10,
57:14, 58:12,
59:6, 59:11,
64:12, 64:15,
64:22, 65:4,
67:5, 69:3,
70:5, 70:11,
73:19, 74:5,
74:6, 74:8,
74:18, 75:18,
75:22, 78:15,
79:10, 79:11,
79:14, 79:18,
83:3, 87:16,
94:22, 95:18,
97:9, 98:22,
100:16, 107:19,
108:7, 113:22,
124:9, 133:6,
134:5, 138:16,
141:20, 142:10,

143:2, 150:13,
152:20, 154:20,
156:5, 161:19,
164:7, 168:7
**sake**
75:2
**sale**
17:14
**sam**
127:11, 160:22
**same**
7:14, 7:15,
22:21, 27:15,
28:22, 30:5,
35:18, 43:1,
51:11, 51:13,
51:14, 52:8,
52:14, 55:10,
60:14, 60:15,
74:22, 76:21,
77:3, 79:13,
80:8, 80:13,
80:17, 80:19,
104:7, 104:15,
105:19, 108:16,
110:1, 110:20,
111:12, 116:4,
118:8, 131:11,
133:3, 133:12,
133:22, 135:2,
135:10, 144:14,
147:7
**sand**
59:20, 61:12
**satisfactory**
86:16
**satisfied**
117:9, 143:18
**satisfy**
88:13
**save**
139:5
**say**
7:10, 16:13,
22:9, 37:11,
49:18, 51:19,
52:2, 53:20,
57:6, 60:3,

60:22, 64:6,
65:22, 66:10,
67:19, 70:12,
73:8, 75:2,
79:19, 80:5,
82:22, 89:9,
90:9, 94:9,
94:11, 96:6,
98:14, 100:9,
100:19, 101:18,
104:14, 106:7,
115:16, 117:3,
120:9, 124:12,
126:2, 126:10,
126:12, 126:13,
130:7, 136:15,
136:16, 141:12,
142:3, 145:21,
146:4, 149:4,
149:9, 150:9
**saying**
14:19, 21:21,
28:1, 41:4,
41:7, 47:10,
51:4, 52:15,
52:21, 55:19,
59:5, 64:6,
66:10, 66:15,
66:16, 67:1,
73:18, 74:4,
79:11, 81:19,
84:14, 88:14,
94:2, 101:10,
101:16, 104:19,
105:7, 105:22,
106:1, 106:16,
108:11, 109:19,
111:7, 119:15,
124:1, 124:6,
131:21, 132:4,
139:5, 143:11,
144:21, 146:14,
149:22
**says**
33:3, 96:12,
105:1, 105:16,
105:19
**schedule**
167:15

Transcript of Meet and Confer
Conducted on January 8, 2025                                    74

scope
50:2, 50:9,
77:22, 113:10,
125:3, 154:12,
154:14
seal
168:14
search
6:15, 8:9,
37:14, 45:9,
49:11, 62:3,
85:14, 102:22,
110:10, 123:2,
123:7, 123:8,
123:12, 123:15,
123:18, 124:13,
127:14, 128:13,
159:16, 161:13,
163:2
searched
62:6, 62:7,
158:22, 159:1
searches
49:18, 65:22,
69:4, 106:14,
106:16, 124:3,
124:10, 124:11,
127:22
second
13:14, 51:18,
64:14, 83:14,
83:21, 87:11,
107:12, 108:5,
140:9, 140:13,
155:10
secondly
81:9
security
5:20, 18:16,
20:7, 22:18,
22:22, 27:17,
35:12, 41:21,
43:6, 60:12,
60:19, 62:7,
63:8, 65:1,
65:9, 66:18,
67:20, 72:11,
75:3, 76:10,

76:15, 81:16,
93:16, 96:4,
105:2, 105:17,
106:5, 106:21,
114:4, 119:16,
127:13, 128:10,
130:10, 132:10,
133:15, 135:7,
137:4
security's
51:12
see
6:14, 8:3, 8:5,
14:5, 30:12,
42:10, 42:16,
42:17, 43:13,
58:11, 58:15,
76:4, 80:18,
80:20, 86:10,
87:6, 102:19,
105:16, 111:15,
121:13, 126:6,
128:22, 134:8,
134:16, 134:21,
134:22, 138:3,
141:8, 142:6,
145:14, 146:3,
146:5, 150:22,
151:7, 156:22,
163:15
seeing
40:16, 43:4,
77:5, 133:7,
162:21
seek
14:6, 28:19,
33:19, 34:9
seeking
11:2, 18:1,
18:13, 23:4,
31:18, 32:1,
33:22, 35:3,
35:6, 39:8,
42:20, 59:2,
69:18, 70:9,
73:22, 98:21,
100:4, 136:13,
140:22

seeks
71:16, 93:4
seem
81:11
seemed
17:19
seems
115:4, 116:7,
154:11
seen
14:22, 15:1,
15:4, 15:8,
34:21, 60:20,
164:2
self-incriminato-
ry
48:2
selling
17:10
sells
15:11
send
15:8, 32:15,
111:20
sense
9:10, 85:3,
103:11, 139:2,
167:18
sensitive
151:4, 151:12
sent
40:11, 139:20,
143:10, 156:8,
156:16, 158:11,
162:2, 164:20,
165:4, 165:13,
165:19, 166:16
sentence
49:9
separate
20:14, 20:18,
41:22, 51:10,
74:10, 89:15
separately
32:22, 42:19
serious
93:19, 94:14,
101:15

