# EXHIBIT 2

# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

<table>
<tr><td>

ROBERT CHEN and OTTERSEC LLC,


       Plaintiffs,

  v.

DAVID CHEN

       Defendant.

</td><td>

Case No. 2:24-cv-00198

</td></tr>
</table>

## AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiffs Robert Chen and OtterSec LLC, by and through their undersigned attorneys, state and allege as follows:

## INTRODUCTION

This action concerns two tech-savvy teenagers who co-founded a successful company in Wyoming, and the deterioration of their relationship when one of them stole and destroyed critical company property. Plaintiff Robert Chen ("Plaintiff Robert" or "Robert") and Defendant David Chen ("Defendant David" or "David") (no relation) created a Wyoming tech company called OtterSec LLC ("OtterSec"), the other Plaintiff in this action. Their young company experienced immediate success and was poised for even greater things in the future. But Defendant David decided not only to stop contributing any work to Plaintiff OtterSec but to steal roughly half of the company's business for his own personal gain. Defendant David stole key company computer code powering OtterSec's crypto trading business worth hundreds of thousands of dollars (if not more), altered the history of edits to the valuable code to try to hide his theft, deleted other company records, and sabotaged the business that was once so promising. Defendant David also stole

company passwords and crypto wallet information, which he later misused to steal the contents of at least one crypto wallet.

## NATURE OF THIS ACTION

1.    In 2019, Plaintiff Robert Chen met Defendant David Chen through a high school cybersecurity competition. In February 2022, they formed a company through which they planned to perform security audits of cryptocurrency platforms and to develop and execute trading strategies for cryptocurrencies.

2.    To accomplish their goals, the two young men agreed to create a Wyoming-based LLC. They named the company "OtterSec." The "Sec" in the name was short for "Security," and referred to the company's planned work in both "*cybersecurity*" (security audits of cryptocurrency platforms) and "financial *securities*" (cryptocurrency trading).

3.    The two members of OtterSec LLC ("OtterSec") were Plaintiff Robert and Sam Mingsan Chen (Defendant David's father) who became a member in David's place because David was not yet 18 at the time.

4.    Although David's father, Sam, was officially a member of OtterSec, he played no role in running the company. David, on the other hand, worked for the company. David told third parties, over emails, on social media, and in other communications that he was a member, co-owner, and co-founder of OtterSec. He referred to his father's membership interest as his own.

5.    Around the same time Plaintiff Robert and Defendant David founded OtterSec, David transferred to OtterSec cryptocurrency-trading code that he had controlled previously, called "solend-liquidator-rust" (hereinafter the "Preexisting Solend Liquidator Code"). At the time, OtterSec planned to devote resources into transforming the code to create a new and improved version that would make money for OtterSec through cryptocurrency trading. David

understood that OtterSec would dedicate resources to develop, modify, revise, and adapt the code into something new.

6.      With the same goals of making money through efficient and profitable cryptocurrency trades, OtterSec also developed a "market maker" code capable of making money for OtterSec from a different set of cryptocurrency trading strategies.

7.      From February through April 2022, OtterSec expended significant creative effort and company resources on the development of these codes. In doing so, OtterSec created a new, unique version of the Preexisting Solend Liquidator Code. This Complaint refers to this new software as the "OtterSec Solend Liquidator Code." OtterSec also created a market maker code, the "OtterSec mSOL Market Maker Code." OtterSec integrated both codes with other technologies to maximize their profitability.

8.      In developing, modifying, enhancing, and transforming the Preexisting Solend Liquidator Code into the OtterSec Solend Liquidator Code, OtterSec created a derivative work with Defendant David's written permission. The derivative work is protected under copyright law and owned by OtterSec.[1]

9.      As an original creation of OtterSec, the OtterSec mSOL Market Maker Code is also protected under copyright law and owned by OtterSec.

10.     Despite having poured creative energies and resources into the creation of the OtterSec Solend Liquidator Code and the OtterSec mSOL Market Maker Code (together, "the OtterSec Codes"), OtterSec never fully benefited from the OtterSec Codes because Defendant David stole the OtterSec Codes, exploiting them to make hundreds of thousands of dollars for

---

[1] Pursuant to a September 24, 2022, asset purchase agreement with OtterSec, Robert Chen purchased all claims and potential claims OtterSec had against David Chen.

himself personally, while preventing OtterSec from using and benefitting from the OtterSec Codes that it rightly owned.

11.    On or around April 27, 2022, Defendant David stopped contributing work to OtterSec, shut down the server that was running OtterSec's trading-related codes, removed trading-related communications channels necessary for further development of the OtterSec Codes, and—most importantly—used his administrator privileges to take control of the OtterSec Codes away from OtterSec. These steps blocked OtterSec from using the OtterSec Codes and converted a substantial portion of its business.

12.    After having dedicated time, money, and personnel to developing the OtterSec Codes, OtterSec was only able to realize approximately $7,900 in revenue from the OtterSec Codes before Defendant David stole them.

13.    After stealing the OtterSec Codes and crippling the trading side of OtterSec's business, David used the OtterSec Solend Liquidator Code to make approximately $500,000 for himself in only a few weeks. Had he not stolen the OtterSec Solend Liquidator Code, at least this same profit would have gone directly to OtterSec, not to Defendant David. Moreover, even if he had just stolen the code, but not deleted and removed it, then OtterSec would have also been able to use it to profit at the same time.

14.    David's theft of these OtterSec Codes also tanked a nearly-finalized deal with a venture capital firm that was considering investing as much as $1 million into the company.

15.    In January 2024, David used stolen company information to access a cryptocurrency wallet owned by OtterSec and stole 20,200 cryptocurrency tokens, valued at $18,988 (as of September 26, 2024), out of an OtterSec wallet (then owned by Plaintiff Robert).

He transferred these stolen funds to his own personal wallet without OtterSec's or Plaintiff Robert's knowledge or permission.

16.    Plaintiff Robert now seeks damages for conversion; breach of fiduciary duty; misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836; misappropriation of trade secrets under Wyoming's Uniform Trade Secrets Act, Wyo. Stat. Ann. § 40-24-101, *et seq.*; and tortious interference with a prospective economic advantage. Plaintiff OtterSec seeks damages for conversion and breach of fiduciary duty.

17.    In the alternative, Defendant David was unjustly enriched in the amount of his trading income, in that he accepted the benefit of having OtterSec devote employee time to working on and improving the Preexisting Solend Liquidator Code. This work was undertaken by OtterSec in the agreed expectation that OtterSec would profit from the use of the OtterSec Solend Liquidator Code, and it would be unjust for David to keep his profits under these circumstances.

