## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>      Plaintiff,<br><br>      v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>      Defendants. | Case No. 8:23-cv-00889-TDC |
| ROBERT CHEN and OTTERSEC LLC,<br><br>      Plaintiffs,<br><br>      v.<br><br>DAVID CHEN,<br><br>      Defendant. | Case No. 8:24-cv-03628-TDC |

## JOINT RECORD – MOTION FOR SANCTIONS (ECF 194)

## INDEX OF EXHIBITS

| Exhibit Number | Exhibit Title | J.R. Page Number for Start of Exhibit |
|---|---|---|
| 1 | Email correspondence between David's counsel and Robert's counsel concerning meet and confers | J.R.001 |
| 2 | December 5, 2025, Meet and Confer Transcript | J.R.041 |
| 3 | December 17, 2025, Meet and Confer Transcript | J.R.109 |
| 4 | February 18, 2026, Meet and Confer Transcript | J.R.166 |
| 5 | July 30, 2025, David Chen Deposition Transcript | J.R.191 |
| 6 | December 10, 2025, David Chen Deposition Transcript | J.R.257 |
| 7 | February 3, 2026, David Chen Deposition Transcript | J.R.304 |
| 8 | Robert Chen's Second Set of ROGs on Li Fen Yao (*Yao v. Chen*) | J.R.385 |
| 9 | Li Fen Yao's Responses to Second Set of ROGs (*Yao v. Chen*) | J.R.391 |
| 10 | Li Fen Yao's Responses to Second Set of ROGs – First Amended (*Yao v. Chen*) | J.R.410 |

| 11 | Li Fen Yao's Responses to Second Set of ROGs – Second Amended (*Yao v. Chen*) | J.R.431 |
|---|---|---|
| 12 | Li Fen Yao's Responses to Second Set of ROGs – Third Amended (*Yao v. Chen*) | J.R.462 |
| 13 | Li Fen Yao's Responses to Robert's First RFPDs (*Yao v. Chen*) | J.R.493 |
| 14 | David Chen's Responses to Defendants' Subpoena (*Yao v. Chen*) | J.R.506 |
| 15 | David Chen's Responses to First Set of ROGs (*Chen v. Chen*) | J.R.522 |
| 16 | David Chen's Responses to First Set of RFPDs (*Chen v. Chen*) | J.R.537 |
| 17 | Robert Chen and OtterSec LLC's Second Set of ROGs on David (*Chen v. Chen*) | J.R.549 |
| 18 | David Chen's Responses to Second Set of ROGs (*Chen v. Chen*) | J.R.554 |
| 19 | Robert Chen and OtterSec LLC's Second Set of RFPDs on David Chen (*Chen v. Chen*) | J.R.567 |
| 20 | David Chen's Responses to Second Set of RFPDs (*Chen v. Chen*) | J.R.573 |
| 21 | Defendants' First Set of ROGs on Li Fen Yao (*Yao v. Chen*) | J.R.583 |
| 22 | Li Fen Yao's Responses to First Set of ROGs (*Yao v. Chen*) | J.R.589 |
| 23 | April 1, 2025, Letter from CLM to LFM regarding Discord messages | J.R.606 |
| 24 | December 2 and 5, 2025, Email correspondence regarding Discord production | J.R.609 |
| 25 | November 27, 2024, Letter from CLM to LFM | J.R.617 |
| 26 | July 21, 2025, Email correspondence from LFM to Tydings | J.R.621 |
| 27 | August 8, 2025, Email correspondence from Tydings to LFM | J.R.623 |
| 28 | November 24, 2025, Letter from Tydings to LFM | J.R.632 |
| 29 | Example of document produced with 38 copies by David's counsel in *Yao v. Chen* | J.R.637 |
| 30 | Correspondence regarding Fifth Production, *Yao v. Chen* | J.R.640 |
| 31 | January 3, 2025, Meet and Confer Transcript (submitted by David and Li Fen) | J.R.653 |
| 32 | January 10, 2025, Meet and Confer Transcript (submitted by David and Li Fen) | J.R.897 |

# Exhibit 1

J.R.001

**Subject:** RE: Chen v. Chen - David Chen's Memorandum in Opposition

**Date:** Monday, September 15, 2025 at 4:06:19 PM Eastern Daylight Time

**From:** Alexander M. Giles

**To:** Kevin Crenny, Rachel Clattenburg, Josh Levy, Justin DiCharia, Emma Floyd, Christina Lamoureux

**CC:** Michael Lentz, Fernando Kirkman, Rachel DeCaluwe, Plotnick, Stephen M., Malyshev, Alexander G., White, Madelyn K., Simpson, Kevin M.

**Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Kevin-

That is certainly your position. We, however, disagree with that position.

As we discussed before, and I believe it was during the actual Meet and Confer session, you have not been elevated to become a Judge, at least as far as I am aware, and in any regard certainly not for this case. So while you certainly can wax poetic about what you think a COURT might do in terms of considering the merits of the arguments of both sides, that's about the extent of what you are able to say.

Furthermore, as we also discussed previously, we are currently involved in the "discovery dispute" and "Meet and Confer" process as governed by Local Rules 104.7 and 104.8, and we are NOT at the point of actually filing the Motion to Compel and the other related pleadings with the Court yet. As such, the primary overriding goal is for the parties to discuss and try to "resolve" discovery disputes, and, as such, there is case law which supports the principle that courts will permit delays in the briefing deadlines provided they are operating in the spirit of the discovery process and the "resolution" process. Moreover, Plaintiffs cannot reasonably or legitimately establish that they have suffered any prejudice as a result of our delay in terms of finalizing Amended Answers as we discussed we would be doing during the July 18 Meet and Confer session, and the delay in our preparation of and service of David's Memorandum in Opposition following the service of our Amended Answers to Plaintiffs' Interrogatories.

As you may have noted in one of the footnotes, we suggested to the Court that if Plaintiffs wanted to take the opportunity to prepare and serve a second/revised Reply Memorandum that you should request the ability to do so from the Court, and that if you did proceed in that manner that we would simply not object to your request to serve a second/revised Reply Memorandum. Let us know what you intend to do in that regard. Thank you.

-Alex

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

J.R.002



**From:** Kevin Crenny <kcrenny@levyfirestone.com>
**Sent:** Monday, September 15, 2025 3:40 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Rachel Clattenburg <rmc@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>
**Cc:** Michael Lentz <mlentz@tydings.com>; Fernando Kirkman <FKirkman@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>; Plotnick, Stephen M. <plotnick@clm.com>; Malyshev, Alexander G. <malyshev@clm.com>; White, Madelyn K. <white@clm.com>; Simpson, Kevin M. <simpson@clm.com>
**Subject:** Re: Chen v. Chen - David Chen's Memorandum in Opposition

Alex,

David's opposition to Robert's July 22, 2025 Motion to Compel was due over a month ago, on Tuesday, August 12 (an extended deadline that you requested). After David did not serve an opposition brief on that extended deadline, we proceeded to serve our Reply, which I attach again here for your convenience. Any merits-based arguments in the brief you served this morning were waived by David's decision not to serve an opposition brief in a timely manner.

**Kevin P. Crenny**

**Levy** | **Firestone** | **Muse**
900 17th Street NW, Suite 605, Washington, DC 20006
T 484-888-8968  •  F 202-595-8253  •  levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Levy Firestone Muse LLP.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Monday, September 15, 2025 at 7:02 AM

J.R.003

**To:** Kevin Crenny <kcrenny@levyfirestone.com>, Rachel Clattenburg <rmc@levyfirestone.com>, Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Chris Harrell <chris_h@coastalvillages.org>, Emma Floyd <efloyd@levyfirestone.com>
**Cc:** Michael Lentz <mlentz@tydings.com>, Fernando Kirkman <FKirkman@tydings.com>, Rachel DeCaluwe <RDeCaluwe@tydings.com>, Plotnick, Stephen M. <plotnick@clm.com>, Malyshev, Alexander G. <malyshev@clm.com>, White, Madelyn K. <white@clm.com>, Simpson, Kevin M. <simpson@clm.com>
**Subject:** Chen v. Chen - David Chen's Memorandum in Opposition

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Attached please find David Chen's Memorandum in Opposition to Plaintiff's Motion to Compel.  I will provide an updated proposed Joint Record with additional documents later today.

-Alex



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.004



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.005

**Subject:**    RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

**Date:**    Friday, February 20, 2026 at 6:40:45 PM Eastern Standard Time

**From:**    Alexander M. Giles

**To:**    Rachel Clattenburg, Gabrielle Caggiano, Michael Lentz, Casey Brinks, Rachel DeCaluwe

**CC:**    Josh Levy, Justin DiCharia, Emma Floyd, Kevin Crenny, Christina Lamoureux, Katherine Bigley, Jennifer Luong

**Attachments:** ~WRD0301.jpg

---

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

I will try to be as polite as possible with this response.  Once again, though, you have conveniently (and purposefully) misstated a fair amount of the facts, which I would have thought would have been difficult to do in essentially a two-paragraph email from you….but, evidently, you must just be an over-achiever and a wonderkin in that regard.  Congratulations.

Despite your comments to the contrary, the record will reflect that I DID, in fact, answer several of your questions during the recent February 18 Meet & Confer session….you just don't like our answers, which, sadly, we have come to expect from you.  As a reminder, though, I answered your following questions/inquiries from your January 23, 2026 email – Item Nos. 3, 4, 5, 6, 7, and we previously provided you a substantive response as to Item No. 8 that fully answered that question.  Furthermore, as I mentioned during our Meet and Confer, I have been working with our people at TransPerfect and with our own associate Rachel D. to get to the bottom of your Item Nos. 1 (Ally Guo) and 2 (Philip Papurt).  I received some initial information from TransPerfect and our Rachel regarding both items immediately prior to me jumping on the Meet and Confer session with you on Wednesday, and I have since now received further information from both of them regarding both issues….BUT I still do not have what I need to conclusively come back to you with what I have learned and reviewed until I am confident that we have the "full" answer, as I certainly do not want to inadvertently create a situation which will undoubtedly just result in further back and forth on these issues which will be to no one's benefit in the grand scheme of things.

With regard to the Privilege Issue that you had previously raised in your January 12, 2026 email (which was sent while I was out of the state traveling regarding another matter), I have communicated with Michael, Casey, and our Rachel on the status of this issue since we wrapped up Wednesday's Meet & Confer session.  Your January 12 email was sent at a time when we had already conducted our privilege review and had only recently produced our various privilege logs regarding both aspects of this consolidated litigation.  After you sent your January 12 email, my colleague Casey Brinks immediately reviewed it and had prepared a written response to it, which he ultimately did not send to your side.  The reason he did not send that response is because we elected to remove the privilege designations on most of those documents and to simply produce them, which we did.  My understanding is that they were included in the YAO020 and YAO021 productions to your side.  For your benefit, though, I am sending to you

1 of 14

J.R.006

and your colleagues the draft email that Casey had prepared, but did not send:

1. Emails and documents with Alex Zhong. Upon further review, we agree that the documents PRIVLOG000000351-367 are not privileged and will produce these documents.

2. Communications between David and Sam Chen. Upon further review, we agree that PRIVLOG00000368 and PRIVLOG00000370 are not privileged and we will produce these documents.

3. Emails with Shelly Huang. Shelly Huang is a licensed certified public accountant and these communications were made between Li Fen Yao and Ms. Huang for the purpose of Ms. Huang rendering professional services. Therefore, these communications are protected by the accountant-client privilege. *See* Md. Cts. & Jud. Proc. Art. § 9-110; *Powers v. Braun*, 2013 U.S. Dist. LEXIS 175767 at *7-8 (D. Md. Dec. 16, 2013) (recognizing accountant-client privilege in Maryland and noting its applicability when the federal court sits in diversity jurisdiction).

4. Communications with June Hao. Upon further review, we agree that the documents you identified in your email are not privileged and will produce these documents.

5. Non-responsive and non-privileged emails. Upon further review, we agree that the documents CTRL00047341-47344 are not privileged and will be produced. However, the documents contain confidential medical information of Li Fen Yao, which will be redacted. The materials are responsive to your requests because they were identified using the agreed-upon search terms.

6. May 2022 communications under PRIVLOG00000348-350. These are confidential communications between David Chen and attorney Marc Oram seeking legal advice and potential representation related to David Chen's claims against Robert Chen. They are protected by the attorney-client privilege. We will supplement our privilege log.

7. Documents PRIVLOG00000868-881. Upon further review, these documents are not privileged and will produce these documents.

In addition to the foregoing information, it is my understanding from Casey and our Rachel that an updated Privilege Log was issued on or about January 21, 2026.  Let us know if you received that updated Privilege Log reflecting the information stated above.  If you did NOT receive it yet, I will ask Casey to locate it and to send it to your collective attentions early next week.  In the meantime, though, let us affirmatively know whether you received it or not.

Finally, with regard to your "demand" that we schedule a follow-up Meet and Confer session for some time next week (February 23-27), the quick and easy answer as I already mentioned to you at the end of Wednesday's Meet and Confer session is "no, that's not going to happen."  I am up in New York City for the entirety of next week in meetings and giving presentations to several different companies.  I am simply not available.  I leave on the train first thing Monday

J.R.007

morning to head up to NYC, and I get back home Friday afternoon just before 5:00 p.m. Both Michael and Casey, on the other hand, are involved in trials next week, two separate trials – Michael is involved with one, Casey is involved with the other one. Consequently, THEY are not available to prepare for and attend your proposed Meet and Confer session next week. Despite that, though, I ***have*** asked Michael, Casey, and our Rachel to continue working on the other items with TransPerfect next week, when their schedules permit them to do so (which will most likely only be in the evenings next week), to try to get you and your colleagues the information and/or documents that you are seeking, assuming, of course, that such information and/or documents actually exist.

Any future Meet and Confer session will have to be conducted sometime the following week, starting no earlier than the afternoon of Monday, March 2. If the afternoon of March 2 does not work for your side, I have availability all day on March 3 as well as in the morning on March 4. Thursday, March 5 and Friday, March 6 are a little more tenuous for me at the moment regarding another case of mine, so I cannot offer either of those dates as an option.

I will look forward to speaking with you soon, and, on our side, we will continue to update matters with you regarding the other items that you raised with me during the February 18, 2026 Meet and Confer session. Have a nice weekend.

-Alex

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Thursday, February 19, 2026 5:26 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Michael Lentz <mlentz@tydings.com>; Casey Brinks <cbrinks@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,

At the end of yesterday's meet and confer, at which you did not answer any of the questions we had identified for discussion weeks and months ago, you claimed to be completely unavailable to work on this case until March 2, 2026. You also said that other members of your team would be working on these issues next week.

As we said during the meet and confer, waiting ten more days to begin discussing the issues raised in my January 23 and February 5, 2026 emails constitutes an unreasonable delay, especially since, even though we asked to only meet and confer when you were fully prepared to discuss the issues we had raised, that did not happen, and you were unable to provide us with any new information. The significant delay to date has already prejudiced Robert. In order to keep moving forward with these issues, we would like to schedule a meet and confer for next week with someone on your team who is prepared to discuss those responses. Please let us know who on your team can join and their availability next week.

You also said you would provide answers to our January 12, 2026, privilege questions by this Friday, February 20. We look forward to receiving those tomorrow.

Thanks,
Rachel

On Feb 11, 2026, at 2:22 PM, Alexander M. Giles <agiles@tydings.com> wrote:

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

That works.  We will get you answers/responses to your questions/requests raised in your January 23 email before February 18.

-Alex

Alexander M. Giles          One East Pratt Street

**4 of 14**

J.R.009

agiles@tydings.com
Office: 410.752.9747

Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Wednesday, February 11, 2026 1:34 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>;
Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>;
Emma Floyd <efloyd@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>;
Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley
<kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,

We can do February 18, 4:30 - 5:30 pm. We can arrange a court reporter.

Thanks,
Rachel

---

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Tuesday, February 10, 2026 at 4:31 PM
**To:** Rachel Clattenburg <rmc@levyfirestone.com>, Michael Lentz
<mlentz@tydings.com>, Gabrielle Caggiano <GCaggiano@tydings.com>,
Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>, Justin DiCharia
<JDiCharia@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>,
Kevin Crenny <kcrenny@levyfirestone.com>, Christina Lamoureux
<Christinal@levyfirestone.com>, Katherine Bigley
<kbigley@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

**Caution:** This is an external email and may be malicious. Please take care
when clicking links or opening attachments.

Rachel-

J.R.010

We are still working on addressing your questions and related requests, as identified below.

In light of your stated position that you would only like to proceed with the meet and confer once we/you have answers to the questions that you raised in your January 23, 2026 email, I would suggest instead looking to a date next week when we are mutually available to schedule the meet and confer and can have a thorough discussion about the outstanding issues after we answer and/or respond to your questions/requests/concerns.

Next week, I am currently available February 18 and 20, all day both days.


-Alex

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street Suite 901 Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Monday, February 9, 2026 9:04 AM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,
We've not gotten a response from you - should we block off time for the meet and confer? If not, please let us know when you will be ready to discuss these production issues.

Thanks,
Rachel

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Date:** Thursday, February 5, 2026 at 10:06 AM
**To:** Alexander M. Giles <agiles@tydings.com>, Michael Lentz <mlentz@tydings.com>, Gabrielle Caggiano <gcaggiano@tydings.com>, Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>, Katherine Bigley <kbigley@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,

We can do a meet and confer on February 11, 2026, in the morning or February 12 at 11 am.

However, we'd like to proceed with it only when you have answers to the questions we raised below in my January 23, 2026, email, and are prepared to discuss those. Please add to that list three of the other outstanding issues we've previously raised with you and that remain unaddressed: (i) De-duplication issue: we discussed this in the December 17, 2025 meet and confer, and we followed up in an email on December 23, 2025 email, with specific examples and questions; (ii) the responsiveness and format of more than 99,000 documents in YAO 17 — see my email to you of December 18, 2025, and the December 17 meet and confer; (iii) the privilege log questions from our January 12, 2026, email.

If you are not prepared to discuss those issues—all related to document productions—on February 11 or 12, 2026, let's wait to schedule a meet and confer until you are prepared to do so. Let us know.

Thanks,
Rachel

J.R.012

1.

---

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Tuesday, February 3, 2026 at 1:45 PM
**To:** Rachel Clattenburg <rmc@levyfirestone.com>, Michael Lentz <mlentz@tydings.com>, Rachel DeCaluwe <RDeCaluwe@tydings.com>, Gabrielle Caggiano <GCaggiano@tydings.com>, Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Josh Levy <jal@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>, Katherine Bigley <kbigley@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

Further to your below email from January 23, and to get something on the calendar just to be safe, I would propose the dates of either February 11, 12 (after 11:00 a.m.), or 13 for a meet and confer on the issues that you have raised therein. In the meantime, though, we are going through each item and attempting to "resolve" them on our end.

See you later this afternoon at 3:00 p.m. at the College Park/UMD Marriott in its Conference Center. I will be leaving my office in Baltimore very shortly.

-Alex

Alexander M. Giles                                    One East
                                                      Pratt Street

J.R.013

agiles@tydings.com
Office: 410.752.9747

Suite 901
Baltimore,
MD 21202
Main:
410.752.9700
Fax:
410.727.5460

**From:** Alexander M. Giles
**Sent:** Wednesday, January 28, 2026 1:53 PM
**To:** 'Rachel Clattenburg' <rmc@levyfirestone.com>; Michael Lentz <mlentz@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Rachel-

In response to Item #8 (below), attached please find my recent email exchange with Maggie Gaffney authorizing the work that you specifically requested in your November 4 email to her.

Regarding the remaining items, we will respond accordingly this week.

-Alex

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East
Pratt Street
Suite 901
Baltimore,
MD 21202
Main:
410.752.9700

J.R.014

Fax:
410.727.5460

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Friday, January 23, 2026 3:25 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Counsel,

In reviewing your productions YAO 017-022, we have the following issues/questions so far. We should set up a meet and confer, unless these issues are promptly resolved by you. <u>Please let us know your availability for a meet and confer next week.</u>

**1.** David and his counsel represented he preserved all of his Discord conversations with Ally Guo before deleting them and that they were provided to Transperfect. D. Chen Deposition Tr. at 71 (July 30, 2025); S. Plotnick Ltr. to LFM at 3 (June 13, 2025). Please point us to where you have produced these, by Bates number, as they do not appear in searches for her username.

**2.** Most of David's chats with Philip Papurt appear to still be missing from your productions. Please show us where you have produced these, or promptly produce. You have so far only produced for these days:  3/28/22, 4/2/22, 4/27/22, 4/29/22, 6/27/22, 1/2/23 (only 4/29, 6/27, and 1/2 are just David and Philip, the rest have Robert on them).

**3.** You have produced text messages (including WeChat) as single messages, and not in 24-hour format. See, e.g., YAO00980224, YAO00979703, and YAO00979781. Please promptly reproduce in the required 24-hour format for all text messages incorrectly produced as single messages.

**4.** Many Telegram messages have only David's side of the conversation. See, e.g., YAO01057140, YAO01057173, and YAO01057275.  Please produce the entire conversations for all Telegram threads. This was a major issue with Li Fen's production of YAO 005 that took months to resolve. We would like to prevent that from happening again. (For that production, she produced one-sided Discord conversations with only David's messages produced — which you also appear to have done again in many instances, see below.)

J.R.015

5. There are responsive and relevant Discord conversations that were produced by third parties that we are not seeing in your production. These include:

- Discord conversations between Darren Chen and David (such as CDA_00013)
- Channels from the New Clickbait server, including the "rubber-duck-debugger" (e.g. Deng_0003775) channel.

The omission of these conversations, which we know included relevant and responsive messages, raise questions about what other conversations may be missing from your productions.

Please note that David and Li Fen claimed to have collected these channels in Li Fen Yao's Third Amended Responses to the Second Set of Interrogatories in Yao v. Chen. The rubber-duck-debugger channel has the Channel IDs 897979229768130572 and appears in Exhibit C to those Responses. David's direct message conversation with Darren Chen (Discord username: D1wan) is listed in Exhibit B to those Responses. For these conversations, all we see in your productions are documents that appear to contain only David's messages from these conversations—no one else's—presented in formats that are not legible, not usable, not what we agreed to, and not even in chronological order. See YAO00896448, YAO00896643. Please point us to where in your productions we can find proper versions of these conversations, or explain why you did not produce these conversations that you claim to have collected and preserved.

6. The Discord material that you have produced includes material from many DM conversations and discussion channels that do not appear on Exhibit A to Li Fen Yao's Third Amended Responses to the Second Set of Interrogatories in Yao v. Chen. This is despite counsel's repeated insistence that David and Li Fen were only searching and producing from conversations and channels that appeared on Exhibit A, a position you reiterated in your January 22, 2026 Letter to the Court (ECF 190). We have repeatedly pointed out why this does not make sense, and your productions confirm that we are correct. For example, the following produced documents come from conversations not listed on Exhibit A. Please explain and correct your representations regarding which channels and direct messages are being searched and produced.

- DMs with friendlyuser2224585 (See YAO01443296, YAO01443450, YAO01443651)
- Bot notifications from Github and Solend APY Bot (See YAO01440850 and YAO01445605)
- DMs and group chats with 0xsoju (See YAO01460655 and YAO01460183)

7. There are Discord conversations that David or Li Fen previously produced that we have not located in a complete and usable format in your recent re-productions of Discord. Based on your representation about your document review process, we should be receiving a new version of any document you had previously produced. Conversations that we are not seeing re-productions of include those represented in the following documents:

- Conversations with Parth Shastri (Discord username: cppio), such as YAO00016168
- Conversations with William Wang (Discord user "defund"), such as YAO00004545

In your recent productions, you appear to have produced David's messages from these conversations (at least some of them), but not the other participants', and you have produced these in a format that is not legible, not usable, not what we agreed to, and not in chronological order. See YAO00896555, YAO00896722. If the full conversations are in your recent

productions, please point us to where we can find them. If not, then again, the omission of these conversations, which we know included relevant and responsive messages, raises questions about what other conversations may be missing from your productions.

**8.** Please forward your correspondence with Maggie Gaffney that you reference in your letter to the Court (ECF 190) and any response you have received. We need to know when you emailed her, what you authorized, and whether she has confirmed that she has started the investigation. You call TeelTech a "jointly designated expert" in your letter. Accordingly, there should not be communications between you and TeelTech about the phone that we are not copied on, and it has been counsel's practice for the past year to copy one another on all correspondence with TeelTech.

**9.** Please point us to the Bates numbers for the documents responsive to Chen v. Chen RFPs 20, 21, 22, 23; Yao v. Chen First Set of RFPS 14, 15; Subpoena on David RFP No. 17; Robert Chen's Second Set of RFPs in Yao v. Chen RFP 5; RC Security's Second Set of RFPs in Yao v. Chen Nos. 5, 6. All of these are requests for documents "sufficient to" show or identify and for which you have claimed your search terms, which did not address these requests, were sufficient. Please point us to where you have responded to these requests.

Thanks,
Rachel

**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • C 914-714-1676 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.018

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460



This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

14 of 14

J.R.019

**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022
**Date:** Wednesday, February 18, 2026 at 4:16:20 PM Eastern Standard Time
**From:** Alexander M. Giles
**To:** Rachel Clattenburg, Michael Lentz, Rachel DeCaluwe, Gabrielle Caggiano, Casey Brinks
**CC:** Kevin Crenny, Justin DiCharia, Emma Floyd, Josh Levy, Christina Lamoureux, Katherine Bigley, Jennifer Luong

**Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel, et al-

Let us attempt to respond to your below requests regarding our various recent document productions (in YAO017-YAO022) in this matter:

1. I have asked both TransPerfect directly, as well as our own associate Rachel DeCaluwe, to investigate this issue. Obviously, as both of us heard (in addition to the cites that you identify below from David's July 30 deposition and from Stephen Plotnick's Letter dated June 13, 2025, which was prior to our firm entering our appearances on behalf of Li Fen Yao and David Chen), David recently testified on February 3, 2026 that it was his understanding that TransPerfect had possession of some amount of Ally Guo messages that had been derived from a much earlier collection of documents which David believes was associated with an initial Discord Take-Out process. Hopefully I will have further information to share during this afternoon's Meet and Confer session.

2. Similarly, I have asked both TransPerfect and (our) Rachel to investigate the Philip Papurt issue that you have raised to see if they can identify any messages with Philip Papurt above and beyond the messages already produced on the dates that you have identified below. Like item 1, hopefully I will have further information to share during this afternoon's Meet and Confer session.

3. My understanding from discussions with Stephen Plotnick and TransPerfect is that we were only agreeing to provide 24-hour formatted productions for Discord and Telegram, nothing else. As a result, text messages (including WeChat) were being produced as singular productions, provided, of course, that they contained one or more of the agreed upon search terms in their text.

4. In addition, I have also asked both TransPerfect and (our) Rachel to investigate the content of the Telegram messages that were previously produced. Also, like items 1 and 2, hopefully I will have further information to share during this afternoon's Meet and Confer session.

5. In response to your below item nos. 5, 6, and 7, the explanation that I believe best answers your inquiries as to those particular items is that during the course of this litigation, we have had at least two separate, large-scale collections of

J.R.020

documents/data/information.  The first collection occurred several years ago, and the documents and information obtained during that initial collection were (I believe) reviewed and narrowed down by the November 2024 search terms in the *Yao v. Chen* side of this litigation and then produced in response to your discovery requests at that time. Since then, pursuant to the entry of the Preservation Order in May 2025, the subsequent discussions this past summer, and then the Meet & Confer sessions that were conducted in July, August, and September 2025, it was determined that we had to undertake a complete re-collection of all of David's digital footprint that existed as of August 2025, and that re-collection, while using both the November 2024 and August 2025 combined search terms, resulted in the more recent document productions that have occurred during the Fall of 2025 up through late January 2026.  For obvious reasons, that have been explored at length by your side regarding the scope of the spoliation issues, it is clear that the documents that were previously collected a couple years ago and were largely produced in the 2024-early 2025 time frame (prior to the entry of the Preservation Order) are NOT entirely identical with the documents that have now been re-collected and re-produced within the past couple of months (in YAO017-YAO022).

6.  We already responded to Item 8 (below).

7.  Finally, while I do not believe that it is our responsibility to undertake such an analysis of pointing out every single document that may or may not respond to the noted discovery requests posed by your side, we, nonetheless, will attempt to provide to you, on a good-faith basis, examples from our various document productions.  In that regard, like items 1, 2, and 4 (above), hopefully I will have further information to share during this afternoon's Meet and Confer session.  If not, we will have to supplement our responses to your inquiries at a later date following the completion of this afternoon's Meet & Confer.

-Alex



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Friday, January 23, 2026 3:25 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Rachel DeCaluwe

J.R.021

<RDeCaluwe@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Counsel,

In reviewing your productions YAO 017-022, we have the following issues/questions so far. We should set up a meet and confer, unless these issues are promptly resolved by you. Please let us know your availability for a meet and confer next week.

**1.** David and his counsel represented he preserved all of his Discord conversations with Ally Guo before deleting them and that they were provided to Transperfect. D. Chen Deposition Tr. at 71 (July 30, 2025); S. Plotnick Ltr. to LFM at 3 (June 13, 2025). Please point us to where you have produced these, by Bates number, as they do not appear in searches for her username.

**2.** Most of David's chats with Philip Papurt appear to still be missing from your productions. Please show us where you have produced these, or promptly produce. You have so far only produced for these days: 3/28/22, 4/2/22, 4/27/22, 4/29/22, 6/27/22, 1/2/23 (only 4/29, 6/27, and 1/2 are just David and Philip, the rest have Robert on them).

**3.** You have produced text messages (including WeChat) as single messages, and not in 24-hour format. See, e.g., YAO00980224, YAO00979703, and YAO00979781. Please promptly reproduce in the required 24-hour format for all text messages incorrectly produced as single messages.

**4.** Many Telegram messages have only David's side of the conversation. See, e.g., YAO01057140, YAO01057173, and YAO01057275.  Please produce the entire conversations for all Telegram threads. This was a major issue with Li Fen's production of YAO 005 that took months to resolve. We would like to prevent that from happening again. (For that production, she produced one-sided Discord conversations with only David's messages produced — which you also appear to have done again in many instances, see below.)

**5.** There are responsive and relevant Discord conversations that were produced by third parties that we are not seeing in your production. These include:
- Discord conversations between Darren Chen and David (such as CDA_00013)
- Channels from the New Clickbait server, including the "rubber-duck-debugger" (e.g. Deng_0003775) channel.

The omission of these conversations, which we know included relevant and responsive messages, raise questions about what other conversations may be missing from your productions.

Please note that David and Li Fen claimed to have collected these channels in Li Fen Yao's Third Amended Responses to the Second Set of Interrogatories in Yao v. Chen. The rubber-duck-debugger channel has the Channel IDs 897979229768130572 and appears in Exhibit C to those Responses. David's direct message conversation with Darren Chen (Discord username: D1wan) is listed in Exhibit B to those Responses. For these conversations, all we see in your productions are documents that appear to contain only David's messages from these conversations—no one else's—presented in formats that are not legible, not usable, not what we agreed to, and not even in chronological order. See YAO00896448, YAO00896643. Please point us to where in your productions we can find proper versions of these conversations, or explain why you did not

3 of 5

J.R.022

produce these conversations that you claim to have collected and preserved.

**6.** The Discord material that you have produced includes material from many DM conversations and discussion channels that do not appear on Exhibit A to Li Fen Yao's Third Amended Responses to the Second Set of Interrogatories in Yao v. Chen. This is despite counsel's repeated insistence that David and Li Fen were only searching and producing from conversations and channels that appeared on Exhibit A, a position you reiterated in your January 22, 2026 Letter to the Court (ECF 190). We have repeatedly pointed out why this does not make sense, and your productions confirm that we are correct. For example, the following produced documents come from conversations not listed on Exhibit A. Please explain and correct your representations regarding which channels and direct messages are being searched and produced.
- DMs with friendlyuser2224585 (See YAO01443296, YAO01443450, YAO01443651)
- Bot notifications from Github and Solend APY Bot (See YAO01440850 and YAO01445605)
- DMs and group chats with 0xsoju (See YAO01460655 and YAO01460183)

**7.** There are Discord conversations that David or Li Fen previously produced that we have not located in a complete and usable format in your recent re-productions of Discord. Based on your representation about your document review process, we should be receiving a new version of any document you had previously produced. Conversations that we are not seeing re-productions of include those represented in the following documents:
- Conversations with Parth Shastri (Discord username: cppio), such as YAO00016168
- Conversations with William Wang (Discord user "defund"), such as YAO00004545

In your recent productions, you appear to have produced David's messages from these conversations (at least some of them), but not the other participants', and you have produced these in a format that is not legible, not usable, not what we agreed to, and not in chronological order. See YAO00896555, YAO00896722. If the full conversations are in your recent productions, please point us to where we can find them. If not, then again, the omission of these conversations, which we know included relevant and responsive messages, raises questions about what other conversations may be missing from your productions.

**8.** Please forward your correspondence with Maggie Gaffney that you reference in your letter to the Court (ECF 190) and any response you have received. We need to know when you emailed her, what you authorized, and whether she has confirmed that she has started the investigation. You call TeelTech a "jointly designated expert" in your letter. Accordingly, there should not be communications between you and TeelTech about the phone that we are not copied on, and it has been counsel's practice for the past year to copy one another on all correspondence with TeelTech.

**9.** Please point us to the Bates numbers for the documents responsive to Chen v. Chen RFPs 20, 21, 22, 23; Yao v. Chen First Set of RFPS 14, 15; Subpoena on David RFP No. 17; Robert Chen's Second Set of RFPs in Yao v. Chen RFP 5; RC Security's Second Set of RFPs in Yao v. Chen Nos. 5, 6. All of these are requests for documents "sufficient to" show or identify and for which you have claimed your search terms, which did not address these requests, were sufficient. Please point us to where you have responded to these requests.

Thanks,
Rachel

**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • C 914-714-1676 • F 202-595-8253 • levyfirestone.com

J.R.023

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Levy Firestone Muse LLP.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460



This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.024

| | |
|---|---|
| **Subject:** | RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022 |
| **Date:** | Wednesday, February 11, 2026 at 2:22:11 PM Eastern Standard Time |
| **From:** | Alexander M. Giles |
| **To:** | Rachel Clattenburg, Michael Lentz, Gabrielle Caggiano, Casey Brinks, Rachel DeCaluwe |
| **CC:** | Josh Levy, Justin DiCharia, Emma Floyd, Kevin Crenny, Christina Lamoureux, Katherine Bigley, Jennifer Luong |
| **Attachments:** | ~WRD0000.jpg |

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

That works.  We will get you answers/responses to your questions/requests raised in your January 23 email before February 18.

-Alex



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

MERITAS LAW FIRMS WORLDWIDE          www.tydings.com



**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Wednesday, February 11, 2026 1:34 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,

We can do February 18, 4:30 - 5:30 pm. We can arrange a court reporter.

Thanks,
Rachel

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Tuesday, February 10, 2026 at 4:31 PM
**To:** Rachel Clattenburg <rmc@levyfirestone.com>, Michael Lentz <mlentz@tydings.com>, Gabrielle Caggiano <GCaggiano@tydings.com>, Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>, Katherine Bigley <kbigley@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

We are still working on addressing your questions and related requests, as identified below.

In light of your stated position that you would only like to proceed with the meet and confer once we/you have answers to the questions that you raised in your January 23, 2026 email, I would suggest instead looking to a date next week when we are mutually available to schedule the meet and confer and can have a thorough discussion about the outstanding issues after we answer and/or respond to your questions/requests/concerns.

Next week, I am currently available February 18 and 20, all day both days.

-Alex

| | |
|---|---|
| Alexander M. Giles | One East Pratt Street Suite 901 |
| agiles@tydings.com | Baltimore, MD 21202 |
| Office: 410.752.9747 | Main: 410.752.9700 |
| | Fax: 410.727.5460 |

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Monday, February 9, 2026 9:04 AM

J.R.026

**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Christina Lamoureux <Christina1@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,
We've not gotten a response from you - should we block off time for the meet and confer? If not, please let us know when you will be ready to discuss these production issues.

Thanks,
Rachel

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Date:** Thursday, February 5, 2026 at 10:06 AM
**To:** Alexander M. Giles <agiles@tydings.com>, Michael Lentz <mlentz@tydings.com>, Gabrielle Caggiano <gcaggiano@tydings.com>, Casey Brinks <cbrinks@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Christina Lamoureux <Christina1@levyfirestone.com>, Katherine Bigley <kbigley@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Alex,

We can do a meet and confer on February 11, 2026, in the morning or February 12 at 11 am.

However, we'd like to proceed with it only when you have answers to the questions we raised below in my January 23, 2026, email, and are prepared to discuss those. Please add to that list three of the other outstanding issues we've previously raised with you and that remain unaddressed: (i) De-duplication issue: we discussed this in the December 17, 2025 meet and confer, and we followed up in an email on December 23, 2025 email, with specific examples and questions; (ii) the responsiveness and format of more than 99,000 documents in YAO 17 — see my email to you of December 18, 2025, and the December 17 meet and confer; (iii) the privilege log questions from our January 12, 2026, email.

If you are not prepared to discuss those issues—all related to document productions—on February 11 or 12, 2026, let's wait to schedule a meet and confer until you are prepared to do so. Let us know.

J.R.027

Thanks,
Rachel

1.

---

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Tuesday, February 3, 2026 at 1:45 PM
**To:** Rachel Clattenburg <rmc@levyfirestone.com>, Michael Lentz <mlentz@tydings.com>, Rachel DeCaluwe <RDeCaluwe@tydings.com>, Gabrielle Caggiano <GCaggiano@tydings.com>, Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Josh Levy <jal@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>, Katherine Bigley <kbigley@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

Further to your below email from January 23, and to get something on the calendar just to be safe, I would propose the dates of either February 11, 12 (after 11:00 a.m.), or 13 for a meet and confer on the issues that you have raised therein.  In the meantime, though, we are going through each item and attempting to "resolve" them on our end.

See you later this afternoon at 3:00 p.m. at the College Park/UMD Marriott in its Conference Center.  I will be leaving my office in Baltimore very shortly.

-Alex

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

J.R.028

**From:** Alexander M. Giles
**Sent:** Wednesday, January 28, 2026 1:53 PM
**To:** 'Rachel Clattenburg' <rmc@levyfirestone.com>; Michael Lentz <mlentz@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** RE: Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Rachel-

In response to Item #8 (below), attached please find my recent email exchange with Maggie Gaffney authorizing the work that you specifically requested in your November 4 email to her.

Regarding the remaining items, we will respond accordingly this week.

-Alex

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Friday, January 23, 2026 3:25 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Casey Brinks <cbrinks@tydings.com>
**Cc:** Kevin Crenny <kcrenny@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Yao v. Chen/Chen v. Chen - Productions YAO 017-022

Counsel,

J.R.029

In reviewing your productions YAO 017-022, we have the following issues/questions so far. We should set up a meet and confer, unless these issues are promptly resolved by you. Please let us know your availability for a meet and confer next week.

**1.** David and his counsel represented he preserved all of his Discord conversations with Ally Guo before deleting them and that they were provided to Transperfect. D. Chen Deposition Tr. at 71 (July 30, 2025); S. Plotnick Ltr. to LFM at 3 (June 13, 2025). Please point us to where you have produced these, by Bates number, as they do not appear in searches for her username.

**2.** Most of David's chats with Philip Papurt appear to still be missing from your productions. Please show us where you have produced these, or promptly produce. You have so far only produced for these days: 3/28/22, 4/2/22, 4/27/22, 4/29/22, 6/27/22, 1/2/23 (only 4/29, 6/27, and 1/2 are just David and Philip, the rest have Robert on them).

**3.** You have produced text messages (including WeChat) as single messages, and not in 24-hour format. See, e.g., YAO00980224, YAO00979703, and YAO00979781. Please promptly reproduce in the required 24-hour format for all text messages incorrectly produced as single messages.

**4.** Many Telegram messages have only David's side of the conversation. See, e.g., YAO01057140, YAO01057173, and YAO01057275.  Please produce the entire conversations for all Telegram threads. This was a major issue with Li Fen's production of YAO 005 that took months to resolve. We would like to prevent that from happening again. (For that production, she produced one-sided Discord conversations with only David's messages produced — which you also appear to have done again in many instances, see below.)

**5.** There are responsive and relevant Discord conversations that were produced by third parties that we are not seeing in your production. These include:
- Discord conversations between Darren Chen and David (such as CDA_00013)
- Channels from the New Clickbait server, including the "rubber-duck-debugger" (e.g. Deng_0003775) channel.

The omission of these conversations, which we know included relevant and responsive messages, raise questions about what other conversations may be missing from your productions.

Please note that David and Li Fen claimed to have collected these channels in Li Fen Yao's Third Amended Responses to the Second Set of Interrogatories in Yao v. Chen. The rubber-duck-debugger channel has the Channel IDs 897979229768130572 and appears in Exhibit C to those Responses. David's direct message conversation with Darren Chen (Discord username: D1wan) is listed in Exhibit B to those Responses. For these conversations, all we see in your productions are documents that appear to contain only David's messages from these conversations—no one else's—presented in formats that are not legible, not usable, not what we agreed to, and not even in chronological order. See YAO00896448, YAO00896643. Please point us to where in your productions we can find proper versions of these conversations, or explain why you did not produce these conversations that you claim to have collected and preserved.

**6.** The Discord material that you have produced includes material from many DM conversations and discussion channels that do not appear on Exhibit A to Li Fen Yao's Third Amended Responses to the Second Set of Interrogatories in Yao v. Chen. This is despite counsel's repeated insistence that David and Li Fen were only searching and producing from conversations and channels that appeared on Exhibit A, a position you reiterated in your January 22, 2026 Letter to the Court (ECF 190). We have repeatedly pointed out why this does not make sense, and your productions confirm that we are correct. For example, the following produced documents come from conversations not listed on Exhibit A. Please explain and correct

your representations regarding which channels and direct messages are being searched and produced.

- • DMs with friendlyuser2224585 (See YAO01443296, YAO01443450, YAO01443651)
- • Bot notifications from Github and Solend APY Bot (See YAO01440850 and YAO01445605)
- • DMs and group chats with 0xsoju (See YAO01460655 and YAO01460183)

**7.** There are Discord conversations that David or Li Fen previously produced that we have not located in a complete and usable format in your recent re-productions of Discord. Based on your representation about your document review process, we should be receiving a new version of any document you had previously produced. Conversations that we are not seeing re-productions of include those represented in the following documents:

- • Conversations with Parth Shastri (Discord username: cppio), such as YAO00016168
- • Conversations with William Wang (Discord user "defund"), such as YAO00004545

In your recent productions, you appear to have produced David's messages from these conversations (at least some of them), but not the other participants', and you have produced these in a format that is not legible, not usable, not what we agreed to, and not in chronological order. See YAO00896555, YAO00896722. If the full conversations are in your recent productions, please point us to where we can find them. If not, then again, the omission of these conversations, which we know included relevant and responsive messages, raises questions about what other conversations may be missing from your productions.

**8.** Please forward your correspondence with Maggie Gaffney that you reference in your letter to the Court (ECF 190) and any response you have received. We need to know when you emailed her, what you authorized, and whether she has confirmed that she has started the investigation. You call TeelTech a "jointly designated expert" in your letter. Accordingly, there should not be communications between you and TeelTech about the phone that we are not copied on, and it has been counsel's practice for the past year to copy one another on all correspondence with TeelTech.

**9.** Please point us to the Bates numbers for the documents responsive to Chen v. Chen RFPs 20, 21, 22, 23; Yao v. Chen First Set of RFPS 14, 15; Subpoena on David RFP No. 17; Robert Chen's Second Set of RFPs in Yao v. Chen RFP 5; RC Security's Second Set of RFPs in Yao v. Chen Nos. 5, 6. All of these are requests for documents "sufficient to" show or identify and for which you have claimed your search terms, which did not address these requests, were sufficient. Please point us to where you have responded to these requests.

Thanks,
Rachel

**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • C 914-714-1676 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

J.R.031

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

J.R.032

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.



| Alexander M. Giles | One East Pratt Street |
| --- | --- |
| | Suite 901 |
| agiles@tydings.com | Baltimore, MD 21202 |
| Office: 410.752.9747 | Main: 410.752.9700 |
| | Fax: 410.727.5460 |

 MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.033

**Tuesday, February 10, 2026 at 2:30:34 PM Eastern Standard Time**

---

**Subject:** RE: Follow up from David Chen deposition and document sources
**Date:** Monday, August 11, 2025 at 2:19:33 PM Eastern Daylight Time
**From:** Alexander M. Giles
**To:** Rachel Clattenburg, Stephen M. Plotnick, Michael Lentz, Madelyn K. White, Alexander G. Malyshev
**CC:** Mary Hickman, Kevin M. Simpson, Josh Levy, Justin DiCharia, Kevin Crenny, Emma Floyd, Christina Lamoureux

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

Let us be direct and very clear with each other….you sending emails every two or so days "following up" on where things are that we "should be providing" to your side is not a productive way for us, as opposing counsel, to deal with each other in a collegial and professional manner.  Furthermore, when you feel the need to send such "follow up" messages, demanding the status of where things are that you are waiting for, at least frame the discussion in a completely accurate fashion.

With regard to your below list of three things that you are "waiting on" from us, I will address each in turn:

1.  Had you taken a reasonable look at my email from the middle of the night (going from July 31 into the early morning hours of August 1), you should have noticed and read that what I actually wrote was as follows (you can also scroll down in this thread to take your own look at the language of my August 1 email):

    "However, just so we are clear with each other, they will not be produced this week (as in by the close of business tomorrow).  If, however, by "this week" you actually meant by next Friday (August 8), then, yes, **_I am certainly hopeful_** that we will be able to locate, organize, bates-stamp, and produce everything by then." (emphasis added).

    I did not say "without a doubt, we will produce everything by August 8" or "I guarantee that everything will be produced by August 8."  Under the circumstances, I detailed and laid out the things that had to be accomplished on our end before those items could be produced in the manner that they need to be produced.   Furthermore, I was quite direct that I, personally, was traveling internationally to Toronto for business meetings from August 7-10, and some of those meetings did in fact occur on Saturday, August 9, and then travel occurred most of Sunday, August 10.  On the other hand, I will readily concede (as I must) that we certainly have other co-counsel representing David Chen and his mom, Li Fen, and I am by no means the only one working on their behalf at this point in time.

    HOWEVER, so we are equally clear and as transparent as we can be, we certainly acknowledge that we (both us, on our side….but also all of us, collectively) need to move all of these issues along in order to continue moving this litigation forward, and I can assure you that we are working on a daily basis to be diligent and responsive in this regard.

J.R.034

2. We realize that we need to revise and supplement David Chen's Answers to Interrogatories, and, as we all know, that is a very clear obligation of the federal rules for all parties and counsel. In that regard, we have certainly self-identified newly discovered information that needed to be shared with all counsel in an effort to comply with those obligations. And as for David's anticipated Amended Answers to Interrogatories, following our Meet and Confer in mid-July and then following David's deposition on July 30, we are in the process of working on those amendments as we speak. However, also in that regard, I don't recall us saying that we will have any such Amended Answers to Interrogatories by "x" date and there is certainly nothing in the federal rules or the local rules of Maryland to suggest that supplemented Answers need to occur by "y" date or within "z" amount of days upon discovering information that needs to be amended, updated, supplemented, or otherwise.

3. I am not personally aware of anyone on our side (i.e., myself, my colleague Michael, or any of the attorneys at CLM) saying that we agreed to produce a "list of Discord and Telegram channels" along with the list that was produced by my colleague Michael Lentz this past Thursday. However, I will be candid with you in saying that we are in the process of following up with our co-counsel at CLM to see if they have any knowledge of such an obligation that they may have separately agreed with directly with all of you at Levy Firestone. The only thing that I am vaguely aware of is discussions between your side and our co-counsel at CLM, as part of the obligations under the Preservation Order, where those discussions significantly preceded Michael's and my entry into this case, and my understanding (which quite frankly may be slightly inaccurate, and if it is I presume that either Stephen, Alex M., or Madelyn will interject and set the record straight) is that we (i.e., David Chen and Li Fen) agreed to "preserve" ALL Discord and Telegram channels, such that it did not make any sense to break out each separate channel when discussing "preservation." With all of that being said, once Michael and I are able to clarify what, if anything, our colleagues at CLM may have promised you in terms of "production" (which I find odd since it is hard to have that discussion before the searches in Chen v. Chen are fully completed), we will come back to you with any needed clarifications on the list of document sources that Michael produced to your side on Thursday, August 7.

   HOWEVER, while we are on the topic of completeness and accuracy of the document sources lists that were exchanged last week, I believe we have objections to the completeness and accuracy of the rather short list that Justin shared in his August 7 email, which you have attached to your below email. We are in the process of determining an exhaustive (or as exhaustive) list of our objections with your list, and was planning to share that with you once we had identified everything that we perceive is missing or lacking….BUT since you have raised this issue (generally speaking) with your below "follow up" email from earlier today, I felt the need to at least alert you and your colleagues to the fact that we will be sending you something on this issue….hopefully soon.

-Alex Giles

J.R.035



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

 MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Monday, August 11, 2025 12:03 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Stephen M. Plotnick <Plotnick@clm.com>; Michael Lentz <mlentz@tydings.com>; Madelyn K. White <white@clm.com>; Alexander G. Malyshev <Malyshev@clm.com>
**Cc:** Mary Hickman <mhickman@tydings.com>; Kevin M. Simpson <Simpson@clm.com>; Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>
**Subject:** Re: Follow up from David Chen deposition and document sources

Counsel,

We are following up on three items we are waiting on from you:

1. The documents David discussed in his deposition, that you said you would produce to us last Friday. See below.

2. Revised answers to interrogatories, as David testified that his are inaccurate. We asked you about this last week and have not gotten an update. See below.

3. The list of Discord and Telegram channels, that you had agreed to send us last Thursday, but we did not receive. See attached.

Please let us know today when you will be sending each of these items.

Thanks,
Rachel


**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • F 202-595-8253 • levyfirestone.com

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Date:** Thursday, August 7, 2025 at 4:10 PM
**To:** Alexander M. Giles <agiles@tydings.com>, Stephen M. Plotnick <Plotnick@clm.com>, Michael Lentz <mlentz@tydings.com>, Madelyn K. White <white@clm.com>, Alexander G. Malyshev <Malyshev@clm.com>
**Cc:** Mary Hickman <mhickman@tydings.com>, Kevin M. Simpson <Simpson@clm.com>, Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>
**Subject:** Re: Follow up from David Chen deposition

Counsel,
During the deposition, David stated that there were various inaccuracies in the Second Amended Responses to Interrogatories dated July 17, 2025, and that David verified. On Monday it will be a full six months since we served those interrogatories. Please let us know when we can expect complete and accurate responses.

Thanks,
Rachel

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Friday, August 1, 2025 at 4:40 AM
**To:** Rachel Clattenburg <rmc@levyfirestone.com>
**Cc:** Stephen M. Plotnick <Plotnick@clm.com>, Michael Lentz <mlentz@tydings.com>, Alexander G. Malyshev <Malyshev@clm.com>, Madelyn K. White <white@clm.com>, Mary Hickman <mhickman@tydings.com>, Kevin M. Simpson <Simpson@clm.com>, Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>
**Subject:** Re: Follow up from David Chen deposition

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

My apologies, I had intended to respond to your below email before leaving the office earlier this evening, but then other matters intervened.

We are working with David to locate all of the identified items that David referenced during yesterday's deposition, and once we have everything we will work with the individuals at

J.R.037

TransPerfect to get the items bates-stamped and organized for production to you and your colleagues.

However, just so we are clear with each other, they will not be produced this week (as in by the close of business tomorrow). If, however, by "this week" you actually meant by next Friday (August 8), then, yes, I am certainly hopeful that we will be able to locate, organize, bates-stamp, and produce everything by then.

-Alex


Sent from my iPhone


> On Jul 31, 2025, at 1:00 PM, Rachel Clattenburg <rmc@levyfirestone.com> wrote:
>
>
> Counsel,
> In yesterday's deposition, David testified about the following documents that have not been produced to us yet. Because his testimony about his deletion of messages relies on these documents, please produce them this week:
> 1. The spreadsheet of the deleted Discord messages that includes the dates the deleted messages were sent.
> 2. The messages (and all other documents) David says he reviewed last Thursday which led him to determine that his Answers to Interrogatories were false to the extent they claimed that he had deleted everything in "new clickbait", and to the extent he claims that nothing relevant was deleted. (Messages from the rubber-duck-debugging channel and messages with Ally Guo).
> 3. Any preservation letter David received in either matter.
> 4. His Amazon purchase history that was reviewed in connection with drafting his ROG responses.
> 5. All of his correspondence with Discord from July 30 and 31, 2024, including but not limited to his request for his Discord messages and his receipt of them from Discord.
> 6. His Github history.
>
> Thanks,
> Rachel
>
> **Rachel M. Clattenburg**
>
> **Levy** | **Firestone** | **Muse**

J.R.038

900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • C 914-714-1676 • F 202-595-8253 • [levyfirestone.com](levyfirestone.com)

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Levy Firestone Muse LLP.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--



Alexander M. Giles

[agiles@tydings.com](agiles@tydings.com)
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

 MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.



Alexander M. Giles

[agiles@tydings.com](agiles@tydings.com)
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

 MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless

J.R.039

you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.040

# Exhibit 2

J.R.041



**Planet Depos**
We Make It *Happen*™

# Transcript of Meet and Confer

**Date:** December 5, 2025
**Case:** Yao -v- Chen / Chen -v- Chen

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

J.R.042

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - x

LI FEN YAO, as           :

administrator of the     :

Estate of Sam Mingsan    :

Chen,                    :   Case No.

    Plaintiff,       :   23-cv-889

  v.                      :

ROBERT CHEN, OTTER       :

AUDITS, LLC, AND RC      :

SECURITY, LLC,           :

    Defendants.      :

- - - - - - - - - - - x

MEET AND CONFER

Via Zoom Videoconference

Friday, December 5, 2025

Job No.: 610587

Pages: 1 - 123

Reported By: Lori L. Thielmann, CSR, RPR

---

Meet and confer held:

\*\*\* ALL PARTIES ATTENDED REMOTELY \*\*\*

Before Lori L. Thielmann, Certified Shorthand Reporter in the State of Illinois and State of California, and Registered Professional Reporter.

---

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    ALEXANDER M. GILES, ESQUIRE

    CASEY D. BRINKS, ESQUIRE

    RACHEL A. DECALUWE, ESQUIRE

    TYDINGS

    One East Pratt Street, Suite 901

    Baltimore, Maryland 21202

    410.752.9700

ON BEHALF OF THE DEFENDANTS:

    KEVIN P. CRENNY, ESQUIRE

    RACHEL CLATTENBURG, ESQUIRE

    CHRISTINA M. LAMOUREUX, ESQUIRE

    LEVY FIRESTONE MUSE, LLP

    900 17th Street NW, Suite 1200

    Washington, DC 20006

    202.261.6564

ALSO PRESENT:

    EMMA FLOYD, Paralegal

---

P R O C E E D I N G S

MS. CLATTENBURG:  Thank you.  All right. Let's get started.  I'm going to just read through kind of the stuff we have on the agenda, see if you have anything else to add, and then we can start working through it if that works?

MR. GILES:  That's fine, yeah.

MS. CLATTENBURG:  All right.  So the first would be to discuss the dates for the joint proposed scheduling order as ordered by the Court, which is due on Monday.

The second is -- the second would be discussing the date and duration for the limited deposition of David Chen regarding spoliation.

Third is your December 12 and January 20 productions, specifically, your e-mails of December 2nd, our response of December 3rd, and then you sent a response very early this morning to some of those issues we'd like to discuss.

Fourth, in terms of the list of channels and servers being searched in Chen v. Chen, you've represented that this list is comprised of the

J.R.043

Transcript of Meet and Confer
Conducted on December 5, 2025

channels and servers and direct messages in Exhibit A to Plaintiff Li Fen Yao's third amended answers to Defendant's second amended interrogatories, which were served on us on August 29, 2025, and you made this representation both in your letter of November 24, 2025, and David Chen's answer to Interrogatory 24. We have a lot of questions about that and the comprehensiveness of that list.

Fifth, we would get into the discovery responses themselves that we have to Li Fen Yao's third amended responses to Defendant's second set of interrogatories dated August 29th, 2025; David's amended responses to the first set of interrogatories in Chen v. Chen served on August 29, 2025; David's responses to the first set of RFPs in Chen v. Chen served on June 23, 2025, and never amended; David's responses to the second sets of RFPs and rogs, and then we would also like to discuss an e-mail we sent asking about Chinese language searches that have been run on potentially relevant documents.

Is there -- I think that is kind of our list of items. Is there anything else that you want to add to that?

MR. GILES: Nope, nope. Your list is fine.

MS. CLATTENBURG: Okay. So for the joint proposed scheduling order, I circulated a schedule. I think you may have just responded moments ago.

MR. GILES: Yeah, I said the dates are all fine.

MS. CLATTENBURG: Okay, great. So we can prepare that to file on Monday. Let me just mark that off.

Okay. Second, we want to discuss the date and duration for the limited deposition of David Chen regarding spoliation.

MR. GILES: Okay.

MS. CLATTENBURG: Because of this January 20th Discord -- Discord and everything else production deadline, we think it makes sense to have the deposition after that to the extent

there's any suggestion that he's producing some of the stuff we think is -- has been deleted. So we are looking ideally for dates in the first two weeks of February if you want to confer with him and see what works.

MR. GILES: I can do that. I know my kids go to the same school that he does. I know that they go back to school on January 26th, that Monday. So after the 20th, there is a window where he's not going to school unless he's taking winter classes, but I haven't heard him say that, but I don't know if that works -- if that's too soon for you guys because you don't have an opportunity to go through all the documents. But if you -- if you really want to do February, I will have to, obviously, as you just alluded to, I'd like to check with David to make sure that those dates or any of those dates work for him, but I can certainly do it.

MS. CLATTENBURG: Thank you. Yeah, I mean, let us know. I mean, if he -- you can also propose -- you know, counter-propose dates that

week as well, but I do think that's probably going to be a little too tight with the document --

MR. GILES: Sure.

MS. CLATTENBURG: -- deadline. But we can -- we can -- if you give us a few dates, then I'm sure we can come up with something that works.

MR. GILES: Is there a date range in February that you guys were eyeing that was out --

MS. CLATTENBURG: Yeah, before the 13th.

MR. GILES: Before the 13th. Okay.

MS. CLATTENBURG: Yeah, the first two weeks ideally.

MR. GILES: Okay. I will ask him what availability he has in those first two weeks.

MS. CLATTENBURG: Great. Thank you. And in terms of duration, we were thinking two and a half hours. Do you want to confer with him or are you okay with that?

MR. GILES: Let me confirm. I'm -- that doesn't shock me. It doesn't, you know, say, oh my gosh, I can't -- we can't do that. So that's fine. But, yeah, let me confer just to make sure

J.R.044

that that's -- he doesn't have any objections to that.

MS. CLATTENBURG: Okay. Great. Thanks. All right, let's turn to this Discord production and the kind of e-mails we've had back and forth about this.

I think the place to start is with the search terms that you say you are running because there seems to be just not -- this does not seem correct to us. So you say in your e-mail of this morning that the search terms that you are running are only those that are on the list for code-related search terms that the parties circulated; is that correct?

MR. GILES: Those are the search terms we're using, yes.

MS. CLATTENBURG: Okay. So that is not sufficient because those were only meant and are only agreed to for code-related searches. They don't address the many other requests for production that require other responsive documents. I listed these in -- at least some of these in the e-mail -- RFP numbers 1, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 23, 24, 25 in Chen v. Chen and these were served on May 23, 2025, and August 15, 2025. The search terms that are just code related would not pull up the responsive and relevant documents to those requests. I mean, for instance, we have, you know -- we have, for instance, copies of all communications relating to your role at and work for OtterSec during the relevant period. That's RFP number 8 on David.

RFP number 9, all non-privileged communications regarding this action or the substance of this action during the relevant period, including but not limited to your departure from OtterSec, actions you took relating to your departure from OtterSec, your use of any Solend liquidator code or any MSOL market maker code, your transfer of 20,000 JUP tokens in January 24, your deletion of Discord messages and your deletion of company records. That's RFP 9.

RFP 11, documents showing all transfers of funds to or from any blockchain, self-custodial, or digital wallets controlled by you or any entity with which you are affiliated -- excuse me.

So those are just a few of the ones that these search terms would not hit on. And I can back up and give you kind of where these search terms came from. They actually -- it came from your side asking for specific code-related searches for Robert to run, so if you go back -- in ECF 106, which is a JSR, Li Fen Yao's counsel said there was still a dispute about whether Robert was adequately searching for the code in response to document requests in Yao v. Chen, and then the Court asked the parties to discuss this in a meet and Confer.

So on June 19, 2025, in advance of a scheduled meet and confer, Steve Plotnick, who was Li Fen Yao's counsel, wrote, quote, Finally, with respect to Item C, as we previously noted, the Robert parties do not appear to have searched for documents and communications concerning their defenses in the Yao v. Chen matter related to the computer code. You have asked us to propose searches and we will send you our proposal by no later than Monday, end quote.

Then on Monday, Alex Malyshev, also counsel to Li Fen Yao, sent these proposed search terms just related to the code and just for purposes of locating documents related to the code, and they were not an exhaustive list of searches. The parties had already exchanged search terms for Yao v. Chen.

And you can see Mr. Malyshev discussing this and the purpose of these searches that you all propose during the June 26, 2025, meet and confer. And I'd point you to pages -- it starts around page 84 and it goes to about 86.

And your side proposed a list of searches specifically just for the code that we would run to find responsive documents in both cases about the code. We then agreed with you all that we should come up with a list of code-related search terms that would run in both cases since they were then consolidated. So Chen v. Chen and Yao v.

J.R.045

Chen would have a list of code-related searches in addition to whatever searches you also had to run to find other responsive documents.

And this agreement is set out in JSR at ECF 151, quote, The parties have now agreed to exchange search terms related to the codes at issue in Chen v. Chen on July 14, 2025, end quote.

So this was always just a matter of how to search for the code and how an agreement as to how both sides would search for the code. Specifically, it did not address the many other requests for responsive documents. So those code terms, they don't include obvious search terms like Robert, OtterSec, you know, a bunch of other terms, any of your financial information that you're supposed to be producing, you know, anything else that's relevant to the action or the claims or defenses. It's very code specific language.

So I'm just -- I'm just trying to understand have you run the Yao v. Chen search terms which I also attached to my e-mail of December 3rd against the documents in Discord that you are now searching?

MR. GILES: I don't know the answer to that question. Certainly TransPerfect has been the same vendor throughout this entire process and they had those search terms from the Yao v. Chen matter. Whether they're running both those search terms and the terms that I asked them to run, I have to find that out. Certainly they are running the ones that Justin and I agreed upon in August, early August, of this year.

MS. CLATTENBURG: Right. But how are you searching for other response -- documents responsive to other requests that are not code specific documents?

MR. GILES: Rachel, that's what I need to follow up with them about. And obviously we're a week out from December 12th so if I determine that they are only using the August -- and I agree with you that -- if I agree with you that there's got to be other search terms that are used to catch the other things, then I will ask them to do that

this week and that may change. That will change, I guess, assuming they're not already doing it, but it will change the numbers that I shared with you in the e-mail of December 2nd.

MS. CLATTENBURG: Okay. Yes. So if you can follow up with this, I guess, before your production deadline or however you want to do it, but -- I think if you follow up with us by e-mail or we can have another meet and confer about it --

MR. GILES: Yeah, as soon as this one is over, finish and get off, that's going to be my first e-mail.

MS. CLATTENBURG: Okay. Thank you.

MR. GILES: Yeah. One thing, Rachel.

MS. CLATTENBURG: Yes.

MR. GILES: You mentioned -- you mentioned several things. You mentioned ECF 106, which I'll pull, which is a JSR. You mentioned the e-mail from Steve Plotnick, June 19, 2025. You mentioned the meet and confer on June 26, particularly pages 84 through 86. You mentioned ECF 151, which is another JSR, and you -- the very first thing that you mentioned was May 23, 2025, and August 15, 2025. What do those two dates --

MS. CLATTENBURG: Yeah, sorry. Those were -- those were -- those were just the dates of requests for documents that we served on David that I was reciting, like some of the --

MR. GILES: Oh.

MS. CLATTENBURG: -- requests.

MR. GILES: I got you.

MS. CLATTENBURG: And then the other e-mail that you might want to look at is from Alex Malyshev where he proposed the first set of terms for the code which we later kind of added to and came up with the list that we agreed to in August for the code-related searches. That first list he proposed on June 23, 2025, by e-mail.

MR. GILES: Okay. So before the meet and confer?

MS. CLATTENBURG: Yeah.

MR. GILES: Okay.

MS. CLATTENBURG: That was just to explain the origin of this if you were not as familiar

Transcript of Meet and Confer
Conducted on December 5, 2025

17

with it.

MR. GILES: That's fine. I appreciate it.

MS. CLATTENBURG: And then in terms of the format, it seems like you are confirming that you're going to produce these Discord messages with the exception of the very large thread that we can talk about in a minute, but in 24-hour format, meaning like the messages in a 24-hour period, that's what the thread would be. They'd be pulled as 24-hour periods of messages; Is that correct?

MR. GILES: That is correct. And so the way it was explained to me by our team at TransPerfect is if any particular day has a hit, a single hit, then they produce that entire day, that entire 24-hour period and -- but what they do is if it's more than 1,000 documents -- quote, unquote documents -- which you're absolutely correct, a document is just a Discord message.

But if there's more than 1,000, then they're going to be chunked in segments of 1,000. So let's say there's 6,500, there'll be six groups

18

of 1,000 and then the last group will be 500. But, yes, it would be a full 24-hour thread and then those -- again, using that example -- 6,500 documents would be chronological. So the first 1,000 would be from 12 a.m. to whenever, and then the next one -- the next group of the 1,000 picks up right immediately after that so then you can piece them together.

MS. CLATTENBURG: Okay. I understand what you mean. In terms of the Discord production, are you reviewing documents with hits to make sure they're actually responsive?

MR. GILES: Well, we haven't seen any of that yet. Obviously, I conveyed the judge's order that they need to provide to me all the Discord documents by December 19th. So we haven't gotten there yet so, quite honestly, I haven't reviewed anything yet.

And, you know, if we're -- you know, we'll see where we are in terms of the issues that we just talked about and how that changes the overall numbers. But to have from December 19 to January

19

20 and over the holidays, it might be tough for us to review 7, 8, 9 million quote, unquote, documents. But certainly I can -- I mean, I don't want to say I'm going to do this or do that, because I haven't figured that out yet, to be quite honest, and, you know, but I imagine there's going to be some spot checking to see if they're actually responsive. But we also have to sort of take the fact that the parties agreed upon search terms and the search terms pull up the documents that have those search terms and so presumably they will be responsive. And that's what's going to get produced.

MS. CLATTENBURG: Well, I think part of this runs into our other issue, which is what you're searching, right? Because that's going to determine whether these hits are actually responsive.

MR. GILES: Well, yeah, we've already talked about that. So, yes, I mean, that's my first e-mail after we get off this call to TransPerfect to see what exactly what they're

20

searching. And if they're not searching what is supposed to be searched -- the full composition of what's supposed to be searched -- then I'm going to ask them to do that.

MS. CLATTENBURG: Sorry. No. I just meant like not the search terms per se. I agree that is one issue. The other issue is the body of documents and Discord servers you're searching. So this is why we were trying to get this list from you much earlier on and we've been -- we had worked really hard to try to get this from you in time before this and we weren't able to which is what is he -- which channels and servers are you actually searching?

Because if you're search -- wait one sec, please -- if you're searching a server where David has joined it, he has access to it, but he's never posted anything and there are no potentially relevant messages then and all it is is a bunch of other people who happen to be using words that come up with the code, that's why we are concerned you're getting a lot of hits from a server where

J.R.047

Transcript of Meet and Confer

6 (21 to 24)

Conducted on December 5, 2025

he's not actually active, and that that is just cluttering the actual production. So that's why we were trying to get this information.

So you have said that the only -- Exhibit A, that's everything that you're searching for Discord. But we're confused by that because there were also attached to that same set of answers to interrogatories where Exhibit A is attached, there are also a bunch of other channels and servers. So we're both unclear whether Exhibit A is actually everything that's being searched and, if not, what is actually being searched.

So Exhibit A is 100 -- you say 135 channels, servers, and direct messages. It seems to only have one server listed. I don't know if that's a typo or not. And then otherwise it's mostly direct messages which would not have this kind of number of hits as you're talking about. So I think we need some clarity on the list of channels and servers for Discord. In addition to that, you know, also Telegram.

MR. GILES: Is that it?

MS. CLATTENBURG: Yeah.

MR. GILES: Okay. So the -- what was produced on August 29 was -- and all the attachments, Exhibit A through F, had been produced previously several times prior to Michael's and my entry into the case on June 20, because this was now the third amended Li Fen Yao answers to your second set of interrogatories to her. But those same exhibits, those same Excel spreadsheets, had been attached the previous two times as well as I understand it.

And, yes, Exhibit A, according to Stephen, was the 135 channels in Discord that David was active in. And that's always been the representation that has been made to me. So I am making that representation to you and have made that representation to you. Stephen made that representation many times. I'm making the same representation. And I -- I seem to recall David telling me that, yes, those -- those are the Discord channels that he was active in. 135. That -- that number has been referenced several

times.

But I don't -- sitting here now, I don't recall the first time that those Excel spreadsheets were produced to your side. But whenever the first time was that they provided answers on behalf of Li Fen Yao, which probably was in 2024, is how long those spreadsheets have been going out to you guys.

Because I don't think the spreadsheets have changed. I can follow up with Stephen and ask him that. But that was, I think, creation of either Stephen or Madelyn, I think. I think Madelyn was sort of the documents person at CLM. And so I certainly can follow up with them to seek clarity from them. But, yes, that's the representation that I'm making, we're making, that our clients are making, that those are the Discord channels that David was active in. 135 channels.

If -- I mean, one of the notes I wrote to myself was, what do you think is missing? Maybe that's -- maybe that's the easier way to attack this. If you let me know -- or you or Kevin or whoever, let me know what you think is missing out of Exhibit A, then I can probably run that down quicker to see if that's accurate, not accurate. If there's an explanation for which you think you don't see, but just saying that it doesn't seem complete, that doesn't really help me that much so.

MS. CLATTENBURG: Sure. I can respond to that. So my question was about the sources being searched for Discord and Telegram in Chen v. Chen, which is what you were required to disclose on November 24th, and you cited only Exhibit A. Those spreadsheets were produced in Yao v. Chen in response to Li Fen Yao's -- interrogatories served on Li Fen Yao that David also signed and are related to questions about, you know, we had discovery about spoliation and what was collected when because we were trying to figure out in terms of when stuff was deleted whether it had already been collected or not, and you can look at the interrogatories for that. So those were never disclosed before November 24th of this year as

J.R.048

being the list -- the Exhibit A. It was the list that was also being searched in Chen v. Chen because that Exhibit A lists servers and channels that were collected in April and May of 2024, well before Chen v. Chen was filed.

So it's unclear how that could be necessarily -- I mean, that doesn't answer necessarily whether those are also all the potentially relevant channels in Chen v. Chen which is what we were trying to discover.

You've now represented that's everything you're searching in Chen v. Chen for Discord and we want to know -- for instance, you asked, well what's missing? For instance, why is Exhibit -- if you look at Exhibit B to those interrogatories, it has a different number of DM conversations. And Exhibit C, it has a Discord collection of David Chen's Discord messages through -- July 31, 2024, it lists 1431 channels and DMs.

Exhibit D is another export from January 2025. It lists 244 -- sorry, 9,701 channels collected and then another 244 collected at a different date. Then Exhibit E, it lists an export from February 2025. So I think you can look at those and they're obviously -- Exhibit A does not include most of those. Maybe it doesn't need to include all of them. Some of them may not be potentially relevant, I'm not sure. But that's why we're trying to get a list and have been trying to get a list from you of which are the ones where you had potentially relevant conversations.

You're pointing to ones that were collected in April and May of 2024. I mean, the discovery in this case goes up through April 17, 2025. So has he not -- does he have no new channels since then, conversations? That's why -- we're just trying to get clarity on this.

In addition, I was saying that it seems like there is a -- some sort of hit in your -- potentially in whatever you're searching where there are a lot of messages that are probably not from David. It may be from some public server where he's a member but doesn't have any posts

himself that are potentially relevant, and we're trying to see is that also included and not listed on Exhibit A. So Exhibit A to us doesn't seem like it would have 6.7 million messages that are hit on just the code-related terms, not to mention the many other terms that need to be searched. That's what we're trying to understand.

MR. GILES: Okay. So I will give you the best way that I can answer this. If you look through the answers, Li Fen Yao's third amended, you can probably also look at her second amended, and you probably look at her amended and probably the original, there's an explanation as to what each spreadsheet is.

My understanding is that Exhibit A was the 135 channels that David was active in. Those are what is being searched. Those 135 channels is what's being searched by -- sorry -- that's being searched by TransPerfect that has resulted in the 6.7 document hits. That's basically reduced by -- because there was 46 -- or 40, let's see -- 46,148,676 Discord documents. But then when you use the search terms, whatever search terms they're using, they're at least using the August, they might be using the other ones, the previous ones, it gets reduced to 6,727,400 documents. And, yes, that's the 135 Discord channels. That's the way it's been represented to me -- one by Stephen and two by TransPerfect, so. That's the best I can tell you, Rachel.

MS. CLATTENBURG: Well, I mean, I do think this is your obligation to know. It's not just, you know, what someone has told you. You do need to know and be able to answer these questions. You're the lead counsel in the case.

So I would ask you to just let me finish this because the question is you represented now affirmatively on November 24th to us that these 135 channels and servers and direct messages identified only in Exhibit A, not the thousands of others identified in other exhibits, are the only ones being searched, and I just want to clarify that that's accurate.

There's nothing in the answers to

J.R.049

Transcript of Meet and Confer
Conducted on December 5, 2025

interrogatories that say these are the ones that are active or anything like that. The term you keep using. There's nothing like that. Exhibit -- the answers to interrogatories say there are 135 servers, channels, and direct message groups that he identified as containing relevant or potentially relevant evidence identified in Exhibit A. That's one thing.

And then it says that it lists the -- they are the group's server channels and direct message groups likely to have potentially responsive and relevant material from David Chen's Discord account.

And if -- and then we just want to make sure, because there are a lot of other exhibits here that list a lot of other channels and DMs that Exhibit A is what's being searched that has produced the 6.7 million messages that hit on terms.

MR. GILES: My understanding is the Exhibit A is what was used that resulted in 6.7 million Discord documents that have been distilled. So that's my understanding.

MR. CRENNY: Can I jump in, Rachel, for a second?

MS. CLATTENBURG: Yes, please do.

MR. CRENNY: So this is like -- I have notes about this in the context of the rog responses that we'll get to, but just -- it just doesn't seem correct to us, and I think we'd like you to take another look at it.

Like, if you look at Exhibit A, it has 97 DM conversations and 38 channels. That adds up to 135, right? The 38 channels, it lists the same server ID for all of them. I don't think that's right that you're only searching from one server. Like, what is it, the OtterSec server or the -- you know, there's many more servers than that that we've talked about on other meet and confers and I don't have in front of me, but, you know, I don't think you've only produced things from one server. So this just doesn't seem accurate especially when there's all these other spreadsheets behind it that indicate there were larger collections done

at other dates. So that's kind of the starting point for why we're struggling with this, and that's kind of boiling it down to kind of a basic point.

MR. GILES: All right, so I've written down just now, as you were talking, Kevin, follow up with Stephen Plotnick, Madelyn White, and TransPerfect today regarding Exhibit A.

MS. CLATTENBURG: Okay. Thank you. I also think that -- this sounds like it also will need to be discussed once you have more information about what search terms are being used. But you suggested in your e-mail this morning that you are not going to be comparing -- this is a quote from you -- We will not be comparing the upcoming document productions with previous document productions, particularly as it relates to Discord messages. So, yes, you will be receiving Discord messages that you may previously already have received.

And then you say, So I would suggest that it might be easiest for your side to simply disregard the previous productions and treat the upcoming productions to be made on December 12, 2025, and by January 20, 2026, as the full set or the master documents.

I don't -- one, I think that's a, you know, something -- a discovery kind of harassing tool that we don't agree with. But, second, I don't -- if you are not -- and I understand you have to follow up on this -- but if you are not searching Yao v. Chen search terms across all of the potentially responsive Discord and other documents, then obviously we can't do that, right? We have to have both sets of documents.

And I also if -- I also -- I don't understand how you haven't served amended discovery responses in Yao v. Chen explaining what you have produced and what you have withheld. And yet it sounds like you aren't running Yao v. Chen searches at all on these documents. So how are you ensuring that all those documents that are responsive are being produced?

MR. GILES: Rachel, we talked about this

Case 8:23-cv-00889-TDC   Document 204   Filed 04/13/26   Page 53 of 1016
Transcript of Meet and Confer
9 (33 to 36)
Conducted on December 5, 2025

33

several times already just in the span of 35 minutes. I'm going to follow up with TransPerfect to see exactly what search terms they're using. They may be using the previous ones as well that you've identified the -- sort of the development of Stephen Plotnick, Alex Malyshev, and the JSRs. They may be using those, they may not be. If they're not, I'm going to ask them to, and that will -- if they're not and I ask them to, that will change the numbers of -- that I sent you on December 2nd. It has to change the numbers.

In terms of going through the documents and making sure that we're not reproducing something that was previously produced, we're not doing that. You've asked for everything. That's how we got into this problem and that's how we got to the point of having to do a full recollection rather than trying to piece things together. And you're gonna get what you're gonna get. And if you don't like that, then you can go to Judge Simms and you can say, hey, this isn't fair. This is harassment. It's not harassment. We're giving

34

you what you asked for, which is everything.

MS. CLATTENBURG: We've never asked for everything. We ask for documents responsive to our document requests. I don't want to relitigate the motion to modify the scheduling order in our response and the hearing we just had. It's obviously clear from our papers and the hearing we requested specific documents from 2021, and you are the one who decided that that meant you had to recollect everything, and we are still befuddled as to how that could possibly be the case. It makes no sense.

And you are creating an enormous document dump as a result and we will seek sanctions if you're producing a bunch of stuff without reviewing it that's nonresponsive or duplicative of what's already been produced and telling us to ignore over a year of document productions from the other case because you can't be bothered to figure out what's been produced in that case.

David moved for consolidation of these cases for purposes of discovery. He was the one

35

who wanted this. Now, you are to have to deal with having consolidated discovery in two cases and they have different time periods. So they should -- I mean this doesn't -- this idea of disregarding everything that's been produced because you guys don't want to deal with addressing what has been the discovery that's been done in Yao v. Chen, what still needs to be done there, what's responsive there, what's different and responsive in Chen v. Chen, that is your party's obligation to do.

And if you just dump everything like you're saying without review, nonresponsive, not using the correct search terms as it seems, you know, we will have to seek discovery sanctions. That's a ton of work for us that is not appropriate. That's harassing.

And I can cite a case for you. I will point you to a case so that you can look at this before we next discuss this. But Branhaven, LLC vs BeefTek, Inc., 288 FRD 386, District of Maryland 2013, I think is a good one to start with

36

in terms of what's going on here.

But I do think you have a ton of stuff to follow up with us on this document production issues and it probably doesn't make sense until you've had more time to talk to TransPerfect to get into this.

But I do think it would make more sense to have a meet and confer with a transcribed call so we can discuss your responses rather than an e-mail from you where it just raises questions for us. So if we can come up with a time next week to discuss these issues again and see what you've learned, that would be great. If you have any days available now that you can tell us.

MR. GILES: No, I'm in depositions in another case so I will have to -- and I appreciate what Judge Simms has said in terms of doing meet and confers as opposed to e-mails. I get that. So I will try to get the answers and I'm sure there's going to be more things I need to get answers to that you're going to raise later here and I will try to get the full set of answers.

J.R.051

It will have to come in an e-mail because you're going to want to see it before we do the next meet and confer but -- and at that time, whether it's later today or over the weekend or Monday, because I start with depositions on Tuesday in another case -- it's Tuesday, Wednesday, Thursday -- and then we have the Friday deadline for us to get you the first non Discord document. So I'm going to be busy with that on Friday.

The following week might be a better week, but let's take it one step at a time. The first step is I need to -- well, first step is I'm sure you still have other things that you want to add on my plate here, and then once we figure that out and we're getting off this meet and confer, then I will take what I need to to TransPerfect, I'll take what I need to to Stephen and Madelyn, and I will try to get all the answers that you guys are hoping to get.

MS. CLATTENBURG: Thanks. I do think it'd be good to try to get one scheduled for next week. If it turns out we don't need it, great. But I worry you -- because you have a busy schedule, if we are waiting until you're able to get the answers and send an e-mail and I think -- and we have busy schedules. I mean, it sounds like you're free on Monday. Can we do Monday?

MR. GILES: Actually, I'm not free on Monday, but I'm more free than all-day depositions down in Southern Maryland on a vessel on Tuesday and Thursday and all-day depositions, including one with you guys, on Wednesday. I've got one in the morning with another case and then I've got the one in the afternoon with you guys at 3:30 with David. So, unfortunately, I'm not available next week and Monday might be too soon. So I don't. There's no sense putting something on the schedule that we're just gonna knock right off.

MS. CLATTENBURG: I mean, we're trying to get answers here and also make this production not, you know, a waste of your time, but it's certainly not a waste of ours. But we think it's worth having discussion next week. If you're unable to do that, then please let us know your earliest time you can do it then.

Kevin, do you want to go into the next set of stuff?

MR. CRENNY: Sure. Sure. So this -- the next sets of things are discovery responses that we need to discuss, some of which we've discussed before, but we need to continue moving them along.

MR. GILES: And is this in light of what I sent you earlier this morning?

MR. CRENNY: I did not -- I looked over it quickly. I didn't get a chance to read the whole thing because I had another call before this one, but it didn't look like it responded to every point I made anyway, so --

MR. GILES: It didn't respond to every point. It responded to most points.

MR. CRENNY: Okay.

MR. GILES: You're correct, it's not all.

MR. CRENNY: Then as we go through, you can just tell me what you said if I don't recall it. I'm not going to read your e-mail. I'll let you respond with whatever you said in your e-mail. So I'll just say what I had prepared.

MR. GILES: Which one are we starting with?

MR. CRENNY: Starting with Li Fen Yao's third amended responses to Defendant's second set of interrogatories in Yao v. Chen served August 29, the third amended version. This is --

MR. GILES: Yep.

MR. CRENNY: So as background, we served this set of interrogatories on March 11, 2025. Li Fen served insufficient and nonresponsive responses On April 10. We served a motion to compel regarding those on May 16. Li Fen and David agreed through meet and confers to serve amended responses and served their first amended responses on May 30 along with an opposition to that motion to compel we had served.

Then we served a motion to compel regarding the first amended responses which are the first substantive ones here. Our motion to compel on that was served on June 30.

On July 17, Li Fen and David served second amended responses to these interrogatories. On July 30, we deposed David about spoliation issues. He testified that some of the answers in the second amended responses from 13 days earlier were false. On August 30th -- I think it was August 29th -- actually, we -- they served their third amended responses, which is what we're talking about now, and there remains some deficiencies in these answers. The Court ordered the parties to meet and confer on the remaining deficiencies. That's in ECF 183 at item 5 on page 3. So that's just set up.

So interrogatory 1 asks Plaintiff Yao to identify what steps you took and when you took each step to preserve evidence potentially relevant in this case. So we have a couple issues with this one.

First, it says, Neither plaintiff -- I'm reading partial quote because it's like four pages long -- more than that -- at one point it says, Neither Plaintiff Sam Chen, nor David Chen, had maintained or utilized backup systems or tapes and they did not have or follow any policies, practices, procedures, or systems for automatically or routinely deleting or destroying documents.

So, one, we don't believe that. That's not true. David testified that he had disappearing messages activated on his Signal chat with at least one witness Which would be a, you know, policy, practice, procedure, or system for automatically routinely deleting or destroying documents, those communications. So that -- the rog would need to be amended in that regard.

And then also he testified to downloading and using a script to automatically mass delete his Discord messages called Undiscord. So that appears to be missing from this as well.

Do you want to discuss those before I go to the next point on Rog 1, which is fairly unrelated?

MR. GILES: No, I can discuss that. So what you put in your e-mail of December 4th, so yesterday, really is written in a fashion that tries to make it look like it's worse than it is. I mean, you left out a lot of stuff.

Now, I'll give you credit. You just read what is found at pages -- the bottom of page 8 to the top of page 9 in Plaintiff Li Fen Yao's third amended responses to the second set of interrogatories of Defendants Robert Chen, Otter Audits, LLC, and RC Security, LLC, which was served on August 29th of this year. Certainly I can -- I've already followed -- actually, I've already followed up with David about this.

And I think, you know, it states it pretty clearly. It says, With the exception of backups of David Chen's computers, which were done prior to any reinstallations, neither Plaintiff Sam Chen, nor David Chen, had maintained or utilized backup systems or tapes.

That's what he's talking about, and they did not have or follow any policies, practice, procedures, or systems for automatically or routinely deleting or destroying documents.

Now, I get what you have said in terms of his testimony, but in terms of the policies, it's policies, practice, procedures, or systems for automatically or routinely deleting or destroying documents. I think the reference to the -- using the script was -- it was a one-time thing. I think it was, what, July of 2024? And I don't see a problem with the answer the way it's given. I will talk to him again, but I don't think that we're going to be updating this any further. I think what's stated there is accurate so.

MR. CRENNY: Okay, I see where you're saying on the Undiscord that it doesn't qualify under that. I think you can check with him. I appreciate that. But what about the Signal messages that were automatically deleting? That seems pretty indisputably a system for automatically or routinely deleting, does it not?

MR. GILES: I'm writing down Signal --

MR. CRENNY: Okay.

MR. GILES: -- deletions, and I will ask him that question.

MR. CRENNY: Okay. Next thing on Rog 1. Material -- so there's an answer to Rog 15 below that talks about preserving disks.

MR. GILES: Yeah.

MR. CRENNY: This is in the brief we served on this, I believe, and that information is missing from Rog 1, you know, which Rog 1 is about which steps did you take to preserve evidence potentially relevant to this case. And the Rog 15 information about preserving disks is not included here.

Rog 15, the response says, Although the original disks and an estimated four to five generations of data disks and one to two generations of operating system disks burned out over the course of normal use, the latest disks for that server have been preserved and a cloned copy of the OS drive from September of 2022 have been found and preserved.

So it seems that that information should be in response to Rog 1 as well in some form.

MR. GILES: So had you read the e-mail that I sent you earlier this morning, this is point number 1 in that e-mail to you and to your colleagues. And it says, With regard to the requested reference about preservation of disks, I posed this issue to David, but these are Li Fen Yao's answers to interrogatories. Yes, David signs off on the answers, but they are still Li Fen Yao's answers. If Li Fen and David feel that we should go ahead and add that reference, we can certainly prepare a fourth amended responses document.

That's what I said this morning.

MR. CRENNY: Okay. Well, I don't quite follow the point about it's Li Fen and David's answers.

MR. GILES: No, it's Li Fen's answers. David signs off on them because David is the one that's providing all the information, but they're her answers. He's got his own discovery that he's responding to, so to talk about the -- or adding in the disks, we might do it. But it's her answers, not his answers. He just signed off on

them.

MR. CRENNY: Sorry. But the Rog 15 that I'm quoting from is in the same set of answers from something David said at his deposition, and she's responding with information she got from David. That's been the agreement the whole time, and you represent both of them.

We've gone through that a million times that she's responding based on information she gets from him. So I -- I'm not sure what distinction you're drawing. It's in the same set of Rog responses.

MR. GILES: Yeah. And so you know that it's in 15. You know it's there. These are signed by both parties -- by both Li Fen and David. It's there in 15. We might add it into one. I don't know that that's necessary because you see it in 15.

MR. CRENNY: Well, 15 does not have all the information we asked for in 1, which is what steps you took, when you took them. There's no timing in 15.

MR. GILES: All right, I got you.

MR. CRENNY: Okay. The other issue with 1, which also goes into 2 and which we've discussed a bit already, is the Exhibit A.

So in Rog 1, Exhibit A is referenced where it says, David Chen also preserved by not deleting messages in 135 servers, channels, and direct message groups that he identified as containing relevant or potentially relevant evidence identified in Exhibit A.

So I think our question with respect to Rog 1 is, is that all he preserved with respect to Discord? Because, you know, there's all these other things in Exhibits B through E that it says he collected over the course of, you know, the next couple years. So is it accurate in Rog 1 to only say that he preserved by not deleting that first set, or does that need to be amended?

MR. GILES: I don't think anything needs to be amended. We've driven this one into the ground ad nauseam. In terms of Exhibit A, I've asked you what you guys think should be there that

J.R.054

Transcript of Meet and Confer
Conducted on December 5, 2025

you think is missing. You don't have something. You claim it's my responsibility or our responsibility. That's fine. I have -- as I've already said, we can go back and, you know -- when we get the transcript, we can go back and look at the original discussion between myself and Rachel in terms of us confirming with both Stephen, Madelyn, and TransPerfect and David as to whether Exhibit A -- the way I understand Exhibit A -- is accurate, and I'm planning to do that. So I don't know why we're discussing this again. It seems like overkill.

So you guys think it's missing something? Rachel's already provided a very good description of what she thinks it's missing or her questions as to Exhibit A versus B versus C versus D versus E versus F. I already told her I'm going to run that down.

MR. CRENNY: Okay. Well, it's referred to in a few places, so not -- you know, Rachel's talked about what it seems to be missing in terms of providing a list of channels that are being searched. I'm talking about what it's missing in terms of responding to Rog 1 here, which is what was preserved.

And I'm -- you know, you said we're not telling you what we think is missing. I am telling you what I think is missing. I'm saying Exhibits B through E list bigger lists of channels that are not -- that Exhibit A doesn't say are preserved, and the response to Rog 1 says, We preserve the stuff in Exhibit A. I think we're helping you here by saying, didn't you also preserve the other ones.

MR. GILES: So, yes --

MR. CRENNY: Let me finish. As I said earlier, all of the channels identified, not the direct message conversations, but the discussion channels that are not direct messages, it all says they're from the same server, and I don't think that's right.

Just looking at the other spreadsheets, it looks like there were more than one server that was collected and preserved, and I would hope

that's the case.

And the channels' IDs. If you look up some of the channel IDs in Exhibit A in the other spreadsheets, they're not all associated with the same server. So it seems that this Exhibit A is incorrect, incomplete, messed up in some way. So we're trying to point out the issues with you. But, no, I can't tell you exactly what it looks like because I don't know, but.

MR. GILES: Yeah, and Rachel has already pointed out those issues. I have written them down. I don't need you to point them out again. You're just wasting time.

MR. CRENNY: I'm trying to raise the issues and point them out to you. I don't think Rachel has said all of those things that I just said --

MR. GILES: She said all those things. She talked about how many more servers there are in B, C, D, E, and F. And I agree there are more. It's been represented to me by Stephen, by Madelyn, by David, by TransPerfect is that the

135, which is what is being searched, is in Exhibit A and that's -- that's the one that we're running, which came up with the 46,148,676 Discord documents, which then was masked over with the search terms, whether it's the August -- just the August search terms or the August and the previous search terms dropped it down to 6.7 million. If it wasn't using the previous search terms, and we determine that, yes, Rachel's right, that we need to use those search terms as well, then that number is going to change. But by recollecting everything, it's all preserved. Everything. His entire Discord footprint is preserved. That's what the 46,148,676 Discord documents is.

MR. CRENNY: Okay. So -- well, it -- first of all, the stuff he's deleted is not preserved. But if, aside from that, everything has been preserved, then the response to Rog 1 should say something like that. It shouldn't just say he preserved the stuff in Exhibit A. That's what I'm saying with respect to Rog 1. It doesn't say what you're telling me right now that

J.R.055

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 58 of 1016
Transcript of Meet and Confer
Conducted on December 5, 2025
14 (53 to 56)

everything was preserved and we have all of it. It says we have -- we preserve the stuff in Exhibit A. And I'm saying Exhibit A doesn't seem big enough to be the complete list of stuff he preserved.

MR. GILES: Okay.

MR. CRENNY: Thank you. Okay.

With respect to Rog 2. Rog 2 asks Plaintiff to identify with specificity what sources of documents you gathered for purposes of discovery in this case, including the name of any Discord guild or also known as a server and or channel, and for each source, identify the date the documents from that source were collected and preserved.

So one big question on this Rog. You've now recollected everything over the past few months. Rog 2, the response, will need to be updated to reflect what's happened in the past month, in -- you know, months, in sufficient detail for us to understand it. So you're planning on amending -- you're nodding -- so it's sounding to me like you're planning to amend for that reason.

MR. GILES: Yes. So what I wrote in the e-mail that I sent you this morning at 6:00 a.m., it says -- it's point number 2. It says, With regard to Rog 2, our plan would be to supplement our answer if there is a need to do so in conformity with our obligation to do so under the federal rules.

But, yes, you are correct that -- and we don't know exactly what needs to be supplemented yet because I haven't received all the Discord messages which I won't get until December 19th. And so our supplement is not going to be something that happens anytime soon. It's probably going to be something that happens after January 20th when we produce all the things and we can sort of say, okay, this is what was produced and here's what needs to be supplemented. I mean, that's just -- that's just the reality of the situation.

MR. CRENNY: Okay, this will -- first -- this is the first time we've asked you about that so you're amending it for that reason.

Second, you've already recollected. So this is about collection. So I think the amending of the answer about collection can happen before production is complete. But I take it you're going to amend it, so.

MR. GILES: Not if I haven't seen the documents, which I haven't. TransPerfect has, but I haven't.

MR. CRENNY: Okay. But won't you -- you'll see it on the 19th, so whatever.

MR. GILES: Yes, I'll see it on the 19th, and on the 22nd, I'm going to Mount Pleasant, South Carolina, for a week for the holidays.

MR. CRENNY: Okay. Regardless. To also -- next issue on Rog 2, request the name of any Discord guild also known as a server and or channel. Exhibit A does not include the names of the servers which it's just one server that lists repeatedly, as I've said, so that information that we requested is missing from Exhibit A as well.

And then as we've discussed, I just want to get it on the record for the discussion of Rog 2, Exhibit A lists the same server for all the channels. Some of these channels, when you search the channel number, appear on other spreadsheets that were produced as exhibits to these rogs and they appear not associated with the same servers and they have a different channel name. In some cases, the channel names in Exhibit A are almost all message_archive and then a parenthetical name which don't seem like, you know, the actual name that they had on Discord.

So that's the issues with Exhibit A again, which has come up again because it's referenced here in terms of what was collected when separate from where it was cited in Rog 1 as what was preserved and where it was cited in your recent e-mail as what's being searched. So that's why it's coming up three times because it's been referenced in three different -- in response to three different questions.

I take it you don't have any response beyond what we've seen before?

J.R.056

57

MR. GILES: I've listened to what you said, Kevin. That's --

MR. CRENNY: Okay. That's all I have on Rog 2.

MR. GILES: We've driven that one into the ground.

MR. CRENNY: I just wanted to let you close that out before I went on to Rog 8.

MR. GILES: Okay.

MR. CRENNY: So we have a record of it. Okay. Rog 8 asked Plaintiff to describe any and all of David Chen's communications that reference OtterSec.io by date, method of communication, the name and username of the person he communicated with and a description of the conversation.

And it seems like you -- I saw -- I remember this from your e-mail, you -- well, I'll let you say it, but it seems like you agree that some of these are missing the description.

MR. GILES: So what you're referring to in my 6 a.m. e-mail this morning is point 4. And

58

what I wrote was Rog 8 identifies 18 separate individuals with whom David had discussions about, quote, unquote, OtterSec.io. If I'm being objective, I probably agree that the current answer does not include quote, unquote, a description of the conversation for the conversation with Robert Chen and the conversation with the eight individuals identified in the second to last paragraph in that answer.

I have asked David if he can provide me -- I said you -- but if he can provide me with any additional information so that we can provide a description for those conversations. But I think the conversations with the other nine individuals does provide an adequate description of the conversation.

And so David just responded a little while ago prior to the start of this, but I didn't have time to send you another e-mail so I just figured I'd talk to you guys about this here. What he says with regard to Rog 8 is that -- so he goes, So with Robert, there's not a real discussion in

59

the first place. His understanding is that OtterSec.io became relevant in 2024, long after we stopped talking. The one time OtterSec.io is mentioned is when we're deciding what website address to use in 2022. So there's the description for Robert.

For the second to last paragraph, These mainly occurred when I was introducing myself as a former co-founder of OtterSec and people ask why I'm a former co-founder. So that's -- those are David's responses with regard to Rog 8 which I can, you know, when the time's right and I've got everything to prepare amended responses, I will do so and I will include that information which then should address the missing description of the conversation with Robert and with those eight people.

MR. CRENNY: Okay. Thanks. Yeah, if you can just put it in there.

MR. GILES: Okay.

MR. CRENNY: Next one here is Rog 12 which requests -- asks for identification of the date

60

and circumstances when Plaintiff learned that the Motorola Moto E telephone that David Chen had used from approximately August 2021 through April 2023 had bricked or otherwise malfunctioned and asks for an explanation of what steps Plaintiff and/or David took to repair or preserve the phone from that time up through May 2024.

The issue here is the Plaintiff's amended response still does not explain the circumstances when she learned that the phone bricked. All that's been added to the prior version of the response in this regard is to say that she learned from David Chen. It doesn't even say when. So it's missing a response to part of the interrogatory.

MR. GILES: So this is point number 5 in my e-mail from this morning at 6 a.m., and what I say there is, I have asked David and Li Fen whether they know, quote, unquote, the circumstances when Plaintiff, friends, Li Fen Yao, learned, end quote, that the phone bricked. Hopefully, I get a response from either of them

before 10 a.m. this morning.

So this -- David did respond. David's response was, I don't know the circumstances. It was probably something casual at the nearest meal time to the bricking about getting a new phone. So I'm waiting now for Li Fen to respond, and she hasn't yet, but I will follow up with her and point out that David doesn't know the circumstances and ask her whether she knows the circumstances. And if she doesn't, we can include that as part of an amended -- further amended to say she doesn't know the circumstances.

MR. CRENNY: Okay. That sounds -- that sounds like that's that one.

Regarding Rog 17, Rog 17 asks Plaintiff to identify any documents, including, but not limited to, Telegram and Discord messages that are responsive to any interrogatory or document request propounded by the defendants at any point during this action and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation, a description of the document's content, the document's author/creator, when the document was destroyed, lost, or transferred, and who was last in possession of the document.

It only lists -- the only thing it lists is potentially response to Discord messages sent by David Chen in the new ClickBait server in May 2022 that were deleted by David Chen on July 29, 2024. This response appears incomplete in light of the spreadsheet David recently produced that annotated many deleted messages as relevant from different channels, that he produced it on the -- right before the hearing, the Monday of the week of the hearing.

It also appears inconsistent with David's response to Rog 15 in Chen v. Chen, where he says that he talked about the codes in the JITO, J-I-T-O, and Alt, A-L-T, T-A-N-K, Alt Tank servers, and we know he deleted messages from both of those so the response appears to be missing those documents -- references -- you know, discussion of those.

MR. GILES: Assuming he even remembers the different categories that you want him to respond to. He may not, but I'll follow up.

MR. CRENNY: I mean, the interrogatory is not meant to be answered off the top of his head.

MR. GILES: No. I get that. But if there are documents that were destroyed, lost or transferred, like I said, destroyed or lost -- let's just deal with destroyed or lost -- he may not be able to reconstruct that from September 20, 2022, to now. Maybe. It would have to be off the top of his head. That would be.

Now, if something was transferred and he still has that, it's being preserved, whatever, it's been downloaded and processed and uploaded, both the Telegram and the Discord messages, you know, obviously, Telegram I should be able to produce on Next Friday. Discord is by January 20th. But we will be able to potentially figure out if something needs to be amended, and if it does, then what needs to be amended. But sitting here right now, I don't have the answer to that question.

MR. CRENNY: Okay. Well, I mean, just -- he needs to respond fully and accurately based on the information available to him, including information in the possession of, you know, his attorney and TransPerfect and whoever else has the information. So, you know, we have information about what was destroyed and lost. So it's not just like, well, it's destroyed and lost, so it's only if he remembers it. We have spreadsheets from Discord that have been annotated that say what was lost, you know, to the degree of accuracy that Discord was able to provide. So, you know, the hypothetical about what he would or wouldn't remember, I don't think is really --

MR. GILES: So if you already have it --

MR. CRENNY: Could I finish? The hypothetical about what he would remember is not really how the response should be -- you know, how the response should be put together. But, yeah, he just needs to respond fully and accurately. So it sounds like you'll -- we'll await your amended

65

response here.

MR. GILES: Well, so what I was going to say was if you already have it, you already know what he's mentioned that he has -- is destroyed and lost, then you already have it.

MR. CRENNY: He's obligated to respond to the -- he and Li Fen are obligated to respond to the interrogatories with their verified, you know, statement of it. We get it from them. We're allowed to ask interrogatories and get the answers, which then they sign and verify that we can use as evidence. You can't just say that, you know, we can get the answer somewhere else when it's an interrogatory.

MR. GILES: Well, I mean, we can. We can say that because one of the objections that we can notice, it's just as easy for you to come up with the information as it is for us. And if that's the case, you just represented on this meet and confer that you know what it is that has been destroyed and lost, so I -- you know, you're probably one step past me then.

66

MR. CRENNY: I didn't say I know it. I said it appears incomplete, things appear to be missing. We can add it to the list of unresolved issues. David has better knowledge than me of what he deleted and what he talked about in the messages he deleted. So we can -- or we can add it straight to the list of unresolved if it's not going to be amended, but those I think are the --

MR. GILES: No, I'm going to look at it, but --

MR. CRENNY: Okay. We'll wait on that then before we hit. And then Rog 18 here asks Li Fen to identify any and all persons with whom you have discussed this action other than your counsel and state the substance of those communications and those persons' contact information.

The responses do not include the substance of the conversation. You know, they say this action but that, you know, that was the question. That's not the substance of the conversation about the action. So there's three people that it says she talked to and there's no substance of the

67

conversation provided for any of them.

MR. GILES: Well, I would disagree with that. I mean, her son David, she said she talks about everything. Plaintiff has discussed all aspects of this action with David Chen on a regular basis throughout the course of this action. So that's -- that's the substance. Junying Hao -- and I might be totally butchering that name -- provide -- let's see here -- provided companionship and emotional support for Plaintiff since the death of Plaintiff's husband, Sam Chen, in July 2022. And in connection therewith, they had discussed many aspects of the case generally.

So I can try to find out if she remembers specifics as opposed to generally.

And then similarly, after Plaintiff's mother passed away in China in March 20, 2022, Lina Yao traveled to the United States to visit Plaintiff and her family in June 2022. She was staying with Plaintiff and her family when Sam Chen was killed in a car accident in July 2022, remained with Plaintiff and her family for an

68

extended period of time thereafter, has provided emotional support to Plaintiff and in connection therewith, they have discussed many case aspects of the case generally.

Okay, again -- so with regard to the two latter ones, I will ask if she recalls any specifics. She may or may not. If she does, that will be a part of an amended -- whenever we amend -- again, a fourth amended answers to interrogatories, but it may just be simply that she doesn't remember beyond generally speaking about the case.

MR. CRENNY: Okay. We'll wait for that amendment there.

MR. GILES: Okay.

MR. CRENNY: Okay. So that's it for that set of requests. So the next group is the -- David's amended responses to the first set of interrogatories in Chen v. Chen -- no, actually I'm going to do the RFPs first.

MR. GILES: Okay.

MR. CRENNY: Sorry. These were served the

J.R.059

same day, the first set of interrogatories and the first set of RFPs in Chen v. Chen. The requests were served the same day. So we served the first set of rogs and the first set of RFPs in Chen v. Chen on David on May 23, 2025.

I am doing the interrogatories first. Sorry, I got confused on my notes here.

David Chen served responses to both the RFPs and rogs on June 23, 2025. We served a motion to compel as to both sets of discovery responses. On July 22, Mr. Giles, you asked for a week's extension to serve an opposition, which we agreed to. We did not get anything by that extended deadline.

On August 15, 2025, having received no opposition brief, we served a reply brief and noted that arguments -- that any arguments that could have been waived, raised in opposition, had been waived. On August 30, David served amended answers to the rogs but not the RFPs. On September 15, David served an opposition brief that was over a month past the extended deadline.

The discovery order at ECF 183 following the hearing asked the parties to meet and confer on the first set of RFPs and the first set of rogs. On the order, there's an error where it suggests that the RFPs had been amended, but they had not actually.

So what we're talking about here is going to be the amended responses to the first set of rogs and then the, you know, unamended, never amended, responses to the first set of RFPs.

So starting with the rogs, Rog 1 asks David to identify all code, data, databases, logs, records, accounts, servers, hard drives, wallets, tokens, cash, assets, access permissions, or any property which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access that you deleted, transferred, took, or removed, or for which you otherwise adjusted or altered OtterSec's access, including the dates of any such adjustments, deletions, transfers, takings, or access removals.

So for one -- first issue on this, the

response does not contain any dates for most of this stuff like retaining possession of the private keys and it's just after April 27, so we think it's short on dates.

Second, it does not address the Discord channels that David deleted on April 27, 2022, and you can see these at our production at LFMDMD 00053298. This is a conversation between Robert and Philip Papurt. Robert says, What did -- RA is David, that's David's username on Discord -- Robert says, What did RA do after removing perms for me -- meaning permissions. Philip Papurt says, He archived all the channels with Barge. Robert says, Oh, wait, he deleted those channels, and sends a screenshot appears to be from the Discord platform app, which says, RA removed, and then it lists three channels where it says RA removed. One called SPL Token Lending Liquidator and it says again, RA removed Market Maker, and it says RA removed Solend Liquidations. So those do not appear to be covered in this response or not identified here.

Third, on this Rog, there's this sentence about VPS instances that is -- it's very technical and we don't understand what it means. It's like jargon that is not explained, so it's very hard for us to work with that. We're not sure -- it's talking about OtterSec never had direct access to any hard drives or logs, but we're not sure what that caveat is meant to mean. Like why, why are we only talking about direct access? You know, the rog asked about, you know, access, custody or access, not only direct access. So it's a limitation, but we don't quite understand what it means because of the technical language so I think that sentence needs to be clarified. At least.

Those are the issues with Rog 1's response.

MR. GILES: So in my 6 a.m. e-mail that you did not read, number one, under this, David's amended responses to the first set of interrogatories, I said we should be able to add a reference to the Discord channels, but I need to confirm that with David first.

73

With regard to the VPS instances, which is referred to, I think, twice in this answer -- yeah, I think twice -- has your client advised you as to what he understands VPS instances to mean?

MR. CRENNY: Can I -- let me respond first regarding your repeated comments about this. We're not disclosing our communications with our client. That's privileged. But you sent an e-mail at 6 a.m., you keep reiterating that this call was scheduled for 10 a.m., you also sent two other e-mails overnight. I made it very clear I had skimmed your e-mail, but I didn't memorize all of the responses and I was not going to be adjusting my outline based on what you had sent. So, yes, I did not read it. It is not necessary or helpful or tactful to keep reiterating that I did not -- I did read it. I skimmed it. I did not, you know, process the whole thing that was sent at 6 a.m. for a 10 a.m. call, and I don't think it's reasonable for you to imply that we should have.

We still have to discuss it even if it's

74

in your e-mail, and I don't think you'd want me to just read it off the top of my head and characterize what your response is, and then you'd have to clarify it. So I'm saying my side of it. And as I said at the beginning, you can respond with what was in your e-mail, but it's not helpful to keep reiterating that I didn't read it, which is not even accurate.

MR. GILES: Okay. So I will stop with that reference. But it would have been helpful if you read this because it expedites a lot of the things that we're going over unnecessarily. But we're doing it. That's fine. That's fine, Kevin. It's okay.

So, yes, you raised your point about the Discord channels. I've responded and it's exactly what I said. We should be able to add a reference to the Discord channels, but I need to confirm that with David first.

MR. CRENNY: Nothing is unnecessary. I can't -- we can't not discuss something because you said you're going to ask David about it. This

75

is the meet and confer to discuss it. So regardless of whether you're going to ask David about it, that's great. The ones you're going to ask David and amend, that's what we're asking for. But I still need to read the issues into the record for the Court, and then we have to get your response so that's why we're doing this so.

MR. GILES: All right. That's fine.

MR. CRENNY: Okay. So it sounds like -- any other response to the issues we raised with Rog 1? Is there anything to discuss or you're going to take all that to David?

MR. GILES: Well, again, you don't need to tell me what your communications are with your client, but I bet if you ask your client what VPS instances is, they would know and then they can tell you what it is. I will ask David for his definition of VPS instances and -- but, you know, you could simply just ask Robert and it probably would not be an issue then.

MR. CRENNY: Okay. I'll go on to Rog 2. Rog 2 asks -- so I'm going to read it again. It's

76

a long one again -- asks David to identify all code, data, databases, logs, records, accounts, servers, hard drives, wallets, token, cash -- tokens, cash, assets, access, permissions, or any property. So then that long list is defined as material. So any material which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access that were in your possession, custody or control at any time between April 27, 2022, through the present day.

If you no longer have possession, custody or control over the material, identify when you relinquished possession, custody or control over the material and/or where you transferred the material to. So that's the Rog.

Regarding logs and hard drives, those are still not addressed in the amended response, so those still seem to be missing. The word logs appears only in the objection that it's vague, but it's not clear whether you're refusing to answer based on that so there's no -- it doesn't address hard drives at all and it's unclear whether you're

J.R.061

declining to respond as to logs.

Also, the response remains incomplete and inconsistent with Li Fen Yao's response to Rog 15, which David also verified. This is something we raised in the motion to compel. There's nothing that was added here in the amended version to explain the wiping of the server and the deletion of the OtterSec virtual machines on or around April 27, 2022, as described in response to Li Fen Yao's Rog 15 or to account for the burnout of multiple disks described in that same response.

And, again, the three channels that were deleted from the OtterSec Discord server, that screenshot I just described, those should appear in one or both of Rogs 1 and 2 in some format as something that was deleted or destroyed, or as something that was transferred or lost. It should be accounted for somewhere in these two responses and it's not -- they are not referenced in either.

That's it for Rog 2 from us.

MR. GILES: Okay, so as you correctly point out, there is an objection as to the undefined scope of the terms data logs, records, accounts, and any property. So, you know, obviously you guys need to provide a better scope of that, and once you do, then we will know what we need to answer or not answer.

With regard to hard drives, I was just reading through it, you're right, it doesn't appear. I thought we had included that, but, okay, so I will make a note here for myself, hard drive to address in Rog 2.

And then with regard to the burned out disks, as I stated in my e-mail this morning, 6:00 a.m., point number 2, with regard to Rog 2, I am seeking confirmation from David as to whether the burned out disks that have been referenced were OtterSec's disks or were just David's disks after he had already left the employment of OtterSec on April 27, 2022. If the latter, there would be no need to update anything since Rog 2 was focused on OtterSec property allegedly taken by David when he left the company. So this is one of the things that I posed to David and his response back to me

a little while ago was the disks were something owned by me. Same goes for the server.

MR. CRENNY: Okay. But the rog is a little broader than I think what you and David seem to be saying there. It's not -- it's which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access that were in your possession, custody, or control.

So I take it if you're saying, you know, this server was in David's basement, it was David's server, but if OtterSec had access to it, it is covered by this rog, regardless of, you know, who says who owned what.

MR. GILES: I think what David is saying is that the burned out disks in the server are after-acquired equipment after April 27, 2022. They were owned by him. They were never owned, controlled, possessed by OtterSec or which OtterSec had custody or access to. That's -- that's the point.

MR. CRENNY: Okay, I take your point on the disks, but I'm saying what about the server itself which was wiped and the OtterSec virtual machines that were deleted that are referenced in Rog 15.

MR. GILES: Well, yeah, I -- yeah, I need to follow up with David about that.

MR. CRENNY: Okay. I don't think you had said that previously, so that's why I was following up on it.

So then are you -- on the logs point, this whole -- this first sentence objecting based on vague, ambiguous, et cetera, are you refusing to answer based on that? Because I don't think you're refusing to answer on any property being vague. You know, that would cover everything. You are answering on some stuff.

MR. GILES: With regard to logs, I think we need a better understanding from your side as to what logs you're referring to.

MR. CRENNY: I mean, I don't know. It's a question asking David to identify it. So anything that could be -- you know, this is pretty broad. I don't -- the Discord, for example, is either

J.R.062

data or a database or logs or record. You know, it's something so.

MR. GILES: Well, I think -- I think David's point is -- and maybe I don't say it here as specifically as you want me to, or David doesn't say it as specifically as you want him to -- but there are different types of logs. And just to say logs and, you know, just to throw it against the wall and say logs, what logs are you talking about?

MR. CRENNY: It says all logs which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access and that were in David's possession, custody or, you know, there's, there's a whole definition. That's the -- that's the -- that's the Rog. It tells you which logs we're asking about.

MR. GILES: Okay.

MR. CRENNY: Okay. Going on to Rog 4, I guess, right?

MR. GILES: Yeah.

MR. CRENNY: Unless you have anything else to add? Okay.

Rog 4 asks David to explain your understanding of why you were paid $60,000 by OtterSec on April 15, 2022. This response was not amended so it remains nonresponsive. As we pointed out before, the answer does not explain why David was paid $60,000. The question is why -- explain your understanding of why. And then it says some things that happened with paying Robert, and then it says, Subsequently it was decided that equal payments would be made to both Robert Chen and David. But that doesn't say why it was decided. It just says it was decided. So it does not answer the question. That is it as described in our briefing, yes.

MR. GILES: So, Kevin, we have gone down this road, I think, on two separate meet and confers, and I provide you the same answer every time. What is there is what is there. This does explain. You disagree with it. You don't like our explanation, but this does explain why each party was paid 60,000.

Robert wanted 60,000 to pay taxes and he was reluctant to sell any of his investments to obtain those needed funds. Several options were discussed, but Sam and David objected to providing a loan to Robert Chen. Subsequently, it was decided -- it was decided between Sam, Robert, and David that equal payments of 60,000 from OtterSec would be made to both Robert Chen and to David. That's -- there's no more information. We've discussed this. It's on the record in two previous meet and confers. There's nothing more I can tell you.

MR. CRENNY: First of all, I think it's one previous meet and confer. I know we have discussed it before, but I think that's -- you meet and confer on it before you serve the briefing. This is the procedure under Rule 104, and as reiterated by Judge Simms, you meet and confer before the briefing, you serve the briefing and then you meet and confer after the briefing which meet and conferring any times more than we're supposed to on it.

So if this is the impasse, then it becomes one that goes to the Court, but we are trying to, you know, discuss it with you and say that this -- we don't see a why here. We don't see a reason here. We see, you know -- most of it is about Robert and then there's, you know, a -- it was decided is not a reason why it was decided. That was the whole question. So we can -- we can mark it down as an unresolved one if refusing to do anything further with it or if you want to take another look at it, you can take it back.

MR. GILES: We've taken several looks at it over the summer and it's all on the record. It's been discussed. We've told you that we think it's adequate. We think it describes and answers the interrogatory fully. For whatever -- I don't know what you're expecting there to be beyond what is written there. You keep saying the why. The why is there.

MR. CRENNY: Okay. Well, this -- I mean, this we should bring this up at some point that, you know, the ones that were unable to resolve, we

proposed doing the -- that spreadsheet method that Judge Simms referenced, that she put the citation in ECF 183. I don't know if you looked at that or if that sounds good to you. We can discuss later. I don't mean to put you on the spot about it, but that is our suggestion for how to like present this to the Court succinctly.

MR. GILES: If this is something that you want to take to the Court that we have not provided you the answer that you are expecting, then so be it. Then go ahead, put it on the spreadsheet.

MR. CRENNY: I mean, I don't think it's about the answer we expected. It's about an answer. You know, our position -- are you agreeing to do the spreadsheet method now instead of doing briefing on it? Because the other option is, I think is we submit the briefs. But I think it sounds like Judge Simms would prefer we use the succinct --

MR. GILES: I got the sense that Judge Simms wants the spreadsheet. That's why she pointed out to both of us. So, yeah, I mean, let's give her what she wants; otherwise, we might get an earful.

MR. CRENNY: Okay. Well, this one will go on the spreadsheet and then we'll have to go back through and see if we had another one that was, but I can't do it off the top of my head.

Okay. So Rog 5 asked David to explain what specificity the creation, development and use of any Solend liquidator code and/or any MSOL market maker code that you or OtterSec created or contributed to, including who wrote or edited the codes at any time, in what respects, during approximately which time frames and where the codes were stored, including, but not limited to any code repositories throughout the relevant period. So that's the Rog.

This has been amended from the first version, which just referred to GitHub without explanation, but it is missing information still. It doesn't say who created the Solend liquidator. It doesn't -- you know, it doesn't identify who

that was. It says the oldest version that David used was created on October 5, which is inconsistent with David's answer to Rog 16 and Chen v. Chen that he started working on it on October 2, 2021.

You know, we'll be discussing that next week, but that will need to be updated here if that's the answer.

There's nothing about the code's development pre OtterSec -- before it went over to OtterSec in this answer, and then there's insufficient detail about what happened at OtterSec. It says three people worked on the code. That's all it says over the course of three months, you know, that it doesn't say in what respect they edited it and who did it at what times within that three-month period. That's -- you know, that's like the key period in the case. So to just say a three-month period people worked on it is not sufficient. There's nothing about who did what on the MSOL market maker code, and it -- you know, it doesn't say that this is -- it seems that -- well, there are GitHub records and it seems like there's more detail than this available to David that he could be responding based on he's not saying this is all he has or remembers.

And then additionally, one final kind of separate point, this interrogatory and a few others objects to the relevant time period without clarifying what period the response is supposed to cover. You know, it objects to the -- on the basis of the time period dating back to February 1st, but doesn't say, you know, notwithstanding that objection, we're going to answer back to that time period anyway. I know the time period, something we're dealing with next week, but that's an issue with this is that we don't know what time period it's supposed to be covering. Like, is this still the October 31st cutoff you had proposed or whatever. So that -- those are the issues with Rog 5.

MR. GILES: So in the e-mail I sent this morning at 6 a.m., there are points 4 and points 5

J.R.064

under this discovery pleading that deal with Rog 5, and then there's also point 8 which talks about relevant period.

But so point number 4 says the correct date that David first started working on a liq on A liquidator code is October 2, 2021. We will amend this answer to reflect the correct date of October 2, 2021, making it consistent with David's answers to Plaintiff's second set of interrogatories that was served by me on November 24, 2025.

And then point 5 says, I have asked David to clarify the other remaining issues identified under Rog 5 in your below e-mail. Hopefully, I will have an answer from David before the 10:00 a.m. meet and confer session.

Point 8 says, All your references to objections to the relevant period are moot now, considering that Judge Simms ordered on November 20, 2025, that the relevant period is now September 5, 2021, through April 17, 2025. It is what it is and as a result this is now the period of time that will frame what documents are being produced going forward and what time frame is being referred to in Chen v. Chen discovery responses.

So David in response to the Rog 5 issues says -- with regard to the date, he goes, I began looking into liquidators on Solend in general on 10/2/21. I then discovered the public Solend liquidator code and created a Git fork -- and he's got a link here -- on or around 10/4/21. The code basis for any liquidator code are stored on GitHub. The specifics of development timelines can be seen in the Git comet history which he says might be produced -- but it will be produced.

With regard to information about development prior to OtterSec he said, Yes, of course, there are additional developments that are specified in granular detail, timestamp and code changes and author in the Git history logs. So there's some logs, Git history logs, which should have, will be, produced during the meet and confer -- just one more second here. Yeah, so

we'll produce these up to the end date of the liquidator code.

With regard to who wrote or edited the codes at any time, he wrote it. Alexander K, is the long last name, did edit the typescript codes which is the one that started on 10/4/21. He did not write or edit the rust codes which only David and OtterSec have edited. The rust code is the one that started on October 31st and was put into use on November 7th of 2021.

With regard to MSOL market maker, he says, Just me and Robert worked on the MSOL market maker. Again, we just need to provide the Git logs. And so that's the end of his comments regarding Rog number 5 which when we get to the point of doing amended answers or further amended answers, I can add all that information in.

MR. CRENNY: Okay. So that's great that's going to be amended. A couple points to clarify.

One, David -- the GitHub records are not David's business records so you -- those cannot be referred to in response to the rog. David needs to answer the rog and verify the answer so we have a verified statement from him. You can't just point to GitHub records. I don't --

MR. GILES: No. I think we can point to them, but also we have to produce them. We haven't done that. I get -- I think I produced certain strands of it which was in relationship to the documents that David reviewed as part of his preparing --

MR. CRENNY: Yeah, I'm not --

MR. GILES: -- position. Can I finish?

MR. CRENNY: Yep.

MR. GILES: Okay. So we did produce that. There are more and we will produce them. And I think that -- you know, the GitHub is -- I would guess that would fall under non Discord. So that would have to be by this next Friday, the 12th, is when we'll produce that.

MR. CRENNY: Okay. But that -- we've briefed this several times in this case that you can't refer to things that are not your business records in response to a rog. You have to respond

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 68 of 1016
Transcript of Meet and Confer
24 (93 to 96)
Conducted on December 5, 2025

to the rog so that we have a verified answer from David that we can use as David's answer to this question.

MR. GILES: Well --

MR. CRENNY: David can Look at the GitHub to put together his answer, certainly, but he cannot just say look at the GitHub that I'm producing.

MR. GILES: Actually, I think he can because it's information that answers your questions. I disagree with your representation that the case law suggests that he can't refer to a record in answering his interrogatories. He absolutely can because it answers your interrogatory.

MR. CRENNY: It -- Rule 33(d) says that he can point to -- you can point to a party's business records. But these are GitHub's records. It gives you the option of producing business records, but not somebody else's business records, a party's business records. So I would suggest you look at Rule 33(d) and the briefing we've done on this.

MR. GILES: I'm familiar with 33(d). Yes, I'm familiar with it.

MR. CRENNY: So is your position that the GitHub records are, what, business records?

MR. GILES: They're not David's business records, they're GitHub's business records. But it does answer your question. It shows the information and the data points that you have asked about. And if you want to have a corporate designee for GitHub to come in and say, yes, those are pulled off our system, and, yes, they appear to be accurate, those are ours, have at it. I mean, I don't know what else to tell you in this regard. He can refer to them.

MR. CRENNY: Okay. We can send you the case law, but we disagree on this point and we'll put it in the spreadsheet that we put together.

The other thing I want to clarify was on the start date -- right now, the period is September 5, 2021, as the start. But, you know, we're -- that's what the deposition is about next

week so that could potentially change. I gather you don't think it will, but, you know, we didn't take the deposition yet, so.

And our concerns would not be moot. Your objections would be moot, not our responses to your objections, because you would still need to amend to clarify what date range you're covering. I take it you know that would now be September 5th through April 17th -- sorry. Yeah, right?

MR. GILES: That's correct.

MR. CRENNY: So you would still need to amend to resolve these ambiguous things where you're objecting to the date range so it's not that our questions --

MR. GILES: I agree with you there that, yes, we would need to reference that in answers or in the instructions, whatever, you know, pursuant to the order of ECF 183 from Judge Simms on November 20, 2020.

MR. CRENNY: Okay. Yeah, that's going to come up in a few of these so we will just -- we can breeze past it then, having discussed it, but I'll just note it for the record when I hit it.

Okay. Next one is Rog 8. Rog 8 asked David to identify all methods of communication, including websites, devices, platforms, or any other means that you used or may have used to discuss the issues alleged in the complaint.

And here David refers -- doesn't identify the devices he used. He identifies two phones, but then he just says laptops and desktops. That doesn't identify the laptops and desktops, obviously.

MR. GILES: So in my e-mail of this morning at 6:00 a.m., point number 6 reads, While David's answer to Rog 8 does say laptops and desktops, it also identifies the two cell phones that he owned. We can probably amend this to identify whether the laptops and desktops refer to all such laptops and desktops owned by David post filing of Plaintiff's complaint against David in October 2024.

MR. CRENNY: Okay. So we'll await the amendment on that.

J.R.066

MR. GILES: Yep.

MR. CRENNY: Okay. Next one is Rog 9, which says, State the amount of income you made from running any Solend liquidator code and/or any MSOL market maker code between February 1, 2021, and April 17, 2025. And identify all blockchain, self-custodial, or digital wallet transactions, transaction histories associated with any Solend liquidator code and or any MSOL market maker code that you or OtterSec created or contributed to. For transaction histories, include transaction hashes, timestamps, and the sending and receiving blockchain, self-custodial, or digital wallet addresses.

So one -- two issues here. One, half of the question is still not responded to. It asks for identification of the blockchain, self-custodial, and/or digital wallet transaction histories, et cetera, and none of those are identified here. So that whole like half of the question is not responded to.

And the -- oh, the other issue is just the time period thing that we just discussed which is it doesn't resolve the issue with objecting to the relevant period without clarifying what period the response is supposed to cover -- I'm sorry, I'm talking too fast for the court reporter. I apologize -- but we've discussed that time period thing. So it's just the -- the identify all blockchain, self-custodial, or digital wallet part.

MR. GILES: So in my 6 a.m. e-mail, point number 7 says with regard to Rog 9, I have asked David if he can provide me with a better response to quote, unquote, Identify any blockchain, self-custodial, or digital wallet transaction histories associated with a Solend liquidator code and or any MSOL market maker code that you or OtterSec created or contributed, end quote.

His response was, We already identified blockchain addresses and labeled them in a different rog. I've attached that spreadsheet for reference. They can look up the history themselves since it's public -- and then he has the link here of what the -- of the spreadsheet which I can print out and produce -- producing -- oh no, I'm not going to read that last part.

But so -- so I will have to follow up with him again to figure out whether his reference to the blockchain addresses that he has responded to in his e-mail to me also includes self-custodial or digital wallet transaction histories which was asked for in number 9. So that'll need to be a follow-up for me to him.

MR. CRENNY: Okay. And we need -- it's not totally clear what you and David were proposing there, so maybe you are proposing this, but we need an identification of those, you know, transaction histories, not just they're on the blockchain, go find them. The question asked them to identify them.

MR. GILES: Yeah, so he's -- I'm just looking at what he wrote and there's a link here that he says is -- I've attached the spreadsheet for reference. So the spreadsheet is going to provide, I believe, that information and so it's not going to just simply be, It's on blockchain, go find it yourself.

MR. CRENNY: Okay.

MR. GILES: There's going to be a spreadsheet that's going to get produced.

MR. CRENNY: Okay. We'll await your amendment on this one then as well.

MR. GILES: And then, I guess quickly, we've already talked about the date.

MR. CRENNY: Yeah, we're good on that.

MR. GILES: Yeah. And I'll revise -- when I make amendments, I will note again whether I do it in each interrogatory answer or if I just do an instructions about the current order from the judge.

MR. CRENNY: Yeah, right. Okay. So then moving to Rog 10. Rog 10 requests David to, Identify and describe the ways in which you have used any and all proceeds made from running any Solend liquidator code and any MSOL market maker code during the relevant period.

This response as amended still only says

J.R.067

how he quote, Generally spent his money, end quote. That is only a partial answer. You know, as we explained in our briefing, the Rog asks for how he, quote, Used any and all proceeds, unquote, which is, you know, more than just spending. It could be investments or I don't know what else. So the answer appears to be limiting itself to spending, which is narrower than what was asked for and what happened to the funds. I see that this is in your e-mail, so I'll let you say what's in your e-mail.

MR. GILES: Yeah, so in the 6 a.m. e-mail, it's point number 9, and I said we can certainly change the phrase, quote, unquote, generally spent his money to now read, quote, unquote, David used any and all proceeds since February 2022 on -- and continue with the rest of the answer as already stated in the interrogatory number 10. And then I will confirm with David whether that's accurate, whether something needs to be added, and if so, what it is that needs to be added and then we would add it.

MR. CRENNY: Okay. Great. That was my concern looking at the e-mail was make sure that it -- you know, take it to David and make sure that's right.

MR. GILES: Yep. He's got a side in the answer so, yeah.

MR. CRENNY: Then also on Rog 10 we have the time period thing that we've discussed a couple times which you will amend at the appropriate time.

Rog 11 asks David to identify all accounts, joint accounts, and/or blockchain, self-custodial or digital wallets with any traditional or decentralized banking, securities or other financial institution, exchange, platform, application or database that you opened, closed or maintained between February 1, '21, and April 17, 2025.

The answer says, David will be providing a spreadsheet with all of the wallet addresses he used.

Until we get that, we have to wait to

discuss this response here, we think, because we can't tell if that's what exactly that is. We'll have to see what that looks like. So I guess I don't have anything to discuss at the moment on that one.

MR. GILES: Point 10 of my 6:00 a.m. e-mail says the reference spreadsheet and the answer to Rog 11 will be produced by on December 12, 2025.

MR. CRENNY: Okay. So we'll look to see that. And then the last one is Rog 14. Rog 14 asked David to describe all of David's conversations related to the OtterSec.io domain including, but not limited to, any about registering this domain.

We noted that there is a -- one or more references to Plaintiff that appear to be references to Li Fen Yao, but this is in Chen v. Chen where Robert and OtterSec are the plaintiffs so that is confusing. This is, I think, a fixable one that just needs a correction, and I think you agreed to that in your e-mail.

MR. GILES: Yeah. Point 11 says, With regard to Rog 14, I said I believe that the first plaintiff, which is at the bottom of page 13, is actually referring to Robert Chen, though it might be Li Fen, but I think it's Robert Chen. But that you're correct that the second plaintiff, which is on the top of page 1 -- let me find it -- yeah, the top of page 14, the very first word at the top of 14, that that inadvertently is referring to Li Fen so I need to change that one and maybe --

MR. CRENNY: Cool. So we'll wait on the amendment there.

Okay. That's the rogs. Then David's first set of -- David's responses to the first set of RFPs in Chen v. Chen. These have not been amended, right? This is not what you sent last night?

MR. GILES: No, no, This is the -- you got served on the 23rd of -- May 23rd. We filed answers on June 23rd.

MR. CRENNY: Yes, I was just double checking that that was not the RFP responses that

J.R.068

we received last night, and they're not so.

So because we have never received amended RFP responses, none of the issues we raised in our briefing on this have been resolved and all of them remain live issues at the moment. So I'm just going to go through them again.

There are a few that cut -- there are two that cut across a number of RFPs. First, there's the time period issue, which is similar to the rogs. You know, they -- this is for RFPs 2 through 9 and 12. There's an objection to the time period and it's not clear whether anything is being withheld based on that objection. So I take it those are going to be amended to reflect the new time period and to clarify whether anything's being withheld, correct?

MR. GILES: Yes.

MR. CRENNY: Okay. Then there are a series of boilerplate objections that are improper under the case law. These are in RFPs 1 through 5, 7 through 9, and 11 through 12, as detailed in our briefing. For all of these, we need

clarification on whether anything's being withheld based on them. If so, under which objection and whether you're producing responsive documents or whether they don't exist. If there's nothing being withheld based on these objections, then they can -- they can stay there. But we just need a clarification on that as things are being amended, as productions are happening -- or following productions.

MR. GILES: Yeah, I would say that obviously the noted objections -- I'm blanking as to the reason why you think they're improper, but being that is -- whatever that is.

We obviously are in the process of putting together a privilege log, which if we're withholding things because of privilege or objections would be included on that and --

MR. CRENNY: Well, if they're not privilege objections, they wouldn't be there.

MR. GILES: That's true. You're right.

MR. CRENNY: So.

MR. GILES: I guess the short answer is

I'm not aware of us withholding anything based on these objections. They're noted objections because they apply, and I guess you think they don't, but certainly a judge can figure out whether they're valid objections or not.

But to your point, to your question, I'm not aware of us withholding any documents because of these objections. Now, if it's a -- I mean, we've noted, I think, a number of rules. So let me see here.

Number 1, David also objects to the request on the basis that it reports to seek the disclosure of information or documentation protected by attorney-client privilege and or work product doctrine. So if we are, if there is a privilege as we just noted, it will be in the privilege log.

MR. CRENNY: Okay. So the case law on boilerplate objections is available in our -- the brief we served on July 22, 2025, at pages 23 to 24 so you can look at that for why they're improper. But, you know, you're saying you -- the

responses just need to be amended to say that assuming it remains the case through the production process and, you know, same thing for the -- any other responses you're amending and then that'll take care of it. They can -- the objection can stay on there. If nothing's being withheld, then that's fine.

MR. GILES: Yeah, I don't know that I need to or have to note the objection and say but nothing's being withheld because of the objection. I don't think that's a requirement of mine or anyone in litigation. I've noted the objection. I'm telling you here on the record in the meet and confer that I'm not aware of us withholding any documents because of those objections unless they are a privilege objection, in which case you're going to see it on a privilege long.

MR. CRENNY: That's fine. Okay. Then we have three specific RFPs to run through here with different objections.

So RFP 3, it requests all documents showing income obtained directly or indirectly

J.R.069

from running any Solend liquidator code or any MSOL market maker code at any time, and any transfers of that income to any traditional or decentralized banking, securities, or other financial institution, exchange platform, application or database, including blockchain, self-custodial, or digital wallets that you opened, closed, or maintained during the relevant period.

Then, as we've said in our brief, the response here is unclear because it states that the information requested is available via blockchain, but it also does state that all non-privileged documents responsive to this request will be produced. So it sounds like nothing's being withheld based on the objection that it's available via blockchain --

MR. GILES: Yeah, right.

MR. CRENNY: So that would be fine. We just would like that clarified.

And to the extent that he is holding anything based on that, we'd like a basis for it, but it sounds like it's not happening.

MR. GILES: Yeah, I don't know that I need to clarify anything beyond what's said there because you correctly point out -- let's see, there's one -- that's 1, 2, 3 -- but subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this request will be produced. I mean that's -- that's pretty clear. If they're privileged, if there's any privileged ones, they'll be on the privilege log. If they're not privileged, they will be produced.

MS. CLATTENBURG: Yeah, I think what we're just seeking clarity on, I don't think those responses are clear in terms of -- it's not clear when you say subject to these objections whether that means you're also withholding documents subject to those objections and then producing other stuff or not. That's what we're seeking clarity on.

And as you seem to agree, if you're withholding on the basis of any objection, privilege or otherwise, you have to identify that specifically what the objection is.

MR. GILES: Yeah, if I were withholding -- let's just go this way. If I were withholding documents because one of those, I would say that I'm withholding documents because of this. When I don't say that -- and this is just, you know, you guys probably don't know my practice, that's fine, we've never been in a case together -- but when I say at the end, Subject to the foregoing objections, without waiving any of those objections, David states that all non-privileged documents responsive to this request will be produced. All non-privileged documents responsive to this request will be produced. That's what I said. That's what I mean.

THE COURT REPORTER: Counsel, this is the court reporter. Could we take a five-minute break, please, when we get a second?

MS. CLATTENBURG: Yeah, of course. We can do that right now.

MR. GILES: Yeah, I'm fine with that.

MR. CRENNY: Okay. 12:10. Come back, 12:10 Eastern?

MR. GILES: Sure.

THE COURT REPORTER: Yes, thank you.

(Off the record.)

MR. CRENNY: Okay. So that was 3. I think we're okay there.

5, this is another one that I recall discussing. I mean, obviously we discussed all these before, but 5 requests all your communications on behalf of or purportedly on behalf of OtterSec during the relevant period. David objects to this request on the basis that it purports to seek the disclosure of information or documentation protected by the attorney-client privilege and/or the work product doctrine.

At our previous meet and confer, you said this was unclear. We explained what we meant by it and you said you would take another look at it. So it's not clear whether you were planning on amending it or not as of the last meet and confer.

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 73 of 1016
Transcript of Meet and Confer
Conducted on December 5, 2025
29 (113 to 116)

113

I don't know if you have a view at this point.

Our point being that as with the communications we've described would not be attorney-client privileged for David, maybe like for OtterSec, they could be. It could be OtterSec's privilege in which case David can't object on that basis. So I think we're just not clear what that objection is doing there, what it means. It doesn't seem to make sense. It doesn't seem like it would cover anything we're asking for here.

MR. GILES: Let me -- let me just. I'm rereading it to myself. I'm going to have to go back and look at when we talked about this before because I know there's a reason why. It was more than just you noted the objection and I said, okay, I'll take a look at it. I think there was some back and forth, if I recall correctly, that I can -- I think I even mentioned examples of where I can see that something might be attorney-client or work product doctrine, but I'm going to have to go back and look through those.

114

No. I mean, as we just discussed with regard to the previous -- the number 3, obviously at the end there, I say, Subject to the foregoing objections and without waiving any of those objections, David states that all non-privileged documents responsive to this request will be produced. And so if there are no -- if you're right and there's no privileged documents, then everything will be produced so.

MR. CRENNY: Okay. I don't recall hypotheticals of what it could be. I recall the discussion was that you were saying who's purporting it? And we were saying it's clear that it's David purporting to act on behalf of OtterSec. But we have it transcribed, so we can go back and check.

MR. GILES: Yep.

MR. CRENNY: So it sounds like you'll --

MR. GILES: I'm going to write it down. I'm going to write it down here.

MR. CRENNY: All right. And then RFP 10 requests all documents received from any third

115

party in connection with this action since the filing of this complaint, whether provided in response to a formal or informal request for documents or information. David says there are no documents responsive to this request in his response, but we said that it's incomplete and that it omits multiple known sets of documents that he's received from third parties in this action. These would include correspondence with Discord, spreadsheet he received from Discord, subpoenaed material from the Michael Best law firm that was received, communications with third parties about the Moto E phone communications with Ally Guo and her counsel.

You know, that was just off the top of our head, and you would know better, but those things seem to be missing, at least from here.

MR. GILES: Yeah, I'm just reading it again. All documents received from any third party. So that would be David receiving documents from a third party. Obviously, you guys received documents from third parties pursuant to your

116

subpoenas. I don't think David has received any documents from third parties. I don't think we've served any subpoenas. I don't think -- I know I haven't been part of any subpoena service, and I don't -- my recollection is that Stephen and Madelyn mentioned that they hadn't subpoenaed any records, but maybe I'm wrong in that regard. I'm noting it. I'm writing it down. I will take another look.

MR. CRENNY: Yeah, I think they subpoenaed Jump, Michael Best, David Agassi. There might have been another one, I think.

MR. GILES: Well, okay. So if they did do that --

MR. CRENNY: I think.

MR. GILES: Yeah, if they did do that. So I've got it. Okay. So I've got a follow-up with Stephen and Madelyn. If they did do that, then, -- and they got documents, then you're correct, there would be documents that were responsive to this request and then I'd need to amend it.

MR. CRENNY: Okay. And the communications

J.R.071

Transcript of Meet and Confer

Conducted on December 5, 2025

117

we described with, you know, Discord, third parties about the phone, Ally Guo.

MR. GILES: Well, communications with Discord is not document. That's communications.

MR. CRENNY: Okay. But Discord sent him documents too, spreadsheets and things.

MR. GILES: The takeouts. Yes, which I think have been produced already. At least that was my understanding that --

MR. CRENNY: Okay.

MR. GILES: July 2024 takeout and then there was an October 2024 takeout. Both of those have been produced already.

MR. CRENNY: Sure. But still that, you know, this says there are no documents responsive to this request from -- we produced them already, right?

MR. GILES: No, I agree with you.

MR. CRENNY: Okay. So it sounds like you're looking on that one. Since we are basically at the time I think we would propose we hold it there. We were going to talk about the

118

second set of rogs in Chen vs. Chen, but then you've served the RFP responses too, so maybe we could put them together for the next meet and confer. They're both Chen v. Chen and they were from the same time. That would make sense as a pairing. We only have 12 more minutes here.

MR. GILES: You want to deal with the answers? I mean, because the answers were served on the 24th.

MR. CRENNY: That's what I'm saying. I have notes on those. But I'm saying we only have 12 more minutes, so we won't finish today anyway --

MR. GILES: Okay.

MR. CRENNY: -- if we start those so let's do them together with the RFPs whenever you're next available.

MR. GILES: I'll leave it up to you. So that's fine.

MR. CRENNY: Yeah, yeah. Well, the organization can be up to us, that's fine, but I think we're waiting on you on availability.

119

MR. GILES: I will as part of my e-mail when I get back information from Stephen, Madelyn, David and TransPerfect.

MR. CRENNY: Okay. The other thing that doesn't -- you know, isn't tied to a discovery request we wanted to raise was we sent you an e-mail on November 4 about asking whether Chinese language searches were being run on potentially relevant documents.

That e-mail said in -- it noted that in David and Li Fen's production to date, we've noticed a number of documents that appear to be text message conversations from Li Fen or from Sam Chen, where some or nearly all of the conversation is in Chinese. The ones you produced have at least like one word or term in English like Sino Global Capital or Rob.

So we wanted to confirm that in searching for responsive communications like these for Li Fen and Sam, you're also running Chinese language search terms in order to capture, you know, if they're talking entirely in Chinese the whole

120

time, but it's very relevant and responsive, they don't happen to use an English word, are you running searches to capture that? Because it seems like they text in mostly Chinese with some people at least.

MR. GILES: So what I can -- yeah, so what I can tell you is when you sent the November 4th e-mail, Michael and I discussed it and said that if there are communications that are in Chinese or some other foreign language that, yes, we would need to.

So we followed up with Stephen. We asked whether he ran searches or if he asked TransPerfect to run searches in Chinese. He confirmed that he had not. So Dave -- I mean, Michael and I are like, well, okay, so we need to do that. It was raised with TransPerfect that this was a request that was made of you, that it's something that we obviously need to do. But I don't think as part of those communications, I told them run -- you know, how do we run it? What's the protocol for running it? So that needs

J.R.072

Case 8:23-cv-00889-TDC   Document 204   Filed 04/13/26   Page 75 of 1016
Transcript of Meet and Confer
Conducted on December 5, 2025
31 (121 to 124)

121

to happen.

But the answer to your question is it was not done, has not been done, was not done by Stephen and Madelyn and -- but we've now raised it with TransPerfect that this is an issue that needs to be addressed and now we just need to address it so.

MR. CRENNY: Okay. Yeah, and I guess we're still working out the -- we still have open questions about English language search terms, so we'll take them one at a time. Okay.

MR. GILES: Yeah.

MS. CLATTENBURG: Alex, I'm going to send a draft JSR for Monday. I haven't changed any of the dates. I just need you to okay so I can add your electronic signature. So I'll send that around later today.

MR. GILES: Okay. Thank you.

MS. CLATTENBURG: Yeah. And -- yeah, we'll be in touch when you know when you can meet and confer next. And I think that's everything for us unless you have something else.

122

MR. GILES: Well, let's do it this way. What's -- do you know your availability for the following week? The week of -- what is that -- the 15th?

MS. CLATTENBURG: Do you want us just to give, generally speaking, or do you have a specific --

MR. GILES: You can put it in an e-mail to me if you want. I guess it's just you and Kevin then sort of.

MS. CLATTENBURG: Yeah, we can -- when I -- yeah, sure. I can send it in -- when I'm done drafting this JSR, I can send you some times that we're available that week.

MR. GILES: Okay.

MS. CLATTENBURG: All right.

(Proceedings concluded at 12:22 p.m. EST.)

123

CERTIFICATE OF SHORTHAND REPORTER

I, LORI THIELMANN, Certified Shorthand Reporter, Registered Professional Reporter, before whom the foregoing proceeding was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given, all done to the best of my skill and ability; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my signature this 8th day of November, 2025.

J.R.073

Transcript of Meet and Confer
Conducted on December 5, 2025

32

| A |
| --- |

**a-l-t**
62:18
**ability**
123:7
**able**
20:12, 28:12, 38:3, 63:10, 63:17, 63:19, 64:13, 72:20, 74:17
**about**
5:8, 5:20, 9:6, 11:11, 12:15, 12:18, 14:17, 15:9, 17:7, 18:21, 19:20, 21:18, 24:9, 24:16, 24:17, 30:6, 30:17, 31:12, 32:22, 41:3, 41:9, 43:12, 43:19, 44:15, 45:3, 45:7, 45:10, 46:4, 46:14, 46:20, 49:21, 50:1, 51:19, 54:22, 55:3, 55:4, 58:2, 58:20, 61:5, 62:17, 64:8, 64:14, 64:18, 66:5, 66:20, 67:4, 68:12, 70:7, 72:2, 72:6, 72:9, 72:10, 73:6, 74:15, 74:22, 75:3, 79:22, 80:5, 81:10, 81:17, 84:5, 85:5, 85:14, 87:9, 87:12, 87:20, 89:2, 90:15, 94:10, 94:22, 100:9,

100:14, 103:14, 113:14, 115:13, 117:2, 117:22, 119:7, 121:10
**absolutely**
17:18, 93:14
**access**
20:17, 70:14, 70:17, 70:19, 70:21, 72:6, 72:9, 72:10, 72:11, 76:4, 76:8, 79:7, 79:11, 79:19, 81:13
**accident**
67:21
**according**
22:12
**account**
29:13, 77:10
**accounted**
77:18
**accounts**
70:13, 76:2, 78:2, 102:12
**accuracy**
64:12
**accurate**
24:3, 28:21, 30:20, 44:11, 48:16, 49:10, 74:8, 94:13, 101:20
**accurately**
64:3, 64:21
**across**
32:10, 105:8
**act**
114:14
**action**
10:13, 10:14, 13:17, 61:20, 66:14, 66:19, 66:21, 67:5, 67:7, 115:1, 115:9
**actions**
10:16

**activated**
42:8
**active**
21:1, 22:14, 22:21, 23:18, 27:16, 29:2
**actual**
21:2, 56:10
**actually**
11:7, 18:12, 19:8, 19:17, 20:14, 21:1, 21:11, 21:12, 38:7, 41:7, 43:11, 68:19, 70:6, 93:9, 104:4
**ad**
48:21
**add**
4:5, 6:3, 37:14, 46:9, 47:16, 66:3, 66:6, 72:20, 74:17, 82:1, 91:17, 101:22, 121:15
**added**
16:13, 60:11, 77:6, 101:21, 101:22
**adding**
46:20
**addition**
13:2, 21:20, 26:17
**additional**
58:12, 90:17
**additionally**
88:6
**address**
9:20, 13:11, 59:5, 59:15, 71:5, 76:21, 78:10, 121:6
**addressed**
76:17, 121:6
**addresses**
97:14, 98:19,

99:6, 102:20
**addressing**
35:7
**adds**
30:11
**adequate**
58:15, 84:15
**adequately**
11:12
**adjusted**
70:18
**adjusting**
73:14
**adjustments**
70:20
**administrator**
1:5
**advance**
11:16
**advised**
73:3
**affiliated**
11:3
**affirmatively**
28:16
**affixed**
123:15
**after**
6:22, 7:9, 18:7, 19:21, 54:16, 59:2, 61:21, 67:16, 71:3, 71:11, 78:16, 79:16, 83:20
**after-acquired**
79:16
**afternoon**
38:13
**again**
18:3, 36:12, 44:9, 49:11, 51:12, 56:12, 56:13, 68:5, 68:9, 71:19, 75:13, 75:22, 76:1, 77:12, 91:13, 99:5,

J.R.074

100:12, 105:6,
115:19
**against**
14:1, 81:9,
96:19
**agassi**
116:11
**agenda**
4:4
**ago**
6:9, 58:18,
79:1
**agree**
14:19, 14:20,
20:6, 32:7,
51:20, 57:19,
58:4, 95:15,
110:22, 117:18
**agreed**
9:19, 12:19,
13:5, 14:10,
16:14, 19:9,
40:15, 69:13,
103:22
**agreeing**
85:16
**agreement**
13:4, 13:9,
47:6
**ahead**
46:9, 85:11
**alex**
12:4, 16:11,
33:6, 121:13
**alexander**
3:3, 91:4
**all**
2:4, 4:2, 4:8,
6:10, 7:14, 9:4,
10:8, 10:12,
10:22, 12:13,
12:19, 18:15,
20:19, 22:3,
25:8, 26:5,
30:13, 30:21,
31:5, 32:10,
32:19, 32:20,
37:19, 39:19,

46:18, 47:19,
48:1, 48:12,
48:13, 50:15,
50:17, 51:4,
51:16, 51:18,
52:12, 52:16,
53:1, 54:12,
54:17, 56:2,
56:9, 57:3,
57:12, 60:10,
66:13, 67:4,
70:12, 71:13,
73:12, 75:8,
75:12, 76:1,
76:22, 81:11,
83:13, 84:13,
87:14, 88:4,
89:17, 91:17,
96:3, 96:18,
97:6, 98:7,
100:19, 101:4,
101:16, 102:11,
102:20, 103:12,
105:4, 105:22,
108:21, 109:13,
110:7, 111:13,
111:15, 112:10,
112:11, 114:5,
114:21, 114:22,
115:19, 119:14,
122:16, 123:6
**all-day**
38:8, 38:10
**alleged**
96:6
**allegedly**
78:20
**allowed**
65:10
**alluded**
7:16
**ally**
115:14, 117:2
**almost**
56:8
**along**
39:8, 40:17
**already**
12:9, 15:2,

19:19, 24:19,
31:20, 33:1,
34:17, 43:11,
43:12, 48:4,
49:4, 49:14,
49:17, 51:10,
55:2, 64:16,
65:3, 65:5,
78:17, 98:18,
100:9, 101:18,
117:8, 117:13,
117:16
**also**
3:20, 5:19,
7:21, 12:4,
13:2, 13:22,
19:8, 21:7,
21:9, 21:21,
24:15, 25:2,
25:8, 27:2,
27:11, 31:10,
32:14, 38:19,
42:14, 48:3,
48:6, 50:11,
53:12, 55:16,
55:17, 62:15,
73:10, 77:2,
77:4, 89:2,
92:5, 96:15,
99:7, 102:7,
107:11, 109:13,
110:18, 119:20
**alt**
62:18
**altered**
70:19
**although**
45:12
**always**
13:8, 22:14
**ambiguous**
80:11, 95:12
**amend**
54:1, 55:6,
68:9, 75:4,
89:7, 95:7,
95:12, 96:16,
102:9, 116:21

**amended**
5:2, 5:3, 5:12,
5:14, 5:18,
22:7, 27:10,
27:11, 27:12,
32:15, 40:6,
40:8, 40:16,
40:20, 41:2,
41:5, 41:8,
42:13, 43:7,
46:10, 48:18,
48:20, 59:13,
60:8, 61:11,
63:20, 63:21,
64:22, 66:8,
68:8, 68:9,
68:18, 69:19,
70:5, 70:8,
70:10, 72:19,
76:17, 77:6,
82:5, 86:18,
91:16, 91:19,
100:22, 104:16,
105:2, 105:14,
106:8, 108:1
**amending**
53:22, 55:1,
55:3, 108:4,
112:22
**amendment**
68:14, 96:22,
100:7, 104:12
**amendments**
100:12
**amount**
97:3
**annotated**
62:11, 64:11
**another**
15:9, 15:22,
25:20, 25:22,
30:9, 36:16,
37:6, 38:12,
39:13, 58:19,
84:11, 86:6,
112:9, 112:20,
116:9, 116:12
**answer**
5:7, 14:3,

J.R.075

Transcript of Meet and Confer
Conducted on December 5, 2025                    34

25:7, 27:9,
28:12, 44:8,
45:2, 54:7,
55:4, 58:5,
58:9, 63:22,
65:13, 73:2,
76:20, 78:5,
80:12, 80:13,
82:6, 82:14,
82:18, 85:10,
85:14, 85:15,
87:3, 87:8,
87:11, 88:13,
89:7, 89:15,
92:1, 93:1,
93:2, 93:6,
94:8, 96:14,
100:13, 101:2,
101:7, 101:18,
102:6, 102:19,
103:8, 106:22,
121:2
**answered**
63:5
**answering**
80:15, 93:13
**answers**
5:3, 21:7,
22:8, 23:6,
27:10, 28:22,
29:4, 36:19,
36:21, 36:22,
37:19, 38:4,
38:19, 41:4,
41:10, 46:6,
46:7, 46:8,
46:15, 46:16,
46:19, 46:22,
47:3, 65:11,
68:9, 69:20,
84:15, 89:9,
91:16, 91:17,
93:10, 93:14,
95:16, 104:20,
118:8
**any**
7:1, 7:18, 9:1,
10:17, 10:18,

11:1, 11:2,
13:15, 17:14,
18:13, 26:22,
36:13, 42:2,
43:16, 43:20,
44:10, 53:11,
55:17, 56:21,
57:12, 58:11,
61:16, 61:18,
61:19, 66:13,
67:1, 68:6,
69:17, 70:14,
70:20, 71:1,
72:7, 75:10,
76:4, 76:6,
76:9, 78:2,
80:13, 83:2,
83:21, 86:10,
86:13, 86:16,
90:11, 91:4,
96:4, 97:4,
97:8, 97:9,
98:13, 98:16,
100:19, 100:20,
101:4, 101:16,
102:13, 103:14,
107:7, 108:4,
108:14, 109:1,
109:2, 109:3,
110:6, 110:11,
111:1, 111:12,
114:4, 114:22,
115:19, 116:1,
116:3, 116:4,
116:6, 121:14,
123:11
**anyone**
108:12
**anything**
4:5, 6:2,
13:17, 18:18,
20:18, 29:2,
48:19, 69:13,
75:11, 78:19,
80:20, 81:22,
84:10, 103:4,
105:12, 107:1,
109:22, 110:3,

113:10
**anything's**
105:15, 106:1
**anytime**
54:15
**anyway**
39:15, 88:14,
118:13
**apologize**
98:6
**app**
71:16
**appear**
11:20, 56:4,
56:6, 66:2,
71:21, 77:14,
78:8, 94:12,
103:17, 119:12
**appears**
42:17, 62:9,
62:15, 62:20,
66:2, 71:15,
76:19, 101:7
**application**
102:16, 109:6
**apply**
107:3
**appreciate**
17:2, 36:16,
44:15
**appropriate**
35:17, 102:10
**approximately**
60:3, 86:14
**april**
25:4, 26:12,
26:13, 40:13,
60:3, 71:3,
71:6, 76:9,
77:9, 78:18,
79:16, 82:4,
89:21, 95:9,
97:6, 102:18
**archived**
71:13
**aren't**
32:18
**arguments**
69:17

**around**
12:15, 77:8,
90:10, 121:17
**aside**
52:17
**asked**
11:14, 12:1,
14:8, 25:13,
33:15, 34:1,
34:2, 47:20,
48:22, 54:22,
57:11, 58:10,
60:18, 69:11,
70:2, 72:10,
86:8, 89:12,
94:10, 96:2,
98:11, 99:9,
99:16, 101:8,
103:12, 120:12,
120:13
**asking**
5:20, 11:8,
75:4, 80:20,
81:17, 113:10,
119:7
**asks**
41:14, 53:8,
59:22, 60:4,
61:15, 66:12,
70:11, 75:22,
76:1, 82:2,
97:16, 101:3,
102:11
**aspects**
67:5, 67:13,
68:3
**assets**
70:14, 76:4
**associated**
51:4, 56:6,
97:8, 98:15
**assuming**
15:2, 63:1,
108:2
**attached**
13:22, 21:7,
21:8, 22:10,
98:20, 99:20

J.R.076

Transcript of Meet and Confer
Conducted on December 5, 2025

35

**attachments**
22:4
**attack**
23:21
**attended**
2:4
**attorney**
64:6
**attorney-client**
107:14, 112:16,
113:4, 113:20
**audits**
1:11, 43:9
**august**
5:4, 5:13,
5:15, 10:4,
14:10, 14:11,
14:19, 16:1,
16:14, 22:3,
28:2, 40:7,
41:6, 43:10,
52:5, 52:6,
60:3, 69:15,
69:19
**author**
62:1, 90:19
**automatically**
42:4, 42:11,
42:15, 43:21,
44:4, 44:16,
44:18
**availability**
8:14, 118:22,
122:2
**available**
36:14, 38:14,
64:4, 88:3,
107:19, 109:12,
109:17, 118:17,
122:14
**await**
64:22, 96:21,
100:6
**aware**
107:1, 107:7,
108:14
**away**
67:17

---

**B**

**back**
7:8, 9:5, 11:6,
11:9, 49:4,
49:5, 78:22,
84:11, 86:5,
88:11, 88:13,
112:2, 113:14,
113:18, 113:22,
114:16, 119:2
**background**
40:10
**backup**
42:1, 43:18
**backups**
43:14
**baltimore**
3:8
**banking**
102:14, 109:4
**barge**
71:13
**based**
47:9, 64:3,
73:14, 76:21,
80:10, 80:12,
88:4, 105:13,
106:2, 106:5,
107:1, 109:16,
109:22
**basement**
79:10
**basic**
31:3
**basically**
27:20, 117:21
**basis**
67:6, 88:11,
90:11, 107:12,
109:22, 111:1,
112:14, 113:7
**became**
59:2
**because**
6:19, 7:13,
9:8, 9:18, 19:5,
19:16, 20:15,

21:6, 22:7,
23:9, 24:18,
25:3, 27:21,
28:15, 29:15,
34:19, 35:6,
37:1, 37:5,
38:2, 39:13,
41:20, 46:17,
47:17, 48:13,
51:9, 54:12,
56:13, 56:18,
65:16, 72:13,
74:11, 74:21,
80:12, 85:17,
93:10, 93:14,
95:6, 103:1,
105:2, 106:16,
107:3, 107:7,
108:10, 108:15,
109:11, 110:4,
111:6, 111:7,
113:15, 118:8,
120:3
**becomes**
84:1
**beeftek**
35:21
**been**
5:21, 7:2,
14:4, 20:10,
22:4, 22:10,
22:14, 22:15,
22:22, 23:8,
24:20, 26:7,
28:6, 29:22,
34:17, 34:20,
35:5, 35:7,
45:17, 45:19,
47:6, 51:21,
52:18, 56:18,
60:11, 63:15,
64:11, 65:20,
69:18, 69:19,
70:5, 74:10,
78:15, 84:14,
86:18, 104:15,
105:4, 111:10,
116:4, 116:12,

117:8, 117:13,
121:3
**before**
2:7, 8:9, 8:10,
15:6, 16:17,
20:12, 24:22,
25:5, 35:20,
37:2, 39:8,
39:13, 42:18,
55:4, 56:22,
57:8, 61:1,
62:13, 66:12,
82:6, 83:15,
83:16, 83:19,
87:10, 89:15,
112:11, 113:14,
123:3
**befuddled**
34:10
**began**
90:6
**beginning**
74:5
**behalf**
3:2, 3:11,
23:6, 112:12,
112:13, 114:14
**behind**
30:21
**being**
4:21, 21:11,
21:12, 24:9,
25:1, 25:2,
27:17, 27:18,
28:20, 29:17,
31:12, 32:21,
49:22, 52:1,
56:17, 58:3,
63:14, 80:13,
90:1, 90:3,
105:13, 105:16,
106:1, 106:5,
106:7, 106:13,
108:6, 108:10,
109:16, 113:2,
119:8
**believe**
42:6, 45:6,

J.R.077

Transcript of Meet and Confer
Conducted on December 5, 2025                          36

99:22, 104:2
**below**
45:2, 89:14
**best**
27:9, 28:8,
115:11, 116:11,
123:7
**bet**
75:15
**better**
37:11, 66:4,
78:3, 80:17,
98:12, 115:16
**between**
49:6, 71:8,
76:9, 83:6,
97:5, 102:17
**beyond**
56:22, 68:11,
84:17, 110:3
**big**
53:4, 53:16
**bigger**
50:7
**bit**
48:4
**blanking**
106:11
**blockchain**
11:1, 97:6,
97:13, 97:17,
98:8, 98:13,
98:19, 99:6,
99:16, 100:1,
102:12, 109:6,
109:13, 109:17
**body**
20:7
**boilerplate**
105:19, 107:19
**boiling**
31:3
**both**
5:5, 12:18,
12:21, 13:10,
14:7, 21:10,
32:13, 47:7,
47:15, 49:7,

62:19, 63:16,
69:8, 69:10,
77:15, 82:11,
83:8, 86:1,
117:12, 118:4
**bothered**
34:19
**bottom**
43:5, 104:3
**branhaven**
35:20
**break**
111:20
**breeze**
95:22
**bricked**
60:4, 60:10,
60:21
**bricking**
61:5
**brief**
45:5, 69:16,
69:21, 107:20,
109:10
**briefed**
92:20
**briefing**
82:15, 83:17,
83:19, 83:20,
85:17, 93:22,
101:3, 105:4,
105:22
**briefs**
85:18
**bring**
84:21
**brinks**
3:4
**broad**
80:21
**broader**
79:4
**bunch**
13:14, 20:19,
21:9, 34:15
**burned**
45:15, 78:11,
78:15, 79:15

**burnout**
77:10
**business**
91:21, 92:21,
93:18, 93:19,
93:20, 93:21,
94:5, 94:6, 94:7
**busy**
37:9, 38:2,
38:5
**butchering**
67:8

———————— C ————————

**california**
2:9
**call**
19:21, 36:8,
39:13, 73:10,
73:19
**called**
42:16, 71:18
**came**
11:7, 16:14,
52:3
**can't**
8:21, 32:12,
34:19, 51:8,
65:12, 74:21,
86:7, 92:2,
92:21, 93:12,
103:2, 113:6
**cannot**
91:21, 93:7
**capital**
119:17
**capture**
119:21, 120:3
**car**
67:21
**care**
108:5
**carolina**
55:14
**case**
1:7, 22:6,
26:13, 28:13,
34:11, 34:19,

34:20, 35:18,
35:19, 36:16,
37:6, 38:12,
41:17, 45:9,
51:1, 53:11,
65:19, 67:13,
68:3, 68:4,
68:12, 87:18,
92:20, 93:12,
94:17, 105:20,
107:18, 108:2,
108:16, 111:10,
113:6, 123:12
**cases**
12:18, 12:21,
34:22, 35:2,
56:8
**casey**
3:4
**cash**
70:14, 76:3,
76:4
**casual**
61:4
**catch**
14:21
**categories**
63:2
**caveat**
72:8
**cell**
96:15
**certain**
92:7
**certainly**
7:19, 14:4,
14:9, 19:3,
23:14, 38:21,
43:10, 46:10,
93:6, 101:14,
107:4
**certificate**
123:1
**certified**
2:7, 123:2
**certify**
123:5
**cetera**
80:11, 97:19

J.R.078

Transcript of Meet and Confer
Conducted on December 5, 2025

37

| | | | |
|---|---|---|---|
| **chance**<br>39:12 | 5:15, 5:17,<br>6:17, 10:3, | 60:20, 61:3,<br>61:9, 61:10, | 121:13, 121:19,<br>122:5, 122:11, |
| **change**<br>15:1, 15:3, | 11:13, 11:22,<br>12:10, 12:22, | 61:12 | 122:16 |
| 33:10, 33:11,<br>52:11, 95:1, | 13:1, 13:7,<br>13:21, 14:6, | **citation**<br>85:2 | **clear**<br>34:7, 73:11, |
| 101:14, 104:10 | 24:10, 24:13,<br>25:2, 25:5, | **cite**<br>35:18 | 76:20, 99:12,<br>105:12, 110:10, |
| **changed**<br>23:10, 121:14 | 25:9, 25:12,<br>32:10, 32:16, | **cited**<br>24:12, 56:15, | 110:16, 112:21,<br>113:8, 114:13 |
| **changes**<br>18:21, 90:19 | 32:18, 35:8,<br>35:10, 40:7, | 56:16 | **clearly**<br>43:14 |
| **channel**<br>51:3, 53:13, | 41:22, 43:8,<br>43:17, 48:6, | **claim**<br>49:2 | **clickbait**<br>62:7 |
| 55:18, 56:4,<br>56:7, 56:8 | 58:7, 60:2,<br>60:13, 62:7, | **claims**<br>13:18 | **client**<br>73:3, 73:8, |
| **channels**<br>4:20, 5:1, | 62:8, 62:16,<br>67:5, 67:11, | **clarification**<br>106:1, 106:7 | 75:15 |
| 20:13, 21:9,<br>21:14, 21:20, | 67:21, 68:19,<br>69:2, 69:4, | **clarified**<br>72:14, 109:20 | **clients**<br>23:17 |
| 22:13, 22:21,<br>23:18, 25:3, | 69:5, 69:8,<br>82:12, 83:5, | **clarify**<br>28:20, 74:4, | **clm**<br>23:13 |
| 25:9, 25:19,<br>25:21, 26:15, | 83:8, 87:4,<br>90:3, 103:18, | 89:13, 91:19,<br>94:19, 95:7, | **cloned**<br>45:17 |
| 27:16, 27:17,<br>28:5, 28:17, | 103:19, 104:4,<br>104:5, 104:15, | 105:15, 110:3 | **close**<br>57:8 |
| 29:5, 29:10,<br>29:16, 30:11, | 118:1, 118:4,<br>119:14 | **clarifying**<br>88:9, 98:3 | **closed**<br>102:17, 109:8 |
| 30:12, 48:7,<br>49:22, 50:7, | **chen's**<br>5:6, 25:18, | **clarity**<br>21:19, 23:15, | **cluttering**<br>21:2 |
| 50:15, 50:17,<br>51:2, 56:3, | 29:12, 43:15,<br>57:12 | 26:16, 110:15,<br>110:21 | **co-founder**<br>59:9, 59:10 |
| 62:12, 71:6,<br>71:13, 71:14, | **china**<br>67:17 | **classes**<br>7:11 | **code**<br>10:5, 10:18, |
| 71:17, 72:21,<br>74:16, 74:18, | **chinese**<br>5:20, 119:7, | **clattenburg**<br>3:13, 4:2, 4:8, | 10:19, 11:12,<br>12:1, 12:6, |
| 77:12 | 119:15, 119:20,<br>119:22, 120:4, | 6:6, 6:12, 6:19,<br>7:20, 8:4, 8:9, | 12:8, 12:17,<br>12:19, 13:9, |
| **characterize**<br>74:3 | 120:9, 120:14 | 8:11, 8:15, 9:3,<br>9:17, 14:12, | 13:10, 13:12,<br>13:18, 14:14, |
| **chat**<br>42:8 | **christina**<br>3:14 | 15:5, 15:13,<br>15:15, 16:3, | 16:13, 20:21,<br>70:12, 76:2, |
| **check**<br>7:17, 44:14, | **chronological**<br>18:4 | 16:8, 16:10,<br>16:19, 16:21, | 86:10, 86:11,<br>86:16, 87:14, |
| 114:16 | **chunked**<br>17:21 | 17:3, 18:9,<br>19:14, 20:5, | 87:21, 89:6,<br>90:9, 90:10, |
| **checking**<br>19:7, 104:22 | **circulated**<br>6:7, 9:14 | 22:1, 24:8,<br>28:9, 30:4, | 90:11, 90:18,<br>91:2, 91:8, |
| **chen**<br>1:7, 1:10, | **circumstances**<br>60:1, 60:9, | 31:9, 34:2,<br>37:21, 38:18, | 97:4, 97:5,<br>97:9, 98:15, |
| 4:14, 4:21, | | 110:14, 111:21, | |

J.R.079

Transcript of Meet and Confer
Conducted on December 5, 2025                                    38

98:16, 100:20,
100:21, 109:1,
109:2
**code's**
87:9
**code-related**
9:13, 9:19,
11:8, 12:20,
13:1, 16:15,
27:5
**codes**
13:6, 62:17,
86:13, 86:15,
91:4, 91:5, 91:7
**colleagues**
46:3
**collected**
24:17, 24:20,
25:4, 25:22,
26:12, 48:15,
50:22, 53:14,
56:14
**collection**
25:17, 55:3,
55:4
**collections**
30:22
**come**
8:6, 12:20,
20:21, 36:11,
37:1, 56:13,
65:17, 94:11,
95:21, 112:2
**comet**
90:13
**coming**
56:18
**comments**
73:6, 91:14
**communicated**
57:15
**communication**
57:14, 96:3
**communications**
10:9, 10:13,
11:21, 42:12,
57:12, 66:15,
73:7, 75:14,

112:12, 113:3,
115:12, 115:13,
116:22, 117:3,
117:4, 119:19,
120:9, 120:20
**companionship**
67:10
**company**
10:21, 78:21
**comparing**
31:14, 31:16
**compel**
40:14, 40:18,
40:19, 40:22,
69:10, 77:5
**complaint**
96:6, 96:19,
115:2
**complete**
24:6, 53:4,
55:5
**composition**
20:2
**comprehensiveness**
5:8
**comprised**
4:22
**computer**
12:1
**computers**
43:15
**concern**
102:2
**concerned**
20:21
**concerning**
11:21
**concerns**
95:4
**concluded**
122:17
**confer**
1:16, 2:1, 7:4,
8:17, 8:22,
11:15, 11:17,
12:14, 15:9,
15:20, 16:18,
36:8, 37:3,

37:16, 41:11,
65:20, 70:2,
75:1, 83:14,
83:16, 83:19,
83:20, 89:16,
90:22, 108:14,
112:18, 112:22,
118:4, 121:21
**conferring**
83:21
**confers**
30:17, 36:18,
40:15, 82:18,
83:11
**confirm**
8:19, 72:22,
74:18, 101:19,
119:18
**confirmation**
78:14
**confirmed**
120:15
**confirming**
17:4, 49:7
**conformity**
54:8
**confused**
21:6, 69:7
**confusing**
103:20
**connection**
67:12, 68:2,
115:1
**considering**
89:19
**consistent**
89:8
**consolidated**
12:22, 35:2
**consolidation**
34:21
**contact**
66:16
**contain**
71:1
**containing**
29:6, 48:8
**content**
62:1

**context**
30:6
**continue**
39:8, 101:17
**contributed**
86:12, 97:10,
98:17
**control**
76:9, 76:12,
76:13, 79:8
**controlled**
11:2, 70:15,
76:7, 79:6,
79:18, 81:12
**conversation**
57:16, 58:6,
58:7, 58:16,
59:16, 66:18,
66:20, 67:1,
71:8, 119:14
**conversations**
25:16, 26:10,
26:15, 30:11,
50:16, 58:13,
58:14, 103:13,
119:13
**conveyed**
18:14
**cool**
104:11
**copies**
10:8
**copy**
45:18
**corporate**
94:10
**correct**
9:10, 9:14,
17:11, 17:12,
17:19, 30:8,
35:14, 39:19,
54:10, 89:4,
89:7, 95:10,
104:6, 105:16,
116:19, 123:6
**correction**
103:21
**correctly**
77:21, 110:4,

J.R.080

113:18
**correspondence**
115:9
**could**
25:6, 34:11,
64:17, 69:18,
75:19, 80:21,
88:3, 95:1,
101:6, 111:19,
113:5, 114:11,
118:3
**counsel**
11:10, 11:18,
12:5, 28:13,
66:14, 111:18,
115:14, 123:10
**counter-propose**
7:22
**couple**
41:17, 48:16,
91:19, 102:9
**course**
45:16, 48:15,
67:6, 87:14,
90:17, 111:21
**court**
1:1, 4:10,
11:14, 41:10,
75:6, 84:2,
85:7, 85:9,
98:5, 111:18,
111:19, 112:5
**cover**
80:14, 88:10,
98:4, 113:10
**covered**
71:21, 79:12
**covering**
88:17, 95:7
**created**
86:11, 86:21,
87:2, 90:9,
97:10, 98:17
**creating**
34:13
**creation**
23:11, 61:22,
86:9

**creator**
62:1
**credit**
43:4
**crenny**
3:12, 30:2,
30:5, 39:5,
39:11, 39:18,
39:20, 40:5,
40:10, 44:12,
44:20, 45:1,
45:5, 46:13,
47:2, 47:19,
48:2, 49:19,
50:14, 51:14,
52:15, 53:7,
54:21, 55:10,
55:15, 57:3,
57:7, 57:10,
59:18, 59:21,
61:13, 63:4,
64:2, 64:17,
65:6, 66:1,
66:11, 68:13,
68:16, 68:22,
73:5, 74:20,
75:9, 75:21,
79:3, 79:21,
80:6, 80:19,
81:11, 81:19,
81:22, 83:13,
84:20, 85:13,
86:4, 91:18,
92:10, 92:12,
92:19, 93:5,
93:16, 94:4,
94:16, 95:11,
95:20, 96:21,
97:2, 99:11,
100:3, 100:6,
100:10, 100:16,
102:1, 102:7,
103:10, 104:11,
104:21, 105:18,
106:18, 106:21,
107:18, 108:18,
109:19, 112:2,
112:7, 114:10,

114:18, 114:21,
116:10, 116:15,
116:22, 117:5,
117:10, 117:14,
117:19, 118:10,
118:15, 118:20,
119:4, 121:8
**csr**
1:22
**current**
58:4, 100:14
**custody**
70:16, 72:10,
76:8, 76:9,
76:11, 76:13,
79:7, 79:8,
79:19, 81:13,
81:14
**cut**
105:7, 105:8
**cutoff**
88:18
**cv**
1:8

### D

**d**
93:16, 93:22,
94:2
**data**
45:14, 70:12,
76:2, 78:1,
81:1, 94:9
**database**
81:1, 102:16,
109:6
**databases**
70:12, 76:2
**date**
4:13, 6:15,
8:7, 26:1,
53:13, 57:13,
59:22, 61:22,
89:5, 89:7,
90:6, 91:1,
94:20, 95:7,
95:13, 100:9,
119:11

**dated**
5:13
**dates**
4:9, 6:10, 7:3,
7:18, 7:22, 8:5,
16:2, 16:4,
31:1, 70:19,
71:1, 71:4,
121:15
**dating**
88:11
**dave**
120:15
**david's**
5:14, 5:16,
5:18, 46:14,
59:11, 61:2,
62:15, 68:18,
71:10, 72:18,
78:16, 79:10,
79:11, 81:4,
81:14, 87:3,
89:8, 91:21,
93:2, 94:6,
96:14, 103:12,
104:13, 104:14
**day**
17:14, 17:15,
69:1, 69:3,
76:10, 123:15
**days**
36:14, 41:5
**dc**
3:17
**deadline**
6:21, 8:4,
15:7, 37:8,
69:14, 69:22
**deal**
35:1, 35:6,
63:9, 89:1,
118:7
**dealing**
88:15
**death**
67:11
**decaluwe**
3:5

J.R.081

Transcript of Meet and Confer
Conducted on December 5, 2025

40

**december**
1:18, 4:15, 4:17, 14:1, 14:18, 15:4, 18:16, 18:22, 32:2, 33:11, 42:22, 54:13, 103:8
**decentralized**
102:14, 109:4
**decided**
34:9, 82:11, 82:13, 83:6, 84:7
**deciding**
59:4
**declining**
77:1
**defendant's**
5:3, 5:12, 40:6
**defendants**
1:13, 3:11, 43:8, 61:19
**defenses**
11:22, 13:18
**deficiencies**
41:9, 41:11
**defined**
76:5
**definition**
75:18, 81:15
**degree**
64:12
**delete**
42:15
**deleted**
7:2, 24:19, 52:16, 62:8, 62:11, 62:19, 66:5, 66:6, 70:17, 71:6, 71:14, 77:13, 77:16, 80:2
**deleting**
42:4, 42:11, 43:22, 44:4, 44:16, 44:18, 48:6, 48:17

**deletion**
10:20, 10:21, 77:7
**deletions**
44:21, 70:20
**departure**
10:16, 10:17
**deposed**
41:3
**deposition**
4:14, 6:16, 6:22, 47:4, 94:22, 95:3
**depositions**
36:15, 37:5, 38:8, 38:10
**describe**
57:11, 100:18, 103:12
**described**
77:9, 77:11, 77:14, 82:15, 113:3, 117:1
**describes**
84:15
**description**
49:14, 57:15, 57:20, 58:6, 58:13, 58:15, 59:6, 59:15, 61:22
**designee**
94:11
**desktops**
96:9, 96:10, 96:15, 96:17, 96:18
**destroyed**
61:20, 62:2, 63:7, 63:8, 63:9, 64:8, 64:9, 65:4, 65:21, 77:16
**destroying**
42:4, 42:11, 43:22, 44:4
**detail**
53:21, 87:12,

88:2, 90:18
**detailed**
105:21
**determine**
14:18, 19:17, 52:9
**development**
33:5, 86:9, 87:10, 90:12, 90:16
**developments**
90:17
**devices**
96:4, 96:8
**different**
25:16, 26:1, 35:3, 35:9, 56:7, 56:19, 56:20, 62:12, 63:2, 81:7, 98:20, 108:20
**digital**
11:2, 97:7, 97:13, 97:18, 98:8, 98:14, 99:8, 102:13, 109:7
**direct**
5:1, 21:14, 21:17, 28:17, 29:5, 29:10, 48:7, 50:16, 50:17, 72:6, 72:9, 72:11
**direction**
123:10
**directly**
108:22
**disagree**
67:2, 82:20, 93:11, 94:17
**disappearing**
42:8
**disclose**
24:11
**disclosed**
24:22
**disclosing**
73:7

**disclosure**
107:13, 112:15
**discord**
6:20, 9:4, 10:20, 14:1, 17:5, 17:19, 18:10, 18:15, 20:8, 21:6, 21:20, 22:13, 22:21, 23:17, 24:10, 25:12, 25:17, 25:18, 27:22, 28:5, 29:12, 29:22, 31:18, 31:19, 32:11, 37:8, 42:16, 48:13, 52:3, 52:13, 52:14, 53:12, 54:12, 55:17, 56:11, 61:17, 62:6, 63:16, 63:18, 64:11, 64:13, 71:5, 71:10, 71:16, 72:21, 74:16, 74:18, 77:13, 80:22, 92:16, 115:10, 117:1, 117:4, 117:5
**discover**
25:10
**discovered**
90:8
**discovery**
5:10, 24:17, 26:13, 32:6, 32:16, 34:22, 35:2, 35:7, 35:15, 39:6, 46:19, 53:11, 69:10, 70:1, 89:1, 90:3, 119:5
**discuss**
4:9, 4:19, 5:20, 6:15, 11:14, 35:20,

J.R.082

36:9, 36:12,
39:7, 42:18,
42:21, 73:22,
74:21, 75:1,
75:11, 84:3,
85:4, 96:6,
103:1, 103:4
**discussed**
31:11, 39:7,
48:4, 55:22,
66:14, 67:4,
67:13, 68:3,
83:4, 83:10,
83:15, 84:14,
95:22, 98:1,
98:6, 102:8,
112:10, 114:1,
120:8
**discussing**
4:13, 12:11,
49:11, 87:6,
112:10
**discussion**
38:22, 49:6,
50:16, 56:1,
58:22, 62:22,
114:12
**discussions**
58:2
**disks**
45:3, 45:10,
45:13, 45:14,
45:15, 45:16,
46:4, 46:21,
77:11, 78:12,
78:15, 78:16,
79:1, 79:15,
79:22
**dispute**
11:11
**disregard**
32:1
**disregarding**
35:5
**distilled**
30:1
**distinction**
47:11

**district**
1:1, 1:2, 35:21
**dm**
25:16, 30:11
**dms**
25:19, 29:16
**doctrine**
107:15, 112:17,
113:21
**document**
8:2, 11:13,
17:19, 27:20,
31:16, 31:17,
34:4, 34:13,
34:18, 36:3,
37:9, 46:11,
61:18, 62:2,
62:4, 117:4
**document's**
62:1
**documentation**
107:13, 112:16
**documents**
5:22, 7:14,
9:22, 10:6,
10:22, 11:21,
12:7, 12:18,
13:3, 13:12,
14:1, 14:13,
14:15, 16:5,
17:17, 17:18,
18:4, 18:11,
18:16, 19:3,
19:10, 20:8,
23:13, 27:22,
28:4, 29:22,
32:4, 32:12,
32:13, 32:19,
32:20, 33:12,
34:3, 34:8,
42:5, 42:12,
43:22, 44:5,
52:4, 52:14,
53:10, 53:14,
55:8, 61:16,
62:21, 63:7,
90:1, 92:8,
106:3, 107:7,

108:15, 108:21,
109:14, 110:8,
110:18, 111:6,
111:7, 111:14,
111:15, 114:6,
114:8, 114:22,
115:4, 115:5,
115:7, 115:19,
115:20, 115:22,
116:2, 116:19,
116:20, 117:6,
117:15, 119:9,
119:12
**doing**
15:2, 33:15,
36:17, 69:6,
74:13, 75:7,
85:1, 85:17,
91:16, 113:8
**domain**
103:13, 103:15
**done**
30:22, 35:8,
43:15, 92:6,
93:22, 121:3,
122:13, 123:7
**double**
104:21
**down**
24:2, 31:3,
31:6, 38:9,
44:19, 49:18,
51:12, 52:7,
82:16, 84:9,
114:19, 114:20,
116:8
**downloaded**
63:15
**downloading**
42:14
**draft**
121:14
**drafting**
122:13
**drawing**
47:11
**drive**
45:18, 78:10

**driven**
48:20, 57:5
**drives**
70:13, 72:7,
76:3, 76:16,
76:22, 78:6
**dropped**
52:7
**due**
4:11
**dump**
34:14, 35:12
**duplicative**
34:16
**duration**
4:13, 6:16,
8:16
**during**
10:10, 10:14,
12:13, 61:20,
86:13, 90:21,
100:21, 109:8,
112:13

**E**

**e-mail**
5:20, 9:10,
10:1, 13:22,
15:4, 15:8,
15:12, 15:18,
16:11, 16:16,
19:21, 31:13,
36:10, 37:1,
38:4, 39:22,
40:1, 42:22,
45:22, 46:2,
54:4, 56:17,
57:18, 57:22,
58:19, 60:17,
72:17, 73:9,
73:12, 74:1,
74:6, 78:12,
88:21, 89:14,
96:12, 98:10,
99:7, 101:10,
101:11, 101:13,
102:2, 103:7,
103:22, 119:1,

J.R.083

Transcript of Meet and Confer
Conducted on December 5, 2025

119:7, 119:10,
120:8, 122:8
**e-mails**
4:16, 9:5,
36:18, 73:11
**each**
27:14, 41:16,
53:13, 82:21,
100:13
**earful**
86:3
**earlier**
20:10, 39:10,
41:5, 46:1,
50:15
**earliest**
39:2
**early**
4:18, 14:11
**easier**
23:21
**easiest**
31:22
**east**
3:7
**eastern**
112:3
**easy**
65:17
**ecf**
11:10, 13:5,
15:17, 15:21,
41:12, 70:1,
85:3, 95:18
**edit**
91:5, 91:7
**edited**
86:12, 87:16,
91:3, 91:8
**eight**
58:8, 59:16
**either**
23:12, 60:22,
77:19, 80:22
**electronic**
121:16
**else**
4:5, 6:2, 6:20,

13:17, 64:6,
65:13, 81:22,
94:14, 101:6,
121:22
**else's**
93:20
**emma**
3:21
**emotional**
67:10, 68:2
**employed**
123:11
**employment**
78:17
**end**
12:3, 13:7,
60:21, 91:1,
91:14, 98:17,
101:1, 111:11,
114:3
**english**
119:16, 120:2,
121:10
**enormous**
34:13
**enough**
53:4
**ensuring**
32:20
**entire**
14:5, 17:15,
17:16, 52:13
**entirely**
119:22
**entity**
11:2
**entry**
22:6
**equal**
82:11, 83:7
**equipment**
79:16
**error**
70:4
**especially**
30:20
**esquire**
3:3, 3:4, 3:5,

3:12, 3:13, 3:14
**est**
122:17
**estate**
1:6
**estimated**
45:13
**et**
80:11, 97:19
**even**
60:13, 63:1,
73:22, 74:8,
113:19
**every**
39:14, 39:16,
82:18
**everything**
6:20, 21:5,
21:11, 25:11,
33:15, 34:1,
34:3, 34:10,
35:5, 35:12,
52:12, 52:17,
53:1, 53:17,
59:13, 67:4,
80:14, 114:9,
121:21
**evidence**
29:7, 41:16,
45:8, 48:9,
65:12
**exactly**
19:22, 33:3,
51:8, 54:11,
74:16, 103:2
**example**
18:3, 80:22
**examples**
113:19
**excel**
22:9, 23:3
**exception**
17:6, 43:14
**exchange**
13:6, 102:15,
109:5
**exchanged**
12:9

**excuse**
11:3
**exhaustive**
12:8
**exhibit**
5:2, 21:4,
21:8, 21:10,
21:13, 22:4,
22:12, 24:2,
24:12, 25:1,
25:3, 25:14,
25:15, 25:17,
25:20, 26:1,
26:3, 27:3,
27:15, 28:18,
29:4, 29:8,
29:17, 29:21,
30:10, 31:8,
48:4, 48:5,
48:10, 48:21,
49:9, 49:16,
50:8, 50:10,
51:3, 51:5,
52:2, 52:20,
53:3, 55:18,
55:21, 56:2,
56:8, 56:12
**exhibits**
22:9, 28:19,
29:15, 48:14,
50:7, 56:5
**exist**
106:4
**expected**
85:14
**expecting**
84:17, 85:10
**expedites**
74:11
**explain**
16:21, 60:9,
77:7, 82:2,
82:6, 82:8,
82:20, 82:21,
86:8
**explained**
17:13, 72:4,
101:3, 112:19

J.R.084

Transcript of Meet and Confer
Conducted on December 5, 2025                    43

| | | | |
|---|---|---|---|
| **explaining** 32:16 | **fen** 1:4, 5:2, 5:11, 11:10, 11:18, 12:5, 22:7, 23:6, 24:14, 24:15, 27:10, 40:5, 40:12, 40:14, 41:1, 43:6, 46:5, 46:8, 46:14, 47:15, 60:18, 60:20, 61:6, 65:7, 66:13, 77:3, 77:9, 103:18, 104:5, 104:10, 119:13, 119:20 | 99:16, 100:2, 104:7 | **floyd** 3:21 |
| **explanation** 24:4, 27:13, 60:5, 82:21, 86:20 | | **fine** 4:7, 6:5, 6:11, 8:22, 17:2, 49:3, 74:13, 75:8, 108:7, 108:18, 109:19, 111:9, 112:1, 118:19, 118:21 | **focused** 78:19 |
| **export** 25:20, 26:2 | | | **follow** 14:17, 15:6, 15:8, 23:10, 23:14, 31:6, 32:9, 33:2, 36:3, 42:2, 43:20, 46:14, 61:7, 63:3, 80:5, 99:4 |
| **extended** 68:1, 69:14, 69:22 | | **finish** 15:11, 28:14, 50:14, 64:17, 92:11, 118:12 | |
| **extension** 69:12 | | **firestone** 3:15 | **follow-up** 99:10, 116:17 |
| **extent** 6:22, 109:21 | | **firm** 115:11 | **followed** 43:11, 43:12, 120:12 |
| **eyeing** 8:8 | **fen's** 46:16, 119:11 | **first** 4:8, 5:14, 5:16, 7:3, 8:11, 8:14, 15:12, 15:22, 16:12, 16:15, 18:4, 19:21, 23:3, 23:5, 37:8, 37:12, 37:13, 40:16, 40:20, 40:21, 41:19, 48:18, 52:16, 54:21, 54:22, 59:1, 68:18, 68:20, 69:1, 69:2, 69:3, 69:4, 69:6, 70:3, 70:8, 70:10, 70:22, 72:19, 72:22, 73:5, 74:19, 80:10, 83:13, 86:18, 89:5, 104:2, 104:8, 104:14, 105:8 | **following** 37:11, 70:1, 80:8, 106:9, 122:3 |
| **F** | **few** 8:5, 11:4, 49:20, 53:17, 88:7, 95:21, 105:7 | | **footprint** 52:13 |
| **fact** 19:9 | | | **foregoing** 110:6, 111:11, 114:3, 123:4, 123:5 |
| **fair** 33:21 | **fifth** 5:10 | | |
| **fairly** 42:19 | **figure** 24:18, 34:20, 37:15, 63:19, 99:5, 107:4 | | **foreign** 120:10 |
| **fall** 92:16 | | | **fork** 90:9 |
| **false** 41:6 | **figured** 19:5, 58:19 | | **form** 45:21 |
| **familiar** 16:22, 94:2, 94:3 | **file** 6:13 | | **formal** 115:3 |
| **family** 67:19, 67:20, 67:22 | **filed** 25:5, 104:19 | **five** 45:13 | **format** 17:4, 17:8, 77:15 |
| **fashion** 43:1 | **filing** 96:19, 115:2 | **five-minute** 111:19 | **former** 59:9, 59:10 |
| **fast** 98:5 | **final** 88:6 | **fixable** 103:20 | **forth** 9:5, 113:18 |
| **february** 7:4, 7:15, 8:8, 26:2, 88:11, 97:5, 101:17, 102:17 | **finally** 11:18 | | **forward** 90:2 |
| | **financial** 13:15, 102:15, 109:5, 123:12 | | **found** 43:5, 45:19 |
| **federal** 54:9 | | | **four** 41:20, 45:13 |
| **feel** 46:8 | **find** 12:18, 13:3, 14:9, 67:14, | | |

J.R.085

Transcript of Meet and Confer
Conducted on December 5, 2025

44

**fourth**
4:20, 46:10, 68:9
**frame**
90:1, 90:2
**frames**
86:14
**frd**
35:21
**free**
38:6, 38:7, 38:8
**friday**
1:18, 37:7, 37:10, 63:18, 92:17
**friends**
60:20
**front**
30:18
**full**
18:2, 20:2, 32:3, 33:17, 36:22
**fully**
64:3, 64:21, 84:16
**funds**
11:1, 83:3, 101:9
**further**
44:10, 61:11, 84:10, 91:16

**G**

**gather**
95:1
**gathered**
53:10
**general**
90:7
**generally**
67:13, 67:15, 68:4, 68:11, 101:1, 101:15, 122:6
**generations**
45:14, 45:15

**getting**
20:22, 37:16, 61:5
**git**
90:9, 90:13, 90:19, 90:20, 91:13
**github**
86:19, 88:1, 90:12, 91:20, 92:3, 92:15, 93:5, 93:7, 94:5, 94:11
**github's**
93:18, 94:7
**give**
8:5, 11:6, 27:8, 43:4, 86:2, 122:6
**given**
44:8, 123:6
**gives**
93:19
**giving**
33:22
**global**
119:17
**go**
7:7, 7:8, 7:14, 11:9, 33:20, 39:3, 39:20, 42:18, 46:9, 49:4, 49:5, 75:21, 85:11, 86:4, 86:5, 99:16, 100:2, 105:6, 111:5, 113:13, 113:22, 114:16
**goes**
12:15, 26:13, 48:3, 58:21, 79:2, 84:2, 90:6
**going**
4:3, 7:10, 8:1, 15:11, 17:5, 17:21, 19:4, 19:7, 19:12,

19:16, 20:3, 23:8, 31:14, 33:2, 33:8, 33:12, 36:1, 36:20, 36:21, 37:2, 37:9, 39:22, 44:10, 49:17, 52:11, 54:14, 54:15, 55:6, 55:13, 65:2, 66:8, 66:9, 68:20, 70:7, 73:13, 74:12, 74:22, 75:2, 75:3, 75:12, 75:22, 81:19, 88:13, 90:2, 91:19, 95:20, 99:3, 99:21, 100:1, 100:4, 100:5, 105:6, 105:14, 108:17, 113:13, 113:21, 114:19, 114:20, 117:22, 121:13
**gone**
47:8, 82:16
**gonna**
33:19, 38:17
**good**
35:22, 37:22, 49:14, 85:4, 100:10
**gosh**
8:21
**gotten**
18:16
**granular**
90:18
**great**
6:12, 8:15, 9:3, 36:13, 38:1, 75:3, 91:18, 102:1
**ground**
48:21, 57:6
**group**
18:1, 18:6,

68:17
**group's**
29:10
**groups**
17:22, 29:6, 29:11, 48:8
**guess**
15:2, 15:6, 81:20, 92:16, 100:8, 103:3, 106:22, 107:3, 121:8, 122:9
**guild**
53:12, 55:17
**guo**
115:14, 117:2
**guys**
7:13, 8:8, 23:8, 35:6, 37:19, 38:11, 38:13, 48:22, 49:13, 58:20, 78:3, 111:9, 115:21

**H**

**half**
8:17, 97:15, 97:20
**hand**
123:15
**hao**
67:8
**happen**
20:20, 55:4, 120:2, 121:1
**happened**
53:19, 82:9, 87:12, 101:9
**happening**
106:8, 110:1
**happens**
54:15, 54:16
**harassing**
32:6, 35:17
**harassment**
33:22
**hard**
20:11, 70:13,

J.R.086

72:4, 72:7, 76:3, 76:16, 76:22, 78:6, 78:9
**hashes**
97:12
**head**
63:5, 63:12, 74:2, 86:7, 115:16
**heard**
7:11
**hearing**
34:6, 34:7, 62:13, 62:14, 70:2
**held**
2:1
**help**
24:6
**helpful**
73:16, 74:6, 74:10
**helping**
50:11
**here**
23:2, 29:16, 36:1, 36:21, 37:15, 38:19, 40:21, 45:11, 50:2, 50:11, 56:14, 58:20, 59:21, 60:8, 63:22, 65:1, 66:12, 67:9, 69:7, 70:7, 71:22, 77:6, 78:9, 81:4, 84:4, 84:5, 87:7, 90:10, 90:22, 96:7, 97:15, 97:20, 99:1, 99:19, 103:1, 107:10, 108:13, 108:19, 109:11, 113:11, 114:20, 115:17, 118:6

**here's**
54:18
**hereby**
123:4
**hereunto**
123:14
**hey**
33:21
**himself**
27:1
**histories**
97:8, 97:11, 97:19, 98:15, 99:8, 99:15
**history**
90:13, 90:19, 90:20, 98:21
**hit**
11:5, 17:14, 17:15, 26:18, 27:5, 29:18, 66:12, 96:1
**hits**
18:11, 19:17, 20:22, 21:18, 27:20
**hold**
117:22
**holding**
109:21
**holidays**
19:1, 55:14
**honest**
19:6
**honestly**
18:17
**hope**
50:22
**hopefully**
60:22, 89:14
**hoping**
37:20
**hour**
17:7, 17:8, 17:10, 17:16, 18:2
**hours**
8:17

**however**
15:7
**husband**
67:11
**hypothetical**
64:14, 64:18
**hypotheticals**
114:11

---
                    **I**
---

**id**
30:13
**idea**
35:4
**ideally**
7:3, 8:12
**identification**
59:22, 97:17, 99:14
**identified**
28:18, 28:19, 29:6, 29:8, 33:5, 48:8, 48:10, 50:15, 58:8, 71:22, 89:13, 97:20, 98:18
**identifies**
58:1, 96:8, 96:15
**identify**
41:15, 53:9, 53:13, 61:16, 66:13, 70:12, 76:1, 76:12, 80:20, 86:22, 96:3, 96:7, 96:10, 96:17, 97:6, 98:7, 98:13, 99:17, 100:18, 102:11, 111:2
**ids**
51:2, 51:3
**ignore**
34:18
**illinois**
2:8

**imagine**
19:6
**immediately**
18:7
**impasse**
84:1
**imply**
73:20
**improper**
105:19, 106:12, 107:22
**inadvertently**
104:9
**inc**
35:21
**include**
13:13, 26:4, 26:5, 55:18, 58:5, 59:14, 61:10, 66:17, 97:11, 115:9
**included**
27:2, 45:10, 78:8, 106:17
**includes**
99:7
**including**
10:15, 38:10, 53:11, 61:16, 64:4, 70:19, 86:12, 86:15, 96:4, 103:14, 109:6
**income**
97:3, 108:22, 109:3
**incomplete**
51:6, 62:9, 66:2, 77:2, 115:6
**inconsistent**
62:15, 77:3, 87:3
**incorrect**
51:6
**indicate**
30:22
**indirectly**
108:22

J.R.087

Transcript of Meet and Confer
Conducted on December 5, 2025

46

**indisputably**
44:17
**individuals**
58:2, 58:8,
58:14
**informal**
115:3
**information**
13:15, 21:3,
31:12, 45:6,
45:10, 45:20,
46:18, 47:5,
47:9, 47:20,
55:20, 58:12,
59:14, 64:4,
64:5, 64:7,
65:18, 66:16,
83:9, 86:20,
90:15, 91:17,
93:10, 94:9,
99:22, 107:13,
109:12, 112:15,
115:4, 119:2
**instance**
10:7, 10:8,
25:13, 25:14
**instances**
72:2, 73:1,
73:4, 75:16,
75:18
**instead**
85:16
**institution**
102:15, 109:5
**instructions**
95:17, 100:14
**insufficient**
40:12, 87:12
**interest**
123:12
**interrogatories**
5:4, 5:13,
5:15, 21:8,
22:8, 24:14,
24:21, 25:15,
29:1, 29:4,
40:7, 40:11,
41:2, 43:8,

46:6, 65:8,
65:10, 68:10,
68:19, 69:1,
69:6, 72:20,
89:10, 93:13
**interrogatory**
5:7, 41:14,
60:15, 61:18,
63:4, 65:14,
84:16, 88:7,
93:15, 100:13,
101:18
**introducing**
59:8
**investments**
83:2, 101:6
**io**
57:13, 58:3,
59:2, 59:3,
103:13
**issue**
13:7, 19:15,
20:7, 46:5,
48:2, 55:16,
60:8, 70:22,
75:20, 88:16,
97:22, 98:2,
105:9, 121:5
**issues**
4:19, 18:20,
36:4, 36:12,
41:3, 41:17,
51:7, 51:11,
51:15, 56:12,
66:4, 72:15,
75:5, 75:10,
88:20, 89:13,
90:5, 96:6,
97:15, 105:3,
105:5
**it'd**
37:21
**item**
11:19, 41:12
**items**
6:2
**itself**
80:1, 101:7

**J**
**j-i-t-o**
62:18
**january**
4:15, 6:19,
7:8, 10:20,
18:22, 25:20,
32:3, 54:16,
63:18
**jargon**
72:4
**jito**
62:17
**job**
1:20
**joined**
20:17
**joint**
4:9, 6:6,
102:12
**jsr**
11:10, 13:4,
15:18, 15:22,
121:14, 122:13
**jsrs**
33:6
**judge**
33:20, 36:17,
83:18, 85:2,
85:19, 85:21,
89:19, 95:18,
100:15, 107:4
**judge's**
18:14
**july**
13:7, 25:18,
41:1, 41:3,
44:7, 62:8,
67:12, 67:21,
69:11, 107:20,
117:11
**jump**
30:2, 116:11
**june**
5:17, 11:16,
12:13, 15:19,
15:20, 16:16,

22:6, 40:22,
67:19, 69:9,
104:20
**junying**
67:8
**jup**
10:19
**justin**
14:10

**K**
**keep**
29:3, 73:9,
73:16, 74:7,
84:18
**kevin**
3:12, 23:22,
31:6, 39:3,
57:2, 74:13,
82:16, 122:9
**key**
87:18
**keys**
71:3
**kids**
7:6
**killed**
67:21
**kind**
4:4, 6:1, 9:5,
11:6, 16:13,
21:18, 31:1,
31:3, 32:6, 88:6
**knock**
38:17
**knowledge**
66:4
**known**
53:12, 55:17,
115:7
**knows**
61:9

**L**
**labeled**
98:19
**lamoureux**
3:14

J.R.088

Transcript of Meet and Confer
Conducted on December 5, 2025

47

**language**
5:21, 13:19,
72:13, 119:8,
119:20, 120:10,
121:10
**laptops**
96:9, 96:10,
96:14, 96:17,
96:18
**large**
17:6
**larger**
30:22
**last**
18:1, 58:9,
59:7, 62:3,
91:5, 99:3,
103:11, 104:16,
105:1, 112:22
**later**
12:3, 16:13,
36:21, 37:4,
85:4, 121:17
**latest**
45:16
**latter**
68:6, 78:18
**law**
93:12, 94:17,
105:20, 107:18,
115:11
**lead**
28:13
**learned**
36:13, 60:1,
60:10, 60:12,
60:21
**least**
9:22, 28:2,
42:9, 72:14,
115:17, 117:8,
119:16, 120:5
**leave**
118:18
**left**
43:3, 78:17,
78:21
**lending**
71:18

**let's**
4:3, 9:4,
17:22, 27:21,
37:12, 63:9,
67:9, 86:2,
110:4, 111:5,
118:15, 122:1
**letter**
5:6
**levy**
3:15
**lfmdmd**
71:7
**li**
1:4, 5:2, 5:11,
11:10, 11:18,
12:5, 22:7,
23:6, 24:14,
24:15, 27:10,
40:5, 40:11,
40:14, 41:1,
43:6, 46:5,
46:7, 46:8,
46:14, 46:16,
47:15, 60:18,
60:20, 61:6,
65:7, 66:12,
77:3, 77:9,
103:18, 104:5,
104:9, 119:11,
119:13, 119:19
**light**
39:9, 62:9
**likely**
29:11
**limitation**
72:12
**limited**
4:13, 6:16,
10:15, 61:16,
86:15, 103:14
**limiting**
101:7
**lina**
67:18
**link**
90:10, 99:1,
99:19

**liq**
89:5
**liquidations**
71:20
**liquidator**
10:18, 71:18,
86:10, 86:21,
89:6, 90:9,
90:11, 91:2,
97:4, 97:9,
98:15, 100:20,
109:1
**liquidators**
90:7
**list**
4:20, 4:22,
5:9, 6:2, 6:4,
9:12, 12:8,
12:16, 12:20,
13:1, 16:14,
16:15, 20:9,
21:19, 25:1,
26:7, 26:8,
29:16, 49:22,
50:7, 53:4,
66:3, 66:7, 76:5
**listed**
9:22, 21:15,
27:2
**listened**
57:1
**lists**
25:3, 25:19,
25:21, 26:1,
29:9, 30:12,
50:7, 55:19,
56:2, 62:5,
71:17
**litigation**
108:12
**little**
8:2, 58:17,
79:1, 79:4
**live**
105:5
**llc**
1:11, 1:12,
35:20, 43:9

**llp**
3:15
**loan**
83:5
**locating**
12:7
**log**
106:15, 107:17,
110:12
**logs**
70:12, 72:7,
76:2, 76:16,
76:18, 77:1,
78:1, 80:9,
80:16, 80:18,
81:1, 81:7,
81:8, 81:9,
81:11, 81:16,
90:19, 90:20,
91:14
**long**
23:7, 41:21,
59:2, 76:1,
76:5, 91:5,
108:17
**longer**
76:11
**look**
16:11, 24:20,
25:15, 26:3,
27:9, 27:11,
27:12, 30:9,
30:10, 35:19,
39:14, 43:2,
49:5, 51:2,
66:9, 84:11,
93:5, 93:7,
93:22, 98:21,
103:10, 107:21,
112:20, 113:14,
113:17, 113:22,
116:9
**looked**
39:11, 85:3
**looking**
7:3, 50:20,
90:7, 99:19,
102:2, 117:20

J.R.089

Transcript of Meet and Confer
Conducted on December 5, 2025

48

| | | | |
|---|---|---|---|
| **looks** | **maker** | 115:11 | 41:11, 65:19, |
| 50:21, 51:8, | 10:18, 71:19, | **matter** | 70:2, 75:1, |
| 84:12, 103:3 | 86:11, 87:21, | 11:22, 13:8, | 82:17, 83:11, |
| **lori** | 91:11, 91:13, | 14:7 | 83:14, 83:16, |
| 1:22, 2:7, | 97:5, 97:9, | **maybe** | 83:18, 83:20, |
| 123:2 | 98:16, 100:20, | 23:20, 23:21, | 83:21, 89:16, |
| **lost** | 109:2 | 26:4, 63:11, | 90:21, 108:13, |
| 61:20, 62:2, | **makes** | 81:4, 99:13, | 112:18, 112:22, |
| 63:7, 63:8, | 6:21, 34:12 | 104:10, 113:4, | 118:3, 121:20 |
| 63:9, 64:8, | **making** | 116:7, 118:2 | **member** |
| 64:9, 64:12, | 22:16, 22:18, | **meal** | 26:22 |
| 65:5, 65:21, | 23:16, 23:17, | 61:4 | **memorize** |
| 77:17 | 33:13, 89:8 | **mean** | 73:12 |
| **lot** | **malfunctioned** | 7:21, 10:7, | **mention** |
| 5:7, 20:22, | 60:4 | 18:10, 19:3, | 27:5 |
| 26:20, 29:15, | **malyshev** | 19:20, 23:19, | **mentioned** |
| 29:16, 43:3, | 12:4, 12:11, | 25:7, 26:12, | 15:16, 15:17, |
| 74:11 | 16:12, 33:6 | 28:9, 35:4, | 15:18, 15:19, |
| **M** | **many** | 38:5, 38:18, | 15:21, 16:1, |
| **machines** | 9:20, 13:11, | 43:3, 54:19, | 59:4, 65:4, |
| 77:8, 80:2 | 22:18, 27:6, | 63:4, 64:2, | 113:19, 116:6 |
| **made** | 30:16, 51:19, | 65:15, 67:3, | **message** |
| 5:5, 22:15, | 62:11, 67:13, | 72:8, 73:4, | 17:19, 29:6, |
| 22:16, 22:17, | 68:3 | 80:19, 84:20, | 29:10, 48:8, |
| 32:2, 39:15, | **march** | 85:5, 85:13, | 50:16, 119:13 |
| 73:11, 82:11, | 40:11, 67:17 | 86:1, 94:14, | **message_archive** |
| 83:8, 97:3, | **mark** | 107:8, 110:9, | 56:9 |
| 100:19, 120:18 | 6:13, 84:8 | 111:17, 112:10, | **messages** |
| **madelyn** | **market** | 114:1, 118:8, | 5:1, 10:20, |
| 23:12, 23:13, | 10:18, 71:19, | 120:15 | 17:5, 17:8, |
| 31:7, 37:18, | 86:11, 87:21, | **meaning** | 17:10, 20:19, |
| 49:8, 51:22, | 91:11, 91:12, | 17:8, 71:12 | 21:14, 21:17, |
| 116:6, 116:18, | 97:5, 97:9, | **means** | 25:18, 26:20, |
| 119:2, 121:4 | 98:16, 100:20, | 72:3, 72:13, | 27:4, 28:17, |
| **mainly** | 109:2 | 96:5, 110:18, | 29:18, 31:18, |
| 59:8 | **maryland** | 113:9 | 31:19, 42:8, |
| **maintained** | 1:2, 3:8, | **meant** | 42:16, 44:16, |
| 42:1, 43:17, | 35:22, 38:9 | 9:18, 20:6, | 48:7, 50:17, |
| 102:17, 109:8 | **masked** | 34:9, 63:5, | 54:13, 61:17, |
| **make** | 52:4 | 72:8, 112:19 | 62:6, 62:11, |
| 7:17, 8:22, | **mass** | **meet** | 62:19, 63:16, |
| 18:11, 29:14, | 42:15 | 1:16, 2:1, | 66:6 |
| 36:4, 36:7, | **master** | 11:15, 11:17, | **messed** |
| 38:19, 43:2, | 32:4 | 12:13, 15:9, | 51:6 |
| 78:9, 100:12, | **material** | 15:20, 16:17, | **method** |
| 102:2, 102:3, | 29:12, 45:2, | 30:17, 36:8, | 57:13, 85:1, |
| 113:9, 118:5 | 76:6, 76:12, | 36:17, 37:3, | 85:16 |
| | 76:14, 76:15, | 37:16, 40:15, | **methods** |
| | | | 96:3 |

J.R.090

Transcript of Meet and Confer
Conducted on December 5, 2025

49

**michael**
115:11, 116:11, 120:8, 120:16
**michael's**
22:6
**might**
16:11, 19:1, 28:3, 31:22, 37:11, 38:15, 46:21, 47:16, 67:8, 86:2, 90:14, 104:4, 113:20, 116:11
**million**
19:2, 27:4, 29:18, 29:22, 47:8, 52:7
**mine**
108:11
**mingsan**
1:6
**minute**
17:7
**minutes**
33:2, 118:6, 118:12
**missing**
23:20, 24:1, 25:14, 42:17, 45:7, 49:1, 49:13, 49:15, 49:21, 50:1, 50:5, 50:6, 55:21, 57:20, 59:15, 60:14, 62:20, 66:3, 76:18, 86:20, 115:17
**modify**
34:5
**moment**
103:4, 105:5
**moments**
6:9
**monday**
4:11, 6:13, 7:9, 12:3, 12:4, 37:5, 38:6,

38:8, 38:15, 62:13, 121:14
**money**
101:1, 101:15
**month**
53:20, 69:22
**months**
53:18, 53:20, 87:15
**moot**
89:18, 95:4, 95:5
**more**
17:17, 17:20, 30:16, 31:11, 36:5, 36:7, 36:20, 38:8, 41:21, 50:21, 51:19, 51:20, 83:9, 83:11, 83:21, 88:2, 90:22, 92:14, 101:5, 103:16, 113:15, 118:6, 118:12
**morning**
4:18, 9:11, 31:14, 38:12, 39:10, 46:1, 46:12, 54:4, 57:22, 60:17, 61:1, 78:12, 88:22, 96:13
**most**
26:4, 39:17, 71:1, 84:5
**mostly**
21:17, 120:4
**mother**
67:17
**motion**
34:5, 40:13, 40:18, 40:19, 40:21, 69:10, 77:5
**moto**
60:2, 115:13
**motorola**
60:2

**mount**
55:13
**moved**
34:21
**moving**
39:8, 100:17
**msol**
10:18, 86:10, 87:21, 91:11, 91:12, 97:5, 97:9, 98:16, 100:20, 109:2
**much**
20:10, 24:6
**multiple**
77:11, 115:7
**muse**
3:15
**myself**
23:20, 49:6, 59:8, 78:9, 113:13

**N**

**name**
53:11, 55:16, 56:7, 56:9, 56:10, 57:14, 67:9, 91:5
**names**
55:18, 56:8
**narrower**
101:8
**nauseam**
48:21
**nd**
55:13
**nearest**
61:4
**nearly**
119:14
**necessarily**
25:7, 25:8
**necessary**
47:17, 73:15
**need**
14:16, 18:15, 21:19, 26:5,

27:6, 28:11, 31:11, 36:20, 37:13, 37:17, 37:18, 38:1, 39:7, 39:8, 42:13, 48:18, 51:12, 52:9, 53:18, 54:7, 72:21, 74:18, 75:5, 75:13, 78:3, 78:5, 78:19, 80:4, 80:17, 87:7, 91:13, 95:6, 95:11, 95:16, 99:9, 99:11, 99:14, 104:10, 105:22, 106:6, 108:1, 108:8, 110:2, 116:21, 120:11, 120:16, 120:19, 121:6, 121:15
**needed**
83:3
**needs**
35:8, 48:19, 54:11, 54:19, 63:20, 63:21, 64:3, 64:21, 72:14, 91:22, 101:20, 101:21, 103:21, 120:22, 121:5
**neither**
41:19, 41:22, 43:16, 123:10
**never**
5:18, 20:17, 24:21, 34:2, 70:9, 72:6, 79:17, 105:2, 111:10
**new**
26:14, 61:5, 62:7, 105:15
**next**
18:6, 35:20,

J.R.091

Transcript of Meet and Confer
Conducted on December 5, 2025                                    50

| | | | |
|---|---|---|---|
| 36:11, 37:3,<br>37:22, 38:15,<br>38:22, 39:3,<br>39:6, 42:19,<br>45:1, 48:16,<br>55:16, 59:21,<br>63:18, 68:17,<br>87:6, 88:15,<br>92:17, 94:22,<br>96:2, 97:2,<br>118:3, 118:17,<br>121:21<br>**night**<br>104:17, 105:1<br>**nine**<br>58:14<br>**nodding**<br>53:22<br>**non**<br>37:8, 92:16<br>**non-privileged**<br>10:12, 109:14,<br>110:8, 111:13,<br>111:15, 114:5<br>**none**<br>97:19, 105:3<br>**nonresponsive**<br>34:16, 35:13,<br>40:12, 82:5<br>**nope**<br>6:4<br>**normal**<br>45:16<br>**note**<br>78:9, 96:1,<br>100:12, 108:9<br>**noted**<br>11:19, 69:17,<br>103:16, 106:11,<br>107:2, 107:9,<br>107:16, 108:12,<br>113:16, 119:10<br>**notes**<br>23:19, 30:6,<br>69:7, 118:11<br>**nothing**<br>28:22, 29:3,<br>74:20, 77:5, | 83:11, 87:9,<br>87:20, 106:4<br>**nothing's**<br>108:6, 108:10,<br>109:16<br>**notice**<br>65:17<br>**noticed**<br>119:12<br>**noting**<br>116:8<br>**notwithstanding**<br>88:12<br>**november**<br>5:6, 24:12,<br>24:22, 28:16,<br>89:10, 89:19,<br>91:10, 95:19,<br>119:7, 120:7,<br>123:16<br>**number**<br>10:11, 10:12,<br>21:18, 22:22,<br>25:16, 46:2,<br>52:11, 54:5,<br>56:4, 60:16,<br>72:18, 78:13,<br>89:4, 91:15,<br>96:13, 98:11,<br>99:9, 101:13,<br>101:19, 105:8,<br>107:9, 107:11,<br>114:2, 119:12<br>**numbers**<br>10:1, 15:3,<br>18:22, 33:10,<br>33:11<br>**nw**<br>3:16<br><hr><br>**O**<br><br>**object**<br>113:7<br>**objected**<br>83:4<br>**objecting**<br>80:10, 95:13,<br>98:2 | **objection**<br>76:19, 77:22,<br>88:13, 105:11,<br>105:13, 106:2,<br>108:6, 108:9,<br>108:10, 108:12,<br>108:16, 109:16,<br>111:1, 111:3,<br>113:8, 113:16<br>**objections**<br>9:1, 65:16,<br>89:18, 95:5,<br>95:6, 105:19,<br>106:5, 106:11,<br>106:17, 106:19,<br>107:2, 107:5,<br>107:8, 107:19,<br>108:15, 108:20,<br>110:6, 110:7,<br>110:17, 110:19,<br>111:12, 111:13,<br>114:4, 114:5<br>**objective**<br>58:4<br>**objects**<br>88:8, 88:10,<br>107:11, 112:14<br>**obligated**<br>65:6, 65:7<br>**obligation**<br>28:10, 35:11,<br>54:8<br>**obtain**<br>83:3<br>**obtained**<br>108:22<br>**obvious**<br>13:13<br>**obviously**<br>7:16, 14:17,<br>18:14, 26:3,<br>32:12, 34:7,<br>63:17, 78:3,<br>96:11, 106:11,<br>106:14, 112:10,<br>114:2, 115:21,<br>120:19<br>**occurred**<br>59:8 | **october**<br>87:2, 87:5,<br>88:18, 89:6,<br>89:8, 91:9,<br>96:20, 117:12<br>**oh**<br>8:20, 16:7,<br>71:14, 97:22,<br>99:3<br>**okay**<br>6:6, 6:12,<br>6:15, 6:18,<br>8:10, 8:13,<br>8:18, 9:3, 9:17,<br>15:5, 15:13,<br>16:17, 16:20,<br>18:9, 22:2,<br>27:8, 31:9,<br>39:18, 44:12,<br>44:20, 45:1,<br>46:13, 48:2,<br>49:19, 52:15,<br>53:6, 53:7,<br>54:18, 54:21,<br>55:10, 55:15,<br>57:3, 57:9,<br>57:11, 59:18,<br>59:20, 61:13,<br>64:2, 66:11,<br>68:5, 68:13,<br>68:15, 68:16,<br>68:21, 74:9,<br>74:14, 75:9,<br>75:21, 77:21,<br>78:9, 79:3,<br>79:21, 80:6,<br>81:18, 81:19,<br>82:1, 84:20,<br>86:4, 86:8,<br>91:18, 92:13,<br>92:19, 94:16,<br>95:20, 96:2,<br>96:21, 97:2,<br>99:11, 100:3,<br>100:6, 100:16,<br>102:1, 103:10,<br>104:13, 105:18,<br>107:18, 108:18, |

J.R.092

112:2, 112:7,
112:8, 113:17,
114:10, 116:13,
116:17, 116:22,
117:5, 117:10,
117:19, 118:14,
119:4, 120:16,
121:8, 121:11,
121:15, 121:18,
122:15
**oldest**
87:1
**omits**
115:7
**once**
31:11, 37:15,
78:4
**one**
3:7, 15:10,
15:14, 18:6,
20:7, 20:15,
21:15, 23:19,
28:6, 29:8,
30:14, 30:19,
32:5, 34:9,
34:22, 35:22,
37:12, 37:22,
38:11, 38:13,
39:13, 40:3,
41:18, 41:21,
42:6, 42:9,
45:14, 46:17,
47:17, 48:20,
50:21, 52:2,
53:16, 55:19,
57:5, 59:3,
59:21, 61:14,
65:16, 65:22,
70:22, 71:18,
72:18, 76:1,
77:15, 78:21,
83:14, 84:2,
84:9, 86:4,
86:6, 88:6,
90:22, 91:6,
91:9, 91:20,
96:2, 97:2,
97:15, 100:7,

103:5, 103:11,
103:16, 103:21,
104:10, 110:5,
111:6, 112:9,
116:12, 117:20,
119:16, 121:11
**one-time**
44:6
**ones**
11:4, 14:10,
26:9, 26:11,
28:3, 28:4,
28:20, 29:1,
33:4, 40:21,
50:12, 68:6,
75:3, 84:22,
110:11, 119:15
**only**
9:12, 9:18,
9:19, 14:19,
21:4, 21:15,
24:12, 28:18,
28:19, 30:14,
30:19, 48:17,
62:5, 64:10,
72:9, 72:11,
76:19, 91:7,
100:22, 101:2,
118:6, 118:11
**open**
121:9
**opened**
102:16, 109:8
**operating**
45:15
**opportunity**
7:14
**opposed**
36:18, 67:15
**opposition**
40:17, 69:12,
69:16, 69:18,
69:21
**option**
85:17, 93:19
**options**
83:3
**order**
4:10, 6:7,

18:14, 34:5,
70:1, 70:4,
95:18, 100:14,
119:21
**ordered**
4:10, 41:10,
89:19
**organization**
118:21
**origin**
16:22
**original**
27:13, 45:13,
49:6
**os**
45:18
**other**
9:20, 9:21,
13:3, 13:11,
13:14, 14:13,
14:14, 14:21,
14:22, 16:10,
19:15, 20:7,
20:20, 21:9,
27:6, 28:3,
28:19, 29:15,
29:16, 30:17,
30:21, 31:1,
32:11, 34:19,
37:14, 48:2,
48:14, 50:12,
50:20, 51:3,
56:4, 58:14,
66:14, 73:11,
75:10, 85:17,
89:13, 94:19,
96:5, 97:22,
102:15, 108:4,
109:4, 110:20,
119:4, 120:10
**others**
28:19, 88:8
**otherwise**
21:16, 60:4,
70:18, 86:2,
111:2, 123:13
**otter**
1:10, 43:8

**ottersec**
10:10, 10:16,
10:17, 13:14,
30:15, 57:13,
58:3, 59:2,
59:3, 59:9,
70:15, 70:16,
72:6, 76:6,
76:7, 77:8,
77:13, 78:17,
78:20, 79:6,
79:7, 79:11,
79:18, 79:19,
80:1, 81:12,
81:13, 82:4,
83:7, 86:11,
87:10, 87:11,
87:13, 90:16,
91:8, 97:10,
98:17, 103:13,
103:19, 112:13,
113:5, 114:15
**ottersec's**
70:19, 78:16,
113:6
**out**
8:8, 13:4,
14:9, 14:18,
19:5, 23:8,
24:1, 24:18,
34:20, 37:15,
38:1, 43:3,
45:15, 51:7,
51:11, 51:12,
51:15, 57:8,
61:8, 63:20,
67:14, 77:22,
78:11, 78:15,
79:15, 82:6,
86:1, 99:2,
99:5, 107:4,
110:4, 121:9
**outcome**
123:13
**outline**
73:14
**over**
15:11, 19:1,

J.R.093

34:18, 37:4,
39:11, 45:16,
48:15, 52:4,
53:17, 69:22,
74:12, 76:12,
76:13, 84:13,
87:10, 87:14
**overall**
18:21
**overkill**
49:12
**overnight**
73:11
**own**
46:19
**owned**
70:15, 76:6,
79:2, 79:6,
79:13, 79:17,
81:12, 96:16,
96:18

**P**

**page**
12:15, 41:12,
43:5, 43:6,
104:3, 104:7,
104:8
**pages**
1:21, 12:14,
15:20, 41:20,
43:5, 107:20
**paid**
82:3, 82:7,
82:22
**pairing**
118:6
**papers**
34:7
**papurt**
71:9, 71:12
**paragraph**
58:9, 59:7
**paralegal**
3:21
**parenthetical**
56:9
**part**
19:14, 60:14,

61:11, 68:8,
92:8, 98:9,
99:3, 116:4,
119:1, 120:20
**partial**
41:20, 101:2
**particular**
17:14
**particularly**
15:20, 31:17
**parties**
2:4, 9:13,
11:14, 11:20,
12:9, 13:5,
19:9, 41:10,
47:15, 70:2,
115:8, 115:13,
115:22, 116:2,
117:2, 123:11
**party**
82:22, 115:1,
115:20, 115:21
**party's**
35:11, 93:17,
93:21
**passed**
67:17
**past**
53:17, 53:19,
65:22, 69:22,
95:22
**pay**
83:1
**paying**
82:9
**payments**
82:11, 83:7
**people**
20:20, 59:9,
59:17, 66:21,
87:13, 87:19,
120:5
**period**
10:10, 10:15,
17:9, 17:16,
68:1, 86:17,
87:17, 87:18,
87:19, 88:8,

88:9, 88:11,
88:14, 88:17,
89:3, 89:18,
89:20, 89:22,
94:20, 98:1,
98:3, 98:6,
100:21, 102:8,
105:9, 105:12,
105:15, 109:9,
112:13
**periods**
17:10, 35:3
**permissions**
70:14, 71:12,
76:4
**perms**
71:11
**person**
23:13, 57:14
**persons**
66:13, 66:16
**philip**
71:9, 71:12
**phone**
60:6, 60:10,
60:21, 61:5,
115:13, 117:2
**phones**
96:8, 96:15
**phrase**
101:14
**picks**
18:6
**piece**
18:8, 33:18
**place**
9:7, 59:1
**places**
49:20
**plaintiff**
1:8, 5:2,
41:14, 41:19,
41:22, 43:6,
43:16, 53:9,
57:11, 60:1,
60:5, 60:20,
61:15, 67:4,
67:10, 67:19,

67:20, 67:22,
68:2, 103:17,
104:3, 104:6
**plaintiff's**
60:8, 67:11,
67:16, 89:9,
96:19
**plaintiffs**
3:2, 103:19
**plan**
54:6
**planning**
49:10, 53:22,
54:1, 112:21
**plate**
37:15
**platform**
71:16, 102:16,
109:5
**platforms**
96:4
**pleading**
89:1
**pleasant**
55:13
**please**
20:16, 30:4,
39:1, 111:20
**plotnick**
11:17, 15:19,
31:7, 33:6
**point**
12:14, 31:2,
31:4, 33:17,
35:19, 39:15,
39:17, 41:21,
42:19, 46:2,
46:14, 51:7,
51:12, 51:15,
54:5, 57:22,
60:16, 61:8,
61:19, 74:15,
77:22, 78:13,
79:20, 79:21,
80:9, 81:4,
84:21, 88:7,
89:2, 89:4,
89:12, 89:17,

J.R.094

91:16, 92:3, 92:4, 93:17, 94:17, 96:13, 98:10, 101:13, 103:6, 104:1, 107:6, 110:4, 113:1, 113:2

**pointed**
51:11, 82:6, 86:1

**pointing**
26:11

**points**
39:17, 88:22, 91:19, 94:9

**policies**
42:2, 43:20, 44:2, 44:3

**policy**
42:10

**posed**
46:5, 78:22

**position**
85:15, 92:11, 94:4

**possessed**
70:16, 76:7, 79:6, 79:18, 81:12

**possession**
62:3, 64:5, 71:2, 76:8, 76:11, 76:13, 79:8, 81:14

**possibly**
34:11

**post**
96:18

**posted**
20:18

**posts**
26:22

**potentially**
5:22, 20:18, 25:9, 26:6, 26:9, 26:19, 27:1, 29:7, 29:11, 32:11,

41:16, 45:9, 48:9, 62:6, 63:19, 95:1, 119:8

**practice**
42:10, 43:20, 44:3, 111:9

**practices**
42:3

**pratt**
3:7

**pre**
87:10

**prefer**
85:19

**prepare**
6:13, 46:10, 59:13

**prepared**
40:2

**preparing**
92:9

**present**
3:20, 76:10, 85:6

**preservation**
46:4

**preserve**
41:16, 45:8, 50:10, 50:12, 53:2, 60:6

**preserved**
45:17, 45:19, 48:6, 48:12, 48:17, 50:3, 50:9, 50:22, 52:12, 52:13, 52:17, 52:18, 52:20, 53:1, 53:5, 53:15, 56:16, 63:14

**preserving**
45:3, 45:10

**presumably**
19:11

**pretty**
43:13, 44:17, 80:21, 110:10

**previous**
22:10, 28:3, 31:17, 32:1, 33:4, 52:6, 52:8, 83:11, 83:14, 112:18, 114:2

**previously**
11:19, 22:5, 31:19, 33:14, 80:7

**print**
99:2

**prior**
22:5, 43:15, 58:18, 60:11, 90:16

**private**
71:3

**privilege**
106:15, 106:16, 106:19, 107:14, 107:16, 107:17, 108:16, 108:17, 110:11, 111:2, 112:17, 113:6

**privileged**
73:8, 110:10, 110:11, 110:12, 113:4, 114:8

**probably**
8:1, 23:6, 24:2, 26:20, 27:11, 27:12, 36:4, 54:15, 58:4, 61:4, 65:22, 75:19, 96:16, 111:9

**problem**
33:16, 44:8

**procedure**
42:10, 83:17

**procedures**
42:3, 43:21, 44:3

**proceeding**
123:4

**proceedings**
122:17

**proceeds**
100:19, 101:4, 101:16

**process**
14:5, 73:18, 106:14, 108:3

**processed**
63:15

**produce**
17:5, 17:15, 54:17, 63:18, 91:1, 92:5, 92:13, 92:14, 92:18, 99:2

**produced**
19:13, 22:3, 22:5, 23:4, 24:13, 29:18, 30:19, 32:17, 32:21, 33:14, 34:17, 34:20, 35:5, 54:18, 56:5, 62:10, 62:12, 90:2, 90:14, 90:21, 92:6, 100:5, 103:8, 109:15, 110:9, 110:13, 111:15, 111:16, 114:7, 114:9, 117:8, 117:13, 117:16, 119:15

**producing**
7:1, 13:16, 34:15, 93:8, 93:19, 99:2, 106:3, 110:19

**product**
107:15, 112:17, 113:21

**production**
6:21, 9:4, 9:21, 15:7, 18:10, 21:2, 36:3, 38:19, 55:5, 71:7, 108:3, 119:11

**productions**
4:16, 31:16,

J.R.095

Transcript of Meet and Confer
Conducted on December 5, 2025                    54

31:17, 32:1,
32:2, 34:18,
106:8, 106:9
**professional**
2:9, 123:3
**property**
70:15, 76:5,
78:2, 78:20,
80:13
**proposal**
12:2
**propose**
7:22, 12:1,
12:13, 117:21
**proposed**
4:10, 6:7,
12:5, 12:16,
16:12, 16:16,
85:1, 88:19
**proposing**
99:13
**propounded**
61:19
**protected**
107:14, 112:16
**protocol**
120:22
**provide**
18:15, 58:10,
58:11, 58:12,
58:15, 64:13,
67:9, 78:3,
82:18, 91:13,
98:12, 99:22
**provided**
23:5, 49:14,
67:1, 67:9,
68:1, 85:10,
115:2
**providing**
46:18, 49:22,
83:4, 102:19
**public**
26:21, 90:8,
98:22
**pull**
10:5, 15:18,
19:10

**pulled**
17:10, 94:12
**purportedly**
112:12
**purporting**
114:13, 114:14
**purports**
112:15
**purpose**
12:12
**purposes**
12:7, 34:22,
53:10
**pursuant**
95:17, 115:22
**put**
42:22, 59:19,
64:20, 85:2,
85:5, 85:11,
91:9, 93:6,
94:18, 118:3,
122:8
**putting**
38:16, 106:14

**Q**

**qualify**
44:13
**question**
14:4, 24:9,
28:15, 44:22,
48:11, 53:16,
64:1, 66:19,
80:20, 82:7,
82:14, 84:8,
93:3, 94:8,
97:16, 97:21,
99:16, 107:6,
121:2
**questions**
5:8, 24:16,
28:12, 36:10,
49:15, 56:20,
93:11, 95:14,
121:10
**quicker**
24:3
**quickly**
39:12, 100:8

**quite**
18:17, 19:6,
46:13, 72:12
**quote**
11:18, 12:3,
13:5, 13:7,
17:17, 19:2,
31:15, 41:20,
58:3, 58:5,
60:19, 60:21,
98:13, 98:17,
101:1, 101:2,
101:4, 101:14,
101:15
**quoting**
47:3

**R**

**ra**
71:9, 71:11,
71:16, 71:17,
71:19, 71:20
**rachel**
3:5, 3:13,
14:16, 15:14,
28:8, 30:2,
32:22, 49:6,
51:10, 51:16
**rachel's**
49:14, 49:20,
52:9
**raise**
36:21, 51:14,
119:6
**raised**
69:18, 74:15,
75:10, 77:5,
105:3, 120:17,
121:4
**raises**
36:10
**ran**
120:13
**range**
8:7, 95:7,
95:13
**rather**
33:18, 36:9

**rc**
1:11, 43:9
**rd**
104:19, 104:20
**read**
4:3, 39:12,
39:22, 43:4,
45:22, 72:18,
73:15, 73:17,
74:2, 74:7,
74:11, 75:5,
75:22, 99:3,
101:15
**reading**
41:20, 78:7,
115:18
**reads**
96:13
**real**
58:22
**reality**
54:20
**really**
7:15, 20:11,
24:6, 43:1,
64:15, 64:19
**reason**
54:2, 55:1,
84:4, 84:7,
106:12, 113:15
**reasonable**
73:20
**recall**
22:19, 23:3,
39:21, 112:9,
113:18, 114:10,
114:11
**recalls**
68:6
**received**
31:20, 54:12,
69:15, 105:1,
105:2, 114:22,
115:8, 115:10,
115:12, 115:19,
115:21, 116:1
**receiving**
31:19, 97:12,

J.R.096

115:20
**recent**
56:16
**recently**
62:10
**reciting**
16:6
**recollect**
34:10
**recollected**
53:17, 55:2
**recollecting**
52:11
**recollection**
33:17, 116:5
**reconstruct**
63:10
**record**
56:1, 57:10,
75:6, 81:1,
83:10, 84:13,
93:13, 96:1,
108:13, 112:6,
123:6
**records**
10:21, 70:13,
76:2, 78:1,
88:1, 91:20,
91:21, 92:3,
92:22, 93:18,
93:20, 93:21,
94:5, 94:7,
116:7
**reduced**
27:20, 28:4,
123:9
**refer**
92:21, 93:12,
94:15, 96:17
**reference**
44:5, 46:4,
46:9, 57:13,
72:21, 74:10,
74:17, 95:16,
98:21, 99:5,
99:21, 103:7
**referenced**
22:22, 48:5,

56:13, 56:19,
77:19, 78:15,
80:2, 85:2
**references**
62:21, 89:17,
103:17, 103:18
**referred**
49:19, 73:2,
86:19, 90:3,
91:22
**referring**
57:21, 80:18,
104:4, 104:9
**refers**
96:7
**reflect**
53:19, 89:7,
105:14
**refusing**
76:20, 80:11,
80:13, 84:9
**regard**
42:13, 46:3,
54:6, 58:21,
59:11, 60:12,
68:5, 73:1,
78:6, 78:11,
78:13, 80:16,
90:6, 90:15,
91:3, 91:11,
94:15, 98:11,
104:2, 114:2,
116:7
**regarding**
4:14, 6:17,
10:13, 31:8,
40:14, 40:20,
61:15, 73:6,
76:16, 91:15
**regardless**
55:15, 75:2,
79:12
**registered**
2:9, 123:3
**registering**
103:15
**regular**
67:6

**reinstallations**
43:16
**reiterated**
83:18
**reiterating**
73:9, 73:16,
74:7
**related**
10:5, 11:22,
12:6, 12:7,
13:6, 24:16,
103:13, 123:11
**relates**
31:18
**relating**
10:9, 10:16
**relationship**
92:7
**relevant**
5:22, 10:6,
10:10, 10:14,
13:17, 20:19,
25:9, 26:6,
26:9, 27:1,
29:7, 29:12,
41:17, 45:9,
48:9, 59:2,
62:11, 86:16,
88:8, 89:3,
89:18, 89:20,
98:3, 100:21,
109:8, 112:13,
119:9, 120:1
**relinquished**
76:13
**relitigate**
34:4
**reluctant**
83:2
**remain**
105:5
**remained**
67:22
**remaining**
41:11, 89:13
**remains**
41:9, 77:2,
82:5, 108:2

**remember**
57:18, 64:15,
64:18, 68:11
**remembers**
63:1, 64:10,
67:14, 88:5
**remotely**
2:4
**removals**
70:21
**removed**
70:18, 71:16,
71:18, 71:19,
71:20
**removing**
71:11
**repair**
60:6
**repeated**
73:6
**repeatedly**
55:20
**reply**
69:16
**reported**
1:22
**reporter**
2:8, 2:9, 98:5,
111:18, 111:19,
112:5, 123:1,
123:3
**reports**
107:12
**repositories**
86:16
**represent**
47:7
**representation**
5:5, 22:15,
22:16, 22:17,
22:18, 22:19,
23:16, 93:11
**represented**
4:22, 25:11,
28:6, 28:15,
51:21, 65:19
**reproducing**
33:13

J.R.097

Transcript of Meet and Confer
Conducted on December 5, 2025                56

**request**
55:16, 61:19,
107:12, 109:15,
110:9, 111:14,
111:16, 112:14,
114:6, 115:3,
115:5, 116:21,
117:16, 119:6,
120:18
**requested**
34:8, 46:4,
55:21, 109:12
**requests**
9:20, 10:7,
11:13, 13:12,
14:14, 16:5,
16:8, 34:4,
59:22, 68:17,
69:2, 100:17,
108:21, 112:11,
114:22
**require**
9:21
**required**
24:11
**requirement**
108:11
**rereading**
113:13
**resolve**
84:22, 95:12,
98:2
**resolved**
105:4
**respect**
11:19, 48:11,
48:12, 52:21,
53:8, 87:16
**respects**
86:13
**respond**
24:8, 39:16,
40:1, 61:2,
61:6, 63:2,
64:3, 64:21,
65:6, 65:7,
73:5, 74:5,
77:1, 92:22

**responded**
6:8, 39:14,
39:17, 58:17,
74:16, 97:16,
97:21, 99:6
**responding**
46:20, 47:5,
47:9, 50:2, 88:3
**response**
4:17, 4:18,
11:13, 14:13,
24:14, 34:6,
45:12, 45:21,
50:9, 52:18,
53:18, 56:19,
56:21, 60:9,
60:12, 60:14,
60:22, 61:3,
62:6, 62:9,
62:16, 62:20,
64:19, 64:20,
65:1, 71:1,
71:21, 72:16,
74:3, 75:7,
75:10, 76:17,
77:2, 77:3,
77:9, 77:11,
78:22, 82:4,
88:9, 90:5,
91:22, 92:22,
98:4, 98:12,
98:18, 100:22,
103:1, 109:11,
115:3, 115:6
**responses**
5:11, 5:12,
5:14, 5:16,
5:18, 30:7,
32:16, 36:9,
39:6, 40:6,
40:13, 40:16,
40:17, 40:20,
41:2, 41:5,
41:8, 43:7,
46:10, 47:12,
59:11, 59:13,
66:17, 68:18,
69:8, 69:11,

70:8, 70:10,
72:19, 73:13,
77:18, 90:4,
95:5, 104:14,
104:22, 105:3,
108:1, 108:4,
110:16, 118:2
**responsibility**
49:2, 49:3
**responsive**
9:21, 10:6,
12:18, 13:3,
13:12, 14:14,
18:12, 19:8,
19:12, 19:18,
29:11, 32:11,
32:21, 34:3,
35:9, 35:10,
61:18, 106:3,
109:14, 110:8,
111:14, 111:15,
114:6, 115:5,
116:20, 117:15,
119:19, 120:1
**rest**
101:17
**result**
34:14, 89:22
**resulted**
27:19, 29:21
**retaining**
71:2
**review**
19:2, 35:13
**reviewed**
18:17, 92:8
**reviewing**
18:11, 34:16
**revise**
100:11
**rfp**
10:1, 10:11,
10:12, 10:21,
10:22, 104:22,
105:3, 108:21,
114:21, 118:2
**rfps**
5:17, 5:19,

68:20, 69:2,
69:4, 69:9,
69:20, 70:3,
70:5, 70:10,
104:15, 105:8,
105:10, 105:20,
108:19, 118:16
**right**
4:2, 4:8, 9:4,
14:12, 18:7,
19:16, 30:12,
30:14, 31:5,
32:12, 38:17,
48:1, 50:19,
52:9, 52:22,
59:12, 62:13,
63:22, 75:8,
78:7, 81:20,
94:20, 95:9,
100:16, 102:4,
104:16, 106:20,
109:18, 111:22,
114:8, 114:21,
117:17, 122:16
**road**
82:17
**rob**
119:17
**robert**
1:10, 11:9,
11:12, 11:20,
13:14, 43:8,
58:7, 58:22,
59:6, 59:16,
71:8, 71:9,
71:11, 71:14,
75:19, 82:10,
82:12, 83:1,
83:5, 83:6,
83:8, 84:6,
91:12, 103:19,
104:4, 104:5
**rog**
30:6, 42:13,
42:19, 45:1,
45:2, 45:7,
45:9, 45:12,
45:21, 47:2,

J.R.098

Transcript of Meet and Confer
Conducted on December 5, 2025

47:12, 48:5,
48:12, 48:16,
50:2, 50:9,
52:18, 52:21,
53:8, 53:16,
53:18, 54:6,
55:16, 56:1,
56:15, 57:4,
57:8, 57:11,
58:1, 58:21,
59:11, 59:21,
61:15, 62:16,
66:12, 70:11,
72:1, 72:10,
72:15, 75:11,
75:21, 75:22,
76:15, 77:3,
77:10, 77:20,
78:10, 78:13,
78:19, 79:3,
79:12, 80:3,
81:16, 81:19,
82:2, 86:8,
86:17, 87:3,
88:20, 89:1,
89:14, 90:5,
91:15, 91:22,
92:1, 92:22,
93:1, 96:2,
96:14, 97:2,
98:11, 98:20,
100:17, 101:3,
102:7, 102:11,
103:8, 103:11,
104:2

**rogs**
5:19, 56:5,
69:4, 69:9,
69:20, 70:4,
70:9, 70:11,
77:15, 104:13,
105:10, 118:1

**role**
10:9

**routinely**
42:4, 42:11,
43:22, 44:4,
44:18

**rpr**
1:22

**rule**
83:17, 93:16,
93:22

**rules**
54:9, 107:9

**run**
5:21, 11:9,
12:17, 12:21,
13:2, 13:21,
14:8, 24:2,
49:17, 108:19,
119:8, 120:14,
120:21

**running**
9:8, 9:11,
14:7, 14:9,
32:18, 52:3,
97:4, 100:19,
109:1, 119:20,
120:3, 120:22

**runs**
19:15

**rust**
91:7, 91:8

---
**S**
---

**said**
6:10, 11:11,
21:4, 36:17,
39:21, 40:1,
44:1, 46:12,
47:4, 49:4,
50:4, 50:14,
51:16, 51:17,
51:18, 55:20,
57:2, 58:11,
63:8, 66:2,
67:3, 72:20,
74:5, 74:17,
74:22, 80:7,
90:16, 101:13,
104:2, 109:10,
110:3, 111:17,
112:18, 112:20,
113:16, 115:6,
119:10, 120:8,

123:8

**sam**
1:6, 41:22,
43:16, 67:11,
67:20, 83:4,
83:6, 119:13,
119:20

**same**
7:7, 14:5,
21:7, 22:9,
22:18, 30:12,
47:3, 47:11,
50:18, 51:5,
56:2, 56:6,
69:1, 69:3,
77:11, 79:2,
82:18, 108:3,
118:5

**sanctions**
34:14, 35:15

**saw**
57:17

**say**
7:11, 8:20,
9:8, 9:10,
17:22, 19:4,
21:13, 29:1,
29:4, 31:21,
33:21, 40:2,
48:17, 50:8,
52:19, 52:20,
52:22, 54:17,
57:19, 60:12,
60:13, 60:18,
61:12, 64:11,
65:3, 65:12,
65:16, 66:1,
66:18, 81:4,
81:6, 81:8,
81:9, 82:12,
84:3, 86:21,
87:15, 87:19,
87:22, 88:12,
93:7, 94:11,
96:14, 101:10,
106:10, 108:1,
108:9, 110:17,
111:6, 111:8,

111:11, 114:3

**saying**
24:5, 26:17,
35:13, 44:13,
50:6, 50:11,
52:21, 53:3,
74:4, 79:5,
79:9, 79:14,
79:22, 84:18,
88:4, 107:22,
114:12, 114:13,
118:10, 118:11

**says**
29:9, 41:19,
41:21, 43:14,
45:12, 46:3,
48:6, 48:14,
50:9, 50:17,
53:2, 54:5,
58:21, 62:16,
66:21, 71:9,
71:11, 71:13,
71:14, 71:16,
71:17, 71:19,
71:20, 79:13,
81:11, 82:9,
82:10, 82:13,
87:1, 87:13,
87:14, 89:4,
89:12, 89:17,
90:6, 90:13,
91:11, 93:16,
96:9, 97:3,
98:11, 99:20,
100:22, 102:19,
103:7, 104:1,
115:4, 117:15

**schedule**
6:8, 38:2,
38:17

**scheduled**
11:17, 37:22,
73:10

**schedules**
38:5

**scheduling**
4:10, 6:7, 34:5

**school**
7:7, 7:8, 7:10

J.R.099

Transcript of Meet and Confer
Conducted on December 5, 2025                                    58

**scope**
78:1, 78:3
**screenshot**
71:15, 77:14
**script**
42:15, 44:6
**se**
20:6
**search**
9:8, 9:11,
9:13, 9:15,
10:4, 11:5,
11:6, 12:5,
12:10, 12:20,
13:6, 13:9,
13:10, 13:13,
13:21, 14:6,
14:7, 14:21,
19:9, 19:10,
19:11, 20:6,
20:15, 28:1,
31:12, 32:10,
33:3, 35:14,
52:5, 52:6,
52:7, 52:8,
52:10, 56:3,
119:21, 121:10
**searched**
4:21, 11:20,
20:2, 20:3,
21:11, 21:12,
24:10, 25:2,
27:6, 27:17,
27:18, 27:19,
28:20, 29:17,
50:1, 52:1,
56:17
**searches**
5:21, 9:19,
11:9, 12:2,
12:9, 12:12,
12:16, 13:1,
13:2, 16:15,
32:19, 119:8,
120:3, 120:13,
120:14
**searching**
11:12, 14:2,

14:13, 19:16,
20:1, 20:8,
20:14, 20:16,
21:5, 25:12,
26:19, 30:14,
32:10, 119:18
**sec**
20:15
**second**
4:12, 5:3,
5:12, 5:18,
6:15, 22:8,
27:11, 30:3,
32:7, 40:6,
41:1, 41:5,
43:7, 55:2,
58:9, 59:7,
71:5, 89:9,
90:22, 104:6,
111:20, 118:1
**securities**
102:14, 109:4
**security**
1:12, 43:9
**see**
4:4, 7:5,
12:11, 18:20,
19:7, 19:22,
24:3, 24:5,
27:2, 27:21,
33:3, 36:12,
37:2, 44:7,
44:12, 47:18,
55:11, 55:12,
67:9, 71:7,
84:4, 84:5,
86:6, 101:9,
103:3, 103:10,
107:10, 108:17,
110:4, 113:20
**seek**
23:14, 34:14,
35:15, 107:12,
112:15
**seeking**
78:14, 110:15,
110:20
**seem**
9:9, 22:19,

24:5, 27:3,
30:8, 30:20,
53:3, 56:10,
76:18, 79:5,
110:22, 113:9,
113:10, 115:17
**seems**
9:9, 17:4,
21:14, 26:17,
35:14, 44:17,
45:20, 49:11,
49:21, 51:5,
57:17, 57:19,
88:1, 88:2,
120:4
**seen**
18:13, 55:7,
56:22, 90:13
**segments**
17:21
**self-custodial**
11:1, 97:7,
97:13, 97:18,
98:8, 98:14,
99:7, 102:13,
109:7
**sell**
83:2
**send**
12:2, 38:4,
58:19, 94:16,
121:13, 121:16,
122:12, 122:13
**sending**
97:12
**sends**
71:15
**sense**
6:21, 34:12,
36:4, 36:7,
38:16, 85:21,
113:9, 118:5
**sent**
4:18, 5:20,
12:5, 33:10,
39:10, 46:1,
54:4, 62:6,
73:8, 73:10,

73:14, 73:19,
88:21, 104:16,
117:5, 119:6,
120:7
**sentence**
72:1, 72:14,
80:10
**separate**
56:14, 58:1,
82:17, 88:7
**september**
45:18, 61:21,
63:10, 69:21,
89:21, 94:21,
95:8
**series**
105:19
**serve**
40:15, 69:12,
83:16, 83:19
**served**
5:4, 5:15,
5:17, 10:3,
16:5, 24:14,
32:15, 40:7,
40:10, 40:12,
40:13, 40:16,
40:18, 40:19,
40:22, 41:1,
41:7, 43:10,
45:6, 68:22,
69:3, 69:8,
69:9, 69:16,
69:19, 69:21,
89:10, 104:19,
107:20, 116:3,
118:2, 118:8
**server**
20:16, 20:22,
21:15, 26:21,
29:10, 30:13,
30:14, 30:15,
30:19, 45:17,
50:18, 50:21,
51:5, 53:12,
55:17, 55:19,
56:2, 62:7,
77:7, 77:13,

J.R.100

Transcript of Meet and Confer
Conducted on December 5, 2025                                    59

79:2, 79:10,
79:11, 79:15,
79:22
**servers**
4:21, 5:1,
20:8, 20:13,
21:9, 21:14,
21:20, 25:3,
28:17, 29:5,
30:16, 48:7,
51:19, 55:19,
56:6, 62:19,
70:13, 76:3
**service**
116:4
**session**
89:16
**set**
5:12, 5:14,
5:16, 13:4,
16:12, 21:7,
22:8, 32:3,
36:22, 39:3,
40:6, 40:11,
41:13, 43:7,
47:3, 47:11,
48:18, 68:17,
68:18, 69:1,
69:2, 69:4,
70:3, 70:8,
70:10, 72:19,
89:9, 104:14,
118:1, 123:14
**sets**
5:19, 32:13,
39:6, 69:10,
115:7
**several**
15:17, 22:5,
22:22, 33:1,
83:3, 84:12,
92:20
**shared**
15:3
**shock**
8:20
**short**
71:4, 106:22

**shorthand**
2:7, 123:1,
123:2
**should**
12:20, 35:4,
45:20, 46:9,
48:22, 52:19,
59:15, 63:17,
64:19, 64:20,
72:20, 73:21,
74:17, 77:14,
77:17, 84:21,
90:20
**shouldn't**
52:19
**showing**
10:22, 108:22
**shows**
94:8
**side**
11:8, 12:16,
23:4, 31:22,
74:4, 80:17,
102:5
**sides**
13:10
**sign**
65:11
**signal**
42:8, 44:15,
44:19
**signature**
121:16, 123:15
**signature-b7fzp**
123:17
**signed**
24:15, 46:22,
47:15
**signs**
46:7, 46:17
**similar**
105:9
**similarly**
67:16
**simms**
33:21, 36:17,
83:18, 85:2,
85:19, 85:22,

89:19, 95:18
**simply**
31:22, 68:10,
75:19, 100:1
**since**
12:21, 26:15,
67:11, 78:19,
98:22, 101:16,
115:1, 117:20
**single**
17:15
**sino**
119:16
**sitting**
23:2, 63:21
**situation**
54:20
**six**
17:22
**skill**
123:7
**skimmed**
73:12, 73:17
**solend**
10:18, 71:20,
86:10, 86:21,
90:7, 90:8,
97:4, 97:8,
98:15, 100:20,
109:1
**some**
4:19, 7:1,
9:22, 16:6,
19:7, 21:19,
26:5, 26:18,
26:21, 39:7,
41:4, 41:9,
45:21, 51:3,
51:6, 56:3,
56:7, 57:20,
77:15, 80:15,
82:9, 84:21,
90:20, 113:18,
119:14, 120:4,
120:10, 122:13
**somebody**
93:20
**someone**
28:11

**something**
8:6, 32:6,
33:14, 38:16,
47:4, 49:1,
49:13, 52:19,
54:14, 54:16,
61:4, 63:13,
63:20, 74:21,
77:4, 77:16,
77:17, 79:1,
81:2, 85:8,
88:15, 101:20,
113:20, 120:19,
121:22
**somewhere**
65:13, 77:18
**son**
67:3
**soon**
7:13, 15:10,
38:15, 54:15
**sorry**
16:3, 20:5,
25:21, 27:18,
47:2, 68:22,
69:7, 95:9, 98:4
**sort**
19:8, 23:13,
26:18, 33:5,
54:17, 122:10
**sounding**
54:1
**sounds**
31:10, 32:18,
38:5, 61:13,
61:14, 64:22,
75:9, 85:4,
85:19, 109:15,
110:1, 114:18,
117:19
**source**
53:13, 53:14
**sources**
24:9, 53:10
**south**
55:14
**southern**
38:9

J.R.101

Transcript of Meet and Confer
Conducted on December 5, 2025

60

**span**
33:1
**speaking**
68:11, 122:6
**specific**
11:8, 13:18,
14:15, 34:8,
108:19, 122:7
**specifically**
4:16, 12:17,
13:11, 81:5,
81:6, 111:3
**specificity**
53:9, 86:9
**specifics**
67:15, 68:7,
90:12
**specified**
90:18
**spending**
101:5, 101:8
**spent**
101:1, 101:15
**spl**
71:18
**spoliation**
4:14, 6:17,
24:17, 41:3
**spot**
19:7, 85:5
**spreadsheet**
27:14, 62:10,
85:1, 85:12,
85:16, 85:22,
86:5, 94:18,
98:20, 99:1,
99:20, 99:21,
100:5, 102:20,
103:7, 115:10
**spreadsheets**
22:10, 23:4,
23:7, 23:9,
24:13, 30:21,
50:20, 51:4,
56:4, 64:10,
117:6
**st**
88:18, 91:9

**start**
4:6, 9:7,
35:22, 37:5,
58:18, 94:20,
94:21, 118:15
**started**
4:3, 87:4,
89:5, 91:6, 91:9
**starting**
31:1, 40:3,
40:5, 70:11
**starts**
12:14
**state**
2:8, 66:15,
97:3, 109:13
**stated**
44:11, 78:12,
101:18
**statement**
65:9, 92:2
**states**
1:1, 43:13,
67:18, 109:11,
110:7, 111:13,
114:5
**stating**
61:22
**stay**
106:6, 108:6
**staying**
67:20
**stenographically**
123:8
**step**
37:12, 37:13,
41:16, 65:22
**stephen**
22:12, 22:17,
23:10, 23:12,
28:7, 31:7,
33:6, 37:18,
49:7, 51:21,
116:5, 116:18,
119:2, 120:12,
121:4
**steps**
41:15, 45:8,

47:21, 60:5
**steve**
11:17, 15:19
**still**
11:11, 34:10,
35:8, 37:14,
46:7, 60:9,
63:14, 73:22,
75:5, 76:17,
76:18, 86:20,
88:18, 95:6,
95:11, 97:16,
100:22, 117:14,
121:9
**stop**
74:9
**stopped**
59:3
**stored**
86:15, 90:11
**straight**
66:7
**strands**
92:7
**street**
3:7, 3:16
**struggling**
31:2
**stuff**
4:4, 7:2,
24:19, 34:15,
36:2, 39:4,
43:3, 50:10,
52:16, 52:20,
53:2, 53:4,
71:2, 80:15,
110:20
**subject**
110:5, 110:17,
110:19, 111:11,
114:3
**submit**
85:18
**subpoena**
116:4
**subpoenaed**
115:11, 116:6,
116:10

**subpoenas**
116:1, 116:3
**subsequently**
82:10, 83:5
**substance**
10:14, 66:15,
66:17, 66:20,
66:22, 67:7
**substantive**
40:21
**succinct**
85:20
**succinctly**
85:7
**sufficient**
9:18, 53:20,
87:20
**suggest**
31:21, 93:21
**suggested**
31:13
**suggestion**
7:1, 85:6
**suggests**
70:5, 93:12
**suite**
3:7, 3:16
**summer**
84:13
**supplement**
54:6, 54:14
**supplemented**
54:11, 54:19
**support**
67:10, 68:2
**supposed**
13:16, 20:2,
20:3, 83:22,
88:9, 88:17,
98:4
**sure**
7:17, 8:3, 8:6,
8:22, 18:11,
24:8, 26:6,
29:15, 33:13,
36:19, 37:13,
39:5, 47:10,
72:5, 72:7,

J.R.102

102:2, 102:3,
112:4, 117:14,
122:12
**system**
42:10, 44:17,
45:15, 94:12
**systems**
42:1, 42:3,
43:18, 43:21,
44:3

---
**T**

**t-a-n-k**
62:18
**tactful**
73:16
**take**
19:9, 30:9,
37:12, 37:17,
37:18, 45:8,
55:5, 56:21,
75:12, 79:9,
79:21, 84:10,
84:11, 85:9,
95:3, 95:8,
102:3, 105:13,
108:5, 111:19,
112:20, 113:17,
116:8, 121:11
**taken**
78:20, 84:12,
123:4, 123:8
**takeout**
117:11, 117:12
**takeouts**
117:7
**taking**
7:10
**takings**
70:21
**talk**
17:7, 36:5,
44:9, 46:20,
58:20, 117:22
**talked**
18:21, 19:20,
30:17, 32:22,
49:21, 51:19,

62:17, 66:5,
66:22, 100:9,
113:14
**talking**
21:18, 31:6,
41:8, 43:19,
50:1, 59:3,
70:7, 72:6,
72:9, 81:10,
98:5, 119:22
**talks**
45:3, 67:3,
89:2
**tank**
62:18
**tapes**
42:1, 43:18
**taxes**
83:1
**team**
17:13
**technical**
72:2, 72:13
**telegram**
21:21, 24:10,
61:17, 63:16,
63:17
**telephone**
60:2
**tell**
28:8, 36:14,
39:21, 51:8,
75:14, 75:17,
83:12, 94:14,
103:2, 120:7
**telling**
22:20, 34:17,
50:5, 50:6,
52:22, 108:13
**tells**
81:16
**term**
29:2, 119:16
**terms**
4:20, 8:16,
9:8, 9:11, 9:13,
9:15, 10:4,
11:5, 11:7,

12:6, 12:10,
12:21, 13:6,
13:13, 13:15,
13:22, 14:6,
14:8, 14:21,
16:12, 17:3,
18:10, 18:20,
19:10, 19:11,
20:6, 24:18,
27:5, 27:6,
28:1, 29:19,
31:12, 32:10,
33:3, 33:12,
35:14, 36:1,
36:17, 44:1,
44:2, 48:21,
49:7, 49:21,
50:2, 52:5,
52:6, 52:7,
52:8, 52:10,
56:14, 78:1,
110:16, 119:21,
121:10
**testified**
41:4, 42:7,
42:14
**testimony**
44:2, 123:6,
123:8
**text**
119:13, 120:4
**th**
3:16, 5:13,
6:20, 7:8, 7:9,
8:9, 8:10,
14:18, 18:16,
24:12, 24:22,
28:16, 41:6,
41:7, 43:10,
54:13, 54:16,
55:11, 55:12,
63:19, 92:17,
95:9, 118:9,
122:4
**thank**
4:2, 7:20,
8:15, 15:13,
31:9, 53:7,

112:5, 121:18
**thanks**
9:3, 37:21,
59:18
**themselves**
5:11, 98:22
**thereafter**
68:1, 123:9
**therewith**
67:12, 68:3
**they'd**
17:9
**thielmann**
1:22, 2:7,
123:2
**thing**
15:14, 15:22,
29:8, 39:13,
44:6, 45:1,
62:5, 73:18,
94:19, 98:1,
98:7, 102:8,
108:3, 119:4
**things**
14:22, 15:17,
30:19, 33:18,
36:20, 37:14,
39:6, 48:14,
51:16, 51:18,
54:17, 66:2,
74:12, 78:21,
82:9, 92:21,
95:12, 106:7,
106:16, 115:16,
117:6
**think**
6:1, 6:8, 6:21,
7:2, 8:1, 9:7,
15:8, 19:14,
21:19, 23:9,
23:11, 23:12,
23:20, 24:1,
24:4, 26:2,
28:9, 30:8,
30:13, 30:19,
31:10, 32:5,
35:22, 36:2,
36:7, 37:21,

J.R.103

Transcript of Meet and Confer
Conducted on December 5, 2025

62

38:4, 38:21,
41:6, 43:13,
44:5, 44:7,
44:9, 44:11,
44:14, 48:11,
48:19, 48:22,
49:1, 49:13,
50:5, 50:6,
50:10, 50:18,
51:15, 55:3,
58:13, 64:15,
66:8, 71:4,
72:13, 73:2,
73:3, 73:20,
74:1, 79:4,
79:14, 80:6,
80:12, 80:16,
81:3, 82:17,
83:13, 83:15,
84:14, 84:15,
85:13, 85:18,
92:4, 92:6,
92:15, 93:9,
95:2, 103:1,
103:20, 103:21,
104:5, 106:12,
107:3, 107:9,
108:11, 110:14,
110:15, 112:8,
113:7, 113:17,
113:19, 116:1,
116:2, 116:3,
116:10, 116:12,
116:15, 117:8,
117:21, 118:22,
120:20, 121:21
**thinking**
8:16
**thinks**
49:15
**third**
4:15, 5:2,
5:12, 22:7,
27:10, 40:6,
40:8, 41:7,
43:6, 72:1,
114:22, 115:8,
115:12, 115:19,

115:21, 115:22,
116:2, 117:1
**thought**
78:8
**thousands**
28:18
**thread**
17:6, 17:9,
18:2
**three**
56:18, 56:19,
56:20, 66:21,
71:17, 77:12,
87:13, 87:14,
108:19
**three-month**
87:17, 87:19
**through**
4:3, 4:6, 7:14,
15:21, 22:4,
25:18, 26:13,
27:10, 33:12,
39:20, 40:15,
47:8, 48:14,
50:7, 60:3,
60:7, 76:10,
78:7, 86:6,
89:21, 95:9,
105:6, 105:11,
105:20, 105:21,
108:2, 108:19,
113:22
**throughout**
14:5, 67:6,
86:16
**throw**
81:8
**thursday**
37:7, 38:10
**tied**
119:5
**tight**
8:2
**time**
20:12, 23:3,
23:5, 35:3,
36:5, 36:11,
37:3, 37:12,

38:20, 39:2,
47:6, 51:13,
54:22, 58:19,
59:3, 60:7,
61:5, 68:1,
76:9, 82:19,
86:13, 86:14,
88:8, 88:11,
88:14, 88:16,
90:1, 90:2,
91:4, 98:1,
98:6, 102:8,
102:10, 105:9,
105:12, 105:15,
109:2, 117:21,
118:5, 120:1,
121:11
**time's**
59:12
**timelines**
90:12
**times**
22:5, 22:11,
22:18, 23:1,
33:1, 47:8,
56:18, 83:21,
87:17, 92:20,
102:9, 122:13
**timestamp**
90:18
**timestamps**
97:12
**timing**
47:22
**today**
31:8, 37:4,
118:12, 121:17
**together**
18:8, 33:18,
64:20, 93:6,
94:18, 106:15,
111:10, 118:3,
118:16
**token**
71:18, 76:3
**tokens**
10:19, 70:14,
76:4

**told**
28:11, 49:17,
84:14, 120:21
**ton**
35:16, 36:2
**took**
10:16, 41:15,
47:21, 60:6,
70:17
**tool**
32:7
**top**
43:6, 63:5,
63:12, 74:2,
86:7, 104:7,
104:8, 115:15
**totally**
67:8, 99:12
**touch**
121:20
**tough**
19:1
**traditional**
102:14, 109:3
**transaction**
97:8, 97:11,
97:18, 98:14,
99:8, 99:15
**transactions**
97:7
**transcribed**
36:8, 114:15
**transcript**
49:5, 123:5
**transfer**
10:19
**transferred**
61:21, 62:3,
63:8, 63:13,
70:17, 76:14,
77:17
**transfers**
10:22, 70:20,
109:3
**transperfect**
14:4, 17:14,
19:22, 27:19,
28:7, 31:8,

J.R.104

33:2, 36:5,
37:17, 49:8,
51:22, 55:8,
64:6, 119:3,
120:14, 120:17,
121:5
**traveled**
67:18
**treat**
32:1
**tries**
43:2
**true**
42:7, 106:20,
123:5
**try**
20:11, 36:19,
36:22, 37:19,
37:22, 67:14
**trying**
13:20, 20:9,
21:3, 24:18,
25:10, 26:7,
26:8, 26:16,
27:2, 27:7,
33:18, 38:18,
51:7, 51:14,
84:2
**tuesday**
37:6, 38:9
**turn**
9:4
**turns**
38:1
**twice**
73:2, 73:3
**two**
7:3, 8:11,
8:14, 8:16,
16:2, 22:10,
28:7, 35:2,
45:14, 68:5,
73:10, 77:18,
82:17, 83:10,
96:8, 96:15,
97:15, 105:7
**tydings**
3:6

**types**
81:7
**typescript**
91:5
**typewriting**
123:9
**typo**
21:16

**U**

**unable**
39:1, 84:22
**unamended**
70:9
**unclear**
21:10, 25:6,
76:22, 109:11,
112:19
**undefined**
78:1
**under**
44:14, 54:8,
72:18, 83:17,
89:1, 89:14,
92:16, 105:20,
106:2, 123:9
**understand**
13:21, 18:9,
22:11, 27:7,
32:8, 32:15,
49:9, 53:21,
72:3, 72:12
**understanding**
27:15, 29:20,
30:1, 59:1,
80:17, 82:3,
82:8, 117:9
**understands**
73:4
**undiscord**
42:16, 44:13
**unfortunately**
38:14
**united**
1:1, 67:18
**unless**
7:10, 81:22,
108:15, 121:22

**unnecessarily**
74:12
**unnecessary**
74:20
**unquote**
17:18, 19:2,
58:3, 58:5,
60:19, 98:13,
101:4, 101:14,
101:16
**unrelated**
42:20
**unresolved**
66:3, 66:7,
84:9
**until**
36:4, 38:3,
54:13, 102:22
**upcoming**
31:16, 32:2
**update**
78:19
**updated**
53:19, 87:7
**updating**
44:10
**uploaded**
63:15
**use**
10:17, 28:1,
45:16, 52:10,
59:5, 65:12,
85:19, 86:9,
91:10, 93:2,
120:2
**username**
57:14, 71:10
**using**
9:16, 14:19,
18:3, 20:20,
28:2, 28:3,
29:3, 33:3,
33:4, 33:7,
35:14, 42:15,
44:5, 52:8
**utilized**
42:1, 43:17

**V**

**vague**
76:19, 80:11,

80:14
**valid**
107:5
**vendor**
14:5
**verified**
65:8, 77:4,
92:2, 93:1
**verify**
65:11, 92:1
**version**
40:8, 60:11,
77:6, 86:19,
87:1
**versus**
49:16, 49:17
**vessel**
38:9
**via**
1:17, 109:12,
109:17
**videoconference**
1:17
**view**
113:1
**virtual**
77:8, 80:1
**visit**
67:18
**vps**
72:2, 73:1,
73:4, 75:15,
75:18
**vs**
35:21, 118:1

**W**

**wait**
20:15, 66:11,
68:13, 71:14,
102:22, 104:11
**waiting**
38:3, 61:6,
118:22
**waived**
69:18, 69:19
**waiving**
110:6, 111:12,

J.R.105

114:4
**wall**
81:9
**wallet**
97:7, 97:13, 97:18, 98:8, 98:14, 99:8, 102:20
**wallets**
11:2, 70:13, 76:3, 102:13, 109:7
**want**
6:3, 6:15, 7:4, 7:15, 8:17, 15:7, 16:11, 19:4, 25:13, 28:20, 29:14, 34:4, 35:6, 37:2, 37:14, 39:3, 42:18, 55:22, 63:2, 74:1, 81:5, 81:6, 84:10, 85:9, 94:10, 94:19, 118:7, 122:5, 122:9
**wanted**
35:1, 57:7, 83:1, 119:6, 119:18
**wants**
85:22, 86:2
**washington**
3:17
**waste**
38:20, 38:21
**wasting**
51:13
**way**
17:13, 23:21, 27:9, 28:6, 44:8, 49:9, 51:6, 111:5, 122:1
**ways**
100:18
**we'll**
18:19, 30:7,

64:22, 66:11, 68:13, 86:5, 87:6, 91:1, 92:18, 94:17, 96:21, 100:6, 103:2, 103:10, 104:11, 121:11, 121:20
**we're**
9:16, 14:17, 18:19, 21:6, 21:10, 23:16, 26:7, 26:16, 27:1, 27:7, 31:2, 33:13, 33:14, 33:22, 37:16, 38:17, 38:18, 41:8, 44:10, 49:11, 50:4, 50:10, 51:7, 52:2, 59:4, 65:9, 70:7, 72:5, 72:7, 73:7, 74:12, 74:13, 75:4, 75:7, 81:17, 83:22, 88:13, 88:15, 94:22, 100:10, 106:15, 110:14, 110:20, 112:8, 113:7, 113:10, 118:22, 121:9, 122:14
**we've**
9:5, 19:19, 20:10, 30:17, 34:2, 39:7, 47:8, 48:3, 48:20, 54:22, 55:22, 56:22, 57:5, 83:9, 84:12, 84:14, 92:19, 93:22, 98:6, 100:9, 102:8, 107:9, 109:10, 111:10, 113:3, 116:2,

119:11, 121:4
**website**
59:4
**websites**
96:4
**wednesday**
37:7, 38:11
**week**
8:1, 14:18, 15:1, 36:11, 37:11, 37:22, 38:15, 38:22, 55:14, 62:13, 87:7, 88:15, 95:1, 122:3, 122:14
**week's**
69:12
**weekend**
37:4
**weeks**
7:4, 8:12, 8:14
**went**
57:8, 87:10
**weren't**
20:12
**whatever**
13:2, 26:19, 28:1, 40:1, 55:11, 63:14, 84:16, 88:19, 95:17, 106:13
**whenever**
18:5, 23:5, 68:8, 118:16
**whereof**
123:14
**whether**
11:11, 14:7, 19:17, 21:10, 24:19, 25:8, 37:4, 49:8, 52:5, 60:19, 61:9, 75:2, 76:20, 76:22, 78:14, 96:17, 99:5, 100:12, 101:20, 105:12,

105:15, 106:1, 106:3, 106:4, 107:5, 110:17, 112:21, 115:2, 119:7, 120:13
**white**
31:7
**whoever**
24:1, 64:6
**whole**
39:12, 47:6, 73:18, 80:10, 81:15, 84:8, 97:20, 119:22
**window**
7:9
**winter**
7:11
**wiped**
80:1
**wiping**
77:7
**withheld**
32:17, 105:13, 105:16, 106:1, 106:5, 108:7, 108:10, 109:16
**withholding**
106:16, 107:1, 107:7, 108:14, 110:18, 111:1, 111:4, 111:5, 111:7
**within**
87:17
**without**
34:15, 35:13, 86:19, 88:8, 98:3, 110:6, 111:12, 114:4
**witness**
42:9, 123:14
**word**
76:18, 104:8, 119:16, 120:2
**words**
20:20
**work**
7:18, 10:9,

J.R.106

35:16, 72:5,
107:14, 112:17,
113:21
**worked**
20:11, 87:13,
87:19, 91:12
**working**
4:6, 87:4,
89:5, 121:9
**works**
4:6, 7:5, 7:12,
8:6
**worry**
38:2
**worse**
43:2
**worth**
38:22
**wouldn't**
64:14, 106:19
**write**
91:7, 114:19,
114:20
**writing**
44:19, 116:8
**written**
31:5, 43:1,
51:11, 84:18
**wrong**
116:7
**wrote**
11:18, 23:19,
54:3, 58:1,
86:12, 91:3,
91:4, 99:19

**Y**

**yao**
1:4, 11:13,
11:22, 12:5,
12:10, 12:22,
13:21, 14:6,
22:7, 23:6,
24:13, 24:15,
32:10, 32:16,
32:18, 35:8,
40:7, 41:14,
60:20, 67:18,

103:18
**yao's**
5:2, 5:11,
11:10, 11:18,
24:14, 27:10,
40:5, 43:6,
46:6, 46:8,
77:3, 77:10
**yeah**
4:7, 6:10,
7:20, 8:9, 8:11,
8:22, 15:10,
15:14, 16:3,
16:19, 19:19,
22:1, 45:4,
47:13, 51:10,
59:18, 64:20,
73:3, 80:4,
81:21, 86:1,
90:22, 92:10,
95:9, 95:20,
99:18, 100:10,
100:11, 100:16,
101:12, 102:6,
104:1, 104:7,
106:10, 108:8,
109:18, 110:2,
110:14, 111:4,
111:21, 112:1,
115:18, 116:10,
116:16, 118:20,
120:6, 121:8,
121:12, 121:19,
122:11, 122:12
**year**
14:11, 24:22,
34:18, 43:10
**years**
48:16
**yep**
40:9, 92:12,
97:1, 102:5,
114:17
**yesterday**
43:1
**yourself**
100:2

**Z**

**zoom**
1:17

**$**

**$60,000**
82:3, 82:7

**.**

**.6564**
3:18
**.9700**
3:9

**0**

**0/2/21**
90:8
**0/4/21**
90:10, 91:6
**00**
54:4, 78:12,
89:15, 96:13,
103:6
**00053298**
71:8

**1**

**1's**
72:15
**1,000**
17:17, 17:20,
17:21, 18:1,
18:5, 18:6
**10**
10:2, 40:13,
61:1, 73:10,
73:19, 89:15,
100:17, 101:19,
102:7, 103:6,
112:2, 112:3,
114:21
**100**
21:13
**104**
83:17
**106**
11:10, 15:17
**11**
10:2, 10:22,
40:11, 102:11,
103:8, 104:1,

105:21
**12**
4:15, 10:2,
14:18, 18:5,
32:2, 59:21,
92:17, 103:9,
105:11, 105:21,
112:2, 112:3,
118:6, 118:12,
122:17
**1200**
3:16
**123**
1:21
**13**
8:9, 8:10,
10:2, 41:5,
104:3
**135**
21:13, 22:13,
22:21, 23:18,
27:16, 27:17,
28:5, 28:17,
29:5, 30:12,
48:7, 52:1
**14**
10:2, 13:7,
103:11, 104:2,
104:8, 104:9
**1431**
25:19
**15**
10:2, 10:4,
16:1, 45:2,
45:9, 45:12,
47:2, 47:14,
47:16, 47:18,
47:19, 47:22,
62:16, 69:15,
69:21, 77:3,
77:10, 80:3,
82:4, 122:4
**151**
13:5, 15:21
**16**
10:2, 40:14,
87:3
**17**
3:16, 10:2,

J.R.107

Transcript of Meet and Confer
Conducted on December 5, 2025                66

26:13, 41:1,
61:15, 89:21,
95:9, 97:6,
102:18
**18**
58:1, 66:12
**183**
41:12, 70:1,
85:3, 95:18
**19**
10:2, 11:16,
15:19, 18:16,
18:22, 54:13,
55:11, 55:12
**1st**
88:12

___ **2** ___

**20**
4:15, 6:20,
7:9, 19:1, 22:6,
32:3, 54:16,
61:21, 63:10,
63:19, 67:17,
89:20, 95:19
**20,000**
10:19
**20006**
3:17
**2013**
35:22
**202.261**
3:18
**2020**
95:19
**2021**
34:8, 60:3,
87:5, 89:6,
89:8, 89:21,
91:10, 94:21,
97:5
**2022**
45:18, 59:5,
61:21, 62:8,
63:11, 67:12,
67:17, 67:19,
67:21, 71:6,
76:10, 77:9,

78:18, 79:16,
82:4, 101:17
**2023**
60:3
**2024**
23:7, 25:4,
25:19, 26:12,
44:7, 59:2,
60:7, 62:9,
96:20, 117:11,
117:12
**2025**
1:18, 5:5, 5:6,
5:13, 5:16,
5:17, 10:4,
11:16, 12:13,
13:7, 15:19,
16:1, 16:2,
16:16, 25:21,
26:2, 26:14,
32:3, 40:11,
69:5, 69:9,
69:15, 89:11,
89:20, 89:21,
97:6, 102:18,
103:9, 107:20,
123:16
**2026**
32:3
**21**
102:17
**21202**
3:8
**22**
55:13, 61:21,
67:17, 69:11,
107:20, 122:17
**23**
1:8, 5:17,
10:2, 10:4,
16:1, 16:16,
69:5, 69:9,
104:19, 104:20,
107:20
**24**
5:6, 5:7, 10:2,
10:20, 17:7,
17:8, 17:10,

17:16, 18:2,
24:12, 24:22,
28:16, 89:11,
107:21, 118:9
**244**
25:21, 25:22
**25**
10:3, 89:20
**26**
7:8, 12:13,
15:20, 32:3
**27**
71:3, 71:6,
76:9, 77:9,
78:18, 79:16
**288**
35:21
**29**
5:5, 5:13,
5:16, 22:3,
40:8, 41:7,
43:10, 62:8
**2nd**
4:17, 15:4,
33:11

___ **3** ___

**3**
38:13
**30**
38:13, 40:17,
40:22, 41:3,
41:6, 69:19
**31**
25:18, 88:18,
91:9
**33**
93:16, 93:22,
94:2
**35**
33:1
**38**
30:11, 30:12
**386**
35:21
**3rd**
4:17, 14:1

___ **4** ___

**40**
27:21

**410.752**
3:9
**46**
27:21
**46,148,676**
27:22, 52:3,
52:14
**4th**
42:22, 120:7

___ **5** ___

**500**
18:1
**5th**
95:8

___ **6** ___

**6**
54:4, 78:12,
96:13, 103:6
**6,500**
17:22, 18:3
**6,727,400**
28:4
**6.7**
27:4, 27:20,
29:18, 29:21,
52:7
**60,000**
82:22, 83:1,
83:7
**610587**
1:20

___ **7** ___

**7th**
91:10

___ **8** ___

**84**
12:15, 15:21
**86**
12:15, 15:21
**889**
1:8
**8th**
123:15

___ **9** ___

**9,701**
25:21

J.R.108

# Exhibit 3

J.R.109



**Planet Depos**
We Make It *Happen*™

# Transcript of Meet and Confer

**Date:** December 17, 2025
**Case:** Yao -v- Chen / Chen -v- Chen

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - x

LI FEN YAO, as                :

administrator of the       :

Estate of Sam Mingsan     :

Chen,                    : Case No. 23-cv-889

          Plaintiff, :

          v.            :

ROBERT CHEN, OTTER       :

AUDITS, LLC, AND RC      :

SECURITY, LLC,           :

Defendants.              :

- - - - - - - - - - - x

MEET AND CONFER

Via Zoom Videoconference

Wednesday, December 17, 2025 at 10:00 a.m.

Job No.: 613192

Pages: 1 - 105

Reported By: Lisa M. Barrett, RPR, CRR, CSR

---

Meet and confer held:

\*\*\* ALL PARTIES ATTENDED REMOTELY \*\*\*

Before Lisa M. Barrett, Certified Realtime
Reporter, Registered Professional Reporter,
Certified Shorthand Reporter, Licensed in
the State of Washington.

---

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:

ALEXANDER M. GILES, ESQUIRE

TYDINGS,

One East Pratt Street, Suite 901

Baltimore, Maryland 21202

410.752.9700

ON BEHALF OF THE DEFENDANTS:

KEVIN P. CRENNY, ESQUIRE

RACHEL CLATTENBURG, ESQUIRE

LEVY FIRESTONE MUSE, LLP

900 17th Street NW, Suite 1200

Washington, DC 20006

202.261.6564

ALSO PRESENT:

EMMA FLOYD, Paralegal

---

--- Commencing at 10:10 a.m.

MS. CLATTENBURG:  So today we are mostly -- the preliminary items will be follow-ups from our meet and confer on December 5th, which are some date issues, search term issues, the disclosure of sources being searched on Discord and Telegram, some questions about the document production so far and the one coming in January, and then a missing spreadsheet and a follow-up about Tealtech.

So I'll start with those and then Kevin will get into discovery responses, both following up on the ones we discussed last meet and confer and then the ones we decided to move to this meet and confer which are the most recent interrogatories and document requests in Chen v. Chen.

So, first off, for the dates we asked you for some proposed dates for deposition of David Chen, the limited deposition regarding spoliation.

Do you have suggestions, Alex?

Transcript of Meet and Confer
Conducted on December 17, 2025

MR. GILES: I do.

MS. CLATTENBURG: Great.

MR. GILES: So if I recall the discussion correctly, obviously we have the January 20th deadline for producing Discord, and then there was the discussion about how David goes back to school on the 26th and you thought that -- and understandably so, you guys thought that maybe doing it between those two dates would be too burdensome, onerous, and so you were looking for dates, if I recall correctly, in the first two weeks of February, and based on David's schedule, the best days -- let me see here -- I've got the email up. The best days are either Tuesdays or Thursdays, 3:00 p.m., or later, and so that would be February 3rd, 5th, 10th or 12th.

MS. CLATTENBURG: Right. Thank you very much. Let me -- we'll discuss and figure out and then get back to you.

MR. GILES: Yes.

MS. CLATTENBURG: Thank you. And then start date for discovery in Chen v. Chen, we had the limited deposition on December 10th and following that, we agreed to the court's suggested start date or ordered start date of, at least, September 5th, 2021. So if that works, we're going to -- let's just go with -- we can treat that issue as resolved now, September 5th --

MR. GILES: Great. Yeah.

MS. CLATTENBURG: Then I'd asked about search terms that you guys are running to locate responsive documents in Chen v. Chen and last time you said you were running the code-related search terms that we agreed to on August 1st, and then last week you got an email -- we got an email from you dated December 15th. I think you said last week you ran the Yao v. Chen search terms which were the ones disclosed to us by Mr. Plotnick in November 2024.

Is that all correct, so the Yao v. Chen and the code-related search terms?

MR. GILES: Yeah, so now sitting here today, and we confirmed this yesterday with Transperfect, they have run all of the documents using all of the search terms.

MS. CLATTENBURG: And then, just in terms of -- I mean, it sounds like you haven't developed separate search terms for Chen v. Chen because there are requests that don't fall within the Yao v. Chen document requests and are not code-related, so how are you addressing those?

MR. GILES: Well, so I'm addressing the search terms in the manner that has been decided by the parties up to this point, and the way that it's been decided up to this point was the September -- or not September, the November 27th, 2024 letter from Stephen Plotnick to you guys for the Yao v. Chen search terms and then there was the discussion and you've -- you attached all these exhibits as part of your -- our back and forth emails.

It started with, I think it was an Alex Malyshev email in late June, and I want to say it was the 23rd, I believe, that went back and forth and there was discussions about proposing terms and responses to terms and then a meet and confer at the end of July, and basically the way all that got resolved, as I understand it, following the correspondence was that Justin DiCharia and I eventually finally agreed on the search terms, the agreed-upon search terms on August 1st around 6:00 o'clock or so, we basically married up our two proposals to make them exactly the same.

Now, obviously that was referred to as a code-related Chen v. Chen search terms. That's the only Chen v. Chen search terms that I'm aware of, and so we're -- as I alluded to, or I mentioned previously, we used all of the November 27th, 2024 search terms and all of the August 1st, 2025 search terms and that is what all 48 million documents have been run against as of today.

MS. CLATTENBURG: Yeah, so I don't want to go through the whole history again that I read at the last meet and confer but those are, as you say, the code-related search terms and you need to go through the requests we've made in Chen v. Chen and figure out how to locate the responsive

J.R.112

documents. That's on you.

It's not -- I mean, if you want us to help you draft search terms, we're happy to do that but it's -- you have to figure out: How do I locate the responsive documents from my client that, you know, they are asking for. So, that doesn't -- the code-related search terms address just some of those.

You have to figure out: How do I get all the documents showing income obtained directly or indirectly from running the code. How do I get all the documents about Sino Global Capital?

How do I get all the documents that were used or referred to in responding to interrogatories?

How do I get all the documents received from third party? Then you have to gather -- get those and figure out how you are going to locate the responsive ones.

There isn't a global set of search terms, nor was that ever discussed.

If that's something you want to

exchange, I think we can talk about that. But there are requests in Chen v. Chen that are not going to be covered by the search terms in Yao v. Chen or the code-related search terms.

MR. GILES: So I would say in response -- is that all, Rachel? I don't want to ...

MS. CLATTENBURG: Yeah.

MR. GILES: Okay, so I would say does that -- I mean, have you guys proposed search terms in Chen v. Chen?

MS. CLATTENBURG: No, because that's your duty to come -- your obligation is to produce responsive documents. You guys never proposed, oh, hey, we don't know how to find our responsive documents, help us. So we didn't do that because we assume you have -- that's your obligation.

You have to figure out how to locate those. You know the documents. You have the client. You can ask: How do I find these sorts of responsive documents? Where are they? What sources do I search? What search terms should I

use? That's on you.

MR. GILES: Yeah. So I would say I'm looking at the letter of November 27th, 2024 from Stephen Plotnick to you and these, obviously, were identified as Yao v. Chen search terms. However, you just referenced, you know, how, you know, how would you search for Sino Global.

Well, one of the search terms in there is "Sino", so that would pull up Sino Global, but I think all of these search terms and again, these two cases are consolidated. And I think you guys have all recognized, at least as I understand it, from the time that I've been in this case since June, that we all recognize that almost all of the documents -- I mean, literally almost all of the documents are from David and -- but these search terms from November 27th, 2024 go to those documents. They search those documents.

So, they apply equally between Yao v. Chen and Chen v. Chen, so I don't think that there is anything different that we would propose other than what's already been proposed.

Obviously there was a collaborative process in terms of coming up with the code-related search terms and both sides proposed strings, you know, about 20 long, in terms of search terms and we worked together, you know, you and I and then Justin and I, and before me, Alexander Malyshev, and maybe Kevin was involved as well, in terms of refining that and getting that to the point where they were exactly the same, which they were, as of August 1st.

So between that list of search terms and the 27 search terms, November 27th, 2024 search terms, proposed by Stephen Plotnick, I think it covers everything that we could ever, ever imagine in terms of this case as being relevant to this case.

MS. CLATTENBURG: Well, a couple of things. Sino Global Capital, Sino doesn't cover all of it because David, in communications that we have from him refers to it as SGC, which is not one of your search terms that you've listed or that Mr. Plotnick listed.

J.R.113

Case 8:23-cv-00889-TDC   Document 204   Filed 04/13/26   Page 116 of 1016
Transcript of Meet and Confer
Conducted on December 17, 2025

4 (13 to 16)

So that's one issue.

But also, have you actually gone through the requests in Chen v. Chen to make sure you are locating all the responsive documents, because it sounds like this is something you are coming up with right now on the call but you haven't actually verified that the search terms you are running are sufficient to locate the responsive documents we've requested.

MR. GILES: I think the search terms that -- between the combination of the two, now that it was made available or made under understanding to us, December 5th, by you, that both of them are supposed to be run, we've run both of them.

I think they cover everything that you can ever imagine. If there are ones that you think have not been included as part of the November 27th, 2024 list, or the August 1st, 2025 list, I'm certainly willing to entertain what it is that you believe that should be searched beyond what's already been searched.

MS. CLATTENBURG: So how are you locating all documents showing income obtained directly or indirectly from running the codes, which is RFP3 in Chen v. Chen?

MR. GILES: We're running these search terms.

MS. CLATTENBURG: But which -- what is locating those?

MR. GILES: The search terms.

MS. CLATTENBURG: Which ones?

MR. GILES: I'm just telling you, look at them.

MS. CLATTENBURG: Yeah, show me which ones. I'm asking you specifically.

MR. GILES: There is "account", there's "asset", and the list goes on. I mean, I can read through all of them, but -- there's FTX. There's --

MS. CLATTENBURG: But have you figured out which are the accounts that actually show this and then searched for those documents? It doesn't sound like it.

I don't -- I mean it seems like you're backtracking -- you're kind of like -- you now see that you have to run searches for Chen v. Chen, as well, and you are trying to make these Yao v. Chen ones fit, but I don't think that -- I mean, SGC is another one.

There is a special request in -- a specific request in Chen v. Chen for documents with Sino Global Capital which he refers to as SGC in his own communications, so are you searching for SGC or just Sino?

MR. GILES: So Rachel, I would believe -- I believe, everyone on our side believes, Transperfect believes that all the search terms that are being used are going to identify every relevant document in this case.

If you believe or your side believes that there are other search terms that should be used, propose them. That's --

MS. CLATTENBURG: Well, the burden is actually on you and when you signed these requests --

MR. GILES: That's -- Rachel, Rachel.

MS. CLATTENBURG: Let me finish --

When you sign these requests, Alex, you are certifying that you have made a reasonable inquiry, that you have found all these responsive documents which requires you to see: Am I actually locating responsive documents with these search terms? I've just pointed out SGC. I've also pointed out all documents showing income obtained directly or indirectly from running the codes.

Documents have -- do you have we have requested "documents sufficient to show ..."

That means you can't just use a search term. You have to make sure -- you have to find the information and make sure you have documents sufficient to show what is requested or documents showing. That's another type of request we have.

So I mean, I can -- we will raise these issues. That's fine. We can raise these issues in a spreadsheet-type, meet and confer -- or motion to compel the process.

I am telling you now it sounds like you

J.R.114

have not reviewed the Chen v. Chen request to make sure that they locate all responsive -- that you have a way to locate all responsive documents.

So I'm raising that as an issue to discuss. I'm doing it with enough warning before your deadline for production but I'm raising that now so you can make sure you actually are doing that.

MR. GILES: And I will reiterate what I said before.

If there are search terms that you believe are not encompassed in the full set of November 27th, 2024 and August 1st, 2025, propose them and we will consider it.

MS. CLATTENBURG: That's fine but in the end, it is your burden, it is your side's burden to produce responsive documents, okay? So we can suggest them but you have to use the information from your client to know what search terms will locate responsive documents.

We don't know the facts. We don't know what accounts he has, we don't know how he made this money, where he made this money, where he put this money. We don't know about the development of the code so it is on you to use the facts from your client to develop the right type of search terms to locate responsive documents.

MR. GILES: Do you really believe anyone to believe what you just said in terms of you don't know where these things are being held? I mean, you guys have subpoenaed probably everyone under the sun so I think you fully know where every financial institution is and every other source and every other potential witness.

I mean, you guys have been very prolific with that. So I think it's sort of rich that you say that you don't know anything about this case. You absolutely -- all five, six of you, absolutely know everything about this case.

Again, all the search terms that have been used we think cover everything.

If there are additional ones that you think should be used, need to be used, please propose them.

MS. CLATTENBURG: Okay. I think we just disagree on this and what your requirements are for discovery, but we'll move on.

The next one is the disclosure of the Discord and Telegram servers, channels and DMs that you are searching.

You had originally pointed to Exhibit A, which we explained last time does not look like it is actually the complete list. This is an issue we've been trying to get this disclosure since the summer and you agreed to make this disclosure of the Telegram servers and Discord servers and channels and DMs that you are searching back on August 1st, and it still seems like we don't have that.

So can you give us an update on that and also on Exhibit A?

MR. GILES: So the answer to that question from our perspective is Exhibit A is the correct exhibit.

I have spoken with Stephen Plotnick and Madelyn White and - and they determined that Exhibit A is the one that contains the responsive messages and that is the one -- those are the channels and the servers that have been used to search for the relevant responsive documents.

MS. CLATTENBURG: So you're not searching Telegram because that doesn't contain any Telegram?

MR. GILES: No, we are searching Telegram. Telegram is going to be a production. It's going to be a production as of this Friday.

MS. CLATTENBURG: So where is the list of those -- that's supposed to be included in the list of servers and channels and DMs. Exhibit A doesn't have Telegram.

MR. GILES: My understanding is that was previously produced by Stephen, Madelyn and Alex --

-- (overspeaking) --

MS. CLATTENBURG: That's not -- never been produced.

MR. GILES: Okay. So I will find that list of Telegram servers and channels.

J.R.115

Transcript of Meet and Confer
Conducted on December 17, 2025

21

MS. CLATTENBURG: Okay. So you are -- we have you saying Exhibit A is correct. That's a complete list of Discord servers, channels and DMs you are searching?

MR. GILES: Correct. Correct.

MS. CLATTENBURG: Telegram you will get back to us on when?

MR. GILES: As soon as I can find it.

MS. CLATTENBURG: All right.

Moving on to some issues with the document production or questions we have, last time there was a question I had for you which is: Are you reviewing documents for responsiveness or are you just producing everything that hits on a search term?

MR. GILES: We are producing everything that hits on a search term.

MS. CLATTENBURG: So can you tell us -- you have not -- more than 99,000 documents which appear to be publicly available, coding manuals that were downloaded from online sites, basically one page at a time, of these manuals so -- more

22

than 99,000 of the documents you just produced were that. Which request is that responsive to and if you don't know off the top of your head please email us later.

MR. GILES: I will email you later.

MS. CLATTENBURG: Can you email us this week, please?

MR. GILES: Sure.

MS. CLATTENBURG: All right. And then there was a question about -- I'd asked you whether you would be de-duplicating and you said you would get back to us on that.

MR. GILES: I think what I said initially, was no, we will not be de-duplicating because it was a full recollection, and I did have discussions with both Stephen, Madelyn, our current team here at Tydings as well as with Transperfect and we are not going to be de-duplicating.

What's been produced is a recollection of September 5, 2021 through April 17th, 2025, run against the two sets of search terms.

23

MS. CLATTENBURG: So is that for all documents you are not de-duplicating?

MR. GILES: All documents.

MS. CLATTENBURG: So if that's the case why did we not get duplicates of the emails?

MR. GILES: Why didn't you get duplicates of the emails?

MS. CLATTENBURG: I mean, we should have then gotten a full -- a full duplicate set of Yao v. Chen documents.

MR. GILES: Which documents are you suggesting that you got previously that you didn't get...

MS. CLATTENBURG: Most of them.

MR. GILES: Umm.

MS. CLATTENBURG: I would say we have not -- I am just trying to understand what you say you are not de-duplicating and what you're de-duplicating because we can't actually treat your production now as a full reproduction because we are not getting the same documents we got previously either, so it's not just a duplicate

24

set.

MR. GILES: Okay, it's a --

MS. CLATTENBURG: So I mean but --

-- (overspeaking) --

MR. GILES: Hold on. Time-out.

MS. CLATTENBURG: What are you not -- what are we getting duplicates of, if you said you are not de-duplicating?

MR. GILES: I'm just saying we are not going --

-- (overspeaking) --

MS. CLATTENBURG: Let's say for emails. We have mostly one set of emails. Are you de-duplicating emails?

MR. GILES: Rachel, I'll make this easy for you. We are not de-duplicating anything from the recollection. The recollection should be a full recollection of everything from September 5th, 2021, through April 17th, 2025, and we are not going through and saying: Was this previously produced? If it was, let's pull it out. We are not doing that. If you want --

J.R.116

-- (overspeaking) --

MS. CLATTENBURG: I get that but --

MR. GILES: Yeah, right.

MS. CLATTENBURG: Alex, wait, let me just -- wait for a second, I don't understand why -- I don't think that is accurate.

That would mean that what you just produced to us should be every non-Discord document that we previously got in Yao v. Chen, plus everything else that you have collected in searches that, however you are choosing responsive documents, met that criteria.

So it should be everything we previously got that's non-Discord, plus -- and then whatever additional stuff, but that isn't what we got.

MR. GILES: I can tell you --

MS. CLATTENBURG: So it doesn't make -- it is either you are not running the search terms on the entire set of documents or you are de-duplicating some stuff and you don't realize it, but we do need an explanation because it is not a complete set.

We can't just look at this or treat this as the master set as you seem to think we can.

MR. GILES: Can I speak now?

MS. CLATTENBURG: Yeah.

MR. GILES: Okay. We are not de-duplicating anything. We are not going through the process, as I just mentioned previously, we are not going through the process of de-duplicating anything.

So what has been produced should be everything. If you believe that there is something that was previously produced that is not produced this time, let us know what it is and I'll look into it.

I can tell you that David's documents and this is -- was represented to me yesterday by the head at Transperfect who is working on our account, David's documents were split into ten different categories and so they are -- and I can run through those for you and tell you where they are with regard to production.

So there are cell data, text messages and things of that sort, that was produced as part of that production, this last Friday.

There is Discord which is being produced by or before January 20th, 2026 pursuant to the order.

There is email and server production which was produced as part of last Friday's production.

There is something called, what they call loose data, which can't be put in any other basket. That was part of this past Friday's production.

There's Facebook data but according to Transperfect there is zero documents that match any search terms for the date range.

So there's no Facebook production, effectively.

The GitHub documents were previously produced as part of our -- I think this is bad coding on our side, Yao 15, but that was what was sent on September 17th, 2025.

There is an Instagram data bucket. That was produced as part of Friday's production.

There is Signal data which was produced as part of Friday's production.

There is Reddit data, but again, like Facebook, there are no hits on a search term during the relevant period from September 5th, 2021 through April 17th, 2025. So there is zero documents, effectively.

Telegram, because we -- late -- said you need also to run these search terms, they -- it's taken a little while for them to rerun the search terms. I think they've rerun the search terms, but now they are putting them in the 24-hour threads.

And so they anticipate producing those this Friday in the 24-hour threads that's required, and then Twitter data, X/Twitter, that was produced last Friday as part of that production.

So those are David's documents.

J.R.117

Transcript of Meet and Confer
Conducted on December 17, 2025

29

MS. CLATTENBURG: Okay, I appreciate that. You are welcome to send us that in an email because it seemed like a long list but -- or I can read through the transcript but I am not -- it is still not responding to my question and maybe you just need to talk to Transperfect, but you are representing that you are not de-duplicating anything and that you are re-searching all of the documents that were collected, including Li Fen Yao's as far as I can tell, and running the search terms from Yao v. Chen and then running certain code-related search terms, which, to me, would mean if you are not de-duplicating anything, you would be re-producing everything that was already produced in this -- to us, in over the past year in Yao v. Chen.

MR. GILES: That is what I'm saying. That should be the case, yes. That should be the case.

MS. CLATTENBURG: That should be the case.

MR. GILES: And if you are

30

suggesting -- hold on a second. If you are suggesting there are things that were previously produced that aren't part of this production, obviously I want to know about that because I want to be able to go back to Transperfect and see what happened.

MS. CLATTENBURG: Okay, I'll -- that will be a follow-up item. Thank you for clarifying that.

All right. Also, I think you might have just mentioned this but I didn't quite hear. I might have missed it.

The message format for Telegram and other text messages is not usable and also not what we agreed to. They are not part of threads. These have been produced to us as individual messages, not part of the conversations they're in.

So there is no context. We can't tell who's the conversation with, who's speaking, who's -- it is not a usable format.

We agreed on the last meet and confer,

31

these would be produced as threads in 24-hour format. So are these getting reproduced or what's happening with the Telegram messages that we've gotten and all the other messages?

There are about a thousand-something that we've gotten from you that are individual messages per document. No context, no conversation, not useful. We can't tell if messages have been, you know, removed from the conversations. It's just not a usable format and it's also not how they are maintained.

MR. GILES: Is that it?

MS. CLATTENBURG: Yes.

MR. GILES: So, Telegram has not been produced as of yet. It will be produced this Friday.

MS. CLATTENBURG: What are the documents we have that say "Source: Telegram" and have an individual message on them?

MR. GILES: That -- that you've got me on that one.

MS. CLATTENBURG: Okay. Maybe do you

32

mind when you --

-- (overspeaking) --

MR. GILES: Hold on, hold on, Rachel, can I speak?

MS. CLATTENBURG: Just follow up. Follow up --

-- (overspeaking) --

MR. GILES: Rachel, can I speak? Can I speak? You keep cutting me off.

MS. CLATTENBURG: Because I'm trying to get to the point.

MR. GILES: I'm getting to the point. I'm at the point. Just let me make the point. So the point is as of yesterday, the information that was provided to us by Telegram, by the head person there, is that Telegram in the 24-hour threads that we agreed upon are going to be produced on Friday. They're going to send them to us; we are going to send them to you.

And so anything previous that was Telegram must have been just something that was produced out of turn but it's going to be produced

J.R.118

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 121 of 1016
Transcript of Meet and Confer
9 (33 to 36)
Conducted on December 17, 2025

in 24-hour threads so that you see the full context of the conversation in that 24 hours, as long as there is a hit in that 24 hours, the 24-hour thread will be provided, and that's exactly, a usable form in the form that was agreed upon.

The same thing is going to happen with Discord, but that's not being produced until by or before January 20th, so this is a non-issue at the moment.

I mean, obviously Telegram is because it should have been produced this last Friday, but because of re-running with the new search terms, not new search terms, the old search terms, that I wasn't aware they were supposed to be part of this situation has delayed it a little about it in terms of converting everything into 24-hour threads as we agreed upon, but that will be provided this Friday, the 19th.

MS. CLATTENBURG: Okay, so we didn't -- we had no information that you thought Telegram had not been produced, and what in what you produced to us are these single-message documents, thousand -- more than a thousand of them so -- and they say "Telegram" so that is why we are raising this as an issue but we look forward to getting those as part of a thread.

Again, this just creates work for us having to try to isolate these documents that are not part of a thread, so similar to this de-duplicating issue, you are just shifting the burden on to Robert if you don't de-duplicate, so I don't think that's appropriate.

MR. GILES: I can't speak to what you guys are seeing in terms of singular documents that say "Source: Telegram," but what I can tell you is what I said earlier when I read through the ten different categories of documents, that Telegram is one of them, it's the ninth one that I read, that says that they're being produced in 24-hour threads this upcoming Friday.

So if there is a search term that has a document hit, it will be part of a 24-hour thread for that day which will show you context before and after and that -- so, I leave it up to you as to whether you need to isolate what was previously identified and produced or just deal with what's going to be produced on Friday and say, "Okay, well, that's all of the Telegrams that -- Telegram messages that the other side is saying is relevant and has a search term hit for a 24-hour period."

MS. CLATTENBURG: Okay, I mean, we thought you had reviewed the documents before you send them to us but apparently you didn't.

There are more than a thousand of these and we're -- you don't know what -- you know, 99,000 of these that you produced we are not sure what those are even responsive to.

So this production process doesn't make a lot of sense to me but we will move on, we will look forward to that Telegram production on Friday and also learning what these online coding manuals are responsive to.

And was there anything else you were going to get back to us on here? Yes, the de-duplicating issue. We will be following up with you on that and pointing you to some specifics.

MR. GILES: So that answer from us is not going to change. I've affirmed to you that we are not de-duplicating.

MS. CLATTENBURG: Right, but if that is -- we need to actually confirm that that's the case because we need to make sure that that's actually what is happening. We don't need to go through this again. I said I will point out to you where we see documents that should have been reproduced that were not here, if you are claiming that nothing is being de-duplicated.

MR. GILES: Okay.

MS. CLATTENBURG: Okay. Moving on to the spreadsheet of David's Wallet addresses, this was responsive to subpoena request 16 and also Rog 11 in Chen v. Chen.

You said this would be produced, this was supposed to be produced to us on or before December 12th. We haven't gotten it.

MR. GILES: So I asked David about that

J.R.119

Transcript of Meet and Confer
Conducted on December 17, 2025

and he sent it to me late last night. We now need to get it Bates stamped and I'll get it produced to you.

MS. CLATTENBURG: Okay.

Tealtech, we emailed them on November 4th with your agreement to what to say. When we hadn't heard a month later, I emailed her a copy and you to follow up that she had gotten the message and she said the delay is that she's waiting for you to respond.

MR. GILES: Okay. I will take a look at that, as soon as we get off this call.

MS. CLATTENBURG: Okay, thank you.

I think that is the end of these sorts of issues and we can move on to the discovery responses now.

Kevin, if you want to go ahead.

MR. CRENNY: Yeah, so this is -- well, first, I'll just check in on the stuff from two weeks ago, which is Li Fen Yao's third amended responses to the second set of interrogatories in Yao v. Chen, and the -- David's responses to the first set of interrogatories in Chen v. Chen. So we talked about those two weeks ago.

MR. GILES: Mm-hmm.

MR. CRENNY: I don't want to read through all those issues again but there were a few where you were going to get back to us on the rogs. It was on Rog 1, Rog 2 and Rog 17.

MR. GILES: Which interrogatories?

MR. CRENNY: Sorry, that's the Li Fen Yao, the Li Fen Yao set. So on Rog 1 you were going to get back to us about on Undiscord, whether Undiscord is a, you know, system for deleting, something like that.

You were going to get back to us about whether the Signal disappearing messages, that we thought those ought to be reflected in this response.

We also thought there was material from Rog 15 that was missing from the response to Rog 1 and there was also the issue of the Exhibit A which we described to you, all the questions and concerns we had about that.

I understand you've said that's the thing that's correct for the other purpose that Rachel was just talking to you about but Rog 1 is asking a different question. You've also represented that Exhibit A is part of the answer to that question, and as I explained on the call two weeks ago, we had a questions about that there were, you know, some overlap, but it's a different question so we need to ask separately: Are you sure it's correct for this? We didn't think it was.

Those were the issues on Rog 1.

Rog 2 ties in, so I'm just going to keep going on Rog 2 and then I'll pause for you to respond.

For Rog 2 we asked about your plan to supplement this whole answer following the re-collection because it's all about when things were collected and what was collected, so I think you agreed to that but you said you were going to get back to us.

And then also Exhibit A is referenced here. This was the first place was it was ever referenced so concerns about whether that was accurate with respect to there and whether it provides all the information we're asking for, you know. As we said, it only references one server for every channel and it doesn't have channel names, so those were with the concerns with Exhibit A and the rogs as distinct from Exhibit A functioning as the list of things searched in Chen v. Chen.

So, any update on rogs 1 or 2?

MR. GILES: So in response to your questions about Exhibit A, Exhibit A is Exhibit A. As I mentioned to Rachel, that's the one. So I think that applies also here to interrogatory -- answer to interrogatory 1 and interrogatory number 2.

With regard to -- I'm trying to remember exactly what you said and what the other things were.

Oh, in terms of supplementing, yes. I did indicate as I recall, that I said yes, we

Transcript of Meet and Confer
Conducted on December 17, 2025

would be supplementing. That is obviously our responsibility under the Federal rules but that we would -- rather than doing periodic intermittent updates several times between now and January 20th, we were going to wait till everything is produced on January 20th so that we have a full production or, at least in our mind, a full production and at that point we are going to update everything in terms of supplemental answers for your benefit.

MR. CRENNY: Okay, and then on the other issues no update at the moment?

MR. GILES: Remind me of the other issues, I apologize.

MR. CRENNY: Undiscord, Signal messages and material from Rog 15 that's missing from Rog 1 response. It's all --

MR. GILES: Rog 15. So with regard to the first two things, I believe I put that in the email to David. It's possible that I did not get a response. I will follow up with him.

As to the Undiscord and Signal,

I believe you said, the disappearing Signal.

MR. CRENNY: Yeah.

MR. GILES: Undiscord. Disappearing Signal. And then 15 -- and I'm sorry, specifically, what is it in interrogatory 15 that's missing?

MR. CRENNY: I'm not sure. I don't have it in front of me. This is just my list of things to follow up. These were things that you said you'd take a look at and get back to us. So you can check the transcript of the last meet and confer.

I think it was something about -- I think there is something referenced in Rog 15 that seems like it should be Rog 1, but I know I laid it out in the previous meet and confer.

MR. GILES: Give me a second here just to read through it again.

It has to do with the disks, is that the --

MR. CRENNY: Yes, that sounds right, but check the transcript to confirm.

MR. GILES: Okay. All right. And I have a vague recollection that I responded to that but maybe not to your satisfaction, in December 5th meet and confer, in terms of the fact that the disks that are being preserved, are being preserved by Transperfect, if that was the issue. I think you wanted an update to the chart is what you wanted.

MR. CRENNY: The chart is Rog 2.

MR. GILES: Yeah.

MR. CRENNY: And I'm talking about Rog 1.

MR. GILES: And you want a reference in Rog 1, as well.

MR. CRENNY: Yes, I believe that should go in Rog 1 --

MR. GILES: Okay.

MR. CRENNY: -- some description of those.

MR. GILES: And so -- again, as I mentioned, we certainly are going to supplement.

There are various things that we are going to supplement, that we talked about in the December 5th meet and confer, but I'm not going through the process now of supplementing them because we're waiting for the full production.

I want to do this all at once and not so that we have a third amended, fourth amended, fifth amended, sixth amended answers to interrogatories.

I'd rather just do it all in one post January 20th, 2026 when we produce all the Discord messages which should be our last production pursuant to all your requests.

MR. CRENNY: That's my next thing which is when are we getting the amended versions of all these? But I'm not reiterating all the points that we discussed on December 5th.

MR. GILES: Oh, no.

MR. CRENNY: I'm raising the ones that you said you would get back to us on. So then there's a list of: Oh, these are the ones you said you would amend; when we're getting those amendments? But I'm not at that yet, so --

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 124 of 1016
Transcript of Meet and Confer
12 (45 to 48)
Conducted on December 17, 2025

45

MR. GILES: Yeah.

MR. CRENNY: -- I take it you are previewing your response for when I get there.

MR. GILES: Yeah, no, but I mean, your point as to the disappearing Signal and Undiscord, because I do remember you raising that, and I do remember saying that I was going to go back to our people i.e. David --

MR. CRENNY: Mm-hmm.

MR. GILES: -- and to try to get an answer on that and I'm pretty sure that I sent it to him, but I don't recall seeing an answer. So I do need to follow up on that.

With regard to the disks, I mean that's going to be, you know, it's, you know, if they fit into number 1, which they probably do, just to raise them and, you know, I'm fine with doing that, that's something that will get done post January 20th.

MR. CRENNY: Okay, so that's moving from the "you were going to get back to us" to the "you've agreed to amend" category?

46

MR. GILES: I've generally agreed to amend, yes.

MR. CRENNY: Probably agreed to amend? Yeah.

MR. GILES: Right. Okay.

MR. CRENNY: Okay. And then Exhibit A, it sounds like we just disagree and we will put that in our spreadsheet to present it to the court.

The other one where you were going to get back to us was Rog 17.

MR. GILES: Okay. Still in the Li Fen Yao one?

MR. CRENNY: Yes. It lists only new clickbait as irrelevant and potentially deleted or destroyed which, seems inconsistent with our understanding from the deposition and also with David's response to Rog -- Chen v. Chen rogs where he's listed a number of other places where he talked about the code and from which we know he deleted messages. So you were going to get back to us about whether anything else should be added

47

to the response to Rog 17.

MR. GILES: Well, and again, that is a sort of an amendment/supplement type thing. So yes, I will get back to you guys on that.

Probably the same thing with 15. Information from 15 going into 1. That will be part of the amended responses, interrogatories -- answers and interrogatories that we provide once we finish with the document production of the Discord documents.

MR. CRENNY: So there is no update on that one?

MR. GILES: No.

MR. CRENNY: Then the next question is: When we will be getting amended responses to ones you had agreed to amend, which were rogs 8, 12 and 18. We don't have to look at them -- I'm not talking about the substance at all, I'm just talking about when we will get the --

-- (overspeaking) --

MR. GILES: Sure.

MR. CRENNY: So Rog 8, 12 and 18.

48

And then in David's first set of rogs from Chen v. Chen you had agreed to amend 1, 2, 5, 8, 9, 10 and 11. So same question: When will we be getting those?

MR. GILES: Same answer.

MR. CRENNY: Same answer being: Not until after the completion of the production?

MR. GILES: Right. Yes.

MR. CRENNY: All right.

Then -- sorry, there's the other one follow-up from last time, is the first set of RFPs in Chen v. Chen.

MR. GILES: Okay.

MR. CRENNY: There were a number of things -- again, you said you were going to get back to us but if you don't have any thing you went and found out and looked at and came back --

MR. GILES: Then I won't --

-- (overspeaking) --

MR. CRENNY: If you don't have anything ready to go, I don't think there's anything -- I don't want to have the same conversation from

J.R.122

December 5th again.

MR. GILES: No, that's fine. I understand. Do you know off-hand what the numbers were?

MR. CRENNY: You agreed to amend -- to clarify whether you were withholding with respect to time period objection on RFPs 2 to 9 and 12 and then with respect to -- we characterized them as boilerplate objections in RFPs 1-5, 7-9 and 11-12.

You said you were going to get back to look at your privilege argument for RFP 5, where we thought it didn't make any logical sense there and then you were also going to check for the one about third parties, documents received from third parties, you were going to check whether you had subpoenaed anyone, I think, and we listed a few people that you had subpoenaed and you had to double-check that with Steve or somebody.

MR. GILES: I did. And I can speak to that one if you want me to.

MR. CRENNY: Sure. Go for it.

MR. GILES: I did speak with Stephen.

He did acknowledge that there were subpoenas that they sent, Jump being one, Discord being one. Sort of the take-outs obviously should be included.

There was an entity Agasi Tax, I believe is one of them that they --

MR. CRENNY: Mm-hmm.

MR. GILES: -- and the indication from Stephen is that one's still pending. It's apparently in Arizona, that that hasn't moved beyond when they were working on it and when you guys were working on it, so that's something obviously that needs to be handled by both sides.

And -- but there was a couple of other ones, so I asked our associate through Relativity, which is the Transperfect platform, to identify all of the things so that we can amend our answer to identify Jump and Discord and Agasi Tax and I think were, like, two other that at least Stephen knew off the top of his head, where they subpoenaed. But there is only a handful of subpoenas.

But yes, that needs to be amended and with regard to the objections as to the date range, the relevant period, we think that's still a viable objection. We are keeping that. You know, obviously it's now been changed in terms of what needs to be produced by court order from the judge, you know, September 5th, which you've now agreed with is fine, September 5th, 2021 through April 17th, 2025 so we think that's a viable one.

I do need to follow up on the other, which you identified as boilerplate objections.

I think -- conceptually I think they're fine but I did agree, as you noted, that I would look at them and that's obviously what will be part of, if we're doing amendments or supplements and we're removing those objections, we will do that as part of the amendment and supplement process that will take place after January 20th, 2026.

MR. CRENNY: I'll go through a couple of those.

On the time period, I think the thing to do is say you can leave the objection to the time period there but then say David is producing for September 5th through April 17th and clarify what's going on so it is not ambiguous.

MR. GILES: That's fine. That's fine. I agree with that.

MR. CRENNY: Yeah, thank you.

And then with the boilerplate ones, I think the same thing. If you can clarify that nothing is being withheld based on them then we don't care if they stay in the response.

MR. GILES: Yes.

MR. CRENNY: But if you can add -- language making it clear that while we're preserving this objection we are -- nothing's being held back based on it, that's fine with us.

On the third -- not preserving objection, sorry, I misspoke --

-- (overspeaking) --

MR. GILES: There are privilege documents that are being withheld which will be -- which are part of the privilege logs, so ...

Transcript of Meet and Confer

Conducted on December 17, 2025

53

MR. CRENNY: Yeah, but usually the last -- I'm just remembering -- generally you write that you are producing non-privilege documents so it's clear on the privilege ones for like the --

-- (overspeaking) --

MR. GILES: I think that's what it says. I think the response says that.

MR. CRENNY: Yeah, yeah, the boilerplate ones that I am -- have raised as reflected on the transcript from last time are not privilege. They're things like vague, overbroad, whatever, like that. And it's not clear, like, is David construing it --

MR. GILES: -- (overspeaking) -- if we're not producing things for those reasons.

MR. CRENNY: Yeah, if David is saying this is vague, you know, is he construing it in a particular way to resolve that vagueness and producing based on that? Like, that's the kind of thing you have to explain.

If you just say it's vague --

54

MR. GILES: Yeah --

-- (overspeaking) --

MR. CRENNY: -- (overspeaking) -- I don't know what you're doing.

MR. GILES: I can tell you, for the record, that we are not withholding documents because of vague, because of those objections.

MR. CRENNY: Okay.

MR. GILES: Vague, ambiguous, overbroad and unduly burdensome. We are withholding documents that are privileged, you know, attorney-client privilege, work product privilege, and we are including those in the privilege logs.

MR. CRENNY: Yeah, I don't think I raised any problems with the privilege.

MR. GILES: No, no, I'm just saying, trying to -- trying to be full and complete my answer.

MR. CRENNY: On the third parties, did you receive documents from those third parties that were subpoenaed?

MR. GILES: Stephen believes that we

55

did.

MR. CRENNY: Okay.

MR. GILES: With regard to Agasi Tax, I don't believe that any documents were produced. Apparently it was briefing in Arizona and that has just been sitting there. That was his recollection that there hasn't been a resolution.

MR. CRENNY: Got it. And when will we be getting those documents from the third parties? This category of documents we're talking about.

MR. GILES: Well, okay. My understanding is they've already been produced previously, prior to Michael and I coming into the case but I will confirm that.

I understand, obviously the need to update the answer to identify the ones that we received documents from but I believe the documents themselves were produced as part of the Yao v. Chen production and I can tell you that in the time that I've been in the case we haven't done any subpoenas. So since June of 2025 there have been no subpoenas served by our side, at

56

least yet.

So, I think my understanding, again, it's an understanding but my understanding is that Stephen, Madelyn and Alex Malyshev and the CLM folks produced, with the assistance of Transperfect, those documents Bates stamped, but I will -- I will try to figure out what the Bates stamp numbers are of those documents.

MR. CRENNY: Okay, we never got documents from Jump. I know that one, at least so can you verify, you know, which third parties made productions and --

MR. GILES: Sure.

MR. CRENNY: -- verify that they've been produced for each of them because I know at least that one -- if you got any documents from them -- I don't think they ever came to us.

MR. GILES: Okay.

MR. CRENNY: Okay, the other follow-up from last time -- and then so -- for this -- things you are going to amend on this also, I imagine, for this first set of RFPs in Chen v.

J.R.124

Chen, also after your document production completes in January?

MR. GILES: Correct.

MR. CRENNY: Can we set a date for all of these, you know, when the RFPs and rogs will be final?

MR. GILES: Obviously we are a little ways out but ...

So let's say January 30th which is a Friday.

MR. CRENNY: If David's deposition is on the 3rd that feels a little late.

Can we say the 28th or 29th?

MR. GILES: Okay, well, I think you guys were going to get back to me on whether the 3rd, 5th, 10th or 12th --

-- (overspeaking) --

MR. CRENNY: Right, I know, what I'm saying right now, the 3rd is on the table and if we get them 11:00 p.m. on Friday, that only gives us one day before we're deposing him.

MR. GILES: Let's tentatively leave it for the 30th and if the 3rd is the only day that works for you guys on his deposition, we will discuss pushing it back earlier to the 28th but let's tentatively say the 30th.

MR. CRENNY: We'll come back to that after we set the deposition.

Final follow-up from two weeks ago is Chinese language searches. You said you had raised with Transperfect, the question of searching things in Chinese and you would update us, so we're checking for an update.

MR. GILES: Yeah, the update is we have gone to them and raised that with them, and I think the response is, basically, once we get a Telegram we will provide you with the services that we can provide in terms of doing the Chinese documents.

MR. CRENNY: Sorry, so it's on hold 'cause Transperfect is busy processing the trial with Telegram; is that what you're saying?

MR. GILES: That's correct.

MR. CRENNY: Okay. I didn't understand if you were saying that you were searching the Telegram for the Chinese things or something.

Okay. So on to things we have not discussed previously which are the responses to discovery requests in Chen v. Chen, that we've received over the past few weeks.

These are David's answers to the second set of interrogatories and his answers to the second set of RFPs. These were all served back in August and they were due in September, and we've received them in the past few weeks, as you know.

So with the second set of rogs --

MR. GILES: Hm-hmm.

MR. CRENNY: -- first -- well, this cuts across both, but on both, David has raised a number of objections that the court has said he cannot raise at this stage. The court said the time has come -- long come and past to object to these requests. You just need to be producing things.

So, all of these objections we think are improperly raised at this stage on that ground alone that he's -- wherever he's not responding to something. Included in this nearly all the responses to rogs, include boilerplate objections.

He objects that all of rogs 16 to 24 are vague and ambiguous, but with one exception which is Rog 20. He doesn't explain what he finds unclear about it. He objects that rogs 20 to 24 are overbroad and unduly burdensome, but he doesn't say how a rule -- I'm quoting a case now, this is Mancia v. Mayflower Textile Servs. Co, it says:

"Rule 33(b)(4) requires that the grounds for objecting to an interrogatory must be stated with specificity and cautions that, 'Any ground not stated in a timely objection is waived unless the court, for good cause, excuses that failure'."

So we think all of those objections are improper on those bases.

MR. GILES: Okay. All right.

MR. CRENNY: No response to those --

-- (overspeaking) --

Case 8:23-cv-00889-TDC   Document 204   Filed 04/13/26   Page 128 of 1016
Transcript of Meet and Confer
Conducted on December 17, 2025

16 (61 to 64)

MR. GILES: No, we disagree with you, and I would note that the judge didn't say they have waived the ability to object on these particular answers, on these particular responses, just that it was a generalized comment like the time has come, you guys need to produce documents and answer interrogatories.

That was the message that she sent on November 17th, I believe it was, and so, you know, that wasn't specific to these particular two documents.

I don't believe we waived those answers or those objections and so we disagree with you in that regard.

MR. CRENNY: Okay, and I mean anything we disagree on is fine. We're just going to put it in the spreadsheet that we'll be doing soon and we'll go back and forth, as Judge Simms laid out.

So rog 15 -- and if we can, you know, reach an agreement on any of these we will note that in the spreadsheet, that won't be amended yet. So we'll put it in the spreadsheet, but we'll put that, you know, counsel agreed on December 17th, whatever, just to lay out what we're doing here.

So, rog 15 asked for identification of individuals he communicated with about the codes and David has not identify -- sorry, I want to change this.

The concern here is where he's listing at the end, towards the end, you know, it's individuals for a while, and then it becomes just groups of people: Members of new clickbait, OtterSec employees that were members of the server, member of the public servers of different kinds.

MR. GILES: Hm-hmm.

MR. CRENNY: You know, he should give us the individual names for as many people as he's able to.

I understand this is, you know -- yeah he should be giving us the names of the people he's able to. If he can't name them all and wants to add "and other members of other server," that's more inclusive and fine, but to the extent he knows the name of some of these people, he should give us the names of all that he's able to.

We know he knows the name of, for example, some of the new clickbait people and he knows some names the people from the AltTank. He certainly knows so some OtterSec names, so I don't think it's proper to just say "groups of people" here, when we're asking for identification of individuals.

MR. GILES: Is that it?

MR. CRENNY: That's it on 15.

MR. GILES: Okay, yeah, I mean so obviously he identifies -- didn't count them, but he identifies a bunch of individualized handle names, actual names, you know: Philip Papurt, Patrick Zhang, those types of names, but obviously then there are some other handles like ccpio, jriggs28.

Certainly we will, as part of the amendment and supplement process, to the extent that we can include more members of the new clickbait, I will raise this with them and then we will -- we will add those names.

MR. CRENNY: Not just the new clickbait but all of these.

MR. GILES: No, I know. All the group members of the (indiscernible) that you are talking about.

MR. CRENNY: Yeah, I said "new clickbait" because that is an obvious one. I can tell you six of those off the top of my head, but I know David has more on all of these than we do.

MR. GILES: I don't know that he knows, necessarily, names of members of the public on Solend Discord server.

He may know members of the Jito Discord, other than the people that are named already above. You indicated that he certainly knows members of the AltTank Discord. I will try to confirm that with him. I think you are probably accurate in that regard.

I don't know whether the names identified or the handles identified above are

J.R.126

people that in that Discord server, but to the extent that there's amendments and more specificity of those things at the end, the last, you know, one, two, three, four, five, six, seven things that are mentioned in this list, then we will supplement and amend.

MR. CRENNY: Okay, and then when he's giving -- when he is doing individuals, it seems he's made some effort to get the information required under the local rules, Appendix D, but I would remind you that he's obligated to, you know, make an effort and not just do it off the top of his head and use the information available to him, cppio, for example. I know he has more information on that person because we've given it to you.

MR. GILES: I believe -- I believe he has sent it me, as well so, yeah, that is one that should be updated beyond cppio.

MR. CRENNY: And, again, that's one that I know, but there are other ones that I am not familiar with that he's obligated to make an effort to try and figure out.

MR. GILES: Okay.

MR. CRENNY: So moving on to rog 16 -- no sorry, moving on to rog 17 regarding the relevance objection here, the Court -- sorry, this, again, is one that we think is one that is improperly raised at this stage based on the Court's ruling, the court stating that it is too late to object to these.

In addition, it is boilerplate, unexplained objection and it's not clear whether he's limiting his response at all, based on the objection to relevance.

So this is similar to what we -- what I said above about vague and ambiguous. I said that that cut across a number of these. Relevance, is specific to this one. It's not clear if he's leaving out some company or property based on relevance or whether he's objecting, but still saying the full answer.

MR. GILES: No, he's objecting and saying the full answer so -- because to identify

the company or property he co-owned with Alexander Karavaltchev and the only agreement they have -- there's two agreements: There's the partnership agreement which is the company that is co-owned, and then there's the Termination Agreement, terminating that company and that relationship. So that's it; that's the extent of the relationship with Alexander K.

MR. CRENNY: Okay, well it doesn't identify the company. It says there was a partnership agreement.

MR. GILES: Right. Exactly. There isn't a named company. It's a partnership between the two of them.

MR. CRENNY: Okay, well then I think, as you're amending, this is the like the RFPs we discussed a few minutes ago. You can make it clear that notwithstanding this objection, here's the full answer, however you want to --

MR. GILES: I will state for the record that I think it's clear in its current form, but I will take your request under advisement.

MR. CRENNY: Okay. 19:
Ask David to identify and describe channels he deleted in April 2022.
He does not identify these specifically. He states that the only ones would have been -- and that he kind of describes them, but he doesn't say what were those channels.
You know, we think we have the names of the three that he deleted and those should be in here and if you look at the document at LFMDND53291 at page 53298 you can see where Robert sends a screen shot of the channels that David deleted, so this response is incomplete and then it doesn't identify those clearly here.

MR. GILES: Can you restate that, Kevin? LFMDND, what was it?

MR. CRENNY: 53291.

MR. GILES: And specifically 53298?

MR. CRENNY: Yeah.

MR. GILES: And you're representing that's where Robert says the servers or the channels that were deleted.

MR. CRENNY: Robert sends a screen shot showing that it says: "RA deleted, 1, 2, 3."

MR. GILES: Okay.

MR. CRENNY: So the big picture, the rog says, "identify and describe" and we've gotten David's description. We didn't get an identification.

MR. GILES: Okay.

MR. CRENNY: Okay, on all these other, you know, I'm assuming we just disagree and we'll put it in the -- unless you are committing to amend, I am just moving on to the next one.

MR. GILES: Okay.

MR. CRENNY: Okay. Rog 20.

MR. GILES: I'm sorry, I apologize.

You are assuming that I'm disagreeing unless I say "I amend." I will look at number 19 to see whether, you know, the three that are identified by Robert on page 53298, are in agreement with David, in terms of those are the ones, and if they are then I will amend and put that into number 19.

MR. CRENNY: Okay, I think what I was saying is I'll put it all in the spreadsheet.

If you say, you're amending I'll note that you are amending, otherwise I'll put them in the spreadsheet and when do you your response, you can say, "Having looked at it with David, you can say whatever you're doing, you can say what you're doing at that point."

MR. GILES: All right.

MR. CRENNY: Okay, my point being if you say, "Okay "I'm just moving on to the next one and I'm not having this back and forth every time," we just -- which was fine to do once, but now we're on the same page.

Okay, rog 20 is asking about messages that -- David deleted that were sent by someone other than David. It seems to be missing that same -- the same channels from -- missing, you know -- I guess, missing any discussion of those same channels from rog 19. It's asking a slightly different question, so it will be different information, but same core thing is missing which

is those three channels.

MR. GILES: Oh, okay, so I think the way that 20 is written, if we provide amendment on 19, 20 probably does not need to be amended because it says, "David states that the aforementioned description of the channels on the Otter site, Discord and several were deleted on April 27th, 2022. That will be referring back to what's identified in 19.

I mean, I can say, as referred to in interrogatory answer number 19, but --

MR. CRENNY: So this one's asking -- 20 is asking about messages, so it's more granular. It's asking about who sent them and when, you know, it's not just the names of the channels that will be the response here.

MR. GILES: It does say identify by channel name, channel ID, server name, server ID.

MR. CRENNY: Date sent, date deleted, Discord ID and name of ... and it continues.

MR. GILES: And then it goes, "any Discord messages..."

I see where it says that.

MR. CRENNY: Yeah.

MR. GILES: Okay. All right.

MR. CRENNY: And, additionally, I mean it also wasn't clear whether you were understanding what it was asking for, which is any messages about these that were deleted by David that somebody else had sent.

You know, the last sentence saying he doesn't recall the names of the ones that he deleted in April 2022. You know, again, it seems like you were thinking it was asking the same exact thing again, but it's a bit broader, so if there's anything that fits in this that is not covered by 19, you know, that last sentence seems kind of beside the point, nonresponsive in that regard.

MR. GILES: We'll take a look at that.

MR. CRENNY: So interrogatory 21, here it's completely improper for David to say that Transperfect has the information, given that they are his agent in this matter, and they are

J.R.128

carrying out all this work for him, through his counsel, maybe before him and we have some authority supporting this, Wright & Miller, S. 2177 says:

"In answering interrogatories, a party's charged with knowledge of what its agents know or what's in records available to it or even information others have given it, on which it intends to rely on its suit.

A party must disclose facts in its attorney's possession, even though the facts have not been transmitted to the party. Though there are limits on the extent to which a party can be required to hunt out information it will be required to provide facts available to it without undue labor and expense."

There's a case: Beach Mart, Inc. 302 F.R.D. 396, which says:

"The rule is that even where a requesting party already has documents in its possession or could otherwise access those documents, the disclosing party may not withhold those documents." [As read.]

There's also:

"He must respond based on records available to him, including information others have given him, on which he intends to rely in his suit and facts in his attorney's possession." [As read.]

That's from Oklahoma v. Tyson Foods, Inc., 262 F.R.D. 617, and they're citing that same Wright & Miller in Hickman v. Taylor 329 U.S. 495 which says:

"A party clearly cannot refuse to answer the interrogatories on the ground the information sought is solely within the knowledge of his attorney."

So this is, you know, to say that Trans-- this comes up in a few of these now, in a row here, I think, to say that Transperfect is responsible for this and David doesn't have to answer on that basis is, we think, completely inappropriate and that information is in his possession, custody and control through

Transperfect, and it's his obligation to talk to them and find out the answer and figure out what the answer to the interrogatory is.

MR. GILES: Is that it?

MR. CRENNY: The other -- I have another kind of distinct issue on 21, but I think if you want to respond to that, respond to that now.

MR. GILES: Sure. So you have provided me with three case cites, which I will take a look at. I would say, in response, that I imagine that none of those cases involve a situation where there's a preservation order that requires the actual individual not to be involved with the collection of the particular evidence.

So I think probably our case falls outside, technically speaking, the holdings of those three cases, but I will take a -- your citation to these cases. That's the first time (indiscernible) US v Hickman or was it Hickman v Taylor?

MR. CRENNY: Mm-hmm.

MR. GILES: I've heard of that case before. The other two I have not heard of, but certainly we'll look at that and I do say -- or and David does say: That David and his counsel will inquire about the requested information from Transperfect and will timely supplement this answer should they obtain any relevant information in that regard.

So, I mean, we acknowledge that, you know, if it -- in consultation with Transperfect regarding collected data, that David isn't allowed to have much ability and involvement with -- due to the preservation order, then he's not obfuscating his responsibility under the federal rules that the actions of his agent are binding on him. He's not saying that at all.

He's just saying that, logistically speaking, because of the preservation order, Transperfect has the information, and so that's -- that's the basis of the answer, but certainly we will follow-up with them. And as part of the amendment supplementing process, that's going to

J.R.129

take place, post January 20th, 2026, this will be one of those items, presumably.

MR. CRENNY: So the preservation order point was actually the second thing, which I didn't think was going to be your response on the Transperfect, so I should have just said it at the outset, but the preservation order is not a wall of not allowing him to know what is collected.

It doesn't make him less responsive for document collection. It imposes additional responsibilities on him with respect to preservation, but it's not like a firewall, like he doesn't know this information anymore.

He's still charged with the knowledge that Transperfect has and that you have. This -- responding in this way is not supported by the law or the preservation order and by just pointing to Transperfect and then saying, you know, we'll -- we'll inquire and supplement, you've basically not answered this interrogatory but, you know, half acknowledged that you need to.

You just -- it's already two and a half months late and now we're saying we'll get an answer some time in January, once you've talked to Transperfect. That's, you know, that's -- that's punting down the road in a way that's totally inappropriate on all of these responses that are coming up, where you're just looking to Transperfect. So, you know, I don't think we agree that you can, on these ones especially, delay that long in that way.

MR. GILES: Okay, I mean, as I said, the things that we're going to amend and supplement, we're going to do after January 20th.

That would include this, if we are amending and supplementing this.

MR. CRENNY: Okay, we're not agreeing to that, for the record. These ones are late already. There's a difference between one that we meet and confer on, and in good faith are saying something needs to be added or corrected, and this one where it's a nonanswer that even acknowledges that you need to follow-up and get the answer from Transperfect for some of these, that you are just

saying you just can't have that yet. That doesn't count as you responding on November 24th, if you're not making any effort to actually respond to it until late January.

MR. GILES: Okay.

MR. CRENNY: Okay, 22, again, it states same issue with Transperfect. It says -- it asks for steps you took to collect this device and it says, Transperfect gained custody of it and attempted to determine if anything was recoverable. That doesn't describe steps taken to collect.

You know, the steps Transperfect took are -- you know, it doesn't say anything about collection. It says Transperfect got it and then doesn't say what they did. You know, this -- same issue, information from Transperfect should be the response here, if that's who has it.

David has not responded to this interrogatory in good faith, and I'll say 23 is the same, just so we -- keep going if you want to respond separately, if there's any difference go for it when I get through 23. But 23 is steps you took to collect a different source in this list and same thing, it just says "Transperfect collected" and doesn't say anything about what steps were taken.

MR. GILES: So with regard to your comment in number 22, you indicated that it merely says that "Transperfect got..." and I would say that Transperfect getting something is synonymous with collecting it. I hear you on your wanting more steps. We will take that under advisement. I'm not necessarily agreeing with you.

I think 23 -- I know that in -- with regard to 23 we have stated this on several occasions in several different formats, whether it be -- I think it might be included in the answers in the Li Fen Yao, third amended responses to the second sets of interrogatories. I think it's in there. I could be wrong in that regard.

I think it's also part of email correspondence with your side and it might have been with Justin, but certainly, you know, I think

J.R.130

this 23 answers the question, in terms of the fact that it says -- it's David's understanding that Transperfect collected the droplets themselves for the miscellaneous digital Ocean host using DD.

So they talk about the platform or the software that they used or command, which is a "line X" copy command, so I think that accurately and adequately identifies the steps that they took to collect the information that's identified in interrogatory number 23.

With regard to 24, I think Exhibit A does provide the answer as to Discord. As we talked about earlier I need to provide you or research and then provide you the Telegram aspect of this, and so I acknowledge that that is something that needs to done on our behalf.

MR. CRENNY: Okay, so I hadn't gotten to 24 yet, but that is one of the issues is, yeah, Exhibit A does not include Telegram at all. This is similar to, you know, we discussed this with Rachel earlier.

First of all, this would need to be updated post re-collection, potentially. That was one question I had was: Are you going to update this based on the re-collection you're doing, and then there's the issues we've discussed with Exhibit A already, which is that it -- according to the Li Fen Yao responses is a list of 135 servers and channels and direct message groups, but they all say that they're from the same server, other than the direct messages which doesn't seem correct. It doesn't have the names of the channels. It doesn't have the names of the server or servers, so it's missing a lot of the information that we asked for in this rog response.

It purports to identify channel names. It just says like, unknown or something like that, over and over. It -- you know, and, again, as we've said before, it doesn't include the channels listed in Exhibits B and E to Li Fen Yao's rog responses which we thought you were searching, but by representing that you're only searching this one, it seems to be that you're not saying that.

You are searching a narrower set, not everything that you collected, which we find confusing, but you know, it just doesn't make sense to us, but it sounds like you are standing on Exhibit A and not touching it at all, not planning to review or amend it so...

-- (overspeaking) --

MR. GILES: For Discord, we are standing on Exhibit A. B and what -- did you say D or E?

MR. CRENNY: B through E are additional, you know -- it says in the rogs these are additional things that were collected later.

MR. GILES: Mm-hmm.

MR. CRENNY: But to the extent you're telling me you're only searching -- that A is what you're searching, it sounds to me that you're saying "We collected B3, but were never searching it...

-- (overspeaking) --

MR. GILES: Correct. We're collecting -- we're searching what's in Exhibit A .

MR. CRENNY: So, there's only one server listed in Exhibit A, and then some direct messages, so you're only searching one server?

MR. GILES: We're searching what's in Exhibit A, the 135 items.

MR. CRENNY: Okay, then going on to the second set of RFPs.

MR. GILES: Sure.

MR. CRENNY: These were also served August 15th. One issue just to flag, as you're amending, not a big one, is that it repeatedly refers to David with "her" or "she" as the pronoun, which seems to coming from the other set of rog. You might want to look for "her" or "she" as you're amending anyway.

Then, with respect to the exception of the time period, again David has raised his opportunity to raise objections to these.

The Court was clear on this and was talking about document production. She said "The time has long come and passed to object to these requests. You just needs to be producing the

J.R.131

Case 8:23-cv-00889-TDC   Document 204   Filed 04/13/26   Page 134 of 1016
Transcript of Meet and Confer
22 (85 to 88)
Conducted on December 17, 2025

materials. You just need to get them to them."

So we're surprised to see any objections to these responses, given that your objections, themselves, reference rulings from November 20th and the same hearing transcript that you referenced, made it clear that the time for David to object had long come and gone.

As with the other RFPs we've discussed recently, if no documents are being withheld based on them and if that can be clarified, then the objections can stay on there.

We don't need you to delete them if you're making clear, that you are not withholding anything because it doesn't matter in that case. So that's across the whole thing.

Then we have a number -- do you have anything to respond? I know we, kind of, already discussed that, but if you have anything to respond, I'll just pause for a second.

MR. GILES: Yeah, so I mean I was looking through the objections and general instructions for this particular pleading and the only "her" that I see is number 11, the second line. So, obviously, that's just inadvertent in terms of a drafting perspective but, you know, if we end up amending and supplementing this particular document, I will add that, otherwise I probably won't 'cause it's really immaterial.

You know, I think everyone realizes that these are David's responses, and David is a "he" so I don't know that we necessarily need to do an update for a misstatement or mistyping or a typo in item number 11 of the general objections and instructions.

MR. CRENNY: It's also in paragraphs 2 and 3.

MR. GILES: Two and 3.

MR. CRENNY: But this is not a productive use of time to go through it right now.

MR. GILES: Yeah, well, okay. All right.

MR. CRENNY: Okay, so nothing on the more substantive points I made?

MR. GILES: I don't think it's in three

because it says "his agents" so -- two, yes, I did see it in two.

MR. CRENNY: Sorry, four, page 3, but again that's not -- that wasn't the important part.

MR. GILES: I apologize. Sorry, just quickly, what were the other things that you said?

MR. CRENNY: That the Court --

MR. GILES: Oh, the objections.

MR. CRENNY: The Court said you could not raise objections, and you've raised a bunch of objections, which other than time period, many of them were new and not in previous RFP objections as I'll go through, so they are entirely too late and inappropriate. To the extent there are ones that you are not withholding anything, based on, however, is kind of an academic issue and if you can clarify that you are not withholding anything based on them, then we don't care if they stay in the document.

MR. GILES: Yeah, so like I mentioned earlier we don't think that the objections have been waived. We don't think that there has been a ruling by the judge as to these particular answers and responses. You know, it was a generalized statement during the November 20th or whatever hearing down in US District Court, down in Greenbelt.

With regard to any documents that are being withheld, based on objections that talk about vague, ambiguous, overly broad or unduly burdensome I can tell you that we're not withholding documents on that basis. However, we are withholding documents on the basis of privilege which then, as I mentioned before, will be included in a privilege log.

MR. CRENNY: Okay, so what is it -- in the hearing she said "The time has long come and passed to object to these requests. You just need to be producing materials. You need to get them to them."

And your position is that didn't mean anything?

MR. GILES: Oh, no, it meant something.

J.R.132

It was obviously a direct message to get on with producing documents and responding to discovery requests, but it wasn't, in particular, to any particular specific document request or lack of document -- you know, responses or answers i.e. these ones that we're talking about now.

So, yes, it was a generalized statement by Judge Simms -- as I understood it, generalized statement by Judge Simms that:  Get on with it. Let's move this along.  And that's what we're doing, but it is not a waiver.

She didn't say, "And you have waived." Mr. Giles, your client has waived their ability to object to answers and responses that have previously been served.  She did not say that.

MR. CRENNY:  So is it your position that you can raise objection, no matter how late to discovery responses and they are never waived? When would they be waived if not --

-- (overspeaking) --

MR. GILES:  My position is these are not waived.  That's my position.

MR. CRENNY:  Okay, let's take a five-minute break for the Court Reporter, primarily, and then we can get into the specifics.

Last time we took a break and then there was only five minutes left, so let's all get a break a little earlier.

A recess was taken at 11:36 a.m. to 11:43 a.m.)

BY MR. CRENNY:

Q    Okay, so that covers the objections section, so I'll get into the RFPs.

First one, RFP 14, this doesn't make clear that David -- the last sentence, in particular, is confusing.

"David does not believe that any..."

So it's asking messages from Rubber Duck Debugging and the new hell/new year channels and it ends by saying that.

"David does not believe any new hell/new year messages actually exist."

For one thing, the response should make it clear that -- and that David is obligated to

search for and produce all responsive non-privileged documents.

This makes it sound like you might not be searching for something if David doesn't think it exists.

This comes up in a few of them. Additionally, we've received copies of, at least, some of these messages from third party discovery, so we know they do exist.

It's not clear why they wouldn't exist but the other channel we're asking about would exist because if David only says that one of the two doesn't exist, so that's the issue with 14.

MR. GILES:  Yeah, so my understanding of Discord and I don't personally -- I don't personally have a Discord account, I've never used Discord personally, but my understanding of how Discord works is that if you -- if you delete certain Discord messages, that you no longer have access to them, but others may -- if they're part of those messages they still have them and so I think that probably answers the question as to why

you have gotten them from others that you have subpoenaed because presumably they haven't gotten rid of those messages.

MR. CRENNY:  That's not correct, as to deleting messages from -- 'cause if you delete them, they're gone for everyone.  That's why we got a production from Ali Guo where it's just her side of the conversation for months and months because David deleted his side.

MR. GILES:  Right.  Hold on a second then.  Back up.  The messages that you have gotten from new hell/new year channel -- the channel, it's your position or your affirmation or representation that it has both sides of the discussion.

MR. CRENNY:  It's a channel with, like, a bunch of people on it and it has messages from all different people.

Anything that David deleted from that channel, nobody has access to anymore, but here David is saying that no messages from that channel exist, period.

MR. GILES: Well, no messages from that channel -- I think what he's saying and I'll confirm this, but I think what he's saying in this is that no messages from that channel exist that he has possession of or has the ability to pull because he doesn't have the messages.

I think that's what he's saying.

MR. CRENNY: Okay, that would make more sense, but is not what he's said in response here so that needs no be...

MR. GILES: Well, no, I think...

MR. CRENNY: If he doesn't have possession custody or control of any such messages that's different from "They don't exist."

MR. GILES: Well I think you are basically trying to split hairs here but, okay, I will confirm precisely what it is that David was trying to say when he says that any -- does not believe that any new hell/new year messages actually exist, but I will confirm that with him.

MR. CRENNY: And it's not clear why he's saying that about only that one and not the other, right?

If it's two channels from the same server, so if you leave -- it seems like either he can get both of them or he can't get either, if that's even the case. It doesn't make sense that one would be accessible and the other one wouldn't.

MR. GILES: Do you know -- I mean you are sort of making a representation as to how Discord works. Do you know whether it works that way?

MR. CRENNY: That is my understanding of how it works having been involved in this case for quite some time and involved in a lot of discussion about Discord, as you have as well.

MR. GILES: They're just different channels though within the same server, so my understanding was that if you -- if you don't have any messages in that channel, that you don't have any messages if, for whatever reason, they're deleted, that you no longer have access to them.

Someone else might -- whoever this person that is discussing something with David in those -- previously in those channels may not have discarded their messages, so they still have the ability to see their messages. And what I was asking you was: The messages that you have received from this particular channel, new hell/new year are you representing here on the record, that they have messages in that there from David?

MR. CRENNY: Yes, definitely.

MR. GILES: Okay, okay. All right. That's what I was asking. So, that -- now I know what I need to follow up with, okay.

MR. CRENNY: Yeah, I think you need to clarify. It doesn't make sense in terms of how Discord works. I mean you -- I think it needs to be discussed with David, would be my recommendation.

So, moving on to 16, the objection here -- it's unclear whether we are requesting his commit history or his account history, and it requests clarification.

I don't think that's the proper way to have done this, but in the interest of efficiency we will clarify that we would like both.

MR. GILES: Yeah.

MR. CRENNY: So, can that be amended and just produced both?

MR. GILES: Well, so that will be part of the amendment supplement process. If we determined that this needs to be amended or supplemented, we will do that.

MR. CRENNY: Okay, and the production will be, you know, it's -- it will be coming on schedule with the rest of the production or... it's not clear to me what the plan was to produce, based on this one?

Were you just not going to produce either until you got clarification or have we already received one or the other or...

MR. GILES: So I received an indication from Transperfect that they, and through us to you, produced GitHub documents on November 17th, 2025.

J.R.134

I went back to them right before we started this this morning to say -- to understand the scope of what it was that was produced because I thought it was one thing and they evidently thought it was another thing, so I'm trying to -- I'm in the process of trying to figure that one out.

MR. CRENNY: Okay, you've got the clarification now, so that one can get back on track. Moving on to 17. The caveat that there are no known documents responsive to the request is improper. David's knowledge is not, you know, relevant to the scope of what he has to do.

He's obligated to search for and produce responsive documents and see if any exist, even if he doesn't know any off the top of his head.

MR. GILES: What number are you looking at?

MR. CRENNY: 17.

MR. GILES: Okay.

MR. CRENNY: I'm looking at the last line because David states there are no known documents responsive to this request, but that is not relevant.

He has to search for and produce responsive documents. This makes it sound like he's not going to search for documents if he doesn't think they exist.

MR. GILES: I don't think that's what he's saying, but I will confirm.

MR. CRENNY: Okay, 22 is the next one.

This is similar to the last one and to the first one we looked at where it says "David -- has not run --" "David states that all non-privileged documents responsive to this request will be produced. In this regard though, David has not run any mSol market marker codes since 2022 and his affiliation with OtterSec."

So that final sentence is improper insofar as it seems to imply that he won't produce documents sufficient to identify ones that he ran in 2022 and during his affiliate with OtterSec.

-- (overspeaking) --

MR. GILES: I don't see anything.

MR. CRENNY: Okay, that's good.

And then to the extent --

-- (overspeaking) --

MR. GILES: -- it's providing you -- it's providing you, sort of, date information that he hasn't run anything since his time with the Ottersec but he says that David states that: All nonprivileged documents, responses, requests will be produced so he's producing everything within the September 5th 2021 to April 17th, 2025 but effectively it really is only going to be from documents that are -- that may have exist from February of 2022 through April 27th of 2022, which was his time with OtterSec.

MR. CRENNY: Okay, so it's just like an FYI sentence.

-- (overspeaking) --

MR. CRENNY: It's not doing any --

MR. GILES: Yes.

MR. CRENNY: Let me just read my last point quickly, but it sounds like it's -- that's the response. To the extent that he was suggesting that he wouldn't search for any documents sufficient to identify codes he ran at later dates, that it's improper for the reason I described above, that his knowledge is not relevant.

He has to search for and produce responsive documents, whether or not he's aware of any at the moment, that's the period.

MR. GILES: Okay, all right.

MR. CRENNY: And, finally, 23, similar. It says that documents, responses to the request will be limited to the OtterSec liquidator-related channels in the OtterSec Discord server, which only included messages up to April 27, 2022 and also the new clickbait Discord messages.

That's a little -- that's ambiguous to us. I just want to clarify here that the documents will be sufficient to identify the server channel and dates that we've requested.

It's not clear whether -- I think documents responsive -- we're saying documents

J.R.135

Transcript of Meet and Confer
Conducted on December 17, 2025

101

sufficient to identify certain details, and it's saying the documents responsive to this request will be limited to certain channels and new clickbait messages, so it's just a little -- that doesn't quite line up with the documents sufficient to identify certain details request, so I just want to clarify that we'll get documents sufficient to identify the details listed in the RFP.

MR. GILES: So the way I read 23, the answer, the response, let's put it this way: The way I read the request is documents sufficient to identify the server. So documents sufficient to identify the server.

So documents that have the information that you have requested, and so the response says, in getting past the objections:

"David states that all non-privileged documents responsive to this request were produced," so that's point A. That's Part A of the response.

Part B, David states that the documents

102

responsive to this request would be limited -- again, this is sort of an FYI, would be limited to the OtterSec Liquidator-related channels in the OtterSec Discord server, which only included messages up through April 27th, 2022 and also the new clickbait Discord messages.

So he's sort of giving you, one, the location of the documents that he would -- is going to be found, as well as the date range.

It's going to up through April 27th, 2022. He does not say that he's not answering request number 23, which requests documents sufficient to identify the server, channel and dates sent for all Discord messages, so he doesn't say that he's not going to comply with that.

He's just giving you an FYI as to where they're located and the date range of those documents. That's all he's doing. It's an FYI.

MR. CRENNY: Okay, I think that's fine.

Our confusion was this is asking about deleted messages, so where he's saying the documents responsive will be these channels that

103

are deleted, we're like, what, we're not getting the channels so what are we -- we're getting documents sufficient to identify. Fine.

MR. GILES: Okay.

MR. CRENNY: Okay, that was the last one.

MR. GILES: Okay.

MR. CRENNY: I think that's it. Rachel?

MS. CLATTENBURG: Yeah, that's it from our side and we'll expect some info this week, as well as the Telegram production.

MR. GILES: Telegram production is going to be on Friday.

MS. CLATTENBURG: And you're going to respond to a couple of things then, is what I heard.

MR. GILES: I didn't say before then. You asked for this week. I said I would try and that's what I'm going to do.

I've got -- just so you guys are aware, I am down in Southern Maryland both tomorrow and Friday, on a vessel out in the Chesapeake Bay

104

taking depositions in another case, so it is possible that these responses may not come until Saturday, which is still this week.

MS. CLATTENBURG: TealTech has been hanging out there a long time.

MR. GILES: Well, that one I said I would look at right after this.

MS. CLATTENBURG: Okay, okay, thanks very much, Lisa.

MR. GILES: Thank you, Lisa.

--- Whereupon the meet and confer concluded at 11:57 a.m.

J.R.136

CERTIFICATE OF SHORTHAND REPORTER

I, LISA BARRETT, Certified Realtime Reporter, Registered Professional Reporter, Certified Shorthand Reporter, before whom the foregoing proceeding was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given, all done to the best of my skill and ability;

That said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction;

And that I am neither counsel for related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my signature this 17th day of December, 2025.

_____

Lisa Barrett, RPR, CRR, CSR

Certified Realtime Court Reporter

J.R.137

Transcript of Meet and Confer
Conducted on December 17, 2025

28

**A**

**ability**
61:3, 76:12,
89:13, 93:5,
95:4, 105:8
**able**
30:5, 62:18,
62:21, 63:3
**about**
4:7, 4:10, 5:6,
6:8, 7:21, 9:12,
10:1, 12:4,
18:2, 18:15,
18:17, 22:10,
30:4, 31:5,
33:16, 36:22,
38:2, 38:11,
38:14, 38:22,
39:3, 39:7,
39:16, 39:18,
40:2, 40:13,
42:13, 43:11,
44:1, 46:20,
46:22, 47:18,
47:19, 49:14,
55:10, 60:7,
62:5, 64:7,
66:15, 70:15,
71:13, 71:14,
72:7, 76:5,
79:14, 80:4,
81:5, 81:13,
84:20, 88:9,
89:6, 91:11,
93:22, 94:15,
102:20
**above**
64:17, 64:22,
66:15, 100:5
**absolutely**
18:16, 18:17
**academic**
87:17
**access**
73:21, 91:20,
92:20, 94:21
**accessible**
94:6

**according**
27:15, 82:5
**account**
14:15, 26:20,
91:16, 95:21
**accounts**
14:20, 17:22
**accurate**
25:6, 40:3,
64:20
**accurately**
81:7
**acknowledge**
50:1, 76:9,
81:15
**acknowledged**
77:21
**acknowledges**
78:20
**across**
59:15, 66:16,
85:15
**actions**
76:15
**actual**
63:16, 75:14
**actually**
13:2, 13:7,
14:20, 15:21,
16:6, 17:7,
19:9, 23:19,
36:7, 36:9,
77:4, 79:3,
90:20, 93:20
**add**
52:13, 62:22,
64:2, 86:5
**added**
46:22, 78:19
**addition**
66:10
**additional**
18:20, 25:15,
77:10, 83:12,
83:13
**additionally**
72:4, 91:7
**address**
9:7

**addresses**
36:16
**addressing**
7:7, 7:8
**adequately**
81:8
**administrator**
1:5
**advisement**
67:22, 80:11
**affiliate**
98:21
**affiliation**
98:17
**affirmation**
92:13
**affirmed**
36:4
**affixed**
105:17
**aforementioned**
71:6
**after**
35:1, 48:7,
51:18, 57:1,
58:6, 78:12,
104:7
**again**
8:18, 11:10,
18:18, 28:6,
34:6, 36:10,
38:5, 42:18,
43:20, 47:2,
48:15, 49:1,
56:2, 65:20,
66:6, 72:11,
72:13, 79:6,
82:17, 84:17,
87:4, 102:2
**against**
8:15, 22:22
**agasi**
50:5, 50:18,
55:3
**agent**
72:22, 76:15
**agents**
73:6, 87:1

**ago**
37:20, 38:2,
39:7, 58:7,
67:17
**agree**
51:13, 52:6,
78:8
**agreed**
6:2, 6:12, 8:4,
19:11, 30:15,
30:22, 32:17,
33:5, 33:18,
39:20, 45:22,
46:1, 46:3,
47:16, 48:2,
49:5, 51:8, 62:1
**agreed-upon**
8:5
**agreeing**
78:15, 80:12
**agreement**
37:6, 61:20,
67:2, 67:4,
67:5, 67:11,
69:20
**agreements**
67:3
**ahead**
37:17
**alex**
4:22, 7:18,
16:3, 20:17,
25:4, 56:4
**alexander**
3:4, 12:7,
67:1, 67:8
**ali**
92:7
**all**
2:4, 6:18,
6:22, 7:1, 7:15,
8:1, 8:12, 8:13,
8:14, 9:10,
9:12, 9:13,
9:16, 10:6,
11:10, 11:12,
11:14, 11:15,
12:19, 13:4,

J.R.138

14:2, 14:17,
15:14, 16:5,
16:9, 17:2,
17:3, 18:16,
18:18, 21:9,
22:9, 23:1,
23:3, 29:8,
30:10, 31:4,
35:5, 38:5,
38:21, 39:18,
40:4, 41:17,
43:1, 44:5,
44:9, 44:10,
44:12, 44:14,
44:15, 47:18,
48:9, 50:17,
57:4, 59:9,
59:21, 60:2,
60:4, 60:18,
60:20, 62:21,
63:3, 64:4,
64:5, 64:11,
66:12, 69:9,
70:2, 70:9,
72:3, 73:1,
76:16, 78:5,
81:19, 81:22,
82:8, 83:5,
86:18, 90:5,
91:1, 92:18,
95:11, 98:13,
99:8, 100:10,
101:18, 102:14,
102:18, 105:7
**allowed**
76:11
**allowing**
77:8
**alluded**
8:11
**almost**
11:14, 11:15
**alone**
60:1
**along**
89:10
**already**
11:22, 13:22,

29:14, 55:12,
64:17, 73:20,
77:22, 78:17,
82:5, 85:17,
96:18
**also**
3:21, 13:2,
16:8, 19:17,
28:12, 30:10,
30:14, 31:11,
35:18, 36:17,
38:18, 38:20,
39:4, 39:22,
40:15, 46:17,
49:13, 56:21,
57:1, 72:5,
74:2, 80:20,
84:9, 86:13,
100:16, 102:5
**alttank**
63:6, 64:18
**ambiguous**
52:4, 54:9,
60:5, 66:15,
88:9, 100:17
**amend**
44:21, 45:22,
46:2, 46:3,
47:16, 48:2,
49:5, 50:17,
56:21, 65:6,
69:12, 69:17,
69:21, 78:11,
83:6
**amended**
37:20, 44:6,
44:7, 44:14,
47:7, 47:15,
51:1, 61:21,
71:4, 80:17,
96:5, 96:9
**amending**
67:16, 70:3,
70:4, 78:14,
84:11, 84:15,
86:4
**amendment**
47:3, 51:17,

63:21, 71:3,
76:22, 96:8
**amendments**
44:22, 51:15,
65:2
**another**
15:6, 16:17,
75:6, 97:5,
104:1
**answer**
19:18, 36:3,
39:5, 39:17,
40:16, 45:11,
45:12, 48:5,
48:6, 50:17,
54:18, 55:16,
61:7, 66:20,
66:22, 67:19,
71:11, 74:13,
74:20, 75:2,
75:3, 76:7,
76:20, 78:2,
78:21, 81:12,
101:11
**answered**
77:20
**answering**
73:5, 102:11
**answers**
41:9, 44:7,
47:8, 59:7,
59:8, 61:4,
61:12, 80:16,
81:1, 88:2,
89:5, 89:14,
91:22
**anticipate**
28:17
**any**
20:7, 27:12,
27:17, 40:11,
48:16, 49:12,
54:15, 55:4,
55:21, 56:16,
60:14, 61:20,
70:19, 71:21,
72:6, 76:7,
79:3, 79:22,

85:2, 88:7,
89:3, 90:15,
90:19, 93:13,
93:18, 93:19,
94:19, 94:20,
97:15, 97:16,
98:16, 99:19,
100:2, 100:9,
105:13
**anymore**
77:13, 92:20
**anyone**
18:7, 49:16
**anything**
11:21, 18:15,
24:16, 26:8,
26:11, 29:8,
29:13, 32:20,
35:20, 46:22,
48:20, 48:21,
61:15, 72:14,
79:10, 79:14,
80:4, 85:14,
85:17, 85:18,
87:16, 87:18,
88:21, 92:19,
99:1, 99:7
**anyway**
84:15
**apologize**
41:14, 69:15,
87:6
**apparently**
35:10, 50:10,
55:5
**appear**
21:20
**appendix**
65:10
**applies**
40:15
**apply**
11:19
**appreciate**
29:1
**appropriate**
34:11
**april**
22:21, 24:19,

J.R.139

Transcript of Meet and Confer
Conducted on December 17, 2025    30

28:9, 51:9, 52:3, 68:3, 71:8, 72:11, 99:11, 99:14, 100:15, 102:5, 102:10

**aren't**
30:3

**argument**
49:11

**arizona**
50:10, 55:5

**around**
8:5

**asked**
4:18, 6:8, 22:10, 36:22, 39:16, 50:15, 62:4, 82:13, 103:18

**asking**
9:6, 14:14, 39:4, 40:4, 63:9, 70:15, 70:20, 71:12, 71:13, 71:14, 72:6, 72:12, 90:16, 91:11, 95:5, 95:12, 102:20

**asks**
79:7

**aspect**
81:14

**asset**
14:16

**assistance**
56:5

**associate**
50:15

**assume**
10:17

**assuming**
69:10, 69:16

**attached**
7:15

**attempted**
79:10

**attended**
2:4

**attorney**
74:15

**attorney's**
73:11, 74:6

**attorney-client**
54:12

**audits**
1:11

**august**
6:12, 8:5, 8:14, 12:10, 13:19, 17:13, 19:14, 59:10, 84:10

**authority**
73:3

**available**
13:12, 21:20, 65:13, 73:7, 73:15, 74:4

**aware**
8:10, 33:15, 100:8, 103:20

---

**B**

**b)(4**
60:12

**b3**
83:18

**back**
5:7, 5:19, 7:16, 7:20, 19:14, 21:7, 22:12, 30:5, 35:21, 38:6, 38:11, 38:14, 39:21, 42:10, 44:19, 45:7, 45:21, 46:11, 46:21, 47:4, 48:16, 48:17, 49:10, 52:16, 57:15, 58:3, 58:5, 59:9, 61:18, 70:12, 71:8, 92:11,

97:1, 97:9

**backtracking**
15:2

**bad**
27:21

**baltimore**
3:7

**barrett**
1:22, 2:6, 105:2, 105:21

**based**
5:12, 52:10, 52:16, 53:20, 66:7, 66:12, 66:18, 74:3, 82:3, 85:9, 87:16, 87:19, 88:8, 96:15

**bases**
60:19

**basically**
8:1, 8:6, 21:21, 58:14, 77:19, 93:16

**basis**
74:20, 76:20, 88:11, 88:12

**basket**
27:13

**bates**
37:2, 56:6, 56:7

**bay**
103:22

**beach**
73:17

**because**
7:5, 10:12, 10:16, 12:19, 13:5, 20:6, 22:15, 23:19, 23:20, 25:22, 28:11, 29:3, 30:4, 32:10, 33:11, 33:13, 36:8, 39:18, 44:4, 45:6, 54:7, 56:15,

64:9, 65:15, 66:22, 71:5, 76:18, 85:14, 87:1, 91:12, 92:2, 92:9, 93:6, 97:3, 98:1

**becomes**
62:10

**been**
7:9, 7:11, 8:15, 11:13, 11:22, 13:18, 13:22, 18:13, 18:19, 19:10, 20:3, 20:20, 22:20, 26:12, 30:16, 31:9, 31:14, 32:21, 33:12, 33:22, 36:11, 51:5, 55:6, 55:7, 55:12, 55:20, 55:22, 56:15, 68:6, 73:12, 80:22, 88:1, 89:15, 94:13, 104:4

**before**
2:6, 12:6, 17:5, 17:10, 27:6, 33:9, 34:22, 35:9, 36:20, 57:21, 73:2, 76:2, 82:18, 88:13, 97:1, 103:17, 105:4

**behalf**
3:3, 3:11, 81:16

**being**
4:6, 12:15, 15:15, 18:8, 27:5, 33:8, 34:18, 36:13, 43:5, 48:6, 50:2, 52:10, 52:16, 52:21,

J.R.140

70:10, 85:9,
88:8
**believe**
7:20, 13:21,
15:13, 15:17,
17:12, 18:6,
18:7, 26:13,
41:19, 42:1,
43:15, 50:6,
55:4, 55:17,
61:9, 61:12,
65:17, 90:15,
90:19, 93:19
**believes**
15:14, 15:17,
54:22
**benefit**
41:10
**beside**
72:16
**best**
5:13, 5:14,
105:8
**between**
5:9, 11:19,
12:11, 13:11,
41:4, 67:13,
78:17
**beyond**
13:21, 50:11,
65:19
**big**
69:4, 84:11
**binding**
76:15
**bit**
72:13
**boilerplate**
49:9, 51:11,
52:8, 53:10,
60:3, 66:10
**both**
4:12, 12:3,
13:14, 13:15,
22:16, 50:13,
59:15, 92:14,
94:4, 96:3,
96:6, 103:21

**break**
90:2, 90:4,
90:6
**briefing**
55:5
**broad**
88:9
**broader**
72:13
**bucket**
28:2
**bunch**
63:15, 87:11,
92:17
**burden**
15:20, 17:16,
17:17, 34:10
**burdensome**
5:10, 54:10,
60:8, 88:10
**busy**
58:19

———— C ————

**call**
13:6, 27:12,
37:12, 39:6
**called**
27:11
**came**
48:17, 56:17
**can't**
16:13, 23:19,
26:2, 27:12,
30:19, 31:8,
34:12, 62:21,
79:1, 94:4
**cannot**
59:17, 74:12
**capital**
9:12, 12:18,
15:9
**care**
52:11, 87:19
**carrying**
73:1
**case**
1:7, 11:13,

12:15, 12:16,
15:16, 18:16,
18:17, 23:4,
29:18, 29:19,
29:21, 36:8,
55:14, 55:20,
60:9, 73:17,
75:10, 75:16,
76:1, 85:14,
94:5, 94:13,
104:1, 105:14
**cases**
11:11, 75:12,
75:18, 75:19
**categories**
26:21, 34:16
**category**
45:22, 55:10
**cause**
58:19, 60:16,
86:6, 92:5
**cautions**
60:14
**caveat**
97:10
**ccpio**
63:18
**cell**
27:2
**certain**
29:11, 91:19,
101:1, 101:3,
101:6
**certainly**
13:20, 43:21,
63:7, 63:20,
64:17, 76:3,
76:20, 80:22
**certificate**
105:1
**certified**
2:6, 2:8,
105:2, 105:4,
105:22
**certify**
105:5
**certifying**
16:4

**change**
36:4, 62:7
**changed**
51:5
**channel**
40:6, 71:18,
82:15, 91:11,
92:12, 92:16,
92:20, 92:21,
93:2, 93:4,
94:19, 95:6,
100:20, 102:13
**channels**
19:5, 19:13,
20:3, 20:13,
20:22, 21:3,
68:3, 68:7,
68:12, 68:22,
70:18, 70:20,
71:1, 71:6,
71:15, 82:7,
82:11, 82:18,
90:17, 94:2,
94:17, 95:2,
100:14, 101:3,
102:3, 102:22,
103:2
**characterized**
49:8
**charged**
73:6, 77:14
**chart**
43:7, 43:9
**check**
37:19, 42:11,
42:22, 49:13,
49:15
**checking**
58:11
**chen**
1:7, 1:10,
4:16, 4:17,
4:20, 5:22,
6:10, 6:15,
6:18, 7:4, 7:6,
7:14, 8:9, 8:10,
8:21, 10:2,
10:4, 10:11,

J.R.141

11:5, 11:20,
13:3, 14:4,
15:3, 15:4,
15:8, 17:1,
23:10, 25:9,
29:11, 29:16,
36:18, 37:22,
38:1, 40:9,
40:10, 46:18,
48:2, 48:12,
55:19, 56:22,
57:1, 59:5
**chesapeake**
103:22
**chinese**
58:8, 58:10,
58:16, 59:2
**choosing**
25:11
**citation**
75:19
**cites**
75:10
**citing**
74:9
**claiming**
36:12
**clarification**
95:22, 96:17,
97:9
**clarified**
85:10
**clarify**
49:6, 52:3,
52:9, 87:18,
95:15, 96:3,
100:18, 101:7
**clarifying**
30:9
**clattenburg**
3:13, 4:2, 5:2,
5:17, 5:21, 6:8,
7:2, 8:17, 10:8,
10:12, 12:17,
14:1, 14:7,
14:10, 14:13,
14:19, 15:20,
16:2, 17:15,

19:1, 20:5,
20:11, 20:19,
21:1, 21:6,
21:9, 21:18,
22:6, 22:9,
23:1, 23:4,
23:8, 23:14,
23:16, 24:3,
24:6, 24:12,
25:2, 25:4,
25:18, 26:6,
29:1, 29:20,
30:7, 31:13,
31:17, 31:22,
32:5, 32:10,
33:20, 35:8,
36:6, 36:15,
37:4, 37:13,
103:9, 103:14,
104:4, 104:8
**clear**
52:14, 53:4,
53:13, 66:11,
66:17, 67:18,
67:21, 72:5,
84:19, 85:6,
85:13, 90:13,
90:22, 91:10,
93:21, 96:14,
100:21
**clearly**
68:14, 74:12
**clickbait**
46:15, 62:11,
63:5, 64:1,
64:3, 64:9,
100:16, 101:4,
102:6
**client**
9:5, 10:20,
17:19, 18:4,
89:13
**clm**
56:4
**co-owned**
67:1, 67:4
**code**
9:11, 18:3,

46:20
**code-related**
6:11, 6:19,
7:7, 8:9, 8:20,
9:7, 10:4, 12:3,
29:12
**codes**
14:3, 16:10,
62:5, 98:16,
100:3
**coding**
21:20, 27:22,
35:18
**collaborative**
12:1
**collect**
79:8, 79:12,
80:2, 81:9
**collected**
25:10, 29:9,
39:19, 76:11,
77:8, 80:4,
81:3, 83:2,
83:13, 83:18
**collecting**
80:10, 83:21
**collection**
75:15, 77:10,
79:15
**combination**
13:11
**come**
10:13, 58:5,
59:18, 61:6,
84:21, 85:7,
88:16, 104:2
**comes**
74:17, 91:6
**coming**
4:8, 12:2,
13:6, 55:13,
78:6, 84:13,
96:12
**command**
81:6, 81:7
**commencing**
4:1
**comment**
61:5, 80:7

**commit**
95:21
**committing**
69:11
**communicated**
62:5
**communications**
12:19, 15:10
**company**
66:18, 67:1,
67:4, 67:6,
67:10, 67:13
**compel**
16:21
**complete**
19:9, 21:3,
26:1, 54:17
**completely**
72:20, 74:20
**completes**
57:2
**completion**
48:7
**comply**
102:15
**conceptually**
51:12
**concern**
62:8
**concerns**
38:22, 40:2,
40:7
**concluded**
104:11
**confer**
1:16, 2:1, 4:4,
4:13, 4:15,
7:22, 8:19,
16:20, 30:22,
42:12, 42:16,
43:4, 44:2,
78:18, 104:11
**confirm**
36:7, 42:22,
55:14, 64:19,
93:3, 93:17,
93:20, 98:9
**confirmed**
6:21

J.R.142

**confusing**
83:2, 90:14
**confusion**
102:20
**consider**
17:14
**consolidated**
11:11
**construing**
53:14, 53:18
**consultation**
76:10
**contain**
20:6
**contains**
20:1
**context**
30:19, 31:7,
33:2, 34:22
**continues**
71:20
**control**
74:22, 93:13
**conversation**
30:20, 31:8,
33:2, 48:22,
92:8
**conversations**
30:17, 31:10
**converting**
33:17
**copies**
91:7
**copy**
37:8, 81:7
**core**
70:22
**correct**
6:18, 19:20,
21:2, 21:5,
39:2, 39:10,
57:3, 58:21,
82:10, 83:21,
92:4, 105:7
**corrected**
78:19
**correctly**
5:4, 5:11

**correspondence**
8:3, 80:21
**could**
12:14, 73:21,
80:19, 87:10
**counsel**
62:1, 73:2,
76:4, 105:12
**count**
63:14, 79:2
**couple**
12:17, 50:14,
51:20, 103:15
**court**
1:1, 46:9,
51:6, 59:16,
59:17, 60:16,
66:5, 66:8,
84:19, 87:8,
87:10, 88:5,
90:2, 105:22
**court's**
6:2, 66:8
**cover**
12:18, 13:16,
18:19
**covered**
10:3, 72:15
**covers**
12:14, 90:10
**cppio**
65:14, 65:19
**creates**
34:6
**criteria**
25:12
**crr**
1:22, 105:21
**csr**
1:22, 105:21
**current**
22:17, 67:21
**custody**
74:22, 79:9,
93:13
**cut**
66:16
**cuts**
59:15

**cutting**
32:9
**cv**
1:7

**D**

**data**
27:2, 27:12,
27:15, 28:2,
28:4, 28:6,
28:19, 76:11
**date**
4:5, 5:22, 6:3,
27:17, 51:2,
57:4, 71:19,
99:6, 102:9,
102:17
**dated**
6:14
**dates**
4:18, 4:19,
5:9, 5:11,
100:4, 100:20,
102:14
**david**
4:20, 5:6,
11:16, 12:19,
36:22, 41:20,
45:8, 52:2,
53:14, 53:17,
59:15, 62:6,
64:11, 68:2,
68:12, 69:20,
70:6, 70:16,
70:17, 71:5,
72:7, 72:20,
74:19, 76:4,
76:11, 79:19,
84:12, 84:17,
85:7, 86:8,
90:13, 90:15,
90:19, 90:22,
91:4, 91:12,
92:9, 92:19,
92:21, 93:17,
95:1, 95:9,
95:17, 98:1,
98:12, 98:13,

98:16, 99:8,
101:18, 101:22
**david's**
5:12, 26:17,
26:20, 28:22,
36:16, 37:22,
46:18, 48:1,
57:11, 59:7,
69:6, 81:2,
86:8, 97:12
**day**
34:22, 57:21,
58:1, 105:18
**days**
5:13, 5:14
**dc**
3:16
**dd**
81:4
**de-duplicate**
34:10
**de-duplicated**
36:13
**de-duplicating**
22:11, 22:14,
22:19, 23:2,
23:18, 23:19,
24:8, 24:14,
24:16, 25:21,
26:8, 26:11,
29:7, 29:13,
34:9, 35:22,
36:5
**deadline**
5:5, 17:6
**deal**
35:3
**debugging**
90:17
**december**
1:18, 4:4, 6:1,
6:14, 13:13,
36:21, 43:4,
44:2, 44:16,
49:1, 62:2,
105:18
**decided**
4:14, 7:9, 7:11

J.R.143

| | | | |
|---|---|---|---|
| **defendants** 1:13, 3:11 | **determined** 19:22, 96:9 | **disclosure** 4:6, 19:4, 19:11, 19:12 | **dms** 19:5, 19:13, 20:13, 21:3 |
| **definitely** 95:10 | **develop** 18:4 | **discord** 4:6, 5:5, 19:5, 19:13, 21:3, 27:5, 33:8, 44:10, 47:10, 50:2, 50:18, 64:14, 64:16, 64:18, 65:1, 71:7, 71:20, 71:22, 81:12, 83:8, 91:15, 91:16, 91:17, 91:18, 91:19, 94:10, 94:15, 95:16, 100:14, 100:16, 102:4, 102:6, 102:14 | **document** 4:7, 4:16, 7:6, 15:16, 21:11, 25:9, 31:7, 34:21, 47:9, 57:1, 68:10, 77:10, 84:20, 86:5, 87:20, 89:4, 89:5 |
| **delay** 37:9, 78:9 | **developed** 7:4 | | |
| **delayed** 33:16 | **development** 18:2 | | **doing** 5:9, 17:5, 17:7, 24:22, 41:3, 45:17, 51:15, 54:4, 58:16, 61:17, 62:3, 65:8, 70:7, 70:8, 82:3, 89:11, 99:19, 102:18 |
| **delete** 85:12, 91:18, 92:5 | **device** 79:8 | | |
| **deleted** 46:15, 46:21, 68:3, 68:9, 68:13, 68:22, 69:2, 70:16, 71:7, 71:19, 72:7, 72:11, 92:9, 92:19, 94:21, 102:21, 103:1 | **dicharia** 8:3 | | |
| | **difference** 78:17, 79:22 | | **done** 45:18, 55:21, 81:16, 96:2, 105:7 |
| | **different** 11:21, 26:21, 34:16, 39:4, 39:8, 62:13, 70:21, 80:2, 80:15, 92:18, 93:14, 94:16 | **discovery** 4:12, 5:22, 19:3, 37:15, 59:5, 89:2, 89:18, 91:8 | |
| **deleting** 38:13, 92:5 | | | **double-check** 49:18 |
| **deposing** 57:21 | **digital** 81:4 | **discuss** 5:18, 17:5, 58:3 | **down** 78:4, 88:5, 103:21 |
| **deposition** 4:19, 4:20, 6:1, 46:17, 57:11, 58:2, 58:6 | **direct** 82:7, 82:9, 84:2, 89:1 | **discussed** 4:13, 9:21, 44:16, 59:4, 67:17, 81:20, 82:4, 85:8, 85:18, 95:17 | **downloaded** 21:21 |
| | **direction** 105:11 | | **draft** 9:3 |
| **depositions** 104:1 | **directly** 9:10, 14:3, 16:10 | **discussing** 95:1 | **drafting** 86:3 |
| **describe** 68:2, 69:5, 79:11 | **disagree** 19:2, 46:7, 61:1, 61:13, 61:16, 69:10 | **discussion** 5:4, 5:6, 7:15, 70:19, 92:15, 94:15 | **droplets** 81:3 |
| **described** 38:21, 100:5 | | | **duck** 90:17 |
| **describes** 68:6 | **disagreeing** 69:16 | **discussions** 7:21, 22:16 | **due** 59:10, 76:12 |
| **description** 43:18, 69:6, 71:6 | **disappearing** 38:15, 42:1, 42:3, 45:5 | **disks** 42:19, 43:5, 45:14 | **duplicate** 23:9, 23:22 |
| **destroyed** 46:16 | **discarded** 95:3 | **distinct** 40:8, 75:6 | **duplicates** 23:5, 23:7, 24:7 |
| **details** 101:1, 101:6, 101:8 | **disclose** 73:10 | **district** 1:1, 1:2, 88:5 | |
| **determine** 79:10 | **disclosed** 6:16 | | |
| | **disclosing** 73:22 | | |

J.R.144

during
28:8, 88:4,
98:21
duty
10:13

**E**

each
56:15
earlier
34:15, 58:3,
81:13, 81:21,
87:22, 90:6
east
3:6
easy
24:15
effectively
27:19, 28:10,
99:12
efficiency
96:2
effort
65:9, 65:12,
66:1, 79:3
either
5:14, 23:22,
25:19, 94:3,
94:4, 96:17
else
25:10, 35:20,
46:22, 72:8,
94:22
email
5:14, 6:13,
7:19, 22:4,
22:5, 22:6,
27:8, 29:2,
41:20, 80:20
emailed
37:5, 37:7
emails
7:17, 23:5,
23:7, 24:12,
24:13, 24:14
emma
3:22
employed
105:13

employees
62:12
encompassed
17:12
end
8:1, 17:16,
37:14, 62:9,
65:3, 86:4
ends
90:18
enough
17:5
entertain
13:20
entire
25:20
entirely
87:14
entity
50:5
equally
11:19
especially
78:8
esquire
3:4, 3:12, 3:13
estate
1:6
even
35:14, 73:7,
73:11, 73:19,
78:20, 94:5,
97:16
eventually
8:4
ever
9:21, 12:14,
12:15, 13:17,
40:1, 56:17
every
15:16, 18:11,
18:12, 25:8,
40:6, 70:12
everyone
15:13, 18:9,
86:7, 92:6
everything
12:14, 13:16,

18:17, 18:19,
21:14, 21:16,
24:18, 25:10,
25:13, 26:13,
29:14, 33:17,
41:6, 41:9,
83:1, 99:10
evidence
75:15
evidently
97:4
exact
72:13
exactly
8:7, 12:9,
33:5, 40:19,
67:12
example
63:5, 65:14
exception
60:5, 84:16
exchange
10:1
excuses
60:16
exhibit
19:8, 19:17,
19:19, 19:20,
20:1, 20:13,
21:2, 38:20,
39:5, 39:22,
40:8, 40:13,
46:6, 81:11,
81:19, 82:5,
83:4, 83:9,
83:22, 84:2,
84:5
exhibits
7:16, 82:19
exist
90:20, 91:9,
91:10, 91:12,
91:13, 92:22,
93:4, 93:14,
93:20, 97:15,
98:7, 99:13
exists
91:5

expect
103:10
expense
73:16
explain
53:21, 60:6
explained
19:8, 39:6
explanation
25:22
extent
63:1, 63:21,
65:2, 67:7,
73:13, 83:15,
87:15, 99:3,
100:1

**F**

facebook
27:15, 27:18,
28:7
fact
43:4, 81:1
facts
17:21, 18:3,
73:10, 73:11,
73:15, 74:6
failure
60:17
faith
78:18, 79:20
fall
7:5
falls
75:16
familiar
65:22
far
4:8, 29:10
february
5:12, 5:16,
99:14
federal
41:2, 76:14
feels
57:12
fen
1:4, 29:9,

J.R.145

Transcript of Meet and Confer
Conducted on December 17, 2025

36

| | | | |
|---|---|---|---|
| 37:20, 38:9, 38:10, 46:12, 80:17, 82:6, 82:19 | 40:1, 41:19, 48:1, 48:11, 56:22, 59:14, 75:19, 81:22, 90:12, 98:12 | 61:18, 70:12 | **generalized** 61:5, 88:3, 89:7, 89:8 |
| **few** 38:6, 49:16, 59:6, 59:11, 67:17, 74:17, 91:6 | **fit** 15:5, 45:15 | **forward** 34:4, 35:17 | **generally** 46:1, 53:2 |
| **fifth** 44:7 | **fits** 72:14 | **found** 16:5, 48:17, 102:9 | **getting** 12:8, 23:21, 24:7, 31:2, 32:12, 34:4, 44:14, 44:21, 47:15, 48:4, 55:9, 80:9, 101:17, 103:1, 103:2 |
| **figure** 5:18, 8:22, 9:4, 9:9, 9:18, 10:18, 56:7, 66:1, 75:2, 97:6 | **five** 18:16, 65:4, 90:5 | **four** 65:4, 87:3 | |
| | **five-minute** 90:2 | **fourth** 44:6 | |
| **figured** 14:19 | **flag** 84:10 | **friday** 20:10, 27:4, 28:18, 28:20, 31:16, 32:18, 33:12, 33:19, 34:19, 35:4, 35:17, 57:10, 57:20, 103:13, 103:22 | **github** 27:20, 96:21 |
| **final** 57:6, 58:7, 98:18 | **floyd** 3:22 | | **give** 19:16, 42:17, 62:16, 63:3 |
| **finally** 8:4, 100:11 | **folks** 56:5 | | **given** 65:15, 72:21, 73:8, 74:5, 85:3, 105:7 |
| **financial** 18:11, 105:14 | **follow** 32:5, 32:6, 37:8, 41:21, 42:9, 45:13, 51:10, 95:13 | | |
| **find** 10:15, 10:20, 16:14, 20:21, 21:8, 75:2, 83:2 | | **friday's** 27:9, 27:13, 28:3, 28:5 | **gives** 57:20 |
| | **follow-up** 4:9, 30:8, 48:11, 56:19, 58:7, 76:21, 78:21 | **front** 42:8 | **giving** 62:20, 65:8, 102:7, 102:16 |
| **finds** 60:6 | | **ftx** 14:17 | |
| **fine** 16:19, 17:15, 45:17, 49:2, 51:8, 51:13, 52:5, 52:16, 61:16, 63:1, 70:13, 102:19, 103:3 | | **full** 17:12, 22:15, 23:9, 23:20, 24:18, 33:1, 41:7, 41:8, 44:4, 54:17, 66:20, 66:22, 67:19 | **global** 9:12, 9:20, 11:7, 11:9, 12:18, 15:9 |
| | **follow-ups** 4:3 | | **go** 6:5, 8:18, 8:21, 11:17, 30:5, 36:9, 37:17, 43:16, 45:7, 48:21, 49:21, 51:20, 61:18, 79:22, 86:17, 87:14 |
| | **following** 4:12, 6:2, 8:2, 35:22, 39:17 | | |
| | **foods** 74:8 | **fully** 18:10 | |
| | **foregoing** 105:5, 105:6 | **functioning** 40:9 | |
| **finish** 16:2, 47:9 | **form** 33:5, 67:21 | **fyi** 99:17, 102:2, 102:16, 102:18 | **goes** 5:6, 14:16, 71:21 |
| **firestone** 3:14 | **format** 30:13, 30:21, 31:2, 31:10 | — G — | |
| **firewall** 77:12 | **formats** 80:15 | **gained** 79:9 | **going** 6:5, 9:18, 10:3, 15:15, 20:9, 20:10, |
| **first** 4:18, 5:11, 37:19, 38:1, | **forth** 7:17, 7:20, | **gather** 9:17 | |
| | | **general** 85:21, 86:11 | |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

J.R.146

22:18, 24:10,
24:20, 26:8,
26:10, 32:17,
32:18, 32:19,
32:22, 33:7,
35:4, 35:21,
36:4, 38:6,
38:11, 38:14,
39:13, 39:14,
39:20, 41:5,
41:8, 43:21,
44:1, 44:2,
45:7, 45:15,
45:21, 46:10,
46:21, 47:6,
48:15, 49:10,
49:13, 49:15,
52:4, 56:21,
57:15, 61:16,
76:22, 77:5,
78:11, 78:12,
79:21, 82:2,
84:6, 96:16,
98:6, 99:12,
102:9, 102:10,
102:15, 103:13,
103:14, 103:19

**gone**
13:2, 58:13,
85:7, 92:6

**good**
60:16, 78:18,
79:20, 99:2

**gotten**
23:9, 31:4,
31:6, 36:21,
37:8, 69:5,
81:17, 92:1,
92:2, 92:11

**granular**
71:13

**great**
5:2, 6:7

**greenbelt**
88:6

**ground**
59:22, 60:15,
74:13

**grounds**
60:13

**group**
64:5

**groups**
62:11, 63:8,
82:7

**guess**
70:19

**guo**
92:7

**guys**
5:8, 6:9, 7:13,
10:10, 10:14,
11:11, 18:9,
18:13, 34:13,
47:4, 50:12,
57:15, 58:2,
61:6, 103:20

**H**

**hairs**
93:16

**half**
77:20, 77:22

**hand**
105:17

**handful**
50:21

**handle**
63:15

**handled**
50:13

**handles**
63:18, 64:22

**hanging**
104:5

**happen**
33:7

**happened**
30:6

**happening**
31:3, 36:9

**happy**
9:3

**head**
22:3, 26:19,
32:15, 50:20,

64:10, 65:13,
97:17

**hear**
30:11, 80:10

**heard**
37:7, 76:1,
76:2, 103:16

**hearing**
85:5, 88:5,
88:16

**held**
2:1, 18:8,
52:16

**hell**
90:17, 90:20,
92:12, 93:19,
95:7

**help**
9:3, 10:16

**here**
5:13, 6:20,
22:17, 35:21,
36:12, 40:1,
40:15, 42:17,
62:3, 62:8,
63:9, 66:5,
68:10, 68:14,
71:16, 72:19,
74:18, 79:18,
92:20, 93:9,
93:16, 95:7,
95:20, 100:18

**here's**
67:18

**hereby**
105:5

**hereunto**
105:16

**hey**
10:15

**hickman**
74:10, 75:20,
75:21

**history**
8:18, 95:21

**hit**
33:3, 34:21,
35:7

**hits**
21:14, 21:17,
28:7

**hm-hmm**
59:13, 62:15

**hold**
24:5, 30:1,
32:3, 58:18,
92:10

**holdings**
75:17

**host**
81:4

**hour**
28:16, 28:18,
31:1, 32:16,
33:1, 33:4,
33:17, 34:19,
34:21, 35:7

**hours**
33:2, 33:3

**however**
11:5, 25:11,
67:19, 87:17,
88:11

**hunt**
73:14

**I**

**id**
71:18, 71:20

**identification**
62:4, 63:9,
69:7

**identified**
11:5, 35:3,
51:11, 64:22,
69:19, 71:9,
81:9

**identifies**
63:14, 63:15,
81:8

**identify**
15:16, 50:16,
50:18, 55:16,
62:6, 66:22,
67:10, 68:2,
68:4, 68:14,

J.R.147

Transcript of Meet and Confer
Conducted on December 17, 2025

69:5, 71:17,
82:15, 98:20,
100:3, 100:19,
101:1, 101:6,
101:8, 101:13,
101:14, 102:13,
103:3
**imagine**
12:15, 13:17,
56:22, 75:11
**immaterial**
86:6
**imply**
98:19
**important**
87:4
**imposes**
77:10
**improper**
60:19, 72:20,
97:12, 98:18,
100:4
**improperly**
59:22, 66:7
**inadvertent**
86:2
**inappropriate**
74:21, 78:5,
87:15
**inc**
73:17, 74:9
**include**
60:3, 63:22,
78:13, 81:19,
82:18
**included**
13:18, 20:12,
50:4, 60:2,
80:16, 88:14,
100:15, 102:4
**including**
29:9, 54:13,
74:4
**inclusive**
63:1
**income**
9:10, 14:2,
16:9

**incomplete**
68:13
**inconsistent**
46:16
**indicate**
40:22
**indicated**
64:17, 80:7
**indication**
50:8, 96:19
**indirectly**
9:11, 14:3,
16:10
**individual**
30:17, 31:6,
31:19, 62:17,
75:14
**individualized**
63:15
**individuals**
62:5, 62:10,
63:10, 65:8
**info**
103:10
**information**
16:15, 17:19,
32:14, 33:21,
40:4, 47:6,
65:9, 65:13,
65:15, 70:22,
72:21, 73:8,
73:14, 74:4,
74:14, 74:21,
76:5, 76:7,
76:19, 77:13,
79:17, 81:9,
82:13, 99:6,
101:15
**initially**
22:14
**inquire**
76:5, 77:19
**inquiry**
16:5
**insofar**
98:19
**instagram**
28:2

**institution**
18:11
**instructions**
85:22, 86:12
**intends**
73:9, 74:5
**interest**
96:2, 105:14
**intermittent**
41:3
**interrogatories**
4:16, 9:15,
37:21, 38:1,
38:8, 44:8,
47:7, 47:8,
59:8, 61:7,
73:5, 74:13,
80:18
**interrogatory**
40:15, 40:16,
42:5, 60:13,
71:11, 72:19,
75:3, 77:20,
79:20, 81:10
**involve**
75:12
**involved**
12:7, 75:14,
94:13, 94:14
**involvement**
76:12
**irrelevant**
46:15
**isolate**
34:7, 35:2
**issue**
6:6, 13:1,
17:4, 19:10,
34:4, 34:9,
35:22, 38:20,
43:6, 75:6,
79:7, 79:17,
84:10, 87:17,
91:13
**issues**
4:5, 16:19,
21:10, 37:15,
38:5, 39:12,

41:12, 41:14,
81:18, 82:4
**item**
30:8, 86:11
**items**
4:3, 77:2, 84:5

**J**

**january**
4:8, 5:5, 27:6,
33:9, 41:5,
41:6, 44:10,
45:19, 51:18,
57:2, 57:9,
77:1, 78:2,
78:12, 79:4
**jito**
64:15
**job**
1:20
**jriggs**
63:19
**judge**
51:7, 61:2,
61:18, 88:2,
89:8, 89:9
**july**
8:1
**jump**
50:2, 50:18,
56:10
**june**
7:19, 11:14,
55:21
**justin**
8:3, 12:6,
80:22

**K**

**karavaltchev**
67:2
**keep**
32:9, 39:14,
79:21
**keeping**
51:4
**kevin**
3:12, 4:11,

J.R.148

12:7, 37:17,
68:16

**kind**
15:2, 53:20,
68:6, 72:16,
75:6, 85:17,
87:17

**kinds**
62:14

**knew**
50:20

**know**
9:6, 10:15,
10:19, 11:6,
12:4, 12:5,
17:19, 17:21,
17:22, 18:2,
18:8, 18:10,
18:15, 18:17,
22:3, 26:15,
30:4, 31:9,
35:12, 38:12,
39:8, 40:5,
42:15, 45:15,
45:17, 46:20,
49:3, 51:5,
51:7, 53:18,
54:4, 54:11,
56:10, 56:11,
56:15, 57:5,
57:18, 59:11,
61:9, 61:19,
62:1, 62:9,
62:16, 62:19,
63:4, 63:16,
64:5, 64:11,
64:12, 64:15,
64:21, 65:4,
65:11, 65:14,
65:21, 68:8,
69:10, 69:18,
70:19, 71:15,
72:9, 72:11,
72:15, 73:7,
74:16, 76:10,
77:8, 77:13,
77:18, 77:20,
78:3, 78:7,

79:13, 79:14,
79:16, 80:13,
80:22, 81:20,
82:17, 83:3,
83:12, 85:17,
86:3, 86:7,
86:9, 88:3,
89:5, 91:9,
94:8, 94:10,
95:12, 96:12,
97:12, 97:16

**knowledge**
73:6, 74:14,
77:14, 97:12,
100:5

**known**
97:11, 98:1

**knows**
63:2, 63:4,
63:6, 63:7,
64:12, 64:18

**L**

**labor**
73:16

**lack**
89:4

**laid**
42:15, 61:18

**language**
52:14, 58:8

**last**
4:13, 6:10,
6:13, 6:14,
8:19, 19:8,
21:11, 27:4,
27:9, 28:20,
30:22, 33:12,
37:1, 42:11,
44:11, 48:11,
53:2, 53:11,
56:20, 65:3,
72:9, 72:15,
90:4, 90:13,
97:22, 98:11,
99:21, 103:5

**late**
7:19, 28:11,

37:1, 57:12,
66:9, 78:1,
78:16, 79:4,
87:14, 89:17

**later**
5:15, 22:4,
22:5, 37:7,
83:13, 100:4

**law**
77:16

**lay**
62:2

**learning**
35:18

**least**
6:3, 11:12,
41:7, 50:19,
56:1, 56:10,
56:16, 91:7

**leave**
35:1, 52:1,
57:22, 94:3

**leaving**
66:18

**left**
90:5

**less**
77:9

**let's**
6:5, 24:12,
24:21, 57:9,
57:22, 58:4,
89:10, 90:1,
90:5, 101:11

**letter**
7:13, 11:3

**levy**
3:14

**lfmdnd**
68:11, 68:16

**li**
1:4, 29:9,
37:20, 38:9,
38:10, 46:12,
80:17, 82:6,
82:19

**licensed**
2:8

**limited**
4:20, 6:1,
100:13, 101:3,
102:1, 102:2

**limiting**
66:12

**limits**
73:13

**line**
81:7, 86:2,
98:1, 101:5

**liquidator-relat-
ed**
100:13, 102:3

**lisa**
1:22, 2:6,
104:9, 104:10,
105:2, 105:21

**list**
12:11, 13:19,
13:20, 14:16,
19:9, 20:11,
20:13, 20:22,
21:3, 29:3,
40:9, 42:8,
44:20, 65:5,
80:2, 82:6

**listed**
12:21, 12:22,
46:19, 49:16,
82:19, 84:2,
101:8

**listing**
62:8

**lists**
46:14

**literally**
11:15

**little**
28:13, 33:16,
57:7, 57:12,
90:6, 100:17,
101:4

**llc**
1:11, 1:12

**llp**
3:14

**local**
65:10

J.R.149

**locate**
6:9, 8:22, 9:5, 9:18, 10:18, 13:8, 17:2, 17:3, 17:20, 18:5

**located**
102:17

**locating**
13:4, 14:2, 14:8, 16:7

**location**
102:8

**log**
88:14

**logical**
49:12

**logistically**
76:17

**logs**
52:22, 54:13

**long**
12:4, 29:3, 33:3, 59:18, 78:9, 84:21, 85:7, 88:16, 104:5

**longer**
91:19, 94:21

**look**
14:11, 19:9, 26:2, 26:16, 34:4, 35:17, 37:11, 42:10, 47:17, 49:11, 51:14, 68:10, 69:17, 72:18, 75:10, 76:3, 84:14, 104:7

**looked**
48:17, 70:6, 98:12

**looking**
5:10, 11:3, 78:6, 85:21, 97:18, 97:22

**loose**
27:12

**lot**
35:16, 82:12, 94:14

**M**

**made**
8:21, 13:12, 16:4, 17:22, 18:1, 56:11, 65:9, 85:6, 86:21

**madelyn**
19:22, 20:16, 22:16, 56:4

**maintained**
31:11

**make**
8:7, 13:3, 15:4, 16:14, 16:15, 17:1, 17:7, 19:11, 24:15, 25:18, 32:13, 35:15, 36:8, 49:12, 65:12, 65:22, 67:17, 77:9, 83:3, 90:12, 90:21, 93:8, 94:5, 95:15

**makes**
91:3, 98:5

**making**
52:14, 79:3, 85:13, 94:9

**malyshev**
7:19, 12:7, 56:4

**mancia**
60:10

**manner**
7:9

**manuals**
21:20, 21:22, 35:18

**many**
62:17, 87:12

**marker**
98:16

**market**
98:16

**married**
8:6

**mart**
73:17

**maryland**
1:2, 3:7, 103:21

**master**
26:3

**match**
27:16

**material**
38:18, 41:16

**materials**
85:1, 88:18

**matter**
72:22, 85:14, 89:17

**maybe**
5:8, 12:7, 29:5, 31:22, 43:3, 73:2

**mayflower**
60:10

**mean**
7:3, 9:2, 10:10, 11:15, 14:16, 15:1, 15:5, 16:18, 18:9, 18:13, 23:8, 24:3, 25:7, 29:13, 33:11, 35:8, 45:4, 45:14, 61:15, 63:13, 71:10, 72:4, 76:9, 78:10, 85:20, 88:20, 94:8, 95:16

**means**
16:13

**meant**
88:22

**meet**
1:16, 2:1, 4:4, 4:13, 4:14,

7:22, 8:19, 16:20, 30:22, 42:11, 42:16, 43:4, 44:2, 78:18, 104:11

**member**
62:13

**members**
62:11, 62:12, 62:22, 63:22, 64:6, 64:13, 64:15, 64:18

**mentioned**
8:12, 26:9, 30:11, 40:14, 43:21, 65:5, 87:21, 88:13

**merely**
80:7

**message**
30:13, 31:19, 37:9, 61:8, 82:7, 89:1

**messages**
20:2, 27:2, 30:14, 30:17, 31:3, 31:4, 31:7, 31:9, 35:6, 38:15, 41:15, 44:11, 46:21, 70:15, 71:13, 71:22, 72:7, 82:9, 84:3, 90:16, 90:20, 91:8, 91:19, 91:21, 92:3, 92:5, 92:11, 92:17, 92:21, 93:1, 93:4, 93:6, 93:13, 93:19, 94:19, 94:20, 95:3, 95:4, 95:5, 95:8, 100:15, 100:16, 101:4, 102:5, 102:6, 102:14, 102:21

J.R.150

Transcript of Meet and Confer
Conducted on December 17, 2025

**met**
25:12
**michael**
55:13
**might**
30:10, 30:12,
80:16, 80:21,
84:14, 91:3,
94:22
**miller**
73:3, 74:10
**million**
8:15
**mind**
32:1, 41:7
**mingsan**
1:6
**minutes**
67:17, 90:5
**miscellaneous**
81:4
**missed**
30:12
**missing**
4:9, 38:19,
41:16, 42:6,
70:17, 70:18,
70:19, 70:22,
82:12
**misspoke**
52:18
**misstatement**
86:10
**mistyping**
86:10
**mm-hmm**
38:3, 45:9,
50:7, 75:22,
83:14
**moment**
33:10, 41:12,
100:9
**money**
18:1, 18:2
**month**
37:7
**months**
78:1, 92:8

**more**
21:19, 21:22,
34:2, 35:11,
63:1, 63:22,
64:11, 65:2,
65:14, 71:13,
80:11, 86:21,
93:8
**morning**
97:2
**most**
4:15, 23:14
**mostly**
4:3, 24:13
**motion**
16:21
**move**
4:14, 19:3,
35:16, 37:15,
89:10
**moved**
50:10
**moving**
21:10, 36:15,
45:20, 66:3,
66:4, 69:12,
70:11, 95:19,
97:10
**msol**
98:16
**much**
5:18, 76:12,
104:9
**muse**
3:14
**must**
32:21, 60:13,
73:10, 74:3

**N**

**name**
62:21, 63:2,
63:4, 71:18,
71:20
**named**
64:16, 67:13
**names**
40:7, 62:17,

62:20, 63:3,
63:6, 63:7,
63:16, 63:17,
64:2, 64:13,
64:21, 68:8,
71:15, 72:10,
82:10, 82:11,
82:15
**narrower**
83:1
**nearly**
60:2
**necessarily**
64:13, 80:12,
86:9
**need**
8:20, 18:21,
25:22, 28:12,
29:6, 35:2,
36:7, 36:8,
36:9, 37:1,
39:9, 45:13,
51:10, 55:15,
59:19, 61:6,
71:4, 77:21,
78:21, 81:13,
81:22, 85:1,
85:12, 86:9,
88:17, 88:18,
95:13, 95:14
**needs**
50:13, 51:1,
51:6, 78:19,
81:16, 84:22,
93:10, 95:16,
96:9
**neither**
105:12
**never**
10:14, 20:19,
56:9, 83:18,
89:18, 91:16
**new**
33:13, 33:14,
46:14, 62:11,
63:5, 63:22,
64:3, 64:8,
87:13, 90:17,

90:19, 90:20,
92:12, 93:19,
95:6, 95:7,
100:16, 101:3,
102:6
**next**
19:4, 44:13,
47:14, 69:12,
70:11, 98:10
**night**
37:1
**ninth**
34:17
**nobody**
92:20
**non-discord**
25:8, 25:14
**non-issue**
33:9
**non-privilege**
53:3
**non-privileged**
91:2, 98:14,
101:18
**nonanswer**
78:20
**none**
75:12
**nonprivileged**
99:9
**nonresponsive**
72:16
**note**
61:2, 61:20,
70:3
**noted**
51:13
**nothing**
36:13, 52:10,
86:20
**nothing's**
52:15
**notwithstanding**
67:18
**november**
6:17, 7:12,
8:13, 11:3,
11:17, 12:12,

J.R.151

13:19, 17:13,
37:6, 61:9,
79:2, 85:5,
88:4, 96:21
**number**
40:17, 45:16,
46:19, 48:14,
59:16, 66:16,
69:17, 69:22,
71:11, 80:7,
81:10, 85:16,
86:1, 86:11,
97:18, 102:12
**numbers**
49:3, 56:8
**nw**
3:15

**O**

**o'clock**
8:6
**obfuscating**
76:14
**object**
59:18, 61:3,
66:9, 84:21,
85:7, 88:17,
89:14
**objecting**
60:13, 66:19,
66:21
**objection**
49:7, 51:4,
52:1, 52:15,
52:18, 60:15,
66:5, 66:11,
66:13, 67:18,
89:17, 95:19
**objections**
49:9, 51:2,
51:11, 51:16,
54:7, 59:16,
59:21, 60:3,
60:18, 61:13,
84:18, 85:3,
85:4, 85:11,
85:21, 86:11,
87:9, 87:11,

87:12, 87:13,
87:22, 88:8,
90:10, 101:17
**objects**
60:4, 60:7
**obligated**
65:11, 65:22,
90:22, 97:14
**obligation**
10:13, 10:17,
75:1
**obtain**
76:7
**obtained**
9:10, 14:2,
16:9
**obvious**
64:9
**obviously**
5:4, 8:8, 11:4,
12:1, 30:4,
33:11, 41:1,
50:3, 50:13,
51:5, 51:14,
55:15, 57:7,
63:14, 63:17,
86:2, 89:1
**occasions**
80:15
**ocean**
81:4
**off-hand**
49:3
**oh**
10:15, 40:21,
44:17, 44:20,
71:2, 87:9,
88:22
**okay**
10:9, 17:17,
19:1, 20:21,
21:1, 24:2,
26:7, 29:1,
30:7, 31:22,
33:20, 35:4,
35:8, 36:14,
36:15, 37:4,
37:11, 37:13,

41:11, 43:1,
43:17, 45:20,
46:5, 46:6,
46:12, 48:13,
54:8, 55:2,
55:11, 56:9,
56:18, 56:19,
57:14, 58:22,
59:3, 60:20,
61:15, 63:13,
65:7, 66:2,
67:9, 67:15,
68:1, 69:3,
69:8, 69:9,
69:13, 69:14,
70:1, 70:10,
70:11, 70:15,
71:2, 72:3,
78:10, 78:15,
79:5, 79:6,
81:17, 84:6,
86:18, 86:20,
88:15, 90:1,
90:10, 93:8,
93:16, 95:11,
95:13, 96:11,
97:8, 97:21,
98:10, 99:2,
99:16, 100:10,
102:19, 103:4,
103:5, 103:7,
104:8
**oklahoma**
74:8
**old**
33:14
**once**
44:5, 47:8,
58:14, 70:13,
78:2
**one**
3:6, 4:8, 11:8,
12:21, 13:1,
15:6, 19:4,
20:1, 20:2,
21:22, 24:13,
31:21, 34:17,
40:5, 40:14,

44:9, 46:10,
46:13, 47:12,
48:10, 49:13,
49:20, 50:2,
50:6, 51:9,
56:10, 56:16,
57:21, 60:5,
64:9, 65:4,
65:18, 65:20,
66:6, 66:17,
69:12, 70:11,
77:2, 78:17,
78:20, 81:18,
82:2, 82:22,
84:1, 84:3,
84:10, 84:11,
90:12, 90:21,
91:12, 93:22,
94:6, 96:15,
96:18, 97:4,
97:6, 97:9,
98:10, 98:11,
98:12, 102:7,
103:6, 104:6
**one's**
50:9, 71:12
**onerous**
5:10
**ones**
4:13, 4:14,
6:16, 9:19,
13:17, 14:10,
14:14, 15:5,
18:20, 44:18,
44:20, 47:15,
50:15, 52:8,
53:4, 53:10,
55:16, 65:21,
68:5, 69:21,
72:10, 78:8,
78:16, 87:15,
89:6, 98:20
**online**
21:21, 35:18
**only**
8:10, 40:5,
46:14, 50:21,
57:20, 58:1,

J.R.152

67:2, 68:5,
82:21, 83:16,
84:1, 84:3,
86:1, 90:5,
91:12, 93:22,
99:12, 100:15,
102:4

**opportunity**
84:18

**order**
27:7, 51:6,
75:13, 76:13,
76:18, 77:3,
77:7, 77:17

**ordered**
6:3

**originally**
19:7

**other**
11:21, 15:18,
18:11, 18:12,
27:12, 30:14,
31:4, 35:6,
39:2, 40:19,
41:12, 41:13,
46:10, 46:19,
48:10, 50:14,
50:19, 51:10,
56:19, 62:22,
63:18, 64:16,
65:21, 69:9,
70:17, 75:5,
76:2, 82:9,
84:13, 85:8,
87:7, 87:12,
91:11, 94:1,
94:6, 96:18

**others**
73:8, 74:4,
91:20, 92:1

**otherwise**
70:4, 73:21,
86:5, 105:15

**otter**
1:10, 71:7

**ottersec**
62:12, 63:7,
98:17, 98:21,

99:8, 99:15,
100:13, 100:14,
102:3, 102:4

**ought**
38:16

**out**
5:18, 8:22,
9:4, 9:9, 9:18,
10:18, 14:20,
16:8, 16:9,
24:22, 32:22,
36:10, 42:16,
48:17, 56:7,
57:8, 61:18,
62:2, 66:1,
66:18, 73:1,
73:14, 75:2,
97:7, 103:22,
104:5

**outcome**
105:15

**outset**
77:7

**outside**
75:17

**over**
29:15, 59:6,
82:17

**overbroad**
53:12, 54:9,
60:8

**overlap**
39:8

**overly**
88:9

**overspeaking**
20:18, 24:4,
24:11, 25:1,
32:2, 32:7,
47:20, 48:19,
52:19, 53:6,
53:15, 54:2,
54:3, 57:17,
60:22, 83:7,
83:20, 89:20,
98:22, 99:4,
99:18

**own**
15:10

---

**P**

**page**
21:22, 68:11,
69:19, 70:14,
87:3

**pages**
1:21

**papurt**
63:16

**paragraphs**
86:13

**paralegal**
3:22

**part**
7:16, 13:18,
27:3, 27:9,
27:13, 27:21,
28:3, 28:5,
28:20, 30:3,
30:15, 30:17,
33:15, 34:5,
34:8, 34:21,
39:5, 47:7,
51:15, 51:17,
52:22, 55:18,
63:20, 76:21,
80:20, 87:5,
91:20, 96:7,
101:20, 101:22

**particular**
53:19, 61:4,
61:10, 75:15,
85:22, 86:5,
88:2, 89:3,
89:4, 90:14,
95:6

**parties**
2:4, 7:10,
49:14, 49:15,
54:19, 54:20,
55:9, 56:11,
105:13

**partnership**
67:3, 67:11,
67:13

**party**
9:17, 73:10,

73:12, 73:13,
73:20, 73:22,
74:12, 91:8

**party's**
73:6

**passed**
84:21, 88:17

**past**
27:13, 29:15,
59:6, 59:11,
59:18, 101:17

**patrick**
63:17

**pause**
39:14, 85:19

**pending**
50:9

**people**
45:8, 49:17,
62:11, 62:17,
62:20, 63:2,
63:5, 63:6,
63:8, 64:16,
65:1, 92:17,
92:18

**period**
28:8, 35:7,
49:7, 51:3,
51:22, 52:2,
84:17, 87:12,
92:22, 100:9

**periodic**
41:3

**person**
32:15, 65:15,
95:1

**personally**
91:15, 91:16,
91:17

**perspective**
19:19, 86:3

**philip**
63:16

**picture**
69:4

**place**
40:1, 51:18,
77:1

J.R.153

**places**
46:19
**plaintiff**
1:8
**plaintiffs**
3:3
**plan**
39:16, 96:14
**planning**
83:5
**platform**
50:16, 81:5
**pleading**
85:22
**please**
18:21, 22:4, 22:7
**plotnick**
6:16, 7:13, 11:4, 12:13, 12:22, 19:21
**plus**
25:10, 25:14
**point**
7:10, 7:11, 12:9, 32:11, 32:12, 32:13, 32:14, 36:10, 41:8, 45:5, 70:8, 70:10, 72:16, 77:4, 99:22, 101:20
**pointed**
16:8, 16:9, 19:7
**pointing**
36:1, 77:17
**points**
44:15, 86:21
**position**
88:20, 89:16, 89:21, 89:22, 92:13
**possession**
73:11, 73:21, 74:6, 74:22, 93:5, 93:13
**possible**
41:20, 104:2

**post**
44:9, 45:18, 77:1, 82:1
**potential**
18:12
**potentially**
46:15, 82:1
**pratt**
3:6
**precisely**
93:17
**preliminary**
4:3
**present**
3:21, 46:8
**preservation**
75:13, 76:13, 76:18, 77:3, 77:7, 77:12, 77:17
**preserved**
43:5, 43:6
**preserving**
52:15, 52:17
**presumably**
77:2, 92:2
**pretty**
45:11
**previewing**
45:3
**previous**
32:20, 42:16, 87:13
**previously**
8:12, 20:16, 23:12, 23:22, 24:21, 25:9, 25:14, 26:9, 26:14, 27:20, 30:2, 35:2, 55:13, 59:4, 89:15, 95:2
**primarily**
90:3
**prior**
55:13
**privilege**
49:11, 52:20,

52:22, 53:4, 53:12, 54:12, 54:13, 54:15, 88:13, 88:14
**privileged**
54:11
**probably**
18:9, 45:16, 46:3, 47:5, 64:20, 71:4, 75:16, 86:6, 91:22
**problems**
54:15
**proceeding**
105:5
**process**
12:2, 16:21, 26:9, 26:10, 35:15, 44:3, 51:18, 63:21, 76:22, 96:8, 97:6
**processing**
58:19
**produce**
10:13, 17:17, 44:10, 61:6, 91:1, 96:14, 96:16, 97:15, 98:4, 98:19, 100:7
**produced**
20:16, 20:20, 22:1, 22:20, 24:21, 25:8, 26:12, 26:14, 26:15, 27:3, 27:6, 27:9, 27:21, 28:3, 28:4, 28:20, 29:15, 30:3, 30:16, 31:1, 31:15, 32:17, 32:22, 33:8, 33:12, 33:22, 34:1, 34:18, 35:3, 35:4,

35:13, 36:19, 36:20, 37:2, 41:6, 51:6, 55:4, 55:12, 55:18, 56:5, 56:15, 96:6, 96:21, 97:3, 98:15, 99:10, 101:20
**producing**
5:5, 21:14, 21:16, 28:17, 52:2, 53:3, 53:16, 53:20, 59:19, 84:22, 88:18, 89:2, 99:10
**product**
54:12
**production**
4:8, 17:6, 20:9, 20:10, 21:11, 23:20, 27:1, 27:4, 27:8, 27:10, 27:14, 27:18, 28:3, 28:5, 28:21, 30:3, 35:15, 35:17, 41:7, 41:8, 44:4, 44:11, 47:9, 48:7, 55:19, 57:1, 84:20, 92:7, 96:11, 96:13, 103:11, 103:12
**productions**
56:12
**productive**
86:17
**professional**
2:7, 105:3
**prolific**
18:14
**pronoun**
84:13
**proper**
63:8, 96:1

J.R.154

Transcript of Meet and Confer
Conducted on December 17, 2025                    45

**property**
66:18, 67:1
**proposals**
8:7
**propose**
11:21, 15:19,
17:13, 18:22
**proposed**
4:19, 10:10,
10:14, 11:22,
12:3, 12:13
**proposing**
7:21
**provide**
47:8, 58:15,
58:16, 71:3,
73:15, 81:12,
81:13, 81:14
**provided**
32:15, 33:4,
33:19, 75:9
**provides**
40:4
**providing**
99:5, 99:6
**public**
62:13, 64:13
**publicly**
21:20
**pull**
11:9, 24:21,
93:5
**punting**
78:4
**purports**
82:15
**purpose**
39:2
**pursuant**
27:6, 44:12
**pushing**
58:3
**put**
18:1, 27:12,
41:19, 46:7,
61:16, 61:22,
62:1, 69:11,
69:21, 70:2,

70:4, 101:11
**putting**
28:15

**Q**

**question**
19:19, 21:12,
22:10, 29:5,
39:4, 39:6,
39:9, 47:14,
48:3, 58:9,
70:21, 81:1,
82:2, 91:22
**questions**
4:7, 21:11,
38:21, 39:7,
40:13
**quickly**
87:7, 99:22
**quite**
30:11, 94:14,
101:5
**quoting**
60:9

**R**

**ra**
69:2
**rachel**
3:13, 10:6,
15:12, 16:1,
24:15, 32:3,
32:8, 39:3,
40:14, 81:21,
103:8
**raise**
16:18, 16:19,
45:17, 59:17,
64:1, 84:18,
87:11, 89:17
**raised**
53:10, 54:15,
58:9, 58:13,
59:15, 59:22,
66:7, 84:17,
87:11
**raising**
17:4, 17:6,

34:3, 44:18,
45:6
**ran**
6:15, 98:20,
100:3
**range**
27:17, 51:3,
102:9, 102:17
**rather**
41:3, 44:9
**rc**
1:11
**rd**
7:20
**re-collection**
39:18, 82:1,
82:3
**re-producing**
29:14
**re-running**
33:13
**re-searching**
29:8
**reach**
61:20
**read**
8:18, 14:16,
29:4, 34:15,
34:18, 38:4,
42:18, 74:1,
74:7, 99:21,
101:10, 101:12
**ready**
48:21
**realize**
25:21
**realizes**
86:7
**really**
18:6, 86:6,
99:12
**realtime**
2:6, 105:2,
105:22
**reason**
94:20, 100:4
**reasonable**
16:4

**reasons**
53:16
**recall**
5:3, 5:11,
40:22, 45:12,
72:10
**receive**
54:20
**received**
9:16, 49:14,
55:17, 59:6,
59:11, 91:7,
95:6, 96:18,
96:19
**recent**
4:15
**recently**
85:9
**recess**
90:7
**recognize**
11:14
**recognized**
11:12
**recollection**
22:15, 22:20,
24:17, 24:18,
43:2, 55:7
**recommendation**
95:18
**record**
54:6, 67:20,
78:16, 95:8,
105:7
**records**
73:7, 74:3
**recoverable**
79:11
**reddit**
28:6
**reduced**
105:10
**reference**
43:13, 85:4
**referenced**
11:6, 39:22,
40:2, 42:14,
85:6

J.R.155

Transcript of Meet and Confer
Conducted on December 17, 2025

46

| | | | |
|---|---|---|---|
| **references**<br>40:5<br>**referred**<br>8:8, 9:14,<br>71:10<br>**referring**<br>71:8<br>**refers**<br>12:20, 15:9,<br>84:12<br>**refining**<br>12:8<br>**reflected**<br>38:16, 53:11<br>**refuse**<br>74:12<br>**regard**<br>27:1, 40:18,<br>41:18, 45:14,<br>51:2, 55:3,<br>61:14, 64:20,<br>72:17, 76:8,<br>80:6, 80:14,<br>80:19, 81:11,<br>88:7, 98:15<br>**regarding**<br>4:20, 66:4,<br>76:11<br>**registered**<br>2:7, 105:3<br>**reiterate**<br>17:9<br>**reiterating**<br>44:15<br>**related**<br>105:13<br>**relationship**<br>67:6, 67:8<br>**relativity**<br>50:15<br>**relevance**<br>66:5, 66:13,<br>66:16, 66:19<br>**relevant**<br>12:16, 15:16,<br>20:4, 28:8,<br>35:6, 51:3,<br>76:7, 97:13, | 98:3, 100:6<br>**rely**<br>73:9, 74:5<br>**remember**<br>40:19, 45:6,<br>45:7<br>**remembering**<br>53:2<br>**remind**<br>41:13, 65:11<br>**remotely**<br>2:4<br>**removed**<br>31:9<br>**removing**<br>51:16<br>**repeatedly**<br>84:11<br>**reported**<br>1:22<br>**reporter**<br>2:7, 2:8, 90:2,<br>105:1, 105:3,<br>105:4, 105:22<br>**representation**<br>92:14, 94:9<br>**represented**<br>26:18, 39:5<br>**representing**<br>29:7, 68:20,<br>82:21, 95:7<br>**reproduced**<br>31:2, 36:12<br>**reproduction**<br>23:20<br>**request**<br>15:7, 15:8,<br>16:17, 17:1,<br>22:2, 36:17,<br>67:22, 89:4,<br>97:11, 98:2,<br>98:15, 100:12,<br>101:2, 101:6,<br>101:12, 101:19,<br>102:1, 102:12<br>**requested**<br>13:9, 16:12,<br>16:16, 76:5, | 100:20, 101:16<br>**requesting**<br>73:20, 95:20<br>**requests**<br>4:16, 7:5, 7:6,<br>8:21, 10:2,<br>13:3, 15:22,<br>16:3, 44:12,<br>59:5, 59:19,<br>84:22, 88:17,<br>89:3, 95:22,<br>99:9, 102:12<br>**required**<br>28:19, 65:10,<br>73:14, 73:15<br>**requirements**<br>19:2<br>**requires**<br>16:6, 60:12,<br>75:13<br>**rerun**<br>28:13, 28:14<br>**research**<br>81:14<br>**resolution**<br>55:7<br>**resolve**<br>53:19<br>**resolved**<br>6:6, 8:2<br>**respect**<br>40:3, 49:6,<br>49:8, 77:11,<br>84:16<br>**respond**<br>37:10, 39:15,<br>74:3, 75:7,<br>79:3, 79:22,<br>85:17, 85:19,<br>103:15<br>**responded**<br>43:2, 79:19<br>**responding**<br>9:14, 29:5,<br>60:1, 77:16,<br>79:2, 89:2<br>**response**<br>10:6, 38:17, | 38:19, 40:12,<br>41:17, 41:21,<br>45:3, 46:18,<br>47:1, 52:11,<br>53:8, 58:14,<br>60:21, 66:12,<br>68:13, 70:5,<br>71:16, 75:11,<br>77:5, 79:18,<br>82:14, 90:21,<br>93:9, 100:1,<br>101:11, 101:16,<br>101:21<br>**responses**<br>4:12, 7:22,<br>37:16, 37:21,<br>37:22, 47:7,<br>47:15, 59:4,<br>60:3, 61:4,<br>78:5, 80:17,<br>82:6, 82:20,<br>85:3, 86:8,<br>88:3, 89:5,<br>89:14, 89:18,<br>99:9, 100:12,<br>104:2<br>**responsibilities**<br>77:11<br>**responsibility**<br>41:2, 76:14<br>**responsible**<br>74:19<br>**responsive**<br>6:10, 8:22,<br>9:5, 9:19,<br>10:14, 10:15,<br>10:21, 13:4,<br>13:9, 16:5,<br>16:7, 17:2,<br>17:3, 17:17,<br>17:20, 18:5,<br>20:1, 20:4,<br>22:2, 25:11,<br>35:14, 35:19,<br>36:17, 77:9,<br>91:1, 97:11,<br>97:15, 98:2,<br>98:5, 98:14, |

J.R.156

100:8, 100:22,
101:2, 101:19,
102:1, 102:22
**responsiveness**
21:13
**rest**
96:13
**restate**
68:15
**review**
83:5
**reviewed**
17:1, 35:9
**reviewing**
21:13
**rfp**
49:11, 87:13,
90:12, 101:9
**rfp3**
14:4
**rfps**
48:11, 49:7,
49:9, 56:22,
57:5, 59:9,
67:16, 84:7,
85:8, 90:11
**rich**
18:14
**rid**
92:3
**right**
5:17, 13:6,
18:4, 21:9,
22:9, 25:3,
30:10, 36:6,
42:21, 43:1,
46:5, 48:8,
48:9, 57:18,
57:19, 60:20,
67:12, 70:9,
72:3, 86:17,
86:19, 92:10,
94:1, 95:11,
97:1, 100:10,
104:7
**road**
78:4
**robert**
1:10, 34:10,

68:11, 68:21,
69:1, 69:19
**rog**
36:18, 38:7,
38:10, 38:19,
39:3, 39:12,
39:13, 39:14,
39:16, 41:16,
41:18, 42:14,
42:15, 43:9,
43:12, 43:14,
43:16, 46:11,
46:18, 47:1,
47:22, 60:6,
61:19, 62:4,
66:3, 66:4,
69:5, 69:14,
70:15, 70:20,
82:13, 82:19,
84:14
**rogs**
38:7, 40:8,
40:11, 46:18,
47:16, 48:1,
57:5, 59:12,
60:3, 60:4,
60:7, 83:12
**row**
74:18
**rpr**
1:22, 105:21
**rubber**
90:16
**rule**
60:9, 60:12,
73:19
**rules**
41:2, 65:10,
76:15
**ruling**
66:8, 88:2
**rulings**
85:4
**run**
6:22, 8:15,
13:14, 15:3,
22:21, 26:22,
28:12, 98:13,

98:16, 99:7
**running**
6:9, 6:11,
9:11, 13:8,
14:3, 14:5,
16:10, 25:19,
29:10, 29:11

---
**S**
---

**s**
3:1
**said**
6:11, 6:14,
17:10, 18:7,
22:11, 22:13,
24:7, 28:11,
34:15, 36:10,
36:19, 37:9,
39:1, 39:20,
40:5, 40:19,
40:22, 42:1,
42:10, 44:19,
44:20, 48:15,
49:10, 58:8,
59:16, 59:17,
64:8, 66:15,
77:6, 78:10,
82:18, 84:20,
87:7, 87:10,
88:16, 93:9,
103:18, 104:6,
105:9
**sam**
1:6
**same**
8:7, 12:10,
23:21, 33:7,
47:5, 48:3,
48:5, 48:6,
48:22, 52:9,
70:14, 70:18,
70:20, 70:22,
72:12, 74:9,
79:7, 79:16,
79:21, 80:3,
82:8, 85:5,
94:2, 94:17
**satisfaction**
43:3

**saturday**
104:3
**say**
7:19, 8:20,
10:5, 10:9,
11:2, 18:15,
23:16, 23:17,
24:12, 31:18,
34:3, 34:14,
35:4, 37:6,
52:1, 52:2,
53:22, 57:9,
57:13, 58:4,
60:9, 61:2,
63:8, 68:7,
69:17, 70:3,
70:6, 70:7,
70:11, 71:10,
71:17, 72:20,
74:16, 74:18,
75:11, 76:3,
76:4, 79:14,
79:16, 79:20,
80:4, 80:8,
82:8, 83:9,
89:12, 89:15,
93:18, 97:2,
102:11, 102:15,
103:17
**saying**
21:2, 24:9,
24:20, 29:17,
35:6, 45:7,
53:17, 54:16,
57:19, 58:20,
59:1, 66:20,
66:22, 70:2,
72:9, 76:16,
76:17, 77:18,
78:1, 78:18,
79:1, 82:22,
83:18, 90:18,
92:21, 93:2,
93:3, 93:7,
93:22, 98:9,
100:22, 101:2,
102:21
**says**
34:18, 53:8,

J.R.157

60:11, 67:10, 68:21, 69:2, 69:5, 71:5, 72:1, 73:4, 73:18, 74:11, 79:7, 79:9, 79:15, 80:3, 80:8, 81:2, 82:16, 83:12, 87:1, 91:12, 93:18, 98:12, 99:8, 100:12, 101:16

**schedule**
5:12, 96:13

**school**
5:7

**scope**
97:3, 97:13

**screen**
68:12, 69:1

**search**
4:5, 6:9, 6:11, 6:15, 6:19, 7:1, 7:4, 7:9, 7:14, 8:4, 8:5, 8:9, 8:10, 8:13, 8:14, 8:20, 9:3, 9:7, 9:20, 10:3, 10:4, 10:10, 10:22, 11:5, 11:7, 11:8, 11:10, 11:16, 11:18, 12:3, 12:5, 12:11, 12:12, 12:13, 12:21, 13:7, 13:10, 14:5, 14:9, 15:15, 15:18, 16:7, 16:13, 17:11, 17:19, 18:4, 18:18, 20:4, 21:15, 21:17, 22:22, 25:19, 27:17, 28:7, 28:12, 28:14, 29:10, 29:12,

33:13, 33:14, 34:20, 35:7, 91:1, 97:14, 98:4, 98:6, 100:2, 100:7

**searched**
4:6, 13:21, 13:22, 14:21, 40:9

**searches**
15:3, 25:11, 58:8

**searching**
15:10, 19:6, 19:14, 20:6, 20:8, 21:4, 58:10, 59:1, 82:20, 82:21, 83:1, 83:16, 83:17, 83:18, 83:22, 84:3, 84:4, 91:4

**second**
25:5, 30:1, 37:21, 42:17, 59:7, 59:9, 59:12, 77:4, 80:18, 84:7, 85:19, 86:1, 92:10

**section**
90:11

**security**
1:12

**see**
5:13, 15:2, 16:6, 30:5, 33:1, 36:11, 68:11, 69:18, 72:1, 85:2, 86:1, 87:2, 95:4, 97:15, 99:1

**seeing**
34:13, 45:12

**seem**
26:3, 82:10

**seemed**
29:3

**seems**
15:1, 19:14, 42:15, 46:16, 65:8, 70:17, 72:11, 72:15, 82:22, 84:13, 94:3, 98:19

**send**
29:2, 32:18, 32:19, 35:10

**sends**
68:12, 69:1

**sense**
35:16, 49:12, 83:3, 93:9, 94:5, 95:15

**sent**
28:1, 37:1, 45:11, 50:2, 61:8, 65:18, 70:16, 71:14, 71:19, 72:8, 102:14

**sentence**
72:9, 72:15, 90:13, 98:18, 99:17

**separate**
7:4

**separately**
39:9, 79:22

**september**
6:4, 6:6, 7:12, 22:21, 24:19, 28:1, 28:8, 51:7, 51:8, 52:3, 59:10, 99:11

**served**
55:22, 59:9, 84:9, 89:15

**server**
27:8, 40:5, 62:13, 62:22, 64:14, 65:1, 71:18, 82:9, 82:12, 84:2, 84:3, 94:3,

94:17, 100:14, 100:20, 101:13, 101:14, 102:4, 102:13

**servers**
19:5, 19:12, 19:13, 20:3, 20:13, 20:22, 21:3, 62:13, 68:21, 82:7, 82:12

**services**
58:15

**servs**
60:10

**set**
9:20, 17:12, 23:9, 24:1, 24:13, 25:20, 26:1, 26:3, 37:21, 38:1, 38:10, 48:1, 48:11, 56:22, 57:4, 58:6, 59:8, 59:9, 59:12, 83:1, 84:7, 84:13, 105:16

**sets**
22:22, 80:18

**seven**
65:4

**several**
41:4, 71:7, 80:14, 80:15

**sgc**
12:20, 15:5, 15:9, 15:11, 16:8

**shifting**
34:9

**shorthand**
2:8, 105:1, 105:4

**shot**
68:12, 69:1

**should**
10:22, 13:21,

J.R.158

15:18, 18:21,
23:8, 24:17,
25:8, 25:13,
26:12, 29:18,
29:19, 29:20,
33:12, 36:11,
42:15, 43:15,
44:11, 46:22,
50:3, 62:16,
62:20, 63:2,
65:19, 68:9,
76:7, 77:6,
79:17, 90:21
**show**
14:13, 14:20,
16:12, 16:16,
34:22
**showing**
9:10, 14:2,
16:9, 16:17,
69:2
**side**
15:13, 15:17,
27:22, 35:6,
55:22, 80:21,
92:8, 92:9,
103:10
**side's**
17:16
**sides**
12:3, 50:13,
92:14
**sign**
16:3
**signal**
28:4, 38:15,
41:15, 41:22,
42:1, 42:4, 45:5
**signature**
105:17
**signature-d2yvl**
105:19
**signed**
15:21
**similar**
34:8, 66:14,
81:20, 98:11,
100:11

**simms**
61:18, 89:8,
89:9
**since**
11:13, 19:11,
55:21, 98:17,
99:7
**single-message**
34:1
**singular**
34:13
**sino**
9:12, 11:7,
11:9, 12:18,
15:9, 15:11
**site**
71:7
**sites**
21:21
**sitting**
6:20, 55:6
**situation**
33:16, 75:12
**six**
18:16, 64:10,
65:4
**sixth**
44:7
**skill**
105:8
**slightly**
70:20
**software**
81:6
**solely**
74:14
**solend**
64:14
**some**
4:5, 4:7, 4:19,
9:8, 21:10,
25:21, 36:1,
39:8, 43:18,
63:2, 63:5,
63:6, 63:7,
63:18, 65:9,
66:18, 73:2,
78:2, 78:22,

84:2, 91:8,
94:14, 103:10
**somebody**
49:18, 72:8
**someone**
70:16, 94:22
**something**
9:22, 13:5,
26:14, 27:11,
32:21, 38:13,
42:13, 42:14,
45:18, 50:12,
59:2, 60:2,
78:19, 80:9,
81:16, 82:16,
88:22, 91:4,
95:1
**soon**
21:8, 37:12,
61:17
**sorry**
38:9, 42:4,
48:10, 52:18,
58:18, 62:6,
66:4, 66:5,
69:15, 87:3,
87:6
**sort**
18:14, 27:3,
47:3, 50:3,
94:9, 99:6,
102:2, 102:7
**sorts**
10:20, 37:14
**sought**
74:14
**sound**
14:22, 91:3,
98:5
**sounds**
7:3, 13:5,
16:22, 42:21,
46:7, 83:4,
83:17, 99:22
**source**
18:12, 31:18,
34:14, 80:2
**sources**
4:6, 10:22

**southern**
103:21
**speak**
26:5, 32:4,
32:8, 32:9,
34:12, 49:19,
49:22
**speaking**
30:20, 75:17,
76:18
**special**
15:7
**specific**
15:8, 61:10,
66:17, 89:4
**specifically**
14:14, 42:5,
68:5, 68:18
**specificity**
60:14, 65:3
**specifics**
36:2, 90:3
**split**
26:20, 93:16
**spoken**
19:21
**spoliation**
4:21
**spreadsheet**
4:9, 36:16,
46:8, 61:17,
61:21, 61:22,
70:2, 70:5
**spreadsheet-type**
16:20
**stage**
59:17, 59:22,
66:7
**stamp**
56:8
**stamped**
37:2, 56:6
**standing**
83:4, 83:9
**start**
4:11, 5:22, 6:3
**started**
7:18, 97:2

J.R.159

Transcript of Meet and Confer
Conducted on December 17, 2025

50

**state**
2:9, 67:20
**stated**
60:14, 60:15,
80:14
**statement**
88:4, 89:7,
89:9
**states**
1:1, 68:5,
71:5, 79:6,
98:1, 98:13,
99:8, 101:18,
101:22
**stating**
66:8
**stay**
52:11, 85:11,
87:19
**stenographically**
105:10
**stephen**
7:13, 11:4,
12:13, 19:21,
20:16, 22:16,
49:22, 50:9,
50:19, 54:22,
56:4
**steps**
79:8, 79:11,
79:13, 80:1,
80:5, 80:11,
81:8
**steve**
49:18
**still**
19:14, 29:5,
46:12, 50:9,
51:3, 66:19,
77:14, 91:21,
95:3, 104:3
**street**
3:6, 3:15
**strings**
12:4
**stuff**
25:15, 25:21,
37:19

**subpoena**
36:17
**subpoenaed**
18:9, 49:16,
49:17, 50:21,
54:21, 92:2
**subpoenas**
50:1, 50:22,
55:21, 55:22
**substance**
47:18
**substantive**
86:21
**sufficient**
13:8, 16:12,
16:16, 98:20,
100:3, 100:19,
101:1, 101:6,
101:8, 101:12,
101:13, 102:13,
103:3
**suggest**
17:18
**suggested**
6:2
**suggesting**
23:12, 30:1,
30:2, 100:2
**suggestions**
4:22
**suit**
73:9, 74:6
**suite**
3:6, 3:15
**summer**
19:11
**sun**
18:10
**supplement**
39:17, 43:21,
44:1, 47:3,
51:17, 63:21,
65:6, 76:6,
77:19, 78:12,
96:8
**supplemental**
41:9
**supplemented**
96:10

**supplementing**
40:21, 41:1,
44:3, 76:22,
78:14, 86:4
**supplements**
51:15
**supported**
77:16
**supporting**
73:3
**supposed**
13:14, 20:12,
33:15, 36:20
**sure**
13:3, 16:14,
16:15, 17:2,
17:7, 22:8,
35:13, 36:8,
39:10, 42:7,
45:11, 47:21,
49:21, 56:13,
75:9, 84:8
**surprised**
85:2
**synonymous**
80:9
**system**
38:12

**T**

**table**
57:19
**take**
37:11, 42:10,
45:2, 51:18,
67:22, 72:18,
75:10, 75:18,
77:1, 80:11,
90:1
**take-outs**
50:3
**taken**
28:13, 79:11,
80:5, 90:7,
105:5, 105:9
**taking**
104:1
**talk**
10:1, 29:6,

75:1, 81:5, 88:8
**talked**
38:2, 44:1,
46:20, 78:2,
81:13
**talking**
39:3, 43:11,
47:18, 47:19,
55:10, 64:7,
84:20, 89:6
**tax**
50:5, 50:18,
55:3
**taylor**
74:10, 75:21
**tealtech**
4:10, 37:5,
104:4
**team**
22:17
**technically**
75:17
**telegram**
4:7, 19:5,
19:12, 20:6,
20:7, 20:9,
20:14, 20:22,
21:6, 28:11,
30:13, 31:3,
31:14, 31:18,
32:15, 32:16,
32:21, 33:11,
33:21, 34:3,
34:14, 34:17,
35:5, 35:17,
58:15, 58:20,
59:2, 81:14,
81:19, 103:11,
103:12
**telegrams**
35:5
**tell**
21:18, 25:17,
26:17, 26:22,
29:10, 30:19,
31:8, 34:14,
54:5, 55:19,
64:10, 88:10

J.R.160

**telling**
14:11, 16:22, 83:16
**ten**
26:20, 34:16
**tentatively**
57:22, 58:4
**term**
4:5, 16:14, 21:15, 21:17, 28:7, 34:20, 35:7
**terminating**
67:6
**termination**
67:5
**terms**
6:9, 6:12, 6:15, 6:19, 7:1, 7:3, 7:4, 7:9, 7:14, 7:21, 7:22, 8:4, 8:5, 8:9, 8:10, 8:13, 8:14, 8:20, 9:3, 9:7, 9:21, 10:3, 10:4, 10:11, 10:22, 11:5, 11:8, 11:10, 11:17, 12:2, 12:3, 12:4, 12:5, 12:8, 12:11, 12:12, 12:13, 12:15, 12:21, 13:7, 13:10, 14:6, 14:9, 15:15, 15:18, 16:8, 17:11, 17:20, 18:5, 18:7, 18:18, 22:22, 25:19, 27:17, 28:12, 28:14, 28:15, 29:11, 29:12, 33:13, 33:14, 33:17, 34:13, 40:21, 41:9, 43:4, 51:5, 58:16,

69:20, 81:1, 86:3, 95:15
**testimony**
105:7, 105:9
**text**
27:2, 30:14
**textile**
60:10
**th**
3:15, 5:5, 5:7, 5:16, 6:1, 6:14, 7:12, 8:13, 11:3, 11:17, 12:12, 13:19, 17:13, 22:21, 24:19, 27:6, 28:1, 28:9, 33:9, 33:19, 36:21, 41:5, 41:6, 44:10, 45:19, 51:9, 51:18, 52:3, 57:9, 57:13, 57:16, 58:1, 58:3, 58:4, 61:9, 62:2, 71:8, 77:1, 78:12, 79:2, 84:10, 85:5, 88:4, 96:21, 99:11, 99:14, 102:5, 102:10, 105:18
**thank**
5:17, 5:21, 30:8, 37:13, 52:7, 104:10
**thanks**
104:8
**themselves**
55:18, 81:3, 85:4
**thereafter**
105:10
**thing**
33:7, 39:2, 44:13, 47:3, 47:5, 48:16,

51:22, 52:9, 53:21, 70:22, 72:13, 77:4, 80:3, 85:15, 90:21, 97:4, 97:5
**things**
12:18, 18:8, 27:3, 30:2, 39:18, 40:9, 40:20, 41:19, 42:9, 43:22, 48:15, 50:17, 53:12, 53:16, 56:21, 58:10, 59:2, 59:3, 59:20, 65:3, 65:5, 78:11, 83:13, 87:7, 103:15
**think**
6:14, 7:18, 10:1, 11:10, 11:11, 11:20, 12:14, 13:10, 13:16, 13:18, 15:5, 18:10, 18:14, 18:19, 18:21, 19:1, 22:13, 25:6, 26:3, 27:21, 28:14, 30:10, 34:11, 37:14, 39:10, 39:19, 40:15, 42:13, 42:14, 43:7, 48:21, 49:16, 50:19, 51:3, 51:9, 51:12, 51:22, 52:9, 53:7, 53:8, 54:14, 56:2, 56:17, 57:14, 58:14, 59:21, 60:18, 63:8, 64:19, 66:6, 67:15, 67:21, 68:8, 70:1,

71:2, 74:18, 74:20, 75:6, 75:16, 77:5, 78:7, 80:13, 80:16, 80:18, 80:20, 80:22, 81:7, 81:11, 86:7, 86:22, 87:22, 88:1, 91:4, 91:22, 93:2, 93:3, 93:7, 93:11, 93:15, 95:14, 95:16, 96:1, 98:7, 98:8, 100:21, 102:19, 103:8
**thinking**
72:12
**third**
9:17, 37:20, 44:6, 49:14, 52:17, 54:19, 54:20, 55:9, 56:11, 80:17, 91:8
**thought**
5:7, 5:8, 33:21, 35:9, 38:16, 38:18, 49:12, 82:20, 97:4, 97:5
**thousand**
34:2, 35:11
**thousand-something**
31:5
**thread**
33:4, 34:5, 34:8, 34:21
**threads**
28:16, 28:18, 30:15, 31:1, 32:16, 33:1, 33:18, 34:19
**three**
65:4, 68:9, 69:18, 71:1,

J.R.161

Transcript of Meet and Confer
Conducted on December 17, 2025                                    52

| | | | |
|---|---|---|---|
| 75:10, 75:18, 86:22 | **together** 12:5 | **trial** 58:19 | **unclear** 60:7, 95:20 |
| **through** 8:18, 8:21, 13:3, 14:17, 22:21, 24:19, 24:20, 26:8, 26:10, 26:22, 28:9, 29:4, 34:15, 36:10, 38:5, 42:18, 44:3, 50:15, 51:8, 51:20, 52:3, 73:1, 74:22, 80:1, 83:11, 85:21, 86:17, 87:14, 96:20, 99:14, 102:5, 102:10 | **tomorrow** 103:21 | **true** 105:6 | **under** 13:12, 18:10, 41:2, 65:10, 67:22, 76:14, 80:11, 105:11 |
| | **took** 79:8, 79:13, 80:2, 81:8, 90:4 | **try** 34:7, 45:10, 56:7, 64:18, 66:1, 103:18 | **understand** 8:2, 11:12, 23:17, 25:5, 39:1, 49:3, 55:15, 58:22, 62:19, 97:2 |
| | **top** 22:3, 50:20, 64:10, 65:12, 97:16 | **trying** 15:4, 19:10, 23:17, 32:10, 40:18, 54:17, 93:16, 93:18, 97:5, 97:6 | **understandably** 5:8 |
| | **totally** 78:4 | **tuesdays** 5:14 | **understanding** 13:13, 20:15, 46:17, 55:12, 56:2, 56:3, 72:6, 81:2, 91:14, 91:17, 94:12, 94:18 |
| | **touching** 83:5 | **turn** 32:22 | |
| **thursdays** 5:15 | **towards** 62:9 | **twitter** 28:19 | **understood** 89:8 |
| **ties** 39:13 | **track** 97:10 | **two** 5:9, 5:11, 8:7, 11:11, 13:11, 22:22, 37:19, 38:2, 39:7, 41:19, 50:19, 58:7, 61:10, 65:4, 67:3, 67:14, 76:2, 77:22, 86:15, 87:1, 87:2, 91:13, 94:2 | **undiscord** 38:11, 38:12, 41:15, 41:22, 42:3, 45:5 |
| **till** 41:5 | **trans-** 74:17 | | **undue** 73:16 |
| **time** 6:10, 11:13, 19:8, 21:12, 21:22, 26:15, 48:11, 49:7, 51:22, 52:2, 53:11, 55:20, 56:20, 59:18, 61:6, 70:13, 75:20, 78:2, 84:17, 84:21, 85:6, 86:17, 87:12, 88:16, 90:4, 94:14, 99:7, 99:15, 104:5 | **transcript** 29:4, 42:11, 42:22, 53:11, 85:5, 105:6 | | **unduly** 54:10, 60:8, 88:9 |
| | **transmitted** 73:12 | **tydings** 3:5, 22:17 | **unexplained** 66:11 |
| | **transperfect** 6:22, 15:14, 22:18, 26:19, 27:16, 29:6, 30:5, 43:6, 50:16, 56:6, 58:9, 58:19, 72:21, 74:18, 75:1, 76:6, 76:10, 76:19, 77:6, 77:15, 77:18, 78:3, 78:7, 78:22, 79:7, 79:9, 79:13, 79:15, 79:17, 80:3, 80:8, 80:9, 81:3, 96:20 | **type** 16:17, 18:4, 47:3 | **united** 1:1 |
| | | **types** 63:17 | **unknown** 82:16 |
| | | **typewriting** 105:11 | **unless** 60:16, 69:11, 69:17 |
| | | **typo** 86:11 | **until** 33:8, 48:7, 79:4, 96:17, 104:2 |
| **time-out** 24:5 | | **tyson** 74:8 | |
| **timely** 60:15, 76:6 | | | **upcoming** 34:19 |
| **times** 41:4 | **treat** 6:5, 23:19, 26:2 | | |
| **today** 4:2, 6:21, 8:16 | | **umm** 23:15 | |

<div align="center">U</div>

J.R.162

Transcript of Meet and Confer
Conducted on December 17, 2025                53

**update**
19:16, 40:11,
41:9, 41:12,
43:7, 47:11,
55:16, 58:10,
58:11, 58:12,
82:2, 86:10
**updated**
65:19, 82:1
**updates**
41:4
**usable**
30:14, 30:21,
31:10, 33:5
**use**
11:1, 16:13,
17:18, 18:3,
65:13, 86:17
**useful**
31:8
**using**
7:1, 81:4
**usually**
53:1

**V**

**vague**
43:2, 53:12,
53:18, 53:22,
54:7, 54:9,
60:5, 66:15,
88:9
**vagueness**
53:19
**various**
43:22
**verified**
13:7
**verify**
56:11, 56:14
**versions**
44:14
**vessel**
103:22
**via**
1:17
**viable**
51:4, 51:9

**videoconference**
1:17

**W**

**wait**
25:4, 25:5,
41:5
**waiting**
37:10, 44:4
**waived**
60:15, 61:3,
61:12, 88:1,
89:12, 89:13,
89:18, 89:19,
89:22
**waiver**
89:11
**wall**
77:7
**wallet**
36:16
**want**
7:19, 8:17,
9:2, 9:22, 10:6,
24:22, 30:4,
37:17, 38:4,
43:13, 44:5,
48:22, 49:20,
62:6, 67:19,
75:7, 79:21,
84:14, 100:18,
101:7
**wanted**
43:7, 43:8
**wanting**
80:10
**wants**
62:21
**warning**
17:5
**washington**
2:9, 3:16
**way**
7:10, 8:1,
17:3, 53:19,
71:3, 77:16,
78:4, 78:9,
94:11, 96:1,

101:10, 101:11,
101:12
**ways**
57:8
**we'll**
5:18, 19:3,
58:5, 61:17,
61:18, 61:22,
62:1, 69:10,
72:18, 76:3,
77:18, 77:19,
78:1, 101:7,
103:10
**we're**
6:4, 8:11, 9:3,
14:5, 35:12,
40:4, 44:4,
44:21, 51:15,
51:16, 52:14,
53:16, 55:10,
57:21, 58:11,
61:16, 62:3,
63:9, 70:14,
78:1, 78:11,
78:12, 78:15,
83:21, 83:22,
84:4, 85:2,
88:10, 89:6,
89:10, 91:11,
100:22, 103:1,
103:2
**we've**
8:21, 13:9,
13:14, 19:10,
31:3, 31:6,
59:5, 59:10,
65:15, 69:5,
82:4, 82:18,
85:8, 91:7,
100:20
**wednesday**
1:18
**week**
6:13, 6:15,
22:7, 103:10,
103:18, 104:3
**weeks**
5:12, 37:20,

38:2, 39:7,
58:7, 59:6,
59:11
**welcome**
29:2
**went**
7:20, 48:17,
97:1
**whatever**
25:15, 53:13,
62:2, 70:7,
88:4, 94:20
**whereof**
105:16
**whereupon**
104:11
**wherever**
60:1
**whether**
22:11, 35:2,
38:12, 38:15,
40:2, 40:3,
46:22, 49:6,
49:15, 57:15,
64:21, 66:11,
66:19, 69:18,
72:5, 80:15,
94:10, 95:20,
100:8, 100:21
**white**
19:22
**whoever**
94:22
**whole**
8:18, 39:17,
85:15
**willing**
13:20
**withheld**
52:10, 52:21,
85:9, 88:8
**withhold**
73:22
**withholding**
49:6, 54:6,
54:10, 85:13,
87:16, 87:18,
88:11, 88:12

J.R.163

**within**
7:5, 74:14,
94:17, 99:10
**without**
73:15
**witness**
18:12, 105:16
**work**
34:6, 54:12,
73:1
**worked**
12:5
**working**
26:19, 50:11,
50:12
**works**
6:4, 58:2,
91:18, 94:10,
94:13, 95:16
**wouldn't**
91:10, 94:7,
100:2
**wright**
73:3, 74:10
**write**
53:3
**written**
71:3
**wrong**
80:19

**X**

**x**
81:7

**Y**

**yao**
1:4, 6:15,
6:18, 7:6, 7:14,
10:3, 11:5,
11:19, 15:4,
23:10, 25:9,
27:22, 29:11,
29:16, 37:22,
38:10, 46:13,
55:19, 80:17,
82:6
**yao's**
29:10, 37:20,

82:19
**yeah**
6:7, 6:20,
8:17, 10:8,
11:2, 14:13,
25:3, 26:6,
37:18, 42:2,
43:10, 45:1,
45:4, 46:4,
52:7, 53:1,
53:9, 53:17,
54:1, 54:14,
58:12, 62:19,
63:13, 64:8,
65:18, 68:19,
72:2, 81:18,
85:20, 86:18,
87:21, 91:14,
95:14, 96:4,
103:9
**year**
29:15, 90:17,
90:20, 92:12,
93:19, 95:7
**yesterday**
6:21, 26:18,
32:14

**Z**

**zero**
27:16, 28:9
**zhang**
63:17
**zoom**
1:17

**.**

**.6564**
3:17
**.9700**
3:8

**0**

**00**
1:18, 5:15,
8:6, 57:20

**1**

**1-5**
49:9

**10**
1:18, 4:1,
5:16, 6:1, 48:3,
57:16
**105**
1:21
**11**
36:18, 48:3,
49:9, 57:20,
86:1, 86:11,
90:7, 90:8,
104:11
**12**
5:16, 36:21,
47:16, 47:22,
49:7, 49:9,
57:16
**1200**
3:15
**135**
82:6, 84:5
**14**
90:12, 91:13
**15**
6:14, 27:22,
38:19, 41:16,
41:18, 42:4,
42:5, 42:14,
47:5, 47:6,
61:19, 62:4,
63:12, 84:10
**16**
36:17, 60:4,
66:3, 95:19
**17**
1:18, 3:15,
22:21, 24:19,
28:1, 28:9,
38:7, 46:11,
47:1, 51:9,
52:3, 61:9,
62:2, 66:4,
96:21, 97:10,
97:20, 99:11,
105:18
**18**
47:17, 47:22
**19**
33:19, 68:1,

69:17, 69:22,
70:20, 71:4,
71:9, 71:11,
72:15
**1st**
6:12, 8:5,
8:14, 12:10,
13:19, 17:13,
19:14

**2**

**20**
5:5, 12:4,
27:6, 33:9,
41:5, 41:6,
44:10, 45:19,
51:18, 60:6,
60:7, 69:14,
70:15, 71:3,
71:4, 71:12,
77:1, 78:12,
85:5, 88:4
**20006**
3:16
**202.261**
3:17
**2021**
6:4, 22:21,
24:19, 28:9,
51:8, 99:11
**2022**
68:3, 71:8,
72:11, 98:17,
98:21, 99:14,
100:15, 102:5,
102:11
**2024**
6:17, 7:13,
8:13, 11:3,
11:17, 12:12,
13:19, 17:13
**2025**
1:18, 8:14,
13:19, 17:13,
22:21, 24:19,
28:1, 28:9,
51:9, 55:21,
96:22, 99:11,

J.R.164

Transcript of Meet and Confer
Conducted on December 17, 2025

105:18

**2026**
27:6, 44:10, 51:19, 77:1

**21**
72:19, 75:6

**21202**
3:7

**2177**
73:4

**22**
79:6, 80:7, 98:10

**23**
1:7, 7:20, 79:20, 80:1, 80:13, 80:14, 81:1, 81:10, 100:11, 101:10, 102:12

**24**
28:16, 28:18, 31:1, 32:16, 33:1, 33:2, 33:3, 33:4, 33:17, 34:19, 34:21, 35:7, 60:4, 60:7, 79:2, 81:11, 81:18

**26**
5:7, 27:6, 44:10, 77:1

**262**
74:9

**27**
7:12, 8:13, 11:3, 11:17, 12:12, 13:19, 17:13, 71:8, 99:14, 100:15, 102:5, 102:10

**28**
57:13, 58:3, 63:19

**29**
57:13

---
**3**
---

**3**
5:15

**30**
57:9, 58:1, 58:4

**302**
73:17

**329**
74:10

**33**
60:12

**36**
90:7

**396**
73:18

**3rd**
5:16, 57:12, 57:16, 57:19, 58:1

---
**4**
---

**410.752**
3:8

**43**
90:8

**48**
8:15

**495**
74:10

**4th**
37:6

---
**5**
---

**53291**
68:11, 68:17

**53298**
68:11, 68:18, 69:19

**57**
104:11

**5th**
4:4, 5:16, 6:4, 6:6, 13:13, 24:19, 28:8, 43:4, 44:2, 44:16, 49:1, 51:7, 51:8, 52:3, 57:16, 99:11

---
**6**
---

**6**
8:6

**613192**
1:20

**617**
74:9

---
**7**
---

**7-9**
49:9

---
**8**
---

**889**
1:7

---
**9**
---

**900**
3:15

**901**
3:6

**99,000**
21:19, 22:1, 35:13

# Exhibit 4



# Transcript of Meet and Confer

**Date:** February 18, 2026
**Case:** Yao -v- Chen / Chen -v- Chen

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

J.R.167

Transcript of Meet and Confer
Conducted on February 18, 2026

1 (1 to 4)

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

- - - - - - - - - - - - - -x

LI FEN YAO, As                :
Administrator of the          :
Estate of SAM MINGSAN   : Case No.
CHEN,                          : 8:23-cv-00889
          Plaintiff,          :
     v.                       :
ROBERT CHEN, OTTER     :
AUDITS LLC, AND RC       :
SECURITY LLC,                :
          Defendants.    :
- - - - - - - - - -           :
ROBERT CHEN AND        : Case No.
OTTERSEC LLC,               : 8:24-cv-03628
          Plaintiffs         :
                              :
     V.                       :
ROBERT CHEN,                :
          Defendant     :
- - - - - - - - - - - - - -x

MEET AND CONFER

Conducted Virtually

Wednesday, February 18, 2026

4:31 p.m. EST

Job No.: 620811

Pages: 1 - 37

Reported By: Cynthia A. Whyte

Meet and Confer conducted virtually.

Before Cynthia A. Whyte, Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

ALEXANDER M. GILES, ESQUIRE

TYDINGS & ROSENBERG, LLP

1 East Pratt Street

Suite 901

Baltimore, Maryland  21202

(410) 752-9700

ON BEHALF OF DEFENDANTS:

RACHEL CLATTENBURG, ESQUIRE

CHRISTINA M. LAMOUREUX, ESQUIRE

LEVY FIRESTONE MUSE LLP

900 17th Street, NW, Suite 1200

Washington, D.C.  20006

(202) 261-6564

ALSO PRESENT:

EMMA FLOYD, Paralegal

Levy Firestone Muse

P R O C E E D I N G S

MS. CLATTENBURG:  I'm here with Christina and Emma.

MR. GILES:  Okay.

MS. CLATTENBURG:  And we are talking about issues with the document productions and privilege log and kind of the document review process.

This relates to I sent an e-mail on January 23, 2026, which also referred to our meet and confers on December 17, 2025, I think we also discussed some of this on December 5, 2025, and I sent e-mails on December 18 and I believe it was also on December 23, 2025, that all dealt with some of these issues.

So the first bullet point is the Ally Guo messages.  So David and his counsel represented that he preserved all of these Discord conversations with Ally Guo before deleting them and that they were provided to TransPerfect, and we have not been able to locate these.

MR. GILES:  So I don't know if you have

J.R.168

Transcript of Meet and Confer
Conducted on February 18, 2026

seen the e-mail that I sent to you guys this afternoon. I responded to each of these points from your January 23 e-mail. But I will gladly go through them.

MS. CLATTENBURG: Is this the e-mail you sent 14 minutes ago?

MR. GILES: Yes.

MS. CLATTENBURG: No, we have not been able to respond to that or look at that in any way.

MR. GILES: That's fine. I understand it was late in the game so...

So I asked both TransPerfect or contacts at TransPerfect as well as our own Rachel here at Tydings to investigate this issue and to determine in Relativity what Ally Guo and/or ClosetDuck messages we had in Relativity.

And when I sent the e-mail, our Rachel was working on doing that search; and Ben Zeltser is his name, he is sort of the lead guy at TransPerfect, he was looking as well.

Rachel found some documents that have the ClosetDuck name, but we were able to determine about five minutes before I jumped on this call that those actually were the third-party production from Ally Guo in response to your subpoena. So we haven't found as of yet documents that I know that Stephen represented as being preserved in his -- I think you said it was the June 13 letter, 2025, as well as I know David has identified it several times or made reference to it several times both in his July 30 deposition as well as his most recent February 3 deposition.

So I mean this is a matter that I need to keep looking into and both us and TransPerfect need to keep searching through Relativity to try to find if those documents exist.

MS. CLATTENBURG: When did you ask TransPerfect to start looking into this?

MR. GILES: It was -- oh, I want to say it was this week, so... It was in preparation for this call.

MS. CLATTENBURG: Okay. So this has been an issue that has been out there for a while so we

do have a spoliation sanctions motion that we will be filing soon.

MR. GILES: Yeah.

MS. CLATTENBURG: So if this is something that actually exists, we need to see it.

MR. GILES: I appreciate that and we're trying to find it.

MS. CLATTENBURG: Okay. Then on Philip Papurt, so most of David chats with Philip Papurt appear to still be missing. We have only a few days of -- we have three days of David/Philip chats. The rest also have Robert on them. And we know they communicated much more frequently than this. Do you have any idea where those are?

MR. GILES: This is another matter that I referred to TransPerfect and to our Rachel to look into, and I don't have a response from them as to the Philip Papurt issue. Obviously I see the dates that you identify where documents -- where conversations exist and the three that you identified that are just David and Philip. But this is another thing we are going to have to supplement.

MS. CLATTENBURG: Okay. And when did you ask them to start looking into that?

MR. GILES: Same.

MS. CLATTENBURG: This week, meaning Monday or Tuesday or today?

MR. GILES: In preparation for this call, yes.

MS. CLATTENBURG: Okay. We are also missing David's side of a number of conversations. We pointed out some Telegram messages; for instance, Yao 01057140, Yao 01057173 and Yao 01057275, and they just have the David side and they don't have the participant's side.

MR. GILES: Yeah. And so this was another item that I specifically asked both TransPerfect and Rachel to look into, our Rachel to look into. And let me tell you the response generally is that in terms of the re-collection, the entire re-collection that we went through starting in August that included David's entire digital footprint which includes Discord and

J.R.169

Transcript of Meet and Confer

Conducted on February 18, 2026

Telegram messages, that these are the documents that were obtained as part of that process and they were produced, nothing has been withheld. And so to the extent that there's one-sided conversations, I can't explain why there are one-sided conversations.

I will reask the folks at TransPerfect, since they are the ones that have collected, produced and, with regard to Discord and Telegram, put them in 24-hour formatting. But the initial response -- let me find that response and I can read it to you for the record.

So I had asked the question about Telegram messages, and I'm just reading portions of it, but it says: Your understanding is correct regarding the Telegram messages. A full re-collection was conducted and all of the documents within the date range provided, which is September 5, 2021 through April 17, 2025, provided that hit on search terms provided were produced -- yeah, okay; within the date range provided that hit on search terms provided were produced. If

certain Telegram conversations that are produced only contain David's side of the conversation, it is because that is how the data existed when it was collected.

So that's TransPerfect's response as to that issue.

MS. CLATTENBURG: Okay. Because they previously produced one-sided conversations like this in December 2024 where it was just David's side and it was determined that they had not exported the Discord data properly -- that was Discord, not Telegram -- and they had to redo the whole thing. And it would be good if you could check that that is not the issue we are having here, that it wasn't a takeout or export issue on their end.

MR. GILES: So I'm writing down takeout or export issue.

MS. CLATTENBURG: So someone needs to log in and look at the Telegram messages and, when you are actually logged in, do you only see David's or is it that when they were exported, they were

exported as export only David's messages or however that's done.

MR. GILES: So I have written down what you just said and I will relay that message to the folks at TransPerfect as well as to our Rachel and ask them to take a look at those messages to see if that's the issue or if it is some other issue.

MS. CLATTENBURG: Okay. There are also documents produced by third parties that we are not seeing in the production that should have been produced. And this includes Discord conversations between Darren Chen and David such as -- this is Darren's production, which is CDA_00013. And then there are also channels from the new Clickbait server including rubber duck debugger, and this is produced at Deng_0003775 as an example. And we know that these include relevant responsive messages and we are wondering what is going on there.

MR. GILES: So our response to it's Items 5, 6 and 7 in your e-mail from January 23 all sort of have the same response, and if -- I know you

like to put things on the record to sort of keep it clear. Do you want to raise 6 and 7 and I can respond to all three?

MS. CLATTENBURG: Yes. Let me just see what I labeled as 6 and 7 in that e-mail. One second. Okay, yeah. So what I just mentioned --

MR. GILES: Was 5.

MS. CLATTENBURG: -- about one-sided Telegrams was 4. 5 is the one I just mentioned, yeah. 6, sure. 6, I mean you can respond to. That gets into Exhibit A which I feel like we have spoken about ad nauseam and we disagree with you on that and we are just going to have to -- I mean we have gone over that probably four or five different meet and confers and other discussions. I don't think we need to rehash Exhibit A.

MR. GILES: I don't think we do either.

MS. CLATTENBURG: Yeah. And you wanted me to include 7?

MR. GILES: 7, yes.

MS. CLATTENBURG: So 7, there are Discord conversations that David or Li Fen previously

Transcript of Meet and Confer
Conducted on February 18, 2026

produced that we have not located in a complete and useable format in this most recent reproduction of Discord. And based on your representations that you are not deduplicating and that you did a complete re-collection, we should be receiving a new version of any document you previously produced but, instead, what we are seeing is conversations that have issues such as conversations with Parth Shastri, whose Discord user name is CPPIO, and I would cite to Yao 00016168; conversations with William Wang, whose Discord user ID is Defund, D-E-F-U-N-D, such as Yao 00004545.

And in those most recent productions, so that is Yao 17 through Yao 22, you appear to have produced David's messages from those conversations, at least for some of them, but not the other participants, so the same problem we just discussed.

And it is also they have been produced in a format that is not reasonably useable, not in the form they are typically maintained either, which is what's required by Rule 34. They are not legible, they are not even in chronological order. I would point you to Yao 000896555 and Yao 00896722.

So, yes, now if you would like to give your response to 5, 6 and 7, go for it.

MR. GILES: So what I said in the e-mail that I sent, as you said 14 minutes before we started this, these three items, Items 5, 6 and 7, of your January 23 e-mail basically have the same explanation as to our response. And that is that through this litigation we have had basically two separate large-scale collections of documents, data information.

The first collection occurred several years ago prior to our firm being involved, but the documents and information obtained during that initial collection were, I believe, reviewed and narrowed down by the November 2024 search terms in the Yao V Chen side of this litigation and we produced in response to your discovery requests at that time.

And so you guys obviously look at those documents when you are then comparing them to the more recent document production which, as we have discussed ad nauseam over the past several months, was a full re-collection based on the search terms in place for November 2024 and August 2025 and were based on the messages and the digital footprint that was in existence at that time starting in August of 2025 running through the completion of the collection which finished I think some time in the end of October, beginning of November sometime.

So, obviously, you know, this has been explored at length by each side regarding the scope of the spoliation issues, but it is clear that the documents that were previously collected a couple years ago were largely produced in 2024 and early 2025 time frame prior to the entry of the preservation order and that those documents are not necessarily entirely identical with the documents that have now been re-collected and reproduced within the past couple months in the more recent document productions, which is Yao 17 through Yao 22, and that is just the reality of the situation.

MS. CLATTENBURG: Why are they not identical?

MR. GILES: Well, so I think I made this point, but when the initial collection was made several years ago, it was made of the documents that existed at that time. And they were then produced. And you use that as the comparison. What was previously produced in the Yao V Chen case, why are certain things produced then that are not being produced now? Well, the understanding that I have is that those documents no longer exist. And we have gone through in various depositions, in your spoliation depositions, spreadsheet after spreadsheet of documents he has identified that have been deleted. I mean that's a known fact. And so that's the explanation, that things have been deleted prior to the preservation order being in place.

J.R.171

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 174 of 1016
Transcript of Meet and Confer
Conducted on February 18, 2026
5 (17 to 20)

MS. CLATTENBURG: But if what was collected previously is more complete, why did you do this re-collection? This is one of the objections we had, Alex, was this re-collection was not going to include all of these messages and apparently now -- wait; just let me finish -- all of these messages and e-mails and data that he has since deleted. So we wanted the most complete collection to be what you are running your searches on.

And it now sounds like you are saying, yeah, we re-collected everything but in the meantime he deleted a bunch of stuff including, apparently, e-mails that we didn't know about and now there is just an unknown quantity of stuff missing between this second re-collection that you just did and this re-collection that was done the beginning of this year according to Mr. Plotnick.

MR. GILES: So there was an original collection that was undertaken. It has a certain composition of documents and a certain date range that was used and documents were produced, and there is a wealth of documents obviously, you know this, millions of documents, tons of terabytes of documents and information and data. And then there was a re-collection. And the reasons and the rationale for doing the re-collection have been discussed at length at various meet and confers, primarily the ones in July and August and September of this past summer.

And the documents that were re-collected, the entire digital footprint that existed at that time, do not necessarily include all the same documents that were collected several years ago, and that's the explanation. That's the only explanation I can give you.

MS. CLATTENBURG: I get it.

MR. GILES: Hold on. Hold on. I sat quiet while you wanted to keep talking so now you get to sit quiet while I keep talking.

MS. CLATTENBURG: Just be polite about it.

MR. GILES: I am being polite about it.

Between what was previously produced, which you guys have, and what has now been reproduced, which you guys have, you have everything from the first collection and now the second collection, which were collected on particular dates or particular time ranges, and that is what it is.

MS. CLATTENBURG: Right. So what I hear you saying is there are documents that were in the first collection that are not in the second collection because they have been deleted and they have been destroyed or whatever it is, they no longer exist as you say. That is a problem. So that means that the searches are being run on an incomplete set of documents.

We don't think and we never agreed that we got all responsive documents from the first collection. So this is a problem; right? We don't have all the ones from that. And the second collection is now, you say, missing even more documents than we realized. We don't think you are running adequate search terms on it. We don't think you have collected all the potentially relevant sources, and we don't know if that's because they no longer exist or because they have just not been collected. We don't know what those sources are yet because we still have not gotten those lists.

But now we are also learning that -- this re-collection was done, as I understand it, largely as an administrative -- to ease an administrative burden on your side, but not because it actually has all the data. It clearly doesn't have all the data.

MR. GILES: So, actually, the re-collection was done because you were demanding that you need to see everything. That's why the re-collection happened. And I know you disagree with that, but that is our perspective on the issue.

And yes, I agree with you that what was produced -- what was collected initially and then produced sometime thereafter included certain documents that are not included in the re-collection because they no longer exist. And

J.R.172

there are certain documents that are included in the second production because they have a defined time period, September 5, 2021, through April 17, 2025, and two sets of search terms as opposed to one set of search terms that provide more documents in the second that probably were not produced in the first.

So it goes both ways in terms of more here/less there, less there/more here. And I don't see that as a problem. I see that you see this as a problem. I don't see this as a problem. You want us to keep sorting through all of these documents and making sure they're perfect and they're not, but between the two sets you have millions upon millions upon millions of documents and everything that is relevant is there. That's our perspective. I get that you disagree with that.

MS. CLATTENBURG: Alex, we started this call with you agreeing we don't have Ally Guo. That's 10,000 messages.

MR. GILES: And we are searching for that. We are searching for that.

MS. CLATTENBURG: We don't have these third-party conversations. You don't have search terms that locate documents responsive to a number of the Chen V Chen requests. No one has ever -- we do not agree, we completely disagree, we have anything near everything responsive and relevant.

I would also correct you. Millions and millions of documents? I don't know what database you are looking at. That is not what we have. So I don't know where that is coming from.

But I just want to clarify something. It sounded like -- and I don't know if this was just a mistake or if this is accurate. You only collected based on search terms or you collected and then ran search terms?

MR. GILES: Oh, no, you're right. We collected and then ran search terms. You're absolutely right, yes.

MS. CLATTENBURG: So you collected and then ran these two searches?

MR. GILES: Yes. They collected the

wealth of his digital footprint, yes, full extent.

MS. CLATTENBURG: Okay. I think we can come back to this when we are discussing your follow-up to the Ally Guo/Philip Papurt, the other, the Telegram, the missing one-sided conversations, et cetera. I don't think this is resolved, but I appreciate the clarification.

Unless you have something more to add, I don't think we have more we are going to accomplish on this particular topic right now.

MR. GILES: That's fine.

MS. CLATTENBURG: So the text messages that are being produced in a one-message format need to be produced as part of a conversation, a chain of messages. This one single message is not a conversation. It's not how it appears, it is not how it's normally maintained as a record, and it is also not a reasonably usable format.

Will you all reproduce these text messages so they are part of the conversation that they are within?

MR. GILES: I will note for the record that my understanding in discussions with Stephen Plotnick, TransPerfect, and looking at discovery requests is that we were producing documents, Telegram and Discord documents, using the 24-hour format but nothing else. Everything else was going to be singular document productions based on what comes out from using the search terms and whether they are relevant and producible. And so that is the way that we have proceeded.

I will look at what was produced in terms of text messages. I saw you -- I think you are referring to Item No. 3 of your January 23 e-mail. You identified text messages including WeeChat I think is what you said.

MS. CLATTENBURG: Uh-huh.

MR. GILES: I will go back -- we -- I will say "we." We, our side, will go back and look at those to see how they were produced and confirm how they were produced. And if we can administratively do that reasonably and it is not too much of a burden on us in terms of money, production, time, whatever the case may be beyond

J.R.173

Transcript of Meet and Confer
Conducted on February 18, 2026

what our discovery responsibilities are, then we will do that, but, if not, I will let you know and you guys can add it to your list of discovery disputes that still exist.

MS. CLATTENBURG: Yeah. I mean our position would be that this is not how -- this is not how the documents are maintained and it is also not a reasonably usable format for text messages to get a single text message. So let us know, please.

You were going to let us know -- there are -- now there are -- originally when I e-mailed there were 99,000-some; now there are more than a hundred thousand documents produced in Yao 17 through 22, and we sent you some examples and asked you what are these responsive to.

MR. GILES: What are you referring to? What number in your e-mail? Is this No. 9?

MS. CLATTENBURG: This is December 18 e-mail.

MR. GILES: Let me find it online here.

MS. CLATTENBURG: Which I reminded you about in the e-mail about this meet and confer.

MR. GILES: Let me go back here. December 18. This is Bullet Point No. 2 of your December 18 e-mail; correct?

MS. CLATTENBURG: Right.

MR. GILES: Publicly available online code names. What do you mean by "publicly available online code names"? What does that mean?

MS. CLATTENBURG: We don't know; you guys produced them, but they are available online. They are produced as individual pages or sometimes a chapter of something you can just find online on the web that have been downloaded and produced. They have been produced individually. They are not linked. They don't appear to be responsive to anything. So we are trying to figure out what are these because there are now more than a hundred thousand of these documents, many more pages than that.

MR. GILES: December 18. Okay, all right.

MS. CLATTENBURG: Thanks.

MR. GILES: What's next?

MS. CLATTENBURG: We also asked you about identifying for us documents responsive to a request for production that asked for documents sufficient to show. For instance, we asked you for RFPs, in Chen V Chen, 20, 21, 22, 23. They are not amenable, we don't think, to search terms and they ask pretty critical questions such as documents sufficient to identify all of the liquidator bots David is running and the platforms on which he is running them, if you could please point us to your Bates numbers that do that and are sufficient to identify all of the liquidator bots and platforms, all of the Solend liquidator codes David has run, all of the mSOL market maker codes he has run.

And you said you would produce these, and we would like you to identify what documents are sufficient to show all of those, but, in addition, it is in Yao V Chen, the first set of RFPs, 14 and 15 are also requests for documents sufficient to show, and then the subpoena on David has requests that ask for documents sufficient to show and a second set of RFPs in Yao V Chen including Robert's RFP 5 and RC Security's RFPs 5 and 6.

MR. GILES: So this is Item No. 9 of your January 23 e-mail?

MS. CLATTENBURG: Sure.

MR. GILES: Yeah, I'm looking right at it so...

So what I wrote in my e-mail response that I sent this afternoon was while I don't believe it's our responsibility to take such an analysis and point out every single document that may or may not respond to the noted discovery request posed by your side, we, nonetheless, will attempt to provide you on a good-faith basis examples from our various document productions.

MS. CLATTENBURG: Sorry. Is your position that you don't have to identify Bates numbers of the documents sufficient to show in response to these requests?

MR. GILES: I don't think that's our

responsibility, no.  I mean we produced them and if they are there --

MS. CLATTENBURG:  How do you know that they are sufficient to show?  Have you actually checked this?

MR. GILES:  No.

MS. CLATTENBURG:  Okay.

MR. GILES:  As I said, we will, nonetheless, attempt to provide you with --

MS. CLATTENBURG:  No, no, I don't want nonetheless attempt.  I would like you to show what documents are sufficient to show.  If you don't have them produced, you need to produce them.

MR. GILES:  Okay.  You have noted your issue on the record.  I get it.

MS. CLATTENBURG:  All right.  We had also asked about the privilege -- I had sent you an e-mail with a number of questions about the privilege log.  Are you prepared to discuss that?

MR. GILES:  Probably not, but go ahead and tell me what day you sent me that e-mail.

MS. CLATTENBURG:  So just to clarify, on February 5 I sent you an e-mail.

MR. GILES:  February 5?

MS. CLATTENBURG:  February 5 I sent you an e-mail, and I asked for a meet and confer on February 11 or February 12 and I said but we only want to proceed with it when you have answers to the questions we raised in my January 23 e-mail and are prepared to discuss those and also prepared to discuss the deduplication issue from the December 17, 2025, meet and confer and the responsiveness of those 99,000-plus documents I just asked about, and also prepared to discuss the privilege log questions which I sent to you on January 12, 2026.  So the privilege log questions are in a January 12, 2026, e-mail.  And then I reminded you about them on February 5.

MR. GILES:  Okay.  So this relates to e-mails and documents with Alex Zhong.

MS. CLATTENBURG:  Right.  So the first category we asked about was there --

MR. GILES:  There are multiple

categories.

MS. CLATTENBURG:  -- are a number of e-mails with Alex Zhong.  Alex Zhong was not a licensed attorney at the time of these communications and the communications are therefore not privileged and we cited them for you in your priv log.

The second set, you have some communications between David and Sam, Shelly Huang.  They are not privileged.  David never retained an accountant according to him.  Communications with June Hao, you have a number of these.  She is not in the privilege chain.  Those need to be produced.  And a lot of them are redactions and those need to be produced without redactions.

We just note that your privilege log has a lot of sort of completely, it seems, nonresponsive documents, let alone documents I don't see why they are privileged, but most of all I would like to know why they are even in here; for example, like an orthodontist it seems like

and then from a bunch of universities, possibly marketing e-mails.

I have asked about documents that don't have enough information or no information about why they are privileged, and I listed those for you.

MR. GILES:  Okay.  So I believe that my colleague Casey Brinks, who is working on the privilege logs, had dealt with the first issue, the Alex Zhong issue, but I need to go back and find where that is, and I think it was post your January 12 but prior to January 20, and whether -- so I have -- so the short answer to your question is am I ready to talk about it?  No, I'm not.  But I will try to get the answer to this question by this Friday.

MS. CLATTENBURG:  Thanks.  How about the other ones?

MR. GILES:  Oh, yeah.  No, I mean this e-mail.

MS. CLATTENBURG:  Oh, okay.

MR. GILES:  The whole e-mail, the

J.R.175

Case 8:23-cv-00889-TDC   Document 204   Filed 04/13/26   Page 178 of 1016
Transcript of Meet and Confer
Conducted on February 18, 2026
9 (33 to 36)

categories.

MS. CLATTENBURG: Okay. Look, we scheduled this so we were hoping we could actually discuss these issues and it seems like nothing was actually ready to be fully discussed or answered on this call. I'm not sure the best way to get your responses from you. You don't like e-mails. When we do meet and confers you don't look at the issues until right before and you are not ready to discuss them. So I guess our only option is to schedule another meet and confer, but it doesn't seem to work, so we need to have them more frequently and hopefully that will prompt you to look at the stuff.

So do you want to send us some times you are available next week?

MR. GILES: I'm not available next week. I'm out of state.

MS. CLATTENBURG: Out of state doesn't mean you're not available.

MR. GILES: No, I am unavailable. I'm giving presentations each day.

MS. CLATTENBURG: Alex, but how do we get more prompt responses from you? Because this is document production, we need this stuff. We can't continue with the cases without you participating in discovery and you seem to be not participating in discovery. So we need the documents. We need to know what is going on with the stuff that is missing. We need it sooner than next week. And if you can't even have a call about it next week, I mean, are you going to set a deadline for yourself? What do you suggest so we actually get this stuff?

MR. GILES: The earliest I can have a call to follow up on these things other than the e-mail I have just told you I will send to you by this Friday, other than that, the earliest I can have a call is Monday, the 2nd.

MS. CLATTENBURG: So what about the Ally Guo documents; when are we learning about those?

MR. GILES: As soon as I find out from the folks at TransPerfect and our Rachel.

MS. CLATTENBURG: But you have had that question now outstanding for about a month at least. I mean I don't understand. What do we need to do so you follow up on it? Are you not responding to e-mails next week?

MR. GILES: Am I not responding --

MS. CLATTENBURG: Are you available? Are you out of the office --

MR. GILES: Out of the office in meetings all day long.

MS. CLATTENBURG: So you are not going to be able to work on this next week? When is this getting done?

MR. GILES: No, I'm not, but the other folks in the office will be working on it.

MS. CLATTENBURG: Okay. Well, we expect a response about all this stuff by the end of next week then. This has dragged on far too long and we already pushed out this meet and confer for a week because you said you needed another week to prepare. We got an e-mail from you 14 minutes before the meet and confer which basically seems to say I don't have answers, I just asked TransPerfect, we will have to follow up.

So please try to get this to us by the end of next week at the latest. I don't want to have to drag the Court into this again on these issues that you should be able to respond to without having the Court's involvement.

MR. GILES: Okay. Are you done?

MS. CLATTENBURG: Yeah, I hope so.

MR. GILES: All right.

MS. CLATTENBURG: Okay. We will schedule one then for the 2nd.

MR. GILES: Okay. Schedule it for the afternoon.

MS. CLATTENBURG: I think we are done, Cindy. Thank you.

THE COURT REPORTER: Okay. I will have the rough draft to you tonight and the final tomorrow.

MS. CLATTENBURG: Okay. Thanks very much.

(Off the record at 5:08 p.m.)

J.R.176

Transcript of Meet and Confer
Conducted on February 18, 2026

37

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Cynthia A. Whyte, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 19th day of February, 2026.

My commission expires:

October 30, 2028

*Cynthia A. Whyte*

CYNTHIA A. WHYTE
NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA

J.R.177

Transcript of Meet and Confer
Conducted on February 18, 2026                    11

| A |
|---|

**able**
4:21, 5:9, 6:1,
35:11, 36:5
**about**
4:6, 6:2, 9:13,
12:8, 12:12,
17:14, 18:19,
18:21, 26:1,
27:3, 29:18,
29:19, 30:13,
30:17, 30:21,
32:3, 32:4,
32:14, 32:17,
34:9, 34:18,
34:19, 35:1,
35:16
**absolutely**
22:19
**accomplish**
23:10
**according**
17:18, 31:11
**accountant**
31:11
**accurate**
22:14
**actually**
6:3, 7:5,
10:21, 20:10,
20:12, 29:4,
33:3, 33:5,
34:11
**ad**
12:12, 15:4
**add**
23:8, 25:3
**addition**
27:20
**adequate**
19:21
**administrative**
20:8, 20:9
**administratively**
24:20
**administrator**
1:5

**affixed**
37:14
**after**
16:17
**afternoon**
5:2, 28:11,
36:13
**again**
36:4
**ago**
5:6, 14:16,
15:17, 16:8,
18:12
**agree**
20:18, 22:6
**agreed**
19:15
**agreeing**
21:20
**ahead**
29:21
**alex**
17:4, 21:19,
30:19, 31:3,
32:10, 34:1
**alexander**
3:3
**all**
4:14, 4:18,
9:17, 11:21,
12:3, 17:5,
17:6, 18:11,
19:16, 19:18,
19:22, 20:10,
20:11, 21:12,
23:19, 26:21,
27:10, 27:14,
27:15, 27:16,
27:20, 29:17,
31:20, 35:9,
35:16, 36:9
**ally**
4:16, 4:19,
5:16, 6:4,
21:20, 23:4,
34:18
**alone**
31:19

**already**
35:18
**also**
3:18, 4:10,
4:11, 4:14,
7:12, 8:9, 11:8,
11:14, 13:20,
20:6, 22:8,
23:18, 25:8,
27:3, 27:22,
29:17, 30:9,
30:13
**amenable**
27:8
**analysis**
28:13
**another**
7:15, 7:22,
8:16, 33:11,
35:19
**answer**
32:13, 32:15
**answered**
33:5
**answers**
30:7, 35:22
**any**
5:9, 7:14,
13:6, 37:10
**anything**
22:7, 26:17
**apparently**
17:6, 17:14
**appear**
7:10, 13:15,
26:16
**appears**
23:16
**appreciate**
7:6, 23:7
**april**
9:19, 21:3
**asked**
5:13, 8:16,
9:13, 25:16,
27:3, 27:5,
27:6, 29:18,
30:5, 30:13,

30:21, 32:3,
35:22
**attempt**
28:16, 29:9,
29:11
**attorney**
31:4
**audits**
1:11
**august**
8:21, 15:6,
15:9, 18:7
**available**
26:6, 26:8,
26:11, 33:16,
33:17, 33:20,
35:6

| B |
|---|

**back**
23:3, 24:16,
24:17, 26:2,
32:10
**baltimore**
3:7
**based**
13:3, 15:5,
15:7, 22:15,
24:6
**basically**
14:10, 14:12,
35:21
**basis**
28:16
**bates**
27:13, 28:19
**because**
10:3, 10:7,
19:10, 20:2,
20:4, 20:10,
20:13, 20:22,
21:2, 26:18,
34:2, 35:19
**been**
4:21, 5:8,
6:21, 6:22, 9:3,
11:10, 13:20,
15:13, 15:21,

J.R.178

16:18, 16:20, 18:6, 19:1, 19:10, 19:11, 20:3, 26:14, 26:15

**before**
2:13, 4:19, 6:2, 14:8, 33:9, 35:21, 37:2

**beginning**
15:11, 17:18

**behalf**
3:2, 3:10

**being**
6:6, 14:16, 16:13, 16:21, 18:21, 19:13, 23:13

**believe**
4:13, 14:18, 28:12, 32:7

**ben**
5:19

**best**
33:6

**between**
11:12, 17:16, 18:22, 21:14, 31:9

**beyond**
24:22

**both**
5:13, 6:10, 6:13, 8:16, 21:8

**bots**
27:11, 27:15

**brinks**
32:8

**bullet**
4:16, 26:3

**bunch**
17:13, 32:1

**burden**
20:9, 24:21

**C**

**call**
6:2, 6:20, 8:7,

21:20, 33:6, 34:9, 34:14, 34:17

**can't**
9:5, 34:3, 34:9

**case**
1:6, 1:15, 16:12, 24:22, 37:11

**cases**
34:4

**casey**
32:8

**categories**
31:1, 33:1

**category**
30:21

**cda**
11:13

**certain**
10:1, 16:12, 17:20, 17:21, 20:20, 21:1

**certificate**
37:1

**certify**
37:4

**cetera**
23:6

**chain**
23:15, 31:13

**channels**
11:14

**chapter**
26:13

**chats**
7:9, 7:12

**check**
10:14

**checked**
29:5

**chen**
1:7, 1:10, 1:15, 1:20, 11:12, 14:20, 16:11, 22:5, 27:7, 27:21, 28:3

**christina**
3:12, 4:2

**chronological**
14:2

**cindy**
36:15

**cite**
13:10

**cited**
31:6

**clarification**
23:7

**clarify**
22:12, 30:1

**clattenburg**
3:11, 4:2, 4:5, 5:5, 5:8, 6:16, 6:21, 7:4, 7:8, 8:2, 8:5, 8:9, 10:7, 10:19, 11:8, 12:4, 12:8, 12:18, 12:21, 16:4, 17:1, 18:15, 18:19, 19:7, 21:19, 22:2, 22:20, 23:2, 23:12, 24:15, 25:5, 25:19, 25:22, 26:5, 26:10, 27:1, 27:3, 28:7, 28:18, 29:3, 29:7, 29:10, 29:17, 30:1, 30:4, 30:20, 31:2, 32:17, 32:21, 33:2, 33:19, 34:1, 34:18, 34:22, 35:6, 35:10, 35:15, 36:8, 36:10, 36:14, 36:19

**clear**
12:2, 15:15

**clearly**
20:10

**clickbait**
11:14

**closetduck**
5:16, 6:1

**code**
26:7, 26:8

**codes**
27:16, 27:17

**colleague**
32:8

**collected**
9:8, 10:4, 15:16, 17:2, 18:12, 19:4, 19:22, 20:3, 20:19, 22:15, 22:18, 22:20, 22:22

**collection**
14:15, 14:18, 15:10, 16:7, 17:9, 17:20, 19:3, 19:4, 19:9, 19:10, 19:17, 19:19

**collections**
14:13

**come**
23:3

**comes**
24:7

**coming**
22:11

**commission**
37:16

**commonwealth**
2:14, 37:22

**communicated**
7:13

**communications**
31:5, 31:9, 31:12

**comparing**
15:2

**comparison**
16:10

**complete**
13:1, 13:5,

J.R.179

17:2, 17:8
**completely**
22:6, 31:18
**completion**
15:10
**composition**
17:21
**conducted**
1:25, 2:1, 9:17
**confer**
1:24, 2:1,
26:1, 30:5,
30:11, 33:11,
35:18, 35:21
**confers**
4:11, 12:15,
18:7, 33:8
**confirm**
24:19
**contacts**
5:13
**contain**
10:2
**continue**
34:4
**conversation**
10:2, 23:14,
23:16, 23:20
**conversations**
4:19, 7:20,
8:10, 9:5, 9:6,
10:1, 10:8,
11:11, 12:22,
13:8, 13:9,
13:11, 13:17,
22:3, 23:6
**correct**
9:15, 22:8,
26:4, 37:5
**could**
10:13, 27:12,
33:3
**counsel**
4:17, 37:9
**couple**
15:17, 15:22
**court**
1:1, 36:4,

36:16
**court's**
36:6
**cppio**
13:10
**critical**
27:9
**cynthia**
1:31, 2:13,
37:2, 37:20

**D**

**d-e-f-u-n-d**
13:12
**darren**
11:12
**darren's**
11:13
**data**
10:3, 10:11,
14:14, 17:7,
18:3, 20:10,
20:11
**database**
22:9
**date**
9:18, 9:21,
17:21
**dates**
7:19, 19:5
**david**
4:17, 6:8, 7:9,
7:11, 7:21,
8:13, 11:12,
12:22, 27:11,
27:16, 28:1,
31:9, 31:10
**david's**
8:10, 8:21,
10:2, 10:9,
10:21, 11:1,
13:16
**day**
29:22, 33:22,
35:9, 37:14
**days**
7:11
**deadline**
34:10

**dealt**
4:14, 32:9
**debugger**
11:15
**december**
4:11, 4:12,
4:13, 4:14,
10:9, 25:19,
26:3, 26:4,
26:21, 30:11
**deduplicating**
13:4
**deduplication**
30:10
**defendant**
1:21
**defendants**
1:13, 3:10
**defined**
21:2
**defund**
13:12
**deleted**
16:19, 16:21,
17:8, 17:13,
19:10
**deleting**
4:19
**demanding**
20:13
**deng**
11:16
**deposition**
6:10, 6:11
**depositions**
16:16, 16:17
**destroyed**
19:11
**determine**
5:15, 6:1
**determined**
10:10
**different**
12:15
**digital**
8:22, 15:7,
18:10, 23:1
**disagree**
12:12, 20:15,

21:17, 22:6
**discord**
4:18, 8:22,
9:9, 10:11,
10:12, 11:11,
12:21, 13:3,
13:9, 13:12,
24:4
**discovery**
14:21, 24:2,
25:1, 25:3,
28:14, 34:5,
34:6
**discuss**
29:20, 30:9,
30:10, 30:13,
33:4, 33:10
**discussed**
4:12, 13:19,
15:4, 18:6, 33:5
**discussing**
23:3
**discussions**
12:15, 24:1
**disputes**
25:4
**district**
1:1, 1:2
**document**
4:6, 4:7, 13:6,
15:3, 16:1,
24:6, 28:13,
28:17, 34:3
**documents**
5:22, 6:5,
6:15, 7:19, 9:1,
9:18, 11:9,
14:13, 14:17,
15:2, 15:16,
15:19, 15:21,
16:8, 16:14,
16:18, 17:21,
17:22, 18:1,
18:2, 18:3,
18:9, 18:12,
19:8, 19:14,
19:16, 19:20,
20:21, 21:1,

J.R.180

21:6, 21:13,
21:15, 22:4,
22:9, 24:3,
24:4, 25:7,
25:14, 26:19,
27:4, 27:5,
27:10, 27:19,
27:22, 28:2,
28:20, 29:12,
30:12, 30:19,
31:19, 32:3,
34:6, 34:19
**doing**
5:19, 18:5
**done**
11:2, 17:17,
20:7, 20:13,
35:12, 36:7,
36:14
**down**
10:17, 11:3,
14:19
**downloaded**
26:14
**draft**
36:17
**drag**
36:4
**dragged**
35:17
**duck**
11:15
**during**
14:17

**E**

**e-mail**
4:9, 5:1, 5:3,
5:5, 5:18,
11:21, 12:5,
14:7, 14:10,
24:12, 25:18,
25:20, 26:1,
26:4, 28:6,
28:10, 29:19,
29:22, 30:2,
30:5, 30:8,
30:16, 32:20,

32:22, 34:15,
35:20
**e-mailed**
25:12
**e-mails**
4:13, 17:7,
17:14, 30:19,
31:3, 32:2,
33:7, 35:4
**each**
5:2, 15:14,
33:22
**earliest**
34:13, 34:16
**early**
15:18
**ease**
20:8
**east**
3:5
**either**
12:17, 13:22
**else**
24:5
**emma**
3:19, 4:3
**employed**
37:10
**end**
10:16, 15:11,
35:16, 36:3
**enough**
32:4
**entire**
8:20, 8:21,
18:10
**entirely**
15:20
**entry**
15:18
**esquire**
3:3, 3:11, 3:12
**est**
1:27
**estate**
1:6
**et**
23:6

**even**
14:2, 19:19,
31:21, 34:9
**ever**
22:5
**every**
28:13
**everything**
17:12, 19:3,
20:14, 21:16,
22:7, 24:5
**example**
11:16, 31:22
**examples**
25:15, 28:17
**exhibit**
12:11, 12:16
**exist**
6:15, 7:20,
16:15, 19:12,
20:2, 20:22,
25:4
**existed**
10:3, 16:9,
18:10
**existence**
15:8
**exists**
7:5
**expect**
35:15
**expires**
37:16
**explain**
9:5
**explanation**
14:11, 16:20,
18:13, 18:14
**explored**
15:14
**export**
10:15, 10:18,
11:1
**exported**
10:11, 10:22,
11:1
**extent**
9:4, 23:1

**F**

**fact**
16:19
**far**
35:17
**february**
1:26, 6:11,
30:2, 30:3,
30:4, 30:6,
30:17, 37:15
**feel**
12:11
**fen**
1:4, 12:22
**few**
7:10
**figure**
26:17
**filing**
7:2
**final**
36:17
**financial**
37:11
**find**
6:15, 7:7,
9:11, 25:21,
26:13, 32:11,
34:20
**fine**
5:11, 23:11
**finish**
17:6
**finished**
15:10
**firestone**
3:13, 3:20
**firm**
14:16
**first**
4:16, 14:15,
19:3, 19:9,
19:16, 21:7,
27:21, 30:20,
32:9
**five**
6:2, 12:14

J.R.181

Transcript of Meet and Confer
Conducted on February 18, 2026

15

| | | | |
|---|---|---|---|
| **floyd** 3:19 | 5:7, 5:11, 6:18, 7:3, 7:6, 7:15, 8:4, 8:7, 8:15, 10:17, 11:3, 11:20, 12:7, 12:17, 12:20, 14:7, 16:6, 17:19, 18:16, 18:21, 20:12, 21:22, 22:17, 22:22, 23:11, 23:22, 24:16, 25:17, 25:21, 26:2, 26:6, 26:21, 27:2, 28:5, 28:8, 28:22, 29:6, 29:8, 29:15, 29:21, 30:3, 30:18, 30:22, 32:7, 32:19, 32:22, 33:17, 33:21, 34:13, 34:20, 35:5, 35:8, 35:13, 36:7, 36:9, 36:12 | **good** 10:13 | **hour** 9:10, 24:4 |
| **folks** 9:7, 11:5, 34:21, 35:14 | | **good-faith** 28:16 | **however** 11:2 |
| **follow** 34:14, 35:3, 36:1 | | **gotten** 20:4 | **huang** 31:10 |
| **follow-up** 23:4 | | **guess** 33:10 | **hundred** 25:14, 26:18 |
| **footprint** 8:22, 15:8, 18:10, 23:1 | | **guo** 4:16, 4:19, 5:16, 6:4, 21:20, 23:4, 34:19 | **I** |
| **foregoing** 37:3, 37:4 | | | **id** 13:12 |
| **form** 13:22 | | **guy** 5:20 | **idea** 7:14 |
| **format** 13:2, 13:21, 23:13, 23:18, 24:5, 25:8 | | **guys** 5:1, 15:1, 19:1, 19:2, 25:3, 26:10 | **identical** 15:20, 16:5 |
| **formatting** 9:10 | | **H** | **identified** 6:9, 7:21, 16:18, 24:13 |
| **found** 5:22, 6:5 | **give** 14:5, 18:14 | **hand** 37:14 | **identify** 7:19, 27:10, 27:14, 27:19, 28:19 |
| **four** 12:14 | **giving** 33:22 | **hao** 31:12 | |
| **frame** 15:18 | **gladly** 5:3 | **happened** 20:15 | **identifying** 27:4 |
| **frequently** 7:13, 33:13 | **go** 5:3, 14:6, 24:16, 24:17, 26:2, 29:21, 32:10 | **hear** 19:7 | **include** 11:17, 12:19, 17:5, 18:11 |
| **friday** 32:16, 34:16 | | **here** 4:2, 5:14, 10:15, 21:9, 25:21, 26:2, 31:21 | **included** 8:21, 20:20, 20:21, 21:1 |
| **full** 9:16, 15:5, 23:1 | | | |
| **fully** 33:5 | **goes** 21:8 | **hereby** 37:3 | **includes** 8:22, 11:11 |
| **G** | **going** 7:22, 11:18, 12:13, 17:5, 23:9, 24:6, 25:11, 34:7, 34:10, 35:10 | **hereunto** 37:13 | **including** 11:15, 17:13, 24:13, 28:3 |
| **game** 5:12 | | **hit** 9:20, 9:22 | **incomplete** 19:14 |
| **generally** 8:19 | | **hold** 18:16 | **individual** 26:12 |
| **getting** 35:12 | | **hope** 36:8 | **individually** 26:15 |
| **giles** 3:3, 4:4, 4:22, | **gone** 12:14, 16:15 | **hopefully** 33:13 | **information** 14:14, 14:17, 18:3, 32:4 |
| | | **hoping** 33:3 | **initial** 9:10, 14:18, 16:7 |

J.R.182

Transcript of Meet and Confer
Conducted on February 18, 2026                              16

**initially**
20:19
**instance**
8:12, 27:6
**instead**
13:7
**interest**
37:11
**investigate**
5:15
**involved**
14:16
**involvement**
36:6
**issue**
5:15, 6:22,
7:18, 10:6,
10:14, 10:15,
10:18, 11:7,
20:17, 29:16,
30:10, 32:9,
32:10
**issues**
4:6, 4:15,
13:8, 15:15,
33:4, 33:9, 36:5
**item**
8:16, 24:12,
28:5
**items**
11:20, 14:9

**J**

**january**
4:10, 5:3,
11:21, 14:10,
24:12, 28:6,
30:8, 30:15,
30:16, 32:12
**job**
1:29
**july**
6:10, 18:7
**jumped**
6:2
**june**
6:8, 31:12

**K**

**keep**
6:13, 6:14,

12:1, 18:17,
18:18, 21:12
**kind**
4:7
**know**
4:22, 6:6, 6:8,
7:13, 11:17,
11:22, 15:13,
17:14, 18:1,
20:1, 20:3,
20:15, 22:9,
22:11, 22:13,
25:2, 25:10,
25:11, 26:10,
29:3, 31:21,
34:7
**known**
16:19

**L**

**labeled**
12:5
**lamoureux**
3:12
**large-scale**
14:13
**largely**
15:17, 20:8
**late**
5:12
**latest**
36:3
**lead**
5:20
**learning**
20:6, 34:19
**least**
13:17, 35:2
**legible**
14:2
**length**
15:14, 18:6
**less**
21:9
**letter**
6:8
**levy**
3:13, 3:20

**li**
1:4, 12:22
**licensed**
31:4
**linked**
26:16
**liquidator**
27:11, 27:14,
27:15
**list**
25:3
**listed**
32:5
**lists**
20:5
**litigation**
14:12, 14:20
**llc**
1:11, 1:12,
1:16
**llp**
3:4, 3:13
**locate**
4:21, 22:4
**located**
13:1
**log**
4:7, 10:19,
29:20, 30:14,
30:15, 31:7,
31:17
**logged**
10:21
**logs**
32:9
**long**
35:9, 35:17
**longer**
16:15, 19:12,
20:2, 20:22
**look**
5:9, 7:16,
8:17, 8:18,
10:20, 11:6,
15:1, 24:10,
24:18, 33:2,
33:8, 33:14
**looking**
5:21, 6:13,

6:17, 8:3,
22:10, 24:2,
28:8
**lot**
31:14, 31:18

**M**

**made**
6:9, 16:6,
16:7, 16:8
**maintained**
13:22, 23:17,
25:7
**maker**
27:16
**making**
21:13
**many**
26:19
**market**
27:16
**marketing**
32:2
**maryland**
1:2, 3:7
**matter**
6:12, 7:15
**mean**
6:12, 12:10,
12:13, 16:19,
25:5, 26:7,
26:9, 29:1,
32:19, 33:20,
34:10, 35:2
**meaning**
8:5
**means**
19:13
**meantime**
17:13
**meet**
1:24, 2:1,
4:10, 12:15,
18:6, 26:1,
30:5, 30:11,
33:8, 33:11,
35:18, 35:21
**meetings**
35:8

J.R.183

mentioned
12:6, 12:9
message
11:4, 23:15, 25:9
messages
4:17, 5:17, 8:11, 9:1, 9:14, 9:16, 10:20, 11:1, 11:6, 11:18, 13:16, 15:7, 17:5, 17:7, 21:21, 23:12, 23:15, 23:20, 24:11, 24:13, 25:9
millions
18:2, 21:15, 22:8, 22:9
mingsan
1:6
minutes
5:6, 6:2, 14:8, 35:20
missing
7:10, 8:10, 17:16, 19:19, 23:5, 34:8
mistake
22:14
monday
8:6, 34:17
money
24:21
month
35:1
months
15:4, 15:22
more
7:13, 15:3, 16:1, 17:2, 19:19, 21:5, 21:8, 21:9, 23:8, 23:9, 25:13, 26:18, 26:19, 33:12, 34:2
most
6:11, 7:9,

13:2, 13:14, 17:8, 31:20
motion
7:1
msol
27:16
much
7:13, 24:21, 36:20
multiple
30:22
muse
3:13, 3:20

### N

name
5:20, 6:1, 13:10
names
26:7, 26:8
narrowed
14:19
nauseam
12:12, 15:4
near
22:7
necessarily
15:20, 18:11
need
6:12, 6:14, 7:5, 12:16, 20:14, 23:14, 29:13, 31:14, 31:15, 32:10, 33:12, 34:3, 34:6, 34:8, 35:3
needed
35:19
needs
10:19
neither
37:9
never
19:15, 31:10
new
11:14, 13:6
next
27:2, 33:16,

33:17, 34:8, 34:9, 35:4, 35:11, 35:16, 36:3
nonetheless
28:15, 29:9, 29:11
nonresponsive
31:19
normally
23:17
notarial
37:14
notary
2:13, 37:1, 37:21
note
23:22, 31:17
noted
28:14, 29:15
nothing
9:3, 24:5, 33:4
november
14:19, 15:6, 15:12
number
8:10, 22:4, 25:18, 29:19, 31:2, 31:12
numbers
27:13, 28:20
nw
3:14

### O

objections
17:4
obtained
9:2, 14:17
obviously
7:18, 15:1, 15:13, 18:1
occurred
14:15
october
15:11, 37:17
office
35:7, 35:8,

35:14
officer
37:2
oh
6:18, 22:17, 32:19, 32:21
okay
4:4, 6:21, 7:8, 8:2, 8:9, 9:21, 10:7, 11:8, 12:6, 23:2, 26:21, 29:7, 29:15, 30:18, 32:7, 32:21, 33:2, 35:15, 36:7, 36:10, 36:12, 36:16, 36:19
one
12:5, 12:9, 17:3, 21:5, 22:5, 23:15, 36:11
one-message
23:13
one-sided
9:4, 9:6, 10:8, 12:8, 23:5
ones
9:8, 18:7, 19:18, 32:18
online
25:21, 26:6, 26:8, 26:11, 26:13
only
7:10, 10:2, 10:21, 11:1, 18:13, 22:14, 30:6, 33:10
opposed
21:4
option
33:10
order
14:2, 15:19, 16:21
original
17:19

J.R.184

originally
25:12
orthodontist
31:22
other
11:7, 12:15,
13:18, 23:5,
32:18, 34:14,
34:16, 35:13
otherwise
37:12
otter
1:10
ottersec
1:16
out
6:22, 8:11,
24:7, 26:17,
28:13, 33:18,
33:19, 34:20,
35:7, 35:8,
35:18
outcome
37:12
outstanding
35:1
over
12:14, 15:4
own
5:14

**P**

pages
1:30, 26:12,
26:19
papurt
7:9, 7:18, 23:4
paralegal
3:19
part
9:2, 23:14,
23:20
parth
13:9
participant's
8:14
participants
13:18

participating
34:4, 34:5
particular
19:5, 23:10
parties
11:9, 37:10
past
15:4, 15:22,
18:8
perfect
21:13
period
21:3
perspective
20:16, 21:17
philip
7:8, 7:9, 7:11,
7:18, 7:21, 23:4
place
15:6, 16:22
plaintiff
1:8, 3:2
plaintiffs
1:17
platforms
27:11, 27:15
please
25:10, 27:12,
36:2
plotnick
17:18, 24:2
plus
30:12
point
4:16, 14:3,
16:7, 26:3,
27:13, 28:13
pointed
8:11
points
5:2
polite
18:19, 18:21
portions
9:14
posed
28:15
position
25:6, 28:19

possibly
32:1
post
32:11
potentially
19:22
pratt
3:5
preparation
6:19, 8:7
prepare
35:20
prepared
29:20, 30:9,
30:10, 30:13
present
3:18
presentations
33:22
preservation
15:19, 16:21
preserved
4:18, 6:7
pretty
27:9
previously
10:8, 12:22,
13:7, 15:16,
16:11, 17:2,
18:22
primarily
18:7
prior
14:16, 15:18,
16:21, 32:12
priv
31:7
privilege
4:7, 29:18,
29:20, 30:14,
30:15, 31:13,
31:17, 32:9
privileged
31:6, 31:10,
31:20, 32:5
probably
12:14, 21:6,
29:21

problem
13:18, 19:12,
19:17, 21:10,
21:11
proceed
30:7
proceeded
24:9
proceedings
37:3, 37:5,
37:6
process
4:8, 9:2
produce
27:18, 29:13
produced
9:3, 9:9, 9:20,
9:22, 10:1,
10:8, 11:9,
11:11, 11:16,
13:1, 13:7,
13:16, 13:20,
14:21, 15:17,
16:10, 16:11,
16:12, 16:13,
17:22, 18:22,
20:19, 20:20,
21:7, 23:13,
23:14, 24:10,
24:18, 24:19,
25:14, 26:11,
26:12, 26:14,
26:15, 29:1,
29:13, 31:14,
31:15
producible
24:8
producing
24:3
production
6:4, 11:10,
11:13, 15:3,
21:2, 24:22,
27:5, 34:3
productions
4:6, 13:14,
16:1, 24:6,
28:17

J.R.185

Transcript of Meet and Confer
Conducted on February 18, 2026

19

**prompt**
33:13, 34:2
**properly**
10:11
**provide**
21:5, 28:16,
29:9
**provided**
4:20, 9:18,
9:19, 9:20,
9:21, 9:22
**public**
2:13, 37:1,
37:21
**publicly**
26:6, 26:7
**pushed**
35:18
**put**
9:10, 12:1

**Q**

**quantity**
17:15
**question**
9:13, 32:13,
32:15, 35:1
**questions**
27:9, 29:19,
30:8, 30:14,
30:15
**quiet**
18:17, 18:18

**R**

**rachel**
3:11, 5:14,
5:18, 5:22,
7:16, 8:17,
11:5, 34:21
**raise**
12:2
**raised**
30:8
**ran**
22:16, 22:18,
22:21
**range**
9:18, 9:21,

17:21
**ranges**
19:5
**rationale**
18:5
**rc**
1:11, 28:4
**re-collected**
15:21, 17:12,
18:9
**re-collection**
8:19, 8:20,
9:17, 13:5,
15:5, 17:3,
17:4, 17:16,
17:17, 18:4,
18:5, 20:7,
20:13, 20:15,
20:22
**read**
9:12
**reading**
9:14, 37:8
**ready**
32:14, 33:5,
33:9
**reality**
16:2
**realized**
19:20
**reask**
9:7
**reasonably**
13:21, 23:18,
24:20, 25:8
**reasons**
18:4
**receiving**
13:6
**recent**
6:11, 13:2,
13:14, 15:3,
16:1
**record**
9:12, 12:1,
23:17, 23:22,
29:16, 36:21,
37:5

**redactions**
31:15, 31:16
**redo**
10:12
**reduced**
37:7
**reference**
6:9
**referred**
4:10, 7:16
**referring**
24:12, 25:17
**regard**
9:9
**regarding**
9:16, 15:14
**rehash**
12:16
**related**
37:10
**relates**
4:9, 30:18
**relativity**
5:16, 5:17,
6:14
**relay**
11:4
**relevant**
11:17, 20:1,
21:16, 22:7,
24:8
**reminded**
25:22, 30:17
**reported**
1:31
**reporter**
36:16, 37:1
**representations**
13:4
**represented**
4:17, 6:6
**reproduce**
23:19
**reproduced**
15:22, 19:2
**reproduction**
13:3
**request**
27:5, 28:15

**requested**
37:9
**requests**
14:21, 22:5,
24:3, 27:22,
28:1, 28:21
**required**
14:1
**resolved**
23:7
**respond**
5:9, 12:3,
12:10, 28:14,
36:5
**responded**
5:2
**responding**
35:4, 35:5
**response**
6:4, 7:17,
8:18, 9:11,
10:5, 11:20,
11:22, 14:6,
14:11, 14:21,
28:10, 28:21,
35:16
**responses**
33:7, 34:2
**responsibilities**
25:1
**responsibility**
28:12, 29:1
**responsive**
11:17, 19:16,
22:4, 22:7,
25:16, 26:16,
27:4
**responsiveness**
30:12
**rest**
7:12
**retained**
31:11
**review**
4:7
**reviewed**
14:18
**rfp**
28:4

J.R.186

**rfps**
27:7, 27:21,
28:3, 28:4
**right**
19:7, 19:17,
22:17, 22:19,
23:10, 26:5,
26:22, 28:8,
29:17, 30:20,
33:9, 36:9
**robert**
1:10, 1:15,
1:20, 7:12
**robert's**
28:4
**rosenberg**
3:4
**rough**
36:17
**rubber**
11:15
**rule**
14:1
**run**
19:13, 27:16,
27:17
**running**
15:9, 17:9,
19:21, 27:11,
27:12

**S**

**said**
6:7, 11:4,
14:7, 14:8,
24:14, 27:18,
29:8, 30:6,
35:19, 37:5
**sam**
1:6, 31:9
**same**
8:4, 11:22,
13:18, 14:10,
18:11
**sanctions**
7:1
**sat**
18:16

**saw**
24:11
**say**
6:18, 19:12,
19:19, 24:17,
35:22
**saying**
17:11, 19:8
**says**
9:15
**schedule**
33:11, 36:10,
36:12
**scheduled**
33:3
**scope**
15:15
**seal**
37:14
**search**
5:19, 9:20,
9:22, 14:19,
15:5, 19:21,
21:4, 21:5,
22:3, 22:15,
22:16, 22:18,
24:7, 27:8
**searches**
17:10, 19:13,
22:21
**searching**
6:14, 21:22,
22:1
**second**
12:6, 17:16,
19:4, 19:9,
19:18, 21:2,
21:6, 28:3, 31:8
**security**
1:12
**security's**
28:4
**see**
7:5, 7:18,
10:21, 11:6,
12:4, 20:14,
21:10, 21:11,
24:18, 31:20

**seeing**
11:10, 13:8
**seem**
33:12, 34:5
**seems**
31:18, 31:22,
33:4, 35:21
**seen**
5:1
**send**
33:15, 34:15
**sent**
4:9, 4:13, 5:1,
5:6, 5:18, 14:8,
25:15, 28:11,
29:18, 29:22,
30:2, 30:4,
30:14
**separate**
14:13
**september**
9:19, 18:8,
21:3
**server**
11:15
**set**
19:14, 21:5,
27:21, 28:3,
31:8, 34:10,
37:13
**sets**
21:4, 21:14
**several**
6:9, 6:10,
14:15, 15:4,
16:8, 18:12
**shastri**
13:9
**shelly**
31:9
**short**
32:13
**shorthand**
37:1
**should**
11:10, 13:5,
36:5
**show**
27:6, 27:20,

28:1, 28:2,
28:20, 29:4,
29:11, 29:12
**side**
8:10, 8:13,
8:14, 10:2,
10:10, 14:20,
15:14, 20:9,
24:17, 28:15
**signature-mig2k**
37:18
**signing**
37:8
**since**
9:8, 17:8
**single**
23:15, 25:9,
28:13
**singular**
24:6
**sit**
18:18
**situation**
16:3
**solend**
27:15
**some**
4:12, 4:15,
5:22, 8:11,
11:7, 13:17,
15:11, 25:13,
25:15, 31:8,
33:15
**someone**
10:19
**something**
7:4, 22:12,
23:8, 26:13
**sometime**
15:12, 20:20
**sometimes**
26:12
**soon**
7:2, 34:20
**sooner**
34:8
**sorry**
28:18

J.R.187

Transcript of Meet and Confer
Conducted on February 18, 2026

**sort**
5:20, 11:21, 12:1, 31:18
**sorting**
21:12
**sounded**
22:13
**sounds**
17:11
**sources**
20:1, 20:4
**specifically**
8:16
**spoken**
12:12
**spoliation**
7:1, 15:15, 16:16
**spreadsheet**
16:17
**start**
6:17, 8:3
**started**
14:9, 21:19
**starting**
8:21, 15:9
**state**
33:18, 33:19
**states**
1:1
**stenographically**
37:6
**stephen**
6:6, 24:1
**still**
7:10, 20:4, 25:4
**street**
3:5, 3:14
**stuff**
17:13, 17:15, 33:14, 34:3, 34:7, 34:12, 35:16
**subpoena**
6:5, 28:1
**sufficient**
27:6, 27:10,

27:14, 27:20, 27:22, 28:2, 28:20, 29:4, 29:12
**suggest**
34:11
**suite**
3:6, 3:14
**summer**
18:8
**supervision**
37:8
**supplement**
8:1
**sure**
12:10, 21:13, 28:7, 33:6

---
**T**

**take**
11:6, 28:12
**taken**
37:3, 37:6
**takeout**
10:15, 10:17
**talk**
32:14
**talking**
4:5, 18:17, 18:18
**telegram**
8:11, 9:1, 9:9, 9:14, 9:16, 10:1, 10:12, 10:20, 23:5, 24:4
**telegrams**
12:9
**tell**
8:18, 29:22
**terabytes**
18:2
**terms**
8:19, 9:20, 9:22, 14:19, 15:5, 19:21, 21:4, 21:5, 21:8, 22:4,

22:15, 22:16, 22:18, 24:7, 24:10, 24:21, 27:8
**text**
23:12, 23:19, 24:11, 24:13, 25:8, 25:9
**th**
3:14, 37:14
**thank**
36:15
**thanks**
27:1, 32:17, 36:19
**thereafter**
20:20, 37:7
**therefore**
31:6
**thing**
7:22, 10:13
**things**
12:1, 16:12, 16:20, 34:14
**think**
4:11, 6:7, 12:16, 12:17, 15:11, 16:6, 19:15, 19:20, 19:22, 23:2, 23:6, 23:9, 24:11, 24:14, 27:8, 28:22, 32:11, 36:14
**third**
11:9
**third-party**
6:3, 22:3
**thousand**
25:14, 26:19
**three**
7:11, 7:20, 12:3, 14:9
**through**
5:4, 6:14, 8:20, 9:19, 13:15, 14:12, 15:9, 16:2,

16:15, 21:3, 21:12, 25:15
**time**
14:22, 15:8, 15:11, 15:18, 16:9, 18:11, 19:5, 21:3, 24:22, 31:4
**times**
6:9, 6:10, 33:15
**today**
8:6
**told**
34:15
**tomorrow**
36:18
**tonight**
36:17
**tons**
18:2
**topic**
23:10
**transcript**
37:4
**transperfect**
4:20, 5:13, 5:14, 5:21, 6:13, 6:17, 7:16, 8:17, 9:7, 11:5, 24:2, 34:21, 36:1
**transperfect's**
10:5
**true**
37:4
**try**
6:14, 32:15, 36:2
**trying**
7:7, 26:17
**tuesday**
8:6
**two**
14:12, 21:4, 21:14, 22:21
**tydings**
3:4, 5:15

J.R.188

Transcript of Meet and Confer
Conducted on February 18, 2026

**typewriting**
37:7
**typically**
13:22

**U**

**uh-huh**
24:15
**unavailable**
33:21
**under**
37:7
**understand**
5:11, 20:7,
35:2
**understanding**
9:15, 16:14,
24:1
**undertaken**
17:20
**united**
1:1
**universities**
32:1
**unknown**
17:15
**unless**
23:8
**until**
33:9
**usable**
23:18, 25:8
**use**
16:10
**useable**
13:2, 13:21
**user**
13:10, 13:12
**using**
24:4, 24:7

**V**

**various**
16:16, 18:6,
28:17
**version**
13:6
**virginia**
2:14, 37:22

**virtually**
1:25, 2:1

**W**

**wait**
17:6
**wang**
13:11
**want**
6:18, 12:2,
21:12, 22:12,
29:10, 30:7,
33:15, 36:3
**wanted**
12:18, 17:8,
18:17
**washington**
3:15
**way**
5:10, 24:9,
33:6
**ways**
21:8
**we're**
7:6
**wealth**
18:1, 23:1
**web**
26:14
**wednesday**
1:26
**weechat**
24:13
**week**
6:19, 8:5,
33:16, 33:17,
34:8, 34:9,
35:4, 35:11,
35:17, 35:19,
36:3
**went**
8:20
**whatever**
19:11, 24:22
**whereof**
37:13
**whether**
24:8, 32:12

**whole**
10:13, 32:22
**whyte**
1:31, 2:13,
37:2, 37:20
**william**
13:11
**withheld**
9:3
**within**
9:18, 9:21,
15:22, 23:21
**without**
31:15, 34:4,
36:6
**witness**
37:13
**wondering**
11:18
**work**
33:12, 35:11
**working**
5:19, 32:8,
35:14
**writing**
10:17
**written**
11:3
**wrote**
28:10

**X**

**x**
1:3, 1:22

**Y**

**yao**
1:4, 8:12,
13:10, 13:13,
13:15, 14:3,
14:20, 16:1,
16:2, 16:11,
25:14, 27:21,
28:3
**yeah**
7:3, 8:15,
9:21, 12:6,
12:10, 12:18,

17:12, 25:5,
28:8, 32:19,
36:8
**year**
17:18
**years**
14:16, 15:17,
16:8, 18:12
**yourself**
34:11

**Z**

**zeltser**
5:19
**zhong**
30:19, 31:3,
32:10

**0**

**00004545**
13:13
**00013**
11:13
**00016168**
13:11
**0003775**
11:16
**000896555**
14:3
**00889**
1:7
**00896722**
14:4
**01057140**
8:12
**01057173**
8:12
**01057275**
8:13
**03628**
1:16
**08**
36:21

**1**

**10,000**
21:21
**11**
30:6

J.R.189

**12**
30:6, 30:15,
30:16, 32:12
**1200**
3:14
**13**
6:8
**14**
5:6, 14:8,
27:21, 35:20
**15**
27:22
**17**
3:14, 4:11,
9:19, 13:15,
16:1, 21:3,
25:14, 30:11
**18**
1:26, 4:13,
25:19, 26:3,
26:4, 26:21
**19**
37:14

**2**

**20**
27:7, 32:12
**20006**
3:15
**202**
3:16
**2021**
9:19, 21:3
**2024**
10:9, 14:19,
15:6, 15:17
**2025**
4:11, 4:12,
4:14, 6:8, 9:19,
15:6, 15:9,
15:18, 21:4,
30:11
**2026**
1:26, 4:10,
30:15, 30:16,
37:15
**2028**
37:17

**21**
27:7
**21202**
3:7
**22**
13:15, 16:2,
25:15, 27:7
**23**
1:7, 4:10,
4:14, 5:3,
11:21, 14:10,
24:12, 27:7,
28:6, 30:8
**24**
1:16, 9:10,
24:4
**261**
3:16
**2nd**
34:17, 36:11

**3**

**30**
6:10, 37:17
**31**
1:27
**34**
14:1
**37**
1:30

**4**

**4**
1:27
**410**
3:8

**5**

**5**
36:21

**6**

**620811**
1:29
**6564**
3:16

**7**

**752**
3:8

**8**

**8:-cv**
1:7, 1:16

**9**

**900**
3:14
**901**
3:6
**9700**
3:8
**99,000**
25:13, 30:12

J.R.190

# Exhibit 5

J.R.191



**Planet Depos**

**We Make It *Happen*™**

# Transcript of David Chen

**Date:** July 30, 2025
**Case:** Yao/Estate of Chen -v- Chen, et al.

**Planet Depos**

**Phone:** 888.433.3767 |**Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

J.R.192

**1**

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

-------------------------------X

LI FEN YAO, as administrator    :

of the Estate of Sam Mingsan    :

Chen,                           :

Plaintiff,      :

v.                  :Case No.:

ROBERT CHEN, OTTER AUDITS, LLC.  :23-cv-889

and RC SECURITY, LLC.,          :

Defendants.     :

-------------------------------X

Videotaped Deposition of DAVID CHEN

Held at Levy, Firestone, Muse, LLP

Wednesday, July 30th, 2025

9:30 a.m. (EST)

Job No.: 591788

Pages 1 - 141

Reported by: Stefanie Towns, CCR

**2**

Videotaped Deposition of DAVID CHEN, Held in Washington, D.C.:

Pursuant to agreement, before Stefanie Towns, Notary Public in and for the District of Columbia.

**3**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

STEPHEN M. PLOTNICK, ESQUIRE

ALEXANDER GILES, ESQUIRE

CARTER, LEDYARD, MILBURN

28 Liberty Street, 41st Floor

New York, New York 20005

212.732.3200

ON BEHALF OF DEFENDANTS:

JOSHUA A. LEVY, ESQUIRE

KEVIN P. CRENNY, ESQUIRE

CHRISTINA LAMOUREUX, ESQUIRE

RACHEL CLATTENBURG, ESQUIRE

LEVY, FIRESTONE, MUSE, LLP

900 17th Street, N.W., Suite 605

Washington, D.C. 20006

202.261.6564

jlevy@levyfirestone.com

Also Present:

Emma Floyd, Paralegal

**4**

C O N T E N T S

EXAMINATION OF DAVID CHEN                PAGE

By Mr. Levy              6, 140

By Mr. Plotnick              139

E X H I B I T S

(Attached to the Transcript.)

PAGE

Ex.1   Plaintiff's Amended Responses to the Second Set of Interrogatories                7

Ex.2   Complaint for Damages and Jury Demand                32

Ex.3   Affidavit of Service              33

Ex.4   Thread 4265              55

Ex.5   Thread 4289              61

Ex.6   Letter dated 4-1-25              98

Ex.7   Letter dataed 2-28-25              120

Ex.8   Thread 4384              132

Ex.9   Direct Message 9222              136

J.R.193

Transcript of David Chen
Conducted on July 30, 2025

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of David Chen in the matter of Li Fen Yao versus Chen, et al., in the United States district Court for the District of Maryland. Case No. 23-CV-88.

Today's date is Wednesday, July 30th, 2025. The time on the video monitor is 9:35 a.m. The videographer today is Brendan Cuenca representing Planet Depos. This video deposition is taking place at Levy, Firestone, Muse, LLP address 900 17th Street, Northwest Suite 605 Washington, D.C. zip code 20006.

Would counsel please voice identify themselves and state whom they represent?

MR. LEVY: Joshua Levy. Levy, Firestone Muse, counsel for Robert Chen, OtterSec, LLC, RC Security and Otter Audits.

MR. PLOTNICK: Oh, I'm sorry. Stephen Plotnick, Carter, Leyard, Milburn for the witness, David Chen. We also represent the Li Fen Yao.

THE VIDEOGRAPHER: Thank you. The court reporter today is Stefanie Towns representing Planet Depos, will the reporter please swear in the witness.

Thereupon,

DAVID CHEN,

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. LEVY:

Q. Mr. Chen, good morning. Do you mind if I call you David?

A. That's fine.

Q. David, in 2020 or 2021 did you flip out and wipe your mother's computer?

A. Yes.

Q. On April 27, 2022 you quit OtterSec?

A. April 27, 2022 -- yes.

Q. And on that day did you remove Robert Chen from the OtterSec Discord server?

A. Around that time, yes, I believe so.

Q. And did you remove or delete any messages from on the OtterSec Discord server after you removed Robert from it?

A. I don't recall.

Q. On April 27, 2022 the same day did you wipe the OtterSec computer server?

A. I don't recall.

Q. I'm going to provide you with what we're going to call Exhibit 1. These are your and your mother's second amended responses to the second set of interrogatories of the defendants in Yao v Chen.

(Exhibit 1 was marked for identification and is attached to the transcript.)

Q. And if you can turn to Pages 24 and 25. You recognize this document, right?

A. Yes.

Q. And you verified the answers to these interrogatories, correct?

A. **I have corrections to make to the answers contained within these interrogatories.**

Q. You've not provided any of those corrections before this deposition, have you?

A. Yes, I need to tell you now. So --

Q. But I want -- I want first for you to go to Page 29.

A. 29, okay. Yes.

Q. And you verified these answers, right? That's your signature?

A. That is correct.

Q. Okay. David, in response to interrogatory No. 15, do you see that it says on Page 25, David then proceeded to wipe the server?

A. Yes.

Q. Does that refresh your recollection?

A. Yes.

Q. You wiped the OtterSec server on April 27, 2022?

A. I believe that to be correct.

Q. And it then says and deleted the OtterSec virtual machines from the server on or about April 27, 2022. Do you see that?

A. Yes.

Q. Is that correct?

Transcript of David Chen
Conducted on July 30, 2025

---

**9**

A. I believe that to be correct.

Q. What are virtual machines?

A. Virtual machines are -- well, they're virtual machines. So what you have -- so in my case it would be Proxmox. It's a virtual machine host where you can have virtual machines on the server. Virtual machines resemble standalone servers in that they have a full operating system, and they can do kind of whatever you could do to a regular server on them.

Q. Do the virtual machines include communications?

A. Not that I'm aware of.

Q. On April 2nd, 2023 that was three days after Yao v Chen was filed, right?

A. April 2nd, 2023 -- I believe that to be correct.

Q. And it's that day that your Motorola Moto E phone bricked?

A. I believe it to be on or before that date.

Q. And you also deleted over 17,000 Discord

---

**10**

messages in 2024, correct?

A. That is correct.

Q. And in May -- on May 19, 2024 did you delete 22 messages with Morericekara?

A. That sounds correct, yeah.

Q. And in July of 2024, did you spend three days, July 28, July 29 and July 30 deleting your Discord messages?

A. I believe that to be correct.

Q. And was it over 6600 Discord messages that you deleted over those three days?

A. That sounds correct.

Q. And the first set of those messages that you deleted over those three day period -- over that three day period, were your messages in Kusuriya no Hitorigoto?

A. That is correct.

Q. And that was 2050 messages you deleted?

A. That sounds correct.

Q. And then on July 29, 2024 you deleted 768 messages in the Jito Server on Discord?

A. That sounds correct.

---

**11**

Q. And those are messages sent after August 5, 2022?

A. That is correct.

Q. And on July 30 -- I'm sorry, on July 29 and July 30th, 2024 you deleted 1927 of your Discord messages in new clickbait?

A. That sounds correct.

Q. And on July 30, 2024 you deleted 1899 Discord messages in Dead meme?

A. That is correct.

Q. And then October 10 to October 28, 2024 you spent this period deleting 10,430 Discord messages with Closet Duck?

A. That is correct.

Q. Who is Closet Duck?

A. Ally Guo.

Q. On October 29, 2024 you deleted one additional Discord message in Advice Help in Cal 3 Math 241, is that right?

A. That sounds correct, yes.

Q. You primarily used Discord and Telegram for your substantive communications about

---

**12**

OtterSec, Robert, Liquidator Bots, Liquidator coding, right?

A. Yes.

Q. And when your phone bricked a year later, your lawyers told us about it. Do you recall that?

A. I don't but that sounds correct.

Q. Do you recall that your lawyers sent Robert's lawyers a letter on May 17, 2024 telling us for the first time that your phone had bricked on April 2nd, 2023 and telling us that it's really the Discord and Telegram messages that are going to be most substantive here?

A. That sounds correct.

Q. And then you were served with a subpoena for documents in June of 2024, right?

A. That sounds correct. Yes.

Q. And a month later you spent three days in July deleting over 6600 messages from Discord, right?

A. Yes.

---

Transcript of David Chen

Conducted on July 30, 2025

---

13

Q. And you mass deleted them, right?

A. Yes.

Q. You downloaded a script from GitHub called Undiscord to delete them. Is that right?

A. That is correct.

Q. And that's because on Discord without that script, you cannot mass delete messages, right?

A. It depends.

Q. But you knew that using this script would allow you to mass delete messages, right?

A. Yes.

Q. And you did that by yourself?

A. Yes.

Q. You didn't ask anyone for help?

A. No.

Q. Did anyone tell you to delete those messages?

A. No.

Q. And you knew deleting those messages July 28, July 29, July 30 that you would be collecting your Discord messages from Discord the very next day, right?

---

14

A. I can't recall.

Q. I want you to turn to Exhibit 1 and if you can look at Page 12.

MR. PLOTNICK: Sorry, Josh you said Page 12?

MR. LEVY: Yes.

Q. If you look at footnote 6 it says, on July 31, 2024 David Chen obtained his personal messages from Discord pursuant to a personal data request described here. And then it says, although the data did not include any deleted messages. You knew while you were deleting those messages over three days July 28, July 29, July 30 that you would be asking Discord for your messages the very next day for this subpoena, right?

A. I can't recall.

Q. And you knew that they would not include those deleted messages, right?

A. I don't recall.

Q. And you know that they did not, in fact, include those delete messages right?

---

15

A. I do not recall.

Q. Well, that's what your answer to interrogatory says, right? It says although these -- the data did not include any deleted messages, that's your answer you verified that, right?

A. Yes.

Q. That's not one of the corrections you're here to make today, is it?

A. It is not.

Q. And your lawyers had requested data from you before you made this request in July 31, right, for the subpoena?

MR. PLOTNICK: Objection. Privilege. Instruct the witness not to answer. You might be able to ask it another way, Josh.

Q. You were gathering these documents for the subpoena, right?

A. I don't recall.

Q. You know that these documents were ultimately given to your lawyers for the subpoena, right?

---

16

A. Yes.

Q. And you know that a subpoena was pending while you were deleting these 6600 documents, right?

A. I don't recall.

Q. And you know that your lawyers do not have a chance to review those documents you deleted, right?

A. Yes.

Q. They're gone for everybody?

A. I don't think that's true. You guys have the Jito messages.

Q. That's -- that's a few hundred. You deleted 17,000 Discord messages, right? And you deleted 6600 Discord messages in July, right?

A. Yes.

Q. There are thousands of these Discord messages that Robert can't see, right, because you deleted them?

A. Yes.

Q. Correct? There are thousands of these Discord messages that your lawyers never had

---

J.R.196

an opportunity to see because you deleted them, right?

A.   Yes.

Q.   You didn't want them to be part of this litigation, right?

A.   I don't recall.

Q.   Well, you deleted them, didn't you?

A.   Sorry, I have a correction to make regarding the messages in New Clickbait. So I stated, I believe, in here that all the messages in New Clickbait were deleted. This is not true. Only messages after, I believe, December 20th of 2021 were deleted in New Clickbait. As part of my preparations for this deposition, I learned of messages in new Clickbait from and before December 20the, 2021. These were in a channel named Rubber-Duck-Debugging in New Clickbait and contained relevant messages that mentioned a Liquidator code. I then took it upon myself to look through the dates of deleted messages in that channel, and I noticed messages on May -- between May 8th and 13th of 2022 that I believe to have mentioned liquidations as a result of the USD collapse around that time.

Q.   And are those deleted or are those preserved?

A.   Those messages are deleted.

Q.   And you deleted those in July of 2024?

A.   That is correct.

Q.   And that's within even what your lawyers call the discovery range, right?

A.   Yes.

Q.   And this is not just what your lawyers are calling but what you call the discovery range, right?

A.   I believe so.

Q.   And your answer to interrogatory No. 3 in Exhibit 1 at the bottom of Page 15 it says that there were 1204 new clickbait messages that you deleted within the discovery range, right?

A.   Sorry, which page is this?

Q.   Page 15.

A.   Page 15.

Q.   Page 15 at the bottom.

A.   Yes, sorry.  Can you repeat the question?

Q.   You knew that you have already told us in your answers to interrogatories that you deleted 12 -- 1204 new clickbait messages within what even your lawyers describe as the discovery range and what you say is the discovery range, right?

A.   Yes.

Q.   And that includes these messages in the Rubber-Duck-Debugger channel that you just described, correct?

A.   That is correct.

Q.   And they relate to the Liquidator codes, right?

A.   That's correct.

Q.   And you know that Liquidator codes are part of this litigation?

A.   Yes.

Q.   They're part of Chen v. Chen, right?

A.   Yes.

Q.   They're part of Yao v Chen?

A.   Yes.

Q.   And you intentionally deleted them so that they wouldn't be part of this litigation, right?

A.   Maybe.

Q.   Yes or no, David.

A.   I don't recall.

Q.   Why do you say maybe?

A.   I'm unsure.

Q.   You're unsure that when you were deleting these messages over a three today period in July of 2024 with the subpoena pending, knowing that the very next day you were collecting messages for the subpoena, that you weren't trying to get rid of those messages for purposes of this litigation?

A.   I believe it may have been one of the reasons that crossed my mind with regard to new clickbait messages.

Q.   What about the Jito server messages, did you delete those to get rid of them for this litigation?

A. I do not believe so because I knew Robert was a member of that channel and he could see these messages. I deleted them because -- or you can see from the date range because it started around the Slope Wallet hack event where I helped take down a part of the Solana network to prevent hackers from absconding with money from Slope Wallet users. This was something I'll definitely describe as immature even if I think it might have been good intentioned. And after that in the Jito channeling similarly immature, I guess, was via the SVBonk events where the team for SVBonk Token on Solana created a game where the last person to send a transaction in that game would win and I designed a bot to do that and win; but I do not believe I intended to hide relevant -- or sorry, I can't say that. I don't believe I intended to really -- I believe it was for these motivations, as well as, knowing that Robert was in there and it would annoy him for immature reasons.

Q. You didn't tell your lawyers that you had deleted these messages before we brought it to their attention, right?

A. That is correct.

Q. And I'm talking specifically about the Jito server messages, right?

A. That's correct.

Q. But that's also true for the other 16,000 plus Discord messages that you deleted, right?

A. That is correct.

Q. You didn't tell your lawyers you had deleted any of those messages until we brought it to your lawyer's attention, right?

A. That is correct.

Q. Did you tell your mom that you had delete these messages before you did it?

A. No.

Q. And -- and did you tell your mother that you had deleted these messages before we brought it to your lawyer's attention?

A. No.

Q. You did this by yourself, right?

A. That is correct.

Q. And Robert wasn't on all those Jito server messages that you deleted, right?

A. I believe he was.

Q. We provided you his messages from the Jito server, that wasn't all the 768 messages you deleted, was it?

A. I can't recall.

Q. Did you take any steps to make sure that it was just the messages Robert was on that you were deleting in Jito server or did use -- or did you not?

A. I did not. But I believe that Robert has the same permissions and access in the Jito server as I do.

Q. Do you have the ability to delete other people's messages in the Jito server?

A. I did not.

Q. Did you have that ability of the new clickbait server?

A. I don't believe so.

Q. Were you the administrator?

A. Of?

Q. Of the new clickbait server?

A. No.

Q. Did you delete other people's messages in the new clickbait server?

A. I don't believe so.

Q. Did you tell other people to delete messages in the new clickbait server?

A. No.

Q. Did you tell Ally Guo not to comply with the subpoena served on her?

A. No.

Q. But you're paying for her legal fees, right?

A. That is correct.

Q. And you gave her no advice about what to do with this subpoena that she got in this case?

A. I believe I told her to talk to legal counsel of her own.

Q. What else did you discuss with her about the subpoena she received?

25

A. That is all. And also finding legal counsel for her.

Q. What did she say to you about the subpoena?

A. I can't recall.

Q. Was this on the phone?

A. I believe so.

Q. Was it one conversation?

A. I believe so.

Q. Did she call you or did you call her?

A. I called her.

Q. You called her to give her a heads up that she'd be getting a subpoena?

A. I believe this was after she already received the subpoena.

Q. Did you call her to tell her that you knew that she was getting a subpoena?

A. I can't recall.

Q. Did your lawyers ask you to do that?

MR. PLOTNICK: Objection. Privileged. Direct the witness not to answer.

Q. Have your lawyers spoken with Ally Guo?

A. I don't believe so.

26

Q. Has your mother spoken with Ally Guo?

A. I don't believe so.

Q. Do your mother and Ally Guo communicate?

A. Not that I know of.

Q. Have they met each other?

A. Have they met each other -- I don't think so.

Q. David, you deleted messages because you found them boastful, crude, and unfiltered, right, in part?

A. That is correct.

Q. You knew that if someone's reading those messages, you wouldn't look very good, right?

A. Yes.

Q. And you knew if there's salacious material that you created, that wouldn't make you look good either, right?

A. Yes.

Q. And it would embarrass you, right?

A. Yes.

Q. And it would look terrible in your litigation, right?

A. I would argue that's not the only thing on my

27

mind but, yes.

Q. But one of the things, right?

A. I don't recall.

Q. And you knew that you're the defendant in one of these cases, right?

A. Yes.

Q. And you also know that you're a central figure in the other, right?

A. Yes.

Q. That throughout the statement of facts in your family's complaint against Robert filed in March of 2023, the paragraphs are littered with alleged conversations that you had, right?

A. Yes.

Q. And you're hoping that your credibility is going to be a big thing that a jury's going to want to look at, right?

A. I believe so.

Q. And you have -- you're an heir to your father's estate, right?

A. Yes.

28

Q. And so you think that you stand to make money out of the Yao v Chen case, right?

A. Yes.

Q. And in July of '24 you thought it was going to be a lot of money, right?

A. Yes.

Q. And you wanted to make sure you would win, right?

A. Yes.

Q. And you didn't want those messages to be part of the record in this case, right?

A. I don't recall.

Q. David, you said that in your interrogatories, the most recent ones, you've had three amended interrogatories, right? You had the original interrogatories, the first amended interrogatories, and the second amended interrogatories, right?

A. Yes.

Q. And the answers kept changing, right, over time?

A. Yes.

J.R.199

Transcript of David Chen
Conducted on July 30, 2025

29

Q.   And in this -- in this most recent set of interrogatories, you -- you've provided answers to why you deleted these messages, right?

A.   **Yes.**

Q.   Why do these answers change over time?

A.   **Regarding the new clickbait messages, I learned on Thursday of last week as part of my preparations for this deposition of messages that existed in -- that still existence in new clickbait and this triggered --**

Q.   David, I'm sorry.  This is not a responsive question.  Why were your answers that were most recently filed in July 17 differed so much from the first amended answers that you provided to us on May 30?

A.   **I'm unsure of my motivations, to be honest.**

Q.   If you -- if you look at your answer to interrogatory 2 in Exhibit 1 it's on Page 11.

A.   **Okay.**

Q.   You're going to see a chart that you filled

30

out talking about documents, sources of documents that were collected and the date of collection, right?

A.   **Yes.**

Q.   And you see that on April 19, 2024 your lawyers collected data from your email accounts in these email addresses, right?

A.   **Yes.**

Q.   And it was davidchen0@protonmail.com which includes one, two, three, four, five, six, seven, eight, nine, ten alias accounts, right?

A.   **Yes.**

Q.   And then on October 29, 2024 you collected -- your lawyers collected email from five new accounts, right?

A.   **Yes.**

Q.   And between April and October of 2024 were you deleting emails from those five accounts that were only collected on October 29, 2024?

A.   **Not that I can recall.**

Q.   Did anyone tell you to delete emails?

31

A.   **No.**

Q.   Why did you only disclose these five email accounts to your lawyers on October 29, 2024?

A.   **Because the first email account is my primary one.**

Q.   Were you not asked for all of your email accounts in April of 2024?

A.   **I don't recall.**

Q.   What about the two accounts that you only disclosed to your lawyers on November 5, 2024, did you --

MR. PLOTNICK:  Objection to the form of the question.

Q.   Did you delete emails from these two accounts between April and November of 2024?

A.   **I don't recall.  I don't think so.**

Q.   And these are the two email accounts here datingapp15@protonmail.com and test109000@protonmail.com?

A.   **Yes.**

Q.   David, when did you learn about the Chen v Chen complaint?

32

A.   **I don't recall.**

MR. LEVY:  I'm going to mark it as Exhibit 2.

(Exhibit 2 was marked for identification and is attached to the transcript.)

MR. PLOTNICK:  Can we put 1 to the side or are you --

MR. LEVY:  Just keep it.

Q.   David, do you recognize this to be the Chen v Chen complaint?

A.   **Yes.**

Q.   And you're the defendant David Chen?

A.   **That's correct.**

Q.   And do you see at the top of the page, the front page of the document it says filed 9/30/24?

A.   **I see that, yes.**

Q.   Does that refresh recollection of when you first remember learning about this complaint?

A.   **It would have been around then, yes.**

Q.   Did you have a Google alert or a pacer alert set up to learn about this complaint?

J.R.200

**33**

A. No.

Q. You learned about it on your own?

A. I don't recall.

Q. Did your mom tell you about it?

A. Maybe.

Q. Did you learn about it before you were served with the complaint?

A. I don't think so.

Q. Do you recall when you were served with the complaint?

A. No.

MR. LEVY: I'm going to put -- this is Exhibit 3. This is the affidavit of service of the Chen v Chen complaint.

(Exhibit 3 was marked for identification and is attached to the transcript.)

Q. Do you see where it says on October 21, 2024 I served the defendant David Chen?

A. Yes.

Q. Does that refresh your recollection as to when you were served this complaint?

A. Yes.

**34**

Q. So between September 30 and October 21, do you recall when you first learned of the Chen v Chen complaint?

A. I believe my mom called me after being served since I would have been at UMD at the time.

Q. And -- and was that the first you had learned about this complaint?

A. I believe so.

Q. But you're not sure?

A. I am not sure.

Q. You may have heard about it before you were served?

A. I think it's unlikely.

Q. And you spent October 10 or 28 deleting over 10,340 messages with Ally Guo on Discord, right?

A. That sounds correct. Yeah.

Q. And that was probably contemporaneous -- it was definitely contemporaneous with you learning about this complaint, right?

A. What do you mean by contemporaneous?

Q. You were deleting these messages while you

**35**

knew about this complaint, right?

A. I don't recall.

Q. You just told me that you, at a minimum learned about this complaint in October '21, right?

A. At least after.

Q. And you also have said a couple of times that you've deleted over 10,000 Discord messages with Ally Guo between October 10 and October 28, right?

A. Yes.

Q. And you and Ally Guo talked about Robert and OtterSec and your legal dispute with -- with him repeatedly on Discord, right?

A. That is correct.

Q. And you deleted those messages, didn't you?

A. That is correct.

Q. And including messages from 2022 and 2023, right?

A. No.

Q. Just 2021?

A. And even older, yes.

**36**

Q. And in those messages you talked about Liquidator codes with her?

A. I don't recall.

Q. You talked about business relations?

A. I don't recall.

Q. And in -- and in new clickbait Ally Guo was a member, right?

A. That is correct.

Q. And your messages with her are gone, right, in new clickbait?

A. Yes.

Q. They're not preserved, are they?

A. The new clickbait messages?

Q. Correct.

A. They are not preserved.

Q. And you say in -- I want you to go back to Exhibit 1 and look at your answers to interrogatory No. 6.

A. Page number?

Q. Look at Page number 18. So this is your most recent reason presented for why you deleted the new clickbait messages, right, in this

J.R.201

37

answer?

A. Besides what I've said so far in this deposition.

Q. I'm saying up to this point.

A. Yes.

Q. Right? You had two tries. This is your third try in the second amended responses, right?

A. Yes.

Q. And in the third try you're saying that the new clickbait server enhanced these personal difficulties may -- by making you feel lonely isolated and sad and you deleted the messages and exited the server in an effort to better manage your well-being, move on, and prepare for college, right?

A. That is correct.

Q. That was one of your reasons you say, right?

A. Yes.

Q. And -- and you -- and you just exited the server, you wouldn't be able to see those messages, right?

38

A. Which messages?

Q. The one that you deleted.

A. That's correct.

Q. And that's all you needed to do to manage your situation to not be reminded of those messages, you just needed to leave the server, right?

A. Disagree. I'd be still bothered that they're out there but, yeah.

Q. You knew that by deleting them, it would serve multiple purposes, right?

A. I don't recall, probably.

Q. You didn't have to delete the messages to not be reminded of them, you could have just left the server, right, David?

A. No, I don't think so.

MR. LEVY: All right. We're going to take a break.

MR. PLOTNICK: Sure.

THE VIDEOGRAPHER: Standby. We're going off the record. The time on the video monitor is 10:13 a.m.

39

(A recess was taken)

THE VIDEOGRAPHER: We're back on the record. The time on the video monitor is 10:28 a.m.

Q. David, can you turn to Exhibit 1, Page 12. Footnote 6.

A. Page 12 -- okay.

Q. You said here that on July 31, 2024, that's the date when you obtained your personal messages from Discord, right?

A. That is correct.

Q. And that was after mass deleting over 6000 Discord messages the three days prior, right?

A. Yes.

Q. When were you requested to pull messages from Discord?

A. July 30th, 2024.

Q. July 30th?

A. Mm-hmm.

Q. Who requested them?

A. Me.

Q. And when did you make that request to

40

Discord?

A. I don't recall.

Q. Was it July 31?

A. No, it was definitely July 30th. It's stated in the email from Discord to me.

Q. July 30 you made the request to Discord --

A. That's correct.

Q. -- for your messages?

A. Yes.

Q. After spending July 28, July 29 and July 30 deleting 6000 of those messages, right?

A. It's unclear what time on July 30th I requested take out but, yes.

Q. And you knew that when you made that request, those deleted messages would not be part of what you would receive from Discord, right?

A. I don't think I knew that.

Q. That, in fact, is what happened, right?

A. Yes.

Q. And that's what you've stated here in footnote 6, right?

A. That's correct.

Q. And you -- you knew that your getting those messages from Discord on the 30th and 31st for this case, right?

A. I believe so.

Q. To respond to the subpoena, right?

A. I'm unsure.

Q. What do you mean you're unsure? Why else would you have gotten those messages from Discord on July 30 and July 31?

A. I'm unsure.

Q. Did you have another lawsuit pending?

A. No.

Q. Did you have another subpoena pending?

A. Not that I'm aware of.

Q. Did you have any other need to get all of your messages from Discord on July 30 or 31 of 2024?

A. I'm not sure.

Q. What do you mean you're not sure? You came here today to prepare for this deposition, you should know why you asked for those documents on July 30 and 31 from Discord,

David? What's the answer?

MR. PLOTNICK: Objection. Argumentative.

Q. David, why did you ask Discord for those messages on July 30, 2024?

A. I can't recall.

Q. David, you prepared answers for these interrogatories three times, right?

A. That is correct.

Q. You and your mother filed a lawsuit against our clients, right?

A. That is correct.

Q. You knew that your documents would be pivotal to that case, right?

A. I believe so, yes.

Q. You knew that you deleted over 17,000 Discord messages after telling us through your lawyers that they were the most important form of communications in this case, right?

A. Yes.

Q. And you went ahead and deleted 6000 plus on three days in July, right?

A. That's correct.

Q. And you knew that you didn't tell your lawyers about any of that until we brought it to your attention, right?

A. Yes.

Q. And you knew that we've been asking you and your lawyers questions about these deletions for months, right?

A. Yes.

Q. And you knew that the court wanted us to depose you about these deletions, right?

A. I thought we offered it but, yeah.

Q. And you knew that we have a stipulated order that we are going to have a deposition today, which we are having on the questions of your collection, preservation, and deletion of evidence, right?

A. Yes.

Q. And you're not prepared to tell me today why you requested from Discord all of your messages on July 30, 2024 with the subpoena pending?

A. I honestly cannot recall.

Q. And those messages were nevertheless collected by your lawyers shortly thereafter, right?

A. I don't recall.

Q. Well, look at same page of the interrogatories you answered. And the last item of the chart it says, on October tractor 29, 2024 your Discord messages were collected through July 31, 2024. Right?

A. Yes.

Q. That was the same batch that you had asked Discord to give you, right, on July 30?

A. Yes. I was unsure when you said it was shortly after, how shortly after, I guess, so, yeah.

Q. Right. And this is all for the subpoena, right?

A. I believe so.

Q. So the deletions that you went through, July 28, July 29, July 30 were to get rid of those messages for everybody to see, right?

Transcript of David Chen

Conducted on July 30, 2025

45

A. You could see it that way, yeah.

Q. And even the Jito messages that Robert was once on, when you delete them you don't know that he can see them, right?

A. Yeah, I did not no for sure. Yeah.

Q. Because you didn't want him to see those messages, right?

A. I disagree with that. I knew that he had seen those messages or like I believe that he had seen those messages.

Q. And you didn't want him to use those messages for the litigation, right?

A. No.

Q. He couldn't use those messages for the litigation once you deleted them, right?

A. I don't think I thought about that.

Q. You don't think you thought about that July 28, 29, 30 right as you're asking Discord for your messages for the subpoena, you didn't think about that?

A. No, I was thinking it would annoy Robert.

Q. Say that again?

46

A. I was thinking it would annoy Robert.

Q. It would annoy Robert?

A. Yeah.

Q. Who's -- who -- who you and your mother are suing at the time, right?

A. Yes. But I believe he would have the Jito messages because he was in the server.

Q. But you didn't delete just messages that he was on, right?

A. That's correct. I'm talking specifically about the messages.

Q. And I'm talking about 6600 messages that you deleted over July 28, 29 and 30 nobody has access to those messages right now because you deleted them, right?

A. Except for Jito messages, yes.

Q. And Robert doesn't have access to those messages, right?

A. Yes.

Q. And you knew that would be the result when you deleted these things by yourself, right?

A. I believe so.

47

Q. The Rubber-Duck channel and new clickbait that you talked about --

A. Yes.

Q. -- why did you look into that only now?

A. Because I was only showed these on Thursday, so the thing is the channel names are in the July 31st take out so --

Q. I'm sorry, who showed them to you on Thursday?

MR. PLOTNICK: So I'm going to object but I'm going to allow the witness to answer.

A. My counsel.

Q. Did you not have access to whatever your counsel gave you before Thursday?

A. It was only shown to me on Thursday.

Q. Did you have the ability on your own to look at whatever your counsel presented you before he did on Thursday?

A. I would have but the copy on my computer is the October take out, which does not have the channel names for the new clickbait.

Q. Did you even try to look at that at some

48

point before Thursday?

A. I looked at the October take out.

Q. When?

A. I don't recall.

Q. This year?

A. Yes.

Q. For the first time?

A. No. Wait. What do you mean by that?

Q. When's the first time -- we've -- we brought your deletions to your counsel's attention on October 28, 2024. Right?

A. October, yes.

Q. Since October 28, 2024 when was the first time that you looked at anything within the new clickbait server to help you understand what you deleted?

A. Wait. Sorry. Can you repeat the question?

Q. When's the first time you looked to see that you had deleted anything in this Rubber-Duck channel?

A. I believe it would have been on Thursday or Friday.

Transcript of David Chen

Conducted on July 30, 2025

---

**49**

Q. You knew that you were deleting messages from the Rubber-Duck channel in July of 2024, right?

A. I believe so.

Q. And the first time that you looked into the Rubber-Duck channel was Thursday?

A. I believe so.

Q. Despite sending us answers to interrogatories three times between July of 2024 when you deleted those messages and today?

A. Yes.

Q. What was in the Rubber-Duck channel in terms of the substance of those communications?

A. So I believe in 2021 there are messages -- so the concept of Rubber-Duck-Debugging is you talk -- the namesake is a literal rubber duck which does not respond and is not a person, but it also involves speaking to people who have no idea what you're saying. So it's basically just a form of talking to a wall, I guess. So in the channel, I believe, in 2021 I mentioned some ideas I had on developing

**50**

the code prior to OtterSec and I also posted links to transactions on the blog chain performed by my Liquidator in 2021.

Q. Anything else on the Rubber-Duck channel that you can recall?

A. Not that I can recall.

Q. And did you delete the Rubber-Duck channel messages after December 2021?

A. Yes.

Q. And did you delete any Rubber-Duck channel messages before December 20, 2021?

A. Not that I'm aware of.

Q. Did you delete any new clickbait messages before December 2021?

A. Not that I'm aware.

Q. So your recollection and knowledge as that you deleted 1927 new clickbait messages after December 20, 2021, December 20, 2021?

A. This is based off of what I can see in the take out, yes.

Q. And that includes messages from 2022 when you were working at OtterSec?

**51**

A. That is correct.

Q. And 2023?

A. Yes, I believe so.

Q. And 2024, through July?

A. I can't recall if there were even messages in 2024 but if there were, yes.

Q. Did you discuss OtterSec on new clickbait?

A. I believe so.

Q. What did you discuss about OtterSec on new clickbait?

A. I don't recall.

Q. Which channel did you use to discuss OtterSec on new clickbait?

A. I don't recall but I don't believe it to be the Rubber-Duck-debugging channel.

Q. But it was one of the other channels?

A. I believe so.

Q. Was it one of the other channels you deleted?

A. Yes.

Q. Did you delete the whole channel or just the messages on it?

A. Just the messages.

**52**

Q. So the Rubber-Duck channel, for example, the channel still exists but the messages you deleted are gone forever?

A. I believe so.

Q. So your lawyers never had the opportunity and will never have the opportunity to review those messages you deleted to figure out whether they're responsive to the subpoena, right?

A. That is correct.

Q. And they're never going to have the opportunity to review those messages to figure out whether they're responsive to requests for documents in Chen v Chen where you're the defendant, right?

A. Yes.

Q. And Robert's never going to have a chance to see them, right?

A. Yes.

Q. And neither is the judge or the jury?

A. Yes.

Q. And this is part of why you deleted these

53

messages, right?  They'd make you look bad. They're boastful, they're crude, they're unfiltered, they're salacious.  They make you look bad in this litigation, right, David?

MR. PLOTNICK: Objection.  Compound.

Q. There salacious, right, David?  I'm using your word is that right?

A. **Sorry, what does salacious mean again?**

Q. It's your word, David.  This is an interrogatory that you verified.  In interrogatory No. 6 -- go to Exhibit 1.  Go to Page 17, the second to last sentence of the page --

A. **Mm-hmm.**

Q. -- it says, David deleted his messages in new clickbait because the conversation frequently included highly personal and sometimes raw or salacious discussions among his adolescent high school friends.  That's your word.

A. **Yeah.**

Q. You knew that would make you look bad, right?

A. **Yes.**

54

Q. And you know what that word means, don't you?

A. **I'm just trying to make sure.**

Q. You know what it means, right?  Do you know what crude means?

A. **Yes.**

Q. That would make you look back, wouldn't it?

A. **Yeah.**

Q. Do you know what unfiltered means?

A. **Yes.**

Q. That would make you look bad, wouldn't it?

A. **Yeah.**

Q. You know what boastful means?

A. **Yeah.**

Q. That would make you look bad, wouldn't it?

A. **Yeah.**

Q. So rather than just leaving the group you deleted these messages, right?

A. **Yes.**

Q. So that nobody could see them?  Including Robert, right?

MR. PLOTNICK: Object -- excuse me, objection.  Asked and answered.

55

Q. David, on April 27, 2022 you quit OtterSec, right?

A. **That is correct.**

Q. And on that day you removed Robert from the OtterSec Discord server?

A. **On or around that date, yes.**

Q. And you knew that he was -- you thought, at least, that he was going to be suing you on that day, didn't you?

A. **I did not think that.  I thought --**

Q. I want to show you --

A. **I don't believe so.**

MR. LEVY: I'm going to mark this Exhibit 4.

(Exhibit 4 was marked for identification and is attached to the transcript.)

Q. Do you recognize this document?  This is -- is this a Discord chat?

A. **Yes.**

Q. Is Exhibit 4 a document that you and your mother produced it's YAO4265 --

A. **Okay.**

56

Q. -- do you see that?

A. **Yes.**

Q. And what's your Discord handle?

A. **Radiantaeon.**

Q. And you're one of the people communicating here?

A. **Yes, that's correct.**

Q. And who's the other person?

A. **Ginkoid or Philip Papurt.**

Q. And what's the date of this document?

A. **Well, it says on here 4/27/22, so I presume that day.**

Q. Pardon me?

A. **I presume 4/27/22.**

Q. So this is on the day you quit OtterSec, right?

A. **Yes.**

Q. And this is the day you removed Robert from the server?

A. **Yes.**

Q. And this is the day that you wiped the OtterSec server?

Transcript of David Chen
Conducted on July 30, 2025

---

57

A.  You mean -- you mean the virtual machines, yes.

Q.  And -- and the server.  This is -- I'm just reading from -- I'll go back to your --

A.  Yes.

Q.  -- interrogatory.

A.  Yeah.

Q.  Right?  You wiped --

A.  Yeah.

Q.  -- the OtterSec server on April 27, 2022, right?

A.  Yeah.  I believe so.

Q.  And on this day you had this conversation on Discord with Papurt you said, right, that's what's in Exhibit 4?

A.  Yes.

Q.  And if you go to 4269 that's the Bates number at the bottom --

A.  Sorry, I have to go back I --

MR. PLOTNICK:  I was just going to point out the Bates number.

MR. LEVY:  Sure.  In the lower

---

58

right-hand corner --

MR. PLOTNICK:  Yeah, when he's referring to the Bates number that's what he's talking about.

THE WITNESS:  Yeah.

A.  Yeah, sorry.  I have to go back.  I don't believe I wiped the server at the same time I wiped the virtual machines.

Q.  The same day?

A.  I am not sure.

Q.  That's your answer to the interrogatory.  We can go back to it.  If you go to Exhibit 1 and you look at your answer to interrogatory 15, Pages 24 and 25 it says, David then proceeded to wipe the server and deleted the OtterSec virtual machines from the server on or about April 27, 2022.  That correct?  You verified this, right?

A.  Yes.  I don't believe that I wiped the server on the same day.

Q.  Then why did you say this in your interrogatory?

---

59

A.  I said something that was not true in my interrogatory.

Q.  What did you do to prepare for this answer in your interrogatory?

A.  I spoke with my counsel, I guess.

Q.  Did you take any steps to figure out when you wiped the server before putting this statement that's unequivocal in your interrogatory?

A.  I did not.

Q.  What's making you think right now that maybe you didn't wipe the server on the day you quit OtterSec?

A.  My memories.

Q.  Anything else?

A.  Anything else?

Q.  Any other support for this change in memory?

A.  None.  I don't have anything to support it.

Q.  It would be convenient for this not to be the truth, right, the statement in your interrogatory that you verified?

A.  Not sure.

---

60

Q.  David, you said you weren't sure if Robert was going -- thinking -- Robert was thinking about suing you that day, April 27, 2022?  I want you to turn back to Exhibit 4.

A.  Okay.

Q.  If you look at 4269?

A.  4269.  Yes.  Okay.

Q.  Do you see the second message from Papurt ginkoid#0000 April 27, 2022 at 3:29:13 p.m.?

A.  Yes.

Q.  Says he's probably going to lawyer up?

A.  Yes.

Q.  Is that in reference to Robert?

A.  I believe so.

Q.  Is that how you understood it that day?

A.  I believe so.

Q.  Does that refresh your recollection that you thought Robert was going to lawyer up and sue you?

A.  I believe all it says it would tell me that I thought he would lawyer up, not necessarily sue me.

---

J.R.207

61

Q. Did you --

MR. LEVY: I want you to turn to Exhibit 5.

(Exhibit 5 was marked for identification and is attached to the transcript.)

Q. This is another Discord chat that you and your mother produced, right?

A. I believe so, yes.

Q. And what's the date of this Discord chat, this is April 27, 2022, right?

A. That is correct.

Q. And this is between you and Ally Guo?

A. That is correct.

Q. She's closetduck#0000?

A. Yes.

Q. And you're radiantaeon0000?

A. Yes.

Q. And do you -- can you turn to 4291? You see that last message that's from you, right? April 27, 2022 at 4:28:43 p.m. right after you've had this conversation with Papurt you say, oh, he's suing me. And then next

62

message says for $500,000, right?

A. Yeah. Yes.

Q. You recall writing that, right?

A. No, but it's here so I did write it, yeah.

Q. And -- and then if you turn to the page to 4293, the top text message from you says, IDK, that's I don't know, right?

A. Yes.

Q. I don't know how well suing a 17 year old will go for him, though, that's also April 27, 2022 4:31 p.m., right?

A. Yeah.

Q. Does this refresh your recollection that you thought Robert was going to be suing you on the same day you deleted the virtual machines, removed Robert from the server, and wiped the server?

A. Wait. Sorry. Can you repeat the question?

Q. Does this refresh your recollection that on April 27, 2022 you thought Robert was going to be suing you?

A. It looks like it, yeah.

63

Q. When you deleted -- I'm sorry, when you removed Robert from the server on April 27, 2022 did you delete messages from the server?

A. I don't recall.

Q. If -- what do you mean you don't recall? You prepared for this deposition today. What did you do to prepare for this deposition about the preservation of evidence on the day that you quit OtterSec and you've already told us in interrogatories that you wiped the server and removed Robert from the server, what do you mean -- what do you mean you don't recall?

MR. PLOTNICK: Objection. Vague and argumentative.

Q. David, did you delete messages from the OtterSec Discord server on April 27, 2022?

A. I don't recall.

Q. Did you remove Robert from the server for any other reason but to delete messages from the Discord server?

A. I believe I removed him for the purpose of

64

downloading the messages to make sure that he would not delete the messages in the Discord server.

Q. But it would allow you to delete the messages, wouldn't it?

A. I don't recall.

Q. Is that -- whether you recall or not --

A. It's possible.

Q. -- you had the opportunity to delete those messages, right?

A. It's possible.

Q. And when he's off the server, he can't see that you're deleting messages, right?

A. Yes.

Q. And you got everybody else off the server when you were having the opportunity to delete those messages on April 27, 2022. Right?

A. I don't recall.

Q. Well, that's what you told us in the interrogatories. You go back to Exhibit 1, your answer to interrogatory number 15, the

65

top of Page 25, after David Chen stopped working for OtterSec in April 2022 he notified users, including Robert Chen that he planned to wipe the server and advised them to remove any data of value off of it. And then you then proceeded to wipe the server and delete virtual machines so you --

A. **Yeah, this is in reference to the like physical server, not the Discord server.**

Q. Did you delete anything from the physical server? You wiped the physical server, right?

A. **I wiped the virtual machines off of it that people were using and I notified them to take anything off.**

Q. And it also says that you proceeded to wipe the server?

A. **I believe I've made this correction earlier but I cannot recall when exactly I wiped the server.**

Q. You're correcting the statement that you verified under penalty of perjury?

66

A. **Yes.**

Q. Uh-huh. And what proof do you have that you didn't wipe the server?

A. **I don't have any.**

Q. Okay.

A. **That I'm aware of.**

Q. And you're saying you didn't delete OtterSec Discord messages on April 27, 2022 or you don't recall?

A. **I don't recall.**

Q. You may have?

A. **It's possible.**

Q. And you knew that Robert was suing you on that day, right?

MR. PLOTNICK: Objection to form.

Q. You understood that Robert was suing you on April 27, 2022 correct?

MR. PLOTNICK: Objection to form.

Q. You told other people that Robert was suing you, right?

MR. PLOTNICK: Objection to form.

Q. Those Discord messages we looked at in

67

Exhibits 4 and 5 are your messages, right?

A. **That is correct.**

Q. Your family filed a lawsuit against Robert and the two South Dakota companies on March 31, 2023?

A. **That is correct.**

Q. When's the first time you were told to preserve documents?

A. **First time I was told to reserve documents -- I don't recall.**

Q. Were you ever given a writing to preserve documents, a letter, a memorandum, an email?

A. **A letter, I believe so.**

Q. When was the first time?

A. **I don't recall.**

Q. Was it before you received the subpoena?

A. **Before I received a subpoena, I believe so.**

Q. When?

A. **I can't recall.**

Q. Did you get a document preservation letter around the time your mother filed the lawsuit?

68

A. **I don't recall.**

Q. But you do recall getting some written instructions to preserve documents before you received the subpoena?

A. **I believe there would have been such documents from CLM, Yes.**

Q. Sorry, say that again?

A. **I believe there would have been such documents from CLM, Yes.**

Q. And CLM were your lawyers?

A. **That's correct.**

Q. You believe there would have been, was there or wasn't there?

A. **I don't know. Pretty sure.**

Q. Did you receive a written letter to preserve documents after you received the subpoena?

A. **Yes.**

Q. Was it before you deleted messages in July of 2024?

A. **After subpoena but before -- I don't know if there was one day. There are multiple.**

Q. Were you told to preserve documents before

you deleted over 6600 Discord messages in July 2024?

MR. PLOTNICK: So I'm going to object to the question but allow the witness to answer under the circumstances. Answer.

A. Sorry, can you repeat the question?

Q. Did you receive instructions to preserve documents before you deleted over 6000 Discord messages in July of 2024?

A. I believe so.

MR. PLOTNICK: Same objection but I'm going to allow the witness to answer.

A. I believe so.

Q. And did you receive an instruction to preserve documents once you became aware of the Chen v Chen lawsuit?

MR. PLOTNICK: Same objection. I will allow the witness to answer.

A. I'm not sure. I am unsure.

Q. Were you told to preserve documents for that case at any time?

MR. PLOTNICK: Objection. Same

objection. Under the circumstances I'll allow the witness to answer.

A. I believe so.

Q. Was it in writing?

A. I believe so.

Q. Do you recall when you received it?

A. No.

Q. Was it in October of 2024?

MR. PLOTNICK: Objection. Asked and answered.

Q. Was it in October of 2024?

A. I have one from then, yes, from October 2024 from CLM.

Q. Was it while -- did you receive that while you were deleting the Ally Guo messages?

A. I'm not sure.

Q. Did you receive it between October 10 and October 28?

A. Not sure.

Q. Did you receive it before October 10?

A. I'm not sure.

Q. The complaint was filed September 30, right?

This is Exhibit 2. Look at the top page.

A. Yeah, that seems correct. Yeah.

Q. Did you receive instructions from your lawyer to preserve documents after September 30 while you were destroying Ally Guo messages?

MR. PLOTNICK: Objection. I'll allow the witness to answer.

A. I'm not sure.

Q. You claim that you've -- have you preserved the Ally Guo messages that you deleted?

A. Yes.

Q. And what did you do to verify that they're preserved?

A. Nothing.

Q. How do you know they're preserved?

A. My lawyers have been able to search them after they were provided to TransPerfect.

Q. Say that again?

A. My lawyers have been able to search them after they were provided to TransPerfect.

Q. To TransPerfect?

A. Yes.

Q. What is TransPerfect hired to do?

A. It's our -- I think it's a discovery E vendor, is that what it's called?

Q. Did they help you put together these answers to interrogatories?

A. Help, meaning?

Q. Did they provide you any information that helped you?

A. Yes.

Q. They helped you put together answers to interrogatories, yes?

A. They would have provided information that was necessary to create these interrogatory responses, yes.

Q. What information did they provide?

A. Since they are the custodian for our discovery -- E discovery information, they would have helped provide dates and information about what we have.

Q. Did you communicate directly with anyone at TransPerfect?

MR. PLOTNICK: Objection. Vague and

73

ambiguous.

Q. For purposes of helping you answer these interrogatories, did you communicate with anyone at TransPerfect?

A. I don't recall doing so.

Q. Do you know who the lead person at TransPerfect was that was helping you with these interrogatories?

A. I'm unsure.

Q. Do you know when they were hired to help you?

A. I'm not sure.

Q. Did anyone else help you answer these interrogatories that's not your lawyer?

A. That's not my lawyer. I guess like with 18 that is something that my mom would have helped respond to.

Q. Your mom?

A. Yeah.

Q. Anyone else?

A. Anyone else? Sorry, let me look through. For interrogatory No. 8 I had to ask people for their names. So people I met that I did

74

not know the names of I have asked for their names.

Q. And were there any individuals not named here whom you talked to for interrogatory No. 8?

A. Not that I can recall.

Q. What about NAXO Labs, did they help you with the answers to these interrogatories?

A. Not directly. It would have been through counsel.

Q. Can you look at Page 14 of Exhibit 1, do you see footnote 10?

A. Yes.

Q. Says collected by NAXO Labs, LLC?

A. Yes.

Q. And that's in reference to David Chen Samsung 980 Pro Mushkin Helix NVMe drive three additional Samsung 980 Pro's and WD MyBook drive?

A. Yes.

Q. Did -- what did NAXO Labs do?

A. NAXO Labs -- so I shipped these drives to my counsel. My counsel provided them to NAXO

75

Labs for the purpose of searching these drivers to see if any Discord messages could be recovered from them.

Q. And what did they say?

A. I believe they did not find any messages.

Q. The messages you had deleted were gone?

A. That is correct.

Q. And that was your intention, right?

MR. PLOTNICK: Objection. Asked and answered.

Q. That was your intention?

MR. PLOTNICK: Objection. Asked and answered.

Q. You can answer the question.

MR. PLOTNICK: You can answer.

A. Sorry, what was the question again?

Q. You deleted those messages because you knew that they'd all be gone for nobody to see once you deleted them, right?

MR. PLOTNICK: Objection. Asked and answered. You can answer, David.

A. I believe so.

76

Q. When you had to come clean ultimately with your mom that you had deleted over 17,000 Discord messages, right?

A. That is correct.

Q. What did you tell her why you did this?

A. She did not ask so I did not say.

Q. You've not told your mother why you deleted these messages?

A. Beyond what is inside these interrogatories, no.

Q. She's not even asked once why you deleted these messages?

A. I believe that to be correct.

Q. Does Ally Guo know you deleted these messages?

MR. PLOTNICK: Objection to form.

Q. Did you tell Ally Guo you deleted these messages?

A. No, not that I'm aware.

Q. Has Ally Guo told you that she's aware that you deleted these messages?

A. I don't believe so.

J.R.211

**77**

Q. Have you told anybody else who's not your lawyers about the deletion of these Discord messages?

A. No, not that I'm aware of.

Q. Have you communicated with anyone on Signal about the deletion of these messages?

A. No.

Q. Do you use Signal?

A. Very technically, yes.

Q. And do you use the auto delete ephemeral mode on Signal?

A. I have not turned on the ephemeral mode myself.

Q. Have other people?

A. Yes.

Q. And you're on their communications?

A. Yes.

Q. And so when you're communicating with them those -- those communications aren't preserved because they're on auto delete, right?

A. Yes.

**78**

Q. Tell me all the people you're communicating with on Signal where it's on auto delete?

A. Philip Papurt reached out to me and turned on auto delete after he was subpoenaed.

Q. Anyone else?

A. No.

Q. Did you take the auto delete off when Papurt reached out to you?

A. I did not.

Q. Did you tell your lawyers --

A. I have --

Q. -- that this happened?

MR. PLOTNICK: Objection. Privilege. Direct the witness not to answer.

Q. Did you tell your mom that you were communicating with Philip Papurt on auto deleting messages?

A. I don't recall but probably not.

Q. Did she ask you about it?

A. Not that I can recall.

Q. Do you know from her whether she knows that you're on those auto delete messages with

**79**

Papurt?

A. I'm not sure.

Q. Have you been told to be on auto delete messages with anybody who's a potential witness in this case?

A. No.

Q. Have you been told the opposite, to take auto delete off of Signal messages?

A. Not that I can recall.

Q. Have you told Papurt that you deleted messages?

A. Not that I can recall.

Q. What do you mean not that you can recall?

A. Exactly what I said, not that I can recall.

Q. Do you only communicate with him by Signal?

A. No.

Q. What other modes of communication do you use with Philip Papurt?

A. I use Discord to communicate with Philip Papurt.

Q. Have you told him on Discord that you deleted Discord messages?

**80**

A. Not that I can recall.

Q. Have you told him on Signal?

A. Not that I can recall.

Q. But they're deleted so Robert can't know, right?

A. That's correct.

Q. And it's totally within your power to take that auto delete off, right?

A. That's correct.

Q. And you've never done that with Papurt?

A. I have not.

Q. And you did that because you don't want those communications with Papurt to be part of this case, right?

MR. PLOTNICK: Objection to form.

Q. Answer the question.

A. I believe it was to respect whatever reason Philip had to be turning on auto delete.

Q. You know that's a direct violation of your obligation to preserve documents in this case, right?

MR. PLOTNICK: Objection.

81

Q. Answer.
A. Do I or did I know?
Q. Both.
A. Not sure.
Q. You're still on auto delete with him, right?
A. I'm not sure.
Q. But you were at a time during this lawsuit, yes?
A. That is correct.
Q. And your lawyers told you to preserve documents, right?
A. That is correct.
Q. And you know that as part of that obligation you're supposed to turn your auto deletes off, right?
A. That is correct.
Q. And you didn't do that? You've already told me you didn't do it.
A. No, I believe he turned it off himself but I can't be sure.
Q. And you haven't turned it back on, right?
A. That is correct. I have not.

82

Q. It's on auto delete. And you could have done that and you could have done that during this litigation and you haven't done that, right?
   MR. PLOTNICK: Objection. Argumentative.
Q. Right? Right? Please answer the question. If he -- don't talk to your lawyer. If he's objecting, you still have to answer.
A. Sorry. Can you repeat the question?
Q. You knew that during this litigation those messages were on auto delete and you haven't turned them back to non auto delete, right?
A. That is correct.
Q. Who are the members of the new clickbait group?
A. As far as I can recall, the members are listed in the interrogatories.
Q. Feel free to tell me who they are.
A. Wait. Sorry. I know it's in here.
Q. You are in the new clickbait group, right?
A. That is correct.
Q. Ally Guo is in the new clickbait group?

83

A. That is correct.
Q. Marisa Liu?
A. Yes.
Q. L-I-U. Claire Dang?
A. Yes.
Q. Angela Zang?
A. Yes.
Q. Iris Guo?
A. Yes.
Q. Olivia Shi?
A. Yes.
Q. Who is the administrator of that group?
A. Who is the administrator of that group -- I'm not sure. But I believe it to be Angela Zang.
Q. In addition to the information you've told us today about what's on the Rubber-Duck channel --
A. Mm-hmm.
Q. -- were there other channels where you discussed OtterSec?
A. I believe there are other channels.

84

Q. And when I say other channels, I mean new clickbait channels, right?
A. Yes.
Q. So you talked about OtterSec and other new clickbait channels?
A. I believe that to be possible, yes.
Q. And so some of the Discord messages that you deleted from the new clickbait group after December 20, 2021 may have discussed OtterSec, right?
A. It is possible, yes.
Q. And they may have discussed Liquidator codes, right?
A. It is possible, yes.
Q. And you knew those were part of the lawsuits, right?
A. Yes.
Q. And you knew that once you deleted those, nobody would have an opportunity to review them, to produce them, to have them be any part of this case, right?
   MR. PLOTNICK: Objection. Asked and

J.R.213

85

answered.

Q. When he objects, you still have to answer.

A. Yes. Yes. Sorry. It's possible.

Q. And you knew that would be the case, right? Not just possible. You knew that when you delete those messages, nobody else can see them, right?

A. Yes.

Q. And you did this while a subpoena was pending, right?

A. Yes.

Q. Subpoena for your documents?

A. Yes.

Q. And you did it on a three day period and on the last of those three days, you asked Discord for your messages for this subpoena, right?

A. I am unsure if it was for that purpose but, yes, I did request a take out.

Q. What do you mean you're unsure of the purpose. What is the other purpose you would have asked Discord for your messages on

86

July 30, 2024?

A. I'm unsure.

Q. You have no idea because you're not telling the truth, right?

MR. PLOTNICK: Objection. Argumentative.

Q. Were there any other lawsuits pending?

A. No.

Q. Did anyone ask you for those messages other than your attorneys?

A. No.

Q. So there's only one possible reason you would have requested Discord send you all of your personal messages, right?

MR. PLOTNICK: Objection.

A. I am not sure.

Q. And you knew those messages would come back after a three day spree of deleting them without those deleted messages, right?

A. I'm not sure.

Q. Your mother alleges in the complaint that you're a computer genius, doesn't she?

87

MR. PLOTNICK: Objection to form.

A. Yes.

Q. And you're familiar with Discord, right?

A. That is correct.

Q. You downloaded a script called Undiscord to delete those messages in July of 2024, right?

A. Yes.

Q. And you did that because that was the best and easiest way to mass delete emails in one sitting, right?

MR. PLOTNICK: Objection to form.

A. You mean messages but --

Q. Messages. Thank you.

A. I believe so. Yes.

Q. And you knew that if you deleted those messages, they'd be gone forever?

MR. PLOTNICK: Objection. Asked and answered.

A. I'm not sure.

Q. What do you mean you're not sure?

A. I'm unsure of the exact workings of Discord at the time.

88

Q. You were hoping that those messages would be ones that no one would ever see again because they were embarrassing, and boastful, and crude, and unfilleted, and salacious, right?

MR. PLOTNICK: Objection to form.

A. Yes.

Q. And so you were hoping that no one would be able to see these messages again, right?

A. I believe so.

Q. Including Robert?

A. Yes.

MR. LEVY: All right. We'll take a break.

THE VIDEOGRAPHER: We're going off the record. The time on the video monitor is 11:21 a.m.

(A recess was taken)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 11:34 a.m.

Q. David, can you clarify for us how you learned about what you had deleted from the

J.R.214

Transcript of David Chen
Conducted on July 30, 2025

**89**

Rubber-Duck-Debugger channel in the new clickbait group?

A. Yes.

Q. Please do.

A. **On Thursday of last week I received an email from my counsel containing messages from the Rubber-Duck-Debugging channel. These involved -- or these referenced the Liquidator code and profits from liquidations in 2021. So I took it upon myself to look through a spreadsheet I have that shows the dates of deletions and when these messages were sent. I then looked through for the channel, Rubber-Duck-Debugging and it discovered that I could recall messages between May 8th and 13th of 2022 would have been referencing liquidations in the context of USD collapse.**

Q. May 8th to 13, 2022 is a specific date range, right?

A. **Yes.**

Q. A six day period?

**90**

A. **Yeah.**

Q. How are you able to recall the substance of those messages that were deleted?

A. **Based on what I was sending in the channel in 2021 and based on the dates I recalled that USD collapse was occurring at that time so I presume those messages were about that. I also looked through my chats with Ally Guo around the same time. I see that I reference talking about the USD collapse in this channel.**

Q. The messages that your lawyer showed you on Thursday, were those messages that you could have seen before Thursday on your own?

A. **Kind of.**

Q. Explain.

A. **So I downloaded this take out.**

Q. What do you mean by a take out?

A. **Discord take out. It's the data store data take out on -- that was sent over on July 31st.**

Q. So when you say take out, you mean the

**91**

messages that you had asked Discord for on July 30, 2024?

A. Yes.

Q. And the messages that you obtained from Discord the very next day?

A. **On July 30th -- yeah, the ones that asked for on July 30th and received on July 31st.**

Q. And they did not include the 6000 plus that you had deleted 28, 29, 30, right?

A. **I believe so.**

Q. And so that's what you're calling the take out what you received on July 31?

A. **Yes, because that's what they're called.**

Q. Okay.

A. **Yeah.**

Q. Keep going.

A. **So on my laptop I have a copy of the October take out, as we're calling it, which does not have channel names. I would have been looking through the October take out on my own but the July take out is on different disks that are in -- not in my possession,**

**92**

**actually. They're in for either NAXO -- actually I believe they're at NAXO.**

Q. There is nothing impeding you from asking your lawyers or NAXO for access to that information, right?

A. **Not that I'm aware of.**

Q. They're your Discord messages, right?

A. **Yes.**

Q. You own them?

A. **Own is a strong word but, yeah.**

Q. And you have control over them, right?

A. **Control over my messages, yes.**

Q. And at no time before Thursday, last week, did you ever ask to see the July 31 or October take out of your Discord messages to review them in the way that you did last Thursday, right?

A. **I had no reason -- sorry, repeat the question.**

Q. You never went to NAXO or your layers to look at the July 31 or October takeouts before Thursday, right?

93

A. No.

Q. No you did not, right?

A. No, I have looked at the take outs before then.

Q. But not in the way that you studied them on Thursday, right?

A. That is correct.

Q. Not for the purpose to figure out what you had deleted in the Rubber-Duck channel, right?

A. That's correct.

Q. You hadn't looked at the Rubber-Duck channel messages in the July 31 take out until last Thursday, right?

A. That is correct.

Q. And you had an obligation to answer interrogatories three times before last Thursday, right?

A. Yes.

Q. And to prepare for those interrogatory answers you never once looked at the July 31 Discord messages that you obtained in 2024 to

94

help you answer those interrogatories, right?

A. I believe we were looking through them but we did not notice these.

Q. No, you just told me you didn't look at them for that purpose.

A. We includes my counsel.

Q. You personally never looked at them, right?

A. Them being?

Q. You never looked at the July 31 or October takeouts before last Thursday?

A. That's not correct.

Q. You never looked at them before last Thursday for purposes of refreshing your recollection about what you deleted in the Rubber-Duck channel, right?

A. That's correct.

Q. And you knew you had deleted messages in the Rubber-Duck channel in July, right?

A. I am now aware of doing so, yes.

Q. And when I say July, I mean July 2024, right?

A. Yes.

Q. Were there other substantive messages on the

95

Rubber-Duck channel that you recall deleting?

A. Not that I can recall.

Q. But on that channel you talked about OtterSec, right?

A. Talk about OtterSec -- I don't believe so.

Q. You talked about the Liquidator codes, right?

A. Yes, I believe so. Or yes, period.

Q. The messages that you were looking at last Thursday, what were they?

A. What were they -- they were messages from the July 31st takeout prior to December 20th, 2021 in the Rubber-Duck-Debugging channel.

Q. And they -- they came from the July 31 take out, right?

A. That is correct.

Q. And had you produced those to us?

A. I am not sure.

Q. Did you ask that question to prepare for that deposition -- the deposition today?

MR. PLOTNICK: Objection. Privilege. Direct the witness not to -- assuming your -- the question includes counsel so I would

96

object to the extent the question calls for requests made for -- to counsel.

MR. LEVY: You're going to instruct him not to answer?

MR. PLOTNICK: On that -- with respect to that portion of the question, yes.

Q. David, what are the documents you looked at to prepare for this deposition?

A. What are the documents -- an incomplete -- sorry, an incomplete list would be the last two amended interrogatories, exhibits attached to those interrogatories, what I've mentioned about the new clickbait messages, GitHub history.

Q. Did you see a list of messages you deleted from Discord saying when those messages were sent?

A. Yes. I have a spreadsheet of my own that also shows that.

Q. Is that a spreadsheet that you personally created?

A. Yes.

J.R.216

Transcript of David Chen
Conducted on July 30, 2025

97

Q. Is that something that you produced to us?

A. I am not sure.

Q. And you said that you looked at Exhibit F to your interrogatories to prepare for this deposition?

A. Can you refresh my memory on what Exhibit F is?

Q. It is a native spreadsheet that is nearly impossible to printout in any legible form, so I can't present it to you in hard copy, but your -- you produced to us as an exhibit attached to your second amended answers to interrogatories a very large spreadsheet called Exhibit F, do you recall seeing that to prepare for this deposition?

A. I believe I have briefly glanced at it.

Q. Are there any other documents you looked at to prepare for this deposition?

A. I guess also affidavits I made.

Q. Your affidavits?

A. Yeah.

Q. Your declaration?

98

A. Yes.

Q. The June 13 declaration?

A. I believe so, yes. And also the latest declaration regarding this reserve.

Q. Any other documents that you looked at to prepare for this deposition?

A. The drop box containing documents I initially produced to CLM.

Q. Anything else?

A. Amazon purchase history. Sorry, I'm thinking. I guess also like the letters attached to some of the declarations.

Q. Okay.

A. Slash email.

Q. Did you look at April 1 letter your counsel had sent to us, April 1 2025?

A. Can you refresh my memory --

Q. Sure.

A. -- what it was.

MR. LEVY: Going to mark it as Exhibit 6.

(Exhibit 6 was marked for identification and

99

is attached to the transcript.)

Q. Have you seen this letter before?

A. Yes.

Q. Prior to your counsel sending this letter to us, did look at the -- what you're calling the July 31 take out from your Discord to help prepare your counsel for this letter?

A. Yes, I believe so.

Q. But not to refresh your recollection about what was in the Rubber-Duck Discord channel, right? You didn't do that until last Thursday, right?

A. Wait. Sorry. I take that back. I was looking -- I believe I looked at a take out. I believe that would have been the October take out.

Q. You did not look at the July 31 take out to help your lawyer prepare for this April 1 letter at Exhibit 6, right?

A. I'm unsure.

Q. You certainly didn't look at the July 31 take out to help you refresh your recollection

100

about Rubber-Duck before this April 1 letter went out, right?

A. Yes.

Q. You did not do that, right?

A. Yes.

Q. Did you delete Telegram messages?

A. No. Not that I'm aware of.

Q. Your phone bricked on April 2nd, 2023?

A. On or before but, yes.

Q. That was three days after your family filed a lawsuit against Robert?

A. Yeah.

Q. And you attempted to switch the operating system on the phone, is that right?

A. In 2022, yes.

Q. This is your Motorola Moto E phone?

A. That is correct.

Q. And you tried to switch the operating system late April or May 2022?

A. Yes.

Q. And why did you do that?

A. Because I had heard about Graphene OS from a

guy I don't recall the name in Miami while we were there for a Solona hacker house Miami as a part of OtterSec. He mentioned that the security of Graphene OS is pretty good and I wanted to try it out.

Q. And this was right around the time you were quitting OtterSec and you were concerned about lawsuits, right?

MR. PLOTNICK: Objection to form.

Q. Answer the question.

A. I guess so.

Q. This was the time you were quitting OtterSec, right? You quit OtterSec in April 27, 2022?

A. Yes.

Q. Right?

A. Yes.

Q. And also on that date you have messages talking about possible lawsuits with Robert, right?

A. Yes.

Q. And this is the time you're switching operating systems on your phone?

A. Around that time, yes.

Q. Why did you switch the operating system at this time?

A. Because I just learned about it probably around a week prior, I believe, so honor hacker house Miami would have been also late April.

Q. You learned about what a week prior?

A. Graphene OS.

Q. And what made you attracted to Graphene OS at this time period?

A. I'd argue at any time period I'd be interested in a hard end operating system, period.

Q. I'm not asking what you'd argue. I'm asking what you actually were thinking at this time. What -- why did you want to switch to Graphene OS at this time?

A. It's interesting.

Q. It's interesting?

A. Yeah.

Q. Is that what -- when you switched the

operating system you call that flashing?

A. Yeah.

Q. When you -- when you flash, did you backup your data?

A. I did not.

Q. So when your phone bricked in April of 2023, you hadn't backed up the data of the phone, right?

A. That is correct.

Q. And by that point in time your mother had filed a lawsuit against Robert and the two South Dakota companies, right?

MR. PLOTNICK: Objection to form.

A. So I would like to say it bricked on or before April 2nd, 2023. This date is from my Amazon purchase history where I purchased a replacement phone on April 2nd, 2023 but otherwise -- wait. Sorry. What was your question?

Q. You didn't back up your data of the phone before it bricked, right?

A. That's correct.

Q. And you knew for months before it bricked, that your family was going to file a lawsuit against Robert, right?

A. I believe so, yes.

Q. And you knew that as part of that process you had to preserve documents, right?

A. I'm not sure.

Q. And you did not back up your phone before that lawsuit was filed, right?

A. That's correct.

Q. And you said that when the flashing occurred, the phone continued to work?

A. You mean in 2022?

Q. Mm-hmm.

A. So flashing to Graphene OS did not work. It's designed for pixels and it doesn't work that way. So that sucked. And then I downloaded a Motorola Android image and flashed that to my phone. That would be the stock image to Android we're talking about.

Q. And you had Discord on that phone, right?

A. It depends but actually probably not.

J.R.218

105

Q. You have Telegram on that phone?

A. **Yes, I believe so.**

Q. Do you have Signal on that phone?

A. **Signal on that phone, I believe so.**

Q. Why weren't you sure Discord wasn't on the phone?

A. **I don't like having Discord on my phone. It's distracting and the notifications, honestly, annoy me so.**

Q. And you know that it's distracting because you've had it on your phone before and it's distracted you, right?

A. **Yes, I usually only keep it on my phone for -- for times when I actually need it so that would be Solana hacker house, because the primary way people reach out to me is on Discord.**

Q. The way people primarily reach out to you is Discord, right?

A. **Yes.**

Q. And so in 2022 you had Discord on your phone, that was over three years ago, right?

106

A. **At points in 2022 I would have had Discord on my phone.**

Q. And when it stopped working after the flash, Discord was still on your phone, right?

A. **Probably not.**

Q. Why do you say that?

A. **Because I just said I usually only have it on my phone for conferences when I'm like out and about. And it's like essential that I get notifications immediately.**

Q. When the flash occurred, did you set your phone to a factory setting in late May or -- late April or early May 2022?

A. **Yes.**

Q. Why did you do that?

A. **Because that's how flashing works. You overwrite what's on the phone in order to flash.**

Q. And the phone kept working until on or about April 2nd, 2023, right?

A. **Yes.**

Q. When it -- when it stopped working, you call

107

that bricking, right?

A. **Yes.**

Q. Why do you understand the bricking to have resulted from this event that occurred a year ago, a year --

A. **I don't --**

Q. -- prior?

A. **I don't.**

Q. That's what you've told us, right, in your interrogatory answers?

A. **Sorry, what page is this?**

Q. David, why did your phone brick?

A. **What page is this?**

Q. David, why did you your phone brick?

A. **I'm not sure. It's possibly related to the flashing because it's a cheap phone and flashing means like a lot of rights to the drive. So that's like my working theory because it's a cheap phone.**

Q. Your working theory is it's a cheap phone?

A. **Yeah.**

Q. Okay. Let's -- let's look at what your

108

answer to interrogatory is, your second amended to the interrogatory is.

MR. PLOTNICK: Which interrogatory now?

MR. LEVY: This is interrogatory No. 14 in Exhibit 1 on Page 24.

Q. Your explantation for why the phone bricked is here, plaintiff states that in or around April or May 2022 David Chen flashed his Motorola Moto E mobile phone while attempting to install a new operating system Graphene OS. To flash the phone, David unlocked the phone's boot loader, downloaded a rom, booted the device to fast boot, uploaded a new rom to the phone, and then rebooted the the phone into the new rom. His attempt at installation was unsuccessful and he then reset the phone to a factory setting, following which, the phone worked until on or about April 2, 2023. David does not recall specifically what he was doing with the phone when it ceased working in or around April 2, 2023 but generally recalls picking it up to

J.R.219

109

use it, discovering that it was functioning, turning it off and then on again, learning that it still was not working, and then purchasing a new phone. Is that answer correct?

A. Yeah.

Q. Is there anything you want to change about that answer?

A. No.

Q. So why is it a year after this phone bricks, it's the first time we become aware of it?

MR. PLOTNICK: Objection to form.

Q. When's the first time that you told your mom that your phone bricked?

A. On or about April 20 -- sorry, April 2nd, 2023.

Q. What steps did you take to preserve the phone at that point?

A. I put it in a cabinet.

Q. Where?

A. In my house.

Q. Did you lock it?

110

A. Or sorry. My mom's house.

Q. In your mom's house?

A. Yeah.

Q. Did you lock the cabinet?

A. No.

Q. Did you tell your lawyers that the phone had bricked in April of 2023?

MR. PLOTNICK: You can answer.

A. Okay. I would have told them at some point.

Q. That's not my question. Did you tell your lawyers in April of 2023 that your telephone had bricked?

A. I don't recall.

Q. When do you recall telling your lawyers that your phone bricked?

A. I don't recall.

Q. Did you tell them before 2024?

A. I don't recall.

Q. Did you prepare for this deposition today?

A. Yes.

Q. What did you do to refresh your recollection about when you told your lawyers that your

111

phone had bricked while this case was pending?

A. I reviewed interrogatories.

Q. That's it?

A. I did not -- I believe so.

Q. You didn't look at your communications with counsel to refresh your recollection about when you told your counsel or didn't tell your counsel that your entire phone had bricked in the middle of this lawsuit?

A. That is correct. I did not review such communications.

Q. You taking this seriously?

MR. PLOTNICK: Objection. Argumentative.

A. I --

Q. Why did you just review the answer to interrogatories and not your communications with counsel?

MR. PLOTNICK: Objection to form.

Q. Why?

A. Counsel advised me not to do homework.

112

Q. Really. He told you not to look at any other documents to prepare for this deposition but your answers to interrogatories?

A. No.

Q. What else did counsel tell you to do to prepare for this deposition since you're waiving privilege?

A. Sorry, can you repeat the question?

Q. Yeah. What else did counsel tell you to do to prepare for this deposition?

A. Review documents that I was sent.

Q. And they told you specifically not to look at anything else?

A. Not that I can recall.

Q. When they told you not to do any homework, what did you understand that to mean?

A. I understood that to mean to not take initiative to review documents that were not sent to me.

Q. When did they tell you that?

A. Within the past week.

Q. Was it before or after Thursday when you were

J.R.220

113

reviewing the Rubber-Duck messages?

A. After Thursday.

Q. When? What day?

A. Probably Monday.

Q. Was that in person?

A. Yes.

Q. Did they give you any other guidance about what to do for this deposition that you want to tell us?

MR. PLOTNICK: Objection. You can answer yes or no but direct the witness not to answer on substance on grounds of attorney/client privilege.

MR. LEVY: I'd argue he's waived privilege.

MR. PLOTNICK: I don't believe it would be a general waiver he spoke specifically and your question was directed to anything else.

MR. LEVY: During preparation for this deposition while he has told us that you -- someone on his legal team has told him not to do homework to prepare for this deposition,

114

so I think it's within the scope.

MR. PLOTNICK: As I said that, David, yes or no. Direct the witness not to answer on grounds of attorney/client privilege.

A. Can you repeat the question?

Q. What other guidance did you receive from your lawyers to prepare for this deposition?

MR. PLOTNICK: Same objection. Same direction to the witness.

Q. Did you help your lawyers prepare the letter on April 1 in Exhibit 6?

A. Yes.

Q. Did your lawyers tell you not to do any homework to help prepare for that letter, too?

MR. PLOTNICK: Objection. Direct the witness not to answer, grounds attorney/client privilege.

Q. If you look at that Exhibit 6 on the second page it says, 1200 -- this is describing the messages you've deleted from Discord, right?

A. Yes.

115

Q. Do you see that?

A. Yes.

Q. And that first group is 1204 messages from a Discord server used by David for communications with a group of his friends, you see that?

A. Yes.

Q. That's the new clickbait group, right?

A. That is correct.

Q. And do you see your lawyers through this letter saying that there are 1204 messages about topics having nothing to do with OtterSec or any issue in this case? Do you see that?

A. Yes.

Q. That's a false statement, right?

A. Yes.

Q. Have you ever corrected that statement until today?

A. No. Not that I'm aware of.

Q. Did you give any information to your lawyers where they would be able to know what the

116

topics of those messages were before April 1?

MR. PLOTNICK: Direct the witness you can answer that yes or no but, otherwise, attorney/client privilege, would direct the witness not to answer beyond a yes or no.

A. Can you repeat the question?

Q. The 1200 messages you're talking -- your lawyers are talking about here in Exhibit 6 on Page 2 --

A. Mm-hmm.

Q. -- were deleted at this time, right?

A. This time being?

Q. April 1, 2025 when this letter was sent.

A. They had been deleted by that time as they were deleted in July of 2024, yes.

Q. Right. So how were your lawyers able to talk about what the topics of those deleted messages were, they couldn't see them, right?

A. Yes. That is correct.

Q. And Thursday of July 2025 for the first time you put together some information to refresh your recollection about the substance of some

J.R.221

**117**

of those 1204 messages in a Rubber-Duck channel, right?

A.   Yes.

Q.   But before this April 1 letter was written, you didn't do that kind of work, did you?

MR. PLOTNICK: Objection to form.

Q.   Answer the question.

A.   Elaborate on, that kind of work.

Q.   You didn't check to see whether you had deleted any potentially relevant messages in Rubber-Duck channel before this April 1 letter in Exhibit 6 went out the door, right? David, you knew this statement at the top of Page 2 of Exhibit 6 was false well it went out the door, right?

A.   At the time my recollection was that I had deleted all messages in new clickbaits, so I did not believe that I would have had anything to review.

Q.   You told us that in new clickbait you had talked about Liquidator codes, right?

A.   That is correct.

**118**

Q.   Isn't that an issue in the case?

A.   Yes.

Q.   And you knew that in July 2024 when you were deleting them, right?

A.   I believe so.

Q.   So this statement was false that 1204 messages about topics having nothing to do with any issue in this case were false on April 1 2025 when this letter went out the door and you knew that, right?

A.   I knew that April -- I'm not sure.

Q.   You approved this letter before it went out the door, right?

A.   I approved -- I believe so.

Q.   And you knew that statement was false, right?

A.   I currently know the statement is false.

Q.   And you knew it then, too, right?

A.   It's possible.

Q.   David, the next sentence is also false, right? And you knew that, too? David's communications with his high school friends are not relevant. You knew that was false,

**119**

right?

A.   I'm unsure.

Q.   Ally Guo was a high school friend, wasn't she?

A.   Yes.

Q.   You deleted 10,433 Discord messages with her in October of 2024 when you knew that a complaint was filed against you, right?

A.   Yes.

Q.   And you knew her messages --

A.   Wait. Sorry. Not when I knew a complaint was filed against me but, yes, I did delete those messages.

Q.   David, you knew that your communications with her are relevant to this case, right?

A.   I believe so.

Q.   So you knew that this statement was false when your lawyers sent it to us, right? The statement that your communications with your high school friends are not relevant?

A.   Yes.

MR. LEVY: I want to turn to what I'm

**120**

going to mark as Exhibit 7.

(Exhibit 7 was marked for identification and is attached to the transcript.)

Q.   David, this is a letter that your lawyers sent to the court on February 28, 2025?

A.   Yes.

Q.   Did you approve this letter before it went to the court?

A.   Yes.

Q.   Did you know at the time that the 1204 new clickbait messages you deleted were within what your counsel understood to be the discovery range?

A.   Yes.

Q.   And you knew that those messages related to issues in this case, right?

A.   I'm not sure.

Q.   Well, you knew that they related to the Liquidator code, right?

A.   I'm unsure.

Q.   You knew that new clickbait and the Rubber-Duck channel, you were talking about

121

the Liquidator codes, right?

A.   I did not know at the time but I do now.

Q.   You knew when you were deleting those messages that they included that information, right?

A.   It's possible.

Q.   It's not just possible, you knew that, right?

A.   It's possible.

Q.   You had -- you had created these messages years before you had deleted them, right?

A.   Yes.

Q.   You knew what you were doing, right?

A.   It's possible.

Q.   And you knew that OtterSec was discussed in the new clickbait channel, right?

A.   I'm unsure.

Q.   You know today that OtterSec was discussed at the new clickbait channel, right?

A.   I'm still unsure.

Q.   You knew that -- you talked about Solana on new clickbait, right?

A.   As it relates to Liquidator code in the

122

Rubber-Duck-Debugging channel, yes.

Q.   And you see the statement on the second page of this letter, the Discord -- you look at the second bullet point, the Discord ID associated with 1722 messages that are within the discovery range correspond to servers or channels that are irrelevant, as they are variously associated with high school friends or friend groups, do you see that?

A.   Yes.

Q.   Including a group of users with whom David formed an online friendship in 2017?

A.   Yes.

Q.   Is that includes Ally Guo, right?

A.   No.  Or sorry, you mean like the combined statement or just the 2017 friend group?

Q.   The 1722 messages here --

A.   Yes.

Q.   -- that your lawyers told the court are irrelevant because among other things, they are variously associated with high school friend or friend groups, that includes Ally

123

Guo, right?

MR. PLOTNICK:  Objection to form.

Q.   Ally Guo is one of the people you communicated with on some of these 1722 messages that you deleted, right?

A.   It's possible.

Q.   What do you mean it's possible?  She's in the new Clickbait group.

A.   Yes.

Q.   You deleted messages with Ally Guo in the new clickbait group, right?

A.   It's possible.  Like I know I'm splitting hairs here but like she was not really active in sending messages in new clickbait so it depends on like if your definition of communication is like she sends a message and I respond, you know.

Q.   If you send a message on a chat group with other people, everybody else receives it, right?

A.   They can see it, yes.

Q.   Right.  And it's a communication with them,

124

right?

A.   By that definition, yes.

Q.   Pretty basic --

A.   Okay.

Q.   -- right?  And you deleted those messages that you sent to a group that included Ally Guo, right?

A.   That is correct.

Q.   And she's one of your high school friends, right?

A.   That is correct.

Q.   And you had all kinds of relevant communications with her on Discord, right?

A.   That is correct.

Q.   And so you knew this statement was false when your lawyer said it to the court?

A.   I guess so.

Q.   And you didn't tell your lawyers this was false, did you?

A.   I did not.

Q.   You let them send this letter to the court without telling them that they made a false

J.R.223

Transcript of David Chen
Conducted on July 30, 2025

125

statement in it, right?

MR. PLOTNICK: Objection. Argumentative.

Q. Answer the question.

A. Sorry, can you repeat the question?

Q. You let your lawyers send this letter to the court knowing it had a false statement, right?

MR. PLOTNICK: Objection to form. Same objection.

Q. Answer the question.

A. I guess that appears to be the case.

Q. When did you form Ragged, LLC?

A. Ragged, LLC.

Q. Before I get there, are there any other false statements in this letter?

A. In this letter?

Q. Yeah.

A. Sorry, give me some time to read through it. Okay. Regarding preservation of my GitHub account between April 27th and May 21st I believe I made comments on top of the code I

126

took from OtterSec on GitHub. Then on or before May 21st I believe that I deleted those comments from GitHub.

Q. What year?

A. 2022.

Q. So between April 27 and May 21 of 2022 tell me what you deleted?

A. I believe I deleted commits on top of the OtterSec code.

Q. What are those comments say?

A. Those commits would have been updates and fixes to the code that due to bugs introduced by OtterSec.

Q. And those were updates that people at OtterSec had made to the code? Let me rephrase that. What you deleted were comments from people at OtterSec?

A. No, they were comments from myself.

Q. But they -- I'm sorry, they were comments about upgrades to the code, right? They were comments about upgrades to the code?

A. Are you saying comments or commits?

127

Q. What did you delete?

A. I deleted GitHub or get commits.

Q. Git commits.

A. I don't know if I'm pronouncing it right. People say commits.

MR. PLOTNICK: I think that you're -- I don't know if you're saying comments E-N-T-S I think he's saying right C-O-M-M-I-T-S, right?

THE WITNESS: Yeah.

Q. Git commits. And the Git commits relate to upgrades on the code?

A. Yes.

Q. And the Git commits -- the upgrades on the code were created or made by people at OtterSec?

A. They were made by me.

Q. Made by you?

A. Yes.

Q. And you deleted the commits?

A. Yes.

Q. Why did you do that?

128

A. I believe I had a conversation with my father and he told me to be careful about utilizing or building on top of OtterSec code or code related to OtterSec. Thus, on May 21st I re-based the code and kept a copy of the code as of April 27th in a branch named Olt. I also re-based the main branch to a commit predating OtterSec and built on top of that. I believe that is when the commits would have been deleted.

Q. And this is a period of time when you knew there might be litigation between you and Robert and OtterSec, right?

A. I believe the litigation at the time would be about Jump crypto. I believe our issues -- I believed at the time that our issues about the code had been resolved due to conversations with -- between me and Robert where he did not oppose my taking of the code.

Q. And why did your father -- did your father direct you to delete those commits?

J.R.224

129

A. No.

Q. You did that on your own?

A. That is correct. I believe that to be correct.

Q. Did you talk to anybody else about the deletion of those commits?

A. No.

Q. Okay. I want to go back to Exhibit 7. This is the letter that your lawyer sent to the courts on February 28, 2025. Are there any other false statements in this letter?

MR. LEVY: How much time do we have left or how much have we been on the record?

THE VIDEOGRAPHER: You've been on the record for two hours and 19 minutes.

MR. LEVY: Okay.

A. Okay. On the second to last paragraph I would add on that --

Q. On Page 3?

A. Yeah. I would add on that at the time I left OtterSec, I believe Philip Papurt asked me to use Signal to transfer private keys to him,

130

and that's the only thing I believe I used Signal for, and that would be exclusively on this phone.

MR. LEVY: Okay. Let's go off the record and take a break.

THE VIDEOGRAPHER: Stand by. We're going off the record. The time on the video monitor is 12:24 p.m.

(A recess was taken)

THE VIDEOGRAPHER: We're back on the record. The time on the video monitor is 12:37 p.m.

Q. David, did you create the companies Ragged, LLC and Adjacent Advertising, LLC?

A. Yes.

Q. Did those two companies have anything to do with this case?

A. No.

Q. Were they advertising companies?

A. So I did nothing with Ragged, LLC. And then for Adjacent Advertising it was watching NFT based advertising. It's basically spam mail.

131

Q. You set them up to advertise?

A. Yeah. I mean I wanted to but like it didn't really pan out so.

Q. Did you want them to advertise anything about Robert?

A. No.

Q. Did you want them to advertise anything about OtterSec?

A. No.

Q. Did you want them to advertise anything about the litigation?

A. No.

Q. Going back to the new clickbait group Rubber-Duck-Debugger channel, you talked about the messages that you deleted that were sent May 18 to May 13, 2022, right?

A. May 8th through May 13th, 2022, yes.

Q. And you said those related to Liquidator codes?

A. I believe so.

Q. And the Liquidator codes in this litigation, right?

132

A. Yes, I believe so.

MR. LEVY: I want you to go now to Exhibit -- this is 8.

(Exhibit 8 was marked for identification and is attached to the transcript.)

Q. David, in late April of 2022 when you quit OtterSec and you understood that Robert might be suing you, right?

A. I guess so.

Q. You understood there might be litigation between the two of you?

A. Yes.

Q. And you knew that you were going to delete messages, right?

MR. PLOTNICK: Objection to form.

Q. Robert -- David. Sorry. David?

A. Yeah.

Q. David, you knew that part of your plan was to delete messages right?

MR. PLOTNICK: Objection to form.

A. I don't recall.

Q. Okay. I want you to look at what's now

133

Exhibit 8. This is a chat between you and Papurt, right?

A. Mm-hmm. That is correct.

Q. And that's April 30, 2022?

A. Yes.

Q. Three days after you quit OtterSec?

A. Yes.

Q. Three days after you have received messages from Papurt about Robert suing you?

A. Yeah.

Q. Three days after you sent messages to Ally Guo about Robert suing you?

A. Yes.

Q. And here in Exhibit 8 on 438 -- 4387 you say on April 30, 2022 at 11:58:14 a.m. paranoid. You see that?

A. Yes.

Q. And then Papurt says, IKR, that's I know right?

A. Yeah.

Q. And then you say, he realized his actions turned osec into a sinking ship I think?

134

A. Yes.

Q. And osec is OtterSec?

A. Yes.

Q. And you said, he asked me if I wanted to come back?

A. Yes.

Q. Papurt sends a skull face and then says, Rob moment, bruh, and then sends you a couple of links, and wtf do I say; and you say, ghost while we yeet messages, right?

A. Yes.

Q. And yeet means delete, doesn't it?

A. I'm not sure of the context.

Q. You use the word yeet frequently on Discord to mean delete, don't you?

A. I'm unsure.

Q. Your intention here was to delete messages during this litigation, wasn't it?

A. I am unsure.

Q. You deleted over 6000 messages on Discord in July of 2024, right?

A. Yes.

135

Q. And you did that intentionally, right?

A. Yes.

Q. And you deleted over 10,000 messages in October of 2024, right?

A. Yes.

Q. And you did that intentionally, right?

A. Yes.

Q. And that was always part of the plan, wasn't it?

A. I'm unsure. I don't believe that to be the case.

MR. LEVY: We'll take a quick break.

THE VIDEOGRAPHER: We are going off the record. The time on the video monitor is 12:43 p.m.

(A recess was taken)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 12:53 p.m.?

Q. David, I think I have the word pronounced correctly this time, you deleted commits, right?

136

A. Yes.

Q. And when you deleted commits and you talked about that with other people on Discord, right?

A. Talk about that with other -- I don't believe doing -- I did so.

Q. And when you talk about deleting commits, you talk about it as yeeting commits, right?

A. I can't recall.

Q. Just like you were yeeting messages, right?

A. I believe in this case yeeting actually referred to downloading the messages from the OtterSec Discord server, which is what I was doing with regards to messages.

Q. Not deleting them?

A. Yes. It would be actually preserving them.

MR. LEVY: I want to put this in front of you. This is Exhibit 9.

(Exhibit 9 was marked for identification and is attached to the transcript.)

Q. David, this is a Discord chat between you and NotDeGhost, right?

J.R.226

**137**

A. That is correct.

Q. Who's NotDeGhost?

A. Robert Chen.

Q. And who's ra?

A. Me.

Q. And what do you see at the bottom of the page there? Do you want credit in the readme or do you want me to yeet your commit. Do you see that?

A. Yes.

Q. You wrote that on April 29, 2022 at 6:08 p.m.?

A. That is correct.

Q. You meant you were going to delete the commit, right?

A. I believe so.

Q. And you deleted messages in 2024, right?

A. That is correct.

Q. And you wiped the computer server at OtterSec in 2022, right?

A. You wiped --, sorry, can you repeat that question?

**138**

Q. You deleted OtterSec Discord messages in 2022, as well, right?

A. I cannot recall if that did or did not happen.

Q. And when you said in Discord on April 30, 2022 while yee -- while we yeet messages, you were talking about deleting messages, right?

A. I'm unsure. But I believe this to be meaning downloading messages as yeets refers to like throwing something, so in this case it would be throwing the messages from the server into like downloads.

Q. It could also mean throwing them away forever?

A. That is possible, yes.

Q. Just like you did with the commits, right?

A. The commits I mentioned or the commits in these messages?

Q. You deleted commits, right?

A. The commits between April 27th and May 21st, yes.

Q. 2022?

**139**

A. Yes.

MR. LEVY: I think we're done.

MR. PLOTNICK: I have just a couple of follow up questions. Should be quick.

CROSS-EXAMINATION BY COUNSEL FOR THE PLAINTIFF BY

BY MR. PLOTNICK:

Q. So, David you were asked some questions earlier about homework in preparing for the deposition. Do you remember that?

A. Yes.

Q. And -- and you referenced advice that you had received from counsel about not doing homework, correct?

A. That's correct.

Q. In what context were you advised not to do homework?

A. Last night as part of being prepared for the deposition as part of like making sure I am well rested for the deposition.

Q. Did you, in fact, do homework to prepare for your deposition?

A. Yes.

**140**

MR. PLOTNICK: No questions.

THE VIDEOGRAPHER: All right. Standby.

MR. LEVY: Can I have one redirect?

THE VIDEOGRAPHER: Yeah. Go ahead.

REDIRECT EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. LEVY:

Q. David, if memory serves when I asked you about your guidance not to do homework, you said that you recall that -- receiving that advice on Monday, was that incorrect?

A. That was incorrect.

Q. You only received that advice yesterday?

A. I believe so.

Q. Why did you say Monday?

A. It's been a rough couple of days. I don't know what to tell you.

MR. LEVY: Nothing further.

THE VIDEOGRAPHER: This marks the end of the deposition of David Chen. We're going off the record at 12:57 p.m.

J.R.227

Transcript of David Chen
Conducted on July 30, 2025

141

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Stefanie Towns, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of July 2025.

*Stefanie Towns*

J.R.228

**A**

**ability**
23:18, 23:21,
47:16
**able**
15:16, 37:21,
71:16, 71:19,
88:8, 90:2,
115:22, 116:16
**about**
8:19, 11:22,
12:5, 20:20,
22:6, 24:17,
24:21, 25:3,
30:1, 31:9,
31:21, 32:19,
32:22, 33:2,
33:4, 33:6,
34:7, 34:11,
34:20, 35:1,
35:4, 35:12,
36:1, 36:4,
43:3, 43:7,
43:11, 45:16,
45:17, 45:20,
46:11, 46:12,
47:2, 51:9,
58:4, 58:17,
60:3, 63:7,
72:19, 74:6,
77:2, 77:6,
78:19, 83:17,
84:4, 88:22,
90:7, 90:10,
94:14, 95:3,
95:5, 95:6,
96:13, 99:9,
100:1, 100:22,
101:8, 101:18,
102:4, 102:8,
104:20, 106:9,
106:19, 108:19,
109:7, 109:15,
110:22, 111:7,
113:7, 115:12,
116:8, 116:17,
116:22, 117:21,

118:7, 120:22,
121:20, 126:20,
126:21, 128:2,
128:15, 128:16,
129:5, 131:4,
131:7, 131:10,
131:15, 133:9,
133:12, 136:3,
136:5, 136:7,
136:8, 138:7,
139:8, 139:12,
140:8
**absconding**
21:7
**access**
23:16, 46:14,
46:17, 47:13,
92:4
**account**
31:4, 125:21
**accounts**
30:7, 30:11,
30:16, 30:19,
31:3, 31:7,
31:9, 31:14,
31:17
**actions**
133:21
**active**
123:13
**actually**
92:1, 92:2,
102:16, 104:22,
105:14, 136:11,
136:16
**add**
129:18, 129:20
**addition**
83:16
**additional**
11:18, 74:17
**address**
5:12
**addresses**
30:7
**adjacent**
130:14, 130:21
**administrator**
1:4, 24:2,

83:12, 83:13
**adolescent**
53:18
**advertise**
131:1, 131:4,
131:7, 131:10
**advertising**
130:14, 130:19,
130:21, 130:22
**advice**
11:18, 24:17,
139:11, 140:10,
140:12
**advised**
65:4, 111:22,
139:15
**affidavit**
4:15, 33:13
**affidavits**
97:19, 97:20
**affixed**
141:13
**after**
7:2, 9:15,
11:1, 17:12,
21:11, 25:13,
34:4, 35:6,
39:12, 40:10,
42:17, 44:15,
50:8, 50:17,
61:20, 65:1,
68:16, 68:20,
71:4, 71:17,
71:20, 78:4,
84:8, 86:18,
100:10, 106:3,
109:10, 112:22,
113:2, 133:6,
133:8, 133:11
**again**
45:22, 53:8,
68:7, 71:18,
75:16, 88:2,
88:8, 109:2
**against**
27:11, 42:10,
67:3, 100:11,
103:11, 104:3,

119:8, 119:12
**ago**
105:22, 107:5
**agreement**
2:13
**ahead**
42:21, 140:4
**al**
5:4
**alert**
32:21
**alexander**
3:5
**alias**
30:11
**all**
17:10, 23:4,
23:8, 25:1,
31:6, 38:4,
38:17, 41:15,
43:20, 44:17,
60:20, 75:18,
78:1, 86:13,
88:12, 117:17,
124:12, 140:2
**alleged**
27:13
**alleges**
86:21
**allow**
13:11, 47:11,
64:4, 69:4,
69:12, 69:18,
70:2, 71:6
**ally**
11:16, 24:12,
25:21, 26:1,
26:3, 34:15,
35:9, 35:12,
36:6, 61:12,
70:15, 71:5,
71:10, 76:14,
76:17, 76:20,
82:22, 90:8,
119:3, 122:14,
122:22, 123:3,
123:10, 124:6,
133:11

J.R.229

Transcript of David Chen
Conducted on July 30, 2025

38

**already**
19:3, 25:13,
63:9, 81:17
**also**
3:21, 5:22,
9:22, 22:9,
25:1, 27:7,
35:7, 49:18,
50:1, 62:10,
65:16, 90:8,
96:19, 97:19,
98:3, 98:11,
101:17, 102:6,
118:19, 128:7,
138:13
**although**
14:11, 15:3
**always**
135:8
**amazon**
98:10, 103:16
**ambiguous**
73:1
**amended**
4:10, 7:10,
28:15, 28:16,
28:17, 29:16,
37:7, 96:11,
97:12, 108:2
**among**
53:18, 122:20
**android**
104:18, 104:20
**angela**
83:6, 83:14
**annoy**
21:22, 45:21,
46:1, 46:2,
105:9
**another**
15:16, 41:11,
41:13, 61:6
**answer**
15:2, 15:5,
15:15, 18:15,
25:20, 29:19,
37:1, 42:1,
47:11, 58:11,

58:13, 59:3,
64:22, 69:4,
69:5, 69:12,
69:18, 70:2,
71:7, 73:2,
73:12, 75:14,
75:15, 75:21,
78:14, 80:16,
81:1, 82:6,
82:8, 85:2,
93:16, 94:1,
96:4, 101:10,
108:1, 109:4,
109:8, 110:8,
111:17, 113:11,
113:12, 114:3,
114:17, 116:3,
116:5, 117:7,
125:4, 125:11
**answered**
44:7, 54:22,
70:10, 75:10,
75:13, 75:21,
85:1, 87:18
**answers**
7:18, 7:20,
8:6, 19:4,
28:20, 29:3,
29:6, 29:14,
29:16, 36:17,
42:7, 49:8,
72:4, 72:10,
74:7, 93:21,
97:12, 107:10,
112:3
**any**
7:1, 7:22,
14:12, 15:4,
22:14, 23:11,
41:15, 43:3,
50:10, 50:13,
59:6, 59:17,
63:19, 65:5,
66:4, 69:21,
72:7, 74:3,
75:2, 75:5,
84:20, 86:7,
97:9, 97:17,

98:5, 102:12,
112:1, 112:15,
113:7, 114:13,
115:13, 115:21,
117:10, 118:8,
125:15, 129:10,
141:9
**anybody**
77:1, 79:4,
129:5
**anyone**
13:15, 13:17,
30:22, 72:20,
73:4, 73:12,
73:19, 73:20,
77:5, 78:5, 86:9
**anything**
48:14, 48:19,
50:4, 59:15,
59:16, 59:18,
65:10, 65:15,
98:9, 109:7,
112:13, 113:18,
117:19, 130:16,
131:4, 131:7,
131:10
**appears**
125:12
**approve**
120:7
**approved**
118:12, 118:14
**april**
6:18, 6:19,
7:5, 8:15, 8:20,
9:15, 9:17,
12:11, 30:5,
30:18, 31:7,
31:15, 55:1,
57:10, 58:17,
60:3, 60:9,
61:10, 61:20,
62:10, 62:20,
63:2, 63:17,
64:17, 65:2,
66:8, 66:17,
98:15, 98:16,
99:18, 100:1,

100:8, 100:19,
101:13, 102:7,
103:6, 103:15,
103:17, 106:13,
106:20, 108:8,
108:19, 108:21,
109:15, 110:7,
110:11, 114:11,
116:1, 116:13,
117:4, 117:11,
118:9, 118:11,
125:21, 126:6,
128:6, 132:6,
133:4, 133:15,
137:11, 138:5,
138:20
**aren't**
77:19
**argue**
26:22, 102:12,
102:15, 113:14
**argumentative**
42:3, 63:15,
82:5, 86:6,
111:15, 125:3
**around**
6:22, 18:3,
21:5, 32:20,
55:6, 67:21,
90:9, 101:6,
102:1, 102:5,
108:7, 108:21
**asked**
31:6, 41:21,
44:12, 54:22,
70:9, 74:1,
75:9, 75:12,
75:20, 76:11,
84:22, 85:15,
85:22, 87:17,
91:1, 91:6,
129:21, 134:4,
139:7, 140:7
**asking**
14:15, 43:6,
45:18, 92:3,
102:15
**associated**
122:5, 122:8,

J.R.230

122:21
**assuming**
95:21
**attached**
4:8, 7:14,
32:5, 33:16,
55:16, 61:5,
96:12, 97:12,
98:12, 99:1,
120:3, 132:5,
136:20
**attempt**
108:15
**attempted**
100:13
**attempting**
108:9
**attention**
22:4, 22:15,
22:22, 43:4,
48:10
**attorney**
113:13, 114:4,
114:18, 116:4
**attorneys**
86:10
**attracted**
102:10
**audits**
1:9, 5:19
**august**
11:1
**auto**
77:10, 77:20,
78:2, 78:4,
78:7, 78:16,
78:22, 79:3,
79:7, 80:8,
80:18, 81:5,
81:14, 82:1,
82:11, 82:12
**aware**
9:14, 41:14,
50:12, 50:15,
66:6, 69:15,
76:19, 76:20,
77:4, 92:6,
94:19, 100:7,

109:11, 115:20
**away**
138:13

**B**

**back**
36:16, 39:2,
54:6, 57:4,
57:19, 58:6,
58:12, 60:4,
64:21, 81:21,
82:12, 86:17,
88:18, 99:13,
103:20, 104:8,
129:8, 130:10,
131:13, 134:5,
135:17
**backed**
103:7
**backup**
103:3
**bad**
53:1, 53:4,
53:21, 54:10,
54:14
**based**
50:19, 90:4,
90:5, 130:22
**basic**
124:3
**basically**
49:20, 130:22
**batch**
44:12
**bates**
57:17, 57:21,
58:3
**became**
69:15
**because**
13:6, 16:18,
17:1, 21:1,
21:3, 21:4,
26:7, 31:4,
45:6, 46:7,
46:14, 47:5,
53:16, 75:17,
77:20, 80:12,

86:3, 87:8,
88:2, 91:13,
100:22, 102:4,
105:10, 105:15,
106:7, 106:16,
107:16, 107:19,
122:20
**become**
109:11
**been**
6:8, 20:17,
21:10, 32:20,
34:5, 43:6,
48:21, 68:5,
68:8, 68:12,
71:16, 71:19,
74:8, 79:3,
79:7, 89:17,
91:19, 99:15,
102:6, 116:14,
126:11, 128:10,
128:17, 129:13,
129:14, 140:15
**before**
2:13, 8:1,
9:21, 15:12,
17:16, 22:3,
22:18, 22:21,
33:6, 34:11,
47:14, 47:17,
48:1, 50:11,
50:14, 59:7,
67:16, 67:17,
68:3, 68:18,
68:20, 68:22,
69:8, 70:20,
90:14, 92:13,
92:21, 93:3,
93:17, 94:10,
94:12, 99:2,
100:1, 100:9,
103:15, 103:21,
104:1, 104:8,
105:11, 110:17,
112:22, 116:1,
117:4, 117:11,
118:12, 120:7,
121:10, 125:15,

126:2, 141:2
**begins**
5:1
**behalf**
3:3, 3:11
**being**
34:4, 94:8,
116:12, 139:17
**believed**
128:16
**besides**
37:2
**best**
87:8
**better**
37:14
**between**
18:1, 30:18,
31:15, 34:1,
35:9, 49:9,
61:12, 70:17,
89:16, 125:21,
126:6, 128:12,
128:18, 132:11,
133:1, 136:21,
138:20
**beyond**
76:9, 116:5
**big**
27:17
**blog**
50:2
**boastful**
26:8, 53:2,
54:12, 88:3
**boot**
108:12, 108:13
**booted**
108:12
**bot**
21:16
**both**
81:3
**bothered**
38:8
**bots**
12:1
**bottom**
18:16, 19:1,

J.R.231

Transcript of David Chen
Conducted on July 30, 2025                                40

57:18, 137:6
**box**
98:7
**branch**
128:6, 128:7
**break**
38:18, 88:13,
130:5, 135:12
**brendan**
5:9
**brick**
107:12, 107:14
**bricked**
9:20, 12:4,
12:11, 100:8,
103:6, 103:14,
103:21, 104:1,
108:6, 109:14,
110:7, 110:12,
110:15, 111:1,
111:10
**bricking**
107:1, 107:3
**bricks**
109:10
**briefly**
97:16
**brought**
22:3, 22:14,
22:21, 43:3,
48:9
**bruh**
134:8
**bugs**
126:12
**building**
128:3
**built**
128:8
**bullet**
122:4
**business**
36:4

**C**

**c-o-m-m-i-t-s**
127:8
**cabinet**
109:19, 110:4

**cal**
11:19
**call**
6:13, 7:9,
18:8, 18:12,
25:9, 25:15,
103:1, 106:22
**called**
6:8, 13:3,
25:10, 25:11,
34:4, 72:3,
87:5, 91:13,
97:14
**calling**
18:12, 91:11,
91:18, 99:5
**calls**
96:1
**came**
41:19, 95:13
**can't**
14:1, 14:17,
16:18, 21:18,
23:10, 25:4,
25:17, 42:6,
51:5, 64:12,
67:19, 80:4,
81:20, 97:10,
136:9
**cannot**
13:7, 44:1,
65:19, 138:3
**careful**
128:2
**carter**
3:6, 5:21
**case**
1:8, 5:5, 9:4,
24:18, 28:2,
28:11, 41:3,
42:14, 42:19,
69:21, 79:5,
80:14, 80:21,
84:21, 85:4,
111:1, 115:13,
118:1, 118:8,
119:15, 120:16,
125:12, 130:17,

135:11, 136:11,
138:10, 141:10
**cases**
27:5
**ccr**
1:22
**ceased**
108:21
**central**
27:7
**certainly**
99:21
**certificate**
141:1
**certify**
141:3
**chain**
50:2
**chance**
16:7, 52:17
**change**
29:6, 59:17,
109:7
**changing**
28:20
**channel**
17:17, 17:22,
19:11, 21:2,
47:1, 47:6,
47:21, 48:20,
49:2, 49:6,
49:12, 49:21,
50:4, 50:7,
50:10, 51:12,
51:15, 51:20,
52:1, 52:2,
83:17, 89:1,
89:7, 89:14,
90:4, 90:11,
91:19, 93:9,
93:12, 94:15,
94:18, 95:1,
95:3, 95:12,
99:10, 117:2,
117:11, 120:22,
121:15, 121:18,
122:1, 131:14
**channeling**
21:12

**channels**
51:16, 51:18,
83:20, 83:22,
84:1, 84:2,
84:5, 122:7
**chart**
29:22, 44:8
**chat**
55:18, 61:6,
61:9, 123:18,
133:1, 136:21
**chats**
90:8
**cheap**
107:16, 107:19,
107:20
**check**
117:9
**chen**
1:6, 1:9, 1:14,
2:1, 4:2, 5:3,
5:4, 5:18, 5:22,
6:7, 6:12, 6:20,
7:12, 9:16,
14:8, 19:20,
19:22, 28:2,
31:21, 31:22,
32:9, 32:10,
32:12, 33:14,
33:18, 34:2,
34:3, 52:14,
65:1, 65:3,
69:16, 74:15,
108:8, 137:3,
140:19
**christina**
3:14
**circumstances**
69:5, 70:1
**claim**
71:9
**claire**
83:4
**clarify**
88:21
**clattenburg**
3:15
**clean**
76:1

J.R.232

Transcript of David Chen
Conducted on July 30, 2025

41

**clickbait**
11:6, 17:9, 17:11, 17:14, 17:16, 17:18, 18:17, 19:5, 20:19, 23:22, 24:4, 24:7, 24:10, 29:7, 29:11, 36:6, 36:10, 36:13, 36:22, 37:11, 47:1, 47:21, 48:15, 50:13, 50:17, 51:7, 51:10, 51:13, 53:16, 82:14, 82:20, 82:22, 84:2, 84:5, 84:8, 89:2, 96:13, 115:8, 117:20, 120:11, 120:21, 121:15, 121:18, 121:21, 123:8, 123:11, 123:14, 131:13

**clickbaits**
117:17

**client**
113:13, 114:4, 114:18, 116:4

**clients**
42:11

**clm**
68:6, 68:9, 68:10, 70:13, 98:8

**closet**
11:13, 11:15

**closetduck**
61:14

**code**
5:13, 17:20, 50:1, 89:9, 120:19, 121:22, 125:22, 126:9, 126:12, 126:15, 126:20, 126:21, 127:12, 127:15,

128:3, 128:5, 128:17, 128:20

**codes**
19:14, 19:17, 36:2, 84:12, 95:6, 117:21, 121:1, 131:19, 131:21

**coding**
12:2

**collapse**
18:3, 89:18, 90:6, 90:10

**collected**
30:2, 30:6, 30:14, 30:15, 30:20, 44:3, 44:9, 74:13

**collecting**
13:20, 20:14

**collection**
30:3, 43:16

**college**
37:16

**columbia**
2:15

**com**
3:20, 30:9, 31:18, 31:19

**combined**
122:15

**come**
76:1, 86:17, 134:4

**comments**
125:22, 126:3, 126:10, 126:17, 126:18, 126:19, 126:21, 126:22, 127:7

**commit**
128:7, 137:8, 137:15

**commits**
126:8, 126:11, 126:22, 127:2, 127:3, 127:5, 127:11, 127:14,

127:20, 128:9, 128:22, 129:6, 135:21, 136:2, 136:7, 136:8, 138:16, 138:17, 138:19, 138:20

**communicate**
26:3, 72:20, 73:3, 79:15, 79:19

**communicated**
77:5, 123:4

**communicating**
56:5, 77:18, 78:1, 78:16

**communication**
79:17, 123:16, 123:22

**communications**
9:13, 11:22, 42:19, 49:13, 77:16, 77:19, 80:13, 111:6, 111:12, 111:18, 115:5, 118:21, 119:14, 119:19, 124:13

**companies**
67:4, 103:12, 130:13, 130:16, 130:19

**complaint**
4:13, 27:11, 31:22, 32:10, 32:19, 32:22, 33:7, 33:10, 33:14, 33:21, 34:3, 34:7, 34:20, 35:1, 35:4, 70:22, 86:21, 119:8, 119:11

**comply**
24:12

**compound**
53:5

**computer**
6:16, 7:6,

47:19, 86:22, 137:19

**concept**
49:15

**concerned**
101:7

**conferences**
106:8

**contained**
7:21, 17:19

**containing**
89:6, 98:7

**contemporaneous**
34:18, 34:19, 34:21

**context**
89:17, 134:13, 139:15

**continued**
104:12

**control**
92:11, 92:12

**convenient**
59:19

**conversation**
25:7, 53:16, 57:13, 61:21, 128:1

**conversations**
27:13, 128:18

**copy**
47:19, 91:17, 97:10, 128:5

**corner**
58:1

**corrected**
115:18

**correcting**
65:21

**correction**
17:8, 65:18

**corrections**
7:20, 7:22, 15:8

**correctly**
135:21

**correspond**
122:6

J.R.233

Transcript of David Chen
Conducted on July 30, 2025                                    42

**could**
9:10, 21:2,
38:14, 45:1,
54:19, 75:2,
82:1, 82:2,
89:15, 90:13,
138:13
**couldn't**
45:14, 116:18
**counsel**
5:15, 5:18,
6:10, 24:19,
25:1, 47:12,
47:14, 47:17,
59:5, 74:9,
74:22, 89:6,
94:6, 95:22,
96:2, 98:15,
99:4, 99:7,
111:7, 111:8,
111:9, 111:19,
111:22, 112:5,
112:9, 120:12,
139:5, 139:12,
140:5, 141:9
**counsel's**
48:10
**couple**
35:7, 134:8,
139:3, 140:15
**court**
1:1, 5:5, 6:2,
43:10, 120:5,
120:8, 122:19,
124:16, 124:21,
125:7
**courts**
129:10
**create**
72:13, 130:13
**created**
21:14, 26:15,
96:21, 121:9,
127:15
**credibility**
27:16
**credit**
137:7

**crenny**
3:13
**cross-examination**
139:5
**crossed**
20:18
**crude**
26:8, 53:2,
54:4, 88:4
**crypto**
128:15
**cuenca**
5:10
**currently**
118:16
**custodian**
72:16
**cv**
1:9, 5:6

---

**D**

**dakota**
67:4, 103:12
**damages**
4:13
**dang**
83:4
**data**
14:10, 14:11,
15:4, 15:11,
30:6, 65:5,
90:19, 103:4,
103:7, 103:20
**dataed**
4:19
**date**
5:7, 9:21,
21:4, 30:2,
39:9, 55:6,
56:10, 61:9,
89:19, 101:17,
103:15
**dated**
4:18
**dates**
17:21, 72:18,
89:12, 90:5
**datingapp@proton-mail**
31:18

**david**
1:14, 2:1, 4:2,
5:3, 5:22, 6:7,
6:13, 6:15, 8:9,
8:11, 14:8,
20:6, 26:7,
28:13, 29:13,
31:21, 32:9,
32:12, 33:18,
38:15, 39:5,
42:1, 42:4,
42:7, 53:4,
53:6, 53:9,
53:15, 55:1,
58:14, 60:1,
63:16, 65:1,
74:15, 75:21,
88:21, 96:7,
107:12, 107:14,
108:8, 108:11,
108:19, 114:2,
115:4, 117:13,
118:19, 119:14,
120:4, 122:11,
130:13, 132:6,
132:16, 132:18,
135:20, 136:21,
139:7, 140:7,
140:19
**david's**
118:20
**davidchen0@proton-nmail**
30:9
**day**
6:20, 7:5,
9:19, 10:14,
10:15, 13:22,
14:16, 20:13,
55:4, 55:9,
56:12, 56:15,
56:18, 56:21,
57:13, 58:9,
58:20, 59:12,
60:3, 60:15,
62:15, 63:8,
66:14, 68:21,
85:14, 86:18,

89:22, 91:5,
113:3, 141:13
**days**
9:15, 10:7,
10:11, 12:19,
14:14, 39:13,
42:22, 85:15,
100:10, 133:6,
133:8, 133:11,
140:15
**dead**
11:9
**december**
17:13, 17:16,
50:8, 50:11,
50:14, 50:18,
84:9, 95:11
**declaration**
97:22, 98:2,
98:4
**declarations**
98:12
**defendant**
6:10, 27:4,
32:12, 33:18,
52:15, 140:5
**defendants**
1:11, 3:11,
7:12
**definitely**
21:9, 34:19,
40:4
**definition**
123:15, 124:2
**delete**
7:1, 10:3,
13:4, 13:7,
13:11, 13:17,
14:22, 20:21,
22:17, 23:18,
24:6, 24:9,
30:22, 31:14,
38:13, 45:3,
46:8, 50:7,
50:10, 50:13,
51:20, 63:3,
63:16, 63:20,
64:2, 64:4,

J.R.234

64:9, 64:17,
65:7, 65:10,
66:7, 77:10,
77:20, 78:2,
78:4, 78:7,
78:22, 79:3,
79:8, 80:8,
80:18, 81:5,
82:1, 82:11,
82:12, 85:6,
87:6, 87:9,
100:6, 119:12,
127:1, 128:22,
132:13, 132:19,
134:12, 134:15,
134:17, 137:14

**deletes**
81:14

**deleting**
10:7, 11:12,
12:20, 13:19,
14:13, 16:3,
20:10, 23:13,
30:19, 34:14,
34:22, 38:10,
39:12, 40:11,
49:1, 64:13,
70:15, 78:17,
86:18, 95:1,
118:4, 121:3,
136:7, 136:15,
138:7

**deletion**
43:16, 77:2,
77:6, 129:6

**deletions**
43:7, 43:11,
44:20, 48:10,
89:12

**demand**
4:14

**depends**
13:9, 104:22,
123:15

**depos**
5:10, 6:4

**depose**
43:11

**deposition**
1:14, 2:1, 5:2,
5:11, 8:1,
17:15, 29:9,
37:3, 41:20,
43:14, 63:6,
63:7, 95:19,
96:8, 97:5,
97:15, 97:18,
98:6, 110:19,
112:2, 112:6,
112:10, 113:8,
113:20, 113:22,
114:7, 139:9,
139:18, 139:19,
139:21, 140:19,
141:3

**describe**
19:6, 21:9

**described**
14:10, 19:12

**describing**
114:20

**designed**
21:16, 104:16

**despite**
49:8

**destroying**
71:5

**developing**
49:22

**device**
108:13

**differed**
29:15

**different**
91:21

**difficulties**
37:12

**direct**
4:21, 25:20,
78:14, 80:19,
95:21, 113:11,
114:3, 114:16,
116:2, 116:4,
128:22

**directed**
113:18

**direction**
114:9, 141:7

**directly**
72:20, 74:8

**disagree**
38:8, 45:8

**disclose**
31:2

**disclosed**
31:10

**discord**
6:21, 7:2,
9:22, 10:8,
10:10, 10:21,
11:6, 11:8,
11:12, 11:18,
11:21, 12:12,
12:21, 13:6,
13:21, 14:9,
14:15, 16:14,
16:15, 16:17,
16:22, 22:10,
34:15, 35:8,
35:14, 39:10,
39:13, 39:16,
40:1, 40:5,
40:6, 40:16,
41:2, 41:9,
41:16, 41:22,
42:4, 42:16,
43:20, 44:9,
44:13, 45:19,
55:5, 55:18,
56:3, 57:14,
61:6, 61:9,
63:17, 63:21,
64:2, 65:9,
66:8, 66:22,
69:1, 69:9,
75:2, 76:3,
77:2, 79:19,
79:21, 79:22,
84:7, 85:16,
85:22, 86:13,
87:3, 87:21,
90:19, 91:1,
91:5, 92:7,
92:15, 93:22,

96:16, 99:6,
99:10, 104:21,
105:5, 105:7,
105:17, 105:19,
105:21, 106:1,
106:4, 114:21,
115:4, 119:6,
122:3, 122:4,
124:13, 134:14,
134:20, 136:3,
136:13, 136:21,
138:1, 138:5

**discovered**
89:15

**discovering**
109:1

**discovery**
18:9, 18:12,
18:18, 19:7,
19:8, 72:2,
72:17, 120:13,
122:6

**discuss**
24:21, 51:7,
51:9, 51:12

**discussed**
83:21, 84:9,
84:12, 121:14,
121:17

**discussions**
53:18

**disks**
91:22

**dispute**
35:13

**distracted**
105:12

**distracting**
105:8, 105:10

**district**
1:1, 1:2, 2:14,
5:4, 5:5

**document**
7:16, 32:15,
55:17, 55:20,
56:10, 67:20

**documents**
12:17, 15:17,

Transcript of David Chen
Conducted on July 30, 2025

44

15:20, 16:3,
16:7, 30:1,
30:2, 41:22,
42:13, 52:14,
67:8, 67:9,
67:12, 68:3,
68:6, 68:9,
68:16, 68:22,
69:8, 69:15,
69:20, 71:4,
80:20, 81:11,
85:12, 96:7,
96:9, 97:17,
98:5, 98:7,
104:6, 112:2,
112:11, 112:18

**doing**
73:5, 94:19,
108:20, 121:12,
136:6, 136:14,
139:12

**done**
80:10, 82:1,
82:2, 82:3,
139:2

**door**
117:12, 117:15,
118:10, 118:13

**down**
21:6

**downloaded**
13:3, 87:5,
90:17, 104:18,
108:12

**downloading**
64:1, 136:12,
138:9

**downloads**
138:12

**drive**
74:16, 74:18,
107:18

**drivers**
75:2

**drives**
74:21

**drop**
98:7

**duck**
11:13, 11:15,
49:16

**due**
126:12, 128:17

**duly**
6:8

**during**
81:7, 82:2,
82:10, 113:19,
134:18

**E**

**e-n-t-s**
127:7

**each**
26:5, 26:6

**earlier**
65:18, 139:8

**early**
106:13

**easiest**
87:9

**effort**
37:14

**eight**
30:11

**either**
26:16, 92:1

**elaborate**
117:8

**else**
24:21, 41:7,
50:4, 59:15,
59:16, 64:15,
73:12, 73:19,
73:20, 77:1,
78:5, 85:6,
98:9, 112:5,
112:9, 112:13,
113:18, 123:19,
129:5

**email**
30:6, 30:7,
30:15, 31:2,
31:4, 31:6,
31:17, 40:5,
67:12, 89:5,

98:14

**emails**
30:19, 30:22,
31:14, 87:9

**embarrass**
26:18

**embarrassing**
88:3

**emma**
3:22

**employed**
141:9

**end**
102:13, 140:18

**enhanced**
37:11

**entire**
111:9

**ephemeral**
77:10, 77:12

**esquire**
3:4, 3:5, 3:12,
3:13, 3:14, 3:15

**essential**
106:9

**est**
1:17

**estate**
1:5, 27:21

**et**
5:4

**even**
18:8, 19:6,
21:10, 35:22,
45:2, 47:22,
51:5, 76:11

**event**
21:5, 107:4

**events**
21:13

**ever**
67:11, 88:2,
92:14, 115:18

**everybody**
16:10, 44:22,
64:15, 123:19

**evidence**
43:17, 63:8

**ex**
4:10, 4:13,
4:15, 4:16,
4:17, 4:18,
4:19, 4:20, 4:21

**exact**
87:21

**exactly**
65:19, 79:14

**examination**
4:2, 6:10,
140:5

**examined**
6:9

**example**
52:1

**except**
46:16

**exclusively**
130:2

**excuse**
54:21

**exhibit**
7:9, 7:13,
14:2, 18:16,
29:20, 32:3,
32:4, 33:13,
33:15, 36:17,
39:5, 53:11,
55:14, 55:15,
55:20, 57:15,
58:12, 60:4,
61:2, 61:4,
64:21, 71:1,
74:10, 97:3,
97:6, 97:11,
97:14, 98:20,
98:22, 99:19,
108:5, 114:11,
114:19, 116:8,
117:12, 117:14,
120:1, 120:2,
129:8, 132:3,
132:4, 133:1,
133:14, 136:18,
136:19

**exhibits**
67:1, 96:11

J.R.236

Transcript of David Chen
Conducted on July 30, 2025                45

**existed**
29:10
**existence**
29:11
**exists**
52:2
**exited**
37:14, 37:20
**explain**
90:16
**explantation**
108:6
**extent**
96:1

**F**

**face**
134:7
**fact**
14:21, 40:18,
139:20
**factory**
106:12, 108:17
**facts**
27:10
**false**
115:16, 117:14,
118:6, 118:8,
118:15, 118:16,
118:19, 118:22,
119:17, 124:15,
124:19, 124:22,
125:7, 125:15,
129:11
**familiar**
87:3
**family**
67:3, 100:10,
104:2
**family's**
27:11
**far**
37:2, 82:16
**fast**
108:13
**father**
128:1, 128:21
**father's**
27:21

**february**
120:5, 129:10
**feel**
37:12, 82:18
**fees**
24:15
**fen**
1:4, 5:3, 6:1
**few**
16:13
**figure**
27:8, 52:7,
52:13, 59:6,
93:8
**file**
104:2
**filed**
9:16, 27:11,
29:15, 32:15,
42:10, 67:3,
67:21, 70:22,
100:10, 103:11,
104:9, 119:8,
119:12
**filled**
29:22
**financial**
141:11
**find**
75:5
**finding**
25:1
**fine**
6:14
**firestone**
1:15, 3:16,
5:12, 5:17
**first**
6:8, 8:3,
10:13, 12:10,
28:16, 29:16,
31:4, 32:19,
34:2, 34:6,
48:7, 48:9,
48:13, 48:18,
49:5, 67:7,
67:9, 67:14,
109:11, 109:13,

115:3, 116:20
**five**
30:10, 30:15,
30:19, 31:2
**fixes**
126:12
**flash**
103:3, 106:3,
106:11, 106:18,
108:11
**flashed**
104:19, 108:8
**flashing**
103:1, 104:11,
104:15, 106:16,
107:16, 107:17
**flip**
6:15
**floor**
3:7
**floyd**
3:22
**follow**
139:4
**following**
108:18
**follows**
6:9
**footnote**
14:7, 39:6,
40:21, 74:11
**foregoing**
141:3, 141:4
**forever**
52:3, 87:16,
138:14
**form**
31:12, 42:19,
49:20, 66:15,
66:18, 66:21,
76:16, 80:15,
87:1, 87:11,
88:5, 97:9,
101:9, 103:13,
109:12, 111:20,
117:6, 123:2,
125:9, 125:13,
132:15, 132:20

**formed**
122:12
**found**
26:7
**four**
30:10
**free**
82:18
**frequently**
53:16, 134:14
**friday**
48:22
**friend**
119:3, 122:9,
122:16, 122:22
**friends**
53:19, 115:5,
118:21, 119:20,
122:8, 124:9
**friendship**
122:12
**front**
32:15, 136:17
**full**
9:8
**functioning**
109:1
**further**
140:17

**G**

**game**
21:14, 21:16
**gathering**
15:17
**gave**
24:17, 47:14
**general**
113:17
**generally**
108:22
**genius**
86:22
**getting**
25:12, 25:16,
41:1, 68:2
**ghost**
134:9

J.R.237

Transcript of David Chen
Conducted on July 30, 2025                                    46

**giles**
3:5
**ginkoid**
56:9, 60:9
**git**
127:3, 127:11, 127:14
**github**
13:3, 96:14, 125:20, 126:1, 126:3, 127:2
**give**
25:11, 44:13, 113:7, 115:21, 125:19
**given**
15:21, 67:11, 141:5
**glanced**
97:16
**go**
8:3, 36:16, 53:11, 57:4, 57:17, 57:19, 58:6, 58:12, 62:10, 64:21, 129:8, 130:4, 132:2, 140:4
**going**
7:8, 7:9, 12:13, 27:17, 28:4, 29:22, 32:2, 33:12, 38:17, 38:20, 43:14, 47:10, 47:11, 52:11, 52:17, 55:8, 55:13, 57:20, 60:2, 60:11, 60:18, 62:14, 62:20, 69:3, 69:12, 88:14, 91:16, 96:3, 98:20, 104:2, 120:1, 130:7, 131:13, 132:13, 135:13, 137:14, 140:19

**gone**
16:10, 36:9, 52:3, 75:6, 75:18, 87:16
**good**
6:12, 21:11, 26:12, 26:16, 101:4
**google**
32:21
**gotten**
41:8
**graphene**
100:22, 101:4, 102:9, 102:10, 102:18, 104:15, 108:10
**grounds**
113:12, 114:4, 114:17
**group**
54:16, 82:15, 82:20, 82:22, 83:12, 83:13, 84:8, 89:2, 115:3, 115:5, 115:8, 122:11, 122:16, 123:8, 123:11, 123:18, 124:6, 131:13
**groups**
122:9, 122:22
**guess**
21:12, 44:15, 49:21, 59:5, 73:14, 97:19, 98:11, 101:11, 124:17, 125:12, 132:9
**guidance**
113:7, 114:6, 140:8
**guo**
11:16, 24:12, 25:21, 26:1, 26:3, 34:15, 35:9, 35:12, 36:6, 61:12,

70:15, 71:5, 71:10, 76:14, 76:17, 76:20, 82:22, 83:8, 90:8, 119:3, 122:14, 123:1, 123:3, 123:10, 124:7, 133:12
**guy**
101:1
**guys**
16:11

**H**

**hack**
21:5
**hacker**
101:2, 102:6, 105:15
**hackers**
21:7
**hairs**
123:13
**hand**
141:13
**handle**
56:3
**happen**
138:4
**happened**
40:18, 78:12
**hard**
97:10, 102:13
**heads**
25:11
**heard**
34:11, 100:22
**heir**
27:20
**held**
1:15, 2:1
**helix**
74:16
**help**
11:18, 13:15, 48:15, 72:4, 72:6, 73:10, 73:12, 74:6,

94:1, 99:7, 99:18, 99:22, 114:10, 114:14
**helped**
21:6, 72:8, 72:10, 72:18, 73:16
**helping**
73:2, 73:7
**here**
5:1, 12:14, 14:10, 15:8, 17:10, 31:17, 39:8, 40:20, 41:20, 56:6, 56:11, 62:4, 74:3, 82:19, 108:7, 116:8, 122:17, 123:13, 133:14, 134:17
**hereby**
141:3
**hereunto**
141:12
**hide**
21:18
**high**
53:19, 118:21, 119:3, 119:20, 122:8, 122:21, 124:9
**highly**
53:17
**himself**
81:19
**hired**
72:1, 73:10
**history**
96:14, 98:10, 103:16
**hitorigoto**
10:16
**homework**
111:22, 112:15, 113:22, 114:14, 139:8, 139:13, 139:16, 139:20, 140:8

J.R.238

Transcript of David Chen
Conducted on July 30, 2025

47

honest
29:18
honestly
44:1, 105:9
honor
102:5
hoping
27:16, 88:1,
88:7
host
9:6
hours
129:15
house
101:2, 102:6,
105:15, 109:21,
110:1, 110:2
hundred
16:13

**I**

id
122:4
idea
49:19, 86:3
ideas
49:22
identification
7:13, 32:4,
33:15, 55:15,
61:4, 98:22,
120:2, 132:4,
136:19
identify
5:15
idk
62:7
ikr
133:18
image
104:18, 104:20
immature
21:10, 21:12,
22:1
immediately
106:10
impeding
92:3

important
42:18
impossible
97:9
include
9:12, 14:12,
14:18, 14:22,
15:4, 91:8
included
53:17, 121:4,
124:6
includes
19:10, 30:10,
50:21, 94:6,
95:22, 122:14,
122:22
including
35:18, 54:19,
65:3, 88:10,
122:11
incomplete
96:9, 96:10
incorrect
140:10, 140:11
individuals
74:3
information
72:7, 72:12,
72:15, 72:17,
72:19, 83:16,
92:5, 115:21,
116:21, 121:4
initially
98:7
initiative
112:18
inside
76:9
install
108:10
installation
108:16
instruct
15:15, 96:3
instruction
69:14
instructions
68:3, 69:7,

71:3
intended
21:17, 21:19
intention
75:8, 75:11,
134:17
intentionally
20:2, 135:1,
135:6
intentioned
21:11
interest
141:10
interested
102:13
interesting
102:19, 102:20
interrogatories
4:12, 7:11,
7:19, 7:21,
19:4, 28:13,
28:15, 28:16,
28:17, 28:18,
29:2, 42:8,
44:7, 49:8,
63:10, 64:21,
72:5, 72:11,
73:3, 73:8,
73:13, 74:7,
76:9, 82:17,
93:17, 94:1,
96:11, 96:12,
97:4, 97:13,
111:3, 111:18,
112:3
interrogatory
8:9, 15:3,
18:15, 29:20,
36:18, 53:10,
53:11, 57:6,
58:11, 58:13,
58:22, 59:2,
59:4, 59:9,
59:21, 64:22,
72:13, 73:21,
74:4, 93:20,
107:10, 108:1,
108:2, 108:3,

108:4
introduced
126:12
involved
89:8
involves
49:18
iris
83:8
irrelevant
122:7, 122:20
isolated
37:13
issue
115:13, 118:1,
118:8
issues
120:16, 128:15,
128:16
item
44:8

**J**

jito
10:21, 16:12,
20:20, 21:11,
22:6, 23:4,
23:7, 23:13,
23:16, 23:19,
45:2, 46:6,
46:16
jlevy@levyfirest-
one
3:20
job
1:20
josh
14:4, 15:16
joshua
3:12, 5:17
judge
52:20
july
1:16, 5:7,
10:6, 10:7,
10:20, 11:4,
11:5, 11:8,
12:20, 13:19,

J.R.239

Transcript of David Chen
Conducted on July 30, 2025

48

13:20, 14:8,
14:14, 15:12,
16:15, 18:6,
20:12, 28:4,
29:15, 39:8,
39:17, 39:18,
40:3, 40:4,
40:6, 40:10,
40:12, 41:9,
41:16, 41:22,
42:5, 42:22,
43:21, 44:10,
44:13, 44:21,
45:18, 46:13,
47:7, 49:2,
49:9, 51:4,
68:18, 69:2,
69:9, 86:1,
87:6, 90:21,
91:2, 91:6,
91:7, 91:12,
91:21, 92:14,
92:21, 93:13,
93:21, 94:9,
94:18, 94:20,
95:11, 95:13,
99:6, 99:17,
99:21, 116:15,
116:20, 118:3,
134:21, 141:14

**jump**
128:15
**june**
12:17, 98:2
**jury**
4:13, 52:20
**jury's**
27:17

### K

**keep**
32:8, 91:16,
105:13
**kept**
28:20, 106:19,
128:5
**kevin**
3:13

**keys**
129:22
**kind**
9:9, 90:15,
117:5, 117:8
**kinds**
124:12
**knew**
13:10, 13:19,
14:12, 14:18,
19:3, 21:1,
25:15, 26:11,
26:14, 27:4,
35:1, 38:10,
40:14, 40:17,
41:1, 42:13,
42:16, 43:2,
43:6, 43:10,
43:13, 45:8,
46:20, 49:1,
53:21, 55:7,
66:13, 75:17,
82:10, 84:15,
84:18, 85:4,
85:5, 86:17,
87:15, 94:17,
104:1, 104:5,
117:13, 118:3,
118:10, 118:11,
118:15, 118:17,
118:20, 118:22,
119:7, 119:10,
119:11, 119:14,
119:17, 120:15,
120:18, 120:21,
121:3, 121:7,
121:12, 121:14,
121:20, 124:15,
128:11, 132:13,
132:18
**know**
14:21, 15:20,
16:2, 16:6,
19:17, 26:4,
27:7, 41:21,
45:3, 54:1,
54:3, 54:8,
54:12, 62:7,

62:9, 68:14,
68:20, 71:15,
73:6, 73:10,
74:1, 76:14,
78:21, 80:4,
80:19, 81:2,
81:13, 82:19,
105:10, 115:22,
118:16, 120:10,
121:2, 121:17,
123:12, 123:17,
127:4, 127:7,
133:18, 140:16
**knowing**
20:13, 21:21,
125:7
**knowledge**
50:16
**knows**
78:21
**kusuriya**
10:16

### L

**l-i-u**
83:4
**labs**
74:6, 74:13,
74:20, 74:21,
75:1
**lamoureux**
3:14
**laptop**
91:17
**large**
97:13
**last**
21:15, 29:8,
44:7, 53:12,
61:19, 85:15,
89:5, 92:13,
92:16, 93:13,
93:17, 94:10,
94:12, 95:8,
96:10, 99:11,
129:17, 139:17
**late**
100:19, 102:6,

106:12, 106:13,
132:6
**later**
12:4, 12:19
**latest**
98:3
**lawsuit**
41:11, 42:10,
67:3, 67:22,
69:16, 81:7,
100:11, 103:11,
104:2, 104:9,
111:10
**lawsuits**
84:15, 86:7,
101:8, 101:18
**lawyer**
60:11, 60:18,
60:21, 71:3,
73:13, 73:14,
82:7, 90:12,
99:18, 124:16,
129:9
**lawyer's**
22:15, 22:22
**lawyers**
12:5, 12:8,
12:9, 15:11,
15:21, 16:6,
16:22, 18:8,
18:11, 19:6,
22:2, 22:13,
25:18, 25:21,
30:6, 30:15,
31:3, 31:10,
42:18, 43:3,
43:7, 44:3,
52:5, 68:10,
71:16, 71:19,
77:2, 78:10,
81:10, 92:4,
110:6, 110:11,
110:14, 110:22,
114:7, 114:10,
114:13, 115:10,
115:21, 116:8,
116:16, 119:18,
120:4, 122:19,

J.R.240

Transcript of David Chen
Conducted on July 30, 2025

49

124:18, 125:6
**layers**
92:20
**lead**
73:6
**learn**
31:21, 32:22,
33:6
**learned**
17:15, 29:8,
33:2, 34:2,
34:6, 35:4,
88:21, 102:4,
102:8
**learning**
32:19, 34:20,
109:2
**least**
35:6, 55:8
**leave**
38:6
**leaving**
54:16
**ledyard**
3:6
**left**
38:14, 129:12,
129:20
**legal**
24:15, 24:19,
25:1, 35:13,
113:21
**legible**
97:9
**let's**
107:22, 130:4
**letter**
4:18, 4:19,
12:9, 67:12,
67:13, 67:20,
68:15, 98:15,
99:2, 99:4,
99:7, 99:19,
100:1, 114:10,
114:14, 115:11,
116:13, 117:4,
117:12, 118:9,
118:12, 120:4,

120:7, 122:3,
124:21, 125:6,
125:16, 125:17,
129:9, 129:11
**letters**
98:11
**levy**
1:15, 3:12,
3:16, 4:3, 5:11,
5:17, 6:11,
14:6, 32:2,
32:8, 33:12,
38:17, 55:13,
57:22, 61:2,
88:12, 96:3,
98:20, 108:4,
113:14, 113:19,
119:22, 129:12,
129:16, 130:4,
132:2, 135:12,
136:17, 139:2,
140:3, 140:6,
140:17
**leyard**
5:21
**li**
1:4, 5:3, 6:1
**liberty**
3:7
**links**
50:2, 134:9
**liquidations**
18:2, 89:9,
89:17
**liquidator**
12:1, 17:20,
19:14, 19:17,
36:2, 50:3,
84:12, 89:9,
95:6, 117:21,
120:19, 121:1,
121:22, 131:18,
131:21
**list**
96:10, 96:15
**listed**
82:17
**literal**
49:16

**litigation**
17:5, 19:18,
20:3, 20:16,
20:22, 26:21,
45:12, 45:15,
53:4, 82:3,
82:10, 128:12,
128:14, 131:11,
131:21, 132:10,
134:18
**littered**
27:12
**liu**
83:2
**llc**
1:9, 1:10,
5:18, 74:13,
125:13, 125:14,
130:14, 130:20
**llp**
1:15, 3:16,
5:12
**loader**
108:12
**lock**
109:22, 110:4
**lonely**
37:12
**look**
14:3, 14:7,
17:21, 26:12,
26:15, 26:20,
27:18, 29:19,
36:17, 36:20,
44:6, 47:4,
47:16, 47:22,
53:1, 53:4,
53:21, 54:6,
54:10, 54:14,
58:13, 60:6,
71:1, 73:20,
74:10, 89:10,
92:20, 94:4,
98:15, 99:5,
99:17, 99:21,
107:22, 111:6,
112:1, 112:12,
114:19, 122:3,

132:22
**looked**
48:2, 48:14,
48:18, 49:5,
66:22, 89:13,
90:8, 93:3,
93:12, 93:21,
94:7, 94:9,
94:12, 96:7,
97:3, 97:17,
98:5, 99:14
**looking**
91:20, 94:2,
95:8, 99:14
**looks**
62:22
**lot**
28:5, 107:17
**lower**
57:22

**M**

**machine**
9:5
**machines**
8:19, 9:2, 9:3,
9:4, 9:6, 9:7,
9:12, 57:1,
58:8, 58:16,
62:16, 65:7,
65:13
**made**
15:12, 40:6,
40:14, 65:18,
96:2, 97:19,
102:10, 124:22,
125:22, 126:15,
127:15, 127:17,
127:18
**mail**
130:22
**main**
128:7
**make**
7:20, 15:9,
17:8, 23:11,
26:15, 28:1,
28:7, 39:22,

J.R.241

53:1, 53:3, 53:21, 54:2, 54:6, 54:10, 54:14, 64:1

**making**
37:12, 59:11, 139:18

**manage**
37:15, 38:4

**march**
27:12, 67:5

**marisa**
83:2

**mark**
32:2, 55:13, 98:20, 120:1

**marked**
7:13, 32:4, 33:15, 55:15, 61:4, 98:22, 120:2, 132:4, 136:19

**marks**
140:18

**maryland**
1:2, 5:5

**mass**
13:1, 13:7, 13:11, 39:12, 87:9

**material**
26:14

**math**
11:19

**matter**
5:3

**maybe**
20:5, 20:8, 33:5, 59:11

**mean**
34:21, 41:7, 41:19, 48:8, 53:8, 57:1, 63:5, 63:12, 79:13, 84:1, 85:20, 87:12, 87:20, 90:18, 90:22, 94:20,

104:13, 112:16, 112:17, 122:15, 123:7, 131:2, 134:15, 138:13

**meaning**
72:6, 138:8

**means**
54:1, 54:3, 54:4, 54:8, 54:12, 107:17, 134:12

**meant**
137:14

**media**
5:1

**member**
21:2, 36:7

**members**
82:14, 82:16

**meme**
11:9

**memorandum**
67:12

**memories**
59:14

**memory**
59:17, 97:6, 98:17, 140:7

**mentioned**
17:19, 18:2, 49:22, 96:13, 101:3, 138:17

**message**
4:21, 11:18, 60:8, 61:19, 62:1, 62:6, 123:16, 123:18

**met**
26:5, 26:6, 73:22

**miami**
101:1, 101:2, 102:6

**middle**
111:10

**might**
15:16, 21:10, 128:12, 132:7,

132:10

**milburn**
3:6, 5:21

**mind**
6:12, 20:18, 27:1

**mingsan**
1:5

**minimum**
35:3

**minutes**
129:15

**mm-hmm**
39:19, 53:14, 83:19, 104:14, 116:10, 133:3

**mobile**
108:9

**mode**
77:10, 77:12

**modes**
79:17

**mom**
22:17, 33:4, 34:4, 73:15, 73:17, 76:2, 78:15, 109:13

**mom's**
110:1, 110:2

**moment**
134:8

**monday**
113:4, 140:10, 140:14

**money**
21:8, 28:1, 28:5

**monitor**
5:8, 38:22, 39:3, 88:15, 88:19, 130:8, 130:11, 135:14, 135:18

**month**
12:19

**months**
43:8, 104:1

**morericekara**
10:4

**morning**
6:12

**most**
12:13, 28:14, 29:1, 29:15, 36:20, 42:18

**mother**
22:20, 26:1, 26:3, 42:10, 46:4, 55:21, 61:7, 67:21, 76:7, 86:21, 103:10

**mother's**
6:16, 7:10

**motivations**
21:21, 29:18

**moto**
9:19, 100:16, 108:9

**motorola**
9:19, 100:16, 104:18, 108:9

**move**
37:15

**much**
29:16, 129:12, 129:13

**multiple**
38:11, 68:21

**muse**
1:15, 3:16, 5:12, 5:18

**mushkin**
74:16

**mybook**
74:17

**myself**
17:20, 77:13, 89:10, 126:18

**N**

**name**
101:1

**named**
17:17, 74:3, 128:6

**names**
47:6, 47:21,

J.R.242

73:22, 74:1, 74:2, 91:19

**namesake**
49:16

**native**
97:8

**naxo**
74:6, 74:13, 74:20, 74:21, 74:22, 92:1, 92:2, 92:4, 92:20

**nearly**
97:8

**necessarily**
60:21

**necessary**
72:13

**need**
8:2, 41:15, 105:14

**needed**
38:4, 38:6

**neither**
52:20, 141:8

**network**
21:7

**never**
16:22, 52:5, 52:6, 52:11, 52:17, 80:10, 92:20, 93:21, 94:7, 94:9, 94:12

**nevertheless**
44:2

**new**
3:8, 11:6, 17:9, 17:11, 17:13, 17:15, 17:18, 18:17, 19:5, 20:18, 23:21, 24:4, 24:7, 24:10, 29:7, 29:11, 30:15, 36:6, 36:10, 36:13, 36:22, 37:11,

47:1, 47:21, 48:15, 50:13, 50:17, 51:7, 51:9, 51:13, 53:15, 82:14, 82:20, 82:22, 84:1, 84:4, 84:8, 89:1, 96:13, 108:10, 108:13, 108:15, 109:4, 115:8, 117:17, 117:20, 120:10, 120:21, 121:15, 121:18, 121:21, 123:8, 123:10, 123:14, 131:13

**next**
13:22, 14:16, 20:13, 61:22, 91:5, 118:19

**nft**
130:21

**night**
139:17

**nine**
30:11

**nobody**
46:13, 54:19, 75:18, 84:19, 85:6

**non**
82:12

**none**
59:18

**northwest**
5:13

**notarial**
141:13

**notary**
2:14, 141:1

**notdeghost**
136:22, 137:2

**nothing**
71:14, 92:3, 115:12, 118:7, 130:20, 140:17

**notice**
94:3

**noticed**
17:22

**notifications**
105:8, 106:10

**notified**
65:3, 65:14

**november**
31:10, 31:15

**number**
5:2, 36:19, 36:20, 57:17, 57:21, 58:3, 64:22

**nvme**
74:16

**O**

**object**
47:10, 54:21, 69:3, 96:1

**objecting**
82:8

**objection**
15:14, 25:19, 31:12, 42:2, 53:5, 54:22, 63:14, 66:15, 66:18, 66:21, 69:11, 69:17, 69:22, 70:1, 70:9, 71:6, 72:22, 75:9, 75:12, 75:20, 76:16, 78:13, 80:15, 80:22, 82:4, 84:22, 86:5, 86:15, 87:1, 87:11, 87:17, 88:5, 95:20, 101:9, 103:13, 109:12, 111:14, 111:20, 113:10, 114:8, 114:16, 117:6, 123:2, 125:2, 125:9, 125:10, 132:15, 132:20

**objects**
85:2

**obligation**
80:20, 81:13, 93:16

**obtained**
14:8, 39:9, 91:4, 93:22

**occurred**
104:11, 106:11, 107:4

**occurring**
90:6

**october**
11:11, 11:17, 30:14, 30:18, 30:20, 31:3, 33:17, 34:1, 34:14, 35:4, 35:9, 35:10, 44:8, 47:20, 48:2, 48:11, 48:12, 48:13, 70:8, 70:11, 70:12, 70:17, 70:18, 70:20, 91:17, 91:20, 92:15, 92:21, 94:9, 99:15, 119:7, 135:4

**offered**
43:12

**officer**
141:2

**oh**
5:20, 61:22

**okay**
8:5, 8:9, 29:21, 39:7, 55:22, 60:5, 60:7, 66:5, 91:14, 98:13, 107:22, 110:9, 124:4, 125:20, 129:8, 129:16, 129:17, 130:4, 132:22

**old**
62:9

**older**
35:22

J.R.243

Transcript of David Chen
Conducted on July 30, 2025                                    52

**olivia**
83:10
**olt**
128:6
**once**
45:3, 45:15,
69:15, 75:19,
76:11, 84:18,
93:21
**one**
11:17, 15:8,
20:17, 25:7,
27:2, 27:4,
30:10, 31:5,
37:18, 38:2,
51:16, 51:18,
56:5, 68:21,
70:12, 86:12,
87:9, 88:2,
88:7, 123:3,
124:9, 140:3
**ones**
28:14, 88:2,
91:6
**online**
122:12
**only**
17:12, 26:22,
30:20, 31:2,
31:9, 47:4,
47:5, 47:15,
79:15, 86:12,
105:13, 106:7,
130:1, 140:12
**operating**
9:9, 100:13,
100:18, 101:22,
102:2, 102:13,
103:1, 108:10
**opportunity**
17:1, 52:5,
52:6, 52:12,
64:9, 64:16,
84:19
**oppose**
128:19
**opposite**
79:7

**order**
43:13, 106:17
**original**
28:16
**os**
100:22, 101:4,
102:9, 102:10,
102:18, 104:15,
108:11
**osec**
133:22, 134:2
**other**
22:9, 23:18,
24:6, 24:9,
26:5, 26:6,
27:8, 41:15,
51:16, 51:18,
56:8, 59:17,
63:20, 66:19,
77:14, 79:17,
83:20, 83:22,
84:1, 84:4,
85:21, 86:7,
86:9, 94:22,
97:17, 98:5,
112:1, 113:7,
114:6, 122:20,
123:19, 125:15,
129:11, 136:3,
136:5
**otherwise**
103:18, 116:3,
141:11
**otter**
1:9, 5:19
**ottersec**
5:18, 6:18,
6:21, 7:2, 7:6,
8:15, 8:18,
12:1, 35:13,
50:1, 50:22,
51:7, 51:9,
51:12, 55:1,
55:5, 56:15,
56:22, 57:10,
58:16, 59:13,
63:9, 63:17,
65:2, 66:7,

83:21, 84:4,
84:10, 95:4,
95:5, 101:3,
101:7, 101:12,
101:13, 115:13,
121:14, 121:17,
126:1, 126:9,
126:13, 126:15,
126:17, 127:16,
128:3, 128:4,
128:8, 128:13,
129:21, 131:8,
132:7, 133:6,
134:2, 136:13,
137:19, 138:1
**out**
6:15, 28:2,
30:1, 38:9,
40:13, 47:7,
47:20, 48:2,
50:20, 52:7,
52:13, 57:21,
59:6, 78:3,
78:8, 85:19,
90:17, 90:18,
90:19, 90:20,
90:22, 91:12,
91:18, 91:20,
91:21, 92:15,
93:8, 93:13,
95:14, 99:6,
99:14, 99:16,
99:17, 99:22,
100:2, 101:5,
105:16, 105:18,
106:8, 117:12,
117:15, 118:9,
118:12, 131:3
**outcome**
141:11
**outs**
93:3
**over**
9:22, 10:10,
10:11, 10:14,
12:20, 14:13,
20:11, 28:20,
29:6, 34:14,

35:8, 39:12,
42:16, 46:13,
69:1, 69:8,
76:2, 90:20,
92:11, 92:12,
105:22, 134:20,
135:3
**overwrite**
106:17
**own**
24:20, 33:2,
47:16, 90:14,
91:21, 92:9,
92:10, 96:18,
129:2

**P**

**pacer**
32:21
**page**
4:2, 4:9, 8:4,
8:10, 14:3,
14:4, 18:16,
18:20, 18:21,
18:22, 19:1,
29:20, 32:14,
32:15, 36:19,
36:20, 39:5,
39:7, 44:6,
53:12, 53:13,
62:5, 65:1,
71:1, 74:10,
107:11, 107:13,
108:5, 114:20,
116:9, 117:14,
122:2, 129:19,
137:6
**pages**
1:21, 7:15,
58:14
**pan**
131:3
**papurt**
56:9, 57:14,
60:8, 61:21,
78:3, 78:7,
78:16, 79:1,
79:10, 79:18,

J.R.244

Transcript of David Chen
Conducted on July 30, 2025                                53

79:20, 80:10,
80:13, 129:21,
133:2, 133:9,
133:18, 134:7
**paragraph**
129:17
**paragraphs**
27:12
**paralegal**
3:22
**paranoid**
133:15
**pardon**
56:13
**part**
17:4, 17:14,
19:17, 19:20,
19:22, 20:3,
21:6, 26:9,
28:10, 29:8,
40:15, 52:22,
80:13, 81:13,
84:15, 84:21,
101:3, 104:5,
132:18, 135:8,
139:17, 139:18
**parties**
141:10
**past**
112:21
**paying**
24:15
**penalty**
65:22
**pending**
16:2, 20:12,
41:11, 41:13,
43:22, 85:10,
86:7, 111:2
**people**
24:9, 49:18,
56:5, 65:14,
66:19, 73:21,
73:22, 77:14,
78:1, 105:16,
105:18, 123:3,
123:19, 126:14,
126:17, 127:5,

127:15, 136:3
**people's**
23:19, 24:6
**performed**
50:3
**period**
10:14, 10:15,
11:12, 20:11,
85:14, 89:22,
95:7, 102:11,
102:12, 102:14,
128:11
**perjury**
65:22
**permissions**
23:16
**person**
21:15, 49:17,
56:8, 73:6,
113:5
**personal**
14:9, 14:10,
37:11, 39:9,
53:17, 86:14
**personally**
94:7, 96:20
**philip**
56:9, 78:3,
78:16, 79:18,
79:19, 80:18,
129:21
**phone**
9:20, 12:4,
12:10, 25:5,
100:8, 100:14,
100:16, 101:22,
103:6, 103:7,
103:17, 103:20,
104:8, 104:12,
104:19, 104:21,
105:1, 105:3,
105:4, 105:6,
105:7, 105:11,
105:13, 105:21,
106:2, 106:4,
106:8, 106:12,
106:17, 106:19,
107:12, 107:14,

107:16, 107:19,
107:20, 108:6,
108:9, 108:11,
108:14, 108:17,
108:18, 108:20,
109:4, 109:10,
109:14, 109:17,
110:6, 110:15,
111:1, 111:9,
130:3
**phone's**
108:12
**physical**
65:9, 65:10,
65:11
**picking**
108:22
**pivotal**
42:13
**pixels**
104:16
**place**
5:11
**plaintiff**
1:7, 3:3,
108:7, 139:5
**plaintiff's**
4:10
**plan**
132:18, 135:8
**planet**
5:10, 6:4
**planned**
65:4
**please**
5:15, 6:4,
82:6, 89:4
**plotnick**
3:4, 4:4, 5:20,
5:21, 14:4,
15:14, 25:19,
31:12, 32:6,
38:19, 42:2,
47:10, 53:5,
54:21, 57:20,
58:2, 63:14,
66:15, 66:18,
66:21, 69:3,

69:11, 69:17,
69:22, 70:9,
71:6, 72:22,
75:9, 75:12,
75:15, 75:20,
76:16, 78:13,
80:15, 80:22,
82:4, 84:22,
86:5, 86:15,
87:1, 87:11,
87:17, 88:5,
95:20, 96:5,
101:9, 103:13,
108:3, 109:12,
110:8, 111:14,
111:20, 113:10,
113:16, 114:2,
114:8, 114:16,
116:2, 117:6,
123:2, 125:2,
125:9, 127:6,
132:15, 132:20,
139:3, 139:6,
140:1
**plus**
22:10, 42:21,
91:8
**point**
37:4, 48:1,
57:20, 103:10,
109:18, 110:9,
122:4
**points**
106:1
**portion**
96:6
**possession**
91:22
**possible**
64:8, 64:11,
66:12, 84:6,
84:11, 84:14,
85:3, 85:5,
86:12, 101:18,
118:18, 121:6,
121:7, 121:8,
121:13, 123:6,
123:7, 123:12,

J.R.245

Transcript of David Chen
Conducted on July 30, 2025                                     54

138:15
**possibly**
107:15
**posted**
50:1
**potential**
79:4
**potentially**
117:10
**power**
80:7
**predating**
128:8
**preparation**
113:19
**preparations**
17:14, 29:9
**prepare**
37:15, 41:20,
59:3, 63:7,
93:20, 95:18,
96:8, 97:4,
97:15, 97:18,
98:6, 99:7,
99:18, 110:19,
112:2, 112:6,
112:10, 113:22,
114:7, 114:10,
114:14, 139:20
**prepared**
42:7, 43:19,
63:6, 139:17
**preparing**
139:8
**present**
3:21, 97:10
**presented**
36:21, 47:17
**preservation**
43:16, 63:8,
67:20, 125:20
**preserve**
67:8, 67:11,
68:3, 68:15,
68:22, 69:7,
69:15, 69:20,
71:4, 80:20,
81:10, 104:6,

109:17
**preserved**
18:4, 36:12,
36:15, 71:9,
71:13, 71:15,
77:20
**preserving**
136:16
**presume**
56:11, 56:14,
90:7
**pretty**
68:14, 101:4,
124:3
**prevent**
21:7
**primarily**
11:21, 105:18
**primary**
31:4, 105:16
**printout**
97:9
**prior**
39:13, 50:1,
95:11, 99:4,
102:5, 102:8,
107:7
**private**
129:22
**privilege**
15:14, 78:13,
95:20, 112:7,
113:13, 113:15,
114:4, 114:18,
116:4
**privileged**
25:19
**pro**
74:16
**pro's**
74:17
**probably**
34:18, 38:12,
60:11, 78:18,
102:4, 104:22,
106:5, 113:4
**proceeded**
8:11, 58:15,

65:6, 65:16
**process**
104:5
**produce**
84:20
**produced**
55:21, 61:7,
95:16, 97:1,
97:11, 98:8
**profits**
89:9
**pronounced**
135:20
**pronouncing**
127:4
**proof**
66:2
**provide**
7:8, 72:7,
72:15, 72:18
**provided**
7:22, 23:7,
29:2, 29:17,
71:17, 71:20,
72:12, 74:22
**proxmox**
9:5
**public**
2:14, 141:1
**pull**
39:15
**purchase**
98:10, 103:16
**purchased**
103:16
**purchasing**
109:4
**purpose**
63:22, 75:1,
85:18, 85:21,
93:8, 94:5
**purposes**
20:16, 38:11,
73:2, 94:13
**pursuant**
2:13, 14:9
**put**
32:6, 33:12,

72:4, 72:10,
109:19, 116:21,
136:17
**putting**
59:7

### Q

**question**
19:2, 29:14,
31:13, 48:17,
62:18, 69:4,
69:6, 75:14,
75:16, 80:16,
82:6, 82:9,
92:19, 95:18,
95:22, 96:1,
96:6, 101:10,
103:19, 110:10,
112:8, 113:18,
114:5, 116:6,
117:7, 125:4,
125:5, 125:11,
137:22
**questions**
43:7, 43:15,
139:4, 139:7,
140:1
**quick**
135:12, 139:4
**quit**
6:18, 55:1,
56:15, 59:13,
63:9, 101:13,
132:6, 133:6
**quitting**
101:7, 101:12

### R

**ra**
137:4
**rachel**
3:15
**radiantaeon**
56:4, 61:16
**ragged**
125:13, 125:14,
130:13, 130:20
**range**
18:9, 18:13,

J.R.246

18:18, 19:7,
19:8, 21:4,
89:19, 120:13,
122:6
**rather**
54:16
**raw**
53:17
**rc**
1:10, 5:19
**re-based**
128:5, 128:7
**reach**
105:16, 105:18
**reached**
78:3, 78:8
**read**
125:19
**reading**
26:11, 57:4,
141:7
**readme**
137:7
**realized**
133:21
**really**
12:12, 21:20,
112:1, 123:13,
131:3
**reason**
36:21, 63:20,
80:17, 86:12,
92:18
**reasons**
20:17, 22:1,
37:18
**rebooted**
108:14
**recall**
7:4, 7:7, 12:5,
12:8, 14:1,
14:17, 14:20,
15:1, 15:19,
16:5, 17:6,
20:7, 23:10,
25:4, 25:17,
27:3, 28:12,
30:21, 31:8,

31:16, 32:1,
33:3, 33:9,
34:2, 35:2,
36:3, 36:5,
38:12, 40:2,
42:6, 44:1,
44:5, 48:4,
50:5, 50:6,
51:5, 51:11,
51:14, 62:3,
63:4, 63:5,
63:13, 63:18,
64:6, 64:7,
64:19, 65:19,
66:9, 66:10,
67:10, 67:15,
67:19, 68:1,
68:2, 70:6,
73:5, 74:5,
78:18, 78:20,
79:9, 79:12,
79:13, 79:14,
80:1, 80:3,
82:16, 89:15,
90:2, 95:1,
95:2, 97:14,
101:1, 108:19,
110:13, 110:14,
110:16, 110:18,
112:14, 132:21,
136:9, 138:3,
140:9
**recalled**
90:5
**recalls**
108:22
**receive**
40:16, 68:15,
69:7, 69:14,
70:14, 70:17,
70:20, 71:3,
114:6
**received**
24:22, 25:13,
67:16, 67:17,
68:4, 68:16,
70:6, 89:5,
91:7, 91:12,

133:8, 139:12,
140:12
**receives**
123:19
**receiving**
140:9
**recent**
28:14, 29:1,
36:21
**recently**
29:15
**recess**
39:1, 88:17,
130:9, 135:16
**recognize**
7:16, 32:9,
55:17
**recollection**
8:13, 32:18,
33:20, 50:16,
60:17, 62:13,
62:19, 94:13,
99:9, 99:22,
110:21, 111:7,
116:22, 117:16
**record**
28:11, 38:21,
39:3, 88:15,
88:19, 129:13,
129:15, 130:5,
130:7, 130:11,
135:14, 135:18,
140:20, 141:5
**recovered**
75:3
**redirect**
140:3, 140:5
**reduced**
141:6
**reference**
60:13, 65:8,
74:15, 90:9
**referenced**
89:8, 139:11
**referencing**
89:17
**referred**
136:12

**referring**
58:2
**refers**
138:9
**refresh**
8:13, 32:18,
33:20, 60:17,
62:13, 62:19,
97:6, 98:17,
99:9, 99:22,
110:21, 111:7,
116:21
**refreshing**
94:13
**regard**
20:18
**regarding**
17:8, 29:7,
98:4, 125:20
**regards**
136:14
**regular**
9:10
**relate**
19:14, 127:11
**related**
107:15, 120:15,
120:18, 128:4,
131:18, 141:9
**relates**
121:22
**relations**
36:4
**relevant**
17:19, 21:18,
117:10, 118:22,
119:15, 119:20,
124:12
**remember**
32:19, 139:9
**reminded**
38:5, 38:14
**remove**
6:20, 7:1,
63:19, 65:5
**removed**
7:3, 55:4,
56:18, 62:16,

J.R.247

Transcript of David Chen
Conducted on July 30, 2025

56

63:2, 63:11,
63:22
**repeat**
19:2, 48:17,
62:18, 69:6,
82:9, 92:18,
112:8, 114:5,
116:6, 125:5,
137:21
**repeatedly**
35:14
**rephrase**
126:16
**replacement**
103:17
**reported**
1:22
**reporter**
6:3, 6:4, 141:1
**represent**
5:16, 5:22
**representing**
5:10, 6:3
**request**
14:10, 15:12,
39:22, 40:6,
40:14, 85:19
**requested**
15:11, 39:15,
39:20, 40:13,
43:20, 86:13,
141:8
**requests**
52:14, 96:2
**resemble**
9:7
**reserve**
67:9, 98:4
**reset**
108:17
**resolved**
128:17
**respect**
80:17, 96:5
**respond**
41:5, 49:17,
73:16, 123:17
**response**
8:9

**responses**
4:10, 7:10,
37:7, 72:14
**responsive**
29:13, 52:8,
52:13
**rested**
139:19
**result**
18:3, 46:20
**resulted**
107:4
**review**
16:7, 52:6,
52:12, 84:19,
92:16, 111:11,
111:17, 112:11,
112:18, 117:19
**reviewed**
111:3
**reviewing**
113:1
**rid**
20:15, 20:21,
44:21
**right-hand**
58:1
**rights**
107:17
**rob**
134:7
**robert**
1:9, 5:18,
6:20, 7:3, 12:1,
16:18, 21:1,
21:21, 23:4,
23:12, 23:15,
27:11, 35:12,
45:2, 45:21,
46:1, 46:2,
46:17, 54:20,
55:4, 56:18,
60:1, 60:2,
60:13, 60:18,
62:14, 62:16,
62:20, 63:2,
63:11, 63:19,
65:3, 66:13,

66:16, 66:19,
67:3, 80:4,
88:10, 100:11,
101:18, 103:11,
104:3, 128:13,
128:18, 131:5,
132:7, 132:16,
133:9, 133:12,
137:3
**robert's**
12:8, 52:17
**rom**
108:12, 108:13,
108:15
**rough**
140:15
**rubber**
49:16
**rubber-duck**
47:1, 48:19,
49:2, 49:6,
49:12, 50:4,
50:7, 50:10,
52:1, 83:17,
93:9, 93:12,
94:14, 94:18,
95:1, 99:10,
100:1, 113:1,
117:1, 117:11,
120:22
**rubber-duck-debu-
gger**
19:11, 89:1,
131:14
**rubber-duck-debu-
gging**
17:18, 49:15,
51:15, 89:7,
89:14, 95:12,
122:1

---
### S
---

**sad**
37:13
**said**
14:4, 28:13,
35:7, 37:2,
39:8, 44:14,

57:14, 59:1,
60:1, 79:14,
97:3, 104:11,
106:7, 114:2,
124:16, 131:18,
134:4, 138:5,
140:9, 141:5
**salacious**
26:14, 53:3,
53:6, 53:8,
53:18, 88:4
**sam**
1:5
**same**
7:5, 23:16,
44:6, 44:12,
58:7, 58:9,
58:20, 62:15,
69:11, 69:17,
69:22, 90:9,
114:8, 125:9
**samsung**
74:15, 74:17
**say**
19:7, 20:8,
21:18, 25:3,
36:16, 37:18,
45:22, 58:21,
61:22, 68:7,
71:18, 75:4,
76:6, 84:1,
90:22, 94:20,
103:14, 106:6,
126:10, 127:5,
133:14, 133:21,
134:9, 140:14
**saying**
37:4, 37:10,
49:19, 66:7,
96:16, 115:11,
126:22, 127:7,
127:8
**says**
8:10, 8:18,
14:7, 14:11,
15:3, 18:16,
32:15, 33:17,
44:8, 53:15,

J.R.248

Transcript of David Chen
Conducted on July 30, 2025

57

56:11, 58:14,
60:11, 60:20,
62:1, 62:6,
65:16, 74:13,
114:20, 133:18,
134:7
**school**
53:19, 118:21,
119:3, 119:20,
122:8, 122:21,
124:9
**scope**
114:1
**script**
13:3, 13:7,
13:10, 87:5
**seal**
141:13
**search**
71:16, 71:19
**searching**
75:1
**second**
4:11, 7:10,
7:11, 28:17,
37:7, 53:12,
60:8, 97:12,
108:1, 114:19,
122:2, 122:4,
129:17
**security**
1:10, 5:19,
101:4
**see**
8:10, 8:20,
16:18, 17:1,
21:2, 21:4,
29:22, 30:5,
32:14, 32:17,
33:17, 37:21,
44:22, 45:1,
45:4, 45:6,
48:18, 50:19,
52:18, 54:19,
56:1, 60:8,
61:18, 64:12,
74:11, 75:2,
75:18, 85:6,

88:2, 88:8,
90:9, 92:14,
96:15, 115:1,
115:6, 115:10,
115:14, 116:18,
117:9, 122:2,
122:9, 123:21,
133:16, 137:6,
137:9
**seeing**
97:14
**seems**
71:2
**seen**
45:9, 45:10,
90:14, 99:2
**send**
21:15, 86:13,
123:18, 124:21,
125:6
**sending**
49:8, 90:4,
99:4, 123:14
**sends**
123:16, 134:7,
134:8
**sent**
11:1, 12:8,
89:13, 90:20,
96:17, 98:16,
112:11, 112:19,
116:13, 119:18,
120:5, 124:6,
129:9, 131:16,
133:11
**sentence**
53:12, 118:19
**september**
34:1, 70:22,
71:4
**seriously**
111:13
**serve**
38:11
**served**
12:16, 24:13,
33:6, 33:9,
33:18, 33:21,

34:4, 34:12
**server**
6:21, 7:2, 7:6,
8:11, 8:15,
8:19, 9:7, 9:10,
10:21, 20:20,
22:7, 23:4,
23:8, 23:13,
23:17, 23:19,
23:22, 24:4,
24:7, 24:10,
37:11, 37:14,
37:21, 38:7,
38:15, 46:7,
48:15, 55:5,
56:19, 56:22,
57:3, 57:10,
58:7, 58:15,
58:16, 58:19,
59:7, 59:12,
62:16, 62:17,
63:2, 63:3,
63:10, 63:11,
63:17, 63:19,
63:21, 64:3,
64:12, 64:15,
65:4, 65:6,
65:9, 65:11,
65:17, 65:20,
66:3, 115:4,
136:13, 137:19,
138:11
**servers**
9:8, 122:6
**serves**
140:7
**service**
4:15, 33:13
**set**
4:11, 7:11,
10:13, 29:1,
32:22, 106:11,
131:1, 141:12
**setting**
106:12, 108:17
**seven**
30:11
**she'd**
25:12

**shi**
83:10
**ship**
133:22
**shipped**
74:21
**shortly**
44:3, 44:15
**should**
41:21, 139:4
**show**
55:11
**showed**
47:5, 47:8,
90:12
**shown**
47:15
**shows**
89:11, 96:19
**side**
32:6
**signal**
77:5, 77:8,
77:11, 78:2,
79:8, 79:15,
80:2, 105:3,
105:4, 129:22,
130:2
**signature**
8:7
**signature-p1kal**
141:15
**signing**
141:8
**similarly**
21:12
**since**
34:5, 48:13,
72:16, 112:6
**sinking**
133:22
**sitting**
87:10
**situation**
38:5
**six**
30:10, 89:22
**skull**
134:7

J.R.249

Transcript of David Chen
Conducted on July 30, 2025

58

| | | | |
|---|---|---|---|
| **slash** | 10:19, 10:22, | **standby** | **strong** |
| 98:14 | 11:7, 11:20, | 38:20, 140:2 | 92:10 |
| **slope** | 12:7, 12:15, | **started** | **studied** |
| 21:5, 21:8 | 12:18, 34:17 | 21:5 | 93:5 |
| **solana** | **sources** | **state** | **subpoena** |
| 21:6, 21:14, | 30:1 | 5:16 | 12:16, 14:16, |
| 105:15, 121:20 | **south** | **stated** | 15:13, 15:18, |
| **solona** | 67:4, 103:12 | 17:9, 40:4, | 15:21, 16:2, |
| 101:2 | **spam** | 40:20 | 20:12, 20:14, |
| **some** | 130:22 | **statement** | 24:13, 24:18, |
| 47:22, 49:22, | **speaking** | 27:10, 59:8, | 24:22, 25:3, |
| 68:2, 84:7, | 49:18 | 59:20, 65:21, | 25:12, 25:14, |
| 98:12, 110:9, | **specific** | 115:16, 115:18, | 25:16, 41:5, |
| 116:21, 116:22, | 89:19 | 117:13, 118:6, | 41:13, 43:21, |
| 123:4, 125:19, | **specifically** | 118:15, 118:16, | 44:17, 45:19, |
| 139:7 | 22:6, 46:10, | 119:17, 119:19, | 52:8, 67:16, |
| **someone** | 108:20, 112:12, | 122:2, 122:16, | 67:17, 68:4, |
| 113:21 | 113:17 | 124:15, 125:1, | 68:16, 68:20, |
| **someone's** | **spend** | 125:7 | 85:9, 85:12, |
| 26:11 | 10:6 | **statements** | 85:16 |
| **something** | **spending** | 125:16, 129:11 | **subpoenaed** |
| 21:9, 59:1, | 40:10 | **states** | 78:4 |
| 73:15, 97:1, | **spent** | 1:1, 5:4, 108:7 | **substance** |
| 138:10 | 11:12, 12:19, | **stefanie** | 49:13, 90:2, |
| **sometimes** | 34:14 | 1:22, 2:13, | 113:12, 116:22 |
| 53:17 | **splitting** | 6:3, 141:2 | **substantive** |
| **sorry** | 123:12 | **stephen** | 11:22, 12:14, |
| 5:20, 11:4, | **spoke** | 3:4, 5:20 | 94:22 |
| 14:4, 17:8, | 59:5, 113:17 | **steps** | **sucked** |
| 18:20, 19:2, | **spoken** | 23:11, 59:6, | 104:17 |
| 21:18, 29:13, | 25:21, 26:1 | 109:17 | **sue** |
| 47:8, 48:17, | **spreadsheet** | **still** | 60:18, 60:22 |
| 53:8, 57:19, | 89:11, 96:18, | 29:10, 38:8, | **suing** |
| 58:6, 62:18, | 96:20, 97:8, | 52:2, 81:5, | 46:5, 55:8, |
| 63:1, 68:7, | 97:13 | 82:8, 85:2, | 60:3, 61:22, |
| 69:6, 73:20, | **spree** | 106:4, 109:3, | 62:9, 62:14, |
| 75:16, 82:9, | 86:18 | 121:19 | 62:21, 66:13, |
| 82:19, 85:3, | **st** | **stipulated** | 66:16, 66:19, |
| 92:18, 96:10, | 3:7, 41:2, | 43:13 | 132:8, 133:9, |
| 98:10, 99:13, | 47:7, 90:21, | **stock** | 133:12 |
| 103:18, 107:11, | 91:7, 95:11, | 104:20 | **suite** |
| 109:15, 110:1, | 125:21, 126:2, | **stopped** | 3:17, 5:13 |
| 112:8, 119:11, | 128:4, 138:20, | 65:1, 106:3, | **support** |
| 122:15, 125:5, | 141:13 | 106:22 | 59:17, 59:18 |
| 125:19, 126:19, | **stand** | **store** | **supposed** |
| 132:16, 137:21 | 28:1, 130:6 | 90:19 | 81:14 |
| **sounds** | **standalone** | **street** | **sure** |
| 10:5, 10:12, | 9:8 | 3:7, 3:17, 5:12 | 23:11, 28:7, |

J.R.250

Transcript of David Chen
Conducted on July 30, 2025                                    59

34:9, 34:10, 38:19, 41:18, 41:19, 45:5, 54:2, 57:22, 58:10, 59:22, 60:1, 64:1, 68:14, 69:19, 70:16, 70:19, 70:21, 71:8, 73:11, 79:2, 81:4, 81:6, 81:20, 83:14, 86:16, 86:20, 87:19, 87:20, 95:17, 97:2, 98:18, 104:7, 105:5, 107:15, 118:11, 120:17, 134:13, 139:18

**svbonk**
21:13, 21:14
**swear**
6:4
**switch**
100:13, 100:18, 102:2, 102:17
**switched**
102:22
**switching**
101:21
**sworn**
6:9
**system**
9:9, 100:14, 100:18, 102:2, 102:13, 103:1, 108:10
**systems**
101:22

**T**

**take**
21:6, 23:11, 38:18, 40:13, 47:7, 47:20, 48:2, 50:20, 59:6, 65:14, 78:7, 79:7,

80:7, 85:19, 88:12, 90:17, 90:18, 90:19, 90:20, 90:22, 91:11, 91:18, 91:20, 91:21, 92:15, 93:3, 93:13, 95:13, 99:6, 99:13, 99:14, 99:16, 99:17, 99:21, 109:17, 112:17, 130:5, 135:12
**taken**
39:1, 88:17, 130:9, 135:16, 141:3, 141:6
**takeout**
95:11
**takeouts**
92:21, 94:10
**taking**
5:11, 111:13, 128:19
**talk**
24:19, 49:16, 82:7, 95:5, 116:16, 129:5, 136:5, 136:7, 136:8
**talked**
35:12, 36:1, 36:4, 47:2, 74:4, 84:4, 95:3, 95:6, 117:21, 121:20, 131:14, 136:2
**talking**
22:6, 30:1, 46:10, 46:12, 49:20, 58:3, 90:10, 101:18, 104:20, 116:7, 116:8, 120:22, 138:7
**team**
21:13, 113:21
**technically**
77:9

**telegram**
11:21, 12:12, 100:6, 105:1
**telephone**
110:11
**tell**
8:2, 13:17, 22:2, 22:13, 22:17, 22:20, 24:9, 24:12, 25:15, 30:22, 33:4, 43:2, 43:19, 60:20, 76:5, 76:17, 78:1, 78:10, 78:15, 82:18, 110:6, 110:10, 110:17, 111:8, 112:5, 112:9, 112:20, 113:9, 114:13, 124:18, 126:6, 140:16
**telling**
12:9, 12:11, 42:17, 86:3, 110:14, 124:22
**ten**
30:11
**terms**
49:12
**terrible**
26:20
**test@protonmail**
31:19
**testified**
6:9
**testimony**
141:5
**text**
62:6
**th**
1:16, 3:17, 5:7, 5:12, 11:5, 17:13, 18:1, 39:17, 39:18, 40:4, 40:12, 41:2, 89:16, 91:6, 91:7,

95:11, 125:21, 128:6, 131:17, 138:20
**thank**
6:2, 87:13
**themselves**
5:16
**theory**
107:18, 107:20
**thereafter**
44:3, 141:6
**thereupon**
6:6
**they'd**
53:1, 75:18, 87:16
**thing**
26:22, 27:17, 47:6, 130:1
**things**
27:2, 46:21, 122:20
**think**
16:11, 21:10, 26:6, 28:1, 31:16, 33:8, 34:13, 38:16, 40:17, 45:16, 45:17, 45:20, 55:10, 59:11, 72:2, 114:1, 127:6, 127:8, 133:22, 135:20, 139:2
**thinking**
45:21, 46:1, 60:2, 98:11, 102:16
**third**
37:7, 37:10
**thought**
28:4, 43:12, 45:16, 45:17, 55:7, 55:10, 60:18, 60:21, 62:14, 62:20
**thousands**
16:17, 16:21

J.R.251

Transcript of David Chen
Conducted on July 30, 2025

60

**thread**
4:16, 4:17,
4:20
**three**
9:15, 10:6,
10:11, 10:14,
10:15, 12:19,
14:13, 20:11,
28:14, 30:10,
39:13, 42:8,
42:22, 49:9,
74:16, 85:14,
85:15, 86:18,
93:17, 100:10,
105:22, 133:6,
133:8, 133:11
**through**
17:21, 42:17,
44:10, 44:20,
51:4, 73:20,
74:8, 89:11,
89:13, 90:8,
91:20, 94:2,
115:10, 125:19,
131:17
**throughout**
27:10
**throwing**
138:10, 138:11,
138:13
**thursday**
29:8, 47:5,
47:9, 47:14,
47:15, 47:18,
48:1, 48:21,
49:6, 89:5,
90:13, 90:14,
92:13, 92:17,
92:22, 93:6,
93:14, 93:18,
94:10, 94:12,
95:9, 99:12,
112:22, 113:2,
116:20
**time**
5:8, 6:22,
12:10, 18:3,
28:21, 29:6,

34:5, 38:21,
39:3, 40:12,
46:5, 48:7,
48:9, 48:14,
48:18, 49:5,
58:7, 67:7,
67:9, 67:14,
67:21, 69:21,
81:7, 87:22,
88:15, 88:19,
90:6, 90:9,
92:13, 101:6,
101:12, 101:21,
102:1, 102:3,
102:11, 102:12,
102:16, 102:18,
103:10, 109:11,
109:13, 116:11,
116:12, 116:14,
116:20, 117:16,
120:10, 121:2,
125:19, 128:11,
128:14, 128:16,
129:12, 129:20,
130:7, 130:11,
135:14, 135:18,
135:21
**times**
35:7, 42:8,
49:9, 93:17,
105:14
**today**
5:9, 6:3, 15:9,
20:11, 41:20,
43:14, 43:19,
49:10, 63:6,
83:17, 95:19,
110:19, 115:19,
121:17
**today's**
5:7
**together**
72:4, 72:10,
116:21
**token**
21:14
**told**
12:5, 19:3,

24:19, 35:3,
63:9, 64:20,
66:19, 67:7,
67:9, 68:22,
69:20, 76:7,
76:20, 77:1,
79:3, 79:7,
79:10, 79:21,
80:2, 81:10,
81:17, 83:16,
94:4, 107:9,
109:13, 110:9,
110:22, 111:8,
112:1, 112:12,
112:15, 113:20,
113:21, 117:20,
122:19, 128:2
**took**
17:20, 89:10,
126:1
**top**
32:14, 62:6,
65:1, 71:1,
117:13, 125:22,
126:8, 128:3,
128:8
**topics**
115:12, 116:1,
116:17, 118:7
**totally**
80:7
**towns**
1:22, 2:14,
6:3, 141:2
**tractor**
44:8
**transaction**
21:15
**transactions**
50:2
**transcript**
4:8, 7:14,
32:5, 33:16,
55:16, 61:5,
99:1, 120:3,
132:5, 136:20,
141:4
**transfer**
129:22

**transperfect**
71:17, 71:20,
71:21, 72:1,
72:21, 73:4,
73:7
**tried**
100:18
**tries**
37:6
**triggered**
29:11
**true**
16:11, 17:12,
22:9, 59:1,
141:4
**truth**
59:20, 86:4
**try**
37:7, 37:10,
47:22, 101:5
**trying**
20:15, 54:2
**turn**
7:15, 14:2,
39:5, 60:4,
61:2, 61:18,
62:5, 81:14,
119:22
**turned**
77:12, 78:3,
81:19, 81:21,
82:12, 133:22
**turning**
80:18, 109:2
**two**
30:10, 31:9,
31:14, 31:17,
37:6, 67:4,
96:11, 103:11,
129:15, 130:16,
132:11
**typewriting**
141:7

**U**

**uh-huh**
66:2
**ultimately**
15:20, 76:1

J.R.252

Transcript of David Chen
Conducted on July 30, 2025                                    61

| | | | |
|---|---|---|---|
| **umd** | **updates** | **video** | 45:6, 45:11, |
| 34:5 | 126:11, 126:14 | 5:8, 5:10, | 55:11, 60:4, |
| **unclear** | **upgrades** | 38:21, 39:3, | 61:2, 80:12, |
| 40:12 | 126:20, 126:21, | 88:15, 88:19, | 102:17, 109:7, |
| **under** | 127:12, 127:14 | 130:7, 130:11, | 113:8, 119:22, |
| 65:22, 69:5, | **uploaded** | 135:14, 135:18 | 129:8, 131:4, |
| 70:1, 141:7 | 108:13 | **videographer** | 131:7, 131:10, |
| **understand** | **usd** | 5:1, 5:9, 6:2, | 132:2, 132:22, |
| 48:15, 107:3, | 18:3, 89:18, | 38:20, 39:2, | 136:17, 137:7, |
| 112:16 | 90:6, 90:10 | 88:14, 88:18, | 137:8 |
| **understood** | **use** | 129:14, 130:6, | **wanted** |
| 60:15, 66:16, | 23:13, 45:11, | 130:10, 135:13, | 28:7, 43:10, |
| 112:17, 120:12, | 45:14, 51:12, | 135:17, 140:2, | 101:5, 131:2, |
| 132:7, 132:10 | 77:8, 77:10, | 140:4, 140:18 | 134:4 |
| **undiscord** | 79:17, 79:19, | **videotaped** | **washington** |
| 13:4, 87:5 | 109:1, 129:22, | 1:14, 2:1, 5:2 | 2:2, 3:18, 5:13 |
| **unequivocal** | 134:14 | **violation** | **watching** |
| 59:8 | **users** | 80:19 | 130:21 |
| **unfilleted** | 21:8, 65:3, | **virtual** | **way** |
| 88:4 | 122:11 | 8:19, 9:2, 9:3, | 15:16, 45:1, |
| **unfiltered** | **using** | 9:5, 9:6, 9:7, | 87:9, 92:16, |
| 26:8, 53:3, | 13:10, 53:6, | 9:12, 57:1, | 93:5, 104:17, |
| 54:8 | 65:14 | 58:8, 58:16, | 105:16, 105:18 |
| **united** | **usually** | 62:15, 65:7, | **wd** |
| 1:1, 5:4 | 105:13, 106:7 | 65:13 | 74:17 |
| **unlikely** | **utilizing** | **voice** | **we'll** |
| 34:13 | 128:2 | 5:15 | 88:12, 135:12 |
| **unlocked** | **V** | **W** | **we're** |
| 108:11 | **vague** | **wait** | 7:8, 38:17, |
| **unsuccessful** | 63:14, 72:22 | 48:8, 48:17, | 38:20, 39:2, |
| 108:16 | **value** | 62:18, 82:19, | 88:14, 91:18, |
| **unsure** | 65:5 | 99:13, 103:18, | 104:20, 130:6, |
| 20:9, 20:10, | **variously** | 119:11 | 130:10, 139:2, |
| 29:18, 41:6, | 122:8, 122:21 | **waived** | 140:19 |
| 41:7, 41:10, | **vendor** | 113:14 | **we've** |
| 44:14, 69:19, | 72:3 | **waiver** | 43:6, 48:9 |
| 73:9, 85:18, | **verified** | 113:17 | **wednesday** |
| 85:20, 86:2, | 7:18, 8:6, | **waiving** | 1:16, 5:7 |
| 87:21, 99:20, | 15:5, 53:10, | 112:7 | **week** |
| 119:2, 120:20, | 58:18, 59:21, | **wall** | 29:8, 89:5, |
| 121:16, 121:19, | 65:22 | 49:20 | 92:13, 102:5, |
| 134:16, 134:19, | **verify** | **wallet** | 102:8, 112:21 |
| 135:10, 138:8 | 71:12 | 21:5, 21:8 | **well-being** |
| **until** | **versus** | **want** | 37:15 |
| 22:14, 43:3, | 5:3 | 8:3, 14:2, | **went** |
| 93:13, 99:11, | **via** | 17:4, 27:18, | 42:21, 44:20, |
| 106:19, 108:18, | 21:13 | 28:10, 36:16, | 92:20, 100:2, |
| 115:18 | | | 117:12, 117:14, |

J.R.253

Transcript of David Chen
Conducted on July 30, 2025

118:9, 118:12, 120:7

**weren't**
20:15, 60:1, 105:5

**whatever**
9:10, 47:13, 47:17, 80:17

**when's**
48:9, 48:18, 67:7, 109:13

**whereof**
141:12

**whether**
52:8, 52:13, 64:7, 78:21, 117:9

**whole**
51:20

**win**
21:16, 21:17, 28:7

**wipe**
6:16, 7:5, 8:11, 58:15, 59:12, 65:4, 65:6, 65:16, 66:3

**wiped**
8:15, 56:21, 57:8, 58:7, 58:8, 58:19, 59:7, 62:17, 63:10, 65:11, 65:13, 65:19, 137:19, 137:21

**within**
7:21, 18:8, 18:18, 19:6, 48:14, 80:7, 112:21, 114:1, 120:11, 122:5

**without**
13:6, 86:19, 124:22

**witness**
5:22, 6:5, 6:8, 15:15, 25:20,

47:11, 58:5, 69:4, 69:12, 69:18, 70:2, 71:7, 78:14, 79:5, 95:21, 113:11, 114:3, 114:9, 114:17, 116:2, 116:5, 127:10, 141:12

**word**
53:7, 53:9, 53:19, 54:1, 92:10, 134:14, 135:20

**work**
104:12, 104:15, 104:16, 117:5, 117:8

**worked**
108:18

**working**
50:22, 65:2, 106:3, 106:19, 106:22, 107:18, 107:20, 108:21, 109:3

**workings**
87:21

**works**
106:16

**wouldn't**
20:3, 26:12, 26:15, 37:21, 54:6, 54:10, 54:14, 64:5

**write**
62:4

**writing**
62:3, 67:11, 70:4

**written**
68:2, 68:15, 117:4

**wrote**
137:11

**wtf**
134:9

**Y**

**yao**
1:4, 5:3, 6:1,

7:12, 9:16, 19:22, 28:2, 55:21

**yeah**
10:5, 34:17, 38:9, 43:12, 44:16, 45:1, 45:5, 46:3, 53:20, 54:7, 54:11, 54:13, 54:15, 57:7, 57:9, 57:12, 58:2, 58:5, 58:6, 62:2, 62:4, 62:12, 62:22, 65:8, 71:2, 73:18, 90:1, 91:6, 91:15, 92:10, 97:21, 100:12, 102:21, 103:2, 107:21, 109:6, 110:3, 112:9, 125:18, 127:10, 129:20, 131:2, 132:17, 133:10, 133:20, 140:4

**year**
12:4, 48:5, 62:9, 107:4, 107:5, 109:10, 126:4

**years**
105:22, 121:10

**yee**
138:6

**yeet**
134:10, 134:12, 134:14, 137:8, 138:6

**yeeting**
136:8, 136:10, 136:11

**yeets**
138:9

**yesterday**
140:12

**york**
3:8

**yourself**
13:13, 23:2, 46:21

**Z**

**zang**
83:6, 83:15

**zip**
5:13

**$**

**$500,000**
62:1

**.**

**.1**
4:10

**.2**
4:13

**.3**
4:15

**.3200**
3:9

**.4**
4:16

**.5**
4:17

**.6**
4:18

**.6564**
3:19

**.7**
4:19

**.8**
4:20

**.9**
4:21

**0**

**0000**
60:9, 61:14, 61:16

**04**
19:5

**08**
137:11

**1**

**10**
11:11, 34:14,

J.R.254

Transcript of David Chen
Conducted on July 30, 2025                                    63

35:9, 38:22,
39:4, 70:17,
70:20, 74:11
**10,000**
35:8, 135:3
**10,340**
34:15
**10,430**
11:12
**10,433**
119:6
**109000**
31:19
**11**
29:20, 88:16,
88:20, 133:15
**12**
14:3, 14:5,
19:5, 39:5,
39:7, 130:8,
130:12, 135:15,
135:19, 140:20
**120**
4:19
**1200**
114:20, 116:7
**1204**
18:17, 19:5,
115:3, 115:11,
117:1, 118:6,
120:10
**13**
18:1, 38:22,
60:9, 89:16,
89:19, 98:2,
131:16, 131:17
**132**
4:20
**136**
4:21
**139**
4:4
**14**
74:10, 108:4,
133:15
**140**
4:3
**141**
1:21

**15**
8:10, 18:16,
18:21, 18:22,
19:1, 31:18,
58:14, 64:22
**16,000**
22:9
**17**
3:17, 5:12,
12:9, 29:15,
53:12, 62:9
**17,000**
9:22, 16:14,
42:16, 76:2
**1722**
122:5, 122:17,
123:4
**18**
36:20, 73:14,
131:16
**1899**
11:8
**19**
10:3, 30:5,
129:15
**1927**
11:5, 50:17

---
**2**
---

**2-**
4:19
**20**
17:13, 17:16,
50:11, 50:18,
84:9, 95:11,
109:15
**20005**
3:8
**20006**
3:18, 5:14
**2017**
122:12, 122:16
**202.261**
3:19
**2020**
6:15
**2021**
6:15, 17:13,

17:17, 35:21,
49:14, 49:21,
50:3, 50:8,
50:11, 50:14,
50:18, 84:9,
89:10, 90:5,
95:12
**2022**
6:18, 6:19,
7:5, 8:16, 8:20,
11:2, 18:1,
35:18, 50:21,
55:1, 57:10,
58:17, 60:3,
60:9, 61:10,
61:20, 62:11,
62:20, 63:3,
63:17, 64:17,
65:2, 66:8,
66:17, 89:16,
89:19, 100:15,
100:19, 101:13,
104:13, 105:21,
106:1, 106:13,
108:8, 126:5,
126:6, 131:16,
131:17, 132:6,
133:4, 133:15,
137:11, 137:20,
138:2, 138:6,
138:22
**2023**
9:15, 9:17,
12:11, 27:12,
35:18, 51:2,
67:5, 100:8,
103:6, 103:15,
103:17, 106:20,
108:19, 108:22,
109:16, 110:7,
110:11
**2024**
10:1, 10:3,
10:6, 10:20,
11:5, 11:8,
11:11, 11:17,
12:9, 12:17,
14:8, 18:6,

20:12, 30:5,
30:14, 30:18,
30:20, 31:3,
31:7, 31:11,
31:15, 33:17,
39:8, 39:17,
41:17, 42:5,
43:21, 44:9,
44:10, 48:11,
48:13, 49:2,
49:9, 51:4,
51:6, 68:19,
69:2, 69:9,
70:8, 70:11,
70:12, 86:1,
87:6, 91:2,
93:22, 94:20,
110:17, 116:15,
118:3, 119:7,
134:21, 135:4,
137:17
**2025**
1:16, 5:8,
98:16, 116:13,
116:20, 118:9,
120:5, 129:10,
141:14
**2050**
10:18
**21**
17:13, 33:17,
34:1, 35:4,
50:11, 50:18,
84:9, 88:16,
125:21, 126:2,
126:6, 128:4,
138:20
**212.732**
3:9
**22**
10:4, 56:11,
56:14
**23**
1:9, 5:6
**24**
7:15, 28:4,
32:16, 58:14,
108:5, 130:8

J.R.255

Transcript of David Chen
Conducted on July 30, 2025

64

**241**
11:19
**25**
4:18, 4:19,
7:15, 8:10,
58:14, 65:1
**27**
6:18, 6:19,
7:5, 8:15, 8:20,
55:1, 56:11,
56:14, 57:10,
58:17, 60:3,
60:9, 61:10,
61:20, 62:11,
62:20, 63:2,
63:17, 64:17,
66:8, 66:17,
101:13, 125:21,
126:6, 128:6,
138:20
**28**
3:7, 4:19,
10:7, 11:11,
13:19, 14:14,
34:14, 35:10,
39:4, 40:10,
44:21, 45:18,
46:13, 48:11,
48:13, 61:20,
70:18, 91:9,
120:5, 129:10
**29**
8:4, 8:5, 10:7,
10:20, 11:4,
11:17, 13:20,
14:14, 30:14,
30:20, 31:3,
40:10, 44:9,
44:21, 45:18,
46:13, 60:9,
91:9, 137:11
**2nd**
9:15, 9:17,
12:11, 100:8,
103:15, 103:17,
106:20, 109:15

---
**3**
---

**30**
1:16, 1:17,

5:7, 10:7, 11:4,
11:5, 11:8,
13:20, 14:14,
29:17, 32:16,
34:1, 39:17,
39:18, 40:4,
40:6, 40:10,
40:12, 41:2,
41:9, 41:16,
41:22, 42:5,
43:21, 44:13,
44:21, 45:18,
46:13, 70:22,
71:4, 86:1,
91:2, 91:6,
91:7, 91:9,
133:4, 133:15,
138:5
**31**
14:8, 15:12,
39:8, 40:3,
41:2, 41:9,
41:16, 41:22,
44:10, 47:7,
62:11, 67:5,
90:21, 91:7,
91:12, 92:14,
92:21, 93:13,
93:21, 94:9,
95:11, 95:13,
99:6, 99:17,
99:21, 141:13
**32**
4:14
**33**
4:15
**34**
88:20
**35**
5:9
**37**
130:12
**3:**
60:9

---
**4**
---

**4**
62:11

**4-1**
4:18
**41**
3:7
**4265**
4:16, 55:21
**4269**
57:17, 60:6,
60:7
**4289**
4:17
**4291**
61:18
**4293**
62:6
**43**
61:20, 135:15
**438**
133:14
**4384**
4:20
**4387**
133:14
**4:**
61:20

---
**5**
---

**53**
135:19
**55**
4:16
**57**
140:20
**58**
133:15
**591788**
1:20

---
**6**
---

**6**
137:11
**6000**
39:12, 40:11,
42:21, 69:8,
91:8, 134:20
**605**
3:17, 5:13
**61**
4:17

**6600**
10:10, 12:20,
16:3, 16:15,
46:12, 69:1

---
**7**
---

**768**
10:20, 23:8

---
**8**
---

**88**
5:6
**889**
1:9
**8th**
18:1, 89:16,
89:19, 131:17

---
**9**
---

**9**
1:17, 5:9
**900**
3:17, 5:12
**9222**
4:21
**98**
4:18
**980**
74:16, 74:17

J.R.256

# Exhibit 6

J.R.257



**Planet Depos**
We Make It *Happen*™

# Transcript of David Chen

**Date:** December 10, 2025
**Case:** Yao -v- Chen / Chen -v- Chen

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

J.R.258

Transcript of David Chen
Conducted on December 10, 2025

1 (1 to 4)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

LI FEN YAO, as administrator  : Case No.:

of Sam Mingsan Chen,          : 8:23-cv-00889-TDC

    Plaintiff,          :

    v.                  :

ROBERT CHEN, OTTER AUDITS      :

LLC, and RC SECURITY, LLC,     :

    Defendants.         :

------------------------------X

ROBERT CHEN and OTTERSEC LLC, : Case No.:

    Plaintiffs,         : 8:24-cv-03628-TDC

    v.                  :

DAVID CHEN,                    :

    Defendant.          :

------------------------------X

DEPOSITION OF DAVID CHEN - CONDUCTED VIRTUALLY

WEDNESDAY, DECEMBER 10, 2025 - 3:31 p.m. EST

Job No.:  610581 - Pages 1 - 89

Reported Stenographically by:

APRIL REID, RPR, CRR, CA CSR #14963

---

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF YAO and DEFENDANT

DAVID CHEN:

ALEXANDER M. GILES, ESQ.

TYDINGS

One East Pratt Street, Suite 901

Baltimore, MD  21202

(410) 752-9747

ON BEHALF OF DEFENDANTS ROBERT CHEN,

OTTER AUDITS LLC, RC SECURITY LLC and

PLAINTIFFS ROBERT CHEN and OTTERSEC LLC:

RACHEL M. CLATTENBURG, ESQ.

JOSHUA A. LEVY, ESQ.

KEVIN P. CRENNY, ESQ.

JUSTIN A. DiCHARIA, ESQ.

CHRISTINA M. LAMOUREUX, ESQ.

LEVY FIRESTONE MUSE LLP

900 17th Street NW, Suite 605

Washington, DC  20005

(202) 845-3215

---

A P P E A R A N C E S cont'd

ALSO PRESENT:

EMMA FLOYD, Levy Firestone Paralegal

BRAD SYDORICK, Videographer

FRANTZ CLERVIL, Remote Tech

---

I N D E X

DAVID CHEN                         PAGE

Examination by Mr. Crenny            8

Examination by Mr. Giles             85

Examination by Mr. Crenny            86

E X H I B I T S

| LETTER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Direct Messages Private/NotDeGhost - 15 pages | 38 |
| Exhibit B | Direct Messages Private/NotDeGhost - 4 pages | 54 |
| Exhibit C | Amended Answers of Defendant David Chen to First Set of Interrogatories from Plaintiffs Robert Chen and OtterSec LLC | 62 |
| Exhibit D | Amended Answers of Defendant David Chen to Second Set of Interrogatories from Plaintiffs Robert Chen and OtterSec LLC | 67 |

J.R.259

E X H I B I T S

| LETTER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit E | Signature page David Chen dated 11/25/25 | 67 |
| Exhibit F | Guild: new clickbait, Bates marked Deng_0001088 and Deng_0002943 | 76 |
| Exhibit G | Guild: new clickbait, Bates marked Deng_0001088 and Deng_0002733-2734 | 78 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number one in the Videotaped Deposition of David Chen, in the matter of Yao v. Chen/Chen v. Chen, in the United States District Court, For the District of Maryland, Case Nos. 8:23-cv-00889-TDC and 8:24-cv-03628-TDC.

Today's date is December 10th, 2025 and the time on the video monitor is 3:32 p.m. Eastern Standard Time.

The remote videographer today is Brad Sydorick, representing Planet Depos.

And all parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. CRENNY: This is Kevin Crenny for Robert Chen, OtterSec LLC, RC Security LLC and Otter Audits LLC. Also representing those same parties and on the call are Joshua Levy, Rachel Clattenburg, Justin DiCharia and Christina Lamoureux -- Lamoureux.

MR. GILES: And I'm Alexander Giles and I represent David Chen as well as Li Fen Yao.

THE VIDEOGRAPHER: The court reporter today is April Reid, representing Planet Depos.

And the witness will now be sworn.

THE STENOGRAPHER: Mr. David Chen, if I may please get you to raise your right hand.

THE WITNESS: (Complies.)

THE STENOGRAPHER: Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

THE STENOGRAPHER: Thank you.

THEREUPON:

DAVID CHEN

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE STENOGRAPHER: We may begin.

EXAMINATION

BY MR. CRENNY:

Q.   Thank you, David.

Could us please state your full name, for the record?

A.   David Yao Chen.

Q.   And where are you located right now?

A.   Right now, I'm at University of Maryland.

Q.   Okay.  And we're just going to do -- do some preliminary stuff that's a little different from last time because it's over Zoom.

And where at the University of Maryland?

A.   Hagerstown Hall.

Q.   Okay.  And is anyone in the room with you there?

MR. GILES:  I am.

A.   That's it.

Q.   Your attorney, Mr. Giles; right?

A.   Yes.

Q.   Correct?

Okay.  Yeah.

Transcript of David Chen
Conducted on December 10, 2025

3 (9 to 12)

**9**

Can you agree you'll -- you'll let us know if anyone else comes into the room?

A. Yeah.

Q. And what do you have in front of you right now?

**A. I've got my laptop. I've got a water bottle. I've got a box or a bag handy; it's another water bottle.**

MR. GILES: I can represent for the record that he only has the screen. I asked him to put it on full screen so it's just viewing you. There's nothing else being viewed.

There's nothing on my iPhone except for his picture and my picture of myself.

MR. CRENNY: Okay. That was the next --

MR. GILES: Yeah.

MR. CRENNY: -- few questions.

Q. So you understand that you can't have anything else up on your computer on a phone in front of you other than this Zoom window?

MR. GILES: Yeah.

**10**

And, Kevin --

MR. CRENNY: Yeah.

MR. GILES: -- just for the record, I did print and bring with me, which I have a manila folder here, a copy of the October 15th agreement with Alexander K., I'm just going to call it K., as well as the termination agreement, which was November 16th, with Alexander K. And those are the only two documents that I have sitting here next to him.

MR. CRENNY: Okay. All right. I will -- please -- we'll let David answer the questions, but --

MR. GILES: Yeah. Absolutely.

MR. CRENNY: Yeah.

Q. Okay. So, David, do you agree you won't look at any other messages, have any notifications on your window, on your screen, open any other windows during this deposition?

**A. Yes.**

Q. Okay. And you understand that you can't

**11**

communicate with anyone other than me while we're on the record?

**A. Yeah.**

Q. And then, I know we deposed you in July, but just to go back over it, you understand you're under oath and have to answer these questions truthfully, as if you were testifying in court; correct?

**A. Yes.**

Q. And it's just important we not speak over each other on the Zoom, especially with the court reporter writing down what we say. So I will try not to do that; I'll ask you to try not to do that as well.

**A. Okay.**

Q. And you have to answer verbally for the record and not nod, which I think you knew.

**A. Okay.**

Q. Understood?

**A. Yes.**

Q. Finally, your counsel might object to some of the questions, but you are still required

**12**

to answer the question unless Mr. Giles instructs you not to answer.

**A. Yeah.**

Q. Do you under- -- does that make sense?

**A. Yes.**

Q. Okay. When did you start working on the Solend liquidator code that you later worked on with or at OtterSec?

**A. You're going to have to be more specific.**

Q. Are there other/multiple versions of that code? Is that why?

**A. Yes.**

Q. When did you start working on the version that you ended up taking with you to OtterSec?

**A. Oh. I don't recall. I think it was October 31st, '21. Something 31st. I don't know. It was in one of the answers.**

Q. We can look at those in a minute.

When did you first start working on any version of that code?

Transcript of David Chen
Conducted on December 10, 2025

A.  Can you define "version"?

Q.  Well, why do I need to be more specific than say the -- the "Solend liquidator code"? What is the confusion on that?

A.  Well, like, I think -- it's not two different versions.  It's, like, two entirely different code bases.  But, like -- they both do similar things, but I wouldn't call them, like, versions of each other.

Q.  Do they both perform liquidations?

A.  Yeah.

Q.  And they both do that on the Solana blockchain?

A.  Yeah.

Q.  And they're both automated automatic bots that you wrote?

A.  Yeah. Yeah.
        But they're, like, in completely different languages.  So they're not, like, versions of each other, per se.  I don't know.
        This is pedantic, I guess.

Q.  So there are two versions, is that what you're saying?

        MR. GILES:  Objection.
        That's not what he's saying.  He's saying they're different, unversions of each other, I think is what he's saying.

A.  Yeah.  It's, like, different modules entirely.  Hmm.

Q.  My question is --

A.  I don't know, versions is, like --

Q.  -- like --

A.  Usually when you say version, right, it's the, like, iteration of the same code base. Right?

Q.  My question was:  Are there two code base -- code base -- I'm trying to think of a word other than versions, two that you're talking about, or are there more beyond that?

A.  There's two code bases, but I wouldn't say the two code bases are versions of each other.

Q.  They're both Solend liquidator codes --

A.  Yes.

Q.  -- that run automated trading bots;

correct?

A.  Yes.

Q.  And one of them, that you later took to OtterSec, you started working on, you believe, on October 31st of 2021?

A.  Yeah, I'd have to --

Q.  That's what you just answered.

A.  -- check the answers, but probably.

Q.  And when do you think you started working on the other one?

A.  The other one.  I think I checked and it was, like -- I think -- what'd I put down?  I think it was October 2nd, 2021.  Is that what I put?  Or can I ask?  Hmm.

Q.  So the other one you think was October 2nd, 2021; is that right?

A.  Yeah.  It's a -- it's also in one of the answers.

Q.  When did you first start working on any liquidator code for the Solana blockchain?

A.  That's the same time.  It's October 2nd.

Q.  There was no prior liquidator code you had worked on that operated on the Solana blockchain?

A.  No, not that I'm aware of.

Q.  When did you first interact with the Solana blockchain?

A.  Interact.  That's a hard question.  I don't know.  But if I had to give a broad range, I could maybe answer that.

Q.  Please give the broad range that's your best recollection right now.

A.  Some time in 2021.

Q.  That's when you first traded on it or used a bot -- ran a bot that interacted with it, ran a code that interacted with it, anything like that?

A.  I don't know.

Q.  For the code that went to Ot- -- the code that you took with you to OtterSec, the one that you say you started on October 31st, how did you determine that start date?

A.  I believe I looked at the messages between me and Alex K., Alexander K., to determine

J.R.262

Transcript of David Chen
Conducted on December 10, 2025

---

17

that. So I was looking for messages that would indicate that I started working on that and then I'm -- like, I cross-ref'd with the actual GitHub Git log.

Q. So Alexander K., who is that?

A. That would be --

Q. I'm not asking for the last name. I'm asking for who he --

A. Oh, yeah. He is the guy I signed a partnership agreement with.

Q. He's somebody you were in business with in the October 2021 time frame; right?

A. In business with.

Q. I can rephrase.

He's someone you were working with in the October 2021 time frame --

A. Yeah.

Q. -- right?

A. Yeah.

Q. And what did you see in your messages with him that made you say that you started working on the code that you later took to

---

18

OtterSec on October 31st?

A. I don't recall.

Q. And what did you see on GitHub that made you say that the code that you took over to OtterSec later you'd -- you had started working on on October 31st?

A. I want to say the first commit in the Git history was later than October 31st, but it's maybe, like, a few days later.

Q. Sorry. For the court reporter, are you saying -- you're saying commit, commit, C-O-M-M-I-T; correct?

A. Yes.

Q. Okay. I'll just clean that up.

So you said the first commit you saw was shortly after October 31st or it was October 31st? I apologize.

A. I believe it was after.

Q. So what makes you say October 31st was the start date, the day you started working on it?

A. Because of something I saw in discord.

Q. In your messages with Alex K.?

---

19

A. Yes.

Q. But you don't recall what that was?

A. No.

Q. What were you doing on October 31st that you say was starting to work on the code, that you characterized as that?

A. I don't know.

Q. Were you -- do you just open a blank document and start writing off the top of your head?

A. I'd have to see the messages.

Q. Is that typically how you start a new coding project?

MR. GILES: Object to the question.

I think he said that he'd have to look at the messages. I don't think he was saying that was typically how he begins the process.

Q. You can answer the question.

Is that how you typically begin a new coding project, by opening a document and just starting to type off the top of your head, write the code?

---

20

A. Honestly, yeah.

Q. On October 31st, when you started writing the code that you say is the one you took over to OtterSec, were you looking at any other code?

A. I don't know.

Q. Were you working off any other code that you had previously written or somebody else had previously written?

A. I'm unsure.

Q. You testified that you had a previous Solend liquidator code that did the same thing that you had started working on at the beginning of October; right?

A. Yes.

Q. Were you looking at that as you started writing what you say is a new Solend liquidator code at the end of October?

A. It's possible.

Q. Would it have been helpful to you in writing a Solend liquidator code to refer to and draw on the Solend liquidator code that you had

---

J.R.263

Transcript of David Chen

6 (21 to 24)

Conducted on December 10, 2025

already created, that you had already worked on?

A. It depends.

Q. What does it depend on?

A. Well, like, they're in two different languages. Right? So it's not so easy as you just look at the previous one. Like, the way the languages behave is quite different. And, like, there's not very much business logic in the version at the time, is how I'd say it.

Sorry. That's kind of speculative. I would have to look at the code to be sure.

Q. What steps does the Solend liquidator code that you took with you to OtterSec undertake? How does it go about doing a liquidation? Broad strokes.

A. All right. All right. All right.

So at the time, how we would have worked is, we: A, we get program accounts. We pull all Solend's program accounts. And then we parse them. Step two, filter. We load -- so we load -- so the -- so how Solend is structured, you got the big lending market at the top and then under that are reserves and then you have obligations that can, like, continue, multiple reserves. So what we're going to do is we pull all those accounts. Then we filter obligations to only look at obligations that have greater than X amount of deposits and are -- also have borrows, I believe. That's step one at loop.

And then second is we have the loop.

And then we keep pulling obligations or -- sorry.

At the time it would have been, we pull all the accounts we want at the top of the loop. So that would be all the obligations we're looking at, reserves we're looking at, which is all them, and oracles, at the top of the loop. So, this is important, we want to batch all those pulls so we don't get any, like, blocking network calls that, like, mess up the multi-threading. So we want to do that at the top of the loop, every loop.

And then, after that, we refresh reserves using the prices from Oracle's. We -- oh, yeah, also, we need to get the slot. We refresh the interest rates. Then we refresh -- oh, we refresh the obligation using the new refresh reserves on chain prices to slot everything.

Then, at the very end, we check to see if any of the obligations are liquidatable. And then we send liquidation transactions.

But you could figure this out from looking at the code, which you have.

Q. That was very technical.

But is the first thing -- broadly, you know, the first several steps you des- -- described, is that the -- that the code finds liquidatable opportunities on the blockchain? Is that accurate?

A. Yeah, I'm not sure -- I guess, you could condense down into one sentence like that.

Q. Right.

It looks at the blockchain, it identifies liquidatable oppor- -- opportunities and it liquidates them; right?

A. Yeah.

Q. It sends the transactions to liquidate them?

A. Yeah.

Q. Okay. So that's the one you created on October 31st does.

That's the one that you were working on starting on October 31st, I mean?

A. Yeah.

Q. Okay. The one you were working on starting October 2nd, does that also look at the Solana blockchain to find opportunities for liquidation, liquidate them and -- you know, send the transactions to liquidate them?

A. Yeah, but it does everything in a really different way. But, yes, it does that.

Q. Okay. So they do the same -- they have the same functionality?

A. Sure, yeah.

Q. Okay. So when did you become interested in making a liquidator for the Solana blockchain?

A. Oh. So that's the messages I was reading about.

J.R.264

So this was in -- yeah, that's the October 2nd, I think. I think what the messages actually said was: I was looking to make a liquidator for a SOL farm, but, as it turns out, SOL farm does not have a public liquidator. So I started more broadly searching for a way to make a liquidator for Solana specifically, Solana anything. That's how I landed on Solend.

Q. And how did you go about pursuing this? What was -- what was step one of you want to make this liquidator, where do you start?

A. Well, step one was going, like, it would be really cool if I could do that. Step two is, like, Google, searching everywhere. Step three is finding the open source code that Solend has. And that's the base of the original code.

Q. So you were researching different things, was the beginning of the process?

A. Yeah.

Q. Who were you talking to as you're researching? About the research, not just generally.

A. About the research. Well, I already told you, I was -- I saw this in AltTank. So I mentioned it in AltTank. I don't know about anywhere else.

Q. And AltTank is a discord server; right?

A. Yes.

Q. And who is in that? Not individuals, but categorized. You know, describe the server to me.

A. It's a bunch of older guys I met doing crypto mining back in 2017, 2018.

Q. Older than you were at the time?

A. Yeah.

Q. Not older --

A. I mean older than you.

Q. Yeah.

And when you start working on a Solend liquidator code of your own, you say on October 2nd, are you working off any other code at that point?

A. Yeah. I just told you it's a fork.

Q. I don't think you said the word "fork."

You said --

A. Oh, okay. My bad. Sorry.

It is -- it is a -- the original typescript code was a fork of the publicly-available Solend liquidator code, that they encouraged people to fork and make their own versions of.

Q. So you were working off a publicly-available Solend liquidator code to make your own Solend liquidator code?

A. Yeah.

Q. That was derivative of that one?

A. Yeah.

Q. Were you plugging in sections of that code as you made yours?

A. Elaborate.

Q. Do you copy and paste? You know, I don't need to change this section, I'm going to use it the same way it is.

Is that something you would do with the open source code?

A. Hmm. That's not how it works.

Q. That's fine.

A. I can tell you -- yeah, yeah. I can tell you what I was doing at the time.

So the open source code, it's single-threaded. It's, like, very slow. What I did was, I made it multi-threaded. Development-wise, it'd be initially leaving most things as it is, but then over time a lot of things changed.

Q. So, then, as you're starting to work on the codes that you're working on, who are you communicating to about it?

A. Well, I saw messages in AltTank. I don't know about anyone else.

Q. What about Alex?

MR. GILES: And for the record, Alex K., not Alex G., his counsel.

Q. Not Mr. Giles?

A. Nope.

Q. Alex K.?

A. Hmm. Alex K., he came in later.

So what happens was, I was talking in

Transcript of David Chen
Conducted on December 10, 2025

the Solend public discord and I think it was -- it was just, like: Does anyone want to work together on this? And it just happened.

Q. So you were talking about it in AltTank and in the Solend public discord?

A. Yeah.

Q. Anywhere else you can think of?

A. Anywhere else.

Time frame?

Q. In October 2021 or thereabouts, you know. Say, September, November to be a little broader.

A. I don't know. I'm unsure.

Q. Did you talk to Robert Chen about it in that time period?

A. No, not that I'm aware of.

Q. Did you talk about it in the new clickbait server in that time period?

A. It's possible.

Q. Did you talk to anyone about how you were making money from the Solend liquidator code in that time period?

A. September to November?

Q. Yes. Let's call it that.

MR. GILES: Well, I am going to object to this line of questioning, Kevin.

The purpose -- the limited purpose of the deposition is the creation of the code. And I think, with talking about these things, you're sort of running afoul of that limited scope.

MR. CRENNY: I'm asking questions to elicit testimony about when and where he had communications about the code that will help us understand when he started working on it.

I'm also trying to jog his memory because he doesn't seem to remember a lot of details here.

MR. GILES: And I appreciate that. And I'm -- I'm fine, relatively speaking, but I think you've gone sort of askew, a little too far over the line in terms of the things you're trying to jog his memory with.

Q. You can answer the question, David.

I can rephrase it, if you don't remember it.

A. Yeah. Can you repeat it?

Q. Did you talk to anyone in the September to November 2021 time period about making money from the Solend liquidator code?

MR. GILES: Same objection, but --

A. Probably.

MR. GILES: -- go ahead.

THE WITNESS: Yeah.

A. Probably.

Q. What would you have referred to the Solend liquidator code as when you talked about it in -- on discord or in other written communications like that? Telegram, whatever.

A. I have no clue. I haven't thought about that.

Q. Would you have called it a "liquidator bot"?

A. That sounds right.

Q. Would you have called it "my bot"?

A. Yeah.

Q. Or "the liquidator," without referring to Solend?

A. Yeah. Probably.

Q. I am going to ask you one terminology point. You said you forked, it was a fork.

A. (Nods head).

Q. Can you explain what you mean by fork or forked in this context, for the record?

A. A fork means I took a copy of the code as it existed publicly and then I started working off of that.

Q. And one thing you said you looked at to determine the start date was GitHub records; right?

A. Yes.

Q. And you said you looked at GitHub commits?

A. Yes.

MR. CRENNY: And this is, again, C-O-M-M-I-T-S, for the court reporter.

Q. Haven't you deleted GitHub commits in

**33**

the past?

MR. GILES:  Objection.

Go ahead, you can answer.

A.  I believe so.

Q.  All right.  Didn't you testify over the summer that you deleted them?

A.  I believe so.

Q.  So how do you know that what you're seeing when you're looking at the GitHub, which is the basis for your giving this date, how do you know that that's accurate?

A.  Oh.  Because I know for sure I didn't go back and touch anything.  This was, like, maybe, like, two commits on top of the OtterSec code.

Q.  What was two commits on top of the OtterSec code?

A.  Oh.  The commits that were deleted.

Q.  But if you're looking at GitHub commit, that's the -- you know, a history of commits, there's no way of knowing from looking at it whether some have been deleted in the middle; right?

**34**

A.  Well, that's actually impossible, but -- it's actually impossible to delete from the middle.

So I know for sure nothing's deleted from the middle because -- well, actually, yeah, technically, you could do that, but that's, like, annoyingly difficult.

I guess, why would I do that?

Q.  So I'm not sure that answered my question.  So I'm just going to ask it again.

So as you're looking at the GitHub commit history of a project, you can't tell whether deletions have been made just by looking at, like, the GitHub page; right?

MR. GILES:  And, just for the record, Kevin, when you say "you" --

MR. CRENNY:  Someone.

MR. GILES:  -- somebody?  Right.

MR. CRENNY:  I'm not talking about this particular -- I'm not saying --

MR. GILES:  Yeah.

MR. CRENNY:  -- you, David Chen, when

**35**

you looked at the October 31st record.

Q.  I'm saying:  When someone is looking at a GitHub project and they're seeing a series of commits, there's no way of telling whether there were other commits at some point that have been deleted; correct?

MR. GILES:  Yeah, you can answer.

A.  Well, there is a way, but, unfortunately, it doesn't apply entirely in this case.

So cppio or hearthS, his commits were signed.  So that means that they're cryptographically signed.  Everything before them is kind of, like, a blockchain.  All the commits before that are, like, locked in; you can't touch them at all.  So that means everything after, it's, like, I guess, kind of free game.  But -- everything that's unsigned, you can touch.  But once there's a signed commit, you can't touch it.

Does that answer your question?

Q.  No.  Because I wasn't asking about this particular project piece of code.

**36**

I was asking:  In general, if you're looking at a history of commits on a GitHub project, you can't tell whether commits have been deleted; right?  Whether there's stuff missing?

A.  It definitely can.

I guess, like, in what way can you not tell, would be my question?  Like, what makes you think that it's not possible to tell?

Q.  You testified that you deleted GitHub commits.

A.  Yeah.

Q.  Does that leave a record on the GitHub page for that project, that there were deletions?

A.  Not directly, but it leaves traces. Right?

So, like, one way you could find it is if, like, if you go into, like, get ref log, then you see, like, what has changed to in Git.

There's another way Git kept or keeps a history of all, like -- all -- all commits.  It doesn't matter if they're working or not.  For, like, two years.

J.R.267

**37**

I searched through that. Unfortunately, it's, like, they're slight -- the commits that were deleted were slightly too far so I couldn't recover it.

What else? Oh. Like, even if you're deleting commits on top of code, it's, like, not unrecoverable. Given -- given some, like, recency constraints, I guess.

Does that help?

Q. I'm going to move on.

Can...

Is it clear, looking at the GitHub of these projects, which commits you deleted?

A. Which commits I deleted.

MR. GILES: Kevin, I'm going to object. Are you referring to a particular commit that you want him to think about?

MR. CRENNY: Oh, I'll -- I'll withdraw it. I'll withdraw it.

Can -- Frantz, can we put up document 2 and mark that as Exhibit A, please.

REMOTE TECHNICIAN: Stand by, counsel.

**38**

MR. CRENNY: Thank you.

(Exhibit A was marked for identification and is attached to the transcript.)

REMOTE TECHNICIAN: You may proceed.

MR. CRENNY: Can we took at the top? Thank you.

Q. So this is --

MR. CRENNY: Can you show the -- the bottom of this page so I can see the Bates number.

Q. This Exhibit A here is Bates -- it's an excerpt from Yao 1238. This is a document you produced.

Do you recognize from the top of it what this is?

A. Yes.

Q. Okay. And what -- what is it?

A. It's the direct messages between me and Robert Chen.

Q. Yeah.

MR. CRENNY: And can we go to the top of it again for one second.

**39**

Q. And this conversation started on August 13th, 2019; right?

A. Yes.

Q. Okay. So you produced at least this document that goes back that far; right?

A. Yeah.

Because this is all my messages with Robert.

Q. And so this is an excerpt. It is the first page to identify what the document is. And then we jump to the part because it's very long, hundreds of pages.

MR. CRENNY: So can we just go to page 2 and just look at the -- the Bates number on page 2 is Bates 1258. And in the middle of the page -- right there. Right at the top there. Can we go, maybe, one line above that.

Q. So you see you're talking in June with Robert, and then nobody says anything for awhile, and then Robert sends a message on December 28th? Do you see that?

**40**

A. Yeah.

Q. And I'm going to read it. I'm going to -- you know, it's written in kind of abbreviated text speak so I'm going to expand it and then you tell me if I get anything wrong.

He says, just a heads up, the liquidation stuff you're talking about sounded pretty cool so I think I'm going to mess around with setting up a bot, but should I look at something other than mango markets to avoid overlap?

Is that accurate, what I read?

A. Yeah.

MR. GILES: And, Kevin, just for clarity sake, you mentioned December 28th, but you didn't say the year. I presume, it's 2021.

MR. CRENNY: It's 2021, yes.

MR. GILES: Okay. All right.

Q. So Robert is referring to the liquidation stuff you're talking about that sounded pretty cool. What is he referring to there?

A. Well, here it looks like -- well, just based on the messages below that, it would be mango markets in Solend liquidations.

Q. So he says you're talking about it. Where were you -- it's not in this conversation; right?

A. Yeah.

Q. Right.

Because this isn't anything since June; right?

A. Yeah.

Q. Did you say yes? Sorry.

A. Yes.

Q. This isn't anything since June.

So where were you talking about it in December that he's responding to?

A. It's probably either the red phone or a dice cam serv. So those were the C-CAP team servers I was in, discord servers.

Q. So those were discord servers you were in that Robert was also in?

A. Yes.

Q. And you were talking about Solend liquidations there?

A. Well, it had to have been. There's no other place he would have seen it.

Q. And how long had you been talking about Solend liquidations in those servers?

A. I don't know.

Q. Did you review those servers to prepare for this deposition today?

A. No.

MR. CRENNY: Can we go to page 9 of this same PDF, please?

REMOTE TECHNICIAN: Stand by.

MR. CRENNY: Thank you.

Q. So this is Bates -- it should be Bates 1265. And if you look at --

MR. CRENNY: Could we go up from there, please? Actually, I might need to see the very bottom of the previous page. There we go. Good.

Q. So that the -- the last message on the previous page you say, "Solend," and you send an

image; right?

This is at Bates 1264. This is that same date, December 28th, 2021.

Is that all correct?

A. Yeah.

Q. Okay. And then, on the next page, you see Robert is talking about how much money he made on it. You're clarifying that you're tracking 300 million total value in accounts within 50 percent of liquidation.

So you're talking about Solend liquidations here as well; is that right?

A. Should be, yeah.

Q. Okay. And then --

MR. CRENNY: Can I get a few more lines down, please? A couple -- give me the -- the next message, please, "sent by RA" there. Thank you.

Q. So Robert says there's an 8-second load time, and you say that you had to do a bunch of optimization to make the actual checks much faster than 8 seconds. The stock bot for Solend takes 50 seconds to check all accounts.

Do you see that?

A. Yeah.

Q. And then Robert says, that seems like a fun optimization problem.

A. Uh-hmm.

Q. And you say, I cheesed optimization by splitting the bots into workers in, like, September.

Do you see that?

A. Yes.

Q. So does that refresh your recollection that you were working on a liquidator bot for Solend in September of 2021?

A. No. I think I must have been mistaken here.

Because the AltTank genuinely seems like the first instance. Because at the time I don't even mention Solend. I mention SOL farm. Which I knew, like, after a few days of research that that was not going to happen. So I believe AltTank one is correct.

Transcript of David Chen
Conducted on December 10, 2025

45

Q. What's the stock bot for Solend?

A. Oh. That's the open source one.

Q. So that's the open source one that you said you created a derivative version of and that's how you created your Solend liquidator bots; right?

A. The typescript one. The typescript code base, yes.

Q. What do you mean by "the typescript code base"?

As opposed to what?

A. Remember at the start, when we were arguing about diversions versus, like, code bases versus whatever, so this is what I was talking about.

So the first code base is a typescript one that's based off the open source code. That's slow.

The one we're generally talking about that's, like, involved in litigation is the Rust code base which was later on. It's much faster.

Q. So you're saying that the one that was

46

derivative from the open source code was the one you started working on in October 2nd?

A. I'm sorry. Can you say that again?

Q. You had said there was the October 2nd one, that you started on the -- October 2nd, and there was the October 31st one; right?

A. Yeah.

Q. And you're saying the one you're talking about here is the October 2nd one, the typescript one?

A. Yes. It should be.

Q. But that's --

A. Well, actually, wait. Actually, wait. No, no, no. Sorry. Let me go back.

Based on these messages, I really want to say this is talking about the typescript one. The reason I believe that is because you see where I say, "I cheesed optimization by splitting the bot into workers"? So that's how I did the typescript one. That's not how the Rust one works.

Q. And "the typescript one" is the one that

47

you said you thought you started working on on October 2nd; right?

A. Yeah.

Q. Does this make you think that you actually started working on it in September?

A. No.

I mean, I thought that for awhile, but, like, October 2nd is really close to September. It's just, like, right on the edge there. Right? So I probably just misremembered here.

Q. You thought for awhile that you thought it -- what did you think for awhile?

A. Oh. I thought I started in September for awhile. But, like, I wasn't really keeping track of these things. But when I looked back at the AltTank messages, it does really seem like it's October 2nd.

Q. Do you recall thinking it was September?

MR. GILES: I am going to object to the question because that's not what he said.

But you can go ahead and answer.

Q. Did you say that you recalled thinking

48

it was September?

A. Yeah. Like, when I was, like, writing resumes and stuff, I always think, like, okay, when did I start on all this? Like, when did my wife get wild? And I would think September. But I looked at the actual messages and it's not, it's October 2nd, so.

Q. When were you writing resumes?

A. Resumes.

Q. That you -- like, when is the time that you're talking about that you were writing resumes and thinking it was September?

A. Probably when I was doing my singular college app for -- that would be the first time. I don't know, like, December '22. Somewhere around then.

Q. Was it before you graduated high school or after?

A. Before.

Q. And you graduated in May '23; is that right? Did you?

A. Yeah.

J.R.270

Transcript of David Chen
Conducted on December 10, 2025

49

Q.   So does -- December '22 is your answer?

A.   It's probably around then.

Q.   Okay.

MR. CRENNY:  Can we go to page 13 of this document.

REMOTE TECHNICIAN:  Stand by.

MR. CRENNY:  Thank you.

And we'll just look at the Bates quickly down at the bottom.  It's Bates 1269, Yao 1269.

Q.   And do you see -- oh.  Strike it there.

MR. CRENNY:  This part's fine.

Q.   You see Robert is asking you about liquidations; right?

A.   Yeah.

Q.   At the top of the page.

And then he says, at 10:21 p.m. on the same date, December 28th, 2021, how long have you been looking at this stuff for?  And you say, since mid September.

A.   Yeah.

Q.   Do you see that?

50

A.   I see that.

Q.   Okay.  Does that refresh your recollection, that you were looking at Solend liquidations in mid September 2021?

A.   I disagree.  I still think the October 2nd is correct.

Maybe here it's just talking about Solana in general, which would make more sense.

Q.   You say "October 2nd is correct" for what?

A.   I mean, that's the date of the messages I found in AltTank.

Q.   And what are those messages?

A.   Yeah.  So it starts off, like, something along the lines, it would be cool if I ran a liquidator for a SOL farm, and then, like, it just goes off from there.

Q.   And what makes you say that you couldn't have been looking at Solend liquidations before that?

A.   Oh.  Because I found out Solend liquidations after I gave up on SOL farm, so

51

that's why.

Q.   Is SOL farm not on the Solana blockchain?

A.   Yes, it is, but, like, it's a different protocol.

Q.   So were you looking at liquidations on the Solana blockchain in mid September?

MR. GILES:  Objection.

Go ahead.  You can answer, if you can.

A.   Well, if you put it like that, I don't know.

Q.   Why not?

A.   I could have been reading up about SOL farm before October 2nd.

Q.   And SOL farm is part of the Solana blockchain, you said; right?

A.   Yes.

Q.   And isn't reading up on the Solana blockchain an important prerequisite to your building a liquidator that works on the Solana blockchain?

MR. GILES:  Objection.

52

But you can go ahead and answer, if you can.

A.   Nah, not really.  The open source one just kind of works out of the box.  You just got to tweak it a little.

Q.   Could you tweak it without having read up on how liquidations work on the Solana blockchain?

A.   Yeah.

Q.   So why did you spend time reading up, as you said you did?

A.   Oh.  'Cause I was, like -- because I know a couple of guys in the AltTank discord, were the ones that introduced me to Solana.  I think some of them were using SOL farm.  And I also might have deposited some funds into it.  Not sure if I used SOL farm, but I know that some guys in the discord did.

Q.   Are your messages on the AltTank server the only basis you have for saying that you started working on your liquidator on October 2nd as opposed to in September?

Transcript of David Chen
Conducted on December 10, 2025

14 (53 to 56)

53

A. Well, I also got the GitHub commit history which commit -- sorry, commit history that goes to, like, some point after October 2nd. I think it's October 4th or 5th. So that's when. Like, the first commit shows up in the commit history on October 4th or 5th. And then, like, I got the messages on October 2nd. So that all lines up.

Q. So the October 2nd date is only coming from the AltTank messages; right?

MR. GILES: Objection. That's not his testimony.

But go ahead.

Q. Is there anything other than the AltTank messages that is pointing to October 2nd as opposed to October 1st or September 29th?

A. No, there's -- sorry. Can you repeat the question?

Q. Is there anything other than the AltTank messages that is making you say October 2nd as opposed to a day or a week prior?

A. Yeah, that's the only thing I relied on

54

for specifically October 2nd.

Q. You don't have any independent recollection of whether it was September or October?

MR. GILES: Objection.

You can answer.

A. I mean, the messages line up with the GitHub. But, otherwise, I don't have anything else, I'm aware of.

Q. Okay.

MR. CRENNY: Can we look at document 12, please. Mark that as Exhibit B.

REMOTE TECHNICIAN: Stand by, Counsel.

MR. CRENNY: Thank you.

(Exhibit B was marked for identification and is attached to the transcript.)

REMOTE TECHNICIAN: You may proceed.

Q. So this is another excerpt from the same conversation we were just looking at. So it's the same cover page here. This is Yao 1238, is the overall document.

MR. CRENNY: We can start at the third

55

page of the PDF which should be Yao 1390. Yes. Oh, no, next page, please. Maybe it's the fourth. Sorry. Go back to 89. You were right. There's an image file. Okay.

Q. Where -- where you sent that image file there.

MR. CRENNY: Can we put that at the top.

Q. Okay. Do you see that, David?

A. Yeah.

Q. Okay. And this is January 12th, 2022, so a little less than a month later. And if you can just read this page for a second.

MR. GILES: Kevin, do you want him to read it out loud or do you want him just to --

MR. CRENNY: No. I just want him to get a sense of what it's about.

MR. GILES: All right.

MR. CRENNY: The thing I want to ask him about is on the next page, but I just want to give him a little context.

MR. GILES: Okay.

56

A. I'm done.

Q. Okay.

MR. CRENNY: Can we look at the top of the next page, please.

REMOTE TECHNICIAN: Got it.

Q. And did you see you're -- you're talking there about someone you're work- -- you're working for or working with, and you're talking about the work you've done for them and whether you've done enough, that kind of thing; is that right?

A. Yeah.

Q. Yeah.

And then here at this -- your second set of messages here, at 7:39 p.m. on the -- on page -- this is 1390 now, you say, "They trust me already. I've been DMing" -- direct messaging -- "them since, like, September in some form when I started working on the liquidator."

Do you see that?

A. Yep.

Q. Does that refresh your recollection that you started working on the Solend liquidator code

J.R.272

Transcript of David Chen

15 (57 to 60)

Conducted on December 10, 2025

57

in September?

A. Nah. I think this is all, like, a misremembering at the time. I think this is a --

Q. This is only a couple months --

A. Remember -- remember in the last deposition when I messed up the difference between, like, a week ago and, like, a day ago?

Q. This is only a couple months after the fact; right?

A. Yeah.

Q. This is January 2022.

A. But I'm telling you, I've messed up stuff that's, like, a day in the past in terms of how long ago it happened.

Q. Who is it that you're talking about here, that you were working with or working for?

A. Solend.

Q. Solend, the organization?

A. Yeah.

Q. So who -- who at Solend?

A. Who at Solend? I don't remember who was supervising me.

58

Q. Do you remember who you were talking to when you started working on the liquidator?

A. Who I talked to. Oh, I think at the time the guy who was mentioning that would be 0Xcactus, like the plant.

I don't think he's with them anymore.

I don't know his real name either.

Q. That's his discord handle?

A. Yeah.

Q. And --

A. Or -- actually, I don't think that's his discord handle.

I think we provided this in one of the answers as well.

Q. Do -- are you saying that's not the right guy or you're saying 0Xcactus is his telegram or something different?

Who is this?

A. This is his, like, discord username, but it's not, like, the underlying, like, tag username. I don't know.

That wasn't very helpful.

59

Like, discord has the display name and, like, the username. I think that's his display name, but not his username.

Q. And you don't know his real name?

A. Yeah.

Q. Did you review your DMs with this person in preparation for this deposition?

A. No.

Q. Would you be able to find your DMs with him, if you wanted to?

A. Yes.

Q. What were you messaging this person about in September in relation to the liquidator?

A. I don't think I was messaging him in September.

Q. What were you messaging this person about in -- as you were working on the liquidator?

A. Well, he was the guy in charge of the open source one, so. Like, I'm a big fan of live posting my development, so.

Q. Okay.

MR. CRENNY: Let's take a -- a short

60

break here. Say, till 4:40, just so it's a round number.

MR. GILES: Okay.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Okay. We are going off the record. The time is 4:32.

(Recess in proceedings.)

THE VIDEOGRAPHER: We are now back on the record. The time is 4:42.

MR. CRENNY: Thanks.

BY MR. CRENNY:

Q. So let me ask the question about Git -- GitHub question. If you don't change anything on a GitHub project for a month, are there any commits for that month?

A. No.

Q. If you create a project on GitHub and you write it all in one go, hit save and then don't touch it for a month, are there any commits at all on that project?

A. Sorry. Are you saying that you hit save, you upload and then you wait a month or you

J.R.273

**61**

hit save, you wait a month and then you upload?

Q. You type it up offline -- do you type it up offline before you load it to Git- -- GitHub?

A. Yes.

Q. Okay. So you type it up offline, you save the file, you wait a month, then you upload to GitHub. Will GitHub have any record of what you did a month ago?

A. So -- that depends.

So if you did the order, like, save commit, upload, the commit itself stores the time that you committed. So that -- in that case, yes, it would store a time.

If it was save, commit, then upload, it would be, like, around the time of the upload. That's what the commit would show.

Q. So the GitHub record might not show if you started it a month ago but didn't put it on GitHub, didn't upload it until a month later, the GitHub record would not show you -- would not reflect that you had started it a month prior?

A. That's correct.

**62**

Q. Okay.

MR. CRENNY: I want to look at document 7. Make that Exhibit C.

REMOTE TECHNICIAN: Stand by, Counsel.

MR. CRENNY: Thank you.

MR. GILES: And, Kevin, just for the record, it was document 7, you said?

MR. CRENNY: Yes.

MR. GILES: Exhibit C. Okay. Thank you.

(Exhibit C was marked for identification and is attached to the transcript.)

REMOTE TECHNICIAN: Counsel, you may proceed.

MR. CRENNY: Sure.

And just so you know, we're going to -- I don't know if you can do anything, but we're going to do 7, 8 and 9 here fairly -- in a row.

Q. This is the -- this is your Amended Answers to the First Set of Interrogatories in the Chen v. Chen case.

**63**

Does this look familiar to you?

A. Yeah.

MR. CRENNY: Can we look at pages 7 to 8, Interrogatory No. 15.

REMOTE TECHNICIAN: You may proceed.

MR. CRENNY: Thank you.

Q. And do you see that this is something that you reviewed and signed at the end of the document, that everything in it was accurate; right?

A. (Nods head).

Q. And this is from -- you're -- you're nodding. Can you please say "yes"?

A. Yes.

Q. And this is from August 29th; is that correct?

A. I believe that to be correct.

MR. CRENNY: Can we look at page 16 just real quick to review the date with him.

REMOTE TECHNICIAN: Stand by.

MR. CRENNY: Thank you.

Q. Is that your signature from August 29th,

**64**

David?

A. That looks correct, yes.

Q. Okay.

MR. CRENNY: Can we go back to 'rog 5 on page 8, please. There we go.

Q. CC Interrogatory No. 5 is asking you to explain with specificity the creation, development and use of any Solend liquidator code?

A. Yeah.

Q. And then at the -- you make some objections in response. And then it -- starting at the second line on page 8, it says, "David states with regard to any Solend liquidator code, the latest version that he used was created on October 5th, 2021."

MR. GILES: Objection.

Q. Do you see that?

A. Yes.

Q. What -- what I just read?

A. Yes.

Q. And do you see where it says that initial version of the Solend liquidator code was

65

written in a different language?

A. Yes.

Q. And you used the word "version" here; right?

MR. GILES: Objection.

Counsel used the word "version," so.

Q. You signed the --

MR. CRENNY: Alex, please stop testifying for him.

MR. GILES: I -- we can get to the top of the answers where it says that the language may not be that of the person that's signing the interrogatory, so. Yes, I'm telling you what it is. I'm the one that drafted the answers. He reviewed them and signed them. Yes.

MR. CRENNY: Please stop testifying for the witness.

MR. GILES: I'm not testifying.

Q. Do you see --

MR. GILES: I'm responding to your question.

66

That was an objection. And I'm telling you what the objection is.

Q. David, do you see where the document that you verified says the initial version of the Solend liquidator code was written in a different language?

A. Yes.

Q. And then you say the version that was written in Rust was created on October 31st?

A. Yes.

Q. Okay.

MR. CRENNY: And can we look at --

Q. Before we go to that, is this what you're saying today or are you saying this is inaccurate?

A. Sorry. Give me a second to re-read the interrogatory.

I believe this to be correct.

MR. CRENNY: Can we look at document 8 and mark that as Exhibit D.

REMOTE TECHNICIAN: Stand by, counsel.

MR. CRENNY: And then we'll make 9

67

Exhibit E, if -- if that's helpful. If you want to do them both at once.

(Exhibit D was marked for identification and is attached to the transcript.)

(Exhibit E was marked for identification and is attached to the transcript.)

REMOTE TECHNICIAN: Exhibit D on your screen, Counsel.

MR. CRENNY: I see it, yes.

Q. So -- and, then, this document is your answers to the second set of interrogatories in Chen v. Chen.

Do you recognize this?

A. Yes.

MR. CRENNY: And can we go to the -- it's either the last page -- go to the last page. It might be the second-to-last. Up from there. Higher. I guess, it's 9. Thank you.

Q. Do you see here it's a -- it's got 'rogs 23 and 24 in the answer and then there's a broad signature line for you?

68

MR. CRENNY: Scroll down a -- a tiny bit, please.

A. Yes, I can see that.

Q. Can you see that?

Okay.

MR. CRENNY: Can we look at Exhibit E, please?

REMOTE TECHNICIAN: Stand by, Counsel. You may proceed.

MR. CRENNY: Thanks.

Can you zoom out a little bit. And scroll down it so we can see that. There we go.

Q. Is that that same page but you've signed it?

A. Yes.

Q. And I'll represent that this is how we received it from your counsel.

But did you review all the interrogatories and your signature on this page --

A. Yes.

Q. -- was for all of them, not just for

69

these two that we -- okay.

A.   Yes.

MR. CRENNY:  So let's go back to Exhibit D, please.

REMOTE TECHNICIAN:  Stand by.

MR. CRENNY:  Thank you.

REMOTE TECHNICIAN:  You may proceed.

MR. CRENNY:  And can we go to page 6, 'rog 16.  There we go.

Q.   Do you see it says -- it asks you to identify by date and location when and where you first started working on the Solend liquidator code?  Right?

A.   Yes.

Q.   And here you say, "David states that he first started working on the Solend liquidator code on October 2nd, 2021."

A.   Yes.

Q.   So why -- is that what you -- is this accurate?

A.   Yeah.

Q.   And you said the previous one was not

70

accurate; right?

A.   No.  I said it was accurate.

Q.   So they're -- so here you said you first started working on the Solend liquidator code on October 2nd?

A.   Yes.

Q.   And the other one said October 5th, didn't it?

A.   Yes.

But they're two different questions.

Q.   This one is, "Identify when you first started working on the Solend liquidator code."

A.   Yes.

MR. CRENNY:  Can we look at the -- Exhibit C again.

REMOTE TECHNICIAN:  Stand by, counsel.  You may proceed.

Q.   This one asks you to "explain with specificity the creation, development and use of any Solend liquidator code."

A.   Yes.

Q.   Wouldn't that include when you started

71

working on it?

A.   I suppose.

Q.   So shouldn't it include October 2nd?

A.   I suppose.

Q.   And does it in this first paragraph here where you're talking about the origins?

MR. GILES:  So I'm -- I'm going to object here, Kevin.

And I'm going to give you a little explanation.  We talked about this on Friday.

MR. CRENNY:  Can you please let your client testify.

MR. GILES:  We spoke about this on Friday at the meet and confer.

MR. CRENNY:  Alex, I'm asking David the question.

MR. GILES:  I get that, but we talked about it on the meet and confer.  It's on the record in the meet and confer.

MR. CRENNY:  I'm -- I'm -- and now it's going to be on the record with David because I'm asking David, because he's being deposed,

72

about the creation of the --

MR. GILES:  Go ahead.  Go ahead.

MR. CRENNY:  -- of the -- of the code.  You can make this argument in another point.

Q.   David, does this response mention the October 2nd date that you said would be in it -- should be in it?

A.   It does not.

Q.   So why has your answer -- why did your answer change between August and November?

MR. GILES:  Objection.

But you can go ahead and answer, if you can.

A.   So specifically, I interpreted this interrogatory to mean when was the code created.  So to look for that information I looked at GitHub, I looked at the Git log, I looked at a first date for the creation of the date, the first commit.

For the other one it asked when did you start working on the code.  So for that I looked through messages, I looked at when I started

73

working.

So I interpreted these two questions differently.

Q. Does development not -- wouldn't the word "development" include when you started working on it?

A. I suppose.

Q. So you've said that the date that you're giving us now is October -- so is the October 2nd date correct for when you started working on the Solend liquidator code?

A. I believe it to be so.

Q. And that's based on GitHub commits and AltTank discussions that you reviewed?

A. That is correct.

Q. And why is Alt -- why are the AltTank messages you reviewed more authoritative to you than the messages we showed you saying September?

A. Those messages are from after the fact. The AltTank messages are from the time I started working.

MR. CRENNY: We can take the exhibit

74

down.

REMOTE TECHNICIAN: Stand by.

MR. CRENNY: Thank you.

Q. What did you look at in order to prepare the interrogatory responses that we were just looking at, the August ones and the more recent November one?

A. I looked at GitHub history and I looked at the AltTank messages. I also looked at the messages between me and Alexander K.

Q. And that's Alexander Karavaltchev; correctly -- correct?

A. Yep.

Q. K-A-R-A-V-A-L-T-C-H-E-V?

A. That is correct.

Q. Thanks.

Are those the only things you looked at to determine when you started working on the Solend liquidator code?

A. I can't recall what else I reviewed, but those are the main things I can give you off the top of my head.

75

Q. Did you look at other discord conversations?

A. It's possible.

Q. Did you look at telegram conversations?

A. No.

Q. What did you do to prepare for this deposition?

A. I looked at those messages. I looked at the GitHub commit history.

Q. Is that -- that's all you reviewed?

Did you review your interrogatory responses?

That was two questions.

Did you review your interrogatory responses?

A. I briefly glanced at them, yes.

MR. CRENNY: Can we look at document 5, please.

REMOTE TECHNICIAN: Stand by, counsel.

MR. CRENNY: Are we at F?

(Exhibit F was marked for identification and is attached to the transcript.)

76

REMOTE TECHNICIAN: You may proceed.

MR. CRENNY: Thank you.

Q. This is a series of messages. This is a series of messages from the new clickbait server. This document is -- it's an excerpt again.

MR. CRENNY: Can we look at the bottom of this first page to get the -- the Bates number is Deng, D-E-N-G, 0001088.

Q. This is -- it says the guild is new clickbait. That means server; right?

A. Yes.

Q. And what -- who was in the new clickbait server? Generally. Not specific people. But what category?

A. A bunch of girls I was friends with in high school.

Q. And this channel is called "new hell/new year."

Right?

A. Yes.

Q. And what was this channel for?

A. Just a general channel of the server.

Q. General chat?

A. Yeah.

Q. And if we look at page 2 here, so this -- again, it's a very long document so it jumps to the page that it -- I've excerpted the page that's relevant, which is Deng 2943. You see that?

A. Yeah.

Q. And if you look at -- you sent a message on August 8th --

MR. CRENNY: Could we go up a little bit. Thank you. There we go.

Q. -- it says, "Radiantaeon, August 8th, 12:31 a.m., bot made $67 while I was away on vacation."

Do you see that?

A. Yes.

Q. What bot was this?

A. Well, it says at the bottom. It says, Bitcoin trading.

Q. And I should clarify, when we're saying "bot," it means automated program that does crypto currency trading; right?

A. In this case, yeah.

Q. Not the most technical definition, but that's accurate?

A. In this case, yes.

Q. And is the Solend liquidator also a bot in that sense?

A. Yes.

Q. Was this code on Solana, operating on Solana blockchain?

A. I'd have to see more. I don't actually know what this is talking about.

Q. Were you working on codes on the Solana blockchain in August 2021?

A. I don't believe so.

MR. CRENNY: Can we look at document 6. We can mark that as Exhibit G.

REMOTE TECHNICIAN: Stand by.

(Exhibit G was marked for identification and is attached to the transcript.)

REMOTE TECHNICIAN: You may proceed.

MR. CRENNY: Thanks.

Q. So this is the same cover page because it's from the same server.

MR. CRENNY: If we go down to page 2 of the PDF. That will be Deng 2733. Right there. That's great.

Q. You see this is July 5th, 2021?

A. Yes.

Q. And it says -- you say, "I got a bot to make money for me starting, like, last week and it's doing pretty good."

A. Yes.

Q. Was this a bot on Solana?

A. I don't believe so.

Q. What makes you say that?

A. Previously I'd worked on trading bots using a platform called Hopper, I think.

I guess, to, like, be clear, I don't know what this is specifically talking about.

Q. And you testified earlier that you frequently don't remember how long ago you did what; right?

A. Yes.

Q. So is it possible that in the summer of 2021 these bots were on the Solana blockchain?

A. Anything's possible.

Q. And is it possible these were earlier versions of the liquidator code --

A. No.

Q. -- that you were thinking about at this point?

A. No.

Q. Why not?

A. Well, I can't disprove a negative. Is that how I word it?

Well, because I started working on it in -- on October 2nd.

Q. Based on your review of --

A. The AltTank messages, yeah.

Q. Primarily of AltTank messages.

Did you review messages in this server?

A. No.

Q. I think that might be it. Give me one moment to...

You said the --

J.R.278

Transcript of David Chen
Conducted on December 10, 2025

MR. CRENNY: That's fine, take the exhibit down.

Q. The October 31st date for the Rust version, you said that you gave that October 31st date based on the messages with Alex Karavaltchev that you reviewed?

A. I don't recall. It was either messages or a GitHub.

Q. That made you -- what was -- that made you say October 30th -- sorry.

What -- I'm going to start this over.

You said October 31st for -- was when you started working on the version that was in the -- the language Rust; correct?

A. All I remember if this was the one that says, like, I created or began working on.

Q. But I think I asked you at the top of the deposition when did you start working on it and you said October 31st. I'm not talking about --

A. Yeah. Yeah. I think I also said I wasn't sure. I'd have to double-check to be sure.

But it's, like, that plus or minus a few days.

Q. You'd have to double-check where?

What is your base -- what is the basis for the 10/31 date for that particular version?

A. Well, I'd have to check if it's the creation or, like -- creation on GitHub or the earliest mention in discord messages. But they're not, like, significantly different. They're, like, at most, like, a week apart.

Q. So you're saying the tenth -- tell me if this is what you're saying. I'm trying to clarify.

The version that was in Rust, you're saying, was created within four or five days of October 31st; correct?

A. It was created either --

Q. By it "was created," you started working on it.

A. I'm not sure if the date I stated was for creation or beginning working on it.

Q. But you -- you gave the date October 31st and you don't remember what that was --

whether that was for -- what's the distinction between "working on it" and "creation," in your mind?

A. The way I define it, "working on it" is, like, the first time I see a mention of it in discord. That's when, like, I start working on it. I, like, talk about it to people.

"Creation" is when it first shows up in Git history.

Q. So when you start working on it is when you first start talking about it with people on discord, in your definition; correct?

A. Yeah.

Q. And you say you started working on the Solend liquidator code on October 2nd?

A. That's correct.

Q. Based on your review of only the AltTank discord server --

A. That's correct.

Q. -- right?

So if you had talked about it with other people in another place prior to taking it to your friends in the AltTank server, you would not have seen that in preparation for this; right?

MR. GILES: Objection.

You can answer, if you can.

A. It's possible.

Q. So how do you know that there aren't other servers where you're talking about it on October 1st or September 29th or September 20th?

A. I explained it earlier. So I'll go over it again. The AltTank messages start off talking about SOL farm liquidation. So I explained how, like, when I was looking into liquidations, I initially looked into SOL farm. And that was a dead end. And then after that was when I started looking at Solend. So, like, when I start talking about SOL farm, that's, like, the absolute earliest. That's actually, maybe, like, even a day before I even start looking at Solend.

Q. And you're seeing yourself talking about SOL farm on October 2nd?

A. Yes.

Q. In Alt- -- in AltTank?

J.R.279

85

A. Yes.

Q. How do you know you weren't talking about SOL farm somewhere else in -- on October 1st or before --

A. I don't know that.

MR. CRENNY: I think that's it.

MR. GILES: I have just one short, little followup. And then, obviously, you might have a followup on top of that, but...

EXAMINATION

BY MR. GILES:

Q. David, do you recall the questions from Mr. Crenny after the break, after the ten-minute break, where he was talking about if you save the work, you wait a month and then you upload it to GitHub, when -- what does the date show for the commit?

Do you remember that testimony, that --

A. Yeah.

Q. -- that question?

A. Yeah.

Q. Okay. With regard to your work on the

86

Solend liquidator code -- and let's call it the -- the typescript language. Putting aside the rough language. The typescript language. In your recollection, your memory, did you save it, wait a month and then upload it as a commit to GitHub?

A. No.

Q. Okay. How many days was it between you working on it and you uploading it as a commit to GitHub?

A. Less than three days.

Q. Okay. So either the same day, one day, two days or three days?

A. Yes.

Q. And it's not longer than three days?

A. Yes.

Q. Okay.

MR. GILES: I have no further questions.

MR. CRENNY: I'll just ask a little quick followup on that.

MR. GILES: Sure.

EXAMINATION

87

BY MR. CRENNY:

Q. How do you know that it was three days or less?

A. Based on the AltTank October 2nd and then the GitHub date is October 4th, October 5th. So that three-days range, 2nd through the 5th.

Q. So it's based on AltTank, which was the only place you looked on discord, and on GitHub a few days later?

A. Yes.

MR. CRENNY: That's it for me.

MR. GILES: Okay.

So you have the right, as we did the last time, the right to review the transcript to make sure that what has been transcribed has been done so accurately. And, obviously, with regard to the last transcript, we had the issue with "comment" versus "commit." So you had to correct that because that was incorrect.

THE WITNESS: (Nods head).

MR. GILES: It's those types of things.

88

It's when there's a typographical error, not changing the -- the testimony.

So do you want to take the opportunity to review the transcript to make sure it's accurate or do you want to waive that opportunity?

I would recommend that you take that opportunity.

THE WITNESS: I would like to take that opportunity.

MR. GILES: Okay. That's it.

THE VIDEOGRAPHER: Okay. This marks the end of the deposition of David Chen. We are going off the video record. The time is 5:11 p.m.

AND FURTHER THIS DEPONENT SAITH NOT.

* * * * *

SIGNATURE RIGHTS RESERVED.

(Videotaped Deposition concluded at 5:11 p.m.)

* * * * *

89

STATE OF MARYLAND   :

COUNTY OF MONTGOMERY:

I, April Reid, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the State of Maryland, and whose commission expires March 13, 2027, do certify that the aforementioned appeared before me, was sworn by me, and was thereupon examined by counsel; and that the foregoing is a true, correct, and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal in Rockville, Maryland, this 11th day of December, 2025.

_____

April Reid, RPR, CRR - Notary Public

J.R.281

Transcript of David Chen
Conducted on December 10, 2025                    24

**A**

**abbreviated**
40:4
**able**
59:9
**about**
7:11, 14:17,
21:14, 24:22,
25:9, 25:21,
26:1, 26:3,
28:12, 28:14,
28:15, 29:4,
29:14, 29:17,
29:20, 30:7,
30:11, 30:12,
31:6, 31:14,
31:17, 34:19,
35:21, 37:17,
40:7, 40:20,
41:4, 41:15,
42:1, 42:5,
43:7, 43:11,
45:13, 45:15,
45:19, 46:9,
46:16, 48:11,
49:13, 50:7,
51:13, 55:17,
55:20, 56:7,
56:8, 57:15,
59:13, 59:17,
60:12, 71:6,
71:10, 71:13,
71:18, 72:1,
78:12, 79:18,
80:7, 81:20,
83:7, 83:11,
83:21, 84:7,
84:11, 84:16,
84:19, 85:3,
85:14
**above**
39:17
**absolute**
84:16
**absolutely**
10:15
**accounts**
21:18, 21:19,

22:3, 22:12,
43:9, 44:1
**accurate**
23:15, 33:11,
40:12, 63:9,
69:20, 70:1,
70:2, 78:4, 88:5
**accurately**
87:16
**actual**
17:3, 43:21,
48:6
**actually**
25:3, 34:1,
34:2, 34:5,
42:18, 46:13,
47:5, 58:11,
78:11, 84:17
**adduced**
89:10
**administrator**
1:4
**affirm**
7:11
**affirmed**
7:18
**aforementioned**
89:7
**afoul**
30:8
**after**
18:16, 18:18,
22:20, 35:16,
44:20, 48:18,
50:22, 53:3,
57:8, 73:19,
84:14, 85:13
**again**
32:20, 34:10,
38:22, 46:3,
70:15, 76:5,
77:4, 84:10
**ago**
57:7, 57:14,
61:8, 61:18,
79:20
**agree**
9:1, 10:17

**agreement**
10:6, 10:8,
17:10
**ahead**
31:10, 33:3,
47:21, 51:9,
52:1, 53:13,
72:2, 72:12
**alex**
16:22, 18:22,
28:15, 28:16,
28:17, 28:20,
28:21, 65:8,
71:15, 81:5
**alexander**
2:5, 7:1, 10:6,
10:9, 16:22,
17:5, 74:10,
74:11
**all**
6:13, 10:12,
21:16, 21:18,
22:3, 22:12,
22:13, 22:14,
22:16, 33:5,
35:14, 35:16,
36:20, 39:7,
40:18, 43:4,
44:1, 48:4,
53:7, 55:18,
57:2, 60:18,
60:20, 68:19,
68:22, 75:10,
81:15
**along**
50:15
**already**
21:1, 26:1,
56:16
**also**
3:3, 6:19,
15:17, 22:6,
22:22, 24:10,
30:14, 41:21,
52:15, 53:1,
74:9, 78:6,
81:21
**alt**
73:16, 84:22

**alttank**
26:2, 26:3,
26:5, 28:13,
29:4, 44:17,
44:21, 47:16,
50:12, 52:13,
52:19, 53:10,
53:14, 53:19,
73:14, 73:16,
73:20, 74:9,
80:16, 80:17,
83:17, 84:1,
84:10, 84:22,
87:4, 87:7
**always**
48:3
**amended**
4:17, 4:22,
62:20
**amount**
22:5
**annoyingly**
34:7
**another**
9:8, 36:19,
54:18, 72:4,
83:22
**answer**
10:13, 11:6,
11:16, 12:1,
12:2, 16:8,
19:18, 31:1,
33:3, 35:7,
35:20, 47:21,
49:1, 51:9,
52:1, 54:6,
67:21, 72:9,
72:10, 72:12,
84:4
**answered**
15:7, 34:9
**answers**
4:17, 4:22,
12:19, 15:8,
15:18, 58:14,
62:21, 65:11,
65:15, 67:11
**any**
10:18, 10:19,

J.R.282

Transcript of David Chen
Conducted on December 10, 2025

25

12:21, 15:19,
20:4, 20:7,
22:17, 23:6,
26:19, 54:2,
60:14, 60:19,
61:7, 64:8,
64:13, 70:20,
89:12
**anymore**
58:6
**anyone**
8:15, 9:2,
11:1, 28:14,
29:2, 29:20,
31:5
**anything**
9:20, 16:14,
25:8, 33:13,
39:20, 40:5,
41:9, 41:14,
53:14, 53:19,
54:8, 60:13,
62:17
**anything's**
80:3
**anywhere**
26:4, 29:7,
29:8
**apart**
82:9
**apologize**
18:17
**app**
48:14
**appeared**
89:7
**apply**
35:9
**appreciate**
30:17
**april**
1:22, 7:4,
89:3, 89:20
**aren't**
84:6
**arguing**
45:13
**argument**
72:4

**around**
40:8, 48:16,
49:2, 61:15
**aside**
86:2
**asked**
9:10, 72:20,
81:17
**askew**
30:20
**asking**
17:7, 17:8,
30:10, 35:21,
36:1, 49:13,
64:6, 71:15,
71:22
**asks**
69:10, 70:18
**associated**
89:12
**attached**
38:3, 54:16,
62:12, 67:4,
67:6, 75:22,
78:20
**attending**
6:14
**attorney**
8:19
**audits**
1:8, 2:12, 6:19
**august**
39:1, 63:15,
63:22, 72:10,
74:6, 77:10,
77:13, 78:14
**authoritative**
73:17
**automated**
13:15, 14:22,
77:22
**automatic**
13:15
**avoid**
40:10
**aware**
16:3, 29:16,
54:9

**away**
77:14
**awhile**
39:20, 47:7,
47:11, 47:12,
47:14

**B**

**back**
11:5, 26:11,
33:13, 39:5,
46:14, 47:15,
55:3, 60:8,
64:4, 69:3
**bad**
27:2
**bag**
9:7
**baltimore**
2:8
**base**
14:12, 14:15,
25:16, 45:8,
45:10, 45:16,
45:21, 82:3
**based**
41:2, 45:17,
46:15, 73:13,
80:15, 81:5,
83:17, 87:4,
87:7
**bases**
13:7, 14:18,
14:19, 45:13
**basis**
33:10, 52:20,
82:3
**batch**
22:16
**bates**
5:6, 5:9, 38:9,
38:11, 39:14,
39:15, 42:15,
43:2, 49:8,
49:9, 76:7
**because**
8:12, 18:21,
30:15, 33:12,

34:5, 35:21,
39:7, 39:11,
41:9, 44:17,
44:18, 46:17,
47:20, 50:21,
52:12, 71:21,
71:22, 79:1,
80:13, 87:19
**become**
24:19
**been**
20:20, 22:11,
33:21, 34:13,
35:5, 36:3,
42:3, 42:5,
44:15, 49:19,
50:19, 51:13,
56:16, 87:15,
87:16
**before**
35:13, 35:15,
48:17, 48:19,
50:19, 51:14,
61:3, 66:13,
84:18, 85:4,
89:7
**began**
81:16
**begin**
7:22, 19:19
**beginning**
20:13, 25:18,
82:20
**begins**
6:2, 19:17
**behalf**
2:3, 2:11
**behave**
21:7
**being**
7:18, 9:12,
71:22
**believe**
15:4, 16:21,
18:18, 22:6,
33:4, 33:7,
44:21, 46:17,
63:17, 66:18,

J.R.283

Transcript of David Chen
Conducted on December 10, 2025                    26

73:12, 78:15,
79:13
**below**
41:2
**best**
16:10
**between**
16:22, 38:18,
57:7, 72:10,
74:10, 83:2,
86:7
**beyond**
14:17
**big**
21:22, 59:19
**bit**
68:2, 68:11,
77:12
**bitcoin**
77:20
**blank**
19:8
**blockchain**
13:13, 15:20,
16:2, 16:5,
23:14, 23:19,
24:11, 24:20,
35:14, 51:3,
51:7, 51:16,
51:19, 51:21,
52:8, 78:10,
78:14, 80:2
**blocking**
22:17
**borrows**
22:6
**bot**
16:13, 31:20,
31:22, 40:9,
43:22, 44:13,
45:1, 46:19,
77:14, 77:18,
77:22, 78:6,
79:8, 79:12
**both**
13:7, 13:10,
13:12, 13:15,
14:20, 67:2

**bots**
13:16, 14:22,
44:8, 45:6,
79:15, 80:2
**bottle**
9:7, 9:8
**bottom**
38:9, 42:19,
49:9, 76:6,
77:19
**box**
9:7, 52:4
**brad**
3:5, 6:11
**break**
60:1, 85:13,
85:14
**briefly**
75:16
**bring**
10:4
**broad**
16:7, 16:9,
21:14, 67:21
**broader**
29:12
**broadly**
23:11, 25:6
**building**
51:20
**bunch**
26:10, 43:20,
76:15
**business**
17:11, 17:13,
21:8

### C

**c-cap**
41:18
**c-o-m-m-i-t**
18:12
**c-o-m-m-i-t-s**
32:21
**ca**
1:22
**call**
6:20, 10:7,

13:8, 30:2, 86:1
**called**
31:19, 31:22,
76:17, 79:16
**calls**
22:17
**cam**
41:18
**came**
28:21
**can't**
9:19, 10:22,
34:12, 35:15,
35:19, 36:3,
74:20, 80:11
**case**
1:4, 1:12, 6:6,
35:10, 61:12,
62:22, 78:2,
78:5
**categorized**
26:8
**category**
76:14
**cause**
52:12
**cc**
64:6
**certified**
89:4
**certify**
89:6, 89:11
**chain**
23:3
**change**
27:18, 60:13,
72:10
**changed**
28:9, 36:18
**changing**
88:2
**channel**
76:17, 76:21,
76:22
**characterized**
19:6
**charge**
59:18

**chat**
77:1
**check**
15:8, 23:5,
44:1, 82:5
**checked**
15:11
**checks**
43:21
**cheesed**
44:7, 46:18
**chen**
1:5, 1:8, 1:12,
1:15, 1:18, 2:4,
2:11, 2:13, 4:3,
4:18, 4:20,
4:23, 4:25, 5:4,
6:4, 6:5, 6:18,
7:2, 7:7, 7:17,
8:6, 29:14,
34:22, 38:19,
62:22, 67:12,
88:13
**christina**
2:18, 6:22
**clarify**
77:21, 82:12
**clarifying**
43:8
**clarity**
40:14
**clattenburg**
2:14, 6:21
**clean**
18:14
**clear**
37:12, 79:17
**clervil**
3:6
**clickbait**
5:6, 5:9,
29:18, 76:4,
76:10, 76:12
**client**
71:12
**close**
47:8
**clue**
31:17

J.R.284

Transcript of David Chen
Conducted on December 10, 2025

**code**
12:7, 12:12, 12:22, 13:3, 13:7, 14:12, 14:14, 14:15, 14:18, 14:19, 15:20, 15:22, 16:14, 16:17, 16:18, 17:22, 18:4, 19:5, 19:22, 20:3, 20:5, 20:7, 20:12, 20:18, 20:21, 20:22, 21:11, 21:13, 23:9, 23:13, 25:15, 25:16, 26:18, 26:19, 27:4, 27:5, 27:9, 27:10, 27:15, 27:21, 28:4, 29:21, 30:6, 30:12, 31:7, 31:14, 32:10, 33:14, 33:16, 35:22, 37:6, 45:7, 45:9, 45:13, 45:16, 45:17, 45:21, 46:1, 56:22, 64:8, 64:13, 64:22, 66:5, 69:13, 69:17, 70:4, 70:12, 70:20, 72:3, 72:15, 72:21, 73:11, 74:19, 78:9, 80:5, 83:15, 86:1

**codes**
14:20, 28:11, 78:13

**coding**
19:13, 19:20

**college**
48:14

**comes**
9:2

**coming**
53:9

**comment**
87:18

**commission**
89:6

**commit**
18:7, 18:11, 18:15, 33:18, 34:12, 35:19, 37:16, 53:1, 53:2, 53:5, 61:11, 61:14, 61:16, 72:19, 75:9, 85:17, 86:5, 86:8, 87:18

**commits**
32:18, 32:22, 33:14, 33:15, 33:17, 33:19, 35:4, 35:5, 35:11, 35:14, 36:2, 36:3, 36:10, 36:20, 37:2, 37:6, 37:13, 37:14, 60:15, 60:19, 73:13

**committed**
61:12

**communicate**
11:1

**communicating**
28:12

**communications**
30:12, 31:16

**completely**
13:18

**complies**
7:9

**computer**
9:20

**concluded**
88:20

**condense**
23:17

**conducted**
1:18

**confer**
71:14, 71:18, 71:19

**confusion**
13:4

**constraints**
37:8

**cont'd**
3:1

**context**
32:9, 55:21

**continue**
22:2

**conversation**
39:1, 41:5, 54:19

**conversations**
75:2, 75:4

**cool**
25:13, 40:8, 40:21, 50:15

**copy**
10:5, 27:17, 32:10

**correct**
8:21, 11:8, 15:1, 18:12, 35:6, 43:4, 44:22, 50:6, 50:9, 61:22, 63:16, 63:17, 64:2, 66:18, 73:10, 73:15, 74:12, 74:15, 81:14, 82:15, 83:12, 83:16, 83:19, 87:19, 89:9

**correctly**
74:12

**could**
8:4, 16:8, 23:8, 23:16, 25:13, 34:6, 36:16, 42:17, 51:13, 52:6, 77:11

**couldn't**
37:3, 50:18

**counsel**
6:15, 11:21, 28:17, 37:22, 54:13, 62:4, 62:13, 65:6, 66:21, 67:8, 68:8, 68:18, 70:16, 75:19, 89:8, 89:12

**county**
89:2

**couple**
43:16, 52:13, 57:4, 57:8

**court**
1:1, 6:5, 7:3, 11:7, 11:12, 18:10, 32:21

**cover**
54:20, 79:1

**cppio**
35:11

**create**
60:17

**created**
21:1, 24:4, 45:4, 45:5, 64:14, 66:9, 72:15, 81:16, 82:14, 82:16, 82:17

**creation**
30:6, 64:7, 70:19, 72:1, 72:18, 82:6, 82:20, 83:2, 83:8

**crenny**
2:16, 4:5, 4:9, 6:17, 8:2, 9:16, 9:18, 10:2, 10:12, 10:16, 30:10, 32:20, 34:17, 34:19, 34:22, 37:18, 38:1, 38:5, 38:8, 38:21, 39:13, 40:17,

J.R.285

Transcript of David Chen
Conducted on December 10, 2025

42:11, 42:14, 42:17, 43:15, 49:4, 49:7, 49:12, 54:11, 54:14, 54:22, 55:7, 55:16, 55:19, 56:3, 59:22, 60:10, 60:11, 62:2, 62:5, 62:8, 62:15, 63:3, 63:6, 63:18, 63:21, 64:4, 65:8, 65:17, 66:12, 66:19, 66:22, 67:9, 67:15, 68:1, 68:6, 68:10, 69:3, 69:6, 69:8, 70:14, 71:11, 71:15, 71:20, 72:3, 73:22, 74:3, 75:17, 75:20, 76:2, 76:6, 77:11, 78:16, 78:22, 79:3, 81:1, 85:6, 85:13, 86:18, 87:1, 87:11

**cross-ref'd**
17:3
**crr**
1:22, 89:20
**crypto**
26:11, 77:22
**cryptographically**
35:13
**csr**
1:22
**currency**
78:1

**D**

**d-e-n-g**
76:8
**date**
6:8, 16:20,

18:20, 32:14, 33:10, 43:3, 49:18, 50:11, 53:9, 63:19, 69:11, 72:6, 72:18, 73:8, 73:10, 81:3, 81:5, 82:4, 82:19, 82:21, 85:16, 87:5
**dated**
5:5
**david**
1:15, 1:18, 2:4, 4:3, 4:18, 4:23, 5:4, 6:4, 7:2, 7:7, 7:17, 8:3, 8:6, 10:13, 10:17, 31:1, 34:22, 55:8, 64:1, 64:12, 66:3, 69:15, 71:15, 71:21, 71:22, 72:5, 85:12, 88:13
**day**
18:20, 53:21, 57:7, 57:13, 84:18, 86:11, 89:16
**days**
18:9, 44:20, 82:1, 82:14, 86:7, 86:10, 86:12, 86:14, 87:2, 87:9
**dc**
2:21
**dead**
84:14
**december**
1:19, 6:8, 39:21, 40:15, 41:16, 43:3, 48:15, 49:1, 49:18, 89:16
**defendant**
1:16, 2:3,

4:17, 4:22
**defendants**
1:10, 2:11
**define**
13:1, 83:4
**definitely**
36:5
**definition**
78:3, 83:12
**delete**
34:2
**deleted**
32:22, 33:6, 33:17, 33:21, 34:4, 35:6, 36:4, 36:9, 37:3, 37:13, 37:14
**deleting**
37:6
**deletions**
34:13, 36:13
**deng**
5:7, 5:8, 5:10, 76:8, 77:6, 79:4
**deng_**
5:11
**depend**
21:3
**depends**
21:2, 61:9
**deponent**
88:17
**depos**
6:12, 7:5
**deposed**
11:4, 71:22
**deposited**
52:16
**deposition**
1:18, 6:3, 6:13, 10:20, 30:6, 42:9, 57:6, 59:7, 75:7, 81:18, 88:13, 88:20
**deposits**
22:6

**derivative**
27:12, 45:4, 46:1
**des**
23:12
**describe**
26:8
**described**
23:13
**description**
4:12, 5:3
**details**
30:16
**determine**
16:20, 16:22, 32:14, 74:18
**development**
59:20, 64:7, 70:19, 73:4, 73:5
**development-wise**
28:7
**dice**
41:18
**dicharia**
2:17, 6:21
**difference**
57:6
**different**
8:11, 13:6, 13:7, 13:19, 14:4, 14:6, 21:4, 21:7, 24:15, 25:17, 51:4, 58:17, 65:1, 66:5, 70:10, 82:8
**differently**
73:3
**difficult**
34:7
**direct**
4:13, 4:15, 38:18, 56:16
**directly**
36:14
**disagree**
50:5

J.R.286

Transcript of David Chen
Conducted on December 10, 2025

**discord**
18:21, 26:5, 29:1, 29:5, 31:15, 41:19, 41:20, 52:13, 52:18, 58:8, 58:12, 58:19, 59:1, 75:1, 82:7, 83:6, 83:12, 83:18, 87:8
**discussions**
73:14
**display**
59:1, 59:2
**disprove**
80:11
**distinction**
83:1
**district**
1:1, 1:2, 6:5, 6:6
**diversions**
45:13
**dming**
56:16
**dms**
59:6, 59:9
**document**
19:9, 19:20, 37:20, 38:12, 39:5, 39:10, 49:5, 54:11, 54:21, 62:2, 62:7, 63:9, 66:3, 66:19, 67:10, 75:17, 76:5, 77:4, 78:16
**documents**
10:10
**doing**
19:4, 21:14, 26:10, 28:3, 48:13, 79:10
**done**
56:1, 56:9, 87:16

**double-check**
81:22, 82:2
**down**
11:12, 15:12, 23:17, 43:16, 49:9, 68:1, 68:12, 74:1, 79:3, 81:2
**drafted**
65:15
**draw**
20:22
**duly**
7:18
**during**
10:20

**E**

**each**
11:11, 13:9, 13:20, 14:4, 14:19
**earlier**
79:19, 80:4, 84:9
**earliest**
82:7, 84:17
**east**
2:7
**eastern**
6:10
**easy**
21:5
**edge**
47:9
**either**
41:17, 58:7, 67:16, 81:7, 82:16, 86:11
**elaborate**
27:16
**elicit**
30:11
**else**
9:2, 9:12, 9:20, 20:8, 26:4, 28:14, 29:7, 29:8,

37:5, 54:9, 74:20, 85:3
**emma**
3:4
**encouraged**
27:6
**end**
20:18, 23:5, 63:8, 84:14, 88:13
**ended**
12:15
**enough**
56:10
**entirely**
13:6, 14:7, 35:9
**error**
88:1
**especially**
11:11
**esq**
2:5, 2:14, 2:15, 2:16, 2:17, 2:18
**est**
1:19
**even**
37:5, 44:19, 84:17, 84:18
**event**
89:14
**every**
22:19
**everything**
23:4, 24:14, 35:13, 35:16, 35:18, 63:9
**everywhere**
25:14
**examination**
4:5, 4:7, 4:9, 8:1, 85:10, 86:21
**examined**
7:20, 89:8
**except**
9:14

**excerpt**
38:12, 39:9, 54:18, 76:5
**excerpted**
77:5
**exhibit**
4:13, 4:15, 4:17, 4:22, 5:4, 5:6, 5:9, 37:21, 38:2, 38:11, 54:12, 54:15, 62:3, 62:9, 62:11, 66:20, 67:1, 67:3, 67:5, 67:7, 68:6, 69:3, 70:15, 73:22, 75:21, 78:17, 78:19, 81:2
**existed**
32:11
**expand**
40:4
**expires**
89:6
**explain**
32:8, 64:7, 70:18
**explained**
84:9, 84:11
**explanation**
71:10

**F**

**fact**
57:9, 73:19
**fairly**
62:18
**familiar**
63:1
**fan**
59:19
**far**
30:20, 37:3, 39:5
**farm**
25:4, 25:5, 44:19, 50:16,

J.R.287

Transcript of David Chen
Conducted on December 10, 2025

30

50:22, 51:2,
51:14, 51:15,
52:15, 52:17,
84:11, 84:13,
84:16, 84:20,
85:3
**faster**
43:21, 45:21
**fen**
1:4, 7:2
**few**
9:18, 18:9,
43:15, 44:20,
82:1, 87:9
**figure**
23:8
**file**
55:4, 55:5,
61:6
**filter**
21:20, 22:4
**finally**
11:21
**find**
24:11, 36:16,
59:9
**finding**
25:15
**finds**
23:13
**fine**
28:1, 30:18,
49:12, 81:1
**firestone**
2:19, 3:4
**first**
4:18, 7:18,
12:21, 15:19,
16:4, 16:12,
18:7, 18:15,
23:11, 23:12,
39:10, 44:18,
45:16, 48:14,
53:5, 62:21,
69:12, 69:16,
70:3, 70:11,
71:5, 72:18,
76:7, 83:5,

83:8, 83:11
**five**
82:14
**floyd**
3:4
**folder**
10:5
**follows**
7:21
**followup**
85:8, 85:9,
86:19
**foregoing**
89:9
**fork**
26:21, 26:22,
27:4, 27:6,
32:6, 32:8,
32:10
**forked**
32:6, 32:9
**form**
56:17
**found**
50:12, 50:21
**four**
82:14
**fourth**
55:3
**frame**
17:12, 17:16,
29:9
**frantz**
3:6, 37:20
**free**
35:17
**frequently**
79:20
**friday**
71:10, 71:14
**friends**
76:15, 84:1
**front**
9:4, 9:21
**full**
8:4, 9:11, 89:9
**fun**
44:5

**functionality**
24:17
**funds**
52:16
**further**
86:17, 88:17,
89:11

### G

**game**
35:17
**gave**
50:22, 81:4,
82:21
**general**
36:1, 50:8,
76:22, 77:1
**generally**
25:22, 45:19,
76:13
**genuinely**
44:17
**giles**
2:5, 4:7, 7:1,
8:17, 8:19, 9:9,
9:17, 9:22,
10:3, 10:15,
12:1, 14:2,
19:14, 28:16,
28:18, 30:3,
30:17, 31:8,
31:10, 33:2,
34:15, 34:18,
34:21, 35:7,
37:15, 40:14,
40:18, 47:19,
51:8, 51:22,
53:11, 54:5,
55:13, 55:18,
55:22, 60:3,
62:6, 62:9,
64:16, 65:5,
65:10, 65:19,
65:21, 71:7,
71:13, 71:17,
72:2, 72:11,
84:3, 85:7,
85:11, 86:17,

86:20, 87:12,
87:22, 88:11
**girls**
76:15
**git**
17:4, 18:8,
36:18, 36:19,
60:12, 61:3,
72:17, 83:9
**github**
17:3, 18:3,
32:14, 32:17,
32:22, 33:9,
33:18, 34:11,
34:14, 35:3,
36:2, 36:9,
36:12, 37:12,
53:1, 54:8,
60:13, 60:14,
60:17, 61:3,
61:7, 61:17,
61:19, 61:20,
72:17, 73:13,
74:8, 75:9,
81:8, 82:6,
85:16, 86:5,
86:9, 87:5, 87:8
**give**
7:12, 16:7,
16:9, 43:16,
55:21, 66:16,
71:9, 74:21,
80:20
**given**
37:7, 89:15
**giving**
33:10, 73:9
**glanced**
75:16
**go**
11:5, 21:14,
25:9, 31:10,
33:3, 33:12,
36:17, 38:21,
39:13, 39:17,
42:11, 42:17,
42:20, 46:14,
47:21, 49:4,

J.R.288

51:9, 52:1,
53:13, 55:3,
60:18, 64:4,
64:5, 66:13,
67:15, 67:16,
68:13, 69:3,
69:8, 69:9,
72:2, 72:12,
77:11, 77:12,
79:3, 84:9

**goes**
39:5, 50:17,
53:3

**going**
8:10, 10:7,
12:9, 22:3,
25:12, 27:18,
30:3, 32:5,
34:10, 37:10,
37:15, 40:2,
40:4, 40:8,
44:21, 47:19,
60:5, 62:16,
62:18, 71:7,
71:9, 71:21,
81:11, 88:14

**gone**
30:19

**good**
42:20, 79:10

**google**
25:14

**graduated**
48:17, 48:20

**great**
79:5

**greater**
22:5

**guess**
13:21, 23:16,
34:8, 35:17,
36:6, 37:8,
67:18, 79:17

**guild**
5:6, 5:9, 76:9

**guy**
17:9, 58:4,
58:16, 59:18

**guys**
26:10, 52:13,
52:17

**H**

**hagerstown**
8:14

**hall**
8:14

**hand**
7:8, 89:15

**handle**
58:8, 58:12

**handy**
9:7

**happen**
44:21

**happened**
29:3, 57:14

**happens**
28:22

**hard**
16:6

**head**
19:10, 19:21,
32:7, 63:11,
74:22, 87:21

**heads**
40:6

**hearths**
35:11

**hell**
76:17

**help**
30:12, 37:9

**helpful**
20:20, 58:22,
67:1

**here**
6:2, 10:5,
10:10, 30:16,
38:11, 41:1,
43:12, 44:16,
46:9, 47:10,
50:7, 54:20,
56:13, 56:14,
57:16, 60:1,
62:18, 65:3,

67:20, 69:15,
70:3, 71:5,
71:8, 77:3

**high**
48:17, 76:16

**higher**
67:18

**history**
18:8, 33:19,
34:12, 36:2,
36:20, 53:2,
53:6, 74:8,
75:9, 83:9

**hit**
60:18, 60:21,
61:1

**hmm**
14:7, 15:14,
27:22, 28:21

**honestly**
20:1

**hopper**
79:16

**hundreds**
39:12

**I**

**identification**
38:2, 54:15,
62:11, 67:3,
67:5, 75:21,
78:19

**identifies**
23:20

**identify**
39:10, 69:11,
70:11

**image**
43:1, 55:4,
55:5

**important**
11:10, 22:16,
51:19

**impossible**
34:1, 34:2

**inaccurate**
66:15

**include**
70:22, 71:3,

73:5

**incorrect**
87:20

**independent**
54:2

**indicate**
17:2

**individuals**
26:7

**information**
72:16

**initial**
64:22, 66:4

**initially**
28:7, 84:13

**instance**
44:18

**instructs**
12:1

**interact**
16:4, 16:6

**interacted**
16:13, 16:14

**interest**
23:1

**interested**
24:19, 89:13

**interpreted**
72:14, 73:2

**interrogatories**
4:19, 4:24,
62:21, 67:11,
68:20

**interrogatory**
63:4, 64:6,
65:13, 66:17,
72:15, 74:5,
75:11, 75:14

**introduced**
52:14

**involved**
45:20

**iphone**
9:14

**issue**
87:18

**it'd**
28:7

J.R.289

**iteration**
14:12
**itself**
61:11

**J**

**january**
55:10, 57:11
**job**
1:20
**jog**
30:14, 30:21
**joshua**
2:15, 6:20
**july**
11:4, 79:6
**jump**
39:11
**jumps**
77:5
**june**
39:19, 41:9, 41:14
**justin**
2:17, 6:21

**K**

**k-a-r-a-v-a-l-t--c-h-e-v**
74:14
**karavaltchev**
74:11, 81:5
**keep**
22:9
**keeping**
47:14
**keeps**
36:19
**kept**
36:19
**kevin**
2:16, 6:17, 10:1, 30:4, 34:16, 37:15, 40:14, 55:13, 62:6, 71:8
**kind**
21:10, 35:14,

35:17, 40:3, 52:4, 56:10
**knew**
11:17, 44:20
**know**
9:2, 11:4, 12:18, 13:20, 14:9, 16:7, 16:16, 19:7, 20:6, 23:12, 24:12, 26:3, 26:8, 27:17, 28:14, 29:11, 29:13, 33:8, 33:11, 33:12, 33:19, 34:4, 40:3, 42:7, 48:15, 51:11, 52:13, 52:17, 58:7, 58:21, 59:4, 62:16, 62:17, 78:12, 79:18, 84:6, 85:2, 85:5, 87:2
**knowing**
33:20

**L**

**lamoureux**
2:18, 6:22
**landed**
25:8
**language**
65:1, 65:12, 66:6, 81:14, 86:2, 86:3
**languages**
13:19, 21:5, 21:7
**laptop**
9:6
**last**
8:12, 17:7, 42:21, 57:5, 67:16, 79:9, 87:14, 87:17
**later**
12:7, 15:3,

17:22, 18:5, 18:8, 18:9, 28:21, 45:21, 55:11, 61:19, 87:9
**latest**
64:14
**least**
39:4
**leave**
36:12
**leaves**
36:14
**leaving**
28:7
**lending**
21:22
**less**
55:11, 86:10, 87:3
**let's**
30:2, 59:22, 69:3, 86:1
**letter**
4:12, 5:3
**levy**
2:15, 2:19, 3:4, 6:21
**li**
1:4, 7:2
**limited**
30:5, 30:8
**line**
30:4, 30:20, 39:17, 54:7, 64:12, 67:22
**lines**
43:15, 50:15, 53:8
**liquidatable**
23:6, 23:14, 23:20
**liquidate**
24:1, 24:12, 24:13
**liquidates**
23:21
**liquidation**
21:14, 23:7,

24:12, 40:7, 40:20, 43:10, 84:11
**liquidations**
13:10, 41:3, 42:2, 42:6, 43:12, 49:14, 50:4, 50:19, 50:22, 51:6, 52:7, 84:12
**liquidator**
12:7, 13:3, 14:20, 15:20, 15:22, 20:12, 20:17, 20:21, 20:22, 21:12, 24:20, 25:4, 25:5, 25:7, 25:11, 26:18, 27:5, 27:9, 27:10, 29:21, 31:7, 31:14, 31:19, 32:2, 44:13, 45:5, 50:16, 51:20, 52:21, 56:18, 56:22, 58:2, 59:13, 59:17, 64:8, 64:13, 64:22, 66:5, 69:12, 69:16, 70:4, 70:12, 70:20, 73:11, 74:19, 78:6, 80:5, 83:15, 86:1
**litigation**
45:20
**little**
8:11, 29:11, 30:20, 52:5, 55:11, 55:21, 68:11, 71:9, 77:11, 85:8, 86:18
**live**
59:19
**llc**
1:9, 1:12,

2:12, 2:13, 4:21, 4:26, 6:18, 6:19

**llp**
2:19

**load**
21:20, 43:19, 61:3

**located**
8:7

**location**
69:11

**locked**
35:15

**log**
17:4, 36:17, 72:17

**logic**
21:8

**long**
39:11, 42:5, 49:18, 57:14, 77:4, 79:20

**longer**
86:14

**look**
10:18, 12:20, 19:15, 21:6, 21:11, 22:4, 24:10, 39:14, 40:9, 42:16, 49:8, 54:11, 56:3, 62:2, 63:1, 63:3, 63:18, 66:12, 66:19, 68:6, 70:14, 72:16, 74:4, 75:1, 75:4, 75:17, 76:6, 77:3, 77:9, 78:16

**looked**
16:21, 32:13, 32:17, 35:1, 47:15, 48:6, 72:16, 72:17, 72:21, 72:22, 74:8, 74:9,

74:17, 75:8, 84:13, 87:8

**looking**
17:1, 20:4, 20:16, 22:13, 22:14, 23:9, 25:3, 33:9, 33:18, 33:20, 34:11, 34:13, 35:2, 36:2, 37:12, 49:19, 50:3, 50:19, 51:6, 54:19, 74:6, 84:12, 84:15, 84:18

**looks**
23:19, 41:1, 64:2

**loop**
22:7, 22:8, 22:12, 22:15, 22:19

**lot**
28:8, 30:15

**loud**
55:14

---
### M

**made**
17:21, 18:3, 27:15, 28:6, 34:13, 43:7, 77:14, 81:9

**main**
74:21

**make**
12:4, 25:3, 25:6, 25:11, 27:6, 27:9, 43:21, 47:4, 50:8, 62:3, 64:10, 66:22, 72:4, 79:9, 87:15, 88:4

**makes**
18:19, 36:7, 50:18, 79:14

**making**
24:20, 29:21,

31:6, 53:20

**mango**
40:10, 41:3

**manila**
10:5

**many**
86:7

**march**
89:6

**mark**
37:21, 54:12, 66:20, 78:17

**marked**
5:7, 5:10, 38:2, 54:15, 62:11, 67:3, 67:5, 75:21, 78:19

**market**
21:22

**markets**
40:10, 41:3

**marks**
88:12

**maryland**
1:2, 6:6, 8:9, 8:13, 89:1, 89:5, 89:16

**matter**
6:4, 36:21

**maybe**
16:8, 18:9, 33:13, 39:17, 50:7, 55:2, 84:17

**md**
2:8

**mean**
24:7, 26:15, 32:8, 45:9, 47:7, 50:11, 54:7, 72:15

**means**
32:10, 35:12, 35:16, 76:10, 77:22

**media**
6:2

**meet**
71:14, 71:18, 71:19

**memory**
30:14, 30:22, 86:4

**mention**
44:19, 72:5, 82:7, 83:5

**mentioned**
26:3, 40:15

**mentioning**
58:4

**mess**
22:18, 40:8

**message**
39:21, 42:21, 43:17, 77:9

**messages**
4:13, 4:15, 10:18, 16:21, 17:1, 17:20, 18:22, 19:11, 19:16, 24:21, 25:2, 28:13, 38:18, 39:7, 41:2, 46:15, 47:16, 48:6, 50:11, 50:13, 52:19, 53:7, 53:10, 53:15, 53:20, 54:7, 56:14, 72:22, 73:17, 73:18, 73:19, 73:20, 74:9, 74:10, 75:8, 76:3, 76:4, 80:16, 80:17, 80:18, 81:5, 81:7, 82:7, 84:10

**messaging**
56:16, 59:12, 59:14, 59:16

**messed**
57:6, 57:12

**met**
26:10

J.R.291

**mid**
49:20, 50:4, 51:7
**middle**
33:21, 34:3, 34:5, 39:15
**might**
11:21, 42:18, 52:16, 61:17, 67:17, 80:20, 85:9
**million**
43:9
**mind**
83:3
**mingsan**
1:5
**mining**
26:11
**minus**
82:1
**minute**
12:20
**misremembered**
47:10
**misremembering**
57:3
**missing**
36:4
**mistaken**
44:15
**modules**
14:6
**moment**
80:21
**money**
29:21, 31:6, 43:7, 79:9
**monitor**
6:9
**montgomery**
89:2
**month**
55:11, 60:14, 60:15, 60:19, 60:22, 61:1, 61:6, 61:8, 61:18, 61:19,

61:21, 85:15, 86:5
**months**
57:4, 57:8
**more**
12:9, 13:2, 14:17, 25:6, 43:15, 50:8, 73:17, 74:6, 78:11
**most**
28:7, 78:3, 82:9
**move**
37:10
**much**
21:8, 43:7, 43:21, 45:21
**multi-threaded**
28:6
**multi-threading**
22:18
**multiple**
12:11, 22:2
**muse**
2:19
**must**
44:15
**myself**
9:15

#### N

**nah**
52:3, 57:2
**name**
8:4, 17:7, 58:7, 59:1, 59:3, 59:4
**need**
13:2, 22:22, 27:18, 42:18
**negative**
80:11
**neither**
89:11
**network**
22:17
**new**
5:6, 5:9,

19:12, 19:19, 20:17, 23:2, 29:17, 76:4, 76:9, 76:12, 76:17
**next**
9:16, 10:11, 43:6, 43:17, 55:2, 55:20, 56:4
**nobody**
39:20
**nod**
11:17
**nodding**
63:13
**nods**
32:7, 63:11, 87:21
**nope**
28:19
**nos**
6:6
**notarial**
89:15
**notary**
89:4, 89:20
**notdeghost**
4:14, 4:16
**nothing**
7:13, 7:20, 9:12, 9:14
**nothing's**
34:4
**notifications**
10:18
**november**
10:8, 29:11, 30:1, 31:6, 72:10, 74:7
**number**
6:3, 38:10, 39:14, 60:2, 76:8
**nw**
2:20

#### O

**oath**
11:6

**object**
11:21, 19:14, 30:3, 37:15, 47:19, 71:8
**objection**
14:2, 31:8, 33:2, 51:8, 51:22, 53:11, 54:5, 64:16, 65:5, 66:1, 66:2, 72:11, 84:3
**objections**
64:11
**obligation**
23:2
**obligations**
22:1, 22:4, 22:5, 22:9, 22:13, 23:6
**obviously**
85:8, 87:16
**october**
10:5, 12:18, 15:5, 15:13, 15:15, 15:21, 16:19, 17:12, 17:16, 18:1, 18:6, 18:8, 18:16, 18:19, 19:4, 20:2, 20:14, 20:18, 24:5, 24:7, 24:10, 25:2, 26:18, 29:10, 35:1, 46:2, 46:4, 46:5, 46:6, 46:9, 47:2, 47:8, 47:17, 48:7, 50:5, 50:9, 51:14, 52:21, 53:3, 53:4, 53:6, 53:7, 53:9, 53:15, 53:16, 53:20, 54:1, 54:4, 64:15, 66:9,

J.R.292

Transcript of David Chen
Conducted on December 10, 2025

35

69:17, 70:5,
70:7, 71:3,
72:6, 73:9,
80:14, 81:3,
81:4, 81:10,
81:12, 81:19,
82:15, 82:21,
83:15, 84:8,
84:20, 85:3,
87:4, 87:5
**offline**
61:2, 61:3,
61:5
**oh**
12:17, 17:9,
22:22, 23:2,
24:21, 27:2,
33:12, 33:17,
37:5, 37:18,
45:2, 47:13,
49:11, 50:21,
52:12, 55:2,
58:3
**okay**
8:10, 8:15,
8:22, 9:16,
10:12, 10:17,
10:22, 11:15,
11:18, 12:6,
18:14, 24:4,
24:9, 24:16,
24:19, 27:2,
38:17, 39:4,
40:18, 43:6,
43:14, 48:3,
49:3, 50:2,
54:10, 55:4,
55:8, 55:10,
55:22, 56:2,
59:21, 60:3,
60:4, 60:5,
61:5, 62:1,
62:9, 64:3,
66:11, 68:5,
69:1, 85:22,
86:7, 86:11,
86:16, 87:12,
88:11, 88:12

**older**
26:10, 26:12,
26:14, 26:15
**once**
35:19, 67:2
**one**
2:7, 6:3,
12:19, 15:3,
15:10, 15:11,
15:15, 15:17,
16:18, 20:3,
21:6, 22:7,
23:17, 24:4,
24:6, 24:9,
25:10, 25:12,
27:12, 32:5,
32:13, 36:16,
38:22, 39:17,
44:21, 45:2,
45:3, 45:7,
45:17, 45:19,
45:22, 46:1,
46:5, 46:6,
46:8, 46:9,
46:10, 46:16,
46:20, 46:22,
52:3, 58:13,
59:19, 60:18,
65:14, 69:22,
70:7, 70:11,
70:18, 72:20,
74:7, 80:20,
81:15, 85:7,
86:11
**ones**
52:14, 74:6
**only**
9:10, 10:10,
22:4, 52:20,
53:9, 53:22,
57:4, 57:8,
74:17, 83:17,
87:8
**open**
10:19, 19:8,
25:15, 27:21,
28:4, 45:2,
45:3, 45:17,

46:1, 52:3,
59:19
**opening**
19:20
**operated**
16:1
**operating**
78:9
**oppor**
23:20
**opportunities**
23:14, 23:20,
24:11
**opportunity**
88:3, 88:6,
88:8, 88:10
**opposed**
45:11, 52:22,
53:16, 53:21
**optimization**
43:21, 44:5,
44:7, 46:18
**oracle's**
22:21
**oracles**
22:15
**order**
61:10, 74:4
**organization**
57:18
**original**
25:16, 27:3
**origins**
71:6
**ot**
16:17
**other**
9:21, 10:18,
10:19, 11:1,
11:11, 12:11,
13:9, 13:20,
14:5, 14:16,
14:19, 15:10,
15:11, 15:15,
20:4, 20:7,
26:19, 31:15,
35:5, 40:10,
42:4, 53:14,

53:19, 70:7,
72:20, 75:1,
83:21, 84:7
**otherwise**
54:8, 89:13
**otter**
1:8, 2:12, 6:19
**ottersec**
1:12, 2:13,
4:21, 4:26,
6:18, 12:8,
12:16, 15:4,
16:18, 18:1,
18:5, 20:4,
21:13, 33:14,
33:16
**out**
23:8, 25:4,
50:21, 52:4,
55:14, 68:11
**over**
8:12, 11:5,
11:11, 18:4,
20:4, 28:8,
30:20, 33:5,
81:11, 84:9
**overall**
54:21
**overlap**
40:11
**own**
26:18, 27:6,
27:10

**P**

**page**
4:3, 4:12, 5:3,
5:4, 34:14,
36:13, 38:9,
39:10, 39:13,
39:15, 39:16,
42:11, 42:19,
42:22, 43:6,
49:4, 49:16,
54:20, 55:1,
55:2, 55:12,
55:20, 56:4,
56:15, 63:18,

J.R.293

64:5, 64:12,
67:16, 67:17,
68:14, 68:20,
69:8, 76:7,
77:3, 77:5,
77:6, 79:1, 79:3
**pages**
1:20, 4:14,
4:16, 39:12,
63:3
**paragraph**
71:5
**paralegal**
3:4
**parse**
21:19
**part**
39:11, 51:15
**part's**
49:12
**particular**
34:20, 35:22,
37:16, 82:4
**parties**
6:13, 6:20
**partnership**
17:10
**party**
89:13
**past**
33:1, 57:13
**paste**
27:17
**pdf**
42:12, 55:1,
79:4
**pedantic**
13:21
**people**
27:6, 76:13,
83:7, 83:11,
83:22
**percent**
43:9
**perform**
13:10
**period**
29:15, 29:18,

29:22, 31:6
**person**
59:6, 59:12,
59:16, 65:12
**phone**
9:20, 41:17
**picture**
9:15
**piece**
35:22
**place**
42:4, 83:22,
87:8
**plaintiff**
1:6, 2:3
**plaintiffs**
1:13, 2:13,
4:20, 4:25
**planet**
6:12, 7:4
**plant**
58:5
**platform**
79:16
**please**
6:15, 7:8, 8:4,
10:13, 16:9,
37:21, 42:12,
42:18, 43:16,
43:17, 54:12,
55:2, 56:4,
63:13, 64:5,
65:8, 65:17,
68:2, 68:7,
69:4, 71:11,
75:18
**plugging**
27:14
**plus**
82:1
**point**
26:20, 32:6,
35:5, 53:3,
72:4, 80:8
**pointing**
53:15
**possible**
20:19, 29:19,

36:8, 75:3,
80:1, 80:3,
80:4, 84:5
**posting**
59:20
**pratt**
2:7
**preliminary**
8:11
**preparation**
59:7, 84:2
**prepare**
42:8, 74:4,
75:6
**prerequisite**
51:19
**present**
3:3
**presume**
40:16
**pretty**
40:8, 40:21,
79:10
**previous**
20:11, 21:6,
42:19, 42:22,
69:22
**previously**
20:8, 20:9,
79:15
**prices**
22:21, 23:3
**primarily**
80:17
**print**
10:4
**prior**
15:22, 53:21,
61:21, 83:22
**private**
4:14, 4:16
**probably**
15:8, 31:9,
31:12, 32:4,
41:17, 47:10,
48:13, 49:2
**problem**
44:5

**proceed**
38:4, 54:17,
62:14, 63:5,
68:9, 69:7,
70:17, 76:1,
78:21
**proceeding**
89:13
**proceedings**
60:7
**process**
19:17, 25:18
**produced**
38:13, 39:4
**professional**
89:3
**program**
21:18, 21:19,
77:22
**project**
19:13, 19:20,
34:12, 35:3,
35:22, 36:3,
36:13, 60:14,
60:17, 60:20
**projects**
37:13
**protocol**
51:5
**provided**
58:13
**public**
25:5, 29:1,
29:5, 89:5,
89:20
**publicly**
32:11
**publicly-availab-
le**
27:5, 27:9
**pull**
21:18, 22:3,
22:11
**pulling**
22:9
**pulls**
22:16
**purpose**
30:5

J.R.294

**pursuing**
25:9
**put**
9:11, 15:12,
15:14, 37:20,
51:10, 55:7,
61:18
**putting**
86:2

**Q**

**question**
12:1, 14:8,
14:14, 16:6,
19:14, 19:18,
31:1, 34:10,
35:20, 36:7,
47:20, 53:18,
60:12, 60:13,
65:22, 71:16,
85:20
**questioning**
30:4
**questions**
9:18, 10:14,
11:6, 11:22,
30:10, 70:10,
73:2, 75:13,
85:12, 86:17
**quick**
63:19, 86:19
**quickly**
49:8
**quite**
21:7

**R**

**ra**
43:17
**rachel**
2:14, 6:21
**radiantaeon**
77:13
**raise**
7:8
**ran**
16:13, 16:14,
50:15

**range**
16:7, 16:9,
87:6
**rates**
23:1
**rc**
1:9, 2:12, 6:18
**re-read**
66:16
**read**
40:2, 40:12,
52:6, 55:12,
55:14, 64:19
**reading**
24:22, 51:13,
51:18, 52:10
**real**
58:7, 59:4,
63:19
**really**
24:14, 25:13,
46:15, 47:8,
47:14, 47:16,
52:3
**realtime**
89:4
**reason**
46:17
**recall**
12:17, 18:2,
19:2, 47:18,
74:20, 81:7,
85:12
**recalled**
47:22
**received**
68:18
**recency**
37:7
**recent**
74:6
**recess**
60:7
**recognize**
38:14, 67:13
**recollection**
16:10, 44:12,
50:3, 54:3,

56:21, 86:4
**recommend**
88:7
**record**
8:5, 9:10,
10:3, 11:2,
11:17, 28:16,
32:9, 34:15,
35:1, 36:12,
60:6, 60:9,
61:7, 61:17,
61:20, 62:7,
71:19, 71:21,
88:14
**records**
32:14
**recover**
37:4
**red**
41:17
**ref**
36:17
**refer**
20:21
**referred**
31:13
**referring**
32:2, 37:16,
40:19, 40:21
**reflect**
61:21
**refresh**
22:20, 23:1,
23:2, 23:3,
44:12, 50:2,
56:21
**regard**
64:13, 85:22,
87:17
**registered**
89:3
**reid**
1:22, 7:4,
89:3, 89:20
**related**
89:12
**relation**
59:13

**relatively**
30:18
**relevant**
77:6
**relied**
53:22
**remember**
30:15, 31:2,
45:12, 57:5,
57:21, 58:1,
79:20, 81:15,
82:22, 85:18
**remote**
3:6, 6:11,
37:22, 38:4,
42:13, 49:6,
54:13, 54:17,
56:5, 62:4,
62:13, 63:5,
63:20, 66:21,
67:7, 68:8,
69:5, 69:7,
70:16, 74:2,
75:19, 76:1,
78:18, 78:21
**remotely**
6:14
**repeat**
31:4, 53:17
**rephrase**
17:14, 31:2
**reported**
1:21
**reporter**
7:3, 11:12,
18:10, 32:21,
89:4
**represent**
6:16, 7:2, 9:9,
68:17
**representing**
6:12, 6:19, 7:4
**required**
11:22
**research**
25:21, 26:1,
44:20
**researching**
25:17, 25:21

reserved
88:19
reserves
22:1, 22:2,
22:14, 22:21,
23:3
responding
41:16, 65:21
response
64:11, 72:5
responses
74:5, 75:12,
75:15
resumes
48:3, 48:8,
48:9, 48:11
review
42:8, 59:6,
63:19, 68:19,
75:11, 75:14,
80:15, 80:18,
83:17, 87:14,
88:4
reviewed
63:8, 65:15,
73:14, 73:17,
74:20, 75:10,
81:6
right
7:8, 8:7, 8:8,
8:19, 9:5,
10:12, 14:11,
14:13, 15:16,
16:10, 17:12,
17:18, 20:14,
21:5, 21:16,
23:18, 23:21,
26:5, 31:21,
32:15, 33:5,
33:22, 34:14,
34:18, 36:4,
36:15, 39:2,
39:5, 39:16,
40:18, 41:6,
41:8, 41:10,
43:1, 43:12,
45:6, 46:6,
47:2, 47:9,

48:21, 49:14,
51:16, 53:10,
55:4, 55:18,
56:10, 57:9,
58:16, 63:10,
65:4, 69:13,
70:1, 76:10,
76:19, 78:1,
79:4, 79:21,
83:20, 84:2,
87:13, 87:14
rights
88:19
robert
1:8, 1:12,
2:11, 2:13,
4:20, 4:25,
6:18, 29:14,
38:19, 39:8,
39:20, 39:21,
40:19, 41:21,
43:7, 43:19,
44:4, 49:13
rockville
89:16
rog
64:4, 69:9
rogs
67:20
room
8:15, 9:2
rough
86:2
round
60:2
row
62:19
rpr
1:22, 89:20
run
14:22
running
30:8
rust
45:20, 46:20,
66:9, 81:3,
81:14, 82:13

--- S ---

said
18:15, 19:15,

25:3, 26:22,
27:1, 32:6,
32:13, 32:17,
45:4, 46:4,
47:1, 47:20,
51:16, 52:11,
62:7, 69:22,
70:2, 70:3,
70:7, 72:6,
73:8, 80:22,
81:4, 81:12,
81:19, 81:21
saith
88:17
sake
40:15
sam
1:5
same
6:20, 14:12,
15:21, 20:12,
24:16, 24:17,
27:19, 31:8,
42:12, 43:3,
49:18, 54:18,
54:20, 68:14,
79:1, 79:2,
86:11
save
60:18, 60:22,
61:1, 61:6,
61:10, 61:14,
85:14, 86:4
saw
18:15, 18:21,
26:2, 28:13
say
11:12, 13:3,
14:11, 14:19,
16:19, 17:21,
18:4, 18:7,
18:19, 19:5,
20:3, 20:17,
21:9, 26:18,
29:11, 34:16,
40:16, 41:12,
42:22, 43:20,
44:7, 46:3,

46:16, 46:18,
47:22, 49:19,
50:9, 50:18,
53:20, 56:15,
60:1, 63:13,
66:8, 69:15,
79:8, 79:14,
81:10, 83:14
saying
14:1, 14:3,
14:4, 14:5,
18:11, 19:16,
34:20, 35:2,
45:22, 46:8,
52:20, 58:15,
58:16, 60:21,
66:14, 73:18,
77:21, 82:10,
82:11, 82:14
says
39:20, 40:6,
41:4, 43:19,
44:4, 49:17,
64:12, 64:21,
65:11, 66:4,
69:10, 76:9,
77:13, 77:19,
79:8, 81:16
school
48:17, 76:16
scope
30:9
screen
9:10, 9:11,
10:19, 67:8
scroll
68:1, 68:12
se
13:20
seal
89:15
searched
37:1
searching
25:6, 25:14
second
4:23, 22:8,
38:22, 55:12,

J.R.296

Transcript of David Chen
Conducted on December 10, 2025                    39

56:13, 64:12,
66:16, 67:11
**second-to-last**
67:17
**seconds**
43:22, 44:1
**section**
27:18
**sections**
27:14
**security**
1:9, 2:12, 6:18
**see**
17:20, 18:3,
19:11, 23:5,
36:18, 38:9,
39:19, 39:22,
42:18, 43:7,
44:2, 44:10,
46:17, 49:11,
49:13, 49:22,
50:1, 55:8,
56:6, 56:19,
63:7, 64:17,
64:21, 65:20,
66:3, 67:9,
67:20, 68:3,
68:4, 68:12,
69:10, 77:6,
77:16, 78:11,
79:6, 83:5
**seeing**
33:9, 35:3,
84:19
**seem**
30:15, 47:16
**seems**
44:4, 44:17
**seen**
42:4, 84:2
**send**
23:7, 24:12,
42:22
**sends**
24:1, 39:21
**sense**
12:4, 50:8,
55:17, 78:7

**sent**
43:17, 55:5,
77:9
**sentence**
23:17
**september**
29:11, 30:1,
31:5, 44:9,
44:14, 47:5,
47:8, 47:13,
47:18, 48:1,
48:5, 48:12,
49:20, 50:4,
51:7, 52:22,
53:16, 54:3,
56:17, 57:1,
59:13, 59:15,
73:18, 84:8
**series**
35:3, 76:3,
76:4
**serv**
41:18
**server**
26:5, 26:8,
29:18, 52:19,
76:4, 76:10,
76:13, 76:22,
79:2, 80:18,
83:18, 84:1
**servers**
41:19, 41:20,
42:6, 42:8, 84:7
**set**
4:18, 4:23,
56:13, 62:21,
67:11
**setting**
40:9
**several**
23:12
**short**
59:22, 85:7
**shortly**
18:16
**should**
40:9, 42:15,
43:13, 46:11,

55:1, 72:7,
77:21
**shouldn't**
71:3
**show**
38:8, 61:16,
61:17, 61:20,
85:16
**showed**
73:18
**shows**
53:5, 83:8
**signature**
5:4, 63:22,
67:22, 68:20,
88:19
**signature-p1kal**
89:18
**signed**
17:9, 35:12,
35:13, 35:19,
63:8, 65:7,
65:16, 68:14
**significantly**
82:8
**signing**
65:13
**similar**
13:8
**since**
41:9, 41:14,
49:20, 56:17
**single-threaded**
28:5
**singular**
48:13
**sitting**
10:10
**slight**
37:2
**slightly**
37:3
**slot**
22:22, 23:3
**slow**
28:5, 45:18
**sol**
25:4, 25:5,

44:19, 50:16,
50:22, 51:2,
51:13, 51:15,
52:15, 52:17,
84:11, 84:13,
84:16, 84:20,
85:3
**solana**
13:12, 15:20,
16:1, 16:5,
24:11, 24:20,
25:7, 50:8,
51:2, 51:7,
51:15, 51:18,
51:20, 52:7,
52:14, 78:9,
78:10, 78:13,
79:12, 80:2
**solend**
12:7, 13:3,
14:20, 20:12,
20:17, 20:21,
20:22, 21:12,
21:21, 25:8,
25:15, 26:17,
27:5, 27:9,
27:10, 29:1,
29:5, 29:21,
31:7, 31:14,
32:3, 41:3,
42:1, 42:6,
42:22, 43:11,
43:22, 44:14,
44:19, 45:1,
45:5, 50:3,
50:19, 50:21,
56:22, 57:17,
57:18, 57:20,
57:21, 64:8,
64:13, 64:22,
66:5, 69:12,
69:16, 70:4,
70:12, 70:20,
73:11, 74:19,
78:6, 83:15,
84:15, 84:18,
86:1
**solend's**
21:19

J.R.297

Transcript of David Chen
Conducted on December 10, 2025

40

**some**
8:11, 11:22,
16:11, 33:21,
35:5, 37:7,
52:15, 52:16,
52:17, 53:3,
56:17, 64:10
**somebody**
17:11, 20:8,
34:18
**someone**
17:15, 34:17,
35:2, 56:7
**something**
12:18, 18:21,
27:20, 40:10,
50:14, 58:17,
63:7
**somewhere**
48:15, 85:3
**sorry**
18:10, 21:10,
22:10, 27:2,
41:12, 46:3,
46:14, 53:2,
53:17, 55:3,
60:21, 66:16,
81:10
**sort**
30:8, 30:19
**sounded**
40:7, 40:21
**sounds**
31:21
**source**
25:15, 27:21,
28:4, 45:2,
45:3, 45:17,
46:1, 52:3,
59:19
**speak**
11:10, 40:4
**speaking**
30:19
**specific**
12:10, 13:2,
76:13
**specifically**
25:7, 54:1,

72:14, 79:18
**specificity**
64:7, 70:19
**speculative**
21:10
**spend**
52:10
**splitting**
44:8, 46:18
**spoke**
71:13
**st**
12:18, 15:5,
16:19, 18:1,
18:6, 18:8,
18:16, 18:19,
19:4, 20:2,
24:5, 24:7,
35:1, 46:6,
66:9, 81:3,
81:4, 81:12,
81:19, 82:15,
82:22
**stand**
37:22, 42:13,
49:6, 54:13,
62:4, 63:20,
66:21, 68:8,
69:5, 70:16,
74:2, 75:19,
78:18
**standard**
6:10
**start**
12:6, 12:14,
12:21, 15:19,
16:20, 18:20,
19:9, 19:12,
25:11, 26:17,
32:14, 45:12,
48:4, 54:22,
72:21, 81:11,
81:18, 83:6,
83:10, 83:11,
84:10, 84:15,
84:18
**started**
15:4, 15:9,

16:19, 17:2,
17:21, 18:5,
18:20, 20:2,
20:13, 20:16,
25:6, 30:13,
32:11, 39:1,
46:2, 46:5,
47:1, 47:5,
47:13, 52:21,
56:18, 56:22,
58:2, 61:18,
61:21, 69:12,
69:16, 70:4,
70:12, 70:22,
72:22, 73:5,
73:10, 73:20,
74:18, 80:13,
81:13, 82:17,
83:14, 84:14
**starting**
19:5, 19:21,
24:7, 24:10,
28:10, 64:11,
79:9
**starts**
50:14
**state**
6:16, 8:4,
89:1, 89:5
**stated**
82:19
**states**
1:1, 6:5,
64:13, 69:15
**stenographer**
7:7, 7:10,
7:15, 7:22
**stenographically**
1:21
**step**
21:20, 22:7,
25:10, 25:12,
25:13, 25:14
**steps**
21:12, 23:12
**still**
11:22, 50:5
**stock**
43:22, 45:1

**stop**
65:8, 65:17
**store**
61:13
**stores**
61:11
**street**
2:7, 2:20
**strike**
49:11
**strokes**
21:15
**structured**
21:21
**stuff**
8:11, 36:4,
40:7, 40:20,
48:3, 49:19,
57:13
**suite**
2:7, 2:20
**summer**
33:6, 80:1
**supervising**
57:22
**suppose**
71:2, 71:4,
73:7
**sure**
21:11, 23:16,
24:18, 33:12,
34:4, 34:9,
52:16, 62:15,
81:22, 82:19,
86:20, 87:15,
88:4
**swear**
7:10
**sworn**
7:6, 7:18, 89:7
**sydorick**
3:5, 6:12

**T**

**tag**
58:20
**take**
59:22, 73:22,

J.R.298

81:1, 88:3,
88:7, 88:9
**takes**
43:22
**taking**
12:15, 83:22
**talk**
29:14, 29:17,
29:20, 31:5,
83:7
**talked**
31:14, 58:3,
71:10, 71:17,
83:21
**talking**
14:16, 25:20,
28:22, 29:4,
30:7, 34:19,
39:19, 40:7,
40:20, 41:4,
41:15, 42:1,
42:5, 43:7,
43:11, 45:14,
45:19, 46:8,
46:16, 48:11,
50:7, 56:6,
56:8, 57:15,
58:1, 71:6,
78:12, 79:18,
81:19, 83:11,
84:7, 84:10,
84:15, 84:19,
85:2, 85:14
**team**
41:18
**tech**
3:6
**technical**
23:10, 78:3
**technically**
34:6
**technician**
37:22, 38:4,
42:13, 49:6,
54:13, 54:17,
56:5, 62:4,
62:13, 63:5,
63:20, 66:21,

67:7, 68:8,
69:5, 69:7,
70:16, 74:2,
75:19, 76:1,
78:18, 78:21
**telegram**
31:16, 58:17,
75:4
**tell**
28:2, 28:3,
34:12, 36:3,
36:7, 36:8,
40:5, 82:10
**telling**
35:4, 57:12,
65:14, 66:1
**ten-minute**
85:13
**tenth**
82:10
**termination**
10:8
**terminology**
32:5
**terms**
30:21, 57:13
**testified**
7:21, 20:11,
36:9, 79:19
**testify**
7:19, 33:5,
71:12
**testifying**
11:7, 65:9,
65:17, 65:19
**testimony**
7:11, 30:11,
53:12, 85:18,
88:2, 89:10
**text**
40:4
**th**
2:20, 6:8,
10:6, 10:9,
39:2, 39:21,
40:15, 43:3,
49:18, 53:16,
55:10, 63:15,

63:22, 81:10,
84:8, 89:16
**thank**
7:15, 8:3,
38:1, 38:6,
42:14, 43:18,
49:7, 54:14,
62:5, 62:9,
63:6, 63:21,
67:18, 69:6,
74:3, 76:2,
77:12
**thanks**
60:10, 68:10,
74:16, 78:22
**themselves**
6:16
**thereabouts**
29:10
**thereof**
89:14
**thereupon**
7:16, 89:8
**thing**
20:12, 23:11,
32:13, 53:22,
55:19, 56:10
**things**
13:8, 25:18,
28:8, 28:9,
30:7, 30:21,
47:15, 74:17,
74:21, 87:22
**think**
11:17, 12:17,
13:5, 14:5,
14:15, 15:9,
15:11, 15:12,
15:13, 15:15,
19:15, 19:16,
25:2, 26:22,
29:1, 29:7,
30:7, 30:19,
36:8, 37:17,
40:8, 44:15,
47:4, 47:12,
48:3, 48:5,
50:5, 52:14,

53:4, 57:2,
57:3, 58:3,
58:6, 58:11,
58:13, 59:2,
59:14, 79:16,
80:20, 81:17,
81:21, 85:6
**thinking**
47:18, 47:22,
48:12, 80:7
**third**
54:22
**thought**
31:17, 47:1,
47:7, 47:11,
47:13
**three**
25:14, 86:10,
86:12, 86:14,
87:2
**three-days**
87:6
**through**
37:1, 72:22,
87:6
**till**
60:1
**time**
6:9, 6:10,
8:12, 15:21,
16:11, 17:12,
17:16, 21:9,
21:17, 22:11,
26:12, 28:3,
28:8, 29:9,
29:15, 29:18,
29:22, 31:6,
43:20, 44:18,
48:10, 48:14,
52:10, 57:3,
58:4, 60:6,
60:9, 61:11,
61:13, 61:15,
73:20, 83:5,
87:14, 88:14
**tiny**
68:1
**today**
6:11, 7:4,

J.R.299

Transcript of David Chen
Conducted on December 10, 2025                    42

42:9, 66:14
**today's**
6:8
**together**
29:2
**told**
26:2, 26:21
**took**
15:3, 16:18,
17:22, 18:4,
20:3, 21:13,
32:10, 38:5
**top**
19:9, 19:21,
21:22, 22:12,
22:15, 22:19,
33:14, 33:15,
37:6, 38:5,
38:14, 38:21,
39:16, 49:16,
55:7, 56:3,
65:10, 74:22,
81:17, 85:9
**total**
43:9
**touch**
33:13, 35:15,
35:18, 35:19,
60:19
**traces**
36:14
**track**
47:15
**tracking**
43:8
**traded**
16:12
**trading**
14:22, 77:20,
78:1, 79:15
**transactions**
23:7, 24:1,
24:13
**transcribed**
87:15
**transcript**
38:3, 54:16,
62:12, 67:4,

67:6, 75:22,
78:20, 87:14,
87:17, 88:4,
89:10
**true**
89:9
**trust**
56:15
**truth**
7:12, 7:13,
7:19, 7:20
**truthfully**
11:7
**try**
11:13
**trying**
14:15, 30:14,
30:21, 82:11
**turns**
25:4
**tweak**
52:5, 52:6
**two**
10:10, 13:5,
13:6, 13:22,
14:14, 14:16,
14:18, 14:19,
21:4, 21:20,
25:13, 33:14,
33:15, 36:22,
69:1, 70:10,
73:2, 75:13,
86:12
**tydings**
2:6
**type**
19:21, 61:2,
61:5
**types**
87:22
**typescript**
27:4, 45:7,
45:9, 45:16,
46:9, 46:16,
46:20, 46:22,
86:2, 86:3
**typically**
19:12, 19:17,

19:19
**typographical**
88:1

---
**U**
---

**uh-hmm**
44:6
**under**
11:6, 12:4,
21:22, 89:15
**underlying**
58:20
**understand**
9:19, 10:22,
11:5, 30:13
**understood**
11:19
**undertake**
21:13
**unfortunately**
35:9, 37:1
**united**
1:1, 6:5
**university**
8:8, 8:13
**unless**
12:1
**unrecoverable**
37:7
**unsigned**
35:18
**unsure**
20:10, 29:13
**until**
61:19
**unversions**
14:4
**upload**
60:22, 61:1,
61:6, 61:11,
61:14, 61:15,
61:19, 85:15,
86:5
**uploading**
86:8
**use**
27:19, 64:8,
70:19

**username**
58:19, 58:21,
59:2, 59:3
**using**
22:21, 23:2,
52:15, 79:16
**usually**
14:11

---
**V**
---

**vacation**
77:15
**value**
43:9
**verbally**
11:16
**verified**
66:4
**version**
12:15, 12:22,
13:1, 14:11,
21:9, 45:4,
64:14, 64:22,
65:3, 65:6,
66:4, 66:8,
81:4, 81:13,
82:4, 82:13
**versions**
12:11, 13:6,
13:9, 13:20,
13:22, 14:9,
14:16, 14:19,
27:7, 80:5
**versus**
45:13, 45:14,
87:18
**video**
6:9, 6:13,
88:14
**videographer**
3:5, 6:2, 6:11,
7:3, 60:5, 60:8,
88:12
**videotaped**
6:3, 88:20
**viewed**
9:13
**viewing**
9:12

J.R.300

**virtually**
1:18
**voice-identify**
6:15

**W**

**wait**
46:13, 60:22,
61:1, 61:6,
85:15, 86:4
**waive**
88:5
**want**
18:7, 22:12,
22:16, 22:18,
25:11, 29:2,
37:17, 46:15,
55:13, 55:14,
55:16, 55:19,
55:20, 62:2,
67:2, 88:3, 88:5
**wanted**
59:10
**washington**
2:21
**water**
9:6, 9:8
**way**
21:6, 24:15,
25:6, 27:19,
33:20, 35:4,
35:8, 36:6,
36:16, 36:19,
83:4
**we'll**
10:13, 49:8,
66:22
**we're**
8:10, 11:1,
22:3, 22:13,
22:14, 45:19,
62:16, 62:18,
77:21
**wednesday**
1:19
**week**
53:21, 57:7,
79:9, 82:9

**went**
16:17
**weren't**
85:2
**what'd**
15:12
**whatever**
31:16, 45:14
**whether**
33:21, 34:13,
35:4, 36:3,
36:4, 54:3,
56:9, 83:1
**whole**
7:12, 7:19
**wife**
48:5
**wild**
48:5
**window**
9:21, 10:19
**windows**
10:20
**withdraw**
37:18, 37:19
**within**
43:9, 82:14
**without**
32:2, 52:6
**witness**
7:6, 7:9, 7:14,
31:11, 60:4,
65:18, 87:21,
88:9
**word**
14:15, 26:22,
65:3, 65:6,
73:5, 80:12
**work**
19:5, 28:10,
29:2, 52:7,
56:7, 56:9,
85:15, 85:22
**worked**
12:7, 16:1,
21:1, 21:17,
79:15
**workers**
44:8, 46:19

**working**
12:6, 12:14,
12:21, 15:4,
15:10, 15:19,
17:2, 17:15,
17:22, 18:5,
18:20, 20:7,
20:13, 24:6,
24:9, 26:17,
26:19, 27:8,
28:11, 30:13,
32:11, 36:21,
44:13, 46:2,
47:1, 47:5,
52:21, 56:7,
56:8, 56:18,
56:22, 57:16,
58:2, 59:17,
69:12, 69:16,
70:4, 70:12,
71:1, 72:21,
73:1, 73:6,
73:10, 73:21,
74:18, 78:13,
80:13, 81:13,
81:16, 81:18,
82:17, 82:20,
83:2, 83:4,
83:6, 83:10,
83:14, 86:8
**works**
27:22, 46:21,
51:20, 52:4
**wouldn't**
13:8, 14:18,
70:22, 73:4
**write**
19:21, 60:18
**writing**
11:12, 19:9,
20:3, 20:17,
20:21, 48:2,
48:8, 48:11
**written**
20:8, 20:9,
31:15, 40:3,
65:1, 66:5, 66:9
**wrong**
40:5

**wrote**
13:16

**Y**

**yao**
1:4, 2:3, 6:4,
7:2, 8:6, 38:12,
49:9, 54:20,
55:1
**yeah**
8:22, 9:3,
9:17, 9:22,
10:2, 10:15,
10:16, 11:3,
12:3, 13:11,
13:14, 13:17,
14:6, 15:6,
15:17, 17:9,
17:17, 17:19,
20:1, 22:22,
23:16, 23:22,
24:3, 24:8,
24:14, 24:18,
25:1, 25:19,
26:13, 26:16,
26:21, 27:11,
27:13, 28:2,
29:6, 31:4,
31:11, 32:1,
32:4, 34:5,
34:21, 35:7,
36:11, 38:20,
39:6, 40:1,
40:13, 41:7,
41:11, 43:5,
43:13, 44:3,
46:7, 47:3,
48:2, 48:22,
49:15, 49:21,
50:14, 52:9,
53:22, 55:9,
56:11, 56:12,
57:10, 57:19,
58:9, 59:5,
63:2, 64:9,
69:21, 77:2,
77:8, 78:2,
80:16, 81:21,

Transcript of David Chen
Conducted on December 10, 2025

44

83:13, 85:19,
85:21
**year**
40:16, 76:18
**years**
36:22
**yep**
56:20, 74:13
**yourself**
84:19

**Z**

**zoom**
8:12, 9:21,
11:11, 68:11

**$**

**$67**
77:14

**0**

**0001088**
5:7, 5:10, 76:8
**0002733**
5:11
**0002943**
5:8
**00889**
1:5, 6:7
**03628**
1:13, 6:7
**0xcactus**
58:5, 58:16

**1**

**10**
1:19, 6:8,
49:17, 82:4
**11**
5:5, 88:14,
88:20, 89:16
**12**
54:11, 55:10,
77:14
**1238**
38:12, 54:20
**1258**
39:15

**1264**
43:2
**1265**
42:16
**1269**
49:9, 49:10
**13**
39:2, 49:4,
89:6
**1390**
55:1, 56:15
**14963**
1:22
**15**
4:14, 10:6,
63:4
**16**
10:9, 63:18,
69:9
**17**
2:20
**1st**
53:16, 84:8,
85:3

**2**

**20**
84:8
**20005**
2:21
**2017**
26:11
**2018**
26:11
**2019**
39:2
**202**
2:22
**2021**
15:5, 15:13,
15:16, 16:11,
17:12, 17:16,
29:10, 31:6,
40:16, 40:17,
43:3, 44:14,
49:18, 50:4,
64:15, 69:17,
78:14, 79:6,

80:2
**2022**
55:10, 57:11
**2025**
1:19, 6:8,
89:17
**2027**
89:6
**21**
12:18, 49:17
**21202**
2:8
**22**
48:15, 49:1
**23**
1:5, 6:7,
48:20, 67:21
**24**
1:13, 6:7,
67:21
**25**
5:5
**2733**
79:4
**2734**
5:11
**28**
39:21, 40:15,
43:3, 49:18
**29**
53:16, 63:15,
63:22, 84:8
**2943**
77:6
**2nd**
15:13, 15:16,
15:21, 24:10,
25:2, 26:19,
46:2, 46:4,
46:5, 46:9,
47:2, 47:8,
47:17, 48:7,
50:6, 50:9,
51:14, 52:21,
53:3, 53:7,
53:9, 53:15,
53:20, 54:1,
69:17, 70:5,

71:3, 72:6,
73:9, 80:14,
83:15, 84:20,
87:4, 87:6

**3**

**3**
1:19, 6:9
**30**
81:10
**300**
43:8
**31**
1:19, 12:18,
15:5, 16:19,
18:1, 18:6,
18:8, 18:16,
18:19, 19:4,
20:2, 24:5,
24:7, 35:1,
46:6, 66:9,
77:14, 81:3,
81:4, 81:12,
81:19, 82:4,
82:15, 82:22
**32**
6:9, 60:6
**3215**
2:22
**38**
4:13
**39**
56:14

**4**

**4**
60:1, 60:6,
60:9
**40**
60:1
**410**
2:9
**42**
60:9
**4th**
53:4, 53:6,
87:5

**5**

**5**
88:14, 88:20

J.R.302

Transcript of David Chen
Conducted on December 10, 2025                    45

| | |
|---|---|
| **50** | **901** |
| 43:9, 43:22 | 2:7 |
| **54** | **9747** |
| 4:15 | 2:9 |
| **5th** | |
| 53:4, 53:6, | |
| 64:15, 70:7, | |
| 79:6, 87:5, 87:6 | |

**6**

**605**
2:20
**610581**
1:20
**62**
4:17
**67**
4:22, 5:4

**7**

**7**
56:14
**752**
2:9
**76**
5:6
**78**
5:9

**8**

**8-second**
43:19
**845**
2:22
**85**
4:7
**86**
4:9
**89**
1:20, 55:3
**8:-cv--tdc**
1:5, 1:13, 6:7
**8th**
77:10, 77:13

**9**

**900**
2:20

J.R.303

# Exhibit 7

J.R.304



# Transcript of David Chen

**Date:** February 3, 2026
**Case:** Yao -v- Chen / Chen -v- Chen

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of David Chen
Conducted on February 3, 2026

1 (1 to 4)

**Page 1**

IN THE UNITED DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - X
LI FEN YAO, as                    X
administrator of the              X
Estate of Sam Mingsan             X
Chen                              X
                                  X
        Plaintiff,                X
                                  X    Case No:
        V                         X    8:23-cv-00889-TDC
                                  X
ROBERT CHEN, OTTER                X
AUDITS LLC, and RC                X
SECURITY LLC                      X
                                  X
        Defendants                X
- - - - - - - - - - - X
ROBERT CHEN and                   X
OTTERSEC LLC                      X
                                  X
        Plaintiffs,               X
                                  X    Case No:
        V.                        X    8:24-cv-03628-TDC
                                  X
DAVID CHEN                        X
                                  X
        Defendant                 X
                                  X

        Deposition of DAVID CHEN

          Wednesday, February 3, 2026

                3:01 p.m.

    Job No.:  618263

    Pages:  1 - 190

    Reported By:  Michael Antonio Rodriquez

**Page 2**

        Deposition of DAVID CHEN, held at:

        College Park Marriott

        Hotel & Conference Center

        3501 University Blvd, East

        Hyattsville, MD 20783

        Telephone:  301-985-7300

        THE VIDEOGRAPHER:  SHEGAN MEKONEN

        ALSO PRESENT:

        RACHEL CLATTENBURG, ESQUIRE

        KEVIN P. CRENNY, ESQUIRE

        KATHERINE BIGLEY

        EMMA FLOYD

                Pursuant to notice, before Michael
A. Rodriquez, Notary Public in and for the State of
Maryland.

**Page 3**

A P P E A R A N C E S

        ON BEHALF OF THE PLAINTIFFS, LI FEN YAO, as
administrator of the Estate of Sam Mingsan Chen:

        ALEXANDER GILES, ESQUIRE

        Tydings & Rosenberg LLP

        One East Pratt Street

        Suite 901

        Baltimore, MD  21202

        Telephone:  410-752-9700

        ON BEHALF OF THE DEFENDANTS, ROBERT CHEN,
OTTER AUDITS LLC, and RC SECURITY LLC:

        JOSHUA A. LEVY, ESQUIRE

        Levy Firestone Muse LLP

        900 17th Street NW, Suite 605

        Washington, DC 20006

        Telephone:  202-261-6564

        E-mail:  Jal@levyfirestone.com

**Page 4**

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Spreadsheets | 17 |
| 2 | Complaint | 30 |
| 3 | Transcript | 45 |
| 4 | Spreadsheets | 59 |
| 5 | Spreadsheets | 76 |
| 6 | Letter | 98 |
| 7 | Document | 110 |
| 8 | Declaration of David Chen | 112 |
| 9 | Letter | 125 |
| 10 | Letter | 126 |
| 11 | Document | 131 |
| 12 | Letter | 133 |
| 13 | Transcript Excerpt | 135 |
| 14 | Document | 136 |
| 15 | Document | 139 |
| 16 | Document | 141 |
| 17 | E-mail Thread | 144 |
| 18 | E-mail Thread | 154 |
| 19 | Document | 165 |

J.R.306

Transcript of David Chen
Conducted on February 3, 2026

C O N T E N T S

WITNESS: DAVID CHEN

EXAMINATION ON BEHALF OF THE DEFENDANTS:
BY ATTORNEY LEVY:                            8

EXAMINATION ON BEHALF OF THE PLAINTIFFS:
BY ATTORNEY GILES:                          172

EXAMINATION ON BEHALF OF THE DEFENDANTS:
BY ATTORNEY LEVY:                           186

(P-R-O-C-E-E-D-I-N-G-S)

(WHEREUPON, the proceedings commenced at 3:01 p.m.)

THE VIDEOGRAPHER:  Standby.

Here begins Media No. 1 in the videotaped deposition of David Chen in the matters of Yao v. Chen and Chen v. Chen, in the United States District Court for the District of Maryland.

Case numbers 8:23-CV-00889-TDC and 8:24-CV-03628-TDC.

Today's date is February 3rd, 2026.

The time on the video monitor is 3:02.

The videographer today is Shegan Mekonen representing Planet Depos.

This video deposition is taking place at 3501 University Boulevard in Hyattsville, Maryland 20783.

Will counsel please voice-identify themselves and state whom they represent.

ATTORNEY LEVY:  Joshua Levy, counsel for the defendants in Yao versus Chen and the plaintiffs in Chen versus Chen.

ATTORNEY DICHARIA:  Justin DiCharia with Joshua Levy.  And then we also have Rachel Clattenburg and Kevin Crenny, from Levy Firestone, our law firm, joining on Zoom.

ATTORNEY LEVY:  And we have two non attorneys here who won't be on the record, but Emma Floyd and Katherine Bigley.

ATTORNEY GILES:  Alexander Giles, counsel for Chen v. Chen -- David Chen in Chen v. Chen.  And Li Fen -- Li Fen Yao in Yao v. Chen.

THE VIDEOGRAPHER:  The court reporter today is Michael Antonio Rodriguez representing Planet Depos.  The witness will now be sworn.

(WHEREUPON,
DAVID CHEN,
after having been first duly sworn or affirmed under the penalty of perjury to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:)

THE COURT REPORTER:  You may proceed, sir.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS:

BY ATTORNEY LEVY:

Q.   David, you deleted 17,222 of your Discord messages, correct?

A.   That sounds correct.

Q.   How many of them were relevant?

ATTORNEY GILES:  Objection.

THE WITNESS:  I don't know.

ATTORNEY GILES:  But go ahead.

BY ATTORNEY LEVY:

Q.   Did you take any steps to determine whether any of those messages you deleted on Discord were relevant?

A.   I believe so.

Q.   And did you determine that any of those messages are relevant to the cases here?

A.   I'm unsure.

Q.   In April 2022, you deleted from OtterSec server three Discord channels that

J.R.307

Transcript of David Chen
Conducted on February 3, 2026

contained conversations relating to the liquidator, Market Maker Codes and the Solend Liquidator codes, right?

A.   **That sounds correct.**

Q.   And those were the #SPL-token-lending liquidator channel, that was one of them?

A.   **Yes.**

Q.   You deleted that on purpose, right?

A.   **Yes.**

Q.   And the second was #market-maker, correct?

A.   **Yes.**

Q.   And you deleted that on purpose?

A.   **Yes.**

Q.   And the third was #Solend-liquidations, correct?

A.   **Yes.**

Q.   And you deleted that on purpose?

A.   **Yes.**

Q.   And those are all relevant to this lawsuit, right?

ATTORNEY GILES:  Objection.  But go ahead.

THE WITNESS:  I'm unsure.

BY ATTORNEY LEVY:

Q.   Did you take any steps to determine whether those channels were relevant to this lawsuit or are relevant to this lawsuit?

A.   **Not that I'm aware of.**

Q.   July 27, July 28, July 29, 2024, you mass deleted over 6,600 of your Discord messages, right?

ATTORNEY GILES:  Objection.  Asked and answered.  The previous deposition.  Go ahead.

ATTORNEY LEVY:  Please object to form.

THE WITNESS:  That sounds correct.

BY ATTORNEY LEVY:

Q.   And how many of those messages did you determine to be relevant, if any?

A.   **I'm not sure.**

Q.   Did you look to see whether the Jito

messages were relevant?

A.   **I believe so.**

Q.   Were any of those messages relevant based on your determination?

A.   **I can't recall.**

Q.   What about the new clickbait messages?

Did you take any steps to determine their relevance?

A.   **Yes.**

Q.   Did you determine any of them to be relevant to this lawsuit?

A.   **I am unsure.**

Q.   What are the steps you took to determine whether any of those new clickbait messages were relevant or are relevant to the lawsuits?

A.   **I looked at them.**

Q.   You looked at the messages you deleted?

A.   **I did not look at the messages I deleted.**

Q.   When you say you "looked at them," what does that mean?

A.   **I looked at the messages that we collected.**

Q.   That did not include the new clickbait messages you deleted, correct?

A.   **That is correct.**

Q.   So what did you look at to the help determine whether there were any relevant messages in the new clickbait channel you deleted?

A.   **I looked at the messages that were not deleted.**

Q.   Any messages in particular?

A.   **Yes.**

Q.   Do you recall which ones?

A.   **Yes.**

Q.   What are they?

A.   **Messages in the rubber-duck-debugging channel.**

Q.   I thought you deleted all those?

A.   **I did not.**

J.R.308

Q.   You have some messages that remained in that channel that you did not delete?

A.   I believe that to be correct.

Q.   And you looked at those and you saw you had deleted other messages from that rubber-duck-debugging channel and came to the conclusion that those messages you deleted weren't relevant; is that right?

ATTORNEY GILES:  Objection.

THE WITNESS:  I don't think I made a determination about messages that were deleted.

BY ATTORNEY LEVY:

Q.   You didn't make a determine about whether they were relevant or not?

A.   I don't believe I made any such determination.

Q.   Did you make a determination about whether they were potentially relevant?

A.   I don't know.

Q.   When you were looking at these messages to determine whether they were relevant or potentially relevant what factors did you consider?

A.   Could you be more specific?

Q.   Were there factual issues that you were looking out for?

Were there legal issues that you were looking out for?

What was in your head to help you determine, if anything -- strike that.

When you were looking at these messages to determine if anything was relevant or potentially relevant, what were the factors that you were considering to help you come to that conclusion?

A.   I think if it mentioned topics related to the lawsuits.

Q.   What were those topics?

A.   In reference to rubber-duck-debugging channel.

Q.   What were the topics in general? All the topics.

A.   The code and/or OtterSec.

Q.   Anything else?

A.   Not that I can recall.

Q.   Did you look at the claims in Yao v. Chen?

A.   No.

Q.   Did you look at the defenses in Yao v. Chen?

A.   No.

Q.   Did you consider the claims or defenses in Yao v. Chen?

A.   No.

Q.   Did you consider the claims or defenses in Chen versus Chen?

A.   No.

Q.   Within the new clickbait channel did the message with Ally Guo show up in your mind as relevant or potentially relevant.

A.   Sorry, could you be more specific?

Q.   When you looked at the new clickbait messages you deleted, you knew that you had deleted messages with Ally Guo, correct?

She was in that channel, correct?

A.   Yes.

Q.   Did you analyze in any way whether those messages you deleted with her in the new clickbait channel were relevant or potentially relevant at any time?

A.   Sorry, could you repeat that?

Q.   Did you make any determination about whether the messages you deleted in new clickbait with Ally Guo were relevant or potentially relevant?

A.   Not that I'm aware of.

Q.   You also deleted over 10,000 messages directly with Ally Guo, right?

A.   I believe that to be correct.

Q.   That was in October of '24 you made those deletions, correct?

A.   Yes.

Q.   Did you make any determinations about whether those messages with Ally Guo that you deleted were relevant or potentially relevant?

A.   Not that I'm aware of.

J.R.309

Transcript of David Chen
Conducted on February 3, 2026

ATTORNEY LEVY: I'm going to show you what I'm going to call Exhibit 1.

(THEREUPON, Exhibit 1 was marked by the court reporter.)

ATTORNEY LEVY: The Bates No. is YAO00020726.

ATTORNEY GILES: Josh, can you restate that. 00020 --

ATTORNEY LEVY: YAO00020276.

ATTORNEY GILES: Thank you.

BY ATTORNEY LEVY:

Q.   This is a spreadsheet that, at the top of the page it says, "Deleted_out_sorted."

Do you see that --

(Simultaneous conversation.)

A.   Yes.

Q.   -- at the top of the page?

A.   Yes.

Q.   Do you recognize this spreadsheet?

A.   Yes.

Q.   Can you tell me what this spreadsheet is?

A.   It's a list of deleted messages, but they're IDs.

Q.   This is the list of messages on Discord that you deleted, right?

A.   Yes.

Q.   And this lists out 17,222 messages you deleted; is that right?

A.   17,223, yep.

Q.   Well, it's got 17,223 rows, but one of the rows doesn't reflect a deleted message, right?

A.   Oh, yeah, yeah.

Q.   So does it reflect 17,222 Discord messages that you deleted?

A.   Yes.

Q.   And did you produce this to us on November 17, 2025?

A.   That sounds correct.

Q.   And did you tell us, through your lawyers, that this is one of the documents that you identified in your deposition of July 30, 2025?

A.   That sounds correct.

Q.   Did you create Exhibit 1?

A.   Yes.

Q.   Did you create it to show when you had sent these messages that you had deleted?

A.   That is one thing it shows, yes.

Q.   And did you look at this spreadsheet to the help you prepare for your July 30 deposition?

A.   Yes.

Q.   And I want to go through the spreadsheet with you.  It looks like these are messages that you deleted, beginning on November 3rd, 2022, or November 2nd, 2022, and then continues through your deletions, ending on the last page, October 30, 2024; is that right?

A.   That sounds correct.

Q.   You can look at the last page to confirm that.

A.   (Complied.)

Yes.

Q.   Column A of this spreadsheet it says, "Message ID," right?

A.   Yes.

Q.   And that corresponds to a unique number for the unique message that you deleted, right?

A.   Yes.

Q.   And Column B says, "Message_timestamp_UTC," right?

A.   Yes.

Q.   And is that the column indicating when the message was sent?

A.   Yes.

Q.   And it's in UTC time, so it's about five or six hours behind Eastern Standard Time; is that right?

A.   I don't know the exact time zone difference, but that sounds right.

Q.   And Column C is "deletion_timestamp_EST," that reflects the date you deleted the message, correct?

A.   Yes.

Q.   And Column D is the channel name, right?

A.   Yet.

Q.   This is the Discord channel from which the deleted message had existed, right?

A.   Yes.

Q.   And -- and Column E is "Channel ID." That's the unique number for the channel name?

A.   Yes.

Q.   For -- Column F, that says "notes," right?

A.   Yes.

Q.   Are those your notes?

A.   I created those notes.

Q.   Did anybody else type notes in the "Notes" column but you?

A.   No.

Q.   When did you create these notes?

A.   I don't recall.

Q.   Did you do that before your deposition on July 30, 2025?

A.   Yes.

Q.   Did you add to those notes after July 30, 2025?

A.   Not that I'm aware of.

Q.   And nobody else typed notes here, just you, right?

A.   Yes.

Q.   Column G, it says, "Message Content If Known," right?

A.   Yes.

Q.   So we'll see data here if there is a message that you've actually seen and can record its content, correct?

A.   Yes.

Q.   There aren't many of those, are there?

A.   Yes.

Q.   David --

    (Simultaneous conversation.)

A.   Yes.

Q.   -- let's go to Page 3.

A.   (Complied.)

    ATTORNEY GILES:  That's the front

and back.

    ATTORNEY LEVY:  Yes.

BY ATTORNEY LEVY:

Q.   If you go to Lines 101 to 102.

A.   (Complied.)

    Uhm-hmm.

Q.   Do you see that?

    And you can use the highlighter, if you want?

A.   (Complied.)

Q.   And a ruler, if it's easier.

A.   Uhm-hmm.

Q.   This is a message that was sent February 21, 2024, deleted the same day.  The channel is "large money notiffs" in Save Team, and you wrote in the notes column that this message is relevant, correct?

A.   I did write that.

Q.   And the mess -- the note in Row 102 is a caret, correct?

A.   Yes.

Q.   And does that indicate that this message is also relevant?

A.   That's reflecting that it has the same tag, yeah.

Q.   The note in 101 applies to the note in 102?

A.   Yes.

Q.   And the note says, "Relevant - commenting on Nojob's reaction in the Solend team's liquidator -- liquidation instead of my mind," correct?

A.   Yes, that is what it says.

Q.   And who is "Nojob"?

A.   Be more specific.

Q.   Is "Nojob" a person?

A.   Yes.

Q.   Who -- what's his name?

A.   Devin.

Q.   What's Devin's last name?

A.   I don't recall.

Q.   Does Devin work for a company?

A.   Yes.

Q.   What is that company?

J.R.311

Transcript of David Chen
Conducted on February 3, 2026

7 (25 to 28)

---

**A.** Do you want the DeFi code name. I don't know the --

(Simultaneous conversation.)

**Q.** Is he with Solend?

**A.** I mean, they are not called Solend anymore, but, yes.

**Q.** They are called Save now, right?

**A.** Yes.

**Q.** Okay.

And he is the cofounder of Solend?

**A.** Yes.

**Q.** And you knew that when you wrote this message, right?

**A.** Yes.

**Q.** And you knew it when you deleted the message, right?

**A.** Yes.

**Q.** How did you determine that this message was relevant, both of these messages?

**A.** I don't know right now.

**Q.** Did anyone help you?

**A.** No.

---

**Q.** You did that by yourself?

**A.** Yes.

**Q.** Did your lawyers ask you to determine whether this is relevant or not?

**A.** Not that I'm aware of.

**Q.** Did you consult any documents when you were making this determination of relevance?

**A.** I looked at the context.

**Q.** The context of what?

**A.** Of the messages.

**Q.** What did you look at to figure that out?

**A.** Figure -- what is that?

What do you mean by that?

**Q.** What did you look at to determine whether these two messages you intentionally deleted were relevant?

**A.** I looked at the context.

**Q.** And what was the context?

**A.** The context is, like, the messages around the messages that were deleted.

---

**Q.** So you've saved messages around the period of time that you deleted these messages, and you looked at those?

**A.** I have looked at messages around those messages.

**Q.** Why did you delete these messages?

**A.** I don't know.

**Q.** At the time, you knew they were relevant to this lawsuit, right?

**A.** I don't believe so.

**Q.** At this point in time, February 21, 2024, when you deleted the messages, Yao v. Chen had been filed, correct?

**A.** Yes.

**Q.** And you knew to preserve messages potentially relevant to that case, correct?

**A.** I'm unsure.

**Q.** Your lawyers didn't directs you to preserve documents potentially relevant to the lawsuit your family filed against Robert?

**A.** I'm unsure.

**Q.** And you knew this was relevant to

---

Yao versus Chen, correct?

**A.** I don't believe so.

**Q.** You knew the code was at issue in Yao versus Chen, right?

**A.** At the time?

**Q.** Today or at the time.

ATTORNEY GILES: Objection.

THE WITNESS: I think, at the time, you guys failed to file the motion to impose, right?

ATTORNEY LEVY: That's not my question. I'm going to strict that as nonresponsive.

BY ATTORNEY LEVY:

**Q.** David, at the time you delete this message, you knew that in Paragraph 71 of your mother's Complaint, you alleged -- your mother alleged that you took code from OtterSec, correct?

ATTORNEY GILES: Objection.

THE WITNESS: I don't have the Complaint in front of me.

BY ATTORNEY LEVY:

Q. Did you look at the Complaint when you -- when you were determining whether this was relevant or not in 101 to 102?

A. No.

Q. You didn't look at claims or defenses, correct?

A. That is correct.

Q. You didn't look at claims or defenses of Chen versus Chen; is that correct?

A. That is correct.

Q. And that is true for the notes in all of this spreadsheet in Exhibit 1?

A. Yes.

Q. You didn't look at claims or defenses for Yao versus Chen, Chen versus Chen for any of these determinations, correct?

A. Yes, you can broadly construed the word "relevant" in these notes as responsive.

Q. But that's not what it says, does it?

A. No.

ATTORNEY LEVY: Look at 71. This is Exhibit 2, this is the Yao versus Chen Complaint.

(THEREUPON, Exhibit 2 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. Do you see 71?

A. Yes.

Q. "David either took with him or removed Robert's and OtterSec's access to the personal code and other property that David had been using or allowing them to use previously."

Do you see that?

A. Yes.

Q. Does that refresh your recollection whether that is part of the evidence in the Chen lawsuit?

A. Yes.

Q. David, can you go to Page 83, please, in Exhibit 1.

A. (Complied.)

Q. You can take the rubber band off.

A. That's fair. (Complied.)

Q. Do you see Line 2622?

A. 2622. Yes.

Q. And these are messages that you deleted July 29, 2024. They were created November 9, 2022. And they go down to the end of the page, right?

A. Yes.

Q. They are all in a channel called MEV Jito with the money bag emoticon.

Do you see that?

A. Yes.

Q. And MEV is Maximal Extractable Value in Jito, right?

A. Yes.

Q. And you have marked all of these messages from 2622 all the way down to the next Page 2650 to be relevant, correct?

A. Yes.

Q. And it says, Relevant-Solend liquidations in context of FTX collapse," in column F, right?

A. Yes.

Q. And these are your notes, correct?

A. Yes.

Q. And these are messages that you have seen, correct?

A. Yes.

Q. And that's because Robert preserved them, right?

A. Yes.

Q. And how did you determine that these messages were relevant?

A. They mentioned liquidations.

Q. Anything else?

A. Do you want me to look at them?

Q. I'm asking you if you did anything else to determine whether these were relevant?

A. Not that I'm aware of at this moment.

Q. And if you look at the next Page 84, you made the same exact notation Relevant-Solend liquidations in context of FTX

J.R.313

33

collapse," for 2664 to 2668, correct?

A.   (Complied.)  Yeah.

Q.   And for 2671 and 2672, correct?

A.   Yeah.

Q.   And 2674 and 2675, correct?

A.   Yes.

Q.   And if you go to Page 85, the same is true for 2799 and 27110, right?

A.   2710?

Q.   2710.  Yes.

A.   Yes.

Q.   And then if you go to Page 86 you will see 2712, 2714, 2716, 2720, 2721, 2724, and 2728 like the ones before them have all said "Relevant-Solend liquidations in context of FTX collapse," right?

A.   Yes.

Q.   These are all messages that you determined to be relevant, yes?

A.   I wrote the relevant -- I wrote relevant as the note next to them, yeah.

Q.   And you determined that by looking

34

at the messages, right?

A.   Yes.

Q.   But there is nothing else that you can recall doing to determine the relevance, correct?

A.   Yes.

Q.   Please turn to Page 178.

A.   (Complied.)

Q.   In Exhibit 1.

A.   (Complied.)

Sorry, can you repeat the page number?

Q.   178.

A.   178.

(Complied.)

Q.   So first look at page -- look at Line 6783?

A.   (Complied.)  Yes.

Q.   You note that that message as "Relevant commenting on a large number of liquidations performed by my bot."  Right?

A.   Yes.

35

Q.   How did you determine that that message was relevant?

A.   The context again.

Q.   Meaning other messages that you had not destroyed, you looked at those?

A.   Yes.

Q.   And did you look at the Complaint claims or defense list?

A.   No.

Q.   Did you look at any other factors to help you determine whether this was relevant or not?

A.   No.

Q.   And you made all these notes before your deposition, correct?

A.   That's correct.

Q.   Immediately before, like the week before?

A.   I don't recall.

Q.   A month before?

A.   I don't recall.

Q.   When did you begin prepping for the

36

July 30th deposition?

A.   I don't recall.

Q.   Was it a year before?

A.   It was not a year before.

Q.   So what's the earliest time you think you would have been working on this spreadsheet in populating the notes column, David?

A.   I don't know, the same year.

Q.   Would it have been in June 2025, July 2025, the deposition was July 30, 2025, David.

Does that refresh your recollection?

A.   I'm not sure.

Q.   I'm going to have you look on Page 178 at Line 6789.

Do you see that?

A.   Yes.

Q.   I'm sorry.  Go to 6791.  That is "Ally mass deletions that we have from Discord takeout."

Do you see that?

J.R.314

Transcript of David Chen
Conducted on February 3, 2026

---

**37**

A.   Yes.

Q.   And in Column D it says, "Direct messages with ClosetDuck#0," correct?

A.   Yes.

Q.   ClosetDuck is Ally Guo, right?

A.   That is correct.

Q.   And then you'll see nothing in the notes column below that one note I just made for you -- just repeated for you, "Ally mass deletions that we have from Discord takeout," because these are all the Ally Guo message you deleted, right?

A.   That's correct.

Q.   The 10,000 of them?

A.   That sounds correct.

Q.   And the deletion here begins on October 10, 2024, right?

A.   Yeah.

Q.   And it continuous through to the last page to October 30, 2024, correct?  Or continues for a while.  I don't know if it continues to the end.  But it continuous for a

---

**38**

while.  It's 10,000 messages, right?

A.   That sounds correct.

Q.   Did you make any determinations here whether these messages were relevant or potentially relevant?

A.   No.

Q.   If you look at the same Page 178, you are going to see Line 6789 and 6790?

A.   Yes.  (Complied.)

Q.   Those two messages you deleted September 19, 2024, and they were created the same day, yes?

A.   Yes.

Q.   And this was after you were served with a subpoena in Yao versus Chen, correct?

A.   What day was the subpoena?

Q.   In June of 2024 you were served with the subpoena.

A.   Then, yes.

Q.   And this is after you had mass deleted over 6,600 of your Discord messages, correct?

---

**39**

A.   Sorry, Line 6789?

Q.   Yes.

A.   No.  Oh, wait, wait, wait.  Sorry.  Yes?  Yes.

Q.   Why did you delete these messages?

A.   Those two messages?

Q.   Uhm-hmm.

A.   I don't -- I can't recall.

Q.   You noted they are possibly relevant, correct?

A.   Yes.

Q.   You said they mentioned liquidations in the lawsuit, right?

A.   That is what I wrote in the notes.

Q.   How did you figure that out?

A.   Context.

Q.   What was the context that helped you understand that these messages mentioned liquidations in the lawsuit?

A.   I think my note meant that it might have.  But, I assumed the surrounding conversation mentioned something along those

---

**40**

lines.

Q.   What do you recall the surrounding conversation mentioned?

A.   I don't know.

Q.   These are direct messages with s3v3rus, right?

A.   That's correct.

Q.   S3v3rus used to work for OtterSec, didn't he?

A.   Yes.

Q.   And he worked with you at OtterSec, right?

A.   Yes.

Q.   Is that why you thought these were relevant potentially?

A.   I don't believe so.

Q.   What else about the context made you understand that this was about the -- these messages were about the lawsuit and the liquidation?

A.   I don't know.

Q.   If you go up to 6783.

---

A.   (Complied.)

Q.   The top of that same page?

A.   Uhm-hmm.  (Complied.)

Q.   What is it about -- this is another message you said, "Relevant commenting on a large number of liquidations performed by my bot."  Right?

A.   Yes.

Q.   And that is in the large money notiff and Save Team channel, right?

A.   Yes.

Q.   What is it about that message that you understood it to be "Relevant commenting on a large number of liquidation performed by my bot"?

A.   Today I think I would say it would be responsive because it mentions the liquidator, but I'm not sure it would be relevant.

Q.   Did it have to deal with the Solend team code, the liquidation code?

A.   No.  Wait, actually, can you be more specific?

Q.   Well, you write "Commenting on a large number of liquidations performed by my bot."  Is that in reference to the Solend Liquidator code?

A.   Yes.

Q.   And that is relevant to the lawsuits, right?

A.   I suppose.

Q.   All right.  Go back up to the top of the spreadsheet, Exhibit 1.

A.   (Complied.)

Q.   Rows 2 and 4.

This is a message from November 3rd, 2022 that you deleted and a message from November 10, 2022 that you deleted, correct?

A.   Yes.

Q.   And these are both from the -- from the channel -- the first one is from the channel called "Server or coding in AltTank," right?

A.   Yes.

Q.   And the next is "Sole ecosystem channel in AltTank," right?

A.   Yes.

Q.   And for the first one, you wrote, "Related to my validator server disk erupting possibly relevant."

Why did you write that these were "possibly relevant"?

A.   I think because my server was mentioned before.

Q.   Where was your server mentioned?

A.   I don't know.  In some document or other that's being passed around.

Q.   In this channel?

A.   No, no, no.  Like, legal document.

Q.   What about this message made you understand or think that it was "possibly relevant"?

A.   I was talking about my server, so I think it would have was being responsive.

Q.   How do you know it was talking about your server?

A.   Context.

Q.   What from the context made you understand that this channel or this message was talking about your server?

A.   I don't know at this time.

Q.   AltTank was the channel that you used to talk with people who are older than you about the development of the code in 2021, right?

A.   Yes.

Q.   And AltTank is the -- is in the channel here for Row 4, right, "Sole ecosystem chat in AltTank," right?

A.   Yes.

Q.   And here, you wrote, "Liquidations maybe around the time of FTX collapse so related to that maybe," right?

A.   Yes.

Q.   And here, you are looking at other messages to make you understand that this deleted message related to your liquidation code?

J.R.316

Transcript of David Chen
Conducted on February 3, 2026

45

A.   I think specifically, for AltTank, it might not have been related to my code specifically.

Q.   But AltTank is a channel that you went to for advice on the development of your code, correct?

A.   I don't think I went for advice.

Q.   What did you go there for?

A.   To talk about things, have conversations.

Q.   Excuse me?

A.   To have conversations.

Q.   About the code, about decisionmaking as it pertains to coding?

A.   I can't recall.

Q.   About ideas, about how to determine develop code and modify code?

A.   I don't recall.

ATTORNEY LEVY:  I'm going to show you your deposition from December 2025.  I'm going to mark it as Exhibit 3.

(THEREUPON, Exhibit 3 was marked by

46

the court reporter.)

BY ATTORNEY LEVY:

Q.   Turn to Page 28, please.

ATTORNEY GILES:  I'm sorry, Josh. What page?

ATTORNEY LEVY:  28, Line 10.

THE WITNESS:  Where are the page numbers?

ATTORNEY GILES:  In the upper right-hand corner.

THE WITNESS:  Okay.

ATTORNEY GILES:  Each of those boxes.

THE WITNESS:  Oh, okay.  Each little box.  Okay.

I'm sorry.  I got it.  Give me a second.

Yeah.  Okay.  28.

BY ATTORNEY LEVY:

Q.   Lower right-hand box.

A.   Yes.  Okay.

Q.   Line 10.

47

A.   Yes.

Q.   Mr. Crenny asked you, "So then as you're starting to work on the codes that you are working on, who are you communicating to about it?"

You answer, "Well, I saw message in AltTank.  I don't know about anyone else."

So when you start working on the Solend liquidator codes, you claim that the people you were talking to about it were in AltTank and nobody else, right?

That's your testimony, correct?

A.   That is what I testified, yes.

Q.   And so messages here that you deleted in November of 2022, after you've left OtterSec, and are feuding with OtterSec's lawyers, pertain to people you've talked about the Solend liquidator codes, right?

A.   Which one are you referring to?

Q.   2 and 4?

A.   2 and 4.  Sorry.  Can you repeat the question?

48

Q.   These messages relate to conversations you had with people that you talked to about your Solend liquidator codes, right?

A.   I have talked to people in the AltTank about my code.

Q.   And -- and you knew that when you deleted these message in November of 2022, right?

A.   I knew that I talked to them about the code, yes.

Q.   All right.  Go to Page 2, please.

A.   (Complied.)

Page 2 of?

Q.   Of Exhibit 1.

A.   (Complied.)

Q.   Look at Line 60, 61, and 62.

A.   (Complied.)

Q.   These are all from a channel called "dev support in Save formally Solend," right?

A.   Yes.

Q.   Solend is the protocol with which

J.R.317

the liquidator is operated, right?

A.   Yes.

Q.   Solend rebranded as Save, right?

A.   Yes.

Q.   And "dev support" here is short for "developer support," right?

A.   Yes.

Q.   And that support is for coders interacting with Solend, right?

A.   Yes.

Q.   And so that's related to this lawsuit, isn't it?

A.   I suppose it could be.

Q.   Did you take any steps to go recover these message that you deleted in 60, 61, 62?

A.   What do you mean "recover"?

Q.   You deleted these messages August 25, 2023, correct?

A.   Yes.

Q.   Did you take any steps to recover the deleted messages?

A.   What do you mean by "recover"?

Q.   Did you take any steps to see if you could obtain the data?

A.   I looked at the Discord takeout.

Q.   After you deleted it?

A.   Yes.

Q.   And the takeout didn't reveal anything because once you deleted these messages, they are gone forever, right?

A.   Yes.

Q.   And you knew that when you deleted that, right?

A.   I don't know.

Q.   Well, you are pretty savvy with Discord, aren't you, David?

A.   That's an opinion, but I guess so.

Q.   And you know when you delete a message on Discord, it's gone forever, correct?

A.   No, I don't think so.  Well, like, I know that now, but...

Q.   You know that now, right?

A.   Yes.

Q.   And -- and you knew it then, too?

A.   I don't know.

Q.   In Line 73, you deleted this message, too.  It was sent October 13, 2023.  This is after your family filed the lawsuit against Robert, right?

A.   Yes.

Q.   And you know that one of the issues in the lawsuit is about you not trust being Roberts's communication with Jump, right?

A.   Yes.

Q.   And your notation here about this message that you deleted on October 12th, 2023, says, "Talking shit about Jump after seeing a related tweet probably not relevant."

How is this not related to the lawsuit, Robert -- David?

Excuse me.

A.   I mean, I don't know.

Q.   This pertains to Jump, right?

A.   Yes.

Q.   How did you know this message was you talking shit about Jump?

A.   Context.

Q.   Looking at other messages that you didn't delete, right?

A.   Not necessarily mine, but, yes.

Q.   Other peoples' messages?

A.   Messages surrounding the message that was deleted.

Q.   And you could tell here that you were talking shit about Jump.  Those were your words, right?

A.   That's what I wrote in the notes.

Q.   Go to Page 73, please.

A.   (Complied.)

Q.   So if you look at Column D of this Page 73, all the channels are Jito channels, right?

A.   Yes.

Q.   And some of them have message because Robert had preserved some of the messages that you tried to delete, right?

A.   Yes.

J.R.318

Transcript of David Chen
Conducted on February 3, 2026

53

Q. But some of them, you don't have the messages for, right?

A. That's correct.

Q. Because you deleted them forever and nobody had a chance to preserve them, right?

A. That we are aware of, yes.

Q. And so the -- if you look at 2203 and 2204.

A. (Complied.)

Q. Where it says "random Jito" is the channel name under Column D?

A. Yes.

Q. Those relate to Jito, right?

A. Those --

Q. Those channels --

A. Yes.

Q. -- are random Jito, right?

A. Yes.

Q. So that covers a broad topic -- a broad slop of topics related to Jito, correct?

A. I mean, by definition, it's random, so --

54

Q. Right. So random here means kind of anything related to Jito, right?

A. No, not necessarily.

Q. But many things related to Jito?

A. Not really.

Q. What does it mean to you?

A. Well, like, random -- like, at the time, Jito was -- Jito Discord was just kind of like a gathering place for like people, I think.

Q. What does "Random in Jito" mean?

A. It means it's a channel about random things in Jito, not necessarily pertaining to Jito.

Q. Did people talk about the Solana market in random in Jito?

A. What do you mean by "Solana market"?

Q. Did they talk about Solana?

A. Yes.

Q. Did they talk about Solend?

A. I don't know.

Q. Did they talk about liquidations in

55

Solana?

A. It's possible.

Q. Did they -- do you recall them talking about and you talking about liquidations in random and Jito?

A. I don't recall.

Q. Did they talk about MEV in random in Jito?

A. I don't recall.

Q. Did they talk about bounties or bots in random in Jito?

A. Probably bots.

Q. Did they talk about your bot?

A. Probably not.

Q. Why not?

A. I didn't talk -- I don't know. I just don't think so.

Q. You don't know for sure because you deleted this message, right?

A. Yes.

Q. You deleted all the messages in the random in Jito channel, right?

56

A. I don't know.

Q. Did you take any steps at any point in time to determine whether any of the message in random and Jito were relevant before filling out this column?

A. I looked at the Discord takeout.

Q. Did you do anything else?

A. I also looked at the Jito Discord server as it exists today.

Q. And neither the Discord or the -- or the other thing you mentioned included any of the messages because you deleted them, right?

A. That's correct.

Q. Go to Page 78.

A. (Complied.)

Q. Line 2473, these are more random in Jito messages that you deleted. And your comment says, "Channel no longer exists but probably FTX collapse commentary."

How did you figure out that's what these messages pertain to?

A. I pulled up the date of the FTX

J.R.319

Transcript of David Chen
Conducted on February 3, 2026

collapse, and I marked everything after that or like the dates after it.

Q. And there were some of these messages where you recall discussing the use of your liquidation bot or code to help get money after the FTX collapse, correct?

A. Yes.

Q. So that could have been part of random in Jito, too, right?

A. At this specific point in time.

Q. Yeah.

A. It's possible.

Q. It's possible, right. That's true for all these messages that you mark random in Jito, "Channel no longer exist but probably FTX commentary," correct?

A. Yes.

Q. So now I want you to go to Page 91.

A. (Complied.)

Q. And here, at 2890, at the bottom of the page, "Please mark all these possibly relevant. Commenting on MEV in general and how to land transactions," correct?

A. Yes.

Q. And you've got the message content for these messages, right?

A. That's correct.

Q. And these are in the money bag and in the Jito chat, right?

A. Yes.

Q. And that is true for the next message on the top of the next page, 2900, as well as 2902 and 2903, right?

A. Yes.

Q. And all the way down to 2920, right?

A. Yes.

Q. They all say, "Possibly relevant commenting on MEV in general and how to land transactions."

A. Yes.

Q. And what made you understand that these messages are possibly relevant?

A. They mentioned techniques I used in the code.

Q. Anything else?

A. That's it.

ATTORNEY LEVY: Okay. All right. I'm now going to show you what I'm going to mark as Exhibit 4.

(THEREUPON, Exhibit 4 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. This is the second sheet of this spreadsheet, Sheet 2. And the top of this page it says "takeout" -- it says "5/18/25, 5-18-25, takeout deleted out sorted."

Do you see that?

A. Yes.

Q. And did you create this spreadsheet as well?

A. Yes.

Q. Did you look at this spreadsheet in advance of your July 30, 2025, deposition?

A. Yes.

Q. If you turn to Page 491 -- or before you do that, you'll recall that at the end of Exhibit 1, the last date that you had deleted messages was October 30, 2024, right? You can check the last page.

A. (Complied.) Yes.

Q. Okay.

And then if you -- if you look at Page 491 of Exhibit 4, this is Sheet 2 -- are you there?

A. Yes.

Q. Do you see the top of that page has -- it's a continuation of these messages you were deleting from Ally Guo, right?

A. Yes.

Q. And then it stops at 17183 and deletions from October 31, pick up in rows 17186.

Do you see that?

A. Yes.

Q. All right.

And if you look at the next page, there are no notes for those messages from 17186 through 17217.

J.R.320

61

Do you see that?

A. Yes.

Q. And in 17218 there is a note that says, "In previous sheet with a caret," right?

A. Yes.

Q. And so you thought that those messages above "In previous sheet" had been in Exhibit 1, in Sheet 1, right?

A. That sounds correct.

Q. But they weren't, were they, because the deletions in Sheet 1 stopped on October 30, correct?

A. Yes.

Q. So let's look at these messages that you didn't comment on in Sheet 1 because they weren't there but are in Sheet 2, okay?

A. Okay.

Q. So if you look at some of these messages such as Row 93 and Row 94 -- I'm sorry, if you look at -- if you look at the messages 17188 through 17196.

Do you see that?

62

A. Yes.

Q. It's random in Save Team, right?

A. Yes.

Q. And right before in 17187 it's trading competition and Save Team, right?

A. Yes.

Q. And the Save Team is the Solend team, right?

A. Yes.

Q. It's the team that works on Solend code, correct?

A. Yes.

Q. And Solend code, including your Solend liquidator box, right?

A. Can you be more specific?

Q. Well, these messages may have everything to could with your code, right, the code you claim is yours?

A. It's possible.

Q. Did you do anything to determine whether these messages, 17187 to 17196 were relevant?

63

A. Not that I'm aware of.

Q. If you go to the next page you will see 17213 and 17214 you see MEV in Jito developers?

A. (Complied.) Yes.

Q. And we just went through a number of messages in Sheet 1 from a channel call MEV in Jito with the money bag emoticon and you marked all those relevant, right?

A. I can't -- I don't know if I mark all of them relevant.

Q. Many of them, right?

A. Yes.

Q. All the ones that we discussed, right?

A. Yes.

Q. Can you recall any that you didn't mark relevant?

A. No.

Q. I'll represent to you that you did not, okay?

A. Okay.

64

I'll take your word for it.

Q. So would these MEV in Jito messages also be relevant, 17213 and 17214?

A. I don't know.

Q. MEV in Jito is relevant to this lawsuit, isn't it?

A. Can you rephrase the question?

Q. One of the things you were trying to do with the Solend Liquidator bot was Maximum Extractable Value in Jito, right?

A. No.

Q. MEV in Jito has no relationship to the Solend Liquidator code?

A. It does.

Q. Explain to me how it does?

A. I have mentioned it in that channel.

Q. How so?

A. I don't recall anything specific.

Q. What in general do you recall?

A. That I have mentioned it in there.

Q. Explain to -- explain to somebody who doesn't know about Solend Liquidator code

J.R.321

Transcript of David Chen
Conducted on February 3, 2026

and how it relates to Maximum Extractable Value in Jito?

A.   **Liquidations are a subset of MEV, right, and then Jito is just attracting all these people who like to talk about that kind of thing.**

Q.   Are you one of those people?

A.   **Who --**

(Simultaneous conversation.)

Q.   Likes to talk about that kind of thing?

A.   **I guess so.**

Q.   And were you in these channels talking about that kind of thing?

A.   **Yes.**

Q.   You were in the MEV in Jito channel talking about that kind of thing, right?

A.   **Yes.**

Q.   Are there any other relevant Discord messages that you deleted, David?

A.   **I don't know.**

Q.   David, I want you to turn to what I'm going to mark Exhibit 5.  I just want to -- before you -- before we leave that just one more message here that I want to talk to you about.

If you look at Row 17202 to 17205, it relates to a channel that -- the same sheet we were just looking at?

A.   **Yeah.**

Q.   It says, "Testnet validators in Solana tech."

Do you see that?

A.   **Yes.**

Q.   Tell me what that is?

A.   **Testnet is the Solana Testnet.  And then validator is a Solana validator, so that channel was about Solana Testnet validators. That is what the name implies.**

Q.   How does that relate to the Solend Liquidator code?

A.   **It doesn't really.**

Q.   You are not validating code on the Solana tech here?

A.   **Could you rephrase that question?**

Q.   Are you part of these -- you are part of these discussions because you deleted these messages, right?

A.   **Yes, I'm in that channel.**

Q.   Okay.

And in these channels, are you talking about liquidations as the Solana platform?

A.   **No.**

Q.   You are not.  What are you talking about?

A.   **Running the Solana Testnet validator.**

Q.   Okay.  And what is a Testnet validator?

A.   **So Solana has two networks, right? They have their main net and their Testnet. The Testnet is where they run their beta code. So there is no real money on Testnet.**

Q.   What -- then why talk about it?

A.   **Because you are required to run a Testnet validator to qualify for Solana validation's delegation program.**

Q.   And Testnet was one of the codes that you claimed you developed, right?

A.   **No.**

Q.   No?

A.   **No.**

Q.   These messages that we've just discussed, that you deleted October 31 through December 28, 2024.

Do you see that here?

A.   **Which one?**

Q.   Beginning on Page 491 of Exhibit 4 -- 17186 through 17217, these are deletions you made from October 31, 2024 to December 28, 2024, correct?

A.   **Yes.**

Q.   These were all after Robert's lawyers notified your lawyers that you had deleted Discord messages, correct?

A.   **That sounds correct.**

Q.   We notified you on October 28, 2024,

J.R.322

69

right?

A.   That sounds correct.

Q.   When you got that letter, did your lawyers tell you, "David, stop deleting messages"?

ATTORNEY GILES:  Objection.

THE WITNESS:  I don't recall.

BY ATTORNEY LEVY:

Q.   But you continued to intentionally delete these messages, correct?

A.   Yes.

Q.   And Chen versus Chen had been served by this point, right?

A.   I believe so.

ATTORNEY LEVY:  Let's take a break. Go off the record.

THE VIDEOGRAPHER:  We are going off the record.

The time is the 4:02.

(THEREUPON, the proceedings recessed at 4:02 p.m.)

(THEREUPON, the proceedings resumed

70

at 4:16 p.m.)

THE VIDEOGRAPHER:  Standby, everyone.

We are back on the record.

The time is 4:17.

BY ATTORNEY LEVY:

Q.   David, I want to redirect you to Exhibit 1, the spreadsheet.

A.   (Complied.)

Q.   Why did you create this spreadsheet?

A.   I think it was for my attorneys.

Q.   In advance of your deposition?

A.   Yes.

Q.   You did this to prepare for your deposition, right?

A.   Yes.

Q.   For no other purpose, right?

A.   Yes.

Q.   You didn't create this in advance of other court filings before your deposition, right?

A.   Not that I'm aware of.

71

Q.   If you look at the "Notes" column, David, there are a number of messages you deleted here where there are no notes, right?

A.   Yes.

Q.   So did you not look at those messages' context to figure out whether they were potentially relevant or irrelevant?

A.   I guess, can you point me to a specific example?

Q.   Sure.

If you -- if you go -- well, just -- this is your spreadsheet, right?  You created it.

A.   Yes.

Q.   And there are all kinds of messages where you have no notes, right?

A.   Yes.

Q.   So how did you make a decision about which messages you were going to comment on and which messages you were not?

A.   I think I didn't comment on the mass deletions.

72

Q.   Why not?

A.   Because how I was writing notes was based on context, right.  So...

Q.   So you weren't going through the mass deleted e-mail -- messages to figure out what the content of them were, right?

A.   That's correct.

Q.   You weren't looking to see whether they related to Robert, were you, one by one?

A.   No.

Q.   You weren't looking to see whether they related to OtterSec one by one, were you?

A.   No.

Q.   You weren't looking to see whether they were related to the Solend liquidator code or the market code, right?

A.   That's correct.

Q.   You weren't looking at them one-by-one for any purposes, were you?

A.   For Jito, I did but --

(Simultaneous conversation.)

Q.   With the exception of Jito, for any

73

message you mass deleted, you weren't looking at them individually to determine what they were?

A. I did not.

Q. Did anyone else?

A. I believe counsel looked at and produced Ally Guo message.

Q. We have not received Ally Guo message. When did your counsel produce them?

A. Then I'm corrected, but you guys do have a copy of it.

Q. How do you know that?

A. Because you subpoenaed her.

Q. We did not receive messages from her. We have not received messages from you.

When did you send us Ally Guo messages, David?

A. Okay.

That is news to me. I thought you guys had it.

Q. Do you have a copy of her messages?

A. Yeah.

74

Q. Where is it?

A. It's from the Discord takeout.

Q. Which Discord takeout?

A. Oh, wait. No. Sorry. Not from Discord takeout. From an earlier collection.

Q. Which earlier collection?

A. I think April of '24.

Q. April of '24, before you deleted them?

A. Yes.

Q. And did your lawyers review the April of '24 takeout this winter, end of 2025, when they are supposed to be producing documents to us?

A. I don't know.

Q. Do -- do your lawyers have the April 2024 takeout or does TransPerfect have it?

A. I believe TransPerfect has it.

Q. Why do you believe that?

A. I believe -- I don't know. Based on recollection.

75

Q. And that April 2024 takeout has the messages you deleted?

A. Between me and Ally Guo?

Q. Yes.

A. Yes.

Q. How do you know that?

A. I don't know that, but it definitely does.

Q. Why did you tell me -- so you haven't looked to see, right?

You have not looked at the April 2024 collection to determine whether the messages with Ally Guo that you deleted are still there, have you?

A. Oh, I haven't.

Q. Why not?

A. Well, actually, I probably have, but not recently.

Q. Have you looked at it since you deleted the messages?

A. I can't recall, but it's possible.

Q. Will you commit to producing them,

76

if you have them, the 10,000-plus deleted messages with ClosetDuck, Ally Guo?

A. I mean, if we have them, they should be produced, yeah.

Q. So yes, you will commit to producing them to us?

A. Yeah.

Q. But you haven't seen them in some time, right?

A. That's correct.

Q. So they might not be there, right?

A. That's unlikely, but I believe they are there.

ATTORNEY LEVY: David, I'm going to show you what I'm going to call Exhibit 5. This is YAO00095239.

(THEREUPON, Exhibit 5 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. And just before I do that, just going back to Exhibit 1, so you created that spreadsheet at your lawyer's direction or was

J.R.324

Q.   it your idea?

A.   I believe it was my idea.

Q.   And why did you think it was a good idea to create that spreadsheet?

A.   I thought it was important to prep for a deposition.

Q.   And -- and you are the only person who worked on that spreadsheet, right?

A.   Yes.

Q.   Okay.
If you look at what I just sent you, this is spreadsheet that you produced to us on December 13, 2025.
And if you look at the third -- there are three stacks because this is a computer printout of a -- of an Excel spreadsheet.

A.   Okay.

Q.   It's voluminous.  If you look at the third stack --
(Simultaneous conversation.)

A.   Third stack.  Okay.

Q.   -- on the front page --
(Simultaneous conversation.)

A.   Okay.

Q.   -- it should say, "List of channels from DC."
Do you see that?

A.   Yes.
(Complied.)

Q.   Okay.
And do you recognize that document?

A.   No.

Q.   Do you know who created it?

A.   No.

Q.   Have you seen this before?

A.   I don't think so.

Q.   Do you know when it was created?

A.   No.

Q.   Do you see Column A says "Name"?

A.   Yes.

Q.   And does Column A look like it's names of Discord channels?

A.   Yes.

Q.   Does it look like it's names of Discord channels that you deleted?

A.   Names of Discord channels I have deleted messages from.

Q.   Okay.
So these are channels where you had communicated in Discord and you deleted messages within those channels?

A.   Yes, I believe so.

Q.   Okay.
And then do you see Column B, it says, "DC Description"?

A.   Yes.

Q.   All right.
And is -- do you think that's David Chen, "DC"?

A.   Yes.

Q.   Do you recall populating this column under "DC Description" with words?

A.   I --
(Simultaneous conversation.)

Q.   David, are these your notes in Column B?

A.   Privileged?

Q.   David, are these your notes in Column B?

A.   Okay.
I think I sent something like this to Stephen Plotnick.

Q.   Are these your notes in Column B?

A.   I don't think so -- or like, I think these are based off of e-mails I sent to my lawyer.

Q.   And do you think these -- do you know if these are your lawyer's notes?

A.   I believe that to be so.

Q.   Reflecting information you gave them?

A.   Yes.

Q.   Let's go through some of these, okay?

A.   Okay.

Q.   Does that refresh your recollection about when this spreadsheet would have been

J.R.325

81

created?

A.   No.

Q.   Do you know when you gave information to your lawyers about what was in these channels to the best of your recollection?

A.   It would have been before the deposition.

Q.   Before the deposition.  If I told you that the metadata for this document is February 27, 2025, does that refresh your recollection about when this was created?

A.   Sure.

Q.   Do you recall giving information to your lawyers around that time about these channels?

A.   I don't remember what time I gave information, but I guess if the spreadsheet was created around that time, it was probably around that time.

Q.   And you review of the notes in Column B suggest to you that these do reflect

82

information that you gave to your lawyers, right?

A.   Sorry, give me a second to read them.

Q.   Sure.  Let's start at Row 26.  Let's look at that one.  The channel is large money notiffs and Save Team.

A.   Yes.

Q.   And we just talked about some messages from that channel in Exhibit 1, right?

A.   Yes.

Q.   And those were some of the messages that you noted before as being relevant, right?

A.   I wrote in the notes that they were relevant, yeah.

Q.   Right.  And here the note here says, "Save has bot setup for when user performs transaction over a certain amount.  In theory could be relevant."

Does that reflect the information

83

that you gave to your lawyers?

A.   Yeah, that sounds correct.

Q.   And what was it about the message that you deleted in that channel in Row 26, that made you think this was related to the lawsuit?

A.   I don't think they're -- wait.  Sorry.  What do you mean related to the lawsuit?  I think they're --

(Simultaneous conversation.)

Q.   What was the information in the channel that you were recalling here?

A.   I think they were related to liquidations.

Q.   Liquidations.  Anything else?

A.   Just liquidations.

Q.   Your liquidation code?

A.   Actions that I performed onto that resulted in large transactions, yes.

Q.   So it could have been using the code that you claim was yours, right?

A.   Those actions could have resulted

84

from my code, yes.

Q.   Okay.  And look at Row 15.

A.   (Complied.)

Q.   That's from a channel called "???  Dev support in Save/Solend."  Do you see that?

A.   Yes.

Q.   And the note there is "Potentially relevant to code stuff."  Do you see that?

A.   Yes.

Q.   Does that reflect the information that you gave your lawyers?

A.   Yes.  Probably.

Q.   What do you recall about the messages you deleted in that channel?

A.   I think -- back to 1, I think in my notes I wrote -- I looked at the messages between me and Nojob around the same time.  So I think its similar to whatever was in those messages.

Q.   That's what you did for Row 15?

J.R.326

85

A. For Row 15? I don't know.

Q. For Row 26 you looked at the messages with Nojob?

A. No.

Q. For Row 15 you look at message with Nojob?

A. No, I think for -- for Exhibit 1 I looked at messages with Nojob.

Q. Did you do anything else for -- for Exhibit 1 to determine what those messages were?

A. Yeah. I tried looking at the context, but there is -- that channel is totally dead. No one sends messages in it. So there is not any context.

Q. Meaning the channel that you deleted?

A. The messages -- the Dev support channel is dead.

Q. And just to be clear, when you were looking at messages with Nojob, and other content for some of the entries in Sheet 1,

86

you were not doing that for the mass deleted messages, right?

A. That's correct.

Q. The mass deleted messages you were not looking at one-by-one, correct?

A. Except for Jito.

Q. Except for some of the Jito, right?

A. Most of the Jito, at that point, yes.

Q. Not the random in Jito, right?

A. Yes.

Q. If you go back to Exhibit 5, you can see you are direct message with "e7l#0"?

A. Where is this?

Q. If you go back to Exhibit 5. This is the list of --

(Simultaneous conversation.)

A. Which page is it?

Q. This is channel -- just one page. We are just going to stay on this one page?

A. Okay.

Q. So if you just look at Row 45.

87

A. 45. Okay.

Q. This is a direct message with Steven Tong, right?

A. Yeah.

Q. Who is Steven Tong?

A. Steven -- or her name is Luna Tong now, but, she is the cofounder of Zellic.

Q. The what?

A. Zellic.

Q. Can you spell that?

A. Z-E-L-L-I-C.

Q. And what is that?

A. That's a security auditing firm.

Q. And your lawyers noted that under Column B for Row 45, "Steven Tong - potentially relevant."

Do you see that?

A. Yes.

Q. Does that reflect the information that you gave them?

A. Probably.

Q. What was that information?

88

A. I am not sure.

Q. Do you know what you did to figure out -- well, what do you recall your message with Steven Tong being about?

A. She was the one who referred CLM to me, so probably something about that.

Q. Why did you talk to her in the first place about your lawsuit?

Meaning she referred your litigation counsel to you for Yao versus Chen?

A. Yes.

Q. CLM was your original litigation counsel, correct?

A. Yes.

Q. And she was the person who referred them to you, correct?

A. Yes.

Q. Not to your mother, right?

A. Yes.

Q. And you had a conversation with her before she referred a law firm to you, right?

A. Yes.

J.R.327

Q. And you talked about the dispute with Robert, right?

A. Yes.

Q. You had to have, right?

A. Yes.

Q. And what did you tell her about the dispute with Robert?

A. I think she actually reached out to me.

Q. Uhm-hmm. And what did you discuss about the dispute with Robert at OtterSec.

A. I believe she told me that Robert dissolved the companies. I was like, "That's crazy," something like that.

Q. And you knew that you had those conversations with her when you deleted the messages with her, right?

A. Deleted the messages. I think I deleted some messages that were, I think probably like two years removed from the start of the lawsuit, but, yeah.

Q. But, yeah, you knew that you had spoken with her about the lawsuit and the dispute with Robert and OtterSec before you deleted the messages with her, correct?

A. Yes.

Q. At the time you deleted these messages, you knew that that was the content of your conversations with her, right?

A. Two years prior to the deletion of the messages and the sending of the messages that I deleted, we had conversations related to the lawsuit.

Q. Right. Meaning that when you deleted them you knew you had conversations with her and she is the person who referred you a lawyer for this lawsuit, right?

A. Yes.

Q. Okay. Why did you delete those messages, David?

A. Which ones?

Q. With her.

A. With her? I think -- I think we were going to go -- go bar hopping I think.

This was in like 2024. I think I sent a message asking to like -- asking if I could come or something.

Q. There were other messages with her that were potentially relevant as well? That's what your notes here say.

A. Yes.

Q. And so why did you delete those messages?

A. I don't think I did.

Q. Why does it say "Potentially relevant"?

A. I think Luna deleted some messages.

Q. But these are messages you deleted, right?

A. I guess like -- can we like look at Exhibit 1 for them.

Q. I'm asking you, David, you deleted messages with Luna, right?

A. Yes.

Q. That's why it's here, right?

A. Yes.

Q. And why did you delete those messages?

A. I just told you it was like around the time of like bar hoping or something.

Q. All right. Go to Row 13. Direct message with "OXSOJU$0". Do you see that?

A. (Complied.) Yes.

Q. And if says, "Probably mentioned the lawsuit." Right?

A. Yes.

Q. That means there are messages that you deleted that probably mentioned the lawsuit, right?

A. Yeah. Oh, actually, wait, no, sorry. I don't know if I deleted messages that mentioned the lawsuit. But I think I had conversations with him that mentioned the lawsuit.

Q. That you deleted?

A. I don't know if the messages I

J.R.328

93

deleted were specifically related to the lawsuit.

Q. You don't know that because the messages are deleted, right?

A. I mean, you can tell based off of the context, but...

Q. Have you looked to see the context?

A. It's probably in Exhibit 1.

Q. Have you looked to see the content?

A. If it's in Exhibit 1, I got notes on it.

Q. And if it's not, you didn't?

A. If it's not, I did not.

Q. What about Row 14, "Direct message with Nojob, cofounder with Solend, now Save."

You deleted messages with them, right?

A. If it's in Exhibit 1. I can't recall any specifics.

Q. Well, you have already told me that Column A in Exhibit 5 are the channels from which you deleted messages, right?

94

A. It looks like it.

Q. Yeah. And there were direct messages with Nojob that you deleted, right?

A. Probably.

Q. And why did you delete them?

A. I don't know.

Q. And if they were part of the mass deleted messages, you never looked to see whether they related to any facts in the lawsuit, right?

A. They are, for sure, not part of the mass deletions.

Q. Do you look to see whether any of your messages with Nojob related to the lawsuit in any way?

A. They are collected -- oh, wait. Sorry, I guess the deleted ones aren't, but they are probably in Exhibit 1.

Q. Row 16, "Direct message with Pertark."

The notes say, "Patrick went to MS with David."

95

Q. That's middle school?

A. Yes.

Q. "Worked for OtterSec for about a month," right?

A. Yeah.

Q. That's all accurate, right?

A. Yes.

Q. So you deleted messages with somebody who worked for OtterSec, right?

A. Yes.

Q. And that's Patrick?

A. Yes.

Q. What's Patrick last name?

A. Zhang.

Q. Row 20, "Random in Save Team. We noticed internal team Discord for Save/Solend."

Does that reflect the information you gave your lawyers?

A. Sorry. Which row is this?

Q. 20.

A. 20.

96

Yes.

Q. And how do you know that that channel included messages related to the internal team at Discord for Save or Solend?

That's what the Save Team is, right?

A. Yes, yeah.

Q. And -- and what did you talk about in that channel?

A. As the name suggest, random things.

Q. Related to Save Team?

A. No, not necessarily.

Q. Could have been anything?

A. Yes.

Q. Could it have included liquidations?

A. It's possible.

Q. Could it have -- could it have included discussions about the code that's at dispute here?

A. Unlikely, but it's possible.

Q. Could it have talked about OtterSec?

A. Unlikely, but possibly.

Q. Jump?

J.R.329

Transcript of David Chen
Conducted on February 3, 2026

---

A.   Very unlikely, but possible.
Q.   Robert?
A.   Also unlikely, but possible.
Q.   Row 21, "Direct message with s3v3rus."
     The note says, "Guy who worked for them."
     Is the "them" OtterSec?
A.   Sorry.  Which row is this again?
Q.   21.
A.   21.
     Yeah.
Q.   And the note says, "Ask David what happened with them.  Ask David to write bots."
     Do you see that?
A.   Yes.
Q.   And that's what these messages pertain to?
A.   "These messages" being?
Q.   The ones you deleted?
A.   Ones I deleted.
     ATTORNEY GILES:  Objection.  Go ahead.
     THE WITNESS:  I assume they were part of that conversation.
BY ATTORNEY LEVY:
Q.   Did you communicate with Luna on Signal?
A.   No.
     ATTORNEY LEVY:  David, I want you to turn now to Exhibit 6, which is going to be the ECF 117.
     (THEREUPON, Exhibit 6 was marked by the court reporter.)
     THE WITNESS:  (Complied.)
BY ATTORNEY LEVY:
Q.   This is your lawyer's response to the notice of intent to file a motion for entry of a preservation order.  This was filed with the Court on February 28, 2025.
     Are you familiar with this document?
A.   I think I have read it, yes.
Q.   And you read it before it was submitted to the Court?

---

A.   I can't recall.
Q.   David, if you go to Page 2.
A.   (Complied.)
Q.   And you look at the second bullet point.
A.   Yes.
Q.   The first sentence says, "The Discord IDs associated with 1,722 messages that are within the discovery range correspond to servers and channels that are relevant."
     Do you see that?
A.   Yeah.
Q.   And that was a false statement that your lawyers admitted was false in a filing to the Court months later, correct?
A.   Yes.
Q.   And that was something that we discussed at your deposition on July 30, 2025, right?
A.   Yes.
Q.   And you acknowledged then that that statement was incorrect, right?
A.   Yes.
Q.   And at the bottom of Page 3 of this letter, ECF 117, Exhibit 6, it says, "In sum, there is no evidence at this point that any relevant evidence has been deleted or destroyed."
     Do you see that?
     ATTORNEY GILES:  I will just note you said "Page 3."
     You mean Page 2.
     ATTORNEY LEVY:  No.  Page 3 of ECF 117.  The last sentence -- the first sentence of the last paragraph.
     ATTORNEY GILES:  I apologize.
BY ATTORNEY LEVY:
Q.   "In sum, there is no evidence at this point that any relevant evidence has been deleted or destroyed."
     Do you see that?
A.   Yes.
Q.   That's a false statement, right?
A.   Yes.

---

J.R.330

Q.   Your lawyers didn't correct that statement with the Court, did they?

ATTORNEY GILES: Objection.

THE WITNESS: I don't know.

BY ATTORNEY LEVY:

Q.   Did you ask your lawyers to correct that statement?

ATTORNEY GILES: Objection.

THE WITNESS: Probably not.

BY ATTORNEY LEVY:

Q.   This was submitted a day after Exhibit 5 was put together, correct?

I represented to you that the metadata for Exhibit 5 was February 27, 2025, correct?

A.   Yes.

Q.   And ECF 117 was submitted the next day, February 28, 2025, right?

A.   Yes.

Q.   And you told me that your lawyers wrote the notes in Exhibit 5, right?

A.   Yes.

Q.   Talking about how there was -- there were some of these channels where you had deleted messages and some of them were relevant or potentially relevant, right?

A.   Yes.

Q.   And yet, they put in the end of this letter to the Court, "There is no evidence at this point that any relevant evidence has been deleted or destroyed," right?

A.   That is something written there.

Q.   How did you let your lawyers file this with your approval?

Did you want them to lie?

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q.   Did you want them to include this false statement?

ATTORNEY GILES: Objection.

THE WITNESS: No.

BY ATTORNEY LEVY:

Q.   Look two paragraphs above in the ECF 117, David.

There, your lawyers are talking about the Jito Discord server. And at the very end of that paragraph, it says, "We can discern nothing about them that is even arguably relevant."

That's not a true statement, is it?

A.   Right.

Q.   Did you ask your lawyers to correct that statement?

ATTORNEY GILES: Objection.

THE WITNESS: I don't believe so.

BY ATTORNEY LEVY:

Q.   At this point in time, David, what had you done, if anything, to determine -- and strike that.

As of February 28, 2025, what, if anything, had you done to determine whether the Jito messages that you deleted were relevant?

A.   I can't speak for how my lawyers arrived at this conclusion.

Q.   What have you done, if anything, by February 28, 2025, to determine whether the Jito Discord server messages that you deleted were relevant?

A.   I don't know.

Q.   You had not created Exhibit 1 by February 28, 2025, correct?

A.   I believe so.

Q.   Meaning you believe you had not created Exhibit 1 before February 28, 2025, correct?

A.   Yes.

Q.   You told me you created that to help you prepare for your deposition, right?

A.   Yes.

Q.   Which would be months later in July, right?

A.   Yes.

Q.   So Exhibit 1 wasn't created by February 28, 2025, was it?

A.   Yeah.

Q.   But Exhibit 5 was, right?

A.   Yes.

J.R.331

105

Q. And Exhibit 5 it talks about Jito, doesn't it?

A. **It has the Jitos in the channels list.**

Q. And how is it that your lawyers wrote, "We can discern nothing about the Jito Discord server message" that you deleted "as even that is arguably relevant"?

A. **I don't know.**

Q. Did you do anything to determine whether any messages that you deleted before ECF 117 was filed -- strike that.

Before ECF 117 was filed, tell me everything you did to determine whether any of the messages you deleted were relevant or potentially relevant.

A. **I assisted my lawyers in making Exhibit 5.**

Q. Exhibit 5?

A. **Yeah, I answered any questions they asked me.**

Q. What's Exhibit 5?

106

A. **I assume it's their internal notes.**

Q. When you say "Exhibit 5," you mean Exhibit 5 of the deposition?

A. **Yes.**

Q. You assisted them with that?

A. **Yes.**

Q. Did you do anything else?

A. **I would have done anything my lawyers asked me to.**

Q. Did they ask you to do anything else?

A. **I can't recall.**

Q. Did you do anything else out of your own volition?

A. **I can't recall. This is a long time ago.**

Q. It's less than a year ago, right?

A. **Yeah.**

Q. Did you talk to anybody other than your lawyers to figure out what you had deleted?

A. **I don't believe so.**

107

Q. Before ECF 117 was filed, did you look at any documents to figure out what you had deleted?

A. **I assume --**

(Simultaneous conversation.)

Q. I don't want you to assume. I want you to tell me what you did or didn't do.

A. **If there is a description here in 5, I believe it was because I looked at the context. I looked at the channel mentioned and then came up with the answer for my lawyers.**

Q. Well, in Exhibit 5, those aren't all the channels from which you deleted messages, right?

A. **I don't know.**

Q. Well, for example, the ClosetDuck messages aren't included there, are they?

A. **They actually -- I thought they were.**

Q. Are they?

A. **Yeah it's Line 3.**

108

Q. Okay.

Are there any other channels -- is this every channel that was deleted?

A. **You mean had messages deleted from it?**

Q. Yeah, that's right.

A. **I don't know. I would have to like cross-reference it.**

Q. Did you put together that list in Column A of Exhibit 5?

ATTORNEY GILES: Objection.

THE COURT REPORTER: Excuse me, was that an objection?

ATTORNEY GILES: It was and then he clarified.

BY ATTORNEY LEVY:

Q. Did you put together the list in Column A of Exhibit 5?

A. **It's possible. In might have also been like based off of what you guys sent. I don't know.**

**But like, if it was like then I**

J.R.332

109

would have based it off of Discord takeout. So I'm not sure.

Q. By February 28, 2025, you were not going message by message of what you deleted to see whether you had deleted something that related to the lawsuit, right?

A. I don't believe so.

Q. The most you would have done would be looking at these channels to figure out whether the messages within those channels related to the lawsuit, right?

A. Yes.

Q. And for these channels in A of Exhibit 5, what you did to figure out whether they related to the lawsuit or not was what?

A. Based on recollection, I think.

Q. Nothing else?

A. Yeah.

Q. You didn't look at anything to refresh your recollection?

A. I may have looked at messages. I don't know.

110

Q. Which messages?

A. I don't know, like context, messages in the channels.

Q. But you don't know?

A. I don't know for sure.

Q. But certainly not message by message?

A. Yeah.

ATTORNEY LEVY: I'm going to send you now Exhibit 7, which is the March 13, 2025, brief that your lawyers filed in opposition to the motion for preservation order, this is ECF 122.

(THEREUPON, Exhibit 7 was marked by the court reporter.)

THE WITNESS: I need a bigger table.

BY ATTORNEY LEVY:

Q. And I want you to turn to Page 3.

A. (Complied.) Page 3.

Q. At the top of the page.

A. (Complied.)

Q. And it says, "David does not have a

111

duty to preserve every single document he has. Rather his duty extends to material evidence relevant to anticipated litigation. Remember case plaintiffs have presented no facts showing that any such evidence has been deleted or destroyed and David is aware of none."

That's not accurate, is it?

A. I think at the time I was -- or this is what my lawyers wrote. So -- and they know what I wrote in Exhibit 5. So if they wrote that I believe them.

Q. David, you saw Exhibit 5, right?

A. Yes.

Q. And you saw that various different places it said, "This channel had messages that were talking about in the lawsuit." Or "This had messages that were relevant."

If you are -- if you knew that at the time and your lawyers knew that at the time you knew that this statement that "David is aware of none" is not correct, right?

112

ATTORNEY GILES: Objection.

THE WITNESS: I guess so.

ATTORNEY LEVY: And I want to give you your declaration, ECF 122-6.

THE COURT REPORTER: Does this have an exhibit number?

ATTORNEY LEVY: Exhibit 8.

(THEREUPON, Exhibit 8 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. Do you recall this declaration. This is your declaration, right, David?

A. Yes.

Q. And can you go to the last page?

A. Last page. (Complied.)

Q. That's your signature?

A. Yes.

Q. And you recall filing this in support of your brief to oppose our motion for a protective order, right? Not a protective order, a preservation order.

A. Yes.

J.R.333

Transcript of David Chen
Conducted on February 3, 2026

113

Q. You didn't want there to be a preservation order in this case, right?

ATTORNEY GILES: Objection.

THE WITNESS: I don't recall.

BY ATTORNEY LEVY:

Q. If you did, you would have consented, right?

ATTORNEY GILES: Objection.

THE WITNESS: I think my lawyers said we should object. I don't know.

BY ATTORNEY LEVY:

Q. And you followed your lawyer's advice?

A. Yes.

Q. And you filed this declaration to help your lawyers oppose the motion for preservation order, right?

A. Yes.

Q. And the declaration that you filed was this Exhibit 8, right?

A. Yes.

Q. I want you to look at Paragraph 4.

114

A. Paragraph 4. (Complied.) Paragraph 4.

Q. In Paragraph 4 you say, "I have made all of my documents and communications, including electronically stored documents and communications available for collection to my attorneys at several junctures."

That's not correct, is it?

A. I guess it's incomplete, yeah. I think all is -- yeah.

Q. This was filed on March 13, 2025, after you had deleted over 17,000 messages that your attorneys could not collect and did not collect, right?

A. Well, I think we had a chance to collect it in April, but --

(Simultaneous conversation.)

Q. This doesn't say in your declaration that you had a chance to collect. It says you -- you had given all of your electronically stored information to your lawyers.

115

You didn't do that, did you David?

A. Well, it says, "Available for collection," right. So like, if it was like possible for it to have been collected. I don't know. I'm sorry. It doesn't matter.

Q. You are talking to the Court here, right, under penalty of perjury. You didn't -- you didn't clarify or qualify that statement, did you?

A. No.

Q. It's a simple declarative statement, and it's false, right?

A. Yes.

Q. You didn't correct the record, did you?

A. No.

Q. You didn't submit a revised declaration to the Court, telling the Court that you had made this false statement, did you?

A. Not that I'm aware of.

Q. You have not given her any

116

additional information to understand that that statement was incorrect?

A. Not that I'm aware of.

Q. And your lawyers haven't informed the Court that this statement is incorrect?

A. Not that I'm aware of.

Q. And you haven't asked them to do so, right?

A. No.

Q. Look at the next sentence in Paragraph 4. You wrote, quote "To the best of knowledge, all potentially relevant documents and communications that existed at the time of collection have been collected and preserved." End of quote.

That was also a false statement, right?

A. Yes.

Q. And you knew it was false at the time you made it, right?

A. I would have known that it was false.

J.R.334

Transcript of David Chen
Conducted on February 3, 2026

117

Q.   And you haven't corrected that statement, have you?

A.   No.

Q.   You haven't updated the Court?

A.   No.

Q.   You haven't submitted a revised declaration on anything, right?

A.   Not that I'm aware of.

Q.   And you haven't directed your lawyers to correct the Court -- to correct your statement to the Court, right?

A.   No.

Q.   Look at Paragraph 5, David?

A.   (Complied.)

Q.   Before -- before we go to Paragraph 5. On Paragraph 4, did you do anything to verify those statements before you made them?

ATTORNEY GILES:  Objection.

THE WITNESS:  I think at the time my lawyers would have been done with document review for what we had collected.  But I did

118

not personally verify.

BY ATTORNEY LEVY:

Q.   You did not personally verify statements for -- in Paragraphs 4 and 5?

A.   4.

Q.   4. Okay.

Neither sentence in Paragraph 4 did you verify personally?

A.   I guess I should have known for the second and third sentences.

Q.   I'm sorry, can you repeat that?

A.   I guess I should have known for the second and third sentences.

Q.   I'm sorry, I don't understand what you are trying to say.

A.   I guess I should have known that they were false.

Q.   You should have known that they were false.  And you didn't do anything to verify them, right?

David you knew they were false, right?

119

A.   I should have known they were false.

Q.   And you did nothing to verify them, right?

A.   I'm trying to think if there was, but I'm not coming up with anything.

Q.   Look at Paragraph 5.

A.   (Complied.)

Yep.

Q.   You wrote here, your Discord message included, quote, "communications with friends" unquote, right?

A.   Yes.

Q.   That includes communications with Ally Guo about Robert, OtterSec, and the Solend liquidator code, right?

A.   Yes.

Q.   You didn't add that to the declaration, did you?

A.   Doesn't look like it.

Q.   You downplayed the is importance of those messages to the Court to help convince the Court not to give you a preservation

120

order, right?

ATTORNEY GILES:  Objection.

THE WITNESS:  In this declaration, it does look like that, but I didn't write this declaration.  My lawyers drafted it.

BY ATTORNEY LEVY:

Q.   It's your signature at the end of it, right?

A.   Yes.

Q.   And you've never clarified what's in Paragraph 5 for the Court, right?

A.   No.

Q.   It's -- it sets -- it sits out there in a misleading way, doesn't it?

ATTORNEY GILES:  Objection.

THE WITNESS:  I suppose it does.

BY ATTORNEY LEVY:

Q.   Look at Paragraph 10.

A.   (Complied.)

Q.   In this paragraph, you wrote, quote, "When I left OtterSec in April of 2022, I made changes from a version of the Solend

J.R.335

Case 8:23-cv-00889-TDC    Document 204    Filed 04/13/26    Page 338 of 1016
Transcript of David Chen
Conducted on February 3, 2026

31 (121 to 124)

121

liquidator code that existed before the formation of OtterSec and applied my changes only on top of that version," end of quote.

That's not a true statement, right?

A.   Right.

Q.   And you testified previously that that's false?

A.   Yes.

Q.   And your lawyers did correct that statement with the Court, didn't they?

A.   They did or they did not?

Q.   They did.

A.   Okay.

Q.   But they didn't correct these other statements we've talked about, have they?

A.   Not that I'm aware of.

Q.   Look at Paragraph 11.

A.   (Complied.)

Q.   You wrote, quote, "I did not delete, alter, or destroy records showing the history of changes to the computer code in GitHub," end of quote.

122

That's not true either, right?

A.   Yeah.

Q.   And your lawyers corrected that statement with the Court, right?

A.   I believe that to be true.

Q.   These two statements that are false in Paragraph 10 and 11, when did you first realize that those statements were false?

A.   I think I was looking through Ally messages, and it jogged my recollection.

Q.   When?

A.   While preparing for the deposition.

Q.   But not before then?

A.   I don't recall.

Q.   Did you do anything to verify the statements in 10 and 11 before you submitted this declaration in Exhibit 8?

A.   I looked at the code I had in the old branch, and I wasn't thinking about those two commits that were deleted.

Q.   Commits, C-O-M-M-I-T-S, right?

A.   Yeah, yeah. Commits.

123

Q.   Then later, in July, to prepare for your deposition, you looked at those commits, right?

A.   No.

Q.   Because they were deleted?

A.   Yes.

Q.   What did you look at to figure out if they were deleted?

A.   I think I was looking at messages from Ally too and then I noticed some of them reminded me of the context of message and the clickbait, those contents that reminded me of these commits that were deleted.

Q.   And those commits are snapshots of the code that you claim you were working on, right?

A.   Snapshot...
They were more like the delta, right? So it's like the different -- or like, they're difference between versions of the code, but yeah, you can think of them as snapshots.

124

Q.   And in a commit, one can see who worked on the code, right, at that point in time?

A.   Yeah.

Q.   And so if you worked on the code, it would -- it would show that, right?

A.   Yes.

Q.   And if someone else from OtterSec worked on the code, it would show that, right?

A.   Yes.

Q.   And it would show the date and the time that someone worked on the code, right?

A.   Yes.

Q.   And it would show what the change was made, right?

A.   Yes.

Q.   It would show a modification of the code, right?

A.   Yes.

Q.   And you deleted this on or about May 21, 2022, right?

A.   Yeah, around then.

J.R.336

Transcript of David Chen
Conducted on February 3, 2026

---

125

Q.   Yeah.  And you left OtterSec April 27, 2022, right?

A.   Yeah.

Q.   So -- and May 2022, the day before you deleted these comments, you got a lawyer -- a letter from OtterSec's lawyers, right?

And the letter told you to preserve documents, didn't it?

A.   I don't know.  That sounds correct.

ATTORNEY LEVY:  I'm looking to show you the letter.  I'm going to mark it Exhibit 9.

(THEREUPON, Exhibit 9 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q.   You recall reading or hearing about that letter?

A.   Yes.

ATTORNEY LEVY:  I'm now going to give you what I'm going to call Exhibit 10, which is an April 1, 2025, letter from your

126

lawyers to Robert's lawyers.

(THEREUPON, Exhibit 10 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q.   Can you go to Page 2?

A.   (Complied.)

Q.   You'll see where your lawyers say, "Regarding the Jito server, having reviewed the 531 messages defendants produced, we can discern nothing about them that is even arguably relevant."

Do you see that at the bottom of the third bullet?

A.   Yes, I see that.

Q.   That's incorrect, right?

A.   Yes.

Q.   Did you review this letter before it went out the door?

A.   I don't recall.

Q.   Did you do anything by this point in time to determine whether the Jito messages were relevant or related to the lawsuit in any

127

way?

A.   I don't think I had a chance to look at them at this point in time.

Q.   But you knew when you deleted the Jito messages to annoy Robert, that they related to this lawsuit, right?

A.   I knew they related to the code.

Q.   To the code.

And when you say "the code," you mean the code that's in dispute in this lawsuit?

A.   In the later October filed lawsuit, yes.

Q.   And the code that's referenced in Paragraph 71 of your mother's Complaint against Robert?

A.   Yeah.

Q.   Same code, right?

A.   Yes.

Q.   You knew that when you deleted those messages, right?

A.   Since it was a mass deletion, I

128

can't be sure.

Q.   You knew that the code was in dispute at the time of your mass deletion, right?

A.   I think I mentioned this earlier, but you guys failed to file a motion -- or like -- sorry.  Not a motion, but counterclaim for the code.  I thought --

(Simultaneous conversation.)

Q.   Your mother alleged the code was something that you had taken from OtterSec and was in dispute, right?

A.   I thought --

(Simultaneous conversation.)

Q.   You had received this letter in Exhibit 9.

A.   Yes.

Q.   You knew this was part of a dispute with Robert, right?

A.   I thought it was, like, insane and then you guys gave up on it, so I just thought it just, like, kind of over, so I think, at

---

129

the time of deletion, I don't think it was in dispute.

Q. The lawsuit hadn't been settled, David, had it?

A. No, but you guys hadn't file any claims relating to the code, either.

Q. We were in the middle of negotiations at the time you deleted all these messages, right?

A. Yeah.

Q. You had been served with a subpoena, right?

A. Yes.

Q. The subpoena asked for all of your documents related to the code, right?

A. I don't recall.

Q. You deleted these documents en masse the day before you were asking Discord for your messages for your lawyers to look at and provide to us to respond to the subpoena, right?

A. I don't think so because --

130

(Simultaneous conversation.)

Q. That's the chronology, David. July 27th, July 28th, July 29th, you are deleting messages.

July 30, you are deleting messages.

July 30, you are asking Discord for your messages for your lawyers, right?

A. No, I don't think for my lawyers.

Q. What are you collecting that for, that takeout, just for your own personal enjoyment?

A. I think so, at the time, actually. Yeah. It was, like, kind of, like, these are -- like...

Q. David, I'm going to -- it's not what you answered in your deposition on July 30, and it's not what's in your answers to your interrogatories.

Do you want me to show them to you?

A. Yes.

ATTORNEY LEVY: August -- let's go to the third amended interrogatory responses.

131

Call this Exhibit 10.

(THEREUPON, Exhibit 11 was marked by the court reporter.)

ATTORNEY GILES: 11.

ATTORNEY LEVY: 11.

BY ATTORNEY LEVY:

Q. All right, David. Turn to Page 12, Footnote 6.

A. 12, Footnote 6.

(Complied.)

Q. I was a date off. You write in Footnote 6, "On the July 31, 2024, David Chen obtained his personal messages from Discord pursuant to a personal data request described here," right?

A. Yes.

Q. That is correct, right?

A. Yes.

ATTORNEY LEVY: Okay.

I'm now going to give you Exhibit 12. This is the April 14 -- actually, before I do that, let me go back to the

132

April 1, 2025, letter from your lawyers to us at Page 2.

BY ATTORNEY LEVY:

Q. If you can go back to the previous exhibit.

A. Exhibit 10?

Q. Yeah.

ATTORNEY GILES: Yes.

BY ATTORNEY LEVY:

Q. And you see it says, "It is clear that no relevant Discord messages have been deleted or destroyed."

A. Yes.

Q. That's false, correct?

A. Correct.

Q. Had you reviewed that statement before it went out the door?

A. I can't recall.

ATTORNEY LEVY: I'm now going to give you the April 14, 2025, request for conference letter.

This is ECF 127.

J.R.338

ATTORNEY GILES: This is Exhibit 12?

(THEREUPON, Exhibit 12 was marked by the court reporter.)

ATTORNEY LEVY: 12.

BY ATTORNEY LEVY:

Q. Go to Page 2, Footnote 1.

A. **Footnote 1.**

(Complied.) Yes.

Q. It says, "751 messages are from the 'Jito' server, which Yao Action defendants/Chen Action Plaintiffs already have and are relevant."

That's not correct, right?

A. **Yeah, I guess so.**

Q. I'm now going to give you Exhibit 13. Have you -- and with Exhibit 12, had you reviewed that statement before your lawyers filed it with the Court?

A. **I don't know.**

Q. Had you told your lawyers that your Jito messages are relevant at that point in time?

A. **I don't think I had been able to look at them yet, the ones that you guys produced.**

Q. Have you looked at anything to determine whether they were relevant or not?

A. **I can't recall but probably not.**

Q. But you note from Exhibit 1 that when you did look at them you did see that a number of them were relevant, right?

A. **Yes.**

Q. And you knew that when you created them and when you deleted them that they were relevant, right?

The content didn't change, did it?

A. **No.**

Q. You knew that when you deleted them they were relevant, right?

A. **Same argument as before, but, I -- sure.**

Q. Sure, right?

A. **Yes, they mentioned the code.**

ATTORNEY LEVY: Okay.

Now I'm going to give you Exhibit 13. This is April 29, 2025, our hearing transcript.

(THEREUPON, Exhibit 13 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. Look at Page 56.

A. **Page 56. (Complied.)**

Q. The Court asked, "But then you believe of these 17,000 -- I'm going to keep calling them that -- you don't think that these messages are relevant to this litigation, right?"

And your lawyer says, "That is correct, your Honor."

That wasn't true, was it?

A. **No.**

Q. Did you talk to your lawyer before this hearing on April 29, 2025, and tell him that there was nothing among the 17,222 Discord messages that you deleted that were relevant?

A. **I mean, you can look at Exhibit 5. I'm pretty sure I did tell them, actually.**

Q. And when you saw this, did you see this transcripts when it came back?

A. **I don't think I had seen this transcript before.**

ATTORNEY LEVY: I'm now going to give you Exhibit 14.

(THEREUPON, Exhibit 14 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. Which is your mother's Answers to Interrogatories, April 10, 2025. Look at interrogatory answer No. 17.

A. **Interrogatory Answer No. 17. Okay. (Complied.)**

Q. In it your mother says, "Plaintiff states that to the best of her knowledge and after making reasonable inquiry, she is unaware of any relevant documents that were destroyed, lost or transferred on or after September 20, 2022." End of quote.

Transcript of David Chen
Conducted on February 3, 2026

137

That's a false statement, right?

A. Yes.

Q. And in making a reasonable inquiry had your mother spoken with you as of April 10, 2025, to determine whether this statement was accurate or not?

A. I don't know. I can't recall.

Q. You don't recall ever having a conversation with your mother before April 10, 2025, about what you deleted?

A. I don't think so.

Q. Did you communicate with your lawyers about what you thought was relevant?

A. Yes.

Q. Did you tell them that there was no -- that there were no relevant documents that were destroyed?

A. See Exhibit 5.

Q. So that's a yes, you did?

A. I'm pretty sure I did.

Q. And yet you let them continue to tell the Court after that point that they

138

didn't have any evidence of documents that you destroyed that were relevant, right?

A. I guess I let them, yeah.

Q. Say that again?

A. I guess I let them.

Q. You let them, right?

A. You can interpret it that way.

Q. Is there any evidence of you stopping them from making those submissions? Did you write them a letter to tell them, "Please don't make that filing in ECF 117"?

A. No.

Q. Did you send them an e-mail to say, "Please don't make that filing"?

A. No.

Q. Is there any writing anywhere in the world that says that, "The statements in ECF 117 and my declaration in ECF 122-6 and the statements in ECF 122 were false"?

A. I don't believe so.

Q. And you knew they were false at the time they were made, right?

139

ATTORNEY GILES: Objection.

THE WITNESS: I think so.

ATTORNEY LEVY: I'm now going to give you Exhibit 15, which is your mother's amended Answer to Interrogatory 17 dated May 30, 2025.

(THEREUPON, Exhibit 15 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. In response to Interrogatory No. 17, she says, "She, Li Fen, is unaware of any responsive documents that were destroyed, lost or transferred on or after September 20, 2022."

Do you see that?

A. Which one?

Q. Answer to Interrogatory 17.

A. So going back to --

(Simultaneous conversation.)

Q. No 15, she has amended her answers, now?

A. Yes.

140

Q. Okay.

This is May 30, 2025?

A. I'm sorry I missed a page.

Q. That's okay.

A. Okay.

Q. Do you see the Answer to Interrogatory 17 there?

A. Yes.

Q. That's false, correct?

A. Yes.

Q. Did you talk to her before she made that statement?

A. I don't think so.

Q. Did you verify those interrogatory answers? Look at the back page.

A. Yes.

Q. Did you review the Answer to Interrogatory 17 before it went out the door and you signed it?

A. I presume so.

Q. Why did you allow this false statement to occur?

141

ATTORNEY GILES: Objection.

THE WITNESS: Because my lawyers wrote it.

BY ATTORNEY LEVY:

Q. You are blaming your lawyers?

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q. Are you not taking any responsibility for this statement?

**A. I guess I should have stopped it. I don't know.**

Q. But you didn't stop it, did you?

**A. No.**

ATTORNEY LEVY: Let's go to the Second Amended Answer to Interrogatory 17. This is Exhibit 16.

(THEREUPON, Exhibit 16 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. Dated July 17, 2025.

**A. (Complied.)**

Q. You verified the answers to these

142

interrogatories, too, right, in Exhibit 16?

**A. Yes.**

Q. And by this point in time had you created Exhibit 1? Your deposition was July 30th.

**A. Probably.**

Q. Look at your mother's Answer to Interrogatory 17, which is also your answer because you verified this, right?

**A. (Complied.)**

Q. David, correct?

**A. Sorry, let me read the answer to 17.**

Q. Sure.

The answer to 17 says, "She, Li Fen, is unaware of any responsive documents that were destroyed, lost or transferred by plaintiffs Sam Chen or David Chen on or after September 20, 2022."

Do you see that?

ATTORNEY GILES: Objection. Go ahead.

ATTORNEY LEVY: Are you objecting to

143

the "do you see that."

ATTORNEY GILES: No. I'm objecting to you reading a portion of the Answer to Interrogatory of something.

THE WITNESS: Can you repeat the question?

BY ATTORNEY LEVY:

Q. Do you see the sentence I just read?

**A. Yes.**

Q. Is it correct?

**A. No.**

Q. Have you corrected it?

**A. Not that I'm aware of.**

Q. Do you know why on July 17, 2025, you allowed that statement to be served on us when you knew it was false?

ATTORNEY GILES: Objection.

THE WITNESS: I don't know.

BY ATTORNEY LEVY:

Q. But you knew it was false at the time, right?

ATTORNEY GILES: Objection.

144

THE WITNESS: I suppose.

BY ATTORNEY LEVY:

Q. Had you looked at -- had you created Exhibit 1 before you made this statement?

**A. I probably did.**

Q. Had you done anything else to verify this statement?

**A. Beyond what's in Exhibit 1?**

Q. Well, Exhibit 1 contradicts this statement, right?

**A. Yeah.**

**No, I don't think so.**

ATTORNEY LEVY: I'm now going to hand you Exhibit 17.

(THEREUPON, Exhibit 17 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q. That's the Third Amended Answers to Interrogatories from August 29, 2025, which you have, which is Exhibit 11. So let's go back to Exhibit 11.

Go to Interrogatory 17.

145

A.   Interrogatory 17.

(Complied.)

Okay.

Q.   So in this answer, it says, "She, Li Fen, is aware of potentially responsive Discord messages sent by Davis Chen in 'new clickbait' server on May 2022 that were deleted by David Chen on July 29, 2024.

"The messages that were deleted, included message from 2022 in the 'Rubber-Duck-Debugger' channel that mentioned liquidations performed by the code, potentially contained monologues about the development of the code."

Do you see that?

A.   Yes.

Q.   Doesn't mention that those messages are relevant, does it?

A.   No.

Q.   Why not?

A.   I don't know.

Q.   Did your lawyers write this for you?

146

A.   Yes.

Q.   Did you verify it?

A.   Yes.  Or I signed off -- signed it, yes.

Q.   Did you make any additional notations to Exhibit 1 between the time of your deposition, July 30, 2025, and the service of Exhibit 11 on August 29, 2025?

A.   I don't think so.

ATTORNEY LEVY:  Let's take a break.

THE VIDEOGRAPHER:  We are going off the record.

The time is 5:27.

(THEREUPON, the proceedings recessed at 5:27 p.m.)

(THEREUPON, the proceedings resumed at 5:44 p.m.)

THE VIDEOGRAPHER:  Standby.

We are back on the record.

The time is 5:44.

BY ATTORNEY LEVY:

Q.   You and your mother are no longer

147

represented by CLM, correct?

A.   That's correct.

Q.   Why did they withdraw?

ATTORNEY GILES:  Objection.

THE WITNESS:  Should I respond?

BY ATTORNEY LEVY:

Q.   Yes.

A.   We ran out of money.

Q.   Did it have anything to do with your deletion of destruction of evidence?

ATTORNEY GILES:  Objection.

THE WITNESS:  I think so.

BY ATTORNEY LEVY:

Q.   You were running out of money or their withdraw --

(Simultaneous conversation.)

A.   Oh.

Q.   Or their withdrawal as your lawyer and lawyer for your mother had anything to do with your destruction of evidence in this case?

A.   Had anything to do -- probably.

148

Q.   Why do you say "probably"?

A.   I think that's what they represented to the Court.

Q.   What I say you about why they withdrew?

ATTORNEY GILES:  Objection.

THE WITNESS:  They didn't say anything -- oh, wait.  I can't recall them saying anything.

BY ATTORNEY LEVY:

Q.   David, what are all the platforms you used to communicate with Luna, also known as Stephen Tong?

A.   You mean Luna Tong?

Q.   Luna Tong.  Thank you.

A.   I think just Discord.

Q.   Anything else?

A.   I think also Telegram.

Q.   Anything else?

A.   No.

Q.   Now, this is foliation deposition, right?

Transcript of David Chen
Conducted on February 3, 2026

149

A.   Yes.

Q.   It's about your destruction of evidence, right?

A.   Yes.

Q.   And you giving truthful statements or false statements about your destruction of evidence, right?

A.   Yes.

Q.   We've already talked about a lot of false statements you've made about the evidence you destroyed in this case, right?

A.   Yes.

Q.   I'm going to ask you one more time.

Are there any other platforms you have used to communicate with Luna?

A.   Not that I'm aware of.

Q.   Tell me all the platforms you have used to communicate about Robert.

A.   Discord, Telegram, Signal, X, I think, technically.  I think that should be it.

Q.   E-mail?

150

A.   Oh, yeah, e-mail.

Q.   Anything else?

A.   Sorry.  Possibly text.

Q.   Text message, e-mails.

Any other platforms?

A.   I don't think so.

Q.   Are there platforms you used to communicate about other topics that you haven't mentioned?

A.   I'm sorry.  Can you repeat that question?

Q.   Tell me all the platforms you use to communicate.

A.   Communicate, period?

Q.   Yep.

A.   Instagram, WhatsApp, technically LinkedIn.

Q.   Anything else?

A.   I'm trying to think.  I guess Reddit.

THE COURT REPORTER:  I guess what?

THE WITNESS:  Reddit.

151

ATTORNEY LEVY:  Reddit.

THE COURT REPORTER:  Thank you.

THE WITNESS:  Sorry.  I think I made a Stack Overflow post once.

ATTORNEY GILES:  Say that again.

THE WITNESS:  I think I made a Stack Overflow post once.

BY ATTORNEY LEVY:

Q.   Was that about Robert or OtterSec or the code?

A.   No.

Q.   The dispute?

A.   No.

Q.   Anything else?

A.   I don't think so.

Q.   Did you send your WhatsApp messages to your lawyers to collect for this case?

A.   I believe they were collected.

Q.   When?

A.   When?  Probably multiple times.  I think every time my phone was collected.

Q.   Did you use WhatsApp to talk about

152

Robert?

A.   I guess it's possible because my mom is a contact.

Q.   Did you talk about OtterSec on WhatsApp?

A.   I don't think so.

Q.   You talked with Luna on Telegram, right?

A.   I think, yeah.

Q.   Did you delete any of your messages with Luna on Telegram?

A.   Not that I'm aware of.

Q.   Did you delete any message on Telegram, period, that are related in any way to this case?

A.   Not that I'm aware of.

Q.   Did you mass delete messages on Telegram?

A.   No.

Q.   David, you claim that your Moto E Motorola cellphone bricked, right?

A.   Yes.

Transcript of David Chen
Conducted on February 3, 2026

153

Q.    And you claimed that that happened on or about April 2, 2023, right?

A.    Yes.

Q.    That was a few days after your family sued Robert in Yao versus Chen, right?

A.    Yes.

Q.    And your lawyers didn't inform us about your phone reportedly bricking until May 17, 2024, right?

A.    That sounds correct.

Q.    Between April 2, 2023, and May 17, 2024, did you take any steps to see if the data on the phone could be recovered?

A.    Besides trying to turn it on, no.

Q.    And you know we asked your lawyers to inspect the phone and see if the data could be recovered, right?

A.    Yes.

Q.    And your lawyers hired a firm called Teel Tech to inspect your phone, correct?

A.    That's correct.

Q.    And you know Teel Tech right now,

154

February 3, 2026, has not completed its inspection of your phone, correct?

A.    I didn't know, okay.

Q.    Are you aware that up until January 21, 2025, that Teel Tech had stopped inspecting your phone for months?

ATTORNEY GILES:  Objection.

THE WITNESS:  It's possible that I knew that.

BY ATTORNEY LEVY:

Q.    Did you know that that delay was caused by your lawyers?

ATTORNEY GILES:  Objection.

THE WITNESS:  I don't think so.

ATTORNEY LEVY:  I'm going to provide you with the next exhibit.  I think it's Exhibit 17.

(THEREUPON, Exhibit 18 was marked by the court reporter.)

BY ATTORNEY LEVY:

Q.    And this is an e-mail thread from -- it begins at the very top with a thread from

155

your attorney, Mr. Giles to Rachel Clattenburg, a number of other lawyers representing you and representing Robert and the Robert parties, dated January 28, 2026.

And this is an e-mail where Mr. Giles Rachel, "In response to Item No. 8 below, attached, please find my recent e-mail exchange with Maggie Gaffney authorizing the work that you specifically requested in your November 4th e-mail to her."

Do you see that?

A.    Yes.

ATTORNEY LEVY:  Okay.

And then if you turn to the attachment, we are going to call this Exhibit 18, you will see the attachment.

BY ATTORNEY LEVY:

Q.    And if you turn to Page 3 of that attachment.

A.    (Complied.)

Q.    I'm sorry.  Page 4.

You will see that on November 4,

156

2025, at 11:30 a.m., Ms. Clattenburg e-mailed Ms. Gaffney at Teel Tech, saying, "You can start with the exemplar chip swap and then the real chip swap if it all goes okay."

Do you see that?

A.    Yes.

Q.    And then, you see, same day, November 4, 1:56 p.m. Ms. Gaffney responds, and says -- and she responds to your lawyers only, okay?

Do you see that.

She is responding to Ms. White, Mr. Giles, Mr. Plotnick, and Mr. Lentz.

Do you see that?

A.    I see that.

Q.    And she says, "Hello all.  Since you are the attorneys representing Mr. Chen, I will need written approval from one of you to proceed with the chip swap and any requested work as Teel Technologies was obtained by Attorney White and not Attorney Clattenburg. We always take direction from our client or

J.R.344

the representative and persons responsible for paying our invoices.

"Please advice on how you would like Teel Technologies to proceed as Tydings and Carter Ledyard are the responsible parties. Any additional work will commence when I get your approval to do so.

Thank you for your understanding?"

And then, do you see the next e-mail from Mr. Giles to Ms. Gaffney, copying your -- his co-counsel and not us -- meaning Robert's lawyers -- and he -- and Mr. Giles wrote, "While we, I, did not authorize Rachel Clattenburg to send" -- I'm sorry. Excuse me.

"While we (I) did authorize Rachel Clattenburg to send the message that she did earlier today, give us a brief second to discuss amongst ourselves. I will get back in -- I will be back in touch soon."

Do you see that?

A. Yes.

Q. And then a month later, Ms. Gaffney e-mails your lawyers, Mr. Giles, Ms. White, Mr. Plotnick, Mr. Lentz.

And she says on December 4, 2025, "Hi all, a month has passed since our last correspondence. We have not heard back as to how you would like to proceed. Would somebody be able to advise as to where we are with this project. If you do not wish to move forward then I can return the device."

Do you see that?

A. Yes.

Q. Do you know if your lawyers had ping Ms. Gaffney before that point?

A. I don't know.

Q. Did you tell your lawyers not to get back to Ms. Gaffney for a month?

ATTORNEY GILES: Objection.

THE WITNESS: No.

BY ATTORNEY LEVY:

Q. Then Mr. Giles doesn't respond until January 21, 2026. And he wrote, "Maggie, my apologies for the delay in responding to your various e-mails. You have our authorization to proceed with the additional work identified in Ms. Clattenburg's November 4th, 2025 e-mail, see below. And the next day, Ms. Gaffney e-mails, "Perfect. Thanks."

That is all she needed from your lawyers, right, to start the work, right?

ATTORNEY GILES: Objection.

THE WITNESS: I don't know.

BY ATTORNEY LEVY:

Q. Did you direct your lawyers to delay between November 4 and January 21?

ATTORNEY GILES: Objection.

THE WITNESS: No.

BY ATTORNEY LEVY:

Q. Was it your decision to make sure that your lawyers made this communication no earlier than the day before they recorded the report on what they had done on the phone?

ATTORNEY GILES: Objection.

THE WITNESS: No.

BY ATTORNEY LEVY:

Q. You know that your lawyers made a filing with the Court the very next day that was due the very next day, where they knew they had to update the Court on the inspection on your phone.

You know that, right?

ATTORNEY GILES: Objection.

THE WITNESS: I do know.

BY ATTORNEY LEVY:

Q. Are you paying Teel Tech?

A. I think so.

Q. When is the last time you made a payment to them?

A. I don't know.

Q. Do you currently owe Teel Tech money?

A. I don't think so.

Q. How much have you paid them?

A. I don't know.

Q. You had Signal communications with Philip Papurt after he was served on December 5, 2024, right?

161

A. That sounds correct.

Q. And he put those messages on auto-delete, right?

A. Yes.

Q. And you didn't take auto-delete off, right?

A. Yes.

Q. And so those messages kept deleting, right?

A. Yes.

Q. And you had the power to take auto-delete off and you didn't do that, right?

ATTORNEY GILES: Objection.

THE WITNESS: Yes.

BY ATTORNEY LEVY:

Q. You know how to take auto-delete off of Signal, correct?

A. Yes.

Q. And you know that when you don't those messages are deleted and lost forever, correct?

A. Yes.

162

Q. And you know that if you want to preserve those messages you can take auto-delete off, right?

A. Yes.

Q. And you also know you can take screenshots of those messages to preserve them, right?

A. Yes.

Q. And you didn't do that, did you?

A. No.

Q. You didn't take screenshots of Philip Papurt's messages, did you?

A. No.

Q. You didn't turn auto-delete off, did you?

A. No.

Q. And you didn't turn auto-delete off between December 5, 2024, and July 30, 2025, when you had the deposition, correct?

A. That's correct.

Q. And have you turned auto-delete off since of the deposition?

163

A. No.

Q. And while the Court had you under a preservation order, you continued to keep auto-delete on your messages with Philip Papurt, right?

A. That is correct. But I haven't been in contact with him since then, so there is nothing new to be deleted.

Q. I'm supposed to trust you with that statement; is that right?

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q. There is no messages because you kept them on auto-delete, right?

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q. Right?

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q. You can -- you can answer the question. He can object. Go ahead. Answer the question. There is no message between you

164

and Philip Papurt because they are deleted, correct?

ATTORNEY GILES: Objection.

THE WITNESS: On Signal, yeah.

BY ATTORNEY LEVY:

Q. On Signal, right?

All the messages between you and Papurt since December 5, 2024 are deleted, correct?

A. Yes.

Q. And you allowed them to be deleted, correct?

A. Allowed is a strong word, but yeah.

Q. How -- why is it a strong word? You can put -- how hard is to switch off auto-delete, David? It's pretty easy, isn't it?

A. That's fair.

Q. And it's very easy to take a screenshot of the message, isn't it?

A. Yes.

Q. And you didn't do any of that, did

165

you?

A.    No.

Q.    So the only thing we can do to verify your statement that there were no messages is just to trust you, right?

ATTORNEY GILES:  Objection.

THE WITNESS:  I guess so.

BY ATTORNEY LEVY:

Q.    And you know that preservation order said that you have to disable any auto-delete, right?

ATTORNEY GILES:  Objection.

THE WITNESS:  That sounds right.

ATTORNEY LEVY:  I'm going to put that order in front of you and mark it as Exhibit 19.

(THEREUPON, Exhibit 19 was marked by the court reporter.)

ATTORNEY LEVY:  Can we go off the record for one second.

THE VIDEOGRAPHER:  We are going off the record.

166

The time is 6:01.

(THEREUPON, the proceedings recessed at 6:01 p.m.)

(THEREUPON, the proceedings resumed at 6:02 p.m.)

THE VIDEOGRAPHER:  Standby, everyone.

We are back on the record.

The time is 6:02.

BY ATTORNEY LEVY:

Q.    David, that's Exhibit 19.  It's the Court's preservation order.

Do you see Paragraph 2 where it says, "You will not enable any auto-deletion of documents"?

A.    Yes.

Q.    And yet, you violated that order, correct?

A.    I mean, it says, "Don't enable."  I didn't enable it.

Q.    If -- if Signal is on auto-delete and you don't turn it off, aren't you enabling

167

auto-delete?

ATTORNEY GILES:  Objection.

THE WITNESS:  I'm not actively preventing it.

BY ATTORNEY LEVY:

Q.    David, if you turn auto-delete off, those messages are preserved, right?

ATTORNEY GILES:  Objection.

THE WITNESS:  Yes.

BY ATTORNEY LEVY:

Q.    It's very simple, isn't it?

A.    Yes, yes, yes.

Q.    Right.  So you violated Paragraph 2 of that order, right?

ATTORNEY GILES:  Objection.

BY ATTORNEY LEVY:

Q.    With your Papurt Signal messages, correct?

A.    Well, it doesn't matter because it didn't delete anything new.

Q.    David, I didn't ask you whether it matters or not.  We can get to that later.

168

The Court can decide whether it matters or not.

I just want to know from you whether you agree with me that you violated that order from the Court in Paragraph 2?

ATTORNEY GILES:  Objection.

BY ATTORNEY LEVY:

Q.    With regard to Papurt's messages with you?

You didn't take screenshots of those messages, did you?

A.    This is after the messages were auto-deleted.

Q.    You told me you haven't turned auto-delete off ever since December 4, 2025, right?

A.    Yes.

Q.    So once that -- you see that order --

(Simultaneous conversation.)

A.    2024, yeah.

Q.    -- you should turn auto-delete off,

J.R.347

Transcript of David Chen
Conducted on February 3, 2026

43 (169 to 172)

169

right? That's what that means, right?

A. Yes.

Q. And you didn't do that, right?

A. Yes, I did not turn off auto-delete.

Q. Thank you.
David, did you use Signal to communicate with Nojob?

A. No.

Q. Did you use Signal to communicate with Daniel Que, 0xrooter?

A. No.

Q. Did use Signal to communicate with Darren Chen?

A. No.

Q. Did you use Signal to communicate with anyone on the Solend or the Save Team?

A. No.

Q. Did you use Signal to communicate with anyone who worked at OtterSec outside of Papurt?

A. I might have had Robert as a contact at one point.

170

Q. Do you now?

A. No.

Q. Did you have auto-deleted message with Robert?

A. I don't think so.

Q. Did you have Signal communications with Pepsipu, Sammy Hajhamid?

A. I don't think so.

Q. Did you have Signal com- --communications with Patrick Zhang --

(Simultaneous conversation.)

A. No.

Q. Did you have Signal communications with Mina, Smeekynuggs?

A. No.

Q. Did you communicate with Mina, Smeekynuggs, on any other platform?

A. Via text, yeah.

Q. Have you ever used, well, just regular text?

A. Yeah.

Q. Have you ever used Signal to discuss

171

the codes that are at issue in this case?

A. Not anything else that wasn't answered in my previous answer.

Q. What previous answer?

A. You already asked me this question.

Q. So what did you say?

A. I think I said this -- wait. Sorry.
Can you repeat the question?
It's just like platforms where I have mentioned OtterSec, right.

Q. David, is there any other relevant evidence that you have deleted or destroyed?

A. Not that I'm aware of.

Q. Is there any potentially relevant evidence that you have deleted or destroyed?

ATTORNEY GILES: Objection.

THE WITNESS: Not that I'm aware of.

BY ATTORNEY LEVY:

Q. So you have told us about every piece of evidence that could possibly be related to these lawsuits that you have deleted or destroyed?

172

A. I believe so.

Q. Are there any other false statements that you or your lawyers have made to the Court or to us about your destruction of evidence?

A. Not that I am currently aware of.

ATTORNEY LEVY: We can go off the record.

ATTORNEY GILES: I'm going to have questions -- some follow-up question.
Do you need a break or you good?

THE WITNESS: No, I think I'm -- if it's not too many.

ATTORNEY GILES: Yeah, not too many. We are still on the record.

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:

BY ATTORNEY GILES:

Q. Okay. All right.
So just starting with the most recent questions that Mr. Levy was asking you?
He was asking you questions about the preservation order.

J.R.348

173

A.  Yes.

Q.  Exhibit 19.

(Indicating).

And the questions were about Item No. 2. In particular the language that says, "and will not enable any automatic deletion of documents."

You indicated in response to that comment that you haven't enabled any automatic deletion of documents.

Was that your testimony?

ATTORNEY LEVY:  Objection.

BY ATTORNEY GILES:

Q.  Was that your testimony?

A.  Yes.

Q.  Okay.

Explain to me the distinction that you are making here with regard to Philip Papurt messages, in terms of who enables the auto-delete function?

ATTORNEY LEVY:  Objection.

THE WITNESS:  I wasn't the one that

174

who enabled the auto-delete.  Philip Papurt was the one who enabled it.

BY ATTORNEY GILES:

Q.  Okay.

So when you are having a Signal discussion, messaging, the person, in this particular instance, Philip Papurt, had enabled an auto-deletion; is that correct?

A.  That's correct.

Q.  And you did not disable his auto-deletion; is that correct?

A.  That's correct.

Q.  And you are able to do that -- you would be able to do that?

A.  Yes.

Q.  Why did you not disable his auto-delete function?

A.  Well, he just sent me those messages and after that, it's nothing.  I guess I forgot about it.

Q.  Okay.

So the date of this order is May 29,

175

2025.  So couple months ago, seven months ago?

A.  Yes.

Q.  Have you had Signal messages with Philip Papurt since?

ATTORNEY LEVY:  Objection.

THE WITNESS:  No.

BY ATTORNEY GILES:

Q.  You have not?

A.  No.

Q.  Okay.

So you have -- because you are not the one that enabled the auto-deletion in your discussions with Philip Papurt, you haven't run afoul of Item No. 2 that Mr. Levy was asking you about, right?

ATTORNEY LEVY:  Objection.

THE WITNESS:  That is correct.

BY ATTORNEY GILES:

Q.  Okay.

We will start from the beginning here.

I will have you look at Exhibit 3,

176

if you can find that.

A.  Exhibits 3.

Exhibit 3.  Exhibit 3.  Okay.

(Complied.)

Q.  And also Exhibit No. 1.

So if you have both Exhibit No. 1 and Exhibit No. 3 in front of you.

A.  Okay.

(Complied.)

Q.  So Exhibit No. 1 was a spreadsheet that contained all of the -- I guess, the deleted messages, including some of the notes about those deleted messages, correct?

A.  Yes.

Q.  Okay.

And Exhibit 3 was as transcript from your December 10, 2025, deposition which was a limited deposition about your formation and creation of the code, correct?

A.  Yes.

THE COURT REPORTER:  Can I ask, is your mic on?

J.R.349

Transcript of David Chen
Conducted on February 3, 2026

177

ATTORNEY GILES: Sorry about that.

BY ATTORNEY GILES:

Q.   And Mr. Levy pointed your attention to an exchange on Page 28 of that transcript.

A.   Yes.

Q.   Okay.

And you can look at this testimony. But, what timeframe were -- was this discussion in this deposition on December 10th?

What timeframe was it that questions were being asked of you about?

A.   **This would have been late 2021.**

Q.   Okay.

And, in fact, it was October 2021, correct?

A.   **I think so, yes.**

Q.   Okay.

And it's when you were working on initially creating the code or, I guess, the forerunner to the code in this case?

A.   **Yes.**

178

Q.   Okay.

And so, I guess, the implication of the deposition testimony that you gave on December 10th was that when you started working on the code, you were communicating with or you were reviewing messages on AltTank, correct?

A.   **Yes, I was reviewing message from AltTank.**

Q.   Okay.

And that would have been in October of 2021?

A.   **Yes.**

Q.   Okay.

So looking at Exhibit No. 1, in particular lines 2 and 3 -- actually, 2, 3, and 4 on the first page there?

A.   **(Complied.)**

Q.   Do you remember answering questions from Mr. Levy about AltTank and the reference to AltTank --

(Simultaneous conversation.)

179

A.   **Yes.**

Q.   -- in relationship to this deposition transcript?

A.   **Yes.**

Q.   Okay.

And so these three messages, when were they created?

A.   **November of 2022.**

Q.   Okay.

And when were they deleted?

A.   **November of 2022, same day.**

Q.   Okay.

And so I notice one thing that confused me. It appears -- if you look at Item No. 2, it appears that the message under Column B -- because Column B is when the message was created or sent, right?

A.   **Yeah.**

Q.   That would -- that is what the earlier testimony was?

A.   **Yes.**

Q.   And Column C is when it was deleted?

180

A.   **Yes.**

Q.   Timestamp when it was deleted?

A.   **Yes.**

Q.   So it appears -- unless I'm looking at this wrong or I've interpreted this wrong.

It appears that for Item No. 2, the message was sent at a later date than it was deleted, or am I getting it wrong?

A.   **It's wrong.**

Q.   Okay.

So how am I getting it wrong?

A.   **It's because Column B is in UTC, which is like, British time and Column C is in Eastern time.**

Q.   Okay. All right.

So if UTC is -- is UTC British time or roughly speaking?

A.   **I think so, yes.**

Q.   Okay.

So it's either -- if it's British time, it's five hours ahead and if it's -- it might be four hours ahead UTC?

J.R.350

181

A.   Yes, I think it depends to Daylight Savings.

Q.   Okay.  All right.

So that explains the difference.

But okay.  But irregardless of that, these are messages that were sent and deleted in November of 2022?

A.   Yes.

Q.   Okay.  All right.

So they might have no relationship whatsoever to the discussion that was talked about in the December 10th deposition in relationship to discussions or communications or reviewing messages on AltTank on October 2021?

ATTORNEY LEVY:  Objection.

THE WITNESS:  That's correct.

BY ATTORNEY GILES:

Q.   Okay.  All right.

I'm going to have you now look at Exhibit 15 and 16 which were --

(Simultaneous conversation.)

182

A.   16.

Q.   -- which were -- 15 was Li Fen Yao's amended responses to the second set of interrogatories.  Exhibit 16 was Li Fen Yao's second set of amended responses to the second set of interrogatories.

You have both of those?

A.   Yes.

Q.   So in each of these documents, Mr. Levy asked you to look at the Answer to Interrogatory No. 17.

Do you recall that --

(Simultaneous conversation.)

A.   Yes.

Q.   -- question and answer?

A.   Yes.

Q.   Okay.

And so, basically, the structure of the question for Mr. Levy was had -- you know, pointed out what the response was and, basically, asked you if that was false.

And my recollection of the testimony

183

was that you indicated that it was false.

And now, I'm going to ask you to look at it again, the response again, and I'm going to read the response.

So this is just on Exhibit No. 15.

The response says, "Subject to plaintiff's" -- and who is the plaintiff in this case?

A.   Li Fen Yao.

Q.   Who is your mom?

A.   Yes.

Q.   Okay.

"Subject to plaintiff's general responses and objections, plaintiff states that to the best of her knowledge and after making reasonable inquiry, she is unaware of any responsive documents that were destroyed, lost, or transferred on or after September 20th, 2022."

Did I read that correctly?

A.   Yes.

Q.   Okay.

184

So the interrogatory and the response are as to her awareness; is that correct?

A.   Yes.

Q.   Okay.

Your testimony earlier in response to Mr. Levy's questions, were you answering based on your knowledge at the time of -- about the destruction, loss, and transfer on or after September 20, 2022 -- 2022?

A.   Yes.

Q.   So you weren't answering on behalf of her knowledge?

A.   That's correct.

Q.   Okay.  All right.

Do you know what her knowledge was?

A.   I don't know.

Q.   Okay.

Did you have discussions with your mom about this?

A.   I can't recall.

Q.   So -- and the same question as to

J.R.351

Transcript of David Chen
Conducted on February 3, 2026

185

Exhibit 16. It's just a later answer and a little more inclusive answer or longer answer, but I'll, again, just sort of refer to the question that Mr. Levy asked, which -- what he focused on, which is the portion on Lines 3 and 4, which says, "She is unaware of any responsive documents that were destroyed, lost, or transferred by plaintiff, Sam Chen or David Chen on or after September 20th, 2022."

So that's her knowledge, correct?

A. Yes.

Q. That's what that answer is?

A. Yes.

Q. It's her case and her knowledge?

A. Yes.

Q. And sitting here today, you don't know if that -- what is stated there is inaccurate?

ATTORNEY LEVY: Objection.

THE WITNESS: Correct. I don't know what she knows.

ATTORNEY GILES: Okay.

186

That is all the questions I have.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS:

BY ATTORNEY LEVY:

Q. I just want to ask a couple questions about Mr. Giles' questions.

Go back to Exhibit 19, please.

A. Uhm-hmm.

Q. This is the Court's preservation order, correct?

A. Correct.

Q. Philip Papurt turned on the auto-delete function per his messages with the two of you, correct?

A. Yes.

Q. You did not turn it off, correct?

A. Yes.

Q. You did not disable it, correct?

A. Yes.

Q. And, therefore, you enabled auto-deletion to continue, right?

ATTORNEY GILES: Objection.

THE WITNESS: Technically, no.

187

BY ATTORNEY LEVY:

Q. Say that again.

A. Technically, no.

Q. What do you mean "technically, no"? They deleted if you don't turn auto-delete off, correct?

A. Yeah, I did not enable it. I failed to disable it.

Q. And the opposite of disable is enable, right?

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q. You are reading this order really narrowly, and you are smiling right now because you know that you are?

A. No, because your insistence as well. But, yeah.

ATTORNEY GILES: Objection.

BY ATTORNEY LEVY:

Q. David --

(Simultaneous conversation.)

A. Yes.

188

Q. -- you didn't turn auto-delete off, correct?

A. I did not turn auto-delete off.

Q. And you did not make a screenshot of messages with Papurt, correct?

A. I don't believe so.

Q. And there is no document, there is no ESI to support or contradict your statement that there were no messages between the two of you after this order was in place, right?

ATTORNEY GILES: Objection.

THE WITNESS: That's correct.

ATTORNEY LEVY: Nothing further.

ATTORNEY GILES: Nothing further.

THE VIDEOGRAPHER: This marks the end of the day's deposition of David Chen. We are going off the record. The time is 6:21.

(Off the record at 6:21 p.m.)

***

E-R-R-A-T-A  S-H-E-E-T

I, DAVID CHEN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_____  _____
(DATE)              (SIGNATURE)

CERTIFICATE OF REPORTER

I, Michael A. Rodriquez, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by the Notary Public; that the testimony of said witness was taken down by me in stenotype and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____
MICHAEL A. RODRIQUEZ, RPR/CP/RMR
FREELANCE VERBATIM REPORTER

J.R.353

Transcript of David Chen
Conducted on February 3, 2026

**A**

**able**
134:1, 158:7, 174:13, 174:14
**above**
61:7, 102:21
**access**
30:10
**accurate**
95:6, 111:8, 137:6
**acknowledge**
189:2
**acknowledged**
99:21
**action**
133:10, 133:11, 190:13, 190:18
**actions**
83:18, 83:22
**actively**
167:3
**actually**
22:11, 41:22, 75:17, 89:8, 92:16, 107:19, 130:12, 131:21, 136:2, 178:16
**add**
22:1, 119:17
**additional**
116:1, 146:5, 157:6, 159:2
**administrator**
1:5, 3:4
**admitted**
99:14
**advance**
59:19, 70:12, 70:19
**advice**
45:5, 45:7, 113:13, 157:3
**advise**
158:7
**affirmed**
7:20

**afoul**
175:14
**after**
7:20, 22:1, 38:14, 38:20, 47:15, 50:4, 51:5, 51:14, 57:1, 57:2, 57:6, 68:18, 101:11, 114:12, 136:19, 136:21, 137:22, 139:13, 142:17, 153:4, 160:21, 168:12, 174:19, 183:15, 183:18, 184:10, 185:9, 188:10
**again**
35:3, 97:9, 138:4, 151:5, 183:3, 185:3, 187:2
**against**
27:20, 51:6, 127:16
**ago**
106:16, 106:17, 175:1
**agree**
168:4
**ahead**
8:12, 10:2, 10:14, 98:1, 142:21, 163:21, 180:21, 180:22
**alexander**
3:6, 7:10
**all**
9:21, 12:21, 14:21, 29:13, 31:10, 31:17, 31:18, 33:14, 33:18, 35:14, 37:11, 42:10, 48:12, 48:19, 52:16, 55:21, 57:14, 57:21, 58:13, 58:15,

59:3, 60:19, 63:9, 63:11, 63:14, 65:4, 68:18, 71:15, 79:14, 92:5, 95:6, 107:13, 114:4, 114:10, 114:20, 116:12, 129:8, 129:14, 131:7, 148:11, 149:17, 150:12, 156:4, 156:16, 158:4, 159:6, 164:7, 172:18, 176:11, 180:15, 181:3, 181:9, 181:19, 184:15, 186:1
**alleged**
28:17, 28:18, 128:10
**allow**
140:21
**allowed**
143:15, 164:11, 164:13
**allowing**
30:12
**ally**
15:16, 15:21, 16:9, 16:13, 16:19, 36:20, 37:5, 37:9, 37:11, 60:12, 73:7, 73:8, 73:16, 75:3, 75:13, 76:2, 119:14, 122:9, 123:10
**along**
39:22
**already**
93:20, 133:11, 149:9, 171:5
**also**
2:11, 7:4, 16:12, 24:1, 56:8, 64:3,

97:3, 108:19, 116:16, 142:8, 148:12, 148:18, 162:5, 176:5
**alter**
121:20
**alttank**
42:20, 43:2, 44:6, 44:11, 44:13, 45:1, 45:4, 47:7, 47:11, 48:6, 178:7, 178:9, 178:20, 178:21, 181:14
**always**
156:22
**amended**
130:22, 139:5, 139:20, 141:15, 144:18, 182:3, 182:5
**among**
135:20
**amongst**
157:18
**amount**
82:20
**analyze**
16:2
**annoy**
127:5
**another**
41:4
**answer**
47:6, 107:11, 136:14, 136:15, 139:5, 139:17, 140:6, 140:17, 141:15, 142:7, 142:8, 142:12, 142:14, 143:3, 145:4, 163:20, 163:21, 171:3, 171:4, 182:10, 182:15, 185:1, 185:2, 185:12
**answered**
10:13, 105:20,

J.R.354

130:16, 171:3
**answering**
178:19, 184:7,
184:12
**answers**
130:17, 136:12,
139:20, 140:15,
141:22, 144:18
**anticipated**
111:3
**antonio**
1:38, 7:15
**any**
8:14, 8:15,
8:18, 10:5,
10:20, 11:3,
11:8, 11:11,
11:15, 12:9,
12:14, 13:16,
16:2, 16:5,
16:7, 16:18,
26:6, 29:17,
35:10, 38:3,
49:14, 49:20,
50:1, 56:2,
56:3, 56:11,
63:17, 65:19,
72:19, 72:22,
85:15, 93:19,
94:9, 94:13,
94:15, 100:4,
100:17, 102:8,
105:11, 105:14,
105:20, 107:2,
108:2, 111:5,
115:22, 126:22,
129:5, 136:20,
138:1, 138:8,
138:16, 139:11,
141:8, 142:15,
146:5, 149:14,
150:5, 152:10,
152:13, 152:14,
153:12, 156:19,
157:6, 164:22,
165:10, 166:14,
170:17, 171:11,
171:14, 172:2,

173:6, 173:9,
183:17, 185:6,
189:6, 190:13,
190:15
**anybody**
21:15, 106:19
**anymore**
25:6
**anyone**
25:21, 47:7,
73:5, 169:16,
169:19
**anything**
14:9, 14:11,
15:1, 32:14,
32:16, 50:7,
54:2, 56:7,
59:1, 62:20,
64:18, 83:15,
85:9, 96:12,
103:14, 103:17,
103:22, 105:10,
106:7, 106:8,
106:10, 106:13,
109:19, 117:7,
117:17, 118:19,
119:5, 122:15,
126:20, 134:4,
144:6, 147:9,
147:19, 147:22,
148:8, 148:9,
148:17, 148:19,
150:2, 150:18,
151:14, 167:20,
171:2
**anywhere**
138:16
**apologies**
158:22
**apologize**
100:14
**appear**
189:6
**appears**
179:14, 179:15,
180:4, 180:6,
190:5
**applied**
121:2

**applies**
24:4
**approval**
102:12, 156:18,
157:7
**april**
8:21, 74:7,
74:8, 74:12,
74:17, 75:1,
75:12, 114:16,
120:21, 125:2,
125:22, 131:21,
132:1, 132:20,
135:2, 135:19,
136:13, 137:5,
137:9, 153:2,
153:11
**aren't**
22:14, 50:14,
94:17, 107:13,
107:18, 166:22
**arguably**
103:5, 105:8,
126:11
**argument**
134:18
**around**
26:22, 27:1,
27:4, 43:13,
44:16, 81:15,
81:19, 81:20,
84:19, 92:3,
124:22
**arrived**
103:21
**asked**
10:12, 47:2,
105:21, 106:9,
116:7, 129:14,
135:9, 153:15,
171:5, 177:12,
182:10, 182:21,
185:4
**asking**
32:16, 91:2,
91:18, 129:18,
130:6, 172:20,
172:21, 175:15

**assisted**
105:17, 106:5
**associated**
99:8
**assume**
98:2, 106:1,
107:4, 107:6
**assumed**
39:21
**attached**
155:7, 189:7
**attachment**
155:15, 155:16,
155:19
**attention**
177:3
**attorneys**
7:8, 70:11,
114:7, 114:13,
156:17
**attracting**
65:4
**auditing**
87:13
**audits**
1:14, 3:14
**august**
49:18, 130:21,
144:19, 146:8
**authorization**
159:1
**authorize**
157:13, 157:15
**authorizing**
155:8
**auto-delete**
161:3, 161:5,
161:12, 161:16,
162:3, 162:14,
162:17, 162:21,
163:4, 163:14,
164:16, 165:10,
166:21, 167:1,
167:6, 168:15,
168:22, 169:4,
173:20, 174:1,
174:17, 186:12,
187:5, 188:1,

J.R.355

188:3
**auto-deleted**
168:13, 170:3
**auto-deletion**
166:14, 174:8,
174:11, 175:12,
186:20
**automatic**
173:6, 173:9
**available**
114:6, 115:2
**aware**
10:8, 16:11,
16:22, 22:3,
26:5, 32:18,
53:6, 63:1,
70:22, 111:6,
111:22, 115:21,
116:3, 116:6,
117:8, 121:16,
143:13, 145:5,
149:16, 152:12,
152:16, 154:4,
171:13, 171:17,
172:6
**awareness**
184:2

**B**

**back**
23:1, 42:10,
70:4, 76:21,
84:17, 86:12,
86:15, 131:22,
132:4, 136:4,
139:18, 140:15,
144:21, 146:19,
157:18, 157:19,
158:5, 158:16,
166:8, 186:6
**bag**
31:11, 58:6,
63:8
**baltimore**
3:10
**band**
31:1
**bar**
90:22, 92:4

**based**
11:4, 72:3,
74:21, 80:10,
93:5, 108:20,
109:1, 109:16,
184:8
**basically**
182:18, 182:21
**bates**
17:5
**because**
32:8, 37:11,
41:17, 43:9,
50:7, 52:20,
53:4, 55:18,
56:12, 61:10,
61:15, 67:3,
67:22, 72:2,
73:13, 77:15,
93:3, 107:9,
123:5, 129:22,
141:2, 142:9,
152:2, 163:13,
164:1, 167:19,
175:11, 179:16,
180:12, 187:15,
187:16
**been**
7:20, 27:13,
30:12, 36:6,
36:10, 45:2,
57:8, 61:7,
69:12, 80:22,
81:7, 83:20,
96:12, 100:5,
100:17, 102:8,
108:20, 111:5,
115:4, 116:14,
117:21, 129:3,
129:11, 132:11,
134:1, 163:6,
177:13, 178:11
**before**
2:20, 21:20,
33:14, 35:14,
35:17, 35:18,
35:20, 36:3,
36:4, 43:10,

56:5, 59:21,
62:4, 66:2,
70:20, 74:8,
76:20, 78:14,
81:7, 81:9,
82:14, 88:21,
90:2, 98:21,
104:9, 105:11,
105:13, 107:1,
117:15, 117:17,
121:1, 122:13,
122:16, 125:4,
126:17, 129:18,
131:22, 132:17,
133:17, 134:18,
135:18, 136:6,
137:9, 140:11,
140:18, 144:4,
158:13, 159:18,
190:3
**begin**
35:22
**beginning**
19:13, 68:13,
175:20
**begins**
6:5, 37:16,
154:22
**behalf**
3:3, 3:13, 5:3,
5:6, 5:8, 184:12
**behind**
20:15
**being**
43:13, 43:20,
51:9, 82:14,
88:4, 97:19,
177:12
**believe**
8:17, 11:2,
13:3, 13:16,
16:14, 27:10,
28:2, 40:16,
69:14, 73:6,
74:19, 74:20,
74:21, 76:12,
77:2, 79:9,
80:14, 89:12,

103:11, 104:7,
104:8, 106:22,
107:9, 109:7,
111:12, 122:5,
135:10, 138:20,
151:18, 172:1,
188:6
**below**
37:8, 155:7,
159:4
**besides**
153:14
**best**
81:5, 116:11,
136:18, 183:15
**beta**
67:19
**between**
75:3, 84:19,
123:20, 146:6,
153:11, 159:12,
162:18, 163:22,
164:7, 188:9
**beyond**
144:8
**bigger**
110:16
**bigley**
2:14, 7:9
**blaming**
141:5
**blvd**
2:5
**bot**
34:21, 41:7,
41:15, 42:4,
55:13, 57:5,
64:9, 82:19
**both**
25:19, 42:18,
176:6, 182:7
**bots**
55:10, 55:12,
97:14
**bottom**
57:20, 100:2,
126:12
**boulevard**
6:18

J.R.356

bounties
55:10
box
46:15, 46:20,
62:14
boxes
46:13
branch
122:19
break
69:15, 146:10,
172:11
bricked
152:21
bricking
153:8
brief
110:11, 112:19,
157:17
british
180:13, 180:16,
180:20
broad
53:19, 53:20
broadly
29:18
bullet
99:4, 126:13

**C**

c-o-m-m-i-t-s
122:21
call
17:2, 63:7,
76:15, 125:21,
131:1, 155:15
called
25:5, 25:7,
31:10, 42:20,
48:19, 84:4,
153:19
calling
135:11
came
13:6, 107:11,
136:4
can't
11:5, 39:8,

45:15, 63:10,
75:21, 93:18,
99:1, 103:20,
106:12, 106:15,
128:1, 132:18,
134:6, 137:7,
148:8, 184:21
caret
23:20, 61:4
carter
157:5
case
1:10, 1:23,
6:10, 27:16,
111:4, 113:2,
147:21, 149:11,
151:17, 152:15,
171:1, 177:21,
183:8, 185:14
cases
8:19
caused
154:12
cellphone
152:21
center
2:4
certain
82:20
certainly
110:6
certificate
190:1
certify
190:4
chance
53:5, 114:15,
114:19, 127:2
change
124:14, 134:14
changes
120:22, 121:2,
121:21
channel
9:6, 12:10,
12:20, 13:2,
13:6, 14:19,
15:15, 15:22,

16:4, 21:1,
21:4, 21:7,
21:8, 23:15,
31:10, 41:10,
42:19, 42:20,
43:2, 43:14,
44:3, 44:6,
44:12, 45:4,
48:19, 53:11,
54:12, 55:22,
56:18, 57:15,
63:7, 64:16,
65:16, 66:6,
66:16, 67:5,
82:6, 82:10,
83:4, 83:12,
84:4, 84:16,
85:13, 85:16,
85:19, 86:19,
96:3, 96:8,
107:10, 108:3,
111:16, 145:11
channels
8:22, 10:6,
52:16, 53:15,
65:13, 67:7,
78:4, 78:21,
79:2, 79:3,
79:6, 79:8,
81:5, 81:16,
93:21, 99:10,
102:2, 105:3,
107:14, 108:2,
109:9, 109:10,
109:13, 110:3
chat
44:13, 58:7
check
60:3
chen
1:7, 1:13,
1:19, 1:26,
1:30, 2:1, 3:4,
3:13, 4:11, 5:2,
6:6, 6:7, 7:1,
7:2, 7:11, 7:12,
7:13, 7:19,
15:4, 15:7,

15:10, 15:13,
27:13, 28:1,
28:4, 29:10,
29:16, 30:2,
30:18, 38:15,
69:12, 79:16,
88:10, 131:12,
133:11, 142:17,
145:6, 145:8,
153:5, 156:17,
169:13, 185:8,
185:9, 188:16,
189:2
chip
156:3, 156:4,
156:19
chronology
130:2
claim
47:9, 62:18,
83:21, 123:15,
152:20
claimed
68:4, 153:1
claims
15:3, 15:9,
15:12, 29:6,
29:9, 29:15,
35:8, 129:6
clarified
108:15, 120:10
clarify
115:8
clattenburg
2:12, 7:5,
155:2, 156:1,
156:21, 157:14,
157:16
clattenburg's
159:3
clear
85:20, 132:10
clickbait
11:6, 11:15,
12:6, 12:10,
15:15, 15:19,
16:4, 16:9,
123:12, 145:7

J.R.357

Transcript of David Chen
Conducted on February 3, 2026                53

**client**
156:22
**clm**
88:5, 88:12,
147:1
**closetduck**
37:3, 37:5,
76:2, 107:17
**co-counsel**
157:11
**code**
14:22, 25:1,
28:3, 28:18,
30:11, 41:21,
42:5, 44:8,
44:22, 45:2,
45:6, 45:13,
45:17, 48:6,
48:11, 57:5,
58:22, 62:11,
62:13, 62:17,
62:18, 64:13,
64:22, 66:19,
66:21, 67:19,
72:16, 83:17,
83:20, 84:1,
84:9, 96:17,
119:15, 121:1,
121:21, 122:18,
123:15, 123:21,
124:2, 124:5,
124:9, 124:12,
124:18, 127:7,
127:8, 127:9,
127:10, 127:14,
127:18, 128:2,
128:8, 128:10,
129:6, 129:15,
134:21, 145:12,
145:14, 151:10,
176:19, 177:20,
177:21, 178:5
**coders**
49:8
**codes**
9:2, 9:3, 47:3,
47:9, 47:18,
48:3, 68:3,

171:1
**coding**
42:20, 45:14
**cofounder**
25:10, 87:7,
93:15
**collapse**
31:22, 33:1,
33:16, 44:16,
56:19, 57:1,
57:6
**collect**
114:13, 114:14,
114:16, 114:19,
151:17
**collected**
12:4, 94:16,
115:4, 116:14,
117:22, 151:18,
151:21
**collecting**
130:9
**collection**
74:5, 74:6,
75:12, 114:6,
115:3, 116:14
**college**
2:3
**column**
20:1, 20:8,
20:11, 20:19,
21:1, 21:7,
21:10, 21:16,
22:7, 23:16,
32:1, 36:7,
37:2, 37:8,
52:15, 53:11,
56:5, 71:1,
78:18, 78:20,
79:11, 79:18,
80:1, 80:4,
80:8, 81:22,
87:15, 93:21,
108:10, 108:18,
179:16, 179:22,
180:12, 180:13
**com**
3:21, 170:9

**come**
14:13, 91:3
**coming**
119:5
**commence**
157:6
**commenced**
6:3
**comment**
56:18, 61:15,
71:19, 71:21,
173:9
**commentary**
56:19, 57:16
**commenting**
24:8, 34:20,
41:5, 41:13,
42:2, 57:22,
58:16
**comments**
125:5
**commit**
75:22, 76:5,
124:1
**commits**
122:20, 122:21,
122:22, 123:2,
123:13, 123:14
**communicate**
98:5, 137:12,
148:12, 149:15,
149:18, 150:8,
150:13, 150:14,
169:7, 169:9,
169:12, 169:15,
169:18, 170:16
**communicated**
79:7
**communicating**
47:4, 178:5
**communication**
51:10, 159:17
**communications**
114:4, 114:6,
116:13, 119:10,
119:13, 160:20,
170:6, 170:10,
170:13, 181:13

**companies**
89:13
**company**
24:20, 24:22
**competition**
62:5
**complaint**
4:5, 28:17,
28:22, 29:2,
30:3, 35:7,
127:15
**complete**
189:5
**completed**
154:1
**complied**
19:21, 22:21,
23:5, 23:10,
30:22, 31:2,
33:2, 34:8,
34:10, 34:15,
34:18, 38:9,
41:1, 41:3,
42:12, 48:13,
48:16, 48:18,
52:14, 53:9,
56:15, 57:19,
60:4, 63:5,
70:9, 78:8,
84:3, 92:9,
98:13, 99:3,
110:19, 110:21,
112:15, 114:1,
117:14, 119:7,
120:19, 121:18,
126:6, 131:10,
133:8, 135:8,
136:16, 141:21,
142:10, 145:2,
155:20, 176:4,
176:9, 178:18
**computer**
77:16, 121:21
**conclusion**
13:7, 14:14,
103:21
**conference**
2:4, 132:21

J.R.358

**confirm**
19:20
**confused**
179:14
**consented**
113:7
**consider**
14:2, 15:9,
15:12
**considering**
14:13
**construed**
29:18
**consult**
26:6
**contact**
152:3, 163:7,
169:21
**contained**
9:1, 145:13,
176:11
**content**
22:7, 22:12,
58:3, 72:6,
85:22, 90:6,
93:9, 134:14
**contents**
123:12
**context**
26:9, 26:10,
26:19, 26:20,
26:21, 31:22,
32:22, 33:15,
35:3, 39:16,
39:17, 40:17,
44:1, 44:2,
52:2, 71:6,
72:3, 85:13,
85:15, 93:6,
93:7, 107:10,
110:2, 123:11
**continuation**
60:11
**continue**
137:21, 186:20
**continued**
69:9, 163:3
**continues**
19:15, 37:21,

37:22
**continuous**
37:19, 37:22
**contradict**
188:8
**contradicts**
144:9
**conversation**
17:15, 22:18,
25:3, 39:22,
40:3, 65:9,
72:21, 77:21,
78:2, 79:21,
83:10, 86:17,
88:20, 98:3,
107:5, 114:17,
128:9, 128:14,
130:1, 137:9,
139:19, 147:16,
168:20, 170:11,
178:22, 181:22,
182:13, 187:21
**conversations**
9:1, 45:10,
45:12, 48:2,
89:16, 90:7,
90:10, 90:13,
92:19
**convince**
119:21
**copy**
73:11, 73:21
**copying**
157:10
**corner**
46:10
**corrected**
73:10, 117:1,
122:3, 143:12
**corrections**
189:6
**correctly**
183:20
**correspond**
99:9
**correspondence**
158:5
**corresponds**
20:4

**could**
14:3, 15:18,
16:6, 49:13,
50:2, 52:9,
57:8, 62:17,
67:1, 82:21,
83:20, 83:22,
91:2, 96:12,
96:14, 96:16,
96:20, 114:13,
153:13, 153:16,
171:20
**counsel**
6:20, 6:22,
7:11, 8:4, 73:6,
73:9, 88:10,
88:13, 172:16,
186:2, 190:12,
190:16
**counterclaim**
128:7
**couple**
175:1, 186:4
**court**
1:1, 6:8, 7:14,
8:2, 17:4, 30:5,
46:1, 59:7,
70:20, 76:18,
98:12, 98:18,
98:22, 99:15,
101:2, 102:7,
108:12, 110:15,
112:5, 112:9,
115:6, 115:18,
116:5, 117:4,
117:10, 117:11,
119:21, 119:22,
120:11, 121:10,
122:4, 125:15,
126:3, 131:3,
133:3, 133:18,
135:5, 135:9,
136:10, 137:22,
139:8, 141:18,
144:16, 148:3,
150:21, 151:2,
154:19, 160:2,
160:4, 163:2,

165:18, 168:1,
168:5, 172:4,
176:21
**court's**
166:12, 186:8
**covers**
53:19
**cp**
190:22
**crazy**
89:14
**create**
19:2, 19:4,
21:18, 59:15,
70:10, 70:19,
77:4
**created**
21:14, 31:6,
38:11, 71:12,
76:21, 78:12,
78:16, 81:1,
81:12, 81:19,
104:5, 104:9,
104:12, 104:18,
134:11, 142:4,
144:3, 179:7,
179:17
**creating**
177:20
**creation**
176:19
**crenny**
2:13, 7:5, 47:2
**cross-reference**
108:8
**currently**
160:15, 172:6

**D**

**daniel**
169:10
**darren**
169:13
**data**
22:10, 50:2,
131:14, 153:13,
153:16
**date**
6:12, 20:21,

J.R.359

56:22, 60:1,
124:11, 131:11,
174:22, 180:7,
189:10
**dated**
139:5, 141:20,
155:4
**dates**
57:2
**david**
1:26, 1:30,
2:1, 4:11, 5:2,
6:6, 7:11, 7:19,
8:6, 22:17,
28:15, 30:9,
30:11, 30:20,
36:8, 36:12,
50:14, 51:17,
65:20, 65:22,
69:4, 70:7,
71:2, 73:17,
76:14, 79:15,
79:22, 80:3,
90:18, 91:18,
94:22, 97:13,
97:14, 98:8,
99:2, 102:22,
103:13, 110:22,
111:6, 111:13,
111:21, 112:12,
115:1, 117:13,
118:21, 129:4,
130:2, 130:15,
131:7, 131:12,
142:11, 142:17,
145:8, 148:11,
152:20, 164:16,
166:11, 167:6,
167:21, 169:6,
171:11, 185:9,
187:20, 188:16,
189:2
**davis**
145:6
**day**
23:14, 38:12,
38:16, 101:11,
101:18, 125:4,

129:18, 156:7,
159:4, 159:18,
160:2, 160:3,
179:11
**day's**
188:16
**daylight**
181:1
**days**
153:4
**dc**
3:19, 78:5,
79:12, 79:16,
79:19
**dead**
85:14, 85:19
**deal**
41:20
**december**
45:20, 68:10,
68:16, 77:13,
158:3, 160:21,
162:18, 164:8,
168:15, 176:17,
177:10, 178:4,
181:12
**decide**
168:1
**decision**
71:18, 159:16
**decisionmaking**
45:13
**declaration**
4:11, 112:4,
112:11, 112:12,
113:15, 113:19,
114:18, 115:18,
117:7, 119:18,
120:3, 120:5,
122:17, 138:18
**declarative**
115:11
**defendant**
1:28
**defendants**
1:17, 3:13,
5:3, 5:8, 7:1,
8:4, 126:9,

133:11, 186:2
**defense**
35:8
**defenses**
15:6, 15:10,
15:13, 29:7,
29:10, 29:16
**defi**
25:1
**definitely**
75:7
**definition**
53:21
**delay**
154:11, 158:22,
159:11
**delegation**
68:2
**delete**
13:2, 27:6,
28:15, 39:5,
50:16, 52:4,
52:21, 69:10,
90:17, 91:8,
92:1, 94:5,
121:19, 152:10,
152:13, 152:17,
167:20
**deleted_out_sort-
ed**
17:13
**deleting**
60:12, 69:4,
130:4, 130:5,
161:8
**deletion**
37:16, 90:8,
127:22, 128:3,
129:1, 147:10,
173:6, 173:10
**deletion_timesta-
mp_est**
20:20
**deletions**
16:16, 19:15,
36:20, 37:10,
60:15, 61:11,
68:15, 71:22,

94:12
**delta**
123:18
**depends**
181:1
**depos**
6:16, 7:16
**deposition**
1:30, 2:1, 6:6,
6:17, 10:13,
18:21, 19:9,
21:21, 35:15,
36:1, 36:11,
45:20, 59:19,
70:12, 70:15,
70:20, 77:6,
81:8, 81:9,
99:18, 104:13,
106:3, 122:12,
123:2, 130:16,
142:4, 146:7,
148:21, 162:19,
162:22, 176:17,
176:18, 177:9,
178:3, 179:3,
181:12, 188:16,
190:3, 190:6,
190:10, 190:14
**described**
131:14
**description**
4:3, 79:12,
79:19, 107:8
**destroy**
121:20
**destroyed**
35:5, 100:6,
100:18, 102:9,
111:6, 132:12,
136:21, 137:17,
138:2, 139:12,
142:16, 149:11,
171:12, 171:15,
171:22, 183:17,
185:7
**destruction**
147:10, 147:20,
149:2, 149:6,

J.R.360

172:4, 184:9
**determination**
11:4, 13:11,
13:17, 13:18,
16:7, 26:7
**determinations**
16:18, 29:17,
38:3
**determine**
8:14, 8:18,
10:5, 10:20,
11:8, 11:11,
11:15, 12:9,
13:14, 13:22,
14:9, 14:11,
25:18, 26:4,
26:16, 32:11,
32:17, 34:4,
35:1, 35:11,
45:16, 56:3,
62:20, 73:2,
75:12, 85:10,
103:14, 103:17,
104:1, 105:10,
105:14, 126:21,
134:5, 137:5
**determined**
33:19, 33:22
**determining**
29:3
**dev**
48:20, 49:5,
84:5, 85:18
**develop**
45:17
**developed**
68:4
**developer**
49:6
**developers**
63:4
**development**
44:8, 45:5,
145:14
**device**
158:9
**devin**
24:17, 24:20

**devin's**
24:18
**dicharia**
7:3
**difference**
20:18, 123:20,
181:4
**different**
111:15, 123:19
**direct**
37:2, 40:5,
86:13, 87:2,
92:6, 93:14,
94:2, 94:19,
97:4, 159:11
**directed**
117:9
**direction**
76:22, 156:22
**directly**
16:13
**directs**
27:18
**disable**
165:10, 174:10,
174:16, 186:17,
187:8, 187:9
**discern**
103:4, 105:6,
126:10
**discord**
8:7, 8:16,
8:22, 10:10,
18:4, 18:13,
21:4, 36:20,
37:10, 38:21,
50:3, 50:14,
50:17, 54:8,
56:6, 56:8,
56:10, 65:19,
68:20, 74:2,
74:3, 74:5,
78:21, 79:2,
79:3, 79:7,
95:16, 96:4,
99:8, 103:2,
104:2, 105:7,
109:1, 119:9,

129:18, 130:6,
131:13, 132:11,
135:21, 145:6,
148:16, 149:19
**discovery**
99:9
**discuss**
89:10, 157:18,
170:22
**discussed**
63:14, 68:9,
99:18
**discussing**
57:4
**discussion**
174:6, 177:9,
181:11
**discussions**
67:3, 96:17,
175:13, 181:13,
184:19
**disk**
43:5
**dispute**
89:1, 89:7,
89:11, 90:2,
96:18, 127:10,
128:3, 128:12,
128:18, 129:2,
151:12
**dissolved**
89:13
**distinction**
173:17
**district**
1:1, 1:2, 6:8,
6:9
**document**
4:10, 4:14,
4:17, 4:18,
4:19, 4:22,
43:12, 43:15,
78:10, 81:10,
98:19, 111:1,
117:21, 188:7
**documents**
18:20, 26:6,
27:19, 74:14,

107:2, 114:4,
114:5, 116:12,
125:9, 129:15,
129:17, 136:20,
137:16, 138:1,
139:12, 142:15,
166:15, 173:7,
173:10, 182:9,
183:17, 185:7
**doing**
34:4, 86:1
**done**
103:14, 103:17,
103:22, 106:8,
109:8, 117:21,
144:6, 159:19
**door**
126:18, 132:17,
140:18
**down**
31:7, 31:18,
58:13, 190:8
**downplayed**
119:20
**drafted**
120:5
**due**
160:3
**duly**
7:20, 190:6
**duty**
111:1, 111:2

---
**E**

**e-mail**
3:21, 4:20,
4:21, 72:5,
138:13, 149:22,
150:1, 154:21,
155:5, 155:7,
155:10, 157:9,
159:4
**e-mailed**
156:1
**e-mails**
80:10, 150:4,
158:1, 159:1,
159:5

J.R.361

Transcript of David Chen
Conducted on February 3, 2026

57

**e-r-r-a-t-a**
189:1
**e7l**
86:13
**each**
46:12, 46:14,
182:9
**earlier**
74:5, 74:6,
128:5, 157:17,
159:18, 179:20,
184:6
**earliest**
36:5
**easier**
23:11
**east**
2:5, 3:8
**eastern**
20:15, 180:14
**easy**
164:16, 164:19
**ecf**
98:10, 100:3,
100:11, 101:17,
102:21, 105:12,
105:13, 107:1,
110:13, 112:4,
132:22, 138:11,
138:17, 138:18,
138:19
**ecosystem**
43:1, 44:12
**either**
30:9, 122:1,
129:6, 180:20
**electronically**
114:5, 114:21
**else**
15:1, 21:15,
22:4, 32:14,
32:17, 34:3,
40:17, 47:7,
47:11, 56:7,
59:1, 73:5,
83:15, 85:9,
106:7, 106:11,
106:13, 109:17,

124:8, 144:6,
148:17, 148:19,
150:2, 150:18,
151:14, 171:2
**emma**
2:15, 7:9
**emoticon**
31:11, 63:8
**employed**
190:12, 190:16
**employee**
190:15
**en**
129:17
**enable**
166:14, 166:19,
166:20, 173:6,
187:7, 187:10
**enabled**
173:9, 174:1,
174:2, 174:8,
175:12, 186:19
**enables**
173:19
**enabling**
166:22
**end**
31:7, 37:22,
59:22, 74:12,
102:6, 103:3,
116:15, 120:7,
121:3, 121:22,
136:22, 188:16
**ending**
19:15
**enjoyment**
130:11
**entries**
85:22
**entry**
98:17
**errata**
189:7
**erupting**
43:5
**esi**
188:8
**esquire**
2:12, 2:13,

3:6, 3:16
**estate**
1:6, 3:4
**even**
103:4, 105:8,
126:10
**ever**
137:8, 168:15,
170:19, 170:22
**every**
108:3, 111:1,
151:21, 171:19
**everyone**
70:3, 166:7
**everything**
57:1, 62:17,
105:14
**evidence**
30:17, 100:4,
100:5, 100:16,
100:17, 102:7,
102:8, 111:2,
111:5, 138:1,
138:8, 147:10,
147:20, 149:3,
149:7, 149:11,
171:12, 171:15,
171:20, 172:5
**exact**
20:17, 32:21
**examination**
5:3, 5:6, 5:8,
8:4, 172:16,
186:2
**examined**
8:1, 189:3
**example**
71:9, 107:17
**excel**
77:16
**except**
86:6, 86:7
**exception**
72:22
**excerpt**
4:16
**exchange**
155:8, 177:4

**excuse**
45:11, 51:18,
108:12, 157:14
**exemplar**
156:3
**exhibits**
176:2
**exist**
57:15
**existed**
21:5, 116:13,
121:1
**exists**
56:9, 56:18
**explain**
64:15, 64:21,
173:17
**explains**
181:4
**extends**
111:2
**extractable**
31:14, 64:10,
65:1

**F**

**fact**
177:15
**factors**
14:1, 14:12,
35:10
**facts**
94:9, 111:4
**factual**
14:4
**failed**
28:9, 128:6,
187:7
**fair**
31:2, 164:18
**false**
99:13, 99:14,
100:21, 102:17,
115:12, 115:19,
116:16, 116:19,
116:22, 118:17,
118:19, 118:21,
119:1, 121:7,

J.R.362

122:6, 122:8,
132:14, 137:1,
138:19, 138:21,
140:9, 140:21,
143:16, 143:20,
149:6, 149:10,
172:2, 182:21,
183:1
**familiar**
98:19
**family**
27:20, 51:5,
153:5
**february**
1:32, 6:12,
23:14, 27:11,
81:11, 98:18,
101:14, 101:18,
103:16, 104:1,
104:6, 104:9,
104:19, 109:3,
154:1
**fen**
1:4, 3:3, 7:12,
139:11, 142:14,
145:5, 182:2,
182:4, 183:9
**feuding**
47:16
**few**
153:4
**figure**
26:12, 26:14,
39:15, 56:20,
71:6, 72:5,
88:2, 106:20,
107:2, 109:9,
109:14, 123:7
**file**
28:9, 98:16,
102:11, 128:6,
129:5
**filed**
27:13, 27:20,
51:5, 98:17,
105:12, 105:13,
107:1, 110:11,
113:15, 113:19,

114:11, 127:12,
133:18
**filing**
99:14, 112:18,
138:11, 138:14,
160:2
**filings**
70:20
**filling**
56:5
**financially**
190:17
**find**
155:7, 176:1
**firestone**
3:17, 7:6
**firm**
7:6, 87:13,
88:21, 153:19
**first**
7:20, 34:16,
42:19, 43:4,
88:7, 99:7,
100:12, 122:7,
178:17
**five**
20:15, 180:21
**floyd**
2:15, 7:9
**focused**
185:5
**foliation**
148:21
**follow-up**
172:10
**followed**
113:12
**follows:**
8:1
**footnote**
131:8, 131:9,
131:12, 133:6,
133:7
**foregoing**
189:3, 190:3,
190:5
**forerunner**
177:21

**forever**
50:8, 50:17,
53:4, 161:20
**forgot**
174:20
**form**
10:16
**formally**
48:20
**formation**
121:2, 176:18
**forward**
158:8
**four**
180:22
**freelance**
190:23
**friends**
119:10
**front**
22:22, 28:22,
78:1, 165:15,
176:7
**ftx**
31:22, 32:22,
33:16, 44:16,
56:19, 56:22,
57:6, 57:16
**function**
173:20, 174:17,
186:12
**further**
188:13, 188:14,
190:14

### G

**gaffney**
155:8, 156:2,
156:8, 157:10,
157:22, 158:13,
158:16, 159:5
**gathering**
54:9
**gave**
80:15, 81:3,
81:17, 82:1,
83:1, 84:13,
87:20, 95:19,

128:21, 178:3
**general**
14:20, 57:22,
58:16, 64:19,
183:13
**getting**
180:8, 180:11
**giles**
3:6, 5:7, 7:10,
8:10, 8:12,
10:1, 10:12,
13:9, 17:7,
17:10, 22:22,
28:7, 28:20,
46:4, 46:9,
46:12, 69:6,
97:22, 100:8,
100:14, 101:3,
101:8, 102:14,
102:18, 103:10,
108:11, 108:14,
112:1, 113:3,
113:8, 117:19,
120:2, 120:15,
131:4, 132:8,
133:1, 139:1,
141:1, 141:6,
142:20, 143:2,
143:17, 143:22,
147:4, 147:11,
148:6, 151:5,
154:7, 154:13,
155:1, 155:6,
156:13, 157:10,
157:12, 158:1,
158:17, 158:20,
159:8, 159:13,
159:20, 160:7,
161:13, 163:11,
163:15, 163:18,
164:3, 165:6,
165:12, 167:2,
167:8, 167:15,
168:6, 171:16,
172:9, 172:14,
172:17, 173:13,
174:3, 175:7,
175:18, 177:1,

J.R.363

177:2, 181:18,
185:22, 186:5,
186:21, 187:11,
187:18, 188:11,
188:14

**github**
121:21

**give**
46:16, 82:3,
112:3, 119:22,
125:21, 131:20,
132:20, 133:15,
135:1, 136:8,
139:4, 157:17

**given**
114:20, 115:22,
189:5, 190:11

**giving**
81:14, 149:5

**go**
8:12, 10:1,
10:13, 19:11,
22:20, 23:4,
30:20, 31:7,
33:7, 33:12,
36:19, 40:22,
42:10, 45:8,
48:12, 49:14,
52:13, 56:14,
57:18, 63:2,
69:16, 71:11,
80:18, 86:12,
86:15, 90:22,
92:6, 97:22,
99:2, 112:14,
117:15, 126:5,
130:21, 131:22,
132:4, 133:6,
141:14, 142:20,
144:20, 144:22,
163:21, 165:19,
172:7, 186:6

**goes**
156:4

**going**
17:1, 17:2,
28:12, 36:15,
38:8, 45:19,

45:21, 59:4,
66:1, 69:17,
71:19, 72:4,
76:14, 76:15,
76:21, 86:20,
90:22, 98:9,
109:4, 110:9,
125:12, 125:20,
125:21, 130:15,
131:20, 132:19,
133:15, 135:1,
135:10, 136:7,
139:3, 139:18,
144:13, 146:11,
149:13, 154:15,
155:15, 165:14,
165:21, 172:9,
181:20, 183:2,
183:4, 188:17

**gone**
50:8, 50:17

**good**
77:3, 172:11

**guess**
50:15, 65:12,
71:8, 81:18,
91:16, 94:17,
112:2, 114:9,
118:9, 118:12,
118:16, 133:14,
138:3, 138:5,
141:10, 150:19,
150:21, 152:2,
165:7, 174:19,
176:11, 177:20,
178:2

**guo**
15:16, 15:21,
16:9, 16:13,
16:19, 37:5,
37:11, 60:12,
73:7, 73:8,
73:16, 75:3,
75:13, 76:2,
119:14

**guy**
97:6

**guys**
28:9, 73:10,

73:20, 108:20,
128:6, 128:21,
129:5, 134:2

___H___

**hajhamid**
170:7

**hand**
144:14

**happened**
97:14, 153:1

**hard**
164:15

**head**
14:8

**heard**
158:5

**hearing**
125:17, 135:3,
135:19

**held**
2:1

**hello**
156:16

**help**
12:8, 14:8,
14:13, 19:8,
25:21, 35:11,
57:5, 104:12,
113:16, 119:21

**helped**
39:17

**here**
6:5, 7:8, 8:19,
22:4, 22:10,
37:16, 38:3,
44:12, 44:15,
44:19, 47:14,
49:5, 51:12,
52:9, 54:1,
57:20, 66:3,
66:22, 68:11,
71:3, 82:18,
83:12, 91:6,
91:21, 96:18,
107:8, 115:6,
119:9, 131:15,
173:18, 175:21,

185:16

**hereby**
189:2, 190:4

**hi**
158:4

**highlighter**
23:8

**hired**
153:19

**history**
121:20

**honor**
135:15

**hoping**
92:4

**hopping**
90:22

**hotel**
2:4

**hours**
20:15, 180:21,
180:22

**hyattsville**
2:6, 6:19

___I___

**id**
20:2, 21:7

**idea**
77:1, 77:2,
77:4

**ideas**
45:16

**identified**
18:21, 159:2

**ids**
18:2, 99:8

**immediately**
35:17

**implication**
178:2

**implies**
66:17

**importance**
119:20

**important**
77:5

**impose**
28:9

J.R.364

| | | | |
|---|---|---|---|
| **inaccurate** 185:18 | **insistence** 187:16 | **issue** 28:3, 171:1 | **joining** 7:6 |
| **include** 12:5, 102:16 | **inspect** 153:16, 153:20 | **issues** 14:4, 14:6, 51:8 | **josh** 17:7, 46:4 |
| **included** 56:11, 96:3, 96:14, 96:17, 107:18, 119:10, 145:10 | **inspecting** 154:6 | **item** 155:6, 173:4, 175:14, 179:15, 180:6 | **joshua** 3:16, 6:22, 7:4 |
| **includes** 119:13 | **inspection** 154:2, 160:4 | **J** | **july** 10:9, 18:22, 19:8, 21:21, 22:2, 31:6, 36:1, 36:11, 59:19, 99:18, 104:15, 123:1, 130:3, 130:5, 130:6, 130:16, 131:12, 141:20, 142:5, 143:14, 145:8, 146:7, 162:18 |
| **including** 62:13, 114:5, 176:12 | **instagram** 150:16 | **jal@levyfirestone** 3:21 | |
| **inclusive** 185:2 | **instance** 174:7 | **january** 154:5, 155:4, 158:21, 159:12 | |
| **incomplete** 114:9 | **instead** 24:9 | **jito** 10:22, 31:11, 31:15, 52:16, 53:10, 53:13, 53:17, 53:20, 54:2, 54:4, 54:8, 54:11, 54:13, 54:14, 54:16, 55:5, 55:8, 55:11, 55:22, 56:4, 56:8, 56:17, 57:9, 57:15, 58:7, 63:3, 63:8, 64:2, 64:5, 64:10, 64:12, 65:2, 65:4, 65:16, 72:20, 72:22, 86:6, 86:7, 86:8, 86:10, 103:2, 103:18, 104:2, 105:1, 105:6, 126:8, 126:21, 127:5, 133:10, 133:21 | |
| **incorrect** 99:22, 116:2, 116:5, 126:15 | **intent** 98:16 | | **jump** 51:10, 51:14, 51:20, 52:1, 52:10, 96:22 |
| **indicate** 23:22 | **intentionally** 26:17, 69:9 | | **junctures** 114:7 |
| **indicated** 173:8, 183:1 | **interacting** 49:9 | | **june** 36:10, 38:17 |
| **indicating** 20:11, 173:3 | **interested** 190:17 | | **justin** 7:3 |
| **individually** 73:2 | **internal** 95:16, 96:4, 106:1 | | **K** |
| **inform** 153:7 | **interpret** 138:7 | | **katherine** 2:14, 7:9 |
| **information** 80:15, 81:4, 81:14, 81:18, 82:1, 82:22, 83:11, 84:12, 87:19, 87:22, 95:18, 114:21, 116:1 | **interpreted** 180:5 | | **keep** 135:10, 163:3 |
| | **interrogatories** 130:18, 136:13, 142:1, 144:19, 182:4, 182:6 | | **kept** 161:8, 163:14 |
| | **interrogatory** 130:22, 136:14, 136:15, 139:5, 139:10, 139:17, 140:7, 140:14, 140:18, 141:15, 142:8, 143:4, 144:22, 145:1, 182:11, 184:1 | | **kevin** 2:13, 7:5 |
| **informed** 116:4 | | **jitos** 105:3 | **kind** 54:1, 54:8, 65:5, 65:10, 65:14, 65:17, 128:22, 130:13 |
| **initially** 177:20 | | **job** 1:36 | |
| **inquiry** 136:19, 137:3, 183:16 | **invoices** 157:2 | **jogged** 122:10 | **kinds** 71:15 |
| | **irregardless** 181:5 | | **knew** 15:20, 25:12, |
| **insane** 128:20 | **irrelevant** 71:7 | | |

J.R.365

25:15, 27:8,
27:15, 27:22,
28:3, 28:16,
48:7, 48:10,
50:10, 51:1,
89:15, 89:22,
90:6, 90:13,
111:19, 111:20,
111:21, 116:19,
118:21, 127:4,
127:7, 127:20,
128:2, 128:18,
134:11, 134:16,
138:21, 143:16,
143:20, 154:9,
160:3
**know**
8:11, 13:20,
20:17, 25:2,
25:20, 27:7,
36:9, 37:21,
40:4, 40:21,
43:12, 43:21,
44:5, 47:7,
50:12, 50:16,
50:20, 50:21,
51:2, 51:8,
51:19, 51:22,
54:21, 55:16,
55:18, 56:1,
63:10, 64:4,
64:22, 65:21,
73:12, 74:15,
74:21, 75:6,
75:7, 78:12,
78:16, 80:13,
81:3, 85:1,
88:2, 92:17,
92:22, 93:3,
94:6, 96:2,
101:4, 104:4,
105:9, 107:16,
108:7, 108:21,
109:22, 110:2,
110:4, 110:5,
111:10, 113:10,
115:5, 125:10,
133:19, 137:7,

141:11, 143:14,
143:18, 145:21,
153:15, 153:22,
154:3, 154:11,
158:12, 158:14,
159:9, 160:1,
160:6, 160:8,
160:14, 160:19,
161:16, 161:19,
162:1, 162:5,
165:9, 168:3,
182:19, 184:16,
184:17, 185:17,
185:20, 187:15
**knowledge**
116:12, 136:18,
183:15, 184:8,
184:13, 184:16,
185:10, 185:14
**known**
22:8, 116:21,
118:9, 118:12,
118:16, 118:18,
119:1, 148:12
**knows**
185:21

---

**L**

**land**
58:1, 58:16
**language**
173:5
**large**
23:15, 34:20,
41:6, 41:9,
41:14, 42:3,
82:6, 83:19
**last**
19:16, 19:19,
24:18, 37:20,
60:1, 60:3,
95:13, 100:12,
100:13, 112:14,
112:15, 158:4,
160:12
**late**
177:13
**later**
99:15, 104:15,

123:1, 127:12,
157:22, 167:22,
180:7, 185:1
**law**
7:6, 88:21
**lawsuit**
9:22, 10:7,
11:12, 27:9,
27:20, 30:18,
39:13, 39:19,
40:19, 49:12,
51:5, 51:9,
51:17, 64:6,
83:6, 83:9,
88:8, 89:21,
90:1, 90:11,
90:15, 92:11,
92:15, 92:18,
92:20, 93:2,
94:10, 94:15,
109:6, 109:11,
109:15, 111:17,
126:22, 127:6,
127:11, 127:12,
129:3
**lawsuits**
11:17, 14:16,
42:8, 171:21
**lawyer**
80:11, 90:15,
125:6, 135:14,
135:18, 147:18,
147:19
**lawyer's**
76:22, 80:13,
98:15, 113:12
**lawyers**
18:20, 26:3,
27:18, 47:17,
68:19, 69:4,
74:11, 74:16,
81:4, 81:15,
82:1, 83:1,
84:13, 87:14,
95:19, 99:14,
101:1, 101:6,
101:20, 102:11,
103:1, 103:8,

103:20, 105:5,
105:17, 106:9,
106:20, 107:12,
110:11, 111:10,
111:20, 113:9,
113:16, 114:22,
116:4, 117:10,
117:21, 120:5,
121:9, 122:3,
125:6, 126:1,
126:7, 129:19,
130:7, 130:8,
132:1, 133:18,
133:20, 137:13,
141:2, 141:5,
145:22, 151:17,
153:7, 153:15,
153:19, 154:12,
155:2, 156:9,
157:12, 158:1,
158:12, 158:15,
159:7, 159:11,
159:17, 160:1,
172:3
**leave**
66:2
**ledyard**
157:5
**left**
47:15, 120:21,
125:1
**legal**
14:6, 43:15
**lentz**
156:13, 158:2
**less**
106:17
**let's**
22:20, 61:14,
69:15, 80:18,
82:5, 130:21,
141:14, 144:20,
146:10
**letter**
4:9, 4:12,
4:13, 4:15,
69:3, 100:3,
102:7, 125:6,

J.R.366

125:8, 125:12, 125:18, 125:22, 126:17, 128:15, 132:1, 132:21, 138:10

**levy's**
184:7

**li**
1:4, 3:3, 7:12, 139:11, 142:14, 145:4, 182:2, 182:4, 183:9

**lie**
102:13

**likes**
65:10

**limited**
176:18

**line**
31:3, 34:17, 36:16, 38:8, 39:1, 46:6, 46:22, 48:17, 51:3, 56:16, 107:22

**lines**
23:4, 40:1, 178:16, 185:5

**linkedin**
150:17

**liquidation**
24:9, 40:20, 41:14, 41:21, 44:21, 57:5, 83:17

**liquidations**
31:22, 32:13, 32:22, 33:15, 34:21, 39:12, 39:19, 41:6, 42:3, 44:15, 54:22, 55:5, 65:3, 67:8, 83:14, 83:15, 83:16, 96:14, 145:12

**liquidator**
9:2, 9:3, 9:6,

24:9, 41:18, 42:5, 47:9, 47:18, 48:3, 49:1, 62:14, 64:9, 64:13, 64:22, 66:19, 72:15, 119:15, 121:1

**list**
18:1, 18:3, 35:8, 78:4, 86:16, 105:4, 108:9, 108:17

**lists**
18:6

**litigation**
88:9, 88:12, 111:3, 135:13

**little**
46:14, 185:2

**llc**
1:14, 1:15, 1:20, 3:14

**llp**
3:7, 3:17

**long**
106:15

**longer**
56:18, 57:15, 146:22, 185:2

**look**
10:22, 11:21, 12:8, 15:3, 15:6, 19:7, 19:19, 26:12, 26:16, 29:2, 29:6, 29:9, 29:15, 30:1, 32:15, 32:20, 34:16, 35:7, 35:10, 36:15, 38:7, 48:17, 52:15, 53:7, 59:18, 60:6, 60:20, 61:14, 61:18, 61:20, 66:5, 71:1, 71:5, 77:11,

77:14, 77:19, 78:20, 79:1, 82:6, 84:2, 85:5, 86:22, 91:16, 94:13, 99:4, 102:21, 107:2, 109:19, 113:22, 116:10, 117:13, 119:6, 119:19, 120:4, 120:18, 121:17, 123:7, 127:2, 129:19, 134:2, 134:8, 135:7, 136:1, 136:13, 140:15, 142:7, 175:22, 177:7, 179:14, 181:20, 182:10, 183:3

**looked**
11:18, 11:19, 12:1, 12:3, 12:12, 13:4, 15:19, 26:9, 26:19, 27:3, 27:4, 35:5, 50:3, 56:6, 56:8, 73:6, 75:10, 75:11, 75:19, 84:18, 85:2, 85:8, 93:7, 93:9, 94:8, 107:9, 107:10, 109:21, 122:18, 123:2, 134:4, 144:3

**looking**
13:21, 14:5, 14:7, 14:10, 33:22, 44:19, 52:3, 66:7, 72:8, 72:11, 72:14, 72:18, 73:1, 85:12, 85:21, 86:5, 109:9, 122:9, 123:9, 125:11, 178:15, 180:4

**looks**
19:12, 94:1

**loss**
184:9

**lost**
136:21, 139:12, 142:16, 161:20, 183:18, 185:8

**lot**
149:9

**lower**
46:20

**luna**
87:6, 91:13, 91:19, 98:5, 148:12, 148:14, 148:15, 149:15, 152:7, 152:11

---
**M**
---

**made**
13:10, 13:16, 16:15, 32:21, 35:14, 37:8, 40:17, 43:16, 44:2, 58:19, 68:15, 83:5, 114:3, 115:19, 116:20, 117:18, 120:21, 124:15, 138:22, 140:11, 144:4, 149:10, 151:3, 151:6, 159:17, 160:1, 160:12, 172:3

**maggie**
155:8, 158:21

**main**
67:18

**make**
13:14, 13:18, 16:7, 16:18, 38:3, 44:20, 71:18, 138:11, 138:14, 146:5, 159:16, 188:4

**maker**
9:2

J.R.367

Transcript of David Chen
Conducted on February 3, 2026

63

| | | | |
|---|---|---|---|
| **making**<br>26:7, 105:17,<br>136:19, 137:3,<br>138:9, 173:18,<br>183:16<br>**many**<br>8:9, 10:19,<br>22:14, 54:4,<br>63:12, 172:13,<br>172:14<br>**march**<br>110:10, 114:11<br>**mark**<br>45:21, 57:14,<br>57:21, 59:5,<br>63:10, 63:18,<br>66:1, 125:12,<br>165:15<br>**marked**<br>17:3, 30:4,<br>31:17, 45:22,<br>57:1, 59:6,<br>63:9, 76:17,<br>98:11, 110:14,<br>112:8, 125:14,<br>126:2, 131:2,<br>133:2, 135:4,<br>136:9, 139:7,<br>141:17, 144:15,<br>154:18, 165:17<br>**market**<br>9:2, 54:16,<br>54:17, 72:16<br>**market-maker**<br>9:11<br>**marks**<br>188:15<br>**marriott**<br>2:3<br>**maryland**<br>1:2, 2:22, 6:9,<br>6:19<br>**mass**<br>10:10, 36:20,<br>37:9, 38:20,<br>71:21, 72:5,<br>73:1, 86:1,<br>86:4, 94:7, | 94:12, 127:22,<br>128:3, 152:17<br>**masse**<br>129:17<br>**material**<br>111:2<br>**matter**<br>115:5, 167:19<br>**matters**<br>6:7, 167:22,<br>168:1<br>**maximal**<br>31:14<br>**maximum**<br>64:9, 65:1<br>**maybe**<br>44:16, 44:17<br>**md**<br>2:6, 3:10<br>**mean**<br>12:2, 25:5,<br>26:15, 49:16,<br>49:22, 51:19,<br>53:21, 54:6,<br>54:11, 54:17,<br>76:3, 83:8,<br>93:5, 100:10,<br>106:2, 108:4,<br>127:10, 136:1,<br>148:14, 166:19,<br>187:4<br>**meaning**<br>35:4, 85:16,<br>88:9, 90:12,<br>104:8, 157:11<br>**means**<br>54:1, 54:12,<br>92:13, 169:1<br>**meant**<br>39:20<br>**media**<br>6:5<br>**mekonen**<br>2:9, 6:16<br>**mention**<br>145:17<br>**mentioned**<br>14:15, 32:13, | 39:12, 39:18,<br>39:22, 40:3,<br>43:10, 43:11,<br>56:11, 58:21,<br>64:16, 64:20,<br>92:10, 92:14,<br>92:18, 92:19,<br>107:10, 128:5,<br>134:21, 145:11,<br>150:9, 171:10<br>**mentions**<br>41:17<br>**mess**<br>23:19<br>**message**<br>15:16, 18:10,<br>20:2, 20:5,<br>20:12, 20:21,<br>21:5, 22:7,<br>22:11, 23:13,<br>23:17, 24:1,<br>25:13, 25:16,<br>25:19, 28:16,<br>34:19, 35:2,<br>37:11, 41:5,<br>41:12, 42:14,<br>42:15, 43:16,<br>44:3, 44:21,<br>47:6, 48:8,<br>49:15, 50:17,<br>51:4, 51:13,<br>51:22, 52:7,<br>52:19, 55:19,<br>56:4, 58:3,<br>58:10, 66:3,<br>73:1, 73:7,<br>73:9, 83:3,<br>85:5, 86:13,<br>87:2, 88:3,<br>91:2, 92:6,<br>93:14, 94:19,<br>97:4, 105:7,<br>109:4, 110:6,<br>110:7, 119:9,<br>123:11, 145:10,<br>150:4, 152:13,<br>157:16, 163:22,<br>164:20, 170:3, | 178:8, 179:15,<br>179:17, 180:7<br>**message_timestam-<br>p_utc**<br>20:9<br>**messaging**<br>174:6<br>**metadata**<br>81:10, 101:14<br>**mev**<br>31:10, 31:14,<br>55:7, 57:22,<br>58:16, 63:3,<br>63:7, 64:2,<br>64:5, 64:12,<br>65:3, 65:16<br>**mic**<br>176:22<br>**michael**<br>1:38, 2:20,<br>7:15, 190:2,<br>190:22<br>**middle**<br>95:1, 129:7<br>**might**<br>39:20, 45:2,<br>76:11, 108:19,<br>169:21, 180:22,<br>181:10<br>**mina**<br>170:14, 170:16<br>**mind**<br>15:16, 24:10<br>**mine**<br>52:5<br>**mingsan**<br>1:6, 3:4<br>**misleading**<br>120:14<br>**missed**<br>140:3<br>**modification**<br>124:17<br>**modify**<br>45:17<br>**mom**<br>152:2, 183:10,<br>184:20 |

J.R.368

| | | | |
|---|---|---|---|
| **moment**<br>32:19<br>**money**<br>23:15, 31:11,<br>41:9, 57:6,<br>58:6, 63:8,<br>67:20, 82:6,<br>147:8, 147:14,<br>160:16<br>**monitor**<br>6:13<br>**monologues**<br>145:13<br>**month**<br>35:20, 95:4,<br>157:22, 158:4,<br>158:16<br>**months**<br>99:15, 104:15,<br>154:6, 175:1<br>**more**<br>14:3, 15:18,<br>24:13, 41:22,<br>56:16, 62:15,<br>66:3, 123:18,<br>149:13, 185:2<br>**most**<br>86:8, 109:8,<br>172:19<br>**mother**<br>28:17, 88:18,<br>128:10, 136:17,<br>137:4, 137:9,<br>146:22, 147:19<br>**mother's**<br>28:17, 127:15,<br>136:12, 139:4,<br>142:7<br>**motion**<br>28:9, 98:16,<br>110:12, 112:19,<br>113:16, 128:6,<br>128:7<br>**moto**<br>152:20<br>**motorola**<br>152:21<br>**move**<br>158:8 | **much**<br>160:18<br>**multiple**<br>151:20<br>**muse**<br>3:17<br><br>**N**<br><br>**name**<br>21:1, 21:8,<br>24:16, 24:18,<br>25:1, 53:11,<br>66:17, 78:18,<br>87:6, 95:13,<br>96:9<br>**names**<br>78:21, 79:1,<br>79:3<br>**narrowly**<br>187:14<br>**necessarily**<br>52:5, 54:3,<br>54:13, 96:11<br>**need**<br>110:16, 156:18,<br>172:11<br>**needed**<br>159:6<br>**negotiations**<br>129:8<br>**neither**<br>56:10, 118:7,<br>190:12<br>**net**<br>67:18<br>**networks**<br>67:17<br>**never**<br>94:8, 120:10<br>**new**<br>11:6, 11:15,<br>12:5, 12:10,<br>15:15, 15:19,<br>16:3, 16:8,<br>145:6, 163:8,<br>167:20<br>**news**<br>73:19 | **next**<br>31:19, 32:20,<br>33:21, 43:1,<br>58:9, 58:10,<br>60:20, 63:2,<br>101:17, 116:10,<br>154:16, 157:9,<br>159:4, 160:2,<br>160:3<br>**nobody**<br>22:4, 47:11,<br>53:5<br>**nojob**<br>24:12, 24:14,<br>84:19, 85:3,<br>85:6, 85:8,<br>85:21, 93:15,<br>94:3, 94:14,<br>169:7<br>**nojob's**<br>24:8<br>**non**<br>7:7<br>**none**<br>111:7, 111:22<br>**nonresponsive**<br>28:13<br>**notary**<br>2:21, 190:6<br>**notation**<br>32:21, 51:12<br>**notations**<br>146:6<br>**note**<br>23:19, 24:4,<br>24:7, 33:21,<br>34:19, 37:8,<br>39:20, 61:3,<br>82:18, 84:8,<br>97:6, 97:13,<br>100:8, 134:7<br>**noted**<br>39:9, 82:14,<br>87:14<br>**notes**<br>21:10, 21:13,<br>21:14, 21:15,<br>21:16, 21:18, | 22:1, 22:4,<br>23:16, 29:12,<br>29:19, 32:3,<br>35:14, 36:7,<br>37:8, 39:14,<br>52:12, 60:21,<br>71:1, 71:3,<br>71:16, 72:2,<br>79:22, 80:3,<br>80:8, 80:13,<br>81:21, 82:16,<br>84:18, 91:6,<br>93:10, 94:21,<br>101:21, 106:1,<br>176:12<br>**nothing**<br>7:22, 34:3,<br>37:7, 103:4,<br>105:6, 109:17,<br>119:2, 126:10,<br>135:20, 163:8,<br>174:19, 188:13,<br>188:14<br>**notice**<br>2:20, 98:16,<br>179:13<br>**noticed**<br>95:16, 123:10<br>**notiff**<br>41:10<br>**notiffs**<br>23:15, 82:7<br>**notified**<br>68:19, 68:22<br>**november**<br>18:17, 19:14,<br>31:7, 42:14,<br>42:16, 47:15,<br>48:8, 155:10,<br>155:22, 156:8,<br>159:3, 159:12,<br>179:8, 179:11,<br>181:7<br>**number**<br>20:5, 21:8,<br>34:12, 34:20,<br>41:6, 41:14,<br>42:3, 63:6, |

J.R.369

71:2, 112:6,
134:9, 155:2
**numbers**
6:10, 46:8
**nw**
3:18

O

**object**
10:15, 113:10,
163:21
**objecting**
142:22, 143:2
**objection**
8:10, 10:1,
10:12, 13:9,
28:7, 28:20,
69:6, 97:22,
101:3, 101:8,
102:14, 102:18,
103:10, 108:11,
108:13, 112:1,
113:3, 113:8,
117:19, 120:2,
120:15, 139:1,
141:1, 141:6,
142:20, 143:17,
143:22, 147:4,
147:11, 148:6,
154:7, 154:13,
158:17, 159:8,
159:13, 159:20,
160:7, 161:13,
163:11, 163:15,
163:18, 164:3,
165:6, 165:12,
167:2, 167:8,
167:15, 168:6,
171:16, 173:12,
173:21, 175:5,
175:16, 181:16,
185:19, 186:21,
187:11, 187:18,
188:11
**objections**
183:14
**obtain**
50:2

**obtained**
131:13, 156:20
**occur**
140:22
**october**
16:15, 19:16,
37:17, 37:20,
51:4, 51:13,
60:2, 60:15,
61:12, 68:9,
68:15, 68:22,
127:12, 177:15,
178:11, 181:15
**officer**
190:2
**oh**
18:12, 39:3,
46:14, 74:4,
75:15, 92:16,
94:16, 147:17,
148:8, 150:1
**okay**
25:9, 46:11,
46:14, 46:15,
46:18, 46:21,
59:3, 60:5,
61:16, 61:17,
63:21, 63:22,
67:6, 67:15,
73:18, 77:10,
77:18, 77:22,
78:3, 78:9,
79:5, 79:10,
80:5, 80:19,
80:20, 84:2,
86:21, 87:1,
90:17, 108:1,
118:6, 121:13,
131:19, 134:22,
136:15, 140:1,
140:4, 140:5,
145:3, 154:3,
155:13, 156:4,
156:10, 172:18,
173:16, 174:4,
174:21, 175:10,
175:19, 176:3,
176:8, 176:15,

177:6, 177:14,
177:18, 178:1,
178:10, 178:14,
179:5, 179:9,
179:12, 180:10,
180:15, 180:19,
181:3, 181:5,
181:9, 181:19,
182:17, 183:12,
183:22, 184:5,
184:15, 184:18,
185:22
**old**
122:19
**older**
44:7
**once**
50:7, 151:4,
151:7, 168:18
**one**
3:8, 9:7, 18:9,
18:20, 19:6,
37:8, 42:19,
43:4, 47:19,
51:8, 64:8,
65:7, 66:3,
68:3, 68:12,
72:9, 72:12,
82:6, 85:14,
86:19, 86:20,
88:5, 124:1,
139:16, 149:13,
156:18, 165:20,
169:22, 173:22,
174:2, 175:12,
179:13
**one-by-one**
72:19, 86:5
**ones**
12:16, 33:14,
63:14, 90:19,
94:17, 97:20,
97:21, 134:2
**only**
77:7, 121:3,
156:10, 165:3
**operated**
49:1

**opinion**
50:15
**oppose**
112:19, 113:16
**opposite**
187:9
**opposition**
110:12
**order**
98:17, 110:13,
112:20, 112:21,
113:2, 113:17,
120:1, 163:3,
165:9, 165:15,
166:12, 166:17,
167:14, 168:4,
168:19, 172:22,
174:22, 186:9,
187:13, 188:10
**original**
88:12
**other**
13:5, 30:11,
35:4, 35:10,
43:13, 44:19,
52:3, 52:6,
56:11, 65:19,
70:17, 70:20,
85:21, 91:4,
106:19, 108:2,
121:14, 149:14,
150:5, 150:8,
155:2, 170:17,
171:11, 172:2
**otherwise**
190:17
**otter**
1:13, 3:14
**ottersec**
1:20, 8:22,
14:22, 28:18,
40:8, 40:11,
47:16, 72:12,
89:11, 90:2,
95:3, 95:9,
96:20, 97:8,
119:14, 120:21,
121:2, 124:8,

J.R.370

125:1, 128:11,
151:9, 152:4,
169:19, 171:10
**ottersec's**
30:10, 47:16,
125:6
**ourselves**
157:18
**out**
14:5, 14:7,
18:6, 26:13,
39:15, 56:5,
56:20, 59:12,
71:6, 72:5,
88:3, 89:8,
106:13, 106:20,
107:2, 109:9,
109:14, 120:13,
123:7, 126:18,
132:17, 140:18,
147:8, 147:14,
182:20
**outcome**
190:18
**outside**
169:19
**over**
10:10, 16:12,
38:21, 82:20,
114:12, 128:22
**overflow**
151:4, 151:7
**owe**
160:15
**own**
106:14, 130:10
**oxsoju**
92:7

**P**

**p-r-o-c-e-e-d-i--
n-g-s**
6:1
**page**
4:3, 17:13,
17:17, 19:16,
19:19, 22:20,
30:20, 31:8,

31:19, 32:20,
33:7, 33:12,
34:7, 34:11,
34:16, 36:16,
37:20, 38:7,
41:2, 46:3,
46:5, 46:7,
48:12, 48:14,
52:13, 52:16,
56:14, 57:18,
57:21, 58:10,
59:11, 59:21,
60:3, 60:7,
60:10, 60:20,
63:2, 68:13,
78:1, 86:18,
86:19, 86:20,
99:2, 100:2,
100:9, 100:10,
100:11, 110:18,
110:19, 110:20,
112:14, 112:15,
126:5, 131:7,
132:2, 133:6,
135:7, 135:8,
140:3, 140:15,
155:18, 155:21,
177:4, 178:17
**pages**
1:37
**paid**
160:18
**papurt**
160:21, 163:5,
164:1, 164:8,
167:17, 169:20,
173:19, 174:1,
174:7, 175:4,
175:13, 186:11,
188:5
**papurt's**
162:12, 168:8
**paragraph**
28:16, 100:13,
103:3, 113:22,
114:1, 114:2,
114:3, 116:11,
117:13, 117:16,

118:7, 119:6,
120:11, 120:18,
120:20, 121:17,
122:7, 127:15,
166:13, 167:13,
168:5
**paragraphs**
102:21, 118:4
**park**
2:3
**part**
30:17, 57:8,
67:2, 67:3,
94:7, 94:11,
98:3, 128:18
**particular**
12:14, 173:5,
174:7, 178:16
**parties**
155:4, 157:5,
190:13, 190:16
**passed**
43:13, 158:4
**patrick**
94:21, 95:11,
95:13, 170:10
**paying**
157:2, 160:10
**payment**
160:13
**penalty**
7:21, 115:7
**people**
44:7, 47:10,
47:17, 48:2,
48:5, 54:9,
54:15, 65:5,
65:7
**peoples**
52:6
**pepsipu**
170:7
**perfect**
159:5
**performed**
34:21, 41:6,
41:14, 42:3,
83:18, 145:12

**performs**
82:19
**period**
27:2, 150:14,
152:14
**perjury**
7:21, 115:7
**person**
24:14, 77:7,
88:15, 90:14,
174:6
**personal**
30:11, 130:10,
131:13, 131:14
**personally**
118:1, 118:3,
118:8
**persons**
157:1
**pertain**
47:17, 56:21,
97:18
**pertaining**
54:13
**pertains**
45:14, 51:20
**pertark**
94:20
**philip**
160:21, 162:12,
163:4, 164:1,
173:18, 174:1,
174:7, 175:4,
175:13, 186:11
**phone**
151:21, 153:8,
153:13, 153:16,
153:20, 154:2,
154:6, 159:19,
160:5
**pick**
60:15
**piece**
171:20
**ping**
158:12
**place**
6:18, 54:9,

J.R.371

88:8, 188:10
**places**
111:16
**plaintiff**
1:9, 136:17,
183:7, 183:14,
185:8
**plaintiff's**
183:7, 183:13
**plaintiffs**
1:22, 3:3, 5:6,
7:2, 111:4,
133:11, 142:17,
172:16
**planet**
6:16, 7:16
**platform**
67:9, 170:17
**platforms**
148:11, 149:14,
149:17, 150:5,
150:7, 150:12,
171:9
**please**
6:20, 10:15,
30:21, 34:7,
46:3, 48:12,
52:13, 57:21,
138:11, 138:14,
155:7, 157:3,
186:6
**plotnick**
80:7, 156:13,
158:2
**plus**
76:1
**point**
27:11, 56:2,
57:10, 69:13,
71:8, 86:8,
99:5, 100:4,
100:17, 102:8,
103:13, 124:2,
126:20, 127:3,
133:21, 137:22,
142:3, 158:13,
169:22
**pointed**
177:3, 182:20

**populating**
36:7, 79:18
**portion**
143:3, 185:5
**possible**
55:2, 57:12,
57:13, 62:19,
75:21, 96:15,
96:19, 97:1,
97:3, 108:19,
115:4, 152:2,
154:8
**possibly**
39:9, 43:6,
43:8, 43:17,
57:21, 58:15,
58:20, 96:21,
150:3, 171:20
**post**
151:4, 151:7
**potentially**
13:19, 14:1,
14:12, 15:17,
16:4, 16:10,
16:20, 27:16,
27:19, 38:5,
40:15, 71:7,
84:8, 87:16,
91:5, 91:11,
102:4, 105:16,
116:12, 145:5,
145:13, 171:14
**power**
161:11
**pratt**
3:8
**prep**
77:5
**prepare**
19:8, 70:14,
104:13, 123:1
**preparing**
122:12
**prepping**
35:22
**present**
2:11
**presented**
111:4

**preservation**
98:17, 110:12,
112:21, 113:2,
113:17, 119:22,
163:3, 165:9,
166:12, 172:22,
186:8
**preserve**
27:15, 27:19,
53:5, 111:1,
125:8, 162:2,
162:6
**preserved**
32:8, 52:20,
116:14, 167:7
**presume**
140:20
**pretty**
50:13, 136:2,
137:20, 164:16
**preventing**
167:4
**previous**
10:13, 61:4,
61:7, 132:4,
171:3, 171:4
**previously**
30:13, 121:6
**printout**
77:16
**prior**
90:8
**privileged**
80:2
**probably**
51:15, 55:12,
55:14, 56:19,
57:15, 75:17,
81:19, 84:14,
87:21, 88:6,
89:20, 92:10,
92:14, 93:8,
94:4, 94:18,
101:9, 134:6,
142:6, 144:5,
147:22, 148:1,
151:20
**proceed**
8:3, 156:19,

157:4, 158:6,
159:2
**proceedings**
6:2, 69:20,
69:22, 146:14,
146:16, 166:2,
166:4
**produce**
18:16, 73:9
**produced**
73:7, 76:4,
77:12, 126:9,
134:3
**producing**
74:13, 75:22,
76:5
**program**
68:2
**project**
158:8
**property**
30:11
**protective**
112:20
**protocol**
48:22
**provide**
129:20, 154:15
**public**
2:21, 190:7
**pulled**
56:22
**purpose**
9:9, 9:14,
9:19, 70:17
**purposes**
72:19
**pursuant**
2:20, 131:14
**put**
101:12, 102:6,
108:9, 108:17,
161:2, 164:15,
165:14

---
**Q**
---

**qualify**
68:1, 115:8

J.R.372

**que**
169:10
**question**
28:12, 47:22,
64:7, 67:1,
143:6, 150:11,
163:21, 163:22,
171:5, 171:8,
172:10, 182:15,
182:19, 184:22,
185:4
**questions**
105:20, 172:10,
172:20, 172:21,
173:4, 177:11,
178:19, 184:7,
186:1, 186:5
**quote**
116:11, 116:15,
119:10, 120:20,
121:3, 121:19,
121:22, 136:22

**R**

**rachel**
2:12, 7:5,
155:1, 155:6,
157:13, 157:15
**ran**
147:8
**random**
53:10, 53:17,
53:21, 54:1,
54:7, 54:11,
54:12, 54:16,
55:5, 55:7,
55:11, 55:22,
56:4, 56:16,
57:9, 57:14,
62:2, 86:10,
95:15, 96:9
**range**
99:9
**rather**
111:2
**rc**
1:14, 3:14
**reached**
89:8

**reaction**
24:8
**read**
82:3, 98:20,
98:21, 142:12,
143:8, 183:4,
183:20, 189:3
**reading**
125:17, 143:3,
187:13
**real**
67:20, 156:4
**realize**
122:8
**really**
54:5, 66:20,
187:13
**reasonable**
136:19, 137:3,
183:16
**rebranded**
49:3
**recall**
11:5, 12:16,
15:2, 21:19,
24:19, 34:4,
35:19, 35:21,
36:2, 39:8,
40:2, 45:15,
45:18, 55:3,
55:6, 55:9,
57:4, 59:22,
63:17, 64:18,
64:19, 69:7,
75:21, 79:18,
81:14, 84:15,
88:3, 93:19,
99:1, 106:12,
106:15, 112:11,
112:18, 113:4,
122:14, 125:17,
126:19, 129:16,
132:18, 134:6,
137:7, 137:8,
148:8, 182:12,
184:21
**recalling**
83:12

**receive**
73:14
**received**
73:8, 73:15,
128:15
**recent**
155:7, 172:20
**recently**
75:18
**recessed**
69:20, 146:14,
166:2
**recognize**
17:19, 78:10
**recollection**
30:16, 36:13,
74:22, 80:21,
81:6, 81:12,
109:16, 109:20,
122:10, 182:22
**record**
7:8, 22:12,
69:16, 69:18,
70:4, 115:14,
146:12, 146:19,
165:20, 165:22,
166:8, 172:8,
172:15, 188:17,
188:19, 190:10
**recorded**
159:18
**records**
121:20
**recover**
49:14, 49:16,
49:20, 49:22
**recovered**
153:13, 153:17
**reddit**
150:20, 150:22,
151:1
**redirect**
70:7
**reduced**
190:9
**refer**
185:3
**reference**
14:18, 42:4,

178:20
**referenced**
127:14
**referred**
88:5, 88:9,
88:15, 88:21,
90:14
**referring**
47:19
**reflect**
18:10, 18:13,
81:22, 82:22,
84:12, 87:19,
95:18
**reflecting**
24:2, 80:15
**reflects**
20:20
**refresh**
30:16, 36:13,
80:21, 81:11,
109:20
**regard**
168:8, 173:18
**regarding**
126:8
**regular**
170:20
**relate**
48:1, 53:13,
66:18
**related**
14:16, 43:5,
44:17, 44:21,
45:2, 49:11,
51:15, 51:16,
53:20, 54:2,
54:4, 72:9,
72:12, 72:15,
83:5, 83:8,
83:13, 90:10,
93:1, 94:9,
94:14, 96:3,
96:10, 109:6,
109:11, 109:15,
126:22, 127:6,
127:7, 129:15,
152:14, 171:21,

J.R.373

190:12
**relates**
65:1, 66:6
**relating**
9:1, 129:6
**relationship**
64:12, 179:2,
181:10, 181:13
**relative**
190:15
**relevance**
11:9, 26:8,
34:4
**relevant-solend**
31:21, 32:22,
33:15
**remained**
13:1
**remember**
81:17, 111:3,
178:19
**reminded**
123:11, 123:12
**removed**
30:10, 89:20
**repeat**
16:6, 34:11,
47:21, 118:11,
143:5, 150:10,
171:8
**repeated**
37:9
**rephrase**
64:7, 67:1
**report**
159:19
**reported**
1:38
**reportedly**
153:8
**reporter**
7:15, 8:2,
17:4, 30:5,
46:1, 59:7,
76:18, 98:12,
108:12, 110:15,
112:5, 112:9,
125:15, 126:3,

131:3, 133:3,
135:5, 136:10,
139:8, 141:18,
144:16, 150:21,
151:2, 154:19,
165:18, 176:21,
190:1, 190:23
**represent**
6:21, 63:20
**representative**
157:1
**represented**
101:13, 147:1,
148:2
**representing**
6:16, 7:16,
155:3, 156:17
**request**
131:14, 132:20
**requested**
155:9, 156:19
**required**
67:22
**respond**
129:20, 147:5,
158:20
**responding**
156:12, 158:22
**responds**
156:8, 156:9
**response**
98:15, 139:10,
155:6, 173:8,
182:20, 183:3,
183:4, 183:6,
184:2, 184:6
**responses**
130:22, 182:3,
182:5, 183:14
**responsibility**
141:9
**responsible**
157:1, 157:5
**responsive**
29:19, 41:17,
43:20, 139:12,
142:15, 145:5,
183:17, 185:7

**restate**
17:8
**resulted**
83:19, 83:22
**resumed**
69:22, 146:16,
166:4
**return**
158:9
**reveal**
50:6
**review**
74:11, 81:21,
117:22, 126:17,
140:17
**reviewed**
126:8, 132:16,
133:17
**reviewing**
178:6, 178:8,
181:14
**revised**
115:17, 117:6
**right-hand**
46:10, 46:20
**rmr**
190:22
**robert**
1:13, 1:19,
3:13, 27:20,
32:8, 51:6,
51:17, 52:20,
72:9, 89:2,
89:7, 89:11,
89:12, 90:2,
97:2, 119:14,
127:5, 127:16,
128:19, 149:18,
151:9, 152:1,
153:5, 155:3,
155:4, 169:21,
170:4
**robert's**
30:10, 68:18,
126:1, 157:11
**roberts's**
51:10
**rodriguez**
7:15

**rodriquez**
1:38, 2:21,
190:2, 190:22
**rosenberg**
3:7
**roughly**
180:17
**row**
23:19, 44:12,
61:19, 66:5,
82:5, 83:4,
84:2, 84:22,
85:1, 85:2,
85:5, 86:22,
87:15, 92:6,
93:14, 94:19,
95:15, 95:20,
97:4, 97:9
**rows**
18:9, 18:10,
42:13, 60:15
**rpr**
190:22
**rubber**
31:1
**rubber-duck-debu-
gger**
145:11
**rubber-duck-debu-
gging**
12:20, 13:6,
14:19
**ruler**
23:11
**run**
67:19, 67:22,
175:14
**running**
67:13, 147:14

**S**

**s-h-e-e-t**
189:1
**s3v3rus**
40:6, 40:8,
97:5
**said**
33:15, 39:12,

J.R.374

Transcript of David Chen
Conducted on February 3, 2026

70

41:5, 100:9,
111:16, 113:10,
165:10, 171:7,
190:7, 190:10,
190:11
**sam**
1:6, 3:4,
142:17, 185:8
**same**
23:14, 24:3,
32:21, 33:7,
36:9, 38:7,
38:12, 41:2,
66:6, 84:19,
127:18, 134:18,
156:7, 179:11,
184:22, 189:4
**sammy**
170:7
**save**
23:15, 25:7,
41:10, 48:20,
49:3, 62:2,
62:5, 62:7,
82:7, 82:19,
84:5, 93:15,
95:15, 95:17,
96:4, 96:5,
96:10, 169:16
**saved**
27:1
**savings**
181:2
**savvy**
50:13
**saw**
13:4, 47:6,
111:13, 111:15,
136:3
**say**
12:1, 41:16,
58:15, 78:4,
91:6, 91:11,
94:21, 106:2,
114:3, 114:18,
118:15, 126:7,
127:9, 138:4,
138:13, 148:1,

148:4, 148:7,
151:5, 171:6,
187:2
**saying**
148:9, 156:2
**says**
17:13, 20:2,
20:8, 21:10,
22:7, 24:7,
24:11, 29:20,
31:21, 37:2,
51:14, 53:10,
56:18, 59:11,
61:4, 66:9,
78:18, 79:12,
82:18, 92:10,
97:6, 97:13,
99:7, 100:3,
103:3, 110:22,
114:19, 115:2,
132:10, 133:9,
135:14, 136:17,
138:17, 139:11,
142:14, 145:4,
156:9, 156:16,
158:3, 166:14,
166:19, 173:5,
183:6, 185:6
**school**
95:1
**screenshot**
164:20, 188:4
**screenshots**
162:6, 162:11,
168:10
**second**
9:11, 46:17,
59:9, 82:3,
99:4, 118:10,
118:13, 141:15,
157:17, 165:20,
182:3, 182:5
**security**
1:15, 3:14,
87:13
**see**
10:22, 17:14,
22:10, 23:7,

30:7, 30:14,
31:3, 31:12,
33:13, 36:17,
36:22, 37:7,
38:8, 50:1,
59:13, 60:10,
60:17, 61:1,
61:22, 63:3,
66:11, 68:11,
72:8, 72:11,
72:14, 75:10,
78:6, 78:18,
79:11, 84:6,
84:10, 86:13,
87:17, 92:8,
93:7, 93:9,
94:8, 94:13,
97:15, 99:11,
100:7, 100:19,
109:5, 124:1,
126:7, 126:12,
126:14, 132:10,
134:8, 136:3,
137:18, 139:15,
140:6, 142:19,
143:1, 143:8,
145:15, 153:12,
153:16, 155:11,
155:16, 155:22,
156:5, 156:7,
156:11, 156:14,
156:15, 157:9,
157:20, 158:10,
159:4, 166:13,
168:18
**seeing**
51:15
**seen**
22:11, 32:6,
76:8, 78:14,
136:5
**send**
73:16, 110:9,
138:13, 151:16,
157:14, 157:16
**sending**
90:9
**sends**
85:14

**sent**
19:5, 20:12,
23:13, 51:4,
77:11, 80:6,
80:10, 91:1,
108:20, 145:6,
174:18, 179:17,
180:7, 181:6
**sentence**
99:7, 100:12,
116:10, 118:7,
143:8
**sentences**
118:10, 118:13
**september**
38:11, 136:22,
139:13, 142:18,
183:19, 184:10,
185:9
**served**
38:14, 38:17,
69:12, 129:11,
143:15, 160:21
**server**
8:22, 42:20,
43:5, 43:9,
43:11, 43:19,
43:22, 44:4,
56:9, 103:2,
104:2, 105:7,
126:8, 133:10,
145:7
**servers**
99:10
**service**
146:8
**set**
182:3, 182:5,
182:6
**sets**
120:13
**settled**
129:3
**setup**
82:19
**seven**
175:1
**several**
114:7

J.R.375

Transcript of David Chen
Conducted on February 3, 2026

71

**sheet**
59:9, 59:10,
60:7, 61:4,
61:7, 61:8,
61:11, 61:15,
61:16, 63:7,
66:6, 85:22,
189:7
**shegan**
2:9, 6:15
**shit**
51:14, 52:1,
52:10
**short**
49:5
**should**
76:3, 78:4,
113:10, 118:9,
118:12, 118:16,
118:18, 119:1,
141:10, 147:5,
149:20, 168:22
**show**
15:16, 17:1,
19:4, 45:19,
59:4, 76:15,
124:6, 124:9,
124:11, 124:14,
124:17, 125:11,
130:19
**showing**
111:5, 121:20
**shows**
19:6
**signal**
98:6, 149:19,
160:20, 161:17,
164:4, 164:6,
166:21, 167:17,
169:6, 169:9,
169:12, 169:15,
169:18, 170:6,
170:9, 170:13,
170:22, 174:5,
175:3
**signature**
112:16, 120:7,
189:10

**signature-mig2k**
190:20
**signed**
140:19, 146:3,
189:7
**similar**
84:20
**simple**
115:11, 167:11
**simultaneous**
17:15, 22:18,
25:3, 65:9,
72:21, 77:21,
78:2, 79:21,
83:10, 86:17,
107:5, 114:17,
128:9, 128:14,
130:1, 139:19,
147:16, 168:20,
170:11, 178:22,
181:22, 182:13,
187:21
**since**
75:19, 127:22,
156:16, 158:4,
162:22, 163:7,
164:8, 168:15,
175:4
**single**
111:1
**sir**
8:3
**sits**
120:13
**sitting**
185:16
**six**
20:15
**slop**
53:20
**smeekynuggs**
170:14, 170:17
**smiling**
187:14
**snapshot**
123:17
**snapshots**
123:14, 123:22

**solana**
54:15, 54:17,
54:18, 55:1,
66:10, 66:14,
66:15, 66:16,
66:22, 67:8,
67:13, 67:17,
68:1
**sole**
43:1, 44:12
**solend**
9:2, 24:8,
25:4, 25:5,
25:10, 41:20,
42:4, 47:9,
47:18, 48:3,
48:20, 48:22,
49:3, 49:9,
54:20, 62:7,
62:10, 62:13,
62:14, 64:9,
64:13, 64:22,
66:18, 72:15,
84:5, 93:15,
95:17, 96:4,
119:15, 120:22,
169:16
**solend-liquidati-
ons**
9:17
**some**
13:1, 43:12,
52:19, 52:20,
53:1, 57:3,
61:18, 76:8,
80:18, 82:9,
82:13, 85:22,
86:7, 89:19,
91:13, 102:2,
102:3, 123:10,
172:10, 176:12
**somebody**
64:21, 95:9,
158:6
**someone**
124:8, 124:12
**something**
39:22, 80:6,

88:6, 89:14,
91:3, 92:4,
99:17, 102:10,
109:5, 128:11,
143:4
**soon**
157:19
**sorry**
15:18, 16:6,
34:11, 36:19,
39:1, 39:3,
46:4, 46:16,
47:21, 61:20,
74:4, 82:3,
83:8, 92:17,
94:17, 95:20,
97:9, 115:5,
118:11, 118:14,
128:7, 140:3,
142:12, 150:3,
150:10, 151:3,
155:21, 157:14,
171:7, 177:1
**sort**
185:3
**sorted**
59:12
**sounds**
8:8, 9:4,
10:17, 18:18,
19:1, 19:18,
20:18, 37:15,
38:2, 61:9,
68:21, 69:2,
83:2, 125:10,
153:10, 161:1,
165:13
**speak**
103:20
**speaking**
180:17
**specific**
14:3, 15:18,
24:13, 42:1,
57:10, 62:15,
64:18, 71:9
**specifically**
45:1, 45:3,

J.R.376

93:1, 155:9
**specifics**
93:19
**spell**
87:10
**spl-token-lending**
9:6
**spoken**
90:1, 137:4
**spreadsheet**
17:12, 17:19,
17:22, 19:7,
19:12, 20:1,
29:13, 36:7,
42:11, 59:10,
59:15, 59:18,
70:8, 70:10,
71:12, 76:22,
77:4, 77:8,
77:12, 77:17,
80:22, 81:18,
176:10
**spreadsheets**
4:4, 4:7, 4:8
**stack**
77:20, 77:22,
151:4, 151:6
**stacks**
77:15
**standard**
20:15
**standby**
6:4, 70:2,
146:18, 166:6
**start**
47:8, 82:5,
89:20, 156:3,
159:7, 175:20
**started**
178:4
**starting**
47:3, 172:19
**state**
2:21, 6:21
**stated**
185:17
**statement**
99:13, 99:22,

100:21, 101:2,
101:7, 102:17,
103:6, 103:9,
111:21, 115:9,
115:11, 115:19,
116:2, 116:5,
116:16, 117:2,
117:11, 121:4,
121:10, 122:4,
132:16, 133:17,
137:1, 137:6,
140:12, 140:22,
141:9, 143:15,
144:4, 144:7,
144:10, 163:10,
165:4, 188:8
**statements**
117:17, 118:4,
121:15, 122:6,
122:8, 122:16,
138:17, 138:19,
149:5, 149:6,
149:10, 172:2
**states**
6:8, 136:18,
183:14
**stay**
86:20
**stenotype**
190:8
**stephen**
80:7, 148:13
**steps**
8:14, 10:5,
11:8, 11:14,
49:14, 49:20,
50:1, 56:2,
153:12
**steven**
87:2, 87:5,
87:6, 87:15,
88:4
**still**
75:14, 172:15
**stop**
69:4, 141:12
**stopped**
61:11, 141:10,

154:5
**stopping**
138:9
**stops**
60:14
**stored**
114:5, 114:21
**street**
3:8, 3:18
**strict**
28:12
**strike**
14:9, 103:15,
105:12
**strong**
164:13, 164:14
**structure**
182:18
**stuff**
84:9
**subject**
183:6, 183:13
**submissions**
138:9
**submit**
115:17
**submitted**
98:22, 101:11,
101:17, 117:6,
122:16
**subpoena**
38:15, 38:16,
38:18, 129:11,
129:14, 129:20
**subpoenaed**
73:13
**subset**
65:3
**sued**
153:5
**suggest**
81:22, 96:9
**suite**
3:9, 3:18
**sum**
100:3, 100:16
**supervision**
190:9

**support**
48:20, 49:5,
49:6, 49:8,
84:5, 85:18,
112:19, 188:8
**suppose**
42:9, 49:13,
120:16, 144:1
**supposed**
74:13, 163:9
**sure**
10:21, 36:14,
41:18, 55:18,
71:10, 81:13,
82:5, 88:1,
94:11, 109:2,
110:5, 128:1,
134:19, 134:20,
136:2, 137:20,
142:13, 159:16
**surrounding**
39:21, 40:2,
52:7
**swap**
156:3, 156:4,
156:19
**switch**
164:15
**sworn**
7:17, 7:20,
190:6

**T**

**table**
110:16
**tag**
24:3
**take**
8:14, 10:5,
11:8, 31:1,
49:14, 49:20,
50:1, 56:2,
64:1, 69:15,
146:10, 153:12,
156:22, 161:5,
161:11, 161:16,
162:2, 162:5,
162:11, 164:19,

J.R.377

168:10
**taken**
128:11, 190:4, 190:8, 190:14
**takeout**
36:21, 37:10, 50:3, 50:6, 56:6, 59:11, 59:12, 74:2, 74:3, 74:5, 74:12, 74:17, 75:1, 109:1, 130:10
**taking**
6:17, 141:8
**talk**
44:7, 45:9, 54:15, 54:18, 54:20, 54:22, 55:7, 55:10, 55:13, 55:16, 65:5, 65:10, 66:3, 67:21, 88:7, 96:7, 106:19, 135:18, 140:11, 151:22, 152:4
**talked**
47:17, 48:3, 48:5, 48:10, 82:9, 89:1, 96:20, 121:15, 149:9, 152:7, 181:11
**talking**
43:19, 43:21, 44:4, 47:10, 51:14, 52:1, 52:10, 55:4, 65:14, 65:17, 67:8, 67:11, 102:1, 103:1, 111:17, 115:6
**talks**
105:1
**team**
23:15, 41:10, 41:21, 62:2,

62:5, 62:7, 62:8, 62:10, 82:7, 95:15, 95:16, 96:4, 96:5, 96:10, 169:16
**team's**
24:9
**tech**
66:10, 66:22, 153:20, 153:22, 154:5, 156:2, 160:10, 160:15
**technically**
149:20, 150:16, 186:22, 187:3, 187:4
**techniques**
58:21
**technologies**
156:20, 157:4
**teel**
153:20, 153:22, 154:5, 156:2, 156:20, 157:4, 160:10, 160:15
**telegram**
148:18, 149:19, 152:7, 152:11, 152:14, 152:18
**telephone**
2:7, 3:11, 3:20
**tell**
17:21, 18:19, 52:9, 66:13, 69:4, 75:9, 89:6, 93:5, 105:13, 107:7, 135:19, 136:2, 137:15, 137:22, 138:10, 149:17, 150:12, 158:15
**telling**
115:18
**terms**
173:19
**testified**
8:1, 47:13,

121:6
**testify**
7:21
**testimony**
47:12, 173:11, 173:14, 177:7, 178:3, 179:20, 182:22, 184:6, 189:4, 189:5, 190:5, 190:7, 190:11
**testnet**
66:9, 66:14, 66:16, 67:13, 67:15, 67:18, 67:19, 67:20, 68:1, 68:3
**text**
150:3, 150:4, 170:18, 170:20
**th**
3:18, 36:1, 51:13, 130:3, 142:5, 177:10, 178:4, 181:12, 183:19, 185:9
**thank**
17:10, 148:15, 151:2, 157:8, 169:5
**thanks**
159:5
**themselves**
6:21
**theory**
82:20
**thereafter**
190:8
**therefore**
186:19
**thereto**
190:16
**thereupon**
17:3, 30:4, 45:22, 59:6, 69:20, 69:22, 76:17, 98:11, 110:14, 112:8,

125:14, 126:2, 131:2, 133:2, 135:4, 136:9, 139:7, 141:17, 144:15, 146:14, 146:16, 154:18, 165:17, 166:2, 166:4
**thing**
19:6, 56:11, 65:6, 65:11, 65:14, 65:17, 165:3, 179:13
**things**
45:9, 54:4, 54:13, 64:8, 96:9
**think**
13:10, 14:15, 28:8, 36:6, 39:20, 41:16, 43:9, 43:17, 43:20, 45:1, 45:7, 50:19, 54:10, 55:17, 70:11, 71:21, 74:7, 77:3, 78:15, 79:15, 80:6, 80:9, 80:12, 83:5, 83:7, 83:9, 83:13, 84:17, 84:20, 85:7, 89:8, 89:18, 89:19, 90:21, 90:22, 91:1, 91:10, 91:13, 92:18, 98:20, 109:16, 111:9, 113:9, 114:10, 114:15, 117:20, 119:4, 122:9, 123:9, 123:21, 127:2, 128:5, 128:22, 129:1, 129:22, 130:8, 130:12, 134:1, 135:11, 136:5,

J.R.378

Transcript of David Chen
Conducted on February 3, 2026

74

137:11, 139:2,
140:13, 144:12,
146:9, 147:12,
148:2, 148:16,
148:18, 149:20,
150:6, 150:19,
151:3, 151:6,
151:15, 151:21,
152:6, 152:9,
154:14, 154:16,
160:11, 160:17,
170:5, 170:8,
171:7, 172:12,
177:17, 180:18,
181:1

**thinking**
122:19

**third**
9:16, 77:14,
77:20, 77:22,
118:10, 118:13,
126:13, 130:22,
144:18

**thought**
12:21, 40:14,
61:6, 73:19,
77:5, 107:19,
128:8, 128:13,
128:20, 128:21,
137:13

**thread**
4:20, 4:21,
154:21, 154:22

**three**
8:22, 77:15,
179:6

**through**
18:19, 19:11,
19:15, 37:19,
60:22, 61:21,
63:6, 68:9,
68:14, 72:4,
80:18, 122:9

**time**
6:13, 16:5,
20:14, 20:16,
20:17, 27:2,
27:8, 27:11,

28:5, 28:6,
28:8, 28:15,
36:5, 44:5,
44:16, 54:8,
56:3, 57:10,
69:19, 70:5,
76:9, 81:15,
81:17, 81:19,
81:20, 84:19,
90:5, 92:4,
103:13, 106:15,
111:9, 111:20,
111:21, 116:13,
116:20, 117:20,
124:3, 124:12,
126:21, 127:3,
128:3, 129:1,
129:8, 130:12,
133:22, 138:22,
142:3, 143:21,
146:6, 146:13,
146:20, 149:13,
151:21, 160:12,
166:1, 166:9,
180:13, 180:14,
180:16, 180:21,
184:8, 188:18

**timeframe**
177:8, 177:11

**times**
151:20

**timestamp**
180:2

**today**
6:15, 7:15,
28:6, 41:16,
56:9, 157:17,
185:16

**today's**
6:12

**together**
101:12, 108:9,
108:17

**told**
81:9, 89:12,
92:3, 93:20,
101:20, 104:12,
125:8, 133:20,

168:14, 171:19

**tong**
87:3, 87:5,
87:6, 87:15,
88:4, 148:13,
148:14, 148:15

**took**
11:14, 28:18,
30:9

**top**
17:13, 17:17,
41:2, 42:10,
58:10, 59:10,
60:10, 110:20,
121:3, 154:22

**topic**
53:19

**topics**
14:15, 14:17,
14:20, 14:21,
53:20, 150:8

**totally**
85:14

**touch**
157:19

**trading**
62:5

**transaction**
82:20

**transactions**
58:1, 58:17,
83:19

**transcript**
4:6, 4:16,
135:3, 136:6,
176:16, 177:4,
179:3

**transcription**
189:5

**transcripts**
136:4

**transfer**
184:9

**transferred**
136:21, 139:13,
142:16, 183:18,
185:8

**transperfect**
74:17, 74:19

**tried**
52:21, 85:12

**true**
29:12, 33:8,
57:13, 58:9,
103:6, 121:4,
122:1, 122:5,
135:16, 189:4,
190:10

**trust**
51:9, 163:9,
165:5

**truth**
7:22, 8:1

**truthful**
149:5

**trying**
64:8, 118:15,
119:4, 150:19,
153:14

**turn**
34:7, 46:3,
59:21, 65:22,
98:9, 110:18,
131:7, 153:14,
155:14, 155:18,
162:14, 162:17,
166:22, 167:6,
168:22, 169:4,
186:15, 187:5,
188:1, 188:3

**turned**
162:21, 168:14,
186:11

**tweet**
51:15

**two**
7:7, 26:17,
38:10, 39:6,
67:17, 89:20,
90:8, 102:21,
122:6, 122:20,
186:13, 188:9

**tydings**
3:7, 157:4

**type**
21:15

**typed**
22:4

J.R.379

**typewriting**
190:9

---U---

**uhm-hmm**
23:6, 23:12,
39:7, 41:3,
89:10, 186:7
**unaware**
136:20, 139:11,
142:15, 183:16,
185:6
**under**
7:21, 53:11,
79:19, 87:14,
115:7, 163:2,
179:15, 190:9
**understand**
39:18, 40:18,
43:17, 44:3,
44:20, 58:19,
116:1, 118:14
**understanding**
157:8
**understood**
41:13
**unique**
20:4, 20:5,
21:8
**united**
1:1, 6:8
**university**
2:5, 6:18
**unless**
180:4
**unlikely**
76:12, 96:19,
96:21, 97:1,
97:3
**unquote**
119:11
**unsure**
8:20, 10:3,
11:13, 27:17,
27:21
**until**
153:8, 154:4,
158:20

**update**
160:4
**updated**
117:4
**upper**
46:9
**use**
23:8, 30:12,
57:4, 150:12,
151:22, 169:6,
169:9, 169:12,
169:15, 169:18
**user**
82:19
**using**
30:12, 83:20
**utc**
20:14, 180:12,
180:16, 180:22

---V---

**validating**
66:21
**validation's**
68:2
**validator**
43:5, 66:15,
67:14, 67:16,
68:1
**validators**
66:9, 66:16
**value**
31:14, 64:10,
65:2
**various**
111:15, 159:1
**verbatim**
190:23
**verified**
141:22, 142:9
**verify**
117:17, 118:1,
118:3, 118:8,
118:19, 119:2,
122:15, 140:14,
144:6, 146:2,
165:4
**version**
120:22, 121:3

**versions**
123:20
**versus**
7:1, 7:2,
15:13, 28:1,
28:4, 29:10,
29:16, 30:2,
38:15, 69:12,
88:10, 153:5
**via**
170:18
**video**
6:13, 6:17
**videographer**
2:9, 6:4, 6:15,
7:14, 69:17,
70:2, 146:11,
146:18, 165:21,
166:6, 188:15
**videotaped**
6:6
**violated**
166:17, 167:13,
168:4
**voice-identify**
6:20
**volition**
106:14
**voluminous**
77:19

---W---

**wait**
39:3, 41:22,
74:4, 83:7,
92:16, 94:16,
148:8, 171:7
**want**
19:11, 23:9,
25:1, 32:15,
57:18, 65:22,
66:1, 66:3,
70:7, 98:8,
102:13, 102:16,
107:6, 110:18,
112:3, 113:1,
113:22, 130:19,
162:1, 168:3,

186:4
**washington**
3:19
**way**
16:2, 31:18,
58:13, 94:15,
120:14, 127:1,
138:7, 152:14
**we'll**
22:10
**we've**
68:8, 121:15,
149:9
**wednesday**
1:32
**week**
35:17
**went**
45:5, 45:7,
63:6, 94:21,
126:18, 132:17,
140:18
**weren't**
13:8, 61:10,
61:16, 72:4,
72:8, 72:11,
72:14, 72:18,
73:1, 184:12
**whatever**
84:20
**whatsapp**
150:16, 151:16,
151:22, 152:5
**whatsoever**
181:11
**whereupon**
6:2, 7:18
**whether**
8:15, 10:6,
10:22, 11:15,
12:9, 13:15,
13:19, 13:22,
16:2, 16:8,
16:19, 26:4,
26:17, 29:3,
30:17, 32:17,
35:11, 38:4,
56:3, 62:21,

J.R.380

Transcript of David Chen
Conducted on February 3, 2026

71:6, 72:8, 72:11, 72:14, 75:12, 94:9, 94:13, 103:17, 104:1, 105:11, 105:14, 109:5, 109:10, 109:14, 126:21, 134:5, 137:5, 167:21, 168:1, 168:3

**white**
156:12, 156:21, 158:1

**whole**
7:22

**winter**
74:12

**wish**
158:8

**withdraw**
147:3, 147:15

**withdrawal**
147:18

**withdrew**
148:5

**within**
15:15, 79:8, 99:9, 109:10

**witness**
5:2, 7:16, 8:11, 10:3, 10:17, 13:10, 28:8, 28:21, 46:7, 46:11, 46:14, 69:7, 98:2, 98:13, 101:4, 101:9, 102:19, 103:11, 110:16, 112:2, 113:4, 113:9, 117:20, 120:3, 120:16, 139:2, 141:2, 143:5, 143:18, 144:1, 147:5, 147:12, 148:7, 150:22, 151:3, 151:6, 154:8, 154:14,

158:18, 159:9, 159:14, 159:21, 160:8, 161:14, 164:4, 165:7, 165:13, 167:3, 167:9, 171:17, 172:12, 173:22, 175:6, 175:17, 181:17, 185:20, 186:22, 188:12, 190:4, 190:7, 190:11

**word**
29:19, 64:1, 164:13, 164:14

**words**
52:11, 79:19

**work**
24:20, 40:8, 47:3, 155:9, 156:20, 157:6, 159:2, 159:7

**worked**
40:11, 77:8, 95:3, 95:9, 97:6, 124:2, 124:5, 124:9, 124:12, 169:19

**working**
36:6, 47:4, 47:8, 123:15, 177:19, 178:5

**works**
62:10

**world**
138:17

**write**
23:18, 42:2, 43:7, 97:14, 120:4, 131:11, 138:10, 145:22

**writing**
72:2, 138:16

**written**
102:10, 156:18

**wrong**
180:5, 180:8, 180:9, 180:11

**wrote**
23:16, 25:12, 33:20, 39:14, 43:4, 44:15, 52:12, 82:16, 84:18, 101:21, 105:6, 111:10, 111:11, 116:11, 119:9, 120:20, 121:19, 141:3, 157:12, 158:21

**Y**

**yao**
1:4, 3:3, 6:7, 7:1, 7:12, 15:3, 15:6, 15:10, 17:6, 17:9, 27:12, 28:1, 28:4, 29:16, 30:2, 38:15, 76:16, 88:10, 133:10, 153:5, 183:9

**yao's**
182:2, 182:4

**yeah**
18:12, 24:3, 33:2, 33:4, 33:21, 37:18, 46:18, 57:11, 66:8, 73:22, 76:4, 76:7, 82:17, 83:2, 85:12, 87:4, 89:21, 89:22, 92:16, 94:2, 95:5, 96:6, 97:12, 99:12, 104:20, 105:20, 106:18, 107:22, 108:6, 109:18, 110:8, 114:9, 114:10, 122:2, 122:22, 123:21, 124:4, 124:22, 125:1, 125:3, 127:17, 129:10,

130:13, 132:7, 133:14, 138:3, 144:11, 150:1, 152:9, 164:4, 164:13, 168:21, 170:18, 170:21, 172:14, 179:18, 187:7, 187:17

**year**
36:3, 36:4, 36:9, 106:17

**years**
89:20, 90:8

**yep**
18:8, 119:8, 150:15

**yourself**
26:1

**Z**

**z-e-l-l-i-c**
87:11

**zellic**
87:7, 87:9

**zhang**
95:14, 170:10

**zone**
20:17

**zoom**
7:6

**$**

**$0**
92:7

**0**

**0**
86:13

**00020**
17:8

**00020276**
17:9

**00020726**
17:6

**00095239**
76:16

**00889**
1:11, 6:10

J.R.381

**01**
1:34, 6:3,
166:1, 166:3
**02**
6:14, 69:19,
69:21, 166:5,
166:9
**03628**
1:24, 6:11
**0xrooter**
169:10

---
**1**
---

**1**
156:8
**1,722**
99:8
**10**
4:13, 37:17,
42:16, 46:6,
46:22, 120:18,
122:7, 122:16,
125:21, 126:2,
131:1, 132:6,
136:13, 137:5,
137:9, 176:17,
177:10, 178:4,
181:12
**10,000**
16:12, 37:14,
38:1, 76:1
**101**
23:4, 24:4,
29:4
**102**
23:4, 23:19,
24:5, 29:4
**11**
4:14, 121:17,
122:7, 122:16,
131:2, 131:4,
131:5, 144:20,
144:21, 146:8,
156:1
**110**
4:10
**112**
4:11

**117**
98:10, 100:3,
100:12, 101:17,
102:22, 105:12,
105:13, 107:1,
138:11, 138:18
**12**
4:15, 51:13,
131:7, 131:9,
131:21, 133:1,
133:2, 133:4,
133:16
**122**
110:13, 112:4,
138:18, 138:19
**125**
4:12
**126**
4:13
**127**
132:22
**13**
4:16, 51:4,
77:13, 92:6,
110:10, 114:11,
133:16, 135:2,
135:4
**131**
4:14
**133**
4:15
**135**
4:16
**136**
4:17
**139**
4:18
**14**
4:17, 93:14,
131:21, 132:20,
136:8, 136:9
**141**
4:19
**144**
4:20
**15**
4:18, 84:2,
84:22, 85:1,

85:5, 139:4,
139:7, 139:20,
181:21, 182:2,
183:5
**154**
4:21
**16**
4:19, 70:1,
94:19, 141:16,
141:17, 142:1,
181:21, 182:1,
182:4, 185:1
**165**
4:22
**17**
3:18, 4:4,
4:20, 18:17,
70:5, 136:14,
136:15, 139:5,
139:10, 139:17,
140:7, 140:18,
141:15, 141:20,
142:8, 142:12,
142:14, 143:14,
144:14, 144:15,
144:22, 145:1,
153:9, 153:11,
154:17, 182:11
**17,000**
114:12, 135:10
**17,222**
8:6, 18:6,
18:13, 135:20
**17,223**
18:8, 18:9
**17183**
60:14
**17186**
60:16, 60:22,
68:14
**17187**
62:4, 62:21
**17188**
61:21
**17196**
61:21, 62:21
**172**
5:7

**17202**
66:5
**17205**
66:5
**17213**
63:3, 64:3
**17214**
63:3, 64:3
**17217**
60:22, 68:14
**17218**
61:3
**178**
34:7, 34:13,
34:14, 36:16,
38:7
**18**
4:21, 59:11,
59:12, 154:18,
155:16
**186**
5:9
**19**
4:22, 38:11,
165:16, 165:17,
166:11, 173:2,
186:6
**190**
1:37

---
**2**
---

**20**
95:15, 95:21,
95:22, 136:22,
139:13, 142:18,
183:19, 184:10,
185:9
**20006**
3:19
**202**
3:20
**2021**
44:8, 177:13,
177:15, 178:12,
181:15
**2022**
8:21, 19:14,
31:7, 42:15,

J.R.382

42:16, 47:15,
48:8, 120:21,
124:21, 125:2,
125:4, 136:22,
139:14, 142:18,
145:7, 145:10,
179:8, 179:11,
181:7, 183:19,
184:10, 185:9
**2023**
49:18, 51:4,
51:14, 153:2,
153:11
**2024**
10:9, 19:16,
23:14, 27:12,
31:6, 37:17,
37:20, 38:11,
38:17, 60:2,
68:10, 68:15,
68:16, 68:22,
74:17, 75:1,
75:12, 91:1,
131:12, 145:8,
153:9, 153:12,
160:22, 162:18,
164:8, 168:21
**2025**
18:17, 18:22,
21:21, 22:2,
36:10, 36:11,
45:20, 59:19,
74:12, 77:13,
81:11, 98:18,
99:18, 101:14,
101:18, 103:16,
104:1, 104:6,
104:9, 104:19,
109:3, 110:11,
114:11, 125:22,
132:1, 132:20,
135:2, 135:19,
136:13, 137:5,
137:10, 139:6,
140:2, 141:20,
143:14, 144:19,
146:7, 146:8,
154:5, 156:1,

158:3, 159:3,
162:18, 168:15,
175:1, 176:17
**2026**
1:32, 6:12,
154:1, 155:4,
158:21
**20783**
2:6, 6:19
**21**
23:14, 27:11,
97:4, 97:10,
97:11, 124:21,
154:5, 158:21,
159:12, 188:18,
188:19
**21202**
3:10
**22**
136:22, 142:18,
183:19, 184:10,
185:9
**2203**
53:7
**2204**
53:8
**23**
1:11, 6:10
**24**
1:24, 6:11,
16:15, 74:7,
74:8, 74:12
**2473**
56:16
**25**
49:18, 59:11,
59:12
**26**
82:5, 83:4,
85:2
**261**
3:20
**2622**
31:3, 31:4,
31:18
**2650**
31:19
**2664**
33:1

**2668**
33:1
**2671**
33:3
**2672**
33:3
**2674**
33:5
**2675**
33:5
**27**
10:9, 81:11,
101:14, 125:2,
130:3, 146:13,
146:15
**2710**
33:9, 33:10
**27110**
33:8
**2712**
33:13
**2714**
33:13
**2716**
33:13
**2720**
33:13
**2721**
33:13
**2724**
33:13
**2728**
33:14
**2799**
33:8
**28**
10:9, 46:3,
46:6, 46:18,
68:10, 68:16,
68:22, 98:18,
101:18, 103:16,
104:1, 104:6,
104:9, 104:19,
109:3, 130:3,
155:4, 177:4
**2890**
57:20
**29**
10:9, 31:6,

130:3, 135:2,
135:19, 144:19,
145:8, 146:8,
174:22
**2900**
58:10
**2902**
58:11
**2903**
58:11
**2920**
58:13
**2nd**
19:14

---
**3**
---
**3**
1:34, 6:3, 6:14
**30**
4:5, 18:22,
19:8, 19:16,
21:21, 22:2,
36:1, 36:11,
37:20, 59:19,
60:2, 61:12,
99:18, 130:5,
130:6, 130:16,
139:6, 140:2,
142:5, 146:7,
156:1, 162:18
**301**
2:7
**31**
60:15, 68:9,
68:15, 131:12
**3501**
2:5, 6:18
**3rd**
6:12, 19:14,
42:14

---
**4**
---
**4**
69:19, 69:21,
70:1, 70:5
**410**
3:11
**44**
146:17, 146:20

J.R.383

**45**
4:6, 86:22, 87:1, 87:15
**491**
59:21, 60:7, 68:13
**4th**
155:10, 159:3

**5**

**5**
59:11, 146:13, 146:15, 146:17, 146:20
**5-**
59:12
**531**
126:9
**56**
135:7, 135:8, 156:8
**59**
4:7

**6**

**6**
112:4, 138:18, 166:1, 166:3, 166:5, 166:9, 188:18, 188:19
**6,600**
10:10, 38:21
**60**
48:17, 49:15
**605**
3:18
**61**
48:17, 49:15
**618263**
1:36
**62**
48:17, 49:15
**6564**
3:20
**6783**
34:17, 40:22
**6789**
36:16, 38:8,

39:1
**6790**
38:8
**6791**
36:19

**7**

**71**
28:16, 30:1, 30:7, 127:15
**73**
51:3, 52:13, 52:16
**7300**
2:7
**751**
133:9
**752**
3:11
**76**
4:8
**78**
56:14

**8**

**83**
30:20
**84**
32:20
**85**
33:7
**86**
33:12
**8:-cv--tdc**
1:11, 1:24, 6:10, 6:11

**9**

**900**
3:18
**901**
3:9
**91**
57:18
**93**
61:19
**94**
61:19

**9700**
3:11
**98**
4:9
**985**
2:7

J.R.384

# Exhibit 8

J.R.385

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LI FEN YAO,
as Administrator of the Estate of Sam Mingsan
Chen

               Plaintiff,

    v.

ROBERT CHEN, OTTER AUDITS LLC, and RC
SECURITY LLC,

               Defendants.

Case No. 8:23-cv-00889-TDC

**DEFENDANTS' SECOND SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Local Rule 104 of the Local

Rules of the United States District Court for the District of Maryland, Appendix A to the Local

Rules of the United States District Court for the District of Maryland, and the Parties' agreement

during meet and confers, Defendants Robert Chen, Otter Audits LLC, and RC Security LLC, by

their undersigned attorneys, propound these Interrogatories to which Plaintiff Li Fen Yao as

Administrator of the Estate of Sam Mingsan Chen, shall respond fully, in writing and under oath,

within the time prescribed by the Federal Rules of Civil Procedure, in accordance with the

Instructions and Definitions set forth hereinafter.

**INSTRUCTIONS AND DEFINITIONS**

A.     These Instructions and Definitions are not intended to broaden or narrow the scope
of discovery permitted by the Federal Rules of Civil Procedure.

B.     The Uniform Instructions and Definitions for Use in Discovery Requests, as set
forth in Appendix D of the Local Rules for the U.S. District Court for the District of Maryland are
incorporated herein.

C.     For purposes of these interrogatories, the Relevant Period is February 1, 2022
through the Present.

1

J.R.386

D.    "Action" means the above-captioned proceeding.

E.    "David Chen" means David Yao Chen, son of Sam Mingsan Chen, and any of his representatives.

F.    "Li Fen Yao" means Li Fen Yao, widow of Sam Mingsan Chen (in her personal capacity), and any of her representatives.

G.    "Defendants" means Robert Chen, Otter Audits LLC, and/or RC Security LLC.

H.    "Estate" means the Estate of Sam Mingsan Chen, and includes any of its representatives, including its Administrator.

I.    "Otter Audits" means Defendant Otter Audits.

J.    "OtterSec" means OtterSec LLC and any of its representatives.

K.    "Philip Papurt" means the individual Philip Papurt, who used the alias "ginkoid" on Discord.

L.    "Plaintiff" means the Estate and its Administrator.

M.    "Robert Chen" means Defendant Robert Chen.

N.    "Sam Chen" means Sam Mingsan Chen and any of his representatives, including David Chen.

O.    "Representative" or "representatives" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

P.    "You" or "you" means the Plaintiff in this Action.

### INTERROGATORIES

1.  Identify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case.

2.  Identify with specificity what sources of documents You gathered for purposes of discovery in this case, including the name of any Discord guild (also known as a "server") and/or channel, and for each source, identify the date the documents from that source were collected and preserved.

3.  Identify all the Discord channels or servers that You claim "are irrelevant," *see* ECF 117, and that You claim are associated with 1,722 messages within the discovery range, *id.*, and also provide the Discord identification numbers associated with those channels and guilds (servers).

2

4.  Identify the "personal friend who was not involved with OtterSec," ECF 117, including the person's Discord username, real name, and address.

5.  Describe how and when David Chen deleted the more than 17,000 Discord messages in 2024. If he used several different mechanisms, describe each one specifically.

6.  Explain how David Chen determined which Discord messages to delete in 2024. If he made different determinations about deleting different messages or categories of messages, describe each determination.

7.  Did David Chen register, or cause to be registered, the domain ottersec.io?

8.  Describe any and all of David Chen's communications that reference "ottersec.io," by date, method of communication, the name and username of the person he communicated with, and a description of the communication.

9.  Identify by Discord username, real name, and address each user in the "group of users with whom David formed an on-line friendship in 2017." ECF 117.

10. For each entry in the spreadsheet produced to Defendants by Discord, which shows David's deletion of Discord messages and was produced to Plaintiff's counsel on January 31, 2025, identify: the name of the guild (server); the name of the channel; and for Direct Messages or Group Messages, identify the usernames of the person(s) in the group chat, or the username of the person to whom the Direct Message was sent (for Direct Messages).

11. Did David Chen delete messages on the Jito server about his work for, and/or his payments from, the Solana Foundation?

12. Identify the date and circumstances when Plaintiff learned that the Motorola "Moto E" telephone that David Chen had used from approximately August 2021 through April 2023 had "bricked" or otherwise malfunctioned, and explain what steps Plaintiff and/or David Chen took to repair or preserve the phone from that time up through May 2024.

13. Identify the date when David provided his Motorola "Moto E" phone to counsel and/or to a forensic examiner.

14. Explain the circumstances of David's Motorola "Moto E" phone becoming "bricked" in April 2023, as You have claimed, including what processes David ran on the phone prior to it "bricking" and when precisely it "bricked."

15. Identify the current location of the computer server "utilized" by OtterSec that is described by David Chen in his declaration at ECF 28-5, and whether the data on that server was preserved, collected and searched as part of discovery in this Action.

16. Identify all OtterSec clients with whom David Chen communicated about auditing, for the period after David Chen stopped working for OtterSec.

3

17. Identify any documents—including, but not limited to, Telegram and Discord messages—that are responsive to any Interrogatory or Document Request propounded by the Defendants at any point during this Action, and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation; a description of the document's content; the document's author/creator; when the document was destroyed, lost or transferred; and who was last in possession of the document(s).

18. Identify any and all person(s) with whom you have discussed this Action, other than Your counsel, and state the substance of those communications and those persons' contact information.

19. Identify by real name, username, and address David's previous "cofounder," to whom David refers in Discord messages to Philip Papurt, on April 23, 2022.

Dated: March 11, 2025                    Respectfully submitted,

      /s/ Rachel Clattenburg
Rachel Clattenburg
Joshua A. Levy
Kevin P. Crenny
Justin A. DiCharia
**LEVY FIRESTONE MUSE LLP**
900 17th St. NW, Suite 1200
Washington, DC 20006
Tel: (202) 845-3215
Fax: (202) 595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com
jdicharia@levyfirestone.com

*Counsel for Defendants*

4

## CERTIFICATE OF SERVICE

I certify that on March 11, 2025, I caused the foregoing Interrogatories to be served on counsel of record.

_/s/ Rachel Clattenburg_

J.R.390

# Exhibit 9

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LI FEN YAO, as Administrator of the Estate of Sam Mingsan Chen,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>　　　　　　Defendants.<br><br>---<br><br>ROBERT CHEN and OTTERSEC LLC,<br><br>　　　　　　Plaintiffs,<br>　　v.<br><br>DAVID CHEN,<br><br>　　　　　　Defendant. | Case No. 8:23-cv-00889-TDC |

**PLAINTIFF LI FEN YAO'S RESPONSES TO THE SECOND SET OF INTERROGATORIES OF DEFENDANTS ROBERT CHEN, OTTER AUDITS LLC, AND RC SECURITY LLC**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule 104 of the Local Rules of the United States District Court for the District of Maryland, Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), by her undersigned attorneys, hereby responds to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC, dated March 11, 2025, ("Interrogatories") as follows:

11406916.4

J.R.392

## GENERAL RESPONSES AND OBJECTIONS

The following general responses and objections are incorporated into each of Plaintiff's specific responses to the Interrogatories:

A.     These responses ("Responses") are being provided based upon documents and information presently available and known to Plaintiff. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek disclosure of information or documents protected by the attorney-client privilege, the work product doctrine or any other privilege, protection or immunity from discovery. Plaintiff's Responses do not include information which is privileged, protected or immune from disclosure. The inadvertent inclusion of any such information or material shall not constitute a general or specific waiver of any such privilege, protection or immunity from disclosure.

C.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to impose obligations that exceed those under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the

2

11406916.4

J.R.393

District of Maryland or applicable law. Plaintiff's Responses are limited to her obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

D.  Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that any specific interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific interrogatory. Any response or objection to any specific interrogatory shall be deemed to be part of any response or objection to any other specific interrogatory that is duplicative, repetitive or cumulative of it, whether or not such response or objection is specifically set forth therein.

E.  Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiff's possession, custody or control, and/or information within the possession, custody or control of non-parties over whom Plaintiff has no authority and/or control. Plaintiff is responding to the Interrogatories on her behalf only, on the basis of her personal knowledge and information within her possession, custody or control, and on information and belief to the extent her responses are based on knowledge or information possessed by David Chen.

F.  Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they are vague, ambiguous, overly broad, unduly burdensome, duplicative, repetitive, cumulative or not proportionate. Plaintiff will make a good faith effort to locate and provide information responsive to the Interrogatories, subject to any objections, in accordance with her obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

3

G.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information which is (i) already in the possession of the defendants; (ii) a matter of public record, (iii) as easily obtainable by the defendants from third-parties as it would be by Plaintiff and/or (iv) in Plaintiff's possession, custody or control only because such information has been provided to Plaintiff by other parties or non-parties through discovery or otherwise in this action.

H.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume or characterize, or are intended to assume or characterize, facts or law. These Responses shall not constitute an endorsement, admission, concession, agreement with or acceptance of any such assumptions or characterizations. Plaintiff expressly reserves, and does not waive, any objections to any characterizations of fact or law set forth in the Interrogatories.

I.      Plaintiff reserves all objections at any hearing or trial or on any motion to the use or admissibility of any information identified or disclosed herein.  The identification or disclosure of information does not constitute an admission by Plaintiff that such information is relevant to the action or admissible in evidence.

J.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information which is properly the subject of expert analysis or opinion or call for legal conclusions.

K.      Plaintiff objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case. Unless

4

11406916.4

J.R.395

otherwise stated in any specific response herein, these Responses are confined to the period of February 1, 2022 through December 31, 2023.

## RESPONSES TO INDIVIDUAL INTERROGATORIES

**Interrogatory No. 1:** Identify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 1 on the grounds that it seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).

**Interrogatory No. 2:** Identify with specificity what sources of documents You gathered for purposes of discovery in this case, including the name of any Discord guild (also known as a "server") and/or channel, and for each source, identify the date the documents from that source were collected and preserved.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 2 on the grounds that it seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).

11406916.4

J.R.396

**Interrogatory No. 3:** Identify all the Discord channels or servers that You claim "are irrelevant," *see* ECF 117, and that You claim are associated with 1,722 messages within the discovery range, *id.*, and also provide the Discord identification numbers associated with those channels and guilds (servers).

**Response:** Plaintiff objects to Interrogatory No. 3 on the grounds that it is unduly burdensome and overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020). Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to and incorporates herein the Excel spreadsheet included with her letter dated April 1, 2025, which was provided to Plaintiff by Discord and sets forth the identification numbers associated with the messages.

**Interrogatory No. 4:** Identify the "personal friend who was not involved with OtterSec," ECF 117, including the person's Discord username, real name, and address.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 4 on the grounds that it seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks irrelevant personal information regarding a non-party who is not alleged to have been involved with or have knowledge of the relevant facts and events; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing*

6

11406916.4

J.R.397

*(BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at \*75 (D. Md. July 27, 2020).

**Interrogatory No. 5:** Describe how and when David Chen deleted the more than 17,000 Discord messages in 2024.  If he used several different mechanisms, describe each one specifically.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 5 on the grounds that it is unduly burdensome and overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at \*66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at \*75 (D. Md. July 27, 2020). As further detailed in Plaintiff's letter dated April 1, 2025, the vast majority of the messages were sent outside of the relevant discovery period; others were sent on irrelevant servers and channels; and the remainder were either deleted within hours of being sent or were associated with the "Jito" server and thus irrelevant to this action and/or are already within Defendants' possession, custody or control.

**Interrogatory No. 6:** Explain how David Chen determined which Discord messages to delete in 2024.  If he made different determinations about deleting different messages or categories of messages, describe each determination.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 5 on the grounds that it is unduly burdensome and overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at \*66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23,

7

11406916.4

J.R.398

2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020). As detailed in Plaintiff's letter dated April 1, 2025, the vast majority of the messages were sent outside of the relevant discovery period; others were sent on irrelevant servers and channels; and the remainder were either deleted within hours of being sent or were associated with the "Jito" server and thus irrelevant to this action and/or are already within Defendants' possession, custody or control.

**Interrogatory No. 7:** Did David Chen register, or cause to be registered, the domain ottersec.io?

**Response:** Plaintiff objects to Interrogatory No. 7 on the grounds that it seeks irrelevant information. The domain ottersec.io has been the subject of Defendants' third-party subpoenas, and it is a publicly-available website that appears to be posting publicly-available information regarding this lawsuit seemingly obtained through the PACER system. Registration of the domain ottersec.io is irrelevant to any issue, claim or defense in this action.  Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, David Chen did not register, or cause to be registered, the domain ottersec.io.

**Interrogatory No. 8:** Describe any and all of David Chen's communications that reference "ottersec.io," by date, method of communication, the name and username of the person he communicated with, and a description of the communication.

**Response:** Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks irrelevant information; seeks discovery that is not proportional to the needs of the case; and seeks information protected from discovery by the attorney-client privilege and the work product doctrine. The domain ottersec.io has been the subject of Defendants' third-party subpoenas, and it is a publicly-available website that appears to be posting publicly-available information regarding this lawsuit seemingly obtained through the PACER system. The domain ottersec.io is irrelevant to any issue, claim or defense in this action.  Notwithstanding and without waiving these objections, and subject

8

11406916.4

to Plaintiff's general responses and objections, to the best of Plaintiff's knowledge and after making reasonable inquiry, Plaintiff identifies and incorporates herein the communication which has been produced at YAO00007568.

**Interrogatory No. 9:** Identify by Discord username, real name, and address each user in the "group of users with whom David formed an on-line friendship in 2017." ECF 117.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 9 on the grounds that it is unduly burdensome and overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks irrelevant personal information regarding non-parties who are not alleged to have been involved with or have knowledge of the relevant facts and events; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery," for which there is no basis, regarding a group of Discord users who are not alleged to have been involved with or have knowledge of the relevant facts and events, and with whom David communicated regarding irrelevant topics. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).

**Interrogatory No. 10:** For each entry in the spreadsheet produced to Defendants by Discord, which shows David's deletion of Discord messages and was produced to Plaintiff's counsel on January 31, 2025, identify: the name of the guild (server); the name of the channel; and for Direct Messages or Group Messages, identify the username of the person(s) in the group chat, or the username of the person to whom the Direct Message was sent (for Direct Messages).

**Response:** Plaintiff objects to Interrogatory No. 10 on the grounds that it is unduly burdensome; overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; seeks irrelevant personal information regarding non-parties who are not alleged to have been involved

9

with or have knowledge of the relevant facts and events; and seeks irrelevant information and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at \*66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at \*75 (D. Md. July 27, 2020). Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to and incorporates herein the Excel spreadsheet included with her letter dated April 1, 2025, which was provided to Plaintiff by Discord and sets forth the identification numbers associated with the messages, and states that much of the information sought by this Interrogatory No. 10 can be obtained by Defendants on the basis of those identification numbers.

**Interrogatory No. 11:** Did David Chen delete messages on the Jito server about his work for, and/or his payments from, the Solana Foundation?

**Response:** Plaintiff objects to Interrogatory No. 11 on the grounds that it seeks discovery Defendants already have, is unduly burdensome and not proportional to the needs of the case. Robert Chen was a member of the Jito server and, in response to Plaintiff's requests, Defendants have produced copies of David's messages spanning the period of February 2022 to March 2023. Defendants also appear to have David Chen's messages from the Jito server beyond March 2023, as evidenced by the fact that (a) Defendants' letter dated October 28, 2024, referenced and attached such messages from April 2023, and (b) Defendants' letter dated February 4, 2025, confirmed that they "have a copy of what existed [on the Jito server] in the Spring of 2024." As detailed in Plaintiff's letter dated April 1, 2025, and the accompanying Excel spreadsheet, all Jito messages from the relevant time period that were deleted, with the exception of two messages that were deleted within hours of being sent, were deleted in July 2024. Plaintiff further objects to

10

11406916.4

Interrogatory No. 11 on the grounds that it seeks irrelevant information; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020). Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, David Chen has not worked for the Solana Foundation.

**Interrogatory No. 12:** Identify the date and circumstances when Plaintiff learned that the Motorola "Moto E" telephone that David Chen had used from approximately August 2021 through April 2023 had "bricked" or otherwise malfunctioned, and explain what steps Plaintiff and/or David took to repair or preserve the phone from that time up through May 2024.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 12 on the grounds that it is unduly burdensome; overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis, particularly in light of the fact that there is no evidence that any relevant information has been lost as a result of the failure of the phone. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).

11406916.4

J.R.402

**Interrogatory No. 13:** Identify the date when David provided his Motorola "Moto E" phone to counsel and/or to a forensic examiner.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 13 on the grounds that it seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis, particularly in light of the fact that there is no evidence that any relevant information has been lost as a result of the failure of the phone. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).

**Interrogatory No. 14:** Explain the circumstances of David's Motorola "Moto E" phone becoming "bricked" in April 2023, as You have claimed, including what processes David ran on the phone prior to it "bricking" and when precisely it "bricked."

**Response:** Plaintiff objects to Interrogatory No. 14 on the grounds that it is unduly burdensome; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis, particularly in light of the fact that there is no evidence that any relevant information has been lost as a result of the failure of the phone. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020). Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable

11406916.4

inquiry, in or around late April or May 2022, David Chen flashed or reset his Motorola "Moto E" phone while attempting to install a new operating system. After his attempt was unsuccessful, he reset the phone to a factory setting, following which the phone worked until in or around March 2023.

**Interrogatory No. 15:** Identify the current location of the computer server "utilized" by OtterSec that is described by David Chen in his declaration at ECF 28-5, and whether the data on that server was preserved, collected and searched as part of discovery in this Action.

**Response:** Plaintiff objects to Interrogatory No. 15 on the grounds that it seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).

**Interrogatory No. 16:** Identify all OtterSec clients with whom David Chen communicated about auditing, for the period after David Chen stopped working for OtterSec.

**Response:** Plaintiff objects to Interrogatory No. 16 on the grounds that it is unduly burdensome, vague and ambiguous; and seeks irrelevant information. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, she does not know "all OtterSec clients" being referenced in this interrogatory but is unaware of any communications that took place between David Chen and any "OtterSec clients" about auditing after David Chen stopped working for OtterSec.

**Interrogatory No. 17:** Identify any documents – including, but not limited to, Telegram and Discord messages – that are responsive to any Interrogatory or Document Request propounded by

13

11406916.4

J.R.404

the Defendants at any point during this Action, and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation; a description of the document's content; the document's author/creator; when the document was destroyed, lost or transferred; and who was last in possession of the document(s).

**Response:** Plaintiff objects to Interrogatory No. 17 on the grounds that it is unduly burdensome, vague ambiguous; overly broad; seeks information protected from discovery by the attorney-client privilege and the work product doctrine; seeks discovery that is not proportional to the needs of the case; and seeks irrelevant and improper "discovery on discovery" for which there is no basis. *See Fish v. Air & Liquid Sys. Corp.*, 2017 U.S. Dist. LEXIS 24188, at *66 (D. Md. Feb. 21, 2017) (citing *Banks v. St. Francis Health Ctr., Inc.*, 2015 U.S. Dist. LEXIS 157752 (D. Kan. Nov. 23, 2015)); *see also In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Products Liability Litig.*, 2020 U.S. Dist. LEXIS 133549, at *75 (D. Md. July 27, 2020).  Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, she is unaware of any relevant documents that were destroyed, lost or transferred on or after September 20, 2022.

**Interrogatory No. 18:** Identify any and all person(s) with whom you have discussed this Action, other than Your counsel, and state the substance of those communications and those persons' contact information.

**Response:** Plaintiff objects to Interrogatory No. 18 on the grounds that it is unduly burdensome, vague, ambiguous, overly broad, and seeks discovery that is not proportional to the needs of the case, particularly insofar as it asks Plaintiff to identify everyone she discussed this Action with regardless of the nature, substance or significance of those discussions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, other than counsel and to the best of her recollection, Plaintiff has had substantive discussions regarding this Action with David Chen, c/o Stephen Plotnick, Carter

14

11406916.4

Ledyard & Milburn LLP, 28 Liberty St., 41st Fl., New York, NY 10005, (212) 732-3200, plotnick@clm.com.

**Interrogatory No. 19:** Identify by real name, username, and address David's previous "cofounder," to whom David refers in Discord messages to Philip Papurt, on April 23, 2022.

**Response:** Plaintiff objects and declines to respond to Interrogatory No. 19 on the grounds that it seeks discovery that, to the best of Plaintiff's knowledge and after making reasonable inquiry, seeks discovery that is irrelevant and not proportional to the needs of the case because the referenced business relationships pre-dates, and is unrelated to, OtterSec or any issue, claim or defense in this action.

15

11406916.4

J.R.406

Dated:  April 10, 2025

CARTER LEDYARD & MILBURN LLP

By: _Stephen Plotnick_____

        Stephen M. Plotnick, *pro hac vice*
        Alexander G. Malyshev, *pro hac vice*
        Madelyn K. White, *pro hac vice*
        Kevin M. Simpson, *pro hac vice*

28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
malyshev@clm.com
white@clm.com
simpson@clm.com

-and-

BARKLEY & KENNEDY

By: _Daniel Kennedy_____

        Daniel M. Kennedy, III
(signed by Stephen M. Plotnick with the
permission of Daniel M. Kennedy, III)

51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600
dkennedy@barkenlaw.com

*Attorneys for Plaintiff Li Fen Yao*

16

11406916.4

J.R.407

## VERIFICATION

I, Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, state that I am the Plaintiff in this Action. I have read the foregoing Response to Defendant Robert Chen's First Set of Interrogatories and, based on reasonable inquiry, including communications with David Chen, believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: April 10, 2025

Li Fen Yao

17

11406916.4

J.R.408

## CERTIFICATE OF SERVICE

I certify that on April 10, 2025, I caused the foregoing Responses to Defendant Robert

Chen's First Set of Interrogatories to be served on counsel for Defendants via email.

*Stephen Plotnick*

_____

Stephen M. Plotnick

11406916.4

J.R.409

# Exhibit 10

J.R.410

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>    Defendants. | Case No. 23-cv-00889-TDC |

**PLAINTIFF LI FEN YAO'S AMENDED RESPONSES TO THE SECOND SET OF
INTERROGATORIES OF DEFENDANTS ROBERT CHEN,
OTTER AUDITS LLC, AND RC SECURITY LLC**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 and

Appendix A of the Local Rules of the United States District Court for the District of Maryland,

Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), submits

the following amended responses to the Second Set of Interrogatories of Defendants Robert Chen,

Otter Audits LLC, and RC Security LLC, dated March 11, 2025 ("Interrogatories"):

**<u>GENERAL RESPONSES AND OBJECTIONS</u>**

Plaintiff makes the following general responses and objections to the Interrogatories and

incorporates them into each of her specific responses below. An assertion of the same, similar or

additional objections in response to any Interrogatory does not waive any of these general

responses and objections as to that or any other Interrogatory. Plaintiff's failure to object to a

specific Interrogatory on a particular ground shall not be construed as a waiver of her right to

object on any ground.

11419712.7

J.R.411

A.      These responses ("Responses") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Plaintiff after reasonable inquiry. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Plaintiff's Responses are being made in accordance with the applicable requirements.

C.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Plaintiff further object to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Plaintiff.

D.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to,

2

information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Plaintiff does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Plaintiff's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Plaintiff expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of her attorneys (or by her attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege

E.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Plaintiff's response to an Interrogatory does not mean that Plaintiff agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Responses are not intended to be and shall not be deemed as an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.      Plaintiff is providing these Responses without waiver of, or prejudice to, her rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Responses or any document produced pursuant to these Responses; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to

11419712.7

J.R.413

the Interrogatories. Plaintiff's Responses are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.      Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Plaintiff specifically reserves the right to amend her response to any specific Interrogatory at the conclusion of expert discovery.

H.      Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of the defendants.

J.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiff's possession, custody or control, and/or information within the possession, custody or control of others over whom Plaintiff have no authority and/or control.

K.      Plaintiff objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case.

4

11419712.7

J.R.414

## RESPONSES TO SPECIFIC INTERROGATORIES

**Interrogatory No. 1:** Identify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case.

**Response:** Plaintiff objects to the terms "steps" and "step" in Interrogatory No. 1 on the grounds that they are open to more than one interpretation and, therefore, ambiguous.  Notwithstanding and without waiving this objection, Plaintiff is assuming a reasonable meaning of these terms for purposes of this response and, subject to her general responses and objections, responds to Interrogatory No. 1 as follows:

Beginning by no later than June 2022, and continuing thereafter, Plaintiff undertook reasonable and good faith efforts to identify, preserve or ensure the preservation of all evidence and sources of evidence that she knew, reasonably foresaw or otherwise understood to be potentially relevant to this action or which was likely to contain evidence potentially relevant to this action. This included preserving and not deleting potentially relevant emails maintained in her personal email account and preserving her personal mobile phone. To the best of Plaintiff's knowledge, Sam Chen also preserved and did not delete potentially relevant emails maintained in his personal email account and his personal mobile phone. Plaintiff continued to preserve Sam Chen's personal mobile phone and emails following his passing in a car accident on July 13, 2022, and has also preserved additional, potentially relevant documents including documents concerning Sam Chen's Estate and the administration of Sam Chen's Estate.

David Chen has preserved his personal computers, drives, servers, and storage devices; documents (including tax returns) relating to his income and sources of income; YubiKey and Ledger wallet; social media accounts; computer code maintained on Github; blockchain wallets and private keys; archived versions of OtterSec-related Discord channels; Discord messages that he knew, reasonably foresaw or otherwise understood to be potentially relevant; Telegram

5

11419712.7

J.R.415

messages that he knew, reasonably foresaw or otherwise understood to be potentially relevant; and emails that he knew, reasonably foresaw or otherwise understood to be potentially relevant. David Chen further preserved his Motorola Moto E mobile phone and the mobile phone that he purchased as a replacement after his Motorola Moto E ceased functioning.

Neither Plaintiff, Sam Chen, nor David Chen maintained, implemented or utilized a routine or automatic document destruction policy or procedure.

Following the Court's decision denying Defendants' Motion to Dismiss on March 11, 2024, and the entry of a Scheduling Order on March 26, 2024, Plaintiff and David Chen began working with an e-discovery vendor, in coordination with their counsel, to collect and preserve for purposes of discovery in this action evidence that they knew, reasonably foresaw or otherwise understood to be potentially relevant to this action, the first of which was completed on April 19, 2024. Plaintiff refers to and incorporates her response to Interrogatory No. 2 below for the additional details of the collections, including dates and sources.

**Interrogatory No. 2:** Identify with specificity what sources of documents You gathered for purposes of discovery in this case, including the name of any Discord guild (also known as a "server") and/or channel, and for each source, identify the date the documents from that source were collected and preserved.

**Response:** Plaintiff objects to the phrase "with specificity" in Interrogatory No. 2 on the grounds that it is open to more than one interpretation and, therefore, ambiguous. Notwithstanding and without waiving this objection, Plaintiff is assuming a reasonable meaning of the phrase and, subject to her general responses and objections, provides the following information in response to Interrogatory No. 2:

6

11419712.7

J.R.416

| Custodians and Sources | Collection Date(s) |
|---|---|
| David Chen's email accounts likely to have potentially responsive and relevant material:<br><br>• davidcheno@protonmail.com, which includes the following alias accounts: davidchen0@proton.me, radiantaeon@proton.me, reddit_throwaway125@proton.me, craigslist_15125@proton.me, wendigo55129@proton.me, adjacentfi@proton.me, commonappdc@proton.me, contact@adjacent.fi, davidchen501295@proton.me, and tinder1525@proton.me | April 19, 2024 |
| Export of Discord channels and direct messages from David Chen's Discord account likely to have potentially responsive and relevant material, as of February 18, 2024: *See* Spreadsheet attached as Exhibit A for list of channels. | April 23, 2024 |
| David Chen's Telegram account: all private channels and direct messages, as of February 18, 2024 | April 23, 2024 |
| Mobile phones:<br>• David Chen's Motorola Moto E phone<br>• Sam Chen's mobile phone<br>• LiFen Yao's mobile phone<br>• David Chen's Google Pixel phone | June 10, 2024 (Sam Chen's and Plaintiff's mobile phones, David Chen's Motorola Moto E phone)<br><br>June 14, 2024 (David Chen's Google Pixel phone) |
| LiFen Yao's email account, Lifen1299@yahoo.com | June 12, 2024 |
| Sam Chen's email account, Smchen90@hotmail.com | June 12, 2024 |

7

11419712.7

J.R.417

| | |
|---|---|
| Export of Discord channels and direct messages from David Chen's Discord account, as of October 17, 2024: *See* spreadsheet attached as Exhibit B for list of channels. | October 21, 2024 |
| "Take-out" of David Chen's Discord messages from servers and channels, including direct messages, to which David Chen was a party, as of July 31, 2024: *See* spreadsheet attached as Exhibit C for list of channels. | October 29, 2024 |
| Email accounts of David Chen:<br>• realawesomenessisreal@gmail.com<br>• RealAwesomeness@outlook.com<br>• RealAwesomeness@protonmail.com<br>• minecraft15230987@outlook.com<br>• Dc0910758@gmail.com<br>• RealAwesomeness@protonmail.com | October 29, 2024 |
| David Chen's Twitter/X account | October 31, 2024 |
| Email accounts of David Chen:<br>• Datingapp15@protonmail.com<br>• Test109000@protonmail.com | November 5, 2024 |
| David Chen's computers:<br>• Linux desktop<br>• Linux laptop<br>• Alienware laptop<br>• Samsung 980 PRO | December 13, 2024 |
| David Chen's NVMe drive | December 17, 2024 |
| David Chen's WD MyBook (which is a backup of David Chen's PC) | December 18, 2024 |

8

11419712.7

J.R.418

| | |
|---|---|
| David Chen's GitHub account, except for repositories in organizations | February 18, 2025 |
| Export of David Chen's Discord account, as of January 9, 2025:<br>*See* spreadsheet attached as Exhibit D for list of channels. | January 21, 2025, January 30, 2025, February 20, 2025, and March 12, 2025 |
| Export of David Chen's Discord account, as of February 11, 2025:<br>*See* spreadsheet attached as Exhibit E for list of channels. | February 20, 2025 |
| David Chen's Samsung 980 PRO (also preserved on December 13, 2024), Mushkin Helix, three additional Samsung 980 PROs, and back-up external drive | February 24, 2025 |
| David Chen's Telegram account | March 18, 2025 |
| Screenshots of David Chen's GitHub account | April 4, 2025 |
| David Chen's GitHub account - all repositories | April 8, 2025 |

**Interrogatory No. 3:** Identify all the Discord channels or servers that You claim "are irrelevant," *see* ECF 117, and that You claim are associated with 1,722 messages within the discovery range, *id.*, and also provide the Discord identification numbers associated with those channels and guilds (servers).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff provides the following information in response Interrogatory No. 3:

| Channel or Server | Discord ID | Number of Messages |
|---|---|---|
| crypto-discussion in AltTank | 4246356983317779082 | 1 |
| Direct Message with kern5099#0 | 837609653075443763 | 1 |

9

| | | |
|---|---|---|
| Direct Messages with morericekara#0 | 769194866688524327 | 22 |
| Direct Message with mr_cahar#0 | 1136699777619341322 | 2 |
| food-pr0n in AltTank | 759813205517271091 | 2 |
| gamez-n-memez in AltTank | 877759997210144798 | 1 |
| general-just-general in AltTank | 761239447369941102 | 4 |
| industry-news in Save Team | 1141579079632552057 | 3 |
| sol-ecosystem-chat in AltTank | 840598469068587012 | 2 |
| trading-talk in AltTank | 438430983075790850 | 7 |
| Kusuriya no Hitorigoto | 1075601030261260288<br>1162495256525291562<br>690813121115455500<br>690813625526648862<br>690822555820621845<br>690822665954394183<br>690823830964535318<br>690823982508802090<br>692385750590816286<br>785583981600702495<br>786048737021526026<br>806352809762357338 | 472 |
| New clickbait | 471845879695802370<br>787328307309445140<br>788144360738259004<br>788502936141299712<br>788861446833700947<br>808494121806856232<br>818669129728917565<br>833850599359250462<br>858162636142673921 | 1,204 |

10

11419712.7

J.R.420

| | 859070020364271616 | |
| | 897979229768130572 | |
| | 927293274161549372 | |
| parrot.fi | Parrot Finance | 837609653075443763 | 1 |

**Interrogatory No. 4:** Identify the "personal friend who was not involved with OtterSec," ECF 117, including the person's Discord username, real name, and address.

**Response:** Plaintiff objects to Interrogatory No. 4 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced "personal friend" is Marissa Liu, 14201 Dav Rd., Rockville, MD 20850, and that her Discord username is morericekara.

**Interrogatory No. 5:** Describe how and when David Chen deleted the more than 17,000 Discord messages in 2024. If he used several different mechanisms, describe each one specifically.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David Chen installed a script from Github called "undiscord," (available at https://github.com/victornpb/undiscord) on or about July 28, 2024, and used it to delete messages in 2024 as follows: (a) on July 28 and 29, 2024, he deleted all of his messages in "Kusuriya no Hitorigoto" (2,050 messages); (b) on July 29, 2024, he deleted all of his messages sent after August 5, 2022, in Jito (768 messages); (c) on July 29 and 30, 2024, he deleted all of his messages in "new clickbait" (1,927 messages); and (d) on July 30, 2024, he deleted all of his messages in "dead meme" (1,899 messages). Between October 10 and 28, 2024, David Chen also deleted, using the same script, all of his messages with "closetduck" sent before January 1, 2022 (10,430 messages). On October 29, 2024, David Chen deleted 1 message in "advice-help in Cal 3 (Math241)." On May 19, 2024, David Chen deleted 22 messages with "morericekara." The remaining 44 messages David deleted

in 2024 were deleted on an individual basis, and all 44 were deleted within twenty-four hours of being sent.

**Interrogatory No. 6:** Explain how David Chen determined which Discord messages to delete in 2024. If he made different determinations about deleting different messages or categories of messages, describe each determination.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the messages that were deleted by David Chen in 2024 on an individual basis within twenty-four hours of being sent were generally deleted because they were sent in error. The other messages, which were sent by David at various times between the ages of 12 and 19, concerned highly personal or intimate matters, or involved crude, unfiltered or boastful conversations and discussions. David Chen deleted these messages because he was embarrassed by them, and did not believe them to be potentially relevant to the parties' claims or defenses.

**Interrogatory No. 7:** Did David Chen register, or cause to be registered, the domain ottersec.io?

**Response:** Plaintiff objects to Interrogatory No. 7 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen did not register, or cause to be registered, the domain ottersec.io.

**Interrogatory No. 8:** Describe any and all of David Chen's communications that reference "ottersec.io," by date, method of communication, the name and username of the person he communicated with, and a description of the communication.

**Response:** Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff identifies the communications which have been produced at YAO00007568, which are Discord messages between David Chen (username, "radiantaeon") and Robert Chen (username, "notdeghost") from February 6, 2022, that include a reference to "ottersec.io" as follows: "but our domain isn't

12

ottersec.io." To the best of Plaintiff's knowledge and after making reasonable inquiry, Plaintiff is unaware of any other responsive communications.

**Interrogatory No. 9:** Identify by Discord username, real name, and address each user in the "group of users with whom David formed an on-line friendship in 2017." ECF 117.

**Response:** Plaintiff objects to Interrogatory No. 9 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that "alttank" is the referenced "group of users with whom David formed an on-line friendship in 2017." The Discord user names of the members of the group are: hensonkraj, trial123, jriggs28, cmallory183, _dznutz_, kott7795, mentaldragon13, dragoon316, trainman, blunto., dfisherman12, hoser5283, 6665sted666, greg.icemining, bill_i_am, adu6, bigassboy., dk808, tim4093, guido8798, joe3kool, oskar_the_ork, porterhousegamer, randomtask6236, smashnbash4651, stilger, sexeast, thebee6035, and xtrmil. Plaintiff does not know, and despite reasonable inquiry and investigation has been unable to discern, the real names and addresses of each user in this group.

**Interrogatory No. 10:** For each entry in the spreadsheet produced to Defendants by Discord, which shows David's deletion of Discord messages and was produced to Plaintiff's counsel on January 31, 2025, identify: the name of the guild (server); the name of the channel; and for Direct Messages or Group Messages, identify the username of the person(s) in the group chat, or the username of the person to whom the Direct Message was sent (for Direct Messages).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff refers to and incorporates herein the spreadsheet attached hereto as Exhibit F, which delineates the information responsive to Interrogatory No. 10.

**Interrogatory No. 11:** Did David Chen delete messages on the Jito server about his work for, and/or his payments from, the Solana Foundation?

**Response:** Plaintiff objects to Interrogatory No. 11 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that David

13

11419712.7

J.R.423

Chen has not worked for the Solana Foundation.  Plaintiff further states that David asked in the Jito discord about over the counter selling of a large sum of locked Solana tokens that were payment to him from the Solana Foundation for finding a bug in Solana's code and that these messages were deleted.

**Interrogatory No. 12:** Identify the date and circumstances when Plaintiff learned that the Motorola "Moto E" telephone that David Chen had used from approximately August 2021 through April 2023 had "bricked" or otherwise malfunctioned, and explain what steps Plaintiff and/or David took to repair or preserve the phone from that time up through May 2024.

**Response:** Plaintiff objects to Interrogatory No. 12 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that she learned that David's Motorola Moto E mobile phone had ceased functioning on or about April 2, 2023.  After the phone ceased functioning, it was preserved in a cabinet in Plaintiff's home until being provided to Plaintiff's e-discovery vendor on or about June 10, 2024.  No steps were taken to repair the phone prior to the end of May 2024.

**Interrogatory No. 13:** Identify the date when David provided his Motorola "Moto E" phone to counsel and/or to a forensic examiner.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David's Motorola Moto E mobile phone was provided directly to Plaintiff's e-discovery vendor (TransPerfect Legal Solutions) on or about June 10, 2024.  After Transperfect was unable to collect data from the phone, attempts were made to identify and work with other vendors in an effort to collect data from the phone.  Through Transperfect, Plaintiff sought to engage the services of Cellebrite and, on July 10, 2024, David Chen signed an agreement with Cellebrite. When Cellebrite informed Transperfect, on or about August 26, 2024, that it had not received the signed agreement, David Chen signed another agreement with Cellebrite on August 28, 2024.  On September 26, 2024, David Chen learned that Cellebrite had not received the mobile phone and

14

would be unable to do the mobile device extraction. After further follow up, Cellebrite indicated that they could attempt to extract data from the phone but that it would be experimental and there was a risk of data loss. The phone was not sent to Cellebrite, but was instead sent to DriveSavers in November 20204. On or about November 21, 2024, DriveSavers returned the phone to Transperfect after recovery efforts were unsuccessful. In December 2024, the mobile phone was sent to TeelTech. TeelTech has retained possession of the phone.

**Interrogatory No. 14:** Explain the circumstances of David's Motorola "Moto E" phone becoming "bricked" in April 2023, as You have claimed, including what processes David ran on the phone prior to it "bricking" and when precisely it "bricked."

**Response:** Plaintiff objects to Interrogatory No. 14 on the grounds that the phrase "as you have claimed" is vague, ambiguous, insufficiently clear, and purports to characterize facts. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that in or around late April or May 2022, David Chen flashed or reset his Motorola Moto E mobile phone while attempting to install a new operating system, Graphene OS. After his attempt was unsuccessful, he reset the phone to a factory setting (Motorola's Android OS for the Motorola "Moto E"), following which the phone worked until in or around April 2, 2023.

**Interrogatory No. 15:** Identify the current location of the computer server "utilized" by OtterSec that is described by David Chen in his declaration at ECF 28-5, and whether the data on that server was preserved, collected and searched as part of discovery in this Action.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the computer server that is described by David Chen in his declaration at ECF 28-5 is currently located in Plaintiff's home. After David Chen stopped working for OtterSec in April 2022, he notified users, including Robert Chen, that he planned to wipe the server and advised them to remove any data of value off of it. David then proceeded to wipe the server and deleted the OtterSec "virtual machines" from the server on or about April 27, 2022. Although the original disks (and 4-5

15

11419712.7

generations of disks after it) burned out through normal use, the latest disks for that server have been preserved and any data or code that David was running on the server has also been preserved.

**Interrogatory No. 16:** Identify all OtterSec clients with whom David Chen communicated about auditing, for the period after David Chen stopped working for OtterSec.

**Response:** Plaintiff objects to Interrogatory No. 16 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, David Chen did not communicate about auditing with anyone that he believed or knew was (at the time) or had previously been a client of OtterSec, including but not limited to anyone associated with Solend, after he stopped working for OtterSec.

**Interrogatory No. 17:** Identify any documents – including, but not limited to, Telegram and Discord messages – that are responsive to any Interrogatory or Document Request propounded by the Defendants at any point during this Action, and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation; a description of the document's content; the document's author/creator; when the document was destroyed, lost or transferred; and who was last in possession of the document(s).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, she is unaware of any responsive documents that were destroyed, lost or transferred on or after September 20, 2022.

**Interrogatory No. 18:** Identify any and all person(s) with whom you have discussed this Action, other than Your counsel, and state the substance of those communications and those persons' contact information.

**Response:** Plaintiff objects to Interrogatory No. 18 on the grounds that it is overly broad, unduly burdensome, seeks information that is not relevant to the parties' claims or defenses. and seeks discovery that is not proportional to the needs of the case, particularly insofar as it asks Plaintiff to identify "any and all" persons with whom she has "discussed" this Action, regardless of the nature, substance or significance of those discussions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, other

<div align="center">16</div>

than counsel and to the best of her recollection, Plaintiff has discussed this Action with the following individuals: (a) David Chen, 13717 Travilah Road, Rockville, MD 20850; (b) Junying Hao, 7858 SE 28th St, A509, Mercer Island, WA 98040; and (c) Lina Yao, 13 Nanxi Huanyuan, Jiaxing Zhejiang, China.

**Interrogatory No. 19:** Identify by real name, username, and address David's previous "cofounder," to whom David refers in Discord messages to Philip Papurt, on April 23, 2022.

**Response:** Plaintiff objects to Interrogatory No. 19 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced cofounder is Alexander Karavaltchev, Discord username: friendlyuser2224585, Discord id: 888979921135878174.  Plaintiff does not know, and despite reasonable inquiry and investigation has been unable to discern, the address of Alexander Karavaltchev.

Dated:  May 30, 2025

<div align="right">

CARTER LEDYARD & MILBURN LLP

By: _Stephen Plotnick_ _____

Stephen M. Plotnick, *pro hac vice*
Alexander G. Malyshev, *pro hac vice*
Madelyn K. White, *pro hac vice*
Kevin M. Simpson, *pro hac vice*

28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
malyshev@clm.com
white@clm.com
simpson@clm.com

</div>

<div align="center">17</div>

11419712.7

<div align="right">J.R.427</div>

-and-

BARKLEY & KENNEDY

By: _Daniel Kennedy_____
     Daniel M. Kennedy, III
(signed by Stephen M. Plotnick with the
permission of Daniel M. Kennedy, III)

51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600
dkennedy@barkenlaw.com

*Attorneys for Plaintiff Li Fen Yao*

18

11419712.7

J.R.428

## VERIFICATION

I, Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, state that I am the Plaintiff in this Action. I have read the foregoing Amended Responses to Defendants Robert Chen, Otter Audits LLC, and RC Security LLC's Second Set of Interrogatories and, based on my personal knowledge, reasonable inquiry and investigation, including communications with David Chen, believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: May 30, 2025

Li Fen Yao

I, David Chen, state that I have read the foregoing Amended Responses to Defendants Robert Chen, Otter Audits LLC, and RC Security LLC's Second Set of Interrogatories and that, based on personal knowledge, reasonable inquiry and investigation, believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: May 30, 2025

David Chen

19

11419712.7

J.R.429

## CERTIFICATE OF SERVICE

I certify that on May 30, 2025, I caused the foregoing Amended Responses to Defendants

Robert Chen, Otter Audits LLC, and RC Security LLC's Second Set of Interrogatories to be served

on counsel for Defendants via email.

*Madelyn White*
_____
Madelyn K. White

20

11419712.7

J.R.430

# Exhibit 11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

<table>
<tr>
<td>

LI FEN YAO, as administrator of the Estate of
Sam Mingsan Chen,

      Plaintiff,

    v.

ROBERT CHEN, OTTER AUDITS LLC, and RC
SECURITY LLC,

      Defendants.

</td>
<td>

Case No. 23-cv-00889-TDC

</td>
</tr>
</table>

**PLAINTIFF LI FEN YAO'S SECOND AMENDED RESPONSES TO THE SECOND SET
OF INTERROGATORIES OF DEFENDANTS ROBERT CHEN,
OTTER AUDITS LLC, AND RC SECURITY LLC**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 and

Appendix A of the Local Rules of the United States District Court for the District of Maryland,

Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), submits

the following second amended responses to the Second Set of Interrogatories of Defendants Robert

Chen, Otter Audits LLC, and RC Security LLC, dated March 11, 2025 ("Interrogatories").

**GENERAL RESPONSES AND OBJECTIONS**

Plaintiff makes the following general responses and objections to the Interrogatories and

incorporates them into each of her specific responses below. An assertion of the same, similar or

additional objections in response to any Interrogatory does not waive any of these general

responses and objections as to that or any other Interrogatory. Plaintiff's failure to object to a

specific Interrogatory on a particular ground shall not be construed as a waiver of her right to

object on any ground.

4906-3846-9971.v5

J.R.432

A.      These responses ("Responses") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Plaintiff after reasonable inquiry. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Plaintiff's Responses are being made in accordance with the applicable requirements.

C.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Plaintiff further objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Plaintiff.

D.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to,

2

4906-3846-9971.v5

J.R.433

information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Plaintiff does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Plaintiff's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Plaintiff expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of her attorneys (or by her attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Plaintiff's response to an Interrogatory does not mean that Plaintiff agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Responses are not intended to be and shall not be deemed as an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.      Plaintiff is providing these Responses without waiver of, or prejudice to, her rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Responses or any document produced pursuant to these Responses; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to

3

4906-3846-9971.v5

J.R.434

the Interrogatories. Plaintiff's Responses are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.      Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Plaintiff specifically reserves the right to amend her response to any specific Interrogatory at the conclusion of expert discovery.

H.      Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of Defendants.

J.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiff's possession, custody or control, and/or information within the possession, custody or control of others over whom Plaintiff has no authority and/or control.

K.      Plaintiff objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreements concerning the scope of discovery, and not proportional to the needs of this case.

4

4906-3846-9971.v5

J.R.435

**RESPONSES TO SPECIFIC INTERROGATORIES**

**Interrogatory No. 1:** Identify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case.

**Response:** Plaintiff objects to the terms "steps" and "step" in Interrogatory No. 1 on the grounds that they are open to more than one interpretation and, therefore, ambiguous.  Notwithstanding and without waiving this objection, Plaintiff is assuming a reasonable meaning of these terms for purposes of this response.  Plaintiff is further construing the phrase "this case" to be synonymous with the definition of "action" in Defendants' Instructions and Definitions, which is *Yao v. Chen*, the case in which the Interrogatories were served. Subject to her general responses and objections, Plaintiff responds as follows:

Sam Chen and David Chen engaged the law firm of Hathaway & Kunz, LLP ("H&K") on May 31, 2022.  The sources of relevant or potentially relevant evidence that they knew of, identified, reasonably foresaw or otherwise understood at the time were David Chen's Discord account, Discord messages from the OtterSec Discord server that David Chen downloaded as of April 27, 2022, David Chen's Telegram account, Sam Chen's email account (Smchen90@hotmail.com), David Chen's email account (davidchen0@protonmail.com) and its alias email addresses, and GitHub. David Chen had a mobile phone but used it primarily for two-factor authentication and to communicate with individuals who do not use Discord or Telegram. For communications related to OtterSec, cybersecurity, coding, or the cryptocurrency world in general, David Chen used Telegram and Discord. Sam Chen's involvement with OtterSec had been limited. He communicated over text message and email with David Chen infrequently, and infrequently with other parties concerning OtterSec or OtterSec related matters. Sam Chen did, however, receive e-mail notifications related to OtterSec financial accounts and transactions, and

5

4906-3846-9971.v5

had more recently been using his email account to communicate about disputes he and David Chen had with Robert Chen in relation to OtterSec. He did not use Discord, Telegram or GitHub.

Between June 1-28, 2022, Sam Chen and David Chen identified and gathered for H&K the messages David Chen had downloaded from the OtterSec Discord server as of April 27, 2022, direct messages David Chen exchanged over Discord and Telegram with Robert Chen, direct messages exchanged over Discord in a direct message group consisting of David Chen, Robert Chen, and Philip Papurt, and direct messages David Chen exchanged over Discord with Philip Papurt. Sam Chen and David Chen further identified and gathered for H&K the emails they exchanged with Iqan Fadaei of Michael Best & Friedrich LLP, copies of OtterSec formation, governance, operational, and related documents (which included OtterSec's Articles of Organization, operating agreements and amendments, IRS filings, and a summary of a member meeting on May 4, 2022). They also identified and gathered repositories from David Chen's GitHub account, in which had he preserved the Solend liquidator code he uploaded to and maintained on Github starting on November 1, 2021 and continuing to the present, did not alter, delete or destroy records showing the history of changes made to the Solend liquidator code, maintained the branch containing changes made by Robert Chen or others at OtterSec as of April 27, 2022, and worked on different branches of it.

Prior to Sam Chen's passing, Plaintiff generally was not involved with OtterSec or OtterSec related matters. She communicated infrequently with David Chen and Sam Chen over text and email, and did not communicate with persons at OtterSec or third parties concerning OtterSec or OtterSec related matters. Plaintiff did not use Discord, Telegram or GitHub, and was not considered by Sam Chen or David Chen as a source of relevant or potentially relevant evidence. Thus, no documents or communications were gathered (or considered for gathering) from Plaintiff

6

prior to Sam Chen's passing. Plaintiff only first became involved in the disputes Sam Chen and David Chen had been having with Robert Chen following Sam Chen's passing on July 13, 2022, and she formally engaged H&K on August 10, 2022. Although Plaintiff did not at the time have the password to access Sam Chen's email account, she collected and maintained Sam Chen's mobile phone in her home after Sam passed away. Plaintiff was able to access the mobile phone, which in turn allowed her to access Sam Chen's text messages and emails. Plaintiff maintained and did not alter, delete or destroy Sam Chen's emails or text messages, and maintained and did not alter, delete or destroy any of her own documents, including emails and text messages, that were relevant or potentially relevant. These generally consisted of text messages with David Chen, emails that post-date Sam Chen's death, and documents and emails relating to the Estate of Sam Chen, her appointment as Administrator of the Estate of Sam Chen, and her administration of the Estate of Sam Chen.

H&K's representation of Plaintiff and David Chen terminated as of December 31, 2022, following which Plaintiff and David Chen arranged for the transfer of H&K's files, which included the documents and communications Sam Chen and David Chen had previously gathered and collected for H&K, to be transferred to their new counsel. The files transferred to new counsel also included correspondence that had been exchanged between H&K and Mr. Fadaei on behalf of OtterSec between June and December 2022, and documents and communications that had been provided to H&K by Mr. Fadaei pursuant to information requests made on behalf of Sam Chen pursuant to Wyoming law. These documents and communications included Discord and Telegram communications, agreements with OtterSec clients and customers, and agreements with OtterSec employees and independent contractors.

7

4906-3846-9971.v5

J.R.438

Through March 2024, Plaintiff and David Chen continued to preserve relevant or potentially relevant documents, communications, and information by not deleting or destroying them. Although David Chen did, from time to time, delete messages he sent over Discord in the course of his normal use, which was extensive, he generally did so on an individual basis because the messages had been sent in error. David Chen also preserved OtterSec's Yubikey and ledger wallet by keeping them in a drawer in his desk in his home; maintained his personal computers, drives, and external storage devices; preserved documents (including his tax returns) relating to income he earned from the Solend liquidator code by not deleting or destroying them (to the extent he was even capable of deleting or destroying them); preserved his X Account by not deleting posts or messages; maintained his blockchain wallets and private keys; preserved, by not deleting, messages in 135 servers, channels, and direct message groups that he identified as containing relevant or potentially relevant evidence (identified in Exhibit A); and preserved the contents of his Telegram account by not deleting direct messages, messages in public channels, and messages in private channels.

As a general matter, Plaintiff and David Chen identified February 2022, when OtterSec was formed, as the applicable starting date for preserving relevant or potentially relevant evidence. When David Chen's Motorola Moto E mobile phone, which he purchased in August 2021, ceased functioning in early April 2023, he preserved it by placing the phone in a cabinet in his home. When he purchased a new mobile phone (a Google Pixel) to replace the Motorola Moto E, David Chen preserved the contents of the phone by not deleting its contents. Plaintiff also continued to maintain Sam Chen's mobile phone in her home and did not alter, delete or destroy Sam Chen's emails or messages, and also did not alter, delete or destroy any of her own relevant or potentially relevant emails or text messages. With the exception of backups of David Chen's computers

8

4906-3846-9971.v5

J.R.439

(which were done prior to any reinstallations), neither Plaintiff, Sam Chen nor David Chen had, maintained, or utilized backup systems or tapes, and they did not have or follow any policies, practices, procedures, or systems for automatically or routinely deleting or destroying documents.

Following the Court's decision denying Defendants' Motion to Dismiss on March 11, 2024, and the entry of a Scheduling Order on March 26, 2024, Plaintiff and David Chen began working with Plaintiff's discovery vendor, in coordination with their counsel, to reasonably identify, gather, collect, and preserve relevant and potentially relevant evidence for purposes of discovery in this action. The first collection was completed on April 19, 2024, and Plaintiff refers to and incorporates her response to Interrogatory No. 2 below for the additional details of this and subsequent collections, including dates and sources. On May 17, 2024, Plaintiff disclosed to Defendants the sources of relevant or potentially relevant evidence that she had initially identified for purposes of discovery in this case,[1] and also disclosed to Defendants both that David Chen's Motorola Moto E mobile phone had become inoperable in April 2023 and that Plaintiff did not at that point have access to Sam Chen's email account. However, shortly thereafter, as Plaintiff advised Defendants on May 24, 2024, Plaintiff was able to successfully gain password access to Sam Chen's email account. Plaintiff also undertook reasonable efforts to recover data from David Chen's Motorola Moto E mobile phone, as further detailed in Plaintiff's response to Interrogatory No. 13 herein.

**Interrogatory No. 2:** Identify with specificity what sources of documents You gathered for purposes of discovery in this case, including the name of any Discord guild (also known as a "server") and/or channel, and for each source, identify the date the documents from that source were collected and preserved.

---

[1] Plaintiff later provided Defendants with further disclosures of her sources of relevant or potentially relevant evidence for purposes of discovery in this case on November 27, 2024. Defendants did not identify any deficiencies in the sources identified by Plaintiff.

4906-3846-9971.v5

**Response:** Plaintiff objects to the phrase "with specificity" in Interrogatory No. 2 on the grounds that it is open to more than one interpretation and, therefore, ambiguous. Notwithstanding and without waiving this objection, Plaintiff assumes a reasonable meaning of the phrase "with specificity" and, subject to her general responses and objections, sets forth in the table below the sources of documents she gathered "for purposes of discovery in this case," which Plaintiff is construing to be referring to discovery in the "action" (as defined in Defendants' Instructions and Definitions) in which the Interrogatories were served, *Yao v. Chen*, and as including Defendants' request that electronically stored documents be produced in discovery "in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland." To the extent known, available or capable of being determined by Plaintiff after reasonable inquiry and investigation, the table below, together with the exhibits they incorporate, includes the name of any Discord guild, server or channel, as applicable. Except as otherwise indicated, all documents gathered from the sources identified below were collected and preserved by Plaintiff with the assistance of her discovery vendor, TransPerfect, on the dates identified in the "Date" column in the table below; each collection included all documents that were available as of the date of collection[2]; and each collection included all available documents from the beginning date of the "Relevant Period" (as defined in Defendants' Instructions and Definitions) to which the Interrogatories apply (in other words, from February 1, 2022, through the applicable dates of collection).

---

[2] Thus, any Discord messages deleted from these sources prior to the date of collection were not included in that collection.

4906-3846-9971.v5

| Source | Date |
|---|---|
| David Chen's email accounts likely to have potentially responsive and relevant material:[3]<br><br>• davidchen0@protonmail.com, which includes the following alias accounts: davidchen0@proton.me, radiantaeon@proton.me, reddit_throwaway125@proton.me, craigslist_15125@proton.me, wendigo55129@proton.me, adjacentfi@proton.me, commonappdc@proton.me, contact@adjacent.fi, davidchen501295@proton.me, and tinder1525@proton.me | April 19, 2024 |
| Export of Discord messages from 135 servers, channels, and direct message groups likely to have potentially responsive and relevant material, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit A for list of servers, channels, and direct message groups collected. | April 23, 2024 (HTML format); May 1, 2024 (JSON format)[4] |
| David Chen's Telegram account: all private channels and direct messages. | April 23, 2024 (HTML format); May 1, 2024 (JSON format) |

---

[3] Plaintiff previously identified the email address ra@solend.fi as one of the sources from which documents were collected for purposes of discovery in this case. This is an email address that David Chen used in connection with work he was doing for Solend (writing "smart contracts") prior to the formation of OtterSec At the time Plaintiff identified ra@solend.fi, her counsel mistakenly understood ra@solend.fi to have been an "alias" email address linked to David Chen's "davidchen0@protonmail.com" email account, and that it had been collected when the davidchen0@protonmail.com email account and its alias email addresses were collected on April 19, 2024. It is not an alias email, and was instead provided to David Chen by Solend. When OtterSec was formed and David Chen ceased his work for Solend, Solend removed his access to the ra@solend.fi email account such that any emails sent or received using that account could not have been gathered, preserved or collected for purposes of discovery in this case.

[4] This collection also included all messages that David Chen had from the OtterSec Discord server, which were through April 27, 2022 (not May 1, 2024).

11

4906-3846-9971.v5

| | |
|---|---|
| Mobile phones:<br><br>• David Chen's Motorola Moto E phone<br>• Sam Chen's mobile phone<br>• LiFen Yao's mobile phone<br>• David Chen's Google Pixel phone | June 10, 2024 (Sam Chen's and Plaintiff's mobile phones, David Chen's Motorola Moto E phone)[5]<br><br>June 14, 2024 (David Chen's Google Pixel phone) |
| Li Fen Yao's email account: Lifen1299@yahoo.com | June 12, 2024 |
| Sam Chen's email account: Smchen90@hotmail.com | June 12, 2024 |
| Export of Discord messages from direct message groups, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit B for list of direct message groups collected. | October 17, 2024 (HTML format); October 21, 2024 (JSON format) |
| Discord collection of David Chen's Discord messages.<br><br>*See* spreadsheet attached as Exhibit C for list of servers, channels, and direct message groups from which messages were collected. | October 29, 2024 (messages through July 31, 2024)[6] |

---

[5] Although the physical device was collected by Plaintiff's discovery vendor on June 10, 2024, data could not be extracted from David Chen's Motorola Moto E phone.

[6] On July 31, 2024, David Chen obtained his personal messages from Discord pursuant to a personal data request described here: https://support.discord.com/hc/en-us/articles/360004027692-Requesting-a-Copy-of-your-Data. Although the data did not include any deleted messages, it included messages that David Chen sent in servers, channels, and direct message groups, irrespective of whether he was still a member of the server, channel or direct message group. The messages were collected by Plaintiff's discovery vendor for purposes of discovery in this case on October 29, 2024.

4906-3846-9971.v5

J.R.443

| | |
|---|---|
| Email accounts of David Chen:<br><br>• realawesomenessisreal@gmail.com<br>• RealAwesomeness@outlook.com<br>• RealAwesomeness@protonmail.com<br>• minecraft15230987@outlook.com<br>• dc0910758@gmail.com | October 29, 2024[7] |
| David Chen's Twitter/X account (all messages and posts) | October 31, 2024 |
| Email accounts of David Chen:<br><br>• Datingapp15@protonmail.com<br>• Test109000@protonmail.com | November 5, 2024 |
| David Chen's computers and drives:<br><br>• Linux desktop<br>• Linux laptop<br>• Alienware laptop<br>• Samsung 980 PRO<br>• External NVMe drive | December 13, 2024 |
| David Chen's Muskin Helix NVMe drive | December 17, 2024 |
| David Chen's WD MyBook drive (backup of David Chen's Linux desktop) | December 18, 2024 |
| David Chen's GitHub account (except for repositories in organizations) | February 18, 2025 |

---

[7] Plaintiff's discovery vendor initially attempted on October 29, 2024, to collect David Chen's dc0910758@gmail.com account but was unsuccessful, because the account had been disabled by Google due to non-use. Google restored access on November 5, 2024, and the account was collected on that day.

13

4906-3846-9971.v5

J.R.444

| | |
|---|---|
| Export of Discord messages from servers and channels, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit D for list of servers and channels collected. | January 9, 2025[8] |
| Export of Discord messages from servers and channels, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit E for list of servers and channels collected. | February 11, 2025[9] |
| David Chen's Samsung 980 PRO (same as December 13, 2024), Mushkin Helix NVMe drive (same as December 17, 2024), three additional Samsung 980 PROs, and WD MyBook drive (same as December 18, 2024).[10] | February 24, 2025 |
| David Chen's Telegram account: all public channels, private channels and direct messages | March 18, 2025 |
| Screenshots of David Chen's GitHub account (commit history, Solend liquidator code) | April 4, 2025 |
| David Chen's GitHub account (all repositories, including repositories in organizations) | April 8, 2025 |

**Interrogatory No. 3:** Identify all the Discord channels or servers that You claim "are irrelevant," *see* ECF 117, and that You claim are associated with 1,722 messages within the discovery range, *id.*, and also provide the Discord identification numbers associated with those channels and guilds (servers).

---

[8] Due to the amount of data, this collection began on January 9, 2025, but was completed in batches on January 21, 2025, January 30, 2025, February 20, 2025, and March 12, 2025, as indicated in Exhibit D.

[9] Due to the amount of data, this collection began on February 11, 2025, but was completed on February 20, 2025 as indicated in Exhibit E.

[10] Collected by NAXO Labs LLC.

14

4906-3846-9971.v5

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff provides the following information in response to Interrogatory No. 3:

| Channel or Server | Discord ID | Number of Messages |
|---|---|---|
| crypto-discussion in AltTank | 424635698331779082 | 1 |
| Direct Message with kern5099#0 | 837609653075443763 | 1 |
| Direct Messages with morericekara#0 | 769194866688524327 | 22 |
| Direct Message with mr_cahar#0 | 1136699777619341322 | 2 |
| food-pr0n in AltTank | 759813205517271091 | 2 |
| gamez-n-memez in AltTank | 877759997210144798 | 1 |
| general-just-general in AltTank | 761239447369941102 | 4 |
| industry-news in Save Team | 1141579079632552057 | 3 |
| sol-ecosystem-chat in AltTank | 840598469068587012 | 2 |
| trading-talk in AltTank | 438430983075790850 | 7 |
| Kusuriya no Hitorigoto | 1075601030261260288 1162495256525291562 690813121115455500 690813625526648862 690822555820621845 690822665954394183 690823830964535318 690823982508802090 692385750590816286 785583981600702495 786048737021526026 806352809762357338 | 472 |
| New clickbait | 471845879695802370 787328307309445140 | 1,204 |

15

4906-3846-9971.v5

J.R.446

|  | 788144360738259004 |  |
|---|---|---|
|  | 788502936141299712 |  |
|  | 788861446833700947 |  |
|  | 808494121806856232 |  |
|  | 818669129728917565 |  |
|  | 833850599359250462 |  |
|  | 858162636142673921 |  |
|  | 859070020364271616 |  |
|  | 897979229768130572 |  |
|  | 927293274161549372 |  |
| parrot.fi | Parrot Finance | 837609653075443763 | 1 |

**Interrogatory No. 4:** Identify the "personal friend who was not involved with OtterSec," ECF 117, including the person's Discord username, real name, and address.

**Response:** Plaintiff objects to Interrogatory No. 4 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced "personal friend" is Marissa Liu, 14201 Dav Rd., Rockville, MD 20850, and that her Discord username is morericekara.

**Interrogatory No. 5:** Describe how and when David Chen deleted the more than 17,000 Discord messages in 2024. If he used several different mechanisms, describe each one specifically.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David Chen installed a script from GitHub called "undiscord," (available at  https://github.com/victornpb/ undiscord) on or about July 28, 2024, and used it to delete messages in 2024 as follows: (a) on July 28 and 29, 2024, he deleted all of his messages in "Kusuriya no Hitorigoto" (2,050 messages); (b) on July 29, 2024, he deleted all of his messages sent after August 5, 2022, in Jito (768 messages); (c) on July 29 and 30, 2024, he deleted all of his messages in "new clickbait" (1,927

16

4906-3846-9971.v5

J.R.447

messages); and (d) on July 30, 2024, he deleted all of his messages in "dead meme" (1,899 messages). Between October 10 and 28, 2024, David Chen also deleted, using the same script, all of his messages with "closetduck" sent before January 1, 2022 (10,430 messages). On October 29, 2024, David Chen deleted 1 message in "advice-help in Cal 3 (Math241)" by deleting that message manually. On May 19, 2024, David Chen deleted 22 messages with "morericekara" by deleting the messages manually. The remaining 44 messages David deleted in 2024 were deleted manually, on an individual basis, and all 44 were deleted within twenty-four hours of being sent.

**Interrogatory No. 6:** Explain how David Chen determined which Discord messages to delete in 2024. If he made different determinations about deleting different messages or categories of messages, describe each determination.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the messages that were deleted by David Chen in 2024 manually, on an individual basis, typically within twenty-four hours of being sent, were generally deleted because they were sent in error. The other messages, which were sent by David at various times between the ages of 12 and 19, concerned highly personal or intimate matters, or involved crude, unfiltered or boastful conversations and discussions. In particular, David deleted his messages in "Kusuriya no Hitorigoto" because messages in this server contained explicit images and discussions, and he was embarrassed by them and no longer wished to be involved with the server or reminded of the messages. He deleted all of his messages sent after August 5, 2022, in Jito, because he had boasted in the server about his efforts, using a denial of service attack, to thwart hackers from accessing and stealing funds from victims' wallets, and also about his success playing the game SVBonk, and considered them to be part of an immature past that he wished to put behind him. David deleted his messages in "new clickbait" because the conversation frequently included highly personal, and sometimes raw or salacious, discussions among his adolescent high school friends. Additionally, the individuals in the "new clickbait" group were high school friends who, by that time, had drifted apart during

17

their final year in high school and moved on to college while David took a gap year as a result of personal difficulties he experienced following the death of his father. The "new clickbait" server enhanced these personal difficulties by making David Chen feel lonely, isolated, and sad, and he deleted the messages (and exited the server) in an effort to better manage his well-being, move on, and prepare for college.  He similarly deleted all of his messages in "dead meme" because it was an old and inactive middle school friend group (dating back to 2017) that was replete with immature, juvenile, and personal discussions that he no longer wished to be part of or reminded of. David deleted his messages with "closetduck" sent before January 1, 2022, because she was a close personal friend whom David had confided in (and vice versa) about highly sensitive or delicate personal matters. The "closetduck" deletions in particular came when David recalled news reports of the publication of personal messages exchanged between Vice President Vance and a former law school classmate, prompting David to become concerned about his digital footprint and the potential for a betrayal of trust. David deleted the single message in "advice-help in Cal 3 (Math241)" because it referenced an exam question, and David was concerned that classmates who had not yet taken the exam might see it. David deleted the 22 messages with "morericekara" because he had a romantic interest in her at the time, the messages were flirtatious, and he was embarrassed by them.

**Interrogatory No. 7**: Did David Chen register, or cause to be registered, the domain ottersec.io?

**Response:** Plaintiff objects to Interrogatory No. 7 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen did not register, or cause to be registered, the domain ottersec.io.

<div align="center">18</div>

4906-3846-9971.v5

**Interrogatory No. 8:** Describe any and all of David Chen's communications that reference "ottersec.io," by date, method of communication, the name and username of the person he communicated with, and a description of the communication.

**Response:** Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff identifies the communications which have been produced at YAO00007568, which are Discord messages between David Chen (username, "radiantaeon") and Robert Chen (username, "notdeghost") from February 6, 2022, that include a reference to "ottersec.io" as follows: "but our domain isn't ottersec.io."  Plaintiff and David have also verbally discussed "ottersec.io" with each other generally.

Plaintiff further states that, while David Chen was attending "DEF CON 32" in Las Vegas in August 2024, other attendees mentioned the website to him during in-person discussions.  To the best of David's recollection, the individuals who mentioned it to him were: (1) Larry Yuan, whose  Discord username is "ehhthing"; (2) Daniel Lu, whose Discord username is "brown.ee"; (3) an individual whom David only knows by the Discord username "Drakon"; (4) Sammy Hajhamid, whose Discord username is "pepsiu"; and (5) Bryce Casaje, whose Discord username is "Strellic."  Each of the conversations consisted of the individuals advising David Chen that they were aware of this action because of the website "ottersec.io," and informing David that they were aware of the website because it was being passed around on Discord.  None of the individuals indicated that they were aware of the person or persons who registered, or caused to be registered, the domain ottersec.io.

Additionally, at a "hacker Thanksgiving" holiday party in or around November 2024, David briefly spoke to Luna Tong (Discord username "e7l") about ottersec.io. She advised David that she was aware of the website and did not know the person or persons behind ottersec.io.  At

<div align="center">19</div>

the same holiday party, David also spoke to an individual whom he did not know previously, but believes his name to have been "Matthew". The individual mentioned that he knew of the website generally, and that he knew of a person (whom "Matthew" did not identify) was known to use the same domain registrar as the person who deployed the website. David also believes that he mentioned ottersec.io to Aaron Esau (Discord username "arinerron") and spoke with Daniel Lu again at the party about ottersec.io generally, but does not recall the details of these conversations except that neither Aaron Liu nor Daniel Lu identified, or stated that they knew, the person or persons behind ottersec.io.

Additionally, in or about June and July 2025, David mentioned, during oral conversations, the website ottersec.io to two people at the office where he was working for the summer, David Cruz and Manny Cruz (Telegram username "eevoy"). During the same time period, David also mentioned, during oral conversations, the website to his summer roommates, Kevin (Discord username "baselinedirector" and Telegram username "fullyallocated"), Indigo (Discord username "ind.igo"), Zach (Discord username "0xzx"), Drew Davis (Telegram username "dithdrew"), Devin Mitchell (Discord username "nojob"), and Alina Lin (Telegram username "alinatyng").

After reasonable inquiry and investigation, neither Plaintiff nor David Chen have, and they have been unable to determine, further responsive, identifying information for the individuals referenced above and are unaware of other responsive communications.

**Interrogatory No. 9:** Identify by Discord username, real name, and address each user in the "group of users with whom David formed an on-line friendship in 2017." ECF 117.

**Response:** Plaintiff objects to Interrogatory No. 9 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that "alttank" is the referenced "group of users with whom David formed an on-line friendship in 2017." The

20

4906-3846-9971.v5

Discord usernames of the members of the group are: hensonkraj, trial123, jriggs28, cmallory183, _dznutz_, kott7795, mentaldragon13, dragoon316, trainman, blunto., dfisherman12, hoser5283, 6665sted666, greg.icemining, bill_i_am, adu6, bigassboy., dk808, tim4093, guido8798, joe3kool, oskar_the_ork, porterhousegamer, randomtask6236, smashnbash4651, stilger, sexeast, thebee6035, and xtrmil. After reasonable inquiry and investigation, Plaintiff is informed and believes that the first name of "Trial123" is Parker, the first name of "oskar_the_ork" is Oscar, the first name of "greg.icemining" is Greg, the first name of "joe3kool" is Joe, and the first name of "6665sted666" is Joe. Neither Plaintiff nor David Chen know, and despite reasonable inquiry and investigation they have been unable to discern, any further responsive information concerning the users in this group.

**Interrogatory No. 10:** For each entry in the spreadsheet produced to Defendants by Discord, which shows David's deletion of Discord messages and was produced to Plaintiff's counsel on January 31, 2025, identify: the name of the guild (server); the name of the channel; and for Direct Messages or Group Messages, identify the username of the person(s) in the group chat, or the username of the person to whom the Direct Message was sent (for Direct Messages).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff refers to and incorporates herein the spreadsheet attached hereto as Exhibit F, which delineates the information responsive to Interrogatory No. 10.  However, the names of some guilds, servers or channels are either unknown or partially unknown to Plaintiff and David Chen, even after reasonable inquiry and investigation, and they are unaware of any way to determine the names of the guilds, servers or channels identified in these Responses as unknown or partially unknown. Defendants have advised that "a Discord user can use guild_id and channel_id numbers to determine the names of the corresponding guilds and channels simply by logging into Discord on a web browser and typing in a URL of the format: https://discord.com/channels/[Guild _ID]/[Channel_ID] in order to navigate to the channel in question."  But, to the best of Plaintiff's and David Chen's knowledge and understanding, and after reasonable inquiry and investigation this appears to be only partially

21

4906-3846-9971.v5

correct.   Using guild, server, and channel IDs with this URL only identifies the names of corresponding guilds, servers, and channels if, and to the extent that, the guild, server or channel still exists and/or a Discord user has permission to access it. For the guilds, servers, and channels identified in these Responses as unknown or partially unknown, Plaintiff has attempted to use the guild, server, and channel IDs with the URL provided by Defendants but has been unable to identify their names, likely because the guild, server or channel does not exist any longer or because David Chen does not have permission to access it. These include channels within the "Kusuriya no Hitorigoto," "Parrot Finance," and "new clickbait" servers, and the channels within the Save Team server listed as "unknown in Save Team."

**Interrogatory No. 11:** Did David Chen delete messages on the Jito server about his work for, and/or his payments from, the Solana Foundation?

**Response:** Plaintiff objects to Interrogatory No. 11 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen has not worked for the Solana Foundation.  Plaintiff further states that David asked in the Jito discord about over-the-counter selling of a large sum of locked Solana tokens that were payment to him from the Solana Foundation for finding a bug in Solana's code and that these messages were deleted.  David found the bug in or about October 2022 and received the locked Solana tokens on or about April 5, 2023. David Chen believes the messages were sent after he received the tokens, but has been unable to verify this because, despite having preserved David Chen's messages on the Jito server, Defendants have not produced messages past March 2023.

**Interrogatory No. 12:** Identify the date and circumstances when Plaintiff learned that the Motorola "Moto E" telephone that David Chen had used from approximately August 2021 through April 2023 had "bricked" or otherwise malfunctioned, and explain what steps Plaintiff and/or David took to repair or preserve the phone from that time up through May 2024.

4906-3846-9971.v5

**Response:** Plaintiff objects to Interrogatory No. 12 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that she learned from David Chen that his Motorola Moto E mobile phone had ceased functioning on or about April 2, 2023.  After David had picked up the phone to use it and learned that it had ceased functioning, he turned it off and then turned it on again, but the phone still did not work. At the time, David assumed that it had simply failed because it was relatively old and inexpensive (having been purchased in August 2021 for approximately $120), considered it to be unworthy of any further effort or expense to repair, and proceeded to purchase a new mobile phone.  He preserved the Motorola Moto E mobile phone in a cabinet in Plaintiff's home, but did not take any additional steps to repair it or access any information on it until providing it to Plaintiff's discovery vendor on June 10, 2024.

**Interrogatory No. 13:** Identify the date when David provided his Motorola "Moto E" phone to counsel and/or to a forensic examiner.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David's Motorola Moto E mobile phone was preserved in a cabinet in Plaintiff's home until being provided directly to Plaintiff's discovery vendor, TransPerfect, on June 10, 2024.  TransPerfect was unable to collect data from the phone and attempted to identify and work with other vendors in an effort to collect the data.  Through TransPerfect, Plaintiff sought to engage the services of Cellebrite and, on July 10, 2024, David Chen signed an agreement with Cellebrite. When Cellebrite informed TransPerfect, on or about August 26, 2024, that it had not received the signed agreement, David Chen signed another agreement with Cellebrite on August 28, 2024.  On September 26, 2024, David Chen learned that Cellebrite had not received the mobile phone and would be unable to do the mobile device extraction.  After further follow up, Cellebrite indicated that they could attempt

23

4906-3846-9971.v5

to extract data from the phone but that it would be experimental and there was a risk of data loss. The phone was not sent to Cellebrite but was instead sent to DriveSavers in November 2024. On or about November 21, 2024, DriveSavers returned the phone to TransPerfect after recovery efforts were unsuccessful. In December 2024, the mobile phone was sent to TeelTech, and TeelTech has since retained possession of the phone.

**Interrogatory No. 14:** Explain the circumstances of David's Motorola "Moto E" phone becoming "bricked" in April 2023, as You have claimed, including what processes David ran on the phone prior to it "bricking" and when precisely it "bricked."

**Response:** Plaintiff objects to Interrogatory No. 14 on the grounds that the phrase "as you have claimed" is vague, ambiguous, insufficiently clear, and purports to characterize facts. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that in or around late April or May 2022, David Chen flashed his Motorola Moto E mobile phone while attempting to install a new operating system, Graphene OS. To flash the phone, David unlocked the phone's bootloader, downloaded a rom, booted the device to fast boot, uploaded a new rom to the phone, and then rebooted the phone into the new rom. His attempted installation was unsuccessful, and he then reset the phone to a factory setting (Motorola's Android OS for the Motorola "Moto E") rom, following which the phone worked until on or about April 2, 2023. David does not recall what specifically he was doing with the phone (if anything) when it ceased working in or around April 2, 2023, but generally recalls picking it up to use it, discovering that it was not functioning, turning it off and then on again, learning that it still was not working, and then purchasing a new phone.

**Interrogatory No. 15:** Identify the current location of the computer server "utilized" by OtterSec that is described by David Chen in his declaration at ECF 28-5, and whether the data on that server was preserved, collected and searched as part of discovery in this Action.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the computer server that is described by David Chen in his declaration at ECF 28-5 is currently located in

24

4906-3846-9971.v5

Plaintiff's home. After David Chen stopped working for OtterSec in April 2022, he notified users, including Robert Chen, that he planned to wipe the server, and advised them to remove any data of value off of it. David then proceeded to wipe the server and deleted the OtterSec "virtual machines" from the server on or about April 27, 2022. Although the original disks (and 4-5 generations of disks after it) burned out through normal use, the latest disks for that server have been preserved and any data or code that David was running on the server has also been preserved.

**Interrogatory No. 16:** Identify all OtterSec clients with whom David Chen communicated about auditing, for the period after David Chen stopped working for OtterSec.

**Response:** Plaintiff objects to Interrogatory No. 16 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, David Chen did not communicate about auditing with anyone that he believed or knew was (at the time) or had previously been a client of OtterSec, including, but not limited to, anyone associated with Solend, after he stopped working for OtterSec.

**Interrogatory No. 17:** Identify any documents – including, but not limited to, Telegram and Discord messages – that are responsive to any Interrogatory or Document Request propounded by the Defendants at any point during this Action, and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation; a description of the document's content; the document's author/creator; when the document was destroyed, lost or transferred; and who was last in possession of the document(s).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, except for discovery requests specifically asking about deleted messages (to which all deleted messages would be responsive), she is unaware of any responsive documents that were destroyed, lost or transferred by Plaintiff, Sam Chen, or David Chen on or after September 20, 2022. To the extent that any responsive documents were destroyed, lost or transferred on or after September 20, 2022, by persons other than Plaintiff, Sam Chen, or David Chen, Plaintiff does not have possession, custody or control of responsive

25

information.  Plaintiff further states that there were a limited number of arguably responsive text messages on David Chen's phone between, on the one hand, David Chen, and either Sam Chen or Plaintiff on the other.  While David's copies of these messages are not available, the messages were not destroyed or lost because they were preserved by Sam Chen and Plaintiff and have been produced.  Apart from the handful of arguably responsive text messages that he exchanged with his parents, David does not recall sending any responsive text messages prior to the failure of his Motorola Moto E phone on or about April 2, 2023.

**Interrogatory No. 18:** Identify any and all person(s) with whom you have discussed this Action, other than Your counsel, and state the substance of those communications and those persons' contact information.

**Response:** Plaintiff objects to Interrogatory No. 18 on the grounds that it is overly broad, unduly burdensome, seeks information that is not relevant to the parties' claims or defenses. and seeks discovery that is not proportional to the needs of the case, particularly insofar as it asks Plaintiff to identify "any and all" persons with whom she has "discussed" this Action, regardless of the nature, substance or significance of those discussions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, other than counsel and to the best of her recollection, Plaintiff has discussed this action with the following individuals: (a) her son, David Chen, 13717 Travilah Road, Rockville, MD 20850; (b) her niece, Junying Hao, 7858 SE 28th St, A509, Mercer Island, WA 98040; and (c) her sister, Lina Yao, 13 Nanxi Huanyuan, Jiaxing Zhejiang, China. Since first becoming involved with the disputes that are the subject of this action, Plaintiff has discussed all aspects of this Action with David Chen on a regular basis throughout the course of the Action. Junying Hao has stayed with Plaintiff during the Relevant Period, provided companionship and emotional support for Plaintiff since the death of Plaintiff's husband, Sam Chen, in July 2022, and in connection therewith they have discussed many aspects of this case generally. Similarly, after Plaintiff's mother passed away

26

4906-3846-9971.v5

in China in March 2022, Lina Yao traveled to the United States to visit Plaintiff and her family in June 2022. She was still staying with Plaintiff and her family when Sam Chen was killed in a car accident in July 2022, remained with Plaintiff and her family for an extended period of time thereafter, has provided emotional support to Plaintiff, and in connection therewith they have discussed many aspects of this case generally.

**Interrogatory No. 19:** Identify by real name, username, and address David's previous "cofounder," to whom David refers in Discord messages to Philip Papurt, on April 23, 2022.

**Response:** Plaintiff objects to Interrogatory No. 19 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced cofounder is Alexander Karavaltchev, Discord username: friendlyuser2224585, Discord id: 888979921135878174. Plaintiff does not know, and despite reasonable inquiry and investigation, has been unable to discern the address of Alexander Karavaltchev.


Dated:  July 17, 2025

CARTER LEDYARD & MILBURN LLP

By:  _/s/ Stephen M. Plotnick_____
Stephen M. Plotnick, *pro hac vice*
Alexander G. Malyshev, *pro hac vice*
Madelyn K. White, *pro hac vice*
Kevin M. Simpson, *pro hac vice*

28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
malyshev@clm.com
white@clm.com
simpson@clm.com

27

4906-3846-9971.v5

J.R.458

-and-

TYDINGS & ROSENBERG, LLP

By:  _/s/Alexander M. Giles_____
        Michael J. Lentz
        Alexander M. Giles
(signed by Stephen M. Plotnick with the
permission of Alexander M. Giles)

One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Plaintiff Li Fen Yao*

28

4906-3846-9971.v5

J.R.459

## VERIFICATION

I, Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, state that I am the Plaintiff in this Action. I have read the foregoing Amended Responses to Defendants Robert Chen, Otter Audits LLC, and RC Security LLC's Second Set of Interrogatories and, based on my personal knowledge, reasonable inquiry and investigation, including communications with David Chen, believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: July 17, 2025

_____
Li Fen Yao

I, David Chen, state that I have read the foregoing Amended Responses to Defendants Robert Chen, Otter Audits LLC, and RC Security LLC's Second Set of Interrogatories and that, based on personal knowledge, reasonable inquiry and investigation, believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: July 17, 2025

_____
David Chen

29

4906-3846-9971.v5

J.R.460

## CERTIFICATE OF SERVICE

I certify that on July 17, 2025, I caused the foregoing Amended Responses to Defendants Robert Chen, Otter Audits LLC, and RC Security LLC's Second Set of Interrogatories to be served on counsel for Defendants via email.

/s/ Madelyn K. White___
Madelyn K. White

30

4906-3846-9971.v5

J.R.461

# Exhibit 12

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LI FEN YAO, as administrator of the Estate of
Sam Mingsan Chen,

        Plaintiff,

        v.

ROBERT CHEN, OTTER AUDITS LLC, and RC
SECURITY LLC,

        Defendants.

Case No. 23-cv-00889-TDC

### PLAINTIFF LI FEN YAO'S THIRD AMENDED RESPONSES TO THE SECOND SET OF INTERROGATORIES OF DEFENDANTS ROBERT CHEN, OTTER AUDITS LLC, AND RC SECURITY LLC

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 and Appendix A of the Local Rules of the United States District Court for the District of Maryland, Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), submits the following third amended responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC, dated March 11, 2025 ("Interrogatories").

### GENERAL RESPONSES AND OBJECTIONS

Plaintiff makes the following general responses and objections to the Interrogatories and incorporates them into each of her specific responses below. An assertion of the same, similar or additional objections in response to any Interrogatory does not waive any of these general responses and objections as to that or any other Interrogatory. Plaintiff's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of her right to object on any ground.

J.R.463

A.     These responses ("Responses") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Plaintiff after reasonable inquiry. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Plaintiff's Responses are being made in accordance with the applicable requirements.

C.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Plaintiff further objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Plaintiff.

D.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to,

2

information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Plaintiff does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Plaintiff's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Plaintiff expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of her attorneys (or by her attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Plaintiff's response to an Interrogatory does not mean that Plaintiff agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Responses are not intended to be and shall not be deemed as an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.      Plaintiff is providing these Responses without waiver of, or prejudice to, her rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Responses or any document produced pursuant to these Responses; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to

3

J.R.465

the Interrogatories. Plaintiff's Responses are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.    Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Plaintiff specifically reserves the right to amend her response to any specific Interrogatory at the conclusion of expert discovery.

H.    Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.    Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of Defendants.

J.    Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiff's possession, custody or control, and/or information within the possession, custody or control of others over whom Plaintiff has no authority and/or control.

K.    Plaintiff objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreements concerning the scope of discovery, and not proportional to the needs of this case.

4

J.R.466

## RESPONSES TO SPECIFIC INTERROGATORIES

**Interrogatory No. 1:** Identify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case.

**Response:** Plaintiff objects to the terms "steps" and "step" in Interrogatory No. 1 on the grounds that they are open to more than one interpretation and, therefore, ambiguous. Notwithstanding and without waiving this objection, Plaintiff is assuming a reasonable meaning of these terms for purposes of this response. Plaintiff is further construing the phrase "this case" to be synonymous with the definition of "action" in Defendants' Instructions and Definitions, which is *Yao v. Chen*, the case in which the Interrogatories were served. Subject to her general responses and objections, Plaintiff responds as follows:

Sam Chen and David Chen engaged the law firm of Hathaway & Kunz, LLP ("H&K") on May 31, 2022. The sources of relevant or potentially relevant evidence that they knew of, identified, reasonably foresaw or otherwise understood at the time were David Chen's Discord account, Discord messages from the OtterSec Discord server that David Chen downloaded as of April 27, 2022, David Chen's Telegram account, Sam Chen's email account (Smchen90@hotmail.com), David Chen's email account (davidchen0@protonmail.com) and its alias email addresses, and GitHub. David Chen had a mobile phone but used it primarily for two-factor authentication and to communicate with individuals who do not use Discord or Telegram. For communications related to OtterSec, cybersecurity, coding, or the cryptocurrency world in general, David Chen used Telegram and Discord. Sam Chen's involvement with OtterSec had been limited. He communicated over text message and email with David Chen infrequently, and infrequently with other parties concerning OtterSec or OtterSec related matters. Sam Chen did, however, receive e-mail notifications related to OtterSec financial accounts and transactions, and

5

J.R.467

had more recently been using his email account to communicate about disputes he and David Chen had with Robert Chen in relation to OtterSec. He did not use Discord, Telegram or GitHub.

Between June 1-28, 2022, Sam Chen and David Chen identified and gathered for H&K the messages David Chen had downloaded from the OtterSec Discord server as of April 27, 2022, direct messages David Chen exchanged over Discord and Telegram with Robert Chen, direct messages exchanged over Discord in a direct message group consisting of David Chen, Robert Chen, and Philip Papurt, and direct messages David Chen exchanged over Discord with Philip Papurt. Sam Chen and David Chen further identified and gathered for H&K the emails they exchanged with Iqan Fadaei of Michael Best & Friedrich LLP, copies of OtterSec formation, governance, operational, and related documents (which included OtterSec's Articles of Organization, operating agreements and amendments, IRS filings, and a summary of a member meeting on May 4, 2022). They also identified and gathered repositories from David Chen's GitHub account, in which had he preserved the Solend liquidator code he uploaded to and maintained on Github starting on November 1, 2021 and continuing to the present, showing the history of changes made to the Solend liquidator code, maintained the branch containing changes made by Robert Chen or others at OtterSec as of April 27, 2022, and worked on different branches of it.

Prior to Sam Chen's passing, Plaintiff generally was not involved with OtterSec or OtterSec related matters. She communicated infrequently with David Chen and Sam Chen over text and email, and did not communicate with persons at OtterSec or third parties concerning OtterSec or OtterSec related matters. Plaintiff did not use Discord or GitHub, and was not considered by Sam Chen or David Chen as a source of relevant or potentially relevant evidence. Thus, no documents or communications were gathered (or considered for gathering) from Plaintiff

6

J.R.468

prior to Sam Chen's passing. Plaintiff only first became involved in the disputes Sam Chen and David Chen had been having with Robert Chen following Sam Chen's passing on July 13, 2022, and she formally engaged H&K on August 10, 2022. Although Plaintiff did not at the time have the password to access Sam Chen's email account, she collected and maintained Sam Chen's mobile phone in her home after Sam passed away. Plaintiff was able to access the mobile phone, which in turn allowed her to access Sam Chen's text messages and emails. Plaintiff maintained and did not alter, delete or destroy Sam Chen's emails or text messages, and maintained and did not alter, delete or destroy any of her own documents, including emails and text messages, that were relevant or potentially relevant. These generally consisted of text messages with David Chen, emails that post-date Sam Chen's death, and documents and emails relating to the Estate of Sam Chen, her appointment as Administrator of the Estate of Sam Chen, and her administration of the Estate of Sam Chen.

H&K's representation of Plaintiff and David Chen terminated as of December 31, 2022, following which Plaintiff and David Chen arranged for the transfer of H&K's files, which included the documents and communications Sam Chen and David Chen had previously gathered and collected for H&K, to be transferred to their new counsel. The files transferred to new counsel also included correspondence that had been exchanged between H&K and Mr. Fadaei on behalf of OtterSec between June and December 2022, and documents and communications that had been provided to H&K by Mr. Fadaei pursuant to information requests made on behalf of Sam Chen pursuant to Wyoming law. These documents and communications included Discord and Telegram communications, agreements with OtterSec clients and customers, and agreements with OtterSec employees and independent contractors.

7

Through March 2024, Plaintiff and David Chen continued to preserve relevant or potentially relevant documents, communications, and information by not deleting or destroying them. Although David Chen did, from time to time, delete messages he sent over Discord in the course of his normal use, which was extensive, he generally did so on an individual basis because the messages had been sent in error. David Chen also preserved OtterSec's Yubikey and ledger wallet by keeping them in a drawer in his desk in his home; maintained his personal computers, drives, and external storage devices; preserved documents (including his tax returns) relating to income he earned from the Solend liquidator code by not deleting or destroying them (to the extent he was even capable of deleting or destroying them); preserved his X Account by not deleting posts or messages; maintained his blockchain wallets and private keys; preserved, by not deleting, messages in 135 servers, channels, and direct message groups that he identified as containing relevant or potentially relevant evidence (identified in Exhibit A); and preserved the contents of his Telegram account by not deleting direct messages, messages in public channels, and messages in private channels.

As a general matter, Plaintiff and David Chen identified February 2022, when OtterSec was formed, as the applicable starting date for preserving relevant or potentially relevant evidence. When David Chen's Motorola Moto E mobile phone, which he purchased in August 2021, ceased functioning in early April 2023, he preserved it by placing the phone in a cabinet in his home. When he purchased a new mobile phone (a Google Pixel) to replace the Motorola Moto E, David Chen preserved the contents of the phone by not deleting its contents. Plaintiff also continued to maintain Sam Chen's mobile phone in her home and did not alter, delete or destroy Sam Chen's emails or messages, and also did not alter, delete or destroy any of her own relevant or potentially relevant emails or text messages. With the exception of backups of David Chen's computers

8

(which were done prior to any reinstallations), neither Plaintiff, Sam Chen nor David Chen had, maintained, or utilized backup systems or tapes, and they did not have or follow any policies, practices, procedures, or systems for automatically or routinely deleting or destroying documents.

Following the Court's decision denying Defendants' Motion to Dismiss on March 11, 2024, and the entry of a Scheduling Order on March 26, 2024, Plaintiff and David Chen began working with Plaintiff's discovery vendor, in coordination with their counsel, to reasonably identify, gather, collect, and preserve relevant and potentially relevant evidence for purposes of discovery in this action. The first collection was completed on April 19, 2024, and Plaintiff refers to and incorporates her response to Interrogatory No. 2 below for the additional details of this and subsequent collections, including dates and sources. On May 17, 2024, Plaintiff disclosed to Defendants the sources of relevant or potentially relevant evidence that she had initially identified for purposes of discovery in this case,[1] and also disclosed to Defendants both that David Chen's Motorola Moto E mobile phone had become inoperable in April 2023 and that Plaintiff did not at that point have access to Sam Chen's email account. However, shortly thereafter, as Plaintiff advised Defendants on May 24, 2024, Plaintiff was able to successfully gain password access to Sam Chen's email account. Plaintiff also undertook reasonable efforts to recover data from David Chen's Motorola Moto E mobile phone, as further detailed in Plaintiff's response to Interrogatory No. 13 herein.

**Interrogatory No. 2:** Identify with specificity what sources of documents You gathered for purposes of discovery in this case, including the name of any Discord guild (also known as a "server") and/or channel, and for each source, identify the date the documents from that source were collected and preserved.

_____

[1] Plaintiff later provided Defendants with further disclosures of her sources of relevant or potentially relevant evidence for purposes of discovery in this case on November 27, 2024. Defendants did not identify any deficiencies in the sources identified by Plaintiff.

J.R.471

**Response:** Plaintiff objects to the phrase "with specificity" in Interrogatory No. 2 on the grounds that it is open to more than one interpretation and, therefore, ambiguous. Notwithstanding and without waiving this objection, Plaintiff assumes a reasonable meaning of the phrase "with specificity" and, subject to her general responses and objections, sets forth in the table below the sources of documents she gathered "for purposes of discovery in this case," which Plaintiff is construing to be referring to discovery in the "action" (as defined in Defendants' Instructions and Definitions) in which the Interrogatories were served, *Yao v. Chen*, and as including Defendants' request that electronically stored documents be produced in discovery "in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland." To the extent known, available or capable of being determined by Plaintiff after reasonable inquiry and investigation, the table below, together with the exhibits they incorporate, includes the name of any Discord guild, server or channel, as applicable. Except as otherwise indicated, all documents gathered from the sources identified below were collected and preserved by Plaintiff with the assistance of her discovery vendor, TransPerfect, on the dates identified in the "Date" column in the table below; each collection included all documents that were available as of the date of collection[2]; and each collection included all available documents from the beginning date of the "Relevant Period" (as defined in Defendants' Instructions and Definitions) to which the Interrogatories apply (in other words, from February 1, 2022, through the applicable dates of collection).

---

[2] Thus, any Discord messages deleted from these sources prior to the date of collection were not included in that collection.

| Source | Date |
|---|---|
| David Chen's email accounts likely to have potentially responsive and relevant material:[3]<br><br>• davidchen0@protonmail.com, which includes the following alias accounts:<br>davidchen0@proton.me,<br>radiantaeon@proton.me,<br>reddit_throwaway125@proton.me,<br>craigslist_15125@proton.me,<br>wendigo55129@proton.me,<br>adjacentfi@proton.me,<br>commonappdc@proton.me,<br>contact@adjacent.fi,<br>davidchen501295@proton.me, and<br>tinder1525@proton.me | April 19, 2024 |
| Export of Discord messages from 135 servers, channels, and direct message groups likely to have potentially responsive and relevant material, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit A for list of servers, channels, and direct message groups collected. | April 23, 2024 (HTML format); May 1, 2024 (JSON format)[4] |
| David Chen's Telegram account: all private channels and direct messages. | April 23, 2024 (HTML format); May 1, 2024 (JSON format) |

---

[3] Plaintiff previously identified the email address ra@solend.fi as one of the sources from which documents were collected for purposes of discovery in this case. This is an email address that David Chen used in connection with work he was doing for Solend (writing "smart contracts") prior to the formation of OtterSec At the time Plaintiff identified ra@solend.fi, her counsel mistakenly understood ra@solend.fi to have been an "alias" email address linked to David Chen's "davidchen0@protonmail.com" email account, and that it had been collected when the davidchen0@protonmail.com email account and its alias email addresses were collected on April 19, 2024. It is not an alias email, and was instead provided to David Chen by Solend. When OtterSec was formed and David Chen ceased his work for Solend, Solend removed his access to the ra@solend.fi email account such that any emails sent or received using that account could not have been gathered, preserved or collected for purposes of discovery in this case.

[4] This collection also included all messages that David Chen had from the OtterSec Discord server, which were through April 27, 2022 (not May 1, 2024).

11

J.R.473

| Mobile phones:<br><br>• David Chen's Motorola Moto E phone<br>• Sam Chen's mobile phone<br>• LiFen Yao's mobile phone<br>• David Chen's Google Pixel phone | June 10, 2024 (Sam Chen's and Plaintiff's mobile phones, David Chen's Motorola Moto E phone)[5]<br><br>June 14, 2024 (David Chen's Google Pixel phone) |
|---|---|
| Li Fen Yao's email account: Lifen1299@yahoo.com | June 12, 2024 |
| Sam Chen's email account: Smchen90@hotmail.com | June 12, 2024 |
| Export of Discord messages from direct message groups, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit B for list of direct message groups collected. | October 17, 2024 (HTML format); October 21, 2024 (JSON format) |
| Discord collection of David Chen's Discord messages.<br><br>*See* spreadsheet attached as Exhibit C for list of servers, channels, and direct message groups from which messages were collected. | October 29, 2024 (messages through July 31, 2024)[6] |

---

[5] Although the physical device was collected by Plaintiff's discovery vendor on June 10, 2024, data could not be extracted from David Chen's Motorola Moto E phone.

[6] On July 31, 2024, David Chen obtained his personal messages from Discord pursuant to a personal data request described here: https://support.discord.com/hc/en-us/articles/360004027692-Requesting-a-Copy-of-your-Data. Although the data did not include any deleted messages, it included messages that David Chen sent in servers, channels, and direct message groups, irrespective of whether he was still a member of the server, channel or direct message group. The messages were collected by Plaintiff's discovery vendor for purposes of discovery in this case on October 29, 2024.

12

J.R.474

| | |
|---|---|
| Email accounts of David Chen:<br><br>• realawesomenessisreal@gmail.com<br>• RealAwesomeness@outlook.com<br>• RealAwesomeness@protonmail.com<br>• minecraft15230987@outlook.com<br>• dc0910758@gmail.com | October 29, 2024[7] |
| David Chen's Twitter/X account (all messages and posts) | October 31, 2024 |
| Email accounts of David Chen:<br><br>• Datingapp15@protonmail.com<br>• Test109000@protonmail.com | November 5, 2024 |
| David Chen's computers and drives:<br><br>• Linux desktop<br>• Linux laptop<br>• Alienware laptop<br>• Samsung 980 PRO<br>• External NVMe drive | December 13, 2024 |
| David Chen's Muskin Helix NVMe drive | December 17, 2024 |
| David Chen's WD MyBook drive (backup of David Chen's Linux desktop) | December 18, 2024 |
| David Chen's GitHub account (except for repositories in organizations) | February 18, 2025 |

---

[7] Plaintiff's discovery vendor initially attempted on October 29, 2024, to collect David Chen's dc0910758@gmail.com account but was unsuccessful, because the account had been disabled by Google due to non-use. Google restored access on November 5, 2024, and the account was collected on that day.

13

J.R.475

| | |
|---|---|
| Export of Discord messages from servers and channels, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit D for list of servers and channels collected. | January 9, 2025[8] |
| Export of Discord messages from servers and channels, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit E for list of servers and channels collected. | February 11, 2025[9] |
| David Chen's Samsung 980 PRO (same as December 13, 2024), Mushkin Helix NVMe drive (same as December 17, 2024), three additional Samsung 980 PROs, and WD MyBook drive (same as December 18, 2024).[10] | February 24, 2025 |
| David Chen's Telegram account: all public channels, private channels and direct messages | March 18, 2025 |
| Screenshots of David Chen's GitHub account (commit history, Solend liquidator code) | April 4, 2025 |
| David Chen's GitHub account (all repositories, including repositories in organizations) | April 8, 2025 |

**Interrogatory No. 3:** Identify all the Discord channels or servers that You claim "are irrelevant," *see* ECF 117, and that You claim are associated with 1,722 messages within the discovery range, *id.*, and also provide the Discord identification numbers associated with those channels and guilds (servers).

---

[8] Due to the amount of data, this collection began on January 9, 2025, but was completed in batches on January 21, 2025, January 30, 2025, February 20, 2025, and March 12, 2025, as indicated in Exhibit D.

[9] Due to the amount of data, this collection began on February 11, 2025, but was completed on February 20, 2025 as indicated in Exhibit E.

[10] Collected by NAXO Labs LLC.

14

J.R.476

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that on August 19, 2025, her counsel advised the Court of (among other things) factual inaccuracies contained in the filing referenced in this interrogatory (ECF 117) and, further, "that some of the 1,722 deleted Discord messages referenced in ECF Doc. Nos. 117 … are potentially relevant." *See* ECF 157. Nonetheless, Plaintiff states that the Discord channels and servers, and Discord identification numbers, associated with the referenced 1,722 messages in ECF 117 are as follows:

| Channel or Server | Discord ID | Number of Messages |
|---|---|---|
| crypto-discussion in AltTank | 424635698331779082 | 1 |
| Direct Message with kern5099#0 | 837609653075443763 | 1 |
| Direct Messages with morericekara#0 | 769194866688524327 | 22 |
| Direct Message with mr_cahar#0 | 1136699777619341322 | 2 |
| food-pr0n in AltTank | 759813205517271091 | 2 |
| gamez-n-memez in AltTank | 877759997210144798 | 1 |
| general-just-general in AltTank | 761239447369941102 | 4 |
| industry-news in Save Team | 1141579079632552057 | 3 |
| sol-ecosystem-chat in AltTank | 840598469068587012 | 2 |
| trading-talk in AltTank | 438430983075790850 | 7 |
| Kusuriya no Hitorigoto | 1075601030261260288<br>1162495256525291562<br>690813121115455500<br>690813625526648862<br>690822555820621845<br>690822665954394183<br>690823830964535318<br>690823982508802090<br>692385750590816286 | 472 |

15

J.R.477

|  | 785583981600702495 |  |
|  | 786048737021526026 |  |
|  | 806352809762357338 |  |
| New clickbait | 471845879695802370 | 1,204 |
|  | 787328307309445140 |  |
|  | 788144360738259004 |  |
|  | 788502936141299712 |  |
|  | 788861446833700947 |  |
|  | 808494121806856232 |  |
|  | 818669129728917565 |  |
|  | 833850599359250462 |  |
|  | 858162636142673921 |  |
|  | 859070020364271616 |  |
|  | 897979229768130572 |  |
|  | 927293274161549372 |  |
| parrot.fi | Parrot Finance | 837609653075443763 | 1 |

**Interrogatory No. 4:** Identify the "personal friend who was not involved with OtterSec," ECF 117, including the person's Discord username, real name, and address.

**Response:** Plaintiff objects to Interrogatory No. 4 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced "personal friend" is Marissa Liu, 14201 Dav Rd., Rockville, MD 20850, and that her Discord username is morericekara.

**Interrogatory No. 5:** Describe how and when David Chen deleted the more than 17,000 Discord messages in 2024. If he used several different mechanisms, describe each one specifically.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David Chen installed a script from GitHub called "undiscord," (available at https://github.com/victornpb/undiscord) on or about July 28, 2024, and used it to delete messages in 2024 as follows: (a) on

16

J.R.478

July 28 and 29, 2024, he deleted 2,050 messages in "Kusuriya no Hitorigoto," sent within the time period of June 2021 through June 2024; (b) on July 29, 2024, he deleted 768 messages in "Jito," sent within the time period of August 2022 and June 2024; (c) on July 29 and 30, 2024, he deleted 1,927 messages in "new clickbait," sent within the time period of December 2021 and January 2024; and (d) on July 30, 2024, he deleted 1,899 messages in "dead meme," sent within the time period of January 2018 and December 2021. Between October 10 and 28, 2024, David Chen also deleted, using the same script, 10,430 messages with "closetduck," sent within the time period of May 2020 and December 2021. On October 29, 2024, David Chen deleted 1 message in "advice-help in Cal 3 (Math241)," sent in October 2024, by deleting that message manually. On May 19, 2024, David Chen deleted 22 messages with "morericekara," sent in August 2023, by deleting the messages manually. The remaining 44 messages David deleted in 2024 were deleted manually, on various dates and on an individual basis, and all 44 were deleted within twenty-four hours of being sent.

**Interrogatory No. 6:** Explain how David Chen determined which Discord messages to delete in 2024. If he made different determinations about deleting different messages or categories of messages, describe each determination.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the messages that were deleted by David Chen in 2024 manually, on an individual basis, typically within twenty-four hours of being sent, were generally deleted for humorous effect a few seconds after they were sent or because they were sent in error. The other messages, which were sent by David at various times between the ages of 12 and 19, concerned highly personal or intimate matters, or involved crude, unfiltered or boastful conversations and discussions which David decided to delete after going to orientation at UMD and as a symbolical way of parting with his old persona and entering a new phase of his life. In particular, David deleted his messages in "Kusuriya no Hitorigoto" because messages in this server contained explicit images and discussions, and he was embarrassed

17

by them and no longer wished to be involved with the server or reminded of the messages. He deleted all of his messages sent after August 5, 2022, in Jito, because he had boasted in the server about his efforts, using a denial of service attack, to thwart hackers from accessing and stealing funds from victims' wallets, and also about his success playing the game SVBonk, and considered them to be part of an immature past that he wished to put behind him. David also deleted these messages to annoy Robert, who was also a member of the server. David deleted his messages in "new clickbait" because the conversation frequently included highly personal, and sometimes raw or salacious, discussions among his adolescent high school friends. Additionally, the individuals in the "new clickbait" group were high school friends who, by that time, had drifted apart during their final year in high school and moved on to college while David took a gap year as a result of personal difficulties he experienced following the death of his father. Ally Guo, the last person in "new clickbait" with whom David still regularly spoke, had a fight with David where she turned down David's advances in June and was no longer speaking to David, breaking one of the last attachments David had to the "new clickbait" server. The "new clickbait" server enhanced these personal difficulties by making David Chen feel lonely, isolated, and sad, and he deleted the messages (and exited the server) in an effort to better manage his well-being, to try to move on from Ally, move on in general from high school, and prepare for college. The "new clickbait" server also likely contained messages that implied David used a version of the code on top of OtterSec changes for a brief period in May of 2022, and this likely also factored into his decision to delete the messages. He similarly deleted all of his messages in "dead meme" because it was an old and inactive middle school friend group (dating back to 2017) that was replete with immature, juvenile, and personal discussions that he no longer wished to be part of or reminded of. David deleted his messages with "closetduck" sent before January 1, 2022, because she (Ally Guo) was

18

a close personal friend whom David had confided in (and vice versa) about highly sensitive or delicate personal matters. The "closetduck" deletions in particular came when David recalled news reports of the publication of personal messages exchanged between Vice President Vance and a former law school classmate, prompting David to become concerned about his digital footprint and the potential for a betrayal of trust especially after the fight in June and her refusal to discuss the fight on October 6, 2024, days before the deletions began. David deleted the single message in "advice-help in Cal 3 (Math241)" because it referenced an exam question, and David was concerned that classmates who had not yet taken the exam might see it. David deleted the 22 messages with "morericekara" because he had a romantic interest in her at the time, the messages were flirtatious, and he was embarrassed by them.

**Interrogatory No. 7:** Did David Chen register, or cause to be registered, the domain ottersec.io?

**Response:** Plaintiff objects to Interrogatory No. 7 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen did not register, or cause to be registered, the domain ottersec.io.

**Interrogatory No. 8:** Describe any and all of David Chen's communications that reference "ottersec.io," by date, method of communication, the name and username of the person he communicated with, and a description of the communication.

**Response:** Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff identifies the communications which have been produced at YAO00007568, which are Discord messages between David Chen (username, "radiantaeon") and Robert Chen (username, "notdeghost") from February 6, 2022, that include a reference to "ottersec.io" as follows: "but our domain isn't

19

J.R.481

ottersec.io." Plaintiff and David have also verbally discussed "ottersec.io" with each other generally.

Plaintiff further states that, while David Chen was attending "DEF CON 32" in Las Vegas in August 2024, other attendees mentioned the website to him during in-person discussions. To the best of David's recollection, the individuals who mentioned it to him were: (1) Larry Yuan, whose Discord username is "ehhthing"; (2) Daniel Lu, whose Discord username is "brown.ee"; (3) an individual whom David only knows by the Discord username "Drakon"; (5) Sammy Hajhamid, whose Discord username is "pepsiu"; and (6) Bryce Casaje, whose Discord username is "Strellic.". Each of the conversations consisted of the individuals advising David Chen that they were aware of this action because of the website "ottersec.io," and informing David that they were aware of the website because it was being passed around on Discord. None of the individuals indicated that they were aware of the person or persons who registered, or caused to be registered, the domain ottersec.io.

Additionally, at a "hacker Thanksgiving" holiday party in or around November 2024, David briefly spoke to Luna Tong (Discord username "e7l") about ottersec.io. She advised David that she was aware of the website and did not know the person or persons behind ottersec.io. At the same holiday party, David also spoke to an individual whom he did not know previously, but believes his name to have been "Matthew". The individual mentioned that he knew of the website generally, and that he knew of a person (whom "Matthew" did not identify) was known to use the same domain registrar as the person who deployed the website. David also believes that he mentioned ottersec.io to Aaron Esau (Discord username "arinerron") and spoke with Daniel Lu again at the party about ottersec.io generally, but does not recall the details of these conversations

20

except that neither Aaron Liu nor Daniel Lu identified, or stated that they knew, the person or persons behind ottersec.io.

Additionally, in or about June and July 2025, David mentioned, during oral conversations, the website ottersec.io to two people at the office where he was working for the summer, David Cruz and Manny Cruz (Telegram username "eevoy"). During the same time period, David also mentioned, during oral conversations, the website to his summer roommates, Kevin (Discord username "baselinedirector" and Telegram username "fullyallocated"), Indigo (Discord username "ind.igo"), Zach (Discord username "0xzx"), Drew Davis (Telegram username "dithdrew"), Devin Mitchell (Discord username "nojob"), and Alina Lin (Telegram username "alinatyng").

After reasonable inquiry and investigation, neither Plaintiff nor David Chen have, and they have been unable to determine, further responsive, identifying information for the individuals referenced above and are unaware of other responsive communications.

**Interrogatory No. 9:** Identify by Discord username, real name, and address each user in the "group of users with whom David formed an on-line friendship in 2017." ECF 117.

**Response:** Plaintiff objects to Interrogatory No. 9 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that "alttank" is the referenced "group of users with whom David formed an on-line friendship in 2017." The Discord usernames of the members of the group are: hensonkraj, trial123, jriggs28, cmallory183, _dznutz_, kott7795, mentaldragon13, dragoon316, trainman, blunto., dfisherman12, hoser5283, 6665sted666, greg.icemining, bill_i_am, adu6, bigassboy., dk808, tim4093, guido8798, joe3kool, oskar_the_ork, porterhousegamer, randomtask6236, smashnbash4651, stilger, sexeast, thebee6035, and xtrmil. After reasonable inquiry and investigation, Plaintiff is informed and believes that the first name of "Trial123" is Parker, the first name of "oskar_the_ork" is Oscar, the

21

first name of "greg.icemining" is Greg, the first name of "joe3kool" is Joe, and the first name of "6665sted666" is Joe. Neither Plaintiff nor David Chen know, and despite reasonable inquiry and investigation they have been unable to discern, any further responsive information concerning the users in this group.

**Interrogatory No. 10:** For each entry in the spreadsheet produced to Defendants by Discord, which shows David's deletion of Discord messages and was produced to Plaintiff's counsel on January 31, 2025, identify: the name of the guild (server); the name of the channel; and for Direct Messages or Group Messages, identify the username of the person(s) in the group chat, or the username of the person to whom the Direct Message was sent (for Direct Messages).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff refers to and incorporates herein the spreadsheet attached hereto as Exhibit F, which delineates the information responsive to Interrogatory No. 10. However, the names of some guilds, servers or channels are either unknown or partially unknown to Plaintiff and David Chen, even after reasonable inquiry and investigation, and they are unaware of any way to determine the names of the guilds, servers or channels identified in these Responses as unknown or partially unknown. Defendants have advised that "a Discord user can use guild_id and channel_id numbers to determine the names of the corresponding guilds and channels simply by logging into Discord on a web browser and typing in a URL of the format: https://discord.com/channels/[Guild _ID]/[Channel_ID] in order to navigate to the channel in question." But, to the best of Plaintiff's and David Chen's knowledge and understanding, and after reasonable inquiry and investigation this appears to be only partially correct. Using guild, server, and channel IDs with this URL only identifies the names of corresponding guilds, servers, and channels if, and to the extent that, the guild, server or channel still exists and/or a Discord user has permission to access it. For the guilds, servers, and channels identified in these Responses as unknown or partially unknown, Plaintiff has attempted to use the guild, server, and channel IDs with the URL provided by Defendants but has been unable to identify their names, likely because the guild, server or channel does not exist any longer or

22

J.R.484

because David Chen does not have permission to access it. These include channels within the "Kusuriya no Hitorigoto," and "Parrot Finance, servers, and the channels within the Save Team server listed as "unknown in Save Team" and the channel within new clickbait listed as "unknown in new clickbait."

**Interrogatory No. 11:** Did David Chen delete messages on the Jito server about his work for, and/or his payments from, the Solana Foundation?

**Response:** Plaintiff objects to Interrogatory No. 11 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen has not worked for the Solana Foundation. Plaintiff further states that David asked in the Jito discord about over-the-counter selling of a large sum of locked Solana tokens that were payment to him from the Solana Foundation for finding a bug in Solana's code and that these messages were deleted. David found the bug in or about October 2022 and received the locked Solana tokens on or about April 5, 2023. David Chen believes the messages were sent after he received the tokens, but has been unable to verify this because, despite having preserved David Chen's messages on the Jito server, Defendants have not produced messages past March 2023.

**Interrogatory No. 12:** Identify the date and circumstances when Plaintiff learned that the Motorola "Moto E" telephone that David Chen had used from approximately August 2021 through April 2023 had "bricked" or otherwise malfunctioned, and explain what steps Plaintiff and/or David took to repair or preserve the phone from that time up through May 2024.

**Response:** Plaintiff objects to Interrogatory No. 12 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that she learned from David Chen that his Motorola Moto E mobile phone had ceased functioning on or about April 2, 2023. After David had picked up the phone to use it and learned that it had ceased functioning, he turned it off and then turned it on again, but the phone still did not work. At the

23

time, David assumed that it had simply failed because it was relatively old and inexpensive (having been purchased in August 2021 for approximately $120), considered it to be unworthy of any further effort or expense to repair, and proceeded to purchase a new mobile phone. He preserved the Motorola Moto E mobile phone in a cabinet in Plaintiff's home, but did not take any additional steps to repair it or access any information on it until providing it to Plaintiff's discovery vendor on June 10, 2024.

**Interrogatory No. 13:** Identify the date when David provided his Motorola "Moto E" phone to counsel and/or to a forensic examiner.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David's Motorola Moto E mobile phone was preserved in a cabinet in Plaintiff's home until being provided directly to Plaintiff's discovery vendor, TransPerfect, on June 10, 2024. TransPerfect was unable to collect data from the phone and attempted to identify and work with other vendors in an effort to collect the data. Through TransPerfect, Plaintiff sought to engage the services of Cellebrite and, on July 10, 2024, David Chen signed an agreement with Cellebrite. When Cellebrite informed TransPerfect, on or about August 26, 2024, that it had not received the signed agreement, David Chen signed another agreement with Cellebrite on August 28, 2024. On September 26, 2024, David Chen learned that Cellebrite had not received the mobile phone and would be unable to do the mobile device extraction. After further follow up, Cellebrite indicated that they could attempt to extract data from the phone but that it would be experimental and there was a risk of data loss. The phone was not sent to Cellebrite but was instead sent to DriveSavers in November 2024. On or about November 21, 2024, DriveSavers returned the phone to TransPerfect after recovery efforts were unsuccessful. In December 2024, the mobile phone was sent to TeelTech, and TeelTech has since retained possession of the phone.

24

**Interrogatory No. 14:** Explain the circumstances of David's Motorola "Moto E" phone becoming "bricked" in April 2023, as You have claimed, including what processes David ran on the phone prior to it "bricking" and when precisely it "bricked."

**Response:** Plaintiff objects to Interrogatory No. 14 on the grounds that the phrase "as you have claimed" is vague, ambiguous, insufficiently clear, and purports to characterize facts. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that in or around late April or May 2022, David Chen flashed his Motorola Moto E mobile phone while attempting to install a new operating system, Graphene OS. To flash the phone, David unlocked the phone's bootloader, downloaded a rom, booted the device to fast boot, uploaded a new rom to the phone, and then rebooted the phone into the new rom. His attempted installation was unsuccessful, and he then reset the phone to a factory setting (Motorola's Android OS for the Motorola "Moto E") rom, following which the phone worked until on or about April 2, 2023. David does not recall what specifically he was doing with the phone (if anything) when it ceased working in or around April 2, 2023, but generally recalls picking it up to use it, discovering that it was not functioning, turning it off and then on again, learning that it still was not working, and then purchasing a new phone.

**Interrogatory No. 15:** Identify the current location of the computer server "utilized" by OtterSec that is described by David Chen in his declaration at ECF 28-5, and whether the data on that server was preserved, collected and searched as part of discovery in this Action.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the computer server that is described by David Chen in his declaration at ECF 28-5 is currently located in Plaintiff's home. After David Chen stopped working for OtterSec in April 2022, he notified users, including Robert Chen, that he planned to wipe the server, and advised them to remove any data of value off of it. David then proceeded to wipe the server and deleted the OtterSec "virtual machines" from the server on or about April 27, 2022. Although the original disks (and an estimated 4-5 generations of data disks and 1-2 generations of operating system disks) burned out

25

over the course of normal use, the latest disks for that server have been preserved and a cloned copy of the OS drive from September of 2022 have been found and preserved.

**Interrogatory No. 16:** Identify all OtterSec clients with whom David Chen communicated about auditing, for the period after David Chen stopped working for OtterSec.

**Response:** Plaintiff objects to Interrogatory No. 16 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, David Chen did not communicate about auditing with anyone that he believed or knew was (at the time) or had previously been a client of OtterSec, including, but not limited to, anyone associated with Solend, after he stopped working for OtterSec.

**Interrogatory No. 17:** Identify any documents – including, but not limited to, Telegram and Discord messages – that are responsive to any Interrogatory or Document Request propounded by the Defendants at any point during this Action, and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation; a description of the document's content; the document's author/creator; when the document was destroyed, lost or transferred; and who was last in possession of the document(s).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, and except for discovery requests specifically asking about deleted messages (to which all deleted messages would be responsive), she is aware of potentially responsive Discord messages sent by David Chen in "new clickbait" server in May 2022 that were deleted by David Chen on July 29, 2024. The messages that were deleted included messages from 2022 in the "rubber-duck-debugging" channel that mentioned liquidations performed by the code and potentially contained monologues about the development of the code.

Plaintiff further states that there were a limited number of arguably responsive text messages on David Chen's phone between, on the one hand, David Chen, and either Sam Chen or Plaintiff on the other.  While David's copies of these messages are not available, the messages

26

were not destroyed or lost because they were preserved by Sam Chen and Plaintiff, and they have been produced. Apart from the limited number of arguably responsive text messages that he exchanged with his parents, David does not recall sending any responsive text messages prior to the failure of his Motorola Moto E phone on or about April 2, 2023.

Except as stated, Plaintiff is unaware of other responsive documents that were destroyed, lost or transferred by Plaintiff, Sam Chen, or David Chen on or after September 20, 2022, and to the extent that any responsive documents were destroyed, lost or transferred on or after September 20, 2022, by persons other than Plaintiff, Sam Chen, or David Chen, Plaintiff does not have possession, custody or control of responsive information.

**Interrogatory No. 18:** Identify any and all person(s) with whom you have discussed this Action, other than Your counsel, and state the substance of those communications and those persons' contact information.

**Response:** Plaintiff objects to Interrogatory No. 18 on the grounds that it is overly broad, unduly burdensome, seeks information that is not relevant to the parties' claims or defenses. and seeks discovery that is not proportional to the needs of the case, particularly insofar as it asks Plaintiff to identify "any and all" persons with whom she has "discussed" this Action, regardless of the nature, substance or significance of those discussions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, other than counsel and to the best of her recollection, Plaintiff has discussed this action with the following individuals: (a) her son, David Chen, 13717 Travilah Road, Rockville, MD 20850; (b) her niece, Junying Hao, 7858 SE 28th St, A509, Mercer Island, WA 98040; and (c) her sister, Lina Yao, 13 Nanxi Huanyuan, Jiaxing Zhejiang, China. Since first becoming involved with the disputes that are the subject of this action, Plaintiff has discussed all aspects of this Action with David Chen on a regular basis throughout the course of the Action. Junying Hao has stayed with Plaintiff during the Relevant Period, provided companionship and emotional support for Plaintiff

27

since the death of Plaintiff's husband, Sam Chen, in July 2022, and in connection therewith they have discussed many aspects of this case generally. Similarly, after Plaintiff's mother passed away in China in March 2022, Lina Yao traveled to the United States to visit Plaintiff and her family in June 2022. She was still staying with Plaintiff and her family when Sam Chen was killed in a car accident in July 2022, remained with Plaintiff and her family for an extended period of time thereafter, has provided emotional support to Plaintiff, and in connection therewith they have discussed many aspects of this case generally.

**Interrogatory No. 19:** Identify by real name, username, and address David's previous "cofounder," to whom David refers in Discord messages to Philip Papurt, on April 23, 2022.

**Response:** Plaintiff objects to Interrogatory No. 19 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced cofounder is Alexander Karavaltchev, Discord username: friendlyuser2224585, Discord id: 888979921135878174. The address of Alexander Karavaltchev is 55 High Street, Butler, New Jersey.

By: _/s/Alexander M. Giles_____
Michael J. Lentz
Alexander M. Giles
TYDINGS & ROSENBERG, LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Plaintiff Li Fen Yao*

6437503.1

28

J.R.490

## VERIFICATION

I, Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, state that I am the Plaintiff in this Action. I have read the foregoing Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC and, based on my personal knowledge, reasonable inquiry and investigation, including communications with David Chen, I believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: August 29, 2025

_____
Li Fen Yao

I, David Chen, state that I have read the foregoing Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC and that, based on personal knowledge, reasonable inquiry and investigation, I believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: August 29, 2025

_____
David Chen

31

J.R.491

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2025, I caused the foregoing Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC to be served on counsel for Defendants via email.


_ */s/Alexander M. Giles*_____ ____
Alexander M. Giles

30

J.R.492

# Exhibit 13

J.R.493

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td>
LI FEN YAO, as Administrator of the
Estate of Sam Mingsan Chen,

        Plaintiff,

v.

ROBERT CHEN, OTTER AUDITS
LLC, and RC SECURITY LLC,

        Defendant.
</td><td>
Case No. 8:23-cv-00889-TDC
</td></tr>
</table>

**PLAINTIFF'S RESPONSES TO DEFENDANTS'
FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Rule 104 of the Local Rules of the United States District Court for the District of Maryland, Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), by her undersigned attorneys, hereby responds to Defendants' First Set of Requests for the Production of Documents dated April 22, 2024 (the "Requests") as follows:

**GENERAL RESPONSES AND OBJECTIONS**

The following general responses and objections are incorporated into each of Plaintiff's specific responses to the Requests:

A.    These responses (the "Responses") are being provided based upon documents and information presently available and known to Plaintiff. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the

11301931.2

J.R.494

relevance or admissibility of the subject matter of any of the Requests or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Requests; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.      Plaintiff objects to the Requests, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek disclosure of documents protected by the attorney-client privilege, the work product doctrine or any other privilege, protection or immunity from discovery. Plaintiff's Responses do not include documents that are privileged, protected or immune from disclosure. The inadvertent production of any such documents shall not constitute a general or specific waiver of any privilege, protection or immunity from disclosure.

C.      Plaintiff objects to the Requests, including the instructions and definitions set forth therein, to the extent that they seek or are intended to impose obligations that exceed those under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland or applicable law. Plaintiff's Responses are limited to her obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

D.      Plaintiff objects to the Requests, including the instructions and definitions set forth therein, to the extent that any specific request is duplicative, repetitive or cumulative, in whole or in part, of any other specific request. Any objection to any specific request shall be deemed to be part of any response to any other specific request that is duplicative, repetitive or cumulative of it, whether or not such objection is specifically set forth therein.

2

11301931.2

J.R.495

E.    Plaintiff objects to the Requests, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek documents not within Plaintiff's possession, custody or control, and/or documents within the possession, custody or control of non-parties over whom Plaintiff has no authority and/or control. Notwithstanding and without waiving this objection, Plaintiff will search for and produce responsive documents that are within the possession, custody or control of David Chen.

F.    Plaintiff objects to the Requests, including the instructions and definitions set forth therein, to the extent that they are vague, ambiguous, overly broad, unduly burdensome, duplicative, repetitive, cumulative or not proportionate. Plaintiff will make a good faith effort to locate and provide information responsive to the Requests, subject to any objections, in accordance with her obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

G.    Plaintiff objects to the Requests, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek documents that are (i) already in the possession of the defendants; (ii) a matter of public record, (iii) as easily obtainable by the Defendants from third-parties as it would be by Plaintiff and/or (iv) in Plaintiff's possession, custody or control only because such documents have been provided to Plaintiff by other parties or non-parties through discovery or otherwise in this action.

H.    Plaintiff objects to the Requests including the instructions and definitions set forth therein, to the extent they assume or characterize, or are intended to assume or characterize, facts or law. These Responses shall not constitute an endorsement, admission, concession, agreement with or acceptance of any such assumptions or characterizations. Plaintiff expressly reserves, and does not waive, any objections to any characterizations of fact or law set forth in the Requests.

3

11301931.2

I.	Plaintiff reserves all objections at any hearing or trial or on any motion to the use or admissibility of any documents identified herein or produced.  The identification or production of documents does not constitute an admission by Plaintiff that such documents are relevant to the action or admissible in evidence.

J.	Documents being produced and/or made available by Plaintiff pursuant to these Responses will be produced on a rolling basis and/or made available by Plaintiff in a reasonable time, place and manner, and upon such other terms as may be determined by agreement of counsel or, failing that, order of the Court. Unless counsel agree or the Court orders otherwise, Plaintiff will produce copies of responsive documents in lieu of originals.

K.	A representation that responsive documents will be searched for, produced or made available for inspection and copying in response to a specific request shall not be construed as a representation that any such documents actually exist, but only that such documents shall be searched for, produced or made available, subject to any objections, to the extent that such documents exit, are available or can be located and identified after reasonable efforts.

L.	Plaintiff will conduct a search for responsive and accessible ESI upon an agreement between the parties or ruling from the Court on the custodians, locations and search terms to be applied to such search.  In the absence of an agreement between the parties or ruling from the Court, Plaintiff will conduct a reasonable search for responsive and accessible ESI.

<div align="center">

**RESPONSES TO INDIVIDUAL DOCUMENT REQUESTS**

</div>

**Request No. 1:**  All documents that support Plaintiff's responses to any Interrogatories served by Defendant.

**Response to Request No. 1:** Plaintiff incorporates her responses and objections to the interrogatories served by Defendants. Plaintiff also objects to Request No. 1 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative,

<div align="center">4</div>

repetitive and cumulative, particularly insofar as it seeks "all" documents. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents supporting her responses to Defendants' interrogatories.

**Request No. 2:** All documents and communications concerning OtterSec, including but not limited to, OtterSec's creation, assets, dissolution, contracts, and prospective contracts.

**Response to Request No. 2:** Plaintiff objects to Request No. 2 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" documents and communications and uses the non-specific phrase "including but not limited to." Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents and communications concerning OtterSec's creation, assets, dissolution, contracts and prospective contracts.

**Request No. 3:** All documents and communications concerning David Chen's role at OtterSec, including but not limited to David Chen's business and agency relationship with Sam Chen; agreements between David Chen and Sam Chen related to OtterSec; any transfer of interest to David Chen; and/or David Chen ceasing work for OtterSec as referenced in Paragraph 70 of your Complaint and on Page 4 of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint for Lack of Personal Jurisdiction, ECF No. 28.

**Response to Request No. 3:** Plaintiff objects to Request No. 3 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" documents and communications and uses the non-specific phrase "including but not limited to." Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents and communications concerning David Chen's role at OtterSec, David Chen's business and

<div align="center">5</div>

11301931.2

agency relationship with Sam Chen, agreements between David Chen and Sam Chen related to OtterSec, any transfer of interest to David Chen, and David Chen ceasing work for OtterSec.

**Request No. 4:** All documents and communications concerning any of the Defendants.

**Response to Request No. 4:** Plaintiff objects to Request No. 4 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" documents and communications. Plaintiff further objects to this request on the grounds that it seeks irrelevant documents and communications insofar as it seeks documents and communications without reference to the subject matter of such documents and communications or any limitation associated with claims or defenses in this matter. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents and communications concerning Defendants to the extent that such documents and communications are relevant to any claim or defense in this matter.

**Request No. 5:** All communications between Sam Chen or the Estate and David Chen concerning OtterSec, Jump, the "personal code and other property" referenced in Paragraph 71 of the Complaint and/or Robert Chen.

**Response to Request No. 5:** Plaintiff objects to Request No. 5 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" communications. Plaintiff further objects to this request on the grounds that it seeks irrelevant communications insofar as it seeks communications concerning the "personal code and other property" referenced in paragraph 71 of the Complaint without any limitation associated with claims or defenses in this matter. Notwithstanding and without waiving these objections, and subject to

6

11301931.2

Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce communications concerning OtterSec, Jump and David Chen's removal of Robert Chen's and OtterSec's access to the personal code and other property as referenced in paragraph 71 of the Complaint. As set forth in Plaintiff's response to Request No. 5, Plaintiff will also make a good faith effort to locate and produce communications concerning Robert Chen to the extent that such communications are relevant to any claim or defense in this matter.

**Request No. 6:** All communications between Sam Chen or the Estate and OtterSec and/or Robert Chen.

**Response to Request No. 6:** Plaintiff objects to Request No. 6 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" communications. Plaintiff further objects to this request on the grounds that it seeks irrelevant communications insofar as it seeks communications without reference to the subject matter of such communications or any limitation associated with claims or defenses in this matter. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce communications between Sam Chen or the Estate and OtterSec or Robert Chen, to the extent that such communications are relevant to any claim or defense in this matter.

**Request No. 7:** All communications between Sam Chen or the Estate and Li Fen Yao, David Chen, Darren Chen, Duo Chen, Sharine Chen, and/or Naiyu Wang concerning OtterSec, any of the Defendants, and/or the "personal code and other property" referenced in Paragraph 71 of the Complaint, including David Chen's use of and profits obtained from such personal code and other property.

**Response to Request No. 7:** Plaintiff objects to Request No. 7 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive

7

and cumulative, particularly insofar as it seeks "all" communications and uses the non-specific phrase "including." Plaintiff further objects to this request on the grounds that it seeks irrelevant communications insofar as it seeks (a) communications concerning the Defendants or the "personal code and other property" referenced in paragraph 71 of the Complaint without any limitation associated with claims or defenses in this matter, and (b) communications concerning "David Chen's use of and profits obtained from such personal code and other property." Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce communications concerning (i) OtterSec, (ii) Defendants, to the extent that such communications are relevant to any claim or defense in this matter, and (iii) David Chen's removal of Robert Chen's and OtterSec's access to the personal code and other property as referenced in paragraph 71 of the Complaint.

**Request No. 8:** Copies of David Chen's 2022 and 2023 federal and state tax returns.

**Response to Request No. 8:** Plaintiff objects to Request No. 8 on the grounds that the request seeks irrelevant documents that are confidential and not material to any claim or defense in this action. Plaintiff declines to produce any responsive documents on the basis of these objections.

**Request No. 9:** Documents sufficient to identify David Chen's work and all his sources of income from April 22, 2022, through March 31, 2023.

**Response to Request No. 9:** Plaintiff objects to Request No. 9 on the grounds that the request seeks irrelevant documents that are confidential and not material to any claim or defense in this action. Plaintiff declines to produce any responsive documents on the basis of these objections.

**Request No. 10:** All documents received from any third-party since the filing of the Complaint, whether provided in response to a formal or informal request in this Action.

8

11301931.2

J.R.501

**Response to Request No. 10:** Plaintiff objects to Request No. 10 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" documents. Plaintiff further objects to this request on the grounds that it seeks irrelevant documents insofar as it seeks documents without reference to the subject matter of such documents or any limitation associated with claims or defenses in this matter. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents received from third parties to the extent that such documents are relevant to any claim or defense in this matter.

**Request No. 11:** All non-privileged communications with non-parties regarding this Action.

**Response to Request No. 11:** Plaintiff objects to Request No. 11 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" communications. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce non-privileged communications with non-parties regarding this Action.

**Request No. 12:** Documents concerning your claim for damages or the methods used to calculate such alleged damages.

**Response to Request No. 12:** Plaintiff objects to Request No. 12 on the grounds that it seeks documents not within Plaintiff's possession, custody or control. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents concerning her claim for damages or the methods used to calculate such damages.

9

11301931.2

**Request No. 13:** All documents and communications that reflect, refer to, substantiate, or support each and every allegation in the Plaintiffs' [sic] Complaint, including but not limited to those referenced in Paragraphs 18-20, 24, 43-44, 49, 58, 67-68, 70-71, 80-86, 89-96, 100-02, 105-08, 114, 116, 118, 132, 134, 136, 142, 143-45, 147, 157-59.

> **Response to Request No. 13:** Plaintiff objects to Request No. 13 on the grounds that the request is unduly burdensome, overly broad, vague and ambiguous, duplicative, repetitive and cumulative, particularly insofar as it seeks "all" documents and communications. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents concerning the claims asserted in the Complaint.

**Request No. 14:** Documents sufficient to show any notice of claims against OtterSec that you sent to OtterSec or Iqan Fadaei in response to Iqan Fadaei's October 11, 2022 "Notice to Known Claimants" letter addressed to Daniel Kennedy.

> **Response to Request No. 14:** Plaintiff objects to Request No. 14 on the grounds that the request seeks irrelevant documents. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce documents sufficient to show any notice of claims against OtterSec that Plaintiff sent to OtterSec or Iqan Fadaei in response to Iqan Fadaei's October 11, 2022 "Notice to Known Claimants" letter addressed to Daniel Kennedy.

**Request No. 15:** Documents sufficient to show that the Estate gave notice to OtterSec of the appointment of Li Fen Yao as Administrator of the Estate and sufficient to show the date the Estate gave such notice.

> **Response to Request No. 15:** Plaintiff objects to Request No. 15 on the grounds that it is vague and ambiguous, assumes or characterizes facts, and seeks irrelevant documents. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce

10

documents sufficient to show OtterSec's notice of the appointment of Plaintiff as Administrator of the Estate and the date or dates of such notice.

Dated:  May 22, 2024

<div style="margin-left: 40%">

CARTER LEDYARD & MILBURN LLP

By: *Stephen Plotnick*
    Stephen M. Plotnick, *pro hac vice*
    Madelyn K. White, *pro hac vice*
    Nathan D. Harp, *pro hac vice*
28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
white@clm.com
harp@clm.com

-and-

BARKLEY & KENNEDY

By: *Daniel Kennedy*
    Daniel M. Kennedy, III
(signed by Stephen M. Plotnick with the permission of Daniel M. Kennedy, III)
51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600
dkennedy@barkenlaw.com

*Attorneys for Plaintiff Li Fen Yao*

</div>

11

11301931.2

J.R.504

J.R.505

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I caused the foregoing Responses to Defendants' First Set of Requests for the Production of Documents to be served on counsel of record for Defendants via email.

*Stephen Plotnick*
_____
Stephen M. Plotnick

11301931.2

# Exhibit 14

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LI FEN YAO, as Administrator of the Estate of Sam Mingsan Chen,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>　　　　　　　Defendant. | Case No. 8:23-cv-00889-TDC |

**RESPONSES AND OBJECTIONS TO DEFENDANTS'
SUBPOENA TO DAVID CHEN**

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, David Chen, by his undersigned attorneys, hereby responds to Defendants' Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises, dated June 6, 2024, (the "Subpoena") as follows:

**GENERAL RESPONSES AND OBJECTIONS**

The following general responses and objections are incorporated into each of David Chen's specific responses to the requests set forth in the Subpoena:

A.　　This response (the "Response") is being provided based upon documents and information presently available and known to David Chen. David Chen reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to his attention; (ii) the right to assert additional objections should he determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the requests set forth in the Subpoena, or any general or specific information, facts or other materials provided pursuant to this Response and/or otherwise in response to the Subpoena; (iv) the

11349687.2

right to object, on any appropriate ground, to any requests for additional documents or information by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify this Response.

B.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek documents or information protected by the attorney-client privilege, the work product doctrine or any other privilege, protection or immunity from discovery. This Response does not include documents and information that are privileged, protected or immune from disclosure. The inadvertent production of any such documents or information shall not constitute a general or specific waiver of any privilege, protection or immunity from disclosure.

C.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent that they seek or are intended to impose obligations that exceed those under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland or applicable law. This Response is limited to David Chen's obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

D.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent that any specific request for documents or information is duplicative, repetitive or cumulative, in whole or in part, of any other specific request. Any objection to any specific request for documents or information shall be deemed to be part of any response to any other specific request that is duplicative, repetitive or cumulative of it, whether or not such objection is specifically set forth therein.

2

11349687.2

E.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent that it seeks or is intended to seek documents or information not within his possession, custody or control, and/or documents within the possession, custody or control of non-parties over whom he has no authority and/or control.

F.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent that any request for documents or information is vague, ambiguous, overly broad, unduly burdensome, duplicative, repetitive, cumulative or not proportionate. David Chen will make a good faith effort to locate and produce documents and information responsive to the Subpoena, subject to any objections, in accordance with his obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland, and applicable law, based on information known or available to David Chen, and based on information within David Chen's possession, custody or control.

G.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent that it seeks or is intended to seek documents or information that are (i) already in the possession of the defendants; (ii) a matter of public record, (iii) as easily obtainable by the defendants from third-parties as it would be by David Chen, and/or (iv) in David Chen's possession, custody or control only because such documents or information have been provided to David Chen by other parties or non-parties through discovery or otherwise in this action.

H.      David Chen objects to the Subpoena, including the instructions and definitions set forth therein, to the extent it assumes or characterizes, or is intended to assume or characterize, facts or law. This Response shall not constitute an endorsement, admission, concession, agreement with or acceptance of any such assumptions or characterizations. David Chen expressly reserves, and does not waive, any objections to any characterizations of fact or law set forth in the Subpoena.

<div align="center">3</div>

J.R.509

I.      David Chen specifically objects to the definition of the term "Relevant Period" as overly broad and inconsistent with the defendants' own position concerning the appropriate scope of discovery in this action.

J.      David Chen reserves all objections to the use or admissibility of any documents or information identified herein or produced. The identification or production of documents or information does not constitute an admission that such documents or information are relevant or admissible in evidence.

K.      Documents or information being produced and/or made available by David Chen pursuant to this Response will be produced on a rolling basis and/or made available by David Chen in a reasonable time, place, and manner, and upon such other terms as may be determined by agreement of counsel or, failing that, Order of the Court. Unless counsel agree or the Court Orders otherwise, David Chen will produce copies of responsive documents and information in lieu of originals.

L.      A representation that responsive documents and information will be searched for, produced or made available for inspection and copying in response to a specific request shall not be construed as a representation that any such documents or information actually exist, but only that such documents and information shall be searched for, produced or made available, subject to any objections, to the extent that such documents or information exist, are available or can be located and identified after reasonable efforts.

M.      David Chen will conduct a search for responsive and accessible ESI upon an agreement between the parties or ruling from the Court on the custodians, locations, search terms, date ranges, and other parameters to be applied to such search.  In the absence of an agreement

11349687.2

between the parties or ruling from the Court, David Chen will conduct a reasonable search for responsive and accessible ESI.

## RESPONSES TO SPECIFIC DOCUMENT REQUESTS

**Request No. 1:** All communications with Sam Chen and/or Li Fen Yao concerning OtterSec during the Relevant Period.

> **Response:** David Chen objects to Request No. 1 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All communications" for the "Relevant Period." Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce communications with Sam Chen and/or Li Fen Yao concerning OtterSec.

**Request No. 2:** All communications and documents concerning Robert Chen during the Relevant Period.

> **Response:** David Chen objects to Request No. 2 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All communications and documents" for the "Relevant Period." David Chen further objects to Request No. 2 on the grounds that it seeks irrelevant communications and documents that that are not material to any claim or defense in this action, particularly insofar as it seeks communications and documents "concerning Robert Chen" without reference to the subject matter of such communications and documents or any limitations associated with claims or defenses in this action. Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce communications and documents concerning Robert Chen to the extent that they relate to OtterSec LLC, Otter Audits LLC or RC Security LLC.

5

11349687.2

**Request No. 3:** All communications concerning the transfer of a ten percent interest in OtterSec from Sam Chen to Robert Chen during the Relevant Period.

> **Response:** David Chen objects to Request No. 3 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All communications" for the "Relevant Period." Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce communications concerning the transfer of a ten percent interest in OtterSec from Sam Chen to Robert Chen.

**Request No. 4:** All communications and documents concerning OtterSec's assets during the Relevant Period.

> **Response:** David Chen objects to Request No. 4 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All communications and documents" for the "Relevant Period." Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce communications and documents concerning OtterSec's assets.

**Request No. 5:** Documents sufficient to identify all parties other than Sam Chen, Li Fen Yao, and Robert Chen with whom you communicated regarding OtterSec during the Relevant Period.

> **Response:** David Chen objects to Request No. 5 on the grounds that the request is overly broad and unduly burdensome insofar as it seeks documents for the "Relevant Period." David Chen further objects to Request No. 5 insofar as it assumes or is intended to assume that such documents exist. Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce his communications with parties other than Sam Chen, Li Fen Yao, and Robert Chen concerning OtterSec.

11349687.2

**Request No. 6:** All documents and communications concerning Your role at OtterSec, including but not limited to Your business and agency relationship with Sam Chen and/or Li Fen Yao; agreements between You and Sam Chen and/or Li Fen Yao related to OtterSec; any transfer of interest to You; and/or You ceasing work for OtterSec as referenced in Paragraph 70 of Plaintiff's Complaint, ECF No. 1 (Exhibit B to the Subpoena).

> **Response:** David Chen objects to Request No. 6 on the grounds that the request is overly broad, unduly burdensome, vague, ambiguous, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications" and utilizes the phrase "including but not limited to." Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce documents and communications concerning his role at OtterSec, his relationship with Sam Chen and/or Li Fen Yao vis-à-vis OtterSec, any agreements he has or had with Sam Chen and/or Li Fen Yao related to OtterSec, any transfer of any interest in OtterSec to him, and his ceasing of work for OtterSec.

**Request No. 7:** All documents and communications concerning Jump for the period of March 29, 2022 through October 11, 2022.

> **Response:** David Chen objects to Request No. 7 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications." Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce documents and communications concerning Jump for the period of March 29, 2022 through October 11, 2022.

**Request No. 8:** Documents sufficient to identify any entity in which You had any ownership or beneficial interest during the Relevant Period.

> **Response:** David Chen objects to Request No. 8 on the grounds that the request is overly broad, unduly burdensome, vague, and ambiguous insofar as it seeks documents for the

7

11349687.2

"Relevant Period" and utilizes the phrase "beneficial interest."  David Chen further objects to Request No. 8 insofar as it assumes or is intended to assume that such documents exist, and as seeking irrelevant documents that are confidential and not material to any claim or defense in this action.  David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 9:** Documents sufficient to identify all financial advisors, including tax advisors and accountants, consulted by You during the Relevant Period.

**Response:** David Chen objects to Request No. 9 on the grounds that the request is overly broad and unduly burdensome insofar as it seeks documents for the "Relevant Period." David Chen further objects to Request No. 9 insofar as it assumes or is intended to assume that such documents exist, and as seeking irrelevant documents that are confidential and not material to any claim or defense in this action.  David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 10:** All documents and communications concerning Your use of the "personal code and other property" referenced in Paragraph 71 of Plaintiff's Complaint, or the use of such personal code and other property by any entity in which You had any ownership or beneficial interest during the Relevant Period.

**Response:** David Chen objects to Request No. 10 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications" for the "Relevant Period." David Chen further objects to Request No. 10 insofar as it assumes or is intended to assume that such documents exist, and as seeking irrelevant documents that are confidential and not material to any claim or

8

11349687.2

defense in this action. David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 11:** All documents and communications concerning revenues or income You earned from the "personal code and other property" referenced in Paragraph 71 of Plaintiff's Complaint.

> **Response:** David Chen objects to Request No. 11 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications." David Chen further objects to Request No. 11 insofar as it assumes or is intended to assume that such documents exist, and as seeking irrelevant documents that are confidential and not material to any claim or defense in this action. David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 12**: All documents and communications concerning revenues or income from the "personal code and other property" referenced in Paragraph 71 of Plaintiff's Complaint and that were earned by any entity in which you had an ownership or beneficial interest.

> **Response:** David Chen objects to Request No. 12 as overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications." David Chen further objects to Request No. 12 insofar as it assumes or is intended to assume that such documents and communications exist or are within his possession, custody or control, and on the grounds that it seeks irrelevant documents that are confidential and not material to any claim or defense in this action. David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

9

11349687.2

**Request No. 13:** Copies of Your 2022 and 2023 federal and state tax returns.

> **Response:** David Chen objects to Request No. 13 on the grounds that the request seeks irrelevant documents that are confidential and not material to any claim or defense in this action. David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 14:** Documents sufficient to identify Your work and all Your sources of income from April 22, 2022, through March 31, 2023.

> **Response:** David Chen objects to Request No. 14 insofar as it assumes or is intended to assume that such documents exist, and on the grounds that the request seeks irrelevant documents that are confidential and not material to any claim or defense in this action. David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 15:** All documents and communications between You and Zellic during the Relevant Period.

> **Response:** David Chen objects to Request No. 15 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications" for the "Relevant Period."  David Chen further objects to Request No. 15 insofar as it assumes or is intended to assume that such documents exist, and on the grounds that it seeks irrelevant communications and documents that that are not material to any claim or defense in this action, particularly insofar as it seeks documents and communications "between You and Zellic" without reference to the subject matter of such documents and communications or any limitations associated with claims or defenses

10

11349687.2

in this action. Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce communications with Zellic concerning OtterSec LLC, Otter Audits LLC or RC Security LLC.

**Request No. 16:** Documents sufficient to identify all blockchain or digital wallets used by You or any entity in which you had an ownership or beneficial interest.

**Response:** David Chen objects to Request No. 16 insofar as it assumes or is intended to assume that such documents exist or are within his possession, custody or control, and on the grounds that the request seeks irrelevant documents that are confidential and not material to any claim or defense in this action. David Chen is not a party to this action, has never had an ownership interest in OtterSec, and never had a contractual relationship with OtterSec. David Chen declines to search for or produce responsive documents on the basis of these objections.

**Request No. 17:** All Your non-privileged communications regarding this Action, including but not limited to those regarding the valuation of litigation claims listed in the inventories filed with Register of Wills and/or Orphans' Court for Montgomery County in relation to *In the Estate of Sam Mingsan Chen*, Estate No. W112298.

**Response:** David Chen objects to Request No. 17 on the grounds that the request is overly broad, unduly burdensome, duplicative, repetitive, and cumulative in so far is it seeks "All Your non-privileged communications regarding this Action" and utilizes the phrase "including but not limited to."  David Chen further objects to Request No. 17 insofar as it assumes or is intended to assume that such documents exist or are within his possession, custody or control. David Chen is not the administrator of the Estate of Sam Mingsan Chen. Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce

11

11349687.2

communications concerning the valuation of litigation claims listed in the inventories filed with Register of Wills and/or Orphans' Court for Montgomery County in relation to *In the Estate of Sam Mingsan Chen*, Estate No. W112298.

**Request No. 18:** All non-privileged documents and communications concerning the execution of Sam Chen's estate.

> **Response:** David Chen objects to Request No. 18 on the grounds that the request is overly broad, unduly burdensome, vague, ambiguous, duplicative, repetitive, and cumulative insofar as it seeks "All non-privileged documents and communications" concerning "the execution of Sam Chen's estate."  David Chen further objects to Request No. 17 insofar as it seeks or is intended to seek documents and communications that are not within his possession, custody or control, and as seeking irrelevant documents and communications that are not material to any claim or defense in this action, particularly insofar as it seeks documents and communications "concerning the execution of Sam Chen's estate" without reference to the subject matter of such documents and communications or any limitations associated with claims or defenses in this action. David Chen is not the administrator of the Estate of Sam Mingsan Chen, and he declines to search for or produce responsive documents on the basis of these objections.

**Request No. 19:** Documents sufficient to identify any and all mobile phones used by You during the Relevant Period.

> **Response:** David Chen objects to Request No. 19 insofar as it assumes or is intended to assume that such documents exist, and on the grounds that the request is overly broad, unduly burdensome, vague, and ambiguous insofar as it seeks documents for the "Relevant Period" and utilizes the phrase "any and all mobile phones." Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen

<div align="center">12</div>

will make a good faith effort to locate and produce documents sufficient to identify the personal mobile phones he used in 2022 and 2023.

**Request No. 20:** All documents and communications concerning the deletion or loss of any data from any mobile phone or other communication device that was in your possession, custody, or control during the Relevant Period, including but not limited to any malfunction by or "bricking" of the Motorola "Moto E" mobile phone used by You beginning in August 2021.

**Response:** David Chen objects to Request No. 20 on the grounds that the request is overly broad, unduly burdensome, vague, ambiguous, duplicative, repetitive, and cumulative insofar as it seeks "All documents and communications" for the "Relevant Period," and insofar as it utilizes the phrases "any mobile phone or other communication device that was in your possession, custody, or control" and "including but not limited to." David Chen further objects to Request No. 20 insofar as it assumes or is intended to assume that such documents and communications exist or are within his possession, custody or control, and insofar as the phrase "concerning the deletion or loss of any data" assumes or characterizes facts. Notwithstanding and without waiving these objections, and subject to his general responses and objections, David Chen will make a good faith effort to locate and produce documents and communications concerning any deletion or loss of data from any personal mobile phone he used in 2022 and 2023 if and to the extent that it is determined that any such data has been deleted or lost. As of the date of this Response, it has not been determined that any such data has been deleted or lost.

13

11349687.2

Dated:  October 10, 2024

CARTER LEDYARD & MILBURN LLP

By: *Stephen M. Plotnick*

Stephen M. Plotnick, *pro hac vice*
Madelyn K. White, *pro hac vice*
Nathan D. Harp, *pro hac vice*

28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
white@clm.com
harp@clm.com

-and-

BARKLEY & KENNEDY

By: *Daniel M. Kennedy*

Daniel M. Kennedy, III
(signed by Stephen M. Plotnick with the
permission of Daniel M. Kennedy, III)

51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600
dkennedy@barkenlaw.com

*Attorneys for David Chen*

14

**CERTIFICATE OF SERVICE**

I certify that on October 10, 2024, I caused the foregoing Responses and Objections to Defendants'

Subpoena to David Chen to be served on counsel of record for the defendants by email.


*Stephen M. Plotnick*
Stephen M. Plotnick

15

11349687.2

J.R.522

# Exhibit 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LI FEN YAO, as Administrator of the
Estate of Sam Mingsan Chen,

        Plaintiff

v.

ROBERT CHEN, OTTER AUDITS LLC,
and RC SECURITY LLC,

        Defendants

\*     \*

     Civil Action No. 8:23-cv-889-TDC

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

ROBERT CHEN and OTTERSEC LLC,

        Plaintiffs

v.

     Civil Action No. 8:24-cv-3628-TDC

DAVID CHEN,

        Defendant

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## ANSWERS OF DEFENDANT DAVID CHEN
## TO FIRST SET OF INTERROGATORIES
## FROM PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC

Defendant David Chen ("David"), by and through his undersigned counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 of the Local Rules of the United States District Court for the District of Maryland, objects to and answers the First Set of Interrogatories from Plaintiffs, Robert Chen ("Robert") and OtterSec LLC ("OtterSec") as follows:

6398856.1

J.R.523

## GENERAL RESPONSES AND OBJECTIONS

Defendant makes the following general responses and objections to the Interrogatories and incorporates them into each of his specific responses below. An assertion of the same, similar, or additional objections in response to any Interrogatory does not waive any of these general responses and objections as to that or any other Interrogatory. Defendant's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of his right to object on any ground.

A. These answers ("Answers") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Defendant after reasonable inquiry. Defendant reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Defendant's attention through discovery or otherwise; (ii) the right to assert additional objections should Defendant determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Answers and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Answers.

B. Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Defendant's Answers are being made in accordance with the applicable requirements.

6398856.1

2

J.R.524

C.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Defendant further object to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Defendant.

D.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to, information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Defendant does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Defendant's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Defendant expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of his attorneys (or by his attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Defendant's response to an Interrogatory does not mean that Defendant agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Answers are not intended to be and shall not be deemed as

6398856.1

3

J.R.525

an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.   Defendant is providing these Answers without waiver of, or prejudice to, his rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Answers or any document produced pursuant to these Answers; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to the Interrogatories. Defendant's Answers are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.   Defendant objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Defendant specifically reserves the right to amend his response to any specific Interrogatory at the conclusion of expert discovery.

H.   Defendant objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.   Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of the defendants.

6398856.1

4

J.R.526

J.    Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Defendant's possession, custody or control, and/or information within the possession, custody or control of others over whom Defendant have no authority and/or control.

K.    Defendant objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case.

## **ANSWERS**

Subject to all of the foregoing General Objections, and without waiver of any of them, David responds as follows:

INTERROGATORY NO. 1:  Identify all code, data, databases, logs, records, accounts, servers, hard drives, wallets, tokens, cash, assets, access permissions, or any property which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access that you deleted, transferred, took, or removed or for which You otherwise adjusted or altered OtterSec's access, including the dates of any such adjustments, deletions, transfers, takings or access-removals.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome, in particular in reference to the undefined scope of the terms "records," "accounts," and "any property."  Subject to the foregoing objections, and without waiving any of those objections, David states that he never deleted, transferred, took, removed, or otherwise adjusted or altered OtterSec's access to any of the following listed "Material": Databases, Records, Accounts, Cash, Assets, or Access Permissions.  David did, however, take with him after April 27, 2022 the relevant Code (Solend Liquidator Code, msol-market-maker, and Arb-bot-code), the Server, and other related hardware/equipment, and the reason why David took these items of "Material" is because he owned them.  Finally, David has acknowledged that he retained possession of the Private keys for the Liquidator wallets, the OtterSec ledger wallet,

J.R.527

Jup tokens, and the Yubikey.

INTERROGATORY NO. 2: Identify all code, data, databases, logs, records, accounts, servers, hard drives, wallets, tokens, cash, assets, access permissions, or any property ("Material") which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access and that were in your possession, custody, or control at any time between April 27, 2022, through present day. If You no longer have possession, custody, or control over the Material, identify when You relinquished possession, custody, or control over the Material and/or where You transferred the Material to.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome, in particular in reference to the undefined scope of the terms "records," "accounts," and "any property."  Subject to the foregoing objections, and without waiving any of those objections, David states that he did not (and does not) have possession, custody, or control at any time between April 27, 2022 and present day of the following listed "Material":  Databases, Records, Accounts, Cash, Assets, and Access Permissions.  David, however, does still have possession, custody, or control of the following other listed "Material": Code (msol-market-maker, and solend-liquidator-rust), Backup data from the OtterSec discord server, the Server, the Private keys for the Liquidator wallets, the OtterSec ledger wallet, Jup tokens, and the Yubikey.  Furthermore, it is David's understanding that his father Sam Chen had maintained email notifications of the OtterSec Bank Account records up through August 2022, and that Sam had access to the OtterSec Bank Account until Robert Chen terminated that access in August 2022.

INTERROGATORY NO. 3: Identify all channels or conversations on Discord or any other messaging platform from which You removed Robert Chen or other OtterSec personnel, regardless of whether You later added them back to the channels or conversations.

ANSWER:  Subject to the foregoing objections, and without waiving any of those objections, David states that he temporarily removed Robert Chen for less than a day from the OtterSec Discord server while he created a backup of the messages contained therein.  David

J.R.528

added Robert back to the OtterSec Discord server immediately thereafter on or about April 28, 2022.

INTERROGATORY NO. 4: Explain your understanding of why You were paid $60,000 by OtterSec on April 15, 2022.

ANSWER:  Subject to the foregoing objections, and without waiving any of those objections, David states that the reason why BOTH he and Robert Chen were paid $60,000 by OtterSec in April 2022 is that Robert expressed a need for funds to pay taxes and he was reluctant to sell any of his investments to obtain those needed funds.  Several options were discussed, but Sam and David objected to providing a loan to Robert Chen.  Subsequently, it was decided that equal payments of $60,000 from OtterSec would be made to both Robert Chen and to David.

INTERROGATORY NO. 5: Explain with specificity the creation, development, and use of any Solend Liquidator Code and/or any mSOL Market Maker Code that You or OtterSec created or contributed to, including who wrote or edited the codes at any time, in what respect(s), during approximately which timeframes, and where the codes were stored, including but not limited to any code repositories, throughout the Relevant Period.

ANSWER:  David objects to this Interrogatory on the basis of the "Relevant Period" dating back to February 1, 2021.  David also objects to this Interrogatory on the basis that it purports to seek the disclosure of information that can be obtained by Plaintiff and their counsel just as easily as on their own.  Subject to the foregoing objections, and without waiving any of those objections, David states that all of the requested specificity regarding the creation, development, and use of the Solend Liquidator Code and the mSOL Market Maker Code can be found on Github.

INTERROGATORY NO. 6: Explain what You meant when You said that You spent time "undo[ing] [Robert Chen's] refactor" of the Solend Liquidator Code and "rebas[ing] [your] changes," as referenced in ¶ 97 of the Complaint.

6398856.1

7

ANSWER:  David objects to this Interrogatory on the basis of relevance, and that it is vague and ambiguous.  Subject to the foregoing objections, and without waiving any of those objections, David states that the foregoing comments relate to David returning the Solend Liquidator Code to a version that existed prior to the work that was performed by Robert Chen and others at OtterSec between February and April 2022.  Contrary to Plaintiff's belief, as stated in ¶ 97 of Plaintiff's Second Amended Complaint, the work performed by Robert Chen and others at OtterSec did not "improve" the Solend Liquidator Code.

INTERROGATORY NO. 7: Explain what You meant when You said that Robert Chen would need "to explain to sino global capital next time they talk why osec doesn't have bots anymore," as referenced in ¶ 99 of the Complaint.

ANSWER:  David objects to this Interrogatory on the basis of relevance, and that it is vague and ambiguous.  Subject to the foregoing objections, and without waiving any of those objections, David states that he and his father Sam felt betrayed by Robert Chen's secretive discussions with Jump once they found out about those discussions.  As a result, David quit OtterSec on April 27, 2022 and took his Code with him.  Sino Global, on the other hand, was apparently very interested in OtterSec because of the msol-market-maker code, and David's comments to Robert Chen that he would have to explain to Sino Global that OtterSec did not have bots anymore was a direct result of and a linear reaction to Robert Chen's unethical and underhanded dealings with Jump.

INTERROGATORY NO. 8: Identify all methods of communication, including websites, devices, platforms, or any other means, that you used or may have used to discuss the issues alleged in the Complaint.

ANSWER:  David objects to this Interrogatory on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of the

6398856.1

8

J.R.530

relevant objections, David states that the methods of communication David used to discuss the

issues alleged in the Complaint included Discord, Telegram, Signal, email communications, and

text messages.

INTERROGATORY NO. 9: State the amount of income You made from running any Solend Liquidator Code and/or any mSOL Market Maker Code between February 1, 2021, and April 17, 2025, and identify all blockchain, self-custodial, or digital wallet transaction histories associated with any Solend Liquidator Code and/or any mSOL Market Maker Code that You or OtterSec created or contributed to. For transaction histories, include transaction hashes, timestamps, and the sending and receiving blockchain, self-custodial, or digital wallet addresses.

ANSWER:  David objects to this Interrogatory on the basis of relevance, the purported

scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous,

overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving

any of those objections, David states that he did not make any income from the msol-market-

maker and that he made $1,578,510.52 in income from his Solend Liquidator Code.

INTERROGATORY NO. 10: Identify and describe the ways in which you have used any and all proceeds made from running any Solend Liquidator Code(s) and any mSOL Market Maker Code(s) during the Relevant Period.

ANSWER:  David objects to this Interrogatory on the basis of relevance, the purported

scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous,

overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving

any of those objections, David has generally spent his money since February 2022 on funeral and

related arrangements for his father Sam, the cost of attending college at the University of

Maryland College Park, daily living expenses, travel expenses, the purchase of miscellaneous

items such as laptops, servers, and server fees, among other things, and litigation expenses and

attorneys' fees related to this litigation.

INTERROGATORY NO. 11: Identify all accounts, joint accounts, and/or blockchain, self-custodial, or digital wallets with any traditional or decentralized banking, securities or other

financial institution, exchange, platform, application or database You opened, closed, or maintained between February 1, 2021, and April 17, 2025.

**ANSWER:** David objects to this Interrogatory on the basis of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that he will produce a spreadsheet in response to Plaintiffs Request for Production of Documents providing all of the wallet addresses that he has used during the Relevant Period.

INTERROGATORY NO. 12: Identify all persons in possession, custody or control of business or financial records for You, including accountants or other professionals, bookkeepers, tax advisors, financial institutions or advisors, and payroll companies between May 2022 and April 17, 2025.

**ANSWER:** David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David identifies himself as the person in possession, custody, or control of such records.

INTERROGATORY NO. 13: Identify all businesses or entities formed by You or in which You hold or held any ownership or financial interest between February 1, 2022, and April 17, 2025. Describe the nature of each such business, the nature of the ownership or financial interest, and whether you transferred or invested any funds into these businesses between February 1, 2022, and April 17, 2025.

**ANSWER:** David objects to this Interrogatory on the basis of relevance, and that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that he formed two separate limited liability companies during the Relevant Period – Ragged LLC and Adjacent Advertising LLC. Ragged LLC was never utilized and was ultimately formally dissolved. As for Adjacent

6398856.1

10

J.R.532

Advertising, LLC, David conducted an ad campaign with regard to that entity that cost him $617, but ultimately he never did anything with the LLC and it was then formally dissolved as well.

INTERROGATORY NO. 14: Describe all of David's conversations related to the OtterSec.io domain, including but not limited to any about registering that domain.

**ANSWER:** David objects to this Interrogatory on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine. Subject to the foregoing objections, and without waiving any of the relevant objections, David identifies the communications which have previously been produced at YAO00007568, which are Discord messages between David Chen (username, "radiantaeon") and Robert Chen (username, "notdeghost") from February 6, 2022, that include a reference to "ottersec.io."

6398856.1

11

J.R.533

I HEREBY CERTIFY, under the penalties for perjury, that the foregoing answers are true, to the best of my knowledge, information and belief.


_____                                    _____
Date                                                              David Chen



                                                          __/s/ Alexander M. Giles_____
                                                          Michael J. Lentz
                                                          Alexander M. Giles
                                                          Tydings & Rosenberg LLP
                                                          One East Pratt Street, Suite 901
                                                          Baltimore, Maryland 21202
                                                          (410) 752-9700
                                                          (410) 727-5460 (fax)
                                                          mlentz@tydings.com
                                                          agiles@tydings.com

                                                          *Attorneys for Defendant,*
                                                          *David Chen*


OF COUNSEL (admitted *Pro Hac Vice*):

Stephen M. Plotnick
Alexander G. Malyshev
Madelyn K. White
Kevin M. Simpson
Carter Ledyard & Milburn LLP
28 Liberty Street, 41st Floor
New York, New York 10005
(212) 732-3200


6398856.1

12

J.R.534

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 23rd day of June 2025, the foregoing Answers to Interrogatories were served via email on all counsel of record in the above-captioned consolidated matter.


                                        __/s/ Alexander M. Giles_____
                                        Alexander M. Giles

6398856.1

13

J.R.535

I HEREBY CERTIFY, under the penalties for perjury, that the foregoing answers are true, to the best of my knowledge, information and belief.

6/23/25

Date

David Chen

/s/ Alexander M. Giles
Michael J. Lentz
Alexander M. Giles
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
(410) 727-5460 (fax)
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Defendant,*
*David Chen*

OF COUNSEL (admitted *Pro Hac Vice*):

Stephen M. Plotnick
Alexander G. Malyshev
Madelyn K. White
Kevin M. Simpson
Carter Ledyard & Milburn LLP
28 Liberty Street, 41st Floor
New York, New York 10005
(212) 732-3200

6398856.1

12

J.R.536

# Exhibit 16

J.R.537

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LI FEN YAO, as Administrator of the     *
Estate of Sam Mingsan Chen,

                                   *

         Plaintiff

                                   *      Civil Action No. 8:23-cv-889-TDC

v.

                                   *

ROBERT CHEN, OTTER AUDITS LLC,
and RC SECURITY LLC,                    *

         Defendants                 *

      *     *     *     *     *     *     *     *     *     *     *     *

ROBERT CHEN and OTTERSEC LLC,    *

         Plaintiffs                  *

v.                                       *      Civil Action No. 8:24-cv-3628-TDC

DAVID CHEN,                        *

         Defendant                 *

      *     *     *     *     *     *     *     *     *     *     *     *

**RESPONSES OF DEFENDANT DAVID CHEN
TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
FROM PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC**

Defendant David Chen ("David"), by and through his undersigned counsel, and pursuant

to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Rule 104 of the Local Rules of

the United States District Court for the District of Maryland, objects and responds to the First Set

of Requests for Production of Documents from Defendants, Robert Chen ("Robert") OtterSec

LLC ("OtterSec"), and states as follows:

6390657.1

J.R.538

**GENERAL RESPONSES AND OBJECTIONS**

Defendant makes the following general responses and objections to the Requests for Production of Documents and incorporates them into each of his specific responses below. An assertion of the same, similar, or additional objections in response to any Request does not waive any of these general responses and objections as to that or any other Request. Defendant's failure to object to a specific Request on a particular ground shall not be construed as a waiver of his right to object on any ground.

A.      These responses ("Responses") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Defendant after reasonable inquiry. Defendant reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Defendant's attention through discovery or otherwise; (ii) the right to assert additional objections should Defendant determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Requests for Production of Documents or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Requests for Production of Documents; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.      Defendant objects to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders

6390657.1

2

J.R.539

relevant to the proper scope, timing, and extent of discovery in this action. Defendant's Responses are being made in accordance with the applicable requirements.

C.      Defendant objects to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Defendant further object to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Defendant.

D.      Defendant objects to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to, information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Defendant does not intend to disclose information or documents in response to the Requests for Production of Documents that is protected by any such Privilege, and Defendant's responses to the Requests for Production of Documents are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information or documents protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Defendant expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of his attorneys (or by his attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

6390657.1

3

J.R.540

E.      Defendant objects to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Defendant's response to a Request does not mean that Defendant agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Request or any definition or instruction. These Responses are not intended to be and shall not be deemed as an admission of the matters stated in, implied by or assumed by any of the Requests for Production of Documents, definitions or instructions.

F.      Defendant is providing these Responses without waiver of, or prejudice to, his rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Requests for Production of Documents or any part thereof, statements made in these Responses or any document produced pursuant to these Responses; or (ii) any other demand for discovery involving or relating to the matters raised in the Requests for Production of Documents or the information provided in response to the Requests for Production of Documents. Defendant's Responses are not and shall not be deemed admissions or concessions of the relevance of any of the Requests for Production of Documents or admissions as to the admissibility of any particular response or objection in the action.

G.      Defendant objects to the Requests for Production of Documents to the extent that any specific Request seeks expert disclosure prematurely and/or is a premature contention Request that should not have to be answered until discovery is complete. Defendant specifically reserves the right to amend his response to any specific Request at the conclusion of expert discovery.

6390657.1

4

J.R.541

H.      Defendant objects to the Requests for Production of Documents to the extent that any specific Request is duplicative, repetitive or cumulative, in whole or in part, of any other specific Request.  Any objections set forth in response to any specific Request shall be deemed to be part of any response to any other Request that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.      Defendant objects to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent that they seek information or documents that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of the Plaintiffs.

J.      Defendant objects to the Requests for Production of Documents, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Defendant's possession, custody or control, and/or information within the possession, custody or control of others over whom Defendant have no authority and/or control.

K.      Defendant objects to the definition of the "Relevant Period" set forth in the Requests for Production of Documents as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case.

## RESPONSES

REQUEST NO. 1:     All documents you used or referred to in responding to any Interrogatories served by Plaintiffs.

RESPONSE:  David objects to this Request on the grounds of relevance, and that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections,

6390657.1

5

J.R.542

and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 2:    All documents or communications regarding any Solend Liquidator Code or any mSOL Market Maker Code ("the codes") during the Relevant Period, including but not limited to documents and communications concerning drafting the codes, edits to the codes, the use of the codes, storage of the codes on source code repositories, commit histories of the codes, contributor metadata of the codes, deployment scripts for the codes, bot output files related to the codes, and smart contract deployment records for the codes.

RESPONSE:  David objects to this Request on the grounds of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome, particularly as it relates to the request for "bot output files." David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that there are no smart contract deployment records.  As for the other requested items, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 3:    All documents showing income obtained, directly or indirectly, from running any Solend Liquidator Code or any mSOL Market Maker Code at any time and any transfers of that income to any traditional or decentralized banking, securities or other financial institution, exchange, platform, application or database, including blockchain, self-custodial, or digital wallets, that You opened, closed, or maintained during the Relevant Period.

RESPONSE:  David objects to this Request on the grounds of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Moreover, David also objects to this Request on the basis that it purports to seek the disclosure of information that can be obtained by Plaintiffs and

their counsel just as easily as on their own via blockchain.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 4:      All documents or communications concerning any valuation of any Solend Liquidator Code or any mSOL Market Maker Code during the Relevant Period, including but not limited to pro forma financial statements or projections.

RESPONSE:  David objects to this Request on the grounds of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 5:      All Your communications on behalf of, or purportedly on behalf of, OtterSec during the Relevant Period.

RESPONSE:  David objects to this Request on the grounds of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 6:      All communications regarding or relating to Sino Global Capital during the Relevant Period, including but not limited to all communications with persons associated with Sino Global Capital.

6390657.1

7

J.R.544

RESPONSE:  David objects to this Request on the grounds of relevance, and the purported scope of the "Relevant Period" dating back to February 1, 2021.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 7:     Documents showing any Solend Liquidator Code and any mSOL Market Maker Code and any documentation related to the development of any Solend Liquidator Code and/or any mSOL Market Maker Code during the Relevant Period, including but not limited to design specifications, version control logs, architecture documents, change logs, deletion logs, and cloud storage access logs.

RESPONSE:  David objects to this Request on the grounds of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 8:     Copies of all communications relating to Your role at, and work for, OtterSec during the Relevant Period.

RESPONSE:  David objects to this Request on the basis of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

6390657.1

8

J.R.545

REQUEST NO. 9:    All non-privileged communications regarding this Action or the substance of this Action during the Relevant Period, including but not limited to Your departure from OtterSec, actions You took relating to Your departure from OtterSec, Your use of any Solend Liquidator Code or any mSOL Market Maker Code, Your transfer of 20,000 JUP tokens in January 2024, Your deletion of Discord messages, and Your deletion of company records.

RESPONSE:  David objects to this Request on the basis of the "Relevant Period" dating back to February 1, 2021, and that it is overbroad and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 10:    All documents received from any third-party in connection with this Action since the filing of this Complaint, whether provided in response to a formal or informal request for documents or information.

RESPONSE:  David objects to this Request on the grounds of relevance.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that there are no documents responsive to this Request.

REQUEST NO. 11:    Documents showing all transfers of funds to or from any blockchain, self-custodial, or digital wallets controlled by You or any entity with which You are affiliated.

RESPONSE:  David objects to this Request on the grounds of relevance, and that it is vague, ambiguous, overbroad, and unduly burdensome, particularly regarding the fact that there is no defined time period for such documents.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request from February 2022 to present will be produced.

6390657.1

9

REQUEST NO. 12:   Documents and communications concerning any accounts, joint accounts, and/or blockchain, self-custodial, or digital wallets with any traditional or decentralized banking, securities or other financial institution, exchange, platform, application or database You opened, closed, or maintained during the Relevant Period, including but not limited to bank account statements, cryptocurrency exchange account records, and cryptocurrency self-custody account records.

RESPONSE:  David objects to this Request on the grounds of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is overbroad and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

REQUEST NO. 13:   All documents provided to your tax preparer for the Relevant Period.

RESPONSE:  None.

6390657.1

10

__/s/ Alexander M. Giles_____
Michael J. Lentz
Alexander M. Giles
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21201
Phone: (410) 752-9700
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Defendant,*
*David Chen*

OF COUNSEL (admitted *Pro Hac Vice*):

Stephen M. Plotnick
Alexander G. Malyshev
Madelyn K. White
Kevin M. Simpson
Carter Ledyard & Milburn LLP
28 Liberty Street, 41st Floor
New York, New York 10005
(212) 732-3200

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of June 2025, the foregoing Responses to

Requests for Production of Documents were served via email on all counsel of record in the

above-captioned consolidated matter.

__/s/ Alexander M. Giles_____
Alexander M. Giles

6390657.1

11

J.R.548

J.R.549

# Exhibit 17

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>Defendants. | Case No. 8:23-cv-00889-TDC |
| ROBERT CHEN and OTTERSEC LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID CHEN,<br><br>Defendant. | Case No. 8:24-cv-03628-TDC |

**PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC'S
<u>SECOND SET OF INTERROGATORIES</u>**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Local Rule 104 of the Local

Rules of the United States District Court for the District of Maryland, and Appendix A to the Local

Rules of the United States District Court for the District of Maryland, Plaintiffs Robert Chen and

OtterSec LLC, by their undersigned attorneys, propound these Interrogatories to which Defendant

David Chen shall respond fully, in writing and under oath, within the time prescribed by the

Federal Rules of Civil Procedure, in accordance with the Instructions and Definitions set forth

hereinafter.

1

J.R.550

## INSTRUCTIONS AND DEFINITIONS

A.    Pursuant to Appendix D to the Local Rules of the United States District Court for the District of Maryland, the Uniform Instructions and Definitions for Use in Discovery Requests are incorporated herein, except that the definitions of "Identify" in Paragraphs 4 & 5 of Appendix D are replaced by the definition herein for "Identify."

B.    These Instructions and Definitions are not intended to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure.

C.    For purposes of these interrogatories, unless otherwise specified, the Relevant Period is February 1, 2021, through April 17, 2025.

D.    "You," "Defendant," or "David Chen" means David Yao Chen, son of Sam Mingsan Chen, and any of his representatives.

E.    "Action" means *Chen v. Chen*, 8:24-cv-3628-TDC.

F.    "Complaint" means the operative Second Amended Complaint in *Chen v. Chen*, 8:24-cv-3628-TDC.

G.    "Identify" means:

 (1) with respect to a person, to state the person's full name, Discord user ID, email address, present or last known address, and, when referring to a natural person, the present or last known place of employment;

(2) with respect to a document, to state the (i) type of document; (ii) general subject matter; (iii) date of the document; and, (iv) author(s), addressee(s), and recipient(s) or, alternatively, to produce the document;

(3) with respect to a source of ESI (e.g., a database, hard drive, or channel), to provide sufficient information to describe the source's nature, location (physical or digital), and contents (digital) in a manner that sufficiently states the general subject matters within the source of ESI;

(4) with respect to a digital wallet, to provide the address of the wallet;

(5) with respect to a cryptocurrency or other digital asset transaction, to state the transaction hash, date, time, and any wallets sending or receiving funds;

(6) with respect to a traditional financial transaction, to state date, time, and accounts involved.

H.    "Plaintiffs" means Robert Chen and OtterSec LLC.

I.    "OtterSec" means OtterSec LLC and any of its representatives.

2

J.R.551

J.       "<u>Representative</u>" or "<u>representatives</u>" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

K.       "<u>Solend Liquidator Code</u>" means any code that ran or runs liquidations on the Solana blockchain.

L.       "<u>mSOL Market Maker Code</u>" means any code that did or does market making or performed or performs market making functions on the Solana blockchain.

## **INTERROGATORIES**

15. Identify all individuals with whom you communicated about the Solend Liquidator Code or the mSOL Market Maker Code.

16. Identify by date and location when and where you first started working on the Solend Liquidator Code.

17. Identify the company or property you co-owned with Alexander Karavaltchev.

18. Identify whether anyone, outside of this Action and *Yao v. Chen*, has ever claimed ownership in the Solend Liquidator Code or the mSOL Market Maker Code.

19. Identify and describe the contents of all Discord or Telegram conversations or channels relating to OtterSec, the Solend Liquidator Code, the mSOL Market Maker Code, or Robert Chen that You deleted in April 2022.

20. Identify by channel name, channel ID, server name, server ID, date sent, date deleted, Discord ID of sender, and name of sender, any Discord messages You deleted that were sent by someone other than You that mentioned or concerned the Solend Liquidator Code, the mSOL Market Maker Code, Robert Chen, or OtterSec.

21. For each source that David Chen is searching in response to requests for production in this Action, including but not limited to each source listed in the list of sources Michael Lentz emailed to Plaintiffs' counsel and that is titled: "2025.08.07 Sources to be Searched.pdf", identify the date(s) of collection of the source, the person(s) who collected the source, and the date ranges for which documents or other material were collected.

22. Describe what steps You took to collect the "Mystery Samsung 980 pro with heatsink that we can't view the contents of" listed in the "2025.08.07 Sources to be Searched.pdf" document.

23. Describe what steps You took to collect the "misc digital ocean hosts" listed in the "2025.08.07 Sources to be Searched.pdf" document.

24. Identify, by Server Name, Server ID, Channel Name, and Channel ID, each Discord and Telegram channel, server, and/or direct messages You are searching in response to discovery requests in this Action.

<center>3</center>

Dated: August 15, 2025

Respectfully submitted,

/s/Rachel Clattenburg
Rachel Clattenburg
Joshua A. Levy
Kevin P. Crenny
Justin A. DiCharia
Christina M. Lamoureux
**LEVY FIRESTONE MUSE LLP**
900 17th St. NW, Suite 605
Washington, DC 20006
Tel: (202) 845-3215
Fax: (202) 595-8253
rmc@levyfirestone.com
jal@levyfirestone.com
kcrenny@levyfirestone.com
jdicharia@levyfirestone.com
christinal@levyfirestone.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on August 15, 2025, I caused the foregoing Interrogatories to be served on counsel of record.

/s/ Rachel Clattenburg
Rachel Clattenburg

4

J.R.553

# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LI FEN YAO, as Administrator of the          *
Estate of Sam Mingsan Chen,
                                             *

        Plaintiff                    *

v.                                           *          Civil Action No. 8:23-cv-889-TDC

                                             *

ROBERT CHEN, OTTER AUDITS LLC,               *
and RC SECURITY LLC,
                                             *

        Defendants                   *

    *    *    *    *    *    *    *    *    *    *    *    *

ROBERT CHEN and OTTERSEC LLC,                *

        Plaintiffs                   *

v.                                           *          Civil Action No. 8:24-cv-3628-TDC

DAVID CHEN,                                  *

        Defendant                    *

    *    *    *    *    *    *    *    *    *    *    *    *

**ANSWERS OF DEFENDANT DAVID CHEN
TO SECOND SET OF INTERROGATORIES
FROM PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC**

      Defendant David Chen ("David"), by and through his undersigned counsel, and pursuant

to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 of the Local Rules of

the United States District Court for the District of Maryland, objects to and answers the First Set

of Interrogatories from Plaintiffs, Robert Chen ("Robert") and OtterSec LLC ("OtterSec") as

follows:

6481184.1

J.R.555

## **GENERAL RESPONSES AND OBJECTIONS**

Defendant makes the following general responses and objections to the Interrogatories and incorporates them into each of his specific responses below. An assertion of the same, similar, or additional objections in response to any Interrogatory does not waive any of these general responses and objections as to that or any other Interrogatory. Defendant's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of his right to object on any ground.

A.  These answers ("Answers") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Defendant after reasonable inquiry. Defendant reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Defendant's attention through discovery or otherwise; (ii) the right to assert additional objections should Defendant determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Answers and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Answers.

B.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Defendant's Answers are being made in accordance with the applicable requirements.

6481184.1

2

J.R.556

C.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Defendant further object to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Defendant.

D.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to, information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Defendant does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Defendant's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Defendant expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of his attorneys (or by his attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Defendant's response to an Interrogatory does not mean that Defendant agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Answers are not intended to be and shall not be deemed as

6481184.1

3

J.R.557

an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.   Defendant is providing these Answers without waiver of, or prejudice to, his rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Answers or any document produced pursuant to these Answers; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to the Interrogatories. Defendant's Answers are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.   Defendant objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Defendant specifically reserves the right to amend his response to any specific Interrogatory at the conclusion of expert discovery.

H.   Defendant objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.   Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of the defendants.

6481184.1

4

J.R.558

J.    Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Defendant's possession, custody or control, and/or information within the possession, custody or control of others over whom Defendant have no authority and/or control.

K.    Defendant objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case.

## **ANSWERS**

Subject to all of the foregoing General Objections, and without waiver of any of them, David responds as follows:

INTERROGATORY NO. 15:  Identify all individuals with whom you communicated about the Solend Liquidator Code or the mSOL Market Maker Code.

ANSWER:  David objects to this Interrogatory on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  David also objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that he communicated about the Solend Liquidator Code and/or the mSOL Market Maker Code with the following individuals:

Alexander Karavaltchev, friendlyuser2224585, alexander@merv.tech
Devin, aka "nojob," Taipei Taiwan, Save/Suilend
Robert Chen, aka "notdeghost," me@robertchen.cc, OtterSec
Lifen Yao, lifen1299@yahoo.com, 13717 Travilah Rd, Rockville MD
Daniel Que, aka "0xrooter," rooter@solend.fi, Save/Suilend
Darren Chen, aka "d1wan," nerfmodulas@outlook.com, 13717 Travilah Rd, Rockville MD
June Hao, jyhllcy202@hotmail.com, 7858 SE 28th St, A509, Mercer Island WA, Amazon
Sam Chen, smchen90@hotmail.com, 13717 Travilah Rd, Rockville MD
Lina Yao
Lucas Bruder, aka "buffalu," Jito Labs
Sammy Hajhamid, aka "pepsipu," Neuralink

6481184.1

5

J.R.559

0xcactus, legocactus, Solend
Neerajen, ripleys_solend, Save/Suilend
Phillip Papurt, aka "ginkoid," Cognition
Patrick Zhang, aka "pertark," zhangpatrick2004@gmail.com
s3v3ru5
0xsoju, Meteora
cppio
jriggs28
asdera123, Save/Suilend
dasichuan, Save/Suilend
Members of "New Clickbait"
OtterSec employees that were a member of the OtterSec Discord server as of April 27, 2022
Members of the Public Solend Discord server
Members of the Jito Discord server
Members of the DiceGang Discord server as of 2022
Members of the RedPwn Discord server as of 2022
Members of the AltTank Discord

INTERROGATORY NO. 16:  Identify by date and location when and where you first started working on the Solend Liquidator Code.

ANSWER:  David objects to this Interrogatory on the basis that it is vague and ambiguous.  Subject to the foregoing objections, and without waiving any of those objections, David states that he first started working on the Solend Liquidator Code on October 2, 2021 at his home, which is located at 13717 Travilah Road, Rockville, Maryland 20850.

INTERROGATORY NO. 17:  Identify the company or property you co-owned with Alexander Karavaltchev.

ANSWER:  David objects to this Interrogatory on the basis of relevance, and that it is otherwise vague and ambiguous.  Subject to the foregoing objections, and without waiving any of those objections, David states that he and Alexander Karavaltchev entered into a Partnership Agreement dated October 15, 2021, to memorialize the financial terms of their joint work pertaining to the Solend Liquidator and any derivations including, but not limited to, implementations of the Solend Liquidator for other defi lending platforms and/or any code

6481184.1

6

written for the purpose of improving the Solend Liquidator or its implementations.  The

Partnership Agreement was subsequently terminated on November 16, 2021.

INTERROGATORY NO. 18:  Identify whether anyone, outside of this Action and *Yao v. Chen*, has ever claimed ownership in the Solend Liquidator Code or the mSOL Market Maker Code.

ANSWER:  David objects to this Interrogatory on the basis that it is vague and

ambiguous.  Subject to the foregoing objections, and without waiving any of those objections,

David states that no one outside of this Action and *Yao v. Chen* has ever claimed ownership in

the Solend Liquidator Code or the mSOL Market Maker Code.


INTERROGATORY NO. 19:  Identify and describe the contents of all Discord or Telegram conversations or channels relating to OtterSec, the Solend Liquidator Code, the mSOL Market Maker Code, or Robert Chen that You deleted in April 2022.

ANSWER:  David objects to this Interrogatory on the basis that it is vague and

ambiguous.  Subject to the foregoing objections, and without waiving any of those objections,

David states that the only Discord conversations or channels relating to OtterSec, the Solend

Liquidator Code, the mSOL Market Maker Code, or Robert Chen that he deleted in April 2022

would have been a user/developer manual of the Code that David wrote in the form of Discord

messages. The Discord messages were created to explain the Code to cppio and Robert Chen so

they could get up to speed and work on the development of the Code.

INTERROGATORY NO. 20:  Identify by channel name, channel ID, server name, server ID, date sent, date deleted, Discord ID of sender, and name of sender, any Discord messages You deleted that were sent by someone other than You that mentioned or concerned the Solend Liquidator Code, the mSOL Market Maker Code, Robert Chen, or OtterSec.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous,

overbroad, and unduly burdensome, in particular the use of the phrase "any Discord messages

You deleted that were sent by someone other than You that mentioned or concerned the Solend

6481184.1

J.R.561

Liquidator Code, the mSOL Market Maker Code, Robert Chen, or OtterSec." Subject to the foregoing objections, and without waiving any of those objections, David states that the aforementioned description of the channels in the OtterSec discord server were deleted on April 27, 2022. David does not have a recollection of the channel name, channel ID, server name, or server ID of the channels that he deleted in April 2022.

INTERROGATORY NO. 21: For each source that David Chen is searching in response to requests for production in this Action, including but not limited to each source listed in the list of sources Michael Lentz emailed to Plaintiffs' counsel and that is titled: "2025.08.07 Sources to be Searched.pdf", identify the date(s) of collection of the source, the person(s) who collected the source, and the date ranges for which documents or other material were collected.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that pursuant to the Preservation Order entered by this Court in May 2025, he is no longer responsible for or actively involved with the collection of any relevant documents from any sources in this matter. Rather, the Third-Party Vendor TransPerfect is responsible for all such actions in coordination with counsel for David. David and his counsel will inquire about the requested information from TransPerfect and will timely supplement this Answer should they obtain any relevant information in this regard.

INTERROGATORY NO. 22: Describe what steps You took to collect the "Mystery Samsung 980 pro with heatsink that we can't view the contents of" listed in the "2025.08.07 Sources to be Searched.pdf" document.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that TransPerfect gained custody of the Mystery 980 Pro with heatsink on or about August 20, 2025, and then attempted to determine whether anything was recoverable from the device.

6481184.1

8

J.R.562

INTERROGATORY NO. 23:  Describe what steps You took to collect the "misc digital ocean hosts" listed in the "2025.08.07 Sources to be Searched.pdf" document.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that based on his understanding TransPerfect collected the droplets themselves for the "misc digital ocean hosts" using "dd", a Linux copy command.

INTERROGATORY NO. 24:  Identify, by Server Name, Server ID, Channel Name, and Channel ID, each Discord and Telegram channel, server, and/or direct messages You are searching in response to discovery requests in this Action.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that this information was previously produced as Exhibit A to Plaintiff Li Fen Yao's Third Amended Answers to Defendant's Second Amended Interrogatories, which were collectively produced to opposing counsel on August 29, 2025.

I HEREBY CERTIFY, under the penalties for perjury, that the foregoing answers are true, to the best of my knowledge, information and belief.

_____                    _____
Date                              David Chen

6481184.1

9

J.R.563

__/s/ Alexander M. Giles_____

Michael J. Lentz
Alexander M. Giles
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
(410) 727-5460 (fax)
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Defendant,*
*David Chen*

6481184.1

10

J.R.564

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of November 2025, the foregoing Answers to Plaintiffs' Second Set of Interrogatories were served via email on all counsel of record in the above-captioned consolidated matter.

$\underline{\phantom{xx}\textit{/s/ Alexander M. Giles}\phantom{xxxxxxxxxxxx}}$
Alexander M. Giles

6481184.1

INTERROGATORY NO. 23: Describe what steps You took to collect the "misc digital ocean hosts" listed in the "2025.08.07 Sources to be Searched.pdf" document.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that based on his understanding TransPerfect collected the droplets themselves for the "misc digital ocean hosts" using "dd", a Linux copy command.

INTERROGATORY NO. 24: Identify, by Server Name, Server ID, Channel Name, and Channel ID, each Discord and Telegram channel, server, and/or direct messages You are searching in response to discovery requests in this Action.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that this information was previously produced as Exhibit A to Plaintiff Li Fen Yao's Third Amended Answers to Defendant's Second Amended Interrogatories, which were collectively produced to opposing counsel on August 29, 2025.

I HEREBY CERTIFY, under the penalties for perjury, that the foregoing answers are true, to the best of my knowledge, information and belief.

11/25/25
Date

David Chen

J.R.566

# Exhibit 19

J.R.567

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>      Plaintiff,<br><br>      v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>      Defendants. | Case No. 8:23-cv-00889-TDC |
| ROBERT CHEN and OTTERSEC LLC,<br><br>      Plaintiffs,<br><br>      v.<br><br>DAVID CHEN,<br><br>      Defendant. | Case No. 8:24-cv-03628-TDC |

**PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC'S
SECOND SET OF REQUESTS FOR PRODUCTION**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Local Rule 104 of the Local Rules of the United States District Court for the District of Maryland, and Appendix A to the Local Rules of the United States District Court for the District of Maryland, Plaintiffs Robert Chen and OtterSec LLC, by their undersigned attorneys, request that Defendant David Chen respond to these requests within the time prescribed by the Federal Rules of Civil Procedure and produce or make available for inspection and copying the documents and electronically stored information described below within thirty (30) days following the date of service of these requests..

1

J.R.568

**INSTRUCTIONS AND DEFINITIONS**

A.    Pursuant to Appendix D to the Local Rules of the United States District Court for the District of Maryland, the Uniform Instructions and Definitions for Use in Discovery Requests are incorporated herein.

B.    These Instructions and Definitions are not intended to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure.

C.    Documents requested herein shall be produced as they are kept in the usual course of business or organized and labeled to respond to the specific categories set forth in these requests and with information sufficient to indicate their source (e.g., the person(s) from whom the documents were obtained).

D.    A request calling for production of any document shall be deemed to include, in addition to the document itself, a request for any and all drafts or non-identical copies of any such document, as well as all exhibits or attachments to the document and any enclosures sent or kept with the document. Documents attached to one another shall not be separated.

E.    Unless otherwise agreed to by the parties, documents shall be produced via a file transfer protocol site, on a portable hard or flash drive or other reasonably accessible media format. Documents maintained in hardcopy shall be produced in TIFF image format with corresponding OCR text, associated data identifying the beginning and ending bates numbers and, to the extent applicable, information associating document families or attachment ranges. Electronically stored documents should be produced in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland.

F.    Discord messages shall be: exported in 12-hour or 24-hour increments and produced in text-searchable pdfs, with metadata for the participant field and date sent field. The time zone for the messages will be Coordinated Universal Time (UTC). No Discord messages shall be removed from within conversations in the 12-hour or 24-hour exported increments.

G.    Plaintiffs retain the right to request to view or inspect the original of any copy of a document provided or produced in response to these requests.

H.    For purposes of these requests, unless otherwise specified, the Relevant Period is February 1, 2021, through April 17, 2025.

I.    Unless otherwise indicated, these requests call for all documents that were applicable or created, sent, received or otherwise possessed during the Relevant Period.

J.    "You," "Defendant," or "David Chen" means David Yao Chen, son of Sam Mingsan Chen, and any of his representatives.

K.    "Action" means *Chen v. Chen*, 8:24-cv-3628-TDC.

2

J.R.569

L.    "Complaint" means the operative Second Amended Complaint in *Chen v. Chen*, 8:24-cv-3628-TDC.

M.    "Plaintiffs" means Robert Chen and OtterSec LLC.

N.    "OtterSec" means OtterSec LLC and any of its representatives.

O.    "Representative" or "representatives" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

P.    "Solend Liquidator Code" means any code that ran or runs liquidations on the Solana blockchain.

Q.    "mSOL Market Maker Code" means any code that did or does market making or performed or performs market making functions on the Solana blockchain.

## REQUESTS FOR PRODUCTION

14. All messages from the rubber-duck-debugging and new-hell-new-year channels in the new clickbait Discord server.

15. All David Chen's correspondence with Discord.

16. David Chen's Github history for the Relevant Period.

17. All documents and communications related to editing, changing, or revising Github history.

18. All documents and communications concerning any Solend Liquidator Code or any mSOL Market Maker Code.

19. All documents and communications concerning allegations You took code or any other property in which Alexander Karavaltchev claimed (or claims) an ownership interest.

20. Documents sufficient to identify all liquidator bots You are running and the platforms on which You are running such liquidator bots.

21. Documents sufficient to identify any Solend Liquidator Codes You have run.

22. Documents sufficient to identify any mSOL Market Maker Codes You have run.

23. Documents sufficient to identify the server, channel, and dates sent for all Discord messages you deleted and in which you or others mentioned the Solend Liquidator Code and/or the mSOL Market Maker Code.

24. All documents and communications with and/or about Robert Chen.

25. All contracts between You and Alexander Karavaltchev.

3

J.R.570

Dated:          August 15, 2025                          Respectfully submitted,

                                                         */s/ Rachel Clattenburg*
                                                         Rachel Clattenburg
                                                         Joshua A. Levy
                                                         Kevin P. Crenny
                                                         Justin A. DiCharia
                                                         Christina M. Lamoureux
                                                         **LEVY FIRESTONE MUSE LLP**
                                                         900 17th St. NW, Suite 605
                                                         Washington, DC 20006
                                                         Tel: (202) 845-3215
                                                         Fax: (202) 595-8253
                                                         rmc@levyfirestone.com
                                                         jal@levyfirestone.com
                                                         kcrenny@levyfirestone.com
                                                         jdicharia@levyfirestone.com
                                                         christinal@levyfirestone.com
                                                         *Counsel for Plaintiffs*

4

5

## CERTIFICATE OF SERVICE

I certify that on August 15, 2025, I caused the foregoing Requests for Production to be served on counsel of record.

/s/ Rachel Clattenburg
Rachel Clattenburg

5

# Exhibit 20

J.R.573

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LI FEN YAO, as Administrator of the              *
Estate of Sam Mingsan Chen,

                                          *

        Plaintiff

                                         *      Civil Action No. 8:23-cv-889-TDC

v.

                                         *

ROBERT CHEN, OTTER AUDITS LLC,
and RC SECURITY LLC,                             *

        Defendants                               *

    *    *    *    *    *    *    *    *    *    *    *    *

ROBERT CHEN and OTTERSEC LLC,                    *

        Plaintiffs                               *

v.                                               *      Civil Action No. 8:24-cv-3628-TDC

DAVID CHEN,                                      *

        Defendant                                *

    *    *    *    *    *    *    *    *    *    *    *    *

### DEFENDANT DAVID CHEN'S RESPONSES TO
### PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant, David Chen ("David"), by and through his attorneys, Michael J. Lentz,

Alexander M. Giles, Casey D. Brinks, Rachel A. DeCaluwe, and Tydings & Rosenberg LLP,

hereby responds to the Requests for Production of Documents served upon it by Plaintiffs,

Robert Chen and OtterSec, LLC ("Robert Chen Parties"), and states as follows:

### INTRODUCTION

A.     The information supplied in these Responses is not based solely on the knowledge

of the executing party, but includes the knowledge of the party's agents, representatives, and

6486331.1

J.R.574

attorneys, unless privileged.

B.    The word usage and sentence structure is that of David's aforementioned counsel assisting in the preparation of these Responses and thus does not purport to be the precise language of the executing party.

C.    The defined terms are used and defined in accordance with the Definitions and Instructions provided by the party serving the Request for Production of Documents.

D.    Documents shall be produced in accordance with the categories by which they have been requested by Plaintiffs.

<div align="center">

**GENERAL OBJECTIONS**

</div>

1.    David objects to the Requests to the extent that they purport to impose obligations greater than those imposed by the Federal Rules and applicable law.

2.    David objects to the Requests to the extent they may be construed to request disclosure of information or documents protected by attorney-client privilege and/or attorney-client confidentiality. David further objects to the Requests to the extent that they may be construed to request disclosure of information or documentation that was prepared in anticipation of litigation, constitutes attorney work product, discloses the mental impressions, conclusions, opinions or legal theories of any attorneys for David, contains privileged attorney-client communications, or is otherwise protected from disclosure under applicable privileges or protections, including the Work-Product Doctrine, laws or rules. In responding to the Requests, David will not undertake to provide information that is privileged or otherwise protected from discovery by law, and she will not produce documents containing any such information. The inadvertent disclosure by David of any information protected by any privilege shall not constitute a waiver of that privilege or relevant doctrine.

6486331.1

<div align="center">

2

</div>

3.     David objects to the Requests to the extent that they seek information already known to Plaintiff and/or information that is in the possession, custody, or control of Plaintiff, or any person acting on Plaintiff's behalf, including, without limitation, his agents, representatives, accountants, and attorneys, wherever such documents may be located.

4.     David objects to the Requests to the extent that they seek information not within David's possession, custody, or control, and shall respond to the Requests as if directed only at information within her possession, custody, or control. David further objects to the Requests to the extent they call for consultation with, and disclosure of information from, persons or entities other than David.

5.     David objects to the Requests to the extent they fail to identify the information sought with reasonable particularity.

6.     David objects to the Requests to the extent that they imply the existence of facts, circumstances, and/or legal obligations that do not or did not exist.

7.     David objects to Plaintiffs' Instructions and Definitions Section to the extent that it seeks to impose obligations and responsibilities upon David that are not reasonable under the circumstances of this case.

8.     David objects to Plaintiffs' Instruction (or Definition) F., which reads as follows: "Discord messages shall be exported in 12-hour or 24-hour increments and produced in text-searchable pdfs, with metadata for the participant field and date sent field. The time zone for the messages will be Coordinated Universal Time (UTC). No Discord messages shall be removed from within conversations in the 12-hour or 24-hour exported increments." David states that Discord messages will be produced in the manner, the format, and the size that makes the most

sense under the circumstances, and as specifically recommended by his third-party document management vendor, TransPerfect.

9.      David objects to Plaintiffs' Instruction (or Definition) H., which reads as follows: "For purposes of these requests, unless otherwise specified, the Relevant Period is February 1, 2021, through April 17, 2025."  The Relevant Period, as ordered by U.S. Magistrate Judge Gina L. Simms on November 20, 2025, is September 5, 2021 through April 17, 2025.

10.     David objects to Plaintiffs' Definitions P. and Q., which read, respectively, as follows: "P. "Solend Liquidator Code" means any code that ran or runs liquidations on the Solana blockchain"; and "Q. "mSOL Market Maker Code" means any code that did or does market making or performed or performs market making functions on the Solana blockchain." These definitions do not properly define the terms at issue, and inadvertently (or intentionally) seek to expand the scope of what might otherwise be discoverable and relevant herein.

11.     David's responses are based on information and documents presently available to and located by her and are given without prejudice to David's right to produce additional information and documents at a later date should such information become known as a result of a subsequent review of records or as a result of additional investigation or discovery.  David reserves the right to alter, amend, or supplement these responses as may be necessary or appropriate. David reserves the right to present at trial additional information discovered subsequently. David reserves the right to raise any new or further objection to the production of additional information or documents.

12.     Inadvertent disclosure or production in response to the Requests that is confidential, privileged, was prepared in anticipation of litigation or for trial, or is irrelevant,

immaterial, or otherwise inadmissible and/or immune from discovery shall not constitute a waiver of any such privilege or of any ground for objection to discovery with respect to such information or with respect to the subject matter thereof or the use of information during a subsequent proceeding herein.

13.     David objects to the Requests to the extent they: (a) fail to identify the requested information with the degree of particularity required; (b) are unreasonably cumulative, redundant, or duplicative; (c) seek information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence; (d) are unduly burdensome, overbroad, vague, ambiguous, and/or incomprehensible; and (e) seek the discovery of otherwise inadmissible or immaterial information.

14.     By providing these Responses, and by providing any documents, David does not in any way waive or intend to waive but rather intends to preserve and is preserving, (a) all objections to competency, relevance, materiality and admissibility of the responses or the subject matter thereof; (b) all objections as to vagueness, ambiguity, or undue burdensomeness; (c) all rights to object on any ground to the use of any of said responses or the subject matter thereof, in any proceedings, including the trial of this or any other actions; and (d) all rights to object on any ground to any request for further responses to these or any other discovery requests involving or related to the subject matter of the Requests.

15.     These General Objections are continuing and are explicitly incorporated into each and every response set forth below to each and every Response.

## **RESPONSES**

**REQUEST NO. 14:** All messages from the rubber-duck-debugging and new-hell-new-year channels in the new clickbait Discord server.

6486331.1

5

J.R.578

**RESPONSE:**  David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.  In that regard, though, David does not believe that any new-hell-new-year messages actually exist.

**REQUEST NO. 15:** All David Chen's correspondence with Discord.

**RESPONSE:**  David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 16:** David Chen's Github history for the Relevant Period.

**RESPONSE:**  David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  Specifically, in that regard, it is unclear whether Plaintiffs are requesting David's Github "commit history" or his Github "account history" so David would would request a clarification from Plaintiffs so that the intended documents can be produced, assuming they exist.  Subject to the foregoing objections and request for clarification, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 17:** All documents and communications related to editing, changing, or revising Github history.

**RESPONSE:**  David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  David also objects to this Request on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  Subject to the foregoing objections, and without

waiving any of those objections, David states that there are no known documents responsive to this Request.

**REQUEST NO. 18:** All documents and communications concerning any Solend Liquidator Code or any Msol Market Maker Code.

**RESPONSE:** David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 19:** All documents and communications concerning allegations You took code or any other property in which Alexander Karavaltchev claimed (or claims) an ownership interest.

**RESPONSE:** David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 20:** Documents sufficient to identify all liquidator bots You are running and the platforms on which You are running such liquidator bots.

**RESPONSE:** David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 21:** Documents sufficient to identify any Solend Liquidator Codes You have run.

**RESPONSE:** David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving

6486331.1

7

J.R.580

any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 22:** Documents sufficient to identify any mSOL Market Maker Codes You have run.

**RESPONSE:** David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.  In this regard, though, David has not run any mSOL Market Maker Codes since 2022 and his affiliation with OtterSec.

**REQUEST NO. 23:** Documents sufficient to identify the server, channel, and dates sent for all Discord messages you deleted and in which you or others mentioned the Solend Liquidator Code and/or the mSOL Market Maker Code.

**RESPONSE:** David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.  David states that the documents responsive to this Request would be limited to the OtterSec liquidator related channels in the OtterSec Discord server, which only included messages up through April 27, 2022, and also the New Clickbait Discord messages.

**REQUEST NO. 24:** All documents and communications with and/or about Robert Chen.

**RESPONSE:**  David objects to this Request on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that all non-privileged documents responsive to this Request will be produced.

**REQUEST NO. 25:** All contracts between You and Alexander Karavaltchev.

**RESPONSE:**  David states that he entered into a total of two contracts with Alexander Karavaltchev – a Partnership Agreement dated October 15, 2021 that formalized their business relationship, and a Termination Agreement dated November 16, 2021, which terminated their business relationship.  David states that both documents will be produced.

<div align="right">

  __/s/ Alexander M. Giles_____

Michael J. Lentz
Alexander M. Giles
Casey D. Brinks
Rachel A. DeCaluwe
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
(410) 727-5460 (fax)
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Defendant,*
*David Chen*

</div>

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I HEREBY CERTIFY that on this 4th day of December 2025, the foregoing Responses to Plaintiffs' Second Set of Requests for Production of Documents were served via email on all counsel of record in the above-captioned consolidated matter.

<div align="right">

  __/s/ Alexander M. Giles_____
Alexander M. Giles

</div>

6486331.1

9

J.R.582

# Exhibit 21

J.R.583

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| LI FEN YAO,<br>as Administrator of the Estate of Sam Mingsan Chen<br><br>  Plaintiff,<br><br>  v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>  Defendants. | Case No. 8:23-cv-00889-TDC |

**DEFENDANT ROBERT CHEN'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Local Rule 104 of the Local Rules of the United States District Court for the District of Maryland, and Appendix A to the Local Rules of the United States District Court for the District of Maryland, Defendant Robert Chen, by his undersigned attorneys, propounds these Interrogatories to which Plaintiff Li Fen Yao as Administrator of the Estate of Sam Mingsan Chen, shall respond fully, in writing and under oath, within the time prescribed by the Federal Rules of Civil Procedure, in accordance with the Instructions and Definitions set forth hereinafter.

**INSTRUCTIONS AND DEFINITIONS**

A.      These Instructions and Definitions are not intended to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure.

B.      The Uniform Instructions and Definitions for Use in Discovery Requests, as set forth in Appendix D of the Local Rules for the U.S. District Court for the District of Maryland, are incorporated herein.

C.      For purposes of these interrogatories, the Relevant Period is February 1, 2022, through the Present.

1

J.R.584

D.      "Action" means the above-captioned proceeding.

E.      "David Chen" means David Yao Chen, son of Sam Mingsan Chen, and any of his representatives.

F.      "Darren Chen" means Darren Yao Chen, son of Sam Mingsan Chen, and any of his representatives.

G.      "Duo Chen" means Duo Chen, daughter of Sam Mingsan Chen, and any of her representatives.

H.      "Sharine Chen" means Sharine Chen, daughter of Sam Mingsan Chen, and any of her representatives.

I.      "Naiyu Wang" means Naiyu Wang, ex-wife of Sam Mingsan Chen, and any of her representatives.

J.      "Li Fen Yao" means Li Fen Yao, widow of Sam Mingsan Chen (in her personal capacity), and any of her representatives.

K.      "Defendants" means Robert Chen, Otter Audits LLC, and/or RC Security LLC.

L.      "Estate" means the Estate of Sam Mingsan Chen, and includes any of its representatives, including its Administrator.

M.      "OtterSec" means OtterSec LLC and any of its representatives.

N.      "Plaintiff" means the Estate and its Administrator.

O.      "Jump" means the entity Jump Trading or Jump Crypto or any of the following Jump-affiliated crypto projects: Wormhole, Pyth, and any of their officers, employees, agents, or representatives.

P.      "Robert Chen" means Defendant Robert Chen.

Q.      "Sam Chen" means Sam Mingsan Chen and any of his representatives, including David Chen.

R.      "Representative" or "representatives" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

## INTERROGATORIES

1.      Identify all persons who are likely to have personal knowledge of any fact alleged in the pleadings, and state the subject matter of the personal knowledge possessed by each such person.

2

J.R.585

2.    Identify and describe all instances in which Robert Chen referenced Jump in communications with David Chen and/or Sam Chen, as well as in communications to which David Chen was a party (i.e. group chats, discord channels, etc.).

3.    Identify all existing and prospective contracts, relationships, business expectancies, and opportunities to which the Estate was a party and with which Robert Chen allegedly tortiously interfered as alleged in Paragraphs 156–59 of the Complaint.

4.    Identify all phone numbers, email addresses and modes of communications (*e.g.*, WhatsApp, telephone, email) used by Sam Chen and David Chen, as well as any handles associated with those accounts (e.g., @ra, @realawesomeness, @radiantaeon, @raggedsec).

5.    Identify and describe all "code," "other property," and "information" that David Chen "took with him" or from which David Chen "removed Robert's and OtterSec's access" as alleged in Paragraphs 71–73 of the Complaint. For each "code," "other property," and "information" identified, state the monetary value of said "code," "other property," or "information" and who owns and/or has access to said "code," "other property," or "information."

6.    For each "code," "other property," and "information" identified in Interrogatory No. 5, state the gross amount of money, regardless of currency type (i.e., cryptocurrencies, other digital currencies, traditional currencies), that David earned or obtained from his use of each "code," "other property," and "information" after leaving OtterSec.

7.    Identify David Chen's work and all his sources of income from April 22, 2022, through March 31, 2023.

8.    Itemize, explain, and show how you calculate any damages claimed by you in this Action, whether economic, non-economic, punitive, or other.

9.    Itemize and describe all communications with and documents relating to the "acquaintance" referenced in Paragraphs 83–86 of the Complaint.

10.    State all the reason(s) why David Chen ceased working for OtterSec as referenced in Paragraph 70 of your Complaint and on Page 4 of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint for Lack of Personal Jurisdiction, ECF No. 28.

11.    State the facts concerning the matters alleged in Paragraphs 41–44, 67, 70–72, 83–86 of your Complaint.

12.    Identify with specificity all misrepresentations and/or omissions upon which you claim Sam Chen relied, as alleged in Paragraphs 138–45 of the Complaint, including the alleged statement or omission, the date of the statement or omissions, the place of the statement or omission, the method of transmission of the statement or omission, and state specifically what action Sam Chen took in reliance on each alleged misrepresentation and/or omission.

13.    Identify all notices you gave OtterSec that Li Fen Yao had been appointed personal representative of the Estate, including the date, method, and content of the notice.

14.    Identify all blockchain or digital wallets used by David Chen, Sam Chen, the Estate, any entity in which David Chen has any interest or for whom David Chen works, any entity in

3

which the Estate has any interest, or any entity in which Sam Chen had any interest during the Relevant Period.

**15.**    Identify specifically all the property to which the Estate had legal title that it claims Defendants misappropriated and converted, as alleged in Paragraphs 146–50 of the Complaint.

**16.**    Explain the valuation of litigation claims listed in the inventories filed with the Register of Wills and/or Orphans' Court for Montgomery County in relation to *In the Estate of Sam Mingsan Chen*, Estate No. W112298, and explain any amendments to said valuation.


Respectfully submitted,


Dated: April 22, 2024                      /s/ Rachel Clattenburg
                                           Rachel Clattenburg
                                           Joshua A. Levy, *pro hac vice*
                                           Kevin P. Crenny, *pro hac vice*
                                           Justin A. DiCharia, *pro hac vice*
                                           **LEVY FIRESTONE MUSE LLP**
                                           900 17th St. NW, Suite 1200
                                           Washington, DC 20006
                                           Tel: (202) 845-3215
                                           Fax: (202) 595-8253
                                           jal@levyfirestone.com
                                           rmc@levyfirestone.com
                                           kcrenny@levyfirestone.com
                                           jdicharia@levyfirestone.com

                                           *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on April 22, 2024, I caused the foregoing Requests for Production to be served on counsel of record.

_/s/ Rachel Clattenburg_

5

# Exhibit 22

J.R.589

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| LI FEN YAO, as Administrator of the Estate of Sam Mingsan Chen, |
| |
| Plaintiff, |
| v. |
| |
| ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC, |
| |
| Defendant. |

Case No. 8:23-cv-00889-TDC

**PLAINTIFF'S RESPONSES TO DEFENDANT ROBERT CHEN'S
FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule 104 of the Local Rules of the United States District Court for the District of Maryland, Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), by her undersigned attorneys, hereby responds to Defendant Robert Chen's First Set of Interrogatories dated April 22, 2024 (the "Interrogatories") as follows:

**GENERAL RESPONSES AND OBJECTIONS**

The following general responses and objections are incorporated into each of Plaintiff's specific responses to the Interrogatories:

A. These responses (the "Responses") are being provided based upon documents and information presently available and known to Plaintiff. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or

11301422.7

J.R.590

specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek disclosure of information or documents protected by the attorney-client privilege, the work product doctrine or any other privilege, protection or immunity from discovery. Plaintiff's Responses do not include information which is privileged, protected or immune from disclosure. The inadvertent inclusion of any such information or material shall not constitute a general or specific waiver of any such privilege, protection or immunity from disclosure.

C.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to impose obligations that exceed those under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland or applicable law. Plaintiff's Responses are limited to her obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

D.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that any specific interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific interrogatory. Any objection to any specific interrogatory shall be deemed to be part of any response to any other specific interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objection is specifically set forth therein.

2

11301422.7

J.R.591

E.        Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiff's possession, custody or control, and/or information within the possession, custody or control of non-parties over whom Plaintiff has no authority and/or control. Plaintiff is responding to the Interrogatories on her behalf only, on the basis of her personal knowledge and information within her possession, custody or control, and on information and belief to the extent her responses are based on knowledge or information possessed by David Chen.

F.        Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they are vague, ambiguous, overly broad, unduly burdensome, duplicative, repetitive, cumulative or not proportionate. Plaintiff will make a good faith effort to locate and provide information responsive to the Interrogatories, subject to any objections, in accordance with her obligations under the Federal Rules of Civil Procedure, Local Rules of the United States District Court for the District of Maryland and applicable law.

G.        Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information which is (i) already in the possession of the defendants; (ii) a matter of public record, (iii) as easily obtainable by the defendants from third-parties as it would be by Plaintiff and/or (iv) in Plaintiff's possession, custody or control only because such information has been provided to Plaintiff by other parties or non-parties through discovery or otherwise in this action.

H.        Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume or characterize, or are intended to assume or characterize, facts or law. These Responses shall not constitute an endorsement, admission, concession, agreement with or acceptance of any such assumptions or characterizations. Plaintiff expressly

3

11301422.7

reserves, and does not waive, any objections to any characterizations of fact or law set forth in the Interrogatories.

I.      Plaintiff reserves all objections at any hearing or trial or on any motion to the use or admissibility of any information identified or disclosed herein.  The identification or disclosure of information does not constitute an admission by Plaintiff that such information is relevant to the action or admissible in evidence.

J.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information which is properly the subject of expert analysis or opinion or call for legal conclusions.

## RESPONSES TO INDIVIDUAL INTERROGATORIES

**Interrogatory No. 1:** Identify all persons who are likely to have personal knowledge of any fact alleged in the pleadings, and state the subject matter of the personal knowledge possessed by each such person.

**Response to Interrogatory No. 1:** Plaintiff objects to Interrogatory No. 1 on the grounds that it is unduly burdensome, overly broad, vague, ambiguous and seeks information not within Plaintiff's possession, custody or control. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff identifies the following persons on the basis of her own knowledge and information, and on information and belief to the extent based on knowledge or information possessed by David Chen:

| Name | Topics |
|------|--------|
| David Chen | Formation of OtterSec |
| | David/Sam Chen involvement in OtterSec |
| | OtterSec business and operations |
| | Ownership interests in OtterSec |
| | Communications involving David Chen referenced in Complaint |

4

11301422.7

| | OtterSec assets, clients/customers and agreements |
| --- | --- |
| | First amendment to OtterSec Operating Agreement |
| Robert Chen | Formation of OtterSec |
| | David/Sam Chen involvement in OtterSec |
| | OtterSec business and operations |
| | OtterSec employment, consulting and non-disclosure agreements |
| | Communications involving Robert Chen referenced in Complaint |
| | Jump Trading/Crypto discussions |
| | Ownership interests in OtterSec |
| | First amendment to OtterSec Operating Agreement |
| | Second amendment to OtterSec Operating Agreement |
| | Dissolution/wind-down of OtterSec |
| | OtterSec assets, clients/customers and agreements |
| | Formation of Otter Audits and RC Security |
| | Assets, customers and agreements of Otter Audits and RC Security |
| | Business and operations of Otter Audits and RC Security |
| Iqan Fadaei | Communications involving Iqan Fadaei referenced in Complaint |
| | Second amendment to OtterSec Operating Agreement |
| | Dissolution/wind-down of OtterSec |
| | Estate of Sam Chen/Appointment of Administrator |
| Philip Papurt | Communications involving Philip Papurt referenced in Complaint |
| Li Fen Yao | Formation of OtterSec |
| | David/Sam Chen involvement in OtterSec |
| | Ownership interests in OtterSec |
| | Estate of Sam Chen/Appointment as Administrator |

5

11301422.7

J.R.594

| | |
|---|---|
| Daniel Kennedy (subject to and without waiver of the attorney-client privilege) | Attorney for Plaintiff and David Chen<br><br>Estate of Sam Chen/Appointment of Administrator |
| Jonathan Claudius | Communications involving Jonathan Claudius referenced in Complaint<br><br>Jump Trading/Crypto discussions |
| Hendrik Hofstadt | Communications involving Hendrik Hofstadt referenced in Complaint<br><br>Jump Trading/ Crypto discussions |
| Kanav Kariya | Communications involving Kanav Kariya referenced in Complaint<br><br>Jump Trading/Crypto discussions |
| William Wang | OtterSec contractor services agreement<br><br>OtterSec business and operations<br><br>OtterSec assets, clients/customers and agreements<br><br>Assets, customers and agreements of Otter Audits and RC Security<br><br>Business and operations of Otter Audits and RC Security<br><br>Jump Trading/Crypto discussions |
| Kevin Chow | OtterSec employment agreement<br><br>OtterSec non-disclosure agreement<br><br>OtterSec business and operations<br><br>OtterSec assets, clients/customers and agreements<br><br>Assets, customers and agreements of Otter Audits and RC Security<br><br>Business and operations of Otter Audits and RC Security<br><br>Jump Trading/Crypto discussions |
| Hathaway & Kunz LLP (subject to and without waiver of the attorney-client privilege) | Attorneys for Sam Chen, Plaintiff and David Chen<br><br>Communications involving Hathaway & Kunz LLP referenced in Complaint |

6

11301422.7

**Interrogatory No. 2:** Identify and describe all instances in which Robert Chen referenced Jump in communications with David Chen and/or Sam Chen, as well as in communications to which David Chen was a party (i.e. group chats, discord channels, etc.).

**Response to Interrogatory No. 2:** Plaintiff objects to Interrogatory No. 2 on the grounds that it is unduly burdensome, overly broad, vague, ambiguous and seeks information not within Plaintiff's possession, custody or control. Plaintiff further objects to Interrogatory No. 2 on the grounds that it is best suited to a document demand and/or deposition, and Plaintiff refers to her response to Request No. 5 in Defendants' First Set of Requests for the Production of Documents on Plaintiff dated April 22, 2024, which seeks communications concerning, *inter alia*, Jump. Plaintiff further refers to the Complaint in this matter, which identifies and describes instances in which Robert Chen referenced Jump in communications with David Chen and/or Sam Chen, as well as communications to which David Chen was a party.

**Interrogatory No. 3:** Identify all existing and prospective contracts, relationships, business expectancies, and opportunities to which the Estate was a party and with which Robert Chen allegedly tortiously interfered as alleged in Paragraphs 156-59 of the Complaint.

**Response to Interrogatory No. 3:** Plaintiff objects to Interrogatory No. 3 on the grounds that it seeks information not within her possession, custody or control, assumes or characterizes facts or law, seeks information which is properly the subject of expert analysis or opinion, and calls for legal conclusions. Plaintiff further objects to this Interrogatory on the grounds that it is unduly burdensome, overly broad, vague and ambiguous.  Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that Robert Chen has interfered and is continuing to interfere with the Estate's rightful interest in OtterSec and its successors, RC Security and Otter Audits.

**Interrogatory No. 4:** Identify all phone numbers, email addresses and modes of communications (*e.g.* WhatsApp, telephone, email) used by Sam Chen and David Chen, as well as any handles associated with those accounts (e.g., @ra, @realawesomeness, @radiantaeon, @raggedsec).

7

11301422.7

**Response to Interrogatory No. 4:** Plaintiff objects to Interrogatory No. 4 on the grounds that it seeks information not within her possession, custody or control, and because it is unduly burdensome, overly broad, vague and ambiguous, and seeks information that is irrelevant to this action. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to documents and communications being produced by Plaintiff in response to Defendants' First Set of Requests for the Production of Documents, and specifically identifies the following on the basis of her own knowledge and information, and on information and belief to the extent based on knowledge or information possessed by David Chen:

Sam Chen;

- Phone number: 301-590-5215

- Email: smchen90@hotmail.com

David Chen:

- Phone number: 301-640-1862

- Email: davidchen0@protonmail.com, davidchen0@proton.me

- Discord: @radiantaeon

- Telegram: @raggedsec

- Twitter/X: @raggedsec

**Interrogatory No. 5:** Identify and describe all "code," "other property," and "information" that David Chen "took with him" or from which David Chen "removed Robert's and OtterSec's access" as alleged in Paragraphs 71-73 of the Complaint. For each "code," "other property," and "information" identified, state the monetary value of said "code," "other property," or "information" and who owns and/or has access to said "code," "other property," or "information."

**Response to Interrogatory No. 5:** Plaintiff objects to Interrogatory No. 5 on the grounds that it seeks information not within her possession, custody or control, and because it is unduly burdensome, overly broad, vague and ambiguous, and seeks information that is irrelevant to this

8

11301422.7

action. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to the Complaint in this matter and adds the following on the basis of knowledge or information possessed by David Chen:

- Server owned by David Chen;

- Solend-liquidator code, owned by David Chen;

- Inventory-management (HTTP server for interfacing with Jupiter's v1 swap aggregator), owned by David Chen;

- Msol-market-maker code, owned by David Chen;

- Arb-bot code, owned by David Chen; and

- Drift-liquidator code, owned by David Chen.

Except as stated, Plaintiff declines to answer the remainder of this Interrogatory on the basis of her objections.

**Interrogatory No. 6:** For each "code," "other property," and "information" identified in Interrogatory No. 5, state the gross amount of money, regardless of currency type (i.e. cryptocurrencies, other digital currencies, traditional currencies), that David earned or obtained from his use of each "code," "other property," and "information" after leaving OtterSec.

**Response to Interrogatory No. 6:** Plaintiff objects to Interrogatory No. 6 on the grounds that it seeks information not within her possession, custody or control, and because it seeks information that is irrelevant to this action. Plaintiff declines to answer this Interrogatory on the basis of these objections.

**Interrogatory No. 7:** Identify David Chen's work and all his sources of income from April 22, 2022, through March 31, 2023.

**Response to Interrogatory No. 7:** Plaintiff objects to Interrogatory No. 7 on the grounds that it seeks information not within her possession, custody or control, and because it seeks information

9

11301422.7

J.R.598

that is irrelevant to this action. Plaintiff declines to answer this Interrogatory on the basis of these objections.

**Interrogatory No. 8:** Itemize, explain, and show how you calculate any damages claimed by you in this Action, whether economic, non-economic, punitive, or other.

**Response to Interrogatory No. 8:** Plaintiff objects to Interrogatory No. 8 on the grounds that it premature insofar as it is subject to discovery of information not within Plaintiff's possession, custody or control and properly the subject of expert analysis or opinion. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will respond to this Interrogatory upon the completion of fact discovery, in accordance with the operative expert disclosure deadlines set forth in the scheduling order in this action and pursuant to her obligations under the Federal Rules of Civil Procedure.

**Interrogatory No. 9:** Itemize and describe all communications with and documents relating to the "acquaintance" referred to in Paragraphs 83-86 of the Complaint.

**Response to Interrogatory No. 9:** Plaintiff objects to Interrogatory No. 9 on the grounds that it seeks information not within her possession, custody or control, and because it is unduly burdensome, overly broad, vague and ambiguous. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to the allegations of the Complaint itemizing and describing communications with the acquaintance referenced therein. Plaintiff will also make a good faith effort to locate and produce all relevant communications with the acquaintance referred to in paragraphs 83-86 of the Complaint and thus refers to all such communications.

**Interrogatory No. 10:** State all the reason(s) why David Chen ceased working for OtterSec as referenced in Paragraph 70 of your Complaint and on Page 4 of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint for Lack of Personal Jurisdiction, ECF No. 28.

10

11301422.7

J.R.599

**Response to Interrogatory No. 10:** Plaintiff objects to Interrogatory No. 10 on the grounds that it seeks information not within her possession, custody or control, and because it is unduly burdensome, overly broad, vague and ambiguous. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to the reasons detailed in the Complaint and in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint for Lack of Personal Jurisdiction, and further states that any additional information sought by defendants would be more appropriate for other discovery devices, including depositions.

**Interrogatory No. 11:** State the facts concerning the matters alleged in Paragraphs 41-44, 67, 70-72, 83-86 of your Complaint.

**Response to Interrogatory No. 11:** Plaintiff objects to Interrogatory No. 11 on the grounds that it seeks information not within her possession, custody or control, and is duplicative, repetitive, and cumulative of the Complaint insofar as the Complaint states the facts concerning the matters alleged therein. Any additional information sought by defendants would be more appropriate for other discovery devices, including depositions. Plaintiff further objects to this Interrogatory as unduly burdensome, overly broad, vague and ambiguous, particularly insofar as it seeks information regarding multiple and various topics within a single interrogatory and is thus an improper attempt to combine multiple interrogatories into a single interrogatory. Plaintiff declines to answer this Interrogatory further on the basis of these objections.

**Interrogatory No. 12:** Identify with specificity all misrepresentations and/or omissions upon which you claim Sam Chen relied, as alleged in Paragraphs 138-45 of the Complaint, including the alleged statement or omission, the date of the statement or omissions, the place of the statement or omission, the method of transmission of the statement or omission, and state specifically what action Sam Chen took in reliance on each alleged misrepresentation and/or omission.

**Response to Interrogatory No. 12:** Plaintiff objects to Interrogatory No. 12 on the grounds that it is unduly burdensome, overly broad, vague and ambiguous, and duplicative, repetitive and

<center>11</center>

cumulative of the Complaint insofar as the Complaint identifies with specificity the misrepresentations and omissions upon which Sam Chen relied. Any additional information sought by defendants would be more appropriate for other discovery devices, including depositions. Plaintiff further objects to this Interrogatory to the extent it assumes or characterize facts and calls for legal conclusions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to each of the misrepresentations and omissions already identified with specificity in the Complaint. Plaintiff will make a good faith effort to locate and produce any documents and communications concerning such misrepresentations and omissions in connection with her document production in this matter, including documents and communications concerning Robert Chen's misrepresentations and omissions concerning Jump Trading/Crypto, and thus refers to such documents and communications.

**Interrogatory No. 13:** Identify all notices you gave OtterSec that Li Fen Yao had been appointed personal representative of the Estate, including the date, method, and content of the notice.

**Response to Interrogatory No. 13:** Plaintiff objects to Interrogatory No. 13 on the grounds that it seeks information that is irrelevant to this action, and is unduly burdensome, overly broad, vague and ambiguous. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff will make a good faith effort to locate and produce any notices provided to OtterSec that Li Fen Yao had been appointed personal representative of the Estate, and thus refers to such notices.

**Interrogatory No. 14:** Identify all blockchain or digital wallets used by David Chen, Sam Chen, the Estate, any entity in which David Chen has any interest or for whom David Chen works, any entity in which the Estate has any interest, or any entity in which Sam Chen had any interest during the Relevant Period.

**Response to Interrogatory No. 14:** Plaintiff objects to Interrogatory No. 14 on the grounds that it seeks information not within her possession, custody or control, and because it seeks information

12

that is irrelevant to this action. Plaintiff declines to answer this Interrogatory on the basis of these objections.

**Interrogatory No. 15:** Identify specifically all the property to which the Estate had legal title that it claims Defendants misappropriated and converted, as alleged in Paragraphs 146-50 of the Complaint.

**Response to Interrogatory No. 15:** Plaintiff objects to Interrogatory No. 15 on the grounds that it seeks information not within her possession, custody or control, assumes or characterizes facts, seeks information which is the subject of expert analysis or opinion, and calls for legal conclusions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that Defendants have misappropriated and converted the Estate's rightful interest in OtterSec and its successors, RC Security and Otter Audits.

**Interrogatory No. 16:** Explain the valuation of litigation claims listed in the inventories filed with the Register of Wills and/or Orphans' Court for Montgomery County in relation to *In the Estate of Sam Mingsan Chen*, Estate No. W112298, and explain any amendments to said valuation.

**Response to Interrogatory No. 16:** Plaintiff objects to Interrogatory No. 16 on the grounds that it seeks information that is irrelevant to this action and/or information that is subject to the attorney/client privilege and work product doctrine. Plaintiff further objects to this Interrogatory insofar as it assumes or characterizes facts or calls for legal conclusions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff refers to said inventories for their actual contents, and states that the litigation line items listed therein were estimated based on information that was then-reasonably accessible and available to Plaintiff or her counsel, net of estimated fees, costs and expenses.

13

11301422.7

J.R.602

Dated:  May 22, 2024

CARTER LEDYARD & MILBURN LLP

By: _____*Stephen Plotnick*_____
    Stephen M. Plotnick, *pro hac vice*
    Madelyn K. White, *pro hac vice*
    Nathan D. Harp, *pro hac vice*
28 Liberty Street, 41st Floor
New York, New York 10005
Tel: 212.732.3200
plotnick@clm.com
white@clm.com
harp@clm.com

-and-

BARKLEY & KENNEDY

By: _____*Daniel Kennedy*_____
    Daniel M. Kennedy, III
(signed by Stephen M. Plotnick with the
permission of Daniel M. Kennedy, III)
51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600
dkennedy@barkenlaw.com

*Attorneys for Plaintiff Li Fen Yao*

14

11301422.7

J.R.603

## VERIFICATION

I, Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, state that I am the Plaintiff in this Action. I have read the foregoing Response to Defendant Robert Chen's First Set of Interrogatories and, based on reasonable inquiry, including communications with David Chen, believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: May 22, 2024

_____
Li Fen Yao

15

11301422.5

J.R.604

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I caused the foregoing Responses to Defendant Robert Chen's First Set of Interrogatories to be served on counsel for Defendants via email.

*Stephen Plotnick*
_____
Stephen M. Plotnick

16

11301422.7

# Exhibit 23

J.R.606

# CARTER LEDYARD MILBURN

Stephen M. Plotnick
Partner
plotnick@clm.com

28 Liberty Street, 41st Floor
New York, NY 10005
D / 212-238-8772

April 1, 2025

**BY EMAIL**

Josh Levy
Rachel Clattenburg
Levy Firestone Muse LLP
900 17th St NW, Suite 1200
Washington, DC 20006

Re:   *Yao v. Chen, et al.*; *Chen, et al. v. Chen*
      Case No. 8:23-cv-00889-TDC

Dear Josh and Rachel:

We have completed our analysis of the response Defendants received to the subpoena they served on Discord, dated November 26, 2024 (the "Subpoena"), which included an Excel spreadsheet that appears to have been produced by Discord in response to Defendants' request for "[r]ecords sufficient to show any and all edits or deletions by David Chen's Discord accounts of messages originally sent by any of David Chen's Discord accounts between February 1, 2022 and the present .… ."

As you know, Defendants produced Discord's response to the Subpoena to Plaintiff by email on January 31, 2025. In a subsequent email sent less than two hours later, Defendants described the Excel spreadsheet as "a log of deleted messages for David Chen for the period of February 1, 2022, through late November 2024."  *See* Email from J. Levy to S. Plotnick, dated Jan. 31, 2025. The log did not show the contents of the deleted messages, who they were exchanged with or the names of Discord servers and channels. Further, in the version of the log Defendants provided to Plaintiff, the Excel spreadsheet truncated ID numbers by converting them into scientific notation and rounding them off, which made it difficult to identify the messages. Plaintiff has since obtained the complete ID numbers, and an Excel spreadsheet which identifies them is enclosed.

Utilizing the complete Discord ID numbers, we have determined that the Discord production is not a log of deleted messages "originally sent … between February 1, 2022 and the present." Rather, the messages shown on the log were sent between December 2017 and October 2024. Of the 17,222 entries,14,711 messages were sent outside of the relevant date range for discovery the parties have agreed upon, February 2022 to December 2023. 14,528 messages pre-date February 2022 and 183 messages post-date December 31, 2023. The 2,511 remaining messages fall into the following categories:

- 472 messages are from a Discord server corresponding to "Kusuriya no Hitorigotoa" or "The Apothecary Diaries," a Japanese anime and manga-themed light novel series written by Natsu Hyūga. These messages are not relevant.

# CARTER LEDYARD MILBURN

-2-

- 1,204 messages are from a Discord server used by David for communications with a group of his high school friends about topics having nothing to do with OtterSec or any issue in this case. David's communications with his high school friends are not relevant.

- 22 are direct messages that David exchanged in August 2023 with an individual he was friendly with in high school. The messages were personal, have nothing to do with OtterSec or any issue in this case, and they are not relevant.

- 751 messages are from channels associated with the "Jito" server referenced in Defendants' letter dated October 28, 2024. Robert Chen was also a member of the Jito server and, in response to Plaintiff's requests, Defendants have produced copies of 531 of David's messages spanning the period of February 2022 to March 2023. Defendants clearly have even more, if not all, of these messages because (a) Defendants' letter dated October 28, 2024, referenced and attached messages from the Jito server that were deleted from an April 2023 conversation, and (b) Defendants' letter dated February 4, 2025, confirmed that they "have a copy of what existed [on the Jito server] in the Spring of 2024" – and all of the 751 Jito messages were deleted in July 2024, with the exception of two messages that were deleted within hours of being sent. In any event, despite multiple requests, Defendants have never articulated the relevance of these messages. Having reviewed the 531 messages Defendants produced, we can discern nothing about them that is even arguably relevant.

- The remaining 62 messages were, like the two Jito messages referenced above, deleted within hours of having been sent. In Defendants' letter dated February 4, 2025, responding to Plaintiff's questions about the 54 messages that were deleted by Robert Chen (according to a similar log produced in response to a subpoena served by Plaintiff on Discord), Defendants stated that the timestamps associated with those messages "indicate that the messages were sent around the time of deletion (hours or days, not months)" and that "[t]his indicates that they were likely messages that Robert deleted after accidentally sending to the wrong user or wrong channel, and thus are not relevant." *See* Letter from J. Levy to S. Plotnick, dated February 4, 2025. We agree with Defendants' analysis and, thus, the messages that were deleted by David within hours of being sent are also not relevant.

We trust that the concerns Defendants have previously raised have now been alleviated, as it is clear that no relevant Discord messages have been deleted or destroyed.

Sincerely,

*Stephen M. Plotnick*

Stephen M. Plotnick

Enclosure

J.R.608

# Exhibit 24

J.R.609

**Monday, February 23, 2026 at 5:08:02 PM Eastern Standard Time**

**Subject:** RE: David Chen - Discord Communication Documents
**Date:** Friday, December 5, 2025 at 4:36:30 AM Eastern Standard Time
**From:** Alexander M. Giles
**To:** Rachel Clattenburg, Michael Lentz, Casey Brinks, Rachel DeCaluwe, Gabrielle Caggiano, Tyra Wilson
**CC:** Emma Floyd, Kevin Crenny, Josh Levy, Justin DiCharia, Christina Lamoureux, Katherine Bigley
**Category:** Blue category

**Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel C.-

Let me try to answer your various questions the best that I can.

I.      Discord Productions Must Comply with Instruction F and the Parties' Agreement to Produce 12-hour or 24-hour Conversation Exports.

If "Instruction F" is what was stated in Plaintiffs' Second Set of Requests for Production of Documents, earlier this evening I finished preparing David Chen's Responses to Plaintiffs' Second Set of Requests for Production of Documents and served those Responses on your side a couple minutes after midnight.  As part of our Objections Section in David's Responses, we objected generally to Plaintiffs' Instructions and Definitions, and we also specifically objected to Plaintiffs' Instructions F. and H. and to Plaintiffs' Definitions P. and Q.

Just because we did not object to Instruction F. prior to serving our Responses earlier this evening does NOT mean that we agreed with your Instruction or that we somehow waived our ability to object to them.  And the lack of an actual Objection prior to serving David's Responses earlier this evening does NOT amount to some sort of "Parties Agreement" to produce Discord messages in some fashion arbitrarily suggested by you and your colleagues, or by your clients.

We will be producing the Discord messages in a 24-hour period of time as long as there is at least one hit in that 24 hour period.  However, because the most voluminous day featured a total of 273,000 "documents," which would have been too large to transmit as a singular document, TransPerfect suggested that they chunk the productions in 1,000 "document" groupings.  So for that one day where there were 273,000 "documents," we/TransPerfect would produce 273 separate 1,000 "document" groupings for that particular day's Discord messages.

The 6.7 million figure is the total number of documents with hits using the *Chen v. Chen* search terms.  I believe (though I will confirm this with our TransPerfect contacts) that the actual "document" will exceed 6.7 million because we are producing documents on a 24-hour cycle where there is at least one document that

**1 of 7**

J.R.610

has a hit using the search terms for that day.  And you are correct that the term "document" (in quotations) refers to each separate Discord message.

II.      Li Fen Yao's Fifth Production Errors Must Not be Repeated.

First, I presume that you meant to say in the first line "December 24, 2024" and NOT "December 24, 2025," correct?

While Stephen and CLM's re-production might have been six (6) months after the errant Fifth Production was initially produced, it was only slightly more than ONE MONTH after the three Meet and Confers that you reference were held in May 2025 and the JSR that was then submitted to the Court on May 23, 2025 when the plan to correct the situation was presumably documented and shared with Judge Simms (and possibly also Judge Chuang) for the first time.

As for your last sentence in Section II of your below email, we will NOT be comparing the upcoming document productions with previous document productions, particularly as it relates to Discord messages. So, yes, you will be receiving Discord messages that you may previously already have received.  This production will be a complete production covering the Relevant Period of September 5, 2021 through April 17, 2025, so I would suggest that it might be easiest for your side to simply disregard the previous productions and treat the upcoming productions to be made on December 12, 2025 and by January 20, 2026 as the full set OR the "Master" documents.

III.      For Chen v. Chen RFPs, the code-related search terms are not the exhaustive list of search terms….

The search terms that were agreed to by and between myself and Justin DiCharia in early August 2025 are the search terms that we/TransPerfect have been using for the productions that will be made on December 12, 2025 and by/before January 20, 2026.  This production is part of the Chen v. Chen litigation.  It was our collective understanding that CLM/TransPerfect had previously produced documents in Yao v. Chen using the search terms and search protocol that was established in November 2024, as you have alluded.

The agreed upon search terms from August 2025 are being used for both Discord and for non-Discord documents, data, information, etc.


-Alex





Alexander M. Giles                           One East Pratt Street
                                                      Suite 901

agiles@tydings.com
Office: 410.752.9747

Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

 MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Wednesday, December 3, 2025 12:45 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Casey Brinks <cbrinks@tydings.com>; Rachel DeCaluwe <RDeCaluwe@tydings.com>; Gabrielle Caggiano <GCaggiano@tydings.com>; Tyra Wilson <twilson@tydings.com>
**Cc:** Emma Floyd <efloyd@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Josh Levy <jal@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Katherine Bigley <kbigley@levyfirestone.com>
**Subject:** Re: David Chen - Discord Communication Documents

Alex,

We are removing Chambers; Judge Simms did not ask for email updates, and we have quite a bit to discuss about the new information in your email below, so it does not make sense to include the Court on this correspondence. We will add this item (*i.e.*, David Chen's Discord production) to the agenda for the meet and confer on Friday. We are providing our responses and questions in an email today so that you can confer with TransPerfect before Friday's meet and confer to allow for a productive conversation about these issues.

## I.    Discord Productions Must Comply with Instruction F and the Parties' Agreement to Produce 12-hour or 24-hour Conversation Exports.

Please clarify with TransPerfect, and then confirm with us, that you are complying with the instructions for producing Discord, as set forth in Instruction F of the RFPs, to which you did not object:

> F. Discord messages shall be: exported in 12-hour or 24-hour increments and produced in text-searchable pdfs, with metadata for the participant field and date sent field. The time zone for the messages will be Coordinated Universal Time (UTC). No Discord messages shall be removed from within conversations in the 12-hour or 24-hour exported increments.

Which messages surrounding each search term hit are you suggesting you would produce? We are unclear on how the 6.7 million search term hits relate to what you are saying you will produce.

It is not clear what you are calling a "document." It seems you and TransPerfect are calling each individual Discord message a "document," and that you are suggesting that TransPerfect will group the "documents" that have hit on search terms. Please correct us if that is not the case. If

**3 of 7**

J.R.612

that is the case, however, it is improper—and certainly not how the parties have agreed to produce Discord. Producing in this manner would appear to group messages with hits but not the surrounding messages, thus removing any context we (or the fact-finder) would need to understand the message.

## II.      Li Fen Yao's Fifth Production Errors Must Not Be Repeated.

As we hope you are aware, and as important background to this discussion, on December 24, 2025, Li Fen Yao produced 1,606 documents, most of which were Discord message threads from David Chen's account. After a lot of time and effort on our part, we discovered that many of those threads were missing highly relevant messages. For example, in one instance, Li Fen Yao produced a Discord thread that was missing 60 pages of highly relevant and responsive messages. *Compare* YAO5189–5250 *with* YAO5256–58. After meet and confers on May 9, 12, and 15, 2025, Li Fen Yao agreed to produce "complete and correct versions" of the Fifth Production documents and "a list that shows which defectively produced documents, identified by Bates numbers, have been replaced by which new, replacement documents (also identified by Bates numbers)" (among other things). Joint Status Report, ECF 139, at 3, 13-14 (May 23, 2025). This re-production was not completed until July 3, 2025, more than six months after the errant Fifth Production was initially produced. Almost all of Li Fen Yao's productions this year have simply been re-productions of that Fifth Production. We expect that you are working with Transperfect to avoid this time-consuming error this time around, but we are concerned that you are using the same process of piecing back together threads from individual messages. The threads need to be complete, authentic, and not missing messages from within a conversation.

Furthermore, we want to confirm that you are not producing duplicate Discord message threads that have already been produced.

## III.      For *Chen v. Chen* RFPs, the code-related search terms are not the exhaustive list of search terms. For *Yao v. Chen* RFPs, Li Fen Yao's counsel identified search terms and a search protocol on November 27, 2024.

In terms of search terms for *Chen v. Chen*, we agreed with you on search terms for the code-related searches only. This is set out in the JSR at ECF 151 ("[T]he Parties have now agreed to exchange search terms related to the codes at issue in *Chen v Chen* on July 14, 2025. The parties will then have a week for comments (July 14 through July 21, 2025) and then will meet and confer during the week of July 28, 2025, if there are any issues."). Our subsequent correspondence on this issue is attached.

We did not agree to search terms for any other category of documents requested in *Chen v. Chen*, and we certainly did not agree to narrow the search of responsive documents in *Chen v. Chen* to code-related searches. Nor did we exchange or even discuss search terms for documents responsive to the other requests in *Chen v. Chen*. If you are suggesting that you are only running code-related searches for documents responsive to all RFPs, that is not sufficient to meet your obligations of searching for and producing responsive documents in *Chen v. Chen*.

We are willing to agree, as a compromise on our part, that the code-related search terms are sufficient for the period of February 1, 2021 – January 1, 2022. However, they are not sufficient for the documents responsive to other RFPs in *Chen v. Chen* (and of course not for *Yao v. Chen*, where the parties exchanged search terms on November 27, 2024). For instance, the code-related search terms are not sufficient to locate documents responsive to RFP Nos. 1, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 23, 24, 25, in *Chen v. Chen* (served on May 23, 2025, and August 15, 2025).

If we are correctly understanding that you are only producing Discord conversations that hit on search terms, and that you are not otherwise reviewing Discord messages to find responsive and relevant documents, please send the set of search terms you are running, as the code-related search terms are not adequate.

As for documents responsive to RFPs in *Yao v. Chen*, it is not clear whether you are also running searches for those documents, or whether your email relates only to *Chen v. Chen* productions. Please clarify. If you are also searching David's Discord messages for threads responsive to RFPs served in *Yao v. Chen*, please confirm whether you are running the searches and search protocol represented in the letter from Stephen Plotnick dated November 27, 2024, attached here.

Thanks,
Rachel

---

**From:** Alexander M. Giles <agiles@tydings.com>
**Date:** Tuesday, December 2, 2025 at 5:56 PM
**To:** Rachel Clattenburg <rmc@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Josh Levy <jal@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>
**Cc:** Michael Lentz <mlentz@tydings.com>, Casey Brinks <cbrinks@tydings.com>, Rachel DeCaluwe <RDeCaluwe@tydings.com>, Gabrielle Caggiano <GCaggiano@tydings.com>, Tyra Wilson <twilson@tydings.com>, MDD_GLSChambers <mdd_glschambers@mdd.uscourts.gov>
**Subject:** David Chen - Discord Communication Documents

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel, Kevin, et al.-

I just want to let everyone on your side know the amount of documents that we are discussing when it comes to David's digital footprint, and, in particular, his Discord messages…his favorite

mode of communication.

We had a conference call with our third-party vendor TransPerfect earlier today, during which they confirmed that they now have all of David's Discord communications/messages downloaded, processed, and uploaded into their document management platform, Relativity. With regard to just David's Discord communications, David has a total of **46,148,676 Discord "documents."** After applying the agreed upon search terms by the parties to those documents, there are a **total of 6,727,400 documents that have hits in line with the agreed upon search terms**. Since, by definition, David's Discord communications will not be privileged communications in any manner, we are simply planning to produce everything to you by our deadline to do so after, obviously, TransPerfect bates stamps all of these documents.

Since 6.7 million "documents" would be impossible (or near impossible) to produce in any platform currently available….at least in the opinion of the folks at TransPerfect….we have discussed with them ways that they can make this more manageable for both our side and your side, in terms of receiving it, being able to review it, etc., etc. The option that they have proposed that seems to make the most sense is to chunk the production in threads that are 1,000 documents each. The threads will be continuous and will be related to each other, and will fall within the same 24 hour period. We had inquired about just chunking everything in 24 hour blocks, but unfortunately, one of the busier days included over 273,000 "documents" in one particular 24 hour window, and that size file would be too large to transmit to anyone else. Consequently, TransPerfect proposed and we agreed upon the option that chunks communications by 1,000 "documents" per combined thread. In terms of the steps involved in this process, TransPerfect is starting to work today on reducing the 6.7 million documents to threads that are no more than 1,000 documents each. Once that step is accomplished, then TransPerfect will work on bates-stamping all of the chunked threads. And once that step is completed, we will theoretically be in a position to produce all of those documents. Obviously, there are a lot of other things that are being reviewed, organized, bates-stamped, and will be produced….most of which have a higher priority than the Discord messages because they need to be produced by December 12, 2025, whereas the Discord communications have until January 20, 2026 to be produced by us. Despite the foregoing, if we find that we can produce the Discord documents PRIOR to the recently established January 20, 2026 cut-off date, we will certainly do so.

We just wanted to provide you with an advanced heads up so that you are aware of what is anticipated and what is coming, and so that you and your colleagues are not caught off guard by its sheer size.

I have also copied Judge Simms and her Chambers on this email just so she and her colleagues are also aware of this development should we end up before her Honor once again regarding any of these discovery-related matters pertaining to the production of Discord documents…..though, hopefully that's not the case.

-Alex

J.R.615



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

MERITAS LAW FIRMS WORLDWIDE        www.tydings.com



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

MERITAS LAW FIRMS WORLDWIDE        www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

MERITAS LAW FIRMS WORLDWIDE        www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

**7 of 7**

J.R.616

Exhibit 25

J.R.617

# CARTER LEDYARD MILBURN

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, 41st Floor
New York, NY 10005
D / 212-238-8772

November 27, 2024

**BY EMAIL**

Rachel Clattenburg
Levy Firestone Muse LLP
900 17th St. NW, Suite 1200
Washington, DC 2006

> Re:    *Yao v. Chen et al.*
> Case No. 8:23-cv-00889-TDC

Dear Rachel:

As agreed, we set forth below the additional details of Plaintiff's ESI collection and search protocol.

A. <u>Custodians</u>: Li Fen Yao, Sam Chen, and David Chen

B. <u>Sources</u>:

1. Li Fen Yao emails: lifen1299@yahoo.com

2. Sam Chen emails: smchen90@hotmail.com / smchen90@outlook.com

3. David Chen emails:

| | |
|---|---|
| Davidchen0@protonmail.com | tinder1525@proton.me |
| davidchen0@proton.me | test109000@protonmail.com |
| RealAwesomeness@protonmail.com | datingapp15@protonmail.com |
| radiantaeon@proton.me | contact@adjacent.fi |
| reddit_throwaway125@proton.me | realawesomenessisreal@gmail.com |
| craigslist_15125@proton.me | minecraft15230987@outlook.com |
| wendigo55129@proton.me | RealAwesomeness@outlook.com |
| adjacentfi@proton.me | ra@solend.fi |
| commonappdc@proton.me | dc0910758@gmail.com |
| davidchen501295@proton.me | |

11363859.3

Carter Ledyard & Milburn LLP / clm.com

J.R.618

**CARTER LEDYARD MILBURN**                                                -2-

4. Telegram (David Chen): @raggedsec

5. Discord (David Chen): @radiantaeon

6. Twitter/X (David Chen): @raggedsec

7. Text messages: Li Fen Yao, Sam Chen, and David Chen. As previously advised, Plaintiff's efforts to obtain David Chen's text messages from his Motorola Moto E mobile phone remain ongoing. However, Plaintiff has obtained the text messages from the Google Pixel 7 Pro mobile phone David Chen began using after his Motorola Moto E mobile phone ceased functioning.

C. <u>Search terms</u>

| | | |
|---|---|---|
| (10 or ten) w/2 (% or percent) | Jump | Robert |
| Account! | Kariya | "Services Agreement" |
| Acqui! | Kanav | "Service Contract" |
| Administrat! | Liquid! | Shareholder |
| "Articles of Organization" | Member | Sino |
| Asset! | Mercury | "Statement of Work" |
| Assign! | NDA | Transfer! |
| Auction! | Non-Disclosure | Valu! |
| Audit! | Nondisclosure | VC! |
| "Auditor Position" | Notdeghost | Verabit |
| Claudius | Offer! | Wallet |
| Dissol! | "Operating Agreement" | "West Realm" |
| Employ! | Osec | Wind-up |
| Estate | Otter! | "wind up" |
| Equity | Race | wind-down |
| FTX | RC | "wind down" |
| Henrick | "Referral Agreement" | winding |
| Hofstadt | Remake | "Work Order" |
| Invest! | Rob | Zellic |

Carter Ledyard & Milburn LLP / clm.com

J.R.619

**CARTER LEDYARD MILBURN**

D. <u>Date range</u>: February 1, 2022 to March 31, 2024

E. <u>Other parameters</u>: Plaintiff has applied a twelve-hour range to all text, telegram, and Discord messages receiving a "hit" on any of the above-referenced search terms, so as to also capture messages sent or received within six hours before and six hours after any such message.

Sincerely,

/s/ Stephen M. Plotnick

Stephen M. Plotnick

---

# Exhibit 26

J.R.621

**Subject:** Exchange of Document Sources - Chen v. Chen

**Date:** Monday, July 21, 2025 at 12:56:59 PM Eastern Daylight Time

**From:** Rachel Clattenburg

**To:** Malyshev, Alexander G., Plotnick, Stephen M., Alexander M. Giles, White, Madelyn K., Dan Kennedy, Simpson, Kevin M., Michael Lentz, Mary Hickman

**CC:** Josh Levy, Christina Lamoureux, Emma Floyd, Justin DiCharia, Kevin Crenny, Jennifer Luong

Counsel,

We would like to exchange the document sources on which each side is running search terms in *Chen v. Chen* in the next couple weeks so that we can work through any potential issues sooner rather than later.

We propose that the list include not only all the custodians, but all sources of documents, including specifying the names of Discord channels and servers that have been collected and are being searched; Telegram channels searched; and the date range being searched for each document source.

Is two weeks sufficient? That would be August 4, 2025.

Thanks,
Rachel


**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**

900 17th St NW, Suite 605, Washington, DC 20006

T 202-845-3215 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--

J.R.622

# Exhibit 27

J.R.623

**Tuesday, February 10, 2026 at 2:32:04 PM Eastern Standard Time**

**Subject:** RE: Exchange of Document Sources - Chen v. Chen
**Date:** Friday, August 1, 2025 at 7:28:43 PM Eastern Daylight Time
**From:** Alexander M. Giles
**To:** Rachel Clattenburg, Malyshev, Alexander G., Plotnick, Stephen M., White, Madelyn K., Simpson, Kevin M., Michael Lentz, Mary Hickman
**CC:** Josh Levy, Christina Lamoureux, Emma Floyd, Justin DiCharia, Kevin Crenny, Jennifer Luong

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel-

Sorry for the delay in responding to your below emails.  I would propose an initial deadline of exchanging the document sources on which each side is running the search terms of Wednesday, August 6.  Please let us know if your side is in agreement with that date.

Thank you, and I hope you have a nice weekend.

-Alex G.



Alexander M. Giles

agiles@tydings.com
Office: 410.752.9747

One East Pratt Street
Suite 901
Baltimore, MD 21202
Main: 410.752.9700
Fax: 410.727.5460

**MERITAS** LAW FIRMS WORLDWIDE

www.tydings.com

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Wednesday, July 30, 2025 4:25 PM
**To:** Malyshev, Alexander G. <Malyshev@clm.com>; Plotnick, Stephen M. <Plotnick@clm.com>; Alexander M. Giles <agiles@tydings.com>; White, Madelyn K. <white@clm.com>; Dan Kennedy <dkennedy@barkenlaw.com>; Simpson, Kevin M. <Simpson@clm.com>; Michael Lentz <mlentz@tydings.com>; Mary Hickman <mhickman@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Re: Exchange of Document Sources - Chen v. Chen

Counsel,

J.R.624

We would appreciate a prompt response to this email that we sent more than a week ago.

Thank you,

**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Levy Firestone Muse LLP.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 845-3215, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.
--

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Date:** Monday, July 21, 2025 at 5:56 PM
**To:** Malyshev, Alexander G. <Malyshev@clm.com>, Plotnick, Stephen M. <Plotnick@clm.com>, Alexander M. Giles <agiles@tydings.com>, White, Madelyn K. <white@clm.com>, Dan Kennedy <dkennedy@barkenlaw.com>, Simpson, Kevin M. <Simpson@clm.com>, Michael Lentz <mlentz@tydings.com>, Mary Hickman <mhickman@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>, Christina Lamoureux <Christinal@levyfirestone.com>, Emma Floyd <efloyd@levyfirestone.com>, Justin DiCharia <JDiCharia@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>, Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Exchange of Document Sources - Chen v. Chen

Counsel,

We would like to exchange the document sources on which each side is running search terms in *Chen v. Chen* in the next couple weeks so that we can work through any potential issues sooner rather than later.

We propose that the list include not only all the custodians, but all sources of documents, including specifying the names of Discord channels and servers that have been collected and are being searched; Telegram channels searched; and the date range being searched for each document source.

Is two weeks sufficient? That would be August 4, 2025.

Thanks,
Rachel


**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 605, Washington, DC 20006
T 202-845-3215 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee.  It is the property of Levy Firestone Muse LLP.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--



| Alexander M. Giles | One East Pratt Street |
| --- | --- |
| | Suite 901 |
| agiles@tydings.com | Baltimore, MD 21202 |
| Office: 410.752.9747 | Main: 410.752.9700 |
| | Fax: 410.727.5460 |

 MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

**3 of 3**

J.R.626

| | |
|---|---|
| **Subject:** | RE: Chen v. Chen - Exchange of Document Sources |
| **Date:** | Thursday, August 7, 2025 at 7:53:29 PM Eastern Daylight Time |
| **From:** | Michael Lentz |
| **To:** | Justin DiCharia, Alexander M. Giles, Stephen M. Plotnick, Alexander G. Malyshev, Madelyn K. White, Kevin M. Simpson, Mary Hickman |
| **CC:** | Josh Levy, Rachel Clattenburg, Kevin Crenny, Christina Lamoureux, Emma Floyd, Jennifer Luong |
| **Attachments:** | 2025.08.07 Sources to be Searched.pdf |

**Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Counsel –

Our list is attached.

Best Regards,
Michael

---

**From:** Justin DiCharia <JDiCharia@levyfirestone.com>
**Sent:** Thursday, August 7, 2025 7:28 PM
**To:** Alexander M. Giles <agiles@tydings.com>; Michael Lentz <mlentz@tydings.com>; Stephen M. Plotnick <plotnick@clm.com>; Alexander G. Malyshev <malyshev@clm.com>; Madelyn K. White <white@clm.com>; Kevin M. Simpson <simpson@clm.com>; Mary Hickman <mhickman@tydings.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Rachel Clattenburg <rmc@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>; Jennifer Luong <jluong@levyfirestone.com>
**Subject:** Chen v. Chen - Exchange of Document Sources

Counsel,

Please see below and attached for the sources of documents currently being searched in *Chen v. Chen*. As we've said, we believe the correct date range to search is Feb. 1, 2021 through Apr. 17, 2025. We will be discussing the date range with you next week.

- OtterSec GSuite accounts
- gamesterrex@gmail.com
- robertchen@live.com
- robertchen400@gmail.com

- me@robertchen.cc (another alias for the google account)

- ottersecio@gmail.com
- OtterSec Slack channels
- Discord channels and Direct Messages – see attached spreadsheet
- Telegram channels – see attached
- Robert's iPhone 12 has been imaged
- Robert Chen Google drive

- OtterSec Github Repository
- Very small number of hard copy documents

Best,
**Justin A. DiCharia**

**Levy** | **Firestone** | **Muse**
900 17th Street NW, Suite 605, Washington, DC 20006
T 202-819-2716 • C 985-960-1395 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 595-8253, and immediately destroy this communication and all copies thereof, including all attachments.

. . .



Michael Lentz                              One East Pratt Street
                                           Suite 901
mlentz@tydings.com                         Baltimore, MD 21202
Office: 410.752.9708                       Main: 410.752.9700
                                           Fax: 410.727.5460



MERITAS LAW FIRMS WORLDWIDE          www.tydings.com

This message contains information that may be privileged, confidential, or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please notify the sender by replying to this message, and then delete it from your system. Thank you very much.

J.R.628

<u>Hardware</u>
*Servers*
- bots.ragged.me
  - Norway, Ubuntu server 22.04, 2TB
- mainnet-validator.ragged.me
  - Norway, Ubuntu server 22.04, 4TB
- mainnet-validator2.ragged.me
  - The Netherlands, Ubuntu server 22.04, 10.5TB
- sui.ragged.me
  - Vinthill USA, Ubuntu server 22.04, 4TB
  - Sending drives to Naxos pending call
- ashburn.validators.lm.finance
  - Ashburn, Virginia, Ubuntu 22.04, 4TB
- no.validators.lm.finance
  - Norway, Ubuntu server 22.04, ??
  - Contract ended, files backed up on backblaze
- testnet-validator.ragged.me
  - Norway, Ubuntu 22.04, 2TB
- misc digital ocean hosts
  - The backups are digital ocean snapshots. Digital ocean snapshots are not downloadable
  - https://docs.digitalocean.com/support/can-i-download-a-backup-or-snapshot/
  - assets.adjacent.fi

- r710
- HP proliant
- Basement server drive with contents dating back to November 2022 (Samsung 980 pro)
- Mystery Samsung 980 pro with heatsink that we can't view the contents of (corrupted or burnt out)

*PCs*
- current laptop
  - Lenovo ThinkPad T480 w/ Core i5-8250U CPU - 16GB RAM
  - 1TB ssd
  - Win 11 pro
- signer laptop
  - Lenovo ThinkPad T495 Laptop AMD Ryzen 5 Pro 512GB SSD 16GB RAM
  - Ubuntu desktop
- school pc
  - Custom build
  - 2TB ssd
  - Kubuntu desktop
- home pc
  - Custom build
  - 2TB ssd
  - Kubuntu desktop
- alienware laptop
  - Alienware x17 R2

6424816.1

J.R.629

- - 2TB ssd
    - Windows 11
  - Old Asus laptop
  - Old xps laptop

*Networking Equipment*
  - home router
    - Dell workstation running Proxmox
    - 256gb ssd
  - switch
    - Managed Cisco switch
    - model: SG300-20
  - Wifi access point

*Miscellaneous*
  - Remarkable
  - iPhone 11 (including WhatsApp)
  - iPhone 14 Pro Max (including WhatsApp)
  - phone – Pixel 7 Pro (including WhatsApp & Telegram & Signal)
    - Graphene OS
    - Set to airplane mode and left it in a drawer
  - WMD MyBook 25ED
    - Backup of PC
  - Mystery router machine drive
  - Mystery safe drive
  - Grab bag returned by TransPerfect (already imaged)
    - Current basement server
    - School laptop
    - Ottersec ledger and yubikey
  - Phone backup – 6/7/25

  - Phillips usb
  - Microcenter usb
  - Newer microcenter usb
    - Pw manager file, ssh pubkey, ssh authorized_keys file
  - Second newer microcenter usb
    - October discord takeout zip file
  - David's own ledger
    - Ledger wallet addresses already provided in address spreadsheet

Software / Websites / Social Media
  - discord
  - telegram
  - signal
  - whatsapp
  - facebook
  - instagram
  - x
  - Linkedin
  - Reddit
  - Github

6424816.1

J.R.630

- Stackexchange
- Dropbox
- Google drive and one drive
- Proton and google calendar
- Google notes
- Proton vpn

Email Addresses
- Davidchen0@protonmail.com
  - davidchen0@proton.me
  - radiantaeon@proton.me
  - reddit_throwaway125@proton.me
  - craigslist_15125@proton.me
  - wendigo55129@proton.me
  - adjacentfi@proton.me
  - commonappdc@proton.me
  - contact@adjacent.fi
  - davidchen501295@proton.me
  - raggedsec@proton.me
  - tinder1525@proton.me
- Smchen90@hotmail.com
- Lifen1299@yahoo.com
- Realawesomenessisreal@gmail.com
- Dc0910758@gmail.com
- Minecraft15230987@outlook.com
- RelAwesomeness@protonmail.com
- RealAwesomeness@outlook.com
- Datingapp15@protonmail.com
- Test109000@protonmail.com
- Supermicrosub@gmail.com
- Dchen0@umd.edu
  - Dchen0@terpmail.umd.edu

6424816.1

J.R.631

# Exhibit 28



One East Pratt Street
Suite 901
Baltimore, MD 21202
410.752.9700
Fax 410.727.5460

**Alexander M. Giles**
410.752.9747
agiles@tydings.com

November 24, 2025

<u>**VIA EMAIL**</u>

Kevin P. Crenny
Joshua Levy
Rachel Clattenburg
Justin DiCharia
Christina Lamoureaux
Levy Firestone Muse, LLP
900 17th Street NW, Suite 605
Washington, D.C. 20006

> RE:    *Yao v. Chen, et al.*, Civil Action No. 8:23-CV-00889-TDC
> <u>*Chen, et al. v. Chen*</u>, Civil Action No. 8:24-CV-03628-TDC

Dear Counsel:

We write in response to the deadlines established by US Magistrate Judge Gina Simms at the hearing in the above-captioned matters that was held on Thursday, November 20, 2025, and which were outlined in the Court's Discovery Order Related to Pending Disputes and Granting the Motion to Modify the Scheduling Order, issued earlier today (November 24, 2025, ECF 183).

Like you, we, too, are working off of our respective recollections from the hearing last Thursday, as we have yet to receive a copy of the hearing transcript. Therefore, despite the chart provided by Judge Simms on pages 2-4 of ECF 183, it is theoretically possible that we will need to follow-up with additional information after we review the hearing transcript from last Thursday's motions hearing.

Despite the foregoing, and using Judge Simms' organizational chart found at pp. 2-4 of the Discovery Order, we hereby provide the following required updates pursuant to our obligations under the Federal Rules of Civil Procedure Rule 26(g):

### 1.a.    David Chen's tax returns for 2022 and 2023

These documents were produced earlier this evening (November 24, 2025) via email and have a bates-stamp range of YAO00023410 - YAO00023477.

J.R.633



**1.b.    David Chen's documents concerning his use of the codes and other property that he took from OtterSec**

David does not believe that there are any responsive documents to this request, as written. It is David's position in this case that he did not take anything **<u>FROM</u>** OtterSec when he left the company on April 27, 2022.

**1.c.    Documents and communications concerning revenues or income from the codes or other property that David Chen took from OtterSec**

David does not believe that there are any responsive documents to this request, as written. It is David's position in this case that he did not take anything **<u>FROM</u>** OtterSec when he left the company on April 27, 2022.

**1.d.    Documents identifying all of David Chen's work and sources of income**

David identifies his 2022 and 2023 tax returns, which were produced earlier this evening. Other than those financial documents, and all of David's financial documents and account statements that Plaintiffs have obtained by subpoena, David is not readily familiar with any other documents identifying his work and sources of income during the "Relevant Period."

**1.e.    Documents identifying David Chen's blockchain or digital wallets**

Undersigned counsel is still investigating the status of production of the foregoing items, and, if not yet produced, counsel will need to work with TransPerfect to identify any such responsive documents. We hope to have a supplemental answer to this category of documents by/before Thanksgiving on Thursday of this week.

**1.f.    Documents concerning David's deletion or loss of data on any mobile phone**

David does not believe that there are any responsive documents to this request, other than documents created by David in relation to this ongoing litigation. For example, David executed the "Declaration of David Chen" on June 13, 2025, which identifies David's Motorola Moto E mobile phone and the fact that it "bricked" in the April 2023 time frame. Thereafter, David was deposed by opposing counsel on July 30, 2025, during which time he was asked numerous questions about his mobile phones.

As counsel for Plaintiffs know, both sides have been working with Maggie Gaffney of TeelTech to investigate the status of David's cell phones and determine whether any information can be retrieved from such phones.

**1.h.    Documents related to the alleged "bricking" of David Chen's phone**

*See* Response to Para. 1.f., above, which addresses the "bricking" issue and David's loss of data or any other information.

6481196.1

**1.i.    Communications between David Chen and any of OtterSec's clients after he stopped working for OtterSec**

David does not believe that there are any responsive documents to this request.

**3.    Information from Discord, Signal, Telegram, X, Facebook, LinkedIn, etc.**

David acknowledges that his digital footprint includes documents/information from the foregoing Social Media, Search Engines, and related online platforms. Undersigned counsel is working with Defendant's Third-Party Vendor at TransPerfect to identify, organize, bates-stamp, and ultimately produce such responsive documents to Plaintiffs' counsel by/before December 12, 2025. The production of David's Discord messages, however, will not be due until Tuesday, January 20, 2026, provided that TransPerfect is able to complete the downloading, processing, and uploading of all of David's documents/information by/before December 19, 2025, AND THEN counsel is able to review and produce the applicable documents for production.

**6.    *Chen v. Chen* – David Chen's Response to Second Set of Document Requests and Second Set of Interrogatories (referred to in ECF 176, para. 28)**

David's signed Answers to Plaintiff's Second Set of Interrogatories have been produced to all counsel herein this evening. David and his counsel are still working on preparing David's Responses to Plaintiffs' Second Set of Document Requests, and hope to have those soon.

**9.    *Yao v. Chen* and *Chen v. Chen* – Discord messages for the period of 2022 through 2023.**

Undersigned counsel is still investigating the status of production of the foregoing items, and, if not yet produced, counsel will need to work with TransPerfect to identify any such responsive documents. We hope to have a supplemental answer to this category of documents by/before Thanksgiving Day on Thursday of this week.

**10.    *Yao v. Chen* and *Chen v. Chen* – List of Discord and Telegram channels**

The list of Discord and Telegram Channels was previous produced to Plaintiffs and their counsel in conjunction with Plaintiff Yao's Third Amended Answers to Defendant's Second Amended Interrogatories, attached thereto as Exhibit A.

**Unsuccessful Document Production Pertaining to Judge Simms' Orders**

The categories where we have searched for items identified in Judge Simms' "Discovery Order Related to Pending Disputes and Granting the Motion to Modify the Scheduling Order" (ECF 183), and cannot seem to find any objections raised/requested by your side in response to our current discovery responses, including the following:

**TYDINGS**

2.   Yao v. Chen – Amended Responses to First and Second Set of Document Requests (ECF No. 176, p. 11, paras 29-30);

4.   Yao v. Chen – First Set of Interrogatories to Yao (April 2024).

5.   Yao v. Chen – Second set of Interrogatories served on March 11, 2025 (where Amended Responses were received on August 30, 2025);

8.   Chen v. Chen – First Set of Document Requests served in May 2025 (where Amended Responses were received on August 29, 2025).

  We will continue to search for and try to make sense of the foregoing items, and should we be able to accomplish any and all of those tasks, we will prepare the necessary amendments or supplements to this letter, and will produce any related documents.

<div align="center">

Very truly yours,

*/s/ Alexander M. Giles*

Alexander M. Giles

</div>

cc:  Michael J. Lentz, Esquire
   Rachel DeCaluwe, Esquire

6481196.1

# Exhibit 29

J.R.637

**Thread Participants:** luciotato;repe1;sonny.dbb;zantetsu_shinobisystems

**ThreadFirst:** 2021-09-05 01:59:10

**ThreadLast:** 2021-09-05 05:52:45

---

zantetsu_shinobisystems

**09/05/21 01:59:10 AM**
Does anyone know anything about the parrot.fi stake pool? Supposedly this pool exists but their website doesn't show any staked SOL. Have the actually staked anything? They've been trading for their pool token for several epochs already. But nothing staked? Is this possible?

repe1

**09/05/21 04:21:27 AM**
https://docs.marinade.finance/litepaper/system-overview#liquidity-pool ---[EMBED] <-MfPpm3qS-08g0BNPaZ0-CF4D7.png> URL: https://docs.marinade.finance/litepaper/system-overview Title: System overview---

repe1

**09/05/21 04:22:06 AM**
Oh they DID stake as far as we know ●

repe1

**09/05/21 04:23:38 AM**
And @Lucio Tato fyi

sonny.dbb

**09/05/21 04:34:22 AM**
Thanks, went through it once again, I'm still not quite sure how they manage to mint mSOL immediately without waiting up to two epochs — unless they use their own program instead of the "official" stake pool program (which would only allow minting SPL when a fully staked account is deposited into the pool)

zantetsu_shinobisystems

**09/05/21 04:37:10 AM**
Do you know their stake pool withdraw authority pubkey?

J.R.638
YAO01440768

sonny.dbb

**09/05/21 05:22:37 AM**
Also: Do I get it right that you can ONLY
stake/unstake via LP on Marinade?.. so
you pay 2x up to 3%, even if you'd be fine
with waiting?

luciotato

**09/05/21 05:37:09 AM**
Hi! these are the docs:
docs.marinade.finance, but ask! Marinade
liq-pool can be understood as a liq-pool
with ad-hoc adaptations to make it fair &
efficient given that is integrated with liquid-
staking. Example: for users it allows them
to "Unstake Now!" paying a fee that's
0.3% most of the time, so we're
exchanging time for money. (If you don't
mind waiting, you also have the option of
Delay-unstake with zero fee). "Unstake
Now!" is powered by Liquidity-Providers,
and LPs are guaranteed by code to *not
lose SOL value*. Except 0.0001 tx fee,
you cannot withdraw less SOL value than
you put in.

luciotato

**09/05/21 05:40:12 AM**
Yes, we have our own Anchor based
source code. We've also two audits with
no critical issues. One from the Neodyme
team and one from Ackee Blockchain.
We're in the process of publishing them.

luciotato

**09/05/21 05:41:20 AM**
No. There's no stake fee, and you can
delay-unstake with zero fee.

repe1

**09/05/21 05:52:45 AM**
@partyparrot[no DM] would you share
that?

J.R.639
YAO01440769

# Exhibit 30

J.R.640

**Tuesday, January 21, 2025 at 13:50:32 Eastern Standard Time**

| | |
|---|---|
| **Subject:** | Re: Meet & Confer Agenda for Jan 8, 2025 |
| **Date:** | Tuesday, January 7, 2025 at 3:18:54 PM Eastern Standard Time |
| **From:** | Rachel Clattenburg |
| **To:** | Plotnick, Stephen M., Malyshev, Alexander G., White, Madelyn K. |
| **CC:** | Josh Levy, Justin DiCharia, Kevin Crenny, Emma Floyd |
| **Attachments:** | image001.png |

Hi Steve, Madelyn, and Alex:

For tomorrow's meet and confer, we would like to go through our responses to the issues you raised last time regarding Plaintiff's Motion to Compel. We would also like to hear your responses regarding our motions to compel.

As agreed, we are also sending you a list of questions about your document productions, in case we have time to get to this.

1. How much more of your production remains for Plaintiff? For David? If they are not substantially completed, what RFPs are we still waiting on and why?

2. Discord:

   a. In your latest production, approximately 241 of the discord conversations (not counting attachments) have only David's messages and are missing all the other messages and participants. Please reproduce with the entirety of the conversations and give a timeline for reproduction.

   b. What was your collection protocol for Discord? For example, we are not seeing any group DMs?

   c. What Discord servers did you search?

   d. How did you collect or export Discord DM conversations? How did you collect or export channels?

   e. What date range did you apply to Discord? For instance, you have produced nothing between David and Philip Papurt past August 2022 even though there were relevant discussions between them on Discord after that date, and that just happens to be one conversation we know about. Most of the Discord conversations you've produced appear to be ending far earlier than we would expect to see; most of them end in early to mid-2022.

   f. There are a number of Discord conversations between David and "closetduck," but this individual does not appear in response to Interrogatory No. 1. Do you plan to amend that answer to add this individual?

3. Where are the Telegram messages for David?

J.R.641

4.  We have seen no text messages. Is it correct that Plaintiff and David have no responsive text messages?

5.  What is the status of the phone inspection? We have not heard anything since December 10th when Madelyn said she expected the phone to be shipped out "today or tomorrow." We have not been copied on any correspondence.

6.  <u>David's emails</u>: We received a third-party production from Cloudflare showing that the website ottersec.io, which hosts a collection of documents related to this case, was registered by someone using the email address matthew.greensmith@proton.me. Is this an email address that is or was associated with David in anyway? In other words, did he ever have access to this email address, use it, or have messages forwarded from it?

Thanks,
Rachel

**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 1200, Washington, DC 20006
T 202-845-3215 • C 914-714-1676 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.
--

**From:** Plotnick, Stephen M. <Plotnick@clm.com>
**Date:** Thursday, January 2, 2025 at 5:22 PM
**To:** Josh Levy <jal@levyfirestone.com>, Rachel Clattenburg <rmc@levyfirestone.com>, Kevin Crenny <kcrenny@levyfirestone.com>
**Cc:** Malyshev, Alexander G. <Malyshev@clm.com>, White, Madelyn K. <white@clm.com>
**Subject:** Plaintiff's Meet & Confer Agenda for Jan 3, 2025

2 of 3

J.R.642

> **Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Dear Josh, Rachel and Kevin,

Happy New Year.

I've attached a high-level agenda of the items we wish to discuss during our call tomorrow. Looking forward to speaking.

Regards,
Steve



**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

****************************************************
This e-mail message and its attachments are confidential, intended only for the addressee(s) named
above and may contain information that is proprietary, privileged, attorney work product or otherwise
exempt from disclosure. If you receive this message in error please notify us at
postmaster@clm.com
and immediately delete this message and its attachments from your system.
****************************************************

J.R.643

# Levy | Firestone | Muse

Levy Firestone Muse LLP
900 17th Street NW, Suite 1200
Washington, DC 20006

levyfirestone.com

January 22, 2025

### *via* email to malyshev@clm.com

Alexander Malyshev
Carter Ledyard & Milburn LLP
28 Liberty Street, 41st Floor
New York, NY 10005

      **RE:**    *Yao v. Chen et al.*, **23-cv-0889-TDC-GLS**

Dear Alex:

We write in response to your letter dated January 15, 2025.

As we discussed in the meet and confer, we are working to retrieve OtterSec statements from FTX, which is in bankruptcy. We will produce the OtterSec statements we are able to retrieve. Furthermore, Defendants have already produced 108 documents mentioning FTX and/or West Realm, so your statement that you "have not received documents and communications concerning the FTX accounts or account statements" is incorrect. Ltr. from A. Malyshev (Jan. 15, 2025) at 1. We also agree to produce any FTX account statements for Otter Audits through 2022 that we are able to retrieve. At this point, we are still in discussions in our meet and confers about production of financial documents for Otter Audits after December 31, 2022, so it is premature at this point to respond to the rest of this question. It will depend on any agreement we reach in the meet and confers.

You have asked about the searches of Slack, Discord, Direct Message (we assume you mean Discord Direct Messages) and Telegram channels. Before we give you more information on our substantial production of these documents, it is worth noting:

- You have provided no Discord group discussions (those with more than one other participant).

- You produced hundreds of Discord documents for which only David's messages are included. These documents are missing the messages for the other participants. That makes these documents incomplete and virtually meaningless, because they are only one side of a conversation with a participant who is not even identified. We spent considerable time reviewing your incomplete production of Discord messages to identify this issue and determine which documents were one-sided conversations. We alerted you to this issue on January 7, 2025, and on January 8, 2025, you represented that in fact you were aware—at the time you produced these documents—that they had not been exported properly from

Letter to A. Malyshev
January 22, 2025
Page 2 of 6

Discord. At the time of your production, on December 24, 2024, you did not alert us to this issue, and instead produced them, leaving us to discover, investigate, and bring to your attention this defect in your production. It took several hours for our team to do so.

- Despite representing that you are producing documents through March 2024, nearly all of the Discord conversations you have produced end in early- to mid-2022. We know that at least some of these conversations did not actually end then. For instance, we know that David Chen had relevant conversations on Discord with Philip Papurt after August 5, 2022, the end date for the David Chen-Philip Papurt messages in your production. This again raises concerns that David Chen has deleted relevant documents.

- You have produced no Telegram documents. We know David Chen used Telegram. On May 17, 2024, Mr. Plotnick wrote: "We are exploring options for recovering the text messages that were on the Moto E, but understand as a general matter that he [David Chen] utilized Telegram and Discord for any substantive communications related to OtterSec." Email from S. Plotnick (May 17, 2024). See also YAO00001203 (David Chen's Discord message that includes a screenshot of a Telegram message to him); Ex. 3 to the Am. Answer, ECF 49-3 (4/27/2022 at 2:09 PM, David says he spoke to "steel perlot" on "telegram"); Ex. 4 to the Am. Answer, ECF 49-4, (Robert and David Telegram conversation).

- You have produced no text messages. It is surprising to us that none of Plaintiff, Sam Chen, or David Chen has a single responsive text message.

Turning to Defendants' production: Defendants preserved, exported, and searched a combined total of more than 23,000 documents and attachments from Slack, Discord, and Telegram channels and chats. As explained in our search protocol, we conferred with our client and used that information to identify those channels or chats that were likely to have potentially responsive and relevant material. For instance, a channel devoted only to discussing a customer's audit would not be included.

Regarding sources of ESI: the Defendants do not have a central repository other than G-Suite. Defendants have access to OtterSec documents and as we have represented all along, we reviewed and produced OtterSec responsive documents consistent with Defendants' responses to the document requests. Of course, Defendants do not have possession, custody, or control of the OtterSec documents that David Chen took or deleted when he left, and cannot produce those documents. For instance, David Chen deleted messages from the OtterSec Discord when he left. Further, OtterSec, RC Security, and Otter Audits have separate accounts, as was also indicated in the search protocol we provided to you. Also, oudit.io is Otter Audits, which is also evident from review of Defendants' production of documents.

Daryl Yeo handled invoicing of customers, and our understanding is that Robert Chen was copied on those invoices. Robert Chen was copied on much of his correspondence in general, and that is evident in the production where we have produced more than 800 documents with Mr. Yeo, including Direct Messages on Discord. Furthermore, Plaintiff did not request invoices, which was the bulk of Mr. Yeo's work for OtterSec. Therefore, Daryl Yeo is not a custodian.

Letter to A. Malyshev
January 22, 2025
Page 3 of 6

Defendants imaged Robert Chen's phone, extracted the data, and searched that data. This is obvious as we have produced Robert Chen's responsive text messages. You previously asked us about text messages, and we emailed you on November 27, 2024, stating: "You had said that you had not received any of Robert's text messages in our production. To date we've produced two text message files from Robert's phone: LFM-DMD-00001548 and LFM-DMD-0001550." Defendants have now produced more text messages. The following are additional text messages from Robert Chen's phone that we have produced:

| Prod Beg | Prod End | Production Volume |
|---|---|---|
| LFM-DMD-00012866 | LFM-DMD-00012867 | LFM-DMD-005 |
| LFM-DMD-00012868 | LFM-DMD-00012869 | LFM-DMD-005 |
| LFM-DMD-00012870 | LFM-DMD-00012871 | LFM-DMD-005 |
| LFM-DMD-00012872 | LFM-DMD-00012873 | LFM-DMD-005 |
| LFM-DMD-00012874 | LFM-DMD-00012875 | LFM-DMD-005 |
| LFM-DMD-00012876 | LFM-DMD-00012877 | LFM-DMD-005 |
| LFM-DMD-00012878 | LFM-DMD-00012879 | LFM-DMD-005 |
| LFM-DMD-00012880 | LFM-DMD-00012881 | LFM-DMD-005 |
| LFM-DMD-00012882 | LFM-DMD-00012883 | LFM-DMD-005 |
| LFM-DMD-00012884 | LFM-DMD-00012885 | LFM-DMD-005 |
| LFM-DMD-00012886 | LFM-DMD-00012887 | LFM-DMD-005 |
| LFM-DMD-00012888 | LFM-DMD-00012889 | LFM-DMD-005 |
| LFM-DMD-00012890 | LFM-DMD-00012891 | LFM-DMD-005 |
| LFM-DMD-00012892 | LFM-DMD-00012893 | LFM-DMD-005 |
| LFM-DMD-00012894 | LFM-DMD-00012895 | LFM-DMD-005 |
| LFM-DMD-00012896 | LFM-DMD-00012897 | LFM-DMD-005 |
| LFM-DMD-00012898 | LFM-DMD-00012899 | LFM-DMD-005 |
| LFM-DMD-00012900 | LFM-DMD-00012901 | LFM-DMD-005 |
| LFM-DMD-00012902 | LFM-DMD-00012903 | LFM-DMD-005 |
| LFM-DMD-00012904 | LFM-DMD-00012905 | LFM-DMD-005 |
| LFM-DMD-00012906 | LFM-DMD-00012907 | LFM-DMD-005 |
| LFM-DMD-00012908 | LFM-DMD-00012909 | LFM-DMD-005 |
| LFM-DMD-00012910 | LFM-DMD-00012911 | LFM-DMD-005 |
| LFM-DMD-00001548 | LFM-DMD-00001549 | LFM-DMD-001 |
| LFM-DMD-00001550 | LFM-DMD-00001551 | LFM-DMD-001 |

No other devices besides Robert's phone were searched, because the Defendants stored their documents on G-Suite and other locations like Discord that are spelled out in the search protocol.

J.R.646

Letter to A. Malyshev
January 22, 2025
Page 4 of 6

In terms of the "Wyoming" search: you did not specify or indicate what Request for Production you think requires a search term of "Wyoming," instead of "State of Wyoming." We included the term "State of Wyoming" to search for the official state filings you requested. For instance, you requested "papers filed with, sent to, or received from the Wyoming Secretary of State" (RFP 8); and "documents and communications concerning the formation … of OtterSec … including documents and communications concerning certificates or articles of incorporation or formation, articles of dissolution…." (RFP 1). You have not stated that you think Defendants have failed to produce responsive official state filings.

You do not specify or indicate the Document Requests to which searches for "Binance," "Kraken," or "Coinbase" would be responsive. Inasmuch as you are referring to Document Requests 16 and 18, we are in the process of discussing both of those Document Requests with you in meet and confers. Since those may be resolved through our ongoing discussions, this request appears to be premature or unnecessary.

Defendants will expand their search to include Dissol* and produce any additional documents that hit on Dissol* that are responsive to Plaintiff's Document Requests and that fall within any limitations as those are set forth in Defendants' responses to Plaintiff's Document Requests.

You ask why Defendants "limited" their searches to domain names, rather than, for instance, the individual names of lawyers. We disagree that this was a "limitation." Searching for the domain name is much broader than searching only for the name of the lawyer. Searching for "Iqan," for instance, does not pull in any responsive documents that have not already been pulled in by the domain for his firm or other searches we ran.

We ran a broad search for Jump related documents -- @jumptrading.com OR acquihire OR Claudius OR Jonathan OR Kariya OR Kanav. We have produced hundreds of documents that refer to Jump and you do not explain why we would need to run additional searches for this. Furthermore, the entity Jump appears in many nonresponsive and irrelevant documents about crypto news and discussions of audits. You asked us to let you know how many additional unique hits there would be by adding the search terms "Offer OR Equit* OR share* OR Pitch* … as it relates to Jump's offer," but you do not provide any way for limiting those hits to "as it relates to Jump's offer." If you have a search that limits it in that way, you can send it to us to consider. Otherwise, of course, these terms bring in many thousands of false hits, as they are used in many irrelevant and nonresponsive contexts. In addition, there are no additional responsive docs for "Agasi" as opposed to what we searched, *agasitax*, again indicating that our use of domain names was reasonable and effective.

You also asked why we did not search "OSec". That is because OtterSec's domain is Osec.io. Therefore, searching for "OSec" pulls in every document that has any reference to that domain, more than 29,700 additional documents.

Regarding the Jito server: we have produced the messages from David Chen that were deleted on the Jito server. Those documents say "Jito" at the top, so they are easily searchable. To summarize what we have already discussed with you in written communications (letter dated

J.R.647

Letter to A. Malyshev
January 22, 2025
Page 5 of 6

October 28, 2024; emails dated November 13 and 19, 2024), and on meet and confers (November 12, 2024, and November 22, 2024), we have a copy of the Jito Discord server from May 2024, which we produced to you. That May 2024 version contains relevant messages from David Chen regarding the code. In the fall of 2024, however, it came to our attention that David had deleted his messages on the Jito server. Exporting messages from the Jito server in November 2024 shows that messages from David that are present in the May 2024 version were not present in the November 2024 export and thus were deleted by him some time after May 2024. It appears there is sometimes a notation in the Discord chats where messages have been deleted ("Original message was deleted or could not be loaded"), although this may only be when a message has been responded to directly. We have produced both versions of the Discord Jito server to you—from May 2024 before David deleted messages and from November 2024 after David deleted messages. You can compare the two different versions of the Discord messages to identify the messages David deleted (as we have done). That comparison is how we identified that he had made deletions; it simply requires searching the earlier versions for messages from David and then searching the later version for that same date to see if his message is there or has been deleted. The May 2024 Jito server documents are at LFM-DMD-00012914 — LFM-DMD-00014183; the November 2024 Jito documents are at: LFM-DMD-00014419 — LFM-DMD-00017134. You could also ask your client, David, to tell you what messages he deleted.

Furthermore, we have yet to get any answers from you or your client as to when David Chen made these deletions, why, and especially, what other servers and documents he has deleted that are relevant to the claims or defenses in this case. We are deeply concerned by these deletions. When we asked you, you said that instead we will need to ask David in a deposition and that you will not respond to these questions. The discovery of David's Jito deletions follows the purported "bricking" of his phone, whereby he claims to not have any accessible messages or data on his phone, as well as productions by you that suggest he deleted relevant emails. (We have not had any updates from you on the phone, despite requesting one two weeks ago.) For instance, several of the emails you produced are forwarded copies of David's emails, rather than the original email. See, e.g., YAO0000348—YAO0000425. That failure to produce the original emails suggests the original emails to David were deleted. It also appears that David did not inform you of most of his email addresses until very late in discovery. *See* Email from S. Plotnick (Nov. 6, 2024) (identifying 17 additional email addresses not previously disclosed to Defendants in the scope of discovery letter of May 17, 2024). We sent you a list of questions by email on January 7, 2025, about Plaintiff's and David's productions, which touch on some of these issues, and have yet to receive a response from you.

As for the metadata, we object to you complaining about the format of the productions after the deadline for the substantial completion of document discovery, with which Defendants complied. Waiting until after Defendants have produced more than 5,000 documents to complain about the format is too late. The only specific question or issue you raise about the metadata pertains to your ability to identify the text messages we produced from Robert Chen. We have identified the text messages in this letter. If you have additional specific questions about metadata, you can ask us.

J.R.648

Letter to A. Malyshev
January 22, 2025
Page 6 of 6

It is appropriate to redact account numbers in statements. Those are not relevant, and you do not state why you need account numbers. You also complain about redactions for lack of relevance or responsiveness, without identifying any specific document. If you have a question about a specific document, you can ask. Generally, we redacted extraneous, irrelevant, non-responsive material from Discord chats, because they can be incredibly long, covering many topics that have no relevance to other parts of the chats that are responsive and/or relevant. Therefore, we redacted those discussions on Discord that have no relevance and are not responsive to the Document Requests.

You complain that Defendants did not search for the computer code that David took from OtterSec. It is David's taking of the code that is the basis of Defendants' claim. Therefore, it is David's communications that are most likely to have the relevant documents concerning his actions in taking the code. Further, Defendants' search protocol, sent to you on November 27, 2024, explains that we reviewed all documents during the period when David Chen took the code. In addition, we do not understand why you think Robert has a copy of the code and ask for you to please explain your basis for this understanding.

You have asked, without respect to any specific communications, and prior to our production of a privilege log, what the basis is for OtterSec's assertion of privilege prior to Sam Chen's death. (OtterSec is claiming privilege after Sam Chen's death as well, but you asked specifically about this earlier period.) As we told you in the meet and confer, we will be producing a privilege log that identifies documents withheld on the basis of privilege and the grounds for that assertion. Therefore, this request is premature. Nevertheless, as a general matter, Sam Chen was only a 40% member of OtterSec from April 16, 2022, until his death. During that time, he was not part of management and was not functionally an employee of OtterSec; he was merely attempting to hold the interest for the benefit of David Chen. Sam Chen did not gain access to the privileged OtterSec communications, and therefore, these communications prior to his death remain confidential and privileged as against the Estate. They are independently protected as attorney work product.

As to the accountant-client privilege, both Maryland and Arizona have enshrined this privilege in statutes. See Md. Code Ann., Cts. & Jud. Proc. § 9-110(b); Ariz. Rev. Stat. Ann. § 32-749.

Finally, as is evident, Defendants have already answered many of your questions through earlier meet and confers and the search protocol they shared. They have produced 5,112 documents, all by the December 30, 2024, deadline set forth in the Scheduling Order, and we respectfully ask that you review your notes from prior meet and confers, the search protocol, and the documents produced before burdening Defendants with any more questions they have already answered.

Sincerely,

Rachel M Clattenburg

Rachel Clattenburg

J.R.649

| **Subject:** | RE: Yao v. Chen - Discord Deletions |
|---|---|
| **Date:** | Tuesday, April 1, 2025 at 1:53:16 PM Eastern Daylight Time |
| **From:** | White, Madelyn K. |
| **To:** | Rachel Clattenburg, Plotnick, Stephen M., Malyshev, Alexander G., Leff, Mara |
| **CC:** | Josh Levy, Kevin Crenny, Justin DiCharia, Christina Lamoureux, Emma Floyd |
| **Attachments:** | image001.png |

**Caution:** This is an external email and may be malicious. Please take care when clicking links or opening attachments.

Rachel,

You provide no explanation for your accusation that David deleted messages with Philip Papurt. The threads that you attach to your email were all produced by Plaintiff and were collected from David's discord account. To be clear, it appears that you are accusing David of deleting messages that he produced.

We have previously informed you that there were problems with Plaintiff's fifth document production which was made in December 2024. All of the threads attached to your email are from that production. Our understanding is that the issues in the threads you have attached to your email stem from problems with the deduplication and batching process. The messages were not deleted.

Thank you,
Madelyn

**CARTER/LEDYARD**

**Madelyn K. White**
Counsel
white@clm.com

28 Liberty Street, New York, NY 10005
212.238.8614 / C 646.522.8113

---

**From:** Rachel Clattenburg <rmc@levyfirestone.com>
**Sent:** Friday, March 28, 2025 3:35 PM
**To:** Plotnick, Stephen M. <Plotnick@clm.com>; White, Madelyn K. <white@clm.com>; Malyshev, Alexander G. <Malyshev@clm.com>; Leff, Mara <leff@clm.com>
**Cc:** Josh Levy <jal@levyfirestone.com>; Kevin Crenny <kcrenny@levyfirestone.com>; Justin DiCharia <JDiCharia@levyfirestone.com>; Christina Lamoureux <Christinal@levyfirestone.com>; Emma Floyd <efloyd@levyfirestone.com>
**Subject:** Yao v. Chen - Discord Deletions

Counsel,

Please see attached. A comparison of the document starting at YAO00004265 to the document starting at YAO00004284, and then the document starting at YAO00004376 to the document

J.R.650

starting at YAO00004382—documents from Plaintiff Yao's and David's production—shows that David deleted many relevant and responsive messages with Philip Papurt.

- YAO00004265 and YAO00004284 are exports of the same conversation, but YAO00004284 was apparently exported at a later date, and is missing many of the messages in YAO00004265, because David deleted them in the time between the two exports. Many of these deleted messages concern Robert, OtterSec, and Jump, showing that David deleted relevant Discord messages.

- YAO00004376 and YAO00004382 are also exports of the same conversation, but YAO00004382 was apparently exported at a later date, and is missing many relevant messages about the liquidator bot, github, and Robert, again showing that David deleted relevant messages.

Please provide the date of the later exports (YAO00004284 and YAO00004382) and the Bates numbers of other Discord messages exported on that date or after, as they would also be missing any messages that David deleted at the same time he deleted the ones that are missing from YAO00004284 and YAO00004382.

Also, please give us an update on when you will be providing information about the deletions and document collections, which is information we have been asking for since January 31, 2025. We also sent you emails and letters about this on February 4, 2025 and February 26, 2025, and discussed this with you in our March 7, 2025 meet and confer. We alerted you that David appeared to be deleting potentially relevant Discord messages many months ago, on October 28, 2024.

Thank you.
Rachel

**Rachel M. Clattenburg**

**Levy** | **Firestone** | **Muse**
900 17th St NW, Suite 1200, Washington, DC 20006
T 202-845-3215 • C 914-714-1676 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.
--

J.R.651

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail message and its attachments are confidential, intended only for the addressee(s) named
above and may contain information that is proprietary, privileged, attorney work product or otherwise
exempt from disclosure. If you receive this message in error please notify us at
postmaster@clm.com
and immediately delete this message and its attachments from your system.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

J.R.652

# Exhibit 31

J.R. 653



# Transcript of Meet & Confer

**Date:** January 3, 2025
**Case:** Yao -v- Chen, et al.

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

- - - - - - - - - - - - x

LI FEN YAO,                    :

     Plaintiff,         :

  v.                           : Case No. 23-cv-889

CHEN, et al.,                  :

     Defendants.        :

- - - - - - - - - - - - x

Meet and Confer

Held Remotely

Friday, January 3, 2025

10:05 a.m. Eastern Standard Time

Job No. 565541

Pages:  1 - 196

Reported by:  Janet A. Hamilton, RDR

J.R. 655

Meet and Confer, held remotely:

Pursuant to Agreement, before Janet A. Hamilton, Registered Diplomate Reporter and Notary Public in and for the State of Maryland.

J.R. 656

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

STEPHEN M. PLOTNICK, ESQUIRE

ALEXANDER G. MALYSHEV, ESQUIRE

MADELYN K. WHITE, ESQUIRE

28 Liberty Street, 41st Floor

New York, New York  10005

212.732.3200


ON BEHALF OF THE DEFENDANTS:

JOSHUA A. LEVY, ESQUIRE

KEVIN P. CRENNY, ESQUIRE

RACHEL CLATTENBURG, ESQUIRE

JUSTIN A. DiCHARIA, ESQUIRE

LEVY FIRESTONE MUSE LLP

900 17th Street, NW, Suite 1200

Washington, DC  20006

202.261.6564


ALSO PRESENT:

EMMA FLOYD, Paralegal, Levy Firestone Muse

J.R. 657

MR. PLOTNICK:  I take it we should probably for the record put in our appearances at the outset.  I'll suggest that just for the record so it's clear when we start off.

MR. CRENNY:  That sounds good.  Do you want to --

MR. PLOTNICK:  Are we officially on the record now?

THE REPORTER:  Yes, we are.

MR. PLOTNICK:  Good morning, everyone. Stephen Plotnick from Carter, Ledyard & Milburn joining the meet and confer.  I'm joined this morning by my colleagues, Madelyn White and Alex Malyshev, also of Carter, Ledyard & Milburn.  We represent the plaintiff, Li Fen Yao.  We also, of course, which will be subject to discussion, I'm sure, represent the third party, David Chen.

MR. CRENNY:  Thank you, Steve.  This is Kevin Crenny from the firm Levy Firestone Muse. With me are Josh Levy, Rachel Clattenburg, Justin DiCharia and paralegal Emma Floyd.  We represent the defendants Robert Chen, RC Security, LLC and

J.R. 658

Otter Audits, LLC.  I hope everybody had a happy new year and happy holidays and are looking forward to working things out over the next ten days or so.

MR. PLOTNICK:  We did.  Steve Plotnick speaking.  We did, and yeah, same to you all. Just as we're getting started, as sort of an opening, at least sort of question, I have, at least in terms of the scope of the call today -- Josh, I got your e-mail last night.  I just want to make sure that we're on the same page here in terms of what we're talking, setting aside the motion to consolidate, which I'll clarify for the record what that is.

So, Josh, our understanding from the judge's directions and, you know, I recognize from a portion of the transcript, but I think there are other portions of the transcript of the conference that we had with Judge Simms that for certain left us with the impression that the scope of the call today or the scope of the meet and confer more generally is to really resolve all discovery

J.R. 659

Transcript of Meet & Confer
Conducted on January 3, 2025                    6

issues, not just the pending motions to compel that were filed, but really the idea here is to raise and attempt to resolve as best we can any discovery issues that we may have with each other at this point and discuss those, and of course I'm happy to deal with this in whatever order. Motions to compel first is certainly fine.

But I take it as a general matter that the defendants are at least not in disagreement with that based on what you had said, Josh, sort of towards the end of the e-mail, and just to clarify for the record yesterday afternoon we forwarded to the defendants at a very high level an agenda of the items that we wished to discuss for purposes of the meet and confer, and Josh, Mr. Levy, had responded to me last night via e-mail.  And that's just a threshold point that I wanted to raise with you, Josh.

And then I'll just raise the one point I have about the motion to consolidate just separately, but I just want to clarify that the idea here is not to confine ourselves just to the,

J.R. 660

you know, the motions to compel that were the subject of the notices of intent to file the motions.

MR. LEVY:  Thanks, Steve, and you may call me Josh for purposes of this meet and confer.

MR. PLOTNICK:  Yeah.  Just trying to be formal for the record, that's all.

MR. LEVY:  I appreciate that, and if it's okay with you, I'm happy to address you the way you'd like to be addressed, same with your colleagues.  And I think we're on the same page --

MR. PLOTNICK:  Okay.

MR. LEVY:  -- in terms of the purpose of today.  Our e-mail tried to make that same point that you were making, that the purpose of this meet and confer is to resolve any known discovery disputes.  We do want to prioritize, of course, the motions --

MR. PLOTNICK:  Yeah.

MR. LEVY:  -- that both parties noticed before the court.  And so inasmuch as there are disputes about discovery, we want to use this time

J.R. 661

productively to resolve them with you.

MR. PLOTNICK:  Yeah, good.  That's -- I had kind of -- that was my takeaway from your e-mail.  Again, it's Steve Plotnick speaking.  So thanks for that, Josh.

In terms of the motion to consolidate, and again, we can sort of turn to that later, and of course, we have other meet and confers scheduled too.  And just to clarify for the record since I presume Judge Simms will be reviewing the transcript, so there was a Complaint that was filed in Wyoming, in Federal Court in Wyoming, originally filed by the defendant in this case, Robert Chen.  The Complaint was subsequently amended to add as an additional plaintiff in the case the entity OtterSec, LLC which is, of course, the subject of this pending action that has been pending in Maryland or at least the, sort of the -- the dissolution of that company is the subject of this litigation.

The defendant that was named in the Wyoming Complaint is David Chen whom, whom my firm

J.R. 662

also represents.

At a high level the Complaint concerns allegations of alleged theft of computer code and some other items from OtterSec.

On behalf of David Chen a motion was filed to transfer the Wyoming case to the District of Maryland, again, just to summarize at a high level essentially on the basis of its relationship and overlap with the pending litigation that is the subject of this meet and confer, it was just prior to Christmas or so, the court in Wyoming granted the motion to transfer.

The case has now been transferred to the District of Maryland.  It has been assigned to a judge different from the judge that is hearing this case.

We have expressed to the defendants our intent or our desire to consolidate the cases together primarily because of common issues of fact or law to avoid inconsistent determinations. We have reached out to the defendants to assess their position on that point, and we've been

J.R. 663

awaiting their response.

I know you needed to speak with your client, Josh, about that.  We understood from our exchange of e-mails that you did that yesterday. You know, we had raised it in our agenda as one of the items we wanted to discuss with you today. You pointed out, Josh, in your e-mail to me of last night that it's, you know, sort of outside the scope of the meet and confer because it's not a discovery dispute.  I mean, I suppose I don't -- I don't dispute that, but it's not a discovery issue.  We just wanted to raise it, well, really for two reasons, I would say, for you to think about -- we can come back to this later -- number one, quite frankly, because we're just awaiting your position on it, and if a motion needs to be filed, we want to move forward with that and get that moving forward.

I guess also in our view it is -- has a relationship to the subject matter of the meet and confer, Josh, really because our takeaway from the conference that we had with Judge Simms is that,

J.R. 664

you know, the idea here is to tee up all of the pending discovery issues, if there are any left that are in dispute once we're done with the meet and confer -- the court will obviously resolve those issues -- but with a view towards establishing a discovery schedule.

So our thinking here and sort of raising it as part of the meet and confer is that if the cases are going to be consolidated together for purposes of trial, it would be ideal to have them proceeding on a similar track that puts them on pace to be completed together.

Again, in our view I think there's a lot of -- there's a substantial amount of overlap in discovery. So a lot of what we'd be doing today and have already done so far in the course of discovery in this pending matter will necessarily involve discovery that would overlap with discovery in the, well, now former Wyoming case.

So really that's why we raised it is with the view towards setting the schedule for discovery in the cases. So that -- just wanted to

J.R. 665

point that out for you, Josh.  That was why we wanted to discuss it.  I understand that you said that you'd be sending us an e-mail later today with your position, which is certainly fine.  You know, we were just hoping at least to kind of get a sense of, yea or nay, of your view on consolidating the cases together.

MR. LEVY:  Thanks, Steve.  As you note, the consolidation question is not a discovery issue.  It is -- it relates to claims that we have -- our client has not brought in this original Maryland case that is before Judge Simms.  They are separate claims made against your client's sons:  theft of computer code and money from OtterSec.  They are, again, not before this judge.  They -- those claims have not been consolidated.

As we indicated to you yesterday, as you've acknowledged today, we are going to send you our position on that after this meet and confer on discovery issues, and when and if the matter is consolidated, we will deal with related

J.R. 666

issues then.  It's not been consolidated at this time, and we have limited time to try to resolve our differences on discovery.  Again, we're very optimistic that we can do that, but we'd like to focus today on those discovery issues.

So as we indicated to you yesterday, we'll send you our position on consolidation in an e-mail after, after this meet and confer and suggest that we move back to the discovery issues that we were all instructed to resolve on this meet and confer.

MR. PLOTNICK:  Steve Plotnick speaking. That's fine.  I mean, if we're going to get your position later today, I don't think there's any material difference and we can move on and sort of focus on the discovery issues in the case.  As I said -- and we can take it up again at our next meet and confer, which I think is, if necessary, which is scheduled for I think, what, next Wednesday or so if we need to talk about it further.  So we'll just await your position and go from there.  I just wanted to make the point that,

J.R. 667

again, depending on what your position here is, it does have the potential to have some overlap with the scheduling issue, but that's all, but you know, if you're going to oppose it, then we'll have to deal with it in the normal course, and that's fine.  So we can come back to that, you know, once we see your position.

So where should we start?  I'm happy to take it in order.  Shall we start with -- from the items that you had the listed, you know, take it in order, our motion to compel?  Does that make sense, Josh?

MR. LEVY:  Fine with me.

MR. PLOTNICK:  Yeah.  As I said, I don't have a strong preference here.  So I will start off with that.  I mean, I think at a high level I think our issues that we've raised that are the subject of our motion to compel primarily deal with I would say production of non-OtterSec documents, documents related to the internal operations, employees, finances of the, of the two defendants in this case, RC Security and Otter

J.R. 668

Audits, and at a high level my understanding of the defendants' objections to producing the documents that we had requested fundamentally fall into two categories.  One is time frame.  At least that's one point of dispute, and secondarily, the primary objection to those requests, as I understand it, or at least read in the defendants' papers, is fundamentally an argument that the two entities, RC Security and Otter Audits, are not successors to OtterSec, LLC.

We've obviously briefed it.  I don't -- we've had some time now to consider our respective positions.  We can go through them, you know, on an item-by-item basis if that's what you want to do, but I think the objections to them are fundamentally the same.

So, you know, perhaps I'll turn it over to you, Josh, or whomever is going to be addressing this issue and just ask whether or not you have considered that position, whether there's any sort of change in position, and go from there.

MR. CRENNY:  So we have -- this is Kevin

J.R. 669

Crenny.  I think we need more specifics on what you want, like what, you know, we understand that the types of issues you have at a very high level, but I think we need to get more specific for purposes of the meet and confer and to be able to try to find areas of compromise.

I don't know if you want to go, you know, you could go request by request.  You could go by -- like, you had done like five categories in your notice.  I don't know if that's a helpful way.  That's the way we were kind of looking at it as we were getting ready was those five categories you had outlined, but we can do it -- it's your motion, so however you want to organize, but I think we need more specifics on anything before we could get into it much further.

MR. PLOTNICK:  Sure, yeah.  Again, Steve Plotnick speaking.  Yeah.  Kevin, thanks for that. Why don't I sort of start off.

Yes, we did sort of group them kind of together broadly in categories.  I think -- you know, I'll just start off with some of the

specific requests and interrogatories at issue, and I think we'll probably find that there's going to be some similar overlap here in what we're dealing with.

So I'll start with, you know, what I'll call DANS:  Digital -- Digital Asset Network Security.  So we had document request number 1 which asked for documents and communications concerning the formation, organization, reorganization, management or governance, and the request encompassed DANS, RC Security, Otter Audits and OtterSec.

The defendants, as I understand their objections, as I'm reading that, in the first instance the defendants objected to producing Digital Asset Network Security documents, DANS, D-A-N-S for short, and the objection was based on an argument that DANS is not a party to the case, isn't mentioned in the Complaint, and there was a further objection -- again, this deals with the time frame issue -- there was a further objection that the document requests sought documents

postdating the filing of the Complaint.  So that's one.

And then separately there was an objection to producing the documents that we had requested from RC Security and Otter Audits who are defendants in the case, and that objection was that those two entities are distinct and separate from OtterSec, that they're not successors or continuations of OtterSec and that, therefore, documents pertaining to those entities are not relevant to the action.  So I'm going to take them in order dealing first with the DANS entity.

We -- in part they're not mentioned in the Complaint because we learned of them when defendants filed their corporate disclosure statement and sort of through, I would say, independent investigation and just sort of general review of other documents that had been produced in the case our understanding is that DANS, Digital Asset Network Security, is a wholly owned subsidiary of Otter Audits, that it is effectively a division in the sense that it is performing

J.R. 672

specific services for specific categories of clients, customers of -- of Otter Audits.

So in our view, I think as a wholly owned subsidiary, you know, whether or not they're a party to the action, I mean we could subpoena them seeking documents related to DANS, but we believe that as a wholly owned subsidiary they would be documents that would be deemed to be in the possession, custody or control of Otter Audits.

Fundamentally the relevance of DANS is, quite frankly, to kind of get an understanding of what that aspect of the business is.  I mean, if it is part of the same business where essentially all that has happened is that Otter Audits has sort of broken off a portion of its existing business for some specific reason of its own, it's still part of the same business and goes fundamentally to the question of -- well, it relates to a few issues, but at the highest level certainly the question of whether or not these are successor entities it also potentially relates to damages to the extent that DANS is, you know,

J.R. 673

generating business, generating profits, those
profits are being shared with Otter Audits.  They
may be entities in which we would claim an
interest in, either directly or indirectly,
through Otter Audits.  But it is fundamentally I
think most relevant to the successor claim, the
declaratory judgment claim that we have in the
case, bleeds over into other issues, and that is
fundamentally I think the relevance of DANS is
getting an understanding of exactly what the
entity is.

Insofar as the objections to producing the
RC Security and Otter Audits components of the
requests --

MR. CRENNY:  Steve, can I interrupt you?
Sorry.

MR. PLOTNICK:  Sure.  Of course.

MR. CRENNY:  This is Kevin.  Can we -- I
think it would be more productive if we just talk
about DANS first before we get into the other.  Is
that all right?

MR. PLOTNICK:  That is totally -- yeah.

J.R. 674

That's fine.

MR. CRENNY:  And correct me if you disagree, but I think this, just so we only talk about DANS once potentially, I think this also covers your document request number 4.  Is there anything you want to add on that one, which is request for documents and communications concerning the ownership or financial interest of defendants in DANS?  Can we do those -- just for purposes of streamlining the conversation, can we talk about those together, the two DANS ones, so that --

MR. PLOTNICK:  Yes, absolutely.

MR. CRENNY:  Is there anything that you want to add to 4 that you hadn't said a moment ago?

MR. PLOTNICK:  No.

MR. CRENNY:  Okay.  So I guess questions we have in response to that.  What -- what are the DANS documents that you feel are relevant that are -- you're not getting?  And what element of successor liability do you think this is -- this

J.R. 675

is relevant to that you need their documents?  You know, as you said, it's a subsidiary of Otter Audits.  Does Otter Audits stuff not cover it somehow?  Like why we're -- we're trying to understand your position on this, a separate entity.

MR. PLOTNICK:  Sure.  Well, I mean the documents that we're seeking are, and not to be cavalier, the documents that we asked for, right, so the documents, communications concerning formation, the organization, the management.  So, you know, how -- how -- formation documents, entity formation documents, right.  When -- when was it created?  What was it created for?  You know, organizational documents, typical documents that you would see to create an entity, governance documents.  So if there is an operating agreement or a shareholder agreement or something of the same, something that shows, you know, what the ownership of the entity is, who the owners of the entity are, what business it's in, you know, what it does.

J.R. 676

Similarly with, you know, request that's also -- I'm speaking of both requests, number 1 and 4 together, but as I said, so they're kind of fundamentally getting an idea of what it is, why it was created, what it does, who its customers are, who its clients are, who works for it.

I mean I think that all relates to the questions of successor because, again, what we're trying to determine here as part of this is what is this entity?  Is it effectively just, you know, doing the same business as OtterSec potentially using the same employees, infrastructure, customers, clients of OtterSec, that sort of thing, all of which go to the successor liability question.

Again, if this is say, for example, you know, these are clients and customers of OtterSec that it is servicing, then, you know, is this an entity where they've just effectively, for whatever the reason may be, broken off a component of the former OtterSec business under the umbrella of a separate entity?  Those are all the points

J.R. 677

that we're trying to cover and why, why we sought that discovery.

MR. CRENNY:  And how are you -- how do you -- the fact that this was not formed until mid 2023 after the lawsuit was initiated, how do you view that?  That seems to us like this is not part of the claim, you know, that the Otter Audits -- you can find out about Otter Audits from the Otter Audits discovery and then whatever they, you know, the subsidiary started doing after the Complaint was filed, that seems --

MR. PLOTNICK:  Yeah -- sorry.  I didn't mean to cut you off.

MR. CRENNY:  Yeah.  I mean, like, the successor liability, like, the factors are, you know, the ownership, the management, the continued existence of the selling corporation, the adequacy of consideration, the transfer of employees from the predecessor to the successor, the purpose of the asset sales that's -- I don't know how to pronounce this case -- but it's O-D-J-A-G-H-I-A-N, 848 F Appendix at 539.

J.R. 678

I mean this subsidiary that's created the following year doesn't seem to us like it tells you those things about Otter Audits.  It seems like the discovery on Otter Audits would be the stuff that matters for that and the creation there.

You know, you're curious about what it's doing and what's happening in 2023, but that doesn't really relate, as we see it, to whether Otter Audits is a successor corporation.  You know, discovery on Otter Audits will prove that or not.

MR. PLOTNICK:  Sorry.  I didn't want to cut you off and speak while you were speaking again.  Yes.

So I am struggling a bit, Kevin, to understand the position that the date of the filing of the Complaint matters one way or the other with respect to this point, others as well, which we'll deal with later, but, you know, if -- if the -- say, for example, the clients, the customers, whatever it may, whoever it is that

J.R. 679

DANS may be servicing, what employees they may be using, the fact that Otter Audits, you know, made a decision, for whatever reason it did, following the filing of the Complaint to colloquially break off a portion of its existing business after the date of the filing of the Complaint, I don't think that matters.  I mean that's -- the question is whether or not this is part of the same business and goes to the question of successor liability.

I mean it's possible that -- I don't know at this point because we don't have the discovery, but it's possible that DANS could be added as a defendant in the case via an Amended Complaint, but, you know, the fact -- the timing of the decision to create this entity, I struggle to see how that is pertinent to the question of whether or not they are, in fact, part of the same business.

So in other words, I guess what I'm saying is, just to -- again, I don't know because we don't have the discovery -- but if this was at one point a component of the existing Otter Audits

J.R. 680

business and they chose, for whatever the reason may be, perhaps they brought in another investor, whatever, to spin off that business into a separate entity and the fact that they may have done that post filing of the Complaint, I don't think that matters.

I mean, you know, at least for purposes of discovery that's exactly what we're trying to determine, right:  What is it that this business does?  Is it, in fact, part of the former -- well, prior to that Otter Audits, prior to that the OtterSec business.  That's exactly what we're trying to determine through discovery.

I don't know if that answered all of your questions.  It's the only ones that I can remember that you had asked about.

MR. CRENNY:  Yeah.  No, I think -- you know, I think that's all helpful.  I think, you know, this is -- this is day one of this process, and there are points like this where we, you know, wanted a clarification of your position, and, like, elaboration of it, and I think there are

J.R. 681

points like this where we now have to kind of take your position and think about it and look at it now that we've gotten it clear, clarified.

So I think this is one where, you know, we understand -- we heard what you're saying on this at this point, and it's something to circle back to next week for discussion probably.  I think there's going to be a few of these, but I think that's helpful and that's how the process is supposed to work, and that's why we're doing more than one day I think, if that makes sense, and you might have ones like that from us.  Does that make sense?

MR. PLOTNICK:  I guess what you're saying is you're going to think about it and come back to us at the next meet and confer on the DANS stuff?

MR. CRENNY:  Yeah.  But I think I'm saying in a way of, like, thank you for elaborating, it's helpful, you know, we are in a better position to think about it and discuss having gotten the clarification from you.  If there's anything further you want to add at this point, go ahead.

J.R. 682

I don't mean to cut off the discussion of it.  I'm saying I don't -- I think I've asked the questions I wanted to ask, and we've gotten the clarification here.

MR. PLOTNICK:  Yeah.  I mean I guess -- I guess the only thing that I would add to it is I mean I think that there are at least potentially other reasons why, you know, DANS is relevant here that we're trying to determine.  I mean I could probably think of some others.

You know, if this is some, for example, an effort to sort of shield assets by transferring them to another entity, right, I mean that's the kind of thing that we're trying to determine here is -- you know, as I said at the outset, I mean at a high level because we don't really have the details and this is not a public company, obviously we don't have all of the details of what DANS is, what it does, who its employees are, but that's fundamentally what we're trying to go to, and that is:  Is DANS effectively a part of, you know, the former OtterSec business in some way,

J.R. 683

shape or form?  So that's -- that's the only addition I guess I would have to add to that, Kevin.

MR. CRENNY:  Okay.  Give me one second to just look over, make sure we don't have any other questions before I close this one out.

MR. LEVY:  Steve, just to be clear, you indicated a couple of ways in which this request might be relevant.  You said there might be others.  It would be helpful to know all of the grounds for relevance today.

MR. PLOTNICK:  Yeah, I don't know that I could list out every single one in part, to be honest with you.  I think, Josh, you know, we don't have all the documents.  I mean I think -- candidly, I think I've listed enough at this point, but I mean I guess if I was going to add to it, right, I think it, as I said, it sort of touches on the point about whether or not assets have been transferred, that sort of thing.  I mean that's also a damages issue I think as well for us, too, and whether or not we would have an

J.R. 684

interest in this entity.

It depends on I think, you know, obviously the way the entity was structured, the purpose for which, you know, DANS was created, whether there are other investors in it, that sort of thing. So, you know, as I said, fundamentally it's a liability and damages issue.

MR. LEVY:  And -- look, it's helpful for us to know what the grounds for relevance are so that we can evaluate those positions and come back to you.  We have set forth objections.  We'll come back to you and add specificity to the objections where appropriate and/or come up with a proposal about how to address your request.

DANS being a wholly owned subsidiary is a separate party and, and so it's a separate entity, and so there's a unique burden that falls on our clients to gather and produce documents from a separate party, and so we're just -- we need to evaluate your claims of relevance as we look at and the specificity of the documents that you want, and this is information that we didn't have

J.R. 685

until today.  We appreciate it.  And if there's anything more you want to tell us, let us know, and we'll take that back and work with you.

MR. PLOTNICK:  Yeah.  I think we've covered it.  We could move on to the next point and, you know, give you guys the opportunity to, you know, consider our position some more, and that's why we have another meet and confer scheduled.

MR. LEVY:  Right.  Kevin, anything else?

MR. CRENNY:  No.  Yes.  I think that's -- that's what I was getting at.  So, yeah, I think that makes sense.

MR. LEVY:  Okay.  Thanks.

MR. CRENNY:  That's helpful.  Thank you.

MR. PLOTNICK:  All right.  So I'll move on to the next aspect of that request, and again, I think, Kevin, this one sort of is a consistent objection sort of throughout several of the document requests, if not all of the ones that are the subject of our motion to compel, and that is the RC Security and Otter Audit documents, and

J.R. 686

that there has been an objection to producing RC Security and Otter Audits documents based on an assertion that the two entities are distinct and separate from OtterSec, that they're not successors, et cetera, and obviously I mean that is the issue in the case. I mean it is certainly -- well, one of the issues in the case for certain but certainly a central issue in the case, that, you know -- look, we briefed the motions to compel already. So we have the benefit of our respective positions on that issue which is helpful, but, you know, fundamentally, again at a high level, I think the way I would describe our response to those objections is that that's a merits-based objection, that there is a -- you know, there was a ruling in the case in connection with the defendants' motion to dismiss for lack of personal jurisdiction that we had pleaded a successor claim. I understand that that was, or at least the defendants' position on that is that that was limited to personal jurisdiction issues. I'm not -- I mean it's a 12(b) motion. I'm not

J.R. 687

sure that there's a material difference there between the two. But regardless, and fundamentally the question of whether or not RC Security and Otter Audits are separate and distinct and whether or not they're successors to the issue is, as I said, the issue in the case.

So where -- and I understand, you know, again, sort of describing the motions at a high level, you know, defendants have taken that position, that the businesses are different in some way, that they do different, different categories of business, derive their revenue in different ways, you know, that those are points that all go to the merits, and our view is that's exactly what we're entitled to take discovery on.

And, you know, again, this was an objection to document request number 1. You know, we can go through these in a line-by-line basis, but that was a consistent objection to, you know, many of the other requests. I'd say all, but it's technically not all because as, Kevin, you had pointed out, right, there was one request -- it

J.R. 688

was document request number 4 that was focused exclusively on the DANS entity, but it certainly is, you know, document request number 1, document request number 5, document request number 9 and, you know, on and on.  I think it was a consistent objection throughout when it came to producing those documents.

Now, I would say related to that, one of the difficulties I think or at least one of the things that we had struggled with is a position that the defendants took in their papers which is that in I guess -- you know, I'll certainly let you correct me if I'm wrong -- but the position that the defendants took in their papers is that, well, okay, well, we're reviewing RC Security and Otter Audits documents as part of our document collection and production, and the defendants have said that the -- they would produce the RC Security and Otter Audits documents -- I think the language is to the extent that they mention OtterSec, right.  That's obvious what that would be, I take it, and then it said to the extent that

J.R. 689

they mention OtterSec or to the extent that they concern OtterSec, and that -- that is -- that's -- that's where we have some difficulty in particular, and that is -- sort of sounds very, very subjective, which I don't think is the point of discovery and not consistent with what the scope of discovery and the rules of discovery are supposed to be.  It's a very sort of subjective criteria and seems sort of inextricably intertwined with these objections which is fundamentally that documents -- and I don't know if that's the case or not or what the specific criteria is that you're utilizing to determine it, but it's difficult to separate that subjective analysis that is, well, we'll produce the RC Security and Otter Audit documents to the extent that they concern OtterSec.  It's difficult to sort of reconcile that, I suppose, with the objection, that this sort of takes the position that, well, these are separate entities and what they do has nothing to do with OtterSec.

So I don't know if you have had the

J.R. 690

opportunity to consider that objection.  I have other points, too, about the time frame as well, which I'll get into, but sort of consistent with your point here, Kevin, with going issue by issue I'll hold that and let you respond on that.

MR. CRENNY:  Thanks.  So I think, as you say, we have produced documents that mention OtterSec, concern OtterSec operation.  We have produced thousands, thousands of documents from Otter Audits, RC Security I believe.  I'm just pulling that number off the top of my head.  I don't have the number in front of me.  But the point being we didn't withhold based on these objections in all cases.  I think we -- both sides here have a number of objections that we've made but are not withholding based on.

So I think, you know, it's not like we have not given you anything that touches on or is from RC Security and Otter Audits here.  We've produced a lot of material that falls under RFP 1 that relates to those two companies, and the same for a lot of the other RFPs here, and then, you

J.R. 691

know, we've -- in an effort to compromise in advance, you know, where we met and conferred last month, we gave over a lot of financial information for the latter part of 2022 that didn't, you know, didn't touch on OtterSec, and we gave you the DocuSign agreements that showed you clients and customers up through the date of the Complaint being filed -- the Complaints being filed, excuse me.

So I think this is -- you know, this is one the judge highlighted in our hearing that in our notice we had, or in our response to your notice we said we're not clear on what more they want here.  We understand that there are these objections that you think are not correct because of your successor liability claim.  That's fine if we, you know, disagree on them, but they're not -- what are we withholding based on those that you think we should not be withholding?

I think we want to try to get a little more specific than the high level like, oh, well, they're objecting -- we're objecting that these

J.R. 692

are different companies, and you're saying, well, they're really the same company.  Like we got that, but what more are you looking for here? Especially in light of our additional stuff we've given, not waiving our objections, but, you know, trying to get you the financial information, you know, any trends, transfer from OtterSec to one of these companies we've produced, or I think we did produce, have produced at this point.

So I think we're just not sure what you are looking for here.

MR. PLOTNICK:  So I think -- I'm sorry, Kevin.  I didn't mean to cut you off.  Were you --

MR. CRENNY:  No, no.  That was the -- I think that was the point for you to jump in.

MR. PLOTNICK:  Yeah.  I mean, look, I think that's a little bit of a case of the tail wagging the dog, right?  I mean we don't know what you're withholding.  And I think you even said it, like, you didn't withhold in all cases which necessarily means that in some cases you withheld some documents, and, sure, you have produced some,

J.R. 693

some stuff through 2022 and, you know, for other categories of documents you've produced beyond 2022.  So, you know, when you say, you know, what more do we want, I mean I could give several examples.

But I mean they're your documents.  So I think you are in the better position as the party who has gathered, collected, reviewed the documents to know what is being withheld and on what basis it's being withheld.

I mean I gather things have been withheld on the basis of that objection, correct?

MR. CRENNY:  Well, I mean not for request 1.  On request 1 we didn't withhold except for privileged or things after the date of the Complaint, which I know you want to talk about; that's on the list, we'll get to after the date of the Complaint, but I think we're not on that yet, right?

Like, we think our responses are clear in laying out what categories of documents we're producing, and we're trying to understand what

J.R. 694

categories you have not seen that you could point to where we have stood on this objection, and you're asking for something more.

MR. PLOTNICK:  Well, again, it is my tail wagging the dog point.  You're asking me to tell you essentially what documents you've withheld, and I can't answer that, but I can give you some -- so you had mentioned the -- those sort of DocuSign agreements.  You know, again, the -- at least some of the requests, right, that we're talking about refer to things like, you know, give us -- give us, you know, your employees, your agreements with your employees; give us the agreements that you have with clients and customers.

If you are saying to us that the production of the DocuSign, HelloSign documents are documents that are sufficient to identify all employees, right, all independent contractors that ever performed any work for RC Security, for Otter Audits, if you're saying that those, you know, DocuSign and HelloSign documents are sufficient to

J.R. 695

identify all of the employees, right, the dates, the times, the periods of time that they worked for the company, right, that would be one thing, but that's not what I understand, you know, what that is.  Again, correct me if I'm wrong.  But what we want to know is, again, sort of staying with that example, who all of the clients and customers are, and again that --

MR. CRENNY:  Can I --

MR. PLOTNICK:  Yeah.  That fundamentally relates to, you know, are they the same as OtterSec?  Same thing with the, you know, employees and their agreements:  Are they the same?  So that was our concern with sort of limiting -- I mean just to --

MR. CRENNY:  Could I respond on that one before we go to the next one?

MR. PLOTNICK:  Yes, yes.  Please, go ahead.

MR. CRENNY:  You have all of the agreements that we have:  All the customer, clients, employees, contractors.  They use

J.R. 696

DocuSign and HelloSign.  So any agreements that they have in records we have given you.  So this is, you know -- for the customers -- you know, the way you broke it down in your notice was that from Otter Audits and RC Security you had concerns about the production of, you know, documents about formation of business plan, financial stuff, and then stuff about clients and customers.  So for like the clients and customers category we've given you the agreements that we have with clients and customers through the date of the Complaint.

MR. PLOTNICK:  You have all agreement -- so -- so -- okay.  So that would be -- but is that -- so part of the question is though, does every single client and customer of RC Security and Otter Audits have an agreement, right, and -- well, specifically with RC Security and Otter Audits.  So, you know, whether that's sufficient or not to identify who all of them were is really the question that I have.  I mean if there was a client or customer that they had of the company that they did not have an agreement with or with

J.R. 697

whom they were operating under a prior OtterSec agreement, that's a separate, separate question from whether or not -- so I appreciate that, right -- so if you're telling me that that's everyone, that would, you know, kind of cover that, but the -- then you also have questions about sort of the employees.  Did they all have -- does that cover all of the employees' agreements, including independent contractors?  Did all of them even have agreements?  I mean that's why, for example, we asked for things like W-2s, 1099s, that sort of thing, to, you know, kind of cover who they are, what they were being paid, when they worked for the company; did they come over from, you know, OtterSec?  Are they the same?  Again, that's just one example.

So that was our concern with sort of limiting it to, you know, the specific DocuSign/ HelloSign.  I mean I know, for example, that each of the, at least the agreements that were signed with OtterSec employees and independent contractors, I mean each of the documents, they

J.R. 698

had, like, the same title on them, and, you know,

just it just struck us -- not trying to get too

deep into the search protocol questions -- that

logically one would run searches for the actual

title of the document, particularly when it's

consistent what they're saying as opposed to sort

of limiting your search to, you know, one database

in particular.  But, you know, again, that's part

of what we're trying to get at with those specific

requests.  It's fundamentally linked to the

successor point.

But I just want to make one other point,

and that is I just want to clarify that on the

basis of -- that you said not in response to

number 1, okay, that you've withheld documents on

the basis of this objection, but this objection,

you know, sort of appears in others, and we could

run through them.  But document request number 5

asked for documents and communication concerning

dividends or distributions paid to shareholders,

members or partners of RC Security, Otter Audits

and OtterSec.  You had the same objection in

J.R. 699

Transcript of Meet & Confer
Conducted on January 3, 2025                46

there.  That's a damages issue.  We're trying to determine whether or not obviously dividends or distributions were paid to, you know, members of these companies, and if we are entitled to have an interest in these companies, then that's a damages question for us.  So that's certainly a point.

When you get into the clients and customers and RC Security and Otter Audit stuff goes into -- we also have a lost profits claim in the case under the Lanham Act as well.

MR. CRENNY:  Steve, can I make a suggestion?

MR. PLOTNICK:  Yes, of course.

MR. CRENNY:  Can we go back to the employees, customers, clients stuff?

MR. PLOTNICK:  Yes.

MR. CRENNY:  I think that is -- we can segregate that from the financial stuff, and I think we could potentially tie up the employees, customers, clients stuff.  I just think if we keep them separate, we are more likely to make progress on this, but it's your motion.  So tell me if this

J.R. 700

is not working.  So I think that may be the way to do it.

But, you know, again, we weren't searching a particular database.  We -- the way they signed agreements was HelloSign and DocuSign.  You asked us for those agreements, so we produced all the HelloSign and DocuSigns.  That is how we would go about identifying them is through going through the DocuSigns and HelloSigns the same way we produced them to you.

There's not some database that we're restricting ourselves to.  We are trying to -- we searched for and have produced every agreement through the way that they signed agreements. We're not aware of agreements with customers, clients, employees that are not HelloSign and DocuSign.

MR. PLOTNICK:  Right.  But the question is, though, is that -- does that cover every single employee and every single independent contractor in the sense that did every single one of them have an employment or consulting agreement

J.R. 701

with the company?  That's in part why we had asked for in addition to the agreements themselves, you know, things like W-2s and 1099s, that sort of thing, because that would also encompass those, you know, that category of employee or customer.

MR. CRENNY:  We've produced the W-2s and 1099s.  I think we've produced the documents we would use to answer the questions you're asking, and that's, you know, a proper way to respond to an RFP or an interrogatory looking for the identification is, like, give the business records that so that the opposing side can do it as easily as you could, you know, if you want to make a list, there's no more comprehensive list that we've withheld.

MR. PLOTNICK:  Well, maybe we're getting into the time frame, the time for --

MR. CRENNY:  Yeah.  Maybe if we -- which request are you talking about specifically that you think we've failed to, you know, do what we need to do in response to with regard to customers, clients, employees?

J.R. 702

MR. PLOTNICK:  Sure.  There is a request for -- let me look for it in my notes here.  I have it right here.  One second.

So on the customers and clients we have document request number 19.  So document request number 19 asked for documents sufficient to show all customers and clients of RC Security, Otter Audits and OtterSec, including all persons for whom RC Security, Otter Audits and OtterSec has performed any auditing work or from whom RC Security, Otter Audits and OtterSec has collected any payments for services or products.  So that's -- that the customers and clients point.

MR. CRENNY:  I'm looking at that one, too.

MR. PLOTNICK:  Yeah, and that's, again, what I'm getting at.  Again, if you're telling me we have all of the agreements, then we have all the agreements.  Then we can again come back to the time period thing.  The question really is whether they're sufficient to show, right, all of them for whom they performed work.

MR. CRENNY:  They are -- we are not aware

J.R. 703

Transcript of Meet & Confer
Conducted on January 3, 2025    50

of any that we are missing, and we don't know where we'd look for others that we haven't looked already if they're, you know -- we only have the company records we have, but we have given you what we have, we're aware of -- yeah.

MR. PLOTNICK: Yeah. I mean does -- I mean I think, again, on some level --

MR. CRENNY: We aren't aware of any that didn't have some sort of agreement, and we've given you the agreements that we have.

MR. PLOTNICK: I'm sorry. I'm just --

MR. CRENNY: Yes.

MR. PLOTNICK: I think it makes sense at least to sort of talk here, too, about the time period as well. We have -- I do know that you've produced some W-2s and 1099s, but I think that's only through -- correct me if I'm mistaken -- that one is limited to the end of 2022. Correct?

MR. CRENNY: Um...

MR. PLOTNICK: Or at least that's one of the categories where we had limited it to --

MR. CRENNY: I think that's right.

J.R. 704

MR. PLOTNICK:  Yeah.

MR. CRENNY:  I believe that's right.  For RC Security and Otter Audits, not for OtterSec.

MR. PLOTNICK:  Right.  So, you know, again, it's not clear to me why that would be cut off at 2022 specifically or what the reasons would be for cutting that off in 2022 if, you know -- the fact that they -- there could have been, you know, very easily -- just say, for example, there could have been an existing client or customer, for example, of OtterSec that they performed work for at some point in time prior to its dissolution, and whatever the reason may be that client or customer didn't necessarily need any specific work, right, to be done through the end of 2022, but they're still an existing client or were a client or customer of OtterSec at the time. So the fact that they may have come in February or, you know, March or April whatever --

MR. CRENNY:  You would have them -- February and March you would have for 2022, you would have through the date of the Complaint for

clients.

MR. PLOTNICK: Or April, for that matter, right? That's the -- that's part of what we're -- again, so to me I still sort of struggle -- I'm trying to understand -- maybe I could ask you -- why, you know, using the date of the filing of the Complaint is being used when, you know, again, fundamentally when you're talking about, you know, questions of successor, well, are these successors, these are the factors that you're looking at, right? Are the clients, are the customers the same as the ones that were with OtterSec?

If these were employees, for example, who worked for OtterSec and had restrictive covenants with OtterSec and had agreements with OtterSec and were hired or rehired to perform work or signed an agreement in April, May, June, whenever it may be, 2023 or later, the pertinent and sort of relevant to the successor question, you know, whether or not, you know, it was in 2022 or not. So that's where I'm struggling to at least understand. I

J.R. 706

Transcript of Meet & Confer
Conducted on January 3, 2025                53

mean --

MR. CRENNY:  We're using -- we're using -- sorry.

MR. PLOTNICK:  Yeah.  No.  Go ahead.  I think I was really just going to repeat myself.

MR. CRENNY:  I mean we are using the dates of the Complaint as the cutoff because that's the day that the claims were brought.

You know, at the time that the Complaint was brought you thought these were successors. You thought that you could -- you know, the evidence existed in the world to establish that they were successors under the, you know, as the Complaint says it.  We disagree.  But that's -- the evidence on the claims should exist before the Complaint is filed.  You raised the claim on that date claiming that they were successors as of that date, and you have the documents to show that at that time they were successors -- I mean if you don't have the documents to show that because they don't exist because, you know, we have not -- we have produced the things up to that date when the

J.R. 707

claims were brought, and that's the reasoning.

MR. PLOTNICK:  But -- but that would only --

MR. CRENNY:  Pertinent to the cutoff.

MR. PLOTNICK:  Yeah.  That would only go to the question of the basis for filing the Complaint in the first place.  One could have a good faith basis for filing a Complaint as of the date of the filing of the Complaint, but surely there can be evidence that postdates the filing of the Complaint that's relevant to the claims and supports the claims themselves, which is exactly what I'm talking about here, and that's the kind of discovery -- I mean a perfect example of that is some of the -- and I know we're not talking about the financial stuff -- but the financial stuff.

I mean there's a lost profits claim in the case under the Lanham Act.  There are damages claims, I mean distributions.  To the extent that there were distributions to members of these companies after the fact, that would be part of

J.R. 708

our damages claim as well.

You know, as I said, to the extent that there were customers, clients, you know, that are the same as OtterSec's that postdate the filing of the Complaint, those, in our view, would be relevant to the claim.

I mean what you're talking about, or at least it sounds to me what you're talking about is only directed to the question of what was the basis for filing the Complaint, the good faith basis for filing the Complaint in the --

MS. CLATTENBURG: Steve, can I jump in just to clarify because I think I'm getting lost here. This is Rachel, by the way. I'm getting lost because I thought we were talking about request 19, and it seems to be about showing the customers and clients, and as we've said, we have produced those agreements that we have. We don't know of any other clients or customers that didn't have agreements, and we've produced all the agreements we have up through the date of the filing of the Complaint.

J.R. 709

You seem to be pushing back I think on that cutoff for showing customers and clients of two entities that were created in the fall of 2022.  So how -- I just want to know what relevance you think it has to continue showing customers and clients this many months after they were created?  And can you point us to some case law that shows that this long after that would be relevant to whatever claim you're trying to show here?

And I want to limit this to request 19 because I'm getting very confused when you start bringing in, like, financial information.  I'm having trouble following what request you're talking about.  So if we're talking about something other than request 19, can you point me to it?  And if it is request 19, can you tell us why and point to something in the law that shows why customers and clients after 3/31/2023 are in, you know, it's relevant to your claims here?

MR. PLOTNICK:  Well, sure.  I mean --

MR. MALYSHEV:  Excuse me.  This is Alex.

J.R. 710

If I can jump in just for one second.  I think something that might have been getting sort of overlooked.  This is not a car accident where you're just talking about what happened on this date caused the accident.  This was an ongoing theme is made in our Complaint to divert the business of OtterSec to these successors which is necessarily an ongoing enterprise.  I'm not aware of anything in the law that requires us to wait until every single client has been transferred and everything is complete before filing a claim.

So despite the date of the filing of the Complaint it is certainly relevant to show that we already had a basis to make the claim, but this is what applies to damages.  If it's transfer of the clients is ongoing and at least based on what we've pleaded, we have shown that your client has used a dissolution after Sam's death to start transferring the business, it is absolutely relevant and it's ongoing even after the Complaint is filed, and that is also why the DANS information is relevant.

J.R. 711

MR. PLOTNICK:  Yeah, and, Rachel, I'm happy to answer your question.  So I mean if you want me to sort of focus on, kind of do this more on a request-by-request basis, I'm happy to do that.  As I said, I mean I think, you know, there has been a general objection I guess I would say or at least a similar objection to many of these requests, but in terms of your question with document request number 19 which was -- which document request number 19, just for the record, called for documents sufficient to show all customers and clients of RC Security, Otter Audits and OtterSec including all persons for whom RC Security, Otter Audits and OtterSec has performed any auditing work or from whom RC Security, Otter Audits and OtterSec has collected any payments for services or products.

So I think your question -- to answer your question, the case law is, quite frankly, it's just -- I don't know that this really is a case law issue.  It's a relevance issue, and to sort of -- I mean I thought I addressed this, but the

J.R. 712

point fundamentally is that utilizing -- I think, Rachel, just to -- your question was more so about the time frame, the scope, the time frame being used, that 2022 is the cutoff, correct?

MS. CLATTENBURG:  No, no, no, no.  I just want to clarify for the record.  For request 19 you have everything up through 3/31/2023.  So what I'm trying to get at is what -- what else are you guys asking for then for request 19?

MR. PLOTNICK:  We want to know who the customers and clients were of RC Security, Otter Audits and OtterSec obviously beyond I think you said, right, March 31, 2023, because -- I guess this is really related to Alex's point -- but -- but the fact -- if you have a customer or a client that perhaps did not transfer their business to RC Security, Otter Audits until after March, March of 2023 -- could have happened in April; it could have happened in May -- I mean clients in general, right, they need services from time to time, and that can postdate it.  So the relevance goes to who their clients, who their customers were.  It's

J.R. 713

fundamentally -- well, it's largely related to the declaratory judgment claim and successor liability claim. I think it's also related to fiduciary duty claims as well and damages, as Alex had mentioned, but to the extent that you have an overlap in clients or customers of the company, that's the question. And there could be overlap, right, where there was a client or customer of OtterSec as of, you know -- pick a date -- August of 2022 where work was performed for that client or customer, and they didn't need services again until April, June, July of 2023, but if --

MR. CRENNY: Steve, can I just -- sorry.

MR. PLOTNICK: No, I was just --

MR. CRENNY: I was looking for a point to jump in.

MR. PLOTNICK: Yeah. The question is: Are they the same? So we're really just looking for a current list of who all of their clients and customers are. I'm not turning to the financial stuff because I'll restrict myself to the question of who they are. So this is really going to the

J.R. 714

question of who they are and looking for who they are. Are they doing the same work for them? Is this the same business? And so go ahead, Kevin.

MR. CRENNY: Yeah. So I think this goes to that, and to -- I understand Alex's point. I don't think that's -- that's wrong, but it's not like the Complaint was filed on October 1st here. Like, it was filed while things were still happening. It was filed five, six months later.

You know, if you were a customer of OtterSec in August, then by January OtterSec is not doing any business, you're not a customer of OtterSec anymore, and then if you're finding somebody new in, you know, April or past that, there has to be some point at which it's more, you know, the burden outweighs the benefit of the -- of additional discovery. The date of the Complaint we think is a reasonable cutoff where we'll give you, you know, six months or however many months that is after the dissolution, but there's got to be some -- we think there's got to be some point where it could be cut off, and we

J.R. 715

think that's a reasonable cutoff date that would give you the things that are relevant to the claim as it was filed at that time.

You know, if the Complaint had been filed on October 1st, I don't know that we'd take the same position because obviously then, like, that's just as it's dissolved.

But here we've given a number of months past the dissolution, and we think there's got to be some cutoff, and when I say dissolved --

MR. MALYSHEV:  I have a question.  Sorry.  I thought you were done.  Sorry.

MR. CRENNY:  No.  I just wanted to clarify, you know, the assets were sold in September.  I said dissolution.  Our position is that it dissolved back in July, but I think you probably understood what I was saying.

MR. MALYSHEV:  Yeah.  So is the windup complete?

MR. CRENNY:  No.  The windup -- we've said the windup is not complete.  It's still in an extended windup period.

J.R. 716

MR. MALYSHEV:  So I don't think -- so I think our position is you cannot take that position while the windup is ongoing.  You might disagree, but I think that's our position.

MR. PLOTNICK:  Well, and also -- look, let me just kind of come back.  You raise a reasonable point, Kevin, and that is, you know, what are we using here as a cutoff?  And that's something that we're open to discussing with you.  In other words, saying, like, let's, like, just sort of pick a date, right, for now as, like, at least as a for-now question and as a starting point.  I think where our disagreement is, is utilizing March.

I mean, you know, you're talking about a date of --

MR. CRENNY:  Okay.  What date would you prefer?  Is there a date you want to propose as a compromise in the interest of resolving some of these things today?  Do you have an alternative date to propose?

MR. PLOTNICK:  Yeah.  We --

MR. CRENNY:  If you leave at a minute, then we're never going to finish discovery if they keep signing clients, right?  Like we've got to have something.

MR. PLOTNICK:  Yeah.  I don't disagree with that, and that's my point.  You know, we do need to at least have some certainty and, you know, perhaps pick up, if things need to be supplemented at a later date, we could do that.

But yeah.  I mean the short answer to your question is we would propose what we have done with our discovery responses is to use, you know, March of 2024 as a cutoff date.

Really what we're trying to do, and this I think would at least apply across the board with the financial stuff is to kind of capture at least all the way through 2023 and at least a little bit into 2024 for some of this stuff.  So that's what we propose.

But, you know, again, just to reiterate my point about the client, you know, you're talking about it would have been in operations, I mean

J.R. 718

these entities RC Security and Otter Audits were formed in, what, September of 2022.  OtterSec was dissolved in -- what was -- the certificate of dissolution was filed in October of 2022.  You know, so utilizing 2022, you're talking about, you know, two, three months of operations of the business in our view is sort of plainly not enough to sort of capture --

MR. CRENNY:  We did 2023 though.  We did the end of March 2023.

MR. PLOTNICK:  Sorry.  Correct.

MR. CRENNY:  So they were started in September.  September, October, November, December, January, February, March.  That's seven months of operation, you know, six of which, you know, OtterSec is in windup but not doing any business anymore.

MR. PLOTNICK:  Yeah.  I think six, right, I think six months, but --

MR. CRENNY:  Six on one side.  Seven on the other.

MR. PLOTNICK:  Yeah.  Sorry.  I was kind

J.R. 719

of conflating I think the customers and clients, same with the employees.

But, yes. Our proposal was through March of 2024, quite frankly, for the reasons that I had mentioned before, and that is you could have very easily a situation where you have clients and customers who did not necessarily need --

MR. CRENNY: Sure, sure. We understand that point. We agree about that. We get that.

MR. PLOTNICK: That's fine.

MR. CRENNY: We can take it under consideration.

MR. PLOTNICK: Yeah.

MR. CRENNY: So this 2024 cutoff, what do you -- this is RFP 19 we're talking about. Is that a cutoff -- you know, I just want to try to cover as much ground as we can. Which requests do you propose that cutoff for? And then we can come back and talk about it next week. Is it just RFP 19 or where do you want to -- just so we don't have to do it again every time.

MR. PLOTNICK: I would say -- I mean we're

J.R. 720

happy to talk about that for others, but as a general cutoff date that has been our -- that is our overall proposal to use as a cutoff date.  I mean it bleeds over into some of the financial documents that we've been looking for which I know we're not taking up, but I'm happy to kind of go through these on a more document request by document basis.  So why don't we do that.

So document request number 1, I think we covered before, but that's -- that I think -- I think we covered that already.  That was one of the requests that was the subject of our motion.  We covered 4 which was restricted to the DANS documents as well.

MS. CLATTENBURG:  So wait.  Steve, Steve, can I point one thing out?  This is Rachel.  On request number 1, for example, where we say subject to the foregoing objections, defendants' general objections and responses set forth above, defendants will make a good faith effort to locate and produce available non-privileged and responsive documents.  So again, that means we are

J.R. 721

not withholding non-privileged documents on the basis of those objections for that request number 1.  That's why we were confused as to what -- you know, I think we've gone through this one, but I just -- that's how you read them, and I think it's similar to how you all wrote your responses.  I mean we had this discussion in a prior meet and confer.  So it's not a mystery as to where the objections are, basis for withholding and where they are.

MR. PLOTNICK:  Yeah.  Let me pull that up because I thought that you had said specifically in your response that you had only produced them for OtterSec.  So if you bear with me one second, I want to pull this up.

MS. CLATTENBURG:  You have these for Otter -- you have these for the other entities, so are we repeating --

MR. PLOTNICK:  But you still had -- but you're questioning why I'm raising this, and you're telling me that you produced it, and what I'm saying is in your document responses you have

J.R. 722

a written response that says we object and here's what we're going to give you, and I believe that your response said specifically that you would only provide them for OtterSec.  Now, you're telling me something different, and I think that would mean that you need to revise your document responses to clarify what it is that you're actually agreeing to give to us because I think the confusion may actually be --

MS. CLATTENBURG:  Well, Steve, can you just point to where -- I just want to find where you're saying that.  In response to request number 1, can you just point me to what you're talking about specifically, please?

MR. PLOTNICK:  Yes, Rachel.  I'm just trying to -- I was trying to pull that up.  Just give me one second.

MR. CRENNY:  It could be -- I'll let you find it, Steve.  Give us an idea of what sentence you're looking at.  That would be helpful.

MR. PLOTNICK:  Yeah.  Hold on.

So okay.  So I have your responses and

J.R. 723

objections up in front of me.  Just give me one second.  So we were talking about request number 1, correct?

MR. CRENNY:  Yes.

MR. PLOTNICK:  So, yeah, in your response to -- wait, wait.  Sorry.  I was looking at the wrong one.  Withdrawn.

Yeah.  So that is not 1.  So request number 1 is not one where your response was limited to producing OtterSec documents specifically.  So, yeah.  Rachel, that -- you're correct, but there are others, and, you know, as I said, I'm happy to kind of go through this on a line by -- in fact, why don't we --

MR. CRENNY:  I think that might be the way to do it so we stop jumping around so much.

MR. PLOTNICK:  I agree.  Yeah.  I'm coming around to that agreement with you, Kevin.  Yeah. Go ahead.

MR. CRENNY:  Yeah.  One other thing. We're approaching the halfway point, and we haven't gotten to our motions.  If we get -- only

J.R. 724

talk about your motions today, because -- that's okay, but then we want to start with ours at the next meeting rather than get back into these, I think would be the fair way to do it.  We can -- if these take all day, they take all day, but I just want to get that out there for scheduling purposes as a suggestion.

MR. PLOTNICK:  Yeah.  I'll do it either way.  I mean, if you want to sort of -- I know we have four hours blocked off today.  We could just kind of get as far as we can on this and sort of put our pencils down and then -- we should get to some of your stuff today, too, to the extent --

MR. CRENNY:  Yeah.  It might be --

(Overlapping speakers/crosstalk)

MR. CRENNY:  -- it's probably more helpful to get through yours, but yeah, we don't want to start the next session starting back over on yours I think is just what I want to put out there.

MR. PLOTNICK:  Yeah.  My only thinking on that is that to the extent you want to raise the things where perhaps we need to consider some

J.R. 725

things in advance of the next one, I think it might make sense to turn to yours, but why don't we just at least spend the next half hour or so, we can start going up -- I think you're right, Kevin.  Let's do this on a document request by document request basis.

So I think we've -- I think we've covered now 1.  I think we've covered 4.  4 was related exclusively to the DANS stuff which you had said you guys will consider.  Okay.

So 5, document request number 5. Documents, communications concerning all dividends or distributions paid to any shareholder, member, partners of RC Security and Otter Audits.  This is a request where there were sort of the similar objection to producing documents for RC Security and Otter Audits because they're separate and distinct entities.  They're not successors or mere continuations of OtterSec.

Let me look specifically, Rachel, thinking of your point -- and then -- right.  So this is one where at least appears that there was an

J.R. 726

Transcript of Meet & Confer
Conducted on January 3, 2025          73

objection that the defendants stood on to producing RC Security and Otter Audits documents all together because I'm looking at, you know, after the series of objections that RC Security and Otter Audits aren't the successors and some others.  The response simply says that subject to the foregoing objections OtterSec has no responsive documents, but no response is provided for RC Security and Otter Audits.

I will at least take the opportunity to head off a question that I think you might be asking, Kevin, and that is:  Why is this relevant? It's a damage -- this is a damages question. Fundamentally it goes to damages because at least our claim is that OtterSec was improperly dissolved, that we should have an ownership interest in Otter Audits and RC Security, and if dividends or distributions were made to shareholders, members -- really these are LLCs -- that would go to our claim for damages to our portion, our appropriate portion of the dividends or the distributions in this case, right.  So --

J.R. 727

MR. CRENNY:  So we can revise our response on this because we have produced some of this. We've given you 1099 -- RC Security 1099s.  We've given you these to the extent they exist for 2022. Sorry.  I'm looking at my list of what we've produced.

So I think this is -- this is one where we've produced stuff in the, you know, as part of our effort at compromising in advance of filing our notices back in late November/early December. So beyond that I think we hear you.  We got your arguments.  This is -- we'll take it under consideration at this point.  I don't think we need to get on it right now, but I think you have some of -- I think the document request -- the response you're looking at is not up to date of what we've done at this point.

MR. PLOTNICK:  And, again, I'd sort of raise to the extent that it's sort of part of the discussion, you had said you produced some of it for 2022.  Again, the idea is I don't -- I don't want to --

J.R. 728

MR. CRENNY:  I think we produced -- we've produced the financials for all of 2022.  The only reason I said some of was because I am not a financial expert and I don't have an immediate sense of like, oh, we did a 1099; that's a dividend; like, I'm not -- I don't know all that off the top of my head.  I was just being cautious, but I think we gave you financials for 2022 broadly, so --

MR. PLOTNICK:  Yeah, and this is a date range point, right?  So --

MR. CRENNY:  Yeah, yeah.  I'm taking your point on the date range point, and we will -- I think we understand your position on that and your suggestion of March 2024.

MR. PLOTNICK:  Okay.  So let's go to the next one.  Document request number 9 is -- let me get to that.  Document request number 9 called for documents, communications concerning any offers, bids, auctions, appraisals or valuations of RC Security, Otter Audits or OtterSec, any ownership interest in RC Security, Otter Audits or OtterSec

J.R. 729

or any assets of RC Security, Otter Audits or OtterSec.

Let me just get to the written responses and objections.  Right.  So again, you know, we have sort of a similar series of objections including the objection that these are not successors.  I think we covered this in the motion.  You had indicated that defendants RC Security and Otter Audits have no responsive documents and that defendant Robert Chen will make a good faith effort to locate and produce available non-privileged responsive documents concerning offers, bids, auctions, appraisals or valuations of OtterSec.

This I think to me really just is more of the time frame issue.  I mean I think -- I take it that the response saying that RC Security and Otter Audits have no responsive documents was limited to the time frame that you were utilizing which is the, I think for this one as well, the date of the filing of the Complaint.  So this one is more of a time frame issue I think than

J.R. 730

anything else.

MR. CRENNY:  Okay.  We will double check that.  I'm not sure if there's a time frame issue on this, but we will -- we understand your position on this one, that the only issue here is time frame?

MR. PLOTNICK:  Yeah.  I mean if you have none for the time frame, then you have none.  You know, but if, you know, it just limits it to the time frame I think.  Okay.

So document request number 10.

MR. CRENNY:  Mm-hmm.

MR. PLOTNICK:  Sorry.  I'm just flipping back and forth between screens.  Here we go. Documents and communications concerning any acquihire of, investment in or purchase, sale, transfer or acquisition of RC Security, Otter Audits or OtterSec, any ownership interest in RC Security, Otter Audits or OtterSec.

Flipping pages here.  Again, this is one where I think, again, sort of same series of objections that we have spoken about before, and

J.R. 731

there happens to be a specific objection.  I think that was -- Kevin, just for your information, too, I think there was the same objection in the previous request that we had talked about, and there was a time frame objection.

But in any event, I know you're talking it under advisement, but number 10 does specifically have this time frame objection in it as I'm looking at it, and, you know, again, this is a time frame issue as I see it because it says -- in your response to 10 it said that defendants RC Security and Otter Audits have no responsive documents, and otherwise you said that Robert Chen would make a good faith effort to locate and produce documents for OtterSec.

MR. CRENNY:  Okay.  So I think this one leaves us in the same spot as the previous of -- we're just talking about time frame?

MR. PLOTNICK:  Yes.

MR. CRENNY:  Okay.

MR. PLOTNICK:  And again, just high level, just to clarify for the record, I mean I think

J.R. 732

we'll come back because we do have some questions related to the protocol.  So I think there's potentially some issues there, too, related to the protocol, but we'll save that issue for a later point.  But, yes, fundamentally it is a time frame issue.  Okay.  So that's 10.

11 is -- 11 was the next one.  Documents, communications concerning efforts to raise money, funds or capital for RC Security, Otter Audits and OtterSec.  Looking at the objections again here just to refresh my memory on them from my notes.  This one looks like this is a time frame issue more than anything else here on this as well because again here you say defendants RC Security, Otter Audits have no responsive documents.  So again I think, Kevin, we're on the same issue here, too, with that one.

MR. CRENNY:  Okay.

MR. PLOTNICK:  The next one up that was the subject of our motion is 15:  Documents, communications concerning general ledgers, state and federal tax returns, financial statements.

J.R. 733

This is the financial stuff, right:  Loans,
expenses, payroll records, balance sheets, revenue
or income, cash flow, assets, liabilities and debt
schedules for the defendants and OtterSec.  And in
response in 15, again, similar series of
objections; entirely separate and distinct from
OtterSec, and the response -- this is -- this is
one where the response was limited to OtterSec,
but I know -- I think it was -- there was some of
your recent productions that you have produced
some of the stuff through 2022.  So I think this
is one where you have a --

        MR. CRENNY:  We have an update to make,
yeah.

        MR. PLOTNICK:  -- an update to make and,
but still, like, a time frame issue as well, and I
know -- I think I saw -- I mean I can pull it
up -- I think -- I mean you may know better.  I
mean I think I looked at what it was.  I know some
general ledgers were produced.  I think in the
more recent productions that just came through
within the last week or so -- I can't remember off

J.R. 734

the top of my head who they were for.  Yeah.  So I'm kind of looking at a summary that I have in here.  We got a balance sheet for RC Security, P&L for RC Security, a few other -- so I gather that essentially at least some responsive documents to this request had been produced.  The question is really sort of what it is, what hasn't been produced.  But it sounds like this one is sort of turning more into a time frame issue more than anything else.  Correct?

          MR. CRENNY:  Right.  I mean it's your issues.  So you tell me if there's something else, but my understanding is that we have given you the kinds of documents you've requested through 2022, and the remaining area of dispute is whether to give you those same kinds of things further into the future.

          You know, we don't think they're relevant even in 2022, but I think -- yeah.  I think -- are you telling me that the only issue is you want the same for farther, or is there something that you've not received that you're saying you think,

you know -- I think the question you asked me I think is a question for your side.  Maybe Alex can jump in a little.

MR. MALYSHEV:  Yeah, I had --

MR. PLOTNICK:  Yeah.  Go ahead, Alex.  Go ahead.

MR. MALYSHEV:  Yeah.  So I was going to ask, and this is relevant to some other issues that we'll get to later, but whether you were not objecting on the basis of this concerns Otter Audits, RC Security, because that is obviously relevant to our subpoena to Agassi, and I need to know what your position is with respect to documents.

MR. CRENNY:  We have -- sorry.  I'm not totally understanding what you're saying.

MR. PLOTNICK:  Let me take a step back and maybe I can --

MR. MALYSHEV:  Sure, yeah.

MR. PLOTNICK:  Yeah, I know what you're going at, Alex, because I was going to sort of ask the same question.  I mean I can see, right,

J.R. 736

Kevin, that certainly some documents responsive to this request apply to RC Security have been produced. So I guess the question really is in the first instance whether the objection that was in here that, and the limiting response saying we're only going to produce responsive info, responsive documents for OtterSec has been at least partially withdrawn such that the agreement here is to produce responsive documents for all of the defendants. Okay. So that's my question.

MR. CRENNY: No. We think they are only relevant if they concern OtterSec. We are producing things that are not relevant in our view in an effort at compromise and in good faith to try to resolve the number of things the court needs to decide, but we are not, you know, admitting that anything that is only related to the South Dakota companies is relevant. We do not think that stuff is relevant. We are just acting in good faith and trying to limit the scope of what the court needs to rule on.

MR. PLOTNICK: So that's what I'm trying

J.R. 737

to understand.  So -- well, so first of all, just to be clear, even to the extent the documents have been produced to some degree through 2022 we think they should be produced beyond '22 for the reasons that I think I've already articulated.

MR. CRENNY:  Sure, sure.

MR. PLOTNICK:  So you've got the time frame issue.  Yeah.  Separately, since you brought it up, what I'm trying to discern here is what sounds to me like a very sort of subjective criteria that the defendants are utilizing to produce documents, and that is this, what you just said, and that is, well, we're only producing them to the extent that they concern OtterSec, and that's where I'm struggling to sort of understand what that means, because the claim in the case, right, fundamentally or at least one of the claims in the case fundamentally is that Otter Audits and RC Security are OtterSec, that it's a continuation of the same business, that they are successors.

So what it sounds to me is that this is sort of a -- the same -- that you are in some way

J.R. 738

relying on a merits-based objection to producing documents that would otherwise be responsive to that request, and that's what I'm trying to understand.

MR. CRENNY:  No.  I think we're talking about the separate corporate entity.  We understand your argument that, you know, in really -- you know, we understand your position in your Complaint, but if OtterSec transferred something to these new entities and there's some, you know, record of it that says OtterSec on it, that is a document that RC Security might have that relates to OtterSec because OtterSec, says OtterSec on.  I'm making this up.  I don't know if there's something like that.  I'm just trying to provide an example.  You know, or if there are any transactions between the two companies, those are things that we agree are relevant because they relate to OtterSec.  They concern OtterSec.

I don't think -- I think concern is, like, a normal word to use in this sort of response in that it has plain normal meaning.

J.R. 739

We are talking about OtterSec, LLC, the entity that is in Wyoming. You know, we are not using it in a way that -- we understand what you're saying about continuation. We are not treating it that way. We are producing things that do not -- we are producing other things that we do not think are relevant that do not touch on OtterSec at all that come from the new company. So we are not conceding that those are relevant, and we don't think they are. I think this is stated pretty clearly in our --

MR. MALYSHEV: Let me ask a question.

MR. CRENNY: Sure, yeah.

MR. MALYSHEV: This is Alex. If I can ask a question. So let's say a tax return, right, which wouldn't identify necessarily information about, you know, specific counterpoints. What is your view on that? Is that responsive or not? Or is that produced or not?

MR. CRENNY: I could tell you we've produced some tax returns, but what -- is there a specific question? It's like a hypothetical.

J.R. 740

It's kind of hard --

MR. MALYSHEV: No. No, it's not a hypothetical. Do we have --

MR. CRENNY: That's what this -- yes, it is.

MR. MALYSHEV: -- loans, so financial statements, federal tax returns -- financial statements may or may not include specific information about parties and let you identify OtterSec or whether or not you're also including any documents in which a client that was previously a client of OtterSec produced. Do you have a list of clients that you're checking them against, or you're just checking against OtterSec?

MR. CRENNY: Sorry. Are we doing what?

MR. MALYSHEV: If you have a document, are you only checking whether or not it mentions OtterSec to determine whether it's related to OtterSec, or are you also checking against a list of clients of OtterSec that is known to you? Because that would capture documents in documents -- in document request number 15 which talks

J.R. 741

about, you know, a whole list of financial documents.  So I'm trying to understand how you're getting to determining whether something is related to OtterSec and you reviewed.

MR. CRENNY:  Yes.

MS. WHITE:  Can I just jump in?  This is Madelyn White, because if I'm understanding you, Kevin, this might kind of moot what Alex is saying.

So for request number 15, are you giving -- I understand your objections as to relevancy.  Have you produced profit and loss statements for RC Security or Otter Audits that don't mention OtterSec even though your position is that those are not relevant?  Have you produced them?

MR. CRENNY:  Yes, for 2022.  We have produced financial documents from these companies for 2022 regardless of whether the word OtterSec appears on them, regardless of whether they mention OtterSec.

MR. PLOTNICK:  I want to -- I don't --

J.R. 742

Steve Plotnick speaking here.  I don't -- we're trying to really understand -- right -- so -- okay.  So to the extent an RC Security or Otter Audits document specifically mentions, uses the word OtterSec, right, through 2022, those documents are being produced, right?  And -- right, Kevin?

MR. CRENNY:  Yeah, for any time.  For any time that specifically mentions it.

MR. PLOTNICK:  Or, well -- through -- I would say through March -- when we say anytime, through March of 2022, right, because this is the time --

MR. CRENNY:  Right.

MR. PLOTNICK:  So, and then separately there is this other criteria that you've mentioned -- you had mentioned it in your opposition to our motion, and the way I think it was phrased was to the extent they mention OtterSec or concern OtterSec, and I think that's what we're trying to understand, what is different between those two, and how is it that you're making a determination

J.R. 743

that a document concerns, quote, unquote, OtterSec?  Because sort of utilizing Alex's example, I mean it just sounds to me that this is fundamentally related to the merits-based argument that these are separate entities, that they're not the successors to OtterSec, which is, you know, a key issue in the case.

So if you have P&Ls or general ledgers or whatever it may be, some sort of financial document that would otherwise be responsive to this request, I mean I think fundamentally those types of documents go directly to that question, whether or not they specifically mention OtterSec, and to use Alex's example, right, it's a customer or a former customer, right, of OtterSec.  Doesn't -- it's not mentioning OtterSec, but if that's a former customer that is responsible for generating revenue for OtterSec and RC Security --

MR. CRENNY:  Well, you have the customers up through the date of the Complaint.

MR. PLOTNICK:  But the financial --

MR. CRENNY:  I mean is this a time frame

J.R. 744

issue?  I understand you're raising this other hypothetical, but is there really anything that's not settled by if we just discuss and figure out a time frame answer?

MR. PLOTNICK:  Well, I don't think so, not without having an understanding of what that criteria is that you're utilizing to say -- right -- saying something mentions OtterSec is objective, right?  It's black and white.  Either it mentions OtterSec or it doesn't.  So that's easy, right?  You run a search term, say it doesn't say OtterSec in it, we'll produce it to you.

MR. CRENNY:  Mm-hmm.

MR. PLOTNICK:  But the question is how are you making determinations about whether or not the documents concern OtterSec?  Because what I'm trying to say, Kevin, is how are we slicing that up?  Because fundamentally the claim in the case is that RC Security and Otter Audits are a continuation of the same business, that they are OtterSec.

J.R. 745

So I think in our view all of this stuff, and I think you're saying that you have not produced everything that would be responsive to this request if it didn't sort of fall within that criteria, but you've -- you have -- are you -- you meaning the defendants -- utilizing some sort of criteria to make determinations as to what to produce and what not to produce, and, again, I think our view is that all of this concerns OtterSec because our claim is that they are OtterSec, but it sounds like you have withheld some responsive documents on the basis of what we consider to be an argument that goes to the merits of the case that will be determined by the fact finder, and that is:  Are they, in fact, the same business?  So that's what we're trying to get to here.

MR. CRENNY:  Yeah.  I mean I see what you're saying.  I think this request is very broad.  You know, is there a way we could work out a compromise of, like, financial information, you know, the financial information of the kind we've

J.R. 746

given you, if we discuss the time period on that, does that solve this other issue that you're raising?  I think maybe we have just discussed this request enough, and we've gotten clarity on your position.  You know, I understand what you're saying more than I did at the start of the conversation from the briefing we had done.  So that's good, but, you know, if that could be -- that's where we got on this one for today, that would be productive.  So maybe if we want to come back to it or maybe -- like, what do you see as a possible way of compromising on this one in a way that could, you know, hypothetically could resolve this in a way that's manageable?  I don't know if you have any thoughts on that.  Sorry.  That was like two different things.

MR. PLOTNICK:  Yeah.  I mean I don't think that there should be this sort of subjective criteria that is not in any way transparent with us as to how these determinations are being made.  So I mean to the extent that you are withholding really any responsive documents to this request,

J.R. 747

be it, you know, financial statements, P&L, whatever it may be, payroll records, right, all that stuff, that are RC Security and Otter Audits documents, we think that they should be produced. Yes, there's a time frame issue on it, but I mean part of it goes to the question I would sort of put over to you in terms of like a compromise. I mean I don't think it's that broad. I mean it certainly covers a lot of categories of information, but, you know, when you're talking about, you know, basically financial statements, general ledgers, P&L, I mean those are, you know, specific identifiable, you know, categories of documents that we're talking about.

If some categories of documents don't exist, well, then, then they don't exist. Obviously they wouldn't be produced, but I think what I heard from you is that documents that would be responsive to this request are being withheld on the basis of this criteria that we don't quite understand what it is or how determinations are being made, and that's what we consider to be

J.R. 748

problematic.

MR. CRENNY:  Okay.  I think we've -- sorry.  Alex, you want to say -- go ahead.

MR. MALYSHEV:  Yeah.  Quick question.  Is your issue with the fact that it's asking for documents and communications?  Because I think the list of documents actually is trying to define that.  Is your issue communications or the actual, you know, document for document for each defendant for a period of three years?

MR. CRENNY:  I don't have an answer to that off the top of my head right now.  I think we've gotten your clarification on your position. I think we discussed this one.  We'll come back. I want to just clarify two things for the record. One being I don't think that the concerns OtterSec phrasing is particularly subjective or confusing. I don't think it's that different from, like, relevance.  You know, if you're trying to decide if something's relevant, we're all reading these Discord conversations and deciding if it's relevant, and that's not exactly, you know, a word

J.R. 749

search and is the word there or not.  But that's not unacceptably subjective.  I don't think our concerns OtterSec thing is that -- the phrasing there is that subjective in the way that you're suggesting.

We can discuss it further next week.  I don't think going in circles on this one is super-productive at this point.  I just wanted to state that for the record.

Also I just want to clarify for the record to the extent that I've said at any point something like, quote, "there's a date range issue," quote, I mean the dispute is over the date range.  I'm not conceding that we have an issue with as we've done something wrong or that a longer date range would be appropriate.  So I just wanted to clarify those two points.

MR. PLOTNICK:  No.  Thanks, Kevin.  So I'm looking at my watch here.  It's 12:00, and I'm fine with sort of turning over to your stuff.  I mean there's a few more that we have to go to, but I do think it would be a good idea if we sort of

J.R. 750

put our pencils down maybe on this and turn to some of your stuff because to the extent that there is anything that we need to kind of go through ahead of the next meet and confer, you know, at a high level, I want to make sure that we have enough time to do that.  So should we turn over to some of your motion to compel maybe is the best place to go to?

MR. CRENNY:  I think we should keep going on yours while we're this deep into it, and then we'll get as far as we can on yours and we'll try to highlight the things that we think we need a response for if we're short on time, rather than have --

(Overlapping speakers/crosstalk).

MR. CRENNY:  -- stuff that we didn't touch on yours.  But I would --

MR. PLOTNICK:  Me neither.  Let's do this. Let me make a suggestion.

MR. CRENNY:  I would request a five-minute break right now to --

MR. PLOTNICK:  Why don't we do this.

J.R. 751

Kevin, let me make a suggestion because I do think we should get to some of yours today.  Let's -- I'll follow -- let's finish up -- let's at least finish going through our document requests, right, and we'll sort of put our pencils down on the document requests at that point and turn to your stuff, and then we can, you know -- the interrogatories are sort of separate issues, and we'll at least put our pencil there, but I do want to make some time to turn to your stuff, too.  So why don't we do that.  Do you want to take like, take like five, ten minutes or so and come back?

MR. CRENNY:  Yeah.  Let's take five minutes, and I will -- let me just confer with Josh and Rachel on that idea of stopping after your document requests and leaving interrogatories, see if they feel -- and you can check with Madelyn and Alex as well, and then we'll come up with a plan when we get back from five minutes.

MR. PLOTNICK:  Yeah.  Sounds good.  Thanks.

J.R. 752

(A recess was taken.)

MR. PLOTNICK:  Okay.  So we were on 15, right?  So just -- just thinking about one of the things that you had -- Steve Plotnick speaking for the record.  I just want to clarify, because I had asked Kevin about -- so talking to our document request number 15 which was for the general ledger, the federal tax returns, the state tax returns, financial statements, et cetera.  I just -- am I -- I had asked whether or not you were withdrawing the objection, the objection based on the argument that these entities are separate and distinct entities, if that objection was being withdrawn at least through the end of 2022.  I think you said no.  So do I take it from that that there are documents that would otherwise be responsive to request number 15 even through the end of 2022 that have been withheld or have not been produced?

MR. CRENNY:  I'm not sure I understand -- understood the question up to the last sentence or two.  We are not withdrawing our relevance

J.R. 753

objection for documents that do not, you know, mention or concern OtterSec. We are not withdrawing it through the end of '22, notwithstanding the fact that we've produced some documents in an effort at compromising and narrowing issues for the court. We are still drawing the line where we have drawn it for purposes of relevance or with respect to relevance. Does that answer your question?

MR. PLOTNICK: Partially. Okay. So the objection was not withdrawn -- is not withdrawn. So am I correct then through the end of 2022 then, therefore, if the objection is not being withdrawn, that there are documents that are responsive to document request number 15 that have been withheld on the basis of that objection?

MR. CRENNY: Well, we produced those. We've produced the ones for 2022. So I think, no, there are none being withheld on that point because we've produced them, even though we're standing on the objection, even though we're not conceding the objection.

J.R. 754

MR. PLOTNICK:  Okay.  So -- so what you -- okay.  So just to be clear, any documents that you have, notwithstanding the fact that you're not -- well, so you're -- you're keeping the objection, but you're saying notwithstanding that objection you are still producing all documents I guess that you have, right, that would be responsive to request number 15 through the end of 2022.

MR. CRENNY:  That sounds correct to me, if I'm understanding what you're saying correctly, but we can get back to you to verify that if you want, you know, to make sure we're being precise there.

MR. PLOTNICK:  Yeah.  That would be helpful because it's not -- it's not clear, because, again --

MR. CRENNY:  I think I'm giving you the right answer, but just because it's a complicated question with different clauses and qualifiers, I would like to look at it in writing and then respond in writing.  That might be helpful for everybody.

J.R. 755

MR. PLOTNICK:  Yeah.  That would be helpful.  Because, again, I'm -- I want to kind of come back to the question that we were talking about, and that is, you know, the -- I understand your position that it's a valid objection to say that you'll only produce them to the extent that they concern OtterSec, but I guess the fact that you are at least maintaining that objection, still I'm trying to discern whether or not anything is being withheld on that basis obviously still.  You have to check, you have to check.

But I'm still trying to understand and just sort of ask if you could sort of explain to me what it means.  So you're looking at documents and you're reviewing documents.  What criteria are you utilize -- again, like I said, saying whether or not a document mentions OtterSec is -- that's black and white.  It either says the word OtterSec in it or it doesn't.  But then separately there's what I consider to be a little bit more subjective and certainly more vague an objection that says, well, and also, right, to the extent that they

concern OtterSec, we'll produce them.  So the question is:  How are you determining -- if you have a document that is otherwise responsive, say, to request number 15, okay, that doesn't utilize the word OtterSec, what criteria are you utilizing to say this either does or does not, quote, unquote, concern OtterSec?

MR. CRENNY:  Yeah.  Steve, I think we're going in circles on this.  I think we understand what you're saying.  We understood -- we understand Alex's point about, you know, a customer, his hypothetical.  I think we don't agree that we're applying a subjective criteria, if that's a word.

We think what we're doing is appropriate.  We understand what your question is and what you're saying.  We will take your question and concern under advisement, and we'll see if we have any further clarification to make on what, to answer it next week, but I think -- I don't think I'm going to give you a better answer today in this meeting as I think we've said what we can say

J.R. 757

right now.  I don't know.  I just feel like we're going in circles on the same point.

MR. PLOTNICK:  Okay.  All right.  So then I guess we'll move on to the next document request which is number 16.  Documents and communications concerning any accounts or joint accounts, open, closed, or maintained by or for the benefit or use of RC Security, Otter Audits and OtterSec with any -- and we could talk about I think 16 and 17 together because, if you're open to that, because one concerns, you know, traditional banking institutions, and then 17 effectively calls for, you know, the same type of request for a, you know, a defi -- decentralized finance institution, a crypto type of exchange, and those both called for -- both of those, 16 and 17, sought for RC Security, Otter Audits and OtterSec.  Both had sort of the similar objections that RC Security are separate entities and Otter Audits are separate entities, and the response to both requests was limited to OtterSec.

You know, again, this goes to a number of

J.R. 758

issues.  I mean there are -- there are transactions.  There's obviously the Mercury account.  There are transactions between the entities that we can see in the Mercury account statements that have been produced.

MR. CRENNY:  But you have them.  I mean that's stuff you have, so --

MR. PLOTNICK:  Right.  And for that I'm sort of looking -- so I think this is another one probably where the written responses may need to be revised.  But I know you gave us -- I disagree that we have all of that stuff.  I think we have some of that stuff.

MR. CRENNY:  No.  I'm saying you have the stuff where you're saying, you know, there's this transaction in the Mercury bank account.  That's also something you're looking at.  So you have that one.

MR. PLOTNICK:  Right.  So there's the Mercury bank account.  We have that, and we have that through the end of 2022 though only, correct?

MR. CRENNY:  That's correct.

J.R. 759

MR. PLOTNICK: Right. So, again, this is another situation where we would be looking to go certainly beyond 2022. I mean even looking at Mercury bank account statements as late as 2024, I mean I was looking yesterday, I think it was the April 2024 Mercury statement there were -- there continue to be ongoing transactions in that Mercury account as recent in that where we see transfers of funds. I think the one that I'm thinking of specifically from April 2024 was a transfer to Robert Chen.

But again, again, I don't want to sort of confine this specifically to Mercury. I mean what we know of is certainly there was the Mercury. We know that there were, you know, wallets, digital wallets that were utilized by OtterSec. We could see transactions kind of going out of the account, but, of course, that either goes out onto an exchange or to another wallet. We can't know specifically in the case of a digital wallet who owns the wallet. We can only see the descriptive hash, the number/letter sequence that goes with

J.R. 760

that.

We also, although we have -- although we have received some -- we know that OtterSec had an FTX account.  We're also aware of the fact that Robert Chen has, in fact -- he filed the claim on behalf of OtterSec and I think it was Otter Audits in the FTX bankruptcy.  It's a public document.  It's been filed.  But we haven't received much in the way of, you know, the documentation at least that would be responsive to 16 or 17 with respect to the FTX account and what happened with respect to those accounts.

So, you know, I think this is one that, you know, the question becomes -- it's sort of both a what has and has not been produced, what has been withheld on the basis of these objections.

I mean, again, I realize some stuff has been produced, but that's to my point with respect to the FTX accounts or any other institutions where they might have maintained -- RC Security and Otter Audits is the they in that sentence --

J.R. 761

wherever else they might have, you know, maintained accounts as well.

MR. CRENNY:  So I'm just looking.  We produced OtterSec documents sufficient to show accounts.  I'm looking at your objections.  Did you object that we didn't produce one sufficient to show, or did you challenge that, that we didn't?

MR. PLOTNICK:  Which?  This was the -- yes.  Both requests 16 and 17 --

MR. CRENNY:  16 and 17, correct.

MR. PLOTNICK:  Yeah, we're -- if you say -- yeah.  By objection you mean were they the subject of our motion to compel --

MR. CRENNY:  Yeah.  That's what I mean. I'm trying to --

MR. PLOTNICK:  Yes.  Yes.

MR. CRENNY:  So I think what -- we'll review your position and take it under advisement. We'll consider it.  I'm not sure if there's another specific question beyond that that I can answer right now.

J.R. 762

And clearly FTX I don't think exists anymore, and we can't get any records there, I don't believe but --

MR. PLOTNICK:  Well, yes, FTX certainly filed for bankruptcy.  That was in November of 2022.  You can absolutely get account statements from them, and that can -- those can be -- those could be obtained to the extent that you have them.  This is more of a search protocol issue, but it doesn't appear that you had searched for them because I think FTX was -- FTX and I think their US-based entity came from -- like the statements came from an entity by the name of, like, West Realm Shire Services, I think is the name of the entity as well, but those don't appear to have been searched for also separately.

Now, again, whether that's because it's on the basis of your objections or not I don't know.  That's a better question for you.  But those types of documents for that account we have not seen.  But there's a website where you can obtain your account statements for FTX.  Those can be

J.R. 763

obtained, to the extent they already have them in their own records.  I don't know off the top of my head how they would have been delivered the account statements, like whether they were sent to e-mails or someplace else.

MR. LEVY:  Steve, thank you for clarifying what exactly plaintiff wants from RFPs 16 and 17. Now that we have that clarification we'll get back to you on the next meet and confer.

MR. PLOTNICK:  Yeah.  I mean this has been the subject of -- I mean this was the subject -- you didn't consider any of this ahead of the meet and confer today?  I mean these were the subject of the motion.  I'm really not raising anything that wasn't already the subject of our motion to compel.

MR. CRENNY:  I think you're being much more specific in a helpful way today than the motion to compel was, and we have a clearer understanding than we did from the briefing.  You know, I mean your motion to compel is -- it's not as long as ours.  I think it's a little less

J.R. 764

detailed and organized differently.  If you want to point out where in your motion to compel you were talking about the FTX account statements.  I don't recall that level of detail.

So, yeah, I think we needed -- we were hoping to use today to get clarification on your position which is something that the judge said. I remember her going through the notices, and I remember we had said -- Judge Simms said, like, where we had said "We don't understand their position," Judge Simms said, "Okay.  Well, it will be on the record and we'll be clear on it now because we're going to do it in front of a court reporter."  So I think that's part of the process is us understanding it better.

MR. PLOTNICK:  Yeah.  FTX, I don't think we mentioned FTX specifically, but, you know, again, like I said, at a higher level I mean part of this is also, you know, 16 and 17, I think, you know, 18 also, too, is more generally, you know, the question of producing, you know, account documents, statements, et cetera, for more broadly

J.R. 765

RC Security and Otter Audits which was specifically the subject of our motion to compel that was in there.  That's why I raised that.  I was I was at least hoping to have some level of answer today, but if you don't have an answer, you don't have an answer.

MR. CRENNY:  I mean I think we said we'd produce documents sufficient to show, and I did not understand your motion to be saying you want all of the account documents, not just documents sufficient to show.  So that is news to us I think that we can take under advisement and try to get back to you.  But, no, we did not understand that to be your argument previously.

MR. PLOTNICK:  Okay.  18 is actually also -- and I should have looped 18 in with 16 and 17 because that's also going to the, you know, as opposed to, you know, account maintained with a defi institution like a coin base or something like that.  18 just goes to, you know, the digital wallets that were utilized by -- well, as I understand the objection I think -- and I think

J.R. 766

you had provided to us in your interrogatory responses the digital wallets utilized by OtterSec.  I think the question here is the RC Security and Otter Audits digital wallets.

MR. CRENNY:  I think we understand you on that one.

MR. PLOTNICK:  Okay.  And that's another one that you don't have an answer for today?

MR. CRENNY:  That's correct.  That's what, you know -- we're getting all -- we want to understand everything that you're looking for, and then we can come back with, you know, proposals and stuff on some of these, but that one -- that -- you know, there I understand from your briefing, yeah, you wanted the other wallet, whereas the other ones I didn't know that you wanted more accounts.  Or no, you're not saying you wanted more accounts.  You're saying you wanted more account documents, which is different than this one, which I did understand you wanted the Otter Audits and RC Security ones.

So, yeah, we're reading what you're

J.R. 767

sending us, and we're trying to do our best to understand and figure out where we can compromise, but there's some parts we just didn't realize, didn't know.

MR. PLOTNICK:  All right.  So that's -- I think that covers 16, 17 and 18 together.

MR. CRENNY:  Yes.

MR. PLOTNICK:  And there, again, I think you have similar -- the question also -- again, I think it's true with most of these, although I will just add into this that when there are sort of specific instances, if there are ways to limit time frames, we're happy to hear your proposal on that point if it makes sense to us, but I think for a lot of these I think time frame is an overarching issue with all of them.

So number 19 is -- 19 I think we covered before, right?  That's the customers and clients?

MR. CRENNY:  We definitely talked about it.  Yeah.  I think we're good.  I think we understand -- we at least understand each other on that one.

MR. PLOTNICK:  Yeah.  That sounds like Josh.  Did you have something to add there, Josh? I don't want to --

MR. LEVY:  No.  Just saying yes, 19, we definitely covered.

MR. PLOTNICK:  Yeah.  19 I think we covered.  Okay.  Yeah.  So, yeah, 20 is the W-2s, the 1099s, K-1s.  K-1 is maybe a little bit different than the others.  I mean K-1 largely will deal with, you know, I think a lot of it has to do with -- it's the ownership question.  You know, what a K-1 would typically show you: Ownership, capital, distributions to members as well as -- and then you have W-2s and 1099s, again, which is going to -- I think, again, the idea with asking for W-2s and the 1099s is going to a few things.  It's potentially damages question, but at bottom I think what we're really looking to do there on the W-2s and the 1099s is to have information that would cover, you know, give us information sufficient to show who all of the employees and who all of the, you know, any

J.R. 769

independent contractor was who worked for, you know, OtterSec, RC Security, Otter Audits primarily.

MR. CRENNY:  Yeah.  And this is one we need to update to reflect that we've given you 2022 material.

MR. PLOTNICK:  Right, right, which would limit it to the time frame, the time frame scope question.

MR. CRENNY:  Yeah.  I think that's the area of dispute here.

MR. PLOTNICK:  Yep.

MR. CRENNY:  Okay.  I think that's it for 20?

MR. PLOTNICK:  Yeah.  20 -- okay.  So 21 called for documents, communications concerning the ownership interest, financial interests or rights of Robert Chen, Sam Chen, plaintiff, the estate or David Chen in or to RC Security, Otter Audits and OtterSec.  Let me just take a quick look, and this is -- yeah.  So this is another one where the response was limited only to OtterSec,

but -- I mean if there are none, there are none, but, you know, the question is, you know, are there documents or communications, you know, concerning, you know, ownership interest, financial interest, rights in these other entities as well.

MR. CRENNY:  Yeah.  I think we'll -- we understand, and we'll take it under advisement.

Rachel, if you want to jump in with anything on this one.

MS. CLATTENBURG:  I just think if you want to just explain the relevance of some of this stuff for the other entities?

MR. PLOTNICK:  Sure.  To the extent there was a discussion taking place, you know, a non-privileged discussion, about rights that -- well, I think -- look, to break it down into sort of two categories.  One is who the sort of existing owner of these entities are, right. That's Robert, and what the nature of his financial interest is in these entities.

Then separately you might have also,

J.R. 771

right, to the extent that there is a discussion, about ownership rights, claims, right, to ownership interests in these entities that Sam Chen might have or claims by the estate, right, or David Chen, for that matter, that's what we're looking for.  So the relevance is the discussion which is the, I think one of the central issues in the case, and that is, is that we should have an ownership interest in these entities because they are the same as OtterSec.

So there could be admissions in there. There could be discussions generally about rights that they would have in those entities.

MS. CLATTENBURG:  I don't think we have anything more on that.  Do you, Kevin?

MR. CRENNY:  Yeah.  No, I don't --

MS. CLATTENBURG:  I don't think any of this exists.  I don't think we have anything more on this request right now.

MR. PLOTNICK:  When you say you don't think you have anything more, meaning you don't have any more documents or you don't have anything

J.R. 772

more, meaning more to add?

MS. CLATTENBURG:  I don't have anything more to add right now.

MR. PLOTNICK:  Yeah.  Okay.  That's what I thought you meant.

MR. CRENNY:  Yeah.

MR. PLOTNICK:  Okay.  And then document request number 22 which is -- yes.  It is the last one that was the subject of our motion to compel, which is documents and communications concerning any business plans, opportunities or strategies for RC Security, Otter Audits and OtterSec.  Let me turn over to your objections to that.  Yeah.

So the same series of objections, and the response was limited to producing documents for OtterSec.  I mean, you know, again, to explain the relevance of that request.  I mean, again, fundamentally it's -- it's looking not just for OtterSec but, you know, what the nature of the business is of Otter Audits and RC Security.

So it's -- again, this is going to the, the fundamentally the successor claim, the

J.R. 773

declaratory judgment claim. I think it does also have a relationship claim as well or is relevant to things like the breach of fiduciary duty claim as well in the case. And, you know, so we're looking for, you know, what the nature of RC Security's business is, what the nature of Otter Audits' business is, what the business, right, that's kind of coming forward in plans as well as when those plans were being put together I think is also just as relevant as well.

MR. CRENNY: Okay. Thank you. I don't think we have anything to add on that one. You know, some of these required more explaining than others, but we kind of want to get a sense of all of them before we start figuring out how we're going to narrow things. So we have nothing to add to our objections there, yeah.

MR. PLOTNICK: Okay. So now we're at the interrogatories. Do you want to keep -- do you want to finish up with the interrogatories, or do you want to turn to yours and put them on --

MR. CRENNY: Yeah. I think we like the

J.R. 774

plan of turning to ours at this point, if that
works.

MR. PLOTNICK:  Yeah, it does.  Either way.
I offered -- I offered it.  So, you know, that's
certainly fine.  So we'll turn to your motion to
compel.

MR. CRENNY:  Sure.  So -- yeah.  The
first -- we thought it made sense to talk about
our first motion to compel directed at the
plaintiff, not the one that's David --

MR. PLOTNICK:  Yeah.

MR. CRENNY:  -- first.  So we have this
broken up into a number of topics.  There's a
couple rogs or RFPs that hit on multiple topics,
but I think topic by topic will make sense here.
That's kind of how we've organized our briefing to
date.

So tell me if you're confused, but here's
what -- I'm going to present it the way we had it.

MR. PLOTNICK:  Sure.

MR. CRENNY:  So the first thing is the
plaintiff's, her responsibility for and possession

J.R. 775

of David's documents and information.  This relates to rogs 6, 7, 11 and 14 where she's objected that those, and all the RFPs where she's objected that they seek information not within her possession and, you know, the same, the document productions and documents not being in her possession.

Our position, which we've laid out in the briefing, is that she clearly has control of the documents.  You know, she's relied on them for his Complaint.  She's produced them to date.  She is, therefore, treated as having possession, custody or control of them.  She's, you know, using them to respond to things.  She's using them to put the Complaint together.  Her attorneys at the very least have them.

MS. WHITE:  Sorry, Kevin.  This is Madelyn White.  I'm going to just kind of cut you off just in the interest of time --

MR. CRENNY:  Okay.

MS. WHITE:  -- because I think our objections to those that you mentioned were based

J.R. 776

on the relevancy.  I mean we are asserting an objection that, you know, you're requesting things that aren't in her possession, custody or control just to preserve that objection because these are documents you're requesting that are really in David's possession, custody and control, not the plaintiff's.  But we are not withholding documents that -- or information that you've directed to the plaintiff on the basis that those are in David's possession, custody or control.

So to the extent we're withholding information or documents, it's on the basis of other objections, not that they are in David's custody, not the plaintiff's.

MR. CRENNY:  Yeah.  We appreciate that you are not withholding, and thank you for that.  I think we do still feel that this objection is improper and should be withdrawn because, you know, as a matter of law, she does control them and is responsible for them, and we need to have the lines of authority clear for the court, especially with the potential spoliation issues in

J.R. 777

this case.

You know, under Rule 34 she has the right, authority or practical ability to obtain the documents from a nonparty, which is her reasonably minor son, now 18, who, you know, lives in the house and whose documents she is using and who her lawyers are using to make this case.

So we think it's improper to be objecting that she doesn't control them even if it's not a basis for withholding.

MS. WHITE:  So we're not -- I mean we'll have to think about that, but sitting here today we're not prepared to withdraw that objection. David is not a minor anymore.  He is 18 now.  He is, you know, his own independent person.  He is voluntarily giving them to, you know, his mother for purposes of this litigation, but were he to suddenly refuse, I don't think she has the ability to obtain them.  She can't -- you know, she doesn't have legal control over David or his documents.

So I don't think we're willing to withdraw

J.R. 778

that objection.  But as I said, we weren't withholding based on that objection.  We were withholding based on other objections, and we have reconsidered those other objections.

MR. CRENNY:  Okay.  I mean I think -- his minor status is I don't think really, like, legally relevant here.  I think there's case law in our memos, like Beneseck versus Limone that says, you know, the question is whether the parties have the legal right to obtain the documents and whether they practically have the -- sorry -- have the practical ability to obtain the documents from another, regardless of whether they're legally entitled to it.  I misspoke at the beginning of that quote, so I'll just take it again.

The courts have sometimes interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of the legal entitlement to the documents.

There's other case law saying -- this is a

J.R. 779

Supreme Court case that says a party clearly cannot refuse to answer interrogatories on the ground that the information sought is solely within the knowledge of his attorney.  That's Hickman versus Taylor.  I think the information from David is in her practical ability to obtain under the case law we've cited and the rules we've cited, and she is responsible for and it's improper for her to say otherwise.

You know, it seems like the documents have already been collected and are now in her attorney's possession at the very least.

She through, at least through her counsel, has been accessing his documents.  It seems like she has the practical ability to obtain them regardless of whether David changes his mind later.

MS. WHITE:  We will --

MR. PLOTNICK:  I think just to -- yeah, just to interject, I think, Kevin, sort of I hear you, but I think even in the case law that you're citing I think the answer I think, which is what

J.R. 780

Madelyn just is -- we're not withholding any documents on the basis of an objection for possession, custody and control. So if your question is just sort of simply will we withdraw the objection? I mean it's -- nothing has been withheld -- yeah. Nothing has been withheld on that basis I guess is unequivocally the answer.

MR. CRENNY: No. We hear that. We've heard that -- you've said that before, but I think it is an issue that needs to go to the court if it's not being withdrawn.

You know, we have the spoliation issue and, like, who's responsible for the fact that David deleted Discord messages, and who's responsible for if something happened to their phone, if that's what we hear from Tealtech. We have these spoliation issues that we need -- that we think the plaintiff is responsible for.

So, and it's an issue that's going to have to go to the court at some point if these are not being withdrawn.

MS. WHITE: We will consider what -- you

J.R. 781

know, we'll take under advisement under your position.  We will think about it and get back to you on it.  But as of now we are not withdrawing that objection.  Just kind of, you know, so we'll think about that and get back to you at the next meet and confer.  I can tell you right now though, like I said, we're not withholding documents based on that objection.  We were withholding documents based on other objections, primarily relevancy, and we have, you know, prior to this call in an effort to compromise and move things along discussed, you know, whether or not we would withdraw other objections.

So for the three requests that you mention maybe it makes sense for me to tell you, you know, our revised position that we would then, you know, follow up with a revised interrogatory response.

MR. CRENNY:  Yeah.  Let me -- I'll -- I think we're wrapping up discussion on this first topic of mine, and I understand that these ones touch on a couple different topics.  But we appreciate that you are not withholding based on

J.R. 782

this, her control of the documents thing.

Unfortunately, I don't think that gets us anywhere

because of the spoliation issue.  So I don't think

that really helps in the end, but it's good to

hear that there's other, you know, basis for

withholding that we are going to be able to reach

some agreement on.

I think -- I think you understand our

position on the first one, and we can, you know --

you'll take it under advisement is what it sounds

like, which, you know, fair.  That's why we do it

on your side, too.

I think we can move on to the next thing,

if that's okay with you, with the understanding

that this one is still something we are concerned

about, this control issue.

MS. WHITE:  That's fine.  I mean do you

want to keep discussing those three

interrogatory -- I guess I'm a little --

MR. CRENNY:  Yeah.  So I have them -- so

it's, what, 6, 7, 11, 14?  I have 6, 7 and 14

together in the next topic I want to talk about,

J.R. 783

and then I have 11 on its own later.  So I'll come back to 11, so if that makes sense, because we had objected to them on -- you know, the objections were different.

So the next thing I wanted to talk about is -- I'll just give you a preview of the structure.  The next thing I want to talk about was the information concerning David's revenues, which is rogs 6, 7 and 14 touch on that, along with RFPs 7, 8 and 9, and then the issue for rog 11 was the multiple parts thing which I had structured somewhere -- I was going to -- you know, that's the next one after that, and the references to improper sources of information issue also is in 11.

What do you -- what do you think for talking about -- I don't know what you're planning on suggesting, so --

MS. WHITE:  I think --

MR. CRENNY:  -- David's revenue, we could do that next.

MS. WHITE:  Just like with our requests to

J.R. 784

you, I felt it was the most productive when we went through them request by request.

MR. CRENNY:  Okay.  Yeah.  I can pull them up that way.  Okay.  So you want to talk about --

MR. MALYSHEV:  Do the want to do the document requests first since there's a few of them?  I think we only have disputes about three of them.  Did you want to do the document requests and then do interrogatories or keep the interrogatories separate?

MR. CRENNY:  Yeah.  I think we have three of them with the, you know, asterisk of plaintiff's control of David's documents is an overarching one on all the document requests, but yeah, we can do the document requests first.  That sounds fine to me.  So it's 7 -- 7, 8 and 9, right?

MS. WHITE:  Yes.

MR. CRENNY:  Okay.

MS. WHITE:  So I can say, I mean, again, we're not withdrawing our objections based on, you know, possession, custody or control.  We were

J.R. 785

withholding documents to request number 7 primarily on the basis of relevancy.  We continue to think that those documents are not relevance, you know, when we're talking about this case in isolation, not with the other case, but we are willing, notwithstanding that objection, to produce responsive documents to your request number 7.

MR. CRENNY:  Okay.  So -- okay.  So you're withdrawing the -- sorry.  You're not withdrawing, but you're going to -- so you had said -- yeah, sorry.  Your last sentence here is plaintiff will make a good faith effort -- I'm looking at the response -- to locate and produce communications concerning, and then how are you I guess amending this?  Is that a helpful way to do it?

MS. WHITE:  Yeah.  Give me one second to pull it up.

MR. CRENNY:  Because there was some stuff you were already producing here.  So I guess you're -- it sounds like you're broadening it here, and I just want to make sure I understand

J.R. 786

exactly how.

MS. WHITE:  I would say just notwithstanding and without waiving these objections and subject to plaintiff's general responses and objections, plaintiff will make a good faith effort to locate and produce responsive documents.  We're dropping the qualifications --

MR. CRENNY:  Okay.  So --

MS. WHITE:  -- for request number 7.

MR. CRENNY:  Yeah, yeah, yeah.  So the most important of them being I think that we had said we wanted communications about the personal code and other property, and you had limited it to David Chen's removal of the personal code and other property, but you're now, you know, going with our phrasing, it sounds like.  I think that's the most significance of these, but tell me.

MR. PLOTNICK:  Kevin, we could give you -- I think we talked about --

MR. CRENNY:  We can do all that in a subsequent phone call.  That's great.

MR. PLOTNICK:  Yeah.  We'll need to amend

J.R. 787

it, but I think the --

MR. CRENNY:  Sure.

MR. PLOTNICK:  -- I think the spirit of this is, yes, we will not -- we will not so limit it that it would be expanded to provide responsive documents across the board.

MR. CRENNY:  Okay.  Thank you.  Appreciate that.  Okay.  So then you want to go on to 8?

MS. WHITE:  Yeah.

MR. CRENNY:  So 8 was copies of David's federal and state tax returns.

MS. WHITE:  So subject to our objections we will produce copies of David's 2022 and 2023 federal and state tax returns.

MR. CRENNY:  Okay.  Easy.  We appreciate that.  Thank you.  9, documents sufficient to identify David Chen's work and all his sources of income through April 22nd, 2022 through March 31, 2023.

MS. WHITE:  For that one we are willing to amend our response to produce documents related to the personal code and other property that's

J.R. 788

referenced in the Complaint, but we are not willing to provide documents related to other work or other sources of income that David might have unrelated to that code and personal property because we don't see how it's relevant.  I mean we're open to listening to an explanation that you have, but that's our revised position there.

MR. CRENNY:  Okay.  Sorry.  I'm just reading over.

MR. PLOTNICK:  Yeah.  I think as we understand that this was -- most of these requests were sort of focused on this defense related to the code and the money earned from the code.  So we hear you on that.  You know, as we said with the other requests, we're, you know, looking for the communication; we'll search for that stuff and produce it.

And the -- and this one -- this request number 9, is broader than that, right.  It looks like it's -- I'm just, you know -- if he worked at Foot Locker -- I mean he didn't -- he didn't, but I'm just using that as an example jokingly.

J.R. 789

MR. CRENNY:  Yeah.

MR. PLOTNICK:  But, you know, I guess the question is:  Are you looking for that?  You know, why?  You know, sort of -- certainly willing to hear from you if you're looking for more than just, you know, revenue or income from -- from code.

MR. CRENNY:  Okay.  I think -- I think we very much appreciate what you're offering here.  I think we -- I think we can probably get back to you confirming whether that satisfies it or whether we still have concerns there next week after we've all kind of conferred a little bit. It's just hard for me to, you know, for the whole team say on the fly whether that settles it or whether we still have questions with it.

MR. PLOTNICK:  Okay.

MR. CRENNY:  Okay.  So that was -- that's 7, 8 and 9.  Let me just look at my outline if I had anything else on those.  No.  Okay.  I think -- okay.  So that's all the RFPs.

So then going on to the interrogatories.

J.R. 790

We have -- so for 2, 5, 9, 10, 11 and 12 we had the issue we raised about referencing improper sources of information, and I could go through these one at a time, but I think our arguments on all of them are the same legal argument here.  So I was thinking of them together, but if that's not helpful for you, we can go one by one.

So, you know, for rog 2 you had objected that it was better suited to a document demand or deposition, and you referred to the Complaint.  As we said in the briefing -- I know we've discussed this before -- Rule 34(d) says you can respond by referencing business records or you can respond -- you know, the other option's respond in writing under oath referencing depositions that have not been noticed yet or, you know, our document demands that we didn't issue or referring to the Complaint we think is not acceptable.  We think the case law supports us on that.

There's the International Painters case that said federal courts nationwide have fairly unequivocally established that merely pointing to

J.R. 791

a noticed deposition, either past or present, is an inappropriate means of answering an interrogatory.  There's this Tailwind Sports Company case out of DDC that says Rule 33(d) cannot be used for documents other than business records.

There's other case law we've cited that says that you can't use, you know, pleadings, depositions or exhibits and you can't -- you know, restating the general allegations in the Complaint is not a proper answer to an interrogatory.  That's this Pennsylvania case at 144 F.R.D. 258.

And I think this matters because the responses to interrogatories are, you know, sworn statements from the party that are verified, and we can cite them in the context of a motion for summary judgment when we get to it and, you know, the Complaint is not that.  The Complaint is not a sworn thing, and so that applies to the Complaint specifically, and also in rog 10 where you've cited a memorandum of law, that's similarly not something that the plaintiff has verified.

J.R. 792

So that's our position on these, that we think the references to these other sorts of -- these other things are not proper on these.

MS. WHITE:  So we're willing to amend our response to this one to list, you know, the communications referenced in the Complaint which the plaintiff is currently aware of, you know, in the response to the interrogatory as opposed to just referring back to the Complaint.

Where we're going to continue to object, I mean she will list the communications that she's currently aware of.  We don't think that list will be exhaustive.

Our real objection -- our remaining objection here is that when you're asking us to identify and describe all instances where certain topics are referenced in communications, we're producing those communications, and this interrogatory is under, you know, burden and other things is better suited to a document request, and we are producing these document records.

MR. CRENNY:  I think -- yeah.  I think

J.R. 793

that makes sense.  I think if we get an answer that doesn't reference the Complaint and, you know, makes a reasonable effort at answering as opposed to just saying ask in a deposition, I think that's -- you know, our main objection is where it's saying ask in a deposition instead of making an effort, but I think if those are removed and there is a proper answer, that, you know, that would satisfy it on rog 2.

          MS. WHITE:  Okay.

          MR. CRENNY:  And I mean, when I say -- when I say reasonable effort, I mean like, you know, I'm referring to -- you know, we cited cases about if the plaintiff is unable to answer after a reasonable effort, she has to indicate what efforts she may -- you know, explain what you've done to search for the thing.  I didn't mean just, you know, do your best.  I was trying to paraphrase the language in the case law about having to make an effort.

          MR. PLOTNICK:  Understood.

          MS. WHITE:  Understood.  I mean, like I

J.R. 794

said, we will, you know, disclose the communications that she's aware of, but we are also, you know, standing on our objection that this is better suited to a document request, and we are producing these documents.

MR. CRENNY:  Okay.  So that's, that's rog 2 it sounds like?

MS. WHITE:  Yeah.

MR. CRENNY:  And then 5, 5 has the reference to the Complaint and then adds several things.

MS. WHITE:  I mean we're willing to remove the reference to the Complaint.  I mean this -- you know, we've identified the code here.  So I think that we largely answered this interrogatory already even though there was the reference to the Complaint.

MR. CRENNY:  Yeah.  I think this one from my perspective is not a difficult fix on your end. I think it's just remove the reference to the Complaint, and if there's anything you need to say that was in the Complaint, you just say it in an

interrogatory, and then we get it signed by the plaintiff verifying it instead of it's just a reference to the Complaint which, you know, doesn't even cite which paragraphs you're talking about, and then we have, like, evidence we can use in a motion for summary judgment here to the extent we need it.  So I think that sounds good.

MS. WHITE:  Okay.

MR. CRENNY:  9 is similar in that we have a reference to the Complaint rather than an answer.

MS. WHITE:  So again, we can revise this to have a substantive answer in the interrogatories referring to the communications that the plaintiff is aware of, you know, which are largely the ones in the Complaint.

But we are going to continue to object that this is just overly burdensome to itemize and describe all communications and documents with a particular individual.  It's just much better suited to a document request, and we are producing these documents.

J.R. 796

MR. CRENNY:  I mean I don't -- yeah.  We appreciate -- yeah.  If you can amend it, that's great.  I know, if I'm remembering correctly, David filed a declaration at one point where he said exactly how many messages he had sent over Discord with Robert.  So I don't know that it's actually impossible to itemize them.

So we will look forward to seeing the amended version, but it doesn't seem impossible to me or overly burdensome necessarily.

MR. MALYSHEV:  I wouldn't say impossible.  I wouldn't say impossible at best.

MR. CRENNY:  Yeah.  No.  Madelyn didn't say impossible, but it doesn't seem overly burdensome to me given the way that these communications happened over Discord that I'm -- yeah.  So that's 9.  It sounds like you'll amend 9.

10, same issue here.  We have a reference to a brief and a reference to the Complaint -- well, no.  We have reference to a brief and to depositions that we haven't noticed which is

improper for the same reasons as these other ones as -- that I've stated.

MS. WHITE:  So we will amend our answer here to remove the reference to the Complaint and the memorandum of law and provide the plaintiff's understanding of why David Chen ceased working for OtterSec.

MR. CRENNY:  Okay.  I believe -- well, that goes then to our other -- the issue we've discussed above.  So I don't want to say that sounds good here because that goes to the issue we've said above of her responsibility for David's information, which, you know, we've left for the moment.  So I won't say, okay, sounds good on that one, but --

MS. WHITE:  Right.  I mean --

MR. CRENNY:  -- I understood what you're saying.  Yeah.  That issue is still outstanding to be discussed and resolved.

MS. WHITE:  It's the plaintiff's understanding based on information she gains from David Chen, but ultimately it is the plaintiff who

J.R. 798

is signing these under penalty of perjury.  So ultimately it has to be based on the plaintiff's knowledge.  Now, it's her knowledge informed by information she has learned from David Chen.

MR. CRENNY:  Mm-hmm.  Yeah.  So maybe it's a -- I mean that's part of the problem is that this is a very confusing standard here.  So I don't want to agree that any of the issues are resolved by that.  It just doesn't --

MR. MALYSHEV:  It would be helpful for us to see any authority you might have for the proposition that a party, a noncorporate party needs to swear as to the information of another noncorporate party.

MR. CRENNY:  Yeah.  That's in our reply brief and further support of our motion to compel at pages 3 through 5.  We've got, like, three pages of case law on it.  I think there might be a bit more in the intro as well right before that where we explain that she has possession, custody or control of David's information and documents. I quoted a bunch of this case law earlier -- I'm

happy to read it back again -- that she must produce responsive and relevant discovery in her possession, custody or control under Rule 34, that this encompasses documents over which she does not have legal ownership or actual physical possession so long as she has the right, authority or practical ability to obtain the documents from a nonparty to the action.

MR. MALYSHEV:  Right.

MR. CRENNY:  That's documents.  We have other case --

MR. MALYSHEV:  I refer to --

THE REPORTER:  One at a time, please.

MR. MALYSHEV:  Yeah.  Sorry.  We'll revise our answers and we can deal with it then.

MR. CRENNY:  Okay.  And I would suggest you review pages 3 to 5 of our reply brief there if you're looking for the case law on these points.

MR. MALYSHEV:  Thank you.

MR. CRENNY:  Thanks.  Madelyn, do you want to do 12 before 11?  Because 11 raises some

J.R. 800

slightly different issues as well.

MS. WHITE:  Sure.  We can do that.

MR. CRENNY:  Is that okay?  Okay.  So we have references -- you know, it says it's cumulative of the Complaint.  We've explained why, you know, interrogatory answers are different from a Complaint and allegations in a Complaint, and --

MS. WHITE:  We will --

MR. CRENNY:  -- made references to these -- yeah.

MS. WHITE:  Yeah.  We will revise this answer to remove the references to the Complaint and provide a substantive response subject to our other objections.

MR. CRENNY:  Okay.  Are you removing the references in all these to more appropriate for other discovery devices including depositions?  That appears in a few of them, and I understand you're removing references to Complaint.  Are you removing those references as well, or are they standing there but you're going to give substantive responses -- yeah.

J.R. 801

MS. WHITE:  For some of them, no.  I mean, as I said, for the ones we were just discussing, like, for the ones where you ask us to, you know, itemize and describe all communications or all documents, things of that nature, we are continuing to object that those are overly burdensome as interrogatories and are better suited to document requests, but we will provide substantive responses.

For 12 this is different because you aren't asking us about all communications or documents.  I don't think we referred to other discovery -- oh, okay.

MR. CRENNY:  No.  It's in there.

MS. WHITE:  We would remove that -- I'll need to confirm with my team, but we would consider removing that objection as well for this one.

MR. CRENNY:  Okay, yeah.  And then we have the same concern every time that that phrase shows up, but I understand you're going to confer and -- got it.  Understood.  Okay.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

So then 11, there is the issue of referencing the Complaint, and then there is the separate issue of the -- you've objected that it's multiple parts, and we've said and provided case law explaining that -- that an interrogatory -- this is -- I'm quoting this -- Mezu, M-E-Z-U, versus Morgan State case which is from Maryland 2010.  An interrogatory containing subparts directed at eliciting details concerning a common theme should be considered a single question.  And we identified in our briefing that this is on the common theme of David's growing distrust of Robert over the course of, you know, February to May 2022, and we're looking for the facts concerning that.

We think this is not multiple parts.  We think it is a common theme.  It is a common theme. And at the very least you -- it was improper for you to decline to answer any part of it if it -- there is the discovery guideline 10(b) says that no part of an interrogatory should be left unanswered merely because an objection is

interposed to another part of the interrogatory.

So, you know, even if you thought it was multiple parts, that it's improper to not answer the first part and to give us no facts at all here and instead to cite the Complaint in an unverified way and reference other discovery devices including depositions.  So those are the concerns we have with 11.

MS. WHITE:  So looking at the paragraphs that you cite or that you're pointing to in your interrogatory, we think that these are much broader than the common theme that you are identifying and that there is no singular common theme between them.  So based on that we continue to assert that this is an improper interrogatory and it's just -- I don't know what the first part is.

Like, you're saying that we were supposed to answer the first part of a multi-part interrogatory even if we believe other parts are objectionable.  I don't understand what the first part is here.  If you want to -- maybe a way of

J.R. 804

dealing with this one, you could revise this interrogatory to ask us specifically about the common theme that you're identifying, removing the references to just pointing to paragraphs in the Complaint that we think have a multiple of themes, we would then respond to a proper interrogatory.

MR. CRENNY:  I mean I think that's -- that's fine -- if you want to amend it in a way that objects that -- I'm just trying to streamline this.  If you want to give us an answer that states the facts concerning, you know, when and why David came to believe that Robert was concealing information from him relating to Jump Crypto, and then you wanted to object, you know, maintain an objection or something that, you know, these paragraphs also touch on other things that we're not going to state all the facts concerning, I think that would be an answer that states the facts concerning the topic I said which is the common theme we had identified.  I believe we'd be satisfied with that.

MR. PLOTNICK:  Yeah, I mean just to

J.R. 805

interject here.  I mean I think it would -- even if it's not by way of sort of a formal amendment, Kevin, if you could at least sort of, at least confirm, like, what it is that you're looking for. Because if you look at the specific paragraphs, right, there's lots of stuff going on in those paragraphs.  When you say, like, sort of state the facts concerning these -- I'm just looking at paragraph, you know, 41, which is the first one listed, and the first sentence of that is OtterSec's explosive growth was due in significant part to David's exceptional dedication and work ethic, right.  So that's a fact that's in there, but I think what I'm hearing from you is you're really not looking for those kinds of facts, right?  To the extent you're sort of focused on, I think the way you describe it was this growing mistrust thing --

MR. CRENNY:  Yes.

MR. PLOTNICK:  -- if you confirm that, I think it would make it easier, because that was the difficulty that we had with those requests,

J.R. 806

right.  There's sort of lots of different sort of minutiae that could be implicated by things like that, right, David's, you know, work ethic, right? So here --

MR. CRENNY:  Yeah, I've typed up a version of it that we would be happy with an answer that answered that.  We could e-mail this to you at the end, but I can read it just for the record.  If the answer states the facts concerning when and why David Chen came to believe that Robert Chen was concealing information from him relating to his, Robert Chen's, conversations with Jump Crypto, that's what we want to know here.

MR. PLOTNICK:  Got it.

MS. WHITE:  Yeah.  If you could e-mail that to us --

MR. CRENNY:  Yeah.  We'll send that to you.

MS. WHITE:  -- we'll take it under advisement, but I think that's something that we can provide an answer to.  You know, we'll confirm when we see it.  Like I heard you read it, but I

J.R. 807

want to see it with my own eyes.

MR. CRENNY:  Yes.  That's reasonable.  I have it written down.  That's fine.  Okay.  So that is -- that is it on the references to other sources of information topic that I had.

The next one I have is rog 13 regarding the notice to OtterSec of Li Fen Yao's appointment as personal representative of the estate.  So --

MS. WHITE:  We will revise this to provide a substantive response.

MR. CRENNY:  Okay.  That's -- we will -- I think we'll look forward to seeing that.  I think that's -- there's no point of getting into it if you're going to be revising the whole thing anyway to make it substantive.  So we can move along.

Next one is the rog 16, the explanation of the valuation of the claim in the filing with the Register of Wills for Montgomery County.  I know we've discussed this with Steve before.  We think the response you gave here is excessively and impermissibly vague and it's a nonanswer.  It also includes a reference to non -- things that are not

J.R. 808

business records under 33(d), and these are documents that have not been produced insofar as it's referring to the information that was available to the plaintiff generally without telling us what that is.  So I think -- we think this is -- is relevant and, and that we're entitled to an answer here.

MS. WHITE:  I'm not sure how we revise this one without waiving attorney-client privilege.  I mean most of this information, like we say here, like, this was based -- this was between plaintiff and counsel who's representing her in connection with the estate, and this is going to be subject to attorney-client and work product privilege.

MR. PLOTNICK:  Yeah, I guess -- I guess what else are you looking for?  I mean what -- maybe it would be helpful to just know and we can think about it some more.  But what specifically are you looking for in response to this interrogatory?

MR. CRENNY:  I -- sorry.  I think this is

J.R. 809

Transcript of Meet & Confer
Conducted on January 3, 2025                    156

basically not an answer is our -- is our position.

MR. PLOTNICK:  All right.  But why?
That's what I'm asking.  I mean what else -- we
gave what I thought was kind of a good faith
effort to respond to that without, as Madelyn
indicated, you know, revealing any sort of details
of attorney-client communications.  So --

MR. CRENNY:  I mean if you're standing on
privilege -- sorry.

MR. PLOTNICK:  No, I'm saying if you think
it is not sufficient, I guess my question is why?
What else do you think it should include that it
does not?

MR. CRENNY:  I guess I don't -- this is,
you know -- you were saying this to me -- I don't
know.  If there's nothing more you can say here
that wouldn't be privileged, I think you could
amend the answer to make that clearer, because
that is not what it looked like.  It looks like
here, the way I read the answer is there's some
stuff that's privileged, and then we're going to
give you this really vague nonanswer.  It does not

J.R. 810

say that all of this is privileged.  It doesn't say that, you know, the information that was then reasonably accessible and available to plaintiff or her counsel was privileged.  If it is, then I think it could be revised to make it clearer the contours of the privilege you're asserting here.

MS. WHITE:  We can take that under advisement whether or not we can amend this to make it clearer, but privilege objection.

MR. CRENNY:  Okay.  I mean if it's privileged, we could talk about whether it's an appropriate privilege objection.  I don't know that we disagree, but it's that information that was then reasonably accessible and available to plaintiff is the part that we were concerned about because it sounds like you're trying not to say what that information is and you're trying to be really vague.  If it's a privilege concern, that is different from what it reads to us as, which is we don't want to answer this question.

MR. LEVY:  And, Steve, just to answer your question, the answer to this interrogatory

J.R. 811

referred to inventories.  It did not include any additional information about how the litigation claim or claims were valued, and so if there is non-privileged information related to how the litigation claim was valued, that is not included in inventories.

MR. PLOTNICK:  Yeah, I get that.  In other words, if there is non-privileged information that was relied on to arrive at the number or whatever it is, some sort of information that was utilized -- I'm just riffing here -- from some sort of third party independent source, you know, perhaps we could provide more details.

I think, candidly, I think basically the response of saying based on information that was then available or reasonably accessible at the time is more so referring to the information that we did not have as opposed to what we do have, but, you know, that's something we could take a look at and maybe make that clearer in there, but we could take a look at that.

MR. LEVY:  Yeah.  I think it's pretty

simple.  If you have information that isn't privileged that speaks to how these claims were evaluated and valued, we'd like it, and if you have that information and it is privileged, let us know that, because right now the answer is not clear on either of those points.

MR. PLOTNICK:  Got it.

MR. CRENNY:  Okay.  So it sounds like that one will be amended as well.

MR. PLOTNICK:  I think we'll take a look at whether we can amend it.

MR. CRENNY:  Yeah.  Sorry.  Yeah.  I didn't mean to try to upsell you.  Okay.  So I think those are the issues on our motion to compel the plaintiff.  The next is the motion to compel directed at David.

MR. PLOTNICK:  Just as an aside before we kind of move on to the next thing, since we have -- if we -- you know, I'll sort of let us go through this, but if you guys are available, we can continue past -- because I'm looking, it's 1:25 now -- we can continue past 2:00 even, you

J.R. 813

know, to -- we'll kind of get through this, and I know we left our interrogatories open -- we could go back to that.  So I don't know if you guys are able to hang on for a little bit longer past 2:00, but on the break as on our side we can keep going for, you know, a little bit longer, too, at least for the sake of trying to sort of push through all of this for day one so that we can kind of go into day two at least having at the top level addressed, kind of gone through these one by one.

MR. LEVY:  Hi, Steve.  This is Josh Levy. I didn't anticipate that we would be talking about the plaintiff's motion for a couple hours.

MR. PLOTNICK:  Me neither.

MR. LEVY:  And I have a call scheduled right at 2 that I unfortunately have to take, and we're happy to continue this with dispatch in the next session, but I'm going to have to go.

MR. PLOTNICK:  Okay.  Go ahead.  All right.  So all right.  I don't want to interrupt. So we'll use the time that we have.

MR. CRENNY:  Can we take just a

J.R. 814

five-minute break before we get into David hopefully?

MR. PLOTNICK:  Sure.

MR. CRENNY:  Okay.  We'll be back 1:30?

MS. WHITE:  Okay.

MR. PLOTNICK:  Sounds good.

(A recess was taken.)

MR. CRENNY:  Thank you.  So this is Kevin Crenny.  So the next thing to talk about is the subpoena on David and our motion to compel relating to that.

The one overarching -- the overarching thing on this is our position that the -- is the fact that the objections were untimely that David has raised to the subpoena.  Rule 45 is clear that objections have to be served before the earlier of the time specified for compliance or 14 days after the subpoena is served.  The compliance date in the subpoena is July 8 which is more than 14 days after service on June 6.  So objections were due on June 20th.  This was before the stay of discovery because -- that we agreed to because of

J.R. 815

mediation.  So David did not object until well after the deadline.  So in that regard he's waived the objections.

We cited case law from the Second Circuit, DG Acquisition Corp. saying that objections must be waived within 14 days of service, and then an EEOC case, EEOC versus Green Job Works in Maryland which is, you know, citing that same DG Acquisition Corp. case.  We cited other case law about failing to observe it.  But the EEOC case is 2024 Westlaw 96340, and that is citing EG Acquisition Corp. which is 151 F.R.D. 75.  End cite is page 81.  I'm going into detail here because these briefs are not on the record anywhere.

We also cited Williams versus Big Picture Loans from the Eastern District of Virginia. That's 303 Federal Supplement Third 434. Nonparty's noncompliance with Rule 45 means that its objections must be considered waived.

There's also a Ninth Circuit case, Arrowhead Capital Finance, 2023 Westlaw 109722.

J.R. 816

That's from the Ninth Circuit 2023 holding that a subpoena respondent failed to preserve its objections and could not preserve any objections when it did not raise them within the 14-day time period under Rule 45.

We -- you know, we understand your position is that we should have known that these were going to be objections because they were similar to plaintiff's objections.  We have not seen any case law supporting that position that would make that an exception to the clearer rules and cases regarding waiver of such objections.  So we -- so in that regard David's -- all these objections are waived and improper.

Before you respond to that, however, we do have a compromise to suggest here.  We wanted to offer dropping some of our requests and dropping this argument about the waiver of the objections if you would agree to a production on this.

So what we're looking -- we're looking for here is we want to see David's tax returns for 2022 and 2023 along with the supporting

J.R. 817

documentation for those tax returns and wallet addresses that he used, and in exchange for that, that would satisfy requests 8, 10, 11, 12, 13, 14 and 16 which are the ones that are the subject of the motion to compel here.

MR. PLOTNICK:  Could you just clarify? You said tax returns '22 and '23 which I think we already told you in response to the party requests we'd be giving to you anyway.

MR. CRENNY:  Yes.

MR. PLOTNICK:  If you just sort of run through which requests are you proposing to resolve with this and what specifically is it that you're --

MR. CRENNY:  These are all the ones that were the subject of our motion to compel which is --

MR. PLOTNICK:  Okay.

MR. CRENNY:  -- 8, 10, 11, 12, 13, 14, 16. We can read through them but --

MR. PLOTNICK:  You're saying all of them basically.

J.R. 818

MR. CRENNY: Yeah.

MR. PLOTNICK: This is your proposal to resolve all the objections to it, and you said it was tax returns. What else? Which I, like I said, we've already agreed to that, yeah.

MR. CRENNY: Tax returns. The supporting documentation that was provided to, you know, that was used to create the tax returns, whether it was provided to an accountant or whether David was using it himself, you know, what was he looking at make these tax returns, to do the tax returns or whoever filled them out.

MS. WHITE: So I don't -- I'm just going to state for the record obviously we disagree with your position on waiver and don't believe that we've waived anything, but, you know, for purposes of moving this along I don't think it's productive to get into that here.

Our position for the requests to David, you know, and I'm looking at what you're asking for now, we are willing to give you some of that. I mean we're already giving you the tax returns.

J.R. 819

But then when you're asking for -- so you said, you know, for example, 11, this would apply to as well -- sorry.  No.  11 is restricted to the personal code and property, but for 14 you're asking for documents sufficient to identify your work and all your sources of income as well as, you know, the supporting documents for the tax returns.  We're willing to give you that to the extent that it's related to the code that is alleged to have been taken from OtterSec.

You know, going back to Steve's earlier example, to the extent that David had a part-time job at Foot Locker, we don't see how that's relevant, and we would not agree to produce that.

MR. PLOTNICK:  Why don't we -- I think -- right.  We're not going through these request by request.  So I just -- Kevin, go ahead.  Why don't you make --

MR. CRENNY:  Yeah.

MR. PLOTNICK:  -- your proposal on them, because I guess what you're doing is you're looking at this and saying what do we really need.

J.R. 820

So I'm fine with listening to that because we had looked at this in advance of the call on like a request-by-request basis, but it's -- yeah.

MR. CRENNY:  Yeah.  No.  It's a global proposal to resolve these specific RFPs and the waiver issue as well.  So we won't press on that if we get these things is the idea.  We're trying to save time.

MR. PLOTNICK:  You said tax returns, the supporting documents behind them and then what --

MR. CRENNY:  And then wallet addresses that he used.

MR. PLOTNICK:  Anything else or just those two?

MR. CRENNY:  Just the tax -- the tax returns, the 2022, 2023, which I know you already said, supporting documentation and wallet addresses.

MR. PLOTNICK:  So for the wallet addresses my only question is the -- and this is I think what Madelyn's point was -- the wallet addresses that were used for the liquidator code you're

J.R. 821

talking about, meaning any wallet into which, you know, funds received from the liquidator code were used, or are you talking sort of more, more generally and even broader?

MR. CRENNY:  I think more generally.  Any wallets.  We're not limiting it to that.

MS. WHITE:  I mean I think for this one, you know, what we should do here is, you know, put your proposal in writing, send it to us.  We will consider it, and probably what we would do is send you a counter-proposal.

MR. PLOTNICK:  Yeah.  We're in agreement, we're in agreement.  I think we just have to think about that on the proposal.

MR. CRENNY:  Yeah.  No.  I think we would want to discuss that at the next session here. Yeah, not just take it offline and do it in writing but keep it on the record here because I think that's what Judge Simms was looking for us to do.  So I don't want to transition the whole discussion to e-mails that --

MS. WHITE:  Yes.  Sorry.  Agreed.  We

J.R. 822

could then discuss it.

MR. CRENNY:  Yeah, that -- that sounds good.  So you've got a proposal, and we can type it up as well for you.  Okay.  I think that -- that's everything to discuss on David's subpoena at the moment.

MR. PLOTNICK:  Yeah.  So should we turn back to our interrogatories with the last sort of bit of time that we have?

MR. CRENNY:  Well, we have another motion -- we have another set of motions to compel still which is the -- the ones that were not fully briefed.  I think we were planning to do those next.

MR. PLOTNICK:  Yeah.  We can do that, yeah.

MR. CRENNY:  Thank you.  So these ones -- so we have what -- we have a compromise to suggest here right off the bat, which is on the, the RFPs, we serve -- the defendants collectively served 17 RFPs in October, and your position was that they only had 15 remaining at that point.  We're

J.R. 823

willing to drop two of those.  So we're down to 15 RFPs, and then we can just talk about rogs just to limit the scope of the dispute.

You know, obviously we want to -- I guess you agree to drop your cross-motion with regard to the RFPs as well, but that's our proposal at the start is that we're going to drop two RFPs.  I could tell you which ones, without waiving our objections obviously, or conceding anything, but just we get that down to 15 to start.

MR. PLOTNICK:  Which two?

MR. CRENNY:  RC Security's number 3 and number 7.

MR. PLOTNICK:  I mean I think you're right about getting to 15.  I just want to double check it.  I don't have the numbers in front of me, but I think -- I will take you at your word for it.  So if dropping the two RFPs, you know, gets --

MR. CRENNY:  Yeah.  15 was the number you wanted us to choose.

MR. PLOTNICK:  Yeah.

MR. CRENNY:  So this gets us down to that.

MR. PLOTNICK:  Then if that's the case, then it's something we can agree, then I can, you know -- we'll confirm it for you.  All I want to do is double check.

MR. CRENNY:  Sure.  Interrogatories, on the other hand, we are -- we do still need and we don't agree with your positions on this.  The rules are clear that each party gets 25 interrogatories.  Rule 33(a) says unless otherwise stipulated or ordered by the court a party may serve on any other party no more than 25 written interrogatories.  That's very clear.  We don't have a court order that says otherwise.  We don't have a stipulation that says otherwise.

So we are standing on the fact that you're obligated to respond to these interrogatories that were served by the defendants.  That's the main point that we know your position is that defendants should be treated as one party.  That we don't see any case law that you've cited that says that's the case.  You know, there's case law that says that could make sense in some cases, but

J.R. 825

those are not situations that apply here.

For one thing the defendants have not acted together as a single unit in all aspects of the case.  There were motions to dismiss that had different declarations from each defendant.  The 12(c) motion highlights different deficiencies in the Complaint with regard to each defendant.  The Complaint obviously charges them with different conduct and different claims, and the plaintiffs would need to prove elements of each claim against each defendant in order to succeed on any given claim.

It doesn't make sense to say that, you know, Robert Chen should use his interrogatory -- that an interrogatory concerning only something that's directed at Robert Chen should count against Otter Audits' total number of interrogatories.  They should each be able to ask about the sufficiency of the evidence that's going to -- that you say is going to prove each of their conduct.

We know that Wright & Miller says that it

J.R. 826

could be attractive in some cases to count multiple parties as one for interrogatories, but the situations they're talking about in the language you cite is about circumstances that aren't present here, like a parent corporation as a subsidiary or, like, a class action of people injured in a bus crash all suing the same defendants.

There -- we just don't think that you've cited case law establishing that this nominally separate parties thing applies here, especially where no court has said it in their -- at the outset where you didn't move for a protective order prior to the due date.  You waited until the due date to not respond and then waited until after we filed a motion or served a motion to start moving for a protective order.

The cases you've cited are all distinguishable, so I'm concerned, like, way higher numbers.  Skinner v. Liller is the Maryland case that mentions this nominally separate parties thing, and in that case the court permitted

J.R. 827

service of 177 interrogatories.  We're nowhere near that close -- that many.  The only other Maryland case that uses this nominally separate parties language is Layani versus Ouzani.  That's 2024 Maryland 3233999 from 2024, and the court there declined to construe Rule 33 as imposing a per-side limitation.

Skinner v. Liller, by the way, the other one is 2023 Maryland 85 -- sorry -- 2023 Westlaw 8520240, and there the court said that they were not nominally separate parties, only nominally separate parties, and permitted 177 separate rogs. The other cases -- some other cases you cited it was interrogatories with 205 subparts or an attempt to serve 150 of these interrogatories.

There are other cases that I think you just misrepresented in your briefing.  This McCarthy versus Paine Webber, the defendant was required to seek leave of court before serving interrogatories because he was trying to serve interrogatories with 26 subparts.  It was not about the fact that they were only nominally

J.R. 828

separate parties.  It was just too many for one party.

And then the Door Dash case that you've cited, the party raising the objection had already responded to 25 interrogatories from each serving party, whereas here you've responded to just 16 total.  So that's our position on this motion.

(A discussion was held off the record.)

MR. MALYSHEV:  Yes.  So, Kevin, this is Alex.  So obviously it sounds like you had the brief ready, your reply ready to go.  I am happy to take a look if you want to send it to me on a no-prejudice basis, and we can take a look at your arguments.  But, you know, sitting here today I think we -- this is something we need the court's decision on because we couldn't reach a compromise on answering some and reserving decision on others.  So I think our position is laid out in our papers.

We don't think that Otter Audits and RC are separate parties.  We don't think they're separate parties from Robert's.  We understand to

J.R. 829

be their sole member.  Maybe that's not correct and you'll correct me that he's not the sole member.  So we don't believe that you will be successful on this point, but, again, we want to work in the spirit of compromise.

If you want to send me your brief in advance of the next meet and confer, I can take a look and tell you our position.

MR. PLOTNICK:  And I would also add -- let me just add to that, Alex.  You know, Kevin, I'll just say our -- our offer still stands, and that is, at least for the sake of moving things forward, and again, it would be on a without-prejudice basis, off the top of my head I don't recall sort of what the math was of the calculation on how many interrogatories were left. We had sort of laid it out in our objections.  You know, if you wanted to select the ones that fall within those limits, you know, again, for the sake of, you know, just avoiding delay because, you know, we do -- we are and would continue to be willing to respond to interrogatories, you know,

J.R. 830

that are within the 25 interrogatory limit.  So, you know, that offer still stands that, you know, if you wanted to pick -- I forget how many were left, as I said -- but we would proceed to move forward and, you know, even if by the time of the next meet and confer we still can't reach agreement on it, at least -- at least we're moving forward on -- on those.

MR. CRENNY:  Thanks.  We'll consider that. I believe, as we've said before, just to get it on the record, we are not able to identify a subset because if the court were to agree with your position, we would need to -- we would have drafted these differently if we knew we only had, you know, nine remaining, which we don't think is correct because we don't think there's a per-side limit.

So that's why we didn't agree to that previously and we're going to -- we'll consider it, but that's been our position thus far.

MR. MALYSHEV:  And, again, just also without prejudice, do you guys want to redraft and

J.R. 831

Transcript of Meet & Confer
Conducted on January 3, 2025                178

serve nine?  We're certainly open to that to resolve this issue.  It sounds to me the way you said it that there was a way for you to draft just nine.  So if you want to do that and serve those, we're happy to answer those and move this whole issue.

MR. CRENNY:  I didn't say that.

MR. MALYSHEV:  I believe what you said was had we known that it was a 25 limit, we would have just drafted nine.  So I'm saying --

MR. CRENNY:  Right, but we don't think there is a 25 limit --

(Overlapping speakers/crosstalk)

MR. MALYSHEV:  All right.  Fair enough.

MR. CRENNY:  -- so I'm not saying that that's the way we're agreeing we want to do it.

MR. MALYSHEV:  Fair enough.

MR. CRENNY:  Sorry.  But Steve, we appreciate the additional offer there.  Sorry. We're talking at the same time.

MR. MALYSHEV:  Fair enough.

MR. CRENNY:  Okay.  So it sounds like

J.R. 832

no -- no progress on that one at this point.

MR. PLOTNICK:  No.  Do you think it would be able to --

MR. MALYSHEV:  I'm sorry.  Go ahead. We're speaking -- no.  What I said was, if you want to send me your brief which you were due to file the day the court took it off -- off the calendar for me to take a look at your arguments rather than your summary that you sounded like you were reading from, I'm happy to do that in advance of the next meet and confer.

MR. CRENNY:  Okay.  Yeah, we'll consider that, yeah.

MR. LEVY:  Steve, do you want to move to the remainder of your motion?

MR. PLOTNICK:  Yeah.  I think that makes sense.  Right.  We're done with everything, right. So that left open -- I think we were up to our interrogatories because we went through the document requests.  Let me just get to my notes on that.

MR. LEVY:  And, Steve, actually before you

J.R. 833

Transcript of Meet & Confer
Conducted on January 3, 2025                    180

do that, just some housekeeping as we get close to departing here.  We know that you had indicated some -- some questions about our production.  We indicated we had questions about your production.  Is there -- can we reach an agreement that we will each send each other questions about the productions that we can respond to and/or discuss in the next call?

MR. PLOTNICK:  Oh, meaning -- sort of like an agenda, kind of like what I did yesterday, meaning get a little bit more specificity behind the questions about the productions?

MR. LEVY:  Yeah, to move things along.  I think -- exactly, right, Steve, more specificity.  Just if we have questions --

MR. CRENNY:  Yeah, and we won't be able to answer them on the fly if they're the first time we're hearing them.  So not just the topics but the actual questions:  What is your issue?  What is your question?

MR. PLOTNICK:  Yes, yes, and we can get you some more speci- -- the answer is yes, we can

J.R. 834

get you some more specificity on it. We're saying -- yeah. In other words, yeah, so that you have -- you're a little bit more prepared for the details of it when we get into the next call. Yes. We can do that, absolutely. I think that makes very, very good sense.

MR. LEVY: Great. Thank you. Sorry for the interruption. Proceed.

MR. PLOTNICK: Yeah. No problem. So first interrogatory that is the subject of plaintiff's motion to compel, interrogatory number 3. Look, there's going to be a lot of overlap here with some of the issues that we raised with the document request, but, you know, interrogatory number 3 asked for all current and former customers and clients of RC Security, Otter Audits and OtterSec including all persons for whom RC Security, Otter Audits and OtterSec has performed any auditing work or from whom RC Security, Otter Audits and OtterSec has collected any payments for service, goods or products.

So, you know, this is sort of another one

J.R. 835

that sort of fell into the category of the objections being based on the, the separateness I suppose, the -- the separateness, I suppose, of RC Security and Otter Audits from OtterSec, which, again, in our view is a merits-based argument, and in the defendants' response they are referring to documents, but I don't -- so there's sort of two components of this.  One is the doc -- whether the documents that have been produced are sufficient to show what we've asked for, right, which is an issue that you have agreed to consider some more and come back to us and, you know, it may be something that gets resolved if you're able to, you know, sort of produce documents in the ordinary course that are maintained that would show that if there's a list, or alternatively, I guess -- I'm not sure if you're taking the position that it's too burdensome to list all the customers and clients.

        MR. CRENNY:  I think -- if I -- if I could -- sorry.

        MR. PLOTNICK:  No.  Go ahead.  Go ahead.

J.R. 836

MR. CRENNY:  I think we're referring to documents we're producing in response to RFPs 6 and 19.  I think that's the, you know, pointing to business records option for responding here.

You know, if you -- if the concern is the time frame, we can put that in, you know, the pile of ones where the concern is the time frame, but other than the time frame is there an issue with this one?

MR. PLOTNICK:  Well, the question is whether or not the documents that you would be producing are, again, subject to the time frame question, yes, that is -- that is certainly a component of it, but in addition to the time frame component of it, right, the question is whether or not the documents would, in fact, right -- I mean you still have objections in there that deal with sort of the relevance arguments that have been made based on --

MR. CRENNY:  Yeah.  We have an amended based on our --

MR. PLOTNICK:  Right, correct.  It's sort

J.R. 837

of intertwined, right, sort of fundamentally with that objection and where your -- what your position is with respect to that objection as well as the time frame, right, and sort of what is being withheld, again, without kind of going back over what we've already gone over, you know, the objections about, you know, we'll give you stuff to the extent that concerns OtterSec and, right.

So fundamentally what we want, whether it's in the documents that you provide, which, like you said, we'd be fine if you were able to produce business records that are sufficient to, in fact, reflect every customer or client that they have, I think that would be fine.  If we could reach an agreement on that, I think it would cover this response subject to the time frame and other issues.

MR. CRENNY:  Okay.  We will take that under advisement along with the other similar ones.

MR. PLOTNICK:  Okay.  So the next --

MR. CRENNY:  I'm not hearing anything

J.R. 838

brand new on this one.

MR. PLOTNICK:  No.  That was really --

MR. CRENNY:  Okay.  Good.  Okay.

MR. PLOTNICK:  As I said, it's really tied -- it's you referring to documents which we think are not sufficient for what we're looking for I guess is really my point.

MR. CRENNY:  Got it.  I think it's stuff for 6 that we already discussed on 19.

MR. PLOTNICK:  All right.  So --

MR. LEVY:  I apologize.  As I indicated earlier, I need to depart at 2 for this other call.  I can -- if, Steve, you don't have very much, I can just trail off.  My colleagues can tell me what happened, or if you have a lot we can continue later.

MR. PLOTNICK:  I don't think it's a lot because I think that there's overlap because I think we're going to run into some similar stuff here.  And there actually aren't that many interrogatories.  So if the others on the call are willing to sort of see this through, I don't see

J.R. 839

Transcript of Meet & Confer
Conducted on January 3, 2025                    186

this taking very long at all.

MR. CRENNY:  Is Miss Hamilton able to do another 10, 15 minutes?

(A discussion was held off the record.)

MR. LEVY:  We can also break here and just pick it up.

MR. PLOTNICK:  Yeah, I'll use my ten minutes.  That's fine.  I'll use my ten minutes.  Okay.  So --

MR. LEVY:  Good-bye, everyone.

MR. PLOTNICK:  Oh, of course.  Thank you.  So I've lost my page.  So here we are.

MR. CRENNY:  15.

MR. PLOTNICK:  Yeah.  15, again, similar issue, right, as the document request.  As I said, you know, we're looking for the identity of all the accounts that were -- that were maintained by all three entities, and again, whether that's, you know, similar objections.  There's been a reference to documents in the response.

You know, I'm looking at the actual response, and it identifies OtterSec, that

J.R. 840

OtterSec had bank accounts with Mercury Bank, an account with TransferWise, an account with FTX, you know, but we're obviously also looking for the RC Security and Otter Audits side of things.

Again, this has to do with transfers of funds between the companies that we're seeing, and I think this also is sort of tied up with interrogatory number 16, right, which asked for the digital wallets.

It's -- you know, it's a damages issue, right, tracing the flow of funds that were transferred from one entity to the other, what was transferred out of OtterSec accounts into RC Security, Otter Audits.

You know, in the case of the digital wallets, I know we had discussed this once before, you know, the nature of the digital wallet is such that without being provided with the identity of -- right, we obviously know and that's been identified, the OtterSec wallet, but without knowing the wallets that were used by Otter Audits, by RC Security, we don't know where the

J.R. 841

funds are going. I mean you could see the -- you could see funds going out. You could see funds going to wallets, but, you know, we're looking for both sides of the transaction here, and there's really -- there's really no way to do that reasonably without seeing both sides.

What happened to the funds in the FTX account, you know, whether there are other accounts into which funds had been transferred is impossible to determine without having both sides of it.

So that's -- it's -- again, it's really related to the similar document request that we had made on that point.

Is everyone still on? Am I the only one talking to myself? Kevin?

MR. CRENNY: I was talking but I was muted. I apologize. That was -- was that 15 and 16?

MR. PLOTNICK: Yeah, 15 and 16, right. Yeah. 15 is sort of like, you know, basically bank accounts, and, you know, 16 is specific to

J.R. 842

the wallets.

MR. CRENNY:  All right.  Yeah.  I think these are the same.  Whether they're left to resolve or for the court, they're the same issues as the other ones.  So okay.

MR. PLOTNICK:  Yep, and then you've got Tom, which is -- for the benefit of our court reporter, this is actually the final one, so I think we're going to be within the ten minutes.  Interrogatory number 17 is the last one in here, and that's identifying all persons in possession, custody or control of business or financial records for each of the defendants and OtterSec.  And, again, the answer that was provided -- you know, again, there's -- the objection's in there.  So part of the question is whether or not anything has been withheld.  I think, Rachel, you answered that, that to the extent the response has been provided, it's basically just a preservation of the objection.

Let me just look at the actual written objection.  If you can just bear with me one

J.R. 843

second.

Yeah, I guess -- I guess the -- I guess that's really -- I'm sort of looking at the response here, and fundamentally that's the question.  I -- perhaps, Rachel, your clarification earlier is, right, that given this response that says subject to and without waiver of these objections defendants respond -- in other words, this is everyone, for all of the defendants.  Notwithstanding the fact that you have interposed that objection, it's these individuals:  Darrell -- if I'm pronouncing this right -- Yeo, Y-E-O; Craig Gatesman, David Agassi and Gusto.

Kevin, you might be on mute.

MR. CRENNY:  I'm sorry.  No, I'm not on mute.  I just missed the last thing you said.  I apologize.

MR. PLOTNICK:  My question is whether or not this response -- I mean, for example, I don't think Robert Chen was listed in response to this interrogatory, but maybe that was an assumption on

J.R. 844

your part that that was a given, but there are a series of objections in here including RC Security and Otter Audits aren't successors, that they're just -- again, what I was referring to was the merits-based argument, and then there's an answer given, and I suppose -- well, not I suppose.  The question is whether or not this provides, you know, all of the individuals that you're aware of obviously that would have control, notwithstanding those objections, because I did -- I don't even think Robert Chen's name appears.

MR. CRENNY:  I think for OtterSec, yes. This is the ones for OtterSec.  We objected that for Robert his personal financial records are not relevant, and we objected with respect to the other two defendants.  So we've given you in the last two paragraphs and then the list there is the answer for OtterSec.  I think the answer is clear on what it is.  I think it's pretty -- it's specific that --

MR. PLOTNICK:  Okay.  So this would -- because it does say -- I think your answer says

J.R. 845

subject to and without waiver of these objections

defendants respond that persons likely to be in

possession, custody -- right --

MR. CRENNY:  For OtterSec.

MR. PLOTNICK:  Right, sorry.  Right.  You

said for OtterSec.  So, again, our view is that

this should encompass Otter Audits.  It should

encompass all defendants.  In part, you know,

again, when you're looking for financial records,

you know, look, Robert is a defendant in the case,

and if he's in possession, custody or control of

documents, whether it's relating to OtterSec or RC

Security, certainly those would be relevant to the

case for all the reasons I think which we've gone

over before that we're seeking business financial

records in the first place.

I also think -- I disagree with your point

that, you know, Robert's personal records are not

relevant.  I mean there is -- there -- I was

referencing or I referenced it earlier before.

You know, there is just in the Mercury bank

account statements that we do have, I mean there's

J.R. 846

evidence of transfers of funds out of OtterSec accounts as recently that I can recall as April of 2024 for Robert Chen personally. I mean it's shown up on the bank account. So there's, you know, evidence of money going from OtterSec to him personally, and it's in the documents that have been produced so far.

So for that reason we think also his personal records in relation to this interrogatory are relevant.

MR. CRENNY: Okay. I -- we will take that under advisement. This is another one where this was not clear what you were saying from the briefing. So some of this is new to us and we can take it under advisement and have further discussions next week I think. We're at 2:10. No changes today regarding our objections here.

Steve, I'm not hearing you. It looks like you're talking but I'm not hearing you.

MR. PLOTNICK: No, yeah. Just to add -- just to add to that. I think part of your response also I should say was a little bit of

J.R. 847

lack of clarity I think in the interrogatory response because you also had said OtterSec used a number of vendors and service providers -- maybe it's just a choice of language -- but it says many of which can be identified in the documents defendants intend to produce, including Google, Discord, Tele -- the question is whether there's any others, right, because it says --

MR. CRENNY:  The next sentence says, to the best of their knowledge they're the following.

MR. PLOTNICK:  Okay.  So the answer to that is you don't know of any others off the top of your head.

MR. CRENNY:  No.  This was an effort to respond to the interrogatory.  You know, we didn't --

MR. PLOTNICK:  Okay.  Yeah.  So that handles that and just the question is whether, as I said, you have Robert's records and what he has and the RC Security and Otter Audits stuff as well.

MR. CRENNY:  Yeah.  We will take that

J.R. 848

under advisement, and we will I think let the court reporter off the hook now.

MR. PLOTNICK:  I think we're concluded for today, yes.  Thank you.

(Off the record at 2:14 p.m.)

J.R. 849

CERTIFICATE OF REPORTER

I, Janet A. Hamilton, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 5th day of January, 2025.

My commission expires

February 4, 2028.

_____

NOTARY PUBLIC IN AND FOR

STATE OF MARYLAND

J.R. 850

Transcript of Meet & Confer
Conducted on January 3, 2025

197

| A |
| --- |

**ability**
124:3, 124:18,
125:12, 125:19,
126:6, 126:15,
146:7
**able**
16:5, 129:6,
160:4, 172:18,
177:11, 179:3,
180:16, 182:13,
184:11, 186:2
**above**
67:19, 144:10,
144:12
**absolutely**
21:13, 57:19,
109:6, 181:5
**acceptable**
137:18
**accessible**
157:3, 157:14,
158:16
**accessing**
126:14
**accident**
57:3, 57:5
**account**
105:3, 105:4,
105:16, 105:20,
106:4, 106:8,
106:17, 107:4,
107:11, 109:6,
109:20, 109:22,
110:4, 111:3,
111:21, 112:10,
112:18, 113:19,
187:2, 188:8,
192:22, 193:4
**accountant**
165:9
**accounts**
104:6, 107:12,
107:20, 108:2,
108:5, 113:17,
113:18, 186:17,
187:1, 187:13,

188:9, 188:22,
193:2
**acknowledged**
12:19
**acquihire**
77:16
**acquisition**
77:17, 162:5,
162:9, 162:12
**across**
64:15, 134:6
**act**
46:10, 54:19
**acted**
172:3
**acting**
83:19
**action**
8:17, 18:11,
19:5, 146:8,
173:6
**actual**
45:4, 95:8,
146:5, 180:19,
186:21, 189:21
**actually**
69:8, 69:9,
95:7, 112:15,
143:7, 179:22,
185:20, 189:8
**add**
8:15, 21:6,
21:15, 28:22,
29:6, 30:2,
30:17, 31:12,
114:11, 115:2,
119:1, 119:3,
120:12, 120:16,
176:9, 176:10,
193:20, 193:21
**added**
26:12
**addition**
30:2, 48:2,
183:14
**additional**
8:15, 39:4,
61:17, 158:2,

178:19
**address**
7:9, 31:14
**addressed**
7:10, 58:22,
160:10
**addresses**
164:2, 167:11,
167:18, 167:19,
167:21
**addressing**
15:18
**adds**
141:10
**adequacy**
24:17
**admissions**
118:11
**admitting**
83:17
**advance**
38:2, 72:1,
74:9, 167:2,
176:7, 179:10
**advisement**
78:7, 103:18,
108:19, 112:12,
117:8, 128:1,
129:10, 153:20,
157:8, 184:19,
193:12, 193:15,
195:1
**affixed**
196:14
**after**
12:20, 13:8,
24:5, 24:10,
26:5, 40:15,
40:17, 54:22,
56:6, 56:8,
56:19, 57:18,
57:20, 59:17,
61:20, 73:4,
98:15, 130:13,
136:13, 140:14,
161:17, 161:20,
162:2, 173:16
**afternoon**
6:12

**again**
8:4, 8:7, 9:7,
11:13, 12:15,
13:3, 13:17,
14:1, 16:17,
17:20, 23:8,
23:16, 25:15,
26:20, 32:17,
33:12, 34:8,
34:16, 41:4,
41:9, 42:5,
42:6, 42:8,
44:15, 45:8,
47:3, 49:15,
49:16, 49:18,
50:7, 51:5,
52:4, 52:7,
60:11, 64:20,
66:21, 67:22,
74:18, 74:21,
76:4, 77:20,
77:21, 78:9,
78:21, 79:10,
79:14, 79:16,
80:5, 92:8,
101:16, 102:2,
102:16, 104:22,
106:1, 106:12,
107:18, 109:17,
111:18, 114:8,
114:9, 115:15,
119:16, 119:17,
119:21, 125:16,
131:20, 142:12,
146:1, 176:4,
176:13, 176:19,
177:21, 182:5,
183:12, 184:5,
186:14, 186:18,
187:5, 188:12,
189:14, 189:15,
191:4, 192:6,
192:9
**against**
12:13, 87:14,
87:19, 172:10,
172:17
**agassi**
82:12, 190:13

J.R. 851

Transcript of Meet & Confer
Conducted on January 3, 2025                    198

**agenda**
6:13, 10:5,
180:10
**ago**
21:16
**agree**
66:9, 70:17,
85:18, 103:13,
145:8, 163:19,
166:14, 170:5,
171:2, 171:7,
177:12, 177:18
**agreed**
161:22, 165:5,
168:22, 182:11
**agreeing**
69:8, 178:16
**agreement**
2:10, 22:17,
22:18, 43:12,
43:16, 43:22,
44:2, 47:13,
47:22, 50:9,
52:18, 70:18,
83:8, 129:7,
168:12, 168:13,
177:7, 180:5,
184:15
**agreements**
38:6, 41:9,
41:13, 41:14,
42:13, 42:21,
43:1, 43:10,
44:8, 44:10,
44:20, 47:5,
47:6, 47:14,
47:15, 48:2,
49:17, 49:18,
50:10, 52:16,
55:18, 55:20,
55:21
**ahead**
28:22, 42:19,
53:4, 61:3,
70:19, 82:5,
82:6, 95:3,
97:4, 110:12,
160:19, 166:17,

179:4, 182:22
**al**
1:7
**alex**
4:13, 56:22,
60:4, 82:2,
82:5, 82:21,
86:14, 88:8,
95:3, 98:18,
175:10, 176:10
**alex's**
59:14, 61:5,
90:2, 90:14,
103:11
**alexander**
3:4
**allegations**
9:3, 138:10,
147:7
**alleged**
9:3, 166:10
**along**
128:11, 130:9,
154:15, 163:22,
165:17, 180:13,
184:19
**already**
11:16, 33:10,
50:3, 57:14,
67:11, 84:5,
110:1, 110:15,
126:11, 132:20,
141:16, 164:8,
165:5, 165:22,
167:16, 175:4,
184:6, 185:9
**also**
3:20, 4:14,
4:15, 9:1,
10:19, 19:21,
21:4, 23:2,
30:21, 44:6,
46:9, 48:4,
57:21, 60:3,
63:5, 87:10,
87:19, 96:10,
102:22, 105:17,
107:2, 107:4,

109:16, 111:19,
111:20, 112:15,
112:17, 114:9,
117:22, 120:1,
120:10, 130:15,
138:20, 141:3,
151:16, 154:21,
162:16, 162:21,
176:9, 177:21,
186:5, 187:3,
187:7, 192:17,
193:8, 193:22,
194:2
**alternative**
63:20
**alternatively**
182:16
**although**
107:2, 114:10
**amend**
133:22, 134:21,
139:4, 143:2,
143:17, 144:3,
151:8, 156:18,
157:8, 159:11
**amended**
8:15, 26:13,
143:9, 159:9,
183:20
**amending**
132:15
**amendment**
152:2
**amount**
11:14
**analysis**
36:15
**another**
27:2, 29:13,
32:8, 105:9,
106:2, 106:19,
108:21, 113:7,
116:21, 125:13,
125:20, 145:13,
150:1, 169:10,
169:11, 181:22,
186:3, 193:12
**answer**
41:7, 48:8,

58:2, 58:18,
64:10, 91:4,
95:11, 100:9,
101:18, 103:20,
103:21, 108:22,
112:5, 112:6,
113:8, 126:2,
126:22, 127:7,
138:11, 140:1,
140:8, 140:14,
142:11, 142:13,
144:3, 147:12,
149:19, 150:3,
150:19, 151:10,
151:18, 153:6,
153:9, 153:21,
155:7, 156:1,
156:18, 156:20,
157:20, 157:21,
157:22, 159:5,
178:5, 180:17,
180:22, 189:14,
191:5, 191:18,
191:22, 194:11
**answered**
27:14, 141:15,
153:7, 189:17
**answering**
138:2, 140:3,
175:17
**answers**
146:15, 147:6
**anticipate**
160:12
**any**
6:3, 7:16,
11:2, 13:14,
15:20, 30:5,
39:7, 41:20,
43:1, 49:10,
49:12, 50:1,
50:8, 51:14,
55:19, 58:15,
58:16, 61:12,
65:16, 72:13,
75:19, 75:21,
76:1, 77:15,
77:18, 78:6,

J.R. 852

Transcript of Meet & Confer
Conducted on January 3, 2025                                              199

85:16, 87:11,
89:8, 93:15,
93:19, 93:22,
96:11, 101:2,
103:19, 104:6,
104:9, 107:20,
109:2, 110:12,
115:22, 118:17,
118:22, 119:11,
127:1, 145:8,
145:11, 149:19,
156:6, 158:1,
163:3, 163:10,
168:1, 168:5,
171:11, 171:20,
172:11, 181:19,
181:20, 194:8,
194:12, 196:10
**anymore**
61:13, 65:17,
109:2, 124:14
**anything**
16:15, 21:6,
21:14, 28:21,
32:2, 32:10,
37:18, 57:9,
77:1, 79:13,
81:10, 83:17,
91:2, 97:3,
102:9, 110:14,
117:10, 118:15,
118:18, 118:21,
118:22, 119:2,
120:12, 136:20,
141:21, 165:16,
167:13, 170:9,
184:22, 189:16
**anytime**
89:11
**anyway**
154:14, 164:9
**anywhere**
129:2, 162:15
**apologize**
185:11, 188:18,
190:18
**appear**
109:10, 109:15

**appearances**
4:2
**appears**
45:17, 72:22,
88:20, 147:18,
191:11
**appendix**
24:22
**applies**
57:15, 138:19,
173:11
**apply**
64:15, 83:2,
166:2, 172:1
**applying**
103:13
**appointment**
154:7
**appraisals**
75:20, 76:13
**appreciate**
7:8, 32:1,
44:3, 123:15,
128:22, 134:7,
134:15, 136:9,
143:2, 178:19
**approaching**
70:21
**appropriate**
31:13, 73:21,
96:16, 103:15,
147:16, 157:12
**april**
51:19, 52:2,
52:18, 59:18,
60:12, 61:14,
106:6, 106:10,
134:18, 193:2
**area**
81:15, 116:11
**areas**
16:6
**aren't**
50:8, 73:5,
123:3, 148:11,
173:5, 185:20,
191:3
**argument**
15:8, 17:18,

85:7, 90:4,
92:13, 99:12,
112:14, 137:5,
163:18, 182:5,
191:5
**arguments**
74:12, 137:4,
175:14, 179:8,
183:18
**around**
70:16, 70:18
**arrive**
158:9
**arrowhead**
162:22
**articulated**
84:5
**aside**
5:12, 159:17
**asked**
17:8, 22:9,
27:16, 29:2,
44:11, 45:19,
47:5, 48:1,
49:6, 82:1,
99:6, 99:10,
181:15, 182:10,
187:8
**asking**
41:3, 41:5,
48:8, 59:9,
73:12, 95:5,
115:16, 139:15,
148:11, 156:3,
165:20, 166:1,
166:5
**aspect**
19:12, 32:17
**aspects**
172:3
**assert**
150:15
**asserting**
123:1, 157:6
**assertion**
33:3
**assess**
9:21

**asset**
17:6, 17:16,
18:20, 24:20
**assets**
29:12, 30:19,
62:14, 76:1,
80:3
**assigned**
9:14
**assumption**
190:22
**asterisk**
131:12
**attempt**
6:3, 174:15
**attorney**
126:4
**attorney's**
126:12
**attorney-client**
155:9, 155:14,
156:7
**attorneys**
122:15
**attractive**
173:1
**auctions**
75:20, 76:13
**audit**
32:22, 36:16,
46:8
**auditing**
49:10, 58:15,
181:19
**audits**
5:1, 15:1,
15:9, 17:12,
18:5, 18:21,
19:2, 19:9,
19:14, 20:2,
20:5, 20:13,
22:3, 24:7,
24:8, 24:9,
25:3, 25:4,
25:10, 25:11,
26:2, 26:22,
27:11, 33:2,
34:4, 35:16,

J.R. 853

Transcript of Meet & Confer
Conducted on January 3, 2025                                    200

35:19, 37:10, 37:19, 41:21, 43:5, 43:16, 43:18, 45:21, 49:8, 49:9, 49:11, 51:3, 58:12, 58:14, 58:16, 59:12, 59:17, 65:1, 72:14, 72:17, 73:2, 73:5, 73:9, 73:17, 75:21, 75:22, 76:1, 76:9, 76:18, 77:18, 77:19, 78:12, 79:9, 79:15, 82:11, 84:18, 88:13, 89:4, 91:20, 94:3, 104:8, 104:17, 104:19, 107:6, 107:22, 112:1, 113:4, 113:21, 116:2, 116:20, 119:12, 119:20, 120:7, 172:17, 175:20, 181:16, 181:18, 181:20, 182:4, 187:4, 187:14, 187:22, 191:3, 192:7, 194:20

**august**
60:9, 61:11

**authority**
123:21, 124:3, 145:11, 146:6

**available**
67:21, 76:12, 155:4, 157:3, 157:14, 158:16, 159:20

**avoid**
9:20

**avoiding**
176:20

**await**
13:21

**awaiting**
10:1, 10:15

**aware**
47:15, 49:22, 50:5, 50:8, 57:8, 107:4, 139:7, 139:12, 141:2, 142:15, 191:8

**B**

**b**
33:22, 149:20

**back**
10:14, 13:9, 14:6, 28:6, 28:15, 31:10, 31:12, 32:3, 46:14, 49:18, 56:1, 62:16, 63:6, 66:19, 71:3, 71:18, 74:10, 77:14, 79:1, 82:17, 93:11, 95:14, 98:12, 98:19, 101:11, 102:3, 110:8, 112:13, 113:12, 128:2, 128:5, 130:2, 136:10, 139:9, 146:1, 160:3, 161:4, 166:11, 169:8, 182:12, 184:5

**balance**
80:2, 81:3

**bank**
105:16, 105:20, 106:4, 187:1, 188:22, 192:21, 193:4

**banking**
104:11

**bankruptcy**
107:7, 109:5

**base**
112:19

**based**
6:10, 17:17, 33:2, 37:13, 37:16, 38:18, 57:16, 99:12, 122:22, 125:2, 125:3, 128:7, 128:9, 128:22, 131:21, 144:21, 145:2, 150:14, 155:11, 158:15, 182:2, 183:19, 183:21

**basically**
94:11, 156:1, 158:14, 164:22, 188:21, 189:19

**basis**
9:8, 15:14, 34:18, 40:10, 40:12, 45:14, 45:16, 54:6, 54:8, 55:10, 55:11, 57:14, 58:4, 67:8, 68:2, 68:9, 72:6, 82:10, 92:12, 94:20, 100:16, 102:10, 107:16, 109:18, 123:9, 123:12, 124:10, 127:2, 127:7, 129:5, 132:2, 167:3, 175:13, 176:14

**bat**
169:19

**bear**
68:14, 189:22

**because**
9:19, 10:9, 10:15, 10:21, 18:14, 23:8, 26:11, 26:20, 29:16, 34:21, 38:15, 48:4, 53:7, 53:20, 53:21, 55:13,

55:15, 56:12, 59:13, 60:21, 62:6, 68:12, 69:8, 71:1, 72:17, 73:3, 73:14, 74:2, 75:3, 78:10, 79:1, 79:14, 82:11, 82:21, 84:16, 85:13, 85:18, 87:21, 88:7, 89:12, 90:2, 91:17, 91:19, 92:10, 95:6, 97:2, 98:1, 99:5, 100:20, 101:15, 101:16, 101:18, 102:2, 104:10, 109:11, 109:17, 111:13, 112:17, 118:9, 122:21, 123:4, 123:18, 129:3, 130:2, 132:19, 135:5, 138:13, 144:11, 146:22, 148:10, 149:22, 152:5, 152:21, 156:18, 157:16, 159:5, 159:21, 161:22, 162:14, 163:8, 166:21, 167:1, 168:18, 174:20, 175:16, 176:20, 177:12, 177:16, 179:19, 185:18, 191:10, 191:22, 194:2, 194:8

**becomes**
107:14

**been**
8:17, 9:13, 9:14, 9:22, 12:16, 13:1, 18:18, 30:20, 33:1, 40:11, 51:8, 51:10,

J.R. 854

Transcript of Meet & Confer
Conducted on January 3, 2025

201

57:2, 57:10,
58:6, 62:4,
64:22, 67:2,
67:5, 81:6,
81:7, 83:2,
83:7, 84:3,
99:18, 99:19,
100:16, 105:5,
107:8, 107:15,
107:16, 107:19,
109:16, 110:3,
110:10, 126:11,
126:14, 127:5,
127:6, 137:16,
155:2, 166:10,
177:20, 182:9,
183:18, 186:19,
187:19, 188:9,
189:17, 189:18,
193:7

**before**
2:10, 7:21,
12:12, 12:15,
16:15, 20:20,
30:6, 42:17,
53:15, 57:11,
66:5, 67:10,
77:22, 114:18,
120:15, 127:9,
137:12, 145:19,
146:22, 154:19,
159:17, 161:1,
161:16, 161:21,
163:15, 174:19,
177:10, 179:22,
187:16, 192:15,
192:20, 196:3

**beginning**
125:15

**behalf**
3:2, 3:10, 9:5,
107:6

**behind**
167:10, 180:11

**being**
20:2, 31:15,
37:13, 38:8,
40:9, 40:10,

44:13, 52:7,
59:3, 75:7,
89:6, 93:20,
94:19, 94:22,
95:16, 99:14,
100:13, 100:19,
101:12, 102:10,
110:17, 120:9,
122:6, 127:11,
127:21, 133:11,
182:2, 184:5,
187:18

**believe**
19:6, 37:10,
51:2, 69:2,
109:3, 144:8,
150:20, 151:12,
151:20, 153:10,
165:15, 176:3,
177:10, 178:8

**benefit**
33:10, 61:16,
104:7, 189:7

**beneseck**
125:8

**best**
6:3, 97:8,
114:1, 140:18,
143:12, 194:10

**better**
28:19, 40:7,
80:18, 103:21,
109:19, 111:15,
137:9, 139:20,
141:4, 142:20,
148:7

**between**
34:2, 77:14,
85:17, 89:21,
105:3, 150:14,
155:12, 187:6

**beyond**
40:2, 59:12,
74:11, 84:4,
106:3, 108:21

**bids**
75:20, 76:13

**big**
162:16

**bit**
25:16, 39:17,
64:17, 102:20,
115:8, 136:13,
145:19, 160:4,
160:6, 169:9,
180:11, 181:3,
193:22

**black**
91:9, 102:18

**bleeds**
20:8, 67:4

**blocked**
71:10

**board**
64:15, 134:6

**both**
7:20, 23:2,
37:14, 104:15,
104:16, 104:17,
104:20, 107:15,
108:10, 188:4,
188:6, 188:10

**bottom**
115:18

**brand**
185:1

**breach**
120:3

**break**
26:4, 97:21,
117:17, 160:5,
161:1, 186:5

**brief**
143:20, 143:21,
145:16, 146:17,
175:11, 176:6,
179:6

**briefed**
15:11, 33:9,
169:13

**briefing**
93:7, 110:20,
113:15, 121:16,
122:9, 137:11,
149:11, 174:17,
193:14

**briefs**
162:14

**bringing**
56:13

**broad**
92:20, 94:8

**broadening**
132:21

**broader**
135:19, 150:12,
168:4

**broadly**
16:21, 75:9,
111:22

**broke**
43:4

**broken**
19:15, 23:20,
121:13

**brought**
12:11, 27:2,
53:8, 53:10,
54:1, 84:8

**bunch**
145:22

**burden**
31:17, 61:16,
139:19

**burdensome**
142:18, 143:10,
143:15, 148:7,
182:18

**bus**
173:7

**business**
19:12, 19:13,
19:16, 19:17,
20:1, 22:21,
23:11, 23:21,
26:5, 26:8,
26:18, 27:1,
27:3, 27:9,
27:12, 29:22,
34:12, 43:7,
48:11, 57:7,
57:19, 59:16,
61:3, 61:12,
65:7, 65:17,
84:20, 91:21,
92:16, 119:11,

J.R. 855

Transcript of Meet & Confer
Conducted on January 3, 2025

202

119:20, 120:6,
120:7, 137:13,
138:5, 155:1,
183:4, 184:12,
189:12, 192:15
**businesses**
34:10

**C**

**c**
172:6
**calculation**
176:16
**calendar**
179:8
**call**
5:9, 5:20, 7:4,
17:6, 128:10,
133:21, 160:15,
167:2, 180:8,
181:4, 185:13,
185:21
**called**
58:11, 75:18,
104:15, 116:16
**calls**
104:12
**came**
35:6, 80:21,
109:12, 109:13,
151:12, 153:10
**can't**
41:7, 80:22,
106:19, 109:2,
124:19, 138:8,
138:9, 177:6
**candidly**
30:16, 158:14
**cannot**
63:2, 126:2,
138:5
**capital**
79:9, 115:13,
162:22
**capture**
64:16, 65:8,
87:21
**car**
57:3

**carter**
4:11, 4:14
**case**
1:6, 8:13,
8:16, 9:6, 9:13,
9:16, 11:19,
12:12, 13:16,
14:22, 17:18,
18:6, 18:19,
20:8, 24:21,
26:13, 33:6,
33:7, 33:9,
33:16, 34:6,
36:12, 39:17,
46:10, 54:19,
56:7, 58:19,
58:20, 73:22,
84:16, 84:18,
90:7, 91:19,
92:14, 106:20,
118:8, 120:4,
124:1, 124:7,
125:7, 125:22,
126:1, 126:7,
126:21, 132:4,
132:5, 137:19,
137:20, 138:4,
138:7, 138:12,
140:19, 145:18,
145:22, 146:11,
146:18, 149:4,
149:7, 162:4,
162:7, 162:9,
162:10, 162:21,
163:10, 171:1,
171:20, 171:21,
172:4, 173:10,
173:21, 173:22,
174:3, 175:3,
187:15, 192:10,
192:14, 196:11
**cases**
9:18, 11:9,
11:22, 12:7,
37:14, 39:20,
39:21, 140:13,
163:12, 171:22,
173:1, 173:18,

174:13, 174:16
**cash**
80:3
**categories**
15:4, 16:9,
16:12, 16:21,
19:1, 34:12,
40:2, 40:21,
41:1, 50:21,
94:9, 94:13,
94:15, 117:18
**category**
43:9, 48:5,
182:1
**caused**
57:5
**cautious**
75:8
**cavalier**
22:9
**ceased**
144:6
**central**
33:8, 118:7
**certain**
5:19, 33:8,
139:16
**certainly**
6:7, 12:4,
19:20, 33:7,
33:8, 35:2,
35:12, 46:6,
57:13, 83:1,
94:9, 102:21,
106:3, 106:14,
109:4, 121:5,
136:4, 178:1,
183:13, 192:13
**certainty**
64:7
**certificate**
65:3, 196:1
**certify**
196:5
**cetera**
33:5, 99:9,
111:22
**challenge**
108:7

**change**
15:21
**changes**
126:16, 193:17
**charges**
172:8
**check**
77:2, 98:18,
102:11, 170:15,
171:4
**checking**
87:13, 87:14,
87:17, 87:19
**chen**
1:7, 4:17,
4:22, 8:14,
8:22, 9:5,
76:10, 78:13,
106:11, 107:5,
116:18, 116:19,
118:4, 118:5,
144:6, 144:22,
145:4, 153:10,
172:14, 172:16,
190:21, 193:3
**chen's**
133:14, 134:17,
153:12, 191:11
**choice**
194:4
**choose**
170:20
**chose**
27:1
**christmas**
9:11
**circle**
28:6
**circles**
96:7, 103:9,
104:2
**circuit**
162:4, 162:21,
163:1
**circumstances**
173:4
**cite**
138:16, 142:4,

J.R. 856

Transcript of Meet & Confer
Conducted on January 3, 2025

203

150:5, 150:10, 162:13, 173:4

**cited**
126:7, 126:8, 138:7, 138:21, 140:13, 162:4, 162:9, 162:16, 171:20, 173:10, 173:18, 174:13, 175:4

**citing**
126:22, 162:8, 162:11

**claim**
20:3, 20:6, 20:7, 24:7, 33:19, 38:16, 46:9, 53:16, 54:18, 55:1, 55:6, 56:9, 57:11, 57:14, 60:2, 60:3, 62:2, 73:15, 73:20, 84:16, 91:19, 92:10, 107:5, 119:22, 120:1, 120:2, 120:3, 154:17, 158:3, 158:5, 172:10, 172:12

**claiming**
53:17

**claims**
12:10, 12:13, 12:16, 31:20, 53:8, 53:15, 54:1, 54:11, 54:12, 54:20, 56:20, 60:4, 84:17, 118:2, 118:4, 158:3, 159:2, 172:9

**clarification**
27:21, 28:21, 29:4, 95:13, 103:19, 110:8, 111:6, 190:6

**clarified**
28:3

**clarify**
5:13, 6:11, 6:21, 8:9, 45:13, 55:13, 59:6, 62:14, 69:7, 78:22, 95:15, 96:10, 96:17, 99:5, 164:6

**clarifying**
110:6

**clarity**
93:4, 194:1

**class**
173:6

**clattenburg**
3:13, 4:20, 55:12, 59:5, 67:15, 68:16, 69:10, 117:11, 118:14, 118:17, 119:2

**clauses**
101:19

**clear**
4:4, 28:3, 30:7, 38:13, 40:20, 51:5, 84:2, 101:2, 101:15, 111:12, 123:21, 159:6, 161:15, 171:8, 171:12, 191:18, 193:13

**clearer**
110:19, 156:18, 157:5, 157:9, 158:20, 163:11

**clearly**
86:11, 109:1, 122:9, 126:1

**client**
10:3, 12:11, 43:15, 43:21, 51:10, 51:14, 51:16, 51:17, 57:10, 57:17, 59:15, 60:8,

60:10, 64:21, 87:11, 87:12, 184:13

**client's**
12:14

**clients**
19:2, 23:6, 23:13, 23:17, 25:21, 31:18, 38:6, 41:14, 42:7, 42:22, 43:8, 43:9, 43:10, 46:7, 46:15, 46:20, 47:16, 48:22, 49:4, 49:7, 49:13, 52:1, 52:11, 55:3, 55:17, 55:19, 56:2, 56:6, 56:19, 57:16, 58:12, 59:11, 59:19, 59:22, 60:6, 60:19, 64:3, 66:1, 66:6, 87:13, 87:20, 114:18, 181:16, 182:19

**close**
30:6, 174:2, 180:1

**closed**
104:7

**code**
9:3, 12:14, 133:13, 133:14, 134:22, 135:4, 135:13, 136:7, 141:14, 166:4, 166:9, 167:22, 168:2

**coin**
112:19

**colleagues**
4:13, 7:11, 185:14

**collected**
40:8, 49:11,

58:16, 126:11, 181:20

**collection**
35:17

**collectively**
169:20

**colloquially**
26:4

**come**
10:14, 14:6, 28:15, 31:10, 31:11, 31:13, 44:14, 49:18, 51:18, 63:6, 66:18, 79:1, 86:8, 93:10, 95:14, 98:12, 98:19, 102:3, 113:12, 130:1, 182:12

**coming**
70:17, 120:8

**commission**
196:17

**common**
9:19, 149:9, 149:12, 149:17, 150:12, 150:13, 151:3, 151:20

**communication**
45:19, 135:16

**communications**
17:8, 21:7, 22:10, 72:12, 75:19, 77:15, 79:8, 79:21, 95:6, 95:8, 104:5, 116:16, 117:3, 119:10, 132:14, 133:12, 139:6, 139:11, 139:17, 139:18, 141:2, 142:14, 142:19, 143:16, 148:4, 148:11, 156:7

**companies**
37:21, 39:1,

J.R. 857

Transcript of Meet & Confer
Conducted on January 3, 2025

204

39:8, 46:4, 46:5, 54:22, 83:18, 85:17, 88:18, 187:6

**company**
8:19, 29:17, 39:2, 42:3, 43:21, 44:14, 48:1, 50:4, 60:6, 86:8, 138:4

**compel**
6:1, 6:7, 7:1, 14:11, 14:18, 32:21, 33:10, 97:7, 108:14, 110:16, 110:19, 110:21, 111:2, 112:2, 119:9, 121:6, 121:9, 145:16, 159:14, 159:15, 161:10, 164:5, 164:16, 169:11, 181:11

**complaint**
8:11, 8:14, 8:22, 9:2, 17:19, 18:1, 18:14, 24:10, 25:18, 26:4, 26:6, 26:13, 27:5, 38:7, 40:16, 40:18, 43:11, 51:22, 52:7, 53:7, 53:9, 53:14, 53:16, 54:7, 54:8, 54:9, 54:11, 55:5, 55:10, 55:11, 55:22, 57:6, 57:13, 57:20, 61:7, 61:18, 62:4, 76:21, 85:9, 90:20, 122:11, 122:15, 135:1, 137:10, 137:18, 138:10,

138:18, 138:19, 139:6, 139:9, 140:2, 141:10, 141:13, 141:17, 141:21, 141:22, 142:3, 142:10, 142:16, 143:20, 144:4, 147:5, 147:7, 147:12, 147:19, 149:2, 150:5, 151:5, 172:7, 172:8

**complaints**
38:8

**complete**
57:11, 62:19, 62:21

**completed**
11:12

**compliance**
161:17, 161:18

**complicated**
101:18

**component**
23:20, 26:22, 183:14, 183:15

**components**
20:13, 182:8

**comprehensive**
48:14

**compromise**
16:6, 38:1, 63:19, 83:14, 92:21, 94:7, 114:2, 128:11, 163:16, 169:18, 175:16, 176:5

**compromising**
74:9, 93:12, 100:5

**computer**
9:3, 12:14

**concealing**
151:13, 153:11

**conceding**
86:9, 96:14, 100:22, 170:9

**concern**
36:2, 36:17,

37:8, 42:14, 44:17, 83:12, 84:14, 85:19, 85:20, 89:19, 91:17, 100:2, 102:7, 103:1, 103:7, 103:18, 148:20, 157:18, 183:5, 183:7

**concerned**
129:15, 157:15, 173:19

**concerning**
17:9, 21:8, 22:10, 45:19, 72:12, 75:19, 76:13, 77:15, 79:8, 79:21, 104:6, 116:16, 117:4, 119:10, 130:8, 132:15, 149:9, 149:14, 151:11, 151:17, 151:19, 152:8, 153:9, 172:15

**concerns**
9:2, 43:5, 82:10, 90:1, 92:9, 95:16, 96:3, 104:11, 136:12, 150:7, 184:8

**concluded**
195:3

**conduct**
172:9, 172:21

**confer**
1:13, 2:1, 4:12, 5:21, 6:15, 7:5, 7:16, 9:10, 10:9, 10:21, 11:4, 11:8, 12:21, 13:8, 13:11, 13:18, 16:5, 28:16, 32:8, 68:8, 97:4, 98:14, 110:9,

110:13, 128:6, 148:21, 176:7, 177:6, 179:11

**conference**
5:18, 10:22

**conferred**
38:2, 136:13

**confers**
8:8

**confine**
6:22, 106:13

**confirm**
148:16, 152:4, 152:20, 153:21, 171:3

**confirming**
136:11

**conflating**
66:1

**confused**
56:12, 68:3, 121:18

**confusing**
95:17, 145:7

**confusion**
69:9

**connection**
33:16, 155:13

**consider**
15:12, 32:7, 37:1, 71:22, 72:10, 92:13, 94:22, 102:20, 108:20, 110:12, 127:22, 148:17, 168:10, 177:9, 177:19, 179:12, 182:11

**consideration**
24:18, 66:12, 74:13

**considered**
15:20, 149:10, 162:20

**consistent**
32:18, 34:19, 35:5, 36:6, 37:3, 45:6

J.R. 858

Transcript of Meet & Confer
Conducted on January 3, 2025                                    205

**consolidate**
5:13, 6:20,
8:6, 9:18
**consolidated**
11:9, 12:17,
12:22, 13:1
**consolidating**
12:7
**consolidation**
12:9, 13:7
**construe**
174:6
**consulting**
47:22
**containing**
149:8
**context**
138:16
**continuation**
84:19, 86:4,
91:21
**continuations**
18:9, 72:19
**continue**
56:5, 106:7,
132:2, 139:10,
142:17, 150:14,
159:21, 159:22,
160:17, 176:21,
185:16
**continued**
24:16
**continuing**
148:6
**contours**
157:6
**contractor**
47:21, 116:1
**contractors**
41:19, 42:22,
44:9, 44:22
**control**
19:9, 122:9,
122:13, 123:3,
123:6, 123:10,
123:19, 124:9,
124:20, 127:3,
129:1, 129:16,

131:13, 131:22,
145:21, 146:3,
189:12, 191:9,
192:11
**conversation**
21:10, 93:7
**conversations**
95:21, 153:12
**copies**
134:10, 134:13
**corp**
162:5, 162:9,
162:12
**corporate**
18:15, 85:6
**corporation**
24:17, 25:10,
173:5
**correct**
21:2, 35:13,
38:15, 40:12,
42:5, 50:17,
50:18, 59:4,
65:11, 70:3,
70:12, 81:10,
100:12, 101:9,
105:21, 105:22,
108:11, 113:9,
176:1, 176:2,
177:16, 183:22,
196:6
**correctly**
101:10, 143:3
**could**
16:8, 16:16,
19:5, 26:12,
29:9, 30:13,
32:5, 40:4,
41:1, 42:16,
45:17, 46:19,
48:13, 51:8,
51:10, 52:5,
53:11, 54:7,
59:18, 60:7,
61:22, 64:9,
66:5, 69:18,
71:10, 86:20,
92:20, 93:8,

93:13, 102:13,
104:9, 106:16,
109:8, 118:11,
118:12, 130:20,
133:18, 137:3,
151:1, 152:3,
153:2, 153:7,
153:15, 156:17,
157:5, 157:11,
158:13, 158:19,
158:21, 160:2,
163:3, 164:6,
169:1, 170:8,
171:22, 173:1,
182:20, 184:15,
188:1, 188:2
**couldn't**
175:16
**counsel**
126:13, 155:12,
157:4, 196:9
**count**
172:16, 173:1
**counter-proposal**
168:11
**counterpoints**
86:17
**county**
154:18
**couple**
30:8, 121:14,
128:21, 160:13
**course**
4:16, 6:5,
7:17, 8:8, 8:16,
11:16, 14:5,
20:17, 46:13,
106:18, 149:13,
182:15, 186:11
**court**
1:1, 7:21,
8:12, 9:11,
11:4, 83:15,
83:21, 100:6,
111:13, 123:21,
126:1, 127:10,
127:20, 171:10,
171:13, 173:12,

173:22, 174:5,
174:10, 174:19,
177:12, 179:7,
189:4, 189:7,
195:2
**court's**
175:15
**courts**
125:17, 137:21
**covenants**
52:15
**cover**
22:3, 24:1,
44:5, 44:8,
44:12, 47:19,
66:17, 115:20,
184:16
**covered**
32:5, 67:10,
67:11, 67:13,
72:7, 72:8,
76:7, 114:17,
115:5, 115:7
**covers**
21:5, 94:9,
114:6
**craig**
190:13
**crash**
173:7
**create**
22:16, 26:15,
165:8
**created**
22:14, 23:5,
25:1, 31:4,
56:3, 56:7
**creation**
25:5
**criteria**
36:9, 36:13,
84:11, 89:16,
91:7, 92:5,
92:7, 93:19,
94:20, 102:15,
103:5, 103:13
**cross-motion**
170:5

J.R. 859

Transcript of Meet & Confer
Conducted on January 3, 2025

**crosstalk**
71:15, 97:15, 178:13
**crypto**
104:15, 151:14, 153:13
**cumulative**
147:5
**curious**
25:7
**current**
60:19, 181:15
**currently**
139:7, 139:12
**custody**
19:9, 122:12, 123:3, 123:6, 123:10, 123:14, 127:3, 131:22, 145:20, 146:3, 189:12, 192:3, 192:11
**customer**
42:21, 43:15, 43:21, 48:5, 51:10, 51:14, 51:17, 59:15, 60:8, 60:11, 61:10, 61:12, 90:14, 90:15, 90:17, 103:12, 184:13
**customers**
19:2, 23:5, 23:13, 23:17, 25:22, 38:7, 41:15, 42:8, 43:3, 43:8, 43:9, 43:11, 46:8, 46:15, 46:20, 47:15, 48:22, 49:4, 49:7, 49:13, 52:12, 55:3, 55:17, 55:19, 56:2, 56:6, 56:19, 58:12, 59:11, 59:22,

60:6, 60:20, 66:1, 66:7, 90:19, 114:18, 181:16, 182:19
**cut**
24:13, 25:14, 29:1, 39:13, 51:5, 61:22, 122:18
**cutoff**
53:7, 54:4, 56:2, 59:4, 61:18, 62:1, 62:10, 63:8, 64:13, 66:14, 66:16, 66:18, 67:2, 67:3
**cutting**
51:7
**cv**
1:6

**D**

**d**
137:12, 138:4, 155:1
**d-a-n-s**
17:17
**dakota**
83:18
**damage**
73:13
**damages**
19:22, 30:21, 31:7, 46:1, 46:5, 54:19, 55:1, 57:15, 60:4, 73:13, 73:14, 73:20, 115:17, 187:10
**dans**
17:6, 17:11, 17:16, 17:18, 18:12, 18:19, 19:6, 19:10, 19:22, 20:9, 20:20, 21:4, 21:9, 21:11,

21:20, 26:1, 26:12, 28:16, 29:8, 29:19, 29:21, 31:4, 31:15, 35:2, 57:21, 67:13, 72:9
**darrell**
190:12
**dash**
175:3
**database**
45:7, 47:4, 47:11
**date**
25:17, 26:6, 38:7, 40:15, 40:17, 43:11, 51:22, 52:6, 53:17, 53:18, 53:22, 54:9, 55:21, 57:5, 57:12, 60:9, 61:17, 62:1, 63:11, 63:16, 63:17, 63:18, 63:21, 64:9, 64:13, 67:2, 67:3, 74:16, 75:10, 75:13, 76:21, 90:20, 96:12, 96:13, 96:16, 121:17, 122:11, 161:18, 173:14, 173:15
**dates**
42:1, 53:6
**david**
4:17, 8:22, 9:5, 116:19, 118:5, 121:10, 124:14, 124:20, 126:6, 126:16, 127:14, 133:14, 134:17, 135:3, 143:4, 144:6, 144:22, 145:4, 151:12, 153:10,

159:16, 161:1, 161:10, 161:14, 162:1, 165:9, 165:19, 166:12, 190:13
**david's**
122:1, 123:6, 123:9, 123:13, 130:8, 130:20, 131:13, 134:10, 134:13, 144:12, 145:21, 149:12, 152:12, 153:3, 163:13, 163:21, 169:5
**day**
27:19, 28:11, 53:8, 71:5, 160:8, 160:9, 163:4, 179:7, 196:14
**days**
5:4, 161:17, 161:19, 162:6
**dc**
3:17
**ddc**
138:4
**deadline**
162:2
**deal**
6:6, 12:22, 14:5, 14:18, 25:20, 115:10, 146:15, 183:17
**dealing**
17:4, 18:12, 151:1
**deals**
17:20
**death**
57:18
**debt**
80:3
**december**
65:14, 74:10
**decentralized**
104:14

Transcript of Meet & Confer
Conducted on January 3, 2025

207

**decide**
83:16, 95:19
**deciding**
95:21
**decision**
26:3, 26:15,
175:16, 175:17
**declaration**
143:4
**declarations**
172:5
**declaratory**
20:7, 60:2,
120:1
**decline**
149:19
**declined**
174:6
**dedication**
152:12
**deemed**
19:8
**deep**
45:3, 97:10
**defendant**
8:13, 8:21,
26:13, 76:10,
95:9, 172:5,
172:7, 172:11,
174:18, 192:10
**defendants**
1:8, 3:10,
4:22, 6:9, 6:13,
9:17, 9:21,
14:22, 15:2,
15:7, 17:13,
17:15, 18:6,
18:15, 21:9,
33:17, 33:20,
34:9, 35:11,
35:14, 35:17,
67:18, 67:20,
73:1, 76:8,
78:11, 79:14,
80:4, 83:10,
84:11, 92:6,
169:20, 171:17,
171:19, 172:2,

173:8, 182:6,
189:13, 190:8,
190:10, 191:16,
192:2, 192:8,
194:6
**defense**
135:12
**defi**
104:14, 112:19
**deficiencies**
172:6
**define**
95:7
**definitely**
114:19, 115:5
**degree**
84:3
**delay**
176:20
**deleted**
127:14
**delivered**
110:3
**demand**
137:9
**demands**
137:17
**depart**
185:12
**departing**
180:2
**depending**
14:1
**depends**
31:2
**deposition**
137:10, 138:1,
140:4, 140:6
**depositions**
137:15, 138:9,
143:22, 147:17,
150:7
**derive**
34:12
**describe**
33:13, 139:16,
142:19, 148:4,
152:17

**describing**
34:8
**descriptive**
106:21
**desire**
9:18
**despite**
57:12
**detail**
111:4, 162:13
**detailed**
111:1
**details**
29:17, 29:18,
149:9, 156:6,
158:13, 181:4
**determination**
89:22
**determinations**
9:20, 91:16,
92:7, 93:20,
94:21
**determine**
23:9, 27:9,
27:13, 29:9,
29:14, 36:13,
46:2, 87:18,
188:10
**determined**
92:14
**determining**
88:3, 103:2
**devices**
147:17, 150:6
**dg**
162:5, 162:8
**dicharia**
3:14, 4:21
**difference**
13:15, 34:1
**differences**
13:3
**different**
9:15, 34:10,
34:11, 34:13,
39:1, 69:5,
89:21, 93:16,
95:18, 101:19,

113:19, 115:9,
128:21, 130:4,
147:1, 147:6,
148:10, 153:1,
157:19, 172:5,
172:6, 172:8,
172:9
**differently**
111:1, 177:14
**difficult**
36:14, 36:17,
141:19
**difficulties**
35:9
**difficulty**
36:3, 152:22
**digital**
17:6, 17:16,
18:20, 106:15,
106:20, 112:20,
113:2, 113:4,
187:9, 187:15,
187:17
**diplomate**
2:11
**directed**
55:9, 121:9,
123:8, 149:9,
159:16, 172:16
**directions**
5:16
**directly**
20:4, 90:12
**disagree**
21:3, 38:17,
53:14, 63:4,
64:5, 105:11,
157:13, 165:14,
192:17
**disagreement**
6:9, 63:13
**discern**
84:9, 102:9
**disclose**
141:1
**disclosure**
18:15
**discord**
95:21, 127:14,

J.R. 861

Transcript of Meet & Confer
Conducted on January 3, 2025    208

143:6, 143:16, 194:7

**discovery**
5:22, 6:4, 7:16, 7:22, 10:10, 10:11, 11:2, 11:6, 11:15, 11:17, 11:18, 11:19, 11:22, 12:9, 12:21, 13:3, 13:5, 13:9, 13:16, 24:2, 24:9, 25:4, 25:11, 26:11, 26:21, 27:8, 27:13, 34:15, 36:6, 36:7, 54:14, 61:17, 64:2, 64:12, 146:2, 147:17, 148:13, 149:20, 150:6, 161:22

**discuss**
6:5, 6:14, 10:6, 12:2, 28:20, 91:3, 93:1, 96:6, 168:16, 169:1, 169:5, 180:7

**discussed**
93:3, 95:14, 128:12, 137:11, 144:10, 144:19, 154:19, 185:9, 187:16

**discussing**
63:9, 129:18, 148:2

**discussion**
4:16, 28:7, 29:1, 68:7, 74:20, 117:15, 117:16, 118:1, 118:6, 128:19, 168:21, 175:8, 186:4

**discussions**
118:12, 193:16

**dismiss**
33:17, 172:4

**dispatch**
160:17

**dispute**
10:10, 10:11, 11:3, 15:5, 81:15, 96:13, 116:11, 170:3

**disputes**
7:17, 7:22, 131:7

**dissolution**
8:19, 51:13, 57:18, 61:20, 62:9, 62:15, 65:4

**dissolved**
62:7, 62:10, 62:16, 65:3, 73:16

**distinct**
18:7, 33:3, 34:5, 72:18, 80:6, 99:13

**distinguishable**
173:19

**distributions**
45:20, 46:3, 54:20, 54:21, 72:13, 73:18, 73:22, 115:13

**district**
1:1, 1:2, 9:6, 9:14, 162:17

**distrust**
149:12

**divert**
57:6

**dividend**
75:6

**dividends**
45:20, 46:2, 72:12, 73:18, 73:21

**division**
18:22

**doc**
182:8

**document**
17:7, 17:22, 21:5, 32:20, 34:17, 35:1, 35:3, 35:4, 35:16, 45:5, 45:18, 49:5, 58:9, 58:10, 67:7, 67:8, 67:9, 68:22, 69:6, 72:5, 72:6, 72:11, 74:15, 75:17, 75:18, 77:11, 85:12, 87:16, 87:22, 89:4, 90:1, 90:10, 95:9, 98:4, 98:6, 98:16, 99:6, 100:15, 102:17, 103:3, 104:4, 107:7, 119:7, 122:5, 131:6, 131:8, 131:14, 131:15, 137:9, 137:16, 139:20, 139:21, 141:4, 142:21, 148:8, 179:20, 181:14, 186:15, 188:13

**documentation**
107:9, 164:1, 165:7, 167:17

**docusign**
38:6, 41:9, 41:17, 41:22, 43:1, 44:18, 47:5, 47:17

**docusigns**
47:7, 47:9

**dog**
39:18, 41:5

**doing**
11:15, 23:11, 24:10, 25:8, 28:10, 61:2, 61:12, 65:16,

87:15, 103:15, 166:21

**done**
11:3, 11:16, 16:9, 27:5, 51:15, 62:12, 64:11, 74:17, 93:7, 96:15, 140:17, 179:17

**door**
175:3

**double**
77:2, 170:15, 171:4

**down**
43:4, 71:12, 97:1, 98:5, 117:17, 154:3, 170:1, 170:10, 170:22

**draft**
178:3

**drafted**
177:14, 178:10

**drawing**
100:7

**drawn**
100:7

**drop**
170:1, 170:5, 170:7

**dropping**
133:7, 163:17, 170:18

**due**
152:11, 161:20, 173:14, 173:15, 179:6

**duty**
60:4, 120:3

**E**

**e-mail**
5:10, 6:11, 6:16, 7:14, 8:4, 10:7, 12:3, 13:8, 153:7, 153:15

J.R. 862

Transcript of Meet & Confer
Conducted on January 3, 2025

**e-mails**
10:4, 110:5,
168:21
**each**
6:4, 44:19,
44:22, 95:9,
114:21, 171:8,
172:5, 172:7,
172:10, 172:11,
172:18, 172:20,
175:5, 180:6,
189:13
**earlier**
145:22, 161:16,
166:11, 185:12,
190:6, 192:20
**early**
74:10
**earned**
135:13
**easier**
152:21
**easily**
48:12, 51:9,
66:6
**eastern**
1:16, 162:17
**easy**
91:11, 134:15
**eeoc**
162:7, 162:10
**effectively**
18:21, 23:10,
23:19, 29:21,
104:12
**effort**
29:12, 38:1,
67:20, 74:9,
76:11, 78:14,
83:14, 100:5,
128:11, 132:13,
133:6, 140:3,
140:7, 140:12,
140:15, 140:20,
156:5, 194:14
**efforts**
79:8, 140:16
**eg**
162:11

**either**
20:4, 71:8,
91:9, 102:18,
103:6, 106:18,
121:3, 138:1,
159:6
**elaborating**
28:18
**elaboration**
27:22
**element**
21:21
**elements**
172:10
**eliciting**
149:9
**else**
32:10, 59:8,
77:1, 79:13,
81:10, 81:12,
108:1, 110:5,
136:20, 155:17,
156:3, 156:12,
165:4, 167:13
**emma**
3:21, 4:21
**employed**
196:10
**employee**
47:20, 48:5
**employees**
14:21, 23:12,
24:18, 26:1,
29:19, 41:12,
41:13, 41:19,
42:1, 42:13,
42:22, 44:7,
44:8, 44:21,
46:15, 46:19,
47:16, 48:22,
52:14, 66:2,
115:22
**employment**
47:22
**encompass**
48:4, 192:7,
192:8
**encompassed**
17:11

**encompasses**
146:4
**end**
6:11, 50:18,
51:15, 65:10,
99:14, 99:18,
100:3, 100:12,
101:8, 105:21,
129:4, 141:19,
153:8, 162:12
**enough**
30:16, 65:7,
93:4, 97:6,
178:14, 178:17,
178:21
**enterprise**
57:8
**entirely**
80:6
**entities**
15:9, 18:7,
18:10, 19:21,
20:3, 33:3,
36:20, 56:3,
65:1, 68:17,
72:18, 85:10,
90:5, 99:12,
99:13, 104:19,
104:20, 105:4,
117:5, 117:13,
117:19, 117:21,
118:3, 118:9,
118:13, 186:18
**entitled**
34:15, 46:4,
125:14, 155:7
**entitlement**
125:20
**entity**
8:16, 18:12,
20:11, 22:6,
22:13, 22:16,
22:20, 22:21,
23:10, 23:19,
23:22, 26:15,
27:4, 29:13,
31:1, 31:3,
31:16, 35:2,

85:6, 86:2,
109:12, 109:13,
109:15, 187:12
**especially**
39:4, 123:22,
173:11
**esquire**
3:3, 3:4, 3:5,
3:11, 3:12,
3:13, 3:14
**essentially**
9:8, 19:13,
41:6, 81:5
**establish**
53:12
**established**
137:22
**establishing**
11:6, 173:10
**estate**
116:19, 118:4,
154:8, 155:13
**et**
1:7, 33:5,
99:9, 111:22
**ethic**
152:13, 153:3
**evaluate**
31:10, 31:20
**evaluated**
159:3
**even**
39:19, 44:10,
57:20, 81:19,
84:2, 88:14,
99:17, 100:20,
100:21, 106:3,
124:9, 126:21,
141:16, 142:4,
150:2, 150:20,
152:1, 159:22,
168:4, 177:5,
191:10
**event**
78:6
**ever**
41:20
**every**
30:13, 43:14,

J.R. 863

Transcript of Meet & Confer
Conducted on January 3, 2025

210

47:13, 47:19,
47:20, 47:21,
57:10, 66:21,
148:20, 184:13
**everybody**
5:1, 101:22
**everyone**
4:10, 44:5,
186:10, 188:15,
190:9
**everything**
57:11, 59:7,
92:3, 113:11,
169:5, 179:17
**evidence**
53:12, 53:15,
54:10, 142:5,
172:19, 193:1,
193:5
**exactly**
20:10, 27:8,
27:12, 34:15,
54:12, 95:22,
110:7, 133:1,
143:5, 180:14
**example**
23:16, 25:21,
29:11, 42:7,
44:11, 44:16,
44:19, 51:9,
51:11, 52:14,
54:14, 67:17,
85:16, 90:3,
90:14, 135:22,
166:2, 166:12,
190:20
**examples**
40:5
**except**
40:14
**exception**
163:11
**exceptional**
152:12
**excessively**
154:20
**exchange**
10:4, 104:15,

106:19, 164:2
**exclusively**
35:2, 72:9
**excuse**
38:8, 56:22
**exhaustive**
139:13
**exhibits**
138:9
**exist**
53:15, 53:21,
74:4, 94:16
**existed**
53:12
**existence**
24:17
**existing**
19:15, 26:5,
26:22, 51:10,
51:16, 117:19
**exists**
109:1, 118:18
**expanded**
134:5
**expenses**
80:2
**expert**
75:4
**expires**
196:17
**explain**
102:13, 117:12,
119:16, 140:16,
145:20
**explained**
147:5
**explaining**
120:13, 149:5
**explanation**
135:6, 154:16
**explosive**
152:11
**expressed**
9:17
**extended**
62:22
**extent**
19:22, 35:20,

35:22, 36:1,
36:16, 54:20,
55:2, 60:5,
71:13, 71:21,
74:4, 74:19,
84:2, 84:14,
89:3, 89:19,
93:21, 96:11,
97:2, 102:6,
102:22, 109:8,
110:1, 117:14,
118:1, 123:11,
142:7, 152:16,
166:9, 166:12,
184:8, 189:18
**eyes**
154:1

**F**

**fact**
9:20, 24:4,
26:2, 26:14,
26:17, 27:4,
27:10, 51:8,
51:18, 54:22,
59:15, 70:14,
92:14, 92:15,
95:5, 100:4,
101:3, 102:7,
107:4, 107:5,
127:13, 152:13,
161:14, 171:15,
174:22, 183:16,
184:13, 190:10
**factors**
24:15, 52:10
**facts**
149:14, 150:4,
151:11, 151:17,
151:19, 152:8,
152:15, 153:9
**failed**
48:20, 163:2
**failing**
162:10
**fair**
71:4, 129:11,
178:14, 178:17,

178:21
**fairly**
137:21
**faith**
54:8, 55:10,
67:20, 76:11,
78:14, 83:14,
83:20, 132:13,
133:6, 156:4
**fall**
15:3, 56:3,
92:4, 176:18
**falls**
31:17, 37:20
**far**
11:16, 71:11,
97:11, 177:20,
193:7
**farther**
81:21
**february**
51:18, 51:21,
65:14, 149:13,
196:18
**federal**
8:12, 79:22,
87:7, 99:8,
134:11, 134:14,
137:21, 162:18
**feel**
21:20, 98:17,
104:1, 123:17
**fell**
182:1
**felt**
131:1
**fen**
1:4, 4:15,
154:7
**few**
19:19, 28:8,
81:4, 96:21,
115:17, 131:6,
147:18
**fiduciary**
60:3, 120:3
**figure**
91:3, 114:2

J.R. 864

Transcript of Meet & Confer
Conducted on January 3, 2025

211

**figuring**
120:15
**file**
7:2, 179:7
**filed**
6:2, 8:12,
8:13, 9:5,
10:17, 18:15,
24:11, 38:8,
53:16, 57:21,
61:7, 61:8,
61:9, 62:3,
62:4, 65:4,
107:5, 107:8,
109:5, 143:4,
173:16
**filing**
18:1, 25:18,
26:4, 26:6,
27:5, 52:6,
54:6, 54:8,
54:9, 54:10,
55:4, 55:10,
55:11, 55:22,
57:11, 57:12,
74:9, 76:21,
154:17
**filled**
165:12
**final**
189:8
**finance**
104:14, 162:22
**finances**
14:21
**financial**
21:8, 38:3,
39:6, 43:7,
46:18, 54:16,
56:13, 60:20,
64:16, 67:4,
75:4, 79:22,
80:1, 87:6,
87:7, 88:1,
88:18, 90:9,
90:21, 92:21,
92:22, 94:1,
94:11, 99:9,

116:17, 117:5,
117:21, 189:12,
191:14, 192:9,
192:15, 196:11
**financials**
75:2, 75:8
**find**
16:6, 17:2,
24:8, 69:11,
69:19
**finder**
92:15
**finding**
61:13
**fine**
6:7, 12:4,
13:13, 14:6,
14:13, 21:1,
38:16, 66:10,
96:20, 121:5,
129:17, 131:16,
151:8, 154:3,
167:1, 184:11,
184:14, 186:8
**finish**
64:2, 98:3,
98:4, 120:20
**firestone**
3:15, 3:21,
4:19
**firm**
4:19, 8:22
**first**
6:7, 17:14,
18:12, 20:20,
54:7, 83:4,
84:1, 121:8,
121:9, 121:12,
121:21, 128:19,
129:9, 131:6,
131:15, 150:4,
150:16, 150:19,
150:21, 152:9,
152:10, 180:17,
181:10, 192:16
**five**
16:9, 16:12,
61:9, 98:12,

98:13, 98:20
**five-minute**
97:20, 161:1
**fix**
141:19
**flipping**
77:13, 77:20
**floor**
3:6
**flow**
80:3, 187:11
**floyd**
3:21, 4:21
**fly**
136:15, 180:17
**focus**
13:5, 13:16,
58:3
**focused**
35:1, 135:12,
152:16
**follow**
98:3, 128:17
**following**
25:2, 26:3,
56:14, 194:10
**foot**
135:21, 166:13
**for-now**
63:12
**foregoing**
67:18, 73:7,
196:4, 196:5
**forget**
177:3
**form**
30:1
**formal**
7:7, 152:2
**formation**
17:9, 22:11,
22:12, 22:13,
43:7
**formed**
24:4, 65:2
**former**
11:19, 23:21,
27:10, 29:22,

90:15, 90:17,
181:15
**forth**
31:11, 67:19,
77:14
**forward**
5:3, 10:17,
10:18, 120:8,
143:8, 154:12,
176:13, 177:5,
177:8
**forwarded**
6:12
**four**
71:10
**frame**
15:4, 17:21,
37:2, 48:17,
59:3, 76:16,
76:19, 76:22,
77:3, 77:6,
77:8, 77:10,
78:5, 78:8,
78:10, 78:18,
79:5, 79:12,
80:16, 81:9,
84:8, 90:22,
91:4, 94:5,
114:15, 116:8,
183:6, 183:7,
183:8, 183:12,
183:14, 184:4,
184:16
**frames**
114:13
**frankly**
10:15, 19:11,
58:19, 66:4
**friday**
1:15
**front**
37:12, 70:1,
111:13, 170:16
**ftx**
107:4, 107:7,
107:11, 107:20,
109:1, 109:4,
109:11, 109:22,

J.R. 865

Transcript of Meet & Confer
Conducted on January 3, 2025                    212

111:3, 111:16, 111:17, 187:2, 188:7

**fully**
169:12

**fundamentally**
15:3, 15:8, 15:16, 19:10, 19:18, 20:5, 20:9, 23:4, 29:20, 31:6, 33:12, 34:3, 36:11, 42:10, 45:10, 52:8, 59:1, 60:1, 73:14, 79:5, 84:17, 84:18, 90:4, 90:11, 91:19, 119:18, 119:22, 184:1, 184:9, 190:4

**funds**
79:9, 106:9, 168:2, 187:6, 187:11, 188:1, 188:2, 188:7, 188:9, 193:1

**further**
13:21, 16:16, 17:20, 17:21, 28:22, 81:16, 96:6, 103:19, 145:16, 193:15

**future**
81:17

**G**

**gains**
144:21

**gatesman**
190:13

**gather**
31:18, 40:11, 81:4

**gathered**
40:8

**gave**
38:3, 38:5,

75:8, 105:11, 154:20, 156:4

**general**
6:8, 18:17, 58:6, 59:19, 67:2, 67:19, 79:21, 80:20, 90:8, 94:12, 99:7, 133:4, 138:10

**generally**
5:22, 111:20, 118:12, 155:4, 168:4, 168:5

**generating**
20:1, 90:17

**getting**
5:7, 16:12, 20:10, 21:21, 23:4, 32:12, 48:16, 49:16, 55:13, 55:14, 56:12, 57:2, 88:3, 113:10, 154:13, 170:15

**give**
30:4, 32:6, 40:4, 41:7, 41:11, 41:12, 41:13, 48:11, 61:19, 62:2, 69:2, 69:8, 69:17, 69:19, 70:1, 81:16, 103:21, 115:21, 130:6, 132:17, 133:18, 147:21, 150:4, 151:10, 156:22, 165:21, 166:8, 184:7

**given**
37:18, 39:5, 43:2, 43:10, 50:4, 50:10, 62:8, 74:3, 74:4, 81:13, 93:1, 116:5, 143:15, 172:11,

190:6, 191:1, 191:6, 191:16

**giving**
88:11, 101:17, 124:16, 164:9, 165:22

**global**
167:4

**go**
13:21, 15:13, 15:21, 16:7, 16:8, 23:14, 28:22, 29:20, 34:14, 34:18, 42:17, 42:18, 46:14, 47:7, 53:4, 54:5, 61:3, 67:6, 70:13, 70:19, 73:20, 75:16, 77:14, 82:5, 90:12, 95:3, 96:21, 97:3, 97:8, 106:2, 127:10, 127:20, 134:8, 137:3, 137:7, 159:19, 160:3, 160:8, 160:18, 160:19, 166:17, 175:11, 179:4, 182:22

**goes**
19:17, 26:9, 46:9, 59:21, 61:4, 73:14, 92:13, 94:6, 104:22, 106:18, 106:22, 112:20, 144:9, 144:11

**going**
11:9, 12:19, 13:13, 14:4, 15:18, 17:2, 18:11, 28:8, 28:15, 30:17, 37:4, 47:8, 53:5, 60:22, 64:2, 69:2,

72:4, 82:7, 82:21, 83:6, 96:7, 97:9, 98:4, 103:9, 103:21, 104:2, 106:17, 111:8, 111:13, 112:17, 115:15, 115:16, 119:21, 120:16, 121:19, 122:18, 127:19, 129:6, 130:12, 132:11, 133:15, 136:22, 139:10, 142:17, 147:21, 148:21, 151:17, 152:6, 154:14, 155:14, 156:21, 160:5, 160:18, 162:13, 163:8, 165:13, 166:11, 166:16, 170:7, 172:19, 172:20, 177:19, 181:12, 184:5, 185:19, 188:1, 188:2, 188:3, 189:9, 193:5

**gone**
68:4, 160:10, 184:6, 192:14

**good**
4:5, 4:10, 8:2, 54:8, 55:10, 67:20, 76:11, 78:14, 83:14, 83:20, 93:8, 96:22, 98:21, 114:20, 129:4, 132:13, 133:6, 142:7, 144:11, 144:14, 156:4, 161:6, 169:3, 181:6, 185:3

**good-bye**
186:10

**goods**
181:21

**google**
194:6

J.R. 866

213

**gotten**
28:3, 28:20, 29:3, 70:22, 93:4, 95:13
**governance**
17:10, 22:16
**granted**
9:11
**great**
133:21, 143:3, 181:7
**green**
162:7
**ground**
66:17, 126:3
**grounds**
30:11, 31:9
**group**
16:20
**growing**
149:12, 152:17
**growth**
152:11
**guess**
10:19, 21:18, 26:19, 28:14, 29:5, 29:6, 30:2, 30:17, 35:12, 58:6, 59:13, 83:3, 101:6, 102:7, 104:4, 127:7, 129:19, 132:15, 132:20, 136:2, 155:16, 156:11, 156:14, 166:21, 170:4, 182:17, 185:7, 190:2
**guideline**
149:20
**gusto**
190:14
**guys**
32:6, 59:9, 72:10, 159:20, 160:3, 177:22

**H**

**half**
72:3

**halfway**
70:21
**hamilton**
1:22, 2:11, 186:2, 196:3
**hand**
171:6, 196:14
**handles**
194:18
**hang**
160:4
**happened**
19:14, 57:4, 59:18, 59:19, 107:11, 127:15, 143:16, 185:15, 188:7
**happening**
25:8, 61:9
**happens**
78:1
**happy**
5:1, 5:2, 6:6, 7:9, 14:8, 58:2, 58:4, 67:1, 67:6, 70:13, 114:13, 146:1, 153:6, 160:17, 175:11, 178:5, 179:10
**hard**
87:1, 136:14
**hash**
106:22
**head**
37:11, 73:11, 75:7, 81:1, 95:12, 110:3, 176:14, 194:13
**hear**
74:11, 114:13, 126:20, 127:8, 127:16, 129:5, 135:14, 136:5
**heard**
28:5, 94:18, 127:9, 153:22
**hearing**
9:15, 38:11,

152:14, 180:18, 184:22, 193:18, 193:19
**held**
1:14, 2:1, 175:8, 186:4
**hellosign**
41:17, 41:22, 43:1, 44:19, 47:5, 47:7, 47:16
**hellosigns**
47:9
**helpful**
16:10, 27:18, 28:9, 28:19, 30:10, 31:8, 32:15, 33:12, 69:20, 71:16, 101:15, 101:21, 102:2, 110:18, 132:16, 137:7, 145:10, 155:18
**helps**
129:4
**here**
5:11, 6:2, 6:22, 11:1, 11:7, 14:1, 14:15, 17:3, 23:9, 29:4, 29:8, 29:14, 37:4, 37:15, 37:19, 37:22, 38:14, 39:3, 39:11, 49:2, 49:3, 50:14, 54:13, 55:14, 56:10, 56:20, 61:7, 62:8, 63:8, 77:5, 77:14, 77:20, 79:10, 79:13, 79:14, 79:17, 81:3, 83:5, 83:9, 84:9, 89:1, 92:17, 96:19, 113:3,

116:11, 121:15, 124:12, 125:7, 132:12, 132:20, 132:22, 136:9, 137:5, 139:15, 141:14, 142:6, 143:19, 144:4, 144:11, 145:7, 150:4, 150:22, 152:1, 153:4, 153:13, 154:20, 155:7, 155:11, 156:16, 156:20, 157:6, 158:11, 162:13, 163:16, 163:21, 164:5, 165:18, 168:8, 168:16, 168:18, 169:19, 172:1, 173:5, 173:11, 175:6, 175:14, 180:2, 181:13, 183:4, 185:20, 186:5, 186:12, 188:4, 189:10, 190:4, 191:2, 193:17
**here's**
69:1, 121:18
**hereby**
196:5
**hereunto**
196:13
**hi**
160:11
**hickman**
126:5
**high**
6:13, 9:2, 9:7, 14:16, 15:1, 16:3, 29:16, 33:13, 34:8, 38:21, 78:21, 97:5
**higher**
111:18, 173:20
**highest**
19:19

J.R. 867

Transcript of Meet & Confer
Conducted on January 3, 2025

214

| | | | |
|---|---|---|---|
| **highlight** 97:12 **highlighted** 38:11 **highlights** 172:6 **himself** 165:10 **hired** 52:17 **hit** 121:14 **hold** 37:5, 69:21 **holding** 163:1 **holidays** 5:2 **honest** 30:14 **hook** 195:2 **hope** 5:1 **hopefully** 161:2 **hoping** 12:5, 111:6, 112:4 **hour** 72:3 **hours** 71:10, 160:13 **house** 124:6 **housekeeping** 180:1 **however** 16:14, 61:19, 163:15 **hypothetical** 86:22, 87:3, 91:2, 103:12 **hypothetically** 93:13 | **I** **idea** 6:2, 6:22, | 11:1, 23:4, 69:19, 74:21, 96:22, 98:15, 115:16, 167:7 **ideal** 11:10 **identifiable** 94:13 **identification** 48:11 **identified** 141:14, 149:11, 151:20, 187:20, 194:5 **identifies** 186:22 **identify** 41:18, 42:1, 43:19, 86:16, 87:9, 134:17, 139:16, 166:5, 177:11 **identifying** 47:8, 150:13, 151:3, 189:11 **identity** 186:16, 187:18 **immediate** 75:4 **impermissibly** 154:21 **implicated** 153:2 **important** 133:11 **imposing** 174:6 **impossible** 143:7, 143:9, 143:11, 143:12, 143:14, 188:10 **impression** 5:20 **improper** 123:18, 124:8, 126:9, 130:14, 137:2, 144:1, 149:18, 150:3, | 150:15, 163:14 **improperly** 73:15 **inappropriate** 138:2 **inasmuch** 7:21 **include** 87:8, 156:12, 158:1 **included** 158:5 **includes** 154:22 **including** 44:9, 49:8, 58:13, 76:6, 87:10, 147:17, 150:7, 181:17, 191:2, 194:6 **income** 80:3, 134:18, 135:3, 136:6, 166:6 **inconsistent** 9:20 **independent** 18:17, 41:19, 44:9, 44:21, 47:20, 116:1, 124:15, 158:12 **indicate** 140:15 **indicated** 12:18, 13:6, 30:8, 76:8, 156:6, 180:2, 180:4, 185:11 **indirectly** 20:4 **individual** 142:20 **individuals** 190:12, 191:8 **inextricably** 36:9 **info** 83:6 | **information** 31:22, 38:3, 39:6, 56:13, 57:22, 78:2, 86:16, 87:9, 92:21, 92:22, 94:10, 115:20, 115:21, 122:1, 122:4, 123:8, 123:12, 126:3, 126:5, 130:8, 130:14, 137:3, 144:13, 144:21, 145:4, 145:13, 145:21, 151:13, 153:11, 154:5, 155:3, 155:10, 157:2, 157:13, 157:17, 158:2, 158:4, 158:8, 158:10, 158:15, 158:17, 159:1, 159:4 **informed** 145:3 **infrastructure** 23:12 **initiated** 24:5 **injured** 173:7 **insofar** 20:12, 155:2 **instance** 17:15, 83:4 **instances** 114:12, 139:16 **instead** 140:6, 142:2, 150:5 **institution** 104:14, 112:19 **institutions** 104:12, 107:20 **instructed** 13:10 **intend** 194:6 |

J.R. 868

Transcript of Meet & Confer
Conducted on January 3, 2025                                      215

**intent**
7:2, 9:18
**interest**
20:4, 21:8,
31:1, 46:5,
63:19, 73:17,
75:22, 77:18,
116:17, 117:4,
117:5, 117:21,
118:9, 122:19,
196:11
**interests**
116:17, 118:3
**interject**
126:20, 152:1
**internal**
14:20
**international**
137:20
**interposed**
150:1, 190:11
**interpreted**
125:17
**interrogatories**
17:1, 98:8,
98:17, 120:19,
120:20, 126:2,
131:9, 131:10,
136:22, 138:14,
142:14, 148:7,
160:2, 169:8,
171:5, 171:9,
171:12, 171:16,
172:18, 173:2,
174:1, 174:14,
174:15, 174:20,
174:21, 175:5,
176:16, 176:22,
179:19, 185:21
**interrogatory**
48:10, 113:1,
128:17, 129:19,
138:3, 138:11,
139:8, 139:19,
141:15, 142:1,
147:6, 149:5,
149:8, 149:21,
150:1, 150:11,

150:15, 150:20,
151:2, 151:6,
155:21, 157:22,
172:14, 172:15,
177:1, 181:10,
181:11, 181:14,
187:8, 189:10,
190:22, 193:9,
194:1, 194:15
**interrupt**
20:15, 160:20
**interruption**
181:8
**intertwined**
36:10, 184:1
**intro**
145:19
**inventories**
158:1, 158:6
**investigation**
18:17
**investment**
77:16
**investor**
27:2
**investors**
31:5
**involve**
11:18
**irrespective**
125:20
**isolation**
132:5
**issue**
10:12, 12:10,
14:3, 15:19,
17:1, 17:21,
30:21, 31:7,
33:6, 33:8,
33:11, 34:6,
37:4, 46:1,
58:21, 76:16,
76:22, 77:3,
77:5, 78:10,
79:4, 79:6,
79:12, 79:16,
80:16, 81:9,
81:20, 84:8,

90:7, 91:1,
93:2, 94:5,
95:5, 95:8,
96:13, 96:14,
109:9, 114:16,
127:10, 127:12,
127:19, 129:3,
129:16, 130:10,
130:15, 137:2,
137:17, 143:19,
144:9, 144:11,
144:18, 149:1,
149:3, 167:6,
178:2, 178:6,
180:19, 182:11,
183:8, 186:15,
187:10
**issues**
6:1, 6:4, 9:19,
11:2, 11:5,
12:21, 13:1,
13:5, 13:9,
13:16, 14:17,
16:3, 19:19,
20:8, 33:7,
33:21, 79:3,
81:12, 82:8,
98:8, 100:6,
105:1, 118:7,
123:22, 127:17,
145:8, 147:1,
159:14, 181:13,
184:17, 189:4
**item-by-item**
15:14
**itemize**
142:18, 143:7,
148:4
**items**
6:14, 9:4,
10:6, 14:10

---
**J**

**janet**
1:22, 2:10,
196:3
**january**
1:15, 61:11,

65:14, 196:15
**job**
1:20, 162:7,
166:13
**joined**
4:12
**joining**
4:12
**joint**
104:6
**jokingly**
135:22
**josh**
4:20, 5:10,
5:15, 6:10,
6:15, 6:18, 7:5,
8:5, 10:3, 10:7,
10:21, 12:1,
14:12, 15:18,
30:14, 98:15,
115:2, 160:11
**joshua**
3:11
**judge**
5:19, 8:10,
9:15, 10:22,
12:12, 12:16,
38:11, 111:7,
111:9, 111:11,
168:19
**judge's**
5:16
**judgment**
20:7, 60:2,
120:1, 138:17,
142:6
**july**
60:12, 62:16,
161:19
**jump**
39:15, 55:12,
57:1, 60:16,
82:3, 88:6,
117:9, 151:13,
153:12
**jumping**
70:16
**june**
52:18, 60:12,

J.R. 869

Transcript of Meet & Confer
Conducted on January 3, 2025

216

161:20, 161:21
**jurisdiction**
33:18, 33:21
**justin**
3:14, 4:20

**K**

**k-1**
115:8, 115:9,
115:12
**k-1s**
115:8
**keep**
46:20, 64:3,
97:9, 120:19,
129:18, 131:9,
160:5, 168:18
**keeping**
101:4
**kevin**
3:12, 4:19,
15:22, 16:18,
20:18, 25:16,
30:3, 32:10,
32:18, 34:21,
37:4, 39:13,
61:3, 63:7,
70:18, 72:5,
73:12, 78:2,
79:16, 83:1,
88:8, 89:7,
91:18, 96:18,
98:1, 99:6,
118:15, 122:17,
126:20, 133:18,
152:3, 161:8,
166:17, 175:9,
176:10, 188:16,
190:15
**key**
90:7
**kind**
8:3, 12:5,
16:11, 16:20,
19:11, 23:3,
28:1, 29:14,
44:5, 44:12,
54:13, 58:3,

63:6, 64:16,
65:22, 67:6,
70:13, 71:11,
81:2, 87:1,
88:8, 92:22,
97:3, 102:2,
106:17, 120:8,
120:14, 121:16,
122:18, 128:4,
136:13, 156:4,
159:18, 160:1,
160:8, 160:10,
180:10, 184:5
**kinds**
81:14, 81:16,
152:15
**knew**
177:14
**knowing**
187:21
**knowledge**
126:4, 145:3,
194:10
**known**
7:16, 87:20,
163:7, 178:9

**L**

**lack**
33:17, 194:1
**laid**
122:8, 175:18,
176:17
**language**
35:20, 140:19,
173:4, 174:4,
194:4
**lanham**
46:10, 54:19
**largely**
60:1, 115:9,
141:15, 142:16
**last**
5:10, 6:16,
10:8, 38:2,
80:22, 99:21,
119:8, 132:12,
169:8, 189:10,

190:17, 191:17
**late**
74:10, 106:4
**later**
8:7, 10:14,
12:3, 13:14,
25:20, 52:19,
61:9, 64:9,
79:4, 82:9,
126:17, 130:1,
185:16
**latter**
38:4
**law**
9:20, 56:8,
56:18, 57:9,
58:19, 58:21,
123:19, 125:7,
125:22, 126:7,
126:21, 137:19,
138:7, 138:21,
140:19, 144:5,
145:18, 145:22,
146:18, 149:5,
162:4, 162:9,
163:10, 171:20,
171:21, 173:10
**lawsuit**
24:5
**lawyers**
124:7
**layani**
174:4
**laying**
40:21
**learned**
18:14, 145:4
**least**
5:8, 5:9, 6:9,
8:18, 12:5,
15:4, 15:7,
27:7, 29:7,
33:20, 35:9,
41:10, 44:20,
50:14, 50:20,
52:22, 55:8,
57:16, 58:7,
63:11, 64:7,

64:15, 64:16,
64:17, 72:3,
72:22, 73:10,
73:14, 81:5,
83:8, 84:17,
98:3, 98:9,
99:14, 102:8,
107:9, 112:4,
114:21, 122:16,
126:12, 126:13,
149:18, 152:3,
160:6, 160:9,
176:12, 177:7
**leave**
64:1, 174:19
**leaves**
78:17
**leaving**
98:16
**ledger**
99:8
**ledgers**
79:21, 80:20,
90:8, 94:12
**ledyard**
4:11, 4:14
**left**
5:19, 11:2,
144:13, 149:21,
160:2, 176:16,
177:4, 179:18,
189:3
**legal**
124:20, 125:10,
125:20, 137:5,
146:5
**legally**
125:7, 125:14
**less**
110:22
**let's**
63:10, 72:5,
75:16, 86:15,
97:18, 98:2,
98:3, 98:13
**letter**
106:22
**level**
6:13, 9:2, 9:7,

J.R. 870

Transcript of Meet & Confer
Conducted on January 3, 2025

217

14:16, 15:1,
16:3, 19:19,
29:16, 33:13,
34:9, 38:21,
50:7, 78:21,
97:5, 111:4,
111:18, 112:4,
160:9

**levy**
3:11, 3:15,
3:21, 4:19,
4:20, 6:15, 7:4,
7:8, 7:13, 7:20,
12:8, 14:13,
30:7, 31:8,
32:10, 32:14,
110:6, 115:4,
157:21, 158:22,
160:11, 160:15,
179:14, 179:22,
180:13, 181:7,
185:11, 186:5,
186:10

**li**
1:4, 4:15,
154:7

**liabilities**
80:3

**liability**
21:22, 23:14,
24:15, 26:9,
31:7, 38:16,
60:2

**liberty**
3:6

**light**
39:4

**likely**
46:21, 192:2

**liller**
173:20, 174:8

**limit**
56:11, 83:20,
114:12, 116:8,
134:4, 170:3,
177:1, 177:17,
178:9, 178:12

**limitation**
174:7

**limited**
13:2, 33:21,
50:18, 50:21,
70:10, 76:19,
80:8, 104:21,
116:22, 119:15,
133:13

**limiting**
42:15, 44:18,
45:7, 83:5,
168:6

**limits**
77:9, 176:19

**limone**
125:8

**line**
70:14, 100:7

**line-by-line**
34:18

**lines**
123:21

**linked**
45:10

**liquidator**
167:22, 168:2

**list**
30:13, 40:17,
48:14, 60:19,
74:5, 87:13,
87:19, 88:1,
95:7, 139:5,
139:11, 139:12,
182:16, 182:18,
191:17

**listed**
14:10, 30:16,
152:10, 190:21

**listening**
135:6, 167:1

**litigation**
8:20, 9:9,
124:17, 158:2,
158:5

**little**
38:20, 39:17,
64:17, 82:3,
102:20, 110:22,
115:8, 129:19,

136:13, 160:4,
160:6, 180:11,
181:3, 193:22

**lives**
124:5

**llc**
4:22, 5:1,
8:16, 15:10,
86:1

**llcs**
73:19

**llp**
3:15

**loans**
80:1, 87:6,
162:17

**locate**
67:20, 76:11,
78:14, 132:14,
133:6

**locker**
135:21, 166:13

**logically**
45:4

**long**
56:8, 110:22,
146:6, 186:1

**longer**
96:16, 160:4,
160:6

**look**
28:2, 30:5,
31:8, 31:20,
33:9, 39:16,
49:2, 50:2,
63:5, 72:20,
101:20, 116:21,
117:17, 136:19,
143:8, 152:5,
154:12, 158:20,
158:21, 159:10,
175:12, 175:13,
176:8, 179:8,
181:12, 189:21,
192:10

**looked**
50:2, 80:19,
156:19, 167:2

**looking**
5:2, 16:11,
39:3, 39:11,
48:10, 49:14,
52:11, 60:15,
60:18, 61:1,
67:5, 69:20,
70:6, 73:3,
74:5, 74:16,
78:9, 79:10,
81:2, 96:19,
102:14, 105:9,
105:17, 106:2,
106:3, 106:5,
108:3, 108:5,
113:11, 115:19,
118:6, 119:18,
120:5, 132:13,
135:15, 136:3,
136:5, 146:18,
149:14, 150:9,
152:4, 152:8,
152:15, 155:17,
155:20, 159:21,
163:20, 165:10,
165:20, 166:22,
168:19, 185:6,
186:16, 186:21,
187:3, 188:3,
190:3, 192:9

**looks**
79:12, 135:19,
156:19, 193:18

**looped**
112:16

**loss**
88:12

**lost**
46:9, 54:18,
55:13, 55:15,
186:12

**lot**
11:13, 11:15,
37:20, 37:22,
38:3, 94:9,
114:15, 115:10,
181:12, 185:15,
185:17

J.R. 871

Transcript of Meet & Confer
Conducted on January 3, 2025                    218

**lots**
152:6, 153:1

**M**

**m-e-z-u**
149:6
**made**
12:13, 26:2,
37:15, 57:6,
73:18, 93:20,
94:22, 121:8,
147:9, 183:19,
188:14
**madelyn**
3:5, 4:13,
88:7, 98:18,
122:17, 127:1,
143:13, 146:21,
156:5
**madelyn's**
167:21
**main**
140:5, 171:17
**maintain**
151:15
**maintained**
104:7, 107:21,
108:2, 112:18,
182:15, 186:17
**maintaining**
102:8
**make**
5:11, 7:14,
13:22, 14:11,
28:12, 30:5,
45:12, 46:11,
46:21, 48:13,
57:14, 67:20,
72:2, 76:10,
78:14, 80:13,
80:15, 92:7,
97:5, 97:19,
98:1, 98:10,
101:12, 103:19,
121:15, 124:7,
132:13, 132:22,
133:5, 140:20,
152:21, 154:15,

156:18, 157:5,
157:9, 158:20,
163:11, 165:11,
166:18, 171:22,
172:13
**makes**
28:11, 32:13,
50:13, 114:14,
128:15, 130:2,
140:1, 140:3,
179:16, 181:6
**making**
7:15, 85:14,
89:22, 91:16,
140:7
**malyshev**
3:4, 4:14,
56:22, 62:11,
62:18, 63:1,
82:4, 82:7,
82:19, 86:12,
86:14, 87:2,
87:6, 87:16,
95:4, 131:5,
143:11, 145:10,
146:9, 146:12,
146:14, 146:20,
175:9, 177:21,
178:8, 178:14,
178:17, 178:21,
179:4
**manageable**
93:14
**management**
17:10, 22:11,
24:16
**many**
34:20, 56:6,
58:7, 61:20,
143:5, 174:2,
175:1, 176:16,
177:3, 185:20,
194:4
**march**
51:19, 51:21,
59:13, 59:17,
63:14, 64:13,
65:10, 65:14,

66:3, 75:15,
89:11, 89:12,
134:18
**maryland**
1:2, 2:12,
8:18, 9:7, 9:14,
12:12, 149:7,
162:7, 173:20,
174:3, 174:5,
174:9, 196:22
**material**
13:15, 34:1,
37:20, 116:6
**math**
176:15
**matter**
6:8, 10:20,
11:17, 12:22,
52:2, 118:5,
123:19
**matters**
25:5, 25:18,
26:7, 27:6,
138:13
**maybe**
48:16, 48:18,
52:5, 82:2,
82:18, 93:3,
93:10, 93:11,
97:1, 97:7,
115:8, 128:15,
145:5, 150:22,
155:18, 158:20,
176:1, 190:22,
194:3
**mccarthy**
174:18
**meaning**
85:22, 92:6,
118:21, 119:1,
168:1, 180:9,
180:11
**means**
39:21, 67:22,
84:16, 102:14,
138:2, 162:19
**meant**
119:5

**mediation**
162:1
**meet**
1:13, 2:1,
4:12, 5:21,
6:15, 7:5, 7:16,
8:8, 9:10, 10:9,
10:20, 11:3,
11:8, 12:20,
13:8, 13:11,
13:18, 16:5,
28:16, 32:8,
68:7, 97:4,
110:9, 110:12,
128:6, 176:7,
177:6, 179:11
**meeting**
71:3, 103:22
**member**
72:13, 176:1,
176:3
**members**
45:21, 46:3,
54:21, 73:19,
115:13
**memorandum**
138:21, 144:5
**memory**
79:11
**memos**
125:8
**mention**
35:20, 36:1,
37:7, 88:14,
88:21, 89:19,
90:13, 100:2,
128:14
**mentioned**
17:19, 18:13,
41:8, 60:5,
66:5, 89:16,
89:17, 111:17,
122:22
**mentioning**
90:16
**mentions**
87:17, 89:4,
89:9, 91:8,

J.R. 872

Transcript of Meet & Confer
Conducted on January 3, 2025                    219

91:10, 102:17,
173:21
**mercury**
105:2, 105:4,
105:16, 105:20,
106:4, 106:6,
106:8, 106:13,
106:14, 187:1,
192:21
**mere**
72:18
**merely**
137:22, 149:22
**merits**
34:14, 92:13
**merits-based**
33:15, 85:1,
90:4, 182:5,
191:5
**messages**
127:14, 143:5
**met**
38:2
**mezu**
149:6
**mid**
24:4
**might**
28:12, 30:9,
57:2, 63:3,
70:15, 71:14,
72:2, 73:11,
85:12, 88:8,
101:21, 107:21,
108:1, 117:22,
118:4, 135:3,
145:11, 145:18,
190:15
**milburn**
4:11, 4:14
**miller**
172:22
**mind**
126:16
**mine**
128:20
**minor**
124:5, 124:14,

125:6
**minute**
64:1
**minutes**
98:12, 98:14,
98:20, 186:3,
186:8, 189:9
**minutiae**
153:2
**misrepresented**
174:17
**miss**
186:2
**missed**
190:17
**missing**
50:1
**misspoke**
125:14
**mistaken**
50:17
**mistrust**
152:18
**mm-hmm**
77:12, 91:14,
145:5
**moment**
21:15, 144:14,
169:6
**money**
12:14, 79:8,
135:13, 193:5
**montgomery**
154:18
**month**
38:3
**months**
56:6, 61:9,
61:19, 61:20,
62:8, 65:6,
65:15, 65:19
**moot**
88:8
**more**
5:21, 16:1,
16:4, 16:15,
20:19, 28:10,
32:2, 32:7,

38:13, 38:21,
39:3, 40:4,
41:3, 46:21,
48:14, 58:3,
59:2, 61:15,
67:7, 71:16,
76:15, 76:22,
79:13, 80:21,
81:9, 93:6,
96:21, 102:20,
102:21, 109:9,
110:18, 111:20,
111:22, 113:17,
113:18, 113:19,
118:15, 118:18,
118:21, 118:22,
119:1, 119:3,
120:13, 136:5,
145:19, 147:16,
155:19, 156:16,
158:13, 158:17,
161:19, 168:3,
168:5, 171:11,
180:11, 180:14,
180:22, 181:1,
181:3, 182:11
**morgan**
149:7
**morning**
4:10, 4:13
**most**
20:6, 114:10,
131:1, 133:11,
133:17, 135:11,
155:10
**mother**
124:16
**motion**
5:13, 6:20,
8:6, 9:5, 9:12,
10:16, 14:11,
14:18, 16:14,
32:21, 33:17,
33:22, 46:22,
67:12, 76:8,
79:20, 89:18,
97:7, 108:14,
110:14, 110:15,

110:19, 110:21,
111:2, 112:2,
112:9, 119:9,
121:5, 121:9,
138:16, 142:6,
145:16, 159:14,
159:15, 160:13,
161:10, 164:5,
164:16, 169:11,
172:6, 173:16,
175:7, 179:15,
181:11
**motions**
6:1, 6:7, 7:1,
7:3, 7:18,
33:10, 34:8,
70:22, 71:1,
169:11, 172:4
**move**
10:17, 13:9,
13:15, 32:5,
32:16, 104:4,
128:11, 129:13,
154:15, 159:18,
173:13, 177:4,
178:5, 179:14,
180:13
**moving**
10:18, 165:17,
173:17, 176:12,
177:7
**much**
16:16, 66:17,
70:16, 107:8,
110:17, 136:9,
142:20, 150:11,
185:14
**multi-part**
150:19
**multiple**
121:14, 130:11,
149:4, 149:16,
150:3, 151:5,
173:2
**muse**
3:15, 3:21,
4:19
**must**
146:1, 162:5,

J.R. 873

Transcript of Meet & Confer
Conducted on January 3, 2025

220

162:20
**mute**
190:15, 190:17
**muted**
188:18
**myself**
53:5, 60:21,
188:16
**mystery**
68:8

**N**

**name**
109:13, 109:15,
191:11
**named**
8:21
**narrow**
120:16
**narrowing**
100:6
**nationwide**
137:21
**nature**
117:20, 119:19,
120:5, 120:6,
148:5, 187:17
**nay**
12:6
**nd**
134:18
**near**
174:2
**necessarily**
11:17, 39:21,
51:14, 57:8,
66:7, 86:16,
143:10
**necessary**
13:18
**need**
13:20, 16:1,
16:4, 16:15,
22:1, 31:19,
48:21, 51:14,
59:20, 60:11,
64:7, 64:8,
66:7, 69:6,

71:22, 74:14,
82:12, 97:3,
97:12, 105:10,
116:5, 123:20,
127:17, 133:22,
141:21, 142:7,
148:16, 166:22,
171:6, 172:10,
175:15, 177:13,
185:12
**needed**
10:2, 111:5
**needs**
10:16, 83:16,
83:21, 127:10,
145:13
**neither**
97:18, 160:14,
196:9
**network**
17:6, 17:16,
18:20
**never**
64:2
**new**
3:7, 5:2,
61:14, 85:10,
86:8, 185:1,
193:14
**news**
112:11
**next**
5:3, 13:17,
13:19, 28:7,
28:16, 32:5,
32:17, 42:17,
66:19, 71:3,
71:18, 72:1,
72:3, 75:17,
79:7, 79:19,
96:6, 97:4,
103:20, 104:4,
110:9, 128:5,
129:13, 129:22,
130:5, 130:7,
130:13, 130:21,
136:12, 154:6,
154:16, 159:15,

159:18, 160:18,
161:9, 168:16,
169:14, 176:7,
177:6, 179:11,
180:8, 181:4,
184:21, 193:16,
194:9
**night**
5:10, 6:16,
10:8
**nine**
177:15, 178:1,
178:4, 178:10
**ninth**
162:21, 163:1
**no-prejudice**
175:13
**nominally**
173:10, 173:21,
174:3, 174:11,
174:22
**non**
154:22
**non-ottersec**
14:19
**non-privileged**
67:21, 68:1,
76:12, 117:16,
158:4, 158:8
**nonanswer**
154:21, 156:22
**noncompliance**
162:19
**noncorporate**
145:12, 145:14
**none**
77:8, 100:19,
117:1
**nonparty**
124:4, 146:8
**nonparty's**
162:19
**normal**
14:5, 85:21,
85:22
**notarial**
196:14
**notary**
2:11, 196:21

**note**
12:8
**notes**
49:2, 79:11,
179:20
**nothing**
36:21, 120:16,
127:5, 127:6,
156:16
**notice**
16:10, 38:12,
38:13, 43:4,
154:7
**noticed**
7:20, 137:16,
138:1, 143:22
**notices**
7:2, 74:10,
111:8
**notwithstanding**
100:4, 101:3,
101:5, 132:6,
133:3, 190:10,
191:9
**november**
65:13, 74:10,
109:5
**nowhere**
174:1
**number**
10:14, 17:7,
21:5, 23:2,
34:17, 35:1,
35:3, 35:4,
37:11, 37:12,
37:15, 45:15,
45:18, 49:5,
49:6, 58:9,
58:10, 62:8,
67:9, 67:17,
68:2, 69:12,
70:2, 70:9,
72:11, 75:17,
75:18, 77:11,
78:7, 83:15,
87:22, 88:10,
99:7, 99:17,
100:15, 101:8,

J.R. 874

Transcript of Meet & Confer
Conducted on January 3, 2025                    221

| | | | |
|---|---|---|---|
| 103:4, 104:5, 104:22, 106:22, 114:17, 119:8, 121:13, 132:1, 132:8, 133:9, 135:19, 158:9, 170:12, 170:13, 170:19, 172:17, 181:11, 181:15, 187:8, 189:10, 194:3 | 78:8, 83:4, 85:1, 99:11, 99:13, 100:1, 100:11, 100:13, 100:16, 100:21, 100:22, 101:4, 101:5, 102:5, 102:8, 102:21, 108:13, 112:22, 123:2, 123:4, 123:17, 124:13, 125:1, 125:2, 127:2, 127:5, 128:4, 128:8, 132:6, 139:14, 139:15, 140:5, 141:3, 148:17, 149:22, 151:15, 157:9, 157:12, 175:4, 184:2, 184:3, 189:20, 189:22, 190:11 | 134:12, 147:14, 161:14, 161:16, 161:20, 162:3, 162:5, 162:20, 163:3, 163:8, 163:9, 163:12, 163:14, 163:18, 165:3, 170:9, 176:17, 182:2, 183:17, 184:7, 186:19, 190:8, 191:2, 191:10, 192:1, 193:17 | 177:2, 178:19 |

**numbers**
170:16, 173:20
**nw**
3:16

**O**

**o-d-j-a-g-h-i-a-n**
24:21
**oath**
137:15
**object**
69:1, 108:6, 139:10, 142:17, 148:6, 151:14, 162:1
**objected**
17:15, 122:3, 122:4, 130:3, 137:8, 149:3, 191:13, 191:15
**objecting**
38:22, 82:10, 124:8
**objection**
15:6, 17:17, 17:20, 17:21, 18:3, 18:6, 32:19, 33:1, 33:15, 34:17, 34:19, 35:6, 36:19, 37:1, 40:12, 41:2, 45:16, 45:22, 58:6, 58:7, 72:16, 73:1, 76:6, 78:1, 78:3, 78:5,

**objection's**
189:15
**objectionable**
150:21
**objections**
15:2, 15:15, 17:14, 20:12, 31:11, 31:12, 33:14, 36:10, 37:14, 37:15, 38:15, 39:5, 67:18, 67:19, 68:2, 68:9, 70:1, 73:4, 73:7, 76:4, 76:5, 77:22, 79:10, 80:6, 88:11, 104:18, 107:17, 108:5, 109:18, 119:13, 119:14, 120:17, 122:22, 123:13, 125:3, 125:4, 128:9, 128:13, 130:3, 131:21, 133:4, 133:5,

**objective**
91:9
**objects**
151:9
**obligated**
171:16
**observe**
162:10
**obtain**
109:21, 124:3, 124:19, 125:10, 125:12, 125:19, 126:6, 126:15, 146:7
**obtained**
109:8, 110:1
**obvious**
35:21
**obviously**
11:4, 15:11, 29:18, 31:2, 33:5, 46:2, 59:12, 62:6, 82:11, 94:17, 102:10, 105:2, 165:14, 170:4, 170:9, 172:8, 175:10, 187:3, 187:19, 191:9
**october**
61:7, 62:5, 65:4, 65:13, 169:21
**offer**
163:17, 176:11,

**offered**
121:4
**offering**
136:9
**offers**
75:19, 76:13
**officer**
196:3
**officially**
4:7
**offline**
168:17
**oh**
38:21, 75:5, 148:13, 180:9, 186:11
**okay**
7:9, 7:12, 21:18, 30:4, 32:14, 35:15, 43:13, 45:15, 63:17, 69:22, 71:2, 72:10, 75:16, 77:2, 77:10, 78:16, 78:20, 79:6, 79:18, 83:10, 89:3, 95:2, 99:2, 100:10, 101:1, 101:2, 103:4, 104:3, 111:11, 112:15, 113:7, 115:7, 116:13, 116:15, 119:4, 119:7, 120:11, 120:18, 122:20, 125:5, 129:14, 131:3, 131:4, 131:19, 132:9, 133:8, 134:7, 134:8, 134:15, 135:8, 136:8, 136:17, 136:18, 136:20, 136:21, 140:10, 141:6, 142:8, 144:8, 144:14,

J.R. 875

Transcript of Meet & Confer
Conducted on January 3, 2025                                        222

146:16, 147:3,
147:15, 148:13,
148:19, 148:22,
154:3, 154:11,
157:10, 159:8,
159:13, 160:19,
161:4, 161:5,
164:18, 169:4,
178:22, 179:12,
184:18, 184:21,
185:3, 186:9,
189:5, 191:21,
193:11, 194:11,
194:17
**once**
11:3, 14:7,
21:4, 187:16
**ones**
21:11, 27:15,
28:12, 32:20,
52:12, 100:18,
113:16, 113:21,
128:20, 142:16,
144:1, 148:2,
148:3, 164:4,
164:15, 169:12,
169:17, 170:8,
176:18, 183:7,
184:20, 189:5,
191:13
**ongoing**
57:5, 57:8,
57:16, 57:20,
63:3, 106:7
**only**
21:3, 27:15,
29:6, 30:1,
50:3, 50:17,
54:3, 54:5,
55:9, 68:13,
69:4, 70:22,
71:20, 75:2,
77:5, 81:20,
83:6, 83:11,
83:17, 84:13,
87:17, 102:6,
105:21, 106:21,
116:22, 131:7,

167:20, 169:22,
172:15, 174:2,
174:11, 174:22,
177:14, 188:15
**open**
63:9, 104:6,
104:10, 135:6,
160:2, 178:1,
179:18
**opening**
5:8
**operating**
22:17, 44:1
**operation**
37:8, 65:15
**operations**
14:21, 64:22,
65:6
**opportunities**
119:11
**opportunity**
32:6, 37:1,
73:10
**oppose**
14:4
**opposed**
45:6, 112:18,
139:8, 140:4,
158:18
**opposing**
48:12
**opposition**
89:17
**optimistic**
13:4
**option**
183:4
**option's**
137:14
**order**
6:6, 14:9,
14:11, 18:12,
171:13, 172:11,
173:14, 173:17
**ordered**
171:10
**ordinary**
182:15

**organization**
17:9, 22:11
**organizational**
22:15
**organize**
16:14
**organized**
111:1, 121:16
**original**
12:12
**originally**
8:13
**other**
5:18, 6:4, 8:8,
9:4, 18:18,
20:8, 20:20,
25:19, 26:19,
29:8, 30:5,
31:5, 34:20,
37:2, 37:22,
40:1, 45:12,
55:19, 56:16,
63:9, 65:21,
68:17, 70:20,
81:4, 82:8,
86:6, 89:16,
91:1, 93:2,
107:20, 113:15,
113:16, 114:21,
117:5, 117:13,
123:13, 125:3,
125:4, 125:22,
128:9, 128:13,
129:5, 132:5,
133:13, 133:15,
134:22, 135:2,
135:3, 135:15,
137:14, 138:5,
138:7, 139:2,
139:3, 139:19,
144:1, 144:9,
146:11, 147:14,
147:17, 148:12,
150:6, 150:20,
151:16, 154:4,
158:7, 162:9,
171:6, 171:11,
174:2, 174:8,

174:13, 174:16,
180:6, 181:2,
183:8, 184:17,
184:19, 185:12,
187:12, 188:8,
189:5, 190:8,
191:16
**others**
25:19, 29:10,
30:10, 45:17,
50:2, 67:1,
70:12, 73:6,
115:9, 120:14,
175:18, 185:21,
194:8, 194:12
**otherwise**
78:13, 85:2,
90:10, 99:16,
103:3, 126:9,
171:9, 171:13,
171:14, 196:12
**otter**
5:1, 14:22,
15:9, 17:11,
18:5, 18:21,
19:2, 19:9,
19:14, 20:2,
20:5, 20:13,
22:2, 22:3,
24:7, 24:8,
25:3, 25:4,
25:10, 25:11,
26:2, 26:22,
27:11, 32:22,
33:2, 34:4,
35:16, 35:19,
36:16, 37:10,
37:19, 41:20,
43:5, 43:16,
43:17, 45:21,
46:8, 49:7,
49:9, 49:11,
51:3, 58:12,
58:14, 58:15,
59:11, 59:17,
65:1, 68:16,
72:14, 72:17,
73:2, 73:5,

J.R. 876

73:9, 73:17,
75:21, 75:22,
76:1, 76:9,
76:18, 77:17,
77:19, 78:12,
79:9, 79:15,
82:10, 84:18,
88:13, 89:3,
91:20, 94:3,
104:8, 104:17,
104:19, 107:6,
107:22, 112:1,
113:4, 113:21,
116:2, 116:19,
119:12, 119:20,
120:6, 172:17,
175:20, 181:16,
181:18, 181:19,
182:4, 187:4,
187:14, 187:21,
191:3, 192:7,
194:20
**ottersec's**
55:4, 152:11
**ourselves**
6:22, 47:12
**out**
5:3, 9:21,
10:7, 12:1,
24:8, 30:6,
30:13, 34:22,
40:21, 67:16,
71:6, 71:19,
91:3, 92:20,
106:17, 106:18,
111:2, 114:2,
120:15, 122:8,
138:4, 165:12,
175:18, 176:17,
187:13, 188:2,
193:1
**outcome**
196:12
**outline**
136:19
**outlined**
16:13
**outset**
4:3, 29:15,

173:13
**outside**
10:8
**outstanding**
144:18
**outweighs**
61:16
**ouzani**
174:4
**over**
5:3, 15:17,
20:8, 30:5,
38:3, 44:14,
67:4, 71:18,
94:7, 96:13,
96:20, 97:7,
119:13, 124:20,
135:9, 143:5,
143:16, 146:4,
149:13, 184:6,
192:15
**overall**
67:3
**overarching**
114:16, 131:14,
161:12
**overlap**
9:9, 11:14,
11:18, 14:2,
17:3, 60:6,
60:7, 181:12,
185:18
**overlapping**
71:15, 97:15,
178:13
**overlooked**
57:3
**overly**
142:18, 143:10,
143:14, 148:6
**own**
19:16, 110:2,
124:15, 130:1,
154:1
**owned**
18:20, 19:3,
19:7, 31:15
**owner**
117:19

**owners**
22:20
**ownership**
21:8, 22:20,
24:16, 73:16,
75:21, 77:18,
115:11, 115:13,
116:17, 117:4,
118:2, 118:3,
118:9, 146:5
**owns**
106:21

**P**

**p&l**
81:3, 94:1,
94:12
**p&ls**
90:8
**pace**
11:12
**page**
5:11, 7:11,
162:13, 186:12
**pages**
1:21, 77:20,
145:17, 145:18,
146:17
**paid**
44:13, 45:20,
46:3, 72:13
**paine**
174:18
**painters**
137:20
**papers**
15:8, 35:11,
35:14, 175:19
**paragraph**
152:9
**paragraphs**
142:4, 150:9,
151:4, 151:16,
152:5, 152:7,
191:17
**paralegal**
3:21, 4:21
**paraphrase**
140:19

**parent**
173:5
**part**
11:8, 18:13,
19:13, 19:17,
23:9, 24:6,
26:8, 26:17,
27:10, 29:21,
30:13, 35:16,
38:4, 43:14,
45:8, 48:1,
52:3, 54:22,
74:8, 74:19,
94:6, 111:14,
111:18, 145:6,
149:19, 149:21,
150:1, 150:4,
150:16, 150:19,
150:22, 152:12,
157:15, 189:16,
191:1, 192:8,
193:21
**part-time**
166:12
**partially**
83:8, 100:10
**particular**
36:4, 45:8,
47:4, 142:20
**particularly**
45:5, 95:17
**parties**
7:20, 87:9,
125:10, 173:2,
173:11, 173:21,
174:4, 174:11,
174:12, 175:1,
175:21, 175:22,
196:10
**partners**
45:21, 72:14
**parts**
114:3, 130:11,
149:4, 149:16,
150:3, 150:20
**party**
4:17, 17:18,
19:5, 31:16,

J.R. 877

Transcript of Meet & Confer
Conducted on January 3, 2025

224

31:19, 40:7,
125:18, 126:1,
138:15, 145:12,
145:14, 158:12,
164:8, 171:8,
171:10, 171:11,
171:19, 175:2,
175:4, 175:6
**past**
61:14, 62:9,
138:1, 159:21,
159:22, 160:4
**payments**
49:12, 58:16,
181:20
**payroll**
80:2, 94:2
**penalty**
145:1
**pencil**
98:9
**pencils**
71:12, 97:1,
98:5
**pending**
6:1, 8:17,
8:18, 9:9, 11:2,
11:17
**pennsylvania**
138:12
**people**
173:6
**per-side**
174:7, 177:16
**perfect**
54:14
**perform**
52:17
**performed**
41:20, 49:10,
49:21, 51:11,
58:14, 60:10,
181:18
**performing**
18:22
**perhaps**
15:17, 27:2,
59:16, 64:8,

71:22, 158:13,
190:5
**period**
49:19, 50:15,
62:22, 93:1,
95:10, 163:5
**periods**
42:2
**perjury**
145:1
**permitted**
173:22, 174:12
**person**
124:15
**personal**
33:18, 33:21,
133:12, 133:14,
134:22, 135:4,
154:8, 166:4,
191:14, 192:18,
193:9
**personally**
193:3, 193:6
**persons**
49:8, 58:13,
181:17, 189:11,
192:2
**perspective**
141:19
**pertaining**
18:10
**pertinent**
26:16, 52:19,
54:4
**phone**
127:16, 133:21
**phrase**
148:20
**phrased**
89:18
**phrasing**
95:17, 96:3,
133:16
**physical**
146:5
**pick**
60:9, 63:11,
64:8, 177:3,

186:6
**picture**
162:16
**pile**
183:6
**place**
54:7, 97:8,
117:15, 192:16
**plain**
85:22
**plainly**
65:7
**plaintiff**
1:5, 3:2, 4:15,
8:15, 110:7,
116:18, 121:10,
123:9, 127:18,
132:12, 133:5,
138:22, 139:7,
140:14, 142:2,
142:15, 144:22,
155:4, 155:12,
157:3, 157:15,
159:15
**plaintiff's**
121:22, 123:7,
123:14, 131:13,
133:4, 144:5,
144:20, 145:2,
160:13, 163:9,
181:11
**plaintiffs**
172:9
**plan**
43:7, 98:19,
121:1
**planning**
130:17, 169:13
**plans**
119:11, 120:8,
120:9
**pleaded**
33:18, 57:17
**pleadings**
138:8
**please**
42:18, 69:14,
146:13

**point**
6:5, 6:17,
6:19, 7:14,
9:22, 12:1,
13:22, 15:5,
25:19, 26:11,
26:22, 28:6,
28:22, 30:17,
30:19, 32:5,
36:5, 37:4,
37:13, 39:9,
39:15, 41:1,
41:5, 45:11,
45:12, 46:6,
49:13, 51:12,
56:7, 56:16,
56:18, 59:1,
59:14, 60:15,
61:5, 61:15,
61:22, 63:7,
63:12, 64:6,
64:21, 66:9,
67:16, 69:11,
69:13, 70:21,
72:21, 74:13,
74:17, 75:11,
75:13, 79:5,
96:8, 96:11,
98:6, 100:19,
103:11, 104:2,
107:19, 111:2,
114:14, 121:1,
127:20, 143:4,
154:13, 167:21,
169:22, 171:18,
176:4, 179:1,
185:7, 188:14,
192:17
**pointed**
10:7, 34:22
**pointing**
137:22, 150:10,
151:4, 183:3
**points**
23:22, 27:20,
28:1, 34:13,
37:2, 96:17,
146:19, 159:6

J.R. 878

Transcript of Meet & Confer
Conducted on January 3, 2025                                          225

**portion**
5:17, 19:15, 26:5, 73:21
**portions**
5:18
**position**
9:22, 10:16, 12:4, 12:20, 13:7, 13:14, 13:21, 14:1, 14:7, 15:20, 15:21, 22:5, 25:17, 27:21, 28:2, 28:19, 32:7, 33:20, 34:10, 35:10, 35:13, 36:19, 40:7, 62:6, 62:15, 63:2, 63:3, 63:4, 75:14, 77:5, 82:13, 85:8, 88:14, 93:5, 95:13, 102:5, 108:19, 111:7, 111:11, 122:8, 128:2, 128:16, 129:9, 135:7, 139:1, 156:1, 161:13, 163:7, 163:10, 165:15, 165:19, 169:21, 171:18, 175:7, 175:18, 176:8, 177:13, 177:20, 182:18, 184:3
**positions**
15:13, 31:10, 33:11, 171:7
**possession**
19:9, 121:22, 122:5, 122:7, 122:12, 123:3, 123:6, 123:10, 126:12, 127:3, 131:22, 145:20, 146:3, 146:5, 189:11, 192:3,

192:11
**possible**
26:10, 26:12, 93:12
**post**
27:5
**postdate**
55:4, 59:21
**postdates**
54:10
**postdating**
18:1
**potential**
14:2, 123:22
**potentially**
19:21, 21:4, 23:11, 29:7, 46:19, 79:3, 115:17
**practical**
124:3, 125:12, 125:19, 126:6, 126:15, 146:7
**practically**
125:11
**precise**
101:12
**predecessor**
24:19
**prefer**
63:18
**preference**
14:15
**prejudice**
177:22
**prepared**
124:13, 181:3
**present**
3:20, 121:19, 138:1, 173:5
**preservation**
189:19
**preserve**
123:4, 163:2, 163:3
**press**
167:6
**presume**
8:10

**pretty**
86:11, 158:22, 191:19
**preview**
130:6
**previous**
78:4, 78:17
**previously**
87:12, 112:14, 177:19
**primarily**
9:19, 14:18, 116:3, 128:9, 132:2
**primary**
15:6
**prior**
9:10, 27:11, 44:1, 51:12, 68:7, 128:10, 173:14
**prioritize**
7:17
**privilege**
155:10, 155:15, 156:9, 157:6, 157:9, 157:12, 157:18
**privileged**
40:15, 156:17, 156:21, 157:1, 157:4, 157:11, 159:2, 159:4
**probably**
4:2, 17:2, 28:7, 29:10, 62:17, 71:16, 105:10, 136:10, 168:10
**problem**
145:6, 181:9
**problematic**
95:1
**proceed**
177:4, 181:8
**proceeding**
11:11
**proceedings**
196:4, 196:6,

196:7
**process**
27:19, 28:9, 111:14
**produce**
31:18, 35:18, 36:15, 39:9, 67:21, 76:11, 78:15, 83:6, 83:9, 84:12, 91:12, 92:8, 102:6, 103:1, 108:6, 112:8, 132:7, 132:14, 133:6, 134:13, 134:21, 135:17, 146:2, 166:14, 182:14, 184:12, 194:6
**produced**
18:18, 37:7, 37:9, 37:20, 39:8, 39:9, 39:22, 40:2, 47:6, 47:10, 47:13, 48:6, 48:7, 50:16, 53:22, 55:18, 55:20, 68:13, 68:21, 74:2, 74:6, 74:8, 74:20, 75:1, 75:2, 80:10, 80:20, 81:6, 81:8, 83:3, 84:3, 84:4, 86:19, 86:21, 87:12, 88:12, 88:15, 88:18, 89:6, 92:3, 94:4, 94:17, 99:19, 100:4, 100:17, 100:18, 100:20, 105:5, 107:15, 107:19, 108:4, 122:11, 155:2, 182:9, 193:7

J.R. 879

Transcript of Meet & Confer
Conducted on January 3, 2025

226

**producing**
15:2, 17:15,
18:4, 20:12,
33:1, 35:6,
40:22, 70:10,
72:16, 73:2,
83:13, 84:13,
85:1, 86:5,
86:6, 101:6,
111:21, 119:15,
132:20, 139:18,
139:21, 141:5,
142:21, 183:2,
183:12
**product**
155:15
**production**
14:19, 35:17,
41:17, 43:6,
125:18, 163:19,
180:3, 180:4
**productions**
80:10, 80:21,
122:6, 180:7,
180:12
**productive**
20:19, 93:10,
131:1, 165:17
**productively**
8:1
**products**
49:12, 58:17,
181:21
**profit**
88:12
**profits**
20:1, 20:2,
46:9, 54:18
**progress**
46:21, 179:1
**pronounce**
24:21
**pronouncing**
190:12
**proper**
48:9, 138:11,
139:3, 140:8,
151:6

**property**
133:13, 133:15,
134:22, 135:4,
166:4
**proposal**
31:13, 66:3,
67:3, 114:13,
165:2, 166:20,
167:5, 168:9,
168:14, 169:3,
170:6
**proposals**
113:12
**propose**
63:18, 63:21,
64:11, 64:19,
66:18
**proposing**
164:12
**proposition**
145:12
**protective**
173:13, 173:17
**protocol**
45:3, 79:2,
79:4, 109:9
**prove**
25:11, 172:10,
172:20
**provide**
69:4, 85:16,
134:5, 135:2,
144:5, 147:13,
148:8, 153:21,
154:9, 158:13,
184:10
**provided**
73:8, 113:1,
149:4, 165:7,
165:9, 187:18,
189:14, 189:19
**providers**
194:3
**provides**
191:7
**public**
2:12, 29:17,
107:7, 196:21

**pull**
68:11, 68:15,
69:16, 80:17,
131:3, 132:18
**pulling**
37:11
**purchase**
77:16
**purpose**
7:13, 7:15,
24:19, 31:3
**purposes**
6:14, 7:5,
11:10, 16:5,
21:10, 27:7,
71:7, 100:8,
124:17, 165:16
**pursuant**
2:10
**push**
160:7
**pushing**
56:1
**put**
4:2, 71:12,
71:19, 94:7,
97:1, 98:5,
98:9, 120:9,
120:21, 122:14,
168:8, 183:6
**puts**
11:11

**Q**

**qualifications**
133:7
**qualifiers**
101:19
**question**
5:8, 12:9,
19:18, 19:20,
23:15, 26:7,
26:9, 26:16,
34:3, 43:14,
43:20, 44:2,
46:6, 47:18,
49:19, 52:20,
54:6, 55:9,

58:2, 58:8,
58:18, 58:19,
59:2, 60:7,
60:17, 60:21,
61:1, 62:11,
63:12, 64:11,
73:11, 73:13,
81:6, 82:1,
82:2, 82:22,
83:3, 83:10,
86:12, 86:15,
86:22, 90:12,
91:15, 94:6,
95:4, 99:21,
100:9, 101:19,
102:3, 103:2,
103:16, 103:17,
107:14, 108:21,
109:19, 111:21,
113:3, 114:9,
115:11, 115:18,
116:9, 117:2,
125:9, 127:4,
136:3, 149:10,
156:11, 157:20,
157:22, 167:20,
180:20, 183:10,
183:13, 183:15,
189:16, 190:5,
190:19, 191:7,
194:7, 194:18
**questioning**
68:20
**questions**
21:18, 23:8,
27:15, 29:2,
30:6, 44:6,
45:3, 48:8,
52:9, 79:1,
136:16, 180:3,
180:4, 180:6,
180:12, 180:15,
180:19
**quick**
95:4, 116:20
**quite**
10:15, 19:11,
58:19, 66:4,

J.R. 880

Transcript of Meet & Confer
Conducted on January 3, 2025                    227

94:20
**quote**
90:1, 96:12,
96:13, 103:6,
125:15
**quoted**
145:22
**quoting**
149:6

**R**

**rachel**
3:13, 4:20,
55:14, 58:1,
59:2, 67:16,
69:15, 70:11,
72:20, 98:15,
117:9, 189:17,
190:5
**raise**
6:3, 6:17,
6:19, 10:12,
63:6, 71:21,
74:19, 79:8,
163:4
**raised**
10:5, 11:20,
14:17, 53:16,
112:3, 137:2,
161:15, 181:13
**raises**
146:22
**raising**
11:7, 68:20,
91:1, 93:3,
110:14, 175:4
**range**
75:11, 75:13,
96:12, 96:14,
96:16
**rather**
71:3, 97:13,
142:10, 179:9
**rc**
4:22, 14:22,
15:9, 17:11,
18:5, 20:13,
32:22, 33:1,

34:3, 35:15,
35:18, 36:15,
37:10, 37:19,
41:20, 43:5,
43:15, 43:17,
45:21, 46:8,
49:7, 49:9,
49:10, 51:3,
58:12, 58:13,
58:15, 59:11,
59:16, 65:1,
72:14, 72:16,
73:2, 73:4,
73:9, 73:17,
74:3, 75:20,
75:22, 76:1,
76:8, 76:17,
77:17, 77:18,
78:11, 79:9,
79:14, 81:3,
81:4, 82:11,
83:2, 84:19,
85:12, 88:13,
89:3, 90:18,
91:20, 94:3,
104:8, 104:16,
104:18, 107:21,
112:1, 113:3,
113:21, 116:2,
116:19, 119:12,
119:20, 120:5,
170:12, 175:20,
181:16, 181:17,
181:19, 182:3,
187:4, 187:13,
187:22, 191:2,
192:12, 194:20
**rdr**
1:22
**reach**
129:6, 175:16,
177:6, 180:5,
184:15
**reached**
9:21
**read**
15:7, 68:5,
146:1, 153:8,

153:22, 156:20,
164:20
**reading**
17:14, 95:20,
113:22, 135:9,
179:10
**reads**
157:19
**ready**
16:12, 175:11
**real**
139:14
**realize**
107:18, 114:3
**really**
5:22, 6:2,
10:12, 10:21,
11:20, 25:9,
29:16, 39:2,
43:19, 49:19,
53:5, 58:20,
59:14, 60:18,
60:22, 64:14,
73:19, 76:15,
81:7, 83:3,
85:8, 89:2,
91:2, 93:22,
110:14, 115:18,
123:5, 125:6,
129:4, 152:15,
156:22, 157:18,
166:22, 185:2,
185:4, 185:7,
188:5, 188:12,
190:3
**realm**
109:14
**reason**
19:16, 23:20,
26:3, 27:1,
51:13, 75:3,
193:8
**reasonable**
61:18, 62:1,
63:6, 140:3,
140:12, 140:15,
154:2
**reasonably**
124:4, 157:3,

157:14, 158:16,
188:6
**reasoning**
54:1
**reasons**
10:13, 29:8,
51:6, 66:4,
84:4, 144:1,
192:14
**recall**
111:4, 176:15,
193:2
**received**
81:22, 107:3,
107:8, 168:2
**recent**
80:10, 80:21,
106:8
**recently**
193:2
**recess**
99:1, 161:7
**recognize**
5:16
**reconcile**
36:18
**reconsidered**
125:4
**record**
4:2, 4:3, 4:8,
5:14, 6:12, 7:7,
8:9, 58:10,
59:6, 78:22,
85:11, 95:15,
96:9, 96:10,
99:5, 111:12,
153:8, 162:14,
165:14, 168:18,
175:8, 177:11,
186:4, 195:5,
196:6
**records**
43:2, 48:11,
50:4, 80:2,
94:2, 109:2,
110:2, 137:13,
138:6, 139:21,
155:1, 183:4,

J.R. 881

Transcript of Meet & Confer
Conducted on January 3, 2025                                228

184:12, 189:13,
191:14, 192:9,
192:16, 192:18,
193:9, 194:19
**redraft**
177:22
**reduced**
196:8
**refer**
41:11, 146:12
**reference**
140:2, 141:10,
141:13, 141:16,
141:20, 142:3,
142:10, 143:19,
143:20, 143:21,
144:4, 150:6,
154:22, 186:20
**referenced**
135:1, 139:6,
139:17, 192:20
**references**
130:14, 139:2,
147:4, 147:9,
147:12, 147:16,
147:19, 147:20,
151:4, 154:4
**referencing**
137:2, 137:13,
137:15, 149:2,
192:20
**referred**
137:10, 148:12,
158:1
**referring**
137:17, 139:9,
140:13, 142:14,
155:3, 158:17,
182:6, 183:1,
185:5, 191:4
**reflect**
116:5, 184:13
**refresh**
79:11
**refuse**
124:18, 126:2
**regard**
48:21, 162:2,

163:13, 170:5,
172:7
**regarding**
154:6, 163:12,
193:17
**regardless**
34:2, 88:19,
88:20, 125:13,
126:16
**register**
154:18
**registered**
2:11
**rehired**
52:17
**reiterate**
64:20
**relate**
25:9, 85:19
**related**
12:22, 14:20,
19:6, 35:8,
59:14, 60:1,
60:3, 72:8,
79:2, 79:3,
83:17, 87:18,
88:4, 90:4,
134:21, 135:2,
135:12, 158:4,
166:9, 188:13,
196:10
**relates**
12:10, 19:19,
19:21, 23:7,
37:21, 42:11,
85:13, 122:2
**relating**
151:13, 153:11,
161:11, 192:12
**relation**
193:9
**relationship**
9:8, 10:20,
120:2
**relevance**
19:10, 20:9,
30:11, 31:9,
31:20, 56:5,

58:21, 59:21,
95:19, 99:22,
100:8, 100:9,
117:12, 118:6,
119:17, 132:3,
183:18
**relevancy**
88:12, 123:1,
128:9, 132:2
**relevant**
18:11, 20:6,
21:20, 22:1,
29:8, 30:9,
52:19, 54:11,
55:6, 56:9,
56:20, 57:13,
57:20, 57:22,
62:2, 73:12,
81:18, 82:8,
82:12, 83:12,
83:13, 83:18,
83:19, 85:18,
86:7, 86:9,
88:15, 95:20,
95:22, 120:2,
120:10, 125:7,
135:5, 146:2,
155:6, 166:14,
191:15, 192:13,
192:19, 193:10
**relied**
122:10, 158:9
**relying**
85:1
**remainder**
179:15
**remaining**
81:15, 139:14,
169:22, 177:15
**remember**
27:15, 80:22,
111:8, 111:9
**remembering**
143:3
**remotely**
1:14, 2:1
**removal**
133:14

**remove**
141:12, 141:20,
144:4, 147:12,
148:15
**removed**
140:7
**removing**
147:15, 147:19,
147:20, 148:17,
151:3
**reorganization**
17:10
**repeat**
53:5
**repeating**
68:18
**reply**
145:15, 146:17,
175:11
**reported**
1:22
**reporter**
2:11, 4:9,
111:14, 146:13,
189:8, 195:2,
196:1
**represent**
4:15, 4:17,
4:21
**representative**
154:8
**representing**
155:12
**represents**
9:1
**request**
16:8, 17:7,
17:11, 21:5,
21:7, 23:1,
30:8, 31:14,
32:17, 34:17,
34:22, 35:1,
35:3, 35:4,
40:13, 40:14,
45:18, 48:19,
49:1, 49:5,
55:16, 56:11,
56:14, 56:16,

J.R. 882

Transcript of Meet & Confer
Conducted on January 3, 2025

229

56:17, 58:9, 58:10, 59:6, 59:9, 67:7, 67:9, 67:17, 68:2, 69:12, 70:2, 70:8, 72:5, 72:6, 72:11, 72:15, 74:15, 75:17, 75:18, 77:11, 78:4, 81:6, 83:2, 85:3, 87:22, 88:10, 90:11, 92:4, 92:19, 93:4, 93:22, 94:19, 97:20, 99:7, 99:17, 100:15, 101:8, 103:4, 104:4, 104:13, 118:19, 119:8, 119:17, 131:2, 132:1, 132:7, 133:9, 135:18, 139:20, 141:4, 142:21, 166:16, 166:17, 181:14, 186:15, 188:13

**request-by-reque-
st**
58:4, 167:3
**requested**
15:3, 18:4, 81:14
**requesting**
123:2, 123:5
**requests**
15:6, 17:1, 17:22, 20:14, 23:2, 32:20, 34:20, 41:10, 45:10, 58:8, 66:17, 67:12, 98:4, 98:6, 98:16, 104:21, 108:10, 128:14, 130:22, 131:6, 131:8, 131:14,

131:15, 135:11, 135:15, 148:8, 152:22, 163:17, 164:3, 164:8, 164:12, 165:19, 179:20
**require**
125:18
**required**
120:13, 174:19
**requires**
57:9
**reserving**
175:17
**resolve**
5:22, 6:3, 7:16, 8:1, 11:4, 13:2, 13:10, 83:15, 93:13, 164:13, 165:3, 167:5, 178:2, 189:4
**resolved**
144:19, 145:9, 182:13
**resolving**
63:19
**respect**
25:19, 82:13, 100:8, 107:10, 107:11, 107:19, 184:3, 191:15
**respective**
15:12, 33:11
**respond**
37:5, 42:16, 48:9, 101:21, 122:14, 137:12, 137:13, 137:14, 151:6, 156:5, 163:15, 171:16, 173:15, 176:22, 180:7, 190:8, 192:2, 194:15
**responded**
6:16, 175:5, 175:6
**respondent**
163:2

**responding**
183:4
**response**
10:1, 21:19, 33:14, 38:12, 45:14, 48:21, 68:13, 69:1, 69:3, 69:12, 70:6, 70:9, 73:6, 73:8, 74:1, 74:16, 76:17, 78:11, 80:5, 80:7, 80:8, 83:5, 85:21, 97:13, 104:20, 116:22, 119:15, 128:17, 132:14, 134:21, 139:5, 139:8, 147:13, 154:10, 154:20, 155:20, 158:15, 164:8, 182:6, 183:2, 184:16, 186:20, 186:22, 189:18, 190:4, 190:7, 190:20, 190:21, 193:22, 194:2
**responses**
40:20, 64:12, 67:19, 68:6, 68:22, 69:7, 69:22, 76:3, 105:10, 113:2, 133:5, 138:14, 147:22, 148:9
**responsibility**
121:22, 144:12
**responsible**
90:17, 123:20, 126:8, 127:13, 127:15, 127:18
**responsive**
67:22, 73:8, 76:9, 76:12, 76:18, 78:12, 79:15, 81:5, 83:1, 83:6,

83:7, 83:9, 85:2, 86:18, 90:10, 92:3, 92:12, 93:22, 94:19, 99:17, 100:15, 101:7, 103:3, 107:10, 132:7, 133:6, 134:5, 146:2
**restating**
138:10
**restrict**
60:21
**restricted**
67:13, 166:3
**restricting**
47:12
**restrictive**
52:15
**return**
86:15
**returns**
79:22, 86:21, 87:7, 99:8, 99:9, 134:11, 134:14, 163:21, 164:1, 164:7, 165:4, 165:6, 165:8, 165:11, 165:22, 166:8, 167:9, 167:16
**revealing**
156:6
**revenue**
34:12, 80:2, 90:18, 130:20, 136:6
**revenues**
130:8
**review**
18:18, 108:19, 146:17
**reviewed**
40:8, 88:4
**reviewing**
8:10, 35:15, 102:15
**revise**
69:6, 74:1,

J.R. 883

142:12, 146:14,
147:11, 151:1,
154:9, 155:8
**revised**
105:11, 128:16,
128:17, 135:7,
157:5
**revising**
154:14
**rfp**
37:20, 48:10,
66:15, 66:19
**rfps**
37:22, 110:7,
121:14, 122:3,
130:10, 136:21,
167:5, 169:19,
169:21, 170:2,
170:6, 170:7,
170:18, 183:2
**riffing**
158:11
**rights**
116:18, 117:5,
117:16, 118:2,
118:12
**robert**
4:22, 8:14,
76:10, 78:13,
106:11, 107:5,
116:18, 117:20,
143:6, 149:12,
151:12, 153:10,
153:12, 172:14,
172:16, 190:21,
191:11, 191:14,
192:10, 193:3
**robert's**
175:22, 192:18,
194:19
**rog**
130:10, 137:8,
138:20, 140:9,
141:6, 154:6,
154:16
**rogs**
121:14, 122:2,
130:9, 170:2,

174:12
**rule**
83:21, 124:2,
125:17, 137:12,
138:4, 146:3,
161:15, 162:19,
163:5, 171:9,
174:6
**rules**
36:7, 126:7,
163:11, 171:8
**ruling**
33:16
**run**
45:4, 45:18,
91:11, 164:11,
185:19

**S**

**said**
6:10, 12:2,
13:17, 14:14,
21:15, 22:2,
23:3, 29:15,
30:9, 30:18,
31:6, 34:6,
35:18, 35:22,
38:13, 39:19,
45:14, 55:2,
55:17, 58:5,
59:13, 62:15,
62:20, 68:12,
69:3, 70:13,
72:9, 74:20,
75:3, 78:11,
78:13, 84:13,
96:11, 99:15,
102:16, 103:22,
111:7, 111:9,
111:10, 111:11,
111:18, 112:7,
125:1, 127:9,
128:7, 132:11,
133:12, 135:14,
137:11, 137:21,
141:1, 143:5,
144:12, 148:2,
149:4, 151:19,

164:7, 165:3,
165:5, 166:1,
167:9, 167:17,
173:12, 174:10,
177:4, 177:10,
178:3, 178:8,
179:5, 184:11,
185:4, 186:15,
190:17, 192:6,
194:2, 194:19,
196:7
**sake**
160:7, 176:12,
176:19
**sale**
77:16
**sales**
24:20
**sam**
116:18, 118:3
**sam's**
57:18
**same**
5:6, 5:11,
7:10, 7:11,
7:14, 15:16,
19:13, 19:17,
22:19, 23:11,
23:12, 26:8,
26:17, 37:21,
39:2, 42:11,
42:12, 42:14,
44:15, 45:1,
45:22, 47:9,
52:12, 55:4,
60:18, 61:2,
61:3, 62:6,
66:2, 77:21,
78:3, 78:17,
79:16, 81:16,
81:21, 82:22,
84:20, 84:22,
91:21, 92:15,
104:2, 104:13,
118:10, 119:14,
122:5, 137:5,
143:19, 144:1,
148:20, 162:8,

173:7, 178:20,
189:3, 189:4
**satisfied**
151:21
**satisfies**
136:11
**satisfy**
140:9, 164:3
**save**
79:4, 167:8
**saw**
80:17
**say**
10:13, 14:19,
18:16, 23:16,
25:21, 34:20,
35:8, 37:7,
40:3, 51:9,
58:6, 62:10,
66:22, 67:17,
79:14, 86:15,
89:11, 91:7,
91:11, 91:12,
91:18, 95:3,
102:5, 103:3,
103:6, 103:22,
108:12, 118:20,
126:9, 131:20,
133:2, 136:15,
140:11, 140:12,
141:21, 141:22,
143:11, 143:12,
143:14, 144:10,
144:14, 152:7,
155:11, 156:16,
157:1, 157:2,
157:16, 172:13,
172:20, 176:11,
178:7, 191:22,
193:22
**saying**
26:19, 28:5,
28:14, 28:17,
29:2, 39:1,
41:16, 41:21,
45:6, 62:17,
63:10, 68:22,
69:12, 76:17,

J.R. 884

Transcript of Meet & Confer
Conducted on January 3, 2025

231

81:22, 82:16,
83:5, 86:4,
88:9, 91:8,
92:2, 92:19,
93:6, 101:5,
101:10, 102:16,
103:10, 103:17,
105:14, 105:15,
112:9, 113:17,
113:18, 115:4,
125:22, 140:4,
140:6, 144:18,
150:18, 156:10,
156:15, 158:15,
162:5, 164:21,
166:22, 178:10,
178:15, 181:2,
193:13
**says**
53:14, 69:1,
73:6, 78:10,
85:11, 85:13,
102:18, 102:21,
125:9, 126:1,
137:12, 138:4,
138:8, 147:4,
149:20, 171:9,
171:13, 171:14,
171:21, 171:22,
172:22, 190:7,
191:22, 194:4,
194:8, 194:9
**schedule**
11:6, 11:21
**scheduled**
8:8, 13:19,
32:9, 160:15
**schedules**
80:4
**scheduling**
14:3, 71:6
**scope**
5:9, 5:20,
5:21, 10:9,
36:7, 59:3,
83:20, 116:8,
170:3
**screens**
77:14

**seal**
196:14
**search**
45:3, 45:7,
91:11, 96:1,
109:9, 135:16,
140:17
**searched**
47:13, 109:10,
109:16
**searches**
45:4
**searching**
47:3
**second**
30:4, 49:3,
57:1, 68:14,
69:17, 70:2,
132:17, 162:4,
190:1
**secondarily**
15:5
**security**
4:22, 14:22,
15:9, 17:7,
17:11, 17:16,
18:5, 18:20,
20:13, 32:22,
33:2, 34:4,
35:15, 35:19,
36:16, 37:10,
37:19, 41:20,
43:5, 43:15,
43:17, 45:21,
46:8, 49:7,
49:9, 49:11,
51:3, 58:12,
58:14, 58:15,
59:11, 59:17,
65:1, 72:14,
72:16, 73:2,
73:4, 73:9,
73:17, 74:3,
75:21, 75:22,
76:1, 76:9,
76:17, 77:17,
77:19, 78:12,
79:9, 79:14,

81:3, 81:4,
82:11, 83:2,
84:19, 85:12,
88:13, 89:3,
90:18, 91:20,
94:3, 104:8,
104:17, 104:18,
107:21, 112:1,
113:4, 113:21,
116:2, 116:19,
119:12, 119:20,
181:16, 181:18,
181:19, 182:4,
187:4, 187:14,
187:22, 191:2,
192:13, 194:20
**security's**
120:6, 170:12
**see**
14:7, 22:16,
25:9, 26:15,
78:10, 82:22,
92:18, 93:11,
98:17, 103:18,
105:4, 106:8,
106:17, 106:21,
135:5, 145:11,
153:22, 154:1,
163:21, 166:13,
171:20, 185:22,
188:1, 188:2
**seeing**
143:8, 154:12,
187:6, 188:6
**seek**
122:4, 174:19
**seeking**
19:6, 22:8,
192:15
**seem**
25:2, 56:1,
143:9, 143:14
**seems**
24:6, 24:11,
25:3, 36:9,
55:16, 126:10,
126:14
**seen**
41:1, 109:20,

163:10
**segregate**
46:18
**select**
176:18
**selling**
24:17
**send**
12:19, 13:7,
153:17, 168:9,
168:10, 175:12,
176:6, 179:6,
180:6
**sending**
12:3, 114:1
**sense**
12:6, 14:12,
18:22, 28:11,
28:13, 32:13,
47:21, 50:13,
72:2, 75:5,
114:14, 120:14,
121:8, 121:15,
128:15, 130:2,
140:1, 171:22,
172:13, 179:17,
181:6
**sent**
110:4, 143:5
**sentence**
69:19, 99:21,
107:22, 132:12,
152:10, 194:9
**separate**
12:13, 18:7,
22:5, 23:22,
27:4, 31:16,
31:19, 33:4,
34:4, 36:14,
36:20, 44:2,
46:21, 72:17,
80:6, 85:6,
90:5, 98:8,
99:13, 104:19,
104:20, 131:10,
149:3, 173:11,
173:21, 174:3,
174:11, 174:12,

J.R. 885

Transcript of Meet & Confer
Conducted on January 3, 2025                              232

175:1, 175:21, 175:22
**separately**
6:21, 18:3, 84:8, 89:15, 102:19, 109:16, 117:22
**separateness**
182:2, 182:3
**september**
62:15, 65:2, 65:13
**sequence**
106:22
**series**
73:4, 76:5, 77:21, 80:5, 119:14, 191:2
**serve**
169:20, 171:11, 174:15, 174:20, 178:1, 178:4
**served**
161:16, 161:18, 169:20, 171:17, 173:16
**service**
161:20, 162:6, 174:1, 181:21, 194:3
**services**
19:1, 49:12, 58:17, 59:20, 60:11, 109:14
**servicing**
23:18, 26:1
**serving**
174:19, 175:5
**session**
71:18, 160:18, 168:16
**set**
31:11, 67:19, 169:11, 196:13
**setting**
5:12, 11:21
**settled**
91:3

**settles**
136:15
**seven**
65:14, 65:20
**several**
32:19, 40:4, 141:10
**shall**
14:9
**shape**
30:1
**shared**
20:2
**shareholder**
22:18, 72:13
**shareholders**
45:20, 73:19
**sheet**
81:3
**sheets**
80:2
**shield**
29:12
**shire**
109:14
**short**
17:17, 64:10, 97:13
**should**
4:1, 14:8, 38:19, 53:15, 71:12, 73:16, 84:4, 93:18, 94:4, 97:6, 97:9, 98:2, 112:16, 118:8, 123:18, 149:10, 149:21, 156:12, 163:7, 168:8, 169:7, 171:19, 172:14, 172:16, 172:18, 192:7, 193:22
**show**
49:6, 49:20, 53:18, 53:20, 56:9, 57:13, 58:11, 108:4,

108:7, 112:8, 112:11, 115:12, 115:21, 182:10, 182:16
**showed**
38:6
**showing**
55:16, 56:2, 56:5
**shown**
57:17, 193:4
**shows**
22:19, 56:8, 56:18, 148:20
**side**
48:12, 65:20, 82:2, 129:12, 160:5, 187:4
**sides**
37:14, 188:4, 188:6, 188:10
**signature-p1kal**
196:19
**signed**
44:20, 47:4, 47:14, 52:17, 142:1
**significance**
133:17
**significant**
152:11
**signing**
64:3, 145:1
**similar**
11:11, 17:3, 58:7, 68:6, 72:15, 76:5, 80:5, 104:18, 114:9, 142:9, 163:9, 184:19, 185:19, 186:14, 186:19, 188:13
**similarly**
23:1, 138:21
**simms**
5:19, 8:10, 10:22, 12:12, 111:9, 111:11,

168:19
**simple**
159:1
**simply**
73:6, 127:4
**since**
8:9, 84:8, 131:6, 159:18
**single**
30:13, 43:15, 47:20, 47:21, 57:10, 149:10, 172:3
**singular**
150:13
**sitting**
124:12, 175:14
**situation**
66:6, 106:2
**situations**
172:1, 173:3
**six**
61:9, 61:19, 65:15, 65:18, 65:19, 65:20
**skinner**
173:20, 174:8
**slicing**
91:18
**slightly**
147:1
**sold**
62:14
**sole**
176:1, 176:2
**solely**
126:3
**solve**
93:2
**some**
9:4, 14:2, 15:12, 16:22, 17:3, 19:16, 29:10, 29:11, 29:22, 32:7, 34:11, 36:3, 39:21, 39:22, 40:1, 41:8,

J.R. 886

Transcript of Meet & Confer
Conducted on January 3, 2025

233

41:10, 47:11,
50:7, 50:9,
50:16, 51:12,
54:15, 56:7,
61:15, 61:21,
61:22, 62:10,
63:19, 64:7,
64:18, 67:4,
71:13, 71:22,
73:5, 74:2,
74:15, 74:20,
75:3, 79:1,
79:3, 80:9,
80:11, 80:19,
81:5, 82:8,
83:1, 84:3,
84:22, 85:10,
86:21, 90:9,
92:6, 92:12,
94:15, 97:2,
97:7, 98:2,
98:10, 100:4,
105:13, 107:3,
107:18, 112:4,
113:13, 114:3,
117:12, 120:13,
127:20, 129:7,
132:19, 146:22,
148:1, 155:19,
156:20, 158:10,
158:11, 163:17,
165:21, 171:22,
173:1, 174:13,
175:17, 180:1,
180:3, 180:22,
181:1, 181:13,
182:11, 185:19,
193:14
**somebody**
61:14
**somehow**
22:4
**someplace**
110:5
**something**
22:18, 22:19,
28:6, 41:3,
56:16, 56:18,

57:2, 63:8,
64:4, 69:5,
81:12, 81:21,
85:10, 85:15,
88:3, 91:8,
96:12, 96:15,
105:17, 111:7,
112:19, 115:2,
127:15, 129:15,
138:22, 151:15,
153:20, 158:19,
171:2, 172:15,
175:15, 182:13
**something's**
95:20
**sometimes**
125:17
**somewhere**
130:12
**son**
124:5
**sons**
12:14
**sorry**
20:16, 24:12,
25:13, 39:12,
50:11, 53:3,
60:13, 62:11,
62:12, 65:11,
65:22, 70:6,
74:5, 77:13,
82:15, 87:15,
93:15, 95:3,
122:17, 125:12,
132:10, 132:12,
135:8, 146:14,
155:22, 156:9,
159:12, 166:3,
168:22, 174:9,
178:18, 178:19,
179:4, 181:7,
182:21, 190:16,
192:5
**sorts**
139:2
**sought**
17:22, 24:1,
104:16, 126:3

**sounded**
179:9
**sounds**
4:5, 36:4,
55:8, 81:8,
84:10, 84:21,
90:3, 92:11,
98:21, 101:9,
115:1, 129:10,
131:16, 132:21,
133:16, 141:7,
142:7, 143:17,
144:11, 144:14,
157:16, 159:8,
161:6, 169:2,
175:10, 178:2,
178:22
**source**
158:12
**sources**
130:14, 134:17,
135:3, 137:3,
154:5, 166:6
**south**
83:18
**speak**
10:2, 25:14
**speakers**
71:15, 97:15,
178:13
**speaking**
5:6, 8:4,
13:12, 16:18,
23:2, 25:14,
89:1, 99:4,
179:5
**speaks**
159:2
**speci**
180:22
**specific**
16:4, 17:1,
19:1, 19:16,
36:12, 38:21,
44:18, 45:9,
51:15, 78:1,
86:17, 86:22,
87:8, 94:13,

108:21, 110:18,
114:12, 152:5,
167:5, 188:22,
191:20
**specifically**
43:17, 48:19,
51:6, 68:12,
69:3, 69:14,
70:11, 72:20,
78:7, 89:4,
89:9, 90:13,
106:10, 106:13,
106:20, 111:17,
112:2, 138:20,
151:2, 155:19,
164:13
**specificity**
31:12, 31:21,
180:11, 180:14,
181:1
**specifics**
16:1, 16:15
**specified**
161:17
**spend**
72:3
**spin**
27:3
**spirit**
134:3, 176:5
**spoken**
77:22
**spoliation**
123:22, 127:12,
127:17, 129:3
**sports**
138:3
**spot**
78:17
**st**
3:6
**standard**
1:16, 145:7
**standing**
100:21, 141:3,
147:21, 156:8,
171:15
**stands**
176:11, 177:2

J.R. 887

Transcript of Meet & Confer
Conducted on January 3, 2025                                    234

**start**
4:4, 14:8,
14:9, 14:15,
16:19, 16:22,
17:5, 56:12,
57:18, 71:2,
71:18, 72:4,
93:6, 120:15,
170:7, 170:10,
173:17
**started**
5:7, 24:10,
65:12
**starting**
63:12, 71:18
**state**
2:12, 79:21,
96:9, 99:8,
134:11, 134:14,
149:7, 151:17,
152:7, 165:14,
196:22
**stated**
86:11, 144:2
**statement**
18:16, 106:6
**statements**
79:22, 87:7,
87:8, 88:13,
94:1, 94:11,
99:9, 105:5,
106:4, 109:6,
109:13, 109:22,
110:4, 111:3,
111:22, 138:15,
192:22
**states**
1:1, 151:11,
151:18, 153:9
**status**
125:6
**stay**
161:21
**staying**
42:6
**stenographically**
196:7
**step**
82:17

**stephen**
3:3, 4:11
**steve**
4:18, 5:5, 7:4,
8:4, 12:8,
13:12, 16:17,
20:15, 30:7,
46:11, 55:12,
60:13, 67:15,
69:10, 69:19,
89:1, 99:4,
103:8, 110:6,
154:19, 157:21,
160:11, 178:18,
179:14, 179:22,
180:14, 185:13,
193:18
**steve's**
166:11
**still**
19:17, 51:16,
52:4, 61:8,
62:21, 68:19,
80:16, 100:6,
101:6, 102:8,
102:10, 102:12,
123:17, 129:15,
136:12, 136:16,
144:18, 169:12,
171:6, 176:11,
177:2, 177:6,
183:17, 188:15
**stipulated**
171:10
**stipulation**
171:14
**stood**
41:2, 73:1
**stop**
70:16
**stopping**
98:15
**strategies**
119:11
**streamline**
151:9
**streamlining**
21:10

**street**
3:6, 3:16
**strong**
14:15
**struck**
45:2
**structure**
130:7
**structured**
31:3, 130:12
**struggle**
26:15, 52:4
**struggled**
35:10
**struggling**
25:16, 52:22,
84:15
**stuff**
22:3, 25:5,
28:16, 39:4,
40:1, 43:7,
43:8, 46:8,
46:15, 46:18,
46:20, 54:16,
54:17, 60:21,
64:16, 64:18,
71:13, 72:9,
74:8, 80:1,
80:11, 83:19,
92:1, 94:3,
96:20, 97:2,
97:16, 98:7,
98:10, 105:7,
105:12, 105:13,
105:15, 107:18,
113:13, 117:13,
132:19, 135:16,
152:6, 156:21,
184:7, 185:8,
185:19, 194:20
**subject**
4:16, 7:2,
8:17, 8:20,
9:10, 10:20,
14:18, 32:21,
67:12, 67:18,
73:6, 79:20,
108:14, 110:11,

110:13, 110:15,
112:2, 119:9,
133:4, 134:12,
147:13, 155:14,
164:4, 164:16,
181:10, 183:12,
184:16, 190:7,
192:1
**subjective**
36:5, 36:8,
36:14, 84:10,
93:18, 95:17,
96:2, 96:4,
102:20, 103:13
**subparts**
149:8, 174:14,
174:21
**subpoena**
19:5, 82:12,
161:10, 161:15,
161:18, 161:19,
163:2, 169:5
**subsequent**
133:21
**subsequently**
8:14
**subset**
177:11
**subsidiary**
18:21, 19:4,
19:7, 22:2,
24:10, 25:1,
31:15, 173:6
**substantial**
11:14
**substantive**
142:13, 147:13,
147:22, 148:9,
154:10, 154:15
**succeed**
172:11
**successful**
176:4
**successor**
19:21, 20:6,
21:22, 23:8,
23:14, 24:15,
24:19, 25:10,

J.R. 888

Transcript of Meet & Confer
Conducted on January 3, 2025                    235

26:9, 33:19,
38:16, 45:11,
52:9, 52:20,
60:2, 119:22
**successors**
15:10, 18:8,
33:5, 34:5,
52:10, 53:10,
53:13, 53:17,
53:19, 57:7,
72:18, 73:5,
76:7, 84:20,
90:6, 191:3
**suddenly**
124:18
**sufficiency**
172:19
**sufficient**
41:18, 41:22,
43:18, 49:6,
49:20, 58:11,
108:4, 108:6,
112:8, 112:11,
115:21, 134:16,
156:11, 166:5,
182:9, 184:12,
185:6
**suggest**
4:3, 13:9,
146:16, 163:16,
169:18
**suggesting**
96:5, 130:18
**suggestion**
46:12, 71:7,
75:15, 97:19,
98:1
**suing**
173:7
**suite**
3:16
**suited**
137:9, 139:20,
141:4, 142:21,
148:8
**summarize**
9:7
**summary**
81:2, 138:17,

142:6, 179:9
**super-productive**
96:8
**supervision**
196:9
**supplement**
162:18
**supplemented**
64:9
**support**
145:16
**supporting**
163:10, 163:22,
165:6, 166:7,
167:10, 167:17
**supports**
54:12, 137:19
**suppose**
10:10, 36:18,
182:3, 191:6
**supposed**
28:10, 36:8,
150:18
**supreme**
126:1
**sure**
4:17, 5:11,
16:17, 20:17,
22:7, 30:5,
34:1, 39:10,
39:22, 49:1,
56:21, 66:8,
77:3, 82:19,
84:6, 86:13,
97:5, 99:20,
101:12, 108:20,
117:14, 121:7,
121:20, 132:22,
134:2, 147:2,
155:8, 161:3,
171:5, 182:17
**surely**
54:9
**swear**
145:13
**sworn**
138:14, 138:19

**T**

**tail**
39:17, 41:4

**tailwind**
138:3
**take**
4:1, 6:8,
13:17, 14:9,
14:10, 18:11,
28:1, 32:3,
34:15, 35:22,
62:5, 63:2,
66:11, 71:5,
73:10, 74:12,
76:16, 82:17,
98:11, 98:12,
98:13, 99:15,
103:17, 108:19,
112:12, 116:20,
117:8, 125:15,
128:1, 129:10,
153:19, 157:7,
158:19, 158:21,
159:10, 160:16,
160:22, 168:17,
170:17, 175:12,
175:13, 176:7,
179:8, 184:18,
193:11, 193:15,
194:22
**takeaway**
8:3, 10:21
**taken**
34:9, 99:1,
161:7, 166:10,
196:4, 196:7
**takes**
36:19
**taking**
67:6, 75:12,
117:15, 182:17,
186:1
**talk**
13:20, 20:19,
21:3, 21:11,
40:16, 50:14,
66:19, 67:1,
71:1, 104:9,
121:8, 129:22,
130:5, 130:7,
131:4, 157:11,

161:9, 170:2
**talked**
78:4, 114:19,
133:19
**talking**
5:12, 41:11,
48:19, 52:8,
54:13, 54:15,
55:7, 55:8,
55:15, 56:15,
57:4, 63:15,
64:21, 65:5,
66:15, 69:13,
70:2, 78:6,
78:18, 85:5,
86:1, 94:10,
94:14, 99:6,
102:3, 111:3,
130:17, 132:4,
142:4, 160:12,
168:1, 168:3,
173:3, 178:20,
188:16, 188:17,
193:19
**talks**
87:22
**tax**
79:22, 86:15,
86:21, 87:7,
99:8, 134:11,
134:14, 163:21,
164:1, 164:7,
165:4, 165:6,
165:8, 165:11,
165:22, 166:7,
167:9, 167:15
**taylor**
126:5
**tealtech**
127:16
**team**
136:15, 148:16
**technically**
34:21
**tee**
11:1
**tele**
194:7

J.R. 889

Transcript of Meet & Confer
Conducted on January 3, 2025                    236

| | | | |
|---|---|---|---|
| **tell** 32:2, 41:5, 46:22, 56:17, 81:12, 86:20, 121:18, 128:6, 128:15, 133:17, 170:8, 176:8, 185:15 | **themselves** 48:2, 54:12 | 106:10, 137:6 | 179:19, 185:22 |
| **telling** 44:4, 49:16, 68:21, 69:5, 81:20, 155:5 | **thereafter** 196:8 | **third** 4:17, 158:12, 162:18 | **throughout** 32:19, 35:6 |
| **tells** 25:2 | **therefore** 18:9, 100:13, 122:12 | **thought** 53:10, 53:11, 55:15, 58:22, 62:12, 68:12, 119:5, 121:8, 150:2, 156:4 | **tie** 46:19 |
| **ten** 5:3, 98:12, 186:7, 186:8, 189:9 | **thing** 23:14, 29:6, 29:14, 30:20, 31:5, 42:3, 42:12, 44:12, 48:4, 49:19, 67:16, 70:20, 96:3, 121:21, 129:1, 129:13, 130:5, 130:7, 130:11, 138:19, 140:17, 152:18, 154:14, 159:18, 161:9, 161:13, 172:2, 173:11, 173:22, 190:17 | **thoughts** 93:15 | **tied** 185:4, 187:7 |
| **term** 91:11 | | **thousands** 37:9 | **time** 1:16, 7:22, 13:2, 15:4, 15:12, 17:21, 37:2, 42:2, 48:17, 49:19, 50:14, 51:12, 51:17, 53:9, 53:19, 59:3, 59:20, 62:3, 66:21, 76:16, 76:19, 76:22, 77:3, 77:6, 77:8, 77:10, 78:5, 78:8, 78:10, 78:18, 79:5, 79:12, 80:16, 81:9, 84:7, 89:8, 89:9, 89:13, 90:22, 91:4, 93:1, 94:5, 97:6, 97:13, 98:10, 114:13, 114:15, 116:8, 122:19, 137:4, 146:13, 148:20, 158:17, 160:21, 161:17, 163:4, 167:8, 169:9, 177:5, 178:20, 180:17, 183:6, 183:7, 183:8, 183:12, 183:14, 184:4, 184:16 |
| **terms** 5:9, 5:12, 7:13, 8:6, 58:8, 94:7 | | **three** 65:6, 95:10, 128:14, 129:18, 131:7, 131:11, 145:17, 186:18 | |
| **th** 3:16, 161:21 | | **threshold** 6:17 | |
| **thank** 4:18, 28:18, 32:15, 110:6, 120:11, 123:16, 134:7, 134:16, 146:20, 161:8, 169:17, 181:7, 186:11, 195:4 | | **through** 15:13, 18:16, 20:5, 27:13, 34:18, 38:7, 40:1, 43:11, 45:18, 47:8, 47:14, 50:17, 51:15, 51:22, 55:21, 59:7, 64:17, 66:3, 67:7, 68:4, 70:13, 71:17, 80:11, 80:21, 81:14, 84:3, 89:5, 89:10, 89:11, 89:12, 90:20, 97:4, 98:4, 99:14, 99:17, 100:3, 100:12, 101:8, 105:21, 111:8, 126:13, 131:2, 134:18, 137:3, 145:17, 159:20, 160:1, 160:7, 160:10, 164:12, 164:20, 166:16, | |
| **thanks** 7:4, 8:5, 12:8, 16:18, 32:14, 37:6, 96:18, 98:22, 146:21, 177:9 | **things** 5:3, 25:3, 35:10, 40:11, 40:15, 41:11, 44:11, 48:3, 53:22, 61:8, 62:2, 63:20, 64:8, 71:22, 72:1, 81:16, 83:13, 83:15, 85:18, 86:5, 86:6, 93:16, 95:15, 97:12, 99:4, 115:17, 120:3, 120:16, 122:14, 123:2, 128:11, 139:3, 139:20, 141:11, 148:5, 151:16, 153:2, 154:22, 167:7, 176:12, 180:13, 187:4 | | **times** 42:2 |
| **theft** 9:3, 12:14 | | | **timing** 26:14 |
| **theme** 57:6, 149:10, 149:12, 149:17, 150:12, 150:14, 151:3, 151:20 | | | **title** 45:1, 45:5 |
| **themes** 151:5 | **thinking** 11:7, 71:20, 72:20, 99:3, | | |

J.R. 890

Transcript of Meet & Confer
Conducted on January 3, 2025

237

**today**
5:9, 5:21,
7:14, 10:6,
11:15, 12:3,
12:19, 13:5,
13:14, 30:11,
32:1, 63:20,
71:1, 71:10,
71:13, 93:9,
98:2, 103:21,
110:13, 110:18,
111:6, 112:5,
113:8, 124:12,
175:14, 193:17,
195:4
**together**
9:19, 11:9,
11:12, 12:7,
16:21, 21:11,
23:3, 73:3,
104:10, 114:6,
120:9, 122:15,
129:22, 137:6,
172:3
**told**
164:8
**tom**
189:7
**took**
35:11, 35:14,
179:7
**top**
37:11, 75:7,
81:1, 95:12,
110:2, 160:9,
176:14, 194:12
**topic**
121:15, 128:20,
129:22, 151:19,
154:5
**topics**
121:13, 121:14,
128:21, 139:17,
180:18
**total**
172:17, 175:7
**totally**
20:22, 82:16

**touch**
38:5, 86:7,
97:16, 128:21,
130:9, 151:16
**touches**
30:19, 37:18
**towards**
6:11, 11:5,
11:21
**tracing**
187:11
**track**
11:11
**traditional**
104:11
**trail**
185:14
**transaction**
105:16, 188:4
**transactions**
85:17, 105:2,
105:3, 106:7,
106:17
**transcript**
5:17, 5:18,
8:11, 196:5
**transfer**
9:6, 9:12,
24:18, 39:7,
57:15, 59:16,
77:17, 106:11
**transferred**
9:13, 30:20,
57:10, 85:9,
187:12, 187:13,
188:9
**transferring**
29:12, 57:19
**transfers**
106:9, 187:5,
193:1
**transferwise**
187:2
**transition**
168:20
**transparent**
93:19
**treated**
122:12, 171:19

**treating**
86:5
**trends**
39:7
**trial**
11:10
**tried**
7:14
**trouble**
56:14
**true**
114:10, 196:6
**try**
13:2, 16:6,
38:20, 66:16,
83:15, 97:11,
112:12, 159:13
**trying**
7:6, 22:4,
23:9, 24:1,
27:8, 27:13,
29:9, 29:14,
29:20, 39:6,
40:22, 45:2,
45:9, 46:1,
47:12, 52:5,
56:9, 59:8,
64:14, 69:16,
83:20, 83:22,
84:9, 85:3,
85:15, 88:2,
89:2, 89:20,
91:18, 92:16,
95:7, 95:19,
102:9, 102:12,
108:16, 114:1,
140:18, 151:9,
157:16, 157:17,
160:7, 167:7,
174:20
**turn**
8:7, 15:17,
72:2, 97:1,
97:6, 98:6,
98:10, 119:13,
120:21, 121:5,
169:7
**turning**
60:20, 81:9,

96:20, 121:1
**two**
10:13, 14:21,
15:4, 15:8,
18:7, 21:11,
33:3, 34:2,
37:21, 56:3,
65:6, 85:17,
89:21, 93:16,
95:15, 96:17,
99:22, 117:18,
160:9, 167:14,
170:1, 170:7,
170:11, 170:18,
182:7, 191:16,
191:17
**type**
104:13, 104:15,
169:3
**typed**
153:5
**types**
16:3, 90:12,
109:19
**typewriting**
196:8
**typical**
22:15
**typically**
115:12

_____ **U** _____
**ultimately**
144:22, 145:2
**um**
50:19
**umbrella**
23:21
**unable**
140:14
**unacceptably**
96:2
**unanswered**
149:22
**under**
23:21, 37:20,
44:1, 46:10,
53:13, 54:19,

J.R. 891

Transcript of Meet & Confer
Conducted on January 3, 2025                      238

66:11, 74:12,
78:7, 103:18,
108:19, 112:12,
117:8, 124:2,
126:7, 128:1,
129:10, 137:15,
139:19, 145:1,
146:3, 153:19,
155:1, 157:7,
163:5, 184:19,
193:12, 193:15,
195:1, 196:8
**understand**
12:2, 15:7,
16:2, 17:13,
22:5, 25:17,
28:5, 33:19,
34:7, 38:14,
40:22, 42:4,
52:5, 52:22,
61:5, 66:8,
75:14, 77:4,
84:1, 84:15,
85:4, 85:7,
85:8, 86:3,
88:2, 88:11,
89:2, 89:21,
91:1, 93:5,
94:21, 99:20,
102:4, 102:12,
103:9, 103:11,
103:16, 111:10,
112:9, 112:13,
112:22, 113:5,
113:11, 113:14,
113:20, 114:2,
114:21, 117:8,
128:20, 129:8,
132:22, 135:11,
147:18, 148:21,
150:21, 163:6,
175:22
**understanding**
5:15, 15:1,
18:19, 19:11,
20:10, 81:13,
82:16, 88:7,
91:6, 101:10,

110:20, 111:15,
129:14, 144:6,
144:21
**understood**
10:3, 62:17,
99:21, 103:10,
140:21, 140:22,
144:17, 148:22
**unequivocally**
127:7, 137:22
**unfortunately**
129:2, 160:16
**unique**
31:17
**unit**
172:3
**united**
1:1
**unless**
171:9
**unquote**
90:1, 103:7
**unrelated**
135:4
**until**
24:4, 32:1,
57:10, 59:17,
60:12, 162:1,
173:14, 173:15
**untimely**
161:14
**unverified**
150:5
**update**
80:13, 80:15,
116:5
**upsell**
159:13
**us-based**
109:12
**use**
7:22, 42:22,
48:8, 64:12,
67:3, 85:21,
90:14, 104:7,
111:6, 138:8,
142:5, 160:21,
172:14, 186:7,

186:8
**uses**
89:4, 174:3
**using**
23:12, 26:2,
52:6, 53:2,
53:6, 63:8,
86:3, 122:13,
122:14, 124:6,
124:7, 135:22,
165:10
**utilize**
102:16, 103:4
**utilized**
106:16, 112:21,
113:2, 158:11
**utilizing**
36:13, 59:1,
63:13, 65:5,
76:19, 84:11,
90:2, 91:7,
92:6, 103:5

---

**V**

**vague**
102:21, 154:21,
156:22, 157:18
**valid**
102:5
**valuation**
154:17
**valuations**
75:20, 76:14
**valued**
158:3, 158:5,
159:3
**vendors**
194:3
**verified**
138:15, 138:22
**verify**
101:11
**verifying**
142:2
**version**
143:9, 153:5
**versus**
125:8, 126:5,

149:7, 162:7,
162:16, 174:4,
174:18
**via**
6:16, 26:13
**view**
10:19, 11:5,
11:13, 11:21,
12:6, 19:3,
24:6, 34:14,
55:5, 65:7,
83:13, 86:18,
92:1, 92:9,
182:5, 192:6
**virginia**
162:17
**voluntarily**
124:16

---

**W**

**w-2s**
44:11, 48:3,
48:6, 50:16,
115:7, 115:14,
115:16, 115:19
**wagging**
39:18, 41:5
**wait**
57:9, 67:15,
70:6
**waited**
173:14, 173:15
**waived**
162:2, 162:6,
162:20, 163:14,
165:16
**waiver**
163:12, 163:18,
165:15, 167:6,
190:7, 192:1
**waiving**
39:5, 133:3,
155:9, 170:8
**wallet**
106:19, 106:20,
106:21, 113:15,
164:1, 167:11,
167:17, 167:19,

J.R. 892

167:21, 168:1,
187:17, 187:20
**wallets**
106:15, 106:16,
112:21, 113:2,
113:4, 168:6,
187:9, 187:16,
187:21, 188:3,
189:1
**want**
4:6, 5:10,
6:21, 7:17,
7:22, 10:17,
15:14, 16:2,
16:7, 16:14,
21:6, 21:15,
25:13, 28:22,
31:22, 32:2,
38:14, 38:20,
40:4, 40:16,
42:6, 45:12,
45:13, 48:13,
56:4, 56:11,
58:3, 59:6,
59:10, 63:18,
66:16, 66:20,
68:15, 69:11,
71:2, 71:6,
71:9, 71:17,
71:19, 71:21,
74:22, 81:20,
88:22, 93:10,
95:3, 95:15,
96:10, 97:5,
98:9, 98:11,
99:5, 101:12,
102:2, 106:12,
111:1, 112:9,
113:10, 115:3,
117:9, 117:11,
120:14, 120:19,
120:20, 120:21,
129:18, 129:22,
130:7, 131:4,
131:5, 131:8,
132:22, 134:8,
144:10, 145:8,
146:21, 150:22,

151:8, 151:10,
153:13, 154:1,
157:20, 160:20,
163:21, 168:16,
168:20, 170:4,
170:15, 171:3,
175:12, 176:4,
176:6, 177:22,
178:4, 178:16,
179:6, 179:14,
184:9
**wanted**
6:17, 10:6,
10:12, 11:22,
12:2, 13:22,
27:21, 29:3,
62:13, 96:8,
96:17, 113:15,
113:17, 113:18,
113:19, 113:20,
130:5, 133:12,
151:14, 163:16,
170:20, 176:18,
177:3
**wants**
110:7
**washington**
3:17
**watch**
96:19
**way**
7:9, 16:10,
16:11, 25:18,
28:18, 29:22,
31:3, 33:13,
34:11, 43:4,
47:1, 47:4,
47:9, 47:14,
48:9, 55:14,
64:17, 70:15,
71:4, 71:9,
84:22, 86:3,
86:5, 89:18,
92:20, 93:12,
93:14, 93:19,
96:4, 107:9,
110:18, 121:3,
121:19, 131:4,

132:16, 143:15,
150:6, 150:22,
151:8, 152:2,
152:17, 156:20,
173:19, 174:8,
178:2, 178:3,
178:16, 188:5
**ways**
30:8, 34:13,
114:12
**we'll**
13:6, 13:21,
14:4, 17:2,
25:20, 31:11,
32:3, 36:15,
40:17, 61:19,
74:12, 79:1,
79:4, 82:9,
91:12, 95:14,
97:11, 98:5,
98:9, 98:19,
103:1, 103:18,
104:4, 108:18,
108:20, 110:8,
111:12, 117:7,
117:8, 121:5,
124:11, 128:1,
128:4, 133:22,
135:16, 146:14,
153:17, 153:19,
153:21, 154:12,
159:10, 160:1,
160:21, 161:4,
171:3, 177:9,
177:19, 179:12,
184:7
**we've**
9:22, 14:17,
15:11, 15:12,
28:3, 29:3,
32:4, 37:15,
37:19, 38:1,
39:4, 39:8,
43:9, 48:6,
48:7, 48:15,
48:20, 50:9,
55:17, 55:20,
57:17, 62:8,

62:20, 64:3,
67:5, 68:4,
72:7, 72:8,
74:3, 74:5,
74:8, 74:17,
75:1, 86:20,
92:22, 93:4,
95:2, 95:13,
96:15, 100:4,
100:18, 100:20,
103:22, 116:5,
121:16, 122:8,
126:7, 127:8,
136:13, 137:11,
138:7, 141:14,
144:9, 144:12,
144:13, 145:17,
147:5, 149:4,
154:19, 165:5,
165:16, 177:10,
182:10, 184:6,
191:16, 192:14
**webber**
174:18
**website**
109:21
**wednesday**
13:20
**week**
28:7, 66:19,
80:22, 96:6,
103:20, 136:12,
193:16
**went**
131:2, 179:19
**weren't**
47:3, 125:1
**west**
109:14
**westlaw**
162:11, 162:22,
174:9
**whatever**
6:6, 23:20,
24:9, 25:22,
26:3, 27:1,
27:3, 51:13,
51:19, 56:9,

J.R. 893

Transcript of Meet & Confer
Conducted on January 3, 2025

240

90:9, 94:2,
158:9
**whenever**
52:18
**whereas**
113:16, 175:6
**whereof**
196:13
**wherever**
108:1
**whether**
15:19, 15:20,
19:4, 19:20,
25:9, 26:8,
26:16, 30:19,
30:22, 31:4,
34:3, 34:5,
43:18, 44:3,
46:2, 49:20,
52:20, 81:15,
82:9, 83:4,
87:10, 87:17,
87:18, 88:3,
88:19, 88:20,
90:13, 91:16,
99:10, 102:9,
102:16, 109:17,
110:4, 125:9,
125:11, 125:13,
126:16, 128:12,
136:11, 136:12,
136:15, 136:16,
157:8, 157:11,
159:11, 165:8,
165:9, 182:8,
183:11, 183:15,
184:9, 186:18,
188:8, 189:3,
189:16, 190:19,
191:7, 192:12,
194:7, 194:18
**white**
3:5, 4:13,
88:6, 88:7,
91:9, 102:18,
122:17, 122:18,
122:21, 124:11,
126:18, 127:22,

129:17, 130:19,
130:22, 131:18,
131:20, 132:17,
133:2, 133:9,
134:9, 134:12,
134:20, 139:4,
140:10, 140:22,
141:8, 141:12,
142:8, 142:12,
144:3, 144:16,
144:20, 147:2,
147:8, 147:11,
148:1, 148:15,
150:9, 153:15,
153:19, 154:9,
155:8, 157:7,
161:5, 165:13,
168:7, 168:22
**whoever**
25:22, 165:12
**whole**
88:1, 136:14,
154:14, 168:20,
178:5
**wholly**
18:20, 19:3,
19:7, 31:15
**whomever**
15:18
**williams**
162:16
**willing**
124:22, 132:6,
134:20, 135:2,
136:4, 139:4,
141:12, 165:21,
166:8, 170:1,
176:22, 185:22
**wills**
154:18
**windup**
62:18, 62:20,
62:21, 62:22,
63:3, 65:16
**wished**
6:14
**withdraw**
124:13, 124:22,

127:4, 128:13
**withdrawing**
99:11, 99:22,
100:3, 128:3,
131:21, 132:10
**withdrawn**
70:7, 83:8,
99:14, 100:11,
100:14, 123:18,
127:11, 127:21
**withheld**
39:21, 40:9,
40:10, 40:11,
41:6, 45:15,
48:15, 92:11,
94:19, 99:18,
100:16, 100:19,
102:10, 107:16,
127:6, 184:5,
189:17
**withhold**
37:13, 39:20,
40:14
**withholding**
37:16, 38:18,
38:19, 39:19,
68:1, 68:9,
93:21, 123:7,
123:11, 123:16,
124:10, 125:2,
125:3, 127:1,
128:7, 128:8,
128:22, 129:6,
132:1
**within**
80:22, 92:4,
122:4, 126:4,
162:6, 163:4,
176:19, 177:1,
189:9
**without**
91:6, 133:3,
155:4, 155:9,
156:5, 170:8,
177:22, 184:5,
187:18, 187:20,
188:6, 188:10,
190:7, 192:1

**without-prejudice**
176:14
**witness**
196:13
**word**
85:21, 88:19,
89:5, 95:22,
96:1, 102:18,
103:5, 103:14,
170:17
**words**
26:19, 63:10,
158:8, 181:2,
190:9
**work**
28:10, 32:3,
41:20, 49:10,
49:21, 51:11,
51:15, 52:17,
58:15, 60:10,
61:2, 92:20,
134:17, 135:2,
152:12, 153:3,
155:14, 166:6,
176:5, 181:19
**worked**
42:2, 44:14,
52:15, 116:1,
135:20
**working**
5:3, 47:1,
144:6
**works**
23:6, 121:2,
162:7
**world**
53:12
**wouldn't**
86:16, 94:17,
143:11, 143:12,
156:17
**wrapping**
128:19
**wright**
172:22
**writing**
101:20, 101:21,
137:14, 168:9,

J.R. 894

168:18
**written**
69:1, 76:3,
105:10, 154:3,
171:11, 189:21
**wrong**
35:13, 42:5,
61:6, 70:7,
96:15
**wrote**
68:6
**wyoming**
8:12, 8:22,
9:6, 9:11,
11:19, 86:2

**Y**

**y-e-o**
190:13
**yao**
1:4, 4:15
**yao's**
154:7
**yea**
12:6
**year**
5:2, 25:2
**years**
95:10
**yeo**
190:13
**yep**
116:12, 189:6
**yesterday**
6:12, 10:4,
12:18, 13:6,
106:5, 180:10
**york**
3:7

**.**

**.3200**
3:8
**.6564**
3:18

**0**

**00**
96:19, 159:22,

160:4
**05**
1:16

**1**

**1**
159:22, 161:4
**10**
1:16, 77:11,
78:7, 78:11,
79:6, 137:1,
138:20, 143:19,
149:20, 164:3,
164:19, 186:3,
193:16
**10005**
3:7
**109722**
162:22
**1099**
44:11, 48:3,
48:7, 50:16,
74:3, 75:5,
115:8, 115:14,
115:16, 115:19
**11**
79:7, 122:2,
129:21, 130:1,
130:2, 130:11,
130:15, 137:1,
146:22, 149:1,
150:8, 164:3,
164:19, 166:2,
166:3
**12**
33:22, 96:19,
137:1, 146:22,
147:3, 148:10,
164:3, 164:19,
172:6
**1200**
3:16
**13**
154:6, 164:3,
164:19
**14**
122:2, 129:21,
130:9, 161:17,

161:19, 162:6,
163:4, 164:3,
164:19, 166:4,
195:5
**144**
138:12
**15**
79:20, 80:5,
87:22, 88:10,
99:2, 99:7,
99:17, 100:15,
101:8, 103:4,
169:22, 170:1,
170:10, 170:15,
170:19, 186:3,
186:13, 186:14,
188:18, 188:20,
188:21
**150**
174:15
**151**
162:12
**16**
104:5, 104:9,
104:16, 107:10,
108:10, 108:11,
110:7, 111:19,
112:16, 114:6,
154:16, 164:4,
164:19, 175:6,
187:8, 188:19,
188:20, 188:22
**17**
3:16, 104:9,
104:12, 104:16,
107:10, 108:10,
108:11, 110:7,
111:19, 112:16,
114:6, 169:20,
189:10
**177**
174:1, 174:12
**18**
111:20, 112:15,
112:16, 112:20,
114:6, 124:5,
124:14
**19**
49:5, 49:6,

55:16, 56:11,
56:16, 56:17,
58:9, 58:10,
59:6, 59:9,
66:15, 66:20,
114:17, 115:4,
115:6, 183:3,
185:9
**196**
1:21
**1st**
61:7, 62:5

**2**

**2**
159:22, 160:4,
193:16, 195:5
**20**
115:7, 116:14,
116:15, 134:18,
161:21
**20006**
3:17
**2010**
149:8
**202.261**
3:18
**2022**
38:4, 40:1,
40:3, 50:18,
51:6, 51:7,
51:16, 51:21,
52:21, 56:4,
59:4, 60:10,
65:2, 65:4,
65:5, 74:4,
74:21, 75:2,
75:9, 80:11,
81:14, 81:19,
84:3, 88:17,
88:19, 89:5,
89:12, 99:15,
99:18, 100:12,
100:18, 101:8,
105:21, 106:3,
109:6, 116:6,
134:13, 134:18,
149:14, 163:22,

J.R. 895

Transcript of Meet & Confer
Conducted on January 3, 2025

242

| | | |
|---|---|---|
| 167:16 | **303** | **96340** |
| **2023** | 162:18 | 162:11 |
| 24:5, 25:8, | **31** | |
| 52:19, 56:19, | 56:19, 59:7, | |
| 59:7, 59:13, | 59:13, 134:18 | |
| 59:18, 60:12, | **3233999** | |
| 64:17, 65:9, | 174:5 | |
| 65:10, 134:13, | **33** | |
| 134:19, 162:22, | 138:4, 155:1, | |
| 163:1, 163:22, | 171:9, 174:6 | |
| 167:16, 174:9 | **34** | |
| **2024** | 124:2, 125:18, | |
| 64:13, 64:18, | 137:12, 146:3 | |
| 66:4, 66:14, | **4** | |
| 75:15, 106:4, | **41** | |
| 106:6, 106:10, | 3:6, 152:9 | |
| 162:11, 174:5, | **434** | |
| 193:3 | 162:18 | |
| **2025** | **45** | |
| 1:15, 196:15 | 161:15, 162:19, | |
| **2028** | 163:5 | |
| 196:18 | **5** | |
| **205** | **539** | |
| 174:14 | 24:22 | |
| **21** | **565541** | |
| 116:15 | 1:20 | |
| **212.732** | **5th** | |
| 3:8 | 196:14 | |
| **22** | **7** | |
| 84:4, 100:3, | **75** | |
| 119:8, 134:18, | 162:12 | |
| 164:7 | **8** | |
| **23** | **81** | |
| 1:6, 164:7 | 162:13 | |
| **25** | **848** | |
| 159:22, 171:8, | 24:22 | |
| 171:11, 175:5, | **85** | |
| 177:1, 178:9, | 174:9 | |
| 178:12 | **8520240** | |
| **258** | 174:10 | |
| 138:12 | **889** | |
| **26** | 1:6 | |
| 174:21 | **9** | |
| **28** | **900** | |
| 3:6 | 3:16 | |
| **3** | | |
| **30** | | |
| 161:4 | | |

J.R. 896

J.R. 897

# Exhibit 32



# Transcript of Meet and Confer

**Date:** January 10, 2025
**Case:** Yao/Estate of Chen -v- Chen, et al.

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

J.R. 898

UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

- - - - - - - - - - - - - - -x

LI FEN YAO,                    :

      Plaintiff,     :

  v.                           :   Case No.

CHEN, et al.,               :   23-cv-889

      Defendants.    :

- - - - - - - - - - - - - - -x

MEET AND CONFER

Conducted Virtually

Friday, January 10, 2025

9:32 a.m. EST

Job No.: 565544

Pages: 1 - 91

Reported By: Cynthia A. Whyte

Meet and Confer conducted virtually.

Before Cynthia A. Whyte, Notary Public in and for the Commonwealth of Virginia.

J.R. 900

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

STEPHEN M. PLOTNICK, ESQUIRE

ALEXANDER G. MALYSHEV, ESQUIRE

MADELYN K. WHITE, ESQUIRE

CARTER LEDYARD

28 Liberty Street, 41st Floor

New York, New York  10005

(212) 238-8772


ON BEHALF OF DEFENDANTS:

JOSHUA A. LEVY, ESQUIRE

RACHEL CLATTENBURG, ESQUIRE

JUSTIN A. DiCHARIA, ESQUIRE

LEVY FIRESTONE MUSE LLP

900 17th Street, NW, Suite 1200

Washington, D.C.  20006

(202) 261-6564


ALSO PRESENT:

EMMA FLOYD, Paralegal

Levy Firestone Muse

J.R. 901

P R O C E E D I N G S

MR. LEVY:  Good morning.  Good morning, Steve, Alex, Madelyn.  Good to be with you again today.

Steve, if it's okay with you, can we start with your motion?

MR. PLOTNICK:  With our motion -- yes, yes.

MR. LEVY:  And your request for documents.

MR. PLOTNICK:  And Interrogatories, yes.

MR. LEVY:  And Interrogatories, yes.

MR. PLOTNICK:  I think that makes sense.

MR. LEVY:  Terrific.  One question for clarification, with regard to Document Request 1, is what is now in dispute, so to speak, in that we have not produced that you are seeking the DANS documents through the end of 2023?  Is that right?

MR. PLOTNICK:  Yes, correct.

MR. LEVY:  Okay.  So we have gone back to our client with thoughts about the compromise that we discussed, and here is what we would propose

J.R. 902

for resolution of all of our outstanding disputes

and disagreements with regard to your document

requests and Interrogatories.

MR. PLOTNICK:  It is limited to -- I'm

sorry to interrupt.  I just want to make sure,

Josh.  I thought we were talking about 1 and then

you said all.  So we are talking about all of

them --

MR. LEVY:  Yes.

MR. PLOTNICK:  -- or just the DANS stuff?

MR. LEVY:  Correct.

No; we are talking about everything.

MR. PLOTNICK:  Everything, okay.

MR. LEVY:  So what we would propose is in

response to -- beyond what we have already

produced, what we would agree to do is produce in

response to Document Requests 5, 15, 16, 17, 18 --

MR. PLOTNICK:  5, 15, 16, 17 and 18.

Okay.

MR. LEVY:  -- we would produce for both

the South Dakota companies for 2023 the tax

returns, the P&L, the loans, the expenses, the

revenue income records, the asset records, liability documents and debt schedule.

For 19 we would provide you with documents sufficient to show all of the clients for both South Dakota companies for 2023.

For RFP 20 we would provide you with the W-2s and the 1099s for the two South Dakota companies for 2023.

And for the Interrogatories my recollection is that we discussed that for -- we already told you we were going to clarify the response to No. 3.  I believe the only other interrogatories in dispute were 15 --

MR. PLOTNICK:  Give me just one second to catch up to you here.  Let me turn to the Interrogatories to make sure.

MR. LEVY:  Take your time.  Tell me when you're ready.

MR. PLOTNICK:  So 3, looking at Interrogatory 3, the idea is that, right, you're producing the documents that would show it, so you would refer to the documents essentially.

J.R. 904

Transcript of Meet and Confer
Conducted on January 10, 2025                    7

MR. LEVY:  Except for two customers that are not reflected on the documents.

MR. PLOTNICK:  Right, right, that's right, except for the two, right.  Yep.

MR. LEVY:  For 15, it would be the documents that we would be producing as part of this compromise, we would provide you the information in response to 15.  That would be our proposal.

MR. PLOTNICK:  Meaning you would identify them?

MR. LEVY:  Meaning the documents -- I believe the documents we produced would be sufficient to show.

MR. PLOTNICK:  Okay.

MR. LEVY:  Let me get back to you on that.

MR. PLOTNICK:  Yeah, that's exactly what my question was going to be, but okay.

MR. LEVY:  Yeah, let me think about that.

And then with 16, what we would propose -- you or I -- this is asking for us to

J.R. 905

identify all blockchain or digital wallets maintained by the three entities.  You have the wallets for OtterSec.  For RC Security and Otter Audits it is challenging, to say the least, for a law firm to identify digital wallets, and so what we think would be a reasonable compromise is that when we asked you about why these were important to you, you said that they were big transactions that you were seeing and that you didn't know what the wallets were that corresponded to those transactions and you wanted to know what those wallets were.

If you identify what those transactions were, we could provide you with the corresponding wallets, but to look at each and every wallet would be unduly burdensome for us.  It's a very difficult task, easier to do when we know there are salient transactions that are of concern to you, and you indicated you did have questions about certain transactions.

MR. PLOTNICK:  So you would want us to identify the transactions we see out of the

wallets as opposed to you -- in other words, just so I understand your proposal, your proposal is for us to utilize what we have in the OtterSec wallet based on that to identify the transactions, let's say, any transfers in or out of the wallet that we see, propose those to you, and then you would do what, basically say this is or is not an RC Security or Otter Audits or whomever, this is what the payment was for?

MR. LEVY:  If there was a wallet that was opened and closed or maintained by or for the benefit of the use of one of the two South Dakota companies, then we would tell you what that was with regard to the transactions that you identified in the last meet and confer as being ones that were of interest to you.

MR. PLOTNICK:  Yeah, I gave those as an example.  But, look, I appreciate the compromise. I just need to think about whether that would work for us.  But I mean you had -- I mean it wouldn't be -- you had said that the challenge was for sort of a law firm to identify the wallets.  I would

J.R. 907

think it wouldn't be a challenge, I don't know, or why it would be.  Can you explain a little bit more on why it would be burdensome for RC Security and Otter Audits to identify -- let me clarify that for the record.

Can you please just explain why you think it would be unduly burdensome for RC Security and Otter Audits to identify its own wallets it is utilizing.

MR. LEVY:  Because it creates a significant number of wallets for small things sometimes and there is not a systematic way to keep track of all of that so even for our client it would be challenging and difficult to make sure we got every single one.  Many of them, most of them, are not meeting the need you articulated in the last meet and confer for these wallets and so we -- obviously if we are going to make a commitment to produce something, we want to get it right.

The balance sheets will track the main transactions and we have offered the balance

J.R. 908

sheets to you.

MR. PLOTNICK:  Okay.  I mean that's just --

MR. LEVY:  And just one more thing.

And we would identify for OtterSec any wallet, right, but it is the South Dakota companies where if there is an OtterSec transaction that -- and you brought this up in the mediation, as we understood it from the mediator. You were talking about there were some significant transactions --

MR. PLOTNICK:  Can we just -- I don't think it is appropriate to be talking about on the record for submission to the Court settlement discussions related to the mediation, Josh.

MR. LEVY:  Okay.  It's not admissible.

MR. PLOTNICK:  It's an objection, but I don't think it is appropriate to sharing mediation discussions.

MR. LEVY:  That's fine.  I think it would be, but it's fine.

The bottom line is that in the meet and

Transcript of Meet and Confer
Conducted on January 10, 2025                12

confer last week --

MR. PLOTNICK:  Yeah.

MR. LEVY:  -- (inaudible) the mediation you indicated when we asked why you needed all of the wallets or any of the wallets for the two South Dakota companies, what we heard you say and what I think the transcript indicates is that you want -- you saw some significant transactions or transactions of interest from OtterSec, you didn't know what the corresponding wallets were, and so we are just saying okay, tell us what those transactions are that you are seeing that are of interest to you and if there is an OtterSec or RC Security wallet that corresponds to that transaction, we will let you know what that is.

MR. PLOTNICK:  Yeah.  So the initial reaction on the wallets -- and, like I said, I just want to think about it -- the initial reaction on the wallets is, yes, that is absolutely the example I gave to you and it was really more of an example than anything else.  I kind of view the wallets as no different than an

J.R. 910

account so it is sort of following the flow of funds I think is part of it and it is not a lot different than the accounts.  But I hear you.  If the balance sheets are going to show some of that information anyway -- I just want to think about it whether as a practical matter -- I don't want to argue with you about nothing, so I just want to give it some thought.  This is new so I want to have a little bit of time to think about that a little bit.  But I want to just make sure based on what your proposal is and what you are talking about.

First things first, we are only talking about the South Dakota companies so far, but what about I think it was 1 and 4 of plaintiff's document requests related to DANS?  I don't think we touched on the defendants' position with respect to those requests insofar as they relate to DANS, the digital asset network company.

MR. LEVY:  With DANS, there we are going to stand on our position that we articulated in the last meet and confer.

MR. PLOTNICK:  Okay.  So that was request No. 1 and Request No. 4.  Okay, understood.

MR. LEVY:  Right.  And so what we are proposing is that this is -- this proposal to you and your client is to discharge all of our obligations under the RFPs and interrogatories the plaintiff has propounded in dispute.

MR. PLOTNICK:  Got it.  Just so I can make sure I understand, I want to go through these a little bit one by one to make sure I understand. And I'm saying that as I look through the actual requests themselves.

MR. LEVY:  Yeah.  And by the way, for 17, I think we had already talked about this, but that we were going to provide a revised answer for the defendants through the end of March of 2023.

MR. PLOTNICK:  I'm sorry.  I just didn't hear you.

MR. LEVY:  For 17.

MR. PLOTNICK:  Yeah.

MR. LEVY:  Interrogatory 17.  We talked about in the last meet and confer if we give you

J.R. 912

the actual financial records, there is not a need for you to go to other people to get them; right?

MR. PLOTNICK:  Well, that's not -- I don't know that that's necessarily true.  I mean among the reasons why you go to third parties is to ensure, of course, that you are capturing everything as well.  And I also think -- I mean you have identified them, but a perfect example of that is the Agasi tax, which is the accountant for the companies.

So sometimes, and utilizing the accountant as the example, they are going to have things that the defendants themselves might not like an accountant's work papers in preparing the tax returns; right?  So I don't necessarily agree with that.

MR. LEVY:  But sometimes they --

MR. PLOTNICK:  Sometimes they do; sometimes they don't.

MR. LEVY:  Sometimes the party has what the third party -- what a party is seeking from a third party and in the main we are not saying we

are not providing you with any information in response to 17, we are just saying -- and, look, you obviously know who Agasi is and you served them with a subpoena and your discussion with Agasi, but beyond that, as we indicated before, and I just wanted to clarify the record, it was just to make sure that you understood what our proposal was, was that in response to 17 we would revise our answer for each of the defendants through the end of March of 2023.

MR. PLOTNICK:  Okay.

MR. LEVY:  So that is all I was going to tell you.

MR. PLOTNICK:  Got it.

I just want to go back to what I was trying to do a moment ago which is look at some of the specific requests and just consider what we would and would not be receiving under your proposal.

MR. LEVY:  What we are really trying to -- what we are eliminating is the documents and communications concerning all these things because

that -- we have talked with our vendor.  It would be thousands of hours.  And that's what we are trying to avoid because that is a significant burden.

MR. PLOTNICK:  Yep.  And just, for example, looking at Document Request No. 5, which relates to dividends and distributions, I -- this may be a recurring theme and what -- are you open in terms of this proposal -- again, just a thought here, not a definitive conclusion -- are you open to doing some of this on a without-prejudice basis because -- the reason why I say that is Request No. 5 is a good example, right?  So Document Request No. 5 asks for documents and communications concerning all dividends and distributions paid to any shareholders, members, partners of RC Security, Otter Audits and OtterSec.

It may be sufficient for us to receive some of the financial documents you have provided -- or you are agreeing to provide to us under your proposed compromise, but I guess it

J.R. 915

depends on what they say. I obviously haven't seen them yet. So how those financials would reflect any dividends or distributions being made, whether they specifically identify them, that might be enough if those documents themselves do do that. But I haven't seen them yet, I suppose is my point, and it's a bit hard to say definitively whether I would be able to compromise on a request like that when I haven't seen the documents yet.

So that is just one example that I'm giving you, you know, the idea, of course, Josh, would be if we get them, if it gives us what we need and really fundamentally what we are looking for, then that's that. But if we were to look at them and, whatever the reason might be, think it isn't sufficient, I wouldn't want to waive our right to come back to you. Because I do think this is a proper request for all the -- I don't want to go over what is already at length discussed in the previous transcripts. And that's my concern.

J.R. 916

MR. LEVY:  Yeah.  So, number one, our understanding of proposal that we were discussing last week is that the purpose of this proposal is to reach an agreement, and so we're not interested in an agreement without prejudice or with an option to revisit old disputes.  We're trying to get to yes.  You are too.  And we in the last meet and confer understood from you that RFP 15 would satisfy the request in 5.  Dividends and distributions are not listed in 15, they are listed in 5, but the documentation sought in 15 allows you to understand dividends and distributions.

And other documentation might as well, but we don't want to have a resolution here that is hanging out for further discussion as you indicated in the last meet and confer correctly. We're trying to resolve the disputes that we can here.

MR. PLOTNICK:  Okay, okay.  So what I'm hearing is this would be a final -- your proposal would be a final resolution of all of this on a

with-prejudice basis and that's just precisely the question that I wanted to understand in the context of all of this.

MR. LEVY:  Yes.

MR. PLOTNICK:  Okay.  That is helpful, thank you, so that we can consider the proposal a bit more closely, which I think we are probably not going to be able to give you a final answer on this because you are talking about a significant number of requests so I think we need to think about that on a request-by-request basis.  And it's a bit hard to do that on the fly since we are hearing that the first time here today.  That is helpful, thank you.

Let me see some of these other requests that are in the --

MR. LEVY:  Steve, what we really tried to do is tailor this proposal to what you and I had discussed.  You may recall we were sort of joking about we couldn't recall who came up with the compromise.

MR. PLOTNICK:  Yes.

J.R. 918

MR. LEVY:  You or us, and we really did try to tailor this proposal close to what we were discussing.  So I don't think it is exactly the first -- I mean it is the first time you are hearing this exactly as it is, but we could take a break, I don't know if you can talk to your client about this proposal and maybe we go off the record and come back on the record at some point, but -- or maybe we can resolve -- maybe there is something to do over -- anyway, this is not exactly the first time we have discussed this.  We discussed much of this last week it seems.

MR. PLOTNICK:  Yes.  Look, we absolutely did.  And it was at a high level.  It was somewhat theoretical, but yes, as a concept we did.  I don't know that we did it on a sort of request-by-request basis and what the impact of the proposal would be and what your proposal specifically would be, you know, and how that might impact some of these other requests.  And it is sort of difficult to consider that without knowing what the defendants' position is in terms

of what they would actually be agreeing to produce and what they would not agree to produce. And all I'm saying is I think I would just need to consider it a bit.

I don't know that I could get in touch with my client right now. I would like to use the time we have to get through some of the things that we also have open. And I expect that I'm going to need more than a few minutes or a half hour or whatever it is today to consider it and that's really all I'm saying, is just to consider it more closely.

MR. LEVY: Okay.

MR. PLOTNICK: Okay. So I think we have talked already about 9 and some of these others where you just didn't have responsive documents. I think that included 10, 11. So 15, so that's the one I want to look at a little bit more closely specifically. So just to be clear, what we're talking about in terms of the specific financial records that you have listed out that you would be providing, which largely is in

J.R. 920

response I think to this Request No. 15, just to give you an example, so for the tax returns, you would be giving us the tax returns for calendar year 2023.  And I just want to clarify, right, that I presume that the tax returns for the South Dakota companies -- I presume they were prepared after 2023 at some point in the first two quarters of 2024.  Your proposal is to give us the tax returns for calendar year 2023; is that correct?

MR. LEVY:  Tax returns for 2023, and where there are documents that were created through December 31, 2023, of the documents I listed in part of that proposal, you would get them, just to be very, very clear.  So if there is a P&L through December 31, 2023, you would get that.  If there are 1099s and W-2s through December 31, 2023, you would get them.

MR. PLOTNICK:  Yeah.  So again for --

MR. LEVY:  And not just created, but if there are 1099s -- the tax returns for 2023 obviously are created -- well, not obviously, but those tax returns are sometimes created and very

J.R. 921

often are created the following year.

MR. PLOTNICK:  Right.

MR. LEVY:  We are not being sneaky.

MR. PLOTNICK:  Josh, I'm not suggesting for a second you are being sneaky.  I just want to clarify; right?  And you are hitting my point.  Same thing with the W-2s and 1099s, they are often created in the following calendar year.

MR. LEVY:  Precisely, precisely.  So that's what we are talking about and that's what we talked about last time.  If you look at Pages 101 and 102 of the transcript, it is very similar.

MR. PLOTNICK:  Right.  And I'm just looking at 15 to see what might not be included.  So I didn't hear general ledgers.

MR. LEVY:  You didn't hear general ledgers.  General ledgers are not part of our proposal.

MR. PLOTNICK:  Okay.  State and federal tax returns, you said yes.  Financial statements, which is again a broad term I think generally, but you're talking about you would be giving us P&Ls?

J.R. 922

Transcript of Meet and Confer
Conducted on January 10, 2025                    25

MR. LEVY:  Yep.

MR. PLOTNICK:  Loans or liabilities.  So I think that would be covered most likely under --

MR. LEVY:  Yep.

MR. PLOTNICK:  -- you said liability statements or debt schedules.

MR. LEVY:  Uh-huh.

MR. PLOTNICK:  I didn't hear payroll records I don't think.  What about payroll records?

MR. LEVY:  The 1099s and the W-2s we offered.  Beyond that I'm not sure what you are seeking in terms of payroll records.

MR. PLOTNICK:  Okay.  Did they use -- and maybe this is a better question.  Did they use Gusto for all of -- if you know sitting here today, do you know if they used that Gusto entity for payroll processing for all of 2023?

MR. LEVY:  Off the top of my head I do not know.

MR. PLOTNICK:  Okay.  Balance sheets, okay, I don't think I heard that, but we may be

J.R. 923

covered otherwise.  Yeah, revenue and income, yep, I have that here that you did say that.  Cash flow, assets, liabilities and debt schedule.

Okay.  So I think with the exception of maybe payroll records, but maybe we don't need that, but essentially not the general ledgers.  Okay.  And just as an aside, that is an example of I think why I need a little bit of time to consider that because that is something that I would want to talk to our expert about as well.  So I would need to get in contact with the expert, too, to discuss whether that would be sufficient or insufficient for our purposes.

So 16 is the account of RC Security, Otter Audits and OtterSec.  I think we could consider limiting it, but would your request -- excuse me.  Would your response -- forgive me if I didn't write it down, but does your proposal include providing things like account statements that you would have for -- I know that -- well, let me put OtterSec to the side.  Would your proposal encompass account statements for RC

J.R. 924

Security and Otter Audits?

MR. LEVY:  We've produced that for 2022 but not beyond 2022.  And this proposal does not include bank statements beyond 2022.

Steve, we built this off of the discussion we had 101-102 of the transcript last week where I was saying that defendants' production of the financial information sought in 15, no need to produce the documents and communications concerning them, and that would discharge defendants' obligations for 5, 15, 16, 17 and 18 beyond what's already produced, and you said yes, that is what we are willing to consider, but kind of gut reaction is I think that would be probably a good compromise.

It doesn't wed us to that, but I'm just sort of explaining to you where we got that from. This is from Wednesday's session.  It seemed like last week, but...

MR. PLOTNICK:  Yeah, yeah, Josh, I appreciate you taking the time and I appreciate the proposal.  I mean I don't think it would be a

fair statement to say that we had made a proposal to resolve everything, right, with respect to these requests.  So I don't think that's fair and that's why I'm looking at these on a request-by-request basis.  That's all I'm saying. I just want to understand what we are getting and what we wouldn't be getting under your proposal. I just want to get that clarification.

17, for example, again, we wouldn't be getting account statements to the extent that they exist, again in response to Request No. 17.  So, for example, if RC Security or Otter Audits maintain -- and 17 applies more specifically to DeFi institutions, exchanges, so your request would not include things like account statements for accounts that would be maintained by RC Security and Otter Audits with any sort of such DeFi -- for the record, decentralized financial institution is De-Fi -- if, using some of the ones that I know, like a coin base or something like that, we wouldn't be receiving any sort of account statement for an entity like -- excuse me -- for

J.R. 926

an exchange like that, but you would otherwise be identifying the account itself; correct, in response to the Interrogatory?

MR. LEVY:  Which Interrogatory?

MR. PLOTNICK:  It was the request that we had -- well, yeah, that's part of what I'm getting at is --

MR. LEVY:  Yeah.  And so part of -- right, and so this is what our understanding was from 101 to 102 in the transcript, was this was a proposal that would discharge our obligations for 5, 15, 16, 17 and 18 of the RFPs and for Interrogatory 15 as well.  And so you're right, that we wouldn't be giving that information to you, but that is what we discussed last week.  We didn't agree to anything, but that's what we discussed.

MR. PLOTNICK:  Yeah.  And, again, I think the spirit of the discussion was it depends on what you are willing to give us in response and that's what I'm trying to understand and, as I said, to say it again for the record, I don't

J.R. 927

think we ever had made a proposal along those lines to resolve all of the outstanding issues with respect to our document requests.

MR. LEVY: We didn't, we didn't, but we were talking about 5, 15, 16, 17 and 18 and it was that we would be producing all of this financial information in response to 15 in particular.

MR. PLOTNICK: Yes.

MR. LEVY: And that that as well as the 1099s and W-2s in response to another request and documents sufficient to show all of the clients through the end of 2023 for the South Dakota entities and that that would discharge our obligations for 5, 15, 16, 17, 18 and Interrogatory 15.

You're right, we didn't talk about all the other document requests like 1 and 4, but we took this seriously and went back to our client and we're coming back with this proposal consistent with the progress we thought we had made with you on Wednesday. And I don't know if you went back to your client and have a similar

J.R. 928

proposal or if you need to take this one back to your client, that's fine, but I just want to make sure that we were really trying to tailor this proposal to what we had discussed as a working framework for coming to yes here and it just seems like we are moving backwards.

But you should absolutely take this back to the client, I totally understand that.  But we are operating in good faith based on our understanding of where the parties were coming to in the last discussion.

MR. PLOTNICK:  Yes.  And, as I said, I'm not disputing that you are operating in good faith.  I certainly appreciate the proposal.  As I said, I think again the spirit of the discussion was it depends on what your proposal would be, and that's all I'm trying to understand, is the impact of what your proposal would be on some of these other requests.

But I do appreciate the obvious consideration you have given to that discussion and some of the things that we had discussed.  So

J.R. 929

as I said, I'm just trying to understand now that I have your proposal.  There really wasn't, I don't think, all that much to consider on our side because I think it depended on what your proposal would be.  So all I'm trying to understand is the impact of what the proposal would be on some of the other items we have requested and how it would resolve it, particularly if it is going to be, as I understand your proposal to be, on a with-prejudice basis, that this is a complete resolution of these requests.

So 17 -- and thank you, I appreciate that now that I understand we wouldn't be getting those kind of account statements from a DeFi institution.

18 I think we talked about, and that's the wallets and the wallet addresses utilized by these entities.  Look, I think for certain we can and would give serious consideration to your point on the last call about the potential breadth of a request that encompasses documents, communications concerning; right?  So I do appreciate that and I

J.R. 930

think that's one that we would absolutely give consideration to, the point being I think 18 is necessarily impacted by your proposal with respect to the wallets before, and that is us identifying the transactions and going from there, but that seems to be covered by that.

MR. LEVY:  Steve, just procedurally speaking, so our meet and confers are supposed to -- this is supposed to be the last one.

MR. PLOTNICK:  Well, it is the last one that we have scheduled.  And this would be, assuming we use the full four hours -- we haven't had a problem so far -- it would be 12 hours of this.  But if we could finish up with this today, that would be great.  I just don't know that we will have a final answer for you on our position sitting here today.

MR. LEVY:  So isn't the deadline for meet and confers Monday?

MR. PLOTNICK:  Yes.

MR. LEVY:  So practically speaking --

MR. PLOTNICK:  Yes, we would have to

J.R. 931

speak on Monday, that is correct.  And I think we contemplated that in our e-mails when we were scheduling this.  At one point we said let's schedule all 16 hours that the Court had directed us and I think where we left it is let's see where we get after the first three meet and confers we have scheduled and, if necessary, we would convene for a further one.  And it sounds like it might be necessary to do that.

MR. LEVY:  That's disappointing and going to be challenging because neither party has asked a court reporter to be there Monday.  Can we just take a break and maybe you can confer with your client -- I don't know if your client is available -- and we can go back on the record.

MR. PLOTNICK:  Josh, I don't think it is adequate time for me to talk to my client and my expert.  I have no idea if they are available, but I think I need more than a short break to consider this.  This is important stuff and, candidly, Josh, it has gotten us -- it has taken us getting to a third meet and confer to finally get a

proposal on this from the defendants.  I mean we had spent eight hours previously discussing this and a lot of these issues were already briefed, they were already the subject -- while we certainly provided some clarity on some specifics, that's not true with respect to all of it.  A lot of this was briefed and already the subject of the motions to compel and I think the defendants had our position already on some of this.  And it has taken us to get to this third meet and confer to get this proposal.  So I don't think that is attributable to anything other than the fact it has taken us to get here today to the third one to hear this.

MR. LEVY:  I don't want to be -- look, I do think I need to respond to some of that.

This proposal was discussed by both of us on Wednesday, number one.  So it's not the first time we have been contemplating proposals.  We thought you might go back to your client between Wednesday and today, as we did, and talk to your client and have a proposal for us.  We have a

proposal for you.  We understand you will take it under advisement and talk with your client about it.

Respectfully, the motion that plaintiff filed was not specific, it did not specify precisely what plaintiff was looking for with regard to the RFPs and Interrogatories that were in dispute.  The articulation of relevance to the claims and defenses in the lawsuit were not made clear in the motion itself, and we had to work for a couple days of this meet and confer to elicit that information from you and you have provided it and we are now working toward a compromise in the last session on Wednesday and we have a proposal today.  We are where we are.  You will take it back.  I just wanted to clarify the record from our perspective.

MR. PLOTNICK:  Yeah.  I personally would rather focus on solutions to some of this rather than going back and forth over this, but fundamentally --

MR. LEVY:  So would I.

J.R. 934

MR. PLOTNICK: But, Josh, respectfully, this is the first concrete proposal we have heard from you. We certainly did brief at length in the motion to compel that the plaintiff had filed the objections that the defendants had raised with respect to what I would call these merits-based arguments. And that sort of -- that covered many of these requests and that was fully argued and fully detailed in the motion to compel papers, and we ended up spending, you know, a great majority of time on the first two calls going over that again and again. So I just disagree with that fundamentally. But the bottom line is this is, in fact, the first time we are hearing a concrete proposal from the defendants.

Yes, we did on the last call discuss some potential resolutions at a high level. I don't think we reached a conclusion on that and it is impossible to, quite frankly, consider what the proposal is if we don't actually have it. So we now have it today. This is the first concrete proposal we have heard from the defendants and

what I'm saying is it is being presented to us today. I appreciate that. I definitely appreciate that you have taken this seriously and considered it with your clients. But it is the first concrete proposal we are hearing with respect to these issues.

MR. LEVY: Appreciate it. We are going to agree to disagree about the level of specificity in the plaintiff's motion, we are going to agree to disagree about the amount of time it took to elicit specific requests from plaintiff, and we are going to agree to disagree about how our discussion of relevance was merit-based.

However, you are correct that today we are giving you a concrete proposal for a global resolution. It is the first time we have done this. We have never received one from plaintiff, and we hope that you and your client can take this under consideration as you said you would, and we appreciate that, and hopefully we will get to yes.

MR. PLOTNICK: Okay. So turning back to

J.R. 936

some of these specific requests and my point about focusing on solutions, so No. 19 is a separate point and that is one, Josh, as I understand it, you would give us -- you would provide a response, as I take it, in response to No. 19 which asks for documents sufficient to show all customers and clients of RC Security, Otter Audits and OtterSec, et cetera.  But essentially you would be agreeing to give us that, documents sufficient to show customers and clients for RC Security, Otter Audits and OtterSec, which I think you have already agreed to give to us with respect to OtterSec.  So you would supplement that and you would provide documents sufficient to show all customers and clients of RC Security and Otter Audits and you would provide that through the end of 2023; correct?

        MR. LEVY:  December 31, 2023.  Plus the answer to Interrogatory No. 3 that would indicate the two clients --

        MR. PLOTNICK:  Right.

        MR. LEVY:  -- that don't have agreements.

J.R. 937

MR. PLOTNICK:  And your proposal with respect to Document Request No. 20 would I suppose be somewhat of a limitation, but you would -- your proposal would be to provide us with -- you had said previously there were no K-1s, but just to clarify, I don't know if you were saying there were no K-1s through March 31, 2023 or through the end of 2022.  Are there no K-1s, period?  In other words, even if with respect to Document Request No. 20, there would be no or there are no K-1s for calendar year 2023 either?

MR. LEVY:  There are no K-1s, period.

MR. PLOTNICK:  Okay.  And under --

MR. LEVY:  The others are C corps.

MR. PLOTNICK:  Yes.

And under your proposal you would provide us with documents and communications concerning -- well, no, you would provide us with W-2s and 1099s issued by or on behalf of, well, OtterSec, which we are already getting, and then the two South Dakota companies, RC Security and Otter Audits; correct, for calendar year 2023?

MR. LEVY:  Through the end of December 31, 2023, W-2s and 1099s for the South Dakota companies and OtterSec.

MR. PLOTNICK:  And your proposal would be -- so the next document request that I have as being in dispute in the subject of our motion to compel is Document Request No. 21, which sought documents and communications concerning the ownership interests, financial interests or rights of Robert Chen, Sam Chen, plaintiff, the estate, or David Chen in or to RC Security, Otter Audits and OtterSec.

So your proposal would -- and the defendants had objected to that and agreed to provide a response only with respect to OtterSec. So I take it your proposal would essentially allow the defendants not to produce responsive documents for anyone else; correct?

MR. LEVY:  Well, for 21 and 22, keep in mind that we are producing documents through the end of March of 2023.  But beyond that you are correct, we would not be producing any more

J.R. 939

documents beyond that end date as part of this proposal, not past March 31, 2023.

MR. PLOTNICK:  Okay.  Did you mean Document Request No. 22?

MR. LEVY:  21 and 22.

MR. PLOTNICK:  Yeah.

MR. LEVY:  The year 2023.  Meaning for Plaintiff's RFPs 21 and 22 we are going to be producing documents through March 31, 2023.  And you have them; sorry.  We have produced them.

MR. PLOTNICK:  So that brings me to another point that we had discussed and that is this objection that is in place.

So for 21 and 22 in particular, although I suppose this does impact other requests, the defendants' response to these requests is somewhat modified or perhaps muddied, I would say, a bit by this objection that has been interposed which was the subject of some lengthy discussion on our last call and the objection that RC Security and Otter Audits are separate and distinct and the limitations that have been placed on those

J.R. 940

responses; namely, that documents would be produced to the extent that they mention OtterSec, or I think the language is concern OtterSec, would that limitation continue to apply? Do the defendants intend to maintain that objection in response whether it is to these requests or the other requests or would that objection be withdrawn as part of this proposal?

MR. LEVY: With regard to 21 and 22 we have not withdrawn the objections; however, we have produced documents notwithstanding those objections.

MR. PLOTNICK: So, in other words, documents would not be withheld on that basis?

MR. LEVY: For 21 and 22 they have not been withheld on that basis. We have produced them already through March 31, 2023. We can revise our responses to make clear any limitations on what we are producing, specifically the time frame; however, while we were making that production, we produced documents responsive notwithstanding those objections.

Transcript of Meet and Confer
Conducted on January 10, 2025                44

MR. PLOTNICK:  But the documents that have been produced notwithstanding those objections, as I understand it, have been limited to producing them to the extent they mention OtterSec or concern OtterSec.  And it's that to the extent they concern OtterSec is one of the issues that we have.  I mean, again, this has been the subject of discussion.

MS. CLATTENBURG:  Steve, this is Rachel, sorry.

No, I think what Josh is saying for RFP 21 and 22 that isn't a limitation.  We still maintain our objection that these are completely separate entities, but we produced documents responsive to these requests with the only limitation being the time period.  So it wasn't whether or not they mention OtterSec.

MR. PLOTNICK:  Okay.  So that --

MS. CLATTENBURG:  And we are going to be revising our responses to the document requests, because I know we are producing more than what some of them say now, and we'll clarify because we

J.R. 942

did produce -- I know our response now I think says it is limited to OtterSec, but that is not how we limited it.  We produced for RC Security and Otter Audits as well through the March 31, 2023 time, and we will be revising our responses to make that clear here and other responses.

MR. PLOTNICK:  Got it.  Thank you, Rachel.  What about the other requests, though?  In terms of your proposal, right, as I understand your proposal, right, this is a global proposal so I take it --

MR. LEVY:  Right.

MR. PLOTNICK:  Right.  So I take it with respect to the global proposal you would not be applying that limitation at all?

MR. LEVY:  Correct.

MS. CLATTENBURG:  Yeah.  I mean for the RFPs, the ones Josh was just talking about, RFP 5, 15, 16, 17, 18, we are not withholding on the basis of that objection that they are separate entities.  The point would be we are producing documents that we still object to their relevance

because they are separate entities, but we are producing responsive documents that we listed for RC Security, Otter Audits regardless of whether we think they are concerning or mention OtterSec.

So we are not withholding on that. We would be producing Otter Audits, we would be producing RC Security; and the limitations would just be the types of documents Josh put there and the time frame through the end of 2023 or for calendar year 2023 as we already discussed.

MR. PLOTNICK: Okay. But what I'm getting at, though, is that there are other requests, okay, that would be impacted by your global -- because this is a global proposal. And that limitation exists or otherwise appears in response to other document requests for which responses have been previously provided and documents have been produced where that limitation has been applied.

So what I'm trying to understand is am I correct to understand that whatever has been produced already, which would be documents that

J.R. 944

are based on that limitation, those would not be supplemented to eliminate that limitation; is that correct?

MR. LEVY:  We are only here talking about the RFPs in dispute; right?  We're talking about 1, 4, 5, 15, 16, 17, 18, 19, 20, 21 and 22.

MR. PLOTNICK:  Yes, that's correct.  But the limitation, this limitation that we are talking about, which is producing documents that mention OtterSec or concern OtterSec, was really raised in the defendants' papers in opposition to our motion to compel.  I mean I'm looking -- in almost all cases in response to our -- in the written responses to the document requests defendants had initially limited their responses to producing OtterSec documents and I think sort of along the way the defendants agreed without some of this meet and confer that we are doing now to produce some additional documents.

And the application of this limitation and in terms of what was provided, it appeared in defendants' opposition to our motion to compel.

So that limitation was in fact the subject of debriefing on the motion to compel which is when we learned of the limitation that was applied to the documents that were being produced for RC Security and Otter Audits, and that was the subject of the motion to compel and that was when we really first learned that that limitation was being applied to the production of documents for RC Security and Otter Audits that were being made.

So what I'm trying to understand is whether that limitation and as it was applied is going to continue to apply.  Because we first learned of it, as I said, through defendants' opposition.  It didn't appear in the written responses to our document requests.

MS. CLATTENBURG:  Steve, I think this is not that.  I think this is getting more confusing how you are talking about it.  The motion to compel dealt with the requests that are in dispute.  So the requests that are in dispute are the ones we are dealing with in these meet and confers and that we have now gone through.  So 1

J.R. 946

we have gone through.  5, 15, 16, 17, 18, 20, 21 and 22 are all the ones we are talking about right now.

So if we resolve these the way that we have offered, then the way we have offered, it is not limited by do they also mention OtterSec. That's what we are proposing, is we would be producing these documents for RC Security and Otter Audits without whether or not we think they are relevant to OtterSec for this time period. And it's only these ones that are in dispute where that actually came up in the motion to compel.  So it didn't go beyond those.  It was 1, 5, whatever, the ones I listed, these financial ones especially; and the financial ones are the ones we just walked through.

So I don't know which other requests you are talking about, but the motion to compel only covers these ones that are in dispute that we are talking about on this call right now.

MR. PLOTNICK:  Yes.  Yes, I agree with that.  Well, I guess I agree with some of that, I

guess is a better way to put it. But what I'm trying to say, Rachel, is yes, you are correct, we are talking about the document requests and interrogatories that are in dispute in response to the motion to compel. Agree with that.

We filed that motion to compel based on the written responses we had received at that point and of course the documents we had received at that point. And what I am explaining is that in response to our motion to compel the defendant, which -- let me take a step back.

So, effectively, most, if not all, of these requests that are in dispute in the written responses that the defendants had provided, for example, in response to -- I think it is most of these, but if I look at, for example -- I don't want to talk about ones for which there is no responsive documents so maybe that's a bad example I was just looking at.

Document Request No. 17, for example, where we asked for documents, communications concerning accounts that were opened by these

J.R. 948

entities, the written response included an objection that said that RC Security and Otter Audits are separate and distinct entities, that they are not successors or mere continuations of OtterSec and thus documents pertaining to those entities have no relevance.  Now, this is the objection we were speaking about on the prior call.

And the written response stated we will give you responsive documents maintained by or for the benefit of OtterSec only.  So the written response limited it to OtterSec and that is true of several of these.  And that was the subject of our motion to compel.

In response to our motion to compel in the defendants' opposition, they pointed out, accurately, that they had nevertheless, notwithstanding what the written responses provide, or state, provided some documents for RC Security or Otter Audits to the extent they mention OtterSec or concern OtterSec; right?

So that came up for the first time when

J.R. 949

we read it in the defendants' opposition papers, that they provided some responsive documents for RC Security and Otter Audits, but the documents that were being provided by RC Security and Otter Audits were subject to this limitation, the limitation being that the documents that were provided for RC Security and Otter Audits were only being provided to the extent that they mentioned OtterSec, so used the name OtterSec, which is fairly black and white I think.

And then beyond that the question we really had is what does this limitation mean, what is the defendants' view as to what concerns OtterSec.

So that came up for the first time and we learned of it for the first time in defendants' opposition papers.  It wasn't in their written responses.  And what we were discussing with you and trying to understand, right, is what does that mean, what is your view for what has been produced, what criteria were used to determine whether or not a document, quote/unquote, concerns

J.R. 950

OtterSec.

So because what we are talking about is a global resolution of these issues, that's what I'm trying to understand.  What I'm trying to understand still is that to the extent that this limitation has been applied to the production of documents, what does that mean.  Because, again, this is a proposed global resolution on a with-prejudice basis, as I understand what the defendants' proposal is, which means that you are asking us to effectively agree that whatever that limitation is, which we still don't understand what it is and haven't heard what the criteria is that were utilized to determine what concerns OtterSec, you are asking us to just accept what we have received at that point without understanding necessarily what has or, more importantly, has not been produced based on that criteria.

So that's what I'm asking and that was the subject.  So we are talking about, because it is a global resolution of these requests, that limitation.  And that is what I'm asking here, is

to better understand what that limitation is if you are asking us to accept it effectively through your proposal.

MR. LEVY:  So, number one, what our proposal is doing is it's offering to produce the different categories of documents we listed, P&Ls, expenses, revenue, income records, et cetera, regardless of whether they mention or concern OtterSec through the end of 2023 for the two South Dakota companies.

Our prior production -- and we have been very clear about this -- we would produce documents through the deadlines that we articulated for the companies we mentioned if they mentioned OtterSec.

You're right that we had a back and forth about what concerns OtterSec means and we were both asking each other on Wednesday what the limiting principle would be and obviate the need to get into that back and forth about that limiting principle, we talked about a proposal similar to what we are raising with you now, which

J.R. 952

would have the defendants produce documents regardless of whether they mention or concern OtterSec under anyone's definition through the end of 2023, full stop.

What we want to have clarity on is at the beginning of this call we walked through the RFPs that were in dispute, 1, 4, 5, 16, 17, 18, 19, 20, 21 and 22. You indicated that that's correct, those are the RFPs in dispute. Your motion also pertained to those RFPs. So I just want to clarify that those are the RFPs that are in dispute and, yes, our proposal would globally resolve any dispute with regard to those RFPs because they're the only ones that are in dispute with prejudice, you're right about that.

But if there are other RFPs that you are now saying are in dispute that were not the subject of your motion --

MR. PLOTNICK: I'm not, I'm not. What I'm saying is that -- okay, so documents have been produced already, right, we have documents that have been produced by defendants, okay? And the

documents that have been produced by defendants so far, okay, have been subject to this limitation. Now, that includes all of these, any documents --

MS. CLATTENBURG:  No, no, no, I need to -- no, because we have gone through this many times and I will go through it one more time. That's not accurate as we said.  For instance, you have 2022 financial documents for Otter Audits and RC Security that do not mention OtterSec.  That's one.

RFP 1, as we clarified last time, the only limitation on that is time frame.  There is not a limitation on whether or not the concern or mention -- and for us concern means mention.  They don't mention OtterSec.  We didn't apply that limitation to RFP 1.  It wasn't applied to RFP 19. You have all of these agreements regardless of whether or not they mention OtterSec.  The same with RFP 20.  Let me just verify what I'm looking at here.  No, sorry, not RFP 20; RFP 21.  Again, there was no limitation on whether it mentions OtterSec.  And I think that is also true with

RFP -- yeah, RFP 22 as well.  There is no limitation on whether it mentions OtterSec.

For all of those, 1, 19, 21, 22, the limitation, the thing that remained in dispute, was the time frame.

MR. PLOTNICK:  Bear with me one second. Can I suggest that we take a quick maybe 10-minute or so break because I'm trying to find --

MR. LEVY:  Sure.

MR. PLOTNICK:  -- your opposition.  I didn't have it in front of me.  As I said, this issue about sort of this limitation was raised in your opposition to our motion to compel.  It was the first time we had heard that this limitation was being applied and I'm just sort of trying to find it on the fly and it may be helpful just to take a 10 --

MS. CLATTENBURG:  I want to point out one thing, Steve, which is that was served on October 16; right?  So there have been a number of productions since then.  We have worked with you since then to try to resolve this.  So I know you

J.R. 955

keep coming back to that and we are updating you on what -- and we will obviously revise our responses, but this is where it is now.  This limitation that you are very -- that you are concerned about is not applied to these RFPs that I keep listing.  So I just want to make that clear.  You can keep going back to this language, but we're telling you -- and we will update our responses -- that for RFPs 1, 19, 21, 22, there is no mention OtterSec limitation being applied. What that dispute there seems to be is the time frame, if anything.  And then the other ones are these financial documents which under our proposal this limitation would not be applied.

I just want to make that clear before we go off the record for you to discuss or whatever you are looking for.

MR. PLOTNICK:  Sure, that's fine.  Can we just take ten minutes and I want to go back and look at the defendants' opposition brief and discuss it with my colleagues, if that's all right.

J.R. 956

MR. LEVY:  Sure.  When do you want to come back, Steve?

MR. PLOTNICK:  11 o'clock even.  It is 10:48.  We will say 11 o'clock even?

MR. LEVY:  Sure.

MR. PLOTNICK:  Thank you.

MR. LEVY:  Off the record.

(A recess was taken).

MR. PLOTNICK:  So, Rachel, thank you for that last point that you had made.  I think that -- my sense is that that may be the clarification that you provided about sort of particularly when it comes to amending the written responses I think is helpful.  This may very well be a nonissue so I don't want to spend too much time on it.

I think we just need to consider more broadly for the reasons we had said before this global proposal that you are making.  And at the expense of beating a dead horse, I think as a global proposal I don't think we ever discussed completely eliminating some of these requests that

J.R. 957

are at issue.

So, for example, as I understand your proposal, it would not include providing documents responsive, for example, to Request No. 16 altogether, so that is what we really need to consider, and I think for the reasons I had said before I just think we need to consider the proposal as a whole in the context of the requests that are actually in dispute.

And I do think, right, certainly your proposal would resolve some of the issues that we have raised with these requests but perhaps not all of them.

So I think it goes certainly a long way. I think, as I said, we need to consider the concept of it being a global proposal that would effectively eliminate providing responses to some of these requests.

So we can move forward now. I think, as I said, I need to consider it. I not only need to talk to my client, I also need to talk to my expert about it as well.

J.R. 958

So thank you for the proposal.  I do appreciate the consideration you have given to it.

MR. LEVY:  Thank you.

So should we move now to defendants' motions?

MR. PLOTNICK:  Yes.

MR. LEVY:  Great.  So with regard to defendants' motion on plaintiff's responses -- I'm sorry.  I guess on the David subpoena we had given you a proposal last week -- sorry, Wednesday -- I keep saying last week because it feels like a week ago -- on Wednesday, and I don't know if you and your client and/or David have been able to discuss it, but please let us know what you think.

MR. PLOTNICK:  Yes.  So we are already agreeing to give you the tax returns.  I mean that was sought in response to the subpoena as well as from plaintiff.  I think that there was a request in the subpoena that sought the wallet addresses utilized by David specifically as well.  I'm looking for it.  It was in there.  I think, you know, while I appreciate giving explanation of why

J.R. 959

you want the backup for every aspect of David's tax returns, we just really look at that as -- I don't know -- guess I fundamentally disagree that that is a credibility issue, that that's in any way relevant or material.  I think it takes us off into areas of the case that are really fully unrelated to the merits of the dispute, certainly not in our view relevant.

We are not inclined to agree to provide every detail.  We are not inclined to provide every detail of every aspect and essentially doing an audit of David Chen's tax returns.  We just don't think that is -- I don't think that's a credibility issue, I don't think it is relevant. I think it takes us off into -- it is a complete sort of distraction I think fundamentally from the merits of the case.

So we are inclined to just withdraw the objections to those requests that are at issue that we had put in the subpoena before, so I think that takes care of that.  And we will just provide those responses to the subpoena, as they have been

J.R. 960

requested.

MR. LEVY:  Repeat that proposal just so I have it.

MR. PLOTNICK:  We will respond to the subpoena.  We will withdraw those objections that we had to each of those requests.  We had agreed to provide responses to, well, several of them and then objected to the others.  We will withdraw those objections and we will provide responses. We will respond to the subpoena, that is correct. So wherever there were objections to producing documents where we had said that, we will provide those responses.  That is what we will do, we will respond to the subpoena.

MR. LEVY:  It just won't include supporting documentation for the tax returns?

MR. PLOTNICK:  That wasn't requested. That's correct.

MR. LEVY:  Okay.  I understand your proposal.  And I would just add, though, that the supporting documentation is also relevant not only to David's credibility but also -- he may have

been making money from something that should have been OtterSec's.  He could have interfered with OtterSec's clients.  We would see that in the supporting documentation.

Nevertheless, what you are saying is that you will produce documents in response to the subpoena in full and withdraw your objections?

MR. PLOTNICK:  Correct.

MR. LEVY:  Okay.  We'll agree to that.

With regard to defendants' --

MR. PLOTNICK:  By the way, Josh, to clarify that, I think sort of consistent, I think we all contemplate here serving amended responses to all of this that provides clarity so we will give that to you as well, right, so you have that. Just as we were talking about with the defendants amending their objections which we were talking about just before we took the break, we will do the same so you have that clarity and know those are withdrawn fully for the record.  We will do the same thing with the subpoena.

MR. LEVY:  Steve, what I -- I may have

been over my skis here.  So it sounds like you are not going to be able to get back to us today on our proposal about your motion; correct?

MR. PLOTNICK:  Yes, that is correct.

MR. LEVY:  And since that is the case, I have not shared your proposal with our client.  So I just want to put this agreement contingent on us talking with our client.

MR. PLOTNICK:  Okay.

MR. MALYSHEV:  Just for clarification -- this is Alex -- so you're taking the position that us withdrawing objections is a proposal you need to clear with your client, Josh?

MR. LEVY:  No, I'm not.  I think we would probably be able to accept that.  Yeah, look, we will accept it.  I don't need to go to the client.  If you are going to fully respond to the subpoena and withdraw the objections, I do not need to go to the client for that.  I'm just trying to --

MR. PLOTNICK:  I understand, Josh.

MR. LEVY:  Look, go ahead, respond fully to the subpoena.  If you actually do it, great.

J.R. 963

MR. PLOTNICK:  Look, and I will say that to the extent it matters for going back to your client, I think we still would consider the proposal that we had made the last time, so if you wanted to go back to your client and discuss that with them again, I'm certainly fine with that.  If you want to think about that, that's fine.

MR. LEVY:  Look, Alex's reminder is helpful.  He is right.  I'm just going to say yes, respond to the subpoena, withdraw objections, we appreciate it, thank you.

Let me move then to defendants' motion to compel on plaintiff's responses to our discovery requests.  In the last meet and confer on Wednesday, plaintiff's counsel indicated there were no objections regarding the plaintiff's responsibility for David's documents in response to the RFPs and that those objections only applied to the Interrogatories.  We wanted to point plaintiff's direction to Contention 2, the general objections that plaintiff has asserted in response to the RFPs and incorporated by reference in

J.R. 964

response to each individual RFP.

Objection E states that plaintiff objects to the requests including the instructions and definitions set forth therein to the extent they seek or are intended to seek documents not within plaintiff's possession, custody or control and/or documents within the possession, custody or control of nonparties over whom plaintiff has no authority and/or control.

Notwithstanding and without waiving this objection, plaintiff will search for and produce responsive documents that are within the possession, custody or control of David Chen.

General Objection G: Plaintiff objects to the requests including the instructions and definitions set forth therein to the extent they seek or are intended to seek documents that are, (i), already in the possession of the defendants; (ii), a matter of public record; (iii), are easily obtainable by defendants from third parties as it would be by plaintiff and/or, (iv), in plaintiff's possession, custody or control only because such

J.R. 965

documents have been provided to plaintiff by other parties or nonparties through discovery or otherwise in this action.

And then I would refer plaintiff to language that is in every single response to every single RFP that defendants propounded on plaintiff. It says and subject to plaintiff's general responses and objections.

So we had asked in the previous meet and confer sessions for plaintiff to withdraw this objection and we renew that request as applied to General Objections E and G and plaintiff's incorporation by reference of the general objections in response to the individual RFPs.

MS. WHITE: We are not going to withdraw these general objections. Like you said, these are general objections and for the most part, except for the one reference to David Chen in E, these are not restricted or specifying possession, documents that are in David Chen's possession, custody or control.

We have a general objection to producing

documents that are not in our possession, custody and control.  That is a proper objection and we are not going to withdraw it.  I haven't looked at yours, but I imagine you have a similar general objection.

MR. LEVY:  Will plaintiff be willing to clarify that Objections E and G do not apply to David Chen's documents?

MS. WHITE:  I'll have to take that under consideration.  This is the first time that this has been brought up.  I mean we say we are producing documents that are within his possession, custody or control.

MR. LEVY:  This is not the first time. You can withdraw the --

MS. WHITE:  These are the general objections that apply to all of our document requests.

MR. LEVY:  That are incorporated by reference --

MS. WHITE:  -- sorry, all of our document responses, not only the ones that are subject to

the motion to compel.  So this is the first time general objections applied to all responses has been brought up, and I think it is very fair for me to sit here today and say I am not in a position to withdraw any general objections.

MR. LEVY:  We want you to withdraw them as to David Chen, and if --

MS. WHITE:  E does not mention David Chen so I don't even understand what you are asking me to do for G.

MR. LEVY:  It says that plaintiff's objections applies to anyone it seems.  I just think it would be very, very helpful --

MS. WHITE:  Josh, I'm not going to list here all third parties who have documents where I would say are in our possession, custody and control.  I mean, for example, like the case law you sent, generally people's attorneys are considered within their possession, custody and control.  Accountants can be.  I'm speaking hypothetically here; I'm not speaking for plaintiff in particular.  I'm not going to list in

J.R. 968

these objections -- notwithstanding this, these are other individuals and other entities who have documents where they are in possession, custody and control.

MR. LEVY:  I'm not asking you to do all that.  I'm just asking you to clarify that the objection does not apply to David Chen.  You could say with the exception of David Chen we object to, curve out David Chen from the general objections. It's just David Chen.

MS. WHITE:  We produced the documents that you requested.  We have a general objection in here.  I'm not in a position to withdraw that general objection.  We will talk about it and get back to you, but to make a blanket statement that plaintiff has -- I mean let me take a step back.

Are you asking us to affirmatively state that plaintiff has custody and control of all documents in David Chen's possession?  Is that what you're requesting?

MR. LEVY:  In the last meet and confer on Wednesday you said that the documents from David

J.R. 969

that we have produced are in plaintiff's control; correct?

MS. WHITE:  No.  I said we are producing these documents without raising that objection.

MR. LEVY:  I don't think that's what you said.  You can go back to the transcript.

MS. WHITE:  We can go back to the transcript.  But what you're saying now is for these general objections you want us to -- I'm trying to get -- we will talk about it and I will take it under advisement and get back to you, but we aren't asserting here in either of these that David Chen's documents are not in plaintiff's possession, custody or control.  These are general objections that apply broadly.  So what I'm trying to get at is what you want us to do.  Do you want us to make an affirmative representation that plaintiff has possession, custody or control of all documents in David Chen's possession?

MR. LEVY:  We don't need you to say that if it is not accurate.  If it is accurate, we need you to say that.  We do want you to make an

J.R. 970

exception from Objections E and G for David Chen. And if plaintiff does have control of the documents, of the responsive documents, then yes, we want you to say that. We understand that you --

MS. WHITE: We can take this under advisement. I'm just not sure what you wanted us to say here, that even if plaintiff does not have possession, custody or control of documents that are in David's Chen's possession, we will be producing them?

MR. LEVY: No. At the last meet and confer you were clear that when plaintiff produced David's documents plaintiff controlled them.

MS. WHITE: Okay. I just don't understand. I'm willing to consider this. I'm not trying to be argumentative here. We will consider it. I just need to know what you want us to consider because I don't understand that so if you can explain it.

MR. LEVY: I have tried. I will try it again. If you could add a clause that says except

for David Chen.

MS. WHITE:  But we do that.  We say notwithstanding without waiving this objection, plaintiff will search for and produce responsive documents that are within the possession, custody or control of David Chen.  So doesn't that already address this?

MR. LEVY:  You need to lift the objection or create an exception to these objections.  In the last meet and confer --

MS. WHITE:  But --

MR. LEVY:  Madelyn, in the last meet and confer you stated there were no objections to RFPs on this issue.  That was not true.  There are two objections that have been incorporated by reference in response to each of the RFPs.  We need you to carve out an exception for David Chen. This is for the issue of spoliation.  This is very significant.  David Chen has deleted, destroyed Discord messages.  It is not clear whether plaintiff had a role in that, and this is highly relevant to the case and we need clarification if

he has control if possible.

MS. WHITE:  In E we say:  Notwithstanding and without waiving this objection, plaintiff will search for and produce responsive documents that are within the possession, custody or control of David Chen.  So we are carving him out.  I don't know what else you want us to do, but if you think that we are going to litigate the merits of a spoliation motion and making revisions to our objections to your document requests, that's not going to happen.

MR. LEVY:  That last sentence doesn't cure our issue.  That last section does not waive the objection.  We want you to be very clear that you are either waiving the objection or you are carving out David Chen from the objection, not for purposes of producing documents but for purposes of articulating the objection.

MS. WHITE:  So in each response --

MR. LEVY:  Alternatively, you can state that plaintiff has control of David Chen's responsive documents.

J.R. 973

MS. WHITE:  We're not going to say that. I mean we are not going to say that.  We have agreed to produce the documents.  These are general objections that don't apply to David Chen specifically.  I mean we are producing our documents subject to general objections.  We have said we are producing documents from David Chen in response.

MR. PLOTNICK:  If I could jump in, Josh, it just strikes me it is a purely theoretical discussion and that's where I think we are having a little bit of difficulty.  I mean I think, as Madelyn pointed out, say, for example, General Objection E refers to plaintiff objects to the requests to the extent they seek or are intended to seek documents not within plaintiff's possession, custody or control.  You know, let me just full stop there; right?  That is not specific to David Chen.  It is not specific to anyone else. For example, that could apply to documents that the defendants have and we don't have; right?  And that's sort of -- we can only produce what we

have.

Nonetheless, E goes on to continue and says notwithstanding without waiving that objection, we will produce documents that are within the possession, custody or control of David Chen, which we have done.  So, look, I understand the defendants want to make this possession, custody or control argument, but it has nothing to do with the motions to compel, which is what we are talking about, because whether or not some documents, all documents, no documents are within the possession, custody or control of plaintiff versus David Chen, what we are saying is that if David Chen has them, you're getting them.  So it is theoretical in the sense that regardless of who has possession, custody or control of them, you are getting them.

So it just sort of strikes me this is a completely theoretical discussion and you are sort of arguing a motion that hasn't been filed or isn't in play, but it has no impact on these motions to compel, which is what we are

discussing.

MR. LEVY:  So it certainly is not theoretical as applied to a spoliation motion, and so what you are saying is when we pick up, assuming you are not going to agree that plaintiff or David should be sanctioned for spoliation and we resolve that dispute in another context, we will re-raise this issue about clarifying plaintiff's objections on its control of nonparty documents and clarify from plaintiff whether plaintiff is going to be lifting that objection as applied to David.  We can take that up later.

MR. PLOTNICK:  Yeah.  I mean, look, for the record we vehemently disagree -- we are not arguing that now -- we vehemently disagree there has been any spoliation or that there is really any -- well, I will leave it at that because I don't want to argue that point, but for the record we vehemently disagree with that point.

Yeah, I mean what I'm trying to say is we are talking about these motions to compel and it just sort of sounds like we are talking about

J.R. 976

something else and, look, if the defendants' want to file their spoliation motion, they are certainly entitled to do that, but what we are talking about are these motions to compel and where we are having difficulty with this is sort of understanding what any of this has to do with these particular motions because, right, let's set aside the point about whether or not plaintiff has possession, custody or control of them, what we are saying is if David has them, if they're David's, you're getting them.  So it doesn't strike us as having any impact on these motions because you are getting them regardless.

MR. LEVY:  We will agree to talk about this issue another day.

MR. PLOTNICK:  What else?  I'm trying to see what else we have with respect to defendants' motion.

MR. LEVY:  Yes, let me know.  Go ahead.

MR. PLOTNICK:  No, I'm asking you.  I'm trying to see what else -- I'm asking you what else we have to discuss that's left.  I don't know

J.R. 977

that there was much left on the defendants' motions.

MR. LEVY:  Let me look.

I think we are just on the motions to compel from the different defendants regarding the interrogatories we had sent to Alex that he had requested, and I don't know if you have been able to review it and want to discuss it here.

MR. MALYSHEV:  Yes.  Thank you, Josh.  It was very helpful.  Rachel, thank you very much for sending those excerpts.  I have reviewed them and I will say as a starting point I was somewhat confused by the description of the cases that start with the bullet point each case plaintiff cites in the Interrogatories is entirely distinguishable because the points did not seem to particularly flow.

I do not see anything in the rules and nothing in the cases that suggest that whether you are over by five Interrogatories or a hundred Interrogatories makes a difference as to whether or not you are over the limit that is established

J.R. 978

by the Federal Rules of Civil Procedure.

In addition, in those cases, while the numbers that you quote in the brief were -- I'm sorry -- in your e-mail were larger, that actually combined responses from individual defendants, in some cases ten of them, where none of them individually was over the limit.

So I think this really does come down to the issue of whether the defendants are treated as substantially related where in fact they are represented by the same counsel and have made similar arguments are both elements.  You don't need to satisfy them both in my reading of the case, but, in any event, I think on that issue we will need the Court to resolve it.  We are not willing to withdraw that objection.

In addition, you have raised the argument that this limitation does not apply to the local rule that deals with the request for production and that you made the argument there doesn't appear to be much case law interpreting that.  I agree on the latter point, but that is a function

J.R. 979

of the fact that this is a local rule that seems to be ahead of the Federal Rules of Civil Procedure with respect to your limitations on request for production.

Nevertheless, if you look at the language of the rule, it is clearly modeled on Federal Rules of Civil Procedure 33(a)(1) which deals with Interrogatories because it uses the same language that no party shall serve upon another party --

MR. LEVY:  Alex, I'm sorry.  I just want to clarify something in the interest of time.

MR. MALYSHEV:  Yes, go ahead.

MR. LEVY:  I think RFPs have been resolved because we withdrew two of them so we are within the number that --

MR. MALYSHEV:  Okay.  I appreciate it.  I appreciate it.  Again, I was responding to a point that was in a bullet point that Rachel sent to me so I felt it fair to address it, but if it is moot, perfect.

MR. LEVY:  Right, two meet and confers ago.

J.R. 980

MR. MALYSHEV:  Again, I'm only responding to what was sent to me.

So I think our position is that the defendants are not entitled to 75 Interrogatories. Whether or not they go over by a couple or 20 is irrelevant to the analysis.  We are not persuaded that the case law as you describe it actually says what it says.

I was particularly bothered by the language that says that we misrepresented how a case was described; in particular, the McCarthy versus PaineWebber Group.  That case actually dealt both with contention Interrogatories and the limits on their Interrogatories, and the language that we quoted was out of the portion of the decision that deals with the number of Interrogatories.

So I think we will stand on our objections.

MR. LEVY:  Thanks, Alex.

The issue, as we understand it, is that plaintiff has brought claims against three

distinct defendants.  Plaintiffs has claims against each of those three defendants.  Each defendant needs to serve discovery to understand specifically what is alleged against that defendant.  Treating them as one does not allow this.  Nine Interrogatories doesn't allow the defendants to do that.

Rule 33 is clear that, quote, a party may serve on any other party no more than 25 written Interrogatories.  There are three party defendants.  We wanted to propose an alternative to you that might satisfy you where the plaintiff could respond to the 25 Interrogatories on behalf of or with regard to each of the three defendants separately.

MR. MALYSHEV:  Can you explain what that means?  I'm actually not quite clear what you mean by that.

MR. LEVY:  So you can't say defendants as a group, but you can respond with regard to each defendant.

MR. PLOTNICK:  Are you referring to sort

of the first 20 -- I guess I don't know what the first 25 are or would be.

MR. LEVY:  So it would say defendant OtterSec -- not OtterSec, sorry; OtterSec is obviously not a defendant -- defendant RC Security did this, defendant Otter Audits did this, defendant Robert Chen did this.  So you could amend the earlier Interrogatories and then we would serve new ones.

MR. MALYSHEV:  I would need to consider that and I think it would be very helpful for you to send the additional Interrogatories that you think would bring us within that 25.  Again, we certainly suggested several solutions during our premeet and confer e-mails so I'm always happy to consider a resolution to this issue.  It would probably be even more helpful if you set out the whole proposal in writing and identified specifically which 25 Interrogatories you think would satisfy all of this and we can take it under consideration.

MR. LEVY:  Happy to --

J.R. 983

MR. PLOTNICK:  Just to add to that Josh, because I think there was an additional set of Interrogatories and they were supplemented and it was the supplement that really went past the 25 or added onto the original.  So the question really is which 25 are we talking about I think.

But thank you for that proposal.  I mean that is something we will give real consideration to.  If you could just identify which 25 we are talking about is really the point.

MR. LEVY:  Yeah.  I think -- look, we will endeavor to do that.  It is Friday.  I don't know that we can do it over the weekend.  But we will do it as soon as we can.

MR. PLOTNICK:  Yeah.  I mean I could pull them up, but I think -- and I'm going off memory here so don't hold me to this -- I think there was an initial set of Interrogatories that the defendant served.  I don't think those went up to 25 off the top of my head.  I will just use an example.  Let's say they went up to 20.  I don't have them in front of me.  I could pull it up and

J.R. 984

take a look if we want to do it right now, but point being I don't think it went all the way up to 25. And then it was the subsequent Interrogatories that sort of would have taken you up to 25 and beyond. And, as you know, one of our original proposals was we will answer 25 of these so tell them what they are. So I think as part of this it is just understanding which 25 we are talking about and that is something we can consider. I presume it would be the first set, right, and then the question is plus which additional ones.

MR. LEVY: Yeah, I think it just makes sense to -- the proposal, for us to send it in writing makes a lot of sense. It will be clear. We will do that. We will certainly do it with plenty of time before the joint status report is due on January 27. Hopefully we can resolve the matter well before then.

MR. PLOTNICK: Good, thank you. I think that's a constructive proposal, Josh, so thank you.

J.R. 985

Transcript of Meet and Confer
Conducted on January 10, 2025                    88

MR. LEVY:  You're welcome.  Great.

MR. PLOTNICK:  Do we want to take a break and just go off the record for a minute?

MR. LEVY:  Sure.

MR. PLOTNICK:  Yeah, I think so.  I think that makes sense and we could take a quick break.

MR. LEVY:  Okay.  Thank you.

Go off the record.

(A discussion was held off the record.)

(A recess was taken.)

(A discussion was held off the record.)

MR. LEVY:  Ms. Whyte, let's go back on the record.

So, Steve, we have been talking now for about 30 minutes or 45 minutes off the record just to hash through some logistics here, and what I understand we have agreed to do in furtherance of our efforts to resolve the discovery disputes that were ripe before the Court when this process began and certainly the remaining disputes is to file a joint motion for extension of the meet and confer deadlines and that would be a two-week extension

from January 13 to January 27, and included in that joint motion would also be a request for an extension of time to file the joint status report from January 27 to February 10, and, lastly, a joint request to stay fact discovery deadlines. Is that right?

MR. PLOTNICK:  Yes.  Yeah, I think that's right.  Yes.

MR. LEVY:  Great.  I'm really glad we could work together and we look forward, as I know you do, to continuing to talk and resolve these issues.

MR. PLOTNICK:  Yes.  I think we have been making some good progress here and I think it makes sense to continue these discussions and there is clearly sort of more that we have to consider, but it is good that we are making this progress.

MR. LEVY:  Thank you.

THE COURT REPORTER:  Mr. Levy, I'll get you the rough draft tonight and the final on Monday?

MR. LEVY:  That would be wonderful, thank you.

And Steve, are you getting everything on time?

MR. PLOTNICK:  Yes, yes, we are.

And we will take the same as well.

(Off the record at 12:15 p.m.)

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Cynthia A. Whyte, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 13th day of January, 2025.

My commission expires:

August 26, 2028

_____

CYNTHIA A. WHYTE

NOTARY PUBLIC IN AND FOR THE

COMMONWEALTH OF VIRGINIA

J.R. 989

Transcript of Meet and Confer
Conducted on January 10, 2025                    92

| A | | | |
|---|---|---|---|

**a)(1**
82:7
**able**
18:8, 20:8,
61:13, 65:2,
65:15, 80:7
**about**
4:21, 5:6, 5:7,
5:12, 7:20, 8:7,
8:20, 9:19,
11:10, 11:13,
12:18, 13:5,
13:7, 13:9,
13:12, 13:14,
13:15, 14:14,
14:22, 20:9,
20:11, 20:20,
21:7, 22:15,
22:20, 24:10,
24:11, 24:22,
25:9, 26:10,
30:5, 30:16,
32:16, 32:20,
36:2, 38:8,
38:10, 38:13,
39:1, 45:8,
45:18, 47:4,
47:5, 47:9,
48:18, 49:2,
49:18, 49:20,
50:3, 50:17,
51:7, 53:2,
53:20, 54:12,
54:17, 54:20,
54:21, 55:15,
57:12, 58:5,
59:12, 60:22,
64:16, 64:18,
65:3, 66:7,
71:14, 72:10,
77:10, 78:8,
78:21, 78:22,
79:4, 79:8,
79:14, 86:6,
86:10, 87:9,
88:15

**absolutely**
12:20, 21:13,
31:7, 33:1
**accept**
53:15, 54:2,
65:15, 65:16
**account**
13:1, 26:14,
26:19, 26:22,
28:10, 28:15,
28:21, 29:2,
32:14
**accountant**
15:9, 15:12
**accountant's**
15:14
**accountants**
70:20
**accounts**
13:3, 28:16,
50:22
**accurate**
56:7, 72:21
**accurately**
51:17
**action**
68:3
**actual**
14:11, 15:1
**actually**
22:1, 37:20,
49:12, 60:9,
65:22, 81:4,
83:7, 83:12,
84:17
**add**
63:20, 73:22,
86:1
**added**
86:5
**addition**
81:2, 81:17
**additional**
47:19, 85:12,
86:2, 87:12
**address**
74:7, 82:19
**addresses**
32:17, 61:19

**adequate**
34:17
**admissible**
11:16
**advisement**
36:2, 72:11,
73:7
**affirmative**
72:17
**affirmatively**
71:17
**affixed**
91:13
**after**
23:7, 34:6
**again**
4:3, 17:9,
23:18, 24:21,
28:9, 28:11,
29:18, 29:22,
31:15, 37:12,
44:7, 53:7,
56:20, 66:6,
73:22, 82:17,
83:1, 85:13
**against**
83:22, 84:2,
84:4
**agasi**
15:9, 16:3,
16:5
**ago**
16:16, 61:12,
82:22
**agree**
5:16, 15:15,
22:2, 29:16,
38:8, 38:10,
38:12, 49:21,
49:22, 50:5,
53:11, 62:9,
64:9, 78:5,
79:14, 81:22
**agreed**
39:12, 41:14,
47:17, 63:6,
76:3, 88:17
**agreeing**
17:21, 22:1,

**39:8, 61:16**
**agreement**
19:4, 19:5,
65:7
**agreements**
39:22, 56:17
**ahead**
65:21, 79:19,
82:2, 82:12
**al**
1:7
**alex**
4:3, 65:11,
80:6, 82:10,
83:20
**alex's**
66:8
**alexander**
3:4
**all**
5:1, 5:7, 6:4,
8:1, 10:13,
12:4, 14:5,
16:12, 16:22,
17:15, 18:19,
19:22, 20:3,
22:2, 22:11,
25:16, 25:18,
28:5, 30:2,
30:6, 30:11,
30:16, 31:17,
32:3, 32:5,
34:4, 35:6,
39:6, 39:14,
45:15, 47:13,
49:2, 50:12,
56:3, 56:17,
57:3, 58:21,
60:13, 64:13,
64:14, 69:17,
69:21, 70:2,
70:15, 71:5,
71:18, 72:19,
77:11, 85:20,
87:2
**alleged**
84:4
**allow**
41:16, 84:5,

J.R. 990

Transcript of Meet and Confer
Conducted on January 10, 2025                    93

| | | | |
|---|---|---|---|
| 84:6 | 78:7, 79:15, | **apply** | 68:9 |
| **allows** | 82:9 | 43:4, 48:12, | **asking** |
| 19:12 | **answer** | 56:15, 69:7, | 7:22, 53:11, |
| **almost** | 14:15, 16:9, | 69:17, 71:7, | 53:15, 53:19, |
| 47:13 | 20:8, 33:16, | 72:15, 76:4, | 53:22, 54:2, |
| **along** | 39:19, 87:6 | 76:20, 81:18 | 54:18, 70:9, |
| 30:1, 47:17 | **any** | **applying** | 71:5, 71:6, |
| **already** | 9:5, 11:5, | 45:15 | 71:17, 79:20, |
| 5:15, 6:11, | 12:5, 16:1, | **appreciate** | 79:21 |
| 14:14, 18:20, | 17:16, 18:3, | 9:18, 27:21, | **asks** |
| 22:15, 27:12, | 28:17, 28:21, | 31:14, 31:20, | 17:14, 39:5 |
| 35:3, 35:4, | 41:22, 43:18, | 32:12, 32:22, | **aspect** |
| 35:7, 35:9, | 55:13, 56:3, | 38:2, 38:3, | 62:1, 62:11 |
| 39:12, 40:20, | 62:4, 70:5, | 38:7, 38:21, | **asserted** |
| 43:17, 46:10, | 78:16, 78:17, | 61:2, 61:22, | 66:21 |
| 46:22, 55:21, | 79:6, 79:12, | 66:11, 82:16, | **asserting** |
| 61:15, 67:18, | 81:14, 84:9, | 82:17 | 72:12 |
| 74:6 | 91:9 | **appropriate** | **asset** |
| **also** | **anyone** | 11:13, 11:18 | 6:1, 13:19 |
| 3:20, 15:7, | 41:18, 70:12, | **areas** | **assets** |
| 22:8, 49:6, | 76:19 | 62:6 | 26:3 |
| 55:9, 56:22, | **anyone's** | **aren't** | **assuming** |
| 60:21, 63:21, | 55:3 | 72:12 | 33:12, 78:5 |
| 63:22, 89:2 | **anything** | **argue** | **attorneys** |
| **alternative** | 12:21, 29:16, | 13:7, 78:18 | 70:18 |
| 84:11 | 35:12, 58:12, | **argued** | **attributable** |
| **alternatively** | 80:18 | 37:8 | 35:12 |
| 75:20 | **anyway** | **arguing** | **audit** |
| **although** | 13:5, 21:10 | 77:20, 78:15 | 62:12 |
| 42:14 | **appear** | **argument** | **audits** |
| **altogether** | 48:14, 81:21 | 77:8, 81:17, | 8:4, 9:8, 10:4, |
| 60:5 | **appeared** | 81:20 | 10:8, 17:17, |
| **always** | 47:21 | **argumentative** | 26:15, 27:1, |
| 85:15 | **appears** | 73:17 | 28:12, 28:17, |
| **amend** | 46:15 | **arguments** | 39:7, 39:11, |
| 85:8 | **application** | 37:7, 81:12 | 39:16, 40:21, |
| **amended** | 47:20 | **articulated** | 41:11, 42:21, |
| 64:13 | **applied** | 10:16, 13:21, | 45:4, 46:3, |
| **amending** | 46:19, 48:3, | 54:14 | 46:6, 48:5, |
| 59:13, 64:17 | 48:8, 48:11, | **articulating** | 48:9, 49:9, |
| **among** | 53:6, 56:16, | 75:18 | 51:3, 51:20, |
| 15:5 | 57:15, 58:5, | **articulation** | 52:3, 52:5, |
| **amount** | 58:10, 58:14, | 36:8 | 52:7, 56:8, 85:6 |
| 38:10 | 66:18, 68:11, | **aside** | **august** |
| **analysis** | 70:2, 78:3, | 26:7, 79:8 | 91:17 |
| 83:6 | 78:12 | **asked** | **authority** |
| **another** | **applies** | 8:7, 12:4, | 67:9 |
| 30:10, 42:12, | 28:13, 70:12 | 34:11, 50:21, | **available** |
| | | | 34:14, 34:18 |

Transcript of Meet and Confer
Conducted on January 10, 2025                                              94

**avoid**
17:3

**B**

**back**
4:20, 7:16,
16:15, 18:18,
21:8, 30:18,
30:19, 30:22,
31:1, 31:7,
34:15, 35:20,
36:16, 36:20,
38:22, 50:11,
54:16, 54:20,
58:1, 58:7,
58:19, 59:2,
65:2, 66:2,
66:5, 71:15,
71:16, 72:6,
72:7, 72:11,
88:12

**backup**
62:1

**backwards**
31:6

**bad**
50:18

**balance**
10:21, 10:22,
13:4, 25:21

**bank**
27:4

**base**
28:20

**based**
9:4, 13:10,
31:9, 47:1,
50:6, 53:18

**basically**
9:7

**basis**
17:11, 20:1,
20:11, 21:17,
28:5, 32:10,
43:14, 43:16,
45:20, 53:9

**bear**
57:6

**beating**
59:20

**because**
10:10, 16:22,
17:3, 17:12,
18:18, 20:9,
26:9, 32:4,
34:11, 44:21,
44:22, 46:1,
46:14, 48:12,
53:2, 53:7,
53:20, 55:14,
56:5, 57:8,
61:11, 67:22,
73:19, 77:10,
78:17, 79:7,
79:13, 80:16,
82:8, 82:14,
86:2

**been**
35:19, 42:18,
42:22, 43:16,
44:2, 44:3,
44:7, 46:17,
46:18, 46:19,
46:21, 52:20,
53:6, 53:18,
54:11, 55:20,
55:22, 56:1,
56:2, 57:20,
61:13, 62:22,
64:1, 64:2,
65:1, 68:1,
69:11, 70:3,
74:15, 77:20,
78:16, 80:7,
82:13, 88:14,
89:13

**before**
2:13, 16:5,
33:4, 58:15,
59:18, 60:7,
62:20, 64:18,
87:17, 87:19,
88:19, 91:2

**began**
88:19

**beginning**
55:6

**behalf**
3:2, 3:11,
40:19, 84:13

**being**
9:15, 18:3,
24:3, 24:5,
33:2, 38:1,
41:6, 44:16,
48:4, 48:8,
48:9, 52:4,
52:6, 52:8,
57:15, 58:10,
60:16, 87:2

**believe**
6:12, 7:13

**benefit**
9:12, 51:11

**better**
25:15, 50:1,
54:1

**between**
35:20

**beyond**
5:15, 16:5,
25:12, 27:3,
27:4, 27:12,
41:21, 42:1,
49:13, 52:11,
87:5

**big**
8:8

**bit**
10:2, 13:9,
13:10, 14:10,
18:7, 20:7,
20:12, 22:4,
22:18, 26:8,
42:17, 76:12

**black**
52:10

**blanket**
71:15

**blockchain**
8:1

**both**
5:20, 6:5,
35:17, 54:18,
81:12, 81:13,

83:13

**bothered**
83:9

**bottom**
11:22, 37:13

**breadth**
32:20

**break**
21:6, 34:13,
34:19, 57:8,
64:18, 88:2,
88:6

**brief**
37:3, 58:20,
81:3

**briefed**
35:3, 35:7

**bring**
85:13

**brings**
42:11

**broad**
24:21

**broadly**
59:18, 72:15

**brought**
11:8, 69:11,
70:3, 83:22

**built**
27:5

**bullet**
80:14, 82:18

**burden**
17:4

**burdensome**
8:16, 10:3,
10:7

**C**

**calendar**
23:3, 23:9,
24:8, 40:11,
40:22, 46:10

**call**
32:20, 37:6,
37:16, 42:20,
49:20, 51:8,
55:6

Transcript of Meet and Confer
Conducted on January 10, 2025                    95

| | | | |
|---|---|---|---|
| **calls** 37:11 | **certify** 91:4 | 69:7, 71:6, 78:10, 82:11 | 22:19 |
| **came** 20:20, 49:12, 51:22, 52:15 | **cetera** 39:8, 54:7 | **clarifying** 78:8 | **coin** 28:20 |
| **can't** 84:19 | **challenge** 9:21, 10:1 | **clarity** 35:5, 55:5, 64:14, 64:19 | **colleagues** 58:21 |
| **candidly** 34:20 | **challenging** 8:4, 10:14, 34:11 | **clattenburg** 3:13, 44:9, 44:19, 45:17, | **combined** 81:5 |
| **capturing** 15:6 | **chen** 1:7, 41:10, 41:11, 67:13, | 48:16, 56:4, 57:18 | **come** 18:18, 21:8, 59:2, 81:8 |
| **care** 62:21 | 68:18, 70:7, 70:8, 71:7, | **clause** 73:22 | **comes** 59:13 |
| **carter** 3:6 | 71:8, 71:9, 71:10, 73:1, | **clear** 22:19, 23:14, | **coming** 30:19, 31:5, |
| **carve** 74:17 | 74:1, 74:6, 74:17, 74:19, | 36:10, 43:18, 45:6, 54:12, | 31:10, 58:1 |
| **carving** 75:6, 75:16 | 75:6, 75:16, 76:4, 76:7, | 58:7, 58:15, 65:13, 73:13, | **commission** 91:16 |
| **case** 1:6, 62:6, | 76:19, 77:6, 77:13, 77:14, | 74:20, 75:14, 84:8, 84:17, | **commitment** 10:19 |
| 62:17, 65:5, 70:17, 74:22, | 85:7 | 87:15 | **commonwealth** 2:14, 91:22 |
| 80:14, 81:14, 81:21, 83:7, | **chen's** 62:12, 68:20, | **clearly** 82:6, 89:16 | **communications** 16:22, 17:15, |
| 83:11, 83:12, 91:10 | 69:8, 71:19, 72:13, 72:19, | **client** 4:21, 10:13, | 27:10, 32:21, 40:17, 41:8, |
| **cases** 47:13, 80:13, | 73:10, 75:21 | 14:5, 21:6, 22:6, 30:18, | 50:21 |
| 80:19, 81:2, 81:6 | **cites** 80:15 | 30:22, 31:2, 31:8, 34:14, | **companies** 5:21, 6:5, 6:8, |
| **cash** 26:2 | **civil** 81:1, 82:2, | 34:17, 35:20, 35:22, 36:2, | 9:13, 11:7, 12:6, 13:14, |
| **catch** 6:15 | 82:7 | 38:19, 60:21, 61:13, 65:6, | 15:10, 23:6, 40:21, 41:3, |
| **categories** 54:6 | **claims** 36:9, 83:22, | 65:8, 65:13, 65:16, 65:19, | 54:10, 54:14 |
| **certain** 8:20, 32:18 | 84:1 | 66:3, 66:5 | **company** 13:19 |
| **certainly** 31:14, 35:5, | **clarification** 4:15, 28:8, | **clients** 6:4, 30:11, | **compel** 35:8, 37:4, |
| 37:3, 60:10, 60:14, 62:7, | 59:12, 65:10, 74:22 | 38:4, 39:7, 39:10, 39:15, | 37:9, 41:7, 47:12, 47:22, |
| 66:6, 78:2, 79:3, 85:14, | **clarified** 56:11 | 39:20, 64:3 | 48:2, 48:6, 48:19, 49:12, |
| 87:16, 88:20 | **clarify** 6:11, 10:4, | **close** 21:2 | 49:18, 50:5, 50:6, 50:10, |
| **certificate** 91:1 | 16:6, 23:4, 24:6, 36:16, | **closed** 9:11 | 51:14, 51:15, 57:13, 66:13, |
| | 40:6, 44:22, 55:11, 64:12, | **closely** 20:7, 22:12, | 70:1, 77:9, 77:22, 78:21, 79:4, 80:5 |

J.R. 993

Transcript of Meet and Confer
Conducted on January 10, 2025                                          96

| | | | |
|---|---|---|---|
| **complete** | 85:15, 88:21 | **continuations** | **could** |
| 32:10, 62:15 | **confers** | 51:4 | 8:14, 21:5, |
| **completely** | 33:8, 33:19, | **continue** | 22:5, 26:15, |
| 44:13, 59:22, | 34:6, 48:22, | 43:4, 48:12, | 33:14, 64:2, |
| 77:19 | 82:21 | 77:2, 89:15 | 71:7, 73:22, |
| **compromise** | **confused** | **continuing** | 76:9, 76:20, |
| 4:21, 7:7, 8:6, | 80:13 | 89:11 | 84:13, 85:7, |
| 9:18, 17:22, | **confusing** | **control** | 86:9, 86:15, |
| 18:8, 20:21, | 48:17 | 67:6, 67:8, | 86:22, 88:6, |
| 27:15, 36:13 | **consider** | 67:9, 67:13, | 89:10 |
| **concept** | 16:17, 20:6, | 67:22, 68:21, | **couldn't** |
| 21:15, 60:16 | 21:21, 22:4, | 69:2, 69:13, | 20:20 |
| **concern** | 22:10, 22:11, | 70:17, 70:20, | **counsel** |
| 8:18, 18:22, | 26:9, 26:16, | 71:4, 71:18, | 66:15, 81:11, |
| 43:3, 44:5, | 27:13, 32:3, | 72:1, 72:14, | 91:8 |
| 44:6, 47:10, | 34:19, 37:19, | 72:18, 73:2, | **couple** |
| 51:21, 54:8, | 59:17, 60:6, | 73:9, 74:6, | 36:11, 83:5 |
| 55:2, 56:13, | 60:7, 60:15, | 75:1, 75:5, | **course** |
| 56:14 | 60:20, 66:3, | 75:21, 76:17, | 15:6, 18:12, |
| **concerned** | 73:16, 73:18, | 77:5, 77:8, | 50:8 |
| 58:5 | 73:19, 85:10, | 77:12, 77:16, | **court** |
| **concerning** | 85:16, 87:10, | 78:9, 79:9 | 1:1, 11:14, |
| 16:22, 17:15, | 89:17 | **controlled** | 34:4, 34:12, |
| 27:10, 32:22, | **consideration** | 73:14 | 81:15, 88:19, |
| 40:17, 41:8, | 31:21, 32:19, | **convene** | 89:20 |
| 46:4, 50:22 | 33:2, 38:20, | 34:7 | **covered** |
| **concerns** | 61:2, 69:10, | **corps** | 25:3, 26:1, |
| 52:13, 52:22, | 85:21, 86:8 | 40:14 | 33:6, 37:7 |
| 53:14, 54:17 | **considered** | **correct** | **covers** |
| **conclusion** | 38:4, 70:19 | 4:19, 5:11, | 49:19 |
| 17:10, 37:18 | **consistent** | 23:9, 29:2, | **create** |
| **concrete** | 30:20, 64:12 | 34:1, 38:15, | 74:9 |
| 37:2, 37:14, | **constructive** | 39:17, 40:22, | **created** |
| 37:21, 38:5, | 87:21 | 41:18, 41:22, | 23:11, 23:19, |
| 38:16 | **contact** | 45:16, 46:21, | 23:21, 23:22, |
| **conducted** | 26:11 | 47:3, 47:7, | 24:1, 24:8 |
| 1:12, 2:1 | **contemplate** | 50:2, 55:8, | **creates** |
| **confer** | 64:13 | 63:10, 63:18, | 10:10 |
| 1:11, 2:1, | **contemplated** | 64:8, 65:3, | **credibility** |
| 9:15, 10:17, | 34:2 | 65:4, 72:2, 91:5 | 62:4, 62:14, |
| 12:1, 13:22, | **contemplating** | **correctly** | 63:22 |
| 14:22, 19:8, | 35:19 | 19:17 | **criteria** |
| 19:17, 34:13, | **contention** | **corresponded** | 52:21, 53:13, |
| 34:22, 35:10, | 66:20, 83:13 | 8:10 | 53:18 |
| 36:11, 47:18, | **context** | **corresponding** | **cure** |
| 66:14, 68:10, | 20:3, 60:8, | 8:14, 12:10 | 75:13 |
| 71:21, 73:13, | 78:7 | **corresponds** | **curve** |
| 74:10, 74:13, | **contingent** | 12:14 | 71:9 |
| | 65:7 | | |

J.R. 994

Transcript of Meet and Confer
Conducted on January 10, 2025                                      97

| | | | |
|---|---|---|---|
| **custody** 67:6, 67:7, 67:13, 67:22, 68:21, 69:1, 69:13, 70:16, 70:19, 71:3, 71:18, 72:14, 72:18, 73:9, 74:5, 75:5, 76:17, 77:5, 77:8, 77:12, 77:16, 79:9 **customers** 7:1, 39:6, 39:10, 39:15 **cv** 1:7 **cynthia** 1:22, 2:13, 91:2, 91:20 **D** **dakota** 5:21, 6:5, 6:7, 9:12, 11:6, 12:6, 13:14, 23:6, 30:12, 40:21, 41:2, 54:10 **dans** 4:17, 5:10, 13:16, 13:19, 13:20 **date** 42:1 **david** 41:11, 61:9, 61:13, 61:20, 62:12, 67:13, 68:18, 68:20, 69:8, 70:7, 70:8, 71:7, 71:8, 71:9, 71:10, 71:19, 71:22, 72:13, 72:19, 73:1, 74:1, 74:6, 74:17, 74:19, | 75:6, 75:16, 75:21, 76:4, 76:7, 76:19, 77:5, 77:13, 77:14, 78:6, 78:12, 79:10 **david's** 62:1, 63:22, 66:17, 73:10, 73:14, 79:11 **day** 79:15, 91:13 **days** 36:11 **de-fi** 28:19 **dead** 59:20 **deadline** 33:18 **deadlines** 54:13, 88:22, 89:5 **dealing** 48:21 **deals** 81:19, 82:7, 83:16 **dealt** 48:19, 83:13 **debriefing** 48:2 **debt** 6:2, 25:6, 26:3 **december** 23:12, 23:15, 23:17, 39:18, 41:1 **decentralized** 28:18 **decision** 83:16 **defendant** 50:10, 84:3, 84:5, 84:21, 85:3, 85:5, 85:6, 85:7, 86:19 | **defendants** 1:8, 3:11, 13:17, 14:16, 15:13, 16:9, 21:22, 27:7, 27:11, 35:1, 35:8, 37:5, 37:15, 37:22, 41:14, 41:17, 42:16, 43:5, 47:11, 47:15, 47:17, 47:22, 48:13, 50:14, 51:16, 52:1, 52:13, 52:16, 53:10, 55:1, 55:22, 56:1, 58:20, 61:4, 61:8, 64:10, 64:16, 66:12, 67:18, 67:20, 68:6, 76:21, 77:7, 79:1, 79:17, 80:1, 80:5, 81:5, 81:9, 83:4, 84:1, 84:2, 84:7, 84:11, 84:14, 84:19 **defenses** 36:9 **defi** 28:14, 28:18, 32:14 **definitely** 38:2 **definition** 55:3 **definitions** 67:4, 67:16 **definitive** 17:10 **definitively** 18:8 **deleted** 74:19 **depended** 32:4 | **depends** 18:1, 29:19, 31:16 **describe** 83:7 **described** 83:11 **description** 80:13 **destroyed** 74:19 **detail** 62:10, 62:11 **detailed** 37:9 **determine** 52:21, 53:14 **dicharia** 3:14 **difference** 80:21 **different** 12:22, 13:3, 54:6, 80:5 **difficult** 8:17, 10:14, 21:21 **difficulty** 76:12, 79:5 **digital** 8:1, 8:5, 13:19 **directed** 34:4 **direction** 66:20 **disagree** 37:12, 38:8, 38:10, 38:12, 62:3, 78:14, 78:15, 78:19 **disagreements** 5:2 **disappointing** 34:10 **discharge** 14:5, 27:11, 29:11, 30:13 **discord** 74:20 |

**discovery**
66:13, 68:2, 84:3, 88:18, 89:5
**discuss**
26:12, 37:16, 58:16, 58:21, 61:13, 66:5, 79:22, 80:8
**discussed**
4:22, 6:10, 18:21, 20:19, 21:11, 21:12, 29:15, 29:17, 31:4, 31:22, 35:17, 42:12, 46:10, 59:21
**discussing**
19:2, 21:3, 35:2, 52:18, 78:1
**discussion**
16:4, 19:16, 27:6, 29:19, 31:11, 31:15, 31:21, 38:13, 42:19, 44:8, 76:11, 77:19, 88:9, 88:11
**discussions**
11:15, 11:19, 89:15
**dispute**
4:16, 6:13, 14:7, 36:8, 41:6, 47:5, 48:20, 49:11, 49:19, 50:4, 50:13, 55:7, 55:9, 55:12, 55:13, 55:14, 55:17, 57:4, 58:11, 60:9, 62:7, 78:7
**disputes**
5:1, 19:6, 19:18, 88:18, 88:20

**disputing**
31:13
**distinct**
42:21, 51:3, 84:1
**distinguishable**
80:16
**distraction**
62:16
**distributions**
17:7, 17:16, 18:3, 19:10, 19:13
**district**
1:1, 1:2
**dividends**
17:7, 17:15, 18:3, 19:9, 19:12
**document**
4:15, 5:2, 5:17, 13:16, 17:6, 17:13, 30:3, 30:17, 40:2, 40:9, 41:5, 41:7, 42:4, 44:20, 46:16, 47:14, 48:15, 50:3, 50:20, 52:22, 69:17, 69:21, 75:10
**documentation**
19:11, 19:14, 63:16, 63:21, 64:4
**doing**
17:11, 47:18, 54:5, 62:11
**done**
38:17, 77:6
**down**
26:18, 81:8
**draft**
89:21
**due**
87:18
**during**
85:14

|  E  |
| :---: |
**e-mail**
81:4
**e-mails**
34:2, 85:15
**each**
8:15, 16:9, 54:18, 63:6, 67:1, 74:16, 75:19, 80:14, 84:2, 84:14, 84:20
**earlier**
85:8
**easier**
8:17
**easily**
67:19
**effectively**
50:12, 53:11, 54:2, 60:17
**efforts**
88:18
**eight**
35:2
**either**
40:11, 72:12, 75:15
**elements**
81:12
**elicit**
36:11, 38:11
**eliminate**
47:2, 60:17
**eliminating**
16:21, 59:22
**else**
12:21, 41:18, 75:7, 76:19, 79:1, 79:16, 79:17, 79:21, 79:22
**emma**
3:21
**employed**
91:9
**encompass**
26:22

**encompasses**
32:21
**end**
4:18, 14:16, 16:10, 30:12, 39:16, 40:8, 41:1, 41:21, 42:1, 46:9, 54:9, 55:3
**endeavor**
86:12
**ended**
37:10
**enough**
18:5
**ensure**
15:6
**entirely**
80:15
**entities**
8:2, 30:13, 32:18, 44:14, 45:21, 46:1, 51:1, 51:3, 51:6, 71:2
**entitled**
79:3, 83:4
**entity**
25:17, 28:22
**especially**
49:15
**esquire**
3:3, 3:4, 3:5, 3:12, 3:13, 3:14
**essentially**
6:22, 26:6, 39:8, 41:16, 62:11
**est**
1:14
**established**
80:22
**estate**
41:10
**et**
1:7, 39:8, 54:7
**even**
10:13, 40:9,

Transcript of Meet and Confer
Conducted on January 10, 2025                                99

59:3, 59:4,
70:9, 73:8,
85:17
**event**
81:14
**ever**
30:1, 59:21
**every**
8:15, 10:15,
62:1, 62:10,
62:11, 68:5
**everything**
5:12, 5:13,
15:7, 28:2, 90:3
**exactly**
7:18, 21:3,
21:5, 21:11
**example**
9:18, 12:20,
12:21, 15:8,
15:12, 17:6,
17:13, 18:11,
23:2, 26:7,
28:9, 28:12,
50:15, 50:16,
50:18, 50:20,
60:2, 60:4,
70:17, 76:13,
76:20, 86:21
**except**
7:1, 7:4,
68:18, 73:22
**exception**
26:4, 71:8,
73:1, 74:9,
74:17
**excerpts**
80:11
**exchange**
29:1
**exchanges**
28:14
**excuse**
26:17, 28:22
**exist**
28:11
**exists**
46:15

**expect**
22:8
**expense**
59:20
**expenses**
5:22, 54:7
**expert**
26:10, 26:11,
34:18, 60:22
**expires**
91:16
**explain**
10:2, 10:6,
73:20, 84:16
**explaining**
27:17, 50:9
**explanation**
61:22
**extension**
88:21, 88:22,
89:3
**extent**
28:10, 43:2,
44:4, 44:6,
51:20, 52:8,
53:5, 66:2,
67:4, 67:16,
76:15

**F**

**fact**
35:12, 37:14,
48:1, 81:10,
82:1, 89:5
**fair**
28:1, 28:3,
70:3, 82:19
**fairly**
52:10
**faith**
31:9, 31:14
**far**
13:14, 33:13,
56:2
**february**
89:4
**federal**
24:19, 81:1,

82:2, 82:6
**feels**
61:11
**felt**
82:19
**fen**
1:4
**few**
22:9
**file**
79:2, 88:20,
89:3
**filed**
36:5, 37:4,
50:6, 77:20
**final**
19:21, 19:22,
20:8, 33:16,
89:21
**finally**
34:22
**financial**
15:1, 17:20,
22:21, 24:20,
27:8, 28:18,
30:6, 41:9,
49:14, 49:15,
56:8, 58:13,
91:10
**financials**
18:2
**find**
57:8, 57:16
**fine**
11:20, 11:21,
31:2, 58:18,
66:6, 66:7
**finish**
33:14
**firestone**
3:15, 3:22
**firm**
8:5, 9:22
**first**
13:13, 20:13,
21:4, 21:11,
23:7, 34:6,
35:18, 37:2,

37:11, 37:14,
37:21, 38:5,
38:17, 48:7,
48:12, 51:22,
52:15, 52:16,
57:14, 69:10,
69:14, 70:1,
85:1, 85:2,
87:10
**five**
80:20
**floor**
3:7
**flow**
13:1, 26:3,
80:17
**floyd**
3:21
**fly**
20:12, 57:16
**focus**
36:19
**focusing**
39:2
**following**
13:1, 24:1,
24:8
**foregoing**
91:3, 91:4
**forgive**
26:17
**forth**
36:20, 54:16,
54:20, 67:4,
67:16
**forward**
60:19, 89:10
**four**
33:12
**frame**
43:20, 46:9,
56:12, 57:5,
58:12
**framework**
31:5
**frankly**
37:19
**friday**
1:13, 86:12

Transcript of Meet and Confer
Conducted on January 10, 2025

100

**front**
57:11, 86:22
**full**
33:12, 55:4,
64:7, 76:18
**fully**
37:8, 37:9,
62:6, 64:20,
65:17, 65:21
**function**
81:22
**fundamentally**
18:14, 36:21,
37:13, 62:3,
62:16
**funds**
13:2
**further**
19:16, 34:8
**furtherance**
88:17

**G**

**g**
67:14
**gave**
9:17, 12:20
**general**
24:15, 24:16,
24:17, 26:6,
66:20, 67:14,
68:8, 68:12,
68:13, 68:16,
68:17, 68:22,
69:4, 69:16,
70:2, 70:5,
71:9, 71:12,
71:14, 72:9,
72:14, 76:4,
76:6, 76:13
**generally**
24:21, 70:18
**getting**
28:6, 28:7,
28:10, 29:6,
32:13, 34:21,
40:20, 46:12,
48:17, 77:14,

77:17, 79:11,
79:13, 90:3
**give**
6:14, 13:8,
14:22, 20:8,
23:2, 23:8,
29:20, 32:19,
33:1, 39:4,
39:9, 39:12,
51:10, 61:16,
64:15, 86:8
**given**
31:21, 61:2,
61:9
**gives**
18:13
**giving**
18:12, 23:3,
24:22, 29:14,
38:16, 61:22
**glad**
89:9
**global**
38:16, 45:10,
45:14, 46:14,
53:3, 53:8,
53:21, 59:19,
59:21, 60:16
**globally**
55:12
**go**
14:9, 15:2,
15:5, 16:15,
18:20, 21:7,
34:15, 35:20,
49:13, 56:6,
58:16, 58:19,
65:16, 65:18,
65:21, 66:5,
72:6, 72:7,
79:19, 82:12,
83:5, 88:3,
88:8, 88:12
**goes**
60:14, 77:2
**going**
6:11, 7:19,
10:18, 13:4,

13:20, 14:15,
15:12, 16:12,
20:8, 22:9,
32:8, 33:5,
34:10, 36:20,
37:11, 38:7,
38:10, 38:12,
42:8, 44:19,
48:12, 58:7,
65:2, 65:17,
66:2, 66:9,
68:15, 69:3,
70:14, 70:22,
75:8, 75:11,
76:1, 76:2,
78:5, 78:11,
86:16
**gone**
4:20, 48:22,
49:1, 56:5
**good**
4:2, 4:3,
17:13, 27:15,
31:9, 31:13,
87:20, 89:14,
89:17
**gotten**
34:21
**great**
33:15, 37:10,
61:7, 65:22,
88:1, 89:9
**group**
83:12, 84:20
**guess**
17:22, 49:22,
50:1, 61:9,
62:3, 85:1
**gusto**
25:16, 25:17
**gut**
27:14

**H**

**half**
22:9
**hand**
91:13

**hanging**
19:16
**happen**
75:11
**happy**
85:15, 85:22
**hard**
18:7, 20:12
**hash**
88:16
**head**
25:19, 86:20
**hear**
13:3, 14:18,
24:15, 24:16,
25:8, 35:14
**heard**
12:6, 25:22,
37:2, 37:22,
53:13, 57:14
**hearing**
19:21, 20:13,
21:5, 37:14,
38:5
**held**
88:9, 88:11
**helpful**
20:5, 20:14,
57:16, 59:14,
66:9, 70:13,
80:10, 85:11,
85:17
**here**
4:22, 6:15,
17:10, 19:15,
19:19, 20:13,
25:16, 26:2,
31:5, 33:17,
35:13, 45:6,
47:4, 53:22,
56:20, 64:13,
65:1, 70:4,
70:15, 70:21,
71:13, 72:12,
73:8, 73:17,
80:8, 86:17,
88:16, 89:14
**hereby**
91:3

J.R. 998

Transcript of Meet and Confer
Conducted on January 10, 2025                                    101

| | | | |
|---|---|---|---|
| **hereunto** 91:12 | **imagine** 69:4 | **individuals** 71:2 | 66:19, 80:6, 80:15, 80:20, |
| **high** 21:14, 37:17 | **impact** 21:17, 21:20, | **information** 7:8, 13:5, | 80:21, 82:8, 83:4, 83:13, |
| **highly** 74:21 | 31:17, 32:6, 42:15, 77:21, | 16:1, 27:8, 29:14, 30:7, | 83:14, 83:17, 84:6, 84:10, |
| **hitting** 24:6 | 79:12 | 36:12 | 84:13, 85:8, 85:12, 85:19, |
| **hold** 86:17 | **impacted** 33:3, 46:13 | **initial** 12:16, 12:18, | 86:3, 86:18, 87:4 |
| **hope** 38:19 | **important** 8:7, 34:20 | 86:18 | **interrogatory** 6:20, 14:21, |
| **hopefully** 38:21, 87:18 | **importantly** 53:17 | **initially** 47:15 | 29:3, 29:4, 29:13, 30:15, |
| **horse** 59:20 | **impossible** 37:19 | **insofar** 13:18 | 39:19 |
| **hour** 22:10 | **inclined** 62:9, 62:10, | **instance** 56:7 | **interrupt** 5:5 |
| **hours** 17:2, 33:12, | 62:18 | **institution** 28:19, 32:15 | **irrelevant** 83:6 |
| 33:13, 34:4, 35:2 | **include** 26:19, 27:4, | **institutions** 28:14 | **issue** 57:12, 60:1, |
| **however** 38:15, 43:10, | 28:15, 60:3, 63:15 | **instructions** 67:3, 67:15 | 62:4, 62:14, 62:19, 74:14, |
| 43:20 | **included** 22:17, 24:14, | **insufficient** 26:13 | 74:18, 75:13, 78:8, 79:15, |
| **hundred** 80:20 | 51:1, 89:1 | **intend** 43:5 | 81:9, 81:14, 83:21, 85:16 |
| **hypothetically** 70:21 | **includes** 56:3 | **intended** 67:5, 67:17, | **issued** 40:19 |
| **I** | **including** 67:3, 67:15 | 76:15 | **issues** 30:2, 35:3, |
| **idea** 6:20, 18:12, | **income** 6:1, 26:1, 54:7 | **interest** 9:16, 12:9, | 38:6, 44:7, 53:3, 60:11, |
| 34:18 | **incorporated** 66:22, 69:19, | 12:13, 82:11, 91:10 | 89:12 |
| **identified** 9:15, 15:8, | 74:15 | **interested** 19:4 | **items** 32:7 |
| 85:18 | **incorporation** 68:13 | **interests** 41:9 | **itself** 29:2, 36:10 |
| **identify** 7:10, 8:1, 8:5, | **indicate** 39:19 | **interfered** 64:2 | **iv** 67:21 |
| 8:13, 8:22, 9:4, 9:22, 10:4, | **indicated** 8:19, 12:4, | **interposed** 42:18 | **J** |
| 10:8, 11:5, 18:4, 86:9 | 16:5, 19:17, 55:8, 66:15 | **interpreting** 81:21 | **january** 1:13, 87:18, |
| **identifying** 29:2, 33:4 | **indicates** 12:7 | **interrogatories** 4:11, 4:12, | 89:1, 89:4, 91:14 |
| **ii** 67:19 | **individual** 67:1, 68:14, | 5:3, 6:9, 6:13, 6:16, 14:6, | **job** 1:20 |
| **iii** 67:19 | 81:5 | 36:7, 50:4, | |
| | **individually** 81:7 | | |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

J.R. 999

**joint**
87:17, 88:21,
89:2, 89:3, 89:5
**joking**
20:19
**josh**
5:6, 11:15,
18:12, 24:4,
27:20, 34:16,
34:21, 37:1,
39:3, 44:11,
45:18, 46:8,
64:11, 65:13,
65:20, 70:14,
76:9, 80:9,
86:1, 87:21
**joshua**
3:12
**jump**
76:9
**justin**
3:14

**K**

**k-1s**
40:5, 40:7,
40:8, 40:10,
40:12
**keep**
10:13, 41:19,
58:1, 58:6,
58:7, 61:11
**kind**
12:22, 27:14,
32:14
**know**
8:9, 8:11,
8:17, 10:1,
12:10, 12:15,
15:4, 16:3,
18:12, 21:6,
21:16, 21:19,
22:5, 25:16,
25:17, 25:20,
26:20, 28:20,
30:21, 33:15,
34:14, 37:10,
40:6, 44:21,

45:1, 49:17,
57:22, 61:12,
61:14, 61:22,
62:3, 64:19,
73:18, 75:7,
76:17, 79:19,
79:22, 80:7,
85:1, 86:13,
87:5, 89:10
**knowing**
21:22

**L**

**language**
43:3, 58:7,
68:5, 82:5,
82:8, 83:10,
83:14
**largely**
22:22
**larger**
81:4
**last**
9:15, 10:17,
12:1, 13:22,
14:22, 19:3,
19:7, 19:17,
21:12, 24:11,
27:6, 27:19,
29:15, 31:11,
32:20, 33:9,
33:10, 36:14,
37:16, 42:19,
56:11, 59:10,
61:10, 61:11,
66:4, 66:14,
71:21, 73:12,
74:10, 74:12,
75:12, 75:13
**lastly**
89:4
**later**
78:12
**latter**
81:22
**law**
8:5, 9:22,
70:17, 81:21,

83:7
**lawsuit**
36:9
**learned**
48:3, 48:7,
48:13, 52:16
**least**
8:4
**leave**
78:17
**ledgers**
24:15, 24:17,
26:6
**ledyard**
3:6
**left**
34:5, 79:22,
80:1
**length**
18:20, 37:3
**lengthy**
42:19
**let's**
9:5, 34:3,
34:5, 79:7,
86:21, 88:12
**level**
21:14, 37:17,
38:8
**li**
1:4
**liabilities**
25:2, 26:3
**liability**
6:2, 25:5
**liberty**
3:7
**lift**
74:8
**lifting**
78:11
**likely**
25:3
**limit**
80:22, 81:7
**limitation**
40:3, 43:4,
44:12, 44:16,

45:15, 46:15,
46:18, 47:1,
47:2, 47:8,
47:20, 48:1,
48:3, 48:7,
48:11, 52:5,
52:6, 52:12,
53:6, 53:12,
53:22, 54:1,
56:2, 56:12,
56:13, 56:16,
56:21, 57:2,
57:4, 57:12,
57:14, 58:4,
58:10, 58:14,
81:18
**limitations**
42:22, 43:18,
46:7, 82:3
**limited**
5:4, 44:3,
45:2, 45:3,
47:15, 49:6,
51:12
**limiting**
26:16, 54:19,
54:21
**limits**
83:14
**line**
11:22, 37:13
**lines**
30:2
**list**
70:14, 70:22
**listed**
19:10, 19:11,
22:21, 23:13,
46:2, 49:14,
54:6
**listing**
58:6
**litigate**
75:8
**little**
10:2, 13:9,
13:10, 14:10,
22:18, 26:8,

Transcript of Meet and Confer
Conducted on January 10, 2025          103

76:12
**llp**
3:15
**loans**
5:22, 25:2
**local**
81:18, 82:1
**logistics**
88:16
**long**
60:14
**look**
8:15, 9:18,
14:11, 16:2,
16:16, 18:15,
21:13, 22:18,
24:11, 32:18,
35:15, 50:16,
58:20, 62:2,
65:15, 65:21,
66:1, 66:8,
77:6, 78:13,
79:1, 80:3,
82:5, 86:11,
87:1, 89:10
**looked**
69:3
**looking**
6:19, 17:6,
18:14, 24:14,
28:4, 36:6,
47:12, 50:19,
56:19, 58:17,
61:21
**lot**
13:2, 35:3,
35:6, 87:15

**M**

**made**
18:3, 28:1,
30:1, 30:21,
36:9, 48:9,
59:10, 66:4,
81:11, 81:20
**madelyn**
3:5, 4:3,
74:12, 76:13

**main**
10:21, 15:22
**maintain**
28:13, 43:5,
44:13
**maintained**
8:2, 9:11,
28:16, 51:10
**majority**
37:10
**make**
5:5, 6:16,
10:14, 10:18,
13:10, 14:9,
14:10, 16:7,
31:2, 43:18,
45:6, 58:6,
58:15, 71:15,
72:17, 72:22,
77:7
**makes**
4:13, 80:21,
87:13, 87:15,
88:6, 89:15
**making**
43:20, 59:19,
64:1, 75:9,
89:14, 89:17
**malyshev**
3:4, 65:10,
80:9, 82:12,
82:16, 83:1,
84:16, 85:10
**many**
10:15, 37:7,
56:5
**march**
14:16, 16:10,
40:7, 41:21,
42:2, 42:9,
43:17, 45:4
**maryland**
1:2
**material**
62:5
**matter**
13:6, 67:19,
87:19

**matters**
66:2
**maybe**
21:7, 21:9,
25:15, 26:5,
34:13, 50:18,
57:7
**mccarthy**
83:11
**mean**
9:20, 11:2,
15:4, 15:7,
21:4, 27:22,
35:1, 42:3,
44:7, 45:17,
47:12, 52:12,
52:20, 53:7,
61:16, 69:11,
70:17, 71:16,
76:2, 76:5,
76:12, 78:13,
78:20, 84:17,
86:7, 86:15
**meaning**
7:10, 7:12,
42:7
**means**
53:10, 54:17,
56:14, 84:17
**mediation**
11:9, 11:15,
11:18, 12:3
**mediator**
11:9
**meet**
1:11, 2:1,
9:15, 10:17,
11:22, 13:22,
14:22, 19:7,
19:17, 33:8,
33:18, 34:6,
34:22, 35:10,
36:11, 47:18,
48:21, 66:14,
68:9, 71:21,
73:12, 74:10,
74:12, 82:21,
88:21

**meeting**
10:16
**members**
17:16
**memory**
86:16
**mention**
43:2, 44:4,
44:17, 46:4,
47:10, 49:6,
51:21, 54:8,
55:2, 56:9,
56:14, 56:15,
56:18, 58:10,
70:8
**mentioned**
52:9, 54:14,
54:15
**mentions**
56:21, 57:2
**mere**
51:4
**merit-based**
38:14
**merits**
62:7, 62:17,
75:8
**merits-based**
37:6
**messages**
74:20
**might**
15:13, 18:5,
18:16, 19:14,
21:20, 24:14,
34:8, 35:20,
84:12
**mind**
41:20
**minute**
57:7, 88:3
**minutes**
22:9, 58:19,
88:15
**misrepresented**
83:10
**modeled**
82:6

J.R. 1001

Transcript of Meet and Confer
Conducted on January 10, 2025

104

| | | | |
|---|---|---|---|
| **modified** 42:17 | 78:21, 79:4, 79:7, 79:12, 80:2, 80:4 | **neither** 34:11, 91:8 | **object** 45:22, 71:8 |
| **moment** 16:16 | **move** 60:19, 61:4, 66:12 | **network** 13:19 | **objected** 41:14, 63:8 |
| **monday** 33:19, 34:1, 34:12, 89:22 | **moving** 31:6 | **never** 38:18 | **objection** 11:17, 42:13, 42:18, 42:20, 43:5, 43:7, |
| **money** 64:1 | **much** 21:12, 32:3, 59:15, 80:1, | **nevertheless** 51:17, 64:5, 82:5 | 44:13, 45:20, 51:2, 51:7, 67:2, 67:11, |
| **moot** 82:20 | 80:10, 81:21 | **new** 3:8, 13:8, 85:9 | 67:14, 68:11, 68:22, 69:2, |
| **more** 10:3, 11:4, | **muddied** 42:17 | **next** 41:5 | 69:5, 71:7, 71:12, 71:14, |
| 12:21, 20:7, 22:9, 22:12, | **muse** 3:15, 3:22 | **nine** 84:6 | 72:4, 74:3, 74:8, 75:3, |
| 22:18, 28:13, 34:19, 41:22, | **N** | **none** 81:6 | 75:14, 75:15, 75:16, 75:18, |
| 44:21, 48:17, 53:17, 56:6, | **name** 52:9 | **nonetheless** 77:2 | 76:14, 77:4, 78:11, 81:16 |
| 59:17, 84:9, 85:17, 89:16 | **namely** 43:1 | **nonissue** 59:15 | **objections** 37:5, 43:10, |
| **morning** 4:2 | **necessarily** 15:4, 15:15, | **nonparties** 67:8, 68:2 | 43:12, 43:22, 44:3, 62:19, |
| **most** 10:15, 25:3, | 33:3, 53:17 | **nonparty** 78:9 | 63:5, 63:9, 63:11, 64:7, |
| 50:12, 50:15, 68:17 | **necessary** 34:7, 34:9 | **notarial** 91:13 | 64:17, 65:12, 65:18, 66:10, |
| **motion** 4:6, 4:7, 36:4, | **need** 9:19, 10:16, | **notary** 2:13, 91:1, | 66:16, 66:18, 66:21, 68:8, |
| 36:10, 37:4, 37:9, 38:9, | 15:1, 18:14, 20:10, 22:3, | 91:21 | 68:12, 68:14, 68:16, 68:17, |
| 41:6, 47:12, 47:22, 48:2, | 22:9, 26:5, 26:8, 26:11, | **nothing** 13:7, 77:8, | 69:7, 69:17, 70:2, 70:5, |
| 48:6, 48:18, 49:12, 49:18, | 27:9, 31:1, 34:19, 35:16, | 80:19 | 70:12, 71:1, 71:9, 72:9, |
| 50:5, 50:6, 50:10, 51:14, | 54:19, 56:4, 59:17, 60:5, | **notwithstanding** 43:11, 43:22, | 72:15, 73:1, 74:9, 74:13, |
| 51:15, 55:9, 55:18, 57:13, | 60:7, 60:15, 60:20, 60:21, | 44:2, 51:18, 67:10, 71:1, | 74:15, 75:10, 76:4, 76:6, |
| 61:8, 65:3, 66:12, 70:1, | 65:12, 65:16, 65:18, 72:20, | 74:3, 75:2, 77:3 | 78:9, 83:19 |
| 75:9, 77:20, 78:3, 79:2, | 72:21, 73:18, 74:8, 74:17, | **number** 10:11, 19:1, | **objects** 67:2, 67:14, |
| 79:18, 88:21, 89:2 | 74:22, 81:13, 81:15, 85:10 | 20:10, 35:18, 54:4, 57:20, | 76:14 |
| **motions** 35:8, 61:5, | **needed** 12:4 | 82:15, 83:16 | **obligations** 14:6, 27:11, |
| 77:9, 77:22, | **needs** 84:3 | **numbers** 81:3 | 29:11, 30:14 |
| | | **nw** 3:16 | |
| | | **O** | |
| | | **o'clock** 59:3, 59:4 | |

J.R. 1002

Transcript of Meet and Confer
Conducted on January 10, 2025

**obtainable**
67:20
**obviate**
54:19
**obvious**
31:20
**obviously**
10:18, 16:3,
18:1, 23:21,
58:2, 85:5
**october**
57:19
**offered**
10:22, 25:12,
49:5
**offering**
54:5
**officer**
91:2
**often**
24:1, 24:7
**okay**
4:5, 4:20,
5:13, 5:19,
7:15, 7:19,
11:2, 11:16,
12:11, 14:1,
14:2, 16:11,
19:20, 20:5,
22:13, 22:14,
24:19, 25:14,
25:21, 25:22,
26:4, 26:7,
38:22, 40:13,
42:3, 44:18,
46:11, 46:13,
55:20, 55:22,
56:2, 63:19,
64:9, 65:9,
73:15, 82:16,
88:7
**old**
19:6
**one**
4:14, 6:14,
9:12, 10:15,
11:4, 14:10,
18:11, 19:1,

22:18, 31:1,
33:1, 33:9,
33:10, 34:3,
34:8, 35:13,
35:18, 38:18,
39:3, 44:6,
54:4, 56:6,
56:10, 57:6,
57:18, 68:18,
84:5, 87:5
**ones**
9:16, 28:19,
45:18, 48:21,
49:2, 49:11,
49:14, 49:15,
49:19, 50:17,
55:14, 58:12,
69:22, 85:9,
87:12
**only**
6:12, 13:13,
41:15, 44:15,
47:4, 49:11,
49:18, 51:11,
52:8, 55:14,
56:12, 60:20,
63:21, 66:18,
67:22, 69:22,
76:22, 83:1
**open**
17:8, 17:10,
22:8
**opened**
9:11, 50:22
**operating**
31:9, 31:13
**opposed**
9:1
**opposition**
47:11, 47:22,
48:14, 51:16,
52:1, 52:17,
57:10, 57:13,
58:20
**option**
19:6
**original**
86:5, 87:6

**other**
6:12, 9:1,
15:2, 19:14,
20:15, 21:20,
30:17, 31:19,
32:7, 35:12,
40:8, 42:15,
43:7, 43:13,
45:6, 45:8,
46:12, 46:16,
49:17, 54:18,
55:16, 58:12,
68:1, 71:2, 84:9
**others**
22:15, 40:14,
63:8
**otherwise**
26:1, 29:1,
46:15, 68:3,
91:11
**otter**
8:3, 9:8, 10:4,
10:8, 17:17,
26:15, 27:1,
28:12, 28:17,
39:7, 39:10,
39:15, 40:21,
41:11, 42:20,
45:4, 46:3,
46:6, 48:5,
48:9, 49:9,
51:2, 51:20,
52:3, 52:4,
52:7, 56:8, 85:6
**ottersec**
8:3, 9:3, 11:5,
11:7, 12:9,
12:13, 17:18,
26:15, 26:21,
39:7, 39:11,
39:13, 40:19,
41:3, 41:12,
41:15, 43:2,
43:3, 44:5,
44:6, 44:17,
45:2, 46:4,
47:10, 47:16,
49:6, 49:10,

51:5, 51:11,
51:12, 51:21,
52:9, 52:14,
53:1, 53:15,
54:9, 54:15,
54:17, 55:3,
56:9, 56:15,
56:18, 56:22,
57:2, 58:10,
85:4
**ottersec's**
64:2, 64:3
**out**
8:22, 9:5,
19:16, 22:21,
51:16, 57:18,
71:9, 74:17,
75:6, 75:16,
76:13, 83:15,
85:17
**outcome**
91:11
**outstanding**
5:1, 30:2
**over**
18:20, 21:10,
36:20, 37:11,
65:1, 67:8,
80:20, 80:22,
81:7, 83:5,
86:13
**own**
10:8
**ownership**
41:9

**P**

**p&l**
5:22, 23:15
**p&ls**
24:22, 54:6
**pages**
1:21, 24:11
**paid**
17:16
**painewebber**
83:12
**papers**
15:14, 37:9,

J.R. 1003

47:11, 52:1,
52:17
**paralegal**
3:21
**part**
7:6, 13:2,
23:13, 24:17,
29:6, 29:8,
42:1, 43:8,
68:17, 87:7
**particular**
30:7, 42:14,
70:22, 79:7,
83:11
**particularly**
32:8, 59:13,
80:17, 83:9
**parties**
15:5, 31:10,
67:20, 68:2,
70:15, 91:9
**partners**
17:17
**party**
15:20, 15:21,
15:22, 34:11,
82:9, 84:8,
84:9, 84:10
**past**
42:2, 86:4
**payment**
9:9
**payroll**
25:8, 25:9,
25:13, 25:18,
26:5
**people**
15:2
**people's**
70:18
**perfect**
15:8, 82:20
**perhaps**
42:17, 60:12
**period**
40:8, 40:12,
44:16, 49:10
**personally**
36:18

**perspective**
36:17
**persuaded**
83:6
**pertained**
55:10
**pertaining**
51:5
**pick**
78:4
**place**
42:13
**placed**
42:22
**plaintiff**
1:5, 3:2, 14:7,
36:4, 36:6,
37:4, 38:12,
38:18, 41:10,
61:18, 66:21,
67:2, 67:8,
67:11, 67:14,
67:21, 68:1,
68:4, 68:7,
68:10, 69:6,
70:22, 71:16,
71:18, 72:18,
73:2, 73:8,
73:13, 73:14,
74:4, 74:21,
75:3, 75:21,
76:14, 77:12,
78:5, 78:10,
78:11, 79:8,
80:14, 83:22,
84:12
**plaintiff's**
13:15, 38:9,
42:8, 61:8,
66:13, 66:15,
66:16, 66:20,
67:6, 67:21,
68:7, 68:12,
70:11, 72:1,
72:13, 76:16,
78:9
**plaintiffs**
84:1

**play**
77:21
**please**
10:6, 61:14
**plenty**
87:17
**plus**
39:18, 87:11
**point**
18:7, 21:8,
23:7, 24:6,
32:19, 33:2,
34:3, 39:1,
39:3, 42:12,
45:21, 50:8,
50:9, 53:16,
57:18, 59:10,
66:19, 78:18,
78:19, 79:8,
80:12, 80:14,
81:22, 82:17,
82:18, 86:10,
87:2
**pointed**
51:16, 76:13
**points**
80:16
**portion**
83:15
**position**
13:17, 13:21,
21:22, 33:16,
35:9, 65:11,
70:5, 71:13,
83:3
**possession**
67:6, 67:7,
67:13, 67:18,
67:22, 68:19,
68:20, 69:1,
69:13, 70:16,
70:19, 71:3,
71:19, 72:14,
72:18, 72:19,
73:9, 73:10,
74:5, 75:5,
76:17, 77:5,
77:7, 77:12,

77:16, 79:9
**possible**
75:1
**potential**
32:20, 37:17
**practical**
13:6
**practically**
33:21
**precisely**
20:1, 24:9,
36:6
**prejudice**
19:5, 55:15
**premeet**
85:15
**prepared**
23:6
**preparing**
15:14
**present**
3:20
**presented**
38:1
**presume**
23:5, 23:6,
87:10
**previous**
18:21, 68:9
**previously**
35:2, 40:5,
46:17
**principle**
54:19, 54:21
**prior**
51:7, 54:11
**probably**
20:7, 27:15,
65:15, 85:17
**problem**
33:13
**procedurally**
33:7
**procedure**
81:1, 82:3,
82:7
**proceedings**
91:3, 91:5,

91:6
**process**
88:19
**processing**
25:18
**produce**
5:16, 5:20,
10:19, 22:1,
22:2, 27:9,
41:17, 45:1,
47:19, 54:5,
54:12, 55:1,
64:6, 67:11,
74:4, 75:4,
76:3, 76:22,
77:4
**produced**
4:17, 5:16,
7:13, 27:2,
27:12, 42:10,
43:2, 43:11,
43:16, 43:21,
44:2, 44:14,
45:3, 46:18,
46:22, 48:4,
52:21, 53:18,
55:21, 55:22,
56:1, 71:11,
72:1, 73:13
**producing**
6:21, 7:6,
30:6, 41:20,
41:22, 42:9,
43:19, 44:4,
44:21, 45:21,
46:2, 46:6,
46:7, 47:9,
47:16, 49:8,
63:11, 68:22,
69:12, 72:3,
73:11, 75:17,
76:5, 76:7
**production**
27:8, 43:21,
48:8, 53:6,
54:11, 81:19,
82:4
**productions**
57:21

**progress**
30:20, 89:14,
89:18
**proper**
18:19, 69:2
**proposal**
7:9, 9:2,
13:11, 14:4,
16:8, 16:19,
17:9, 19:2,
19:3, 19:21,
20:6, 20:18,
21:2, 21:7,
21:18, 23:8,
23:13, 24:18,
26:18, 26:22,
27:3, 27:22,
28:1, 28:7,
29:11, 30:1,
30:19, 31:1,
31:4, 31:14,
31:16, 31:18,
32:2, 32:4,
32:6, 32:9,
33:3, 35:1,
35:11, 35:17,
35:22, 36:1,
36:14, 37:2,
37:15, 37:20,
37:22, 38:5,
38:16, 40:1,
40:4, 40:16,
41:4, 41:13,
41:16, 42:2,
43:8, 45:9,
45:10, 45:14,
46:14, 53:10,
54:3, 54:5,
54:21, 55:12,
58:13, 59:19,
59:21, 60:3,
60:8, 60:11,
60:16, 61:1,
61:10, 63:2,
63:20, 65:3,
65:6, 65:12,
66:4, 85:18,
86:7, 87:14,

87:21
**proposals**
35:19, 87:6
**propose**
4:22, 5:14,
7:22, 9:6, 84:11
**proposed**
17:22, 53:8
**proposing**
14:4, 49:7
**propounded**
14:7, 68:6
**provide**
6:3, 6:6, 7:7,
8:14, 14:15,
17:21, 39:4,
39:14, 39:16,
40:4, 40:16,
40:18, 41:15,
51:19, 62:9,
62:10, 62:21,
63:7, 63:9,
63:12
**provided**
17:21, 35:5,
36:12, 46:17,
47:21, 50:14,
51:19, 52:2,
52:4, 52:7,
52:8, 59:12,
68:1
**provides**
64:14
**providing**
16:1, 22:22,
26:19, 60:3,
60:17
**public**
2:13, 67:19,
91:1, 91:21
**pull**
86:15, 86:22
**purely**
76:10
**purpose**
19:3
**purposes**
26:13, 75:17

**put**
26:21, 46:8,
50:1, 62:20,
65:7

**Q**

**quarters**
23:7
**question**
4:14, 7:19,
20:2, 25:15,
52:11, 86:5,
87:11
**questions**
8:19
**quick**
57:7, 88:6
**quite**
37:19, 84:17
**quote**
52:22, 81:3,
84:8
**quoted**
83:15

**R**

**rachel**
3:13, 44:9,
45:8, 50:2,
59:9, 80:10,
82:18
**raised**
37:5, 47:11,
57:12, 60:12,
81:17
**raising**
54:22, 72:4
**rather**
36:19
**rc**
8:3, 9:8, 10:3,
10:7, 12:13,
17:17, 26:14,
26:22, 28:12,
28:16, 39:7,
39:10, 39:15,
40:21, 41:11,
42:20, 45:3,

J.R. 1005

Transcript of Meet and Confer
Conducted on January 10, 2025                108

46:3, 46:7,
48:4, 48:9,
49:8, 51:2,
51:19, 52:3,
52:4, 52:7,
56:9, 85:5
**re-raise**
78:8
**reach**
19:4
**reached**
37:18
**reaction**
12:17, 12:19,
27:14
**read**
52:1
**reading**
81:13
**ready**
6:18
**real**
86:8
**really**
12:21, 16:20,
18:14, 20:17,
21:1, 22:11,
31:3, 32:2,
47:10, 48:7,
52:12, 60:5,
62:2, 62:6,
78:16, 81:8,
86:4, 86:5,
86:10, 89:9
**reason**
17:12, 18:16
**reasonable**
8:6
**reasons**
15:5, 59:18,
60:6
**recall**
20:19, 20:20
**receive**
17:19
**received**
38:18, 50:7,
50:8, 53:16

**receiving**
16:18, 28:21
**recess**
59:8, 88:10
**recollection**
6:10
**record**
10:5, 11:14,
16:6, 21:7,
21:8, 28:18,
29:22, 34:15,
36:16, 58:16,
59:7, 64:20,
67:19, 78:14,
78:18, 88:3,
88:8, 88:9,
88:11, 88:13,
88:15, 90:7,
91:5
**records**
6:1, 15:1,
22:21, 25:9,
25:10, 25:13,
26:5, 54:7
**recurring**
17:8
**reduced**
91:7
**refer**
6:22, 68:4
**reference**
66:22, 68:13,
68:18, 69:20,
74:16
**referring**
84:22
**refers**
76:14
**reflect**
18:3
**reflected**
7:2
**regard**
4:15, 5:2,
9:14, 36:7,
43:9, 55:13,
61:7, 64:10,
84:14, 84:20

**regarding**
66:16, 80:5
**regardless**
46:3, 54:8,
55:2, 56:17,
77:15, 79:13
**relate**
13:18
**related**
11:15, 13:16,
81:10, 91:9
**relates**
17:7
**relevance**
36:8, 38:13,
45:22, 51:6
**relevant**
49:10, 62:5,
62:8, 62:14,
63:21, 74:22
**remained**
57:4
**remaining**
88:20
**reminder**
66:8
**renew**
68:11
**repeat**
63:2
**report**
87:17, 89:3
**reported**
1:22
**reporter**
34:12, 89:20,
91:1
**representation**
72:17
**represented**
81:11
**request**
4:9, 4:15,
14:1, 14:2,
17:6, 17:12,
17:14, 18:9,
18:19, 19:9,
23:1, 26:16,

28:11, 28:14,
29:5, 30:10,
32:21, 40:2,
40:9, 41:5,
41:7, 42:4,
50:20, 60:4,
61:18, 68:11,
81:19, 82:4,
89:2, 89:5
**request-by-reque-
st**
20:11, 21:17,
28:5
**requested**
32:7, 63:1,
63:17, 71:12,
80:7
**requesting**
71:20
**requests**
5:3, 5:17,
13:16, 13:18,
14:12, 16:17,
20:10, 20:15,
21:20, 28:3,
30:3, 30:17,
31:19, 32:11,
37:8, 38:11,
39:1, 42:15,
42:16, 43:6,
43:7, 44:15,
44:20, 45:8,
46:13, 46:16,
47:14, 48:15,
48:19, 48:20,
49:17, 50:3,
50:13, 53:21,
59:22, 60:8,
60:12, 60:18,
62:19, 63:6,
66:14, 67:3,
67:15, 69:18,
75:10, 76:15
**resolution**
5:1, 19:15,
19:22, 32:11,
38:17, 53:3,
53:8, 53:21,

J.R. 1006

85:16
**resolutions**
37:17
**resolve**
19:18, 21:9,
28:2, 30:2,
32:8, 49:4,
55:13, 57:22,
60:11, 78:7,
81:15, 87:18,
88:18, 89:11
**resolved**
82:14
**respect**
13:18, 28:2,
30:3, 33:3,
35:6, 37:6,
38:6, 39:12,
40:2, 40:9,
41:15, 45:14,
79:17, 82:3
**respectfully**
36:4, 37:1
**respond**
35:16, 63:4,
63:10, 63:14,
65:17, 65:21,
66:10, 84:13,
84:20
**responding**
82:17, 83:1
**response**
5:15, 5:17,
6:12, 7:8, 16:2,
16:8, 23:1,
26:17, 28:11,
29:3, 29:20,
30:7, 30:10,
39:4, 39:5,
41:15, 42:16,
43:6, 45:1,
46:16, 47:13,
50:4, 50:10,
50:15, 51:1,
51:9, 51:12,
51:15, 61:17,
64:6, 66:17,
66:21, 67:1,

68:5, 68:14,
74:16, 75:19,
76:8
**responses**
43:1, 43:18,
44:20, 45:5,
45:6, 46:17,
47:14, 47:15,
48:15, 50:7,
50:14, 51:18,
52:18, 58:3,
58:9, 59:14,
60:17, 61:8,
62:22, 63:7,
63:9, 63:13,
64:13, 66:13,
68:8, 69:22,
70:2, 81:5
**responsibility**
66:17
**responsive**
22:16, 41:17,
43:21, 44:15,
46:2, 50:18,
51:10, 52:2,
60:4, 67:12,
73:3, 74:4,
75:4, 75:22
**restricted**
68:19
**returns**
5:22, 15:15,
23:2, 23:3,
23:5, 23:9,
23:10, 23:20,
23:22, 24:20,
61:16, 62:2,
62:12, 63:16
**revenue**
6:1, 26:1, 54:7
**review**
80:8
**reviewed**
80:11
**revise**
16:9, 43:18,
58:2
**revised**
14:15

**revising**
44:20, 45:5
**revisions**
75:9
**revisit**
19:6
**rfp**
6:6, 19:8,
44:11, 45:18,
56:11, 56:16,
56:19, 56:20,
57:1, 67:1, 68:6
**rfps**
14:6, 29:12,
36:7, 42:8,
45:18, 47:5,
55:6, 55:9,
55:10, 55:11,
55:13, 55:16,
58:5, 58:9,
66:18, 66:22,
68:14, 74:13,
74:16, 82:13
**right**
4:18, 6:20,
7:3, 7:4, 10:20,
11:6, 14:3,
15:2, 15:15,
17:13, 18:18,
22:6, 23:4,
24:2, 24:6,
24:13, 28:2,
29:9, 29:13,
30:16, 32:22,
39:21, 45:9,
45:10, 45:12,
45:13, 47:5,
49:2, 49:20,
51:21, 52:19,
54:16, 55:15,
55:21, 57:20,
58:22, 60:10,
64:15, 66:9,
76:18, 76:21,
79:7, 82:21,
87:1, 87:11,
89:6, 89:8
**rights**
41:9

**ripe**
88:19
**robert**
41:10, 85:7
**role**
74:21
**rough**
89:21
**rule**
81:19, 82:1,
82:6, 84:8
**rules**
80:18, 81:1,
82:2, 82:7

### S

**said**
5:7, 8:8, 9:21,
12:17, 24:20,
25:5, 27:13,
29:22, 31:12,
31:15, 32:1,
34:3, 38:20,
40:5, 48:13,
51:2, 56:7,
57:11, 59:18,
60:6, 60:15,
60:20, 63:12,
68:16, 71:22,
72:3, 72:6,
76:7, 91:5
**salient**
8:18
**sam**
41:10
**same**
24:7, 56:18,
64:19, 64:21,
81:11, 82:8,
90:6
**sanctioned**
78:6
**satisfy**
19:9, 81:13,
84:12, 85:20
**saw**
12:8
**say**
8:4, 9:5, 9:7,

Transcript of Meet and Confer
Conducted on January 10, 2025

110

12:6, 17:12,
18:1, 18:7,
26:2, 28:1,
29:22, 42:17,
44:22, 50:2,
59:4, 66:1,
66:9, 69:11,
70:4, 70:16,
71:8, 72:20,
72:22, 73:4,
73:8, 74:2,
75:2, 76:1,
76:2, 76:13,
78:20, 80:12,
84:19, 85:3,
86:21
**saying**
12:11, 14:11,
15:22, 16:2,
22:3, 22:11,
27:7, 28:5,
38:1, 40:6,
44:11, 55:17,
55:20, 61:11,
64:5, 72:8,
77:13, 78:4,
79:10
**says**
45:2, 68:7,
70:11, 73:22,
77:3, 83:7,
83:8, 83:10
**schedule**
6:2, 26:3, 34:4
**scheduled**
33:11, 34:7
**schedules**
25:6
**scheduling**
34:3
**seal**
91:13
**search**
67:11, 74:4,
75:4
**second**
6:14, 24:5,
57:6

**section**
75:13
**security**
8:3, 9:8, 10:3,
10:7, 12:14,
17:17, 26:14,
27:1, 28:12,
28:17, 39:7,
39:10, 39:15,
40:21, 41:11,
42:20, 45:3,
46:3, 46:7,
48:5, 48:9,
49:8, 51:2,
51:20, 52:3,
52:4, 52:7,
56:9, 85:5
**see**
8:22, 9:6,
20:15, 24:14,
34:5, 64:3,
79:17, 79:21,
80:18
**seeing**
8:9, 12:12
**seek**
67:5, 67:17,
76:15, 76:16
**seeking**
4:17, 15:21,
25:13
**seem**
80:16
**seemed**
27:18
**seems**
21:12, 31:5,
33:6, 58:11,
70:12, 82:1
**seen**
18:2, 18:6,
18:9
**send**
85:12, 87:14
**sending**
80:11
**sense**
4:13, 59:11,

77:15, 87:14,
87:15, 88:6,
89:15
**sent**
70:18, 80:6,
82:18, 83:2
**sentence**
75:12
**separate**
39:2, 42:21,
44:14, 45:20,
46:1, 51:3
**separately**
84:15
**serious**
32:19
**seriously**
30:18, 38:3
**serve**
82:9, 84:3,
84:9, 85:9
**served**
16:3, 57:19,
86:19
**serving**
64:13
**session**
27:18, 36:14
**sessions**
68:10
**set**
67:4, 67:16,
79:7, 85:17,
86:2, 86:18,
87:10, 91:12
**settlement**
11:14
**several**
51:13, 63:7,
85:14
**shall**
82:9
**shared**
65:6
**shareholders**
17:16
**sharing**
11:18

**sheets**
10:21, 11:1,
13:4, 25:21
**short**
34:19
**shorthand**
91:1
**should**
31:7, 61:4,
64:1, 78:6
**show**
6:4, 6:21,
7:14, 13:4,
30:11, 39:6,
39:9, 39:14
**side**
26:21, 32:3
**signature-mig2k**
91:18
**significant**
10:11, 11:10,
12:8, 17:3,
20:9, 74:19
**similar**
24:12, 30:22,
54:22, 69:4,
81:12
**since**
20:12, 57:21,
57:22, 65:5
**single**
10:15, 68:5,
68:6
**sit**
70:4
**sitting**
25:16, 33:17
**skis**
65:1
**small**
10:11
**sneaky**
24:3, 24:5
**solutions**
36:19, 39:2,
85:14
**some**
11:10, 12:8,

J.R. 1008

Transcript of Meet and Confer
Conducted on January 10, 2025

111

| | | | |
|---|---|---|---|
| 13:4, 13:8, 16:16, 17:11, 17:20, 20:15, 21:8, 21:20, 22:7, 22:15, 23:7, 28:19, 31:18, 31:22, 32:6, 35:5, 35:9, 35:16, 36:19, 37:16, 39:1, 42:19, 44:22, 47:18, 47:19, 49:22, 51:19, 52:2, 59:22, 60:11, 60:17, 77:10, 81:6, 88:16, 89:14 | 59:12, 62:16, 64:12, 76:22, 77:18, 77:19, 78:22, 79:5, 84:22, 87:4, 89:16 | **spent** 35:2 | **still** 44:12, 45:22, 53:5, 53:12, 66:3 |
| | **sought** 19:11, 27:8, 41:7, 61:17, 61:19 | **spirit** 29:19, 31:15 | **stop** 55:4, 76:18 |
| | | **spoliation** 74:18, 75:9, 78:3, 78:6, 78:16, 79:2 | **street** 3:7, 3:16 |
| | **sounds** 34:8, 65:1, 78:22 | **st** 3:7 | **strike** 79:12 |
| **something** 10:19, 21:10, 26:9, 28:20, 64:1, 79:1, 82:11, 86:8, 87:9 | **south** 5:21, 6:5, 6:7, 9:12, 11:6, 12:6, 13:14, 23:5, 30:12, 40:20, 41:2, 54:9 | **stand** 13:21, 83:18 | **strikes** 76:10, 77:18 |
| | | **start** 4:6, 80:14 | **stuff** 5:10, 34:20 |
| | | **starting** 80:12 | **subject** 35:4, 35:7, 41:6, 42:19, 44:8, 48:1, 48:6, 51:13, 52:5, 53:20, 55:18, 56:2, 68:7, 69:22, 76:6 |
| **sometimes** 10:12, 15:11, 15:17, 15:18, 15:19, 15:20, 23:22 | **speak** 4:16, 34:1 | **state** 24:19, 51:19, 71:17, 75:20 | |
| | **speaking** 33:8, 33:21, 51:7, 70:20, 70:21 | **stated** 51:9, 74:13 | |
| | | **statement** 28:1, 28:22, 71:15 | |
| **somewhat** 21:14, 40:3, 42:16, 80:12 | **specific** 16:17, 22:20, 36:5, 38:11, 39:1, 76:18, 76:19 | **statements** 24:20, 25:6, 26:19, 26:22, 27:4, 28:10, 28:15, 32:14 | **submission** 11:14 |
| | | | **subpoena** 16:4, 61:9, 61:17, 61:19, 62:20, 62:22, 63:5, 63:10, 63:14, 64:7, 64:21, 65:17, 65:22, 66:10 |
| **soon** 86:14 | **specifically** 18:4, 21:19, 22:19, 28:13, 43:19, 61:20, 76:5, 84:4, 85:19 | **states** 1:1, 67:2 | |
| **sorry** 5:5, 14:17, 42:10, 44:10, 56:20, 61:9, 61:10, 69:21, 81:4, 82:10, 85:4 | | **status** 87:17, 89:3 | |
| | | **stay** 89:5 | |
| | **specificity** 38:9 | **stenographically** 91:6 | **subsequent** 87:3 |
| | **specifics** 35:5 | **step** 50:11, 71:16 | **substantially** 81:10 |
| **sort** 9:21, 13:1, 20:19, 21:16, 21:21, 27:17, 28:17, 28:21, 37:7, 47:16, 57:12, 57:15, | **specify** 36:5 | **stephen** 3:3 | **successors** 51:4 |
| | **specifying** 68:19 | **steve** 4:3, 4:5, 20:17, 27:5, 33:7, 44:9, 48:16, 57:19, 59:2, 64:22, 88:14, 90:3 | **sufficient** 6:4, 7:14, 17:19, 18:17, 26:12, 30:11, 39:6, 39:9, 39:14 |
| | **spend** 59:15 | | **suggest** 57:7, 80:19 |
| | **spending** 37:10 | | **suggested** 85:14 |

**suggesting**
24:4
**suite**
3:16
**supervision**
91:8
**supplement**
39:13, 86:4
**supplemented**
47:2, 86:3
**supporting**
63:16, 63:21,
64:4
**suppose**
18:6, 40:2,
42:15
**supposed**
33:8, 33:9
**sure**
5:5, 6:16,
10:14, 13:10,
14:9, 14:10,
16:7, 25:12,
31:3, 57:9,
58:18, 59:1,
59:5, 73:7, 88:4
**systematic**
10:12

**T**

**tailor**
20:18, 21:2,
31:3
**take**
6:17, 21:5,
31:1, 31:7,
34:13, 36:1,
36:15, 38:19,
39:5, 41:16,
45:11, 45:13,
50:11, 57:7,
57:17, 58:19,
69:9, 71:16,
72:11, 73:6,
78:12, 85:20,
87:1, 88:2,
88:6, 90:6
**taken**
34:21, 35:10,

35:13, 38:3,
59:8, 87:4,
88:10, 91:3,
91:6
**takes**
62:5, 62:15,
62:21
**taking**
27:21, 65:11
**talk**
21:6, 26:10,
30:16, 34:17,
35:21, 36:2,
50:17, 60:21,
71:14, 72:10,
79:14, 89:11
**talked**
14:14, 14:21,
17:1, 22:15,
24:11, 32:16,
54:21
**talking**
5:6, 5:7, 5:12,
11:10, 11:13,
13:11, 13:13,
20:9, 22:20,
24:10, 24:22,
30:5, 45:18,
47:4, 47:5,
47:9, 48:18,
49:2, 49:18,
49:20, 50:3,
53:2, 53:20,
64:16, 64:17,
65:8, 77:10,
78:21, 78:22,
79:4, 86:6,
86:10, 87:9,
88:14
**task**
8:17
**tax**
5:21, 15:9,
15:15, 23:2,
23:3, 23:5,
23:8, 23:10,
23:20, 23:22,
24:20, 61:16,

62:2, 62:12,
63:16
**tell**
6:17, 9:13,
12:11, 16:13,
87:7
**telling**
58:8
**ten**
58:19, 81:6
**term**
24:21
**terms**
17:9, 21:22,
22:20, 25:13,
45:9, 47:21
**terrific**
4:14
**th**
3:16, 91:13
**thank**
20:6, 20:14,
32:12, 45:7,
59:6, 59:9,
61:1, 61:3,
66:11, 80:9,
80:10, 86:7,
87:20, 87:21,
88:7, 89:19,
90:1
**thanks**
83:20
**theme**
17:8
**themselves**
14:12, 15:13,
18:5
**theoretical**
21:15, 76:10,
77:15, 77:19,
78:3
**thereafter**
91:7
**therein**
67:4, 67:16
**thing**
11:4, 24:7,
57:4, 57:19,

64:21
**things**
10:11, 13:13,
15:13, 16:22,
22:7, 26:19,
28:15, 31:22
**third**
15:5, 15:21,
15:22, 34:22,
35:10, 35:13,
67:20, 70:15
**thought**
5:6, 13:8,
17:9, 30:20,
35:20
**thoughts**
4:21
**thousands**
17:2
**three**
8:2, 34:6,
83:22, 84:2,
84:10, 84:14
**through**
4:18, 14:9,
14:11, 14:16,
16:10, 22:7,
23:12, 23:15,
23:16, 30:12,
39:16, 40:7,
41:1, 41:20,
42:9, 43:17,
45:4, 46:9,
48:13, 48:22,
49:1, 49:16,
54:2, 54:9,
54:13, 55:3,
55:6, 56:5,
56:6, 68:2,
88:16
**time**
6:17, 13:9,
20:13, 21:4,
21:11, 22:7,
24:11, 26:8,
27:21, 34:17,
35:19, 37:11,
37:14, 38:11,

38:17, 43:19,
44:16, 45:5,
46:9, 49:10,
51:22, 52:15,
52:16, 56:6,
56:11, 56:12,
57:5, 57:14,
58:11, 59:16,
66:4, 69:10,
69:14, 70:1,
82:11, 87:17,
89:3, 90:4
**times**
56:6
**today**
4:4, 20:13,
22:10, 25:17,
33:14, 33:17,
35:13, 35:21,
36:15, 37:21,
38:2, 38:15,
65:2, 70:4
**together**
89:10
**told**
6:11
**tonight**
89:21
**took**
30:18, 38:11,
64:18
**top**
25:19, 86:20
**totally**
31:8
**touch**
22:5
**touched**
13:17
**toward**
36:13
**track**
10:13, 10:21
**transaction**
11:8, 12:15
**transactions**
8:8, 8:11,
8:13, 8:18,

8:20, 8:22, 9:4,
9:14, 10:22,
11:11, 12:8,
12:9, 12:12,
33:5
**transcript**
12:7, 24:12,
27:6, 29:10,
72:6, 72:8, 91:4
**transcripts**
18:21
**transfers**
9:5
**treated**
81:9
**treating**
84:5
**tried**
20:17, 73:21
**true**
15:4, 35:6,
51:12, 56:22,
74:14, 91:4
**try**
21:2, 57:22,
73:21
**trying**
16:16, 16:20,
17:3, 19:6,
19:18, 29:21,
31:3, 31:17,
32:1, 32:5,
46:20, 48:10,
50:2, 52:19,
53:4, 57:8,
57:15, 65:19,
72:10, 72:15,
73:17, 78:20,
79:16, 79:21
**turn**
6:15
**turning**
38:22
**two**
6:7, 7:1, 7:4,
9:12, 12:5,
23:7, 37:11,
39:20, 40:20,

54:9, 74:14,
82:14, 82:21
**two-week**
88:22
**types**
46:8
**typewriting**
91:7

---
**U**
---

**uh-huh**
25:7
**under**
14:6, 16:18,
17:22, 25:3,
28:7, 36:2,
38:20, 40:13,
40:16, 55:3,
58:13, 69:9,
72:11, 73:6,
85:20, 91:7
**understand**
9:2, 14:9,
14:10, 19:12,
20:2, 28:6,
29:21, 31:8,
31:17, 32:1,
32:5, 32:9,
32:13, 36:1,
39:3, 44:3,
45:9, 46:20,
46:21, 48:10,
52:19, 53:4,
53:5, 53:9,
53:12, 54:1,
60:2, 63:19,
65:20, 70:9,
73:4, 73:16,
73:19, 77:6,
83:21, 84:3,
88:17
**understanding**
19:2, 29:9,
31:10, 53:16,
79:6, 87:8
**understood**
11:9, 14:2,
16:7, 19:8

**unduly**
8:16, 10:7
**united**
1:1
**unquote**
52:22
**unrelated**
62:7
**update**
58:8
**updating**
58:1
**use**
9:12, 22:6,
25:14, 25:15,
33:12, 86:20
**uses**
82:8
**using**
28:19
**utilize**
9:3
**utilized**
32:17, 53:14,
61:20
**utilizing**
10:9, 15:11

---
**V**
---

**vehemently**
78:14, 78:15,
78:19
**vendor**
17:1
**verify**
56:19
**versus**
77:13, 83:12
**view**
12:22, 52:13,
52:20, 62:8
**virginia**
2:14, 91:22
**virtually**
1:12, 2:1

---
**W**
---

**w-2s**
6:7, 23:16,

J.R. 1011

Transcript of Meet and Confer
Conducted on January 10, 2025

114

24:7, 25:11, 30:10, 40:18, 41:2

**waive**
18:17, 75:13

**waiving**
67:10, 74:3, 75:3, 75:15, 77:3

**walked**
49:16, 55:6

**wallet**
8:15, 9:4, 9:5, 9:10, 11:6, 12:14, 32:17, 61:19

**wallets**
8:1, 8:3, 8:5, 8:10, 8:12, 8:15, 9:1, 9:22, 10:8, 10:11, 10:17, 12:5, 12:10, 12:17, 12:19, 12:22, 32:17, 33:4

**want**
5:5, 8:21, 10:19, 12:8, 12:18, 13:5, 13:6, 13:7, 13:8, 13:10, 14:9, 16:15, 18:17, 18:20, 19:15, 22:18, 23:4, 24:5, 26:10, 28:6, 28:8, 31:2, 35:15, 50:17, 55:5, 55:10, 57:18, 58:6, 58:15, 58:19, 59:1, 59:15, 62:1, 65:7, 66:7, 70:6, 72:9, 72:16, 72:22, 73:4, 73:18, 75:7, 75:14, 77:7,

78:18, 79:1, 80:8, 82:10, 87:1, 88:2

**wanted**
8:11, 16:6, 20:2, 36:16, 66:5, 66:19, 73:7, 84:11

**washington**
3:17

**way**
10:12, 14:13, 47:17, 49:4, 49:5, 50:1, 60:14, 62:5, 64:11, 87:2

**we'll**
44:22, 64:9

**we're**
19:4, 19:6, 19:18, 22:20, 30:19, 47:5, 58:8, 76:1

**we've**
27:2

**wed**
27:16

**wednesday**
30:21, 35:18, 35:21, 36:14, 54:18, 61:10, 61:12, 66:15, 71:22

**wednesday's**
27:18

**week**
12:1, 19:3, 21:12, 27:7, 27:19, 29:15, 61:10, 61:11

**weekend**
86:13

**welcome**
88:1

**went**
30:18, 30:22, 86:4, 86:19, 86:21, 87:2

**whatever**
18:16, 22:10, 46:21, 49:13, 53:11, 58:16

**whereof**
91:12

**wherever**
63:11

**whether**
9:19, 13:6, 18:4, 18:8, 26:12, 43:6, 44:17, 46:3, 48:11, 49:9, 52:22, 54:8, 55:2, 56:13, 56:18, 56:21, 57:2, 74:20, 77:10, 78:10, 79:8, 80:19, 80:21, 81:9, 83:5

**white**
3:5, 52:10, 68:15, 69:9, 69:16, 69:21, 70:8, 70:14, 71:11, 72:3, 72:7, 73:6, 73:15, 74:2, 74:11, 75:2, 75:19, 76:1

**whole**
60:8, 85:18

**whomever**
9:8

**whyte**
1:22, 2:13, 88:12, 91:2, 91:20

**willing**
27:13, 29:20, 69:6, 73:16, 81:16

**with-prejudice**
20:1, 32:10, 53:9

**withdraw**
62:18, 63:5,

63:8, 64:7, 65:18, 66:10, 68:10, 68:15, 69:3, 69:15, 70:5, 70:6, 71:13, 81:16

**withdrawing**
65:12

**withdrawn**
43:8, 43:10, 64:20

**withdrew**
82:14

**withheld**
43:14, 43:16

**withholding**
45:19, 46:5

**within**
67:5, 67:7, 67:12, 69:12, 70:19, 74:5, 75:5, 76:16, 77:5, 77:11, 82:15, 85:13

**without**
19:5, 21:21, 47:17, 49:9, 53:16, 67:10, 72:4, 74:3, 75:3, 77:3

**without-prejudice**
17:11

**witness**
91:12

**wonderful**
90:1

**words**
9:1, 40:9, 43:13

**work**
9:19, 15:14, 36:10, 89:10

**worked**
57:21

**working**
31:4, 36:13

**wouldn't**
9:20, 10:1,

J.R. 1012

Transcript of Meet and Confer
Conducted on January 10, 2025

115

18:17, 28:7,
28:9, 28:21,
29:14, 32:13
**write**
26:18
**writing**
85:18, 87:15
**written**
47:14, 48:14,
50:7, 50:13,
51:1, 51:9,
51:11, 51:18,
52:17, 59:13,
84:9

**X**

**x**
1:3, 1:9

**Y**

**yao**
1:4
**yeah**
7:18, 7:20,
9:17, 12:2,
12:16, 14:13,
14:20, 19:1,
23:18, 26:1,
27:20, 29:6,
29:8, 29:18,
36:18, 42:6,
45:17, 57:1,
65:15, 78:13,
78:20, 86:11,
86:15, 87:13,
88:5, 89:7
**year**
23:4, 23:9,
24:1, 24:8,
40:11, 40:22,
42:7, 46:10
**yep**
7:4, 17:5,
25:1, 25:4, 26:1
**york**
3:8

**1**

**10**
1:13, 22:17,

57:7, 57:17,
59:4, 89:4
**10005**
3:8
**101**
24:12, 27:6,
29:10
**102**
24:12, 27:6,
29:10
**1099**
6:7, 23:16,
23:20, 24:7,
25:11, 30:10,
40:18, 41:2
**11**
22:17, 59:3,
59:4
**12**
33:13, 90:7
**1200**
3:16
**13**
89:1, 91:13
**15**
5:17, 5:18,
6:13, 7:5, 7:8,
19:8, 19:10,
19:11, 22:17,
23:1, 24:14,
27:9, 27:11,
29:12, 29:13,
30:5, 30:7,
30:14, 30:15,
45:19, 47:6,
49:1, 90:7
**16**
5:17, 5:18,
7:21, 26:14,
27:11, 29:12,
30:5, 30:14,
34:4, 45:19,
47:6, 49:1,
55:7, 57:20,
60:4
**17**
3:16, 5:17,
5:18, 14:13,

14:19, 14:21,
16:2, 16:8,
27:12, 28:9,
28:11, 28:13,
29:12, 30:5,
30:14, 32:12,
45:19, 47:6,
49:1, 50:20,
55:7
**18**
5:17, 5:18,
27:12, 29:12,
30:5, 30:14,
32:16, 33:2,
45:19, 47:6,
49:1, 55:7
**19**
6:3, 39:2,
39:5, 47:6,
55:7, 56:16,
57:3, 58:9

**2**

**20**
6:6, 40:2,
40:10, 47:6,
49:1, 55:7,
56:19, 56:20,
83:5, 85:1,
86:21
**20006**
3:17
**202**
3:18
**2022**
27:2, 27:3,
27:4, 40:8, 56:8
**2023**
4:18, 5:21,
6:5, 6:8, 14:16,
16:10, 23:4,
23:7, 23:9,
23:10, 23:12,
23:15, 23:17,
23:20, 25:18,
30:12, 39:17,
39:18, 40:7,
40:11, 40:22,

41:2, 41:21,
42:2, 42:7,
42:9, 43:17,
45:5, 46:9,
46:10, 54:9,
55:4
**2024**
23:8
**2025**
1:13, 91:14
**2028**
91:17
**21**
41:7, 41:19,
42:5, 42:8,
42:14, 43:9,
43:15, 44:12,
47:6, 49:1,
55:8, 56:20,
57:3, 58:9
**212**
3:9
**22**
41:19, 42:4,
42:5, 42:8,
42:14, 43:9,
43:15, 44:12,
47:6, 49:2,
55:8, 57:1,
57:3, 58:9
**23**
1:7
**238**
3:9
**25**
84:9, 84:13,
85:2, 85:13,
85:19, 86:4,
86:6, 86:9,
86:20, 87:3,
87:5, 87:6, 87:8
**26**
91:17
**261**
3:18
**27**
87:18, 89:1,
89:4

J.R. 1013

Transcript of Meet and Confer
Conducted on January 10, 2025                    116

**28**
3:7

**3**

**30**
88:15
**31**
23:12, 23:15,
23:17, 39:18,
40:7, 41:2,
42:2, 42:9,
43:17, 45:4
**32**
1:14
**33**
82:7, 84:8

**4**

**41**
3:7
**45**
88:15
**48**
59:4

**5**

**565544**
1:20

**6**

**6564**
3:18

**7**

**75**
83:4

**8**

**8772**
3:9
**889**
1:7

**9**

**9**
1:14
**900**
3:16

**91**
1:21

J.R. 1014