serve
36:14, 36:16
served
12:11, 140:1,
157:15, 157:17,
160:15
servers
163:1
service
60:15
services
60:16, 114:3,
114:8
session
4:4, 15:7,
139:21, 157:4,
157:19
set
8:7, 155:10,
168:13
setting
101:12, 102:20,
120:10, 123:13,
131:16, 137:20
several
53:6, 53:7
shall
119:1
shape
72:20, 75:5
share
49:1, 85:4
sheets
69:9
shielded
11:13
shipped
164:8
shires
110:12, 110:13,
110:16
shot
57:9
should
5:3, 23:1,
23:3, 34:14,
45:4, 47:12,
47:13, 47:17,

Transcript of Meet and Confer
Conducted on January 8, 2025                                     75

53:18, 54:17,
55:1, 68:3,
72:15, 72:20,
78:8, 80:6,
83:11, 86:4,
88:4, 91:2,
91:3, 92:19,
111:4, 136:4,
136:13, 136:15,
148:16, 154:5,
161:19
**shouldn't**
138:14
**show**
13:19, 16:14,
17:17, 37:9,
40:10, 54:3,
63:2, 80:15,
81:2, 99:13,
99:16, 99:20,
100:10, 112:5,
112:11, 115:11,
115:17, 116:17
**showing**
18:20, 32:13,
85:22, 164:11
**shown**
16:20, 55:16,
144:3
**shows**
32:12, 83:17
**side**
72:3, 117:1
**sides**
12:10, 133:7
**signature-1apgj**
168:18
**signed**
65:11, 96:2,
112:14, 112:16
**significant**
121:19
**similar**
135:1, 135:2
**simms**
24:10, 31:22,
37:6, 45:13
**simple**
90:1

**simply**
14:7, 49:17,
61:11, 66:6,
79:7
**since**
125:8, 155:21,
164:6
**single**
21:17, 57:14,
58:8, 85:8
**site**
108:8
**sitting**
57:22, 156:6,
156:18
**six**
6:1, 116:5
**six-month**
6:3
**small**
43:10, 70:19,
77:7
**snapshot**
43:10, 70:19,
77:7
**snapshot-in-time**
57:12
**solution**
160:12
**some**
22:1, 28:10,
31:2, 42:10,
62:10, 68:5,
75:4, 76:14,
89:22, 104:7,
106:19, 107:16,
109:19, 109:21,
110:8, 110:9,
111:14, 112:14,
116:9, 123:4,
123:10, 127:4,
127:18, 127:21,
128:12, 128:13,
129:3, 129:5,
134:20, 138:13,
139:14, 141:13,
141:19, 141:22,
146:5, 146:6,

146:12, 148:19,
150:9, 153:11,
158:3, 159:15,
160:12, 166:7,
166:14, 167:15
**somebody**
45:4, 45:6,
137:3, 138:15
**somebody's**
147:10
**somehow**
108:22
**someone**
138:5, 164:14
**something**
14:11, 45:3,
57:10, 65:15,
67:16, 69:22,
93:18, 107:20,
110:4, 111:2,
117:2, 118:4,
118:5, 118:16,
118:20, 120:2,
123:21, 138:9,
141:9, 141:17,
141:19, 142:6,
142:22, 143:3,
149:7, 157:2
**somewhat**
117:4
**soon**
59:10
**sorry**
12:7, 17:8,
21:1, 40:20,
41:14, 45:17,
59:4, 59:8,
64:20, 73:15,
80:2, 87:9,
95:7, 97:3,
99:14, 105:12,
142:16, 148:7,
148:12, 149:1,
150:7, 156:11
**sought**
6:4, 6:9, 10:4,
12:9, 28:11,
102:11, 138:7,

138:8
**sounds**
31:18, 48:22,
103:17, 108:17,
113:12, 126:20
**south**
5:19, 5:21,
6:16, 18:14,
18:21, 19:3,
20:9, 20:18,
20:22, 46:7,
46:22, 47:5,
63:10, 63:19,
80:7, 80:16,
86:20, 94:10,
120:1
**southern**
16:10
**speaking**
4:13, 5:13,
45:6
**speaks**
97:1
**special**
16:4
**specific**
8:6, 25:1,
46:13, 47:1,
66:11, 67:12,
89:14, 91:20,
93:14, 94:3,
104:12, 134:4
**specifically**
12:18, 12:22,
13:6, 41:18,
42:21, 46:21,
47:15, 47:20,
52:4, 60:2,
61:1, 61:7,
69:2, 74:12,
77:13, 125:10,
149:11, 160:6
**specificity**
49:15
**specifics**
52:6
**specifies**
82:2

specify
39:12, 47:18,
51:21, 52:2
spend
45:20
spent
159:20
spoke
59:10
spun
35:15
st
3:8, 105:7,
105:9, 125:18
stand
148:20, 156:1
standard
10:10, 37:6,
57:18, 58:6,
77:18, 78:1
standing
68:6
standpoint
4:6, 145:4,
156:1
start
4:14, 68:21,
78:10, 141:7,
142:3, 142:21,
146:2, 146:8
starting
88:3, 88:14,
88:16
state
2:10, 39:7,
159:19, 168:22
stated
23:13, 28:8,
37:2, 38:5,
43:22, 58:18,
98:7, 132:4,
132:5
statement
8:22, 42:9,
60:4, 71:19,
153:8
statements
60:18, 63:11,