## PLAINTIFF

18.    Plaintiffs in this action are: Robert Chen, an individual residing in Bellevue, Washington, and the only member of OtterSec LLC; and OtterSec, an LLC incorporated in Wyoming and now dissolved.

19.    OtterSec entered dissolution on July 13, 2022, by the terms of its Operating Agreement. As part of winding up, OtterSec may prosecute this civil action. Wyo. Stat. Ann. § 17-29-702(b)(ii)(C).

20.    Pursuant to a September 24, 2022, asset purchase agreement with OtterSec, Robert Chen purchased all claims and potential claims OtterSec had against David Chen.

**DEFENDANT**

21.     Defendant in this action is David Chen, an individual residing in Rockville, Maryland.

22.     Defendant is the is the co-founder and former agent of OtterSec, and is the son of former OtterSec member Sam Chen (who, on information and belief, became a member of OtterSec for the purpose of holding Defendant David's interest in OtterSec).

**JURISDICTION AND VENUE**

23.     Plaintiff Robert Chen has asserted a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

24.     This Court also has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

25.     Defendant David is subject to personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(1)(A) and Wyo. Stat. Ann. § 5-1-107(a). Plaintiff Robert and Defendant David created a Wyoming LLC in February 2022, and on February 8, 2022, OtterSec filed its Articles of Organization with the Wyoming Secretary of State. Defendant David, as an agent and worker at OtterSec, made the decision, along with Plaintiff Robert, to form a Wyoming LLC, and deliberately directed his conduct toward Wyoming as described herein. Defendant David, therefore, purposefully availed himself of the privilege of conducting activities in Wyoming. Defendant David's harmful conduct was also directed at Wyoming in that his purpose was to harm OtterSec in Wyoming, where it was based.

26.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**David Chen and Robert Chen Co-Founded OtterSec as a Wyoming LLC.**

27.    Defendant David and Plaintiff Robert met while competing in a cybersecurity tournament when they were both in high school.

28.    After discussing cybersecurity issues and cryptocurrency trading strategies for several years, the two young men decided to create a company that would both conduct security audits on cryptocurrency platforms and also trade cryptocurrencies for profit using sophisticated software and strategies.

29.    The two opted to create an LLC together, elected to create it in Wyoming, and initially planned that both Defendant David and Plaintiff Robert would be members of the LLC.

30.    On February 7, 2022, based on their discussions, Robert sent David a message saying, "ok im gonna form an llc in wyoming." At Robert's request, David sent him $160 via PayPal to help cover Wyoming registration fees.

31.    Because Defendant David was sixteen years old at the time, he suggested that one of his parents become a member of OtterSec and hold David's share of the company.

32.    On February 14, 2022, Sam Chen — Defendant David's father — became the second member of OtterSec. Although Sam did not conduct business for or on behalf of OtterSec, David did, and ultimately, Sam's ownership was for David's benefit.

33.    Defendant David held himself out and presented himself as a member, co-owner, and co-founder of OtterSec. He referred to his father's membership interest as his own.

34.    Defendant David was functionally an employee of OtterSec. David worked on a variety of OtterSec projects and helped Plaintiff Robert decide what work OtterSec would conduct

and which personnel would be staffed on which tasks. At other times Robert assigned work to David.

35.    David was compensated for his work, had administrative access to OtterSec platforms, made work-related decisions with Robert daily, was assigned custodial responsibilities for OtterSec's digital currencies, and signed contracts with third parties on behalf of OtterSec.

36.    OtterSec paid David $60,000 for the value of his time worked on behalf of OtterSec within a two-month period.

37.    Additionally, David was an agent of OtterSec.

38.    OtterSec held David out as its co-founder both internally and externally. OtterSec included David on investment and project calls with third parties, and Plaintiff Robert introduced David as his "co-founder" in communications with potential business partners.

39.    David still holds himself out as a co-founder of OtterSec as seen on his X (formerly known as Twitter) account, which is shown below (https://x.com/raggedsec) as of November 24, 2024.



40.     Defendant David purposefully chose to establish OtterSec in Wyoming. He engaged in a continuing relationship with OtterSec, a corporate citizen of Wyoming, and purposefully availed himself of the benefits of doing business in Wyoming and operating OtterSec under Wyoming law.

41.     In his dealings with OtterSec clients, potential clients, and potential investors, David held himself out to be a co-founder of OtterSec and acted outwardly on the company's behalf. He also played a role in managing the company's day-to-day business decisions and operations and worked to further the company's profits and success, including when he helped create the OtterSec Solend Liquidator and mSOL Market Maker Codes.

42.     While Plaintiff Robert spent most of his time working on OtterSec's security audit work and Defendant David spent most of his time on OtterSec's cryptocurrency trading work, both co-founders had responsibilities in both spheres. Specifically, both worked on developing cryptocurrency trading software codes that could be used to buy and sell cryptocurrencies in certain situations.

43.     Defendant David knew that OtterSec was a Wyoming company.

44.     On February 8, 2022, Plaintiff Robert sent Defendant David login credentials for an account with OtterSec's registered agent in Wyoming, whose website was https://www.wyregisteredagent.net/. David acknowledged receipt of the login credentials and responded, "nice."

45.     David was aware that OtterSec had its headquarters at 30 N Gould St, Suite R, Sheridan Wyoming, 82801. The address appeared, among other places, on OtterSec's bank statements.

46.     On March 3, 2022, Robert confirmed for David in a message sent over the Discord, a messaging platform, that OtterSec had been created in Wyoming.

47.     David knew and represented to others that OtterSec was incorporated in Wyoming.

48.     In 2022, after some of his misdeeds first came to light, in recognition of the fact that he had been doing business under Wyoming law and that Wyoming law would govern his dispute with OtterSec and with Robert, David hired Wyoming counsel to represent him in connection with his dealings with OtterSec and Robert.

**OtterSec Paid David $60,000 for Work at OtterSec.**

49.     On April 11, 2022, after several weeks of successful security audits, Plaintiff Robert and Defendant David jointly decided that OtterSec would pay $60,000 to each of them as compensation for their work performed for OtterSec to date.

50.     Robert transferred $60,000 to himself on April 11, and David, on behalf of OtterSec, did the same four days later, on April 15.