68:17, 68:18,
69:10, 93:13,
107:20, 108:6,
108:12, 109:1
states
1:1
status
164:5
statute
32:17, 33:18,
38:3
stay
8:13, 118:13
stayed
157:10
stenographically
1:17, 168:7
step
8:16, 41:7,
60:10
stephen
3:3
steve
4:4, 4:10,
4:13, 11:18,
21:3, 24:13,
31:16, 36:21,
37:21, 40:20,
44:22, 47:4,
50:13, 57:14,
67:2, 68:11,
75:9, 75:10,
75:13, 76:1,
79:22, 87:9,
98:3, 103:22,
105:1, 107:17,
118:10, 121:7,
122:11, 124:12,
150:7, 152:1,
165:2
steve's
46:6
sticking
143:2
still
6:11, 7:13,
7:14, 22:15,
25:18, 26:1,

40:16, 53:19,
53:20, 67:7,
67:8, 104:15,
104:20, 155:16,
162:11
stood
156:21
stop
5:16, 51:17,
51:18, 57:19,
66:19, 119:14
straightforward
116:3
strategies
122:2, 122:19,
128:10
street
3:7, 3:17
strike
90:2
stringently
16:7
stripped
27:7
stuff
53:15, 65:19,
67:6, 97:10,
131:20, 131:22,
151:3, 152:7,
166:8
subject
4:16, 52:18,
62:15, 92:7,
156:22
subpoena
36:15, 36:16,
139:12, 139:22,
140:1, 143:12,
145:19, 148:14,
150:21, 161:6
subpoenaed
12:20
subpoenas
136:19, 160:15,
161:17
subsequent
119:10
subsidiary
9:7, 9:14,

9:21, 36:3, 40:3
substance
28:5, 28:15,
61:15, 61:16,
166:5
substantial
134:17
substantially
162:10
successor
7:13, 14:8,
14:10, 14:17,
14:18, 14:20,
15:4, 15:9,
16:1, 16:5,
16:14, 16:16,
16:17, 16:22,
17:3, 17:13,
18:2, 18:3,
18:6, 18:8,
19:1, 23:13,
24:21, 25:18,
25:22, 26:1,
27:2, 28:8,
30:5, 51:16,
51:19, 51:21,
80:14
successors
44:11, 44:13,
54:17, 70:8,
85:3
sued
155:15, 155:18
sufficient
55:8, 61:14,
70:21, 87:6,
99:13, 99:16,
99:20, 100:10,
101:6, 112:5,
115:11, 115:17,
116:13
suggest
17:19, 158:5
suggesting
17:20, 78:7
suggestion
158:9
suite
3:18

Transcript of Meet and Confer
Conducted on January 8, 2025

77

**summary**
21:18, 22:9,
24:3, 31:10,
78:18, 79:4
**supervision**
168:9
**support**
14:22, 20:19,
141:10, 149:17
**supporting**
140:14, 140:18,
144:1, 145:1,
145:4, 145:15,
146:12, 147:5
**supports**
18:22
**suppose**
114:1, 130:9
**supposed**
102:5
**sure**
21:6, 24:16,
25:8, 26:11,
30:11, 59:7,
83:16, 86:9,
87:14, 87:18,
94:5, 108:20,
110:1, 111:12,
119:2, 122:13,
134:9, 153:19,
166:1, 166:17
**switch**
16:8

**T**

**tag-teaming**
45:5
**take**
4:22, 8:8,
8:16, 41:7,
45:21, 49:5,
57:9, 60:10,
64:5, 69:12,
82:14, 82:18,
96:8, 98:1,
99:21, 102:7,
103:9, 103:11,
110:3, 116:9,

126:1, 126:4,
130:4, 141:7,
142:1, 142:21,
146:2, 151:18,
156:6, 164:21,
166:1
**taken**
103:18, 151:20,
168:4, 168:7
**taking**
37:22, 62:17
**talk**
37:3, 71:3,
82:17, 93:22,
99:22, 100:12,
102:7, 107:4,
123:11, 150:2,
150:14, 150:19,
156:17, 157:3,
160:11, 161:19,
167:2, 167:15
**talked**
31:21, 101:22,
102:1, 147:19
**talking**
37:16, 41:17,
45:15, 45:16,
45:19, 45:21,
46:20, 47:3,
48:8, 55:6,
59:10, 59:18,
62:19, 70:20,
71:21, 73:13,
74:9, 77:8,
78:21, 79:2,
79:3, 79:4,
83:6, 84:15,
84:18, 84:19,
88:2, 91:9,
93:3, 94:6,
94:19, 95:16,
99:4, 99:6,
102:21, 103:1,
104:13, 108:16,
108:21, 109:6,
111:12, 111:19,
111:21, 116:15,
116:22, 123:4,