51.     Around the same time, David claimed that he was unable to keep abreast of his security audit responsibilities and that, in general, he could not contribute as much work to OtterSec as Robert was contributing or would contribute to OtterSec. On information and belief, at about this time, despite his father holding an ownership interest in OtterSec, Defendant David determined that he no longer wanted to perform work for OtterSec or otherwise contribute to its business.

52.     In a conversation on Discord, Defendant David suggested — without any prompting from Plaintiff Robert — that his father could transfer 10% from his ownership in OtterSec to Robert, making Robert the 60% owner of the company. When Robert asked for an explanation for this decision, David responded that "it's the best compromise[.] [T]his way it's not

unfair when you do more work because you reap more of the benefits[.] [A]s much as [I] want to, [I]'m not developed enough to perform on the same level as you[.]"



*Screenshot from Discord, where David posted under the username "ra."*

53.    On April 16, 2022, Robert and Sam, David's father, amended the OtterSec Operating Agreement (resulting in the "First Amended Operating Agreement") so that Robert now owned 60% of the company.

**The Solend Liquidator Code Was a Profitable Trading Strategy.**

54.    On or around February 20, 2022, Defendant David transferred the Preexisting Solend Liquidator Code to OtterSec's control. This code was a piece of software for cryptocurrency trading that David had previously worked with.

55.    The Preexisting Solend Liquidator Code, when run, functioned as a "liquidator bot" for a decentralized finance ("DeFi") cryptocurrency platform called Solend.[2]

56.    On a DeFi platform like Solend, a user can obtain a loan in one type of cryptocurrency from the platform by using another type of cryptocurrency as collateral. These loans are conditioned on the value of the cryptocurrency used as collateral retaining a certain percentage of value above the total value of the loan. If the value of the collateral comes within a certain percentage value of the loan, the collateral can be liquidated by a third party "liquidator"

---

[2] Many cryptocurrency trading platforms are decentralized "DeFi" platforms, meaning that they are run by a group of people operating separate computers and servers, as opposed to traditional financial systems which, even when operating online, are "centralized" around banks and other similar institutions.

who can earn profit off the liquidation through an "incentive bonus" siphoned from the collateral provided by the borrower.

57.    Rather than actively monitoring the relative values and waiting for the right moment to execute a liquidation, a tech-savvy trader can program a "liquidator bot" to execute these liquidations automatically under certain predetermined conditions. These rewards are what make liquidations profitable and obtaining them is the goal behind creating a "liquidation bot."

58.    Efficient and quick "liquidator bots" can be the difference between a loss of money and hundreds of thousands of dollars in profits. Solend liquidation rewards are first-come, first-served and winner-take-all. A successful "liquidator bot" therefore must operate based on code that enables it to process information and to act quickly. It must identify a liquidation opportunity and repay a percentage of the borrowed asset as soon as the opportunity arises, before any other traders or "liquidator bots" seize the same opportunity.

59.    Solend requires liquidators to repay a percentage of the loan upfront using the same cryptocurrency with which the loan was made. A liquidator must make this repayment before it can collect collateral to cover the amount repaid on the loan. As an "incentive bonus," the liquidator also collects an additional amount of collateral beyond the amount repaid on the loan. That is, Solend will allow the liquidator to collect 5% of the collateral, for example, in addition to the collateral required to cover the amount of the loan repaid.

60.    Because liquidators must repay the percentage of the loan with the same cryptocurrency with which the loan was made, liquidators are required to either have the type of cryptocurrency borrowed on hand or swap other types of cryptocurrencies to obtain the type of cryptocurrency borrowed in order to make the loan repayment. And since repayment must be made before the liquidator assumes the collateral, liquidators must take on the risk of swapping tokens

out to make repayment without a guarantee that they will be fast enough to seize the liquidation opportunity before another trader operating a faster and more efficient "liquidator bot" gets there first. Traders must pay a fee to swap cryptocurrencies, so a trader whose "liquidation bot" is fast enough to make a swap but not fast enough to also seize the liquidation opportunity will lose money. That trader may also be stuck holding an unprofitable cryptocurrency.

61.    Thus, the quicker and more efficient a trader's "liquidator bot" is, the higher the chance the trader will make money on the DeFi platform.

### David Transferred the Preexisting Solend Liquidator Code to OtterSec and OtterSec Created the OtterSec Solend Liquidator Code.

62.    Defendant David accomplished the transfer of the Preexisting Solend Liquidator Code on Github[3] by transferring ownership of the code's repository from his personal account to OtterSec's organizational account.

63.    David transferred the Preexisting Solend Liquidator Code to OtterSec in exchange for (a) his father's ownership interest in OtterSec (which David treated as his own), (b) his own unofficial status as a co-founder, and (c) his share of expected future profits from OtterSec.

64.    On February 20, 2022, David gave written permission for OtterSec to develop a new version of the Preexisting Solend Liquidator Code. On that day, David messaged Plaintiff Robert, "[I] can transfer my liquidator and yall can make it work with larix/apricot," referring to two additional cryptocurrency platforms with which the code was not compatible. Later that same day, David sent Robert a link showing that the transfer had been completed.

---

[3] Github is a web platform that allows software developers to share, store, and collaborate on code.





*Screenshots from Discord, where David posted under the username "ra."*

65.     David transferred the Preexisting Solend Liquidator Code to OtterSec so that OtterSec personnel — including David himself, but also others — could edit the code and develop new and enhanced versions of the code, which OtterSec would then use to earn profits from trading cryptocurrencies on Solend.

66.     OtterSec hired developers specifically to work on the two OtterSec codes and other trading strategies and OtterSec was still considering hiring more when David's theft destroyed the trading side of OtterSec's business.

67.     OtterSec dedicated hundreds of personnel hours and significant funds to developing, modifying, enhancing, and adapting the Preexisting Solend Liquidator Code to create the OtterSec Solend Liquidator Code. This transformation of the code yielded a new and more efficient "liquidator bot."

68.     OtterSec personnel were paid by OtterSec for the time they spent developing the OtterSec Solend Liquidator Code, and OtterSec would not have dedicated resources to this project if it did not expect a return on those resources.

69.     The OtterSec Solend Liquidator Code that resulted from OtterSec's efforts was far more valuable than the Preexisting Solend Liquidator Code that Defendant David transferred to

OtterSec in February 2022. With respect to identifying liquidation opportunities, swapping tokens efficiently, execution speed, development velocity, and ultimately earning profit, the OtterSec Solend Liquidator Code was better than other "liquidator bots" on Solend and significantly more effective than the Preexisting Solend Liquidator Code.