123:16, 125:3,
125:4, 125:16,
137:19, 139:7,
139:15, 147:9
**tangible**
50:5
**targeted**
124:3, 127:22
**tax**
60:5, 68:17,
81:18, 91:11,
93:13, 95:13,
97:12, 120:3,
137:1, 138:7,
140:7, 140:15,
140:17, 140:19,
141:4, 141:8,
142:3, 142:6,
144:1, 144:2,
144:4, 144:9,
145:1, 145:5,
145:15, 146:3,
146:5, 146:16,
147:2, 147:5,
147:6, 147:10,
147:12, 147:17,
148:4, 148:18,
160:18, 161:7,
161:17
**taxed**
121:8
**taxes**
145:9, 160:19
**team**
48:2, 87:16,
101:22, 156:17
**telegram**
163:22
**tell**
14:3, 25:3,
51:22, 52:9,
53:1, 59:15,
88:20, 90:19,
109:12, 109:16,
148:17, 153:16,
154:3, 154:5
**telling**
82:3, 93:11,

96:4, 96:7,
97:19
**term**
14:10, 76:11,
123:9, 124:13,
127:14, 159:14
**terms**
6:9, 35:19,
39:6, 39:15,
39:20, 50:5,
63:16, 85:14,
108:5, 121:21,
122:4, 123:7,
123:15, 123:18,
125:2, 128:13,
129:1, 140:13,
159:11, 159:16,
159:19
**terrific**
4:7, 4:18
**text**
159:1, 164:2,
164:4
**texts**
158:22
**th**
3:17, 164:7
**thank**
21:9, 44:21,
45:2, 50:19,
65:20, 66:8,
83:10, 103:8,
105:10, 150:1
**thanks**
4:4, 11:18,
31:16, 62:2,
64:4, 86:8,
103:15, 112:1,
150:20, 165:1
**themselves**
101:12, 115:8,
115:18
**theories**
27:2
**theory**
78:6
**thereafter**
168:8

Transcript of Meet and Confer
Conducted on January 8, 2025

78

**thing**
48:4, 51:5,
51:6, 59:6,
64:14, 69:10,
80:22, 101:4,
108:3, 108:4,
108:5, 116:22,
128:5, 131:17
**things**
6:5, 11:19,
34:9, 39:17,
41:8, 56:11,
68:11, 72:3,
72:5, 74:3,
75:1, 86:12,
87:10, 90:12,
99:21, 107:21,
115:10, 120:19,
120:20, 121:2,
122:1, 124:18,
133:7, 141:22,
142:10, 143:12,
145:20, 156:21,
158:10
**thinking**
100:8, 100:9,
117:8, 118:1,
128:12
**thinks**
151:13
**third**
8:9, 12:10,
12:11, 13:2,
13:8, 46:17,
46:20, 136:19,
140:10, 145:8
**third-party**
164:11
**thirdly**
14:4
**thought**
24:9, 73:20,
87:15, 88:11,
119:22, 127:4,
129:6
**three**
17:10, 45:17,
45:18, 84:16,

112:6, 112:9,
112:12, 119:4,
121:7, 121:18,
129:12, 135:21,
136:8
**through**
5:20, 8:19,
8:21, 11:13,
30:15, 35:8,
39:19, 42:5,
42:7, 43:12,
44:2, 47:6,
49:19, 51:14,
51:18, 53:11,
54:1, 54:15,
54:18, 55:2,
55:16, 65:13,
65:16, 67:8,
68:2, 71:7,
72:9, 81:7,
96:3, 97:13,
103:10, 104:5,
105:7, 105:9,
108:11, 108:19,
108:21, 109:13,
109:22, 111:2,
111:5, 111:9,
111:11, 112:10,
112:12, 112:22,
113:1, 115:21,
115:22, 116:12,
116:15, 118:10,
118:11, 118:12,
118:15, 118:17,
119:5, 121:18,
122:7, 123:2,
123:14, 124:19,
125:12, 125:15,
128:21, 130:1,
130:11, 136:8,
160:11, 162:5,
167:2
**throughout**
42:2
**tied**
44:14, 72:13,
117:4
**time**
6:3, 6:4, 8:8,

9:11, 17:18,
19:14, 30:13,
30:22, 40:6,
45:20, 48:17,
49:5, 57:5,
57:9, 58:7,
58:11, 62:15,
62:19, 62:20,
65:5, 70:20,
71:4, 71:19,
74:10, 74:11,
77:7, 82:17,
82:18, 91:18,
97:11, 97:12,
103:13, 104:9,
105:6, 106:2,
106:20, 111:14,
113:5, 113:10,
114:8, 116:4,
123:2, 123:13,
125:2, 137:8,
158:2, 158:3,
158:4, 160:21,
164:22, 166:18,
167:15
**timeline**
162:18
**timely**
143:16
**times**
29:16, 65:5,
72:5, 74:8,
79:12
**today**
22:18, 23:3,
27:6, 27:12,
35:11, 39:12,
57:22, 71:1,
93:11, 98:5,
136:1, 151:9,
156:7, 156:19,
157:21, 161:20,
164:8, 165:22,
166:9
**today's**
111:20
**together**
5:5, 21:2,