70.     OtterSec made a faster "liquidator bot." OtterSec refactored the Preexisting Solend Liquidator Code in order to create a "liquidator bot" with increased execution speed and development velocity, thus increasing profit capabilities and making for smoother implementation of subsequent changes.

71.     OtterSec made a "liquidator bot" that was better able to guarantee it identified the best available prices when making trades. OtterSec did this by improving the Preexisting Solend Liquidator Code's inventory management by integrating the code with a DeFi aggregator called Jupiter. Aggregators like Jupiter guarantee that traders are getting the best available prices for token swaps by routing trades across multiple DeFi platforms.

72.     OtterSec made a "liquidator bot" that, unlike the Preexisting Solend Liquidator Code, could take advantage of the best available price, even if that price was not available on Solend. It accomplished this by developing and integrating something called a "node.js microservice," which coordinated with the bot's liquidation programming to enable it to execute swaps across different DeFi platforms.

73.     On information and belief, OtterSec also made a "liquidator bot" that could operate with and conduct liquidations on two additional lending platforms beyond Solend. These were called Port and Apricot. A "liquidator bot" operating according to code that was integrated to operate with Port and Apricot would have more opportunities for liquidation and rewards than one

operating according to code that was integrated only with Solend, like the Preexisting Solend Liquidator Code.

74.    The OtterSec Solend Liquidator Code was programmed to deposit funds it received into an OtterSec-controlled wallet with the following address:

- uwuP2PNjTmz2SgyHKEW1SWWCjsHETQFjRjXiLZn2bmQ

("the OtterSec wallet ending in -2bmQ"). When OtterSec ran the OtterSec Solend Liquidator Code, it deposited the rewards it earned into the OtterSec wallet ending in -2bmQ.

75.    The OtterSec wallet ending in -2bmQ had been created by OtterSec, after the formation of the company, and held funds earned by OtterSec through its cryptocurrency trading line of business.

**OtterSec Created the OtterSec mSOL Market Maker Code.**

76.    In addition to developing a new and improved liquidation bot from David's preexisting code, OtterSec also created a market maker code for a token called mSOL hosted on the Solana platform.

77.    A market maker code in cryptocurrency serves the same purpose as a market maker in the stock exchange: it continuously places buy and sell orders in a particular cryptocurrency to ensure that there is always liquidity (demand or supply) in the market for that currency. Whenever possible, a market maker code, like an ordinary market maker, tries to sell for a profit.

78.    The OtterSec mSOL Market Maker Code provided liquidity and could profit from constantly buying and selling in the Solana marketplace by buying mSOL tokens at lower prices and selling them at higher prices.

79.    Defendant David, acting for OtterSec, took the role of lead programmer working on the OtterSec mSOL Market Maker Code. He developed the code from beginning to end within

the scope of his work for OtterSec.

### A Venture Capital Firm Was Interested in Funding OtterSec's Trading Work
### — Until David Quit and Stole the OtterSec Codes.

80.    As OtterSec began conducting security audits, it began to garner respect in the cryptocurrency industry, including for its promising trading technology, and it began receiving invitations to meet potential investors.

81.    Plaintiff Robert met representatives of a venture capital firm called Sino Global Capital ("SGC"), and OtterSec went on to meet with SGC several times in March and April 2022.

82.    When speaking with SGC and other venture capital firms generally, OtterSec identified profits from both OtterSec Codes — the OtterSec Solend Liquidator Code and the OtterSec mSOL Market Maker Code — as company revenue.

83.    SGC was interested in investing in OtterSec because of the OtterSec Codes, as the auditor side of the business was an active personal services business less attractive to investors.

84.    On April 7, 2022, Robert and Defendant David participated in a call with SGC's investments team during which Robert and David fielded technical due diligence questions from SGC in relation to OtterSec's cryptocurrency trading strategies and the OtterSec Codes.

85.    The call went well and went on for some time. SGC representatives on the call expressed interest in investing up to $1 million in OtterSec to bolster its cryptocurrency trading capabilities. After the call, Lawrence Yan, a member of SGC's investments team, sent messages thanking Robert and David for "going in depth on the [cryptocurrency trading] strategies" and suggested a follow up call with SGC's CEO, Matthew Graham, and OtterSec.

86.    The expectation on both sides was that OtterSec would be securing investment from SGC following their already scheduled follow-up call.

87.     Two days later, on April 9, 2022, in a message over Discord, David wrote, "[w]e were talking to a vc the other day and they want to give us money for our bots . . . ."

88.     Preliminary discussions with SGC and other potential investors apparently proved too tempting for David.

89.     On April 27, 2022, Defendant David quit doing any work for OtterSec (but kept his ownership position via his father).

90.     As he cut his work for OtterSec, David took the code-based automatic trading strategies that had so interested investors.

91.     As part of his theft, David used his status as an "administrator" on OtterSec's Github account to remove OtterSec's access to the OtterSec Codes.

92.     David then shut down an OtterSec server that was running proprietary trading-related strategies, including the OtterSec Solend Liquidator Code and deleted numerous OtterSec messaging logs that contained OtterSec communications relating to the OtterSec Codes and other lines of OtterSec business.

93.     By shutting down the server that was running the OtterSec Solend Liquidator Code, David also removed Plaintiff OtterSec's access to the OtterSec wallet ending in -2bmQ.

94.     David took these actions without discussing them with Robert and without any consent from OtterSec.

95.     OtterSec's counsel sent David a letter dated May 20, 2022, explaining that OtterSec had intellectual property rights in the stolen code and asking him to return it.

96.     On June 9, 2022, David and his father Sam Chen's Wyoming counsel sent a document preservation request to OtterSec's counsel.

97.     Around this same time, David was attempting to cover his tracks. He told an

acquaintance on June 24, 2022, that he had undone some of the work that OtterSec — specifically Robert — had done to improve the OtterSec Solend Liquidator Code, and suggested that he had "rebased" the changes he made, meaning he altered records showing the history of changes to the code, presumably to hide the record of Robert and other OtterSec personnel having worked on it. In private direct messages over Discord, David told this acquaintance "it took me about 3 hours to undo [Robert's] refactor and rebase my changes."

98.     Later, at some point in 2024, David deleted Discord messages he sent over a two-year period on one or more chat servers where he had discussed cryptocurrency trading codes and strategies.

99.     Defendant David intended for his actions to hurt OtterSec. He wrote to the same acquaintance over Discord on April 27, 2022, that, "now [Robert] has to explain to sino global capital the next time they talk why osec [OtterSec] doesn't have bots anymore."