89:4, 89:18,
89:19
**told**
39:22, 53:14,
82:12, 129:12,
129:15
**tomorrow**
164:8
**ton**
148:1
**top**
11:6, 32:21,
131:21
**torts**
62:22
**totally**
98:8, 158:13
**touching**
85:16
**trade**
159:12
**transcript**
86:11, 168:5
**transfer**
7:22, 9:8,
9:17, 9:19,
17:11, 30:12,
135:7
**transferred**
13:17, 13:20,
13:21, 30:18,
30:20, 40:2,
40:10, 41:10,
42:11
**transfers**
15:12, 134:17
**transferwise**
131:19, 131:22
**transitioned**
57:19, 58:10
**treat**
143:17
**treated**
119:18
**trial**
21:19, 56:14
**tried**
99:1, 147:20

Transcript of Meet and Confer
Conducted on January 8, 2025                                    79

| | | | |
|---|---|---|---|
| **trouble** | 43:9, 43:18, | 95:4, 96:1, | 60:7, 81:14, |
| 14:15, 52:6, | 92:14, 128:5 | 98:8, 101:20, | 96:2, 96:14, |
| 90:18, 146:17 | **types** | 113:17, 118:7, | 97:13, 138:9, |
| **troubling** | 91:9, 127:22 | 122:21, 133:10, | 140:20, 145:2, |
| 68:8 | **typewriting** | 137:22, 139:4, | 158:2, 164:18 |
| **true** | 168:8 | 145:9, 149:6, | **using** |
| 168:6 | **typically** | 149:13, 150:16, | 14:9, 97:5, |
| **truly** | 15:13 | 153:19, 153:21, | 113:12, 115:2, |
| 132:17 | | 154:8, 154:16, | 123:18, 159:17, |
| **try** | **U** | 158:21, 159:10, | 159:19, 164:14 |
| 85:17, 98:15 | **uh-huh** | 159:14, 160:10, | **utilize** |
| **trying** | 117:6 | 160:19, 161:5, | 61:20, 114:3 |
| 10:8, 11:1, | **ukraine** | 161:15, 167:9 | **utilized** |
| 25:8, 31:4, | 141:14, 141:16 | **understanding** | 56:7, 97:10, |
| 40:15, 54:1, | **ultimately** | 4:19, 8:16, | 123:8, 123:12, |
| 54:6, 54:10, | 29:12 | 25:16, 29:3, | 136:18 |
| 56:5, 67:10, | **umbrella** | 72:6, 113:14, | **utilizing** |
| 67:15, 76:12, | 56:4 | 133:8, 141:2, | 60:1, 95:19, |
| 79:5, 81:2, | **unclear** | 144:10 | 128:14, 137:1 |
| 98:20, 108:6, | 111:10 | **understood** | **V** |
| 119:13, 142:18, | **under** | 14:4 | **vague** |
| 145:19, 149:6, | 10:9, 15:13, | **unfolded** | 6:11, 39:16, |
| 158:21, 159:10 | 25:13, 26:18, | 58:12 | 39:20, 67:11, |
| **turn** | 29:14, 30:3, | **unique** | 68:16 |
| 136:4, 151:2 | 31:19, 32:3, | 147:19, 155:21, | **vagueness** |
| **turning** | 32:20, 34:7, | 155:22 | 128:3, 128:4 |
| 24:12 | 38:8, 55:12, | **uniquely** | **valid** |
| **two** | 56:3, 57:17, | 161:9 | 20:16 |
| 5:3, 5:19, | 86:6, 95:22, | **united** | **value** |
| 5:21, 6:1, 6:16, | 96:18, 99:11, | 1:1 | 18:17, 19:13, |
| 17:9, 18:20, | 149:15, 156:6, | **unless** | 20:3, 20:13 |
| 20:18, 20:21, | 168:8 | 42:17, 107:4, | **various** |
| 38:14, 41:22, | **underlying** | 120:2 | 27:2 |
| 45:12, 45:17, | 18:5, 38:17, | **unlike** | **vehicle** |
| 46:22, 47:5, | 138:11, 145:7, | 166:20 | 14:20, 19:1 |
| 63:9, 63:19, | 148:3 | **until** | **vein** |
| 68:11, 74:9, | **understand** | 151:9, 166:15 | 133:3 |
| 79:6, 80:7, | 6:8, 6:13, | **unwilling** | **versus** |
| 80:16, 82:11, | 8:14, 8:15, | 148:3 | 159:19 |
| 83:8, 86:20, | 10:9, 21:10, | **update** | **via** |
| 87:10, 87:18, | 23:14, 27:13, | 129:16, 135:20 | 30:19 |
| 88:12, 89:18, | 31:6, 32:7, | **updating** | **viable** |
| 99:16, 99:17, | 34:18, 46:12, | 136:8 | 23:22 |
| 99:21, 107:21, | 47:4, 47:14, | **usc** | **view** |
| 112:14, 112:18, | 51:7, 63:18, | 32:19, 33:1, | 36:2, 55:8, |
| 114:1, 129:17, | 67:7, 67:15, | 33:18 | 61:14, 66:4, |
| 140:13 | 79:5, 80:9, | **use** | 67:13, 70:1, |
| **type** | 81:3, 81:19, | 51:3, 59:19, | |
| 20:19, 35:6, | | | |