100.     David's theft and obstruction effectively ended OtterSec's chances of receiving investment from SGC. Accordingly, SGC never invested in OtterSec.

101.     On April 28, 2022, Yan, from SGC's investments team, reached out to Robert and David again, in a group chat on the platform Telegram, asking to schedule a call between them and Graham, SGC's CEO. When David — who knew he had just sabotaged the investment deal — received this message, he exited the Telegram group without writing or saying anything.

102.     David's actions were purposefully directed at Wyoming. David knew that OtterSec was a Wyoming company so, when he acted to harm OtterSec, the focal point of his actions was Wyoming, where OtterSec was headquartered. He intended that the harmful effects of his theft would be felt in Wyoming by harming a Wyoming corporation.

103.     Ultimately, David's actions completely eviscerated OtterSec's ability to continue

trading cryptocurrencies, which was roughly half of the Wyoming company's business practice at that time. David knew that this would happen because he had intimate knowledge of the Wyoming company's cryptocurrency trading practices.

104.    OtterSec had only been able to profit approximately $7,000 from the OtterSec Codes before Defendant David stole the OtterSec Codes and removed company access to the OtterSec Codes.

105.    After David destroyed OtterSec's trading business and quit performing any work, Plaintiff Robert, a 60% owner, was left solely responsible for OtterSec's entire business: now limited to providing security auditing services.

### David Operated the Stolen Codes Exclusively for His Own Benefit.

106.    Shortly after stealing the OtterSec Codes, Defendant David began running them purely for his own benefit. David turned the OtterSec Codes on and reprogrammed the OtterSec Codes to operate from and to deposit rewards into his personal wallet (or wallets), rather than into the OtterSec wallet ending in -2bmQ.

107.    On June 24, 2022, David wrote to an acquaintance that the OtterSec Solend Liquidator Code had made "like $500k" and was "worth way more than that."

108.    This major increase from the $7,900 OtterSec made from that Code reflected David's successful timing, in stealing the Code for his personal use right as crypto trading volatility exploded, not any improvements he made over and above those made by OtterSec.

109.    Had OtterSec been running the code in May and June 2022, OtterSec, not David, would have made approximately $500,000.

110.    David continued to operate the OtterSec Solend Liquidator Code after June 2022, and in total has earned approximately $500,000 and more thereafter that should rightly have gone

to OtterSec.

111.    After David stole the OtterSec Codes by removing OtterSec's access to them, OtterSec could not enjoy the use of its works. David used the OtterSec Solend Liquidator Code entirely for his own financial benefit and never returned access to OtterSec. David also never returned the OtterSec mSOL Market Maker Code to OtterSec.

**OtterSec Dissolved, David's Family Sued Robert.**

112.    On July 13, 2022, David's father, Sam Chen, died in a car accident.

113.    Under OtterSec's operating agreement, Sam's death necessitated and triggered dissolution of the company.

114.    During the process of winding up OtterSec's operations, Plaintiff Robert purchased all assets and all legal claims held by OtterSec on September 24, 2022, thereby providing him the right to sue David for his conversion of OtterSec's property, breach of fiduciary duty, misappropriation of trade secrets under federal and Wyoming law, tortious interference with a prospective economic advantage, and, in the alternative, unjust enrichment.

115.    David continued operating the OtterSec Codes for his own benefit after September 24, 2022.

116.    On March 31, 2023, Sam's Estate filed a suit against Robert in the District of Maryland falsely alleging, among other things, that OtterSec was dissolved improperly.

**David Stole Funds from OtterSec in February 2024.**

117.    In January of 2024, a cryptocurrency project called Jupiter deposited 20,200 tokens of its cryptocurrency, called JUP, into the OtterSec wallet ending in -2bmQ.

118.    This was an "airdrop," a common practice for cryptocurrency projects whereby a project deposits tokens to all wallets that are connected to a particular blockchain, as a means of

promoting their cryptocurrency.

119.    The OtterSec wallet ending in -2bmQ received an airdrop of 20,200 JUP tokens

because it was connected to the Solend blockchain.

120.    The JUP tokens were the property of Plaintiff OtterSec, to be distributed upon

winding up to the membership interests of OtterSec LLC.

121.    On January 31, 2024, Defendant David stole those tokens by transferring the 20,200

JUP tokens from the OtterSec wallet ending in -2bmQ into a different wallet, which he controlled,

and which was affiliated with the domain raggedsec.sol. "Raggedsec" is a handle David uses

online. *See supra* ¶ 38 (including a screenshot of his X account, @raggedsec).

122.    David could only have accessed the OtterSec wallet ending in -2bmQ if he had

retained the wallet's "private key" (which was the property of OtterSec) and had used it to identify

himself as the owner of the wallet.

123.    Because David had stolen access to the wallet ending in -2bmQ when he left

OtterSec in April 2022, Robert was not able to purchase this wallet from OtterSec in September

2022. David had already wrongfully taken possession of that wallet.

124.    OtterSec, not David, was the owner of the OtterSec wallet ending in -2bmQ, and

David improperly obtained and retained the wallet's "private key" without OtterSec's or Robert

Chen's permission.

125.    OtterSec had treated the OtterSec wallet ending in -2bmQ, along with its contents,

as belonging to OtterSec when it filed its 2022 taxes.

126.    The JUP tokens David took from the OtterSec wallet ending in -2bmQ were worth

approximately $23,836 (as of November 23, 2024).

127.    OtterSec was harmed by this conduct, because those tokens belong to OtterSec and

should be part of the amount that is distributed upon winding up of OtterSec.

### COUNT ONE – CONVERSION CLAIM
### (Claim by Robert Chen and OtterSec LLC)

128.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

### Preexisting Solend Liquidator Code and mSOL Market Maker Code
### (Claim by Robert Chen)

129.    In February 2022, when Defendant David transferred ownership of the Preexisting Solend Liquidator Code to OtterSec's Github repository, David intended that OtterSec would develop new and improved works, through which OtterSec could profit from Solend liquidations.

130.    David transferred the Preexisting Solend Liquidator Code to OtterSec in exchange for (a) his father's ownership interest in OtterSec (which David treated as his own), (b) his own unofficial status as a co-founder, and (c) his share of expected future profits from OtterSec.

131.    OtterSec, through its work and efforts, transformed the preexisting code into a new work with greater money-making capabilities. OtterSec transformed and adapted the new version of the code from the preexisting code when, among other modifications and enhancements, OtterSec made the code faster, made it better able to identify the best available prices, and made sure that it could take advantage of those prices.