Transcript of Meet and Confer
Conducted on January 8, 2025                                                        80

70:19, 70:21,
71:5, 113:2,
113:20, 114:18,
123:6
**violated**
29:22, 33:12,
33:15
**virtually**
1:12, 2:1,
65:14
**volume**
82:9
**voluminous**
103:6

---
**W**

---
**w-2**
126:11, 126:13
**w-2s**
120:10, 122:1,
125:7, 125:9,
125:17, 125:21,
126:2
**waiting**
51:20, 162:11
**waived**
143:15
**waiver**
148:13
**wallet**
92:9, 92:10,
134:5, 134:9,
134:10, 134:14,
134:20, 135:3,
140:10, 144:5,
144:22, 148:19
**wallets**
133:19, 133:22,
134:22, 135:1,
135:2
**want**
12:7, 13:8,
21:6, 26:10,
36:2, 40:1,
41:12, 41:15,
47:4, 47:13,
48:11, 63:3,
65:18, 68:14,

80:5, 85:8,
85:13, 86:9,
87:13, 90:7,
90:11, 91:22,
93:10, 93:20,
93:22, 94:3,
94:15, 94:16,
95:1, 97:17,
99:2, 99:9,
100:12, 107:4,
107:20, 110:9,
124:21, 146:14,
146:15, 149:7,
150:17, 151:4,
151:6, 151:12,
151:16, 155:22,
158:8, 158:12,
158:15, 161:15,
165:9, 167:11
**wanted**
4:8, 4:22,
13:14, 21:6,
31:22, 67:3,
104:8, 107:15,
107:21, 108:20,
110:1, 111:2,
111:11, 123:11,
141:16, 149:12,
149:13, 160:11,
160:19, 161:4,
162:1
**wants**
16:13
**wary**
62:12
**washington**
3:19
**way**
5:1, 14:19,
18:4, 22:9,
25:20, 34:15,
34:17, 43:3,
45:13, 52:5,
61:3, 62:8,
62:10, 63:18,
64:12, 66:5,
67:11, 68:22,
72:13, 72:20,

75:4, 77:4,
77:6, 84:5,
84:21, 85:7,
85:10, 85:22,
92:11, 94:2,
98:16, 117:10,
117:21, 118:6,
118:8, 120:22,
124:20, 124:21,
127:21, 135:6,
138:4, 142:12,
164:17
**ways**
50:1, 50:8,
100:3, 124:2
**we'll**
47:11, 48:3,
50:18, 66:19,
86:1, 86:10,
93:11, 103:8,
103:16, 106:13,
123:10, 127:3,
129:5, 135:20,
140:11, 145:18,
145:22, 151:2,
157:18, 167:13
**we've**
8:4, 8:7,
14:21, 15:1,
15:4, 24:19,
25:15, 26:4,
27:1, 31:21,
31:22, 39:22,
46:10, 47:16,
47:19, 51:20,
58:9, 58:18,
63:1, 68:12,
83:3, 86:15,
89:5, 89:7,
91:4, 93:17,
101:11, 103:9,
112:8, 115:21,
116:11, 121:20,
122:5, 122:14,
122:21, 129:12,
129:15, 131:20,
132:4, 132:5,
132:6, 133:21,

136:1, 139:15,
147:11, 147:14,
147:19, 150:22,
154:20, 155:13
**website**
108:14, 108:17,
109:5, 109:7,
110:2, 110:19,
110:20, 111:12,
111:18, 111:21,
164:12
**wednesday**
1:13
**week**
17:4, 17:20,
18:12, 39:9
**went**
36:1, 65:13,
75:17, 111:11,
150:12
**weren't**
129:17
**west**
110:12, 110:13,
110:16, 159:13
**whatever**
34:15, 40:10,
40:11, 54:4,
60:5, 85:5,
106:18, 111:1,
146:12, 156:22,
157:22
**whereas**
76:20
**whereof**
168:13
**whether**
7:13, 7:14,
10:1, 10:16,
11:16, 11:21,
12:8, 12:12,
13:2, 34:1,
35:19, 36:12,
37:14, 38:8,
38:10, 38:13,
38:16, 40:1,
41:18, 42:4,
43:21, 43:22,

45:15, 48:21,
54:21, 57:18,
57:20, 58:1,
60:9, 61:19,
65:10, 65:17,
66:16, 67:22,
68:22, 72:6,
72:14, 72:19,
73:2, 79:5,
80:18, 84:6,
101:8, 114:5,
116:16, 118:3,
130:22, 135:6,
137:20, 140:4,
142:18, 145:9,
147:17, 149:9,
150:10, 150:11,
151:5, 151:12,
152:4, 154:3,
156:4, 158:17,
158:21, 158:22,
159:1, 160:1,
160:20, 161:1,
161:5