132.    These capabilities did not exist before OtterSec personnel worked on the code.

133.    Because OtterSec authored this improved, derivative code—the OtterSec Solend Liquidator Code—OtterSec has legal title to all copyright in the OtterSec Solend Liquidator Code and possessed that code up until the time at which David converted it.

134.    David converted OtterSec's copyrighted property when he wrongfully and completely removed OtterSec's access to the OtterSec Solend Liquidator Code, designated himself

as the only one who could access the Code, and used it for his own personal benefit.

135.    David also deleted data owned by OtterSec and removed trading-related communications channels necessary for the development of OtterSec's codes. In so doing, he deleted conversations memorializing improvements OtterSec personnel had made to the codes. By deleting these records of OtterSec's work on the codes, David made it more difficult for the Wyoming company to reconstruct the work it had done (and obfuscated the reality of its ownership). David's actions were wrongful because they were undertaken without the Wyoming company's consent.

136.    Because of Defendant David's actions, OtterSec was not able to use the OtterSec Solend Liquidator Code. Had the Code been in OtterSec's possession in May and June 2022, OtterSec, not David, would have profited approximately $500,000 and more thereafter. Had the Code been in OtterSec's possession up to the present, OtterSec would have earned these profits.

137.    In addition to his theft of the OtterSec Solend Liquidator Code, David stole the OtterSec mSOL Market Maker Code. This code was developed by OtterSec. David accomplished his theft of the OtterSec mSOL Market Maker Code by, again, removing OtterSec's access and designating himself as the only person with access to the code.

138.    Because of David's theft of the OtterSec mSOL Market Maker Code, OtterSec was unable to use and profit from this code.

139.    David's theft of both OtterSec Codes also harmed OtterSec in that both the OtterSec Solend Liquidator Code and the OtterSec mSOL Market Maker Code were valuable pieces of technology with significant actual value. David took both OtterSec codes without compensating OtterSec for their value.

140.    Accordingly, David's conversion of the OtterSec Codes harmed OtterSec.

**Conversion of JUP tokens from OtterSec's Wallet**
**(claim by OtterSec LLC)**

141.    Additionally, on February 1, 2024, Defendant David wrongfully transferred 20,200 JUP tokens from the OtterSec wallet ending in -2bmQ to a personal wallet that he controlled.

142.    The JUP tokens that David took had been deposited to the OtterSec wallet ending in -2bmQ, which had been created and was owned by OtterSec. The JUP tokens were therefore the legal property of OtterSec.

143.    By transferring the JUP tokens out of the OtterSec wallet ending in -2bmQ and into his personal wallet, David prevented OtterSec from accessing, holding, trading, or selling those tokens.

144.    OtterSec was harmed by this theft in the amount of at least $23,836 as of the date of this Complaint.

<u>**COUNT TWO – BREACH OF FIDUCIARY DUTY**</u>
<u>**(Claim by Robert Chen and OtterSec LLC)**</u>

145.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

146.    Defendant David was an agent of OtterSec with actual authority. OtterSec manifested its intent for David to act as its agent through written and spoken words, as well as its conduct.

147.    OtterSec held David out as its agent when it informed third parties that David was a "co-founder" of OtterSec. By introducing David as a "co-founder," despite the technicality that he was not a member of the company (which his father standing in instead), OtterSec intended third parties to understand that David had the authority to negotiate and interact with third companies on OtterSec's behalf. OtterSec also authorized David to instruct employees with respect

to OtterSec operations—security audits and work on trading codes—further indicating a manifestation that David had authority to act as OtterSec's agent.

148.    As OtterSec's agent, Defendant David owed fiduciary duties to the company, including a duty of loyalty, duty of care, and duty to act in good faith, as well as a duty not to compete with OtterSec, a duty to deal fairly with OtterSec, and a duty to act for OtterSec's benefit in all matters connected to his role as OtterSec's agent.

149.    David breached his duty of loyalty, duty of care, duty to act in good faith, and duty to deal fairly with OtterSec when he deleted data owned by OtterSec, removed trading-related communications channels necessary for the development of OtterSec's codes, removed OtterSec's access to the OtterSec codes, and used OtterSec's codes for his own personal financial gain, depriving OtterSec of the same financial gain. These breaches prevented OtterSec from using the OtterSec codes for OtterSec's benefit.

150.    David breached his duty not to compete with OtterSec and his duty to act for OtterSec's benefit when he took for himself the opportunity to use the stolen OtterSec Solend Liquidator Code in May and June 2022 (and thereafter) to profit from trading on the Solend platform. David's breach cost OtterSec the profits it would have made ($500,000, if not more) from trading using the OtterSec Solend Liquidator Code in May 2022, and more thereafter. The Code's liquidation bots would have earned those funds for OtterSec had David not removed the Code from OtterSec's possession.

151.    David's breach also harmed OtterSec in that it undermined and prevented an investment offer from Sino Global Capital.

152.    David continued to engage in conduct that breached his fiduciary duty to OtterSec and to injure OtterSec following Robert's purchase on September 24, 2022, of all then-existing

claims OtterSec.

## COUNT THREE – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
### (Claim by Robert Chen)

153.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

154.    The OtterSec Codes were trade secrets belonging to OtterSec.

   a.    Both codes contained technical cryptocurrency trading information, were owned by OtterSec, and were not publicly available. OtterSec hosted the codes in its own private GitHub repository, not open to the public, and to which only OtterSec employees had access. OtterSec employees were required to sign non-disclosure agreements governing their work for OtterSec and their work on the OtterSec Codes.

   b.    The OtterSec Codes also had independent economic value due to their ability to profit from cryptocurrency trading in a unique way. They were more valuable because they were not generally known. Because other cryptocurrency traders did not have access to the OtterSec Codes, OtterSec was able to use the OtterSec Codes to take advantage of more lucrative opportunities than other traders.

   c.    If others had access to the OtterSec Codes, OtterSec would lose the advantage of having superior cryptocurrency trading operations. Others could seize the same opportunities if they were able to operate identically fast and effective liquidator bots and market makers. That is, the OtterSec Codes were therefore only profitable so long as they remained unavailable to the public.

   d.    Furthermore, the information compiled to make up the OtterSec Codes was not

readily ascertainable to any person unaffiliated with OtterSec, especially given the significant amount of time spent on developing the OtterSec Codes and the technical knowledge required to create the OtterSec Codes.