**white**
3:5, 110:14,
152:6, 152:18,
153:5, 153:19,
154:7, 154:20,
155:4, 155:8

**whole**
5:16, 48:2

**wholly**
9:6, 36:3, 45:1

**wildcard**
159:17

**willing**
50:11, 101:15,
102:17, 143:4,
144:9, 145:14,
147:4, 148:18,
153:7

**wish**
31:11

**withdraw**
60:10

**withdrawing**
46:11, 152:5,

152:14, 152:16

**withdrawn**
42:4, 42:7,
44:2, 53:11,
53:18, 54:18,
55:1, 68:4

**withheld**
28:7, 44:3,
53:12, 53:14,
54:14, 54:22,
65:7, 68:8,
160:3

**withholding**
23:18, 24:8

**within**
10:2, 10:17,
11:16, 42:13,
43:10, 60:18,
61:5, 77:22,
88:21, 89:3,
89:13

**without**
20:19, 27:21,
43:4, 54:12,
61:9, 77:5,
77:10, 84:22,
89:20, 92:10,
92:14, 113:19,
114:17, 124:22,
134:5, 134:10,
135:3, 141:5,
143:13, 167:3

**without-prejudice**
142:20

**witness**
145:11, 168:13

**w1**
16:3, 16:10

**wondering**
48:21

**word**
59:19, 60:7,
61:13, 61:21,
82:14, 82:19,
85:3, 96:8, 98:1

**words**
7:15, 9:20,
23:20, 94:1,

117:15, 125:22,
142:21, 164:17

**work**
43:9, 43:16,
43:18, 51:7,
51:14, 53:1,
56:7, 57:16,
57:18, 61:16,
61:17, 63:11,
70:14, 74:22,
86:11, 114:15,
122:5, 142:19,
162:5

**workers**
80:22

**working**
48:13, 70:16,
73:10, 86:20,
124:19

**works**
43:7, 111:21

**world**
139:11

**worth**
134:19

**wouldn't**
42:16, 42:17,
90:2, 108:14,
117:15

**wrapped**
131:9

**written**
128:16

**wrong**
21:21, 27:16,
82:20, 105:11,
140:22

**wrote**
59:12, 95:15

**wyoming**
19:12, 19:20,
25:13, 32:3,
45:12, 159:19

_____
            **Y**
_____

**yao**
1:4, 158:19

**yeah**
21:5, 21:8,

41:2, 41:15,
45:7, 48:15,
49:7, 50:17,
64:4, 68:20,
69:19, 70:3,
72:17, 75:12,
76:3, 80:2,
82:1, 94:14,
94:17, 94:18,
95:5, 95:11,
98:9, 98:18,
100:6, 100:13,
101:19, 102:3,
103:5, 103:12,
104:4, 104:5,
105:10, 105:15,
105:16, 109:2,
109:8, 109:15,
109:18, 110:14,
110:17, 111:13,
111:22, 112:7,
113:8, 113:9,
117:20, 118:2,
118:19, 119:21,
122:13, 122:16,
123:3, 126:8,
126:9, 126:10,
126:15, 126:19,
126:21, 128:8,
131:3, 131:8,
131:14, 132:1,
133:5, 134:3,
135:11, 135:20,
136:6, 136:11,
137:11, 139:9,
139:18, 140:6,
143:6, 144:13,
149:21, 150:4,
150:5, 150:13,
151:18, 165:1,
165:18, 167:8

**year**
43:12, 58:17,
71:9, 78:14,
118:14, 125:16,
125:17, 125:21

**years**
20:21, 39:19,

45:18, 84:17
**yep**
96:21, 115:13,
117:17, 121:11,
121:14, 131:5,
133:20, 143:9,
167:17
**yesterday**
158:11, 165:5,
166:12, 166:17
**york**
3:9, 16:11

---

.

---

**.3**
19:20, 19:21
**.6564**
3:20
**.8618**
3:10

---

0

---

**00**
165:17

---

1

---

**1**
151:9, 158:2,
167:20
**10**
104:1, 104:7,
105:15, 105:19,
106:21, 107:5,
143:17, 164:7
**100**
34:18
**10005**
3:9
**1099**
120:10, 122:1,
125:8, 125:9,
125:17, 125:21,
126:3, 126:11
**11**
103:18, 103:19,
104:1, 104:7,
105:20, 106:21,
107:5, 143:17

**12**
143:17, 151:20,
151:21
**1200**
3:18
**1296**
19:21
**13**
143:18
**1311**
19:22
**14**
16:9, 143:18
**15**
14:13, 16:19,
18:1, 20:6,
32:4, 62:5,
66:12, 66:17,
67:11, 67:15,
68:1, 68:12,
69:11, 73:13,
86:14, 88:21,
89:3, 89:9,
89:10, 89:11,
89:12, 90:6,
90:14, 91:1,
91:2, 93:4,
97:5, 100:9,
101:11, 101:21,
102:12, 102:14,
117:5, 117:9,
121:2, 129:18,
129:19, 131:6,
131:8, 131:9,
132:8, 133:4,
134:1, 135:10,
137:13, 139:8,
166:8, 167:12,
167:20
**16**
14:13, 16:20,
18:1, 20:6,
32:4, 62:5,
73:13, 86:14,
88:21, 93:4,
99:12, 102:14,
107:14, 131:9,
132:9, 133:17,