155.    Defendant David misappropriated the OtterSec Codes in April 2022 when he prevented OtterSec from ever again accessing the OtterSec Codes, maintained his own exclusive access to the OtterSec Codes, and used the OtterSec Codes to compete with OtterSec and to seize trading opportunities for his own personal benefit that should rightfully have been taken by OtterSec. In so doing, David exceeded the scope of whatever use of the OtterSec Codes that was permitted to him.

156.    David knew his actions to be improper. He removed OtterSec's access to the codes swiftly and secretly after quitting OtterSec, and without asking permission from Plaintiff Robert or anyone else. David did not explain himself. He covered his tracks and destroyed evidence by altering records showing the history of changes to the code in GitHub and deleted conversation channels in which OtterSec personnel had discussed the work they had put into creating the OtterSec Codes.

157.    David also acted maliciously and punitively as evidenced by his deletion of OtterSec data and property.

158.    Later, in May and June 2022, when David profited approximately $500,000 from the OtterSec Solend Liquidator Code, and thereafter when he profited more, David was using an OtterSec trade secret without consent, and he knew its acquisition and use to be improper as he was the person who wrongfully acquired the trade secret.

159.    The OtterSec Solend Liquidator Code implicates interstate and foreign commerce because it is designed to operate on the Solend platform and other decentralized finance platforms

that operate across state and national lines. OtterSec personnel in multiple states including Washington and Maryland worked on the code while it was in the possession of OtterSec, a Wyoming LLC. David deployed the OtterSec Solend Liquidator Code in interstate and foreign commerce when he used it to make trades on Solend and other platforms.

160.    As a result of Defendant David's actions, OtterSec was harmed.

161.    Thus, Plaintiff Robert is entitled to:

    a.    injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A); and/or

    b.    actual and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(B) and (C); and/or

    c.    attorney fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

### COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS UNDER THE UNIFORM TRADE SECRETS ACT, WYO. STAT. ANN. § 40-24-101, *ET SEQ.* (Claim by Robert Chen)

162.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

163.    As described in the above paragraphs 146–154, Defendant David misappropriated trade secrets (the OtterSec Codes) belonging to OtterSec by improperly taking and using the OtterSec Codes.

164.    David did this willfully and maliciously as evidenced by his actions following his abrupt departure from OtterSec in April 2022.

165.    David benefited from his unlawful actions by using the OtterSec Solend Liquidator Code to profit approximately $500,000 in just two months after he quit OtterSec, and more thereafter.

166.    Accordingly, OtterSec was damaged by David's actions.

167.    As a result, Plaintiff Robert is entitled to:

a.    injunctive relief pursuant to Wyo. Stat. Ann. § 40-24-102; and/or

b.    actual and exemplary damages pursuant to Wyo. Stat. Ann. § 40-24-103(b); and/or

c.    attorney fees pursuant to Wyo. Stat. Ann. § 40-24-104.

## COUNT FIVE – TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE
### (Claim by Robert Chen)

168.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

169.    Beginning in early March 2022, OtterSec entered discussions with Sino Global Capital ("SGC") regarding potential investment into OtterSec.

170.    Plaintiff Robert and Defendant David met virtually with SGC, on OtterSec's behalf, several times in March and April to discuss these investment opportunities. SGC's investment interests were focused on OtterSec's cryptocurrency trading strategies.

171.    At one point during negotiations for investment into OtterSec, SGC indicated that it was prepared to invest up to $1 million into OtterSec.

172.    On April 7, 2022, Robert and David met with SGC's investment team and answered a litany of technical, due diligence questions relating to OtterSec's cryptocurrency trading work and to the OtterSec Codes in particular. The call went well and the expectation on both sides was that SGC would be investing in OtterSec.

173.    Around the time that David quit and sabotaged OtterSec's operations, SGC was hoping to schedule a call for its CEO with Robert and David.

174.    David took part in and was fully aware of these conversations with SGC. David knew that OtterSec's expectation of investment from SGC depended on OtterSec's cryptocurrency

trading strategies and knew the particular importance of the OtterSec codes to the SGC deal. David knew the potential magnitude of the deal.

175.    David intentionally and improperly interfered with OtterSec's business expectancy with SGC when he misappropriated the OtterSec Codes upon which OtterSec's cryptocurrency trading strategies, and thus their business expectation with SGC, heavily relied. David knew that if OtterSec did not have the OtterSec Codes, SGC would not invest in OtterSec.

176.    As a result of David's actions, OtterSec's business expectancy with SGC was completely lost and OtterSec was damaged.

177.    David's tortious interference harmed OtterSec in that it did not receive the previously forthcoming investment from SGC.

<b><u>COUNT SIX – UNJUST ENRICHMENT</u></b><br><b>(Claim by Robert Chen and OtterSec LLC)</b>

178.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

179.    Plaintiffs allege unjust enrichment as an alternative pleading. This alternative pleading does not rely on any assertions of intellectual property rights by OtterSec, but is instead premised on the alternative argument that Defendant David was unjustly enriched at OtterSec's expense, regardless of who owned the Solend Liquidator Code that OtterSec personnel edited between February and April 2022. This alternative pleading, therefore, does not distinguish between the Preexisting and OtterSec versions of the Solend Liquidator Code.

180.    Sometime prior to the creation of OtterSec, David began the development of the Solend Liquidator Code. When David eventually began his work with OtterSec in February 2022, David transferred ownership of the code on GitHub to OtterSec.

181.    With the transfer of the code to OtterSec and the allocation of resources for the

development of the code, OtterSec reasonably believed that its developments would result in profits for the Wyoming company.

182.    For two months, OtterSec dedicated hundreds of personnel hours of its employees, agents, and contractors to develop the Solend Liquidator Code, with the expectation that the resulting "liquidator bots" would be operated for the benefit of OtterSec.

183.    After OtterSec's improvements, the "liquidator bots" for which that code contained instructions were significantly more efficient, more reliable, and integrated with more platforms than they would have been before OtterSec's efforts. Increasing the bots' efficiency, reliability, and integration were crucial to increasing the Code's profitability as they ensured the Code could identify assets to be swapped at an advantageous and extremely profitable price.

184.    At no time did OtterSec, Robert, or David ever consider David to be a client of OtterSec. OtterSec was not in the business of rewriting code for its clients, and OtterSec worked on code that could be used for automated cryptocurrency training only to the extent that it (OtterSec) intended and expected to use such code itself and for its own benefit.