**134:2, 135:10,**
137:13, 139:8,
143:18
**168**
1:16
**17**
3:17, 14:13,
16:20, 18:1,
20:6, 32:4,
62:5, 73:13,
86:14, 88:21,
93:4, 99:12,
102:15, 131:10,
132:9, 135:10,
135:12, 136:7,
137:13, 139:8
**1716650**
16:3
**18**
14:13, 16:20,
18:1, 20:6,
32:4, 62:5,
73:14, 86:14,
88:21, 93:4,
99:12, 102:15,
131:10, 134:1,
135:10, 137:13,
139:8
**19**
47:11, 83:6,
83:7, 107:4,
107:10, 112:4,
115:10, 117:11

---

2

---

**20**
119:1, 125:4,
125:10, 127:3
**20006**
3:19
**2009**
19:22
**2015**
19:20
**2017**
16:10
**2018**
16:11

**202.261**
3:20
**2021**
16:3, 16:4,
17:5
**2022**
5:22, 19:4,
19:17, 20:4,
20:8, 20:10,
38:15, 40:7,
41:9, 42:5,
42:7, 42:14,
42:15, 42:16,
42:20, 43:11,
43:13, 44:2,
47:8, 53:12,
53:16, 54:1,
54:15, 54:19,
55:2, 55:4,
55:14, 55:17,
55:22, 63:1,
63:7, 64:15,
65:1, 65:8,
66:3, 66:8,
67:6, 67:9,
67:19, 67:20,
68:2, 68:11,
70:6, 70:10,
70:18, 71:17,
73:9, 77:9,
91:3, 93:18,
95:12, 101:13,
101:14, 120:4,
140:7, 140:11,
140:15, 143:22,
144:6, 144:9,
144:22, 163:9,
163:11, 163:16
**2023**
5:20, 6:16,
7:18, 8:17,
9:21, 40:5,
42:18, 47:7,
55:14, 65:17,
70:6, 71:7,
71:17, 73:9,
78:15, 81:18,
94:11, 95:14,

Transcript of Meet and Confer
Conducted on January 8, 2025                                    83

| | | | |
|---|---|---|---|
| 104:9, 104:20, 105:7, 105:9, 106:1, 106:14, 112:11, 113:1, 113:18, 113:21, 114:4, 114:10, 114:14, 115:4, 116:1, 116:12, 117:12, 117:13, 117:19, 118:10, 118:15, 118:18, 119:5, 121:19, 122:7, 125:13, 125:15, 125:16, 125:17, 125:19, 125:21, 128:22, 129:5, 130:1, 130:11, 130:17, 131:2, 131:4, 136:9, 136:16, 136:21, 137:7, 137:14, 137:16, 137:21, 138:10, 138:13, 138:17, 138:18, 138:22, 140:7, 140:11, 140:15, 144:1, 144:6, 144:9, 144:22<br>**2024**<br>17:18, 71:12<br>**2025**<br>1:13, 168:15<br>**2028**<br>168:16<br>**208**<br>19:21<br>**21**<br>119:1, 127:6, 127:7, 127:8, 128:6<br>**212.238**<br>3:10<br>**22**<br>114:9, 119:1, 125:5, 128:8, 128:16<br>**2201**<br>32:19 | **2202**<br>33:1, 33:18, 33:19<br>**23**<br>1:7<br>**241**<br>162:14<br>**2453**<br>16:9<br>**25**<br>16:11<br>**28**<br>3:7, 32:19, 33:1, 33:18<br><br>       **3**<br><br>**30**<br>16:4, 151:9, 158:2<br>**31**<br>5:20, 6:16, 47:6, 65:16, 104:9, 105:7, 105:9, 113:1, 115:22, 116:12, 118:10, 118:18, 125:18, 136:9, 137:16<br>**33**<br>1:14<br>**34**<br>153:1<br>**354**<br>19:20<br>**3rd**<br>139:20, 143:11<br><br>       **4**<br><br>**40**<br>19:5, 19:8, 20:2, 20:17, 34:15, 44:1, 56:14, 112:21<br>**41**<br>3:8<br>**42**<br>103:18<br>**45**<br>13:6, 36:15 | **49**<br>103:19, 151:20<br><br>       **5**<br><br>**50**<br>34:14, 56:14, 84:6<br>**534**<br>17:6<br>**538**<br>17:6<br>**539**<br>17:6<br>**565542**<br>1:15<br>**57**<br>32:21, 151:21<br><br>       **6**<br><br>**6509256**<br>16:10<br><br>       **7**<br><br>**7**<br>165:17<br><br>       **8**<br><br>**848**<br>17:6<br>**8832**<br>121:9<br>**889**<br>1:7<br><br>       **9**<br><br>**9**<br>1:14<br>**900**<br>3:17<br>**95**<br>84:7, 167:2<br>**965**<br>19:20<br>**976**<br>19:20<br>**99**<br>76:20<br>**9th**<br>168:14 | |