185.    David did not pay OtterSec for its employees' work on and with the Solend Liquidator Code. He accepted their work.

186.    David was paid $60,000 for his own work as an OtterSec employee, including his work on the Solend Liquidator Code after it was transferred to OtterSec.

187.    David understood that OtterSec anticipated a return on the resources it invested into making improvements to the Code, and that, specifically, OtterSec anticipated to receive the profits earned by the "liquidator bots" for an indefinite amount of time. In particular, Defendant David consented to Plaintiff Robert's plan that, after a certain amount of time, "liquidator bot" operations would be funded not with David's loaned cryptocurrency assets, but with company assets. David

also consented to programming the liquidator bots being operated from and delivering funds into the OtterSec wallet ending in -2bmQ.

188.    Prior to David's sudden departure from OtterSec, the company only earned approximately $7,900 from the OtterSec Codes.

189.    OtterSec typically charged $500 per hour for its employees' time on audits, so even if OtterSec had been in the business of updating cryptocurrency trading codes for clients at an hourly rate, $7,900 would not come close to adequately compensating OtterSec for the employee-time it dedicated to working on the Solend Liquidator Code.

190.    By April 27, 2022, David removed OtterSec's access to the Solend Liquidator Code and prevented OtterSec from accessing the code. David then proceeded to use the code himself, using and enjoying the benefits of OtterSec's improvements on the Solend Liquidator Code, and taking all the proceeds from that Code for himself.

191.    Immediately after he quit, David began operating the Solend Liquidator Code, which OtterSec had improved, for his own personal gain. He did this using a new account (a new public key) on the Solend blockchain.

192.    In the first months of using the Solend Liquidator Code for his own personal gain, David profited approximately $500,000. David would not have made such an incredible profit but for the developments made by OtterSec, and therefore has enriched himself at OtterSec's expense.

193.    Likewise, David would not have made more money thereafter with the code were it not for OtterSec's work.

194.    Defendant David has returned none of the profits he made using the Code to OtterSec, nor has he provided any form of compensation to OtterSec for its work developing the code, work which ultimately benefitted only him.

195.    After taking the Code, David claimed to an acquaintance that he had undone some of the work OtterSec—specifically Plaintiff Robert—had done to improve the Solend Liquidator Code and suggested that he had "rebased" the changes he made, meaning he altered records showing the history of changes to the code, presumably to hide the record of Robert and other OtterSec personnel having worked on it. David told this acquaintance "it took me about 3 hours to undo [Plaintiff Robert's] refactor and rebase my changes."

196.    David never reinstated OtterSec's access to the Code.

197.    OtterSec did not intend to donate to David company resources for the development of the Solend Liquidator Code. Rather, OtterSec expected a return on its investment of resources through use of the OtterSec codes for company purposes. OtterSec's expectation that it would reap the benefits of its developments was reasonable given its investment of time and resources.

198.    David's actions in revoking OtterSec's access and using the Code were egregious and knowingly wrongful because he knew that he was profiting at OtterSec's expense.

199.    Through counsel, in early June 2022, OtterSec notified David that it expected payment for OtterSec's contributions to the Code.

200.    When OtterSec dedicated resources to improving the Solend Liquidator Code and did not receive meaningful returns from its dedication of resources to the development of these codes, David was unjustly enriched by his knowingly wrongful removal of OtterSec's access to the code and his knowing sabotage of OtterSec infrastructure related to the codes. OtterSec suffered a loss in an amount that can be calculated based on David's wrongfully obtained profits. Absent disgorgement of such profits, OtterSec cannot be adequately compensated for its efforts and David will have profited from his wrongdoing.

201.    David continued to engage in conduct by which he was unjustly enriched at

OtterSec's expense and to injure OtterSec following Robert's purchase on September 24, 2022, of all then-existing claims OtterSec.

202.    Defendant David, as a conscious wrongdoer, is liable in restitution in the amount of his net profits attributable to his revocation of OtterSec's assets and use of the Code, and such disgorgement of profits is an equitable remedy for his wrongdoing.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs Robert Chen and OtterSec LLC respectfully demand judgment in their favor and against Defendant David as follows:

A.    Awarding Plaintiffs Robert Chen damages, including punitive damages, for conversion, breach of fiduciary duty, misappropriation of trade secrets under the Defend Trade Secrets Act (Robert only), misappropriation of trade secrets under the Wyoming Uniform Trade Secrets Act (Robert only), intentional interference with a prospective economic advantage (Robert only), and, in the alternative, an award of restitution requiring Defendant David to disgorge the amount by which he was unjustly enriched by his wrongdoing, in an amount to be determined at trial;

B.    Awarding Plaintiff OtterSec damages for conversion of the JUP tokens and for breach of fiduciary duty, in an amount to be determined at trial;

C.    Requiring Defendant David to disgorge all benefits obtained during the course of his breach of fiduciary duty and other wrongful conduct discussed above;

D.    Awarding Plaintiffs pre-judgment and post-judgment interest;

E.    Awarding Plaintiff Robert attorneys fees and costs for this action as provided by law under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and Wyoming Uniform Trade Secrets Act, Wyo. Stat. Ann. § 40-24-101, *et seq.*;

F.     Awarding Plaintiff Robert all necessary and proper injunctive relief to prevent Defendant David from using OtterSec trade secrets; and

G.     In the alternative, awarding Plaintiffs Robert Chen and OtterSec restitution and requiring disgorgement of Defendant David's profits from his use of the Solend Liquidator Code; and

H.     Awarding Plaintiffs Robert and OtterSec such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of six (6) of all issues so triable.

DATED this 25th day of November 2024.

Respectfully Submitted,

_____/s/ Amy M. Iberlin_____
Amy M. Iberlin, W.S.B. #7-5322
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY  82602-3902
Telephone:     (307) 265-0700
Facsimile:     (307) 266-2306
E-Mail:        aiberlin@wpdn.net

*Counsel for Plaintiffs Robert Chen and OtterSec, LLC*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing was served on the 25th day of November 2024, to the following:

Timothy M. Stubson, WSB #6-3144                ☒ CM/ECF
CROWLEY FLECK PLLP                             ☐ U.S. Mail (Postage Prepaid)
111 West 2nd St. Suite 220                     ☐ Fax
Casper, WY 82601                               ☐ E-mail
(307) 265-2279                                 ☐ Overnight Delivery
tstubson@crowleyfleck.com                      ☐ Hand Delivery


                              /s/ Amy M. Iberlin
                              Amy M. Iberlin